IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN

JAN 2 4 2002

FILED/RECEIVED
JOSEPH W. SKUPNIEWITZ, CLERK
CASE
NUMBER

NEIL GAIMAN,                                  )
a resident of Wisconsin, and                  )
MARVELS AND MIRACLES, LLC,                     )
a Wisconsin Limited Liability Company,        )
                                              )
            Plaintiffs,                        )
                                              )
      v.                                       )          Case No.  02 C C 48 S
                                              )
TODD MCFARLANE, a resident of                 )
Arizona, and TODD MCFARLANE                   )
PRODUCTIONS, INC., an Arizona                 )
corporation, TMP INTERNATIONAL,               )
INC., a Michigan corporation,                 )
MCFARLANE WORLDWIDE, INC.,                    )
a Michigan corporation, and                   )
IMAGE COMICS, INC.,                           )
a California corporation,                      )          JURY DEMANDED
                                              )
            Defendants.                        )

## COMPLAINT FOR DAMAGES, DECLARATORY
## JUDGMENT AND INJUNCTIVE AND ANCILLARY RELIEF

### I. LEGAL DESCRIPTION OF THE PARTIES

1.     Plaintiff Neil Gaiman (sometimes herein "Gaiman") is a resident of the Western

District of Wisconsin, and has been a resident of the Western District of Wisconsin during all

times relevant to the Complaint.

2.     Plaintiff MARVELS AND MIRACLES, L.L.C., ("MARVELS AND MIRACLES") is a

Wisconsin Limited Liability Company, having a principal place of business in the Western

District of Wisconsin.

003.335304.3

3.     On information and belief, Defendant Todd McFarlane ("McFarlane") is a resident of Arizona.  On information and belief, McFarlane is the principal and the sole owner or shareholder of all other Defendants excepting only Image Comics, Inc.

4.     On information and belief, Defendant Todd McFarlane Productions, Inc. ("TMP") is a corporation organized under the laws of the State of Arizona having a principal place of business at 408 W Baseline Rd., Tempe, Arizona 85283.  On information and belief, TMP is engaged in the production of comic books and related works of entertainment.

5.     On information and belief, Defendant TMP International, Inc. ("TMPII") is a corporation organized under the laws of the State of Michigan having a principal place of business at 15155 Fogg St. Plymouth, Michigan 48170.  On information and belief, TMPII is engaged in the worldwide production and marketing of spin-off products on behalf of Defendant TMP.

6.     On information and belief, Defendant McFarlane Worldwide, Inc. ("MW") is a corporation organized under the laws of the State of Michigan having a principal place of business at 15155 Fogg St. Plymouth, Michigan 48170. On information and belief, MW is engaged in the worldwide production and marketing of spin-off products on behalf of Defendant TMP.

7.     On information and belief, Defendant Image Comics, Inc. ("Image") is a corporation organized under the laws of the State of California having a principal place of business at 1071 N. Batavia St. Orange, California 92867.  On information and belief, Defendant McFarlane is a part owner of Defendant Image.

8.     Defendants TMP, TMPII, and MW are sometimes hereinafter referred to as the "McFarlane Corporate Defendants".

9.	On information and belief, McFarlane owns and controls the McFarlane Corporate Defendants.  On information and belief, the McFarlane Corporate Defendants are alter-egos of McFarlane in that they have, for example, failed to maintain adequate independence, been substantially controlled by McFarlane, intermingled assets, used corporate assets as personal assets, failed to adhere to corporate procedure, and/or have failed to maintain adequate capitalization.

10.	On information and belief, Defendant Image and the McFarlane Corporate Defendants are engaged in a partnership, joint venture, alliance or other similar relationship that involves a close degree of connection and cooperation.

11.	On information and belief, all Defendants have regularly conducted business in the Western District of Wisconsin, and/or have significant contacts with the state of Wisconsin and the Western District of Wisconsin.

12.	Defendants are and/or have been jointly engaged in, among other things, the production of a comic book series entitled Spawn®, and the production and marketing of goods and services related to that series and its comic publication spin-off titles.

## II.	JURISDICTION AND VENUE REQUIREMENTS

13.	This Court has exclusive jurisdiction under 28 U.S.C. § 1338(a) for an action arising under the copyright laws of the United States and jurisdiction under 28 U.S.C. § 1338(a) and (b) for an action under the Lanham Act.

14.	This Court further has jurisdiction under 28 U.S.C. § 1331 for actions arising under the laws of the United States.

15.     This Court has diversity jurisdiction under 28 U.S.C. § 1332, as the Plaintiffs, on the one hand, and all Defendants, on the other hand, are citizens of different states, and the amount in controversy is greater than $75,000.

16.     This Court has supplemental jurisdiction over all claims arising under state law pursuant to 28 U.S.C. § 1367(a).

17.     For declaratory counts, this court has jurisdiction under 28 U.S.C. §§ 2201-02.

18.     This Court is a proper venue under 28 U.S.C. §§1391(b)(1) and (c) and 28 U.S.C. § 1400, in that one or more of the Defendants resides in this judicial district, one or more of the Defendants can be found in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of the property that is the subject of the action is situated in this district.

19.     On information and belief, this Court has personal jurisdiction over each Defendant.

### III.    THE FACTS

### A. The Characters and Their Origins

20.     "Angela™", "Cogliostro™", and "Medieval Spawn™" are comic book characters originally created by Plaintiff Neil Gaiman in the ninth edition of the Spawn® monthly series which was published as an Image Comics title by defendants McFarlane, Image and TMP.

21.     The "Angela™ intellectual property" comprises at least copyright protection in the character Angela™, copyrights to previous works of art and authorship embodying the character including derivative works (collectively the "Angela™ copyrights"), trademarks in the name Angela™ and images associated with Angela™ publications that have secondary

meaning (collectively the "Angela™ trademarks"), and related equitable, common law and foreign rights.

22.    The "Cogliostro™ intellectual property" comprises at least a copyright in the character Cogliostro™, copyrights to previous works of art and authorship embodying the character including derivative works (collectively the "Cogliostro™ copyrights"), trademarks in the name Cogliostro™ and images associated with Cogliostro™ publications that have secondary meaning (collectively the "Cogliostro™ trademarks"), and related equitable, common law and foreign rights.

23.    The "Medieval Spawn™ intellectual property" comprises at least a copyright in the character Medieval Spawn™, copyrights to previous works of art and authorship embodying the character including derivative works (collectively the "Medieval Spawn™ copyrights"), trademarks in the name Medieval Spawn™ and images associated with Medieval Spawn™ publications that have secondary meaning (collectively the "Medieval Spawn™ trademarks"), and related equitable, common law and foreign rights.

24.    Miracleman™ is a comic book superhero with origins older than and unrelated to the Spawn® series. The Miracleman™ comic book series published in the United States (before the issues were repackaged as so-called "graphic novels") consisted of twenty-four comic book issues. Author Alan Moore ("Moore") wrote each of issues 1 though 16. Plaintiff Neil Gaiman wrote each of the last eight issues of the Miracleman™ comic book series (issues 17 through 24), with all of the artwork for said issues having been created by illustrator Mark Buckingham ("Buckingham"). Neither McFarlane nor any other Defendant had anything to do with the creation or publication of any Miracleman™ story.

25. The "Miracleman™ intellectual property" comprises at least copyright protection in the character Miracleman™, copyrights to other characters in the Miracleman™ series, copyrights to previous works of art and authorship embodying the character or the series including derivative works, (collectively the "Miracleman™ copyrights"), trademarks in the name Miracleman™, the MM logo, and associated images associated with Miracleman™ publications that have secondary meaning (collectively the "Miracleman™ trademarks"), and related equitable, common law and foreign rights.

26. In the United States, Miracleman™ was published by a company known as Eclipse Comics pursuant to agreements with Plaintiff Gaiman, Moore and Buckingham. At no time did Eclipse Comics ever acquire any rights in or to the Miracleman™ intellectual property. Further, Eclipse Comics' rights of publication in respect of Miracleman™ were limited to print publication and were personal to Eclipse Comics and non-transferable.

27. Eclipse Comics published other comic books in addition to Miracleman™. Ultimately Eclipse Comics filed for bankruptcy, and, on information and belief, Defendant McFarlane subsequently bought all of the assets of Eclipse Comics from the Trustee in the Eclipse Comics bankruptcy. In the process of that purchase, McFarlane acquired certain tangible property which had been in Eclipse Comics' possession and had been used by Eclipse in its publishing of Miracleman™.

28. Plaintiff MARVELS AND MIRACLES is the assignee and owner of all of the rights and interest of Gaiman, Buckingham and Moore in the Miracleman™ intellectual property.

## B. The 1992 Agreement

29.     In 1992, McFarlane, acting on behalf of himself and all of the other Defendants, came to an oral agreement with Gaiman as to Gaiman's contribution to the Spawn® series (the "1992 Agreement"). At this time, Neil Gaiman was recognized as one of the world's foremost comic book authors. As examples, Mr. Gaiman's work on the Sandman® comic book series for DC Comics had won him the Will Eisner Comic Industry Awards for Best Writer (1991 and 1992), Best Continuing Series (1991 and 1992) and Best Graphic Album—Reprint (1991); won him the Harvey Awards for Best Writer (1990, 1991) and Best Continuing Series (1992); and won him the Eagle Award for Best Writer of American Comics in 1990. The nineteenth issue of Sandman® received the 1991 World Fantasy Award for best short story (making it the first comic ever to be presented with a literary award). By 1992, Gaiman had published seven novels, graphic novels or novellas, including "Good Omens" (1990), a novel with Terry Prachett that spent 17 weeks on the Sunday (London) Times bestseller list, and "Signal to Noise" (1989-90), which won an Eisner Award for Best Graphic Album.

30.     Gaiman agreed to author issue number nine of Spawn®, and McFarlane represented to Gaiman that Gaiman would be recognized as a creator in Spawn® issue nine and any works derived from Spawn® issue nine, that Gaiman would be financially compensated at rates greater than those provided for in Gaiman's contract with DC Comics for Gaiman's work on Sandman®, and that Gaiman would retain an ownership interest in each of his creative works. On information and belief, McFarlane reasonably intended Gaiman to rely on McFarlane's representations.

31.     Gaiman became a celebrated guest-writer for Spawn®, but was never an employee of McFarlane or any of the other Defendants. The Defendants capitalized on Gaiman's fame and the fact that Gaiman would be acting as guest writer to promote Spawn® issue nine.

32.     Relying on Defendants' representations via McFarlane under the 1992 Agreement, Gaiman in good faith, and at a considerable cost of his own time, authored Spawn® issue nine. In the process of authoring Spawn® issue nine, Gaiman conceived and developed a story for the issue involving two new characters, Angela™ and Cogliostro™, and one new derivative character, Medieval Spawn™, between late 1992 and mid-1993. In developing the story line, Gaiman set forth, orally and in writing, an array of traits for Angela™ and Cogliostro™ including their appearances, clothing, origins, personality, equipment, special powers, and their specific roles in issue nine as well as their general roles in the Spawn® stories. Gaiman set forth the story for issue nine in treatments, scripts and a number of thumbnail sketches and drawings, all of which, taken together, mapped out the story for issue nine and set forth many of the perceptible and predictable characteristics of Angela™ and Cogliostro™.

33.     In the process of developing issue nine, Gaiman, with the express permission of Defendants, also created a derivative work of the Spawn® character called "Medieval Spawn™". Gaiman set forth, both orally and in writing (in the treatments, scripts and thumbnail sketches for issue nine), descriptions of Medieval Spawn™, articulating many attributes of the physical appearance of that character, including his weaponry and costuming.

34.     Gaiman completed the story for Spawn® issue nine in or around the fall of 1993. Gaiman then provided scripts and thumbnail sketches to McFarlane. McFarlane, in conjunction

with the other Defendants, set about having artwork prepared in a manner instructed by Gaiman's script, treatment and thumbnail sketches. During the preparation of such derivative works, Defendants and Defendants' representatives relied heavily on Gaiman's treatments, scripts and thumbnail sketches.

35.    Spawn® issue nine was released in or around March, 1994. Spawn® issue nine enjoyed extensive commercial success. McFarlane represented to Gaiman that the issue sold at least one million one hundred thousand (1,100,000) copies.

36.    Gaiman also authored a partial script for a Spawn® issue, which the Defendants later published in Spawn® issue 26 without attribution to Gaiman.

37.    Soon McFarlane and Gaiman began receiving requests for more work featuring Angela™. Defendants requested that Gaiman write a short series of comics featuring Angela™, under the same terms as the 1992 Agreement (the "Angela™ series"). Gaiman wrote a script for three issues of the Angela™ series, including treatments and thumbnail sketches that were used by Defendants to prepare drawings in the same manner as with Spawn® issue nine. The Angela™ series was also highly successful. Defendants have subsequently republished the Angela™ series in graphic novel book format in both North America and the United Kingdom.

38.    Gaiman never signed a work-for-hire agreement or transferred his interest in any copyrighted subject matter created pursuant to the 1992 Agreement.

39.    Gaiman duly filed and obtained federal copyright registrations in the script for Angela Issue No. 1, Registration No. TX 5-276-922, the script for Angela Issue No. 2, Registration No. TX 5-276-923, the script for Angela Issue No. 3, Registration No. TX 5-276-924, in the Thumbnail Sketches of Angela No. 1, Registration No. VAu 481-446, in the Thumbnail Sketch of Angela No. 2, Registration No. VAu 481-424, in the Thumbnail Sketch

-9-

of Angela No. 3, Registration No. VAu 481-439, in the Treatment for Angela Issue No. 2, TXu 966-575, and in the Treatment for Angela Series TX 966-576. Gaiman currently owns these registrations and the rights embodied therein.

40.     Gaiman also duly filed and obtained federal copyright registrations in the script for Spawn™ No. 9, Registration No. TX 5-352-460 and in a partial script for Spawn™ No. 26, Registration No. TX 5-352-461. Gaiman currently owns these registrations and the rights embodied therein.

41.     On information and belief, McFarlane and the other Defendants actively misrepresented themselves as the authors of Gaiman's works. Unbeknownst to Gaiman, in the period following the release of Spawn® issues nine and twenty-six, McFarlane and the other Defendants filed several copyright applications for Gaiman's works, including Reg. No. TX40-29-098 to the text of Spawn issue 26. On information and belief, Defendants intentionally misrepresented material aspects of the authorship of the various deposited works to the United States Copyright Office in order to obscure Gaiman's ownership interest and authorship.

### C. The 1997 Agreement

42.     On or around February 18, 1997, Gaiman received a memo from Larry Marder of Defendant Image, setting forth terms "regarding royalties for Angela, Medieval Spawn and Cogliostro." The written offer was substantially worse than the terms of Gaiman's Sandman® contract with DC Comics, contrary to the agreed upon standard for treatment of Gaiman under the 1992 Agreement.

43.     Gaiman rejected the terms referenced in the memo sent by Image, and Gaiman requested that all money due and owing to Gaiman under the 1992 Agreement for Gaiman's works be accounted for and paid.

44.     In response, McFarlane, acting on behalf of all Defendants, met with Gaiman in Oakland, California in or around April 1997, and had a discussion regarding Gaiman's entitlements, which the parties tape-recorded by mutual consent.  On or around May 5, 1997, Gaiman sent McFarlane a letter providing a list of figures for various forms of commercial exploitation, including a rate for comic book sales, a rate for collected editions (trade paperbacks, etc.), a rate for character equity, a rate for merchandising and promotional licensing, and a rate for media use (motion pictures, audio-visual recording, stage plays, television, etc.).

45.     On July 15, 1997, McFarlane, acting on behalf of himself and the other Defendants, and Gaiman discussed Gaiman's entitlement terms by telephone, which included a prospective swap of certain of Gaiman's rights in Cogliostro and Medieval Spawn (subject to McFarlane accounting for and paying Gaiman current to date) for McFarlane's giving to Gaiman all of McFarlane's claims, involvement and tangible property in respect of Miracleman.  During a telephone call from McFarlane to Gaiman July 15, 1997, McFarlane quantified an "offer" to Gaiman.  Gaiman agreed to accept McFarlane's offer.  Following the call Gaiman wrote a confirming letter (sent via FAX) to McFarlane stating in material part:

> Dear Todd—
>
> this is to confirm the main points touched on in our conversation of July 15, 1997.
>
> You agree that with regard to the character of Angela, her appearances, spin-offs, merchandising and foreign translations of

Spawn 9 or the Angela mini-series, that you'll be using the figures we put together based on the DC deal (I'll attach my letter to you following the Oakland meeting to this).

That my rights in Cogliostro and Medieval Spawn as above will be exchanged for your share of Miracleman. However, you will make all payments up until the date of exchange for the use of the characters, based on the same figures as above. You'll include whatever you have in the way of inventory or film for Miracleman, received from Eclipse in the bankruptcy buy-out.

The date of exchange will be that of the first accounting, currently planned for August 1st.

That there will be a $5,000 'bonus' paid to me on the handover fee, essentially as an apology for having dragged this thing on so long.

That I send you a copy of the tape of our Oakland meeting.

That I have, exclusive of any other Angela projects I might do with the Todd McFarlane division of Image, the rights to do a one-off Angela comics project, and a one-off Medieval Spawn project, on each of which I would keep 100% of the revenue: that if these are team-up projects they could go to other comics companies, but if they exclusively feature the character in the title, I agree to do them with Image (although not necessarily with you).

That you will make your best efforts to ensure that there is a "created by Neil & Todd" credit for Angela in her appearances in other comics, or other media.

Gaiman closed the letter by requesting of McFarlane:

Can you review this, and confirm that this is what was agreed?

Yours sincerely, (and very pleased to be in sight of wrapping all this up).

Neil Gaiman

PS   As a separate point, not sure that I made this clear, but Terri Cunningham at DC explained that in the case where an animated TV show is adapted from an existing comic they pay a bonus to the author of the comic

46.     On the same day, McFarlane, acting on behalf of himself and the other

defendants, FAXed an answer, stating:

> My Dearest Neil –
>
> Having read your rather prompt response to my offer today (re: Angela, Cog[liostro], Medieval Spawn, Miracle Man [sic]) all I can say to the points is <u>BEAUTY</u>!
>
> (That is a Canadian term).
>
> Before consumating [sic] this marriage I just need clarification on a few things.  1) can we exchange on July 31 so as to be at the end of a month for accounting purposes. and 2) is the creator royalty presented in your DC offer usually divided by 2. so that the artist also shares this piece?
>
> Also, accounting on the Medieval Spawn will be done from a formula you said DC comics uses on dirivative [sic] characters. Not the standard agreement of a new hero.  Is this acceptable?
>
> If all this looks fine please FAX your okay and I'll make this a priority to finish.  Thanks for your patience ---- Toddy.

47.     Gaiman FAXed assent to McFarlane the same day.  Gaiman wrote:

> Dear Todd—
>
> Hurrah!
>
> (1) Yes, we can exchange July 31st—but the exchange should be tied to the day of accounting (so if the accounting is delayed, so is the exchange).
>
> (2) Nope –it's the writer creator royalty (they do the same deal for the artist.)  So that's the full amount.
>
> (3) Medieval Spawn accounting—yes, I should have put that in. (I'd formula him at 50% of Angela.).
>
> Looking forward to getting done with this –
>
> Tra! la!
>
> /s/ Neil Gaiman.

48.     Gaiman's May 5, 1997 letter, Gaiman's first July 15, 1997 letter, McFarlane's July 15, 1997 letter and Gaiman's confirming July 15, 1997 letter form a written agreement (the "1997 Agreement") between Gaiman and Defendants about the terms of Gaiman's past due and future compensation and entitlements in respect of Gaiman's work on and rights in the Spawn® series and Gaiman's intellectual property rights and entitlements in respect of Angela™, Cogliostro™, and Medieval Spawn™.

49.     On August 1, 1997, having not received the Miracleman™ materials, an accounting for royalty payments or the $5,000 promised in the 1997 Agreement, Gaiman FAXed McFarlane an inquiry letter. Shortly thereafter, on August 4, 1997, Defendants sent Gaiman materials from Eclipse related to Miracleman™ according to the 1997 Agreement, various accounting for specified royalties owed to Gaiman (presuming the accuracy of the accountings), and a payment. Gaiman has had since that time and currently has possession of those Miracleman™ materials, which are now held for the benefit of Plaintiff MARVELS AND MIRACLES.

50.     On information and belief, McFarlane and Defendants never intended to adhere to the terms of the 1997 Agreement. To wit, on October 27, 1997, less than two months after the exchange of materials and accounting called for in the 1997 Agreement, McFarlane and TMP filed trademark applications in the United States Patent and Trademark Office for the name "Miracleman™". The applications included declarations signed by Todd McFarlane, under oath, stating that TMP intended to use the trademark Miracleman™ in connection with the sale of comic books, clothing, action figures, and accessories. Defendant TMP II subsequently filed requests for extensions of time to file statements of use with regard to the Miracleman™ mark.

51.     After the effective date of the 1997 Agreement, Defendants have continued to successfully exploit Gaiman's Angela™ character without permission, attribution, accounting or proper royalty payments to Gaiman, including through an HBO animated television series sold in VCR and DVD formats and through toys and comic art publications in the United States and the UK.  Additionally, since that time the Defendants have successfully exploited Gaiman's Cogliostro™ and Medieval Spawn™ intellectual property without paying royalties to Gaiman, including through a New Line Cinema live action theatrical motion picture sold in VCR and DVD formats, through sales of the HBO animated series (in which Gaiman's Cogliostro character is the narrator), and through toys and comic art publications in the United States and the UK.

52.     Recently, the Defendants have made public their intent to further derogate the 1997 Agreement.  For example, although McFarlane and TMP ultimately allowed their 1997 trademark application for Miracleman™ to expire, on July 11, 2001 McFarlane and TMP again filed an "intent to use" trademark application for the word mark "Miracleman™".  The applications included a declaration signed by Todd McFarlane, under oath, stating that McFarlane and TMP were intending to use the trademark Miracleman™ in commerce for, among other things, comic books, clothing, and toys.  On information and belief, all TMP comic books are published exclusively through defendant Image.  McFarlane further declared in that filing that "I believe I am the owner of any existing copyrights in the Miracleman characters and comic books."

53.     On information and belief, Defendants have exploited and intend to exploit the Miracleman™ intellectual property through the sale of publications and products.

54.     Plaintiff Gaiman assigned all rights related to the character Miracleman™, obtained from the Defendants or otherwise, to Plaintiff MARVELS AND MIRACLES. MARVELS AND MIRACLES is the successor in interest to Gaiman with respect to all Gaiman's rights relating to Miracleman™.

55.     On information and belief, McFarlane and the other Defendants profited greatly from Gaiman's works, often without acknowledging Gaiman's creative input, without Gaiman's permission and/or without properly accounting for royalties under the 1992 Agreement and/or the 1997 Agreement.  McFarlane and the other Defendants have profited from Gaiman's works by creating story lines using the Angela™, Cogliostro™ and Medieval Spawn™ characters, creating posters, trade paperbacks, tee shirts, trading cards, reprints and other print media featuring the characters, and producing a feature film and an HBO television series employing the characters, each of which continues to generate revenues through rentals and sales in DVD, VCR and similar formats.

56.     On information and belief, Defendants have published and distributed a poster featuring the Miracleman™ character as an incentive offer to sell merchandise.

57.     On information and belief, McFarlane and the other Defendants have prevented Plaintiffs from using their intellectual property related to Angela™, Cogliostro™, Medieval Spawn™ and Miracleman™, by, *inter alia*, publicly claiming the property, by refusing to acknowledge Gaiman's interests in the property and/or rights to use the property in response to direct inquiries, and by attempting to exclude Plaintiffs from using their property through federal intellectual property registrations.

# IV. Counts

## COUNT I: DEROGATION OF MORAL RIGHTS

58.  Gaiman is the true and rightful author of Spawn® issue nine, the Angela™ mini-series, portions of Spawn® issue 26, the characters therein and derivative works thereof.

59.  Defendants have exploited Gaiman's works commercially and otherwise, without proper attribution to Gaiman.

60.  Defendants have derogated Gaiman's moral rights as a creator under section 6bis of the Berne convention, United States law and foreign law.

## COUNT II: COPYRIGHT INFRINGEMENT—ANGELA™

61.  Gaiman holds valid U.S. copyrights to the character Angela™ by virtue of his authorship and valid U.S. copyrights Nos. TX 5-352-460, TX 5-276-922, TX 5-276-923, TX 5-276-924, VAu 481-446, VAu 481-424, VAu 481-439, TXu 966-575, TX 966-576.

62.  Defendants have received significant income from the willful exploitation copying, reproduction, adaptation and derivative use of Gaiman's copyrighted works related to Angela™. Defendants have done so without Gaiman's consent, or under a requirement to pay Gaiman royalties.

63.  Defendants' conduct constitutes copyright infringement in violation of 17 U.S.C. § 1001 *et. seq.*

## COUNT III: COPYRIGHT INFRINGEMENT – COGLIOSTRO™ AND MEDIEVAL SPAWN™

64.  Gaiman holds valid U.S. copyrights to the characters Cogliostro™ and Medieval Spawn™ by virtue of his authorship and valid U.S. copyrights Nos. TX 5-352-460 and TX 5-352-461.

65.     Prior to the effective date of the 1997 Agreement, Defendants received significant income from the willful exploitation, copying, reproduction, adaptation and derivative use of Gaiman's copyrighted works related to Cogliostro™ and Medieval Spawn. Defendants have done so without Gaiman's consent or under an obligation to pay Gaiman royalties.

66.     Defendants' conduct constitutes copyright infringement in violation of 17 U.S.C. § 1001 *et. seq.*

### COUNT IV: BREACH OF CONTRACT

67.     Defendants breached the 1997 Agreement by, *inter alia*, filing for a federal trademark application on the "Miracleman™" name, and interfering with Plaintiffs' use of the Miracleman™ intellectual property.

68.     Defendants breached the 1992 and 1997 Agreements by, *inter alia*, failing to pay Gaiman the agreed upon royalties for exploitation of the Angela™ intellectual property and other intellectual property held by Gaiman.

69.     Defendants breached the 1992 and 1997 Agreements by, *inter alia*, interfering with Gaimin's right to do and commercially benefit from publication "one-offs" and by interfering with Gaiman's right to do and commercially benefit from a Randy Bowen Design Angela™ statue.

70.     Defendants breached the 1997 Agreement by, *inter alia*, attempting to rescind the 1997 Agreement without ground.

### COUNT V: FRAUD

71.     Defendants committed common law fraud by entering into the 1997 agreement with no intent to abide by its terms.

72.     Specifically, Defendants made representations to Gaiman during the negotiation of the 1997 Agreement, such as that Gaiman would be transferred the Defendants' full rights and claims to the Miracleman™ character, and that Gaiman would be paid royalties and be given proper attribution for Defendants' exploitations of his works. Defendants made these statements and others with full knowledge that they were false, and with the intent to not abide by them.

73.     Evidence of the Defendants' intent during negotiation is provided by McFarlane's nearly contemporaneous declaration to the United States Patent and Trademark office in an intent-to-use application for a United States trademark registration on the name "Miracleman™".

74.     Gaiman justifiably relied on the Defendants' intentional misstatements in that he abided by the terms of the 1997 Agreement and did not pursue royalties for the use of his works related to the characters Cogliostro™ and Medieval Spawn™.

## COUNT VI: VIOLATION OF THE LANHAM ACT § 43(A)

75.     The Defendants willfully used a false designation of origin in connection with their exploitation of Gaiman's works in Spawn® issue nine, Spawn® issue 26 and the Angela™ series and derivatives thereof. Defendants engaged in "reverse palming off" by refusing to attribute credit to Gaiman for his works and derivatives thereof.

76.     On information and belief, such falsely designated goods are likely to cause and have already caused confusion among the relevant consumers.

77.     On information and belief, such falsely designated goods have entered and significantly impacted upon interstate commerce.

-19-

78.     Gaiman has suffered and will continue to suffer injury as a direct and proximate result of Defendants' conduct.

79.     Defendants have willfully violated the Lanham Act, 15 U.S.C. § 1125(a).

80.     Gaiman has no adequate remedy at law, and will continue to suffer injury unless Defendants are restrained by this Court.

## COUNT VII:  STATE LAW FALSE ADVERTISING

81.     The Defendants' actions in willfully reverse  palming off Gaiman's works in Spawn® issue nine, Spawn® issue 26 and the Angela™ series and the characters therein as works of their own creation, is likely to deceive relevant consumers as to the origin of the Gaiman's works.

82.     On information and belief, consumers have been confused as to the origins of Gaiman's works falsely attributed to be the works of Defendants.

83.     Defendants have willfully violated Wis. Stat. § 100.18(1).

84.     Gaiman has suffered and will continue to suffer injury as a direct and proximate result of Defendants' conduct.

85.     Gaiman has no adequate remedy at law, and will continue to suffer injury unless Defendants are restrained by this Court.

## COUNT VIII:  PROMISSORY ESTOPPEL

86.     Defendants promised Gaiman under the 1992 Agreement, *inter alia*, an ongoing ownership interest in the intellectual property related to Spawn® nine and the characters therein created by Gaiman, royalty payments at rates equal to or better than those Gaiman was receiving under his DC Comics Sandman® contract, and ongoing attribution for his work.

87.     Defendants promised Gaiman under the 1997 Agreement ongoing attribution for his works, royalty payments according to the terms of the 1997 Agreement, proper accountings, rights of one-off publishing, on-going rights and entitlements in respect of the character Angela™, and quitclaim of and non-interference with the rights to the character "Miracleman™".

88.     These promises were of a type that Defendants should have reasonably expected would induce action or forbearance of a definite and substantial character on the part of Gaiman.

89.     Gaiman did, in fact, rely on such promises, in that he, *inter alia*, authored Spawn® issue nine at considerable cost of his own time, he conveyed his works to Defendants without a written contract, and he did not pursue Defendants for royalty payments for Cogliostro™ and Medieval Spawn™ for profits and revenues generated after the effective date of the 1997 Agreement.

90.     Injustice can be avoided only through enforcement of Defendants' promises.

### COUNT IX: DECLARATORY JUDGMENT

91.     An actual and justiciable case or controversy exists between Gaiman and MARVELS AND MIRACLES L.L.C, on the one hand, and the Defendants, on the other hand.

92.     Defendants have publicly revealed their intention to exploit all of Gaiman's works related to Spawn® issue nine, Spawn® issue twenty-six, the Angela™ series, and MARVELS AND MIRACLES' intellectual property relating to Miracleman™ without permission from Gaiman or MARVELS AND MIRACLES and/or without adherence to their existing promises and contracts, involving publication without proper acknowledgement and without accounting for or paying of royalties. Defendants have, *inter alia,* published Gaiman's works and

-21-

derivatives thereof without acknowledgment, accounting or royalty; applied for federal copyright registrations on Gaiman's works without disclosing Gaiman's authorship to the copyright office; and filed for federal trademark registrations on the name "Miracleman™" without disclosing MARVELS AND MIRACLES' interest, or those of its predecessors-in-interest, in the mark.

93.    The conduct of the Defendant is imminent, and such conduct will harm Plaintiffs' legal rights.

94.    Plaintiffs therefore seek a declaration of rights from this Court, stating:

a.    that Gaiman is the proper owner of copyrights to the text of Spawn® issue nine, the text of Spawn® issue 26, Angela™ series issue 1, Angela™ series issue 2, Angela™ series issue 3 and the character Angela™.

b.    that any of the alleged copyrights registered by Defendants which cover works authored by Gaiman or which involve rights transferred to Gaiman are invalid, unenforceable, and nullities;

c.    that Defendants are required to properly account for and pay royalties to Gaiman under the terms of the 1997 Agreement or, in the alternative, to properly account for and pay royalties to Gaiman under the terms of the 1992 Agreement;

d.    that as of the effective date of the 1997 Agreement, Gaiman was the proper owner of any intellectual property or other rights or claims in the character Miracleman™ owned or claimed by McFarlane or any other Defendant, including but not

limited to copyrights, trademarks, equitable rights, foreign rights and common law rights over which McFarlane or the other Defendants have asserted a claimed ownership;

      e.     that McFarlane and the other Defendants received no rights to any of the Miracleman™ intellectual property from the Eclipse bankruptcy or said bankruptcy's Trustee, and have no such rights; and,

      e.     that Defendants' intended actions in exploiting the Miracleman™ intellectual property will infringe MARVELS AND MIRACLES' intellectual property rights.

## V. PRAYER

WHEREFORE, Plaintiff Gaiman respectfully requests:

      a.     damages in an amount to be determined at trial;

      b.     an order directing Defendants to account for royalties due to Gaiman and to conform to the terms of the 1997 Agreement or, in the alternative, for an order directing Defendants to account for royalties due to Gaiman pursuant to the terms of the 1992 Agreement, or alternatively, an order directing Defendants to account for all of their income and profits from the intellectual property rights of Gaiman to permit the Court to assess royalties due to Gaiman therefore;

      c.     a declaration setting forth the rights of Gaiman as enumerated in Count IX;

      d.     an award of treble damages under the Lanham Act;

e. an award of punitive damages;

f. an award of statutory and special damages for copyright infringement;

g. an award of his costs and reasonable attorneys' fees expended in this action;

h. an award of double damages under Wis. Stat. § 100.18(11)(b)(2); and

i. such further relief as the Court deems just and reasonable; and

WHEREFORE, Plaintiff MARVELS AND MIRACLES respectfully requests:

a. a declaration setting forth the rights of MARVELS AND MIRACLES as enumerated in Count IX;

b. an award of their costs and reasonable attorneys' fees expended in this action;

c. an award of punitive damages; and

d. such other relief as the Court deems just and reasonable.

The Plaintiffs request a **trial by jury** of all issues.

Dated this $2\cancel{4}$ day of January, 2002.

FOLEY & LARDNER

By: _Allen A. Arntsen_
Jeffrey A. Simmons
*Attorneys for Plaintiffs*

Foley & Lardner
150 East Gilman Street
Madison, WI 53703-2808
Tel: (608) 257-5035
Fax: (608) 258-4258

Of Counsel:
Mark Hellmann
Michael Rechtin
Joseph Talarico
Foley & Lardner
1 IBM Plaza
220 N. Wabash Ste. 3300
Chicago, IL 60611
Tel: (312) 755-1900
Fax: (312) 755-1925

Kenneth F. Levin
Kenneth F. Levin and Associates
20 North Wacker Drive, Suite 2200
Chicago, IL 60606
Tel: (312) 984-6000
Fax: (312) 977-2990
email: KFL@2200.com