# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

28

DOCKET #

U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN

APR 1 9 2002

FILED
JOSEPH W. SKUPNIEWITZ CLERK
CASE #

NEIL GAIMAN,                               )
a resident of Wisconsin, and              )
MARVELS AND MIRACLES, LLC,                )
a Wisconsin Limited Liability Company,    )
                                          )
            Plaintiffs,                   )
                                          )
      v.                                  )     Case No. 02-C-0048 S
                                          )
TODD MCFARLANE, a resident of             )
Arizona, and TODD MCFARLANE              )
PRODUCTIONS, INC., an Arizona             )
corporation, TMP INTERNATIONAL,           )
INC., a Michigan corporation,             )
MCFARLANE WORLDWIDE, INC.,                )
a Michigan corporation, and               )
IMAGE COMICS, INC.,                       )
a California corporation,                 )     JURY DEMANDED
                                          )
            Defendants.                   )

## AMENDED COMPLAINT FOR DAMAGES, DECLARATORY
## JUDGMENT AND INJUNCTIVE AND ANCILLARY RELIEF

### I. LEGAL DESCRIPTION OF THE PARTIES

1.     Plaintiff Neil Gaiman ("Gaiman") is a resident of the Western District of

Wisconsin, and has been a resident of the Western District of Wisconsin during all times

relevant to the Complaint.

2.     Plaintiff MARVELS AND MIRACLES, L.L.C., ("MARVELS AND MIRACLES") is a

Wisconsin Limited Liability Company, having a principal place of business in the Western

District of Wisconsin.

1

3.     Defendant Todd McFarlane ("McFarlane") is a resident of Arizona.  On information and belief, McFarlane is the principal and the sole owner or shareholder of all other Defendants excepting only Image Comics, Inc.

4.     Defendant Todd McFarlane Productions, Inc. ("TMP") is a corporation organized under the laws of the State of Arizona having a principal place of business at 40 West Baseline Rd., Tempe, Arizona 85283.  On information and belief, TMP is engaged in the production of comic books and related works of entertainment.

5.     On information and belief, Defendant TMP International, Inc. ("TMPII") is a corporation organized under the laws of the State of Michigan having a principal place of business at 15155 Fogg St. Plymouth, Michigan 48170.  On information and belief, TMPII is engaged in the worldwide production and marketing of spin-off products on behalf of Defendant TMP.

6.     On information and belief, Defendant McFarlane Worldwide, Inc. ("McFarlane Worldwide") is a corporation organized under the laws of the State of Michigan having a principal place of business at 15155 Fogg St. Plymouth, Michigan 48170.  On information and belief, McFarlane Worldwide is engaged in the worldwide production and marketing of spin-off products on behalf of Defendant TMP.

7.     On information and belief, Defendant Image Comics, Inc. ("Image") is a corporation organized under the laws of the State of California having a principal place of business at 1071 N. Batavia St. Orange, California 92867.  On information and belief, Defendant McFarlane is a part owner of Defendant Image.

8.     Defendants TMP, TMPII, and McFarlane Worldwide are sometimes hereinafter referred to as the "McFarlane Corporate Defendants".

9. On information and belief, McFarlane owns and controls the McFarlane Corporate Defendants. On information and belief, the McFarlane Corporate Defendants are alter-egos of McFarlane in that they have, for example, failed to maintain adequate independence, been substantially controlled by McFarlane, intermingled assets, used corporate assets as personal assets, failed to adhere to corporate procedure, and/or have failed to maintain adequate capitalization.

10. On information and belief, Defendant Image and the McFarlane Corporate Defendants are engaged in a partnership, joint venture, alliance or other similar relationship that involves a close degree of connection and cooperation.

11. On information and belief, all Defendants have regularly conducted business in the Western District of Wisconsin, and/or have significant contacts with the state of Wisconsin and the Western District of Wisconsin.

12. Defendants are and/or have been jointly engaged in, among other things, the production of a comic book series entitled Spawn®, and the production and marketing of goods and services related to that series and its comic publication spin-off titles.

## II. JURISDICTION AND VENUE REQUIREMENTS

13. This Court has exclusive jurisdiction under 28 U.S.C. § 1338(a) for an action arising under the copyright laws of the United States and jurisdiction under 28 U.S.C. § 1338(a) and (b) for an action under the Lanham Act.

14. This Court further has jurisdiction under 28 U.S.C. § 1331 for actions arising under the laws of the United States.

15. This Court has diversity jurisdiction under 28 U.S.C. § 1332, as the Plaintiffs, on the one hand, and all Defendants, on the other hand, are citizens of different states, and the amount in controversy is greater than $75,000.

16. This Court has supplemental jurisdiction over all claims arising under state law pursuant to 28 U.S.C. § 1367(a).

17. For declaratory counts, this court has jurisdiction under 28 U.S.C. §§ 2201-02.

18. This Court is a proper venue under 28 U.S.C. §§1391(b)(1) and (c) and 28 U.S.C. § 1400, in that one or more of the Defendants resides in this judicial district, one or more of the Defendants can be found in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district and a substantial part of the property that is the subject of the action is situated in this district.

19. This Court has personal jurisdiction over each Defendant.

### III. THE FACTS

#### A. The Characters and Their Origins

20. "Angela™", "Cogliostro™", and "Medieval Spawn™" are comic book characters originally created by Plaintiff Neil Gaiman in the ninth edition of the Spawn® monthly series which was published as an Image Comics title by defendants McFarlane, Image and TMP.

21. The "Angela™ intellectual property" comprises at least copyright protection in the character Angela™, copyrights to previous works of art and authorship embodying the character including derivative works (collectively the "Angela™ copyrights"), trademarks in the name Angela™ and images associated with Angela™ publications that have secondary

meaning (collectively the "Angela™ trademarks"), and related equitable, common law and foreign rights.

22.    The "Cogliostro™ intellectual property" comprises at least a copyright in the character Cogliostro™, copyrights to previous works of art and authorship embodying the character including derivative works (collectively the "Cogliostro™ copyrights"), trademarks in the name Cogliostro™ and images associated with Cogliostro™ publications that have secondary meaning (collectively the "Cogliostro™ trademarks"), and related equitable, common law and foreign rights.

23.    The "Medieval Spawn™ intellectual property" comprises at least a copyright in the character Medieval Spawn™, copyrights to previous works of art and authorship embodying the character including derivative works (collectively the "Medieval Spawn™ copyrights"), trademarks in the name Medieval Spawn™ and images associated with Medieval Spawn™ publications that have secondary meaning (collectively the "Medieval Spawn™ trademarks"), and related equitable, common law and foreign rights.

24.    Miracleman™ is a comic book superhero with origins older than and unrelated to the Spawn® series. The Miracleman™ comic book series published in the United States (before the issues were repackaged as so-called "graphic novels") consisted of twenty-four comic book issues. Author Alan Moore ("Moore") wrote each of issues 1 though 16. Plaintiff Neil Gaiman wrote each of the last eight issues of the Miracleman™ comic book series (issues 17 through 24), with all of the artwork for said issues having been created by illustrator Mark Buckingham ("Buckingham"). Neither McFarlane nor any other Defendant had anything to do with the creation or publication of any Miracleman™ story.

25.     The "Miracleman™ intellectual property" comprises at least copyright protection in the character Miracleman™, copyrights to other characters in the Miracleman™ series, copyrights to previous works of art and authorship embodying the character or the series including derivative works, (collectively the "Miracleman™ copyrights"), trademarks in the name Miracleman™, the MM logo, and associated images associated with Miracleman™ publications that have secondary meaning (collectively the "Miracleman™ trademarks"), and related equitable, common law and foreign rights.

26.     In the United States, Miracleman™ was published by a company known as Eclipse Comics pursuant to agreements with Plaintiff Gaiman, Moore and Buckingham.  At no time did Eclipse Comics ever acquire any rights in or to the Miracleman™ intellectual property. Further, Eclipse Comics' rights of publication in respect of Miracleman™ were limited to print publication and were personal to Eclipse Comics and non-transferable.

27.     Eclipse Comics published other comic books in addition to Miracleman™. Ultimately Eclipse Comics filed for bankruptcy, and, on information and belief, Defendants McFarlane and/or TMP subsequently bought all of the assets of Eclipse Comics from the Trustee in the Eclipse Comics bankruptcy.  In the process of that purchase, McFarlane and/or acquired certain tangible property which had been in Eclipse Comics' possession and had been used by Eclipse in its publishing of Miracleman™.

28.     Plaintiff MARVELS AND MIRACLES is the assignee and owner of all of the rights and interest of Gaiman, Buckingham and Moore in the Miracleman™ intellectual property.

## B. The 1992 Agreement

29.     In 1992, McFarlane, acting on behalf of himself and the McFarlane Corporate Defendants, came to an oral agreement with Gaiman as to Gaiman's contribution to the Spawn® series (the "1992 Agreement"). At this time, Neil Gaiman was recognized as one of the world's foremost comic book authors. As examples, Mr. Gaiman's work on the Sandman® comic book series for DC Comics had won him the Will Eisner Comic Industry Awards for Best Writer (1991 and 1992), Best Continuing Series (1991 and 1992) and Best Graphic Album—Reprint (1991); won him the Harvey Awards for Best Writer (1990, 1991) and Best Continuing Series (1992); and won him the Eagle Award for Best Writer of American Comics in 1990. The nineteenth issue of Sandman® received the 1991 World Fantasy Award for best short story (making it the first comic ever to be presented with a literary award). By 1992, Gaiman had published seven novels, graphic novels or novellas, including "Good Omens" (1990), a novel with Terry Prachett that spent 17 weeks on the Sunday (London) Times bestseller list, and "Signal to Noise" (1989-90), which won an Eisner Award for Best Graphic Album.

30.     Gaiman agreed to author issue number nine of Spawn® ("Spawn® 9"), and McFarlane represented to Gaiman that Gaiman would be recognized as a creator in Spawn® 9 and any works derived from Spawn® 9, that Gaiman would be financially compensated at rates greater than those provided for in Gaiman's contract with DC Comics for Gaiman's work on Sandman®, and that Gaiman would retain an ownership interest in each of his creative works. On information and belief, McFarlane reasonably intended Gaiman to rely on McFarlane's representations.

31.     Gaiman became a celebrated guest-writer for Spawn®, but was never an employee of McFarlane or any of the other Defendants. The Defendants capitalized on Gaiman's fame and the fact that Gaiman would be acting as guest writer to promote Spawn® 9.

32.     Relying on Defendants' representations via McFarlane under the 1992 Agreement, Gaiman in good faith, and at a considerable cost of his own time, authored Spawn® 9. In the process of authoring Spawn® 9, Gaiman conceived and developed a story for the issue involving two new characters, Angela™ and Cogliostro™, and one new derivative character, Medieval Spawn™, between late 1992 and mid-1993. In developing the story line, Gaiman set forth, orally and in writing, an array of traits for Angela™ and Cogliostro™ including their appearances, clothing, origins, personality, equipment, special powers, and their specific roles in Spawn® 9 as well as their general roles in the Spawn® stories. Gaiman set forth the story for Spawn® 9 in treatments, scripts and a number of thumbnail sketches and drawings, all of which, taken together, mapped out the story for Spawn® 9 and set forth many of the perceptible and predictable characteristics of Angela™ and Cogliostro™.

33.     In the process of developing Spawn® 9, Gaiman, with the express permission of Defendants, also created a derivative work of the Spawn® character called "Medieval Spawn™". Gaiman set forth, both orally and in writing (in the treatments, scripts and thumbnail sketches for Spawn® 9), descriptions of Medieval Spawn™, articulating many attributes of the physical appearance of that character, including his weaponry and costuming.

34.     Gaiman completed the story for Spawn® 9 in or around the fall of 1992. Gaiman then provided scripts and thumbnail sketches to McFarlane. McFarlane, in conjunction with the other Defendants, set about having artwork prepared in a manner instructed by Gaiman's script, treatment and thumbnail sketches. During the preparation of

those works, Defendants and Defendants' representatives relied heavily on Gaiman's treatments, scripts and thumbnail sketches.

35.     Spawn® 9 was released in or around March, 1993. Spawn® 9 enjoyed extensive commercial success. McFarlane represented to Gaiman that the issue sold at least one million one hundred thousand (1,100,000) copies.

36.     The inside title page of Spawn® 9 identifies Gaiman as the author of the story. Spawn® 9 does not contain a notice identifying the owners of the copyright in Spawn® 9 and the characters created in that issue.

37.     Defendants have made representations to Gaiman and others indicating that the creators of characters used in *Spawn*® comics retain a copyright interest in those characters.

38.     Gaiman also authored a partial script for a Spawn® issue, which the Defendants later published in Spawn® Issue 26 ("Spawn® 26") without attribution to Gaiman. Defendants published Spawn® 26 on or about December 1994. Defendants are currently republishing Spawn® 26 in a graphic novel format entitled *Pathways to Judgement*. Gaiman has never received any payment from Defendants for his contribution to *Pathways to Judgement*.

39.     Spawn® 26 does not contain a notice identifying the owners of the copyright in Spawn® 26 and the characters created in that issue.

40.     Soon McFarlane and Gaiman began receiving requests for more work featuring Angela™. Defendants requested that Gaiman write a short series of comics featuring Angela™, under the same terms as the 1992 Agreement. Gaiman wrote scripts for Angela™ Issues 1, 2, and 3 (collectively "the Angela™ series"), including treatments and thumbnail sketches that

were used by Defendants to prepare drawings in the same manner as with Spawn® 9. The Angela™ series was also highly successful.

41.     The inside title pages for the Angela™ series identify Gaiman as the author of the stories. The inside title pages Angela™ Issue 1 and Angela™ Issue 3 do not contain any notice of copyright ownership regarding Angela™.

42.     Defendants are currently republishing the Angela™ series in a graphic novel book format entitled *Angela's Hunt*. The back cover and inside back cover of *Angela's Hunt* highlight Gaiman's authorship of the Angela™ series, stating, in part:

> NEIL GAIMAN, best known for his comic book cult classic *Sandman*, wrote this popular mini-series about the warrior angel Angela. Gaiman, who has won several awards for his fantasy fiction books, now writes screen adaptations including the critically acclaimed *Princess Mononoke* animated feature and *Neverwhere*, a six-part series for BBC television.

43.     Defendants never obtained Gaiman's written consent to use Gaiman's name and biographical information to promote *Angela's Hunt*. Nor have defendants paid Gaiman for the use of his name and biographical information to promote *Angela's Hunt*.

44.     Gaiman never signed a work-for-hire agreement or transferred his interest in any copyrighted subject matter created pursuant to the 1992 Agreement.

45.     Gaiman duly filed and obtained federal copyright registrations in the script for Angela Issue No. 1, Registration No. TX 5-276-922, the script for Angela Issue No. 2, Registration No. TX 5-276-923, the script for Angela Issue No. 3, Registration No. TX 5-276-924, in the Thumbnail Sketches of Angela No. 1, Registration No. VAu 481-446, in the Thumbnail Sketch of Angela No. 2, Registration No. VAu 481-424, in the Thumbnail Sketch of Angela No. 3, Registration No. VAu 481-439, in the Treatment for Angela Issue No. 2,

TXu 966-575, and in the Treatment for Angela Series TX 966-576. Gaiman currently owns these registrations and the rights embodied therein.

46. Gaiman also duly filed and obtained federal copyright registrations in the script for Spawn™ 9, Registration No. TX 5-352-460 and in a partial script for Spawn™ 26, Registration No. TX 5-352-461. Gaiman currently owns these registrations and the rights embodied therein.

47. On information and belief, McFarlane actively misrepresented himself as the author of Gaiman's works. Unbeknownst to Gaiman, in the period following the release of Spawn® 9 and Spawn® 26, McFarlane filed several copyright applications for Gaiman's works, including Reg. No. TX4-029-098 to the text of Spawn® 26. On information and belief, McFarlane intentionally misrepresented material aspects of the authorship of the various deposited works to the United States Copyright Office in order to obscure Gaiman's ownership interest and authorship.

### C. The 1997 Agreement

48. On or around February 18, 1997, Gaiman received a memo from Larry Marder of Defendant Image, setting forth terms "regarding royalties for Angela, Medieval Spawn and Cogliostro." The written offer was substantially worse than the terms of Gaiman's Sandman® contract with DC Comics, contrary to the agreed upon standard for treatment of Gaiman under the 1992 Agreement.

49. Gaiman rejected the terms referenced in the memo sent by Marder, and Gaiman requested that all money due and owing to Gaiman under the 1992 Agreement for Gaiman's works be accounted for and paid.

50.     In response, McFarlane, acting on behalf of the McFarlane Corporate Defendants, met with Gaiman in Oakland, California in or around April 1997, and had a discussion regarding Gaiman's entitlements, which the parties tape-recorded by mutual consent. On or around May 5, 1997, Gaiman sent McFarlane a letter providing a list of figures for various forms of commercial exploitation, including a rate for comic book sales, a rate for collected editions (trade paperbacks, etc.), a rate for character equity, a rate for merchandising and promotional licensing, and a rate for media use (motion pictures, audio-visual recording, stage plays, television, etc.).

51.     On July 15, 1997, McFarlane, acting on behalf of himself and the McFarlane Corporate Defendants, and Gaiman discussed Gaiman's entitlement terms by telephone, which included a prospective swap of certain of Gaiman's rights in Cogliostro and Medieval Spawn (subject to McFarlane accounting for and paying Gaiman current to date) for McFarlane's giving to Gaiman all of McFarlane's claims, involvement and tangible property in respect of Miracleman. During a telephone call from McFarlane to Gaiman July 15, 1997, McFarlane quantified an "offer" to Gaiman. Gaiman agreed to accept McFarlane's offer. Following the call Gaiman wrote a confirming letter (sent via FAX) to McFarlane stating in material part:

> Dear Todd—
>
> this is to confirm the main points touched on in our conversation of July 15, 1997.
>
> You agree that with regard to the character of Angela, her appearances, spin-offs, merchandising and foreign translations of Spawn 9 or the Angela mini-series, that you'll be using the figures we put together based on the DC deal (I'll attach my letter to you following the Oakland meeting to this).
>
> That my rights in Cogliostro and Medieval Spawn as above will be exchanged for your share of Miracleman. However, you will

make all payments up until the date of exchange for the use of the characters, based on the same figures as above. You'll include whatever you have in the way of inventory or film for Miracleman, received from Eclipse in the bankruptcy buy-out.

The date of exchange will be that of the first accounting, currently planned for August 1st.

That there will be a $5,000 'bonus' paid to me on the handover fee, essentially as an apology for having dragged this thing on so long.

That I send you a copy of the tape of our Oakland meeting.

That I have, exclusive of any other Angela projects I might do with the Todd McFarlane division of Image, the rights to do a one-off Angela comics project, and a one-off Medieval Spawn project, on each of which I would keep 100% of the revenue: that if these are team-up projects they could go to other comics companies, but if they exclusively feature the character in the title, I agree to do them with Image (although not necessarily with you).

That you will make your best efforts to ensure that there is a "created by Neil & Todd" credit for Angela in her appearances in other comics, or other media.

Gaiman closed the letter by requesting of McFarlane:

Can you review this, and confirm that this is what was agreed?

Yours sincerely, (and very pleased to be in sight of wrapping all this up).

Neil Gaiman

PS   As a separate point, not sure that I made this clear, but Terri Cunningham at DC explained that in the case where an animated TV show is adapted from an existing comic they pay a bonus to the author of the comic

52.    On the same day, McFarlane, acting on behalf of himself and the McFarlane

Corporate Defendants, FAXed an answer, stating:

My Dearest Neil –

Having read your rather prompt response to my offer today (re: Angela, Cog[liostro], Medieval Spawn, Miracle Man [sic]) all I can say to the points is <u>BEAUTY</u>!

(That is a Canadian term).

Before consumating [sic] this marriage I just need clarification on a few things. 1) can we exchange on July 31 so as to be at the end of a month for accounting purposes. and 2) is the creator royalty presented in your DC offer usually divided by 2. so that the artist also shares this piece?

Also, accounting on the Medieval Spawn will be done from a formula you said DC comics uses on dirivative [sic] characters. Not the standard agreement of a new hero. Is this acceptable?

If all this looks fine please FAX your okay and I'll make this a priority to finish. Thanks for your patience ---- Toddy.

53.     Gaiman FAXed assent to McFarlane the same day. Gaiman wrote:

Dear Todd—

Hurrah!

(1) Yes, we can exchange July 31st—but the exchange should be tied to the day of accounting (so if the accounting is delayed, so is the exchange).

(2) Nope –it's the writer creator royalty (they do the same deal for the artist.) So that's the full amount.

(3) Medieval Spawn accounting—yes, I should have put that in. (I'd formula him at 50% of Angela.).

Looking forward to getting done with this –

Tra! la!

/s/ Neil Gaiman.

54.     Gaiman's May 5, 1997 letter, Gaiman's first July 15, 1997 letter, McFarlane's

July 15, 1997 letter and Gaiman's confirming July 15, 1997 letter form a written agreement

(the "1997 Agreement") between Gaiman and McFarlane and the McFarlane Corporate

Defendants about the terms of Gaiman's past due and future compensation and entitlements in respect of Gaiman's work on and rights in the Spawn® series and Gaiman's intellectual property rights and entitlements in respect of Angela™, Cogliostro™, and Medieval Spawn™.

55.     On August 1, 1997, having not received the Miracleman™ materials, an accounting for royalty payments or the $5,000 promised in the 1997 Agreement, Gaiman FAXed McFarlane an inquiry letter. Shortly thereafter, on August 4, 1997, Defendants sent Gaiman materials from Eclipse related to Miracleman™ according to the 1997 Agreement, various accounting for specified royalties owed to Gaiman (presuming the accuracy of the accountings), and a payment. Gaiman has had since that time and currently has possession of those Miracleman™ materials, which are now held for the benefit of Plaintiff MARVELS AND MIRACLES.

56.     On information and belief, McFarlane and the McFarlane Corporate Defendants never intended to adhere to the terms of the 1997 Agreement. To wit, on October 27, 1997, less than two months after the exchange of materials and accounting called for in the 1997 Agreement, McFarlane and TMP filed trademark applications in the United States Patent and Trademark Office for the name "Miracleman™". The applications included declarations signed by Todd McFarlane, under oath, stating that TMP intended to use the trademark Miracleman™ in connection with the sale of comic books, clothing, action figures, and accessories. Defendant TMP II subsequently filed requests for extensions of time to file statements of use with regard to the Miracleman™ mark.

57.     After the effective date of the 1997 Agreement, Defendants have continued to successfully exploit Gaiman's Angela™ character without permission, attribution, accounting or proper royalty payments to Gaiman, including through an HBO animated television series sold

-15-

in VCR and DVD formats and through toys and comic art publications in the United States and the UK. Additionally, since that time the Defendants have successfully exploited Gaiman's Cogliostro™ and Medieval Spawn™ intellectual property without paying royalties to Gaiman, including through a New Line Cinema live action theatrical motion picture sold in VCR and DVD formats, through sales of the HBO animated series (in which Gaiman's Cogliostro character is the narrator), and through toys and comic art publications in the United States and the UK.

58.     Recently, the Defendants have made public their intent to further derogate the 1997 Agreement. For example, although McFarlane and TMP ultimately allowed their 1997 trademark application for Miracleman™ to expire, on July 11, 2001 McFarlane and TMP again filed an "intent to use" trademark application for the word mark "Miracleman™". The applications included a declaration signed by Todd McFarlane, under oath, stating that McFarlane and TMP were intending to use the trademark Miracleman™ in commerce for, among other things, comic books, clothing, and toys. On information and belief, all TMP comic books are published exclusively through defendant Image. McFarlane further declared in that filing that "I believe I am the owner of any existing copyrights in the Miracleman characters and comic books."

59.     On information and belief, Defendants have exploited or intend to exploit the Miracleman™ intellectual property through the sale of publications and products.

60.     Plaintiff Gaiman assigned all rights related to the character Miracleman™, obtained from the Defendants or otherwise, to Plaintiff MARVELS AND MIRACLES. MARVELS AND MIRACLES is the successor in interest to Gaiman with respect to all Gaiman's rights relating to Miracleman™.

61.     On information and belief, McFarlane and the other Defendants profited greatly from Gaiman's works, often without acknowledging Gaiman's creative input, without Gaiman's permission and/or without properly accounting for royalties under the 1992 Agreement and/or the 1997 Agreement.  McFarlane and the other Defendants have profited from Gaiman's works by creating story lines using the Angela™, Cogliostro™ and Medieval Spawn™ characters, creating posters, trade paperbacks, tee shirts, trading cards, reprints and other print media featuring the characters, and producing a feature film and an HBO television series employing the characters, each of which continues to generate revenues through rentals and sales in DVD, VCR and similar formats.

62.     On information and belief, McFarlane and the McFarlane Corporate Defendants have published and distributed a poster featuring the Miracleman™ character as an incentive offer to sell merchandise.

63.     On information and belief, McFarlane and the other Defendants have prevented Plaintiffs from using their intellectual property related to Angela™, Cogliostro™, Medieval Spawn™ and Miracleman™, by, *inter alia*, publicly claiming the property, by refusing to acknowledge Gaiman's interests in the property and/or rights to use the property in response to direct inquiries, and by attempting to exclude Plaintiffs from using their property through federal intellectual property registrations.

DOCKET # Add to 24

U. DISTRICT COURT
WEST. DIST. OF WISCONSIN

APR - 8 2002

FILED
JOSEPH W. SKUPNIEWITZ CLERK
CASE #

**IV.  COUNTS**

## COUNT I:  DECLARATORY JUDGMENT OF COPYRIGHT OWNERSHIP AND ACCOUNTING FOR PROFITS

64.     An actual and justiciable case or controversy exists between Gaiman and

McFarlane regarding ownership of the copyrights to Spawn® 9, Spawn® 26, the Angela™

series, and the Angela™, Cogliostro™ and Medieval Spawn™ characters contained within those

works.

65.     The comic books Spawn® 9, Spawn® 26, the Angela™ series, and the Angela™,

Cogliostro™ and Medieval Spawn™ characters contained within those comic books are all "joint

works" as defined by 17 U.S.C. § 101 in that they are "works prepared by two or more

authors with the intention that the contributions be merged into inseparable or interdependent

parts of a unitary whole."

66.     Gaiman is a co-author of the comic books and characters described above and

a co-owner of the copyrights in those works by virtue of his intentional copyrightable

contributions to those works.

67.     McFarlane obtained his copyright registrations in Spawn® 9, Spawn® 26, and

the Angela™ series as a result of fraud on the U.S. Copyright Office in that he obtained those

registrations by knowingly omitting material facts on the registration applications regarding

Gaiman's authorship of those works.

68.     Gaiman therefore seeks a declaration of rights from this Court, stating:

a.      that Gaiman is a co-owner of the copyrights to Spawn® issue 9, Spawn® issue 26, Angela™ issue 1, Angela™ issue 2, Angela™ issue 3 and the Angela™, Cogliostro™ and Medieval Spawn™ characters contained within those works.

b.      that McFarlane's copyright registrations for Spawn® issue 9, Spawn® issue 26, Angela™ issue 1, Angela™ issue 2, Angela™ issue 3 are invalid.

c.      that McFarlane is required to account to Gaiman for all income and profits earned by McFarlane from his exploitation of Spawn® issue 9, Spawn® issue 26, Angela™ issue 1, Angela™ issue 2, Angela™ issue 3, and the Angela™, Cogliostro™ and Medieval Spawn™ characters contained within those works.

## COUNT II:  COPYRIGHT INFRINGEMENT AGAINST IMAGE, TMP, TMP II, AND MCFARLANE WORLDWIDE – ANGELA™

69.     Gaiman is a co-owner of the copyrights to Spawn® 9, Spawn® 26, the Angela™ series, and the Angela™ character contained within those works.

70.     Defendants Image, TMP, TMP II, and McFarlane Worldwide have received significant income from the willful exploitation, copying, reproduction, adaptation and derivative use of Gaiman's copyrighted works related to Angela™.  Those defendants have done so without Gaiman's consent and without paying Gaiman royalties.

71.     The conduct of Image, TMP, TMP II, and McFarlane Worldwide constitutes copyright infringement in violation of 17 U.S.C. § 101 *et. seq.*

## COUNT III: COPYRIGHT INFRINGEMENT AGAINST IMAGE, TMP, TMP II, AND MCFARLANE WORLDWIDE – COGLIOSTRO™ AND MEDIEVAL SPAWN™

72.     Gaiman is a co-owner of the copyrights to Spawn® 9, Spawn® 26, the Angela™ series, and the Cogliostro™ and Medieval Spawn™ characters contained within those works.

73.     Both before and after the effective date of the 1997 Agreement, defendants Image, TMP, TMP II, and McFarlane Worldwide have received significant income from the willful exploitation, copying, reproduction, adaptation and derivative use of Gaiman's copyrighted works related to Cogliostro™ and Medieval Spawn.™ Those defendants have done so without Gaiman's consent and without paying Gaiman royalties.

74.     Defendants' conduct constitutes copyright infringement in violation of 17 U.S.C. § 101 *et. seq.*

## COUNT IV: BREACH OF CONTRACT

75.     McFarlane and the McFarlane Corporate Defendants breached the 1997 Agreement by, *inter alia*, filing for a federal trademark application on the "Miracleman™" name, and interfering with Plaintiffs' use of the Miracleman™ intellectual property.

76.     McFarlane and the McFarlane Corporate Defendants breached the 1992 and 1997 Agreements by, *inter alia*, failing to pay Gaiman the agreed upon royalties for exploitation of the Angela™ intellectual property and other intellectual property held by Gaiman.

77.     McFarlane and the McFarlane Corporate Defendants breached the 1992 and 1997 Agreements by, *inter alia*, interfering with Gaiman's right to do and commercially benefit from publication "one-offs" and by interfering with Gaiman's right to do and commercially benefit from a Randy Bowen Design Angela™ statue.

78.     McFarlane and the McFarlane Corporate Defendants breached the 1997 Agreement by, *inter alia*, attempting to rescind the 1997 Agreement without ground.

## COUNT V: PROMISSORY ESTOPPEL

79.     McFarlane and the McFarlane Corporate Defendants promised Gaiman under the 1992 Agreement, *inter alia*, an ongoing ownership interest in the intellectual property related to Spawn® 9 and the characters therein created by Gaiman, royalty payments at rates equal to or better than those Gaiman was receiving under his DC Comics Sandman® contract, and ongoing attribution for his work.

80.     McFarlane and the McFarlane Corporate Defendants promised Gaiman under the 1997 Agreement ongoing attribution for his works, royalty payments according to the terms of the 1997 Agreement, proper accountings, rights of one-off publishing, on-going rights and entitlements in respect of the character Angela™, and quitclaim of and non-interference with the rights to the character "Miracleman™".

81.     These promises were of a type that Defendants should have reasonably expected would induce action or forbearance of a definite and substantial character on the part of Gaiman.

82.     Gaiman did, in fact, rely on such promises, in that he, *inter alia*, authored Spawn® 9 at considerable cost of his own time, he conveyed his works to Defendants without a written contract, and he did not pursue Defendants for royalty payments for Cogliostro™ and Medieval Spawn™ for profits and revenues generated after the effective date of the 1997 Agreement.

83.     Injustice can be avoided only through enforcement of Defendants' promises.

## COUNT VI: FRAUD

84.     McFarlane and the McFarlane Corporate Defendants committed common law fraud by entering into the 1997 agreement with no intent to abide by its terms.

85.     Specifically, McFarlane, on behalf of himself and the McFarlane Corporate Defendants, made representations to Gaiman during the negotiation of the 1997 Agreement, such as that Gaiman would be transferred the Defendants' full rights and claims to the Miracleman™ character, and that Gaiman would be paid royalties and be given proper attribution for Defendants' exploitations of Gaiman's works.  McFarlane made these statements and others with full knowledge that they were false, and with the intent to not abide by them.

86.     Evidence of McFarlane and the McFarlane Corporate Defendant's intent during negotiation is provided by McFarlane's nearly contemporaneous declaration to the United States Patent and Trademark office in an intent-to-use application for a United States trademark registration on the name "Miracleman™".

87.     Gaiman justifiably relied on McFarlane's intentional misstatements in that, *inter alia*, he abided by the terms of the 1997 Agreement and did not pursue royalties for the use of his works related to the characters Cogliostro™ and Medieval Spawn™.

## COUNT VII: VIOLATION OF THE LANHAM ACT § 43(A)

88.     The Defendants willfully used a false designation of origin in connection with their exploitation of Gaiman's characters in Spawn® 9, the Angela™ series, and *Angela's Hunt,* and of the works Spawn® 26 and *Pathways to Judgement.*  Defendants engaged in "reverse palming off" by refusing to attribute credit to Gaiman for his characters, works and derivatives thereof.

89. On information and belief, such falsely designated goods are likely to cause and have already caused confusion among the relevant consumers.

90. On information and belief, such falsely designated goods have entered and significantly impacted upon interstate commerce.

91. Gaiman has suffered and will continue to suffer injury as a direct and proximate result of Defendants' conduct.

92. Defendants have willfully violated the Lanham Act, 15 U.S.C. § 1125(a).

93. Gaiman has no adequate remedy at law, and will continue to suffer injury unless Defendants are restrained by this Court.

### COUNT VIII: STATE LAW FALSE ADVERTISING, WIS. STAT. § 100.18(1)

94. The Defendants' failure to properly attribute Gaiman's authorship for, *inter alia*, Spawn® 26, *Pathway to Judgement*, and the Angela™, Cogliostro™, and Medieval Spawn™ characters, is deceptive and misleading.

95. On information and belief, consumers have been confused as to the origins of Gaiman's works falsely attributed to be solely the works of Defendants.

96. Defendants have willfully violated Wis. Stat. § 100.18(1).

97. Gaiman has suffered and will continue to suffer injury as a direct and proximate result of Defendants' conduct.

98. Gaiman has no adequate remedy at law, and will continue to suffer injury unless Defendants are restrained by this Court.

## COUNT IX: VIOLATION OF RIGHT OF PRIVACY, WIS. STAT. § 895.50

99.    Defendants have used Gaiman's name and biographical information for purposes of advertising and trade by including that information on the covers of the graphic novel entitled *Angela's Hunt*.

100.    Defendants have not obtained Gaiman's written consent for their use of his name and biographical information.

101.    Because of Gaiman's fame as an author, his name and biographical information have value. Gaiman has repeatedly received compensation for his personal appearances at public events.

102.    Gaiman has been damaged by Defendants' unauthorized use of his name and biographical information in an amount to be determined at trial.

## COUNT X: MISAPPROPRIATION OF GAIMAN'S NAME AND IDENTITY

103.    Plaintiffs incorporate paragraphs 99 through 103 of this Amended Complaint as if fully restated here.

104.    Defendants' unauthorized use of Gaiman's name and biographical information constitute misappropriation of Gaiman's name and identity in violation of Wisconsin law.

## COUNT XI: DECLARATORY JUDGMENT – MIRACLEMAN™

105.    An actual and justiciable case or controversy exists between MARVELS AND MIRACLES L.L.C, on the one hand, and McFarlane and the McFarlane Corporate Defendants on the other hand.

106.    McFarlane and the McFarlane Corporate Defendants have revealed their intention to exploit MARVELS AND MIRACLES' intellectual property relating to Miracleman™ without permission from MARVELS AND MIRACLES. Those defendants have, *inter alia,* filed

for federal trademark registrations on the name "Miracleman™" without disclosing MARVELS AND MIRACLES' interest, or those of its predecessors-in-interest, in the mark.

107.    The conduct of the Defendants is imminent, and such conduct will harm Plaintiffs' legal rights.

108.    Plaintiffs therefore seek a declaration of rights from this Court, stating:

a.    that as of the effective date of the 1997 Agreement, Gaiman was the proper owner of any intellectual property or other rights or claims in the character Miracleman™ owned or claimed by McFarlane or any other Defendant, including but not limited to copyrights, trademarks, equitable rights, foreign rights and common law rights over which McFarlane or the other Defendants have asserted a claimed ownership;

b.    that McFarlane and the other Defendants received no rights to any of the Miracleman™ intellectual property from the Eclipse bankruptcy or said bankruptcy's Trustee, and have no such rights; and

c.    that Defendants' intended actions in exploiting the Miracleman™ intellectual property will infringe MARVELS AND MIRACLES' intellectual property rights.

## V.    PRAYER

WHEREFORE, Plaintiff Gaiman respectfully requests:

a.    damages in an amount to be determined at trial;

b.    an accounting of income and profits earned by Defendants as a result of their use of Plaintiffs' intellectual property;

c.     an order directing Defendants to account for royalties due to Gaiman and to conform to the terms of the 1997 Agreement or, in the alternative, for an order directing Defendants to account for royalties due to Gaiman pursuant to the terms of the 1992 Agreement;

d.     a declaration setting forth the rights of Gaiman as enumerated in Count I;

e.     an award of treble damages under the Lanham Act;

f.     an award of punitive damages;

g.     an award of statutory and special damages for copyright infringement;

h.     an award of his costs and reasonable attorneys' fees expended in this action;

i.     an award of double damages under Wis. Stat. § 100.18(11)(b)(2);

j.     compensatory damages, reasonable fees and costs, and injunctive relief under Wis. Stat. § 895.50;

k.     such further relief as the Court deems just and reasonable; and

WHEREFORE, Plaintiff MARVELS AND MIRACLES respectfully requests:

a.     a declaration setting forth the rights of MARVELS AND MIRACLES as enumerated in Count XI;

     b.     an award of their costs and reasonable attorneys' fees expended in this

action;

     c.     an award of punitive damages; and

     d.     such other relief as the Court deems just and reasonable.

The Plaintiffs request a **trial by jury** of all issues.

Dated this 5ᵀᴴ day of April, 2002.

FOLEY & LARDNER

By: _____
Allen A. Arntsen
Jeffrey A. Simmons
*Attorneys for Plaintiffs*

Foley & Lardner
150 East Gilman Street
Madison, WI 53703-2808
Tel: (608) 257-5035
Fax: (608) 258-4258

Of Counsel:
Mark Hellmann
Michael Rechtin
Joseph Talarico
Foley & Lardner
1 IBM Plaza
220 N. Wabash Ste. 3300
Chicago, IL 60611
Tel: (312) 755-1900
Fax: (312) 755-1925

Kenneth F. Levin
Kenneth F. Levin and Associates
20 North Wacker Drive, Suite 2200
Chicago, IL 60606
Tel: (312) 984-6000
Fax: (312) 977-2990
email: KFL@2200.com