50

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **NEIL GAIMAN and MARVELS AND MIRACLES, L.L.C.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**TODD MCFARLANE, TODD MCFARLANE PRODUCTIONS, INC., TMP INTERNATIONAL, INC., MCFARLANE WORLDWIDE, INC., and IMAGE COMICS, INC.,**<br><br>**Defendants.** | **Case No.: 02-C-0048-S** |

DOCKET NUMBER
U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN
JUL - 1 2002
FILED/RECEIVED
JOSEPH W. SKUPNIEWITZ, CLERK
CASE NUMBER

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiffs Neil Gaiman and Marvels and Miracles, LLC, move for partial summary judgment dismissing the McFarlane Defendants' (Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc., and McFarlane Worldwide, Inc.) counterclaim and affirmative defense relating to alleged fraud by Mr. Gaiman. In 1997, Gaiman and Todd McFarlane (acting on behalf of himself and/or one or more of his corporations) entered into a contract relating to royalties for and ownership of various comic-art characters. The parties agreed that the terms of the contract would be equivalent to or better than Gaiman's existing contracts with D.C. Comics. The McFarlane Defendants contend that they can now rescind that agreement because Gaiman allegedly misrepresented the terms of his D.C. Comics contracts.

The undisputed facts, however, show that there are three independent reasons to dismiss the McFarlane Defendants' fraud claim and defense: 1) there was no misrepresentation

because Gaiman accurately stated the terms of his D.C. contracts and, in fact, repeatedly provided the McFarlane Defendants with copies of his D.C. Comics contracts for their review; 2) there was no reasonable reliance because McFarlane admits that he chose to go forward with the contract despite knowing of Gaiman's alleged "fraud;" and 3) McFarlane's testimony is too ambiguous to satisfy the clear-and-convincing evidence standard necessary to prove fraud.

## II. UNDISPUTED FACTS

### A. McFarlane and Gaiman's History in the Comic Book Industry

Gaiman and McFarlane are both well-known and critically-acclaimed in the comic book field. Gaiman gained fame in the comic book industry by, among other things, authoring the popular *Sandman* comic book series. (Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("PFOF"). The *Sandman* series was published by D.C. Comics. (PFOF ¶ 2.) McFarlane gained fame writing and illustrating the *Spiderman* comic book series for Marvel Comics. (Id. ¶ 3.) McFarlane also worked for D.C. Comics at various times in his career and had a written contract with D.C. for some of his work. (Id. ¶ 4.) In 1991, McFarlane and six other comic book artists formed defendant Image Comics, Inc., in order to publish their own works. (Id. ¶ 5.) Shortly thereafter, McFarlane also formed defendant Todd McFarlane Productions, Inc. and began publishing the *Spawn* series of comic books. (Id. ¶ 6.)

### B. The Parties' 1992 Oral Agreement and Gaiman's Work on *Spawn* 9, *Spawn* 26 and the *Angela* Mini-Series

The present dispute stems from contributions Gaiman made to the *Spawn* comic book series. In 1992, McFarlane decided to recruit prominent comic book authors to write issues of *Spawn* in order to boost the comic's reputation. (PFOF ¶ 7.) Gaiman was one of those authors. (Id. ¶ 8.) According to McFarlane, he agreed to provide Gaiman with contract terms

and compensation equivalent to Gaiman's existing contract with D.C. Comics.[1] (Id. ¶ 9.) Gaiman accepted McFarlane's offer and agreed to write the script for issue 9 of *Spawn* (hereafter "*Spawn* 9"). (Id. ¶ 11.)

Gaiman's script for *Spawn* 9 included three characters that had never appeared in a prior issue of *Spawn*: Angela, Cogliostro, and Medieval Spawn.[2] (PFOF ¶ 12). In the vernacular of the *Spawn* comics, Medieval Spawn is a "Hellspawn" character who was a knight during the Middle Ages. (Id. ¶ 14.) Medieval Spawn is based upon, but distinct from, the "Spawn" character that serves as the lead in McFarlane's comics. (Id. ¶ 15.) Angela and Cogliostro, by contrast, were entirely original and not based upon pre-existing characters. (Id. ¶ 16.) The new characters proved popular and, shortly after publication, McFarlane's companies began selling action figure toys of Angela and Medieval Spawn. (Id. ¶ 17.) Gaiman was the only guest author hired by McFarlane who created characters that were later sold as action figures. (Id. ¶ 18.)

McFarlane was pleased with Gaiman's work on *Spawn* 9 and, shortly after its publication, began discussing the possibility of having Gaiman author a comic book mini-series featuring the Angela character. (Id. ¶ 19.) As with *Spawn* 9, McFarlane agreed that the terms and compensation for Gaiman's work on the *Angela* mini-series would be equivalent to the terms and compensation Gaiman received under his contracts with D.C. Comics. (Id. ¶ 20.) Gaiman then wrote the scripts for a three issue Angela mini-series (hereafter "the *Angela* mini-series").

---

[1] Gaiman contends that McFarlane promised that he would provide terms better than those provided in Gaiman's D.C. contracts. (PFOF ¶ 10.) That dispute, however, is irrelevant to the present motion.

[2] In *Spawn* 9, the Medieval Spawn character is unnamed. The name "Medieval Spawn" was coined sometime after publication. However, the parties agree that the name Medieval Spawn applies to the unnamed character in *Spawn* 9. (PFOF ¶ 13.)

(Id. ¶ 21.) In addition, Gaiman wrote a portion of the script for issue 26 of *Spawn* (hereafter "*Spawn* 26"), which served as a segue to the *Angela* mini-series. (Id. ¶ 22.)

Gaiman and McFarlane did not memorialize their initial oral agreements in a written agreement during the time Gaiman was writing the scripts for *Spawn* 9, *Spawn* 26, and the *Angela* series. (PFOF ¶ 23.) Instead, the parties tended to address compensation issues as they arose. For example, Gaiman requested that he receive a royalty if any of the issues he authored were ever reprinted or published in a trade paperback,[3] and also requested royalties for the sale of actions figure toys of his Angela, Medieval Spawn and Cogliostro characters. (Id. ¶ 24.) Those requests were consistent with the terms of Gaiman's contracts with D.C. comics. (Id. ¶ 26.) Consistent with their oral agreement, McFarlane did make a payment to Gaiman for sale of the Medieval Spawn action figures. (Id. ¶ 27.) That payment, however, was not accompanied by any accounting showing how the amount had been calculated. (Id. at 28.)

**C. McFarlane and Gaiman's 1997 Agreement**

**1. Gaiman asks for a written agreement**

In 1996, Gaiman became concerned that he was not receiving the full amount of royalties he was entitled to under his agreement with McFarlane. (PFOF ¶ 29.) Gaiman was also concerned that McFarlane's corporations might be purchased by another company that would not honor (or find evidence of) the oral agreement between he and McFarlane. (Id. ¶ 30.) Sometime in the spring of 1996, Gaiman flew to Phoenix and met with McFarlane and the executive director of defendant Image Comics, Larry Marder, to discuss Gaiman's concerns. (Id. ¶ 31.) But the parties were unable to resolve their differences at that meeting. (Id. ¶ 32.)

[3] A collection of several comic issues published in book form. (PFOF ¶ 25.)

Gaiman then began phoning McFarlane regularly with questions about his royalty payments and seeking to obtain a written contract. (Id. ¶ 33.)

In response, McFarlane asked Marder to serve as a mediator to help resolve all outstanding issues between McFarlane and Gaiman. (PFOF ¶ 34.) At that time, McFarlane was the president of Image and one of the company's six shareholders. (Id. ¶ 35.) As Image's executive director, Marder was McFarlane's subordinate. (Id. ¶ 36.) Marder's goal was to understand the terms of Gaiman's contracts with D.C. Comics so that McFarlane could match those terms. (Id. ¶ 37.) In particular, Marder understood that the parties wanted to resolve issues relating the royalties Gaiman would receive on future uses of the Angela, Cogliostro and Medieval Spawn characters. (Id. ¶ 38.)

**2. Gaiman sends Marder copies of his D.C. Comics contracts**

On November 6 or 7, 1996, Gaiman sent Marder a fax attaching portions of two of Gaiman's contracts with D.C. Comics and a cover page summarizing the contract terms that were most important to him. (PFOF ¶ 39.) Gaiman's summary indicated, among other things, that D.C. provided him with a royalty of 15% of the net receipts of any "movies/audio/stage, etc." incorporating characters he created. (Id. ¶ 40.) Although the parties have been unable to locate copies of the contracts Gaiman attached to his fax, Marder does not dispute that he received those contracts from Gaiman. (Id. ¶ 41.)

Marder then prepared a memo summarizing the terms of Gaiman's D.C. contracts and forwarded that memo to McFarlane. (PFOF ¶ 42.) Consistent with Gaiman's description of his D.C. contracts, Marder's summary states, among other things, that Gaiman's D.C. contracts provide Gaiman 15% of the net receipts on "movies/audio/stage." (Id. ¶ 43.)

### 3. McFarlane's counteroffers

In December 1996, McFarlane dictated a counteroffer to Marder. (PFOF ¶ 44.) McFarlane's counteroffer differed from Gaiman and Marder's summaries of Gaiman's D.C. contracts in that the counteroffer assigned different royalty percentages for each of the Angela, Cogliostro and Medieval Spawn characters. (Id. ¶ 45.) In addition, for all of the characters, the percentages McFarlane proposed with regard to "movies/audio/stage" royalties were significantly less than the 15% Gaiman received from D.C. (Id. ¶ 46.) For "movies/audio/stage," McFarlane proposed a 10% royalty for Angela and a 1% royalty for Cogliostro and Medieval Spawn. (Id. ¶ 47.) Various other percentages McFarlane proposed were less favorable as well. (Id. ¶ 48.) Gaiman did not accept McFarlane's offer. (Id. ¶ 49.)

In February 1997, McFarlane had Marder send Gaiman a revised offer. (PFOF ¶ 50.) McFarlane's revised offer increased some of the royalty percentages Gaiman would receive, but they still did not match the royalties he received under his D.C. contracts. (Id. ¶ 51.) Again, Gaiman did not accept McFarlane's revised offer. (Id. ¶ 52.)

### 4. Gaiman's attorney sends Marder copies of Gaiman's D.C. Comics contracts

Frustrated with McFarlane's refusal to follow-through on his promise to match the terms of Gaiman's D.C. contracts, on April 2, 1997, Gaiman had his attorney send Larry Marder a letter demanding that Gaiman receive the payments he was entitled to under terms equivalent to those of his D.C. contracts. (PFOF ¶ 53.) Gaiman's attorney attached copies of drafts of Gaiman's D.C. contracts to the letter for Marder's review. (Id. ¶ 54.) In those draft contracts, D.C. Comics offered, among other things, to pay Gaiman a 15% royalty for motion pictures, audio or visual recordings, and stage productions, incorporating any characters he created. (Id. ¶ 55.) In the draft contracts, those royalties applied to "pre-existing characters" that

had been revised by Gaiman. (Id. ¶ 56.) The existence of that provision is significant to the McFarlane Defendants' fraud allegations.

**5. McFarlane and Gaiman communicate directly**

After Gaiman's attorney sent that letter, Gaiman and McFarlane began dealing directly with each other. (PFOF ¶ 57.) In late April or early May 1997, Gaiman and McFarlane met in Oakland, California to attempt to resolve their differences. (Id. ¶ 58.) After that meeting, on May 5, 1997 Gaiman sent McFarlane another fax summarizing the terms of his contracts with D.C. Comics. (Id. ¶ 59.) Gaiman's fax again stated that his D.C. contracts provided him with a 15% royalty for motion pictures, audio-visual recording, stage plays and other similar uses. (Id. ¶ 60.)

On July 15, 1997, Gaiman and McFarlane had a phone conversation in which McFarlane agreed to the royalty amounts set forth in Gaiman's May 5 fax. (PFOF ¶ 61.) In addition, they agreed that Gaiman would exchange his rights in the Cogliostro and Medieval Spawn characters for McFarlane's rights in an unrelated character named "Miracleman." (Id. ¶ 62.) Gaiman and McFarlane agreed that their exchange of characters and accounting of royalty payments would take place on August 1, 1997. (Id. ¶ 63.) That same day, Gaiman sent McFarlane a fax memorializing their conversation. (Id. ¶ 64.) McFarlane replied with a fax stating: "Having read your rather prompt response to my offer today (re: Angela, Cog[liosto], Medieval Spawn, [and] Miracleman) All I can say to the points is BEAUTY!" (Id. ¶ 65.)[4] In his fax, McFarlane also requested that they change the date of exchange and accounting to July 31 and raised some final questions regarding the proper method for calculating royalties. (Id. ¶ 67.)

---

[4] According to McFarlane, "beauty!" is a Canadian term for "pretty good." (PFOF ¶ 66.)

Gaiman immediately responded to McFarlane's questions in another fax that same day. (Id. ¶ 68.)

McFarlane testified that when he received Gaiman's final fax, he and Gaiman had reached agreement on issues relating to the royalty payments Gaiman was to receive for Angela, Cogliostro and Medieval Spawn. (PFOF ¶ 69.) In McFarlane's view, the only remaining issues were "silly paragraphs" "that lawyers like to have in contracts" such as indemnity clauses and jurisdictional provisions. (Id. ¶ 70.)

On August 1, 1997, Gaiman had not yet received any royalty payments or Miracleman material from McFarlane. Gaiman sent McFarlane a fax that day stating, "Todd – I thought we were due to exchange yesterday (31 July '97) – has the accounting been done? . . . . If this isn't going to happen, let me know, and we can re-negotiate." (PFOF ¶ 71.) McFarlane did not respond directly to Gaiman's fax.

**6. McFarlane's alleged phone conversations with Terri Cunningham**

At some point during this time period, McFarlane called Terri Cunningham, an executive at D.C. Comics who plays a significant role in negotiating that company's contracts, and inquired about D.C.'s contracting practices. (PFOF ¶ 72.) McFarlane had dealt with Cunningham about contractual issues during the time he worked at D.C. (Id. ¶ 73.) McFarlane attempted to find out from Cunningham whether D.C. would pay a writer royalties for creating a derivative character such as Medieval Spawn. (Id. ¶ 74.) McFarlane did not, however, ask Cunningham any questions about Gaiman's contracts with D.C. (Id. ¶ 75.) According to McFarlane, he and Cunningham only "talk[ed] in generalities." (Id. ¶ 76.) Cunningham told McFarlane that, generally, D.C. would not pay royalties for such hypothetical characters as "Medieval Superman" or "Medieval Batman." (Id. ¶ 77.) However, Cunningham acknowledged

that on certain occasions D.C. had paid royalties where a writer engaged in "extensive reworking" of a character. (Id. at 78.)

On August 4, 1997, McFarlane sent Gaiman a check for $9,392.30 and a "Royalty Report" purporting to set forth the calculations for the various royalties due Gaiman under their agreement. (PFOF ¶ 79.) McFarlane dictated the substance of the report to his assistant. (Id. ¶ 80.) The report includes a note dictated by McFarlane in which he suggests that Gaiman misrepresented what he would have received for his work under the terms of his contracts with D.C. Comics:

> I had a conversation with Terri Cunningham who said that when a derivative character is created, no money is given to those creating the knock-off character. Only on rare occasions, when extensive reworking and extensive work have been done, is money usually given. I.e.: your Sandman book being one of those rare exceptions. So far you have worked on parts of 8 pages that include Medieval Spawn and I wouldn't define that as extensive. Still, I am willing to pay some monies as long as all other matters are sorted out."

(Id. ¶ 81.) McFarlane did not explain what "other matters" he was referring to. (Id. ¶ 82.) A week later, on August 11, 1997, McFarlane sent Gaiman another Royalty Report and a check for $2,740.28. (Id. ¶ 83.) Also during this time, McFarlane sent Gaiman various materials related to the Miracleman character, which he had agreed to provide to Gaiman. (Id. ¶ 84.)

In his deposition of June 19 and 20, 2002, McFarlane for the first time claimed that sometime during or after the time he made those payments to Gaiman, he had another conversation with Terri Cunningham. (PFOF ¶ 85.) However, McFarlane cannot remember the substance of the conversation, but thinks "[i]t may have been on how you spend money on people in movies or television shows or on how they divide those moneys up . . . film, Hollywood stuff maybe." (Id. at 86.) McFarlane cannot remember what specific royalty

numbers Cunningham stated to him, but he claims they were "inconsistent with the information [he] was getting [from Gaiman]." (Id. at 87.) Nor can McFarlane remember whether Cunningham's information related to one or more of the Angela, Cogliostro and Medieval Spawn characters or whether it was "just a general breakdown of that category." (Id. ¶ 88.)

Despite his inability to remember any of the specifics of the purported conversation, McFarlane now claims that this conversation was "the proverbial straw on the camel's back." (PFOF ¶ 89.) According to McFarlane, from that point forward he viewed his agreement with Gaiman as rescinded and he decided not to give Gaiman any further rights in the Miracleman character. (Id. ¶ 90.) Despite the fact that McFarlane supposedly considered the agreement rescinded, on March 26, 1998, McFarlane's wife, Wanda Kolomyjec, sent Gaiman a $4,420.62 royalty check for foreign sales of Gaiman's work. (Id. ¶ 91.) McFarlane testified that Wanda performs a variety of duties for McFarlane's companies. (Id. ¶ 92.)

It was not until January 12, 1999, that McFarlane sent Gaiman a letter officially rescinding their agreement. (PFOF ¶ 93.) Again, McFarlane's letter makes no mention of a second phone conversation with Terri Cunningham regarding royalties for movies or television shows or anything remotely related to them. (Id. ¶ 94.) Instead, McFarlane's letter alludes to McFarlane's first "Medieval-Spawn-derivative-character" conversation with Terri Cunningham, stating, "Payments for Medieval Spawn were based on false information you gave me regarding D.C. Comics' policy of payment on a derivative character." (Id. ¶ 95.)

The purported second conversation with Terri Cunningham is also conspicuously absent from the McFarlane Defendants' pleadings and discovery responses. They make no mention of the conversation in their counterclaim for fraud. (Id. ¶ 96.) Nor do they mention this purported conversation in their response to an interrogatory asking them to state all facts in

support of their fraud allegations. (Id. ¶ 97.) McFarlane's nebulous description of the purported phone conversation in his recent deposition is the first time that alleged fact has been raised in this case.

## III. ARGUMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where a heightened burden of proof, such as proof by clear and convincing evidence, is applicable to a party's claim or defense, the court must take that heightened standard into consideration when deciding summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "The mere existence of a scintilla of evidence in support of [a party's] position" is insufficient to defeat a motion for summary judgment. Id. at 252. In the case of a claim or defense of fraud, summary judgment is appropriate where a party fails to raise a genuine issue of fact regarding the existence of a fraudulent representation. See Continental Assur. Co. v. American Bankshares Corp., 601 F. Supp. 277, 283 (E.D. Wis. 1984).

### A. The Undisputed Facts Show That No Fraud Occurred.

Under Wisconsin law, a party claiming that it was fraudulently induced to enter a contract must prove the following elements: 1) an untrue statement of fact, 2) made with intent to defraud, 3) made for the purpose of inducing the party to act on it, and 3) reasonable reliance on that statement by the party. Kailin v. Armstrong, 2002 WI App 70, ¶ 31, 643 N.W.2d 132, 145-46. Allegations of fraud must be pled with specificity. Fed. R. Civ. P. 9(b). "The party alleging the fraud has the burden of proving the elements by clear and convincing evidence." Lundin v. Shimanski, 124 Wis. 2d 175, 184, 368 N.W.2d 676, 681 (1985).

Here, the McFarlane Defendants' fraud claim and affirmative defense fail for a number of reasons. First, and most simply, Gaiman never made a false statement to McFarlane. Second, if McFarlane believed Gaiman's statements to be false, then his reliance on them was not reasonable. Third, McFarlane's descriptions of his purported final conversation with Terri Cunningham are too nebulous and speculative to support his claim of fraud.

**1. Gaiman Never Made A False Statement.**

The McFarlane Defendants cannot prove the fundamental element of fraud – that Gaiman made a false statement. McFarlane claims that Gaiman made two misrepresentations: first, that D.C. comics would have paid him royalties for his work on a derivative character such as Medieval Spawn and, second, that Gaiman misrepresented the royalties he would have received for movie-related activities. The undisputed evidence shows that Gaiman consistently told the truth with regard to both of those subjects.

The undisputed facts show that D.C. Comics would have paid Gaiman royalties for a derivative character such as Medieval Spawn. The D.C. contract Gaiman's attorney sent to Larry Marder in April of 1997 states in its first paragraph that "you have revised the pre-existing characters of DREAM (SANDMAN) AND DESTINY" and goes on to provide Gaiman with royalties for those and other characters – in other words, D.C. would pay Gaiman for derivative characters. (PFOF ¶ 98.) Thus, Gaiman's representation to McFarlane about Gaiman's D.C. contracts was completely accurate.

In addition, McFarlane, by his own admission, never asked Cunningham what D.C. would pay Gaiman for derivative characters. Instead, McFarlane and Cunningham only spoke in "generalities." (PFOF ¶ 76.) Moreover, McFarlane testified that Cunningham told him D.C. <u>does</u> pay royalties for derivative characters, but that it only does so in cases of extensive

reworking of a character. (Id. ¶ 78.) Since McFarlane and Cunningham only "talk[ed] in generalities," there is no evidence of how Cunningham would have responded had McFarlane explained to her the specifics of Gaiman's creation of Medieval Spawn. This "evidence" fails to show the alleged falsity of Gaiman's representations and is insufficient as a matter of law.

McFarlane's ambiguous contention that Gaiman made some unspecified misrepresentation regarding movie royalties is similarly baseless. The contracts Gaiman's attorney sent to Larry Marder state that Gaiman would receive a 15% royalty if any of his characters appeared in a motion picture, audio-visual recording, or live stage production. (PFOF ¶ 55.) That is the same percentage Gaiman described in his November 7, 1996 fax to Larry Marder and the same percentage Larry Marder described in his November 14, 1996 memo summarizing Gaiman's D.C. contract terms for McFarlane. (Id. ¶¶ 40, 43.) Just what misrepresentation McFarlane is referring to is impossible to know given his extraordinarily hazy recollection of his conversation with Terri Cunningham on this subject.

**2. McFarlane Cannot Show Reasonable Reliance.**

The McFarlane Defendants' fraud claim and defense also fail because McFarlane did not rely on those representations. The requirement that a party show reasonable reliance is intended to screen out trivial or concocted fraud claims. In re Barnes, 969 F.2d 526, 529 (7th Cir. 1992). A party's reliance is not reasonable as a matter of law, and cannot sustain a defense or claim of fraudulent inducement, where the party knows of the alleged falsity prior to entering the contract. Fullin v. Martin, 34 F. Supp. 2d 726, 737-38 (E.D. Wis. 1999). See also Foss v. Madison Twentieth Century Theaters, Inc., 203 Wis. 2d 210, 218-19, 551 N.W.2d 862, 218 (Ct. App. 1996) ("The law will not permit a person to predicate damage upon statements which he

does not believe to be true, for if he knows they are false, it cannot be said that he is deceived by them.").

According to McFarlane, he spoke with Terri Cunningham about D.C. Comics' practices regarding royalties for derivative characters before he began making royalty payments to Gaiman. Yet after discovering the alleged inconsistency between Gaiman's representations and D.C.'s supposed practices, McFarlane chose to go ahead with the contract anyway. McFarlane made this clear in the note he included with his first Royalty Report to Gaiman, writing: "I had a conversation with Terri Cunningham who said that when a derivative character is created, no money is given to those creating the knock-off character. . . . Still, I am willing to pay some monies as long as all other matters are sorted out." (PFOF ¶ 81.) And, as promised, McFarlane did make those royalty payments to Gaiman. (Id. ¶¶ 79, 83, 91.)

McFarlane's purported second conversation with Cunningham does not save his claim. First, McFarlane continued to perform the contract even after that second conversation. In March 1998, at least six months after that conversation allegedly took place, McFarlane's wife sent Gaiman a royalty check for foreign sales of Gaiman's work. (PFOF ¶ 91). McFarlane did not send Gaiman a letter announcing his rescission of the contract until January 1999 and that letter did not state that his decision was based upon any second conversation with Terri Cunningham regarding anything resembling movie royalties. (Id. ¶¶ 94, 95.)

Second, under Wisconsin law, a party who chooses to go forward with a contract despite knowing of potentially false representations, cannot seek to escape that contract by claiming he later discovered that the misrepresentations were more extensive than he had realized. Fullin, 34 F. Supp. 2d at 738; First Credit Corp. v. Behrend, 45 Wis. 2d 243, 250, 172 N.W.2d 668, 671 (1969). That is precisely what McFarlane seeks to do here. Having decided to

pay Gaiman royalties despite knowing about alleged misrepresentations, he cannot now claim that he should be permitted to abrogate his agreement because he supposedly discovered more extensive misrepresentations at a later date. That is especially so where, as here, McFarlane is unable to provide even the most basic description of the alleged subsequent revelations.

### 3. McFarlane's "Evidence" Of His Alleged Second Conversation With Terri Cunningham Is Too Speculative To Meet The Clear-and-Convincing Evidence Standard Required For Fraud.

At his deposition, McFarlane for the first time revealed that he allegedly had a second conversation with Terri Cunningham in which he supposedly learned that Gaiman had misrepresented what D.C. would have paid Gaiman for movies or television shows. The McFarlane Defendants made no mention of this second conversation in their pleadings or in their response to plaintiffs' interrogatory asking that they set forth all of the facts supporting their fraud allegations. (PFOF ¶¶ 96, 97.) Despite claiming that his second conversation with Cunningham was "the proverbial straw on the camel's back," McFarlane can remember almost nothing about that supposed conversation. (Id. ¶¶ 85-89.) He *thinks* the conversation "may have been on how you spend money on people in movies or television shows or on how they divide those moneys up," but he is not sure. (Id. ¶ 86.) Nor can he remember the royalty percentages Cunningham supposedly related to him, but he claims to remember that they were "inconsistent with the information [he] was getting [from Gaiman]." (Id. at 87.) And he can't remember whether Cunningham's information related to one or more of the Angela, Cogliostro and Medieval Spawn characters or whether it was "just a general breakdown of that category." (Id. ¶ 88.)

Even if the Court assumes that this conversation actually took place, McFarlane's testimony about it is so ambiguous that no reasonable jury could conclude that the McFarlane

Defendants have met the clear-and-convincing evidence standard required to prove a claim of fraud. A "metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the facts of record make a party's claim implausible, then the party "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Id. at 587.

Given the extreme ambiguity of McFarlane's testimony, the McFarlane Defendants' fraud claim and defense must fail as a matter of law. See Continental Assur. Co., 601 F. Supp. at 283 (summary judgment dismissing fraud claim appropriate where defendant's deposition testimony was "too vague" regarding necessary element of fraud). See also Schimpf v. Gerald, Inc., 52 F. Supp. 976, 992-93 (E.D. Wis. 1999) (court would not consider conclusory and speculative statements in affidavit because "[t]he object of Rule 56(e) is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit"). That is especially so where, as here, it is the McFarlane Defendants' burden to prove their claims of fraud by clear and convincing evidence. Lundin, 124 Wis. at 184, 368 N.W.2d at 681; Liberty Lobby, 477 U.S. at 255 ("the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions").

## IV. CONCLUSION

For all of the above reasons, plaintiffs Neil Gaiman and Marvels and Miracles, LLC, respectfully request that the Court grant their motion for partial summary judgment and enter judgment in the plaintiffs' favor on the McFarlane Defendants' counterclaim and affirmative defense of fraud.

Dated this 1st day of July, 2002.

FOLEY & LARDNER

By: [signature]

Allen A. Arntsen
Joan L. Eads
Jeffrey A. Simmons
*Attorneys for Plaintiffs*

Foley & Lardner
150 East Gilman Street
Madison, WI 53703-2808
Tel: (608) 257-5035
Fax: (608) 258-4258

Of Counsel:
Mark Hellmann
Michael Rechtin
Foley & Lardner
1 IBM Plaza
220 N. Wabash Ste. 3300
Chicago, IL 60611
Tel: (312) 755-1900
Fax: (312) 755-1925

Co-Counsel:
Kenneth F. Levin
20 North Wacker Drive, Suite 2200
Chicago, IL 60606
Tel: (312) 984-6000
Fax: (312) 977-2990