UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NEIL GAIMAN and<br>MARVELS AND MIRACLES, L.L.C.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD MCFARLANE,<br>TODD MCFARLANE PRODUCTIONS,<br>INC., TMP INTERNATIONAL, INC.,<br>MCFARLANE WORLDWIDE, INC., and<br>IMAGE COMICS, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No.: 02-C-0048-S |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Neil Gaiman and Marvels and Miracles, L.L.C. propose the following findings of fact and conclusions of law in support of its Motion for Partial Summary Judgment.

**PROPOSED FINDINGS OF FACT**

1. Gaiman gained fame in the comic book industry by, among other things, authoring the popular *Sandman* comic book series. July 24, 2002 Deposition of Neil Gaiman ("Gaiman Dep.") at 16 (See July 1, 2002 Affidavit of Jeffrey A. Simmons ("Simmons Aff.") at ¶ 2, Ex. A).

2. The *Sandman* series was published by D.C. Comics. (Simmons Aff., ¶ 4, Ex. C at Ex. 47 at 3.)

003.366724.1

3. McFarlane gained fame writing the *Spiderman* comic book series for Marvel Comics. (July 19 and 20, 2002 Deposition of Todd McFarlane ("McFarlane Dep.") at 25.) (See Simmons Aff., ¶ 3, Ex. B.)

4. McFarlane also worked for D.C. Comics at various times in his career and had a written contract with D.C. for some of his work. (McFarlane Dep. at 8, 16, 17-19, 23.)

5. In 1991, McFarlane and six other comic book artists formed defendant Image Comics, Inc., in order to publish their own works. (Id. at 28-29.)

6. Shortly thereafter, McFarlane also formed defendant Todd McFarlane Productions, Inc. and began publishing the *Spawn* series of comic books. (Id. at 8, 30-31.)

7. In 1992, McFarlane decided to recruit prominent comic book authors to write issues of *Spawn* in order to boost the comic's reputation. (McFarlane Dep. at 35-36.)

8. Gaiman was one of those authors. (Id.)

9. Although McFarlane and Gaiman at first did not talk about the specifics of Gaiman's compensation, McFarlane eventually agreed to provide Gaiman with contract terms and compensation equivalent to Gaiman's existing contract with D.C. Comics. (Id. at 37, 47, 67, 68.)

10. Gaiman contends that McFarlane promised that he would provide terms better than those provided in Gaiman's D.C. contract. (Gaiman Dep. at 30.) That dispute, however, is irrelevant to the present motion.

11. Gaiman accepted McFarlane's offer and wrote the script for issue 9 of *Spawn* (hereafter "*Spawn* 9"). (McFarlane Dep. at 47; Gaiman Dep. at 40.)

12. Gaiman's script for *Spawn* 9 included three characters that had never appeared in a prior issue of *Spawn*: Angela, Cogliostro, and Medieval Spawn. (McFarlane Dep. at 42-47.)

003.366724.1

13. The parties agree that the name Medieval Spawn applies to the unnamed character in *Spawn* 9. (McFarlane Dep. at 43-44.)

14. In the vernacular of the *Spawn* comics, Medieval Spawn is a "Hellspawn" character who was a knight during the Middle Ages. (See Appendix to April 29, 2002 Amended Answer, Ex. B.) Docket No. 31.

15. Medieval Spawn is based upon, but distinct from, the "Spawn" character that serves as the lead in McFarlane's comics. (Gaiman Dep. at 75-76, 78.)

16. Angela and Cogliostro, by contrast, were entirely original and not based upon pre-existing characters. (Id. at 78.)

17. The new characters proved popular and, shortly after publication, McFarlane's companies began selling action figure toys of Angela and Medieval Spawn. (McFarlane Dep. at 60, 77; Gaiman Dep. at 83-85.)

18. Gaiman was the only guest author hired by McFarlane who created characters that were later sold as action figures. (McFarlane Dep. at 54.)

19. McFarlane was pleased with Gaiman's work on *Spawn* 9 and, shortly after its publication, began discussing the possibility of having Gaiman author a comic book mini-series featuring the Angela character. (McFarlane Dep. at 56-57.)

20. As with *Spawn* 9, McFarlane agreed that the terms and compensation for Gaiman's work on the *Angela* miniseries would be equivalent to the terms and compensation Gaiman received under his contract with D.C. Comics. (Id. at 57-58; Gaiman Dep. at 30, 82.)

21. Gaiman then wrote the scripts for a three issue Angela mini-series (hereafter "the *Angela* series"). (McFarlane Dep. at 154-55.)

3

22. In addition, Gaiman wrote a portion of the script for issue 26 of *Spawn* (hereafter "*Spawn* 26"), which served as a segue to the *Angela* mini-series. (Id. at 89-91.)

23. Gaiman and McFarlane did not memorialize their initial oral agreements in a written agreement during the time Gaiman was writing the scripts for *Spawn* 9, *Spawn* 26, and the *Angela* series. (04-19-02 Amended Complaint ¶ 30.) Docket No. 28.

24. Instead, the parties tended to address compensation issues as they arose. For example, Gaiman requested that he receive a royalty if any of the issues he authored were ever reprinted or published in a trade paperback. (McFarlane Dep. at 47), and also requested royalties for the sale of actions figure toys of his Angela, Medieval Spawn and Cogliostro characters. (McFarlane Dep. at 96-97.)

25. A collection of several comic issues published in book form. (Gaiman Dep. at 17.)

26. Those requests were consistent with the terms of Gaiman's contract with D.C. comics. (See generally, Simmons Aff., ¶ 4, Ex. C at Ex. 47.)

27. Consistent with their oral agreement, McFarlane did make a payment to Gaiman for sale of the Medieval Spawn action figures. (Gaiman Dep. at 83-84.)

28. That payment, however, was not accompanied by any accounting showing how the amount had been calculated. (Id. at 84.)

29. In 1996, Gaiman became concerned that he was not receiving the full amount of royalties he was entitled to under his agreement with McFarlane. (Gaiman Dep. at 57-58.)

30. Gaiman was also concerned that McFarlane's corporations might be purchased by another company that would not honor (or find evidence of) the oral agreement between he and McFarlane. (Id. at 88.)

4

31. Sometime in the spring of 1996, Gaiman flew to Phoenix and met with McFarlane and the executive director of defendant Image Comics, Larry Marder, to discuss Gaiman's concerns. (Simmons Aff., ¶ 5, Ex. D ("Marder Dep.") at 53, 67.)

32. But the parties were unable to resolve their differences at that meeting. (McFarlane Dep. at 161; Gaiman Dep. at 92.)

33. Gaiman then began phoning McFarlane regularly with questions about his royalty payments and seeking to obtain a written contract. (McFarlane Dep. at 103.)

34. In response, McFarlane asked Marder to serve as a mediator to help resolve all outstanding issues between McFarlane and Gaiman. (McFarlane Dep. at 103-04, 106-07; Marder Dep. at 51, 53.)

35. At that time, McFarlane was the president of Image and one of the company's six shareholders. (Marder Dep. at 20-21, 76-77; McFarlane Dep. at 12.)

36. As Image's executive director, Marder was McFarlane's subordinate (Marder Dep. at 27.)

37. Marder's goal was to understand the terms of Gaiman's contract with D.C. Comics so that McFarlane could match those terms. (Marder Dep. at 55.)

38. In particular, Marder understood that the parties wanted to resolve issues relating the royalties Gaiman would receive on future uses of the Angela, Cogliostro and Medieval Spawn characters. (Id.. at 55; McFarlane Dep. at 106-08.)

39. On November 6 or 7, 1996, Gaiman sent Marder a fax attaching portions of two of Gaiman's contracts with D.C. Comics and a cover page summarizing the contract terms that were most important to him. (Marder Dep. at 82; Gaiman Dep. at 97; Simmons Aff., Ex. 25.)

5

40. Gaiman's summary indicated, among other things, that D.C. provided him with a royalty of 15% of the net receipts of any "movies/audio/stage, etc." incorporating characters he created. (Simmons Aff., ¶ 4, Ex. C at Ex. 25.)

41. Although the parties have been unable to locate copies of the contracts Gaiman attached to his fax, Marder does not dispute that he received those contracts from Gaiman. (Marder Dep. at 82.)

42. Marder then prepared a memo summarizing the terms of Gaiman's D.C. contracts and forwarded that memo to McFarlane. (Marder Dep. at 85, 87, 96; Simmons Aff., ¶ 4, Ex. C at Ex. 27.)

43. Consistent with Gaiman's description of his D.C. contracts, Marder's summary states, among other things, that Gaiman's D.C. contracts provide Gaiman 15% of the net receipts on "movies/audio/stage." (Simmons Aff., ¶ 4, Ex. C at Ex. 27 at 3.)

44. In December 1996, McFarlane dictated a counteroffer to Marder. (Marder Dep. at 96-97.)

45. McFarlane's counteroffer differed from Gaiman and Marder's summaries of Gaiman's D.C. contracts in that the counteroffer assigned different royalty percentages for each of the Angela, Cogliostro and Medieval Spawn characters. (See Simmons Aff., ¶ 4, Ex. C at Ex. 30.)

46. In addition, for all of the characters, the percentages McFarlane proposed with regard to "movies/audio/stage" royalties were significantly less than the 15% Gaiman received from D.C. (Compare Ex. 30 (Simmons Aff., ¶ 4, Ex. C) with Exs. 25 and 27.)

47. For "movies/audio/stage," McFarlane proposed a 10% royalty for Angela and a 1% royalty for Cogliostro and Medieval Spawn. (Compare Ex. 30 with Exs. 25 and 27.)

003.366724.1

48. Various other percentages McFarlane proposed were less favorable as well. (Compare generally Ex. 30 with Ex. 27 at 3.)

49. Gaiman did not accept McFarlane's offer. (Marder Dep. at 62-63.)

50. In February 1997, McFarlane had Marder send Gaiman a revised offer. (Marder Dep. at 100-01.)

51. McFarlane's revised offer increased some of the royalty percentages Gaiman would receive, but they still did not match the royalties he received under his D.C. contracts. (Compare Simmons Aff., (¶ 4, Ex. C) Ex. 32 with Exs. 25 and 27.)

52. Again, Gaiman did not accept McFarlane's revised offer. (Marder Dep. at 62-63.)

53. Frustrated with McFarlane's refusal to follow-through on his promise to match the terms of Gaiman's D.C. contracts, on April 2, 1997, Gaiman had his attorney send Larry Marder a letter demanding that Gaiman receive the payments he was entitled to under terms equivalent to those of his D.C. contracts. (July 1, 2002 Affidavit of Melanie Cook ("Cook Aff.") ¶ 2, Ex. A; Marder Dep. at 63-64.)

54. Gaiman's attorney attached copies of drafts of Gaiman's D.C. contracts to the letter for Marder's review. (See Cook Aff., Ex. A.)

55. In those draft contracts, D.C. Comics offered, among other things, to pay Gaiman a 15% royalty for motion pictures, audio or visual recordings, and stage productions, incorporating any characters he created. (See id. at 5, "Media Rights" provision.)

56. In the draft contracts, those royalties applied to "pre-existing characters" that had been revised by Gaiman. (See id. at 3, introductory paragraph to D.C. offer.)

57. After Gaiman's attorney sent that letter, Gaiman and McFarlane began dealing directly with each other. (See Marder Dep. at 64-65; McFarlane Dep. at 182-84.)

7

58. In late April or early May 1997, Gaiman and McFarlane met in Oakland, California to attempt to resolve their differences. (Id. at 183.)

59. After that meeting, on May 5, 1997 Gaiman sent McFarlane another fax summarizing the terms of his contracts with D.C. Comics. (Id. at 184-85; Simmons Aff., ¶ 4, Ex. C at Ex. 2.)

60. Gaiman's fax again stated that his D.C. contracts provided him with a 15% royalty for motion pictures, audio-visual recording, stage plays and other similar uses. (See Simmons Aff., ¶ 4, Ex. C at Ex. 2.)

61. On July 15, 1997, Gaiman and McFarlane had a phone conversation in which McFarlane agreed to the royalty amounts set forth in Gaiman's May 5 fax. (McFarlane Dep. at 188-89; Simmons Aff., ¶ 4, Ex. C at Ex. 19.)

62. In addition, they agreed that Gaiman would exchange his rights in the Cogliostro and Medieval Spawn characters for McFarlane's rights in an unrelated character named "Miracleman." (See id.)

63. Gaiman and McFarlane agreed that their exchange of characters and accounting of royalty payments would take place on August 1, 1997. (See id.)

64. That same day, Gaiman sent McFarlane a fax memorializing their conversation. (Simmons Aff., ¶ 4, Ex. C at Ex. 19; Gaiman Dep. at 173.)

65. McFarlane replied with a fax stating: "Having read your rather prompt response to my offer today (re: Angela, Cog[liosto], Medieval Spawn, [and] Miracleman) All I can say to the points is BEAUTY!" (Simmons Aff., Ex. 20 (emphasis in original); McFarlane Dep. at 189.)

003.366724.1

66. According to McFarlane, "beauty!" is a Canadian term for "pretty good." (McFarlane Dep. at 189.)

67. In his fax, McFarlane also requested that they change the date of exchange and accounting to July 31 and raised some final questions regarding the proper method for calculating royalties. (Id.)

68. Gaiman immediately responded to McFarlane's questions in another fax that same day. (McFarlane Dep. 193-94; Gaiman Dep. at 180; Simmons Aff., ¶ 4, Ex. C at Ex. 33.)

69. McFarlane testified that when he received Gaiman's final fax, he and Gaiman had reached agreement on issues relating to the royalty payments Gaiman was to receive for Angela, Cogliostro and Medieval Spawn. (See McFarlane Dep. at 194 ("the big points for accounting purposes were agreed upon here"); id. at 192 (the "accounting issues" related to payments for the three characters).

70. In McFarlane's view, the only remaining issues were "silly paragraphs" "that lawyers like to have in contracts" such as indemnity clauses and jurisdictional provisions. (McFarlane Dep. at 188-89.)

71. On August 1, 1997, Gaiman had not yet received any royalty payments or Miracleman material from McFarlane. Gaiman sent McFarlane a fax that day stating, "Todd – I thought we were due to exchange yesterday (31 July '97) – has the accounting been done? . . . . If this isn't going to happen, let me know, and we can re-negotiate." (Gaiman Dep. at 150; Simmons Aff., ¶ 4, Ex. C at Ex. 50.)

72. At some point during this time period, McFarlane called Terri Cunningham, an executive at D.C. Comics who plays a significant role in negotiating that company's contracts, and inquired about D.C.'s contracting practices. (McFarlane Dep. at 79-82.)

9

73. McFarlane had dealt with Cunningham about contractual issues during the time he worked at D.C. (McFarlane Dep. at 130.)

74. McFarlane attempted to find out from Cunningham whether D.C. would pay a writer royalties for creating a derivative character such as Medieval Spawn. (McFarlane Dep. at 79-80.)

75. McFarlane did not, however, ask Cunningham any questions about Gaiman's contracts with D.C. (Id. at 78-79, 81.)

76. According to McFarlane, he and Cunningham only "talk[ed] in generalities." (Id. at 79.)

77. Cunningham told McFarlane that, generally, D.C. would not pay royalties for such hypothetical characters as "Medieval Superman" or "Medieval Batman." (Id. at 79-81.)

78. However, Cunningham acknowledged that on certain occasions D.C. had paid royalties where a writer engaged in "extensive reworking" of a character. (Id. at 80-81.)

79. On August 4, 1997, McFarlane sent Gaiman a check for $9,392.30 and a "Royalty Report" purporting to set forth the calculations for the various royalties due Gaiman under their agreement. (McFarlane Dep. at 216-17; Simmons Aff., ¶ 4, Ex. C at Ex. 5.)

80. McFarlane dictated the substance of the report to his assistant. (July 1, 2002 Second Declaration of Neil Gaiman ("Gaiman Decl.") ¶ 2; McFarlane Dep. at 216-17; July 18, 2002 Deposition of Sheila Egger ("Egger Dep.") at 19-20; Simmons Aff., ¶ 6, Ex. E.)

81. The report includes a note dictated by McFarlane in which he suggests that Gaiman misrepresented what he would have received for his work under the terms of his contracts with D.C. Comics:

> I had a conversation with Terri Cunningham who said that when a derivative character is created, no money is given to those creating the knock-off character. Only on rare occasions, when extensive reworking and extensive work have been done, is money usually

10

> given. I.e.: your Sandman book being one of those rare
> exceptions. So far you have worked on parts of 8 pages that
> include Medieval Spawn and I wouldn't define that as extensive.
> <u>Still, I am willing to pay some monies as long as all other matters
> are sorted out.</u>

(Simmons Aff., ¶ 4, Ex. C at Ex. 5 (emphasis added).)

82. McFarlane did not explain what "other matters" he was referring to. (<u>See</u> <u>id.</u>)

83. A week later, on August 11, 1997, McFarlane sent Gaiman another Royalty Report and a check for $2,740.28. (Egger Dep. at 21; McFarlane Dep. at 221-22; Gaiman Decl., ¶ 3, Simmons Aff., ¶ 4, Ex. C at Ex. 6.)

84. Also during this time, McFarlane also sent Gaiman various materials related to the Miracleman character, which he had agreed to provide to Gaiman. (Gaiman Dep. at 187-88.)

85. McFarlane now claims that sometime during or after the time he made those payments to Gaiman, he had another conversation with Terri Cunningham. (McFarlane Dep. at 116.)

86. However, McFarlane cannot remember the substance of the conversation, but thinks "[i]t may have been on how you spend money on people in movies or television shows or on how they divide those moneys up . . . film, Hollywood stuff maybe." (<u>Id.</u> at 117.)

87. McFarlane cannot remember what specific royalty numbers Cunningham stated to him, but he claims they were "inconsistent with the information [he] was getting [from Gaiman]." (<u>Id.</u> at 117.)

88. Nor can McFarlane remember whether Cunningham's information related to one or more of the Angela, Cogliostro and Medieval Spawn characters or whether it was "just a general breakdown of that category." (McFarlane Dep. at 118.)

11

89. Despite his inability to remember any of the specifics of the conversation, McFarlane claims that this conversation was "the proverbial straw on the camel's back." (McFarlane Dep. at 119.)

90. According to McFarlane, from that point forward he viewed his agreement with Gaiman as rescinded and he decided not to give Gaiman any further rights in the Miracleman character. (Id. at 120-21.)

91. Despite the fact that McFarlane supposedly considered the agreement rescinded, on March 26, 1998, McFarlane's wife, Wanda Kolomyjec, sent Gaiman a $4,420.62 royalty check for foreign sales of Gaiman's work. (Gaiman Dep. at 195; Gaiman Decl., ¶ 4.)

92. McFarlane testified that Wanda performs a variety of duties for McFarlane's companies. (McFarlane Dep. at 124.)

93. It was not until January 12, 1999, that McFarlane sent Gaiman a letter officially rescinding their agreement. (McFarlane Dep. at 224; Simmons Aff., ¶ 4, Ex. C at Ex. 8.)

94. Again, McFarlane's letter makes no mention of a second phone conversation with Terri Cunningham regarding royalties for movies or television shows or anything remotely related to them. (Simmons Aff., ¶ 4, Ex. C at Ex. 8.)

95. Instead, McFarlane's letter alludes to McFarlane's first "Medieval Spawn-derivative character" conversation with Terri Cunningham, stating, "Payments for Medieval Spawn were based on false information you gave me regarding D.C. Comics' policy of payment on a derivative character." (See id.)

96. The purported second conversation with Terri Cunningham is also conspicuously absent from the McFarlane Defendants' pleadings and discovery responses. They make no

003.366724.1

mention of the conversation in their counterclaim for fraud. (See April 29, 2002 Counterclaim, ¶ 70.) Docket No. 30.

97. Nor do they mention this purported conversation in their response to an interrogatory asking them to state all facts in support of their fraud allegations. (Simmons Aff., ¶ 7, Ex. F, Interrogatory No. 4.)

98. The D.C. contract Gaiman's attorney sent to Larry Marder in April of 1997 states in its first paragraph that "you have revised the pre-existing characters of DREAM (SANDMAN) and DESTINY" and goes on to provide Gaiman with royalties for those and other characters--in other words, D.C. would pay Gaiman for derivative characters. (Simmons Aff., ¶ 6, Ex. E, at Ex. 47 at 3.)

### Proposed Conclusions of Law

1. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

2. Where a heightened burden of proof, such as proof by clear and convincing evidence, is applicable to a party's claim or defense, the court must take that heightened standard into consideration when deciding summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

3. "The mere existence of a scintilla of evidence in support of [a party's] position" is insufficient to defeat a motion for summary judgment. Id. at 252. In the case of a claim or defense of fraud, summary judgment is appropriate where a party fails to raise a genuine

003.366724.1

issue of fact regarding the existence of a fraudulent representation. See Continental Assur. Co. v. American Bankshares Corp., 601 F. Supp. 277, 283 (E.D. Wis. 1984).

4. Under Wisconsin law, a party claiming that it was fraudulently induced to enter a contract must prove the following elements: 1) an untrue statement of fact, 2) made with intent to defraud, 3) made for the purpose of inducing the party to act on it, and 3) reasonable reliance on that statement by the party. Kailin v. Armstrong, 2002 WI App 70, ¶ 31, 643 N.W.2d 132, 145-46.

5. Allegations of fraud must be pled with specificity. Fed. R. Civ. P. 9(b).

6. "The party alleging the fraud has the burden of proving the elements by clear and convincing evidence." Lundin v. Shimanski, 124 Wis. 2d 175, 184, 368 N.W.2d 676, 681 (1985).

7. The undisputed facts show that Gaiman did not make false representations to McFarlane and, therefore, their counterclaim and affirmative defense of fraud fail as a matter of law.

8. The requirement that a party show reasonable reliance is intended to screen out trivial or concocted fraud claims. In re Barnes, 969 F.2d 526, 529 (7th Cir. 1992).

9. A party's reliance is not reasonable as a matter of law, and cannot sustain a defense or claim of fraudulent inducement, where the party knows of the alleged falsity prior to entering the contract. Fullin v. Martin, 34 F. Supp. 2d 726, 737-38 (E.D. Wis. 1999). See also Foss v. Madison Twentieth Century Theaters, Inc., 203 Wis. 2d 210, 218-19, 551 N.W.2d 862, 218 (Ct. App. 1996) ("The law will not permit a person to predicate damage upon statements which he does not believe to be true, for if he knows they are false, it cannot be said that he is deceived by them.").

003.366724.1

10. Under Wisconsin law, a party who chooses to go forward with a contract despite knowing of potentially false representations, cannot seek to escape that contract by claiming he later discovered that the misrepresentations were more extensive than he had realized. Fullin, 34 F. Supp. 2d at 738; First Credit Corp. v. Behrend, 45 Wis. 2d 243, 250, 172 N.W.2d 668, 671 (1969).

11. A "metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

12. If the facts of record make a party's claim implausible, then the party "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Id. at 587.

13. Given the extreme ambiguity of McFarlane's testimony, the McFarlane Defendants' fraud claim and defense must fail as a matter of law. See Continental Assur. Co., 601 F. Supp. at 283 (summary judgment dismissing fraud claim appropriate where defendant's deposition testimony was "too vague" regarding necessary element of fraud). See also Schimpf v. Gerald, Inc., 52 F. Supp. 976, 992-93 (E.D. Wis. 1999) (court would not consider conclusory and speculative statements in affidavit because "[t]he object of Rule 56(e) is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit").

14. That is especially so where, as here, it is the McFarlane Defendants' burden to prove their claims of fraud by clear and convincing evidence. Lundin, 124 Wis. at 184, 368 N.W.2d at 681; Liberty Lobby, 477 U.S. at 255 ("the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions").

003.366724.1

Dated this \_\_1st\_\_ day of July, 2002.

                                         **FOLEY & LARDNER**

                                         By: _____
                                              Allen A. Arntsen
                                              Joan L. Eads
                                              Jeffrey A. Simmons
                                              *Attorneys for Plaintiffs*

| | |
|---|---|
| Foley & Lardner<br>150 East Gilman Street<br>Madison, WI 53703-2808<br>Tel: (608) 257-5035<br>Fax: (608) 258-4258 | Of Counsel:<br>Mark Hellmann<br>Michael Rechtin<br>Foley & Lardner<br>1 IBM Plaza<br>220 N. Wabash, Suite 3300<br>Chicago, IL 60611<br>Tel: (312) 755-1900<br>Fax: (312) 755-1925 |
| Co-Counsel:<br>Kenneth F. Levin<br>20 North Wacker Drive, Suite 2200<br>Chicago, IL 60606<br>Tel: (312) 984-6000<br>Fax: (312) 977-2990 | |

003.366724.1