54

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DOCKET NUMBER
U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN

JUL - 1 2002

JOSEPH W. SKUPNIEWITZ, CLERK
CASE NUMBER

**NEIL GAIMAN, and**
**MARVELS AND MIRACLES, LLC,**

Plaintiffs,

v.

Case No. 02-C-0048-S

**TODD MCFARLANE, and**
**TODD MCFARLANE PRODUCTIONS, INC.,**
**TMP INTERNATIONAL, INC.,**
**MCFARLANE WORLDWIDE, INC., and**
**IMAGE COMICS, INC.,**

Defendants.

**AFFIDAVIT OF MELANIE COOK**

STATE OF CALIFORNIA )
) ss.
COUNTY OF Los Angeles )

Melanie Cook, being duly sworn, deposes and states as follows:

1. I am an attorney who represents plaintiff Neil Gaiman in various matters. I am not representing Mr. Gaiman in the present lawsuit.

2. On or about April 2, 1997, I sent Larry Marder, who I understood to be an executive at Image Comics, a letter demanding that Mr. Gaiman be paid all royalties he was due pursuant to an oral agreement between Mr. Gaiman and Todd McFarlane. I attached to that letter copies of two draft contracts between Mr. Gaiman and D.C. Comics. A copy of my April 2, 1997 letter, including the attached contracts, is attached to this affidavit as **Exhibit A**. The copies attached as Exhibit A include an exhibit sticker identifying the document as "Exhibit 47." It is my understanding that the exhibit sticker was added during the deposition of Todd

McFarlane. With the exception of that exhibit sticker, Exhibit A is a true and correct copy of my April 2, 1997.

3. Attached as **Exhibit B** to this affidavit is a true and correct copy of the certified mail receipt I received from the U.S. Postal Service showing that the letter was received by someone at Image Comics' offices.

Melanie Cook

Melanie Cook

Subscribed and sworn to me this
1st day of ~~June,~~ July 2002.

Nancy E. Gray
Notary Public
State of California, County of Los Angeles
My commission expires: __________.

NANCY E. GRAY
Commission # 1301013
Notary Public - California
Los Angeles County
My Comm. Expires May 2, 2005

Case: 3:02-cv-00048-bbc Document #: 54 Filed: 07/01/02 Page 3 of 18

BLOOM, H ERGOTT, COOK, DIEMER AND . LEIN, LLP
ATTORNEYS AT LAW
150 SOUTH RODEO DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90212

FILE C

JACOB A. BLOOM
ALAN S. HERGOTT
LAWRENCE H. GREAVES
CANDICE S. HANSON
MELANIE COOK
TINA J. KAHN
THOMAS F. HUNTER
JOHN D. DIEMER
STEPHEN D. BARNES
STUART M. ROSENTHAL
LEIGH BRECHEEN
STEPHEN F. BREIMER
DEBORAH L. KLEIN
STEVEN L. BROOKMAN
JOHN LAVIOLETTE
ROBYN L. ROTH
RICHARD D. THOMPSON
JONATHAN BLAUFARB
DAVID B. FELDMAN
ROGER L. PATTON
ROBERT OFFER
THOMAS B. COLLIER
DAVID E. WEBER
ERIC M. BROOKS
MICHAEL L. SCHENKMAN

THOMAS P. POLLOCK
FOUNDING PARTNER
THROUGH 1986

TELEPHONE (310) 859-6800
FAX (310) 859-2788

DIRECT DIAL NUMBER
(310) 859-6895

April 2, 1997

VIA CERTIFIED MAIL

8981.8

Mr. Larry Marder
Image Comics
1440 North Harbor Boulevard, Suite 305
Fullerton, California 92835

Re: Neil Gaiman

Dear Larry:

This office represents Neil Gaiman, and Mr. Gaiman has forwarded to me a copy of your written offer to him dated February 18, 1997 (the "February 18 Offer").

As you know, Mr. Gaiman created the characters of Angela, Medieval Spawn and Cogliostro (the "Characters"). At the time he created the Characters, Mr. Gaiman was not an employee of Todd McFarlane nor did Mr. Gaiman sign any work-for-hire agreement. Rather, the Characters were created pursuant to the terms of an oral agreement under which Mr. McFarlane agreed that Mr. Gaiman would be compensated on the same terms as set forth in Mr. Gaiman's DC Comics Agreements dated August 1, 1993 (the "DC Agreement"), a copy of which I have attached hereto. As you can see from the DC Agreement, the February 18 Offer is significantly less favorable in all respects.

To date, Mr. Gaiman has not received any monies from the exploitation of Angela toys, Angela posters, or the Spawn trading card set which features characters created by Mr. Gaiman. In addition, we understand that Angela will be making an appearance in the Spawn HBO series and Cogliostro will be making an appearance in the New Line Spawn feature film. Both of these forms of exploitation will also require the payment of a royalty. Demand is hereby made that Image Comics immediately forward all monies which are currently owing to Mr. Gaiman in accordance with the terms of the DC Agreement as well as a current statement of accounting.

RDO/78595_1.DOC
03/27/97 10:28 AM

This letter is not intended to be a complete statement of the facts, or of our client's rights and remedies, all of which are hereby reserved.

Sincerely yours,

Melanie Cook

MELANIE COOK
of BLOOM, HERGOTT, COOK, DIEMER and KLEIN, LLP

RDO:jt
Enclosure
cc: Neil Gaiman

DC COMICS INC.
1325 Avenue of the Americas
New York, New York 10019
(212) 636-5555
FAX (212) 636-5401

Paul Levitz/Executive Vice President & Publisher

Dated as of August 1, 1993

Neil Gaiman
3208 West Lake Street, #419
Minneapolis, MN 55416

Re: Character Equity

Dear Mr. Gaiman:

Reference is made to the agreement between you (hereinafter "Creative Contributor") and DC Comics ("Publisher") dated April 20, 1988, as amended January 2, 1990 and May 28, 1991 (the "Agreement") regarding your services on SANDMAN (the "Publication"). In accordance with the agreement, you have revised the pre-existing characters of DREAM (SANDMAN) and DESTINY, and have created the characters of DEATH (first appearing in Sandman #8), DESIRE, DESPAIR, UNITY KINCAID (all first appearing in Sandman #10), DELIRIUM (first appearing in Sandman #21), and DESTRUCTION (first appearing in SANDMAN SPECIAL) (collectively referred to herein as the "Characters"). This agreement shall serve to amend the Agreement with respect to the Characters, as follows, and shall supersede all prior understandings and agreements regarding its subject matter.

In addition to the amounts that may become payable to you pursuant to the various agreements between you and Publisher for your writing services, Publisher will pay you the following:

1. ROYALTIES:

(a) Original Publications: For each print publication published by Publisher for sale to the general public which uses any of the Characters' names as its title or in its title (e.g. The Adventures of [Character Name]) and which features the Character substantially as expressed in the Publication) (a "Work"), Creative Contributor shall be entitled to receive the following:

(i) If the Work is sold either partially or wholly on a returnable basis, an amount equal to one half of one percent (.5%) of the cover price of each copy of the Work on Net Domestic Sales of such Work in excess of 75,000 copies.

As used herein, Net Domestic Sale(s) shall mean the number of copies or units which are actually sold by Publisher in the United States and Canada through Publisher's wholesale and retail distribution channels

OK

4/27/93:gaiman:chr.eqty

less the number of copies or units which are returned, damaged, lost, distributed by Publisher as premiums or promotions and/or distributed to uncollectible accounts. Sales of additional printings of any Work following its first printing shall be accounted for as additional sales of such Work.

(ii) If the Work is sold either solely on a non-returnable basis, or solely on a non-returnable basis and also through national retail chain stores such as Walden Books on a returnable basis, an amount equal to one-half of one percent (.5%) of the cover price of the Work for Net Domestic Sales of from 40,001 - 100,000 copies; and an amount equal to eight tenths of one percent (.8%) of the cover price of the Work for Net Domestic Sales in excess of 100,000 copies.

(b) Retail Products and Services: For each product other than a Work and/or for each service produced by Publisher and distributed or rendered by Publisher itself for sale to the public (and not by a licensee of Publisher) through Publisher's wholesale and retail distribution channels (a "Retail Product or Service") which is based entirely upon the Character(s), Creative Contributor shall be entitled to receive either (i) an amount equal to eight tenths of one percent (.8%) of the suggested retail selling price of such Retail Product or Service multiplied by its Net Domestic Sale(s); or, (ii) if there shall not be a suggested retail selling price, an amount equal to two and one-half percent (2.5%) of Publisher's gross receipts derived therefrom.

Notwithstanding the foregoing, with respect to the characters of DREAM (SANDMAN) and DESTINY only, Creative Contributor shall be entitled to receive either (i) an amount equal to five hundred and ninety-two thousandths of one percent (.592%) of the suggested retail selling price of such Retail Product or Service multiplied by its Net Domestic Sales(s); or (ii) if there shall not be a suggested retail selling price, an amount equal to one and eighty-five hundredths of one percent (1.85%) of Publisher's gross receipts derived therefrom.

(c) Licensed Reprint Editions: For each Licensed Reprint Edition of a Work which is distributed for sale to the public anywhere in the world, Creative Contributor shall be entitled to receive an amount equal to ten percent (10%) of Publisher's Net Receipts derived therefrom. As used herein "Licensed Reprint Edition shall mean a literal adaptation of any work originally published by Publisher which is reprinted in whole or in part, in any language, in any format, in a print publication or in microfilm, microfiche, computer software or in any other electronic, magnetic, laser, or related medium now known or

hereafter devised which is distributed for sale to the public through normal retail and wholesale distribution channels by a licensee of Publisher.

"Net Receipts" shall mean all amounts actually received by Publisher in United States Dollars from the licensing of rights to the Character, less any unrecouped foreign taxes, import duties and/or currency exchange losses, and less all direct costs incurred by Publisher. Notwithstanding the foregoing, with respect to Licensed Reprint Editions only, direct costs shall not include agency commissions, which shall be borne entirely by Publisher. Any advance against royalties paid to Publisher by a licensee shall be considered received by Publisher when such amount is either earned out or forfeited by the licensee, whichever occurs later.

(d) Media Rights: For each of the following Creative Contributor shall be entitled to receive an amount equal to fifteen percent (15%) of Publisher's Net Receipts derived therefrom:

(i) Any motion picture in which the Character(s) has a speaking part which is produced by Publisher or Publisher's licensee and is released either for theatrical exhibition or broadcast on standard or non-standard television;

(ii) Any audio and/or visual recording in which the Character(s) has a speaking part which is produced by Publisher or Publisher's licensee and released for sale to the general public; and

(iii) Any live stage production in which the Character(s) has a speaking part which is produced by Publisher or Publisher's licensee and is open to the general public for admission.

(e) Publishing Rights: For any publication (other than Licensed Reprint Editions) in which the Character(s) has a speaking part, including any original novels or novelizations, published by a licensee of Publisher and distributed through normal book or magazine wholesale and retail distribution channels, Creative Contributor shall be entitled to receive an amount equal to fifteen percent (15%) of Publisher's Net Receipts derived therefrom.

(f) Merchandising and Promotional Licensing: For each product or service based upon the Character(s), other than those provided above, which is manufactured and distributed by a licensee of Publisher through normal wholesale and retail distribution channels, Creative Contributor shall be entitled to receive an amount equal to fifteen percent (15%) of Publisher's Net Receipts derived therefrom.

(g) Non-Speaking Characters: For purposes of subparagraphs (d) and (e) above, in the event that any Character is incapable of speech or is otherwise a non-speaking character, DC shall, in its good faith discretion, treat the Character as having a speaking part if such Character is used in a manner comparable to the manner in which speaking characters are used.

2. CONTINGENCIES AFFECTING ROYALTIES:

In the event that Publisher determines that any one of the following contingencies apply, then the royalties payable hereunder may be reduced as follows.

(a) Spin-Offs: In the event that Publisher uses or licenses the use of a version of any of the Characters that Publisher determines (i) consists primarily or only of "Spin-Off Elements"; and (ii) is published under a substantially different title than the Character(s) (if published under any title) or is not substantially as originally created and written or drawn by Creative Contributor, then Publisher shall pay Creative Contributor royalties based upon Publisher's pro rata allocation of the amounts set forth in paragraph 1 among all elements used as created by Creative Contributor and all Spin-Off elements. The foregoing allocation (and all other allocations) made by Publisher pursuant to this agreement shall be made in good faith in Publisher's sole discretion.

As used herein, "elements" shall include without limitation characters, stories, themes, titles, names, logos, devices, designs, locales, scripts, artwork, and any portion of the foregoing. "Spin-Off Elements" shall mean elements either (i) not created by Creative Contributor; or (ii) originally created by Creative Contributor and later substantially changed or developed by another party.

(b) Commingling of Elements: In the event that Publisher uses or licenses the use of any of the Characters, or any element thereof, in combination and/or in conjunction with any other property, including other characters, then Publisher shall pay Creative Contributor royalties based upon Publisher's pro rata allocation of the amounts set forth in paragraph 1 among all such elements. Notwithstanding the foregoing, no royalties shall be due for any Minor Use of the Character. As used herein, Minor Use shall mean a use of the Character(s) in another property, as in, for example, multi property crossovers, guest appearances, occasional team-ups, cameos and "Who's Who" or other index type listings, as those terms are commonly used in the comic book industry.

(c) DC Editions in Other Formats. In the event that a Work is published by Publisher (whether initially or subsequently) in a format for which Publisher has an established royalty structure that is more favorable to Creative Contributor than the rates set

WRITER: Neil Gaiman DATE: As of August 1, 1993

ADDRESS: 3208 West Lake Street, #419 TITLE: SANDMAN #50-73
Minneapolis, MN 55416

WORK: FULL SCRIPT (INCLUDING SYNOPSIS, PLOT AND DIALOGUE)

PAGE RATE: $106.25 (or 125% of Writer's current page rate as set by DC, whichever is greater)

TERM: 24 ISSUES OF 24-27 PAGES EACH

The following shall constitute the complete and sole understanding and agreement between Writer and DC Comics ("DC") hereto:

1. DC hereby engages Writer, as an independent contractor, for the Term, and the Title, to perform the Work for DC and Writer accepts such engagement.

2. During the Term, Writer shall deliver the Work for each issue to DC within DC's deadline for same, after which date DC shall no longer be obligated to accept any Work or make payment for it. Writer further agrees to complete any revisions requested by DC as expeditiously as possible but in any event by the date that such revisions are required by DC to be delivered.

3. DC's approval of any synopsis of the Work in no way limits DC's right to further revisions of any portion of the Work. An editor selected by DC will be assigned to supervise and work with Writer in the fulfillment by Writer of his obligations hereunder. Writer agrees to cooperate with such editor and to comply with DC's instructions, directions, requests, rules and regulations including those involving artistic taste and judgment.

4. (a) Upon DC's approval of the final Work for each issue hereunder and receipt of payment request voucher, DC shall pay Writer the Page Rate therefor, which sum shall include payment for all revisions of the Work as DC may require hereunder to fulfill its editorial instructions and standards. In addition, DC shall pay Writer the applicable royalties and reprint rates set forth on Schedule A hereto.

(b) If Writer shall have delivered the full script for all issues on schedule for each year (defined as tweleve (12) consecutive issues) of the Term and otherwise in accordance with this Agreement, then at the end of the first such year (i.e. completion of issues #50-61) DC shall pay Writer a non-recoupable performance bonus of Five Thousand Dollars ($5,000.00) and at the end of the second year (i.e. completion of issues #62-73) DC shall pay Writer a non-recoupable performance bonus of Ten Thousand Dollars ($10,000.00). The foregoing bonus shall not be payable for any year in which a late delivery by Writer results in late shipping of any issue contracted for hereunder.

5. (a) Writer represents, warrants and agrees: that Writer is free to enter into this Agreement and has the right to grant all rights granted to DC hereunder; that except insofar as it may derive from the Title; all Work created by Writer hereunder will be wholly original with Writer or in the public domain throughout the world, and shall not infringe or violate any copyright, trademark, right of privacy or publicity or any other right of any person or entity, or constitute libel or slander of any person or entity; and that Writer will indemnify DC, its parent company, affiliated companies, assigns, licensees and successors in interest and each of their officers, directors and employees, from and against any and all claims, actions, damages, costs and expenses, including attorneys' fees, arising out of any breach of any of the warranties made by Writer hereunder.

(b) DC shall indemnify Writer against any and all claims, actions, damages, costs and expenses, including attorneys' fees, which may arise from Writer's use of material supplied to him by an officer or authorized employee of DC for use in connection with the Work; provided however, that Writer uses the material only to the extent and in the manner requested by DC.

6. (a) The Work created hereunder has been specially commissioned by DC for use as a contribution to a collective work, and constitutes a work made for hire as that term is used in the United States Copyright Act of 1976. Writer acknowledges that he or she has entered this agreement before commencing performance of the services he or she has been engaged to perform hereunder. In the event the Work is not deemed a work made for hire, then Writer hereby assigns all rights in the Work, including copyright and trademark rights, and all other rights to exploit the Work, to DC in all media now or hereafter existing, throughout the world in perpetuity. Upon DC's request, Writer shall execute any additional documents necessary to evidence this assignment. DC shall also have the right, but not the obligation, to use Writer's name, likeness and biographical information in connection with the Work and any publicity, promotion or advertising therefor.

(b) Writer acknowledges that the Work shall be derivative of preexisting material including, without limitation, the names and pictorial and literary representations of fictional characters, companies, places and things (the "Preexisting Material"); that DC owns or otherwise has rights in the Preexisting Material; and that Writer would be unable to produce the Work without the Preexisting Material. Writer further acknowledges that he or she shall not have, acquire or claim right or privilege to use any of the Preexisting Material except as provided herein or as DC otherwise consents in writing.

7. (a) If Writer does not comply with Writer's obligations hereunder by reason of illness, incapacity or disability ("Incapacity"), DC may suspend the services hereunder and if such

Incapacity continues for a period or periods aggregating four (4) weeks, DC may terminate Writer's engagement hereunder.

(b)   If publication of the Title shall be prevented or interrupted because of "force majeure" (i.e. any unexpected or disruptive event sufficient to excuse performance hereof as a matter of law), DC may suspend the services hereunder and if any such force majeure event should exceed eight (8) weeks, DC may terminate Writer's engagement hereunder.

(c)   If Writer fails to perform Writer's obligations hereunder other than by reason of Incapacity or Force Majeure ("Default"), DC may terminate Writer's engagement without further compensation to Writer by giving written notice to Writer, which notice shall be effective ten (10) days following DC's delivery thereof.

(d)   Time is of the essence of all delivery dates and deadlines committed to by Writer hereunder and Writer's failure to deliver any Work by the delivery date or deadline therefor shall constitute a Default hereunder, but such dates may be suspended at DC's discretion. During any such suspension, DC shall not be obligated to accept or pay for any Work tendered by Writer, but if such suspension is for reasons unrelated to Writer's performance hereunder, it shall not affect Writer's right to the Performance Bonus as provided for in Paragraph 4 above.

(e)   If prior to acceptance of the twelfth (12th) issue hereunder DC shall cancel publication of the Title, then DC may terminate Writer's engagement hereunder by giving Writer notice of such cancellation and by paying Writer a Performance bonus of Five Thousand Dollars ($5,000.00), provided, however, that in the event Writer has been in Default at any time during the Term or is in Default at the time of such cancellation, Writer shall not be entitled to the Performance Bonus, or any part thereof, nor any other compensation for any Work in connection with the cancelled issues except to the extent, if any, such Work has been completed by Writer and accepted by DC before cancellation of the Title.

8.   As an additional incentive to enter into this Agreement, DC hereby offers Writer medical insurance at DC's expense, under a plan provided by DC, for twenty-four (24) consecutive calendar months, beginning with Writer's acceptance into the plan, provided that (i) DC continues to maintain such insurance for its creative contributors, and (ii) Writer is accepted by DC's insurance carrier. In the event Writer shall default at any time under this Agreement, the amount of the monthly contribution to the Plan paid by DC on Writer's behalf shall automatically be deducted from any sums payable to Writer under this Agreement every month following such default. In the event DC shall cancel the Title for which the Work is being prepared before the twenty-four issues commissioned hereunder are completed, DC shall continue to pay Writer's contribution for the full twelve months. Upon expiration of this

Agreement, DC will deduct each monthly contribution from any compensation becoming due to Writer thereafter, unless Writer notifies DC that he wishes cancellation of his enrollment in the policy. Nothing contained herein is intended to obligate DC to continue maintaining medical insurance for its creative contributors or otherwise. Writer understands and agrees that all sums paid by DC as Writer's contribution are included in Writer's taxable income under the United States tax laws.

9. Creative Contributor hereby authorizes and directs Publisher to pay Merrilee Haifetz of Writer's House ten percent (10%) of all amounts that may become due and owing to Creative Contributor hereunder and further directs that the remaining ninety percent (90%) of such amounts shall be payable directly to Creative Contributor. Payment(s) so made shall be a good and valid discharge of Publisher's payment obligations to Creative Contributor hereunder.

10. A waiver of any provision of this Agreement in any instance shall not be deemed a waiver of such provision for the future, nor of any subsequent breach thereof.

11. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements executed and fully performed therein. New York courts (state and federal) only will have jurisdiction over any controversies regarding this agreement; any action or proceeding which involves such a controversy will be brought only in those courts, in New York County. In the event that any provision hereof violates any present or future statute, law, ordinance or regulation, the latter shall prevail and the Agreement shall be deemed modified to the extent required by such statute, law, ordinance or regulation.

AGREED AND ACCEPTED:
WRITER:

DC COMICS

By:________________

________________________

SOC SEC # ______________

SCHEDULE A
ROYALTY PROVISIONS

1. Definitions:

(a) Net Domestic Sale: copies of the United States edition sold in the United States and Canada by DC through regular wholesale and retail channels, less returns, "hurt books," bad debts, and not including copies sold as a premium or given away at no charge for promotional or other purposes.

(b) Entire story content: one story being the sole content of the Title.

2. Schedule of payments for Titles sold (partially or wholly) on a returnable basis:

If any issue in which the work is published shall have a net domestic sale in excess of seventy-five thousand (75,000) copies, DC shall pay to the sole writer of the entire story content, a royalty equal to two percent (2%) of the cover price times the number of copies sold in excess of seventy-five thousand (75,000).

3. Schedule of payments for Titles sold on a non-returnable basis (except to national retail chains):

(a) DC shall pay the following royalties - expressed as the applicable percentage of the cover price times the applicable total net domestic sale - to the sole writer of the entire story-content of any issue sold exclusively or primarily on a non-returnable basis:

(i) two percent (2%) from forty thousand and one (40,001) up to one hundred thousand (100,000);

(ii) three and two-tenths percent (3.2%) above one hundred thousand (100,000).

(b) If any issue in which the work is published shall be distributed on a returnable basis to national retail chains in addition to its non-returnable distribution, DC shall pay royalties on the net domestic sale of such returnable distribution as though this, too, was concluded on a non-returnable basis.

4. Multiple writers:

(a) In the event the Work does not form the entire story content, DC shall pay to the writer that proportion of royalties which the Work shall bear to the entire story content of the issue.

(b) In the event the writer is not the sole writer of the story:

Where one writer provides plot/breakdown services only, such writer shall be entitled to thirty-three percent (33%) of the sum to which a sole writer would be entitled.

Where one writer provides dialogue services only, such writer shall be entitled to sixty-seven percent (67%) of the sum to which a sole writer would be entitled.

Where more than one writer provides either or both of the foregoing services, such writers shall divide the sum to which they are entitled in proportion to their share of the number of pages written.

5. Payments:

DC shall make any payment due under this Schedule A not later than sixty (60) days after DC shall determine the "Final Sale" of each issue. For Titles sold on a non-returnable basis only the Final Sale shall be determined by DC not later than sixty (60) days after each issue's last announced on sale date. For Titles sold on a returnable basis, the Final Sale shall be determined by DC not later than eight (8) months after each issue's last announced off sale date. For Titles sold primarily on a non-returnable basis but with returnable distribution to retail chains as defined in Paragraph 3(b) herein, DC shall determine the Final Sale on the returnable distribution not later than eight (8) months after each issue's announced on sale date.

6. Remedies:

Writer's sole remedy, for any failure by DC to make any of the payments due pursuant to this Schedule A, in lieu of all other remedies at law or in equity, shall be an action at law to obtain such payments and under no circumstances shall any such failure entitle them to any reversion or termination of DC's rights under this Agreement.

7. Reprint Rates:

For any pages of the Work reprinted in any book or magazine published by DC for distribution and sale to the public (after initial publication, which shall include additional printings)

DC agrees to pay Writer a sum of not less than $20.00 if Full Script; $6.60 if Plot; $13.40 if Dialogue; as well as royalties under DC's standard royalty policy, as set forth herein.

[illegible]/4.9.7.95



SENDER:
- Complete items 1 and/or 2 for additional services.
- Complete items 3, 4a, and 4b.
- Print your name and address on the reverse of this form so that we can return this card to you.
- Attach this form to the front of the mailpiece, or on the back if space does not permit.
- Write "Return Receipt Requested" on the mailpiece below the article number.
- The Return Receipt will show to whom the article was delivered and the date delivered.

I also wish to receive the following services (for an extra fee):
1. ☐ Addressee's Address
2. ☐ Restricted Delivery

Consult postmaster for fee.

3. Article Addressed to:
Larry Marder
Image Comics
1440 N. Harbor, #305
Fullerton, CA 92835

4a. Article Number
P085 180 382

4b. Service Type
☐ Registered ☑ Certified
☐ Express Mail ☐ Insured
☐ Return Receipt for Merchandise ☐ COD

7. Date of Delivery

5. Received By: (Print Name)

8. Addressee's Address (Only if requested and fee is paid)

6. Signature: (Addressee or Agent)
X Brent Braun

PS Form 3811, December 1994

Domestic Return Receipt

Is your RETURN ADDRESS completed on the reverse side?

Thank you for using Return Receipt Service.