56

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DOCKET
NUMBER

U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN

JUL - 1 2002

FILED/RECEIVED
JOSEPH W. SKUPNIEWITZ, CLERK

CASE
NUMBER

| | | |
|---|---|---|
| NEIL GAIMAN and MARVELS AND MIRACLES, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 02-C-0048-S |
| TODD McFARLANE, TODD McFARLANE PRODUCTIONS, INC., TMP INTERNATIONAL, INC., and McFARLANE WORLDWIDE, INC. | ) ) ) ) ) | |
| Defendants-Counterclaimants, | ) ) | |
| And | ) ) | |
| IMAGE COMICS, INC., | ) ) | |
| Defendant. | ) ) | |

---

**MEMORANDUM OF LAW OF DEFENDANTS TODD McFARLANE, TODD McFARLANE PRODUCTIONS, INC., TMP INTERNATIONAL, INC. AND McFARLANE WORLDWIDE, INC. IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

LaFollette Godfrey & Kahn
One East Main Street, Suite 500
Madison, WI 53701
Tel: (608) 257-3911
Fax: (608) 257-0609

*LaFollette Godfrey & Kahn is the
Madison office of Godfrey & Kahn, S.C.*

Blackwell Sanders Peper Martin, LLP
720 Olive Street, Suite 2400
St. Louis, MO 63101
Tel: (314) 345-6000
Fax: (314) 345-6060

## INTRODUCTION

Defendants Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc. and McFarlane Worldwide, Inc. (the "McFarlane Defendants") placed several dispositive issues before the Court with their May 21, 2002 Motion for Judgment on the Pleadings. Now, with their Motion for Partial Summary Judgment, the McFarlane Defendants provide the Court with facts supplementing those contained in the pleadings, establishing beyond dispute that the Court may dismiss five of the plaintiffs' eleven causes of action as barred by either the applicable statutes of limitation (Counts I, II, III, VII, and VIII) or by special rules of copyright governing joint authors and licensing (Counts II and III).

Discovery has progressed since the filing and briefing of the McFarlane Defendants' Motion for Judgment of the Pleadings. The principal parties, Todd McFarlane and Neil Gaiman, have been deposed, along with several other witnesses. The additional facts supplement the previous motion, further establishing that the McFarlane Defendants are entitled to judgment on several of the claims, as follows:

- Count I, the plaintiffs' claim "regarding ownership of the copyrights to Spawn® 9, Spawn® 26, the Angela™ series, and the Angela™, Cogliostro™, and Medieval Spawn™ characters contained within those works," Amended Complaint, ¶ 64, is time-barred;
- Counts II and III, both for copyright infringement, *id.*, ¶¶ 71, 74, are barred by basic principles of joint copyright ownership and licensing;
- Counts VII and VIII, both claiming the plaintiffs' alleged right to attribution, *id.*, ¶¶ 88-98, are also barred by the relevant statute of limitations.

Thus, the Court should grant the McFarlane Defendants summary judgment on these five counts as they are all barred as a matter of law.

## RELEVANT FACTS

Pursuant to the Court's standing order on Procedure to be Followed on Motions for Summary Judgment in the Western District of Wisconsin, the McFarlane Defendants will not repeat in this brief the facts proposed in their Proposed Findings of Fact. That document has been submitted along with this brief and is incorporated herein.

## LEGAL STANDARDS

A court may grant summary judgment when the pleadings, depositions, answers to interrogatories,[1] and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Howland v. Kilquist*, 833 F.2d 639, 642 (7th Cir. 1987). Where "the nonmoving party fails to make a sufficient showing on an essential element" of any of its claims, "the moving party is entitled to judgment as a matter of law because 'a complete failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial.'" *Beer Capitol Distrib. v. Guinness Bass Imp. Co.*, 290 F.3d 877, 2002 U.S. App. LEXIS 9453 at *4-*5 (7th Cir. 2002) (brackets in original) (quoting *Celotex*, 477 U.S. at 323). Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case. *Celotex*, 477 U.S. at 322. As to the five central issues identified above, there are no material disputes of fact and the Court may enter summary judgment in favor of the McFarlane Defendants.

---

[1] To date, the McFarlane Defendants have not received responses to their First Set of Interrogaotries or their First Set of Requests for Documents, both hand-delivered on May 16, 2002 to counsel for the plaintiffs. The McFarlane Defendants thus reserve the right to supplement their Proposed Findings of Fact and Conclusions of Law, and this brief as necessary with the plaintiffs' responses to these discovery requests.

## ARGUMENT

The parties' recent discovery has cast further light on the untimely nature of the plaintiffs' copyright, Lanham Act, and false advertising claims. No genuine issues of fact exist as to five of the plaintiffs' claims, which now may be resolved by the Court on summary judgment solely as matters of law.

I.  **COUNT I: THE UNDISPUTED FACTS SHOW THAT THE PLAINTIFFS' COPYRIGHT OWNERSHIP CLAIMS ACCRUED MORE THAN THREE YEARS AGO AND ARE THEREFORE TIME-BARRED.**

In their briefing of the pending Motion for Judgment on the Pleadings, the parties disputed whether the pleadings alone contained facts sufficient to indicate the accrual dates of the plaintiffs' claims for copyright ownership, asserted in Count I of the Amended Complaint. Through discovery, the parties have established a number of undisputed facts that make clear these claims accrued more than three years before this suit was filed, rendering them barred by the Copyright Act's statute of limitations, 17 U.S.C. § 507(b).

A.  **Plaintiffs Who Claim Copyright Ownership Must Make Reasonably Diligent Efforts To Learn Of And File Such Claims Within Three Years Of Their Accrual, Or Else They Are Time-Barred.**

As a matter of policy, it is inherently inequitable to allow a joint author of a work to sit idly by—while his co-author claims sole ownership to the copyright in the work, assumes the financial burdens of advertising and promoting the work, and successfully commercializes the work—only to file a lawsuit years later, seeking a share of the profits earned through his creative partner's skillful management of the intellectual property. *See Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir. 1996); *Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916) (L. Hand, J.). Indeed, the Copyright Act prohibits this behavior by barring the filing of any such claim more than three years after its accrual. 17 U.S.C. § 507(b).

4

Case law from the Seventh Circuit and elsewhere holds that a copyright claim accrues when *a reasonably diligent person* would have learned of his cause of action. *Taylor v. Meirick*, 712 F.2d 1112, 1117 (7th Cir. 1983); *Zuill*, 80 F.3d at 1370. In *Taylor*, where the plaintiff's copyright infringement claim was not time-barred, the court noted that, for purposes of the statute of limitations, a copyright claim accrues when a "plaintiff learned or by reasonable diligence could have learned that he had a cause of action." *Id.* The factual record in this case demonstrates conclusively that the plaintiffs learned or, by reasonable diligence, should have learned of their copyright ownership claims well more than three years before they initiated this suit in January, 2002.

Accrual of a copyright ownership claim is marked by someone else's express assertion of sole copyright ownership of the work at issue. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000); *Zuill*, 80 F.3d at 1371; 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* (2002) ("*Nimmer*") § 12.05[C] at 12-132.3, n.49. Such accrual may occur by the placement of copyright notice on the work, *Zuill*, 80 F.3d at 1368, or by federally registering copyright in the work. *Willsea v. Theis*, 1999 U.S. Dist. LEXIS 22471 at *13-*14 (S.D.N.Y. 1999); *Margo v. Weiss*, 1997 U.S. Dist. LEXIS 20867 at *14-*15 (S.D.N.Y. 1998). Here, the plaintiffs' copyright ownership claims accrued both ways. In either situation, the fact that the copyright notice or registration fails to identify a putative joint author marks the accrual of the claim. The record contains undisputed evidence of the McFarlane Defendants' publications of the works with copyright notices, as well as their federal copyright registrations of those publications. The undisputed facts show that the plaintiffs knew, or with reasonable diligence should have known, that someone other than Gaiman had claimed sole copyright ownership more than three years before the plaintiffs filed this lawsuit.

**B.**   **Gaiman Knew Or, In The Exercise Of Due Diligence, Should Have Known Of The McFarlane Defendants' Express Assertions Of Sole Copyright Ownership In The Works At Issue More Than Three Years Before The Plaintiffs Filed This Suit.**

The following works, which comprise all of the intellectual property at issue in this case, were published with copyright notices identifying Todd McFarlane Productions, Inc. as the sole copyright owner:

- *Spawn* Issue 9, which was published in 1993; Gaiman Dep., p. 191:9-22.

- *Spawn* Issue 26, which was shipped for publication by Image Comics on December 27, 1994; Affidavit of Lawrence P. Marder (Marder Aff.), ¶ 7;

- *Spawn* Volume 6, a trade paperback also known as *Pathway to Judgement* (containing *Spawn* Issue 26), which was shipped for publication by Image Comics on May 29, 1998; *Id.*, ¶ 8;

- the *Angela* trade paperback (containing *Angela* Issues 1-3), which was shipped for publication by Image Comics on November 7, 1995; *Id.*, ¶ 9; and

- the *Angela's Hunt* trade paperback (containing *Angela* Issues 1-3), which was shipped for publication by Image Comics on August 21, 1998; *Id.*, ¶ 10.

In addition, Lawrence P. Marder, who at all relevant times was the Executive Director of defendant Image Comics, Inc., testified that some were shipped directly to plaintiff Neil Gaiman upon their publication. For example, twenty copies of the *Angela* trade paperback also shipped directly to Gaiman on November 7, 1995. Marder Aff., ¶ 9. Gaiman himself also testified that he received a hard copy of each of the works at issue shortly after their publication, providing additional evidence that he possessed these copyright notice-bearing publications more than three years before filing his lawsuit:

> **Q:**       Did you ever receive a copy of *Spawn* Issue Nine?
>
> **Gaiman:**  Yes.
>
> **Q:**       When was that?

6

| | |
|---|---|
| **Gaiman:** | I would have received—I was first handed one at Oakland in 1993, I think April of 1993. |
| **Q:** | Right about when it came out? |
| **Gaiman:** | Right. It was the day of the publication. Todd and I were signing them together. |
| **Q:** | What about issue 26, did you ever receive a copy of that? |
| **Gaiman:** | Probably. |
| **Q:** | What about the Angela miniseries? |
| **Gaiman:** | Yes. They would have sent me my author copies. |

Gaiman Dep., p. 191:9-22. Gaiman thus acknowledged his receipt of "author copies,"
concurrent with the first publications of *Spawn* Issue 9, of the entire *Angela* miniseries (issues 1-3), and "probably" of *Spawn* Issue 26. Gaiman also testified that at book signings in 1994 and 1995, he became aware of the circulation of trade paperbacks, containing scripts he authored, that bore the McFarlane Defendants' copyright notice.

| | |
|---|---|
| **Q:** | Do you recall if you got an author's copy of the *Angela* miniseries? |
| **Gaiman:** | Yes, I would have got them. |
| **Q:** | What about the *Angela* trade paperback? |
| **Gaiman:** | Haven't I testified—didn't we do this already? |
| **Q:** | I'm not sure if I did. Bear with me. |
| **Gaiman:** | I don't know on the *Angela* trade paperback. ... there was definitely another version of the *Angela* trade paperback, I think, because I have signed [it] .... |
| | ... |
| **Q:** | Would you agree with me that it's possible that [at] some of these book signings you may have signed a copy of the *Angela* miniseries? |
| **Gaiman:** | Oh, absolutely. |
| **Q:** | Would it be possible that you signed a copy of the first *Angela* trade paperback? |
| **Gaiman:** | It's certainly possible that I would have signed copies because people put them in front of you. ... I may even have done it on a couple of occasions where I have actually declined to sign it. People put some of the trade paperbacks in front of me and I would say I don't get royalties on this. |
| **Q:** | Back in 1994, '95, at that point in time, do you recall doing signings [during] which you were handed copies of *Spawn* 9? |

| **Gaiman:** | Yeah. |
| | ... |
| **Q:** | Do you recall back in 1994, '95 time frame signing any trade paperbacks, say that trade paperback number 2 which contained issue 9 in it? |
| **Gaiman:** | I must have signed that at some point .... |

Gaiman Dep., pp. 212:8-214:7.

Thus, Gaiman acknowledges that he signed copies of the trade paperbacks. He knew that these compilations (of works to which he now alleges co-ownership rights) were being published and distributed in 1994 and 1995. These works were not concealed and were not kept secret from Gaiman—indeed, Gaiman recalls that "[p]eople put some of the trade paperbacks in front of me," alerting him to their existence in 1994 or 1995. *Id.*, p. 213:11-21. Therefore, at these signings Gaiman became aware that these works were published and available to the public. Indeed, if Gaiman could identify these works with enough particularity to refuse autographs, saying to his likely disappointed fans, "I don't get royalties on this," *Id.*, p. 213:21, it would have taken little additional effort for him to verify the copyright notices on these works. Any diligent author in this situation would have known of his copyright ownership claims.

Moreover, the undisputed facts demonstrate that Gaiman is no novice in the realm of copyright, which speaks to his diligence in learning of his copyright ownership claims. He is the author of numerous publications, both in the United States and Great Britain, all of which bear copyright notices, some in his own name and some in the name of those for whom he provides works made for hire. Gaiman Dep., pp. 207-10. Gaiman testified as to his own experience with copyright notices:

| **Gaiman:** | ... And I asked for [publisher Titan Books] to make sure that I had the standard copyright notice that you get in the U.K. – |
| **Q:** | What is the standard – |
| **Gaiman:** | Are you familiar with that? |

Q:    No. Tell me what you know about the standard copyright notice in the U.K.

Gaiman:  There is a clause in the U.K. copyright where you get identified as the author, the copyrights and patents act, which gives you, you know, your – it's partly the moral right and partly you are the author from a copyright purpose, so they put in whatever the standard. And I just said look, can I have the standard wording, please.

Q:    And you were familiar with the fact that there was such a thing as standard wording how?

Gaiman:  Because I'm an author in the U.K. and every book I get of mine would have a standard wording in front that would say the right of you know, Gaiman to be identified as the author of this book has been asserted under the copyright and patents act, and so forth. I got books before with it in. And I thought well, I am the author, can I have this, please, to Titan.

…

Q:    … [I]t was your experience as being an author in the U.K. [that] gave you the knowledge that there was such a thing as standard copyright language that should be put in books in the U.K., is that correct?

Gaiman:  I had seen it in books before.

Q:    And you are an author – were you not an author in the United States at the same time?

Gaiman:  Yes, but that language is not language that appears in the front of American books.

…

Q:    When is the first time one of your works was published in the United States? And when I say your works, I mean a work that you retain the copyright ownership to.

…

Gaiman:  First stuff that would have been imported would have been my book Violent Cases.

Q:    When was that?

Gaiman:  1987.

Gaiman Dep., p. 207:16-210:11. Gaiman, a successful author both abroad and domestically, was experienced, if not formally trained, in the area of copyright notices. An international author, Gaiman was certainly aware that copyright notices may effect his rights to his work. At the very least, in the exercise of due diligence, Gaiman would have known about the copyright notices appearing on works he authored.

9

Collectively, the affidavit of Lawrence P. Marder and Gaiman's own deposition testimony reveal that Gaiman was in receipt of or at least fully aware of each of the works bearing the copyright notices of Todd McFarlane Productions, Inc., at the time of their publications or shortly thereafter. Each work contains a copyright notice indicating not just the date of publication, but also that TMP claimed sole copyright ownership of each of these comic books. Thus, by Gaiman's possession or knowledge of the works containing the McFarlane Defendants' express assertions of sole copyright ownership, the plaintiffs were on notice of their claim for copyright ownership as early as 1993, and no later than 1995. Any diligent plaintiff in possession of works to which he contributed, bearing another's copyright notice, would have or should have known of his claim for copyright ownership. The plaintiffs' copyright ownership claim to *Spawn* Issue 9 thus accrued in 1993, to *Spawn* Issue 26 in 1994, and to the *Angela* trade paperback in 1995, the years in which each was published. *Supra* at 6. Applying the Copyright Act's three-year limitations period to each of these claims indicates that by the time of filing this suit in January, 2002, they all were time-barred.

The untimely nature of the plaintiffs' copyright ownership claim to *Spawn* Issue 9 has special significance. The undisputed accrual of the plaintiffs' copyright ownership claim to that work alone, in 1993, is fatal to their ownership claims to the three characters Gaiman allegedly created—Angela, Cogliostro, and Medieval Spawn—because all three first appeared in *Spawn* Issue 9. Amended Complaint, ¶ 32. Thus, all of the plaintiffs' copyright ownership claims, including both the comic books and the characters, are barred as a matter of law.

**C.    Gaiman Knew Or, In The Exercise Of Due Diligence, Should Have Known Of The McFarlane Defendants' Federal Registrations of Copyright In The Works At Issue More Than Three Years Before The Plaintiffs Filed This Suit.**

To reinforce that the plaintiffs' copyright ownership claims are time-barred, the Court need only look to the dates of the federal copyright registration of each of the works at issue. As federal copyright registrations are public records that formalize one's copyright ownership, courts have held that once an author registers his copyright, a diligent co-author should be cognizant of his alleged injury stemming from another's assertion of ownership. *Willsea v. Theis*, 1999 U.S. Dist. LEXIS 22471 at *13 (S.D.N.Y. Aug. 5, 1999); *Margo v. Weiss*, 1997 U.S. Dist. LEXIS 20867 at *15 (S.D.N.Y. Dec. 31, 1997). For each work, the McFarlane Defendants registered copyright with the United States Copyright Office more than three years before the plaintiffs brought this suit.

The plaintiffs attempt to circumvent the consequences of these copyright registrations in connection with the pending Rule 12(c) motion by seizing upon the fact that the registrations are in the name of Todd McFarlane individually, instead of Todd McFarlane Productions, Inc. This is a red herring. For the purposes of this motion (and the pending Rule 12(c) motion), the registrations could have been in the name of Homer Simpson or Jerry Springer. The critical fact is that *they were not in the name of Neil Gaiman. See* Part I.A., *supra* at 5. McFarlane himself has acknowledged that due to a clerical error, he was erroneously listed as the copyright "owner" of the works at issue, though the actual owner of copyright is his employer, Todd McFarlane Productions, Inc.[2]  McFarlane Aff., ¶ 2. McFarlane explained the mistake, in the context of the registration certificate for *Spawn* Issue 26:

---

[2]    Notwithstanding this clerical error on the registration applications, Todd McFarlane Productions, Inc. was correctly identified as the copyright owner in all of the copyright notices discussed above. *See* Part I.B., *supra*, at 6.

| Q: | Did you review this Certificate of Registration before someone signed it and sent it in on your behalf? |
|---|---|
| **McFarlane:** | No. |
| Q: | Is the name of the author in paragraph 2 of this registration, namely Todd Dean McFarlane, your understanding of who the copyright owner was? |
| **McFarlane:** | No. Like I said, those should have been Todd McFarlane Productions. So, Todd McFarlane, an individual, has never grabbed any of those rights. |
| Q: | And did anyone talk to you about why the box under 2a for contribution to this being a work made for hire, did anyone talk to you about that before that was checked? |
| **McFarlane:** | No. |

McFarlane Dep., 242:9-23. The clerical error is of little significance, however, as scholars and federal courts generally "forgive[] even serious mistakes on the registration certificate, such as an erroneous statement as to identity of the author, or of the copyright claimant, or where the copyright is claimed in the name of the partnership rather than in the name of the individual partners." 2 *Nimmer*, § 7.20[B] (compiling cases).[3]

The McFarlane Defendants' copyright registrations, (referenced in the plaintiffs' Amended Complaint, ¶ 41 and provided by the Defendants as Exhibits C, F. K, K, and L in the Combined Appendix), show a range of effective dates from January 20, 1995 through April 12, 1996. *See Todd McFarlane, et al.'s Proposed Findings of Fact and Conclusions of Law* at 5; *see also* Reply Brief of Defendants Todd McFarlane, et al., in Support of Their Motion for Judgment on the Pleadings at 4. These copyright registrations provide all the undisputed facts necessary for the Court's ruling on the impact of the statute of limitations on the plaintiffs'

---

[3]     Mentioning only one of two co-authors on an application for copyright registration does not affect the registration's validity. *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 827-828 (11th Cir. 1982). Indeed, misstatements on a copyright registration application due to "clerical error," *e.g.*, McFarlane Aff., ¶2, have virtually no impact on the validity of the registration. 2 *Nimmer*, § 7.20 at 7-208, n.19 (citing *Baldwin Cooke Co. v. Keith Clark, Inc.*, 505 F.2d 1250 (7th Cir. 1947) ("[A] clerical error in the registration application, if unaccompanied by fraud, should neither invalidate the copyright nor render the registration certificate incapable of supporting an infringement action."). Most importantly, however, the registrations indicate that someone other than Gaiman claimed copyright ownership in the works in dispute—and such express assertion of copyright ownership, by whomever, marks the accrual of the plaintiffs' ownership claims. *Supra* at 5.

copyright ownership claims. The plaintiffs indeed knew or should have known of their alleged

claims for copyright ownership in the three years following the copyright registrations. This

means that the copyright ownership claims relating to the last work registered, *Spawn* Issue 9,

registered in 1996, should have been brought no later than 1999.[4] The plaintiffs' ownership

claims—which accrued by virtue of the McFarlane Defendants' use of copyright notices *and*

federal copyright registrations—are time-barred under 17 U.S.C. § 507(b).

## II.    COUNTS II AND III: TODD MCFARLANE PRODUCTIONS, INC.'S OWNERSHIP OF COPYRIGHT IN THE WORKS AT ISSUE AND ITS LICENSING OF THOSE RIGHTS TO OTHER PARTIES, PRECLUDES THE PLAINTIFFS' CLAIMS FOR COPYRIGHT INFRINGEMENT.

The plaintiffs' copyright infringement claims against the McFarlane Defendants fail

because, quite simply, under American copyright law joint owners of works may not sue each

other or their licensees for infringement. However, before addressing this dispositive issue, it is

important to emphasize that a crucial element of an infringement claims is that the party

claiming infringement must establish that it owns the copyright. Thus, the plaintiffs'

infringement claims die in the starting blocks, because their copyright ownership claims are

time-barred under the Copyright Act. *Supra*, at 6-12. Without ownership of the copyright, the

infringement claims will fail. The law on this issue was briefed fully on the Motion for

Judgment on the Pleadings, and need not be repeated here. *See* McFarlane 12(c) Brief at 12-16;

Plaintiffs' Response Brief at 12-14; Reply Brief at 13. Nonetheless, the import of new evidence

on the accrual of the plaintiffs' copyright ownership claims, *see supra* at 6 – 9, reinforces the

point that the plaintiffs have failed to prove the *sine qua non* of copyright infringement, that is,

---

[4]        To reiterate a point addressed on the motion for judgment on the pleadings, the effective registration dates are the dates the Copyright Office received the McFarlane Defendants' applications. 17 U.S.C. § 410(d). Even taking into consideration an additional four to five months for the Copyright Office to process the application and issue a certificate of registration, which is standard, *see* http://www.copyright.gov/faq.html#q7, each these registrations still pre-dates the filing of this lawsuit by well more than *five* years, far beyond the statutory allowance of three years for bringing copyright ownership claims. 17 U.S.C. § 507(b).

they have failed to show they have a valid claim to ownership of copyright in any of the works at issue. In any event, basic principles of joint copyright authorship and licensing would bar their infringement claims, even had they been timely asserted.

> ### A.  Todd McFarlane Productions, Inc., As A Copyright Owner Of The Intellectual Property At Issue, Licensed Its Exclusive Rights To The Other Defendants.

In Todd McFarlane's deposition and written testimony, he explains that although he was not the sole author of each work at issue in this case, he registered the copyright in the comic books at issue for his company, Todd McFarlane Productions, Inc. ("TMP") as works for hire. *See* McFarlane Aff,. ¶ 2; Transcript of June 20, 2002 Deposition of Todd McFarlane ("McFarlane Dep.") at 147, 157. Due to a clerical error, he was individually listed as the copyright owner, rather than his employer, TMP. McFarlane Aff., ¶ 2. The mistake matters little, because as president and chief executive officer of TMP, *Id.*, ¶ 1, McFarlane himself consented to all of TMP's licensing activities with respect to these works. *Id.*, ¶ 3. The plaintiffs have not and cannot suggest that McFarlane (the individual) or TMP lack an ownership interest in the copyrights disputed in this case—they only assert Gaiman's claims for co-ownership and infringement. Amended Complaint, ¶ 66. The undisputed facts show that TMP authorized the use of the works by the allegedly infringing defendants:

- TMP licensed its rights in the *Spawn* and *Angela* comic books to other parties, including the grants of licenses to:
  - Malibu Comics to publish *Spawn* Issue 9 (before the creation of Image Comics, Inc.), McFarlane Aff., ¶ 4;
  - defendant Image Comics, Inc. to publish *Spawn* Issue 26, *Angela* Issues 1 through 3, "and the trade paperback reprints of those comic books and issue 9 of *Spawn*." *Id.*
  - defendant TMP International, Inc. to create action figure toys based upon *Spawn* characters, including Angela, Cogliostro, and Medieval Spawn. *Id.*, ¶ 5.

The McFarlane Defendants' copyright registrations and the additional testimony from Todd McFarlane establish beyond dispute that he and TMP, as a copyright owner of the works at issue, authorized all the activities about which the plaintiffs now complain—that is, the publication, compilation, and preparation of derivative works.

### B. Because Copyright Law Precludes An Author From Suing His Co-author Or His Co-author's Licensees For Infringement, The Plaintiffs' Copyright Infringement Claims Must Fail.

For all of the works at issue, Gaiman alleges he wrote whole or partial scripts that were merged with another's artwork. Amended Complaint, ¶¶ 23, 38, 40. At most, therefore, Gaiman is "a co-owner of the copyrights in [the] works" at issue. *Id.*, ¶¶ 66, 68(a). Even if Gaiman can prove his status as a co-owner, the plaintiffs' infringement claims will necessarily fail, for it is black-letter copyright law that "a joint author cannot be liable for copyright infringement of another joint author, because he or she cannot infringe his own copyright." *Beloit Corp. v. C3 Datatec, Inc.*, 1995 U.S. Dist. LEXIS 16685 at \*23-\*24 (E.D. Wis. 1995) (citing *Weissmann v. Freeman*, 868 F.2d 1313, 1317 (2d Cir. 1989)); *see also Oddo v. Ries*, 743 F.2d 640, 632-33 (9th Cir. 1984); *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984) ("It is elementary that the lawful owner of a copyright is incapable of infringing a copyright interest that is owned by him; *nor can a joint owner of a copyright sue his co-owner for infringement*." (emphasis added)). To the extent that the plaintiffs' copyright infringement claims are directed against any of the defendants as co-owners of copyright in any of the works, these claims must fail.

From the established proposition that co-owners cannot sue one another for copyright infringement, it follows naturally that a copyright owner also cannot sue his co-owner's licensees of the work. "[A]n authorization to [a] defendant from one joint owner will be an effective defense to an infringement action brought by another joint owner." 1 *Nimmer*, § 6.10 (citations omitted). Federal courts agree. *Batiste v. Island Records, Inc.*, 179 F.3d 217, 224 (2d Cir.

1999); *Oddo*, 743 F.2d at 633 ("Each co-owner has an independent right to use or license the use of the copyrights."). In the *Batiste* case, for example, two brothers claimed that a third brother, without their permission, licensed away their rights to a song which all three had created as joint authors. 179 F.3d at 222-24. The brothers sued the licensees for copyright infringement, but these claims failed on summary judgment. In affirming the grant of summary judgment, the appeals court noted than a party's use of a work is not an infringing use, if such use is licensed by a co-owner of copyright in the work. *Id.* at 223-25 (citing *Quintilla v. Texas Television, Inc.*, 139 F.3d 494, 498 (5th Cir. 1998); *Oddo*, 743 F.2d at 632-33; *Cortner*, 732 F.2d at 271; 1 *Nimmer*, § 6.10). Under the same reasoning, neither McFarlane, TMP, nor any of the parties to whom they licensed the works at issue may be liable to the plaintiffs for copyright infringement.

McFarlane himself has testified that as a copyright owner of the works at issue, his employer TMP licensed publishers to produce the comic books and trade paperbacks, licensed defendant TMP International, Inc., to create toy action figures based on various characters, and licensed "various third parties" to create other derivative works. McFarlane Aff., ¶¶ 4-6. To the extent that the plaintiffs' copyright claims implicate any of these licensees as alleged copyright infringers, these claims must fail because the licensees were authorized by a copyright owner. Thus, even if the court deems the plaintiffs have a valid copyright ownership interest in the works at issue, fundamental principles of joint copyright ownership preclude the plaintiffs from proceeding on their claims for copyright infringement. The plaintiffs' copyright ownership claims, if they succeed, spell defeat for their infringement claims, because the latter have been asserted only against parties that, as a matter of law, cannot be held liable for infringement: co-owners of the copyrighted works at issue and their licensees.

III.    **COUNTS VII AND VIII:  THE PLAINTIFFS' FALSE
       ADVERTISING AND LANHAM ACT CLAIMS ACCRUED MORE
       THAN THREE YEARS BEFORE THIS LAWSUIT, AND ARE
       THUS TIME-BARRED.**

The facts established through discovery illuminate the effect of the limitations period

contained in section 100.18 of the Wisconsin Statutes.  This state law claim for attribution is

analogous to their claim for a violation of the Lanham Act, as both stem from the plaintiffs'

allegations that the defendants failed to properly attribute Gaiman for his contributions to the

comic books at issue.  The undisputed facts confirm that each of these claims is time-barred.

   A.    **The Plaintiffs Have Asserted Claims Relating To
         Gaiman's Attribution Under Both The Federal Lanham
         Act And Wisconsin's False Advertising Statute, Which
         Are Analogous For The Purpose Of Applying The
         Statute Of Limitations.**

The plaintiffs assert a claim under the federal Lanham Act, alleging the "[d]efendants

engaged in 'reverse palming off' by refusing to attribute credit to Gaiman" for his contributions

to the works at issue.  Amended Complaint, ¶ 88.  In the same breath, the plaintiffs also claim

that this "failure to properly attribute Gaiman's authorship … is deceptive and misleading,"

constituting a violation of Wisconsin's false advertising statute.  *Id.*, ¶ 94; Wis. Stat. § 100.18.

First in the federal claim and again in the state claim, the plaintiffs allege that consumers have

been confused, *id.*, ¶¶ 89, 95, by the defendants' willful conduct, *id.*, ¶¶ 92, 96, in failing to

attribute Gaiman for his contributions.  *Id.*, ¶¶ 88, 94.  The elements of these two claims are

virtually identical, simplifying the analysis of whether both claims are time-barred.

The Lanham Act contains no explicit statute of limitations.  *See generally* 15 U.S.C.

§ 1051, *et seq.*; *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 821 (7th Cir. 1999).  Therefore,

federal courts refer to the analogous state laws to determine whether a claim brought under the

Lanham Act is time-barred.  *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985) ("When Congress

has not established a time limitation for a federal cause of action, the settled practice has been to

17

adopt a local time limitation as federal law if it is not inconsistent with federal law or policy to

do so."), *cited with approval in Hot Wax, Inc.*, 191 F.3d at 821.  As the language of the plaintiffs'

Amended Complaint makes clear, their Lanham Act claim is directly analogous to their state law

claim for false advertising, invoking the statute of limitations contained in section 100.18.[5]

### B.    The Accrual Of The Plaintiffs' Claims For Attribution Occurred More Than Three Years Before Filing This Suit, Thus These Federal And State Law Claims Are Time-Barred.

The undisputed facts support the McFarlane Defendants' argument, voiced in the briefing

of the Motion for Judgment on the Pleadings, that the plaintiffs' state law claim for false

advertising is time-barred.  *See* McFarlane 12(c) Brief at 24-26; Reply Brief, at 18-19.  The

Wisconsin statute imposes a three-year time bar: "No action may be commenced under this

section more than 3 years after the occurrence of the unlawful act or practice which is the subject

of the action."  Wis. Stat. § 100.18(11)(b)3.  No "discovery rule" qualifies this limitations period.

*Skrupky v. Elbert*, 189 Wis. 2d 31, 5556, 526 N.W.2d 264, 273-74 (Ct. App. 1994).  Regardless

of whether the plaintiffs' false advertising claim is based on an ongoing wrong, Wisconsin courts

recognize that the statute establishes a single, "definite point of accrual" for such claims.  *Id.*

That "definite point" was clarified recently in *Kain v. Bluemound E. Indus. Park, Inc.*, where the

appeals court confirmed that the "legislature has already determined when the claim 'accrues'—

---

[5]       Courts within the Seventh Circuit recognize that state law consumer protection statutes are often analogous to the federal Lanham Act for these purposes.  In *Johnson Controls, Inc. v. Exide Corp.*, for example, the court noted that "[s]everal courts in this district have held that the Illinois Consumer Fraud and Deceptive Practices Act is most closely analogous to the Lanham Act and have therefore applied its three year statute of limitations to bar Lanham Act claims.  152 F. Supp. 1075, 1079 (N.D. Ill. 2001).  The Illinois statute, much like section 100.18 in Wisconsin, focuses on consumer protection.  "The [Illinois Act] is intended to protect consumers, borrowers and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices.  *Zazove v. Pelikan, Inc.*, 326 Ill.App.3d 798, 761 N.E.2d 256 (Ill. App. 2001).  Similarly, its Wisconsin counterpart, section 100.18, "is [designed] to prevent certain activities deemed harmful to citizens' economic and social well-being," *Tim Torres Enters., Inc. v. Linscott*, 142 Wis. 2d 56, 72, 416 N.W.2d 670 (Ct. App. 1987), by "protect[ing the] public from all untrue, deceptive or misleading representations" in marketing and trade practices.  *Grube v. Daun*, 173 Wis.2d 30, 57, 496 N.W.2d 106 (Ct. App. 1992).  These state-level analogues to the Lanham Act also share a three-year limitations period.  Wis. Stat. § 100.18(11)(b)3; 815 ILCS § 505/10a(e).

at the time of *the defendant's* action." 2001 WI App 230, ¶ 14, 248 Wis. 2d 172, 635 N.W.2d 640 (emphasis added). In this case, it is undisputed "the time of the defendant[s'] action" was more than three years before this action began.

The facts relating to when the defendants allegedly failed to attribute Gaiman's contribution to *Spawn* Issue 26 and *Pathway to Judgement*[6] are summarized below.

- *Spawn* Issue 26 was published "on or about December 1994." Amended Complaint, ¶ 38.
- *Spawn* Issue 26 was republished as *Pathway to Judgement* in 1998. Combined Appendix, Exhibits O, Q.
- Gaiman acknowledges "probably" having received his author copy of *Spawn* Issue 26 around the time of its publication. Gaiman Dep., p. 191:9-24.
- Gaiman acknowledges that he likely saw the trade paperbacks in which *Spawn* Issue 26 was reprinted, "because somebody would have … put stuff in front of [him]" at comic book signings. *Id.*, p. 192:13-22.

Unequivocally, these facts identify the "definite point of accrual" of the plaintiffs' false advertising claims as the dates the McFarlane Defendants published *Spawn* Issue 26 and *Pathway to Judgement* (in 1994 and 1998, respectively), when they allegedly failed to give Gaiman proper attribution. Moreover, Gaiman knew of both the original publication of Issue 26 and its reprints in trade paperbacks. What is critical—and undisputed—is that the "time of the defendant[s' alleged] action," *Kain*, 2001 WI App, ¶ 14, was well more than three years before the January 2002 filing of this lawsuit. Thus, the plaintiffs' state false advertising claim and their analogous Lanham Act claim are both time-barred.

## CONCLUSION

There are no genuine issues of fact as to the accrual of the plaintiffs' copyright ownership claims, as to the Todd McFarlane Productions' ownership of copyright in the intellectual

---

[6] The plaintiffs have conceded their attribution claims are limited to these two works. *See* Response [to McFarlane Defendants' Brief in Support of 12(c) Motion] at 10, 15.

property at issue or its licensing of those rights to the other defendants, or as to the accrual of the

plaintiffs' attribution claims. The undisputed facts demonstrate that, as to five claims, Counts I,

II, III, VII, and VIII, the McFarlane Defendants are entitled to summary judgment.

Dated: July 1, 2002

LA FOLLETTE GODFREY & KAHN

Eugenia G. Carter
Todd G. Smith
Gabriel S. Gross
One East Main Street, Suite 500
Madison, WI 53701
Tel: (608) 257-3911
Fax: (608) 257-0609

—and—

Michael A. Kahn
Peter W. Salsich, III
Blackwell Sanders Peper Martin LLP
720 Olive Street, Suite 2400
St. Louis, MO 63101
Tel: (314) 345-6000
Fax: (314) 345-6060

Attorneys for Todd McFarlane, Todd McFarlane
Productions, Inc., TMP International, Inc. and
McFarlane Worldwide, Inc.

MN151327_1.DOC