DOC NO
REC'D/FILED
2002 JUL 22 PM 4: 17
J W SKUPNIEWITZ
CLERK US DIST COURT
WD OF WI

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NEIL GAIMAN and MIRACLES AND )
MARVELS, LLC,                  )
                               )
          Plaintiffs,          )
                               )
     v.                        )   Case No. 02-C-0048-S
                               )
TODD McFARLANE, et al.         )
                               )
     Defendants-Counterclaimants. )

---

### THE McFARLANE DEFENDANTS' BRIEF IN OPPOSITION
### TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Defendants Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc., and McFarlane Worldwide, Inc. (together, the "McFarlane Defendants"), by their attorneys, respectfully request that the Court deny Plaintiffs' Motion for Partial Summary Judgment on the McFarlane Defendants' counterclaim and affirmative defense of fraud. As set forth in the attached Response to Plaintiffs' Proposed Findings of Fact and Defendants' Proposed Findings of Fact, and as explained more fully below, the McFarlane Defendants have established substantial competent evidence to support each element of their fraud claim and defense. At a minimum, this evidence raises genuinely disputed issues of material fact as to each element of the claim and defense, rendering summary judgment inappropriate.

### INTRODUCTION AND FACTS

In 1996 and 1997, plaintiff Neil Gaiman and Defendant Todd McFarlane Productions, Inc. ("TMP"), through Defendant Todd McFarlane, entered into negotiations with the goal of executing an agreement regarding royalty payments for certain comic books and characters

McFarlane and Gaiman had jointly created for TMP's *Spawn* comic book series several years earlier, including royalties received by TMP from licenses for toys and other products based on the comic book characters. (Defendants' Proposed Finding Of Fact (hereinafter, "DPFOF"), ¶¶ 1-2) In the course of these negotiations, McFarlane and Gaiman also discussed a possible exchange of rights in certain characters (including one character, Miracleman, unrelated to *Spawn*) in an effort to resolve their differences. (DPFOF, ¶ 3) This case exists today because the parties could not reach agreement in 1997 on all of the material terms, and still cannot come to an understanding as to who agreed to what and on what terms. This fundamental factual dispute — namely, the existence or non-existence of a 1997 contract — proves fatal to plaintiffs' partial summary judgment motion. Moreover, during their discussions over royalties McFarlane learned through independent investigation that Gaiman had significantly and materially misrepresented the terms of his contracts with DC Comics – the device the parties had used as a reference point in their attempt to negotiate the terms of an agreement.

At the heart of the contractual dispute is a term used loosely as a point of reference by Gaiman throughout his relationship with McFarlane — the "standard DC Comics contract." (DPFOF, ¶ 6) As early as 1993, when Gaiman and McFarlane first collaborated on Issue 9 of *Spawn*, Gaiman expressed his desire to be compensated for his work on *Spawn* on terms at least as good as he had under his "standard DC Comics contract," an arrangement to which McFarlane agreed in principle. (*Id.*) The problem was, as Gaiman admitted at his deposition, he never once told McFarlane in 1992 what the terms of his DC Comics contract were, or whether he wanted McFarlane to match all of the DC contractual terms or just some. (DPFOF, ¶ 9) Nor was he any more forthcoming over the next four years, when he and McFarlane worked together on other comic books without any defined formula for royalties or other compensation. During this

period, McFarlane repeatedly asked Gaiman to send him a copy of his DC Comics contract so that McFarlane could understand the terms, conditions and royalty calculations. (DPFOF, ¶ 10) Gaiman never sent McFarlane any DC Comics contract and the first one McFarlane saw was at his deposition in this lawsuit. (DPFOF, ¶¶ 11-12). Gaiman was no charity case, though. Over the years, TMP paid him close to $200,000 — far more than he had ever received for similar work at DC Comics. (DPFOF, ¶ 5)

When Gaiman decided that he wanted to formalize his relationship with McFarlane and TMP, he began for the first time to propose a specific formula for calculating royalties — a formula he claimed was based on his standard DC Comics contract. He ultimately set forth this formula in summary fashion in a letter dated May 5, 1997. (DPFOF, ¶13) Gaiman and McFarlane then exchanged three letters by facsimile on July 15, 1997, two of which incorporated by reference the royalty terms summarized in the May 5 letter. (DPFOF, ¶¶ 15-16) Gaiman represented that he received a flat 15% of net receipts for all non-comic-book uses of the characters, including movies, other media, and merchandise licensing. (DPFOF, ¶ 14) According to plaintiffs, these four letters formed a written contract, under which (1) Gaiman would exchange his rights in two *Spawn* characters, Cogliostro and Medieval Spawn, for McFarlane's rights in Miracleman; and (2) TMP would pay Gaiman past royalties for the use of Cogliostro and Medieval Spawn, and pay past and future royalties for the use of the character Angela. (Amended Complaint, ¶¶ 51, 54) Plaintiffs allege that the McFarlane Defendants have breached this agreement by not completing the transfer of the Miracleman rights and by not paying royalties at a 15% rate.

The McFarlane Defendants vigorously dispute that this exchange of letters, or any other combination of written or oral discourse with Gaiman, resulted in an enforceable contract.

3

(Answer, ¶¶ 51, 54) Contrary to plaintiffs' self-serving characterizations (*see* Plaintiffs' Brief in Support of Motion for Partial Summary Judgment at 8; Plaintiffs' Proposed Findings of Fact ¶¶ 69, 70), McFarlane's unequivocal deposition testimony makes it clear that no final agreement was ever reached. (DPFOF, ¶19) More importantly for purposes of plaintiffs' partial summary judgment motion, the McFarlane Defendants have asserted a counterclaim and an affirmative defense in this action alleging that Gaiman's representations in the May 5 and July 15 letters as to the royalty formula — and its operation with respect to certain characters — were knowingly false and/or misleadingly incomplete in describing the existence and operative terms of his "standard DC Comics contract" and in asserting that such terms would even apply to the Medieval Spawn character. (Affirmative Defenses, ¶ 9; Counterclaim, Second Claim for Relief)

McFarlane felt he needed to conduct further investigation into Gaiman's claims regarding royalty formulas before he would agree to incorporate those formulas into any contract with Gaiman. (DPFOF, ¶ 21) McFarlane contacted Terri Cunningham at DC Comics and learned that Gaiman had misrepresented the rights he would have received for his contribution to Medieval Spawn. (DPFOF, ¶ 22) When McFarlane finally learned from Terri Cunningham at DC Comics of the misleading nature of these foundational representations, he justifiably terminated negotiations with Gaiman, stopped any further payments for Cogliostro and Medieval Spawn, and rescinded his previous offer to transfer his Miracleman intellectual property rights. (DPFOF, ¶ 29) Plaintiffs chastise McFarlane at length in their brief because at his deposition he was not able to remember all of the details of his second conversation with Ms. Cunningham. (*See* Plaintiffs' Brief at 15-16.) Yet he remembers the only critical part, namely, that she provided him with information about how DC Comics handles the payment of royalties for

motion pictures and television rights — information that was inconsistent with what Gaiman had been telling him. (DPFOF, ¶ 28; Plaintiffs' Proposed Findings of Fact ¶¶ 86, 87)

However, Plaintiffs have produced copies of Gaiman's many different DC Comics contracts, which corroborate and elaborate on the general facts McFarlane learned from Ms. Cunningham during their second conversation. These contracts paint a picture of Gaiman's relationship with DC Comics that is materially different and more complex and variable than Gaiman's representations to McFarlane as to his "standard DC Comics contract." When viewed in light of the facts that Gaiman (1) never provided McFarlane with a single executed copy of any DC Comics contract, despite McFarlane's many requests over the years, and (2) failed to disclose that earlier in 1997 he had signed *two* DC Comics contracts in which the royalty rate was a maximum of 10% (instead of the purported "standard" 15% flat rate), the actual contracts provide strong evidence of Gaiman's fraud.

## ARGUMENT

The evidence already adduced at this point in discovery clearly establishes each element of the McFarlane Defendants' fraud counterclaim and affirmative defense. Those elements are: (1) a false representation of fact, (2) made with the intent to defraud and for the purpose of inducing another to act upon it, (3) upon which the other party reasonably relies to his or her detriment. *Kailin v. Armstrong*, 2002 WI App 70, ¶ 31, 643 N.W.2d 132, 145-46 (Ct. App. 2002); *Lundin v. Shimansky*, 124 Wis. 2d 175, 184-85, 368 N.W.2d 676, 680-81 (Wis. 1985). Failure to disclose a fact may be a misrepresentation for purposes of a fraud claim if the person who failed to disclose had a duty to do so. *Kailin*, 2002 WI App 70, ¶ 32, 643 N.W.2d at 146; *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95, 100 (Wis. 1980). "A person has a duty to disclose 'matters known to him [or her] that he [or she] knows to be necessary to prevent his [or her] partial or ambiguous statement of the facts from being misleading.'" *Kailin*,

5

2002 WI App 70, ¶ 32, 643 N.W.2d at 146 (quoting Restatement (Second) of Torts, § 551(2)(b) (1977)).

When reviewing plaintiffs' motion for partial summary judgment on the McFarlane Defendants' claim and defense of fraud, the question is whether the parties' submissions reveal genuine disputes of material fact, entitling the McFarlane Defendants to a trial on this issue. Fed. R. Civ. P. 56(c). "Summary judgment is only appropriate where the record discloses no dispute as to any material fact." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002); *Taylor v. Monsanto Co.*, 150 F.3d 806, 808 (7th Cir. 1998). A factual dispute is "genuine" for summary judgment purposes when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). All doubts must be resolved in the nonmoving party's favor. *Id.*

Plaintiffs contend that the McFarlane Defendants' fraud claim and defense must be dismissed for three reasons: (1) there was no misrepresentation because Gaiman accurately stated the terms of his DC Comics contracts; (2) there was no reasonable reliance because McFarlane chose to go forward with the contract despite knowing of the alleged fraud; and (3) McFarlane's testimony regarding how he learned of the fraud was too vague to satisfy the necessary evidentiary standard. (Plaintiffs' Brief at 1-2) Plaintiffs are mistaken on all three points.

1. **Gaiman's Representations About His DC Comics Contract Were Knowingly False and/or Misleadingly Incomplete.**

Plaintiffs boldly state in their Brief that "Gaiman never made a false statement to McFarlane." (Plaintiffs' Brief at 12) According to plaintiffs, Gaiman "consistently told the truth" when he represented that (1) DC Comics would have paid him royalties for his work on a

6

derivative character such as Medieval Spawn and (2) that under his standard DC Comics contract, Gaiman would receive a royalty of "15% of publisher's net receipts" for merchandising and promotional licensing and/or if one of his characters had a speaking part in a motion picture, audio-visual recording, stage play or television production. (Plaintiffs' Brief at 12-13) Plaintiffs' arguments cannot withstand scrutiny when the contracts themselves are examined.

As the recent discovery in this case has dramatically demonstrated, there is no such thing as one "standard" DC Comics contract that covers all of the terms Gaiman proposed in his letters to McFarlane. (DPFOF, ¶ 35) Documents produced by plaintiffs, including numerous copies of Gaiman's many different contracts with DC Comics dating back to 1988, show at least two distinct types of DC Comics contracts applicable to Gaiman — one for his writing services on comic books (which pays royalties based on sales of the comic books themselves, including reprints), and another one for "Character Equity" (which pays royalties for non-comic-book uses of specifically identified characters, such as merchandise licensing, movies, audio-visuals, etc.). (DPFOF, ¶¶ 35-37) The parties are not disputing the payment of royalties based on comic books sales; rather, the negotiations in 1997, and the dispute in this case, arise from Gaiman's claims to "character equity" in the characters of Cogliostro and Medieval Spawn.[1]

Throughout his negotiations with McFarlane in 1997, culminating in his May 5, 1997 letter, Gaiman claimed that under his "basic DC deal," his work on Issue 9 of *Spawn* entitled him to receive royalties on non-comic-book uses of Cogliostro and Medieval Spawn. (DPFOF, ¶¶ 13-14) At the time he was making these representations, however, Gaiman knew but did not disclose to McFarlane several very important additional facts that were necessary to prevent

---

[1] The parties also discussed "character equity" for Angela, but the scope of Gaiman's alleged rights in that character is not relevant to the McFarlane Defendants' fraud counterclaim and affirmative defense.

7

McFarlane from being misled by Gaiman's representations — facts that Gaiman concealed from McFarlane by refusing McFarlane's numerous requests for a copy of his DC Comics contract.

First, Gaiman knew that his minimal work on the character that *McFarlane* later named Medieval Spawn would not have entitled him to any character equity under any of his DC Comics contracts. (DPFOF, ¶¶ 32-33) Plaintiffs contend that because one of Gaiman's DC Comics contracts gave him character equity rights in a pre-existing character called "Dream (Sandman)," this proves that "D.C. would pay Gaiman for derivative characters."[2] (Plaintiffs' Brief at 12; Plaintiffs' PFOF, ¶ 98) On the contrary, what Gaiman failed to tell McFarlane was that DC Comics had a specific and rigorous method of determining character equity rights — a procedure that Gaiman's minimal efforts on the Medieval Spawn character would have never satisfied.

The evolution of Gaiman's contractual relationship with DC Comics on the *Sandman* series demonstrates this process. Specifically, paragraph 8(c) of Gaiman's first *Sandman* contract, dated April 20, 1988, establishes basic foundational requirements of duration and originality before character equity is earned:

> It is understood and agreed that if after Writer [Gaiman] has supplied the full script for the first twelve consecutive issues of the Work, Writer shall have created and/or shall subsequently create <u>wholly original</u> characters for the Work, DC shall grant Writer Creator Equity in those characters only ....

(DPFOF, ¶ 39; emphasis in original) Thus, Gaiman had to produce twelve consecutive scripts of *Sandman* before he would be entitled to any character equity, and then only for "wholly original" characters. (DPFOF, ¶ 40) One year later, after he had completed six of the issues, Gaiman and

---

[2] Plaintiffs assert that Gaiman's attorney sent a copy of this agreement to Larry Marder of Image Comics in 1997. (Plaintiffs' Brief at 12). On the contrary, Gaiman's attorney only sent an unexecuted draft of an agreement to Marder, a draft which differed in material respects from the agreement Gaiman ultimately executed (and which McFarlane never saw until this litigation). (DPFOF, ¶ 56)

8

DC Comics exchanged correspondence regarding his desire to receive character equity for his version of the title character Sandman, who had been in existence at DC Comics since the 1940s. (DPFOF, ¶¶ 42-43)  In a letter dated July 10, 1989, Chantal d'Aulnis of DC Comics acknowledged how much Gaiman had changed the Sandman character, and offered to grant Gaiman's request:

> Dear Neil,
>
> As you know, Paul handed to me your letter of April 17 regarding the SANDMAN, and asked me to come up with some innovative answers to your reasonable questions. . . .
>
> First off, it is clear that "a" Sandman has been sprinkling grains of sand in the eyes of the sleepless throughout mythology.  It is also clear that the character which you and Sam Kieth have created *has little in common with any version previously published by DC*.  When we concluded our contract with you on the basis of your original outline, this was not as obvious as it is now, after half a dozen issues have been published, and your point is well taken. . . .
>
> . . . I propose to compromise by upgrading your status and royalties not to those of a full "creator" as you suggested, but to those of a "creative contributor."

(DPFOF, ¶ 42)  Ms. d'Aulnis then proceeded to outline DC's proposal for licensing royalties on this character, as well as certain limitations on Gaiman's right to claim royalties on the character in the future:

> <u>Licensing Royalties</u> ("Creator Equity" in your current contract):
>
> These days, the licensing split between DC and creators is one of the issues negotiated from property to property.  We engaged you under the old rules, so the equity you can qualify for is <u>10%</u> of any amounts generated by "Death" and the other original characters. . . . To upgrade your status to Creative Contributor, I propose that we increase your equity from <u>10%</u> to <u>15%</u>.  Under the new policy for this status, your version of the Sandman character (excluding his name, which was a pre-existing element besides being the property's main trademark) can qualify as a fully vested element, just like Death or Desire ....

9

> Future Financials:
>
> If one day you leave the book and another writer starts writing it <u>substantially</u> like you, you retain all percentages shown in this letter. That's the good news. Should your successor add substantial changes or new characters, then your share gets pro-rated down so he/she can get a cut. That's the bad news ....

(DPFOF, ¶ 43)

Six months later, by letter agreement dated January 2, 1990, Gaiman and DC Comics amended their April 20, 1988 contract to reflect Gaiman's successful completion of the first twelve consecutive issues of *Sandman* and his new status as a "Creative Contributor" to the series. (DPFOF, ¶ 44) This letter agreement expressed DC Comics' appreciation for Gaiman's "innovative interpretation of the central character," and defined "Creative Contributor" as someone who "creates a specific new element (such as a new character) or alters an old element to such an extent that it *in DC's judgment qualifies as new*, and who is contractually entitled to receive a Creator Royalty and/or Licensing Royalty for any and all substantial use of that element." (DPFOF, ¶ 45; emphasis added)

Finally, the "Character Equity Agreement" dated February 1, 1993 expressly incorporated Gaiman's April 20, 1988 and January 2, 1990 *Sandman* contracts and specifically listed the characters for which Gaiman was to receive non-comic-book royalties. (DPFOF, ¶ 47) It is this list of characters — specifically, the inclusion of the "preexisting character of DREAM (aka SANDMAN)" on the list — upon which plaintiffs justify Gaiman's representations to McFarlane claiming entitlement to character equity royalties for the derivative character of Medieval Spawn. As demonstrated by Gaiman's earlier contracts and negotiations, however, it was only Gaiman's extensive alteration of the *central* character in the *Sandman* series into a character that "has little in common with any version previously published by DC" that convinced DC Comics to give him any equity in that character. (DPFOF, ¶ 48)

10

By contrast, Gaiman's work on the Medieval Spawn character does not begin to approach the level required by DC Comics for character equity in pre-existing characters. It is undisputed that Gaiman's script for *Spawn* Issue 9 contained nothing more than the following very brief description of the character:

> Spawn rides up on a huge horse. He's wearing a kind of Spawn suit and mask, although the actual costume under the cloak is reminiscent of a suit of armour. His lettering is like the Spawn lettering, but maybe with a different colour in the border.

(DPFOF, ¶ 49) This is Gaiman's entire contribution to this character; Gaiman does not name him or embellish him further. After negotiating for almost a year to get character equity for his substantially altered version of the central character of Dream/Sandman, Gaiman was intimately aware that his skeletal derivative of McFarlane's Spawn would never be entitled to any character equity from DC Comics. Under these circumstances, Gaiman's representations to the contrary can only be considered intentionally false and misleading.

In addition, Gaiman knew — but again never told McFarlane — that his various "Character Equity" agreements with DC Comics did not always assign a flat 15% royalty for non-comic-book uses of specific characters. In fact, his recently produced contracts demonstrate a range of royalty percentages, including 7.5% and 10% in addition to 15%. (DPFOF, ¶¶ 32-34) Particularly telling are two Character Equity agreements from the *Sandman* series, each dated January 3, 1997 — the very time period Gaiman is negotiating with McFarlane — in which Gaiman received only a 10% character equity royalty for the characters AUBERON and TITANIA. (DPFOF ¶ 32) Gaiman testified at his deposition that a variety of factors went into determining the royalty rate assigned to certain characters, including whether he was the sole creator of the character. (DPFOF ¶ 54) While this may explain the variety of royalty percentages in his different agreements, it also proves the point in the McFarlane Defendants'

fraud claims — namely, that Gaiman's intimate knowledge of the complexity and limitations of his various DC Comics' contracts imposed upon him a duty to share that information with McFarlane in order to explain his written statements – particularly when the parties are using those contracts as a guide for their negotiations and knowing McFarlane doesn't have copies of the contracts themselves. When he chose to keep that information from McFarlane, he knowingly induced McFarlane to rely on his inaccurate and incomplete representations regarding his entitlements to royalties from DC Comics. This constitutes actionable fraud under Wisconsin law. *See Kailin*, 2002 WI App 70, ¶ 32, 643 N.W.2d at 146.

Finally, Gaiman knew — but did not tell McFarlane — that *all* of his DC Comics "Character Equity" agreements contained a section entitled "Contingencies Affecting Royalties" that could have greatly reduced the royalty percentage for Cogliostro and Medieval Spawn because of *McFarlane's* extensive reworking of those characters long before they ever appeared in any other medium. (DPFOF, ¶ 51) In particular, this section provides that if DC Comics uses or licenses the use of a version of the character that consists primarily of "Spin-Off Elements" — which include, among other things, names, themes, titles, devices, and artwork that were either not created by Gaiman or, if created by Gaiman, were later substantially changed or developed by someone else — then DC Comics will reduce the royalties it pays to Gaiman based on its pro-rata allocation of the proportion of Gaiman's contributions to the whole version of the character used. (DPFOF, ¶ 52) In the case of Cogliostro, by the time that character appeared in a live-action movie and an HBO animated series, McFarlane and others had contributed new themes, locales, devices, scripts (he appeared in many issues of *Spawn* written by people other than Gaiman) and artwork (none of which was contributed by Gaiman) to the character. (DPFOF, ¶ 50) The situation with Medieval Spawn is even more compelling. When that character was

12

made into an action figure, McFarlane — not Gaiman — had added the character's name, all of its designs and devices, and all of the artwork that went into the character. (*Id.*) In fact, almost nothing of Gaiman's was used in the ultimately licensed Medieval Spawn character. Under every one of Gaiman's DC Comics Character Equity agreements, these factors would have permitted DC, at its sole discretion, to significantly reduce Gaiman's royalties.

Gaiman had a duty to disclose these material additional facts — which were exclusively within his control — because without them, his representations about character equity rights under his "basic DC deal" were either outright false or seriously misleading. Without these additional facts, McFarlane was misled into believing that he had no choice but to agree to relinquish his intellectual property rights in Miracleman in order to regain the complete rights to Medieval Spawn — a derivative of his prized creation Spawn. McFarlane was also misled to believe that in order to honor his 1992 pledge to treat Gaiman the way he was treated at DC Comics, he would have to pay significant royalties (15%) to Gaiman from a live-action movie and an HBO animated series in which a much more fully developed Cogliostro character appeared. Under Wisconsin law, such material non-disclosures constitute material misrepresentations of fact, thereby satisfying the first element of the McFarlane Defendants' fraud counterclaim and affirmative defense. *Kailin*, 2002 WI App 70, ¶ 32, 643 N.W.2d at 146; *Ollerman*, 94 Wis. 2d at 26, 288 N.W.2d at 100. At a minimum, the evidence set forth herein raises a genuine dispute of material fact as to the truth or falsity of Gaiman's representations, precluding summary judgment on this issue. *Lesch*, 282 F.3d at 471; *Taylor*, 150 F.3d at 808.

  2. **McFarlane Reasonably Relied on Gaiman's False Representations.**

As their second reason for seeking summary judgment, plaintiffs contend that even if Gaiman's statements regarding Medieval Spawn and the royalty percentages were false, the McFarlane Defendants' fraud claim and defense must still be dismissed because McFarlane did

13

not reasonably rely on those representations. (Plaintiffs' Brief at 13) This is so, according to plaintiffs, because even though he had already learned from Terri Cunningham at DC Comics that Gaiman had lied about his entitlement to royalties for Medieval Spawn, McFarlane "chose to go ahead with the contract anyway." (Plaintiffs' Brief at 14)

Under Wisconsin law, a fraudulent inducement defense or claim requires a showing of justifiable reliance. *Fullin v. Martin*, 34 F. Supp. 2d 726, 738 (E.D. Wis. 1999) (citing *Caulfield v. Caulfield*, 183 Wis. 2d 83, 92-93, 515 N.W.2d 278, 282 (Ct. App. 1994). Wisconsin courts have recognized that a party cannot justifiably rely on statements — and later claim to have been fraudulently induced into entering into a contract based on those same statements — where the party already knew the statements to be false. *Id.*; *First Credit Corp. v. Behrend*, 45 Wis. 2d 243, 250, 172 N.W.2d 668, 671 (Wis. 1970). Citing these cases and others, plaintiffs argue that McFarlane's decision to make a royalty payment to Gaiman after his first conversation with Terri Cunningham renders his reliance on Gaiman's false statements unreasonable as a matter of law. (Plaintiffs' Brief at 13-14)

Plaintiffs' argument fails for two reasons. First, it incorrectly assumes the existence of only one false statement. As demonstrated above, in his attempts to induce McFarlane to relinquish his intellectual property rights in Miracleman, Gaiman falsely represented both (1) the *existence* of character equity rights in Medieval Spawn and (2) the *value* of character equity rights in Cogliostro. At the time he made the royalty payment to which plaintiffs refer, McFarlane suspected but had not yet confirmed that Gaiman's claim to a flat 15% royalty for the use of Cogliostro in the HBO animated series and elsewhere was also false or seriously misleading. In fact, the full extent to which this statement was misleading and incomplete was not known until plaintiffs recently produced Gaiman's complicated set of DC Comics contracts.

14

Thus, McFarlane's first conversation with Terri Cunningham had no bearing on Gaiman's second, separate and distinct falsehood.

Plaintiffs' argument fails for another reason. Unlike the parties who unsuccessfully asserted fraud in *Fullin*, *Behrend*, and the other cases plaintiffs cite, the evidence in this case does not undisputedly show that McFarlane completed his negotiations and entered into a contract with Gaiman. In short, plaintiffs' summary judgment argument — for which they are required to demonstrate the *absence* of factual disputes — fails because it ignores the largest factual dispute in this case: the existence or non-existence of a contract.

Plaintiffs seize upon the fact that McFarlane paid some royalties to Gaiman even after learning that some of Gaiman's representations were false, and interpret this as proof that McFarlane entered the contract despite this knowledge. (Plaintiffs' Brief at 14) However, a simple reading of the language McFarlane used in his note accompanying this payment — minus plaintiffs' characterizations — makes it clear that this is nothing more than a good faith payment in a negotiation process that McFarlane still hoped would conclude successfully:

> I had a conversation with Terri Cunningham who said that when a derivative character is created, no money is given to those creating the knock-off character. Only on rare occasions, when extensive reworking and extensive work have been done, is money usually given. I.e., your Sandman book being one of those rare exceptions. So far you have worked on parts of 8 pages that include Medieval Spawn and I wouldn't define that as extensive. Still, I am willing to pay some monies *as long as all other matters are sorted out*.

(emphasis added). McFarlane also testified that some time after sending this statement to Gaiman, he had a second conversation with Terri Cunningham during which he learned more about how DC Comics paid royalties for the use of characters in "Hollywood stuff" — movies and television, etc. (DPFOF, ¶¶ 26-29) This second conversation made McFarlane realize that Gaiman had misrepresented both aspects of the rights he was proposing to exchange for

15

Miracleman — their existence *and* their value. It is not surprising, therefore, that McFarlane testified that this was the "proverbial straw on the camel's back" and broke off further negotiations with Gaiman. (DPFOF, ¶ 29).[3]

Thus, contrary to plaintiffs' assertions, McFarlane's payment of "some monies" did *not* constitute "going ahead with the contract." However, the plaintiffs themselves allege that one of the terms — if not the key term — was the exchange of McFarlane's intellectual property rights in Miracleman for Gaiman's claimed rights in Cogliostro and Medieval Spawn. (Amended Complaint, ¶ 51; Plaintiffs' Brief at 7) It is also undisputed that McFarlane did not go through with this exchange, nor did he continue paying royalties to Gaiman.[4] Under these circumstances, because they cannot show as a matter of undisputed fact that McFarlane went ahead with the contract despite his knowledge of Gaiman's falsity, there is no way plaintiffs can satisfy their burden to show, as a matter of law, that McFarlane's reliance on Gaiman's statements was unreasonable. *Fullin*, 34 F. Supp. 2d at 738; *Behrend*, 45 Wis. 2d at 250, 172 N.W.2d at 671.

Eventually, whether McFarlane's reliance on Gaiman's false statements was reasonable will be a question of fact for the jury, and the jury will decide if Gaiman's false statements relieve McFarlane of any obligation he might have had to transfer Miracleman to Gaiman.

---

[3] Plaintiffs try to make a distinction between the subject matter of McFarlane's two conversations with Terri Cunningham, as if this is somehow determinative of the issue. Plaintiffs describe the first conversation as dealing with payment of royalties for derivative characters such as Medieval Spawn, and the second conversation as dealing with payment of "movie royalties," and then scoff at the possibility that this second conversation could have been related to the first or that it could have influenced McFarlane's actions they way he claims it did. (Plaintiffs' Brief at 10, 14, 15) A quick review of Gaiman's DC Comics contracts, however — all of which were produced *after* McFarlane's deposition — demonstrates that "movie royalties" and all other licensing royalties are all part of the Character Equity agreements, not the normal script-writing agreements. Thus, McFarlane's two conversations with Terri Cunningham likely *did* give McFarlane reason to believe Gaiman had lied about both aspects of the rights he was going to be exchanging for Miracleman — their existence *and* their value. At this point, McFarlane's refusal to complete the exchange was imminently reasonable.

[4] Plaintiffs point to the fact that McFarlane's wife made a royalty payment to Gaiman for foreign sales in March of 1998, six months after the negotiations broke down, as proof that TMP had entered into a contract with Gaiman in 1997. This is a red herring. This royalty payment was for foreign sales of comic books, including the Angela series, which were not affected by Gaiman's assertions of character equity royalties for non-comic-book uses of the Cogliostro and Medieval Spawn characters. (*See* Second Declaration of Neil Gaiman, ¶ 4; DPFOF, ¶ 55)

16

Before the jury gets to the McFarlane Defendants' fraud defense, however, it will have to determine the ultimate fact issue in this case — namely, whether Gaiman and McFarlane ever reached an agreement that imposed enforceable obligations on the parties. In any event, the evidence adduced so far establishes the existence of genuine issues of material fact as to the reasonableness of McFarlane's reliance on Gaiman's false statements, thereby precluding summary judgment on this issue.

### 3. The McFarlane Defendants' Evidence Meets the "Clear and Convincing" Evidence Standard Required for Fraud.

As their last argument in support of their partial summary judgment motion, plaintiffs claim that the McFarlane Defendants' fraud claim and defense fail because McFarlane's evidence of his second conversation with Terri Cunningham is too speculative as a matter of law to satisfy the appropriate evidentiary standard. (Plaintiffs' Brief at 15). Plaintiffs misunderstand the evidentiary purpose of the second Terri Cunningham conversation and ignore the hundreds of pages of documentary evidence they produced which easily satisfies the "clear and convincing" evidentiary standard.

One of the elements the McFarlane Defendants must prove in their fraud claim and defense is the existence of a material misrepresentation by Gaiman. *Kailin*, 2002 WI App 70, ¶ 31, 643 N.W.2d at 145. There is no dispute that Gaiman represented that his standard DC Comics contract would entitle him to character equity rights in the characters of Medieval Spawn and Cogliostro, and that these rights included a flat 15% royalty for all non-comic-book uses of these characters, including movies and television. McFarlane testified that in his second conversation with Terri Cunningham he learned that Gaiman's representations about the royalty rate were false or misleadingly incomplete. Thus, this testimony would be offered only to show

the falsity of one of Gaiman's representations. The operative issue here is what Gaiman said, not what Ms. Cunningham said.

Plaintiffs contend that this testimony is too speculative to satisfy the "clear and convincing" evidentiary standard and raises no more than a "metaphysical doubt as to the material facts." (Plaintiffs' Brief at 15-16; citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Citing *Matsushita* again, plaintiffs state that the McFarlane Defendants "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." (*Id.* at 587.) Here, plaintiffs provided just such "persuasive evidence" when they produced hundreds of pages of Gaiman's DC Comics contracts *after* they took McFarlane's deposition. As discussed in part 1 above, these contracts illuminate the falsity of Gaiman's statements. Thus, even if the Court disregards McFarlane's testimony regarding his second conversation with Terri Cunningham, the McFarlane Defendants have produced substantial evidence of Gaiman's falsity to satisfy the "clear and convincing" standard.

Under these circumstances, the fact that McFarlane was unable to remember more specific details about his second conversation with Terri Cunningham provides no basis for granting plaintiffs' summary judgment motion. McFarlane testified to the only important part of his conversation with Ms. Cunningham, namely, that Gaiman had misrepresented the terms of his DC Comics contracts. This misrepresentation is all but established when the actual contracts are considered, as they are plainly inconsistent with Gaiman's representations. The plaintiffs' motion must be denied.

## CONCLUSION

For all of the foregoing reasons, Defendants Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc., and McFarlane Worldwide, Inc., respectfully request

that this Court deny Plaintiffs' Motion for Partial Summary Judgment on the McFarlane Defendants' counterclaim and affirmative defense of fraud.

Dated: July 22, 2002

                                            LA FOLLETTE GODFREY & KAHN

                                  By _____
                                            Eugenia G. Carter
                                            Todd G. Smith
                                            Gabriel S. Gross
                                            One East Main Street, Suite 500
                                            Madison, WI 53701
                                            Tel: (608) 257-3911
                                            Fax: (608) 257-0609

                                                   —and—

                                            Michael A. Kahn
                                            Peter W. Salsich, III
                                            Blackwell Sanders Peper Martin, LLP
                                            720 Olive Street, Suite 2400
                                            Saint Louis, MO 63101
                                            Tel: (314) 345-6000
                                            Fax: (314) 345-6060

                                            Attorneys for Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc. and McFarlane Worldwide, Inc.

MN152668_1.DOC

CERTIFICATE OF SERVICE

    The undersigned certifies that a true and correct copy of the foregoing was served on all counsel of record via facsimile transmission this 22 day of July, 2002, addressed to the following:

    Allen A. Arntsen
    Jeffrey A. Simmons
    Foley & Lardner
    150 East Gilman Street
    Madison, WI 53703-2808
    Fax: 608-258-4258

    Kenneth F. Levin
    Kenneth F. Levin & Associates
    20 North Wacker Drive, Suite 2200
    Chicago, IL 60606
    Fax: 312-977-2990

    R. Scott Feldmann
    Brobeck, Phleger & Harrison, LLP
    38 Technology Drive
    Irvine, CA 92618-5312
    Fax: 949-790-6301