IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NEIL GAIMAN and MIRACLES AND MARVELS, LLC, | )<br>)<br>) |
| Plaintiffs, | )<br>)<br>) |
| v. | ) Case No. 02-C-0048-S |
| TODD McFARLANE, et al. | )<br>)<br>) |
| Defendants-Counterclaimants. | ) |

---

**THE MCFARLANE DEFENDANTS' RESPONSE TO PLAINTIFFS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

Defendants Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc. and McFarlane Worldwide, Inc. (together, the "McFarlane Defendants") by their attorneys, hereby submit their response to Plaintiffs' Proposed Findings of Fact and Conclusions of Law.

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**

1. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 1.

2. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 2.

3. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 3.

4. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 4.

5. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 5.

6. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 6.

7. The McFarlane Defendants admit that McFarlane recruited four prominent comic book authors to write issues of *Spawn*. The McFarlane Defendants deny that this was done "in order to boost the comic's reputation." Mr. McFarlane's testimony does not contain any such

statement. (June 19-20, 2002 Deposition of Todd McFarlane ("McFarlane Dep.") at 35-36 (*see* July 1, 2002 Affidavit of Jeffrey A. Simmon ("Simmons Aff."), Ex. B)

8. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 8.

9. The McFarlane Defendants admit that McFarlane and Gaiman did not talk about the specifics of Gaiman's compensation but deny that McFarlane eventually agreed to provide Gaiman with any specific contract terms. Gaiman and McFarlane never discussed any specific contract terms until 1996. (June 24, 2002 Deposition of Neil Gaiman ("Gaiman Dep.") at 58, 79, 81-82; July 22, 200 Affidavit of Gabriel S. Gross ("Gross Aff."), Ex. A.)

10. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 10.

11. The McFarlane Defendants admit that Gaiman wrote the script for *Spawn* Issue 9, but only after extensive consultation with McFarlane as to plot, themes and characters. (McFarlane Dep. at 41-46; Gross Aff., Ex. B; Simmons Aff., Ex. B)

12. The McFarlane Defendants admit that *Spawn* Issue 9, which incorporated Gaiman's script, contained three characters that had not appeared in earlier issues of the *Spawn* comic series. The McFarlane Defendants deny that either Gaiman's script or the completed comic book contained a character named "Medieval Spawn." (Gross Aff., Ex. C at Dep. Ex. 12; *see also* Combined Appendix, Ex. B (*Spawn* Issue 9))

13. The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 13. The deposition testimony cited by Plaintiffs in support of this proposed finding states only that Gaiman's counsel and Mr. McFarlane agreed to use the name "Medieval Spawn" for purposes of the deposition questioning. Gaiman's counsel specifically acknowledges that "there are some issues, et cetera, et cetera" regarding the use of this name. (McFarlane Dep. at 43-44; Simmons Aff., Ex. B) Gaiman testified that he killed the unnamed Spawn character from the Middle Ages

at the end of its eight-page appearance in *Spawn* issue 9, and he never used him again. (Gaiman Dep. at 77; Gross Aff., ¶ 2, Ex. A) The name "Medieval Spawn" was given to a later version of the character by McFarlane, who used the Medieval Spawn character in later issues of *Spawn* and made an action figure based on that version of the character. (Gaiman Dep. at 59; Gross Aff., Ex. A; McFarlane Dep. at 77; Simmons Aff., Ex. B)

14.  The McFarlane Defendants admit that the unnamed Spawn character in *Spawn* Issue 9 is known as a "Hellspawn." The McFarlane Defendants deny that this character was called "Medieval Spawn." (Gross Aff., Ex. C at Dep. Ex. 12; Combined Appendix, Ex. B)

15.  The McFarlane Defendants admit that the unnamed Spawn character from the Middle Ages who appears in *Spawn* Issue 9 is a different version of the Spawn character who is the main character in the *Spawn* series. The McFarlane Defendants deny that the unnamed Spawn character who appears in Issue 9 was called "Medieval Spawn." (*Id.*)

16.  The McFarlane Defendants admit that the Angela character was entirely original, but deny that Cogliostro was entirely original. Gaiman testified that the Cogliostro character was based upon a pre-existing historical and literary character from the French Revolution. (Gaiman Dep. at 63-64; Gross Aff., Ex. A)

17.  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 17.

18.  The McFarlane Defendants admit that of the new characters introduced to the *Spawn* series in Issues 8, 9, 10 and 11 — each written by a different guest author — only the characters who appeared in Issue 9 were made into action figures. The McFarlane Defendants deny that any of the characters in Issue 9 were created solely by Gaiman. All of the characters in Issue 9 were jointly created by Gaiman and McFarlane. (McFarlane Dep. at 41-46; Gross Aff., Ex. B; Simmons Aff., Ex. B)

3

19. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 19.

20. The McFarlane Defendants admit that McFarlane and Gaiman agreed that Gaiman would be compensated for his work on the *Angela* mini-series in the same manner as he had been compensated for his work on *Spawn* issue 9. This meant that McFarlane agreed to honor Gaiman's request that he be compensated in a manner equivalent to his compensation under his DC Comics contract. At no time, however, either when discussing *Spawn* issue 9 or the *Angela* mini-series, did Gaiman ever identify any specific terms of his DC Comics contract. (Gaiman Dep. at 58, 79, 81-82; Gross Aff., Ex. A)

21. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 21.

22. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 22.

23. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 23.

24. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 24.

25. Plaintiffs' Proposed Finding of Fact No. 25 is an incomplete sentence that cannot be either admitted or denied.

26. Plaintiffs' Proposed Finding of Fact No. 26 is a vague and ambiguous statement that is unsupported by the record cites included therein. The McFarlane Defendants deny the general statement that Gaiman's "requests were consistent with the terms of Gaiman's contract with DC Comics" because Gaiman had many different contracts with DC Comics with many different royalty amounts and conditions affecting these royalty amounts. (Gross Aff., Ex. D)

27. The McFarlane Defendants admit that McFarlane sent a payment to Gaiman in connection with the Medieval Spawn action figure. The McFarlane Defendants deny that this payment was consistent with McFarlane's and Gaiman's oral agreement because the oral

agreement did not contain any terms regarding such payments. (Gaiman Dep. at 58, 79, 81-82; Gross Aff., Ex. A)

28.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 28.

29.     The McFarlane Defendants admit that Gaiman testified that *he believed* he was entitled to royalties under his 1992 oral agreement with McFarlane, but deny that Gaiman was in fact entitled to any royalties under this agreement because until 1996, Gaiman had never provided McFarlane with any specific terms or any copies of any of his DC Comics contracts. (Gaiman Dep. at 58, 79, 81-82; Gross Aff., Ex. A)

30.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 30.

31.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 31.

32.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 32.

33.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 33.

34.     The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 34 because it is unsupported by and inconsistent with the deposition testimony cited by Plaintiffs. Larry Marder testified that he did not recall whether McFarlane or Gaiman asked him to mediate their dispute (Marder Dep. at 55; Simmons Aff., Ex. D) and McFarlane testified that it was "possibly" him, but that he did not know. (McFarlane Dep. at 103-04; Simmons Aff., Ex. B)

35.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 35.

36.     The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 36 because it is unsupported by and inconsistent with the deposition testimony cited by Plaintiffs. Larry Marder testified only that as Executive Director of Image Comics he reported to "the shareholders." (Marder Dep. 27; Simmons Aff., Ex. D) McFarlane was one of several shareholders.

37. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 37.

38. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 38.

39. The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 39, because the document referred to (Simmons Aff., Ex. 25) did not contain actual contracts; rather, it comprised an alleged "breakdown" of all of Gaiman's DC contracts.

40. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 40.

41. The McFarlane Defendants admit that Larry Marder testified only that he remembers receiving "pages of DC contracts." The McFarlane Defendants deny that Marder testified that he received any specific DC Comics contracts. (Marder Dep. at 82; Simmons Aff., Ex. D)

42. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 42.

43. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 43.

44. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 44.

45. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 45.

46. The McFarlane Defendants admit that the percentages McFarlane proposed were less than the percentages that Gaiman represented he received from DC Comics, but deny that McFarlane's proposed percentages were lower than what Gaiman actually received from DC Comics. Gaiman had some DC Comics contracts with royalty percentages less than 15%, and all of his DC Comics contracts contained a section entitled "Contingencies Affecting Royalties" that could significantly reduce the royalty percentage depending on how a particular character was used. (Gross Aff., Ex. D)

47. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 47.

48. The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 48 because it is vague and ambiguous and contains an improper record cite in that it invites the Court to generally compare two exhibits without citing any specific support in either exhibit for the proposed finding.

49. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 49.

50. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 50.

51. The McFarlane Defendants admit that McFarlane's revised offer increased some of the royalty percentages Gaiman would receive, but deny that these royalties did not match the royalties he received under his DC contracts. Gaiman's DC contracts contained a variety of royalty percentages as well as specific contingencies that reduced royalty percentages by varying amounts. The application and effect of these contingencies upon royalty percentages was left to the sole discretion of DC Comics as publisher. Accordingly, McFarlane's discretionary reduction of the royalty percentages in his revised offer was consistent with—or even better than—the terms of Gaiman's D.C. contracts. (Gross Aff., Ex. D, at G04024, G04103, G04121, G04126-27, G04131-32, G04138-39)

52. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 52.

53. The McFarlane Defendants admit that Gaiman's attorney sent Larry Marder a letter demanding that Gaiman receive the payments he was entitled to under terms equivalent to those of his DC contracts. The McFarlane Defendants deny that McFarlane refused to follow through on his promise to match the terms of Gaiman's contracts, because the royalty percentages in McFarlane's revised offer was consistent with—or even better than—the terms of Gaiman's D.C. contracts. (*Id.*)

7

54. The McFarlane Defendants admit that Gaiman's attorney attached drafts of two of Gaiman's contracts with DC Comics from 1993. The McFarlane Defendants qualify this admission by further stating that the 15% royalty rate contained in these draft contracts was materially different from the 10% royalty rate contained in two of Gaiman's DC Comics fully-executed contracts dated January 3, 1997, just a few months before Gaiman's attorney's letter. (*Id.* at G04124-33)

55. The McFarlane Defendants' deny the general statement that the "draft contracts" attached to Gaiman's attorney's letter offered to pay Gaiman a 15% royalty for motion pictures, audio or visual recordings and stage productions incorporating "any characters" he created. The McFarlane Defendants state that only one of the two draft contracts attached to Gaiman's attorney's letter included any royalty percentage for motion pictures, audio visual recordings, and stage productions. Further, that draft contract did not offer to pay Gaiman a 15% royalty for such uses incorporating "any characters" he created, but instead specifically identified characters for which Gaiman would receive such a royalty. Finally, that draft contract included a section entitled "Contingencies Affecting Royalties" which provided several factors that would reduce the royalty for motion pictures, audio or visual records and stage productions downward from 15%, at DC Comics' sole discretion. (*See* Affidavit of Melanie Cook, Ex. A, attached to Plaintiffs' Proposed Finding of Fact No. 55)

56. The McFarlane Defendants' deny the general statement that royalties apply to "pre-existing characters" that had been revised by Gaiman. The McFarlane Defendants state that the one draft contract which provided royalties for motion pictures, audio or visual recordings, and stage productions, stated that such royalties would be applied only to two specifically identified pre-existing characters. (*Id.*)

8

57.  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 57.

58.  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 58.

59.  The McFarlane Defendants' deny that Gaiman's May 5, 1997 letter to McFarlane accurately summarized the terms of his contracts with DC Comics. Among other things, Gaiman's May 5, 1997 letter to McFarlane did not disclose the existence of the section entitled "Contingencies Affecting Royalties," nor did it disclose Gaiman's predicate contractual requirement that he complete 12 issues of a comic book series before he would be entitled to any royalties for merchandise licensing or media use of characters. Finally, it did not disclose that the alleged 15% royalty rate was actually downwardly adjustable and it did not disclose that he had recently signed two DC Comics contracts in which the royalty rate was 10%. (Simmons Aff., Ex. C at Dep. Ex. 2)

60.  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 60.

61.  The McFarlane Defendants deny that McFarlane agreed to the royalty amounts set forth in Gaiman's May 5, 1997 fax. Specifically, the McFarlane deposition pages cited by Plaintiffs do not contain testimony indicating that McFarlane had agreed to the royalty amounts; rather this deposition testimony only refer to Exhibit 19, which is a July 15, 1997 letter from Gaiman in which <u>Gaiman</u> refers to the phone conversation. When asked about Exhibit 19, McFarlane testified only that "I think we were heading in a good direction." (McFarlane Dep. at 188-89; Simmons Aff., Ex. B and Ex. C at Dep. Ex. 19)

62.  The McFarlane defendants deny that Gaiman agreed to exchange his rights in the Cogliostro and Medieval Spawn characters for McFarlane's rights in an unrelated character named Miracleman for the same reasons set forth in their response to Plaintiff's Proposed Finding of Fact No. 61. Exhibit 19 is just Gaiman's proposal, and McFarlane's deposition

9

testimony states only that he and Gaiman "were heading in a good direction." (McFarlane Dep. at 188-89; Simmons Aff., Ex. B and Ex. C at Dep. Ex. 19)

63. The McFarlane Defendants deny that Gaiman and McFarlane reached any agreement in a telephone conversation on July 15, 1997 regarding the exchange of characters, accounting of royalty payments, or the date of exchange. (McFarlane Dep. at 188-89; Simmons Aff., Ex. B and Ex. C at Dep. Ex. 19)

64. The McFarlane Defendants deny that Gaiman's fax accurately memorialized their telephone conversation of July 15, 1997, because contrary to Gaiman's assertions in the fax, McFarlane had not agreed to any specific terms in that telephone conversation. (McFarlane Dep. at 188-89; Simmons Aff., Ex. B and Ex. C at Dep. Ex. 19)

65. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 65.

66. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 66.

67. The McFarlane Defendants admit that McFarlane requested that the exchange date be changed to July 31, but deny that his fax raised "final questions" because McFarlane testified that he still had questions after this exchange of faxes on July 15, 1997. (McFarlane Dep. at 190, 197; Gross Aff., Ex. B)

68. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 68.

69. McFarlane Defendants deny Plaintiff's Proposed Finding of Fact No. 69. The deposition pages cited by Plaintiffs therein are incomplete and do not support this proposed finding. McFarlane was specifically asked at his deposition if, after the exchange of faxes identified in Plaintiffs' Proposed Findings of Fact 64-68, he believed that he and Neil had reached an agreement on the royalty and accounting issues. McFarlane answered: "No." (McFarlane Dep. at 196-97; Gross Aff., Ex. B)

10

70.     The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 70 for the same reasons as their denial of Plaintiffs' Proposed Finding of Fact No. 69, namely that McFarlane and Gaiman had not reached any agreement. (*Id.*)

71.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 71.

72.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 72.

73.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 73.

74.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 74.

75.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 75.

76.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 76.

77.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 77.

78.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 78.

79.     The McFarlane Defendants admit that McFarlane sent Gaiman a check and a royalty report on August 4, 1997. The McFarlane Defendants deny that this was done pursuant to any agreement. The testimony cited by Plaintiffs does not indicate the existence of an agreement, but only refers to the payment. In addition, McFarlane testified unequivocally that no agreement had been reached. (McFarlane Dep. at 196-97; 216-17; Gross Aff., Ex. B; Simmons Aff., Ex. B)

80.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 80.

81.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 81.

82.     The McFarlane Defendants deny Plaintiffs' editorial characterization of the absence of certain language in the August 4, 1997 report, which document speaks for itself. (Simmons Aff., Ex. C at Dep. Ex. 5)

83.     The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 83.

84. The McFarlane Defendants admit that McFarlane sent Miracleman film to Gaiman, but deny that this was pursuant to any agreement. The testimony cited by Plaintiffs does not indicate the existence of an agreement, but only refers to the shipment of Miracleman film. In addition, McFarlane testified unequivocally that no agreement had been reached. (McFarlane Dep. at 196-97; Gaiman Dep. at 187-88; Gross Aff., Exs. A-B)

85. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 85.

86. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 86.

87. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 87.

88. The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 88.

89. The McFarlane Defendants deny Plaintiffs' editorial characterization ("despite his inability to remember") of McFarlane's testimony. The McFarlane Defendants admit that McFarlane testified that his second conversation with Terri Cunningham was "the proverbial straw on the camel's back." (McFarlane Dep. at 119; Gross Aff., Ex. B)

90. The McFarlane Defendants admit that from McFarlane's point of view, all of his previous offers and negotiations were rescinded after his second conversation with Terri Cunningham and that he decided not to transfer his *Miracleman* intellectual property rights to Gaiman. (*Id.* at 120-21) The McFarlane Defendants deny the existence of any agreement between McFarlane and Gaiman as asserted in Plaintiff's Proposed Finding of Fact No. 90. (*Id.* at 196-97)

91. The McFarlane Defendants admit that Wanda Kolomyjec sent Gaiman a royalty check for foreign sales of certain comic books on March 26, 1998. The McFarlane Defendants deny the existence of any agreement between McFarlane and Gaiman as asserted in Plaintiff's Proposed Finding of Fact No. 91. (*Id.*) The McFarlane Defendants further state that the

March 26, 1998 royalty payment to Gaiman was for foreign sales of comic books and thus were not related to McFarlane's decision to rescind his offer to exchange intellectual property rights in the *Miracleman* character for Gaiman's claimed royalty rights for non-comic-book uses of the Cogliostro and Medieval Spawn characters.

      92.    The McFarlane Defendants deny the general statement that McFarlane's wife Wanda "performs a variety of duties for McFarlane's companies." McFarlane testified that at various times from 1992 to the present his wife has performed different tasks, but that at other times, she was not working for the company. (McFarlane Dep. at 124; Simmons Aff., Ex. B)

      93.    The McFarlane Defendants admit that McFarlane sent a letter to Gaiman dated January 12, 1999. The McFarlane Defendants deny that in this letter McFarlane rescinded an agreement with Gaiman, because there was no such agreement. McFarlane's January 12, 1999 letter states that McFarlane is officially rescinding his previous <u>offers</u>, not any agreement. In addition, McFarlane unequivocally testified that he and Gaiman did not reach an agreement. (McFarlane Dep. 196-97; Gross Aff., Ex. B; Simmons Aff., Ex. C at Dep. Ex. 8)

      94.    The McFarlane Defendants deny Plaintiffs' characterization of McFarlane's January 12, 1999 letter. That letter, which speaks for itself, contains no reference to any conversations with Terri Cunningham. (Simmons Aff., Ex. C at Dep. Ex. 8)

      95.    The McFarlane Defendants deny that McFarlane's letter of January 12, 1999 refers to any specific conversation between McFarlane and Terri Cunningham. The McFarlane defendants admit that McFarlane's letter of January 12, 1999 states that "payments for Medieval Spawn were based on false information you gave me regarding DC Comics' policy of payment on a derivative character." (*Id.*)

13

96. The McFarlane Defendants deny Plaintiffs' editorial characterizations of the McFarlane Defendants' discovery and pleadings. The McFarlane Defendants further state that despite McFarlane's repeated requests, Gaiman never provided McFarlane with an executed copy of any of his DC Comics contracts until the discovery phase of this litigation. (McFarlane Dep. at 198; Gross Aff., Ex. B)

97. The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 97. In response to Plaintiffs' Interrogatory No. 4, the McFarlane Defendants stated that Mr. McFarlane had "one or more conversations with Ms. Terri Cunningham." In addition, the McFarlane Defendants stated that their "investigation continues." (Simmons Aff., Ex. F) That continuing investigation has now uncovered Gaiman's many DC Comics contracts, which further detail several specific ways in which Gaiman's representations about his DC Comics contracts were fraudulent, including (1) he did not disclose the existence of the section entitled "Contingencies Affecting Royalties" that provides several factors that could significantly reduce the royalty rate Gaiman quoted; (2) he did not disclose his predicate contractual requirement that he complete 12 issues of a comic book series before he would be entitled to any royalties for merchandise licensing or media use of characters; and (3) he did not disclose that the alleged 15% royalty rate was not uniformly granted, as demonstrated by the 10% royalty rate he received in his two most recent DC Comics contracts. (Gross Aff., Ex. D)

98. The McFarlane Defendants admit that Gaiman's attorney sent a letter to Larry Marder in April of 1997 attaching an unexecuted draft of a contract between Gaiman DC Comics. The McFarlane Defendants further admit that this draft contract included the words "you have revised the pre-existing characters of DREAM (SANDMAN) and DESTINY" and goes on to provide Gaiman with the royalties for those and other characters. The McFarlane

Defendants deny Plaintiffs' ultimate Finding of Fact that "D.C. would pay Gaiman for derivative characters," because it is too general and not supported by the record cites therein. Specifically, the finally executed version of the contract whose draft was attached to Gaiman's attorney's letter does not include the pre-existing character of DESTINY among those characters for whom DC Comics would pay royalties (Gross Aff., Ex. C at Dep. Ex. 58) Furthermore, Gaiman's April 20, 1988 contract with D.C Comics, his correspondence with Chantal d'Aulnis of DC Comics dated July 10, 1989, and his January 2, 1990 contract with DC Comics, all demonstrate that DC Comics only agreed to pay royalties for the pre-existing character of DREAM (a/k/a SANDMAN) *after* Gaiman completed 12 issues of the *Sandman* comic book series and only in recognition of the substantial alternations Gaiman had made in the original *Sandman* character. (Gross Aff., Ex. D at G04022-29, G04075-86, G04230-33)

## **PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW**

1. The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 1.

2. The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 2.

3. The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 3.

4. The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 4.

5. The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 5.

6. The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 6.

7. The McFarlane Defendants deny Plaintiffs' Proposed Conclusion of Law No. 7.

The McFarlane Defendants have produced substantial evidence that Gaiman intentionally misrepresented the terms of his DC Comics contracts by failing to disclose to McFarlane, among other things, (1) the existence of the section entitled "Contingencies Affecting Royalties" that provides several factors that could significantly reduce the royalty rate Gaiman quoted; (2) his

predicate contractual requirement that he complete 12 issues of a comic book series before he would be entitled to any royalties for merchandise licensing or media use of characters; (3) the fact that the alleged 15% royalty rate was not uniformly granted, as demonstrated by the 10% royalty rate he received in his two most recent DC Comics contracts. Accordingly, the McFarlane Defendants have raised genuine issues of material fact with respect to the truth or falsity of Gaiman's representations. Summary judgment on this issue is inappropriate because "summary judgment is only appropriate where the record discloses no dispute as to any material fact." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002); *Taylor v. Monsanto Co.*, 150 F.3d 806, 808 (7th Cir. 1998).

       8.      The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 8.

       9.      With respect to Plaintiffs' Proposed Conclusion of Law No. 9, the McFarlane Defendants admit that a party's reliance is not reasonable as a matter of law where the party knows that a particular statement is false prior to entering into a contract based on that same false statement. *Fullin v. Martin*, 34 F. Supp. 2d 726, 737-38 (E.D. Wis. 1999). The McFarlane Defendants have raised a genuine issue of material fact with respect to the reasonableness of McFarlane's reliance on Gaiman's false statements because they have submitted substantial evidence upon which a reasonable fact finder could find that: (1) Gaiman made at least two different misrepresentations about his DC Comics, both of which McFarlane was intended to rely on and did rely on; (2) McFarlane knew of the falsity of only one of these representations when he made the payment to Gaiman; (3) McFarlane's payment to Gaiman was a good faith payment during ongoing contract negotiations and not payment in full of a contractual obligation; and (4) McFarlane did not enter into any agreement with Gaiman based on Gaiman's false statement in

16

that he refused to transfer his Miracleman rights after learning of Gaiman's second false statement.

10.     With respect to Plaintiffs' Proposed Conclusion of Law No. 10, The McFarlane Defendants admit that a party who chooses to go forward with a contract despite knowing of potentially false representations cannot seek to escape that contract by claiming he later discovered that the misrepresentations were more extensive than he had realized. *Fullin*, 34 F. Supp. 2d at 738; *First Credit Corp. v. Behrend*, 172 N.W.2d 668, 671 (Wis. 1969). The McFarlane Defendants have raised a genuine issue of material fact regarding whether McFarlane chose to go forward with a contract in that they have submitted substantial evidence that McFarlane did not believe that he entered into a contract, broke off further contract discussions after he discovered Gaiman's second material misrepresentation, and declined to transfer his Miracleman rights to Gaiman after learning of Gaiman's potentially false representations.

11.     The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 11.

12.     The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 12.

13.     The McFarlane Defendants deny Plaintiffs' Proposed Conclusion of Law No. 13. McFarlane's testimony regarding his conversations with Terri Cunningham of DC Comics, combined with the information contained in Gaiman's various DC Comics contracts, constitutes substantial evidence of the falsity of Gaiman's representations, which is an element of the McFarlane Defendants' fraud claim and defense. *Kailin v. Armstrong*, 643 N.W.2d 132, 145-46 (Wis. Ct. App. 2002); *Lundin v. Shimansky*, 368 N.W.2d 676, 680-81 (Wis. 1985).

14.     The McFarlane Defendants deny Plaintiffs' Proposed Conclusion of Law No. 14. McFarlane's testimony regarding his conversations with Terri Cunningham of DC Comics, combined with the information contained in Gaiman's various DC Comics contracts, constitutes

clear and convincing evidence of the falsity of Gaiman's representations, precluding summary judgment on that issue. *Lundin*, 368 N.W.2d at 681; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Dated: July 22, 2002

LA FOLLETTE GODFREY & KAHN

By _____Eugenia G. Carter_____
Eugenia G. Carter
Todd G. Smith
Gabriel S. Gross
One East Main Street, Suite 500
Madison, WI 53701
Tel: (608) 257-3911
Fax: (608) 257-0609

—and—

Michael A. Kahn
Peter W. Salsich, III
Blackwell Sanders Peper Martin, LLP
720 Olive Street, Suite 2400
Saint Louis, MO 63101
Tel: (314) 345-6000
Fax: (314) 345-6060

Attorneys for Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc. and McFarlane Worldwide, Inc.

MN152671_1.DOC

## **CERTIFICATE OF SERVICE**

The undersigned certifies that a true and correct copy of the foregoing was served on all counsel of record via facsimile transmission this 22 day of July, 2002, addressed to the following:

    Allen A. Arntsen
    Jeffrey A. Simmons
    Foley & Lardner
    150 East Gilman Street
    Madison, WI 53703-2808
    Fax: 608-258-4258

    Kenneth F. Levin
    Kenneth F. Levin & Associates
    20 North Wacker Drive, Suite 2200
    Chicago, IL 60606
    Fax: 312-977-2990

    R. Scott Feldmann
    Brobeck, Phleger & Harrison, LLP
    38 Technology Drive
    Irvine, CA 92618-5312
    Fax: 949-790-6301

MN152671_1.DOC

STLD01-951227-2