IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| NEIL GAIMAN and MIRACLES AND MARVELS, LLC, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 02-C-0048-S |
| TODD McFARLANE, et al. | ) ) ) | |
| Defendants-Counterclaimants. | ) | |

## THE MCFARLANE DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc., and McFarlane Worldwide, Inc. (together, the "McFarlane Defendants"), by their attorneys, respectfully submit their Proposed Findings of Fact and Conclusions of Law in opposition to Plaintiffs' Motion for Partial Summary Judgment.

### PROPOSED FINDINGS OF FACT

1. Beginning in 1996, Plaintiff Neil Gaiman and Defendant Todd McFarlane Productions, Inc. ("TMP"), through Defendant Todd McFarlane, entered into negotiations with the goal of executing an agreement regarding the parties' respective rights and obligations with respect to three comic book characters—Angela, Cogliostro, and Medieval Spawn. (June 19-20, 2002 Deposition of Todd McFarlane ("McFarlane Dep.") at 107-08; June 24, 2002 Deposition of Neil Gaiman ("Gaiman Dep.") at 88-90; (*see* July 22, 2002 Affidavit of Gabriel S. Gross ("Gross Aff."), Exs. A-B))

2.  McFarlane and Gaiman had jointly created these characters for TMP's *Spawn* comic book series several years earlier. (McFarlane Dep. at 107-08; Gaiman Dep. at 88-90) (Gross Aff., Exs. A-B)

3.  At some point during these negotiations, TMP's rights in an unrelated comic book character known as Miracleman also become a subject of discussion between the parties. (McFarlane Dep. at 109; Gaiman Dep. at 90-91; Gross Aff., Exs. A-B)

4.  The focus of these negotiations was Gaiman's request for a percentage of the royalties received by TMP from reissues of the comic books and licenses for toys and other products based on the three comic book characters. (McFarlane Dep. at 107-08; Gaiman Dep. at 92-93; Gross Aff., Exs. A-B)

5.  Between 1993 and 1995, TMP had paid Gaiman close to $200,000 for his work on Issue 9 of *Spawn*, Issues 1 through 3 of *Angela*, and Issue 26 of *Spawn*. (McFarlane Dep. at 52; Gross Aff., Ex. B, and Ex. C at Dep. Ex. 38.)

6.  Beginning in 1993 and during their negotiations in 1996 and 1997, Gaiman repeated his desire to be paid at rates commensurate with his standard DC Comics contract. (McFarlane Dep. at 61-63, 68; Gross Aff., Ex. B)

7.  The 1996 negotiations, however, marked the first time in their relationship that the parties discussed any specific financial terms. (Gaiman Dep. at 82, 134-35; Gross Aff., Ex. A)

8.  Early on in these discussions, the parties generally agreed that TMP would attempt to work out an arrangement that would be equivalent to the contract Gaiman had with DC Comics, although initially the parties did not actually discuss any of the terms of that DC Comics contract. (*Id.*)

9. At no time before these 1996 discussions had Gaiman ever told McFarlane what the actual terms of his DC Comics contract were, or whether he wanted McFarlane to match all of the DC contractual terms or just some. (*Id.* at 58, 79, 81-82, 134-35)

10. Throughout this entire period, McFarlane repeatedly asked Gaiman to send him a copy of his DC Comics contract so that McFarlane could understand the terms, conditions, and royalty calculations. (McFarlane Dep. at 61-63, 200; Gross Aff., Ex. B)

11. Gaiman never sent McFarlane any DC Comics contract. (*Id.*)

12. Indeed, the first time McFarlane ever saw such a contract was at his deposition. (*Id.* at 198)

13. In a letter to McFarlane dated May 5, 1997, Gaiman set forth what he represented to be "a set of figures based on the basic DC deal." (July 1, 2002 Affidavit of Jeffrey A. Simmons ("Simmons Aff."), Ex. C at Dep. Ex. 2)

14. That letter includes the following royalty numbers under what is described as "Character Equity":

> **Merchandising and promotional licensing:**
> 15 % of publisher's net receipts
> **Media:**
> (This includes Motion Pictures, Audio-visual recording, Stage Plays, TV and so forth and only activates if the character has a speaking part)
> 15% of publisher's net receipts

(*Id.*)

15. Gaiman and McFarlane subsequently exchanged three letters by facsimile on July 15, 1997. (*Id.* at Dep. Exs. 19, 20, 33)

16. Two of these letters incorporated by reference the royalty terms summarized in the May 5 letter. (*Id.* at Dep. Exs. 20, 33)

3

17. McFarlane's July 15, 1997 fax posed three questions, two having to do with royalty and accounting issues. (*Id.* at Dep. Ex. 20)

18. Mr. Gaiman's responding July 15, 1997 fax purports to answer those questions. (*Id.* at Dep. Ex. 33)

19. After the exchange of letters and faxes, the parties had not reached agreement on the terms of any contract. (McFarlane Dep. at 196-97; Gross Aff., Ex. B)

20. In particular, while the parties were close to reaching an agreement, some areas of disagreement existed, including the accuracy of the formulas Gaiman had described to McFarlane. (*Id.*)

21. McFarlane felt he needed to conduct further investigation into Gaiman's claims regarding royalty formulas before he would agree to incorporate those formulas into any contract with Gaiman. (*Id.*)

22. McFarlane proceeded to investigate Gaiman's claims and contacted Terri Cunningham at DC Comics and learned that Gaiman had misrepresented the rights he would have received for his contribution to Medieval Spawn. (McFarlane Dep. at 79-81; Gross Aff., Ex. B)

23. According to Ms. Cunningham, DC Comics did not pay royalties to creators of preexisting derivative characters, such as Medieval Superman or Aqua Batman, unless the creator has extensively reworked the character. (*Id.* at 79-81, 199, 241)

24. In a royalty report he sent to Gaiman on August 4, 1997, McFarlane references this conversation and his discovery of Gaiman's misrepresentation about his rights in Medieval Spawn. (Simmons Aff., Ex. C at Dep. Ex. 5)

4

25. In that royalty report, McFarlane makes clear that he is making future royalty payments in a good faith effort as part of a contract negotiation process that, as of August 4, 1997, was still ongoing:

> I had a conversation with Terri Cunningham who said that when a derivative character is created, no money is given to those creating the knock-off character. Only on rare occasions, when extensive reworking and extensive work have been done, is money usually given. I.e., your Sandman book being one of those rare exceptions. So far you have worked on parts of 8 pages that include Medieval Spawn and I wouldn't define that as extensive. **Still, I am willing to pay some monies as long as all other matters are sorted out.**

(*Id.*; emphasis added)

26. Shortly thereafter, however, McFarlane had another conversation with Ms. Cunningham in an effort to determine the truth of Gaiman's representation about his entitlement, under what he labeled "the basic DC deal" (*Id.* at Dep. Ex. 2), to a 15% flat royalty for media uses of his characters. (McFarlane Dep. at 116-17; Gross Aff., Ex. B).

27. Specifically, Gaiman had given him certain royalty numbers, and McFarlane "decided to verify them with Terri Cunningam." (*Id.* at 119)

28. Cunningham confirmed that the information Gaiman had given him regarding his royalty rate with DC Comics was inconsistent with what Gaiman would actually have received from DC Comics under his contracts with that company. (*Id.* at 117)

29. When he learned that Gaiman had given him inaccurate information about royalty rates, McFarlane decided not to negotiate further with Gaiman. (*Id.* at 120-21)

30. At that point, McFarlane determined that he had been suckered by Gaiman into paying royalties to which Gaiman never would have been entitled under his DC Comics contracts and was therefore not entitled to receive from McFarlane. (*Id.*)

31. After McFarlane's deposition was concluded, Plaintiffs produced copies of Gaiman's many different DC Comics contracts. (Gross Affidavit, Ex. D)

32. In January of 1997—just a few months before his May 5th letter to McFarlane stating that the standard DC contract specifies a flat 15% royalty on licensing and media uses of characters—Gaiman signed two separate "character equity" contracts with DC Comics in which the royalty on licensing and media uses of the two characters was 10%, not 15%. (Gross Affidavit, Ex. D at G04124-28, G04129-33)

33. Gaiman concealed these facts from McFarlane and never told him that his royalty rate was only 10%. (Plaintiffs' PFOF, ¶ 40; Simmons Aff., Ex. C at Dep. Ex. 2)

34. Gaiman knew — but never told McFarlane — that his various "Character Equity" agreements with DC Comics assigned other royalty rates for non-comic-book uses of specific characters, including one contract that had a maximum royalty of 7.5%. (*Id.* at G04136-41)

35. These contracts reveal that there are two distinct types of DC Contracts applicable to Gaiman. (*Compare id.* at G04105-11 *with id.* at G04100-04)

36. The first type of contract is for his writing services on comic books. These contracts pay royalties based on sales of the comic books themselves, including reprints. (Gross Aff., Ex. C, at Dep. Ex. 57)

37. The second type of contract is for "Character Equity" and pays royalties for non-comic-book uses of specifically identified characters, such as merchandise licensing, movies, audio-visuals, etc. (*Id.* at Dep. Ex. 58)

38. The writing services contracts do not give him any rights beyond sales of the comic books themselves. (*Id.* at Dep. Ex. 57)

39. The contracts used by DC Comics established a rigorous standard for granting writers "character equity"—specifically, paragraph 8(c) of Gaiman's first *Sandman* contract, dated April 20, 1988, establishes the basic foundational requirements of duration and originality before character equity is earned:

> It is understood and agreed that if after Writer [Gaiman] has supplied the full script for the first twelve consecutive issues of the Work, Writer shall have created and/or shall subsequently create wholly original characters for the Work, DC shall grant Writer Creator Equity in those characters only ....

(Gross Affidavit, Ex. D at G04077; emphasis in original)

40. Thus, Gaiman had to produce twelve consecutive scripts of *Sandman* before he would be entitled to any character equity, and then only for "wholly original" characters. (*Id.*)

41. Although Gaiman used his Sandman contract with DC Comics as the grounds for his alleged right to character equity in what he deemed the "derivative character" of Medieval Spawn, the work he performed on the Sandman character was far greater than what he had done in his eight-page episode involving Medieval Spawn and the rights he obtained from DC Comics were far less than what he claimed for Medieval Spawn. (Combined Appendix, Ex. B; Gross Aff., Ex. D at G04230-33)

42. In a letter dated July 10, 1989, Chantal d'Aulnis of DC Comics acknowledged how much Gaiman had changed the Sandman character, and offered to grant Gaiman's request for character equity rights in that character:

> Dear Neil,
>
> As you know, Paul handed to me your letter of April 17 regarding the SANDMAN, and asked me to come up with some innovative answers to your reasonable questions ....
>
> First off, it is clear that "a" Sandman has been sprinkling grains of sand in the eyes of the sleepless throughout mythology. It is also clear that the character, which you and Sam Keith have created,

7

> has little in common with any version previously published by DC. When we concluded our contract with you on the basis of your original outline, this was not as obvious as it is now, after half a dozen issues have been published, and your point is well taken ....
>
> ... I propose to compromise by upgrading your status and royalties not to those of a full "creator" as you suggested, but to those of a "creative contributor."

(*Id.* at G04230-33)

43. Ms. d'Aulnis then proceeded to outline DC's proposal for licensing royalties on this character, as well as certain limitations on Gaiman's right to claim royalties on the character in the future:

> Future Financials:
>
> If one day you leave the book and another writer starts writing it <u>substantially</u> like you, you retain all percentages shown in this letter. That's the good news. Should your successor add substantial changes or new characters, then your share gets pro-rated down so he/she can get a cut. That's the bad news ....

(*Id.*)

44. Six months later, by letter agreement dated January 2, 1990, Gaiman and DC Comics amended their April 20, 1988 contract to reflect Gaiman's successful completion of the first twelve consecutive issues of *Sandman* and his new status as a "Creative Contributor" to the series. (*Id.* at G04022-29)

45. This letter agreement expressed DC's appreciation for Gaiman's "innovative interpretation of the central character," and defined "Creative Contributor" as someone who "creates a specific new element (such as a new character) or alters an old element to such an extent that it in DC's judgment qualifies as new, and who is contractually entitled to receive a Creator Royalty and/or Licensing Royalty for any and all substantial use of that element." (*Id.*)

46.     Gaiman did not disclose to McFarlane the requirements for obtaining character equity rights in characters he worked on for DC Comics, instead falsely representing that he obtains such rights simply through the one-time use of a character. (Plaintiffs' PFOF, ¶ 40)

47.     The "Character Equity Agreement" dated February 1, 1993 expressly incorporated Gaiman's April 20, 1988 and January 2, 1990 *Sandman* contracts and specifically listed the characters for which Gaiman was to receive non-comic-book royalties. (Gross Aff., Ex. D at G4100-04)

48.     It was only Gaiman's extensive alteration of the <u>central</u> character in the *Sandman* series into a character that "has little in common with any version previously published by DC" that convinced DC Comics to give him any equity in that character. (*Id.* at G04230-33).

49.     Gaiman's script for *Spawn* Issue 9 contained nothing more than the following very brief description of the character:

> Spawn rides up on a huge horse. He's wearing a kind of Spawn suit and mask, although the actual costume under the cloak is reminiscent of a suit of armour. His lettering is like the Spawn lettering, but maybe with a different colour in the border.

(Gross Aff., Ex. C at Dep. Ex. 12)

50.     By the time the characters of Medieval Spawn and Cogliostro appear in movies, televisions series or action figures, McFarlane and other individuals have transformed the characters with new themes, locales, devices, scripts and artwork. (McFarlane Dep. at 69-74, 77; Gross Aff., Ex. B)

51.     Finally, Gaiman knew — but did not tell McFarlane — that *all* of his DC Comics "Character Equity" agreements contained a section entitled "Contingencies Affecting Royalties" that could have greatly reduced the royalty percentage for Cogliostro and Medieval Spawn

because of McFarlane's extensive reworking of those characters long before they ever appeared in any other medium. (Gross Aff., Ex. D at G4100-04, G04118-23)

52. In particular, this section provides that if DC Comics uses or licenses the use of a version of the character that consists primarily of "Spin-Off Elements" —which include, among other things, names, themes, titles, devices, and artwork that were either not created by Gaiman or, if created by Gaiman, were later substantially changed or developed by someone else — then DC Comics will reduce the royalties it pays to Gaiman based on its pro-rata allocation of the proportion of Gaiman's contributions to the whole version of the character used. (*Id.*)

53. Gaiman concealed all of these material facts from McFarlane until after the filing of this lawsuit: Gaiman had no "standard DC Comics contract"; instead, Gaiman had two distinct types of contracts—one for writing services and a special one for "character equity" in specific types of characters he created; those "character equity" agreements did not uniformly provide for a 15% royalty on licensing and media uses; those "character equity" agreements did not cover all characters, derivative or otherwise, created by Gaiman, but only certain ones that met threshold requirements; and the royalty rates themselves were far more complex and variable than Gaiman revealed to McFarlane. (*Compare* Gross Aff., Ex. C at Dep. Ex. 57 *with id.* at Dep. Ex. 58)

54. DC Comics considered a variety of factors when determining the royalty rates assigned to certain characters, including whether Gaiman was the sole creator of the character. (Gross Aff., Ex. D at G04230-33)

55. The March 1998 royalty payment made by McFarlane's wife to Gaiman was for foreign sales of comic books, including the Angela series. (Plaintiffs' PFOF, ¶ 91)

56. McFarlane did not receive a copy of Gaiman's 1997 DC Comics contract. Gaiman's attorney only sent an unexecuted draft of an agreement to Marder, a draft which differed in material respects from the agreement Gaiman ultimately executed. (*Compare* Simmons Aff., Ex. 25 *with* Gross Aff., Ex. D; *see also* McFarlane Dep. at 198; Gross Aff., Ex. B)

## CONCLUSIONS OF LAW

1. Summary judgment is only appropriate where the record indicates there are no disputes as to any material fact. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

2. A factual dispute is "genuine"—and summary judgment thus inappropriate—when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

3. The evidence adduced at this point, including the DC Comics contracts cited in the McFarlane Defendants' brief and proposed findings, establishes genuine disputes about material facts, precluding summary judgment on the McFarlane Defendants' fraud counterclaim and defense.

4. The elements of fraud are (1) a false representation of fact, (2) made with the intent to defraud and for the purpose of inducing another to act upon it, (3) upon which another party reasonably relies to his detriment. *Kailin v. Armstrong*, 2002 WI App 70, ¶ 31, 643 N.W.2d 132, 145-46 (Ct. App. 2002).

5. Failure to disclose a fact may be a misrepresentation for purposes of a fraud claim, if the person who failed to disclose it had a duty to do so. *Kailin*, 2002 WI App 70, ¶ 32, 643 N.W.2d at 146; *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95, 100 (1980).

6. Such a duty arises when a person knows that his disclosure of such facts is necessary to prevent his partial or ambiguous statement of the facts from being misleading. *Kailin*, 2002 WI App 70, ¶ 32, 643 N.W.2d at 146.

7. Where, as here, genuine disputes as to the elements of a party's fraud claim or defense exist, summary judgment is inappropriate and must be denied.

DATED: July 22, 2002.

                          LA FOLLETTE GODFREY & KAHN

                          By _____
                          Eugenia G. Carter
                          Todd G. Smith
                          Gabriel S. Gross
                          One East Main Street, Suite 500
                          Madison, WI 53701
                          Tel: (608) 257-3911
                          Fax: (608) 257-0609

                              —and—

                          Michael A. Kahn
                          Peter W. Salsich, III
                          Blackwell Sanders Peper Martin, LLP
                          720 Olive Street, Suite 2400
                          Saint Louis, MO 63101
                          Tel: (314) 345-6000
                          Fax: (314) 345-6060

                          Attorneys for Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc. and McFarlane Worldwide, Inc

MN152672.1

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was served on all counsel of record via facsimile transmission this 22nd day of July, 2002, addressed to the following:

    Allen A. Arntsen
    Jeffrey A. Simmons
    Foley & Lardner
    150 East Gilman Street
    Madison, WI 53703-2808
    Fax: 608-258-4258

    Kenneth F. Levin
    Kenneth F. Levin & Associates
    20 North Wacker Drive, Suite 2200
    Chicago, IL 60606
    Fax: 312-977-2990

    R. Scott Feldmann
    Brobeck, Phleger & Harrison, LLP
    38 Technology Drive
    Irvine, CA 92618-5312
    Fax: 949-790-6301

_[signature]_

MN152672_1.DOC