UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NEIL GAIMAN and<br>MARVELS AND MIRACLES, L.L.C.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD MCFARLANE,<br>TODD MCFARLANE PRODUCTIONS,<br>INC., TMP INTERNATIONAL, INC.,<br>MCFARLANE WORLDWIDE, INC., and<br>IMAGE COMICS, INC.,<br><br>Defendants. | DOCKET #<br>U.S. DISTRICT COURT<br>WEST DIST OF WISCONSIN<br>JUL 22 2002<br>FILED<br>JOSEPH W. SKUPNIEWITZ CLERK<br>CASE #<br>Case No.: 02-C-0048-S |

---

**PLAINTIFFS' BRIEF IN OPPOSITION TO THE MCFARLANE DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Todd McFarlane told Neil Gaiman that Gaiman was "not signing anything away" when he agreed to author *Spawn* Issue 9 and subsequent comics for McFarlane. McFarlane's copyright notices in *Spawn* 9 and other works authored by Gaiman were consistent with that promise. In 1997, McFarlane entered into an agreement confirming that Gaiman had retained his copyright interest in his works and the characters he created. McFarlane paid Gaiman royalties for uses of Gaiman's work, and as late as 1999, McFarlane again confirmed that Gaiman retained those rights. At the same time, defendants admit that they filed materially false copyright notices in McFarlane's name for each work authored by Gaiman and never told Gaiman of those filings. Nor did McFarlane ever tell Gaiman he was claiming the sole copyright credit for Gaiman's work until, at the earliest, he sent a letter rescinding their agreement in 1999.

Those are the facts of this case revealed during discovery. Nevertheless, defendants assert (for the third time in this action) that Gaiman's copyright claims are time-barred, arguing that it would be "inequitable" for Gaiman to maintain his claim for copyright ownership. In defendants' view, the law requires Gaiman to ignore McFarlane's statements, read defendant's copyright notices more broadly than their express terms, and police the Copyright Office to discover defendants' false copyright registrations. The law does not impose such burdens on Gaiman. Nor does the law bar Gaiman's claims under the Lanham Act and state law for false advertising. Accordingly, defendants' motion should be denied.

## MATERIAL FACTS

In 1992, Todd McFarlane was looking for prominent writers to author issues of his *Spawn* comic book series. (July 22, 2002 Plaintiff's Additional Proposed Findings of Fact ("PFOF") ¶ 1.) Earlier that year, McFarlane and six other comic book artists had founded defendant Image Comics, Inc. (Id. ¶ 2.) Although McFarlane was a prominent comic book artist, "the knock against [Image] what that . . . we didn't know how to write." (Id. ¶ 3.) So McFarlane set out to entice four of the most respected authors in the comic book industry to write issues of *Spawn* for him. (Id. ¶ 4.)

One of those authors was Neil Gaiman. McFarlane approached Gaiman because "Neil was given a lot of critical acclaim at that point." (PFOF ¶ 5.) In fact, Gaiman was then author of the *Sandman* comic series, one of the most successful comic series ever. (Id. ¶ 6.)

To encourage Gaiman to write an issue of *Spawn*, McFarlane stressed the rights Gaiman would receive as a creator of the *Spawn* issue he authored. (PFOF ¶ 7.) "Creator rights" was a buzzword in the comic industry at that time. (Id. ¶ 8.) In 1988, several prominent comic book authors and artists had written "A Bill of Rights for Comics Creators." (Id. ¶ 9.) The

003.366944.2

document became a cornerstone of the creators' rights movement in the comic industry. (Id. ¶ 10.) Article 1 of the Bill of Rights for Comics Creators states that comic book creators shall have "The right to full ownership of what we fully create." (Id. ¶ 11.) The annotation to the Bill of Rights explains: "This means copyright and trademark." (Id. ¶ 12.) When McFarlane and his partners founded Image Comics, "they announced . . . [Image] was all about creators' rights and treating creators well." (Id. ¶¶ 13, 14.)

It was against this background of the creators' rights movement and Image Comics publicizing itself as a bastion of creators' rights that McFarlane made his offer to Gaiman. McFarlane told Gaiman that "this is all about creator rights." (PFOF ¶ 15.) He "talked to [Gaiman] about . . . showing unity with creators, sticking it to the big companies, [and] complete creative freedom." (Id. ¶ 16.) Most important, McFarlane emphasized that Gaiman was "not signing anything away" if he became the creator of a *Spawn* issue. (Id. ¶ 17.) Gaiman, as an experienced author, understood that by "not signing anything away, he would be retaining his copyright interests in the comic and his characters because under copyright law 'it's not work for hire unless you sign a specific agreement to that effect.'" (Id. ¶ 18.) Under the Copyright Act, an author retains his copyright interest in a work if it is not a work for hire. See 17 U.S.C. §§ 201(a) and (b).

McFarlane, who had worked under contract with comic book publishers on many occasions, also knew it was standard practice in the comic book industry for publishers to require written contracts establishing that an author's work was work-for-hire. (PFOF ¶ 20.) Despite his knowledge of that industry practice and the importance of copyright ownership issues to publishers and artists, McFarlane claims not to remember whether he ever spoke to any of the four guest authors about copyright ownership or work-for-hire agreements. (Id. ¶ 21.)

3

Relying on McFarlane's assurances that the project was "all about creator rights" and that Gaiman was "not signing anything away," Gaiman agreed to author the script for what became *Spawn* Issue 9 (hereafter "*Spawn* 9"). (PFOF ¶ 22.) In his script, Gaiman created three new characters for the *Spawn* series: Angela, Cogliostro, and Medieval Spawn. (Id. ¶ 23.) Image Comics published *Spawn* 9 in March 1993. (Id. ¶ 24.) Consistent with McFarlane's representation that Gaiman was "not signing anything away" to the defendants, *Spawn* 9 does not contain a copyright notice asserting ownership rights in that particular issue. (Id. ¶ 25.) Instead, *Spawn* 9 contains only a general notice for the *Spawn* character. (Id. ¶ 26.) The notice reads: "*Spawn* and its logo are trademark™ and copyright © 1993 Todd McFarlane Productions, Inc." (Id.) Also consistent with his representations to Gaiman, McFarlane filed no application for copyright registration for *Spawn* 9 at that time. (Id. ¶ 27.)

The willingness of Gaiman and the three other authors to write issues for McFarlane was a boon to the *Spawn* franchise. Sales of *Spawn* doubled for the four issues Gaiman and the others authored. (PFOF ¶ 28.) Gaiman's issue, and the new characters he created, proved especially helpful to McFarlane. McFarlane wrote in *Spawn* Issue 11 that Gaiman "gave me enough spring-board ideas from his issue to keep me going for another year or so." (Id. ¶ 29.) In fact, Gaiman's Cogliostro character became a central character in the *Spawn* comic book series, appearing in over 50 issues of *Spawn* and related comics. (Id. ¶ 30.) Gaiman's Angela character was so popular that McFarlane agreed to have Gaiman write a separate three issue mini-series featuring Angela as the main character (hereafter "the *Angela* series"). (Id. ¶ 31.)

To promote the *Angela* series, McFarlane agreed to have Gaiman write a portion of the script for *Spawn* Issue 26 (hereafter "*Spawn* 26") that included a discussion of the Angela

003.366944.2

character. (PFOF ¶ 32.) *Spawn* 26 was published in December 1994. (Id. ¶ 33.) Again, consistent with McFarlane's representations that Gaiman was "not signing anything away" when he worked for the defendants, *Spawn* 26 does not contain any copyright notice adverse to Gaiman's copyright interests. (*Spawn* 26, in fact, contains no copyright notice at all.) (PFOF ¶¶ 34, 35.)

The first issue of the *Angela* series (hereafter "*Angela* 1") was also published in December 1994. (PFOF ¶ 36.) Gaiman authored the entire text of *Angela* 1. (Id. ¶ 37.) Again, consistent with McFarlane's representations that this was "all about creator rights" and that Gaiman was "not signing anything away," *Angela* 1, like *Spawn* 26, does not contain any copyright notice at all. (Id. ¶ 38.)

The second issue in the *Angela* series (hereafter "*Angela* 2") was published in January 1995. (PFOF ¶ 39.) Again, Gaiman authored the entire text of the issue. (Id. ¶ 40.) *Angela* 2 contained a copyright notice, but it did not claim ownership in the copyright of the issue's story or the Angela character, but focused on the stylized logo and symbol—the notice stated: "*Angela*, its logo and its symbol are registered Trademarks™ and copyright © 1995 Todd McFarlane Productions, Inc." (Id. ¶ 41.)

Regardless, the next month, in *Angela* Issue 3 (hereafter "*Angela* 3"), defendants returned to the same notice they had used in *Angela* 1, which did not contain any mention of copyright ownership at all. (PFOF ¶ 42.) The notice in *Angela* 3 merely states: "Angela®, its logo and its symbol are registered Trademarks™ 1995 of Todd McFarlane Productions, Inc." (Id. ¶ 42.) Nowhere in *Angela* 3 is there any notice that any of the defendants are claiming any copyright interest in the *Angela* character or any issue of the series. (Id. ¶ 43.)

5

Unbeknownst to Gaiman, in 1995 McFarlane began filing applications for copyright registrations for the work Gaiman authored. (PFOF ¶ 44.) Although McFarlane testified that he did not author <u>any</u> of the text or artwork for the issues in the *Angela* series, in January 1995, McFarlane filed applications with the U.S. Copyright Office falsely claiming that he was the author of <u>both</u> the text and the artwork in those issues. (<u>Id.</u> ¶¶ 45, 46.) That same month, McFarlane also filed an application claiming that he was the sole author of the text of *Spawn* 26. (<u>Id.</u> ¶ 47.) At that point, however, McFarlane still had not filed an application for copyright registration for *Spawn* 9. McFarlane did not file for copyright registration for *Spawn* 9 until April 1996 – more that three years after *Spawn* 9 was first published. (<u>Id.</u> ¶ 48.) The copyright application McFarlane filed for *Spawn* 9 falsely claimed that McFarlane and not Gaiman authored the text. McFarlane never told Gaiman that he was going to file any of these applications, nor did he ever tell Gaiman he had filed any of the applications. (<u>Id.</u> ¶ 49.)

In November 1995, the defendants reprinted the *Angela* series in a trade paperback format entitled *Angela* (hereafter "the *Angela* trade paperback") which included all three issues of the comic. (PFOF ¶ 50.) For the first time, the *Angela* trade paperback contained a copyright notice claiming a copyright interest in both the paperback and the Angela character. (<u>Id.</u> ¶ 51.) Defendants claim to have sent a copy of the *Angela* trade paperback to Gaiman's Minnesota address in November 1995. (<u>Id.</u> ¶ 52.) However, Gaiman was working in Great Britain during much of the fall of 1995 and 1996 and does not remember defendants sending him a copy of the *Angela* trade paperback in 1995. (<u>Id.</u> ¶¶ 53, 54.) Gaiman has in excess of 200 comic books, trade paperbacks, and novels in publication and, understandably, finds it infeasible to keep track of when any individual work is republished unless it is directly called to his attention. (<u>Id.</u> ¶ 55.)

6

In June 1996, defendants reprinted *Spawn* 9 in a trade paperback entitled *Spawn* Volume 2. (PFOF ¶ 56.) *Spawn* Volume 2 does not contain a copyright notice claiming ownership of the individual issues of *Spawn* reprinted in that volume. (Id. ¶ 57.) *Spawn* Volume 2 does contain a notice claiming a copyright interest in all *Spawn*-related characters. (Id. ¶ 58.) However, defendants have not presented any evidence that they ever sent Gaiman a copy of *Spawn* Volume 2. (Id. ¶ 59.) In fact, Gaiman testified that "[b]y the time they were publishing trade paperbacks, nobody was sending me stuff automatically." (Id. ¶ 60.)

In 1997, Gaiman and McFarlane entered into negotiations to formalize their understanding of Gaiman's rights in the Angela, Cogliostro, and Medieval Spawn characters Gaiman had first created in *Spawn* 9. (PFOF ¶ 61.) On July 15, 1997, Gaiman and McFarlane then made a trade in a phone conversation by which, among other things, McFarlane agreed to exchange his rights in an unrelated character named Miracleman for Gaiman's rights in Cogliostro and Medieval Spawn. (Id. ¶ 62.) Gaiman confirmed the conversation in a letter sent to McFarlane that same day. In the letter, Gaiman wrote: "my rights in Cogliostro and Medieval Spawn as above will be exchanged for your share of Miracleman." (Id. ¶ 63.) Gaiman understood that his rights in Cogliostro and Medieval Spawn included his copyright interest. (Id. ¶ 64.) McFarlane understood that his "share" of Miracleman included the copyright to that character. (Id. ¶ 65.) McFarlane wanted to enter into the agreement because he "[w]anted more than anything else to have Spawn lock, stock and barrel . . . [and] not have a sliver of it existing some place that I somehow can't control." (Id. ¶ 66.) McFarlane wanted to regain control over the characters Gaiman had created in *Spawn* 9, and by this agreement, McFarlane was acquiring two of the three, leaving Gaiman with only Angela. (Id. ¶ 67.)

Until 1999, McFarlane appeared to be honoring his agreement with Gaiman. (PFOF ¶ 68.) As part of their agreement, McFarlane was to pay Gaiman royalties for various uses of the works and characters Gaiman had created. (Id. ¶ 69.) In August 1997, McFarlane sent Gaiman two separate royalty payments and extensive royalty reports purporting to substantiate those payments in respect of the Gaiman-created characters and stories. (Id. ¶ 70.) In April 1998, McFarlane's wife sent Gaiman another royalty payment for foreign sales of Gaiman's work. (Id. ¶ 71.)

Shortly after defendants made the April 1998 royalty payment to Gaiman, they also began republishing *Spawn* 26 and the *Angela* series in new trade paperbacks. (PFOF ¶ 72.) The trade paperback reprinting *Spawn* 26 was entitled both *Spawn* Volume 6 and *Pathways to Judgement*. (Id. ¶ 73.) Both issues contained a notice claiming ownership of all *Spawn*-related characters. However, defendants have again presented no evidence that they ever sent Gaiman a copy of those publications. (Id. ¶ 74.) In fact, Gaiman does not recall ever receiving a copy of those publications prior to this litigation. (Id. ¶ 75.)

The 1998 version of the *Angela* trade paperback was entitled *Angela's Hunt*. (PFOF ¶ 76.) Defendants have failed to produce a copy of the 1998 version of *Angela's Hunt* during this litigation and have not included a copy of that version as part of their motion for summary judgment. (Id. ¶ 77.) As a result, it is impossible to tell what, if anything, was stated in the copyright notice for that publication. Defendants have also presented no evidence that they ever sent a copy of that publication to Gaiman. (Id. ¶ 78.) Gaiman did not see a copy of *Angela's Hunt* until he happened to run across one at a convention after this case was filed. (Id. ¶ 79.) The book is a verbatim reprinting of Gaiman's work in *Angela* Issues 1, 2 and 3. (Id. ¶ 98.)

003.366944.2

It was not until after February 14, 1999 that Gaiman finally learned that McFarlane was rescinding all previous agreements between them. (PFOF ¶ 80.) Gaiman received a letter from McFarlane, bluntly stating: "This letter rescinds any previous offers I have placed on the table."[1] (Id. ¶ 82.) McFarlane continued:

> Today, I am willing to offer the following deal:
>
> 1. All rights to Angela (which has a monetary value) shall be relinquished 100% to Todd McFarlane Productions with no further monies due upon signing and in exchange I will grant you all rights to Miracle Man;
>
> 2. All rights to Medieval Spawn and Cogliostro shall continue to be owned by Todd McFarlane Productions with no monies to be paid for any reason whatsoever from past activity or any future use, regardless of whether the transaction between Angela and Miracle Man is finalized . . . .

(Id.)

After reading through McFarlane's letter, Gaiman forwarded it to his lawyer and all further communications between Gaiman and McFarlane were handled through their attorneys. (PFOF ¶ 84.) This suit was filed within three years of the date Gaiman received that letter.

## ARGUMENT

### I. GAIMAN'S COPYRIGHT OWNERSHIP CLAIMS ARE NOT TIME-BARRED.

As this Court noted in its July 18, 2002 Memorandum and Order, whether Gaiman's claims for copyright ownership are barred by the three-year statute of limitations turns on one question: whether "a reasonable man in his shoes would have" discovered Gaiman's cause of action. Id. at 3 (citing Taylor v. Meirick, 712 F.2d 1112, 1118 (7th Cir. 1983)). See also

---

[1] Although the letter is dated January 12, 1999, Gaiman testified that he did not receive it until he returned from a book tour sometime after Valentine's Day, 1999. (PFOF ¶ 81.)

003.366944.2

3 Nimmer on Copyright § 12.05[B] at 12-132 (stating that the rule of Taylor "appears to this writer to be a better view"). Whether a party should have discovered its cause of action is a question of fact. See generally Sellars v. Perry, 80 F.3d 243, 245-46 (7th Cir. 1996).

In Taylor v. Meirick, the Seventh Circuit noted that, for purposes of determining the accrual of a cause of action, a copyright holder's obligation of diligence does not include a duty to continuously monitor an adverse party's activities. See id. at 1118 ("We doubt that every time the sales of a publication dip, the publisher must, to preserve his right to sue for copyright infringement, examine all of his competitors' publications to make sure none is infringing any of his copyrights.").

### A. The Notices Contained in Defendants' Publications Would Not Cause a Reasonable Person to Discover Gaiman's Claim.

#### 1. The individual comic issues did not provide Gaiman with notice of his claim.

Looking at the totality of facts surrounding the notices contained in defendants' publications, it was entirely reasonable for Gaiman not to believe that McFarlane was somehow secretly usurping Gaiman's copyright interests. *Spawn* 9 does not contain a copyright notice asserting ownership rights in that particular issue, but only in the *Spawn* character. (PFOF ¶ 26.) The next publication, *Spawn* 26, does not contain any copyright notice at all. (Id. ¶ 34.) The publication after that, *Angela* 1, also does not contain any copyright notice at all. (Id. ¶ 38.) At that point, Gaiman's looking at the copyright notices for the initial works of each of the three volumes he created—Spawn 9, Spawn 26, and Angela 1—would not have given him any reason to believe that McFarlane was attempting to assert a claim to the very rights McFarlane had expressly acknowledged were Gaiman's, and which he had always acknowledged he would (and did) compensate Gaiman for as Gaiman's works and characters generated income.

003.366944.2

How a reasonable person would read those notices must be viewed in the context of the representations McFarlane made to Gaiman. McFarlane expressly told Gaiman that Gaiman was "not signing anything away" if he authored work for McFarlane, a statement which McFarlane – as a comic artist familiar with the "work for hire" practices of comic book publishers (PFOF ¶ 20) – had to know meant Gaiman would retain his copyright interest. McFarlane also stressed to Gaiman that their work was "all about creator's rights" (PFOF ¶ 22) which, given McFarlane's background in the industry and Image Comics' promotion of itself as a bastion of creators' rights (PFOF ¶¶ 13, 14), he had to intend as a statement that he would not be taking Gaiman's copyright interests. After hearing McFarlane make such representations, any reasonable person in Gaiman's shoes would not believe they had to file a cause of action to enforce their copyright ownership rights when they looked at the defendants' initial copyright notices. At most there is a fact issue regarding whether a reasonable person would have been alerted to a cause of action for copyright ownership given McFarlane's statements and defendants' later notices on those later follow-up publications and reprintings.

### 2. Gaiman's knowledge of copyright law makes his interpretation of McFarlane's statements even more reasonable.

Defendants suggest that Gaiman's experience as an author and working knowledge of copyright law made it more likely that he would discover McFarlane's usurpation of his copyright interests. In fact, the reverse is true. Gaiman, like McFarlane, had been working in the comic book industry for long enough to know that an author who is not an employee of the publisher retains his copyright interest unless he signs a work-for-hire agreement. (PFOF ¶¶ 18, 19.) McFarlane admits that Gaiman was not his employee. (Id. ¶ 86.) Thus, when McFarlane said Gaiman was "not signing anything away" he reasonably understood that to mean that he would be retaining the copyrights to his works and the characters he created.

11

### 3. The trade paperbacks did not provide Gaiman with notice of his claim.

Given the lack of adverse assertion in their initial copyright notices, defendants are reduced to pointing to the notices they included in their subsequently published trade paperbacks and to their (admittedly false) copyright registrations. The copyright notices contained in the *Angela* and *Spawn* Volume 2 reprintings of Gaiman's work in trade paperbacks claim copyrights in the publications' characters. However, the problem for defendants is that there is no evidence Gaiman ever received a copy of either publication. Defendants must show that Gaiman received those trade paperbacks in order to trigger the statute of limitations. See Sellars 80 F.3d at 246 (summary judgment inappropriate where defendants failed to show that plaintiff actually received letters providing notice of claim).

Gaiman does not remember even receiving copies of them except for *Angela's Hunt*, which he knows he did not see until a convention after this suit was filed. (PFOF ¶ 79.) While defendants claim to have sent copies of *Angela* to Gaiman's Minnesota address in November 1995, Gaiman was working in Great Britain during much of the fall of that year and does not remember receiving the copy. (PFOF ¶¶ 53, 54.) Defendants do not even contend that they ever sent Gaiman a copy of *Spawn* Volume 2. (See Resp. PFOF ¶¶ 8-9.)

Even if Gaiman had received copies of the *Angela* and *Spawn* Volume 2 trade paperbacks, at that point it would have been reasonable for Gaiman to no longer check the copyright notices contained in those publications. By the time those trade paperbacks were published, Gaiman had already seen the original comic books with copyright notices that were consistent with McFarlane's representations that Gaiman was "not signing anything away" and that McFarlane was "all about creator's rights." Why would a reasonable person assume that McFarlane would suddenly renege on his promises and stake a claim to Gaiman's copyrights?

12

Moreover, Gaiman has in excess of 200 works in publication and could not reasonably be expected to monitor the copyright notices on every publication absent some other actual notice that McFarlane was attempting to usurp Gaiman's copyright while all the while treating and compensating Gaiman as a rights-holder.

It was perfectly reasonable for someone in Gaiman's shoes to believe they no longer had to continuously monitor McFarlane's copyright notices. After Gaiman and McFarlane entered into their 1997 Agreement, McFarlane republished some of Gaiman's work in the *Spawn* Volume 6, *Pathways to Judgement*, and *Angela's Hunt* trade paperbacks. However, defendants have again presented no evidence that they ever sent Gaiman copies of those publications. (Resp. FOF ¶ 15.) Defendants have not even produced a copy of the 1998 version of *Angela's Hunt*, so it is impossible to determine what, if any, copyright notice that publication contained. Moreover, it is particularly telling that McFarlane continued to pay royalties to Gaiman before and during 1998 (PFOF ¶ 72), giving Gaiman no reason to believe McFarlane had decided to breach their agreement and, thus, no reason to begin seeking out McFarlane's publications for potential adverse copyright claims different from what their deal called for, and what had been originally printed.

### 4. There is no evidence Gaiman received copies of trade paperbacks at book signings in 1994 or 1995.

Recognizing the lack of any evidence that Gaiman received copies of their publications, defendants attempt to force the point of accrual back to 1994 or 1995 by misrepresenting the record. Defendants' statement that "Gaiman recalls that 'people put some of the trade paperbacks in front of me,' alerting him to their existence in 1994 or 1995," is not an accurate reflection of the record. (Defs.' Br. at 8.) At Gaiman's deposition, defendants' counsel asked: "Do you recall back in 1994, '95 time frame signing any trade paperbacks, say that trade

13

paperback number 2 which contained issue 9 in it?" (Gaiman Dep. at 212:8-214:7.) To which Gaiman replied: "I must have signed that <u>at some point</u>." (<u>Id.</u>) Gaiman never agreed that he actually signed those trade paperbacks in 1994 or 1995; indeed the first reprint books were not published until late 1995 when Gaiman was out of the country. Even if he had signed some of those trade paperbacks, a reasonable person is unlikely to take the time to examine copyright notices in the hectic environment of a book signing, looking for something he would have no reason to believe would be there. (PFOF ¶ 93.)

Finally, defendants also point to Gaiman's testimony regarding his book signings to improperly suggest that Gaiman realized he was not getting royalties on those trade paperbacks as early as 1994 or 1995. Again, Gaiman's deposition testimony does not support that inference. Gaiman simply testified that <u>at some point</u> fans began asking him to sign trade paperbacks for which he was not receiving a royalty. In fact, it was not until after Gaiman received McFarlane's rescission letter in February 1999 that Gaiman began to refuse to sign paperbacks for which he was not receiving a royalty. (PFOF ¶ 94.)

### B. No Reasonable Person Would Police McFarlane's Copyright Registrations.

There is no support in the Seventh Circuit or other Circuits for defendants' assertion that a cause of action for copyright ownership accrues when the adverse party obtains a copyright registration for the work. Such a rule would require a copyright owner to constantly police the Copyright Office – for the 70-year life of the copyright – to see whether anyone else has attempted to steal the copyright interest by falsely registering the work in their name, much less one who was acting (and paying) in a manner which acknowledged Gaiman's interests.

As previously stated, in the Seventh Circuit, a cause of action accrues when a reasonable person would have discovered the claim. <u>Taylor</u>, 712 F.2d at 1118. Contrary to

14

defendants' reading of the case law, both the Second and Ninth Circuits require some form of actual notice alerting the party to the cause of action. See Merchant v. Levy, 92 F.3d 51, 52 (2nd Cir. 1996) (defendant informed plaintiffs that he would not be listing them as co-authors and plaintiffs knew they were not receiving royalties they were entitled to as co-authors); Zuill v. Shanahan, 80 F.3d 1366, 1369 (9th Cir. 1996) ("claims of co-ownership, as distinct from claims of infringement, accrue when plain and express repudiation of co-ownership *is communicated to the claimant*") (emphasis added).

The facts of this case highlight the unreasonableness of defendants' position. Had Gaiman checked for a copyright registration by McFarlane shortly after the publication of *Spawn* 9, he would have found nothing. That is because McFarlane waited more than three years after publication to file his application for *Spawn* 9 in which McFarlane misrepresented that he, and not Gaiman, had created the text of that book. (PFOF ¶ 48.) It would be a unique principle of law which required a copyright holder to insure that person with whom he was in active business was not going behind his back to file false registrations with the United States Copyright Office to insure that a claim that he was going to be cheated had not begun to accrue.

C. **The Equities Favor Gaiman.**

Finally, the defendants argue that it would be "inherently inequitable" to allow Gaiman to maintain his claim for copyright ownership and seek "a share of the profits earned through his creative partner's skillful management of the intellectual property." (Defs.' Br. at 4.) That contention has no basis in the facts of this case. It was unquestionably Gaiman and his fellow guest authors who provided McFarlane with a tremendous financial and credibility boost by agreeing to author issues of *Spawn* at a time when McFarlane admits "the knock against [Image] was that . . . we couldn't write." (PFOF ¶ 3.) Sales of *Spawn* doubled for the issues

15

written by Gaiman and the other guest authors. (Id. ¶ 28.) In addition, it is McFarlane who filed applications for copyright registrations in which he falsely claimed to have authored the text of *Spawn* 9 and both the text and artwork for the *Angela* series. (Id. ¶¶ 46, 48.) To the extent the equities weigh in the Court's decision, they unquestionably tip in Gaiman's favor.

## II. PLAINTIFFS WITHDRAW THEIR CLAIMS FOR COPYRIGHT INFRINGEMENT.

Having conducted discovery regarding McFarlane's licenses with the other defendants in this action, plaintiffs have concluded that they can no longer maintain their claims for copyright infringement. Accordingly, plaintiffs withdraw those claims.

## III. GAIMAN'S LANHAM ACT AND STATE LAW FALSE ADVERTISING CLAIMS ARE NOT TIME-BARRED.

As this Court held in its July 18, 2002 Memorandum and Order, Gaiman's Lanham Act and Wisconsin False Advertising Statute claims are not time-barred if Gaiman can "show that defendants engaged in a continuing course of misconduct and that one of their acts fell inside the three year [limitation] period." Id. at 7 (citing Werner v. Pittway Corp., 90 F. Supp. 2d 1018, 1033 (W.D. Wis. 2000). See also Taylor, 712 F. 2d at 1118 (statute of limitations does not begin to run until the wrong is "over and done with"); Anderson v. Village of Little Chute, 201 Wis. 2d 467, 487 (Ct. App. 1996) ("An action for a continuing injury may be maintained beyond the ordinary statute of limitations.").

Contrary to defendants' assertion, their wrongful acts – failing to provide any attribution to Gaiman for his authorship of *Spawn* 26 and *Pathway to Judgement* – are ongoing. A search just last week reveals that defendants are currently selling *Pathway to Judgement*. (PFOF ¶ 97.) Thus, Gaiman's claims are not time-barred and defendants' motion should be denied.

003.366944.2

## CONCLUSION

For all of the above reasons, plaintiffs Neil Gaiman and Marvels and Miracles, LLC, respectfully request that the Court deny the McFarlane Defendants' motion for partial summary judgment.

Dated this 22nd day of July, 2002.

FOLEY & LARDNER

By: _____
Allen A. Arntsen
~~Joan L. Eads~~
Jeffrey A. Simmons
*Attorneys for Plaintiffs*

Foley & Lardner
150 East Gilman Street
Madison, WI 53703-2808
Tel: (608) 257-5035
Fax: (608) 258-4258

Of Counsel:
Mark Hellmann
Michael Rechtin
Foley & Lardner
330 N. Wabash Avenue
Suite 3300
Chicago, IL 60611
Tel: (312) 755-1900
Fax: (312) 755-1925

Co-Counsel:
Kenneth F. Levin
20 North Wacker Drive
Suite 2200
Chicago, IL 60606
Tel: (312) 984-6000
Fax: (312) 977-2990