UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DOCKET #
U.S. DISTRICT COURT
WEST DIST OF WISCONSIN
JUL 22 2002
FILED
JOSEPH W. SKUPNIEWITZ, CLER'
CASE #

NEIL GAIMAN and )
MARVELS AND MIRACLES, L.L.C., )
)
      **Plaintiffs,** )
)
v. ) Case No.: 02-C-0048-S
)
TODD MCFARLANE, )
TODD MCFARLANE PRODUCTIONS, )
INC., TMP INTERNATIONAL, INC., )
MCFARLANE WORLDWIDE, INC., and )
IMAGE COMICS, INC., )
)
      **Defendants.** )

**PLAINTIFFS' ADDITIONAL PROPOSED FINDINGS OF FACT IN OPPOSITION TO THE MCFARLANE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

      Plaintiffs Neil Gaiman and Marvels and Miracles, LLC propose the following findings of fact in opposition to the McFarlane Defendants' Motion for Partial Summary Judgment:

      1.    In 1992, Todd McFarlane was looking for prominent writers to author issues of his Spawn comic book series. (June 19-20, 2002 Deposition of Todd McFarlane ("McFarlane Dep.") at 35.)

      2.    Earlier that year, McFarlane and six other comic book artists had founded defendant Image Comics, Inc. (Id. at 29:9-20.)

      3.    Although McFarlane was a prominent comic book artist, "the knock against [Image] what that . . . we didn't know how to write." (Id. at 35:10-14.)

4.  So McFarlane set out to entice four of the most famous and respected authors in the comic book industry to write issues of *Spawn* for him. (Id.; July 22, 2002 Declaration of Neil Gaiman ("Gaiman Decl.") ¶ 2.)

5.  One of those authors was Neil Gaiman. McFarlane approached Gaiman because "Neil was given a lot of critical acclaim at that point." (McFarlane Dep. at 36:2-8.)

6.  In fact, Gaiman was then author of the *Sandman* comic series, one of the most successful comic series ever. (June 24, 2002 Deposition of Neil Gaiman ("Gaiman Dep.") at 16:14 – 17:6; McFarlane Dep. at 36:8-9.)

7.  To encourage Gaiman to write an issue of *Spawn*, McFarlane stressed the rights Gaiman would receive as a creator of the *Spawn* issue he authored. (See Findings of Fact 15-17 below.)

8.  "Creator rights" was a buzzword in the comic industry at that time. (July 22, 2002 Declaration of Denis Kitchen ("Kitchen Decl.") ¶ 5.)

9.  In 1988, several prominent comic book authors and artists had written "A Bill of Rights for Comics Creators." (Kitchen Decl. ¶ 5; June 19, 2002 Deposition of Lawrence Marder ("Marder Dep.") at 79.)

10. The document became a cornerstone of the creators' rights movement in the comic industry. (Kitchen Decl. ¶ 5.)

11. Article 1 of the Bill of Rights for Comic Creators states that comic book creators shall have "The right to full ownership of what we fully create." (Marder Dep. at 79:12-14; Ex. 24.)

12. The annotation to the Bill of Rights explains: "This means copyright and trademark." (Kitchen Decl. ¶ 6, Ex. A.)

13. When McFarlane and his partners founded Image Comics, "they announced . . . [Image] was all about creators' rights and treating creators well." (Gaiman Dep. at 18:22 – 19:4.)

14. McFarlane admitted at his deposition that Image was holding itself out as a business that respected creators rights more than the more established comic book companies. (McFarlane Dep. at 83:23 – 84:2.)

15. McFarlane told Gaiman that "this is all about creator rights." (Gaiman Dep. at 40:11-18.)

16. He "talked to [Gaiman] about . . . showing unity with creators, sticking it to the big companies, [and] complete creative freedom." (Gaiman Dep. at 29:5-11. See also id. at 40:11-18.)

17. Most important, McFarlane emphasized that Gaiman was "not signing anything away" if he became the creator of a *Spawn* issue. (Gaiman Dep. at 53:4-10.)

18. Gaiman, as an experienced author, understood that by "not signing anything away, he would be retaining his copyright interests in the comic and his characters because under copyright law "it's not work for hire unless you sign a specific agreement to that effect." (Gaiman Dep. at 53:12-14, 155:12 – 156:11.)

19. Under the Copyright Act, an author generally retains his copyright interest in a work if it is not a work for hire. See 17 U.S.C. §§ 201 (a) and (b).

20. McFarlane, who had worked under contract with comic book publishers on many occasions, also knew it was standard practice in the comic book industry for publishers to require written contracts stating that an author's work was work-for-hire. (McFarlane Dep. at 17:19 – 18:7, 20:15-19, 106:3-7.)

3

21. Despite his knowledge of that industry practice and the importance of copyright ownership issues to publishers and artists, McFarlane claims not to remember whether he spoke to any of the four guest authors about copyright ownership or work for hire agreements. (McFarlane Dep. at 53:3 – 54:9.)

22. Relying on McFarlane's assurances that the project was "all about creator rights" and that Gaiman was "not signing anything away," Gaiman agreed to author the script for what became *Spawn* Issue 9 (hereafter "*Spawn* 9"). (Gaiman Dep. at 40:1-19, 29:7-11.)

23. In his script, Gaiman created three new characters for the *Spawn* series: Angela, Cogliostro, and Medieval Spawn. (McFarlane Dep. at 43:23 – 46:25.)

24. Image Comics published *Spawn* 9 in March 1993. (See Response to Defendants Proposed Findings of Fact and Conclusions of Law (Resp. FOF ¶ 4.)

25. Consistent with McFarlane's representation that Gaiman was "not signing anything away" to the defendants, *Spawn* 9 does not contain a copyright notice asserting ownership rights in that particular issue. (See Defendants' Combined Appendix ("Defs.' App."), Ex. B at 2.)

26. Instead, *Spawn* 9 contains only a general notice for either the *Spawn* character. The notice reads: "*Spawn* and its logo are trademark™ and copyright © 1993 Todd McFarlane Productions, Inc." (Id.)

27. Also consistent with his representations to Gaiman, McFarlane did not file an application for copyright registration for *Spawn* 9 at the time that work was published. (McFarlane Dep. at 147:20 – 148:9; Ex. 35.)

4

28. The willingness of Gaiman and the three other authors to write issues for McFarlane was a boon to the *Spawn* franchise. Sales of *Spawn* doubled for the four issues Gaiman and the others authored. (Gaiman Dep. at 31:3-12.)

29. Gaiman's issue, and the new characters he created, proved especially helpful to McFarlane. McFarlane wrote in *Spawn* Issue 11 that Gaiman "gave me enough spring-board ideas from his issue to keep me going for another year or so." (McFarlane Dep. at 240:5-22; Ex. 55.)

30. In fact, Gaiman's Cogliostro character became a central character in the *Spawn* series, appearing in over 50 issues of *Spawn* and related comics. (McFarlane Dep. at 74:8-18; Simmons Aff. ¶ 6; TM 1523.)

31. Gaiman's Angela character was so popular that McFarlane agreed to have Gaiman write a separate three issue mini-series featuring Angela as the main character (hereafter "the *Angela* series"). (McFarlane Dep. at 56:15 – 57:23.)

32. To promote the *Angela* series, McFarlane agreed to have Gaiman write a portion of the script for *Spawn* Issue 26 (hereafter *Spawn* 26) that included a discussion of the Angela character. (McFarlane Dep. at 90:5 – 91:22; Gaiman Dep. at 81:21 – 82:7; Gaiman Decl. ¶ 4.)

33. *Spawn* 26 was published in December 1994. (Resp. FOF ¶ 12.)

34. Consistent with McFarlane's representations that Gaiman was "not signing anything away" when he worked for the defendants, *Spawn* 26 does not contain any copyright notice at all. (Defs.' App., Ex. E at 2.)

35. *Spawn* 26 merely contains a notice stating that Todd McFarlane Productions owns the trademarks to the *Spawn* logo and symbol. (Id.)

003.369745.1

36. The first issue of the *Angela* series (hereafter "*Angela* 1") was also published in December 1994. (Resp. FOF ¶ 17.)

37. Gaiman authored the entire text of *Angela* 1. (Gaiman Decl. ¶ 4; McFarlane Dep. at 157:1-16.)

38. Consistent with McFarlane's representations that this was "all about creator rights" and that Gaiman was "not signing anything away," *Angela* 1, like *Spawn* 26, does not contain any copyright notice at all. (Defs.' App., Ex. G at 2.)

39. The second issue in the *Angela* series (hereafter "*Angela* 2") was published in January 1995. (Resp. FOF ¶ 17.)

40. Gaiman authored the entire text of *Angela* 2. (Gaiman Decl. ¶ 4; McFarlane Dep. at 157:1-16.)

41. *Angela* 2 contained a copyright notice, but it did not claim ownership in the copyright of the issue's story or the *Angela* character, but focused on the stylized logo. The notice stated: "*Angela*, its logo and its symbol are registered Trademarks™ and copyright © 1995 Todd McFarlane Productions, Inc." (Defs.' App., Ex. H at 2.)

42. The next month, in *Angela* Issue 3 (hereafter "*Angela* 3"), defendants returned to the same notice they had used in *Angela* 1, which did not contain any mention of copyright ownership at all. The notice in *Angela* 3 merely states: "Angela®, its logo and its symbol are registered Trademarks™ 1995 of Todd McFarlane Productions, Inc." (Id., Ex. I at 2.)

43. Nowhere in *Angela* 3 is there any notice that any of the defendants are claiming any copyright interest in the *Angela* character or any issue of the series. (See id.)

6

44. Unbeknownst to Gaiman, in 1995 McFarlane began filing applications for copyright registrations for the work Gaiman authored. (Gaiman Decl. ¶ 5; McFarlane Dep. at 157:17-19.)

45. McFarlane did not author <u>any</u> of the text or artwork for the issues in the *Angela* series. (McFarlane Dep. at 91:23 – 92:9, 157:1-16.)

46. In January 1995, McFarlane filed applications with the U.S. Copyright Office falsely claiming that he was the author of <u>both</u> the text and the artwork in those issues. (McFarlane Dep. at 157:1-16; Ex. 45.)

47. In January 1995, McFarlane also filed an application claiming that he was the sole author of the text of *Spawn* 26. (McFarlane Dep. at 149:16 – 150:25; Ex. 37.)

48. McFarlane did not file for copyright registration for *Spawn* 9 until April 1996 – more that three years after *Spawn* 9 was first published. In that application, McFarlane is identified as having authored the text of *Spawn 9*. (McFarlane Dep. at 147:20 – 148:9; Ex. 35.)

49. McFarlane never told Gaiman that he was filing any of these applications. (Gaiman Decl. ¶ 5; McFarlane Dep. at 157:17-19.)

50. In November 1995, the defendants reprinted the *Angela* series in a trade paperback format entitled *Angela* (hereafter "the *Angela* trade paperback") which included all three issues of the comic. (Resp. FOF ¶ 20.)

51. For the first time, the *Angela* trade paperback contained a copyright notice claiming a copyright interest in both the paperback and the Angela character. (<u>See</u> Defs.' Appendix, Ex. P at 2.)

003.369745.1

52. Defendants claim to have sent a copy of the *Angela* trade paperback to Gaiman's Minnesota address in November 1995. (Resp. FOF ¶ 21; Marder Aff. ¶ 9, Ex. Bates No. IC 005181.)

53. Gaiman was working in Great Britain during much of the fall of 1995 and 1996. (Gaiman Dep. at 193; Gaiman Decl. ¶ 6.)

54. Gaiman does not remember defendants sending him a copy of the *Angela* trade paperback in 1995. (Gaiman Decl. ¶ 6; see also Gaiman Dep. at 191:25 – 192:2.)

55. Gaiman has in excess of 200 comic books, trade paperbacks, and novels in publication and, understandably, finds it infeasible to keep track of when any individual work is republished unless it is directly called to his attention. (Gaiman Decl. ¶ 6.)

56. In June 1996, defendants reprinted *Spawn* 9 in a trade paperback entitled *Spawn* Volume 2. (Resp. FOF ¶ 7.)

57. *Spawn* Volume 2 does not contain a copyright notice claiming ownership of the individual issues of *Spawn* reprinted in that volume. (Resp. FOF ¶ 8; Defs.' App., Ex. D at 2.)

58. *Spawn* Volume 2 does contain a notice claiming a copyright interest in all *Spawn*-related characters. (Id.)

59. Defendants have not presented any evidence that they ever sent Gaiman a copy of *Spawn* Volume 2. (See Resp. PFOF ¶¶ 8-9.)

60. In fact, Gaiman testified that "[b]y the time they were publishing trade paperbacks, nobody was sending me stuff automatically." (Gaiman Dep. at 191:25 – 192:2.)

61. In 1997, Gaiman and McFarlane entered into negotiations to formalize their understanding of Gaiman's rights in the Angela, Cogliostro, and Medieval Spawn characters Gaiman had first created in *Spawn* 9. (See Proposed Findings of Fact 62-63 below.)

8

62. On July 15, 1997, Gaiman and McFarlane had a phone conversation in which McFarlane agreed to exchange his rights in an unrelated character named Miracleman for Gaiman's rights in Cogliostro and Medieval Spawn. (Gaiman dep. at 151; Ex. 19.)

63. Gaiman confirmed the conversation in a letter sent to McFarlane that same day. In the letter, Gaiman wrote: "my rights in Cogliostro and Medieval Spawn as above will be exchanged for your share of Miracleman." (Id.)

64. Gaiman understood that his rights in Cogliostro and Medieval Spawn included his copyright interest. (Gaiman Dep. at 159:22 – 160:6.)

65. McFarlane understood that his "share" of Miracleman included the copyright to that character. (McFarlane Dep. at 110:24 – 111:12, 192:23 – 193:2.)

66. McFarlane wanted to enter into the agreement because he "[w]anted more than anything else to have Spawn lock, stock and barrel . . . [and] not have a sliver of it existing some place that I somehow can't control." (McFarlane Dep. at 105:1-5. See also id. at 113:22-24, 193:3-9.)

67. He wanted to regain control over the characters Gaiman had created in *Spawn* 9. (McFarlane Dep. at 105:1-5, 193:3-9.)

68. Until 1999, McFarlane appeared to be honoring his agreement with Gaiman. (See Proposed Findings of Fact 69-71 below.)

69. As part of their agreement, McFarlane was to pay Gaiman royalties for various uses of the works and characters Gaiman had created. (McFarlane Dep. at 186 – 196:22; Exs. 2, 19, 20, 33.)

9

70. In August 1997, McFarlane sent Gaiman two separate royalty payments and extensive royalty reports purporting to substantiate those payments. (McFarlane Dep. at 214:23 – 216:8, 221:16 – 222:10; Exs. 5-6.)

71. In April 1998, McFarlane's wife sent Gaiman another royalty payment for foreign sales of Gaiman's work. (Id. at 222:11 – 223:10, Ex. 51; July 1, 2002 Second Declaration of Neil Gaiman ¶ 4.)

72. Shortly after defendants made the April 1998 royalty payment to Gaiman, they also began republishing *Spawn* 26 and the *Angela* series in new trade paperbacks. (Resp. FOF ¶¶ 13, 23.)

73. The trade paperback reprinting *Spawn* 26 was entitled both *Spawn* Volume 6 and *Pathways to Judgement*. (Resp. FOF ¶ 13.)

74. Defendants again presented no evidence that they ever sent Gaiman copies of those publications. (Resp. FOF ¶ 15.)

75. In fact, Gaiman does not recall ever seeing copies of those publications prior to this litigation. (Gaiman Decl. ¶ 6.)

76. The 1998 version of the *Angela* trade paperback was entitled *Angela's Hunt*. (Resp. FOF ¶ 23.)

77. Defendants have failed to produce a copy of the 1998 version of *Angela's Hunt* during this litigation and have not included a copy of that version as part of their motion for summary judgment. (Resp. FOF ¶ 23.)

78. Defendants have also presented no evidence that they ever sent a copy of that publication to Gaiman. (Resp. FOF ¶ 24.)

003.369745.1

79. Gaiman did not see a copy of *Angela's Hunt* until he happened to run across one at a convention after this case was filed. (Gaiman Dep. at 192:7-12.)

80. It was not until after February 14, 1999, when Gaiman received a letter from McFarlane, that Gaiman finally learned McFarlane was rescinding all previous agreements between them. (Gaiman Dep. at 197: 3-10, 198:4-11.)

81. Although the letter is dated January 12, 1999, Gaiman testified that he did not receive it until he returned from a book tour sometime after Valentine's Day, 1999. (Gaiman Dep. at 198:4-11.)

82. Gaiman received a letter from McFarlane, bluntly stating: "This letter rescinds any previous offers I have placed on the table." (McFarlane Dep. at 224:9-21; Ex. 8.)

83. McFarlane's letter continued:

Today, I am willing to offer the following deal:

1. All rights to Angela (which has a monetary value) shall be relinquished 100% to Todd McFarlane Productions with no further monies due upon signing and in exchange I will grant you all rights to Miracle Man;

2. All rights to Medieval Spawn and Cogliostro shall continue to be owned by Todd McFarlane Productions with no monies to be paid for any reason whatsoever from past activity or any future use, regardless of whether the transaction between Angela and Miracle Man is finalized . . . .

(Id.)

84. After reading through McFarlane's letter, Gaiman forwarded it to his lawyer and all further communications between Gaiman and McFarlane were handled through their attorneys. (Gaiman Dep. at 198:9-11.)

003.369745.1

85.  Gaiman, like McFarlane, had been working in the comic book industry for long enough to know that an author who is not an employee of the publisher retains his copyright interest unless he signs a work-for-hire agreement. (McFarlane Dep. at 17:19 – 18:7, 20:15-19, 106:3-7.)

86.  McFarlane admits that Gaiman was not his employee. (McFarlane Dep. at 41:1-3.)

87.  There is no evidence Gaiman ever received copies of the *Angela* and *Spawn* Volume 2 trade paperbacks. (See Resp. FOF ¶ 7, 20.)

88.  Gaiman does not remember receiving copies of *Angela* and *Spawn* Volume 2. (Gaiman Decl. ¶ 6.)

89.  While defendants claim to have sent copies of *Angela* to Gaiman, they mailed them to his Minnesota address during a time when Gaiman was working in Great Britain for more than a year. (Gaiman Decl. ¶ 6.)

90.  As for *Spawn* Volume 2, defendants do not even contend that they ever sent Gaiman a copy of that publication. (Resp. FOF ¶¶ 8-9.)

91.  Defendants have presented no evidence that they ever sent Gaiman copies of *Spawn* Volume 6, *Pathway to Judgement*, and *Angela's Hunt* trade paperbacks. Resp. FOF ¶ 15.)

92.  Defendants have not even produced a copy of the 1998 version of *Angela's Hunt*, so it is impossible to determine what, if any, copyright notice that publication contained. (Resp. FOF ¶ 24.)

003.369745.1

93. A reasonable person is unlikely to take the time to examine copyright notices in the hectic environment, with hundreds of people waiting for signatures, of a book signing. (Gaiman Decl. ¶ 7.)

94. In fact, it was not until after Gaiman received McFarlane's rescission letter in February 1999 that Gaiman began to refuse to sign paperbacks for which he was not receiving a royalty. (Gaiman Decl. ¶ 7.)

95. McFarlane filed applications for copyright registrations in which he falsely claimed to have authored the text of *Spawn* 9 and both the text and artwork for the *Angela* series. (McFarlane Dep. 145:21-26, 147:3-19, 157:1-16; Exs. 35, 45.)

96. Defendants are currently selling *Pathway to Judgement*. (Simmons Aff. ¶ 7.)

97. *Angela's Hunt* is a verbatim reprinting of Gaiman's work in *Angela* Issues 1, 2 and 3.

Dated this 22nd day of July, 2002.

FOLEY & LARDNER

By: _____
Allen A. Arntsen
Joan L. Eads
Jeffrey A. Simmons
*Attorneys for Plaintiffs*

Foley & Lardner
150 East Gilman Street
Madison, WI 53703-2808
Tel: (608) 257-5035
Fax: (608) 258-4258

Co-Counsel:
Kenneth F. Levin
20 North Wacker Drive, Suite 2200
Chicago, IL 60606
Tel: (312) 984-6000
Fax: (312) 977-2990

Of Counsel:
Mark Hellmann
Michael Rechtin
Foley & Lardner
1 IBM Plaza
220 N. Wabash Ste. 3300
Chicago, IL 60611
Tel: (312) 755-1900
Fax: (312) 755-1925