IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NEIL GAIMAN and MARVELS AND )
MIRACLES, LLC., )
                         )
            Plaintiffs, )
                         )
      -vs-               )    No. 02-C-0048-S
                         )
TODD MCFARLANE, TODD MCFARLANE )
PRODUCTIONS, INC., TMP INTER- )
NATIONAL, INC., MCFARLANE )
WORLDWIDE, INC. and IMAGE )
COMICS, INC., )
                         )
            Defendants. )
_____)

**03-1461**

DOCKET
NUMBER **77**
U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN

AUG - 1 2002

FILED/RECEIVED
JOSEPH W. SKUPNIEWITZ, CLERK
CASE
NUMBER

DEPOSITION OF SHEILA EGGER

Phoenix, Arizona
June 18, 2002
9:10 a.m.

U.S.C.A.—7th Circuit
FILED

NOV 2 6 2003   JC

GINO J. AGNELLO
CLERK
Prepared for:
     DOC. #_____

U.S. DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
(Original)

Reported by:

PAUL GROSSMAN
AZ CCR #50028
CA CSR #1487

BROWN
& TOLEU ltd.
Court Reporters
101 West Adams

Phoenix, Arizona 85003-2003

Telephone (602) 254-5479     FAX (602) 254-5013

I N D E X

Examination:                                              Page

BY MR. SIMMONS                                              4
BY MR. SALSICH                                             28
BY MR. SIMMONS                                             30

E X H I B I T S

No.   Description                                         Page

1   (FAX from Ms. Egger to Mr. Gaiman, 5-9-97.)           9

2   (Letter from Neil to Todd, 5 May 97.)               10

3   (Memo from Wanda to Sheila, 7-26-97.)               11

4   (FAX from Ms. Egger to Mr. McFarlane,
        7-29-97.)                                         14

4A (Angela Book Appearances Income.)                    17

5   (Royalty Report, Neil Gaiman, 8-4-97.)              19

6   (FAX from Ms. Egger to Mr. Gaiman, 8-11-97.)        20

7   (FAX from Ms. Egger to Mr. McFarlane,
        8-5-97.)                                          22

8   (Letter from Mr. McFarlane to Mr. Gaiman,
        1-12-99.)                                         24

9   (E-mail from Ms. Egger to Mr. Peterson,
        8-17-01.)                                         25

10 (Handwritten notes.)                                 28

1

2

3              THE DEPOSITION OF SHEILA EGGER,

4    taken at 9:10 a.m. on June 18, 2002, at the offices of

5    Brown & Toleu, Ltd., 101 West Adams Street, Phoenix,

6    Arizona, before PAUL GROSSMAN, a Notary Public and

7    Certified Court Reporter #50028 in and for the State of

8    Arizona, pursuant to the Federal Rules of Civil

9    Procedure.

10           The plaintiffs were represented by their

11   attorneys, Foley & Lardner, by Jeffrey A. Simmons, Esq.

12           The defendants Todd McFarlane were

13   represented by their attorneys, Blackwell, Sanders,

14   Peper, Martin, L.L.P., by Pete Salsich, III, Esq.

15           The defendant Image Comics was represented by

16   its attorneys, Brobeck, Phleger & Harrison, LLP, by

17   Matthew C. Lapple, Esq.

18           Also present was Kenneth F. Levin, Esq.

19

20

21

22

23

24

25

```
 1                                      Phoenix, Arizona

 2                                      June 18, 2002

 3                                      9:10 a.m.

 4

 5

 6                      SHEILA EGGER,

 7    called as a witness herein, having been first duly

 8    sworn, was examined and testified as follows:

 9

10                       EXAMINATION

11    BY MR. SIMMONS:

12         Q.    Would you just state your name for the record

13    for us?

14         A.    Sheila Egger.

15         Q.    And where do you live?

16         A.    Phoenix.

17         Q.    Have you ever given a deposition before?

18         A.    Yes, I have.

19         Q.    When was that?

20         A.    I believe it was two years ago.

21         Q.    Can you just tell me a little bit about what

22    the case was about?

23         A.    It was Tony Twist versus -- I think it was

24    Todd McFarlane Productions.

25         Q.    And what was the lawsuit about?  Do you know
```

```
1    what the substance was?

2         A.    It was -- I think it was a -- it was about

3    Todd using Tony Twist's name in an HBO series that he

4    produced.

5         Q.    And when you say "Todd," you mean Todd

6    McFarlane?

7         A.    Todd McFarlane.

8         Q.    And I think I'll do the same thing throughout

9    the deposition, just call him Todd and when I refer to

10   Neil it will be Neil Gaiman.

11               I'll just go over some of the basic rules for

12   a deposition again.  When I ask you questions I'll need

13   you to give me an audible response.  You can't -- don't

14   nod your head, give me any uh-huhs or anything like

15   that.  You need to speak so the court reporter can get

16   it down.

17        A.    Okay.

18        Q.    If you don't understand a question that I

19   ask, just ask me to rephrase it.  Let me know.

20   Otherwise if you answer the question, I'll assume that

21   you understood it.

22               And I'll try not to speak over you and if

23   you'd do the same for me, and that will also give your

24   attorney a chance to object if he needs to.

25        A.    All right.
```

1    Q.    Did you do anything to prepare for the

2    deposition today other than, you know, you don't need to

3    tell me if you talked to your attorney.  Anything else

4    to prepare?

5    A.    Not really.

6    Q.    Did you review any documents?

7    A.    I reviewed a few with Pete.

8    Q.    Where are you working now?

9    A.    I work in Phoenix, Todd McFarlane

10   Productions.

11   Q.    How long have you been with -- I'll call it

12   Todd McFarlane Productions, TMP.  Does that work for

13   you?

14   A.    Yes.

15   Q.    How long have you been there?

16   A.    I've been there seven years.

17   Q.    Have you worked for any other companies that

18   Todd McFarlane is associated with?

19   A.    No.

20   Q.    Like McFarlane Worldwide, have you ever been

21   employed there?

22   A.    No.

23   Q.    Todd McFarlane or TMP International --

24   A.    No.

25   Q.    -- ever been employed there?

1        Can you describe your employment history for

2   me with TMP?  What did you start out doing when you

3   first got hired?

4        A.    I started -- the first couple of years I just

5   did general office duties, filing and answering the

6   phones.  And then I believe probably in '97 I started

7   helping Todd schedule his appointments or -- oh, let's

8   see.  Just keeping a general calendar of what he was

9   doing, sometimes coordinating FAXes that came in or

10  planning his travel plans.

11       Q.    Did you get a new title at that time in '97?

12       A.    No.

13       Q.    Do you have a title now?

14       A.    I do and I don't -- I'm not even sure what it

15  is.  We just kind of went through a change in titles,

16  and I think it's Senior Administrative Assistant or

17  something.  I don't even remember.  We changed all the

18  titles.  It was Vice-President of Operations, but that

19  wasn't really indicative of what I did, so --

20       Q.    And what do you do now?  What are your duties

21  now?

22       A.    I still work directly with Todd, planning his

23  travel, organizing memos that come in, FAXes, just

24  helping him keep organized.

25       Q.    Do you know how many employees TMP has?

1      A.    I believe it's around 35.

2      Q.    I just want to back up for a second.  You

3  said you started with TMP about seven years ago?

4      A.    Yes.

5      Q.    So you started in '94, '95?

6      A.    January of '95.

7      Q.    When you started in January of '95 or roughly

8  about that time, after you first started working with

9  TMP were you aware that -- were you aware that TMP was

10  paying royalties to Neil Gaiman for work he had done for

11  TMP?

12      A.    No.

13      Q.    And you didn't assist in the calculation of

14  any royalties that might have been paid to Neil Gaiman

15  at that time?

16      A.    No.

17      Q.    Can you remember when the first time was that

18  you either spoke or wrote to Neil Gaiman?

19      A.    I'm not certain when the first was I would

20  have spoken to him.

21      Q.    Do you have any sort of rough recollection?

22      A.    I wouldn't want to guess.  I don't -- I

23  couldn't name a time when I remember like specifically

24  what year or how long I'd been there when I first spoke

25  to him.

```
 1          Q.    That's fine.

 2                I'll bring you to 1997 now.

 3          A.    Uh-huh.

 4          Q.    Do you remember Neil and Todd having any sort

 5     of negotiations during that time period during 1997?

 6          A.    I remember Todd preparing checks for Neil.

 7          Q.    And when was that roughly?

 8          A.    That was in 1997, in the first half of the

 9     year.  Right around the summertime.

10          Q.    I'm just going to -- we'll mark this as

11     Exhibit 1.

12                (Deposition Exhibit Number 1 was then

13                 marked for identification.)

14     BY MR. SIMMONS:

15          Q.    We'll mark this as Exhibit 1.

16                Do you recognize this document?

17          A.    I don't recognize -- I don't recall it.

18          Q.    Looking at this document, does this help you

19     sort of place a time-frame on when Neil and Todd may

20     have been talking to each other?

21          A.    Yes, because it was May and it seems like it

22     was a quarterish -- I know the Spawn movie came out in

23     the summer and it was prior to the release of that that

24     I remember Todd talking to Neil or preparing some checks

25     for him.
```

1    Q.    Okay.  Any recollection -- and you will see

2    in the text of the FAX there it talks about "Todd wanted

3    me to let you know that he received your FAX and he will

4    go over the information."

5              Do you have any recollection of what that FAX

6    was there then?

7    A.    No, I don't.

8    Q.    I'll show you -- I'll mark this as Exhibit 2.

9              (Deposition Exhibit Number 2 was then

10              marked for identification.)

11   BY MR. SIMMONS:

12   Q.    If you'll take a look at it.  Do you

13   recognize that document?  Ever seen it before?

14   A.    Not that I recall.

15   Q.    You don't recall whether that might be the

16   FAX that's referred to in the --

17   A.    No.  I couldn't say for certain, but I would

18   assume that that's what he's -- I could assume that

19   that's what he's referring to.

20   Q.    Do you remember any -- any messages that you

21   were passing between Neil and Todd or vice-versa at that

22   time?  And by "that time" I mean in the May, 1997 time

23   period.

24   A.    I remember Neil calling a few times, but I

25   don't -- I didn't really pass on any information other

1    than, you know, "Return Neil's call."  I mean --

2        Q.    I'm sorry.

3        A.    Neil wouldn't have -- Neil didn't give me any

4    information.  I just remember talking to him briefly on

5    the phone.  "Have Todd return my call when he gets a

6    chance," or --

7        Q.    Do you remember anybody else at TMP talking

8    with Neil Gaiman during this time period, again sort of

9    the May to August, '97 time period?

10       A.    I don't.

11       Q.    You don't recall?

12       A.    I don't recall anyone else talking to him.

13             MR. SIMMONS:  Mark this as Exhibit 3.

14             (Deposition Exhibit Number 3 was then

15               marked for identification.)

16   BY MR. SIMMONS:

17       Q.    Exhibit 3 is a collection of what looks like

18   three separate documents.  Do you recall any of these

19   documents?  Do any of them look familiar to you?

20       A.    I remember that Wanda did work on the foreign

21   publishing at the time.

22       Q.    What do you mean "work on the foreign

23   publishing"?

24       A.    Well, she was -- I don't know at what point

25   she came in, but she -- it was her job to try to have

1    the books published in other countries, so she was the

2    foreign publishing person, whoever handles that.

3         Q.    Who is Wanda?

4         A.    Wanda is Todd's wife.

5         Q.    Do you remember specifically receiving this

6    FAX?  I should say -- actually, I'm not sure if it is a

7    FAX.  Receiving this document.

8         A.    It's a memo.  We were at the same office, so

9    I think it was a FAX.  I know that she was getting some

10   of these numbers together for Todd, so she probably

11   passed this on to me to give to Todd, but I don't --

12   I'll just look at these others.

13        Q.    The next page, which is TM 368 -- I'm

14   referring to the bottom corner when I cite those

15   numbers -- looks like a message that you sent to Larry

16   Marder.

17        A.    Yes.

18        Q.    Do you recall sending that --

19        A.    Yes.

20        Q.    -- this note to Larry?

21        A.    Yes.

22        Q.    And why did you send this to Larry?

23        A.    At Todd's request for this information.

24        Q.    Do you know why Todd was gathering this

25   information?

1      A.   Specifically, no.  I know that he -- I mean,

2  it's --

3      Q.   Did you understand that Todd and Neil had

4  reached an agreement --

5      A.   Yes, I did.

6      Q.   -- during this time period?

7      A.   Yes.

8      Q.   Did you understand that Todd was attempting

9  to collect information to help provide to pay royalties

10 to Neil pursuant to that agreement?

11     A.   Yes.

12     Q.   And so these documents, the three documents

13 that are included as Exhibit 3 --

14     A.   Correct.  I'm just trying to recall what this

15 is all --

16     Q.   Sure.

17     A.   -- pertaining to.

18     Q.   So, would all three of these have been

19 created as part of that process of gathering information

20 for Todd so that he could pay royalties to Neil?

21     A.   I would assume so, yes.

22     Q.   Do you recall?

23     A.   I'm trying to think of who Pat is.

24     Q.   That was my next question actually.

25     A.   I'm looking at it.  Pat was probably Pat

1    Carron and Pat Carron worked in Michigan for -- I

2    believe he -- the company he worked for was TMPI.

3         Q.    By TMPI you mean TMP International?

4         A.    TMP International.

5         Q.    Do you know how to spell Pat's last name?

6         A.    C-A-R-R-O-N.

7         Q.    Do you know what Pat's job was over at TMPI?

8         A.    That's what I'm trying to remember and I

9    can't say what his job was.  I think he worked in the

10   Accounting Department, but I don't know what his

11   specific job or title was.

12        Q.    Referring to the last two documents, TM --

13   the handwritten documents --

14        A.    Yes.

15        Q.    -- 368 and 369, do you know -- do you recall

16   whether Larry Marder or Pat responded to your request

17   here?

18        A.    I don't recall.

19        Q.    Do you recall whether they ever sent you any

20   financial information regarding revenues that had been

21   generated by various Spawn products?

22        A.    No, I don't recall.

23             MR. SIMMONS:  Mark this as Exhibit 4.

24             (Deposition Exhibit Number 4 was then

25               marked for identification.)

1    BY MR. SIMMONS:

2        Q.    Why don't you take a look at this document.

3    Is this a document that you created?

4        A.    May I refer to it?

5        Q.    Yes, sure.

6        A.    Yes, I remember these.

7        Q.    So the cover page on this document, TM 467,

8    that's a document you created?

9        A.    Yes.

10        Q.    And can you describe the circumstances,

11    explain why you created this document?

12        A.    Well, I don't know where Todd was, but he did

13    ask me to collect information, which according to this I

14    have included.

15        Q.    Okay.  Did you have any understanding of why

16    Todd was having you do this?

17        A.    I do know that he wanted to get checks out to

18    Neil.

19        Q.    Turning past page 1 of that document, do you

20    recall whether you created any of the subsequent

21    documents that are attached?

22        A.    A lot of this information I gathered from

23    other people and just put the information down and sent

24    it off.

25            This 469 document --

1      Q.      Yes.

2      A.      -- I probably would have got this from

3   whoever was in charge of the comic book trafficking,

4   comic books and doing any kind of -- I don't even know

5   what that person's job would be called, but they just

6   would have been in charge of comic books.

7      Q.      Is this someone at TMP that you're referring

8   to?

9      A.      Yes.  And I don't know who it was at the

10  time.

11     Q.      So you don't specifically recall who you

12  received those pages from?

13     A.      No.  But I know I remember asking I needed a

14  list of Angela's appearances.  And I don't remember who

15  that would be.  It may have been Melanie Simmons.

16     Q.      Who's Melanie Simmons?

17     A.      I believe she is an employee at the company

18  and I believe at the time she was working on the comic

19  books.

20     Q.      And if you'll turn to TM 475, that's a couple

21  pages back from where you're at.  Right.

22              Do you recognize whose handwriting is on this

23  document?

24     A.      That's Todd's handwriting.

25     Q.      All right.  Off the record.

```
1                 (Discussion off the record.)

2                 MR. SIMMONS:  We'll mark this document as

3    Exhibit 4A.  I have only got one copy right now so we'll

4    make copies in a little bit.  And Exhibit 4A consists of

5    documents based on TM 470, TM 471, TM 472, 473 and it

6    looks like 479 and 80.

7                 (Deposition Exhibit Number 4A was then

8                  marked for identification.)

9    BY MR. SIMMONS:

10        Q.    Okay.  I'll have you take a look at that.

11   Okay.  Do you recognize any of those documents?

12        A.    Yes.

13        Q.    Were they part of the FAX that we were just

14   looking at, Exhibit 4?  Do you recall whether they were?

15        A.    I don't recall.  I would assume the sales

16   figures from Michigan.

17        Q.    Why don't you just -- we'll go page by page

18   on this one.  Do you recall where you obtained that

19   document from?

20                Or I guess I should start, is that a document

21   you created or you obtained from somebody else?

22        A.    No, it's not something I created.

23        Q.    Any idea who did?

24        A.    No.

25        Q.    Okay.  Would you just flip to the next one?
```

```
1          A.      Uh-huh.   From Allan Inglis.

2          Q.      Who is Allan Inglis?

3          A.      Allan Inglis worked in Michigan for TMP

4   International and he was the CFO.

5          Q.      Is he no longer there?

6          A.      He's not.

7          Q.      Any idea when he left?

8          A.      I believe it was June of 2001.   We relocated

9   our offices from Michigan to Phoenix.

10         Q.      And Allan didn't come?

11         A.      He chose not to come, correct.

12         Q.      You can continue flipping.

13                 Do you recognize -- what document are you on

14  now?

15         A.      I'm sorry.   It's TM 473.

16         Q.      Do you know who created that document?

17         A.      I would assume Allan Inglis because this

18  first two pages refer to it.

19         Q.      Okay.   It's part of the same document.   And

20  there's some handwritten notes on that document.

21         A.      It looks like Todd's writing.

22         Q.      Okay.   You can flip to the next page.   Is

23  that also from Allan Inglis?

24         A.      That's what it says.

25         Q.      That's what it says.
```

1          Okay.  You didn't play any part in creating
2    that document?
3          A.    No, I did not.
4          Q.    Okay.  Did Todd talk to you at all about any
5    of these documents that you were sending out to him?
6          A.    No.
7          Q.    Did he call you after you sent them out to
8    him and make any comments to you about them?
9          A.    No.
10          MR. SIMMONS:  Mark this as Exhibit 5.
11          (Deposition Exhibit Number 5 was then
12              marked for identification.)
13    BY MR. SIMMONS:
14          Q.    Why don't you take a look at that.  Just let
15    me know when you're done looking through it.
16          A.    Okay.
17          Q.    Do you recognize that document?
18          A.    Yes.
19          Q.    Did you play any role in creating that
20    document?
21          A.    I did.  I didn't compile the information.  I
22    mean, Todd gave me the information how he wanted this
23    and I input numbers.
24          Q.    So you basically -- did you --
25          A.    I typed it.

1          Q.     You typed in the information he gave you?

2          A.     Right.

3          Q.     Did anybody else give you information,

4    anybody other than Todd give you information to record

5    in this document?

6          A.     Not that I recall.

7          Q.     On several of the pages -- it looks like

8    actually it's the first five pages -- there are notes at

9    the bottom.

10         A.     Yes.

11         Q.     Do you see what I'm referring to?

12         A.     Yes, I do.

13         Q.     I know that you typed the document, but who

14   gave you the text for the notes?

15         A.     He did.

16         Q.     So those notes are all Todd's words

17   essentially?

18         A.     Correct.

19                MR. SIMMONS:   This is Exhibit 6.

20                (Deposition Exhibit Number 6 was then

21                 marked for identification.)

22   BY MR. SIMMONS:

23         Q.     Would you take a look at Exhibit 6 and let me

24   know when you're done.

25         A.     Okay.

1      Q.    Do you recognize Exhibit 6?

2      A.    Yes, I do.

3      Q.    Is that a document you created?

4      A.    Again I typed it for Todd, but I -- he

5    dictated what he wanted me to put in it so I didn't

6    create -- or I typed it.  I prepared it, but I didn't

7    have any of the numbers.  Those were just input by the

8    information Todd gave me.

9      Q.    Did anybody other than Todd give you any

10   information to put in this report?

11     A.    No, I don't believe so.

12     Q.    On the first page, first line of the body of

13   the document it says, "I am sending another check for

14   the next royalty payments."

15     A.    Correct.

16     Q.    What role did you play in cutting the checks

17   to go out to Neil?

18     A.    I don't remember.  I'm assuming I just got

19   them with the reports and sent them out.  I don't

20   remember who specifically was doing the accounting at

21   the time.

22     Q.    Do you recall whether Terry Fitzgerald played

23   any role in compiling any of the information that's

24   included in this report?

25     A.    No, I don't believe he did.

```
1              MR. SIMMONS:  This one is Exhibit 7.

2              (Deposition Exhibit Number 7 was then

3              marked for identification.)

4   BY MR. SIMMONS:

5       Q.    Just let me know when you're done taking a

6   look at it.

7       A.    Okay.  I'm done.

8       Q.    Okay.  Do you recognize this document?

9       A.    Yes.

10      Q.    It's a document you created?

11      A.    Correct.

12      Q.    The second paragraph of the text says, "I

13  phoned Terri Cunningham and she is out ill today."

14             Why were you calling Terri Cunningham?

15      A.    I don't recall.

16      Q.    Did Todd ask you to call Terri Cunningham?

17      A.    Possibly.

18      Q.    Do you recall whether Terri Cunningham

19  returned your call?

20      A.    That I don't remember.

21      Q.    Did Todd ever explain to you why he wanted to

22  get ahold of Terri Cunningham?

23      A.    He wanted to discuss DC's standard, from what

24  I recall, DC's standard deal with artists.

25      Q.    And do you know whether Terri Cunningham ever
```

1    got back to him?

2        A.    I know that Todd and Terri spoke on the

3    phone.  I don't know whether it was before this date or

4    after this date.

5        Q.    Do you know whether it was -- whether it was

6    before you sent out any of the reports, Exhibits 5 and

7    6?

8        A.    No, I don't.

9        Q.    Did you send out checks to Neil Gaiman for

10   royalties during or after August of 1997?

11       A.    Not that I recall.

12             MR. SALSICH:  Wait.  Let me just impose an

13   objection here just for clarity's sake.

14             You asked her if she had sent out checks

15   during or after August of 1997.  I think we've gone

16   through several exhibits that show that exhibits were --

17   checks were sent out during August of 1997, so I'm

18   unclear if you're asking her if she sent out royalty

19   checks after August of 1997 or just asking again if she

20   actually sent them and so forth.

21             MR. SIMMONS:  Yes.  Let me be more precise.

22             MR. SALSICH:  Okay.

23   BY MR. SIMMONS:

24       Q.    Do you recall whether you sent out any checks

25   to Neil Gaiman after you created the documents 5, 6 or

1    7?

2          A.    Five being which one?

3          Q.    Five I think is one of the other -- 5 and 6

4    are the two royalty reports.

5          A.    Dated August 4th and 11th on the memos?

6          Q.    Yes.

7          A.    No, I don't recall if I sent any after that.

8          Q.    I'm sorry if I asked this, but do you recall

9    whether Todd ever told you what, if anything, Terri

10   Cunningham might have told him?

11         A.    He didn't discuss it with me.

12               MR. SIMMONS:   Exhibit 8.

13               (Deposition Exhibit Number 8 was then

14                 marked for identification.)

15   BY MR. SIMMONS:

16         Q.    Do you recognize Exhibit 8?

17         A.    Yes, I do.

18         Q.    Did you play any role in creating Exhibit 8?

19         A.    No, not that I recall.

20         Q.    What do you recall about Exhibit 8?  When was

21   the first time that you remember seeing it?

22         A.    I believe when it was sent, but I don't think

23   I created this document.

24         Q.    Do you remember Todd ever explaining why he

25   was sending it?

1    A.    No.

2    Q.    Do you recall Todd saying anything to you

3  about whether Neil Gaiman ever responded to this letter?

4    A.    No, I don't.

5    Q.    Do you remember Todd saying anything about

6  this letter one way or another?

7    A.    I don't remember.

8            MR. SIMMONS:  Mark this as Exhibit 9.

9            (Deposition Exhibit Number 9 was then

10               marked for identification.)

11  BY MR. SIMMONS:

12    Q.    It looks like it's an e-mail addressed to S.

13  Peterson.  Do you know who S. Peterson is?

14    A.    That would be Steve Peterson.  He's CFO

15  for -- I'm not sure which company.  He does work in our

16  office in Tempe.  He's just CFO for all the companies of

17  McFarlane.

18            MR. SALSICH:  If I can just make a statement

19  on the record.

20            MR. SIMMONS:  Sure.

21            MR. SALSICH:  I agree it does appear that

22  Mike Kahn at Stinson.com was copied on this e-mail.

23  Mike Kahn is outside counsel for Todd McFarlane, Todd

24  McFarlane Productions, TMPI, all of whom are defendants

25  in the lawsuit.

1          It does appear that we produced this document

2    in the course of our discovery in this case and to the

3    extent it contains information that is attorney-client

4    privileged, I believe that the information contained in

5    this document is also contained in other documents that

6    themselves are not attorney-client privileged.  So,

7    while I don't want to waive any privileges that may be

8    part of this particular document, again I don't see any

9    prejudice at this point in going forward with it.

10          MR. SIMMONS:  That's fine.  I have only one

11   other question.

12     Q.   Do you know why you -- why you produced this

13   document, why you created it?

14     A.   Steve Peterson asked me for if I had some of

15   the early records of the company that would have

16   payments -- that would show payments to Neil Gaiman and

17   I did have those at the office I was at and I listed

18   them here.

19     Q.   Do you have any understanding of why he

20   wanted that information?

21     A.   I'm assuming it was when we were preparing

22   for -- just preparing numbers on what we paid Neil, but

23   I --

24          MR. SALSICH:  Let me just make an objection

25   again.  To the extent that any understanding you may

1    have as to why this particular document, this e-mail in

2    Exhibit 9 or the information you were gathering therein

3    was as a result of advice given to you by Mr. Kahn as

4    indicated by the cc: on this letter, I'd instruct you

5    not to answer that as to what Mr. Kahn may or may not

6    have said as to the reasons for getting this

7    information.

8            If you want to answer factually as to what

9    you did or did not do in obtaining this information,

10   that's fine, but as to the reasons for why you gathered

11   it or for any instructions you may have received from

12   Mike Kahn about it or that Steve Peterson or Larry

13   Marder may have told you that Mike Kahn said to do this

14   or that, I'd instruct you not to answer those questions

15   on the ground it may invade the attorney-client

16   privilege.  Other than that, you may answer the

17   question.

18           And I'm not sure that she is getting there,

19   but I just wanted to make sure.

20           MR. SIMMONS:  No, that's perfectly all right.

21           THE WITNESS:  No, on those documents I had

22   these tax records and I sent them over to Steve.

23   BY MR. SIMMONS:

24       Q.   And I think the question we had was do you

25   know why he wanted the information?

1        A.    Not specifically, no.

2        Q.    Mark this as Exhibit 10.

3              (Deposition Exhibit Number 10 was then

4              marked for identification.)

5    BY MR. SIMMONS:

6        Q.    My question is just do you recognize this

7    document?

8        A.    No, I don't.

9        Q.    Do you recognize the handwriting?

10       A.    It looks like Todd's handwriting.

11       Q.    But as far as you recall you've never seen it

12   before?

13       A.    No, I don't recall seeing it.

14             MR. SIMMONS:  Okay.  I think that's it.

15                         EXAMINATION

16   BY MR. SALSICH:

17       Q.    I just have one or two questions by way of

18   clarification.

19             Sheila, do you recall being asked -- you were

20   discussing what was marked as Exhibit 3, and take a

21   quick look at that again if you recall this so we can

22   get back to that discussion.  Do you recognize Exhibit

23   3?

24       A.    Yes.

25       Q.    And do you recall a discussion you had with

1    Mr. Simmons a few minutes ago about that exhibit?

2         A.    Yes.

3         Q.    If I understood your testimony correctly, at

4    one point Mr. Simmons asked you if you were aware of or

5    if you had an understanding that Todd and Neil Gaiman

6    had reached an agreement during this time and you

7    answered that question "Yes." Do you recall that

8    testimony?

9         A.    Yes.

10        Q.    I'd just like to ask you a couple of

11   questions about that.

12             At any time during the period about which

13   we've been talking today in the summer of 1997 did Todd

14   tell you that he and Neil had reached any specific

15   agreement?

16        A.    He told me that they had come to an

17   agreement.  I don't know the details of that, no.

18        Q.    Did he tell you the terms of that agreement?

19        A.    No, he did not.

20        Q.    Did he tell you specifically what that

21   agreement was?

22        A.    No, he didn't.

23        Q.    Do you have any understanding of the terms,

24   any specific terms of the agreement about which you're

25   referring to?

1    A.    No.

2    Q.    You also stated that you -- I believe the

3  answer to the question was you understood that this --

4  the information you were gathering here was in an effort

5  so that Todd could send royalty checks to Neil.  Do you

6  recall that?

7    A.    Yes.

8    Q.    At any time did Todd tell you specifically

9  why he was asking for any specific information that you

10 were asked to gather during this time period?

11   A.    No.

12   Q.    Was it your testimony then that Todd simply

13 said "I need this information" or "I need that

14 information" and you gathered it to the extent you knew

15 who might have that information?

16   A.    Correct.

17         MR. SALSICH:  Okay.  That's all I have.

18                   RE-EXAMINATION

19 BY MR. SIMMONS:

20   Q.    And just one follow-up.

21         You said that Todd told you that he had

22 reached an agreement with Neil, is that correct?

23   A.    Well, he didn't tell me specifically.  He

24 just said that they had come to an agreement.

25   Q.    Can you tell me everything you remember about

1    that conversation?

2         A.    I don't.  That's -- that's all I remember was

3    that I remember him mentioning that he had -- that they

4    had come to an agreement.

5         Q.    Do you recall roughly when that was?

6         A.    No, I don't.

7              MR. SIMMONS:  That's it.  I think we are

8    done.

9              MR. SALSICH:  Yes, we are done.

10             (Whereupon, the deposition was then

11              concluded at 10:23 a.m.)

12

13

14

15              _____
                           SHEILA EGGER

16

17

18

19

20

21

22

23

24    3442-G

25

```
 1    STATE OF ARIZONA      )
                            )   ss.
 2    COUNTY OF MARICOPA    )

 3

 4            BE IT KNOWN that the foregoing deposition was

 5    taken before me, PAUL GROSSMAN, a Notary Public and

 6    Certified Court Reporter #50028 in and for the County of

 7    Maricopa, State of Arizona; that the witness before

 8    testifying was duly sworn by me to testify to the whole

 9    truth; that the witness will read and sign the

10    deposition; that the questions propounded to the witness

11    and the answers of the witness thereto were taken down

12    by me in shorthand and thereafter reduced to print by

13    computer-aided transcription under my direction; that

14    the foregoing 31 pages are a true and correct transcript

15    of all proceedings had upon the taking of said

16    deposition, all done to the best of my skill and

17    ability.

18            I FURTHER CERTIFY that I am in no way related

19    to any of the parties hereto, nor am I in any way

20    interested in the outcome hereof.

21            DATED at Phoenix, Arizona, this 20th day of

22    June, 2002.

23                         _____

24                         Paul Grossman, Notary Public
                           AZ CCR #50028
25
```



OFFICIAL SEAL
PAUL GROSSMAN
Notary Public - State of Arizona
MARICOPA COUNTY
My comm. expires Oct. 13, 2005