IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NEIL GAIMAN and MARVELS AND )
MIRACLES, LLC, )
) **03-1461**
             Plaintiffs, )
)
    -vs- ) DOCKET 2-C-0048-S **79**
) NUMBER
TODD MCFARLANE, TODD MCFARLANE ) U.S. DISTRICT COURT
PRODUCTIONS, INC., TMP INTER- ) WEST. DIST. OF WISCONSIN
NATIONAL, INC., MCFARLANE )
WORLDWIDE, INC. and IMAGE ) AUG - 1 2002
COMICS, INC., )
) FILED/RECEIVED
             Defendants. ) JOSEPH W. SKUPNIEWITZ, CLERK
_____ ) CASE
NUMBER

DEPOSITION OF LAWRENCE P. MARDER

Phoenix, Arizona
June 19, 2002
9:00 a.m.

U.S.C.A. — 7th Circuit
F I L E D

NOV 2 6 2003  **JC**

GINO J. AGNELLO
CLERK

DOC. #_____
Prepared for:

U.S. DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
(Original)

Reported by:

PAUL GROSSMAN
AZ CCR #50028
CA CSR #1487

**BROWN
& TOLEU ltd.**
Court Reporters
101 West Adams

Phoenix, Arizona 85003-2003

Telephone (602) 254-5479          FAX (602) 254-5013

1

# I N D E X

2

3

Examination:                                          Page

4

BY MR. ARNTSEN                                          4

5

6

7

8                           E X H I B I T S

9        No.   Description                              Page

10       24 (A Bill of Rights for Comics Creators.)      79

11       25 (Handwritten memo from Mr. Gaiman to
              Mr. Marder.)                                81
12
         26 (Memo from Larry to Todd, 11/14/96.)         81
13
         27 (Memo from Larry to Todd, 11/14/96.)         81
14
         28 (Memo from Larry to Neil, 11/18/96.)         81
15
         29 (Memo from Larry to Neil, 12/17/96.)         81
16
         30 (Memo from Larry to Neil, 12/17/96.)         81
17
         31 (Memo from Larry to Neil, 1/9/96.)           81
18
         32 (Memo from Larry to Neil, 2/18/97.)          81
19
         33 (Handwritten note from Neil to Todd,
20            7-15-97.)                                   81

21

22

23

24

25

1

2

3          THE DEPOSITION OF LAWRENCE P. MARDER,

4   taken at 9:00 a.m. on June 19, 2002, at the offices of

5   Brown & Toleu, Ltd., 101 West Adams Street, Phoenix,

6   Arizona, before PAUL GROSSMAN, a Notary Public and

7   Certified Court Reporter #50028 in and for the State of

8   Arizona, pursuant to the Federal Rules of Civil

9   Procedure.

10         The plaintiffs were represented by their

11  attorneys, Foley & Lardner, by Allen A. Arntsen, Esq.

12  and Jeffrey A. Simmons, Esq.

13         The defendants Todd McFarlane were

14  represented by their attorneys, Blackwell, Sanders,

15  Peper, Martin, L.L.P., by Michael A. Kahn, Esq.

16         The defendant Image Comics was represented by

17  its attorneys, Brobeck, Phleger & Harrison, LLP, by

18  Matthew C. Lapple, Esq.

19         Also present was Kenneth F. Levin, Esq.,

20  Mr. Neil Gaiman and Mr. Todd McFarlane

21

22

23

24

25

```
 1                                        Phoenix, Arizona
 2                                        June 19, 2002
 3                                        9:00 a.m.
 4
 5
 6                     LAWRENCE P. MARDER,
 7     called as a witness herein, having been first duly
 8     sworn, was examined and testified as follows:
 9
10                     EXAMINATION
11     BY MR. ARNTSEN:
12          Q.   Please state your name.
13          A.   My full name?
14          Q.   Yes.
15          A.   Lawrence Peter Marder.
16          Q.   What's your home address?
17          A.   11 Lucania, Newport Coast, California 926577.
18     92657.
19          Q.   How are you presently employed?
20          A.   By TMP International.
21          Q.   In what position?
22          A.   President.
23          Q.   What's the business of TMP International?
24          A.   Manufacture of toys.
25          Q.   Do you have any other employment other than
```

1    as President of TMP International?

2        A.    I'm on the board of directors and the

3    vice-president of the board.

4        Q.    Of TMP International?

5        A.    I'm not sure what.  I'm not sure what it is.

6    I think it's TMP International, the parent company.

7        Q.    Okay.  I'm just trying to understand this.

8    You are the president of?

9        A.    The toy company.

10       Q.    Which is TMP International?

11       A.    Uh-huh.

12       Q.    You have to use yes or no.

13       A.    Yes.

14       Q.    Have you ever had your deposition taken

15   before?

16       A.    No.

17       Q.    A couple of ground rules.  First of all,

18   you're aware you're under oath, right?

19       A.    Sure.

20       Q.    You have to wait 'til I finish my question to

21   start your answer and I'll return the same courtesy.

22   That's for the court reporter.  Okay?

23       A.    Okay.

24       Q.    If you need to take a break, say so and we

25   will take it.  All right?

1          A.    Okay.

2          Q.    If you don't understand a question, tell me

3    and I'll rephrase it. Okay?

4          A.    Okay.

5          Q.    And kind of the other side of that is if you

6    answer a question I'll assume you understood it. Fair

7    enough?

8          A.    Fair.

9          Q.    Okay. So you're the president of TMP

10   International which makes toys, right?

11         A.    Correct.

12         Q.    And you're on the board of directors of what

13   entity?

14         A.    I think it's TMP Worldwide, but I'm not --

15   I'm not sure.

16         Q.    Are you also a vice-president of TMP

17   Worldwide or of whatever that entity is?

18         A.    Of the parent corporation. Of the parent

19   entity I am the vice-president of the board.

20         Q.    Okay. So you're the president of TMP

21   International and you're on the board and the

22   vice-president of its parent company which you believe

23   is TMP Worldwide, is that correct?

24         A.    Yes.

25         Q.    And what's the business of TMP Worldwide?

1      A.    It's the parent corporation of -- of all the

2   other companies, I believe.

3      Q.    And what companies are those?

4      A.    Todd McFarlane Productions, Todd McFarlane

5   Entertainment, TMP Asia, TMP Europe.  Those are all that

6   I recall at this moment.

7      Q.    Okay.  And so is TMP Worldwide or whatever

8   the parent company's name, is that just essentially a

9   holding company; it doesn't have any separate business

10   of its own?

11      A.    No.

12      Q.    But it oversees the other companies?

13      A.    No.

14          MR. KAHN:  Let him finish his question so

15   that the court reporter can get down what he says.

16          THE WITNESS:  Okay.

17          MR. KAHN:  And so that the court reporter can

18   get down your answer.

19          THE WITNESS:  Okay.

20   BY MR. ARNTSEN:

21      Q.    I'll just rephrase the question.

22          So the parent company doesn't have any

23   business of its own; it sort of oversees the businesses

24   of the children companies, is that correct?

25      A.    That's my understanding.

1    Q.    And what's the business of Todd McFarlane

2    Productions?

3        A.    It's the production of comic books.

4        Q.    And what's the business of Todd McFarlane

5    Entertainment?

6        A.    Production of movies, animation.

7        Q.    And what's the business of TMP Asia?

8        A.    It is the office that oversees the production

9    of our toys in China.

10       Q.    And what's the business of TMP Europe?

11       A.    It is the -- it oversees the distribution of

12   toys in Europe and I believe we are presently dissolving

13   it.

14       Q.    At least as you sit here today, those are all

15   of the children?

16       A.    That's all I recall at this moment, yes.

17       Q.    Okay.  Do you have any other employment or

18   duties outside of your services for TMP International

19   and TMP Worldwide?

20       A.    No.

21       Q.    What are your duties as president of TMP

22   International?

23       A.    I don't have any duties.

24            Oh, TMP International.  I'm sorry.

25       Q.    Yes.

1    A.    I'm sorry.  I misunderstood.  I oversee

2    everything that has to do with the toy company.

3    Q.    And do you have any duties relating to any

4    other, for want of a better word, media other than toys?

5    A.    No.

6    Q.    When did you first start working in the comic

7    book industry?

8    A.    In 1985.  1984, the comic book industry.

9    Q.    Actually, I just might go through your

10   education and employment background.  When did you

11   graduate from high school?

12   A.    1969.

13   Q.    Did you graduate from college?

14   A.    Yes.

15   Q.    When?

16   A.    1973.

17   Q.    Any postgraduate?

18   A.    No.

19   Q.    Would you summarize for me your employment

20   history from 1973 until you got involved in the comic

21   book industry?

22   A.    I was in the advertising business.  I was an

23   art director in the advertising business and worked my

24   way up to vice-president and creative director of an

25   advertising agency.

```
 1              Q.    What agency was that?

 2              A.    Sandra Allen Advertising in Chicago,

 3    Illinois.

 4              Q.    And did you work for Sandra Allen Advertising

 5    from 1973 to 1984?

 6              A.    No.  I worked for Sandra Allen from 1977 to

 7    1991.

 8              Q.    Then what did you do after you left Sandra

 9    Allen Advertising?

10              A.    I was the marketing director of Moon Dogs, a

11    chain of comic book stores in Chicago.

12              Q.    And when did you start doing that?

13              A.    1991.

14              Q.    Now, you indicated that your first -- let me

15    back up just a minute.

16                    What years did you say you were with Sandra

17    Allen?  I apologize.

18              A.    1977 to -- I was affiliated with that agency

19    from 1977 to 1991.

20              Q.    In what positions?

21              A.    Oh, I started out as a paste up artist and

22    when I left I was vice-president and creative director.

23              Q.    Can you just kind of briefly summarize for me

24    your career path at Sandra Allen from 1977 to '91?

25              A.    I started out as a graphic artist working on
```

1    accounts and worked my way up to account executive.

2         Q.    When was that?

3         A.    Pardon?

4         Q.    When was that?

5         A.    Oh, I would say that was in the early '80s.

6              And after I started doing account work I also

7    became creative director, which meant that I oversaw all

8    advertising and presentation of advertising to the

9    client.

10        Q.    That was again in the early '80s when you

11   assumed --

12        A.    Correct.

13        Q.    -- when you assumed those responsibilities?

14        A.    Yes.

15        Q.    I believe you said you first became involved

16   in the comic book industry in 1984, is that correct?

17        A.    Yes.

18        Q.    Doing what?

19        A.    Two things.  I was publishing my own comic

20   book called Tales of the Bean World.

21        Q.    You started doing that in 1984?

22        A.    Yes.  I was first published in 1985.

23        Q.    So, was your first involvement in the comic

24   book industry in connection with Tales of the Bean

25   World?

```
 1        A.    My first connection in the comic book
 2   industry was being published, yes.
 3        Q.    Okay.  Well, how about other connections
 4   other than being published?
 5        A.    I created some advertising work for
 6   publishers.
 7        Q.    When was that?
 8        A.    1984.
 9        Q.    For what comics?
10        A.    Eclipse.
11        Q.    Was Tales of the Bean World published by
12   Eclipse?
13        A.    Tales of the Bean World was self published
14   and it was distributed by Eclipse.
15        Q.    What is Tales of the Bean World?
16        A.    It's -- it's a comic book that is an
17   environmental, an ecological romance.
18        Q.    And were you the creator of Tales of the Bean
19   World?
20        A.    Yes.
21        Q.    And so you wrote the scripts?
22        A.    Yes.
23        Q.    And did you draw the animation?
24        A.    I drew the pictures.
25        Q.    Okay.  And when did you first come up with
```

1    the idea of Tales of the Bean World?

2        A.    When I was in college.

3        Q.    And describe the process by which Tales of

4    the Bean World came to be published and go out as a

5    comic book?

6        A.    I'm not sure I understand the question.

7        Q.    As I gather from your answer, you came up

8    with this idea and this concept while you were in

9    college that turned into Tales of the Bean World, right?

10       A.    Yes.

11       Q.    And then it sounds to me like it's one that

12   just you kind of played around with for, you know, the

13   next decade or so.  Is that correct?

14       A.    That's correct.

15       Q.    And at some point in time in 1985 you

16   published a comic book, right?

17       A.    Yes.

18       Q.    And Eclipse distributed that comic, correct?

19       A.    Correct.

20       Q.    Was there more than one Tales of the Bean

21   World published?

22       A.    There were 21 issues published.

23       Q.    Over what period of time?

24       A.    1985 to 1993, I believe.

25       Q.    And did you self publish all of them?

1          A.     I self published all of them and they were

2     all distributed by Eclipse.

3          Q.     Did you hold the copyrights to Tales of the

4     Bean World?

5          A.     Yes.

6          Q.     Were there any trademarks associated with

7     Tales of the Bean World?

8          A.     Yes.

9          Q.     Did you hold those trademarks?

10          MR. KAHN:  Let me just clarify, Allen.  You

11    mean, are you talking about registered trademarks or

12    simply just trademarks?

13          MR. ARNTSEN:  I first started with

14    trademarks.

15          MR. KAHN:  All right.

16          MR. ARNTSEN:  I'll ask about registration

17    later.

18          MR. KAHN:  Okay.

19    BY MR. ARNTSEN:

20          Q.     Any trademarks?  You indicated there were

21    some trademarks associated with Tales of the Bean World,

22    correct?

23          A.     Yes.

24          Q.     And did you hold those trademarks?

25          A.     Yes.

1    Q.    And did you ever register the copyrights, any

2    of the copyrights?

3    A.    Yes.

4    Q.    Did you register the copyrights for all of

5    the Tales of the Bean World?

6    A.    I don't know.

7    Q.    What do you recall in that regard?

8    A.    I don't know.  I know that I registered some.

9    Q.    Talking about trademarks, did you register

10   any trademarks in connection Tales of the Bean World?

11   A.    Yes.

12   Q.    Did you have a written contract with Eclipse

13   to distribute those comics?

14   A.    No.

15   Q.    What was the contract?

16   A.    "You pay for the comic and we'll distribute

17   it."  And I would do some marketing work for them and in

18   exchange for that they would publish -- they would

19   distribute my comic.

20   Q.    And then there was some division of the sales

21   price, is that how it worked?

22   A.    No.  They didn't take anything for a long,

23   long time.

24   Q.    Okay.  What was your next involvement in the

25   comic book industry following your or, you know, we

1    started out saying you became involved with Tales of the

2    Bean World in 1985.

3              What was -- in what other ways, and I'm just

4    trying to kind of run them through chronologically, were

5    you involved with the comic book industry?

6         A.    Well, I went to Moon Dogs and I was the

7    marketing director.

8         Q.    In 1991?

9         A.    1991.

10        Q.    Prior to 1991 did you have any other role or

11   involvement in the comic book industry other than, you

12   know, what you've testified to in connection with your

13   art direction for Eclipse, for your advertising agency

14   and also for Tales of the Bean World?  Anything else you

15   did?

16        A.    I did advertising for Friendly Frank

17   Distribution.

18        Q.    Okay.  Anything else prior to your going to

19   Moon Dog?

20        A.    Not that I recall.

21        Q.    Okay.  Now, what was your job with Moon Dog?

22        A.    I was the marketing director.

23        Q.    And what was Moon Dog?

24        A.    It was a chain of pop culture stores in the

25   Chicagoland area.

1    Q.    Over what period of time were you affiliated

2    with Moon Dog?

3    A.    1991 to 1993.

4    Q.    Always as marketing director?

5    A.    Yes.

6    Q.    And what were your responsibilities as

7    marketing director?

8    A.    To oversee all of the advertising and sales

9    promotions.

10    Q.    Now, during this period of time were you

11    involved with something called the creators bill of

12    rights?

13    A.    I went to the meeting, yes.

14    Q.    Tell me about that.  What meeting are you

15    referring to?

16    A.    It was a meeting at Northhampton,

17    Massachusetts.

18    Q.    When?

19    A.    In 1988.

20    Q.    Of whom?

21    A.    What?

22    Q.    Who was at the meeting?

23    A.    Dave Simm, Gerhardt, most of the people that

24    worked at Mirage.

25    Q.    And what was your role or involvement in the

1    meeting?

2        A.    I wasn't invited, so I was a last minute

3    addition and I basically listened for however long it

4    was.

5        Q.    And how long was it about?

6        A.    I think it was two days.

7        Q.    And did anything come out of the meeting?

8        A.    They drafted the creators bill of rights.

9        Q.    Did you have any involvement in that drafting

10   process?

11       A.    No.

12       Q.    Did you have any involvement with the

13   creators bill of rights following that meeting?

14       A.    I don't really understand the question

15   because it was just a document.

16       Q.    And was anything further done at least in

17   which you were involved in connection with that

18   document?

19       A.    No.  I'm sorry.  No.

20       Q.    Why did you go to the meeting?

21       A.    Scott McCloud called me and asked me if I

22   wanted to go.  They -- that if I paid my -- most of the

23   people that attended had their way paid and at the very

24   last minute he called me and asked me to go, and if I

25   paid my own way out that they would give me a hotel

1    room, so at the very last minute I decided to go.

2        Q.    And why?  What interested you about it?

3        A.    It was a gathering of a lot of my friends.

4        Q.    Anything else?

5        A.    Really at that moment, no.  I went on a lark.

6        Q.    And did you provide any input into the

7    creators bill of rights that was drafted at that

8    meeting?

9        A.    Oh, no.  That first day I didn't speak a

10   word.

11       Q.    As opposed to the second day?

12       A.    The second day was not about the creators

13   bill of rights.  It was -- it was talk about the

14   distribution system and I did talk about that and I

15   talked about the theory of advertising and marketing

16   comic books and I spoke quite a bit that day, but the

17   actual drafting of the bill I don't recall speaking at

18   all.

19       Q.    And what was the connection between the

20   discussion of the distribution system with the

21   discussion of the creators bill of rights?

22       A.    I don't think -- I think they were very

23   disparate.  I think they were very separate

24   conversations.

25       Q.    Okay.  Now, what did you do after you left

```
1    Moon Dog?
2         A.    I went to Image Comics.
3         Q.    In what position?
4         A.    Executive Director.
5         Q.    Describe the circumstances that caused you to
6    switch jobs from Moon Dog to Image?
7         A.    I left Moon Dogs because my contract was up
8    and I didn't know what I was going to do next and then I
9    received a phone call from Image asking me to come out
10   and talk to them.
11        Q.    Who called you?
12        A.    Jim Valentino.
13        Q.    Then what happened next other than apparently
14   they offered you a job and you took it?
15        A.    Yes.
16        Q.    Is that about it?
17        A.    More or less.
18        Q.    Did I miss anything significant --
19        A.    No.
20        Q.    -- about your going to Image?
21        A.    No.
22        Q.    What were your duties as Executive Director
23   of Image?
24        A.    To oversee their collective business of their
25   partnership.  There were six shareholders.
```

1    Q.    I'm just trying to get an understanding of

2    the terms.  You said collective business of their

3    partnership and you said there were six shareholders.

4    What kind of entity was Image?

5    A.    S. corp.

6    Q.    And it had six owners?

7    A.    Six shareholders, yes.

8    Q.    And who were they?

9    A.    Jim Lee, Todd McFarlane, Rob Liefeld, Eric

10   Larsen, Mark Silvestre, Jim Valentino.

11   Q.    And what was the business of Image?

12   A.    Publishing comics.

13   Q.    What were your duties as Executive Director?

14   A.    To oversee the office.

15   Q.    Chief Operating Officer?

16   A.    No.  Executive Director was my title.

17   Q.    And how were your duties different than what

18   a Chief Operating Officer might do?

19   A.    Well, I'm not sure what a COO would do

20   because we weren't a traditional publishing company in

21   any sense of the word.

22   Q.    Okay.  Describe what Image was.

23   A.    Image was an entity that existed to publish

24   comics that were created by -- by other people.  In

25   other words, Image didn't own anything except for its

1    trademark and -- and the office equipment.

2        Q.    And then would Image contract with people to

3    do something for them?

4        A.    We would basically -- we had the license

5    to -- to publish, to manufacture and distribute other

6    people's property, other people's comics.

7        Q.    So Image was party to licenses with other

8    people and pursuant to those licenses Image would

9    publish and distribute comics, is that correct?

10        A.    That's correct.

11        Q.    And when you say your job was to oversee the

12    office, is that the same as oversee the business?

13        A.    The business was publishing comics, so, yes.

14        Q.    And were the six people who you listed as

15    Image shareholders, were they all equal shareholders?

16        A.    Yes.

17        Q.    And did Image publish comics through licenses

18    with anyone other than its shareholders?

19        A.    Yes.

20        Q.    Did Image publish comics through licenses

21    with its shareholders?

22        A.    Could you repeat that?

23        Q.    Did Image -- were some of images licenses to

24    publish comics with its shareholders?

25        A.    Oh, yes.

1    Q.    And were these written license agreements?

2    A.    No.

3    Q.    Oral license agreements?

4    A.    Yes.

5    Q.    Did all the license agreements have the same

6    terms or did the terms vary?

7    A.    All the license agreements for the

8    shareholders were the same.

9    Q.    And basically can you tell me what the oral

10   agreements were?

11   A.    That the comics would be published in

12   exchange for a fee.

13   Q.    In other words, the license -- the

14   shareholder would pay fee to Image to publish the

15   comics, is that what you're saying?

16   A.    The licensor would pay a fee for the

17   publishing of the comics, yes.

18   Q.    Okay.  And was that fee the same for all the

19   shareholders?

20   A.    Yes.

21   Q.    And what was it?

22   A.    It changed over the years, so I think it -- I

23   think it went from $2,500 to $1,800 over the years.

24        MR. KAHN:  Can we take a break for one

25   second?

1          (Whereupon, a short recess was then had at

2                9:32 a.m. until 9:33 a.m.)

3    BY MR. ARNTSEN:

4        Q.    And with the fee, the $2,500 or $1,800, was

5    that per issue?  How did that -- what was that per?

6        A.    Per issue.

7        Q.    And what would Image do in exchange for its

8    $2,500?

9        A.    It would secure a solicitation with the

10   distributors.  It would oversee the printing of the

11   book.  It would oversee the distribution of the book and

12   it would collect the funds from the distributor which

13   would then be disbursed.

14       Q.    Okay.  To the licensor?

15       A.    To the licensor.

16       Q.    Now, you indicated that Image's licenses with

17   each of its owners were all the same.  Were the licenses

18   different with non-owners?

19       A.    With non-owners the fee tended to be larger.

20       Q.    Was it still based on the same general

21   format, just --

22       A.    Everything was the same.

23       Q.    It would just be a higher dollar number, is

24   that correct?

25       A.    Slightly higher dollar number, yes.

1    Q.    But everything else the same?

2    A.    Uh-huh.  Yes.

3    Q.    Okay.  Over what period of time were you the

4    Executive Director of Image?

5    A.    December of '93 to September, 1999.

6    Q.    And did the business of Image change at all

7    during the period, that period of time?

8    A.    I don't understand the question.

9    Q.    You described for me generally what Image's

10   business was with regard to entering into licenses with

11   its owners or other creators and then kind of overseeing

12   the publication of comics.  Did that change at all over

13   the period of time you were involved?

14   A.    No.  Image published comics.

15   Q.    So the description you gave me was true

16   throughout the time you were Executive Director,

17   correct?

18   A.    Correct.

19   Q.    Did Image ever do anything else other than

20   what you described?

21   A.    No.

22   Q.    Did you have any other employment during the

23   December of 1993 to September of 1999 period other than

24   as Executive Director of Image?

25   A.    No.

1    Q.    Then what did do you in September of '99?

2    A.    I went to work for Todd McFarlane.

3    Q.    In your current position or some other

4    position?

5    A.    Originally I was the President of Operations

6    of Todd McFarlane Productions.

7    Q.    And what period of time were you in that

8    position?

9    A.    From October, '99 to December of 2001.

10   Q.    Why did you change jobs from Image to Todd

11   McFarlane Productions?

12   A.    I was asked to.

13   Q.    By whom?

14   A.    Todd McFarlane.

15   Q.    What were your job duties as President of

16   Todd McFarlane Productions?

17   A.    I oversaw the advertising and marketing of

18   the toys and I oversaw the web-site.

19   Q.    Did you have any involvement with the comic

20   books?

21   A.    No.

22   Q.    And then in December of 2001 you transferred

23   over to -- to your current position?

24   A.    Correct.

25   Q.    And how did your job duties change?

1        A.      I became responsible for more of the

2    financial aspects of the toy company.

3        Q.      Have we pretty well -- I'm sorry.

4        A.      I was always paid, though, by TMP

5    International.

6        Q.      From October of 1999 on?

7        A.      Correct.

8        Q.      And who is the person whom you have reported

9    to since you started at Todd McFarlane Productions in

10   October of 1999?

11       A.      Todd McFarlane.

12       Q.      And who did you report to as Executive

13   Director of Image?

14       A.      To the shareholders.

15       Q.      Have we covered, recognizing it's a fair bit

16   of generality, you know, in fairly general terms your

17   career in the comic book industry or are there some

18   things we missed?

19       A.      I think you covered it.

20       Q.      Did you have any involvement in the -- with

21   the Miracleman series of comics published by Eclipse?

22       A.      The comic book publishing?

23       Q.      Well, let's pull it back more generally.  Any

24   involvement whatsoever with anything related to the

25   Miracleman comic book character?

1  A.  Yes.

2  Q.  And what was that?

3  A.  I created the original ad campaign when it

4 was first published by Eclipse.

5  Q.  When was that?

6  A.  1984.  I created the advertising program in

7 1984.  I suppose it was published in 1985.

8  Q.  Did you have any continuing involvement with

9 that advertising campaign or anything else in connection

10 with Miracleman?

11  A.  No.

12  Q.  When did you first meet Neil Gaiman?

13  A.  I'm not quite sure.  I would suspect it was

14 in 1992.

15  Q.  In what context?

16  A.  I either met him at a convention or it was in

17 conjunction with my duties at Moon Dogs.

18  Q.  And what do you recall in connection with

19 Neil with regard to your duties at Moon Dogs?

20  A.  I believe Neil did a signing at Moon Dogs.

21 He created a ashcan mini comic for Moon Dogs which I did

22 the production work on also.

23    He was in 1993, I think, the guest of honor

24 at the Chicago Comicon and being involved in that was

25 part of my duties at Moon Dogs.

1      Q.     With regard to the 1993 Chicago -- did you

2  call it a Comicon?

3      A.     Comic book convention.

4      Q.     You indicated Neil was the guest of honor

5  there?

6      A.     I believe so, yes.

7      Q.     And what does that involve?

8      A.     That he's given special panels, things like

9  that.

10     Q.     When did you first hear of Neil Gaiman in

11  connection with the comic book business?

12     A.     The comic book business is such that one is

13  never really quite sure when one first hears of someone.

14  I don't have any recollection of the first time I heard

15  of Neil Gaiman.

16     Q.     What's the context that you can recall of

17  when you first learned of Neil, became aware of him?

18     A.     Someone probably told me that I should read

19  Sandman.

20     Q.     And Neil was the person who did Sandman?

21     A.     Yes.

22     Q.     Did you have any involvement in work that

23  Neil did for Image Comics?

24     A.     I don't understand the word "involvement."

25     Q.     You're aware that Neil did some work for

1   Image Comics, correct?

2       A.     Neil created work that was published by Image

3   Comics.

4       Q.     And what are you referring to?

5       A.     The Angela mini series.

6       Q.     And what role did you play in the publication

7   of the Angela mini series?

8       A.     The role that I played was that I was

9   Executive Director of Image Comics and all of the things

10  that I described to you before as to what Image would do

11  as far as the publishing, the printing, and the

12  distribution of any comic that was done by Image Comics.

13      Q.     And did Image enter into a license with Neil

14  for the Angela mini series?

15      A.     No.

16      Q.     How was that done?

17      A.     It was done through Todd McFarlane

18  Productions.

19      Q.     And did Image enter into a license with Todd

20  McFarlane Productions for the Angela mini series along

21  the lines of what you described earlier in which Image

22  would be paid somewhere --

23      A.     Correct.

24      Q.     -- somewhere between $1,800 and $2,500, is

25  that correct?

1      A.      Correct.

2      Q.      While you were Executive Director of Image

3  did Image ever hold or take possession of any of the

4  intellectual property rights to any of the comic books

5  that it published?

6      A.      No.

7      Q.      Did you have any understanding as to the

8  division of intellectual property rights to the Angela

9  mini series?

10     A.      No.

11     Q.      Did you have any other involvement at Image

12  with any other work involving Neil Gaiman other than the

13  Angela mini series?

14     A.      Could you repeat the question?

15              MR. ARNTSEN:   Can you read it back, please?

16              (Whereupon, the record was then read

17               back by the reporter as requested.)

18              THE WITNESS:   Image published trade

19  paperbacks with stories that were written by Neil.

20  BY MR. ARNTSEN:

21     Q.      Which ones?

22     A.      The Angela mini series, Spawn 9.

23     Q.      What was the contractual arrangement that

24  Image worked under in publishing trade paperbacks?

25     A.      The same as everything else.  A licensor

1    would contact Image, say that they wanted to publish the

2    book.  The book would be solicited, the book would be

3    manufactured and the book would be distributed.

4        Q.    And with regard to the Angela mini series and

5    Spawn 9, was Todd McFarlane the licensor of Image?

6        A.    Yes.

7        Q.    And Mr. McFarlane paid Image a flat fee

8    again?

9            MR. KAHN:  Are you saying Mr. McFarlane?

10           MR. ARNTSEN:  Yes.

11           MR. KAHN:  You said the licensor was Todd

12   McFarlane Productions.

13           MR. ARNTSEN:  I said individual.

14       Q.    Who was the licensor with Image for the

15   Angela mini series and Spawn, the Spawn 9 trade

16   paperback?

17           MR. KAHN:  If you know.

18           THE WITNESS:  I don't know.  We certainly did

19   business with Todd McFarlane Productions.

20   BY MR. ARNTSEN:

21       Q.    And so is what you're saying you're not sure

22   whether the licensor --

23       A.    Oh --

24       Q.    You're not sure whether the licensor was with

25   Todd McFarlane individually or with one of his entities,

1    is that what you're saying?

2        A.    The check would be written to Todd McFarlane

3    Productions.

4        Q.    And, similarly, you indicated that Image was

5    paid a flat fee for its work, correct?

6        A.    Image deducted a flat fee, yes.

7        Q.    Okay.  And that was the case with trade

8    paperbacks as well as with comics?

9        A.    Yes.

10       Q.    And if I understand your answer, Image would

11   distribute the publication, would collect some money for

12   it and would remit that money to the licensor after

13   having deducted Image's fee, is that correct?

14       A.    Image's fee and the cost of the

15   manufacturing.

16       Q.    And as best you can recall, with regard to

17   the Angela mini series and Spawn 9 paperbacks, that

18   Image cut the check to Todd McFarlane Productions?

19       A.    Correct.

20       Q.    And was that also true with regard to the --

21   when you say Angela mini series, is that the three

22   volume Angela comics?  Is that what you're referring to?

23       A.    Yes.  Three consecutive comics.

24       Q.    While you were at Image were you involved in

25   any other publications in which Neil Gaiman was

1    involved?

2              And I keep mispronouncing it.  Neil Gaiman

3    was involved.  I apologize.  I apologize to everyone in

4    the room.  I'll probably keep doing it.

5              MR. KAHN:  Off the record.

6              (Discussion off the record.)

7              MR. KAHN:  We are back on the record.

8              Did you hear the question?

9              THE WITNESS:  You should have the question

10   repeated.  Could you repeat the question?

11   BY MR. ARNTSEN:

12        Q.   Were you involved in any other publications

13   while you were at Image in which Neil Gaiman was

14   involved other than what you testified?

15        A.   I don't recall any.

16              (The following excerpt was designated

17              "Confidential.")

18   BY MR. ARNTSEN:

19        Q.   What did you do to get ready for this

20   deposition?

21        A.   Not much.

22        Q.   And what --

23        A.   I -- for this deposition?

24        Q.   For this deposition.

25        A.   Just --

```
 1              MR. KAHN:  You mean beyond his meeting with
 2    me?
 3    BY MR. ARNTSEN:
 4       Q.    I don't want you to tell me about the
 5    substance of conversations with Attorney Kahn or any of
 6    your lawyers.
 7              MR. KAHN:  Anything else?
 8              THE WITNESS:  Anything other than that, no.
 9    BY MR. ARNTSEN:
10       Q.    Did you look at any documents?
11       A.    For the deposition, no.  I helped gather
12    these documents.
13       Q.    The documents that were produced in
14    connection --
15       A.    Correct.
16       Q.    -- in connection with the recent discovery
17    responses?
18       A.    I'm sorry.  Correct.
19       Q.    Did you talk to anyone about the depositions
20    other than your lawyers?
21       A.    Well, Todd certainly knew I was coming, but
22    we didn't discuss it.
23       Q.    Okay.  That's really what I'm asking you.
24       A.    Yes.
25              MR. KAHN:  Allen, when you get to a
```

```
 1   convenient point -- it doesn't have to be right away --
 2   when you get ready to change a topic, can we take a
 3   break in the next several minutes, five to ten minutes?
 4              MR. ARNTSEN:  We can take a break right now.
 5   That's fine.
 6              (Whereupon, a short recess was then had at
 7                 9:54 a.m. until 10:08 a.m.)
 8   BY MR. ARNTSEN:
 9        Q.    Did you become a director of TMP Worldwide in
10   1999?
11        A.    No.
12        Q.    When did you become a director of TMP
13   Worldwide?
14        A.    I became a director last winter.
15        Q.    The winter of 2001, 2002?
16        A.    Yes.
17        Q.    How long has TMP Worldwide been around?
18        A.    I don't know.
19        Q.    Was it around when you were at Image?
20        A.    I don't know.
21        Q.    When you were at Image what entities in which
22   Todd McFarlane was involved were you involved in your
23   capacity as Executive Director of Image?
24        A.    Can you rephrase that?
25        Q.    Well, you testified earlier that, for
```

1    instance, Todd McFarlane was a shareholder of Image and

2    that Image wrote checks out to Todd McFarlane

3    Productions.  Was Image involved in any other, for want

4    of a better word, Todd McFarlane entities other than

5    Todd McFarlane Productions?

6        A.    I think you need to repeat the question

7    again.  There's a couple words I'm not sure of what you

8    mean.

9        Q.    Okay.  Todd McFarlane as an individual was a

10   shareholder of Image, correct?

11       A.    Yes.

12       Q.    Image wrote checks out to Todd McFarlane

13   Productions, correct?

14       A.    Yes.

15       Q.    Did Image write checks out -- to your

16   knowledge did Image write checks out to Todd McFarlane

17   individually?

18       A.    I don't know.

19       Q.    Did Image write any checks out to any other

20   entity in which Todd McFarlane was involved other than

21   Todd McFarlane Productions?

22       A.    I don't think so.

23             MR. KAHN:  Let him finish the question.

24             THE WITNESS:  I know.

25   BY MR. ARNTSEN:

```
1        Q.    And do you recall while you were at Image

2   having any contact with any other -- any Todd McFarlane

3   related entity other than Todd McFarlane Productions?

4        A.    We would put the ads for McFarlane Toys in

5   the Image section of the -- I'm sorry, of the Diamond

6   Catalog.

7        Q.    So the Diamond Catalog is a comic book

8   catalog, is that correct?

9        A.    Yes.

10       Q.    And Image would have a part of that catalog?

11       A.    Correct.

12       Q.    And in Image's part of that catalog it would

13  list various Image publications, is that correct?

14       A.    Correct.

15       Q.    And also in that section you would put ads

16  for toys from, say, Todd McFarlane?

17       A.    For McFarlane Toys.

18       Q.    McFarlane Toys.

19             And would Image get a fee for that?

20       A.    Yes.

21       Q.    What was the fee?  How was that calculated?

22       A.    It was the same as a comic book.

23       Q.    1,800 to 2,500?

24       A.    Yes.

25       Q.    And just so I understand generally Image's
```

1   business with regard to publishing comic books, you

2   indicated that Image would enter into -- would sort of

3   oversee the publication of a comic book or trade

4   paperback and charge a fee to the licensor, correct?

5       A.    Correct.

6       Q.    And so would the way that would work is that

7   Image would enter into these various arrangements and --

8   I'm trying to figure out how the money went through.

9           You indicated a check came into Image and

10  Image would deduct its fee and then issue a check back

11  to the licensor, correct?

12      A.    The material would come in completed from the

13  licensor.  In some cases Image may have typeset the

14  letters page.  In most cases it came in complete.  It

15  went to the printer.  It was printed.  It was then sent

16  to the distributor.  Image -- I mean, Image oversaw all

17  of these steps.

18          Then the gross check would come in from the

19  distributor and the fee and the production costs, the

20  costs of printing, the cost of any ads perhaps that were

21  put in the magazine would all be deducted and a lump sum

22  would be given to the licensor.

23      Q.    And did Image keep any of that other than its

24  fee?

25      A.    No.

```
 1        Q.    Everything else was strictly a pass-through?

 2        A.    Correct.

 3        Q.    So Image's overhead was covered by its fee,

 4   is that correct?

 5        A.    Correct.

 6             MR. KAHN:  And, Allen, just so the record's

 7   clear, Image was also paying checks, if I understand

 8   you, to the printer, paying bills to the printer.

 9             THE WITNESS:  Correct.

10             MR. KAHN:  Incurred in that comic book, and

11   distributors and others.

12             MR. ARNTSEN:  And advertisers.

13             MR. KAHN:  Right.

14             MR. ARNTSEN:  Those were all just

15   pass-throughs involved in the comic book cost and

16   distribution process.

17             MR. KAHN:  Correct.

18             THE WITNESS:  They were not marked up.

19   BY MR. ARNTSEN:

20        Q.    And at the end you had a little accounting

21   sheet that says, "This is what came in.  This is what we

22   spent the costs on.  This is our fee.  This is how much

23   you get," right?

24        A.    Correct.

25        Q.    And, if I understand correctly, Image never
```

1    entered into a license arrangement with Neil Gaiman,

2    correct?

3        A.    Correct.

4        Q.    And you told me before the break publications

5    in which -- publications of Image which you were aware

6    that Neil Gaiman was involved and really what I'd like

7    to do here is just come up with a list of those.  There

8    was Spawn 9, right?

9        A.    Spawn 9 was published by Malibu Comics.

10        Q.    So did Image have any connection with Spawn

11    9?

12        A.    I wasn't at Image.  I don't know.

13        Q.    And was Image involved in the publication of

14    Spawn 26?

15        A.    Yes.

16        Q.    And Image -- oh, and there was a trade

17    paperback with Spawn 9 in it, correct?

18        A.    Correct.

19        Q.    And what was that called?

20        A.    I don't know what it was called.

21        Q.    And you were involved in the publication of

22    that, right?

23        A.    I was Executive Director at Image when it was

24    published, yes.

25        Q.    And you wrote an introduction to that trade

```
 1   paperback?

 2        A.    If that's the one, yes.

 3        Q.    Well, it had Spawn 9 in it, right?

 4        A.    Yes.

 5        Q.    But you don't remember what that paperback

 6   was called?

 7        A.    I think it was called Number 2.

 8        Q.    Spawn Number 2 or just Number 2?

 9        A.    I don't know.

10        Q.    And then there was the Angela mini series,

11   which was comics, right?

12        A.    Yes.

13        Q.    Angela 1, 2 and 3, is that correct?

14        A.    Correct.

15        Q.    And then there were -- was there one or two

16   Angela trade paperbacks?

17        A.    I'm not sure.

18        Q.    Was one called Hunt for Angela or Angela's

19   Hunt I mean?  I'm sorry.

20        A.    Yes.

21        Q.    Were you involved in the publication of that?

22        A.    I was the Executive Director at Image when

23   that happened.  I wasn't involved in the production of

24   it.

25        Q.    Who at Image would be?  How did that work at
```

1    Image?

2        A.    Either the books would come in completely

3    done, ready to go to print or they would come in with

4    the various pieces to be assembled by the Art Department

5    and then it would go out.  It was not my day-to-day

6    activity to be involved in those things.

7              If the production was done inside the Image

8    office, it was okayed by the licensor.

9        Q.    Okay.

10       A.    I wasn't involved in overseeing it.

11       Q.    Okay.  Well, for instance, with the trade

12   paperback Number 2 that you testified to earlier, was

13   that one of those where the copy came in in a finished

14   form and Image essentially just shipped it off?

15       A.    I can't recall that.

16       Q.    Did you write in productions, you know, did

17   you write copy for Image works other than the

18   introduction to Number 2?

19       A.    Probably.

20       Q.    I mean, do you recall whether you did or not?

21       A.    I think I wrote one for Rob Liefeld but I

22   couldn't tell you for what.

23       Q.    The Angela comics, did that copy come in this

24   a finished form or did Image have to do something to it?

25       A.    I don't know.

1    Q.    Would that also be true about the Angela

2  trade paperback?

3    A.    I don't know.

4    Q.    Did Image have any involvement in the

5  placement of copyright or trademark notices on the

6  materials it published?

7    A.    Placement?

8    Q.    Language.  You know, anything, you know,

9  anything to do with the copyright or trademark notices?

10    A.    Image did not write that language, no.

11    Q.    Did Image have -- for instance, did it make

12  any difference to Image if any language was there at all

13  with regard to copyright or trademark?

14    A.    Image did what the licensor directed Image to

15  do.  Image would have no opinion one way or the other.

16    Q.    So you'd take what the licensor told you and

17  include that?

18    A.    And produce, yes, to the licensor's wishes,

19  yes.

20    Q.    And that would be true of copyright and

21  trademark notices, correct?

22    A.    Yes.

23    Q.    Did Image publish -- well, what were the

24  geographic kind of scope of Image's publications?  Was

25  it just the U.S. or was it where?

1       A.    Image published comics that were distributed

2   in the United States, Canada, Great Britain.

3       Q.    Were they all in English?

4       A.    Oh, yes.

5       Q.    Image -- did Image have any involvement in

6   any foreign language reproductions of materials that it

7   published?

8       A.    Those deals were done by the individual

9   licensors.

10      Q.    And Image, did Image have any involvement?

11      A.    I don't recall any.

12      Q.    Did Image ever, you know, have any source of

13  fee revenue from its -- from any of its licensors other

14  than the flat fee that you discussed earlier?

15      A.    To my recollection all the money that came

16  into Image was from the flat fee.

17      Q.    Nothing in connection with, say, movie rights

18  or anything like that?

19      A.    Oh, certainly not.

20      Q.    And in Image's -- Image's licenses with Todd

21  McFarlane or one of his entities, these were all verbal

22  licenses you said, correct?

23      A.    All licenses with all the shareholders were

24  verbal.

25      Q.    And did Image do anything in connection with

```
 1    sort of nailing down the entity it was licensing to,

 2    entering into a license with?

 3        A.    I don't know.

 4        Q.    To your recollection, do you recall anything?

 5        A.    We did business with the various incorporated

 6    entities.

 7        Q.    Well, and again for Todd McFarlane it would

 8    have been Todd McFarlane Productions, correct?

 9        A.    Yes.

10        Q.    And you testified -- and who would be --

11    would you speak with different people who were

12    speaking -- purporting to speak on behalf of Todd

13    McFarlane Productions or was it always with Todd

14    McFarlane?

15        A.    Me personally?

16        Q.    Or people at Image to your knowledge.

17        A.    People at Image would speak to the various

18    people involved in the production of the comic books.

19        Q.    And how about you?  Who was your contact

20    person at Todd McFarlane Productions?

21        A.    Todd McFarlane.

22        Q.    And he'd tell you who to write the check out

23    to, for instance?

24        A.    That he'd tell me?  We wrote the check out to

25    Todd McFarlane Productions.
```

```
 1        Q.    At Mr. McFarlane's request?

 2        A.    I suppose so.

 3        Q.    Okay.

 4        A.    They were already doing that before I got

 5   there.

 6        Q.    How did you know that?

 7        A.    Whatever was going on was continued once I

 8   got there.  I just took over a system that was already

 9   up and running.

10        Q.    Now, were you involved in organizing the 1993

11   comic convention in Chicago you testified to?

12        A.    I coordinated public relations.

13        Q.    What were the circumstances that led to Neil

14   Gaiman being named the guest of honor at that

15   convention.

16        A.    Gary Colobono and the board of directors of

17   the Comicon would have decided that.

18        Q.    Would there be -- how many of these

19   conventions have there been?

20        A.    Oh, I suppose it's been going on since the

21   mid '70s.

22        Q.    And does each one have a guest of honor?  Is

23   that how that works?

24        A.    Yes, they tend to.

25        Q.    And what are the criteria or how do they go
```

1    about picking who that's going to be?

2         A.    Someone that the fans would be interested in.

3         Q.    So you are trying to get somebody who will

4    draw people to the convention?

5         A.    Yes.

6         Q.    And was Neil a pretty well known name in the

7    comic book business at that time?

8         A.    Yes.

9         Q.    What was the relationship, if any, between

10   Image and Malibu Comics?

11        A.    It's before my time.

12        Q.    So, do you know?

13        A.    No.

14        Q.    At what point in time did Image become the

15   publisher of the Spawn comic books and related

16   materials?

17        A.    I think it was around issue 12 or 13 or 14.

18        Q.    And has Image been the publisher of the Spawn

19   material since?

20        A.    Yes.

21        Q.    I had asked you some questions earlier

22   concerning the Creators Bill of Rights.  Can you

23   describe what that is?

24        A.    It's a -- I haven't thought about it in a

25   while.  It's -- it's a document that was drafted by a

1    bunch of creators talking about their inherent rights.

2        Q.    Vis-a-vis whom?

3        A.    Publishing.

4        Q.    And is it something that people would sign on

5    to or something?  How was it used?

6        A.    It was -- I don't know that people signed on

7    to it.  The people that were there signed and it was

8    circulated.  It was in some books.  I -- pretty much

9    that.

10       Q.    For instance, did you sign on to it?

11       A.    Yes, I did.

12       Q.    And then did you use it in any way after

13   that?

14       A.    No.

15       Q.    Did you speak about it in any way after that?

16       A.    I don't recall.

17       Q.    Do you recall any connection between the

18   Creators Bill of Rights and anything you were involved

19   with in the comic book industry since it was enacted?

20       A.    I'm not sure I understand the question.

21       Q.    Well, for instance, would someone say,

22   "Here's a Creators Bill of Rights.  I'd like this.  You

23   know, I'd like a publisher to acknowledge that this is,

24   you know, these rights exist in this"?  You know, this

25   kind of thing.

1      A.    No.  I had no involvement in anything like

2   that.

3      Q.    And just describe, what are some of the

4   rights discussed in the Creators Bill of Rights?

5      A.    You would have to show it to me.

6      Q.    You don't recall any of that?

7      A.    No, I really don't.  It was fifteen years

8   ago.

9      Q.    And you haven't had any involvement with it

10  in the past fifteen years?

11     A.    It's a document.  It's not a movement.

12     Q.    When is the last time you saw the document?

13  I'm just trying to get a sense of it.

14     A.    Probably when the book Great Comic Book

15  Creators came out.  It was published in the book.

16  That's the last time I remember seeing it.

17     Q.    And when was that?

18     A.    I don't know.  Early '90s.

19     Q.    Okay.  Did you have any understanding of the

20  contractual arrangement between Todd McFarlane and Neil

21  Gaiman relating to Spawn number 9?

22          MR. KAHN:  Just so we're clear, we are

23  talking about the period before the lawsuit was filed?

24          MR. ARNTSEN:  Right.  Prior to that.

25          MR. KAHN:  All right.

```
 1                    THE WITNESS:  Prior to the publication of
 2    Spawn?
 3                    MR. KAHN:  No, no.
 4                    MR. ARNTSEN:  Prior to the filing of this
 5    lawsuit.
 6                    MR. KAHN:  Prior to the filing of this
 7    lawsuit.
 8                    THE WITNESS:  Yes.
 9    BY MR. ARNTSEN:
10        Q.    Okay.  Tell me what your understanding was
11    and how you came by that understanding?
12                    When did you first become aware of the
13    contractual relationship between Todd and Neil relating
14    to Spawn number 9?
15                    MR. KAHN:  I just object to the form.  It
16    assumes that there's a contractual relationship.
17                    But with that objection, you can go ahead and
18    answer.
19    BY MR. ARNTSEN:
20        Q.    The contractual relationship, if any.
21        A.    I was asked by Todd or Neil if I could help
22    mediate whatever misunderstandings there may have been
23    at that point in time.
24        Q.    And when was this?
25        A.    I would say 1996.
```

1        Q.    Prior to that did you have any awareness at

2   all of the -- of any of the contractual arrangements

3   involving Todd and Neil relating to Spawn Number 9?

4        A.    I just don't know.

5        Q.    Okay.  The first -- the earliest back you can

6   recall being involved with this issue was in 1996, is

7   that correct?

8        A.    I think so.

9        Q.    And that was in connection with trying to

10  mediate a dispute, correct?

11       A.    Correct.

12       Q.    The same question with regard to a

13  contractual arrangement, if any, between Todd and Neil

14  relating to the Angela mini series?

15       A.    No.

16       Q.    Do you have any knowledge or involvement at

17  all in that?

18       A.    In what?

19             MR. KAHN:  I think the question is do you

20  have any knowledge of any contractual relationships

21  between Neil and Todd involving the Angela mini series

22  before you got asked in 1996 to try to mediate.

23             THE WITNESS:  I knew that Neil wrote it.

24  BY MR. ARNTSEN:

25       Q.    Anything beyond that?

1    A.    That I knew?  No.

2    Q.    Did you have any understanding of contractual

3  arrangements, if any, between Todd and Neil relating to

4  Spawn Number 26?

5    A.    No.

6    Q.    Do you have any knowledge of any contractual

7  arrangement between Todd and Neil relating to the trade

8  paperback number 2 that you wrote the introduction to?

9    A.    No.

10    Q.    Do you have any knowledge of contractual

11  arrangements relating to the Angela's Hunt trade

12  paperback?

13    A.    No.

14    Q.    Or the Spawn Pathway to Judgment trade

15  paperback?

16    A.    No.  I'm not even sure what that is.

17    Q.    Tell me, kind of going back, you mentioned

18  being asked to mediate a dispute between Todd and Neil

19  some time probably in 1996.  Why don't you just tell me

20  what you recall of that just sort of taking it from the

21  top?

22         At the time you were Executive Director of

23  Image, right?

24    A.    Correct.  I was asked as an individual to see

25  if I could figure out some way to initiate a dialog

```
 1    between these two parties.
 2         Q.    Do you recall --
 3         A.    I do not recall who asked me.
 4         Q.    Okay.
 5         A.    And my guess would be at that point I called
 6    Neil and said, "It's my understanding that I should try
 7    to -- try to bring everybody to some sort of terms and
 8    that I was willing to give it a try."
 9         Q.    And what was your understanding of the
10    problem that you were being asked to help solve?
11         A.    To determine some sort of schedule for Neil
12    to receive royalties.
13         Q.    Relating to what?
14         A.    What?
15         Q.    Royalties for what?
16         A.    Oh, the publication of any usage of the --
17    the comic books in question.
18         Q.    And so was it your understanding that there
19    was -- that the parties hadn't been able to reach an
20    agreement on a royalty structure?  Is that -- was that
21    what you were looking to do?
22         A.    Yes, yes.
23         Q.    So, what did you do?
24         A.    I asked Neil what he thought it should be, I
25    believe.
```

1   Q.    And do you recall what publications or what

2   things you were referring to?

3   A.    Oh, well, based on -- on what we assembled,

4   we were talking about Angela, Medieval Spawn and

5   Cogliostro.

6   Q.    So those -- these were the characters you

7   were looking at, correct?

8   A.    Correct.

9   Q.    And then what were the types of things you

10  were looking at in terms of, you know, royalty rates?

11  You know what I'm talking about, toys, books.  What

12  kinds of things were you looking at?

13  A.    We were trying to establish the terms of

14  Neil's DC contract because Neil said that -- that we

15  were trying -- what we were trying to do is attempt to

16  define what rights he may have had under his DC

17  contract.

18  Q.    And why were you doing that?

19  A.    Because I believe we were trying to match his

20  DC contract.

21  Q.    And who is "we"?

22  A.    We were trying to figure out what the terms

23  are of his -- of his DC contract so we could figure out

24  how those things were broken out.

25  Q.    And who is "we"?

1    A.    Me personally.

2    Q.    And were you trying to do that on anyone's

3    behalf?

4    A.    I was doing it as a favor to both.

5    Q.    And you don't recall who first asked you to

6    get involved in this, correct?

7    A.    I truly don't.

8    Q.    So, did you do anything to try to ascertain

9    the terms of Neil's DC Comics contract?

10    A.    Yes.  Neil sent me a FAX saying that these

11    were the -- that he believed that this is the way that

12    it broke down.

13          I asked -- I wrote it up in a sheet for him

14    to try to figure out if what he was telling me over the

15    phone and what he had written down -- to put it in a

16    more logical fashion.

17    Q.    Then what did you do with that?

18    A.    I believe I submitted it to Neil and we

19    talked about it on the phone and I made some

20    corrections.

21          And then I think I asked if I could see the

22    relevant parts of those contracts or if I could actually

23    see the contract and he sent me some materials, but they

24    were red lined and they didn't seem like the final

25    version to me, but I submitted it anyway.

1    Q.    So what do you mean you submitted it?

2    A.    I submitted it to Todd to show him that this

3    is what we believe from my discussions with Neil, that

4    this is -- that these are the terms of his DC contract.

5    Q.    So you prepared this breakdown?

6    A.    This work-sheet.  I'm sorry.

7    Q.    And you sent that to Mr. McFarlane along with

8    the contract excerpts that Neil had sent you?

9    A.    I believe so, yes.

10    Q.    Okay.  Then what happened?

11    A.    I think what happened was Todd kept it for a

12    while and then -- and then I worked out the work-sheet

13    for Todd that would have some sort of counter-proposal

14    or some sort of understanding as to ways of defining

15    these things with questions regarding some of -- some of

16    the language because the language, I think it was

17    imprecise.

18    Q.    In what way?

19    A.    In the work-sheet.

20    Q.    What kind of language?

21    A.    I'd have to see the work-sheet to know.

22    Q.    So, what you were trying to do, if I

23    understand correctly, you were asked to help resolve a

24    royalty dispute between Neil and Todd, right?

25    A.    Uh-huh.

1    Q.    You have to use words.

2    A.    Yes.

3    Q.    And what you were trying to do is set up a

4 royalty arrangement that would be -- that would match

5 Neil's arrangement with DC Comics, is that correct?

6    A.    Correct.

7    Q.    And so Neil -- you got some information from

8 Neil and you got some red lined excerpts and you came up

9 with a work-sheet which said, "You know, based on this,

10 these are the terms of Neil's deal with DC," right?

11    A.    Correct.

12    Q.    And then you sent that to Todd and then you

13 began -- then you had some discussions with Todd on a

14 counter-proposal, correct?

15    A.    Todd dictated a counter-proposal, yes.

16    Q.    Okay.  What I'm trying to understand is if

17 what you were trying to do is match the DC provisions

18 and you had or Neil had sent you what you indicated were

19 the DC provisions, what was the purpose of a

20 counter-proposal?

21    A.    I think to clarify some of the open questions

22 that were in that original work-sheet.  But I was

23 strictly a messenger.

24    Q.    So your goal was still to try to match the DC

25 proposal?  You were just trying to figure out how to do

1    it in the context of Mr. McFarlane's businesses, is that

2    right?

3        A.    Would you repeat that question?

4        Q.    Yes.  Was your goal still to try to come up

5    with an arrangement that would, you know, be comparable

6    to the DC arrangement but just -- but you had to do some

7    adjustments?

8            MR. KAHN:  You know, I'm going to object

9    because I think it's getting confusing here between

10   you're using the "you's" and the "we's."

11           MR. ARNTSEN:  Okay.

12           MR. KAHN:  He said Mr. Gaiman gave him the DC

13   contract deal.

14           MR. ARNTSEN:  Right.

15           MR. KAHN:  He said he was a mediator.

16           MR. ARNTSEN:  Right.

17           MR. KAHN:  We don't know what Todd -- and

18   you'll get to ask Todd about it, but you're saying --

19   it's not clear whether Larry is saying all three of them

20   are working together or he's trying to mediate something

21   between them.

22           MR. ARNTSEN:  Okay.  I'll ask a different

23   question.

24       Q.    When you started this task did Mr. McFarlane

25   and Mr. Gaiman both tell you that what they wanted to do

1    is end up with an agreement that was comparable to

2    Mr. Gaiman's DC agreement?

3        A.    They asked me to sort through these

4    questions.

5        Q.    And was it your understanding again that they

6    both shared that goal of coming up with an arrangement

7    that was comparable to Mr. Gaiman's DC agreement?

8        A.    My participation was strictly on royalties.

9        Q.    Right.  And with regard to royalties, was it

10    your understanding that both Mr. Gaiman and

11    Mr. McFarlane were looking to put in place a royalty

12    structure comparable to Mr. Gaiman's DC agreement?

13        A.    Similar to the DC agreement, yes.

14        Q.    Okay.  Did you ever contact anyone at DC in

15    that regard?

16        A.    Personally, no.

17        Q.    Did you ever ask anybody else to do that on

18    your behalf?

19        A.    No.

20        Q.    Okay.  So, was one of your goals to try to

21    write up, draft up a royalty structure between

22    Mr. Gaiman and Mr. McFarlane that came as close as

23    possible to Mr. Gaiman's DC agreement?

24        A.    Yes.  So they could find some common ground

25    for dialogue, yes.

1      Q.    Okay.   And we started through how you went

2   about doing that, getting the information from

3   Mr. Gaiman and presenting it to Mr. McFarlane.   What was

4   the nature of the counter-proposal?

5            MR. KAHN:   You mean what were the terms of

6   it?

7   BY MR. ARNTSEN:

8      Q.    Well, really what I'm trying to understand

9   here is, is what you're trying to do is say, "Okay.   How

10  do we translate these DC provisions into Todd

11  McFarlane's business," or was it, "This is our counter

12  to the terms that you're proposing to me"?   Is it a

13  clarification or is it a negotiation?   That's what I'm

14  trying to find out.

15     A.    Well, it wasn't a negotiation on my part.   I

16  was strictly passing the messages back and forth.

17     Q.    Right.   But with regard to your understanding

18  of the counter-proposal that Mr. McFarlane was asking

19  you to give to Mr. Gaiman, were you looking for

20  clarification or were you asking him to consider some

21  proposal different from what he represented was the DC

22  proposal, the DC arrangement?

23     A.    Well, I think -- well, no, I don't quite

24  understand the question.

25     Q.    At any time during your involvement in this

1    mediation process were you -- did your goal change from

2    trying to put together a royalty structure comparable to

3    the DC arrangement?

4         A.    My goal?

5         Q.    Yes.  As a mediator.

6         A.    My goal was to get them to come to some sort

7    of agreement that both sides could agree upon.

8         Q.    And Mr. Gaiman was looking for?

9         A.    Mr. Gaiman would say that he was looking for

10   something comparable to his DC agreement.

11        Q.    And was Mr. McFarlane saying, "No, I don't

12   want to agree to something comparable to the DC

13   agreement" or was he saying, "Well, I don't understand

14   what these terms mean"?

15        A.    He was saying, "I don't understand what these

16   terms mean."

17        Q.    Okay.  And so was that sort of the nature of

18   the counter-proposal; "This is -- I'm proposing this,

19   you know, whether you're talking gross in terms of net

20   percentages, this is what I'm proposing here and I think

21   this is comparable."  Was that the nature of the

22   counter-proposal?

23        A.    I think so, yes.

24        Q.    Okay.  So then Mr. McFarlane made a

25   counter-proposal, correct?

1        A.    Correct.

2        Q.    Then what happened?

3        A.    I spoke to Neil. He asked me some questions.

4   I -- I don't remember. He asked me some questions, and

5   then I spoke to Todd and we -- we -- we clarified what

6   Neil asked.

7        Q.    Do you recall what areas of disagreement --

8   what the areas of disagreement were?

9        A.    I would have to -- no, I don't.

10       Q.    You have no independent recollection?

11       A.    No.

12       Q.    Okay. Then what happened after you clarified

13  what Mr. Gaiman was looking for?

14       A.    I wrote -- I made some additions and then

15  that was resubmitted to Mr. Gaiman.

16       Q.    And then?

17       A.    Then from my point, I don't believe I talked

18  to Mr. Gaiman again after that until we received a

19  letter from Mr. Gaiman's counsel rejecting the whole

20  thing.

21       Q.    When was that?

22       A.    Well, it must have been in the spring of '97.

23       Q.    Okay. And then -- and do you recall who the

24  letter was from?

25       A.    No.

```
 1          Q.    When you say "rejecting the whole thing,"
 2    what do you mean by that?
 3          A.    I received a letter saying that -- that
 4    Mr. Gaiman rejected the proposal.
 5          Q.    So then what happened with regard to your
 6    involvement?
 7          A.    From that point on?
 8          Q.    Yes.
 9          A.    Nothing.
10          Q.    You were out of the loop?
11          A.    Yes.
12          Q.    Did Mr. McFarlane ever say anything to you in
13    connection with, you know, from his perspective, you
14    know, his goal was to treat Neil comparably or better
15    than Neil was treated by DC?
16          A.    The word "better" was never used.
17          Q.    Okay.  Comparable?
18          A.    You asked who said what?
19          Q.    Mr. McFarlane.
20          A.    No.  All -- all Todd was asking me to do was
21    try to determine the parameters of Mr. Gaiman's DC
22    contract.
23          Q.    Okay.  And so and that's what you did and
24    you've discussed that's what you tried to do?
25          A.    I believe that I -- that Mr. Gaiman provided
```

1    me the parameters of how his royalty structure -- how

2    his royalties were structured.

3        Q.    And you passed that on to Mr. McFarlane,

4    right?

5        A.    Correct.

6        Q.    And then Mr. McFarlane made a

7    counter-proposal and things went back and forth until

8    your involvement ceased, is that right?

9        A.    My involvement as a person who was

10   negotiating between the two of them, yes.

11       Q.    You indicated that sort of the scope of what

12   you were doing was to resolve issues relating to the

13   Angela, Medieval Spawn and Cogliostro characters,

14   correct?

15       A.    Those were the three characters that were

16   discussed.

17       Q.    Who was the one -- who kind of gave you this

18   assignment, said, you know, "These are the characters we

19   are trying to work out"?

20       A.    Neil.

21       Q.    Okay.   And during the course of your

22   involvement the appropriate royalty arrangements

23   relating to those three characters were what you were

24   trying to come up with?

25       A.    They were the three characters that were

```
1    discussed.
2         Q.   All the way through?
3         A.   All the way through my involvement.
4         Q.   And were the characters -- were there
5    different royalty arrangements proposed for each of the
6    various characters?
7              MR. KAHN:  Do you mean by Neil?
8    BY MR. ARNTSEN:
9         Q.   Well, either side.  Either side.
10             Were they all lumped together or were they
11   dealt with separately?
12        A.   They were dealt with separately.
13        Q.   And did you understand -- what was your
14   understanding of sort of the considerations that
15   militated in favor of one character being treated
16   differently than another character?
17        A.   I'm not sure that I had an understanding.  I
18   believe I just passed messages.
19        Q.   Okay.  Were you ever involved in any meetings
20   with Mr. McFarlane and Mr. Gaiman, you know, the three
21   of you in connection with this?
22        A.   Before that period of time, yes.
23        Q.   Okay.  Tell me about that.
24        A.   Mr. Gaiman came to Mr. McFarlane's house and
25   I believe I was there that day.  I do not believe that I
```

```
 1   came for that meeting.
 2        Q.   When was this about?
 3        A.   Oh, in the spring of 1996, I think.
 4        Q.   Tell me everything you can recall about that
 5   meeting?
 6        A.   Mr. Gaiman came to the house and showed us
 7   the videotape of his television show in England and I
 8   think that they talked -- the problem is with that day
 9   that's the day that Mark Silvestre, who was one of the
10   partners, left Image Comics and I was very preoccupied.
11        Q.   I understand. I'm just trying to get as best
12   you can recall of this meeting.
13             Mr. Gaiman came to Mr. McFarlane's house,
14   correct?
15        A.   Correct.
16        Q.   And is that here in the Phoenix area?
17        A.   Yes.
18        Q.   And you were already at Mr. McFarlane's house
19   when Mr. Gaiman came, correct?
20        A.   Yes.
21        Q.   And was Mr. Gaiman expected? In other words,
22   had he made arrangements to come to Mr. McFarlane's
23   house?
24        A.   I expect so.
25        Q.   And was anybody else there in connection with
```

1    this meeting other than you and Mr. McFarlane and

2    Mr. Gaiman?

3         A.    Oh, I don't recall.

4         Q.    And so the first thing you can recall is

5    looking at the video of Mr. Gaiman's television series,

6    correct?

7         A.    Correct.

8         Q.    Do you recall whether anyone else beside you

9    and Mr. McFarlane and Mr. Gaiman were involved in that?

10        A.    No, I don't.

11        Q.    And then what happened next?

12        A.    Neil went to the bathroom.  Mr. McFarlane

13   told me that Mr. Silvestre had resigned from Image

14   Comics and I believe I got on the phone trying to figure

15   out what happened.

16        Q.    Do you have any other recollection of

17   conversations involving Mr. McFarlane and Mr. Gaiman

18   relating to --

19        A.    Not that day.  I truly do not.

20        Q.    Okay.  Were you present at any other meetings

21   between Mr. Gaiman and Mr. McFarlane concerning again

22   this subject of --

23        A.    No.

24        Q.    Were you involved in any conference calls in

25   which they were both involved?

```
1         A.    I don't remember any.

2         Q.    And your role, if I understand correctly,

3    your role was initially -- and I'm sort of -- trying to

4    synthesize the terms of Mr. Gaiman's DC contract,

5    correct?

6         A.    The royalty structure of his DC contract,

7    yes.

8         Q.    And then -- and then after that it was

9    passing messages back and forth, correct?

10        A.    Correct.

11        Q.    Any other involvement other than those two

12   things?

13        A.    No.   Other than passing messages back and

14   forth or anything like that, I don't think so.

15        Q.    Were you involved in arranging for Mr. Gaiman

16   or Mr. McFarlane again to meet in Oakland in May of

17   1997?

18        A.    Oh, I see what you're asking.

19              Mr. Gaiman was the speaker at Procon, which I

20   was in charge of securing him as a speaker, and so and

21   Mr. McFarlane did come to meet with Mr. Gaiman at -- at

22   Oakland when Mr. Gaiman was the actual speaker, but

23   if -- but did I actually arrange that meeting? I don't

24   know.

25        Q.    Okay.   You just don't recall?
```

1   A.    I just don't recall.

2         Q.    And Procon is another comic book convention?

3   A.    Comic book convention.

4         Q.    And you were involved in organizing -- you

5   were involved somehow in the organization of that

6   convention, is that correct?

7   A.    I was the person that was on the board of

8   directors of Procon that secured the speakers, yes.

9         Q.    And why did -- what was -- tell me how you

10  came about asking Neil to speak there?

11  A.    It was his turn.

12        Q.    What does that -- I just don't understand

13  this.

14  A.    The keynote speaker at Procon was generally

15  someone in the industry that other creators might have

16  interest in hearing what they have to say.  I suppose

17  there have been ten or eleven keynote speakers.

18        Q.    Okay.  Had Mr. Gaiman spoken at any other

19  Procons or was this the only one to your knowledge?

20  A.    Oh, as a keynote speaker?  No, this was the

21  first time he was a keynote speaker.  He may have been

22  involved in panels and the like.

23        Q.    Is a keynote speaker kind of like a guest of

24  honor?

25  A.    No.  A keynote speaker is a keynote speaker.

1   It's the person that gives the very first speech that
2   kicks it off.

3       Q.    And why was it Mr. Gaiman's turn?

4       A.    Because getting -- being able to get someone
5   to be the keynote speaker was not something that
6   everyone necessarily wanted to do, so you attempted -- I
7   attempted to get the best public speakers that I could
8   possibly get.  I only did it two years.

9       Q.    Okay.  Now, did you have any other
10  involvement in trying to work out an agreement between
11  Mr. McFarlane and Mr. Gaiman subsequent to the May, '97
12  Oakland meeting?

13      A.    Could you repeat the question?

14            MR. ARNTSEN:  Could you read it back, please?

15            (Whereupon, the record was then read

16            back by the reporter as requested.)

17            THE WITNESS:  Not that I recall.

18  BY MR. ARNTSEN:

19      Q.    Did you ever talk to Todd McFarlane about
20  this issue subsequently prior to the commencement of
21  this lawsuit?

22      A.    After -- after the meeting in Oakland, no.

23      Q.    Did you ever talk to Terry Fitzgerald about
24  it?

25      A.    Not that I recall.

1    Q.   Did you ever -- did anybody ever tell you

2  that things had been worked out?

3    A.   Not that I recall.

4    Q.   Anything to that effect?

5    A.   No.  I believed that they were, but I can't

6  tell you why.

7    Q.   And do you recall any -- what caused you to

8  believe that they had been worked out?

9    A.   No one was talking about it any more.

10    Q.   Do you recall about when that was?

11    A.   After the Oakland meeting.

12    Q.   And do you recall at any time it blowing up

13  again, for want of a better term?

14    A.   I spoke to Neil possibly -- yeah.  Neil

15  called me in 1999, I think.

16    Q.   Tell me about that.

17    A.   He said that it hadn't been worked out and --

18  and this was really a surprise to me.

19    Q.   That it was news to you that it hadn't been

20  worked out?

21    A.   Correct.

22    Q.   Did you do anything following that call?

23    A.   Not that I remember.

24    Q.   Did you talk to Mr. McFarlane about it?

25    A.   I don't think so.

```
 1              Q.    How often do you communicate -- with what
 2    frequency do you communicate with Mr. McFarlane?
 3                    MR. KAHN:   In 1999 or today?
 4    BY MR. ARNTSEN:
 5              Q.    Let's talk about since you left Image.  And
 6    if it changed, just tell me if it ebbed and flowed.
 7    Just give me the best answer you can.
 8              A.    From the time that I left Image?
 9              Q.    Yes.
10              A.    Oh, I probably speak to Mr. McFarlane every
11    day.
12              Q.    Throughout the period up to the present?
13              A.    Certainly.
14              Q.    And how about when you were at Image, what
15    was the frequency about?
16              A.    Anywhere from once a week to once a month.
17              Q.    But you don't recall ever after Mr. Gaiman
18    called you in 1999 bringing this up with Mr. McFarlane?
19              A.    No, I don't.
20              Q.    Did you ever talk to anybody else affiliated
21    with Mr. McFarlane about this again following
22    Mr. Gaiman's call in '99?
23              A.    I don't really remember, no.
24              Q.    Who is Terry Fitzgerald?
25              A.    He's the president of Todd McFarlane
```

```
 1   Entertainment.
 2        Q.   Are you involved, you know, do you have any
 3   involvement with him in your day-to-day business
 4   activities?
 5        A.   In my day-to-day business, no.
 6             MR. ARNTSEN:  Why don't we take a little
 7   break right now.
 8             (Whereupon, a short recess was then had at
 9             11:04 a.m. until 11:17 a.m.)
10   BY MR. ARNTSEN:
11        Q.   Before the break you were telling me about a
12   phone conversation you had with Neil some time in 1999
13   in which he told you something to the effect of -- which
14   was when you learned that an agreement hadn't been
15   reached in '97, is that right?
16        A.   Yes.
17        Q.   And was that the last time you spoke with
18   Neil?
19        A.   The last -- the last telephone conversation,
20   yes.
21        Q.   Did you ever speak with him in person since
22   then?
23        A.   Yes.
24        Q.   When was that?
25        A.   San Diego comic book convention, 1999.
```

```
 1        Q.    And just tell me as best you can recall about
 2   that conversation?
 3        A.    I was -- I ran into Neil on the escalator in
 4   the mezzanine area on the way to a panel and I said
 5   hello to Neil and we stopped and we talked.
 6        Q.    Did you talk about issues relating to
 7   Mr. McFarlane?
 8        A.    Yes.
 9        Q.    Tell me as best you can recall the
10   conversation that you had?
11        A.    I was saying hello to Neil and he was very
12   angry.
13        Q.    And --
14        A.    And he said that -- he had a large group of
15   people with him, none of whom I knew, and they sort of
16   formed a circle around us.
17        Q.    Who is "us"?
18        A.    Neil and I.
19              And Neil was saying that this needs to be
20   solved.
21        Q.    Did he say what "this" was?
22        A.    No.
23        Q.    Did you know what this was?
24        A.    I could figure it out, yes.
25        Q.    Okay.  And what did you say?
```

```
 1        A.      Then Neil said that he was going to put --
 2   that he was going to assign this to the comic book legal
 3   defense fund and I suggested that this was neither the
 4   time nor place to have a conversation like this in
 5   public and I asked that we discuss this privately at a
 6   later date.
 7        Q.      And then?
 8        A.      He agreed.
 9        Q.      Was that the end of the conversation?
10        A.      Pretty much.
11        Q.      Did you discuss it privately at a later date?
12        A.      No.
13        Q.      Was that your last conversation with
14   Mr. Gaiman?
15        A.      Yes.
16        Q.      And when was this again?
17        A.      The San Diego comic book convention in 1999.
18        Q.      When in 1999?
19        A.      The summer.  I don't know.  That would be
20   July or August.
21        Q.      Was that while you were still the Executive
22   Director of Image?
23        A.      Yes.
24        Q.      Was Mr. McFarlane an officer of Image while
25   you were Executive Director of Image?
```

```
1          A.    Yes.

2          Q.    What office?

3          A.    President.

4          Q.    The entire time?

5          A.    Yes.

6          Q.    And going back again to your next prior

7    conversation with Mr. Gaiman before the San Diego

8    convention was this phone call which you had discussed

9    earlier, is that correct?

10         A.    Yes.

11         Q.    Did Neil call you or did you call him?

12         A.    I believe he called me.

13         Q.    And do you recall about when in 1999 that

14   was?

15         A.    January or February.

16         Q.    He called you at Image?

17         A.    Yes.

18         Q.    Tell me as best you can recall that

19   conversation?

20         A.    Neil said that -- well, he was angry because

21   of Todd's purchase of the Mark McGwire baseball and --

22   and again said that none of this has been resolved and

23   beyond that I don't really remember.

24               I believe that I told him, you know, that at

25   this point this was not my business and -- and that
```

1    there was nothing I could do.

2        Q.    When he said none of this has been resolved,

3    what was he referring to?

4        A.    His -- his relationship with Todd McFarlane.

5        Q.    And his rights to the Angela, Cogliostro and

6    Medieval Spawn characters?

7        A.    That would be my assumption, yes.

8        Q.    Who at Image -- who did you consider to be

9    the creator of the Angela character?

10        A.    At Image?

11        Q.    Yes.  While you were at Image.

12        A.    I would have considered it a co-creation of

13    Mr. McFarlane and Mr. Gaiman.

14        Q.    How about the same question with regard to

15    the Cogliostro character?

16        A.    I don't believe I would have had an opinion

17    on the Cogliostro character.

18        Q.    How about the Medieval Spawn character?

19        A.    Same thing.

20        Q.    No opinion?

21        A.    I don't believe I would have had an opinion,

22    no.

23        Q.    Who's Scott McCloud?

24        A.    He is a cartoonist who did a book called Zot.

25        Q.    And was he involved in the Creators Bill of

1    Rights?

2        A.    Yes.

3        Q.    And did you help him in that regard?

4        A.    Did I help him?  No.  What I did was help him

5    get a copy, but I didn't draft any of the language.

6              MR. ARNTSEN:  Okay.  Why don't we mark that.

7              (Deposition Exhibit Number 24 was then

8              marked for identification.)

9    BY MR. ARNTSEN:

10       Q.    Can you identify what Exhibit 24 is?

11             MR. KAHN:  Take a minute and read the whole

12   thing.

13             THE WITNESS:  A Bill of Rights for Comics

14   Creators.

15   BY MR. ARNTSEN:

16       Q.    Have you seen that before?

17       A.    Yes.

18       Q.    Is that what we've been referring to as the

19   Creators Bill of Rights?

20       A.    Some version of it, yes.

21       Q.    How many versions are you aware of?

22       A.    I believe originally there were fourteen, but

23   I can't remember.  I really don't remember.

24       Q.    Okay.  And it's my understanding that the

25   Bill of Rights that was presented at this November, 1998

1    meeting that you testified to -- 1988, if I didn't say

2    that, was typed out by Mr. McCloud, is that correct?

3          A.    The version that was brought, yes.

4          Q.    And you were dictating that to Mr. McCloud

5    and he typed it, correct?

6          A.    From his handwritten, yes.

7          MR. ARNTSEN:  What I'm going to do -- I have

8    got a string of documents talking about the negotiations

9    in '96 and '97.  I'll just mark them, put them in a pile

10   in front of you and we'll talk about them going through

11   them.

12         MR. KAHN:  Sure.

13         MR. ARNTSEN:  Would you mark this next one?

14               (Deposition Exhibit Numbers 25 through 33,

15               inclusive, were then marked for

16               identification.)

17   BY MR. ARNTSEN:

18         Q.    Mr. Marder, I have placed a number of

19   exhibits in front of you, and for the record I'll just

20   go down the exhibit numbers in order so hopefully we are

21   all on the same page as we go.

22               Exhibit 25.  Maybe if you could page through

23   with me just to make sure.  It's easier to get it all

24   straightened out now rather than muck up in the middle

25   of it.

1          Exhibit 26, Exhibit 27, Exhibit 28, Exhibit

2   29, Exhibit 30, Exhibit 31, Exhibit 32, Exhibit 2,

3   Exhibit 19, Exhibit 20, Exhibit 33 and Exhibit 8.  Did I

4   get them right?

5          A.    That's what I have.

6          Q.    Good.  Thank you.

7                Again do you -- you testified earlier you

8   don't recall whether it was Neil or Todd who asked you

9   to get involved in mediating this in 1996, is that

10  correct?

11         A.    That's correct.

12         Q.    Showing you what's been marked Exhibit 25,

13  which is a November 6 -- 1996, a page of a November 6,

14  1996 letter from Neil Gaiman to you, do you recall

15  receiving this?

16         A.    Yes.

17         Q.    Do you recall any written communications in

18  connection with your mediation activities prior to

19  Exhibit 25?

20         A.    I don't recall any written.

21         Q.    Okay.  What do you recall happening in

22  connection with this activity prior to getting this

23  communication, again recognizing that it's five and a

24  half years ago?

25         A.    Neil was in Los Angeles doing a signing and

1    needed a ride to the airport and we agreed that we would

2    discuss this then and try to establish sort of the --

3    what it is that we were trying to -- what is it we were

4    trying to mediate. And this FAX would either be before

5    or I believe after we had that conversation where I took

6    him to the airport.

7         Q.   Okay. And did you understand this as Neil

8    telling you what he thought was a reasonable resolution

9    or what was your understanding of what this was?

10        A.   This was a summary of the specific issues

11   that Neil wanted resolved regarding royalties based on

12   what he said was in his DC contract.

13        Q.   Okay. And then it says -- while Exhibit 25

14   is one page, it says eight pages total. Do you recall

15   pages of DC contracts being attached to this when you

16   received it?

17        A.   I believe so, yes.

18        Q.   Now, and that's dated November 6th of '96,

19   correct?

20        A.   Correct.

21        Q.   And I guess if you look at the FAX cover

22   sheet it looks like the FAX time date is November 7,

23   1996. Is that consistent with your recollection of the

24   time period?

25        A.   Sure, yes.

1       Q.    Okay.  Would you take a look at Exhibit 26.

2    Can you tell me what happened between your receipt of

3    Exhibit 25 and your preparing the memo to Todd McFarlane

4    approximately a week later that's Exhibit 26?

5       A.    Neil would have -- well, just based on what

6    it says here, that Neil is calling me every day or

7    almost every day, that -- that he would have anticipated

8    a response to the previous document.

9       Q.    Okay.  Exhibit 26 is a memo from you to

10   Mr. McFarlane, right?

11      A.    Correct.

12      Q.    And whose graffiti is on it?

13      A.    Mine.

14      Q.    Do you recall conversations with Mr. --

15            MR. KAHN:  For the record, Allen, it's

16   probably not graffiti.  It's probably visual art.

17            MR. ARNTSEN:  Here we go.

18            MR. KAHN:  That shows some respect for the

19   creative element here.

20            MR. ARNTSEN:  I stand corrected.

21      Q.    Do you recall discussions with Mr. McFarlane

22   about, you know, what the next step was going to be as

23   referred to in Exhibit 26?

24      A.    I believe that I would have attempted -- what

25   I did next was attempt to take Neil's handwritten

1   document and turn it into a work-sheet.

2       Q.   Okay.  Do you recall these phone

3   conversations -- phone calls from Neil that are referred

4   to in this memo?

5       A.   I don't.

6       Q.   Any recollection at all?

7       A.   No.  It says, "Calling me every day."  That

8   doesn't mean that I actually spoke to him.

9       Q.   Okay.  Do you suspect what it is are

10  messages?

11      A.   Possibly.

12      Q.   And what you wanted to do is talk to

13  Mr. McFarlane before getting back to Mr. Gaiman, right?

14      A.   Yes.

15      Q.   Okay.  Exhibit 27.  I notice it's got the

16  same date as Exhibit 26.  Can you -- and it may be -- I

17  also note that while they both have the same date,

18  Exhibit 27 has a FAX date at the top of November 14th

19  whereas Exhibit 26 has a FAX date at the top of November

20  25th.  Is it possible that the typed dated on Exhibit 26

21  is wrong?

22      A.   Yes.

23      Q.   Is that likely?

24      A.   Highly.

25      Q.   Okay.  Chances are Exhibit 26 is probably a

1    November 25th document rather than a November 14th

2    document, right?

3    A.   Yes.

4    Q.   Okay. I think what I'm going to do is I'm

5    going to put Exhibit 26 back in the pile between

6    Exhibits 28 and 29 and we'll get to it a little later.

7    A.   Okay.

8    Q.   Take a look at Exhibit 27. Is this the

9    work-sheet you put together?

10    A.   Yes.

11    Q.   And was that information based on the -- on

12    the contracts that Neil had forwarded to you and the

13    information that he had given you?

14    A.   It would have been my best effort to

15    extrapolate that.

16    Q.   And did you do anything else to try to get

17    this information other than get information from Neil?

18    A.   No.

19    Q.   And then looking at the second page of

20    Exhibit 27, I'm just trying to understand what some of

21    these terms mean.

22    The first under "Comic Books" it says "8

23    percent of cover price goes to creative team." What's

24    the creative team?

25    A.   This language is language that Neil dictated.

1   I could not tell you what that would mean in the context

2   of his DC contract.

3       Q.   Okay.  So you don't know what was meant by

4   "creative team"?

5       A.   I know what a creative team is in comics.  I

6   don't know what it meant here.

7       Q.   What is a creative team in comics?

8       A.   It's the people that pencil and write in ink

9   and color and letter the comic book.

10      Q.   And then when you've got various sales

11  numbers, you know, like in the second line it talks

12  about 200,000.  Do you see that number?

13      A.   Uh-huh.

14      Q.   Is that -- where in the distribution process

15  is that number?  Is that retail sales, you know, cover

16  price times number sold?  Where is that?

17      A.   Sales in comics generally means wholesale

18  sales.

19      Q.   So, sales to the retail outlet?

20      A.   To the distributor.

21      Q.   Sales to the distributor.  Okay.

22           And was that your understanding of what was

23  meant here with that?

24      A.   I don't know that I would have had an

25  understanding.  I was working out a sheet to pass along

1   information.

2       Q.   Okay.  Now, again you stated Neil dictated

3   this?

4       A.   Yes.  I believe these numbers were

5   extrapolated out of Exhibit 25 and further from

6   conversations.

7       Q.   Okay.  And again Exhibit 25 had this initial

8   summary -- is the initial summary sheet here and it had

9   DC Comics, DC contract excerpts attached to it, correct?

10      A.   Red lined DC contracts, yes.

11      Q.   And that, Exhibit 25 and those red lined DC

12  contracts, were the source of some of the information

13  you got --

14      A.   Yes.

15      Q.   -- for Exhibit 27, correct?

16      A.   Yes.

17      Q.   And was there any other source of information

18  for Exhibit 27?

19      A.   Possibly from Neil over the phone.  I'm not

20  sure that everything on this page is here.

21      Q.   You're saying you're not sure that everything

22  that's on Exhibit 25 is on Exhibit 27?

23      A.   Correct.

24      Q.   Did you take notes of your phone call with

25  Neil?

```
1         A.    No.
2         Q.    So, if it was over the phone what's the
3    process from the phone call to Exhibit 27?
4         A.    I probably would have done it right on the
5    computer.
6         Q.    Do you recall whether you were typing on your
7    computer while you were on the phone with Neil?
8         A.    I don't.  I do not recall.
9         Q.    You're just not sure, correct?
10        A.    Not sure, correct.
11        Q.    Then the second bold print says "Joint
12   Creator Royalty."  What's a joint creator?
13        A.    This was something that was dictated by Neil.
14        Q.    And what do you mean -- and again I'm just
15   going back again to what was -- what was the process
16   that led to you typing this onto here?
17        A.    I don't recall.
18        Q.    So when you say it was dictated by Neil, what
19   do you mean by that?
20        A.    I can't -- well, the last line in Exhibit
21   25 --
22        Q.    Right.
23        A.    -- where he talks about "in addition .81 up
24   to 1 percent creator royalty," that language is in this
25   Joint Creator Royalty paragraph.
```

1    Q.    The word "joint" isn't in it, correct?

2    A.    The word "joint" isn't, so that would have

3    had to come from Neil.

4    Q.    What's the difference between joint creator

5    and creator as you understood it in putting Exhibit 27

6    together?

7    A.    My understanding or my understanding in -- in

8    the language within DC Comics?

9    Q.    Well, your understanding of what you meant by

10   that term as you were putting it in Exhibit 27 to

11   present to Mr. McFarlane.

12   A.    I would assume that it was -- I don't know.

13   I don't know because again this language came from

14   Mr. Gaiman.

15   Q.    And so you don't have any understanding as to

16   the meaning of the term "joint creator" in Exhibit 27,

17   is that correct?

18   A.    In the context of his DC contract, no.

19   Q.    Okay.  But I'm just talking about -- okay.

20   You prepared Exhibit 27 and gave to it Mr. McFarlane for

21   his consideration, correct?

22   A.    Correct.

23   Q.    Did you have any understanding as to the

24   meaning of the word "joint creator"?

25   A.    No.

1    Q.    Okay.  As you sit here today, do you have an

2    understanding as to the meaning of the word "joint

3    creator" on Exhibit 27?

4    A.    I know what joint creator means, that it's --

5    it's when two people create something together.

6    Q.    Okay.  And is that the standard understanding

7    of the meaning of that term in the comic book industry?

8    A.    I have only created things myself.

9         MR. ARNTSEN:  Can you read the question back,

10   please?

11            (Whereupon, the record was then read

12             back by the reporter as requested.)

13            THE WITNESS:  Yes.

14   BY MR. ARNTSEN:

15   Q.    And do you recall intending some other

16   meaning for the term other than it's standard meaning?

17   A.    No, I do not.

18   Q.    And was this royalty to each of the joint

19   creators?

20   A.    I don't know.

21   Q.    Now, under -- and again it says again "0.8

22   percent of cover."  Is that again -- is it your

23   understanding that that's the price to the distributor?

24   A.    Cover would be cover price.

25   Q.    So if a comic cost two bucks, it would be 1.6

1    cents, correct?

2        A.    If that's what .8 is.

3        Q.    Okay.  Trust me on that one.

4              And so, similarly, up under Comic Books where

5    it says "Royalties 8 percent of cover price goes to

6    creative team," they are the comics that says two bucks

7    on its cover, that's 16 cents, right?

8        A.    If that's what the calculation is, yes.

9        Q.    But you indicated in the second line where it

10   refers to sales of 200,000, that doesn't refer to the

11   cover price, correct?

12       A.    I'm not sure.

13       Q.    Okay.  It might, it might not?

14       A.    It might or might not.

15       Q.    You don't have -- there's no standard

16   understanding in the industry on that?

17       A.    I wouldn't know.

18       Q.    Okay.  But cover price means the price put on

19   the cover of the magazine, does it not?

20       A.    Yes.

21       Q.    Okay.  And then going down under Licensed

22   Editions you see where it says "writer receives 15

23   percent of net"?

24       A.    Yes.

25       Q.    What's "net"?

1      A.      Net in general is everything that is deducted
2    from the gross.
3      Q.      Okay.  And in the comic book industry what
4    comes off of the cover price to get to the net?
5      A.      In the comic book industry or at Image
6    Comics?
7      Q.      Well, let's start first with the comic book
8    industry and then you can tell me how Image Comics is
9    different.
10     A.      I have no direct knowledge of the comic book
11   industry.
12     Q.      Do you have any knowledge of what the term --
13   how net is typically calculated in the comic book
14   industry?  Is there an industry standard?
15             MR. KAHN:  Are you referring to outside of
16   Image?
17             MR. ARNTSEN:  I'm referring to the extent he
18   knows of an industry standard.
19             THE WITNESS:  I don't believe there is an
20   industry standard.
21   BY MR. ARNTSEN:
22     Q.      Okay.  How does Image do it?
23     A.      It takes the -- it takes the cost of printing
24   the comic book, the cost of preparing the film, the cost
25   of distribution, the Image licensing fee, any

1    advertising fees that may have been accumulated, and
2    they are all deducted from the gross and that's how you
3    arrive at the net.
4        Q.   And just so I understand, that net figure is
5    the one that, if you know, is the one you testified
6    earlier is the amount of the check that you'd write to
7    the licensor, correct?
8        A.   That's correct.
9        Q.   And so was that your understanding of what
10   the writer was receiving 15 percent of here?
11       A.   This refers directly to DC.
12       Q.   Okay.  How did DC calculate net?
13       A.   I don't know.
14       Q.   You have no understanding?
15       A.   No, I don't.
16       Q.   All right.  And then at the bottom of the
17   second page of Exhibit 27, the TPBs are trade
18   paperbacks, correct?
19       A.   Correct.
20       Q.   And that again refers back to cover price,
21   correct?
22       A.   Correct.
23       Q.   Okay.  And then turning to page 3,
24   Anthologies, do you see where it says "writer gets 3.2
25   percent of cover prorated by number of pages of story

```
 1    count"?  Do you see what I'm referring to there?
 2         A.    Uh-huh.
 3         Q.    You have to use words.
 4         A.    Yes.
 5         Q.    How does that proration work?
 6         A.    I don't know.
 7         Q.    Any idea?
 8         A.    No.
 9         Q.    Okay.  Then under "Joint licensed edition" it
10    says, "10 percent of publisher's net."  Do you know what
11    publisher's net is?
12         A.    In the context of DC, no.
13         Q.    And so with regard to in the context of this
14    memo you're putting together for Mr. McFarlane, you
15    didn't have any understanding of what the phrase
16    "publisher's net" meant, is that correct?
17         A.    That would be correct.
18         Q.    And then, similarly, down under the next one,
19    "Movies/Audio/Stage, 15 percent of DC's net receipts,"
20    you didn't know how that was calculated, right?
21         A.    No.
22         Q.    That's correct, you did not know?
23         A.    I did not know.
24         Q.    And then under "Retail Products," what are
25    retail products?
```

1  A. I'm not sure how DC would have defined it.

2  Q. What was your understanding of retail

3 products in this context?

4  A. Basically anything that isn't covered

5 previously.  So I would say that that would be toys,

6 pins, posters.

7  Q. Okay.  And it says "retail selling price."

8 That just means what it says, the price the retailer

9 sells it for?

10  A. I don't believe that that could be

11 established.  I'm assuming that in the next sentence

12 where it says "no SRP," which is suggested retail price,

13 that it's referring to that.

14  Q. Okay.  And so then under there it says "12.5

15 percent of gross receipts."  What are "gross receipts"?

16  A. Gross receipts are all of the money that is

17 taken in, but again I don't know how it's defined in the

18 DC contract.

19  Q. And does the fact that the next one says "or

20 15 percent of net receipts" help your understanding of

21 the relationship between gross and net receipts?

22  A. No.

23  Q. Okay.  And then at the bottom in italics

24 where it says "No royalties for 'Minor Uses,'" do you

25 have any understanding of what "minor uses" are?

1      A.     Not in the context of the DC contract.

2      Q.     How about at Image?

3      A.     At Image we would have no opinion whatsoever.

4      Q.     Okay.  Then the last line, "DC classifies

5   source books as minor uses," what are "source books"?

6      A.     They are books that give information about

7   the character, the powers, et cetera.

8      Q.     Almost an encyclopedic formula or whatever?

9      A.     Yes.

10     Q.     And cameos, just showing up in a frame or

11   two, is that what you mean by that?

12     A.     I would assume that that's a standard usage

13   of that word.

14     Q.     All right.  Now, do you recall discussing

15   Exhibit 27 with Mr. McFarlane?

16     A.     Yes.

17     Q.     Tell me what you recall in that regard?

18     A.     I recall that I sent it to him and he said

19   that he would think about it and that he would get back

20   to me.

21     Q.     And Exhibit 28 was sent -- you sent Exhibit

22   28 to Mr. Gaiman during that period?

23     A.     I would think so.

24     Q.     And Exhibit 26 may be a reminder to

25   Mr. McFarlane on that issue, is that correct?

1    A.    That would be my guess, yes.

2    Q.    And then Exhibit 29, what's that?

3    A.    This is a draft or possibly a copy of the

4    counter-proposal that I sent to Neil.

5    Q.    Describe the process by which Exhibit 29 was

6    prepared?

7    A.    As I recall, I broke out the information that

8    was in Exhibit 27 and came up with a work-sheet for

9    Mr. McFarlane.

10   Q.    And how does that relate to Exhibit 29?

11   A.    This would have been what I would have

12   assembled from a conversation with Mr. McFarlane.

13   Q.    Okay.  Well, for instance, just in terms of

14   format, one difference between Exhibits 27 and 29 is

15   Exhibit 29 treats as different -- has different

16   provisions for different characters, correct?

17   A.    That's correct.

18   Q.    Tell me the discussion that resulted in that

19   change?

20   A.    I don't remember a conversation.

21   Q.    Do you remember the process by which

22   Mr. McFarlane -- do you recall discussing with

23   Mr. McFarlane proposing different percentages for the

24   different characters?

25   A.    I believe Mr. McFarlane dictated these to me,

1    yes.

2        Q.   So, in other words, is Exhibit 29 -- Exhibit

3    29 is a memo from you to Neil Gaiman, correct?

4        A.   Yes.

5        Q.   And with regard to the terms, everything

6    below the phrase "Creator Royalties," those were

7    dictated to you by Mr. McFarlane?

8        A.   Yes.

9        Q.   And do you have any recollection of any

10   conversation with Mr. McFarlane about these terms or did

11   you simply transcribe them?

12       A.   I simply transcribed them.

13       Q.   Did you have any understanding looking under

14   the first page and where it says "10 percent of net"

15   what "net" means?

16       A.   No.

17       Q.   And the term net carries through on each of

18   the items, correct?

19       A.   That's correct.

20       Q.   And do you have any understanding what's

21   meant by the term "net" anywhere in Exhibit 29?

22       A.   No.

23       Q.   Okay.  And Mr. McFarlane asked you to send

24   this proposal to Mr. Gaiman, correct?

25       A.   Correct.

1    Q.    Do you recall any discussion or connection

2 between the proposal set forth in Exhibit 29 and the DC

3 contract provisions?

4    A.    Could you repeat that?

5    Q.    Do you recall any discussion with

6 Mr. McFarlane concerning any relationship between the

7 proposal in Exhibit 29 and the DC contracts?

8    A.    No, I don't remember any conversation.

9    Q.    Okay.  It was simply a counter-proposal as

10 best you can recall?

11   A.    Yes.

12   Q.    Exhibit 29, the handwriting on the front, is

13 that your handwriting?

14   A.    Yes.

15   Q.    And you were asking Mr. McFarlane if he had

16 any comments on it, correct?

17   A.    Correct.

18   Q.    Do you recall whether he had any?

19   A.    I don't.

20   Q.    And then Exhibit 30 is a document produced

21 you said by Mr. Gaiman.  It appears to be the same

22 document but with some notes on the last page and not

23 the notes on the first page, correct?

24   A.    Correct.

25   Q.    And do you know whose handwriting the notes

1   on the last page are?

2        A.   No.

3        Q.   Do you recall any conversations with

4   Mr. Gaiman on the first of the topics listed which says

5   "Define net in context" on the page?

6        A.   Yes.   Neil asked if I could define "net" and

7   I could not.

8        Q.   Okay.   That was in a phone call?

9        A.   Yes.

10        Q.   And what about the second note in relation to

11   Medieval Spawn payment?

12        A.   I don't remember that.

13        Q.   Did you ask Mr. -- did you go back to

14   Mr. McFarlane and ask what he meant by that?

15        A.   No, I don't believe I did.

16        Q.   Okay.   The next communication we have is

17   Exhibit 31.   Do you recall anything transpiring in this

18   regard between December 17th of '96 and January 9th of

19   '97?

20        A.   No, I do not.

21        Q.   I assume looking at Exhibit 31 that we should

22   believe the FAXed date rather than the typed date, is

23   that right?

24        A.   That would be correct.

25        Q.   And then Exhibit 32 is the February 18th memo

1    from you to Mr. Gaiman, correct?

2         A.    Correct.

3         Q.    How did that come about?

4         A.    It was dictated to me by Mr. McFarlane.

5         Q.    And it seems like it adds a McFarlane Toys

6    category under each of the items, correct?

7         A.    Correct.

8         Q.    And it contains some language at the end with

9    regard to records and access to records, correct?

10        A.    Correct.

11        Q.    And do you recall what prompted Mr. McFarlane

12   to revise his offer as set forth in Exhibit 32?

13        A.    I do not.

14        Q.    Do you recall speaking with Neil about

15   Mr. McFarlane's offer either in Exhibit 29 or Exhibit

16   32?

17        A.    I don't have any direct memory.

18        Q.    Any general memory?

19        A.    Well, my general memory is jogged by Exhibit

20   30 where he asked me about "net" and I did not know.

21        Q.    Okay.  Do you recall anything else?

22        A.    No.

23        Q.    Just looking back again at Exhibit 32 for a

24   minute, the references to McFarlane Toys, I guess, on

25   page 2 is the first one.  Again you said Mr. McFarlane

1    dictated this to you and you simply transcribed it?

2        A.    Yes.

3        Q.    And was there an entity called McFarlane Toys

4    at this time of February of '97?

5        A.    Yes.

6        Q.    And the provision is "10 percent of the gross

7    royalty Todd McFarlane receives from McFarlane Toys."

8    What was meant by "gross royalty"?

9        A.    I don't know.

10        Q.    And again where it says here after the

11    parenthetical that that's derived from a standard toy

12    industry formula, that's something Mr. McFarlane told

13    you?

14        A.    Yes.

15        Q.    Do you have any independent knowledge in that

16    regard?

17        A.    At the time I typed this, no.

18        Q.    Do you now?

19        A.    I have some knowledge, yes.

20        Q.    Does McFarlane Toys still exist as an entity?

21        A.    McFarlane Toys, yes.  As a stand-alone

22    entity?

23        Q.    Yes.  What entity is McFarlane Toys?

24        A.    TMP International.

25        Q.    And was that the case in February of '97,

1   too?

2       A.    I don't know.

3       Q.    Do you have any recollection of what entity

4   Mr. McFarlane was referring to when he refers to

5   McFarlane Toys in Exhibit 32?

6       A.    He was talking about McFarlane Toys.

7       Q.    And was there a company called McFarlane Toys

8   then?

9       A.    There was a company manufacturing toys called

10  McFarlane Toys.

11      Q.    Does that company still exist?

12      A.    Yes.

13      Q.    Does it still manufacture toys?

14      A.    Yes.

15      Q.    How is it different from TMP International?

16      A.    I believe it's a dba.

17      Q.    Okay.  Okay.  And you don't know whether that

18  was the status in February of '97 or not?

19      A.    Not directly, no.

20      Q.    Indirectly, I mean, do you have any

21  knowledge?

22      A.    No, I don't know.  I was at Image.

23      Q.    When you say not directly that leads to a

24  follow-up question.

25      A.    Okay.  Thank you.

1    MR. KAHN:  I know I'm not a witness.  To the

2  extent it helps at all, TMP International was the dba of

3  McFarlane Toys back in 1997.

4    MR. ARNTSEN:  Okay.  Thank you.

5    MR. KAHN:  I know that directly.

6  BY MR. ARNTSEN:

7    Q.    Exhibit 2, have you ever seen that before?

8    A.    Not until after the lawsuit was initiated.

9    Q.    Okay.  Do you see it's dated May 5th of '97?

10    A.    Yes.

11    Q.    Do you recall anything occurring with regard

12  to your involvement in mediating this dispute between

13  February 18, 1997, which is the date of Exhibit 32, and

14  May 5th of 1997, which is the date of Exhibit 2?

15    A.    Can you repeat that question?

16    Q.    What happened next after the -- can you

17  recall after Exhibit 32?

18    A.    That's when we -- Image Comics received a

19  letter that -- that Exhibit 32 had been rejected.

20    Q.    Okay.  And can you recall anything else?

21    A.    In what context?

22    Q.    With regard to this dispute and your trying

23  to help the parties find a resolution to it.

24    A.    If I -- Todd came to Oakland to -- to meet

25  Neil.  I do not know what part I played in that.

1    Q.    Okay.  And you've already testified to that,

2  correct?

3    A.    Yes.

4    Q.    And again the first time you saw Exhibit 2

5  was after this lawsuit was filed, correct?

6    A.    Correct.

7    Q.    And so in 1997 you didn't have any further

8  involvement with regard to the resolution of this

9  dispute following the Oakland meeting, correct?

10   A.    Correct.

11   Q.    Do you recall ever talking to Todd about the

12  things set forth in Exhibit 2?

13   A.    No.

14   Q.    You were just out of the loop on this issue,

15  is that correct?

16   A.    That's correct.

17   Q.    Okay.  So the next exhibit, Exhibit 19, did

18  you see this document prior to this lawsuit being filed?

19   A.    No.

20   Q.    Okay.  That's easy then.

21         The next one, Exhibit 20, did you see this

22  document prior to this lawsuit being filed?

23   A.    No.

24   Q.    And again you had no involvement in this

25  issue at the time of Exhibits 19 and 20, correct?

1     A.    Correct.

2     Q.    Exhibit 33, did you see this document prior

3   to the filing of this lawsuit?

4     A.    No.

5     Q.    The next document, Exhibit 8.  Did you see

6   this document prior to the filing of this lawsuit?

7     A.    No.

8     Q.    Did you have any involvement or discussion in

9   early 1999 with regard to the subjects discussed in

10  Exhibit 8?

11    A.    No.

12          MR. ARNTSEN:  Okay.  Let's take a quick

13  break.

14          MR. KAHN:  Okay.

15          MR. ARNTSEN:  I mean, we could take a lunch

16  break, but I may -- I mean, after taking a quick break I

17  might say this witness can go home pretty quickly, so

18  let's take a quick break and if I think I'm going to

19  have any time at all we can take a lunch break.  We can

20  revisit that issue in a minute.

21          MR. KAHN:  Right.

22          MR. ARNTSEN:  Sounds good.

23          MR. KAHN:  Sounds great.  Well, sounds good.

24          (Whereupon, a short recess was then had at

25            12:14 p.m. until 12:22 p.m.)

1    BY MR. ARNTSEN:

2        Q.    Take a look at Exhibit 32 again.

3        A.    32?  Okay.

4        Q.    The second page.  I want to ask you a couple

5    more questions on that.

6        A.    Sure.

7        Q.    And again right now you're in the toy

8    business, right?

9        A.    Yes.

10       Q.    And what toy are you -- is your company

11   involved in the manufacture presently of any toys that

12   involve the Angela, Cogliostro or Medieval Spawn

13   characters?

14       A.    Currently, no.

15       Q.    Over the period of time that you've been --

16   what's the name of the company again?

17            MR. KAHN:  TMP International.

18   BY MR. ARNTSEN:

19       Q.    Okay.  That you've been the president of TMP

20   International, has TMP International sold toys involving

21   the Angela, Medieval Spawn or Cogliostro characters?

22       A.    There was a Medieval Spawn toy, Medieval

23   Spawn II.

24       Q.    And what was it?

25       A.    An action figure.

1    Q.    And any others?

2    A.    No.

3    Q.    Are you aware of what toys involving the

4  Angela, Cogliostro or Medieval Spawn figures were sold

5  by TMP International or McFarlane Toys at any time in

6  addition to the Medieval Spawn II character you referred

7  to?

8    A.    I need that repeated.

9    Q.    What other toys are you aware of reflecting

10  the Angela, Medieval Spawn or Cogliostro characters?

11    A.    There was -- there were several toys labeled

12  Angela.  There was a Medieval -- there was a Medieval

13  Spawn toy.

14    Q.    These are action figures?

15    A.    Yes, action figure.

16    Q.    Any others?

17    A.    That's what I recall.

18    Q.    Okay.  What are the royalty provisions

19  between TMP International and Todd McFarlane on toys?

20    A.    I don't know.

21    Q.    What royalty does TMP International pay Todd

22  McFarlane on toys?

23    A.    TMP International pays Todd McFarlane

24  Productions a royalty, the number of which I couldn't

25  say for sure.

1    Q.    What's the range?  Give me a sense of it.

2    A.    I would say 5 percent.

3    Q.    Five percent of what?

4    A.    Sales.  I actually don't know.

5    Q.    Does TMP International pay any royalty to

6    anyone else other than Todd McFarlane Productions?

7    A.    It pays royalties to the licensors of the

8    toys that we license from other intellectual property

9    holders.

10    Q.    Those would be persons or entities other than

11    Mr. McFarlane or entities he controls?

12    A.    Yes.

13    Q.    Okay.  And is there an industry standard

14    royalty that you pay these licensors?

15    A.    Not today.  It's a range.

16    Q.    What's the range?

17    A.    It can be anywhere from 5 percent to 12

18    percent.

19    Q.    Okay.  Did there used to be an industry

20    standard?

21    A.    It's before my time.

22    Q.    So you don't know?

23    A.    I do not know.

24    Q.    And does TMP Worldwide, is that the complete

25    owner of TMP International?

1    A.    I can't answer that.  I don't know.

2    Q.    You're an officer of both companies, right?

3    A.    Yes.

4    Q.    But you don't know the ownership

5    relationship?

6    A.    No.

7    Q.    Okay.  Is Todd McFarlane the sole owner of

8    TMP Worldwide?

9    A.    Yes.

10    Q.    Are you aware of any other persons or

11    entities that have any ownership interest in TMP

12    International than TMP Worldwide?

13    A.    No.

14          (The following excerpt was designated

15           "Confidential.")

16    BY MR. ARNTSEN:

17    Q.    Okay.  I probably asked you this already and

18    I apologize if I did.

19          You mentioned meeting Mr. Gaiman in San Diego

20    in 1999 where he was angry.  Do you recall that

21    discussion?

22    A.    Yes, I do.

23    Q.    Did you pass that on to Mr. McFarlane?

24    A.    Yes.

25    Q.    What do you recall about that conversation?

1    A.    I told Todd that Neal was angry and
2    Mr. McFarlane acknowledged that.
3        Q.    Anything else in the conversation?
4        A.    No.
5        Q.    Have you ever spoken with anyone at DC Comics
6    concerning DC Comics' contract royalty arrangements with
7    creators?
8        A.    No.
9        Q.    Have you ever spoken with anyone at DC Comics
10   about DC Comics' contractual relationships with
11   Mr. Gaiman?
12       A.    No.
13       Q.    I think it's time for a lunch break unless
14   somebody here tells me there's another question they
15   want me to ask.
16            Are you aware of anyone, of either
17   Mr. McFarlane or anyone on his behalf, having any
18   conversations with anyone at DC concerning DC Comics'
19   royalty arrangements with creators?
20       A.    Not until after the initiation of this
21   lawsuit.
22       Q.    Okay.   The same question with regard to DC
23   Comics' contract with Mr. Gaiman?
24       A.    Not until after the initiation of this
25   lawsuit.

1          Q.     Okay.  What conversations did you have on

2     those subjects with people other than your lawyers?

3               MR. KAHN:  Or other than with his lawyer

4     present.

5     BY MR. ARNTSEN:

6          Q.     Or other than with your lawyer present?

7          A.     I can't recall any.

8          Q.     Okay.  Any conversations that you can recall

9     were either with the lawyers or with lawyers present, is

10    that correct?

11         A.     With lawyers present.

12         Q.     Okay.  That's all.  Thanks.

13               MR. KAHN:  Okay.  We will not waive

14    signature.

15               (Whereupon, the deposition was then

16                concluded at 12:35 p.m.)

17

18

19

20               _____

                           LAWRENCE P. MARDER

21    3442-G

22

23

24

25

1    STATE OF ARIZONA      )
                            )  ss.
2    COUNTY OF MARICOPA    )

3

4         BE IT KNOWN that the foregoing deposition was

5    taken before me, PAUL GROSSMAN, a Notary Public and

6    Certified Court Reporter #50028 in and for the County of

7    Maricopa, State of Arizona; that the witness before

8    testifying was duly sworn by me to testify to the whole

9    truth; that the witness will read and sign the

10   deposition; that the questions propounded to the witness

11   and the answers of the witness thereto were taken down

12   by me in shorthand and thereafter reduced to print by

13   computer-aided transcription under my direction; that

14   the foregoing 112 pages are a true and correct

15   transcript of all proceedings had upon the taking of

16   said deposition, all done to the best of my skill and

17   ability.

18        I FURTHER CERTIFY that I am in no way related

19   to any of the parties hereto, nor am I in any way

20   interested in the outcome hereof.

21        DATED at Phoenix, Arizona, this 21st day of

22   June, 2002.

23



24   OFFICIAL SEAL
     PAUL GROSSMAN
     Notary Public - State of Arizona
     MARICOPA COUNTY
     My comm. expires Oct. 13, 2005

     Paul Grossman, Notary Public
     AZ CCR #50028

25