IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NEIL GAIMAN and MARVELS AND
MIRACLES, LLC,

        Plaintiffs,

    -vs-

TODD McFARLANE, TODD McFARLANE
PRODUCTIONS, INC., TMP INTER-
NATIONAL, INC., McFARLANE
WORLDWIDE, INC. and IMAGE
COMICS, INC.,

        Defendants.

**03-1461**

No. 02-C-0048-S

DOCKET
NUMBER **81**

U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN

AUG - 1 2002

FILED/RECEIVED
JOSEPH W. SKUPNIEWITZ, CLERK
CASE
NUMBER

---

30(b)(6) DEPOSITION OF TODD McFARLANE PRODUCTIONS, INC.
AND DEPOSITION OF TODD D.M. McFARLANE

Volume 1
(Pages 1 - 132.)

Phoenix, Arizona
June 19, 2002
1:45 p.m.

U.S.C.A. ___ ___
F I L E D

NOV ___ ___ ___

GINO J. AGNELLO
CLERK

DOC. #_____

Prepared for:

U.S. DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
(Original)

Reported by:

PAUL GROSSMAN
AZ CCR #50028
CA CSR #1487

BROWN
& TOLEU ltd.
Court Reporters
101 West Adams

Phoenix, Arizona 85003-2003

Telephone (602) 254-5479    FAX (602) 254-5013

I N D E X

Examination:                                                    Page

BY MR. ARNTSEN                                                    4


E X H I B I T S

No.    Description                                              Page

No exhibits were marked.

1

2

3              THE DEPOSITION OF TODD D.M. McFARLANE,

4       taken at 1:45 p.m. on June 19, 2002, at the offices of

5       Brown & Toleu, Ltd., 101 West Adams Street, Phoenix,

6       Arizona, before PAUL GROSSMAN, a Notary Public and

7       Certified Court Reporter #50028 in and for the State of

8       Arizona, pursuant to the Federal Rules of Civil

9       Procedure.

10             The plaintiffs were represented by their

11      attorneys, Foley & Lardner, by Allen A. Arntsen, Esq.

12      and Jeffrey A. Simmons, Esq.

13             The defendants Todd McFarlane were

14      represented by their attorneys, Blackwell, Sanders,

15      Peper, Martin, L.L.P., by Michael A. Kahn, Esq.

16             The defendant Image Comics was represented by

17      its attorneys, Brobeck, Phleger & Harrison, LLP, by

18      Matthew C. Lapple, Esq.

19             Also present was Kenneth F. Levin, Esq.,

20      Mr. Neil Gaiman.

21

22

23

24

25

```
 1                                    Phoenix, Arizona
 2                                    June 19, 2002
 3                                    1:45 p.m.
 4
 5
 6                  TODD D.M. McFARLANE,
 7     called as a witness herein, having been first duly
 8     sworn, was examined and testified as follows:
 9
10                      EXAMINATION
11     BY MR. ARNTSEN:
12          Q.    Please state your name.
13          A.    Todd -- full name?
14          Q.    Yes.
15          A.    Todd Dean Mark McFarlane.
16          Q.    What's your home address?
17          A.    122 South -- 12240 South Honah Lee Court,
18     Phoenix, Arizona 85044.
19          Q.    Mr. McFarlane, it's my understanding that in
20     addition to having your deposition today on an
21     individual basis, you're also being presented as the
22     designated witness on a number of the 30(b)(6) topics
23     involving the corporate defendants.  Is that correct?
24          A.    Correct.
25          Q.    And I guess what I would suggest is if
```

1    Attorney Kahn wants to just read into the record --

2         MR. KAHN:   I'll go ahead.   For the record,

3    earlier this week or late last week I sent Jeff Simmons

4    a letter going through the ten topics that were listed

5    in the 30(b)(6) deposition notice designating Todd

6    McFarlane for certain of those topics and designating

7    Julaine Claybaugh on certain other accounting topics

8    concerning documents she had been gathering in response

9    to the document request.   Todd has previously been

10   designated under the 30(b)(6) notice for topics 1, 5, 7

11   and 10 from that deposition notice.

12        For the purpose of this deposition, Allen, I

13   mentioned to you earlier Julaine Claybaugh was not with

14   Todd McFarlane Productions back in 1987 when there were

15   a great deal of accounting type and royalty type

16   documents reviewed and compiled in July of 1987 before

17   certain materials were sent to Mr. Gaiman in August of

18   1987 and Todd McFarlane had at least an opportunity to

19   review all those materials back then, and to the extent

20   that any of the other topics that are included in the

21   30(b)(6) designations which deal with copies being sold

22   and moneys being made on various products related to the

23   comic books at issue, then Todd McFarlane Productions

24   will also designate Todd McFarlane himself to testify on

25   those topics.

1    MR. ARNTSEN: So, if I understand the subject

2    areas that Mr. McFarlane is the witness for, he is the

3    witness for topics 1, 5, 7 and 10 and as to the

4    remaining topics he is the witness up to a certain date?

5    MR. KAHN: Yes. He's a witness at least

6    through 1998.

7    MR. ARNTSEN: Okay.

8    MR. KAHN: And since 1998 Julaine Claybaugh

9    has been going through the company records to try to

10   find more recent information on sales of Angela comics,

11   on sales of Angela action figures and other items that

12   would be included within those topics and she would have

13   more knowledge about what those documents say than Todd

14   would.

15   MR. ARNTSEN: So, do we have a separation

16   date between the two witnesses or what are you saying in

17   that regard?

18   MR. KAHN: I'm saying why don't we let Todd

19   try to talk about everything.

20   MR. ARNTSEN: Okay.

21   MR. KAHN: But he may not know actual numbers

22   on sales numbers from '99 to the present because those

23   documents have been gathered by Julaine, but I wanted

24   you to be able to ask him those areas as well.

25   MR. ARNTSEN: So I'll be proceeding as if

1   Mr. McFarlane is the designated witness on all the

2   30(b)(6) topics recognizing there's more recent

3   information since 1998?

4           MR. KAHN:  Of a quantitative nature.

5           MR. ARNTSEN:  Concerning numbers, he may not

6   have the information and Julaine Claybaugh might.

7           Off the record.

8           (Discussion off the record.)

9   BY MR. ARNTSEN:

10      Q.   Mr. McFarlane, why don't you summarize your

11  educational background from high school graduation up?

12      A.   I attended Spokane Falls Community College

13  starting in, I think, the beginning of 1980, spent about

14  a year and a half there and then transferred over to

15  Eastern Washington University and stayed there until

16  graduation in 1984.  About May of '84.

17      Q.   What was your degree in?

18      A.   It was just a B.A.

19      Q.   Major?

20      A.   Well, in the field of art.

21      Q.   Okay.

22      A.   Graphic design.

23      Q.   Did you graduate from high school in 1980?

24      A.   No, in '79.

25      Q.   Take me up through your employment history

1    from college graduation on.  Just bring it through

2    chronologically.

3         A.    From the beginning of college?

4         Q.    College graduation.

5         A.    Oh, college graduation.

6         Q.    Or if there was some significant employment

7    prior to college graduation you can bring that up, but I

8    don't care to know about waiting tables.

9         A.    Graduation about May of '84, started working

10   for Marvel Comics, sort of a subdivision called Epic

11   Comics.

12             And then in '85 moved over to DC Comics.

13   Worked at DC comic books as a free-lancer for about

14   three years and then -- 'til about '88; went back to

15   Marvel comic books and stayed there as a free-lancer

16   until August of 1991 and then have been self-employed

17   with -- starting in the end of '91, beginning of '92,

18   Todd McFarlane Productions, that I'm the company where I

19   employ myself and became a part shareholder of Image

20   comic books in 1992, and then the toy company I think

21   was like around Christmas '94 maybe.  Maybe it might

22   have been -- it might have been Christmas '93.

23        Q.    When you say "the toy company," is that TMP

24   Worldwide?

25        A.    Well, I'll refer to it as TMP International.

1    Q.    Okay.

2    A.    Now, can I make a clarification?

3    Q.    Yes.

4    A.    I have done stuff in Hollywood.  Should I

5  tack that on here, too?

6    Q.    Yes, why don't you.

7    A.    I was exec producer on an HBO animated series

8  from '97 through '99; was exec producer on a full length

9  feature for New Line Cinema '96, '97; directed,

10  co-directed a couple of music videos probably in 1999

11  and 2000, and worked on a film that just got released

12  here, 2001, on doing animation, produced animation and

13  then a couple of small sort of screen plays, scripts in

14  between that.

15    Q.    Any other general areas?

16    A.    No, not really.

17    Q.    The film you just finished in 2001, what's

18  that called?

19    A.    Dangerous Lives of the Altar Boys.

20    Q.    And you did animation and were a producer?

21    A.    Well, there's no sort of good guild rules for

22  animators, but I was credited as a producer of the

23  animation sequences in that film.

24    Q.    And executive producer for HBO, was that the

25  Spawn series?

1    A.    Correct.

2    Q.    And the executive producer for New Line, that

3    was the Spawn movie?

4    A.    Right.

5    Q.    Backing up now, let me cover one other topic.

6    There are various corporate entities with your names or

7    initials on them.

8    A.    Uh-huh.

9    Q.    Can you tell me what they are and what they

10    do?

11    A.    Todd McFarlane Productions is essentially a

12    publishing company that does some free-lance art work,

13    designs stuff and owns a lot of the trademarks,

14    copyrights of a lot of the characters we design.

15        TMP International is a toy company that

16    produces for the most part action figures that we

17    distribute world-wide.

18        And TMP Asia is a smaller subdivision which

19    helps with our international FOB business with our

20    international distributors.

21    Q.    With toys?

22    A.    With toys, right.

23        And McFarlane Design Group is where we do a

24    lot of the research and development for a lot of the toy

25    designs.

1                And McFarlane Toys-Canada is again a smaller

2   entity that helps facilitate the sales and distribution

3   of toys up in Canada.

4       Q.   Any others?

5       A.   TME, which is Todd McFarlane Entertainment,

6   is an office in southern California that deals with

7   entertainment.  Usually with the Hollywood business.

8       Q.   And are you the sole owner of all these

9   entities, recognizing that one of your entities may own

10  other entities, both getting it back to people?

11      A.   I think TME is the only one that I'm not a

12  hundred percent.

13      Q.   Okay.  Who else is an owner of that?

14      A.   Terry Fitzgerald.

15      Q.   Okay.  And how about McFarlane Worldwide,

16  Inc.?

17      A.   You know, I don't know.  I don't know what

18  that does.

19      Q.   Seriously?

20      A.   Right.

21      Q.   Okay.  But you own it?

22      A.   Yes.  All that's on that list I own.

23      Q.   Okay.

24      A.   A lot of accounting reasons for it.

25      Q.   Okay.  And you're also an owner of Image

Comics?

A.    One of the shareholders, right.

Q.    And you're the President?

A.    Right.

Q.    Are you an officer of any other companies?

A.    No.  I'm a share owner -- I'm a shareholder of another.

Q.    Are you a shareholder of other companies -- I'm putting aside public companies, that kind of thing -- are you a shareholder of any other closely held companies?

A.    I own a minority stake in an NHL franchise, Edmonton Oilers.

Q.    Anything else?

A.    No.

Q.    Were you one of the founders of Image?

A.    Yes.

Q.    And when was that?

A.    That would have been late -- about December of '91.

Q.    And who are the current Image shareholders?

A.    Mark Silvestre, Jim Valentino, Eric Larson and myself.

Q.    And do you receive a salary from any of your entities?

1        A.    From Todd McFarlane -- from TME International

2    I receive a salary from and from Todd McFarlane

3    Productions.  And then -- and then anything I do as

4    either an individual or through TME, through Hollywood,

5    but those are not steady paychecks,

6        Q.    Those are on kind of a project basis?

7        A.    Right.  Project by project.

8        Q.    And we can designate this part confidential.

9              (The following excerpt was designated

10             "Confidential.")

11   BY MR. ARNTSEN:

12       Q.    When you started work at Marvel in 1984 what

13   did you do?

14       A.    I was the penciler on a back-up series for a

15   comic entitled Steve Engelhart's Coyote.

16       Q.    Were you paid a salary?

17       A.    Well, a page rate.  You get paid a page rate,

18   X amount of dollars per page.

19       Q.    And what's a penciler do?

20       A.    He does the drawings with the pencils.

21       Q.    Okay.  And he's paid piece-work, so much a

22   page?

23       A.    Yes.

24       Q.    And so as you -- I guess I might as well try

25   to get an understanding of how this business works.

1    What is given to you and what do you produce

2    to put on presumably to the next step in the process?

3    A.    In that specific case they would have given

4    me what they call a plot outline, which is essentially

5    two or four pages that just give a general overview of

6    what they want you to draw, and then depending upon the

7    number of pages I have allocated I have to get all that

8    information visually onto the art boards.  So, and then

9    from there I would hand it in and it would sort of go

10    through the process.

11    Q.    What is the process?  What's the process in

12    the creation of a comic book?

13    A.    There's variations in it, you know, so -- but

14    again IT sort of goes something like this.  That, you

15    know, ideas are come up with and then you hire a writer.

16    The writer takes that idea and then either writes a

17    script or an outline that I was just talking about.

18    From there the writer's job then is given to the

19    penciler and the penciler again has to take all that

20    information and put it into the allocated number of

21    pages.

22    A traditional comic book is generally right

23    now 22 pages, so that's sort of the bulk of what you

24    will see out on the stands.

25    Once the pencils are done, it will go back.

1  There's usually an editor on the books.  The editor

2  makes sure that nothing is sort of getting off the

3  track.  They will send it out to an inker.  An inker

4  will then, just like his name sounds, he will take an

5  ink pen and turn the pencils into a black and white sort

6  of finished Image.

7  Again it will go back to the editor.  He'll

8  hand it over off to a letterer.  A letterer will then

9  take a script that sometimes while the book's being

10  inked, the writer is getting copies of the pencil pages

11  and is now writing a script.

12  So, at some point the script comes in from

13  the writer, the ink pages come in from the inker and now

14  they've got to get balloons placed on it, you know,

15  where the words are in those circles with tails on them.

16  They give that to the letterer.  He does

17  balloon placements, puts it on top of the black and

18  white art work, and then the last guy in the run is the

19  colorist who will then take all of it and will color it,

20  handing it back before it then gets shipped off to the

21  printer to go through that process of converting it into

22  tens if not hundreds of thousands of books.

23      Q.    Okay.  And you started out as a penciler?

24      A.    Yes.

25      Q.    And you worked at Marvel initially from '84

1    to '85, correct?

2        A.    Yes.

3        Q.    Was that always as a penciler?

4        A.    Yes.

5        Q.    And were you always paid on a sort of page

6    rate, as you discussed?

7        A.    Yes.

8        Q.    And in 1985 you went over to DC Comics,

9    correct?

10       A.    Yes.

11       Q.    Why?

12       A.    The book that I had been working on at

13   Marvel, although I was only doing a backup, the book got

14   canceled so essentially I had no -- I had no work.  So

15   you, you know, you just jump from job to job.  And so I

16   went back to somebody I'd met and sent and corresponded

17   with earlier and I was able to pick up another job.

18       Q.    And what was that?

19       A.    Well, initially it was a couple of what we

20   call fill in issues, which are sort of temp jobs to get

21   you through from month to month, but it became -- it

22   turned into a permanent job, which was the penciler on a

23   book entitled Infinity, Incorporated.

24       Q.    And when you say a book, that's --

25       A.    A comic book.

1    Q.    A comic book series?

2    A.    A comic book series, correct.

3    Q.    And so these Infinity comic books, they had

4  come out on a regular basis?

5    A.    Yes.  They were a monthly publication at that

6  time.

7    Q.    And so that becomes a regular job for you?

8    A.    Yes.

9    Q.    And were you the sole penciler or did you

10  work with other pencilers on it?

11    A.    It depended on each issue depending upon

12  their deadlines and how fast or slow I was at any given

13  time.

14    Q.    And how long did you work as a penciler for

15  that Infinity comic book?

16    A.    About three years.

17    Q.    And again you were paid on a page rate?

18    A.    Yes.

19    Q.    Were you -- is that a work for hire?

20    A.    I believe so.

21    Q.    Did you sign any kind of agreements in

22  connection with that with DC?

23    A.    Yes.  On the Infinity one I had a contract.

24    Q.    And is that a contract that says that this is

25  how much you'll be paid and this is what you'll do and

1  what rights to your -- who has what rights to your

2  work-product?

3    A.    And things like sometimes they include sort

4  of if you do ten issues in a row on time they will give

5  you a couple extra bucks or sometimes they will include

6  medical or something like that, so it's spelled out what

7  to expect from them, yes.

8    Q.    And how much in this kind of job, how much

9  freedom or artistic leeway do you have?

10   A.    I would say a great deal actually.

11         As a guy who has to put the visual, you know,

12  you have to -- sometimes you have to condense a writer's

13  ideas and sometimes you have to expand it depending

14  upon, you know, again you've got this allotment and at

15  times, you know, you'd get stories.  You'd just go,

16  "This is bigger than 22 pages," you know.  Other times

17  it was shorter than 22 pages.  You had to stretch it.

18  So, depending on any given month, you just -- and the

19  way you lay out the page is completely -- it's

20  completely up to the artist's sort of interpretation of

21  how they sort of want to pace all of it.  So I'd say

22  yes, I'd say we had a lot of freedom.

23   Q.    In connection with this job, did you consider

24  yourself a creator?

25   A.    Well, a penciler of comic books, yes.  That's

1    sort of how I called myself and introduced myself, "I do

2    pencil comic books."

3        Q.    And you did that at DC -- you had essentially

4    the same job at DC from '85 to '88?

5        A.    Yes.

6        Q.    And then you went back to Marvel?

7        A.    Right.

8        Q.    Why?

9        A.    Everybody is sort of looking out for their

10   career and I'd been on the book for three years and I

11   was looking.

12             It was a team.  It may seem silly, but it was

13   a team book which meant it had a lot of characters in it

14   and it can get very arduous drawing a lot of different

15   people.  So I was looking to see if I could grab a job

16   that was sort of more focused on a headline character

17   than doing twenty guys in a book.

18       Q.    Did Marvel offer you that job?

19       A.    I think I did a couple fill ins for them just

20   to sort of show them I can meet a deadline and then I

21   ended up picking -- they gave me the Incredible Hulk to

22   pencil.

23       Q.    And was that a monthly comic book again?

24       A.    Yes.

25       Q.    You were the penciler for Incredible Hulk?

```
 1         A.    Yes.

 2         Q.    For what period of time?

 3         A.    Probably '88, '89 era.

 4         Q.    Was your contractual arrangement with Marvel

 5   for Incredible Hulk different in any way from your

 6   contractual arrangement with DC?

 7         A.    I don't know if I ever had a contract.  Once

 8   I went back to Marvel I was just -- it was just

 9   piecemeal at that point, so I don't recall if I had a

10   contract with them or not.

11         Q.    You were paid per page?

12         A.    Per page, right.

13         Q.    And it was a work for hire arrangement again?

14         A.    Yes.

15         Q.    So you understood you didn't retain any

16   intellectual property rights in the work you had done,

17   is that correct?

18         A.    Right.  I think they actually printed it on

19   the back of checks just in case you didn't understand.

20         Q.    How long were you working as the penciler for

21   Incredible Hulk?

22         A.    About eighteen months, something like that.

23         Q.    Then what did you do?

24         A.    Did a little bit of Batman back over at DC

25   for a couple months and then moved on to do the
```

1    penciling on a comic called Amazing Spiderman.

2        Q.    So, how did you come about switching?   Why

3    did you switch from Hulk to Batman and then from Batman

4    to Spiderman?

5        A.    When I was doing the Hulk I was -- I was

6    building speed and so I was then capable of doing more

7    than one book a month, and so I'd picked up the odd job,

8    but then the opportunity when I left DC, I told a couple

9    of people I'll come back and do some Batman and the

10   opportunity came up to do some Batman.   I did that, but

11   it was only temporary, three months.

12           And once that job ended, then I go, well,

13   I -- I'm down to one book.   I can actually do two books.

14   And so I went looking for another job and I ended up

15   getting the Amazing Spiderman.

16       Q.    During this period of time -- and again this

17   reflects my lack of knowledge of the comic book

18   industry -- is your career advancing?   In other words,

19   are you building a reputation in any sense of the word?

20           Can you command higher rates of pay, that

21   type of thing, or is it still sort of a commodity?

22       A.    No, there's a little bit of that in there.

23   Again at times it's not different than a normal business

24   in that they have twenty year vets there and they don't

25   want you to sort of exceed sort of the senior, you know,

1    artist.  And so, you know, you'd ask.  They always used

2    to say, "I can't pay you more than that guy, you know,

3    twenty years."

4              And, "Okay.  I understand that."

5              But they are very good AND the raise they

6    gave you a lot of times is to character.  It doesn't

7    cost them any money.  They shift you from a character

8    you don't like to a character you do.  Because you leave

9    the office:  "Well, I'm doing Superman.  Cool."  But you

10   didn't get a raise, right?  So you go.

11             But they try to figure out who your favorite

12   characters are so they can actually have an answer for

13   it, but sometimes they would bump you up, but it was

14   maybe five or ten dollars a page at a time or something.

15   Q.    And that was the progress of your career up

16   that we've covered so far?

17   A.    Right.

18   Q.    And you started working on Spiderman in what,

19   '89?

20   A.    Yes, I think so.

21             Then again let's just be clear here.  It's

22   called Amazing Spiderman.

23   Q.    Okay.

24   A.    Because we are going to get later to a book

25   called Spiderman, so I don't want to mix our metaphors

1  here.  Amazing Spiderman.

2      Q.     Amazing Spiderman.

3      A.     At the beginning, right.

4      Q.     And how is Amazing Spiderman different from

5  Spiderman?

6      A.     They -- on some of the more popular

7  characters, given that a book can only come out once a

8  month, they go, "Hey, there's more than one week in a

9  month," and so they figure out how to do sort of another

10 version of it.  And so they had three, you know,

11 Superman and Batman, Spiderman, X-Men, all the popular

12 guys usually have more than one title going at any one

13 time.

14     Q.     Okay.  So you initially were doing the

15 pencilling for Amazing Spiderman and anything else at

16 that time?

17     A.     I did a quick couple months on a mini series

18 for DC called -- I think it was called Invasion.  I

19 think that might have been the title.  So I did that.

20     Q.     You indicated that with your initial work for

21 DC you were operating under a written contract, correct?

22     A.     Right.

23     Q.     And as best you can recall, when you worked

24 for Marvel you were not operating under a written

25 contract, correct?

1        A.      Right.  I don't recall one.

2        Q.      And was that true throughout the period with

3   regard to when you were working for DC and when you were

4   working for Marvel; did you typically work under written

5   contracts with DC and not under written contracts with

6   Marvel?

7        A.      No.  I think one time I went back and I did

8   the stuff like the Batman fill-ins, if you will, and the

9   Invasion.  I don't think there was any contracts for

10  that.

11       Q.      Was that also true all the way through your

12  Marvel employment, no contracts?

13       A.      I think so.  I don't think we ever had a

14  formal contract.

15       Q.      So when you then -- take me through from when

16  you started working on Amazing Spiderman 'til you left

17  Marvel?

18       A.      Amazing Spiderman probably started in '88,

19  '89.  I worked on that one for two and a half years, in

20  that area.

21              And then by this time I'd progressed into --

22  it was the only book I was doing at that time and I

23  had -- I decided instead of doing two books what I'd

24  rather do is do the penciling and the inking on the same

25  book instead of handing it over to somebody else.  So I

1    was the penciler and inker on Spiderman as well as doing

2    the covers.

3            And so just because I was always sort of a

4    curious little kid, you know, I kept getting somebody

5    else's stories and I wanted to write my own stories.

6    And so knowing that something had to give, I walked away

7    from Amazing Spiderman and said, you know, I want to try

8    and find a job that I can write and I don't want to -- I

9    don't want to write somebody else's stuff.  And so I'll

10   just quit and I'll go see if somebody will give me a job

11   as a novice writer, if you will, but a skilled artist at

12   this point and move from there.

13           Given at that time Spiderman, Amazing

14   Spiderman, was doing pretty good and I helped boost the

15   sales on the book, they didn't want me to really leave

16   Spiderman.

17           So I don't know what the origin of it was,

18   but they had Spiderman books and somebody figured out

19   there's four weeks, so they went, "Well, what if we let

20   you stay on Spiderman?  We'll let you write it and we'll

21   create a new Spiderman book for you."  I mean, it was

22   better, better than I'd ever thought.  I thought I was

23   falling into that part because it would be a big title

24   and I was sort of a novice writer, but, of course, I

25   enthusiastically said yes.  And so I then became the

1   writer, penciler, inker of a new title that was just

2   called Spiderman, so there were no adjectives in front

3   of it.

4       Q.    So this was a monthly comic and you were

5   doing everything on it other than the -- well, up to the

6   lettering?

7       A.    Right.  Although there's more one or two

8   issues I actually did letter and one that I colored, so

9   I dabbled in all of it at some point.

10      Q.    All right.

11      A.    But there was just those three jobs were the

12  main jobs I did, writing, penciling and inking.

13      Q.    Was this still on a work for hire basis?

14      A.    Right.

15      Q.    And did you retain any of the intellectual

16  property rights to any of the Spider -- any of these

17  Spiderman books that you did?

18      A.    No.

19      Q.    Were you still paid on a page rate?

20      A.    Right.

21      Q.    But presumably your pay is going up as you're

22  doing additional jobs with it?

23      A.    Well, you get some extra money on the

24  royalties depending on sales, so again that's where they

25  could keep your page rates going down and, well, if you

1    go on a big selling book you get some extra money.

2        Q.    Is that true if you're a penciler?

3        A.    Right.

4        Q.    It's true at every one of the stages then?

5        A.    I can't say that for sure.  I don't know if

6    that's true.  I don't know.

7        Q.    And were these royalty agreements, was there

8    a standard rate, a standard formula or program in place?

9        A.    Yes, I think so.

10        Q.    So again for a book that you were doing,

11    would you get -- there would be some royalty arrangement

12    for the stories you were the writer on, correct?

13        A.    Right.

14        Q.    And then there would be a royalty arrangement

15    for the books that you were a writer and penciler on,

16    correct?

17        A.    If it met their formula, right.

18        Q.    And can you just describe for me what the

19    formula was, how it worked?

20        A.    You know, I think -- I think it was if you

21    sold more than around 140,000 copies then you were in

22    line to get something.

23        Q.    Did you create any characters in connection

24    with this work?

25        A.    With the Spiderman work?

```
 1        Q.    Yes.

 2        A.    Yes.

 3        Q.    And did any -- did you get any rights in

 4   connection with the characters you created?

 5        A.    No.

 6        Q.    So, all -- I mean, in connection with your

 7   work, you understood it was all work for hire, correct?

 8        A.    Correct.

 9        Q.    And your employer was keeping all of the --

10   all of the sort of residual rights to your work,

11   correct?

12        A.    Correct.

13        Q.    So, during what period of time --

14        A.    Excuse me for a minute.

15        Q.    During what period of time were you the

16   writer for Spiderman?

17        A.    Probably '90 and '91.

18        Q.    Were you doing anything else during that time

19   period?

20        A.    I don't think so.

21        Q.    So, what did you do from there?

22        A.    After Spiderman?

23        Q.    Yes.

24        A.    I stopped working on the book.  We had our

25   first child, my wife and I, and I wanted to take a
```

1    break.   We never had a kid before so I wanted to sort of

2    enjoy that time.   That would have been in August, 1991.

3              And I'd been having off and on conversations

4    with sort of other free-lancers and friends about sort

5    of saying, "Why don't we -- why don't we start our own

6    company.   What are we working for the companies for.

7    So, sort of dancing to their tunes to some extent.   Why

8    don't go we go and try to band together."

9              And so by the end of 1991 we had gathered

10   seven of us and three of us announced to Marvel that we

11   were in unison leaving Marvel comic books to sort of

12   start a commune of artists and writers together and that

13   started -- that began that we ended up calling it Image

14   Comics and that began in 1992, the beginning of '92.

15       Q.    Who were the other founders of Image Comics?

16       A.    Back then the other six would have been Mark

17   Silvestre, Eric Larson, Jim Valentino, Rob Liefeld, Jim

18   Lee and Wills Portacio.

19       Q.    Image was founded at the start of '92?

20       A.    I'd say probably December, December of '91.

21       Q.    What did you do in connection with your work

22   with Image initially?

23       A.    Well, Image was put together to sort of

24   create a logo.   You know, we had sort of a brand name.

25   We as artists were not necessarily skilled in the

1    details of business at this time and so we ended up

2    running into some people that had a smaller company

3    called Malibu Comics and they offered to publish the

4    books for us to help us on our way; let us sort of as

5    much as possible concentrate on doing the art, if you

6    will, and the books and the writing and not worry about

7    sort of the other things that are inherent with

8    publishing a comic book.

9              So each one of us went to our little hovels,

10   started our own companies, created our own characters

11   and then fed those ideas in the forms of comic books

12   into this commune and then those were published by

13   Malibu Comics starting in 1992.

14        Q.    So when was the first comic you did published

15   by Malibu Comics?

16        A.    June, 1992, I believe.

17        Q.    And what comic was that?

18        A.    Spawn Issue 1.

19        Q.    Were you the -- what was your involvement in

20   Spawn Issue 1?

21        A.    I was the writer, penciler, inker, creator,

22   editor.  You know, most of the dirty work.  I did the

23   dirty work other than the lettering and coloring at that

24   point.

25        Q.    So you did everything but the lettering and

1   coloring for the final copy that was sent in to Malibu

2   to publish?

3      A.   Right.  For the most part, right.

4      Q.   And the first Spawn Issue 1 came out in June,

5   1992?

6      A.   Yes.

7      Q.   Then did it come out at a certain frequency?

8      A.   We attempted to be monthly.  I can't quite

9   say that we were accurate every month, no.

10      Q.   Does Spawn still come out on a regular basis?

11      A.   Yes.

12      Q.   And are you still -- do you still write and

13   draw for Spawn?

14      A.   No.  I help in the plotting and the editorial

15   work.

16      Q.   In 1992 were you involved in any other comics

17   other than Spawn?

18      A.   No.

19      Q.   Did you enter into any kind of contractual

20   arrangement with Image with regard to Spawn?

21      A.   I don't know if there were formal contracts

22   at that time or not.

23      Q.   Did you enter --

24      A.   Because again there was sort of a shell

25   company, so there wasn't really sort of a company.  It

1      was a commune.

2         Q.    Did you generate any contracts with Malibu in

3      connection with Spawn?

4         A.    I don't know.  I remember having

5      conversations with them individually because they

6      understood that there was no Image.  It was only the

7      individuals.  So I think they had to negotiate

8      individually.

9             MR. KAHN:  Let me clarify it for you.  When

10     Allen asks you about contracts, he's not asking you for

11     some legal definition.  It can be an agreement either

12     written or oral.  That's what he's doing.

13            THE WITNESS:  Oh.

14            MR. KAHN:  So if there were any agreements

15     with Image, any agreements with Malibu, you can tell him

16     whether or not it was written.  Correct me if I'm wrong.

17     When he says "contracts" it doesn't mean only a written

18     contract.

19            MR. ARNTSEN:  I apologize.

20            MR. KAHN:  That's all right.  It just became

21     clear from his answer when he said "I can't think of any

22     written contracts."

23            THE WITNESS:  So with the shell company or

24     commune of Image we agreed to take all of our ideas that

25     we sort of created separately and put them into the

1   middle and then from there we sort of shopped that

2   around and had them published by Malibu.  And again I

3   think Malibu may have dealt with us individually.  I

4   don't recall.

5   BY MR. ARNTSEN:

6        Q.   And you don't, if I understand correctly, you

7   don't recall any written contracts, correct?

8        A.   Right.

9        Q.   Do you recall what the general structure or

10  terms of the contracts were between you and Malibu?

11       A.   I think it was -- I think they ended up

12  getting -- it would -- they would help us with the

13  production of it, you know, so again with accounting,

14  solicitation, collecting the bills.  And then at the end

15  of that I think they would get 10 percent of whatever

16  they collected from each individual title I think is how

17  it worked.

18            Now, it may have been a flat fee plus 10

19  percent.  I don't recall.  But they got a percentage of

20  sales.

21       Q.   And the way it worked out is that you --

22  essentially what you and your colleagues at Image would

23  get, you'd pay Malibu something and pay various people

24  things and then what's left is what you got?

25       A.   No.  It actually worked the opposite because

1    Malibu was the publisher and dealt directly with the
2    printers and the distributors.

3            They would collect all the moneys, deduct
4    their fee out of that, whatever we had agreed to at that
5    time, and then whatever was left over then -- they may
6    have paid the printers again and some of the shipping,
7    some of the inherent costs, and then whatever was sort
8    of left over then -- then they'd send out the check.
9    And I don't recall whether they sent it to the
10   individuals or to the clearinghouse of Image.

11           Q.    How did it work with -- who retained the
12   intellectual property rights to the work you did on
13   Spawn?

14           A.    All the books were controlled by the
15   individual creators.

16           Q.    What did you do with regard to -- when you
17   started out with this, what did you do with regard to
18   like copyright notices?

19           A.    I think -- I think -- I mean we put notices
20   at the bottom of the first page or Malibu helped us with
21   that and I think later on somewhere along the line I
22   think we did some filings on the trademarks.

23           Q.    How did you come up with the language of the
24   copyright notices that you used?

25           A.    You know, probably just from looking at other

1    comic books, use our best knowledge and talking to

2    Malibu.

3        Q.    Do you recall putting much thought into that?

4        A.    Just enough to make sure that everybody

5    thought that it seemed official, yes.

6        Q.    Now, in 1992 you had -- you arranged with

7    some guest writers to do some Spawn issues, correct?

8        A.    Yes.

9        Q.    How did that come about?

10       A.    Spawn had been out for maybe about a year at

11   this point or close to it and Image Comics was founded

12   by a bunch of artists and the knock against us was that,

13   you know, we didn't know how to write.  We could only

14   draw.

15            And so again it would be -- I thought it

16   would be sort of an interesting idea to bring some

17   writers on to -- on to the book to sort of see what

18   their take would be on some of the ideas for it.

19       Q.    Was that your idea?

20       A.    Right.

21       Q.    So how did you go about implementing that

22   idea?

23       A.    I came with a mental list of guys that sort

24   of would fit the bill, that would sort of -- sort of

25   would be interesting names to put on it and then started

1    making phone calls.

2        Q.    And who did you come up with as guest

3    writers?

4        A.    Alan Moore, Neil Gaiman, Dave Simm and Frank

5    Miller.

6        Q.    How did you come up with Neil Gaiman?

7        A.    I think Neil was given a lot of critical

8    acclaim at that point.  Sandman was his book I believe

9    that he was writing that was, you know, winning awards

10   and, you know, he was -- and again I think Neil had done

11   little, if any, sort of superhero comic book work and so

12   I thought again it would be an interesting choice.

13       Q.    When did you first meet Neil?

14       A.    Oh, I don't know.  I don't know.

15       Q.    As far back as you can recall, recognizing

16   we're talking about stuff that happened ten years ago.

17       A.    Yes.  It probably was at a comic book

18   convention, you know.  So, before all -- all of him

19   doing work.  Again all of us are a small community.  You

20   sort of butt into everybody.  So my guess is we had an

21   introduction somewhere.

22       Q.    And if I understand correctly, prior to Neil

23   doing work for you on the Spawn series you believe you

24   had met him and run into him on some occasions but you

25   don't -- there's no specific recollection, is that

1    right?

2        A.    Right.  I don't recall specifically.

3        Q.    You were acquainted with him?

4        A.    His work, yes.  His work.

5        Q.    Okay.  How did you -- how did you decide you

6    were going to compensate and allocate creative rights

7    between with regard to these guest writers you were

8    looking to have help with Spawn?

9        A.    I don't think that was sort of the topic of

10   conversation at the beginning.  It was -- my first

11   intent was to find the writers and sort of go, "Hey,

12   here's some -- there's an opportunity here.  Would you

13   guys be interested in it?"  And then -- and then sort of

14   tell them it's a Spawn book and have some fun with it.

15            Later on in some of the conversations I told

16   them that they would get $100,000 for doing it and in a

17   sense it was pretty much the same conversation for

18   everybody.  I wanted them to be equal, so did all of

19   them, so they could pass notes back and forth.  And so

20   we started from there.

21       Q.    Okay.  Tell me as best you can recall your

22   conversations with Neil Gaiman in connection with his

23   work for Spawn 9?

24            MR. KAHN:  Just a second so I can clarify.

25   Allen, do you want the first conversations regarding his

1    agreement to do it or do you want the conversations all

2    the way through the creation of publishing Spawn 9?

3              MR. ARNTSEN:  I guess the agreement.  What

4    would work best is if we -- and unless I tell you

5    otherwise, somewhat my question is going to work them

6    through chronologically.

7              MR. KAHN:  Okay.

8    BY MR. ARNTSEN:

9        Q.   As best we can.  I'm trying to kind of get

10   your recollection out in a logical way without having

11   the questions be too either parsed on the one hand or

12   vague on the other.

13       A.   I would have somehow contacted Neil talking

14   about him coming and potentially writing an issue, him

15   eventually saying yes, talking about some of the

16   creative stuff that I was doing already in the book,

17   talked a little bit about the money, talked a little bit

18   about some of other guys that were already coming on.

19   And then from there the follow-up conversations for the

20   most part would have been sort of creative talk about

21   what we were going to sort of do or not do and how Spawn

22   continuity was doing up to this point and things of that

23   matter.

24       Q.   What did you talk about with regard to

25   financial terms?

1    A.    I think at the beginning it was -- it was

2  just $100,000 and a payment for all works in

3  consideration for him coming on board and doing that and

4  that we'd pay him in advance before he got started and

5  then a lump sum would come later.

6    Q.    What did you do -- what were your

7  conversations with regard to how the process would work?

8    A.    I believe I asked Neil how he normally works.

9  Neil from my experience writes different than what I was

10 used to.

11        I would get a plot outline.  Neil is one of

12 the writers that likes to write the script before the

13 art instead of after the fact.

14        So I'd done a couple jobs like that and so I

15 went, "Oh, okay," you know.  I think Al Moore had done

16 it the same way.

17        And so I go, "However you like to write, you

18 know, sort of write it down and then we'll just sort of

19 move forward from there.  We got to get a cover out.

20 We've got to do a cover.  So just come up with some

21 ideas and I'll get a cover because you have got to do

22 solicitations and then we can sort of get going."

23    Q.    Do you recall where Neil was living when you

24 were having these discussions with him?

25    A.    My understanding is that he was in Minnesota

1    some place.

2        Q.    Did you ever meet in person with Neil in

3    connection with, you know, putting together this

4    agreement to have him write for Spawn prior to him

5    actually starting the job?

6        A.    I don't think so.  It might have just been

7    all over the phone, you know.  I can't say for certain.

8        Q.    What types of -- did you exercise any control

9    with regard to Neil's script?

10        A.    I told him to go and write it and unless

11    something was sort of completely off the radar map after

12    our discussions on what direction I was heading in, what

13    the book was and what the characters were about, that,

14    you know, hand it in and if it looks good then we will

15    bless it and get it out to print.

16        Q.    Did you tell him a schedule, this is the

17    schedule you want for him?

18        A.    I probably -- I probably gave all of them

19    some parameters of the schedule, right.

20        Q.    And then you were just looking to receive a

21    script?

22        A.    Right.

23        Q.    And along with any conversation, interim

24    conversations along the way for discussions, correct?

25        A.    Right.

1        Q.    And Neil was never an employee of you or any

2  of your companies, correct?

3        A.    Right.

4        Q.    Did you ever sign any, or enter into any kind

5  of work for hire agreement with Neil?

6        A.    No.

7        Q.    Did you have any discussions with Neil with

8  regard to who would hold what intellectual property

9  rights to the work he was doing?

10       A.    I don't think we got overly specific with it.

11  They were coming on to my book, writing for me, so I

12  think it was a basis of understanding from everybody.

13       Q.    Well, do you recall any -- any discussions in

14  connection with that?

15       A.    Nothing specific.  We were artists.  I don't

16  think that we had sat there and talked about copyrights

17  at that moment.

18       Q.    Okay.  So, if I understand, as best you can

19  recall there weren't discussions with copyrights or

20  trademarks in connection with this, correct?

21       A.    No.  At that moment.

22       Q.    Did you talk at all before Neil wrote the

23  script of any characters he might introduce or anything

24  like that?

25       A.    Yes.  When we were having our creative

1   conversations his issue was Issue 9. Issue 8 was

2   written by Alan Moore. Again Neil was the most curious

3   of the four as to sort of, you know, continuity in the

4   book and how it all sort of worked where the other guys

5   were more about doing stand-alone stuff.

6           So Issue 8 Alan Moore delved in the concepts

7   of hell after some of my discussions and so it sort of

8   was an easy one for him to go, "Hey, Alan's doing hell.

9   How about I do heaven given that Spawn's character's

10  from the pit of hell?"

11          Q.   So that was Neil's suggestion to you?

12          A.   Oh, well, I can't say where it came from.  In

13  the midst of a conversation you know, again he was

14  asking questions, "What is Spawn? Where are you headed

15  with Spawn? What's in it? What sin do you sort of want

16  me to put in there or not put in there?"  And so we sort

17  of these had conversations about what would make an

18  interesting issue.

19          Q.   These were all over the phone as best you can

20  recall?

21          A.   I believe so.

22          Q.   When did you first recall hearing about the

23  Angela character?

24          A.   We probably came to an understanding we were

25  going to deal with heaven so we needed an angel

1   character of some sort. I don't know if she had a name,

2   but I had to get a cover out because the covers precede

3   everything.

4           So, once we said we're going to do heaven and

5   heaven has angels, I went and did a cover and from there

6   then at that point Neil probably gave her the name at

7   that point. I don't know if she had a name or if she

8   was just a generic angel at that point.

9       Q.    Had Neil provided to you any thumbnail

10  sketches of angels prior to your doing the cover?

11      A.    No.

12      Q.    Did Neil provide drafts of his script to you

13  or did you just essentially get a final product that you

14  then plugged into your comic book process?

15      A.    I mean, he gave me a draft that I don't know

16  if I made any or little changes on it and then started

17  drawing away at that time at it because again I was the

18  artist on it, so credit seemed pretty fine, and I

19  started doing the art work.

20      Q.    So, do you recall making any changes in the

21  words of the script?

22      A.    No.

23      Q.    There was a character in Spawn Issue 9 that,

24  for want of a better word, and I'm not trying to put any

25  conclusion on this, but that was Spawn in the Middle

| | | |
|---|---|---|
| 1 | | Ages.  Do you know what I'm referring to? |
| 2 | A. | Yes, yes, right. |
| 3 | Q. | And we'll call him Medieval Spawn. |
| 4 | A. | Yes. |
| 5 | Q. | And for the purposes of these questions I |

5      Q.    And for the purposes of these questions I
6   understand there are some issues, et cetera, et cetera.
7            How did that character come about?
8      A.    Probably through the conversations Neil and I
9   had had throwing ideas back and forth and then him
10  inquiring about what directions I wanted to go to, what
11  the back story was of Spawn, what I had done, what I was
12  planning on doing and from all of that comes a story.
13     Q.    Prior to this Medieval Spawn character had
14  you had any Spawns in other times other than the
15  present?
16     A.    I don't think visually.  I may have mentioned
17  it in some of the writing I had done.
18     Q.    Do you recall?
19     A.    Pardon me?
20     Q.    Do you have any specific recollection --
21     A.    No.
22     Q.    -- in that regard?
23     A.    I'll have to go reread my books.
24     Q.    But as you sit here today you have no
25  recollection, correct?

1    A.    Right.

2    Q.    Backing up a minute to the Angela character,

3  one of the early things you did was drew a cover with a

4  picture of an angel on it, correct?

5    A.    Yes.

6    Q.    Do you recall any further discussions with

7  regard to that character and features, qualities, that

8  kind of thing prior to your getting the script from

9  Neil?

10    A.    Again, we knew she was going to battle Spawn

11  or there was going to be somebody battling Spawn.

12  There's always a good guy and a bad guy.  And so she was

13  essentially going to be the bad guy.  And so, you know,

14  she couldn't be a wimp, you know.  None of the bad guys

15  are soft looking.  So we needed to make her a warrior,

16  yes.

17    Q.    Do you have any recollection of any specific

18  conversations in that regard?

19    A.    No.

20    Q.    There's another character in Spawn Issue 9

21  called Count Cogliostro.  Do you know which character

22  I'm referring to?

23    A.    Right.

24    Q.    Do you have any recollection as to the

25  genesis of that character?

1          A.     Again in our conversations and again Neil's
2     curiosity about where I was going and what I wanted to
3     do, he wanted to know if there's anything he wanted me
4     or I wanted him to add that I was going to do to sort of
5     get the stories going.

6                 I told him that I had sort of this antihero,
7     that I also wanted this sort of anti-Moses character
8     here and so this all sane sort of guy, and so we talked
9     in parameters about this Moses character and then I was
10    going to eventually bring in this guy.  So if you want
11    to plug him in here, so here's sort of parameters of
12    what he is and if you can find a spot for him, put him
13    in.

14         Q.     And what were those parameters that you gave
15    to Neil?

16         A.     Again using Moses as -- the biblical Moses as
17    sort of the back drop, sort of the anti version of that
18    guy, a guy who sort of knows more than anybody else and,
19    you know, has more insight than anybody else and may
20    have sort of the divine knowledge of what's going on,
21    although in this case he's actually from the pit of hell
22    which is why the anti-Moses.  But again just in those --
23    in those sort of terms.

24         Q.     Who came up with the name for Cogliostro?
25         A.     I believe it was Neil.

1       Q.     Is the same true with Angela?

2       A.     Yes, probably.

3       Q.     Did you have any discussions at this time,

4    and I'm talking about the time prior to the publication

5    of Spawn Issue 9, as to who had the rights between Neil

6    and you with regard to these characters he was creating?

7       A.     I think the -- the only conversations was

8    Neil began to ask questions like, "What happens if this

9    book gets reprinted or a trade paperback?"  He started

10   asking sort of follow-up questions.

11      Q.     And what did you say?

12      A.     "Oh, how do you want me to handle it?"

13      Q.     And what did he say?

14      A.     "Well, you know, I've got a pretty good

15   contract at DC.  I'm doing pretty good.  I don't want to

16   be any worse off for the wear here.  And so, you know,

17   you can just keep it, you know, and get close to my DC

18   contract.  That would be good."

19      Q.     And what did you say?

20      A.     "Okay."

21      Q.     And have we now made it through the end of

22   the conversation?

23      A.     That's the gist of it.

24      Q.     What else do you recall of it?

25      A.     Most of it.

1    Q.    That's all you can recall of that?

2    A.    Yes.

3          MR. ARNTSEN:  Let's take a little break.

4          (Whereupon, a short recess was then had from

5          2:50 p.m. until 3:06 p.m.)

6    BY MR. ARNTSEN:

7    Q.    Did Neil provide some -- what I guess are

8    called thumbnail sketches to you for Spawn 9?

9    A.    With the script, yes.

10   Q.    So he sent those to you when he sent the

11   script to you?

12   A.    Right.

13   Q.    Is that a typical part of the process?

14   A.    No.

15   Q.    Were there any discussions beforehand, before

16   him providing these to you of him providing the

17   thumbnail sketches?

18   A.    Just, you know, again Neil had a way of

19   working and I didn't want to disrupt that so, you know,

20   "However you work, I'll adjust around it."

21   Q.    Did you use the thumbnail sketches at all?

22   A.    I looked at them for some of the pacing that

23   he wanted, so -- but again not -- so it would be bad

24   against writers, but they are they are not artists,

25   but -- so you have to make adjustments where you see

1    fit, so --

2        Q.    Backing up a minute on this comic book

3    process and what -- the final piece of original art work

4    that becomes the copy for the publication, what does

5    that look like?  How big is it?  What does it look like?

6        A.    Generally it's -- the image is 10 inches by

7    15 inches and it's black and white because the inker has

8    now come on and made it.  The color is done at the

9    printer or now on computer, so the color rarely is

10   there.  It's black and white imagery of what you would

11   see in a comic book at a larger size.

12       Q.    So it's a page?

13       A.    Yes, a page.  Each page, each page would be

14   10 by 15.

15       Q.    Okay.  Then what use is made of those pages

16   once the comic book comes out?

17            Do they have some value as original art work

18   like you see these Disney things and stuff like that?

19       A.    Yes.  Traditionally the way that it works and

20   the way it's been explained to me is that we don't own,

21   for instance, when I was working on Spiderman, I don't

22   own Spiderman but I own the paper that it's on, the

23   image that it's on.  So, although you can't now separate

24   the image from the paper, what they do is historically

25   they give you the original art work back and you can do

1    with it as you want as long as you're not doing

2    reproductions of it.

3           And so again historically most artists would

4    take them to conventions, sell them, give them away,

5    give them to family members, whatever they want to do.

6    Hang them up, whatever they choose.

7       Q.    And is that what you did with your Spawn art

8    work also?

9       A.    No.

10      Q.    What did you do with that?

11      A.    Kept it.

12      Q.    You still have all of it?

13      A.    Yes.

14      Q.    What about your Spiderman art work?

15      A.    No.  I -- I sold some of those pages, the

16   good ones.

17      Q.    In your initial discussions with the four

18   guest writers who were doing, I believe it's Spawn 8

19   through 11, did you tell them up front it's $100,000?

20      A.    Uh-huh.

21      Q.    You have to use words.

22      A.    Oh, I'm sorry.  Yes.

23      Q.    You were testifying earlier concerning your

24   conversation with Neil concerning his DC agreement.  Do

25   you recall that?

1      A.    Right.

2      Q.    Did you do anything to look into what his DC

3   agreement was?

4      A.    Once he mentioned that he wanted the same

5   rights and privileges of it, then I go, "Well, you're

6   going to have to tell me what those are, you know.  So,

7   better yet, you know, if you want to give me a copy,

8   cool."  So, but he just -- just handed over some of the

9   terms whenever that was a specific item we happened to

10  be talking about.

11     Q.    Did you refer back to the contract that you

12  had with DC?

13     A.    Not at the beginning.

14     Q.    At some point in time?

15     A.    Yes.

16           MR. ARNTSEN:  Mike, did you produce those?

17           MR. KAHN:  No, I don't -- I don't remember

18  seeing them, but let me ask you, can you put your hands

19  on that contract?

20           THE WITNESS:  I can look for it.  Again we're

21  going back to '85, so it's probably in a weird spot if I

22  still have it.

23           MR. KAHN:  Well, if you can find it -- if we

24  can find it we will produce it, and if you stumble on it

25  tonight we'll give it to you tomorrow.

1           THE WITNESS:  All right.

2    BY MR. ARNTSEN:

3       Q.   Okay.  Did you ever do anything -- back in

4    this 1992 period did you do anything else to try to

5    determine, okay, what are the terms of the DC agreement

6    that Neil is talking about?

7       A.   No.  For the most part Neil, Neil fed me most

8    of the information.

9       Q.   Did in fact the compensation that each of the

10   guest writers for Spawn 8 through 11 receive, was it

11   $100,000 apiece?

12      A.   I believe so.

13      Q.   Any other compensation?

14      A.   I know there were additional payments, not --

15   I'm trying to think.  For those issues?  No.

16      Q.   How about for reprints of those issues?

17      A.   There were -- there were additional payments

18   made after the publication of it to Neil, but again I

19   don't know specifically what each one of those was for.

20      Q.   How about the other artists, the other

21   authors?  For instance, I note there was -- the issues

22   were reprinted in trade paperbacks, correct?

23      A.   Right.

24      Q.   And were the writers paid something for that?

25      A.   I don't think so, or I don't know.

1    Q.    Your answer is you don't know?

2    A.    I don't know.

3    Q.    Did you have any discussions in this 1992

4    period with any of these guest writers about -- about

5    the copyrights for the work?

6    A.    Not specifically in those terms, no.

7    Q.    And when you're saying "not specifically in

8    those terms," do you ever recall the word "copyright"

9    being mentioned?

10    A.    No.

11    Q.    The same with trademark?

12    A.    Well, I owned the trademark for Spawn, so

13    everybody sort of knew it was my book.  They knew they

14    were coming to my book, so they knew who owned that.

15    Q.    With regard to the Spawn trademark?

16    A.    Right.

17    Q.    Have there been other guest authors for Spawn

18    since these Spawn 8 through 11 guest authors?

19    A.    There have been other people write the books.

20    Q.    Was this on a work for hire basis?

21    A.    I don't know how we broke down everybody.

22    Q.    These four guest authors weren't on a work

23    for hire basis, correct?

24    A.    I can't say that.  It wasn't in writing and

25    we all sort of understood what the task was in front of

1    us.

2         Q.    What do you mean by that?

3         A.    I created a book, Spawn.  I wanted them to

4    come on to my book and do some writing for my book, so

5    although -- although we weren't lawyers, we didn't get

6    into it, I think it was a general understanding as to

7    what everybody was getting into.

8         Q.    Was the phrase "work for hire" mentioned?

9         A.    I don't recall.

10        Q.    Did any of the other three guest authors for

11   Spawn 8 through 11 create any new characters?

12        A.    Yes.

13        Q.    And who created what?

14        A.    I don't know.  I don't know if they actually

15   gave them names or every -- it's impossible to write

16   something and not create something new, so I'd have to

17   look at those issues before I could give you that

18   answer.

19        Q.    Did any of the other guest authors create any

20   characters of whom action figures were made?

21        A.    No.

22        Q.    Following the -- was Spawn Issue 9

23   successful?

24        A.    I'd say yes.

25        Q.    What was it's -- I mean, putting it in the

1    spectrum of the, you know, of the Spawn comics, how

2    did -- was it more successful than most, less

3    successful, within the middle, that kind of thing?

4        A.    I believe that when Spawn 1 came out it was

5    Issue Number 1 and it continued to be Issue Number 1.

6    So in the confines that Issue 9 was I believe still

7    Issue Number 1, then it was -- it was equal to task, if

8    you will, so -- and I think 8, 9, 10 and 11 were all

9    Issue Number 1.  Spawn was the number 1 selling book.

10       Q.    So you're saying each succeeding issue

11   outsold the preceding one?

12       A.    No, no.  I'm saying we have charts in our

13   industry and regardless of sales, because that's all

14   relevant, that they say who is the biggest seller.

15             So, to be sort of overly simplistic, you

16   could sell a million and be in first.  You could also

17   sell three and if everybody else only sold two you'd

18   still only be number 1.  So, taking out sales sort of

19   within the confines of it, sales I believe was non-stop

20   1 for almost twenty issues in a row.

21       Q.    So you're saying that, if I understand

22   correctly, as best you can recall Spawns 1 through 20

23   were each the biggest selling comic book for their month

24   of issue, is that correct?

25       A.    Or for a regular book or pretty damn close,

1    right.

2        Q.    Okay.   And how did -- was Spawn Issue Number

3    9 -- within the context of the first twenty Spawn issues

4    where did it come out?   In other words, were they all

5    approximately equally successful, did it outsell the

6    ones before and after?   I'm just trying to get a

7    context.

8        A.    Probably it would be mid range if you average

9    the first twenty because by Issue 20 the market's

10   starting to soften a bit so you're still behind the

11   charts and not be selling near what you were selling at

12   the beginning.

13       Q.    What was the biggest selling Spawn issue?

14       A.    Spawn Number 1.

15       Q.    Did you have any discussions then following

16   the issuance of Spawn Number 9 of Neil doing some other

17   work following up on the work he'd done for Spawn 9?

18       A.    I think shortly after Issue 9 came out we

19   sort of both seemed to be happy with what had gone down

20   and Neil wanted to do some more work, so we sort of

21   talked about some other project and the obvious one was

22   for him to do a mini series, which isn't a regular book,

23   with Angela in it.

24       Q.    And what's a mini series?

25       A.    A mini series is not unlike what you see on

1    TV.  That it's not part of regular programming or -- and

2    so again Spawn is a monthly comic book and so is

3    Superman and Batman and those kinds of books, but every

4    now and then companies will add or creators or

5    publishers will add sort of stand-alone stories, but

6    they don't mean it to be an ongoing book.  They just

7    have a story to tell.

8         Sometimes it's one issue sometimes it's ten

9    and in between that, but it's not meant to be something

10   that will last much longer than a short period of time.

11        Q.   So you had discussions about Neil doing

12   something like this with regard to Angela?

13        A.   Yes.  We talked about doing more work

14   together, uh-huh.

15        Q.   Tell me how that came about, what you recall

16   about that?

17        A.   Like I said, I think it was -- Issue 9 came

18   out.  We were both happy with sort of the results and so

19   again, you know, he wanted to do some more work.  I was

20   happy with what he had done and he said, "Let me do some

21   more Angela.

22             "Okay.  Do you want to write a mini series?

23             "That's good."

24        Q.   What did you talk about with regard to the

25   contractual provisions of that?

1    A.    Again I think it fell into the same sort of

2    discussions we'd had; again get it within my DC

3    contract.  And I don't even know if we got that

4    specific.  We were just happy that we had a success of

5    one book.  You know, "let's go and do some more books

6    together."

7    Q.    So, did you talk about money at all for it?

8    A.    I think we discussed again being able to give

9    him a bit of an advance before he started writing the

10   issues and then -- and then there may have been some

11   parameters of, you know, a minimum amount that he, you

12   know, that he could sort of count on that he wouldn't

13   get any less than something so that he knew at the end

14   of the day he'd have X amount of dollars in his pocket.

15   Q.    Did you talk about percentages at all?

16   A.    I don't recall.  We may have.

17   Q.    And was the process for the writing of the

18   Angela mini series the same as the process for Spawn 9?

19   A.    I don't think so.

20   Q.    How was it different?

21   A.    My recollection is that Neil did a full

22   script on Issue 9 and when the Angela mini series

23   started I wasn't the artist on that book.  A fellow by

24   the name of Greg Capullo was.

25        And I told Neil -- I was working with Greg at

1    that time.  I told Neil how I worked with Greg, which

2    was to give him an outline and let him do the art work

3    and come back.

4            So I think somewhere along in the process of

5    the Angela mini series one or more of those issues got

6    converted into that style of somehow getting the

7    information to Greg and then letting Greg do the art

8    work and then writing it later.  So I don't know if all

9    three were done that way or it was mix and match, but I

10   think there was a conversion there.

11       Q.    Did you ever apply for a copyright on the

12   Spawn Issue 9 script?

13            MR. KAHN:  Do you mean the script and nothing

14   else?

15            MR. ARNTSEN:  I mean the script.

16            THE WITNESS:  The script as a separate thing?

17   BY MR. ARNTSEN:

18       Q.    Yes.

19       A.    I don't think so.

20       Q.    Did you ever have any discussions with Neil

21   concerning intellectual property rights or respective

22   creative rights with regard to the Angela mini series?

23       A.    Only -- only as they related to his DC

24   contract.

25       Q.    And have you fully told us your recollection

1    of that?

2        A.    Uh-huh.

3        Q.    You have to use words.

4              MR. KAHN:  You have to answer with words.

5              THE WITNESS:  Yes.

6    BY MR. ARNTSEN:

7        Q.    When did you first come up with selling

8    Angela toys?

9        A.    Is the question when did we first sell the

10   Angela toy?

11       Q.    Yes.

12       A.    Maybe -- maybe early '94, '95, '93.  I'm

13   not -- early to mid '90s.

14       Q.    Did you have any discussions with Neil as to

15   whether he was entitled to a share of the royalties for

16   the Angela toys?

17       A.    Nothing I recall specifically.

18       Q.    Anything you recall generally?

19       A.    Just again, you know, "I thought I get paid

20   money when I do stuff like this for DC.

21             "Okay.  So just how much is that?  Send it

22   over."

23       Q.    Did you have any discussions with Neil

24   concerning whether he was entitled to any payment for

25   the reprints of Spawn Issue 9?

1    A.    Again I don't know if we talked about it
2    specifically.
3    Q.    Was Neil paid?
4    A.    I don't know.
5    Q.    And the Angela mini series was reprinted into
6    a trade paperback, correct?
7    A.    Right.
8    Q.    Did you have any discussions with Neil as to
9    if he'd be paid anything for that?
10    A.    Again just as it related to how he was used
11    to getting paid on those kinds of books.
12    Q.    From DC?
13    A.    Right.
14    Q.    And you were in agreement with that?
15    A.    Well, again I go, "Well, what is it?  Give
16    me -- let me see the contract.  Let me see it or give me
17    the information."  And so he'd give me some numbers
18    sometimes.
19    Q.    Did you do anything else to again verify the
20    information?
21    A.    Well, I kept prodding Neil, kept asking
22    questions to Neil, kept trying to sort of get the
23    information.
24          I all the time asked if I could actually see
25    this elusive contract and then much later, you know,

 1    made some phone calls to sort of verify some of the

 2    information.

 3         Q.    Are you talking about in 1997?

 4         A.    I'm talking from 1993 onward.

 5         Q.    With regard to phone calls you made to verify

 6    the information?

 7         A.    To the initial statement of "I need this to

 8    sort of match my DC contract."  From there the race

 9    began.

10         Q.    What?  The what?

11         A.    The race began from there.

12         Q.    Okay.  And what did you do?  Tell me about

13    the race?

14         A.    Again from the very beginning, okay, "I don't

15    want to -- I don't want to be any worse off than the DC

16    contract.  I need to match that contract.

17              "Okay.  What is it?  What am I matching?

18    What am I matching?"

19              And then every now and then he'd sort of go,

20    "Well, here's some numbers, some payments if you happen

21    to do a T shirt or you happen to do a toy or if you

22    happen to do a reprint or something."  And then I'd get

23    that information, okay, ask some follow-up questions

24    about it.

25              I think there were some initial payments made

1    upon some of that information.  And then -- and then as

2    the process went on I started sort of seeing

3    inconsistencies and so I asked sort of more questions

4    and as questions sort of were asked there those

5    inconsistencies became a bit of a problem.

6        Q.    What inconsistencies?

7        A.    A number of inconsistencies.  The

8    inconsistencies of the numbers or the calculations and

9    how he got there and what it was all relevant to and

10   what the definitions were; everything that comes from a

11   normal contract.

12       Q.    Can you give me some examples?

13       A.    Payments for, say, paperbacks; payments for a

14   toy; payments for characters whether they are in their

15   own books or not.  I mean, it's sort of a wide spectrum.

16       Q.    What inconsistency do you recall with regard

17   to payments for a trade paperback?

18       A.    I don't know specifically right now.  I'm

19   sure you're going to show me documents.  We can point

20   them out if you'd like later on.

21       Q.    But do you have any?  It sounds to me like

22   you're referring to inconsistencies in conversations and

23   I'm trying to see what you recall from conversations.

24       A.    Right.  Well, in conversations Neil giving a

25   number saying that he would get X amount of money for --

1    for a DC job and then later on as I'd get through it

2    didn't sound right to me now given that I had worked at

3    DC.

4           So I'd go, "Well, just sort of be clear here.

5    Angela, there's two of us created that character, so

6    does that number get divided in two?

7           "Oh, yes.  Oh, yes.  My mistake.  Yes, you're

8    right, that number does get divided.  Oops."

9    Q.    When was that conversation?

10   A.    Those conversations unfortunately were pretty

11   much ongoing from about late '93 on.

12   Q.    The conversation with regard to Angela being

13   divided in two?

14   A.    No.  Those conversations in general.

15   Q.    Okay.  But what I'm trying to do is focus

16   on --

17   A.    I don't remember the specific conversation

18   that I'm speaking about.

19   Q.    Do you remember any specific conversations in

20   this regard?

21   A.    Just asking him again what are the numbers,

22   is there any chance we are ever going to see these

23   contracts?  You know, taking him for his word, making

24   the payments, seeing this inconsistency later, asking

25   some questions.  And then just sort of going, I've got a

1    bit of a moving target here.  It's tough for me to sort

2    of nail what it is I'm supposed to be matching when it

3    seems to be moving.  It's elusive to me.

4        Q.    And again in what specific context did these

5    come up?

6        A.    Conversations over the phone for the most

7    part.

8        Q.    Okay.  But with regard to what types of

9    rights?

10           For instance, did you have such conversations

11   concerning trade paperbacks?

12       A.    Right, the paperbacks.

13       Q.    All right.  And what did Neil say he got paid

14   from DC, say, with regard to the Angela paperback?

15       A.    I don't recall the number.  I would have

16   asked him, "How do you get paid," and then he would

17   either have given it to me verbally or sent something to

18   me.

19       Q.    Okay.  And did something come to you that

20   caused you to question the veracity of that information?

21       A.    For Angela?  Not really.

22       Q.    Okay.  Not for Angela.  For what?

23       A.    For Medieval Spawn and Cog.

24       Q.    All right.  Tell me about the conversations

25   with Medieval Spawn that caused you to question the

1    veracity of what Neil told you?

2        A.    Medieval Spawn is what I would define as a

3    derivative character of something that preexisted.  So,

4    there was a Spawn.  There's a mytho -- there was sort of

5    a history there and then you do a slight variation on

6    the ongoing theme that preexisted.

7            According to Neil, no matter how slight that

8    is that he is entitled to an accounting price, if you

9    will, to derivative characters.  It didn't seem right to

10    me, but again I was taking Neil at his word at that

11    time.

12        Q.    And so I guess what I'd like is as best you

13    can recall the conversation you are referring to

14    concerning Neil's position with regard to what he was

15    entitled to for Medieval Spawn?

16        A.    It was more that he was entitled to any

17    ownership --

18        Q.    Okay.

19        A.    -- of any of it.  It was awkward that he

20    would have any stake.  And I'm saying accounting

21    ownership, not to actual accounting ownership in DC

22    comic books for doing a derivative of an existing

23    character.

24            He assured me that that was indeed correct

25    and then supplied numbers to me either written or

1    verbally and again subsequent payments were made based

2    upon that information.

3        Q.    Okay.  What did he -- what did he tell you?

4    What numbers did he supply?

5        A.    I don't recall the specific numbers.

6              I was -- I was more transfixed on that there

7    would be any numbers attached to a derivative character.

8        Q.    So it was your view that -- it was your

9    thought that he wasn't entitled to anything for Medieval

10   Spawn, is that correct?

11       A.    Well, I was surprised that his answer was,

12   "With my DC contract, yes, indeed."  That's true again

13   that I had told him I'd match the contract.  I -- I go,

14   "Okay."  You know, I don't have to like it, but okay.

15       Q.    All right.  Based on your experience with DC

16   Comics, had you had any insights as to how DC treated

17   rights to derivative characters?

18       A.    Infinity, Incorporated, the book I did, was

19   essentially made up of the sons and daughters of

20   existing superheros, and so some of those used the same

21   names and costume designs and things like that and I

22   was -- I was never entitled to anything.

23       Q.    Of course.  But that was on a work for hire

24   basis, correct?

25       A.    Correct.

1    Q.    You never told Neil that in your view his

2    work in connection with, you know, writing for Image was

3    on a work for hire basis, correct?

4    A.    Only in -- only in the confines of his DC

5    contract.

6    Q.    What do you mean by that?

7    A.    That he goes, "Match my DC contract."  So I

8    assumed all these years DC is a work for hire contract,

9    so given that that's what he continued to point at, then

10   we can all sort of assume that all those rights are sort

11   of transferred now into this new job.

12   Q.    And did you have any specific discussions

13   with Neil in that regard?

14   A.    Again only in, you know, "I want you to match

15   the terms of the DC contract."

16   Q.    With regard to the other three guest writers

17   in Spawn 8 through 11, did you ever have any

18   conversations with them concerning whether their work

19   for you was on a work for hire basis?

20   A.    Not specifically.

21   Q.    Generally?

22   A.    Not -- I don't recall.

23   Q.    Okay.  Do you recall anything in that regard?

24   A.    No.

25   Q.    Did you have any discussions in connection

1    with the Cogliostro character as to how Neil -- what

2    Neil's rights would be under his DC contract?

3         A.    Cogliostro?  Neil would supply me with

4    numbers, but he -- and Cogliostro was always a bit of a

5    bone of contention.

6         Q.    Why was that?

7         A.    Because Neil thought we co-created it and I

8    was more of the mind that I -- I gave it to him, given

9    that he -- he was very sensitive when he was going to

10   write the script as to what I wanted in it, what I would

11   like to see in it, if there was anything I wanted to

12   add, if I had any characters coming through or anything.

13            We just, you know -- so I told him about this

14   Moses character I was going to bring in there.  He said,

15   "Oh, I'll help you bring it in there."  So I didn't

16   consider that to be the same creative process that's

17   something like Angela.

18        Q.    But did you view that Neil had been part of

19   the creative process for Cogliostro?

20        A.    Well, maybe, maybe in a slight -- maybe in a

21   slight way because I ignored what he actually wrote

22   thereafter and essentially reinvented the guy

23   afterwards, so --

24        Q.    How did you reinvent the guy?

25        A.    I thought he was a little too corny, a little

1  blase faire, a little sort of cooky.  He's a little bit

2  of a drunk bum who knew something, where Cog, the

3  anti-Moses, is a father figure, should be sort of a like

4  a Harvard graduate.  He shouldn't be a buffoon to some

5  extent.  He should actually be a guy who's actually like

6  a professor that can actually correct you at any given

7  time and sort of use big words and sort of give, be like

8  an overseer of all the stories.

9        And so what this character was that I wanted

10 never matched my expectations and so I sort of ignored

11 it and moved on and just went in my direction.

12    Q.    And what was -- was that direction sort of

13 making him smarter it sounds like what you're saying?

14    A.    Changing his costume, changing when he

15 appears, when he doesn't appear, his mannerisms, the way

16 he talks, the way he speaks, what his agenda is.  You

17 know, where he comes from, his whole back history, you

18 know, how he relates to Spawn, how he relates to heaven

19 and the earth and the curse and everything else; I added

20 all that.

21    Q.    So that wasn't a change so much as an

22 addition, correct?

23    A.    No.  That was a change.

24    Q.    Okay.  Describe how it was a change, how it

25 was different from what Neil wrote?

1    A.    Well, again let's be clear that Neil wrote

2    after having conversations with me as to how this

3    character would speak and what he was about, so let's

4    just get that on the record.

5    Q.    But what I'm talking about, Spawn Issue 9

6    introduces a character named Cogliostro, correct?

7    A.    Right.

8    Q.    And it's in the script for Spawn Issue 9

9    which Neil wrote, correct?

10    A.    Correct.

11    Q.    And then I believe you indicated that, and

12    there was a -- you used the character Cogliostro in

13    subsequent works relating to Spawn, correct?

14    A.    Correct.

15    Q.    And I understood what you were saying earlier

16    that the character that you subsequently used you

17    changed significantly from the Cogliostro character that

18    appears in Spawn Issue 9, is that correct?

19    A.    Right.

20    Q.    Okay.  What were the changes?

21    A.    His mannerisms, his body appearance, his

22    physical appearance, whether he would carry animals with

23    him or not, what he spoke of, why he spoke of it.

24    Q.    And I guess -- I apologize for interrupting,

25    but I guess what I'd like is specifics.  What mannerisms

1    did he have and how did you change them, for instance?

2         A.    Instead of -- instead of being a sort of a

3    bum whose concern was getting a 6-pack of Ripple wine,

4    his concern was to be the father image, to actually

5    bring knowledge to people, not to necessarily worry

6    about his own personal drunkard at that stage and to

7    bring insight specifically to the characters around him

8    and more specifically to Spawn and guide him along the

9    path through the 120 issues I've done so far.

10        Q.    Did Cogliostro bring insight to Spawn in

11   Spawn Issue 9?

12        A.    Not -- not any in the way that I wanted, no.

13        Q.    Okay.  And what was different about the way

14   you wanted him to do it than it was done in Spawn Issue

15   9?

16        A.    Again just that he seemed like a high school

17   graduate instead of a Harvard graduate.  So make your

18   inferences from what that means.

19        Q.    Okay.  You wanted him smarter?

20        A.    Right.

21        Q.    What other changes did you make?  And again

22   I'm looking at specifics rather than generalities.

23        A.    I wanted him to be more -- again Moses, Moses

24   coming down the hill with the tablets.  It should be

25   revered when you see him.  It shouldn't be a drunk, if

1    you will, looking for the next bottle of whiskey, which

2    is sort of what he was in Issue Number 9.  So I was

3    looking for grandeur and I didn't feel like I got

4    grandeur.

5        Q.    Okay.  So you made him grander, correct?

6        A.    Correct.

7        Q.    Okay.  What other changes did you make?

8        A.    Grandeur is a big word, so that qualifies a

9    lot.  So I'll leave it at that.

10        Q.    Why don't you describe the ways you made him

11    grander then?

12            MR. KAHN:  Let me just at least for the

13    record object.  I think it's been asked and answered --

14            THE WITNESS:  Yes, I thought so.

15            MR. KAHN:  -- if you look at his transcript

16    in the last ten minutes, Todd's efforts that he made to

17    change the character.

18            MR. ARNTSEN:  That's what I'm trying to find

19    out.  I don't think we are going over the same ground.

20    I think we are getting some detail, turning general

21    statements into specific statements.

22            MR. KAHN:  Maybe so.  And the record will

23    speak for itself.  I just want to save the record.

24    BY MR. ARNTSEN:

25        Q.    How did you go about making him grander?

1       A.    Making him smarter, giving considerations to

2   when he appeared, giving him reasons for why he

3   appeared, giving him insight into the mechanisms of sort

4   of all that was going around Spawn, giving him sort of

5   quasi-mystical powers, making him a sort of former Spawn

6   that knew how sort of the curse worked, if you will.

7   Just some examples there.

8       Q.    Okay.  And Cogliostro appeared in a number of

9   Spawn issues?

10      A.    Yeah.  Later on in the run, right.

11      Q.    During what period of time roughly or what

12  issue range, number range?

13      A.    He appears off and on probably starting

14  around the early 20s onward or something.  I don't know

15  specific issues, but he's throughout a lot of the

16  issues.

17      Q.    A recurring character?

18      A.    Right.

19      Q.    And the first issue he was in was Issue 9,

20  correct?

21      A.    Yes.

22      Q.    Now, at some point in time you changed his

23  name, correct?

24      A.    Right.

25      Q.    Tell me the process that resulted in that?

1    A.    Well, I think -- I think -- I think the first

2    change was just a spelling mistake, you know.

3        We give scripts to writers or to letterers

4    and sometimes they work late and they don't pay

5    attention and I don't know.  I think -- I think Neil

6    might have had Cagliostro and it got changed to

7    Cogliostro.

8        And again it was sort of a tongue twister

9    sort of name.  At some point you get stuck with what the

10    letterer gives you and that was the new name, right, and

11    then later on as we sort of changed him.  We had given

12    him a history.  We had to give him sort of a full name.

13    Cogliostro is just like Madonna.  There's no sort of

14    name there.  So we had to give him a sort of a full

15    identity and I think later on we gave him sort of a full

16    blown name that went with it instead of just Cog,

17    Cogliostro.

18    Q.    Well, wasn't his initial name called Nicholas

19    Cogliostro?

20    A.    I don't know what his first name was.

21    Q.    What first name did you give him?

22    A.    I don't know.

23    Q.    You just recall giving him a first name?

24    A.    Right.

25    Q.    So what discussions did you have with Neil

1  with regard to payment for Cogliostro in the context of

2  Neil's DC contract?

3      A.    Just trying to figure out where Cog would

4  fall in all of this given that he didn't seem to be

5  Angela.  So, you know, it was tough for me to sort of

6  use those same numbers as -- as sort of the value of

7  that character, if you will.

8      Q.    So what you were disagreeing with is the

9  amount of compensation Neil was entitled to for

10  subsequent uses of Cogliostro?

11      A.    Well, the definition of who created that

12  character more specifically.

13      Q.    So, was it your position that Neil wasn't

14  entitled to any additional compensation?

15      A.    Well, not really.  Again I thought -- I

16  thought that again using that he said he had numbers

17  that were put in there no matter what you sort of

18  create, that he was there in Issue Number 9 and although

19  I changed sort of whatever, it would be a smaller number

20  because it wasn't the same process we went through with

21  Angela.

22      Q.    Did you and Neil ever agree on that number?

23      A.    No.

24      Q.    Did you ever make payments to Neil for your

25  uses of the Cogliostro character?

1      A.      I don't know specifically.

2      Q.      Did you ever make payments to Neil for your

3   uses of the Medieval Spawn character?

4      A.      I believe there were some payments made for

5   that.

6      Q.      Was Medieval Spawn in any subsequent Spawn

7   issues after Issue 9?

8      A.      Yes, I believe so.

9      Q.      Do you recall approximately how many?

10      A.      Maybe two to four or something.

11      Q.      Who came up with the Medieval Spawn name?

12      A.      I did.

13      Q.      And was Medieval Spawn shown or was he made

14   into action figures?

15      A.      Right.

16      Q.      Fairly successful action figures?

17      A.      It's a relative term, so --

18      Q.      Can you answer?

19      A.      Well, define "successful."

20      Q.      Within the context of the various characters

21   you made into action figures, how did Medieval Spawn

22   come out?

23      A.      He did pretty good again as a Spawn.

24   Generally in toys the people like the main characters,

25   so they like Spawn.

1    Q.    Cogliostro had a fairly significant role in

2    the TV series, correct?

3    A.    Right.

4    Q.    Was Cogliostro in the movie?

5    A.    Yes.

6    Q.    Was Medieval Spawn in the movie?

7    A.    No.

8    Q.    Was Angela in the movie?

9    A.    Not as a -- not as it reflected in what she

10   was in the comic book, so I would say no.

11   Q.    Was there a character named Angela in the

12   movie?

13   A.    Not I.D.

14   Q.    I mean, I was just trying to understand how

15   your answer is different from saying, "No, Angela was

16   not in the movie."

17        What was in the movie that might have been

18   sort of like Angela?

19   A.    We put a -- we put a redhead, a redhead in

20   the background at a party as sort of a bit of an

21   in-joke, if you will.

22   Q.    Okay.  That was it?

23   A.    Right.

24   Q.    Now, at some point in time did you talk with

25   anyone at DC concerning the terms of Neil's DC contract?

1    A.    Not -- not specific to Neil's contract per

2  se.

3    Q.    Okay.  At some point in time did you talk

4  with anyone at DC about how DC Comics handled derivative

5  characters?

6    A.    Right.

7    Q.    Who did you talk to when?

8    A.    A lady by the name of Terri Cunningham, and

9  that would have probably been maybe, I'm guessing, maybe

10  in '96 some time.

11    Q.    Was it a phone call?

12    A.    Yes.

13    Q.    Did you call her or did she call you?

14    A.    No, I called her.

15    Q.    Tell me about the conversation?

16    A.    Just I wanted, you know, I knew she wasn't

17  able to speak about anybody's contract specifically, so

18  I wouldn't put her in that position.  So I wanted to

19  just sort of talk in generalities, you know.

20         "Do you give moneys for derivative characters

21  that are preexisting?  And if you do, how does any of

22  that work?"

23         And she explained to me that DC doesn't do

24  that.  They don't.  If you do Medieval Superman you are

25  entitled to nothing.  So, if you do Medieval Batman you

1    are entitled to nothing.

2        Q.    Were those her words with regard to Medieval

3    Superman, Medieval Batman?

4        A.    No.  I go, "Let me give you an example.  If I

5    did Aqua -- if I did Aqua Batman would I get anything?

6    If I did Caveman Superman, if I did a derivative with

7    any sort of name, you know, Cowboy Billy Superman, would

8    I get -- would I get anything?"

9            And she was like, "No, no.  We own Superman,

10   so -- we own Batman."

11       Q.    Did she explain any circumstances in which DC

12   would pay creative payments for derivative characters?

13       A.    If you're going into -- she didn't go into it

14   in any detail, no.

15       Q.    But I guess what I'm saying is was it just a

16   flat out "if it's a derivative of one of our characters

17   we don't pay anything" or was there some nuance?

18       A.    I think she mentioned later that if there was

19   an extensive reworking, if somebody took a name of

20   something and reworked it, and at that point I believe

21   potentially Neil's Sandman actually became an example --

22   she didn't know I was phoning on behalf of Neil -- that

23   there was a character from the '40s called Sandman that

24   had that name and then the character that Neil wrote had

25   that name but nobody would look at those two and look at

1    their history and what they were about and the

2    background, nobody would make a confusion of them other

3    than they both sort of had the same name. And so in

4    that case, although it was the same name of a character,

5    as long as there was an extensive reworking of something

6    and it appeared to be a new character, then -- then that

7    was a -- they had a few examples of that within the

8    confines of their stables.

9        Q.    And was this all within the same

10   conversation?

11       A.    Right.

12       Q.    And did you specifically ask anyone at DC

13   about any provisions in Neil's agreements with DC with

14   regard to derivative characters?

15       A.    No. Because again I knew that people weren't

16   supposed to talk about other people's contracts and I

17   wouldn't put them into that position.

18       Q.    With regard to DC's treatment of derivative

19   characters generally, did you speak with anyone else at

20   DC other than Terri Cunningham?

21       A.    No. Terri was the person who did most of the

22   contracts, so it eventually fell on her desk to finalize

23   most of the contracts.

24       Q.    And did you have more than one conversation

25   with Terri Cunningham on this subject?

1        A.      Of derivative characters?

2        Q.      Correct.

3        A.      No.    That was -- that was the gist of that.

4        Q.      So, if I understand the substance of what she

5    told you, it's that DC would not pay for derivative

6    characters unless there was an extensive reworking of

7    the character, is that correct?

8        A.      Right.

9        Q.      Now, at some point in time some contention

10    arose between you and Neil concerning what Neil was

11    being paid for the work he had done on the Spawn and

12    Angela comics, correct?

13        A.      Yes.    We -- we -- we didn't see eye to eye on

14    some issues, right.

15        Q.      Okay.    When did that first come up?

16        A.      I don't know.    Maybe -- maybe '94 or

17    something.

18        Q.      In what context, do you recall?

19        A.      I think it was -- I think it was -- it was

20    either in -- in the context of a toy maybe or a foreign

21    reprint possibly.

22        Q.      Did you ever have any conversations with Neil

23    concerning, you know, creative credit for what Neil had

24    done or was going to do?

25        A.      Only -- only in regards to his contract and

1   in some of the conversation we had going back and forth
2   over those years.
3       Q.   Okay.  Tell me what discussions you had with
4   him in that regard again with the idea of creative
5   credit and creator's rights generally in giving credit
6   to creators and that sort of subject?
7       A.   Again it was not necessarily for creative
8   rights at -- "This is what I get at DC."  So again if
9   you create something and somebody maybe appears
10  subsequently in their name thing, they sometimes put a
11  vanity credit some place there to sort of acknowledge
12  somebody's time on something.
13      Q.   Did you ever talk to Neil about this in any
14  context other than Neil's DC contract?
15      A.   Yes.  We probably had ongoing conversation
16  about it.
17      Q.   Okay.  What types of conversations, again
18  putting aside --
19      A.   I don't recall the specifics.  I know that --
20  that my mind tells me that those were part of the
21  conversations, but I don't -- I don't recall
22  specifically.
23      Q.   Was one of the things Image was holding
24  itself out as is as a business that respected creators
25  rights perhaps more than the more established comic book

1  companies?

2    A.    Right.

3    Q.    And did you have those kinds of discussions

4  with Neil?

5    A.    Just clarify.  Who are you asking the

6  question to?  Are you asking it to Todd McFarlane the

7  head of a toy company, the head of publishing, part

8  owner of Image comic books or the individual?  So will

9  you ask your question and ask me which one of those

10  people you just asked the question to?

11   Q.    They are all sitting in front of me, so --

12   A.    But they each have a different agenda during

13  their day, a different task to accomplish during the

14  day.  I'm sure you do as a father and a lawyer.

15   Q.    Well, I guess what I do with regard to this,

16  any conversations you had with Neil in this regard, if

17  you could answer the question as such and say, "Well,

18  this was in my capacity as."

19   A.    Okay.

20   Q.    Such as, I think that makes a lot more

21  sense --

22   A.    Okay.

23   Q.    -- rather than go through and ask --

24   A.    Okay.

25   Q.    -- the same question six different times.

```
 1                    MR. KAHN:  Good idea.
 2                    THE WITNESS:  That's fine.
 3      BY MR. ARNTSEN:
 4           Q.    Are you comfortable proceeding that way?
 5           A.    Yes.
 6           Q.    And so feel free to put a preamble in.  You
 7      have to be clear; "This was in my capacity as blank."
 8           A.    Okay.  That's fair.
 9           Q.    Okay.  So what discussions did you have with
10      Neil with regard to this creator's rights issue putting
11      aside the, you know, "the same as my DC Comics" issue?
12           A.    As the head of Todd McFarlane Productions
13      who's the one requesting Neil to do art work, that
14      again, you know, asking him to come on board, help me
15      write a comic book and if, you know, you have any
16      special requests that go along with that then bring them
17      to the forefront and if I'm capable of delivering those
18      then and we come to an agreement, then we'll get there.
19           Q.    Do you recall any special requests that he
20      made in response to that offer?
21           A.    Not at the beginning.
22           Q.    Okay.  How about later on?
23           A.    Later he was concerned talking to me as the
24      head of Todd McFarlane Productions about how some of the
25      royalty would break down and, you know, how certain
```

1      things would be credited would be one way or another.

2          Q.     And what was your response?

3          A.     "Well, what would you like, Neil?"

4          Q.     Okay.  And did he tell you what he'd like?

5          A.     Okay.

6          Q.     And what was your response?

7          A.     "Well, okay.  We can sort all this out, come

8      to some agreement with all of this and we can move

9      forward and I'll be happy."

10         Q.     Okay.  And were you able to sort it out and

11     come to agreement on it?

12         A.     I'm going to guess because Neil is suing me

13     today that the answer is probably no.

14         Q.     Okay.  What areas weren't you able to come to

15     agreement on?

16         A.     You know, I'd say right now him and I

17     probably aren't satisfied on too many of them, so we

18     probably have a disagreement on most of it today.

19         Q.     And I guess really what I'm looking for are

20     the specific subjects of disagreement that you tried to

21     work through this in your capacity as head of Todd

22     McFarlane Productions and weren't able to.

23             And I'm not limiting it.  I'm just following

24     up on your answer that you gave as the head of Todd

25     McFarlane Productions.  If a different hat is

1    appropriate, put it on and tell me you're putting it on.

2        A.    Right.  Can I -- can I simplify this even

3    more?

4        Q.    Yes.

5        A.    Can we assume that if I don't say anything it

6    is as the head of Todd McFarlane Productions because

7    99.9 if not 100 percent of this is as Todd McFarlane

8    Productions.

9        Q.    Okay.

10       A.    So, unless I stipulate something different,

11   if I talk about myself I'm talking about myself as the

12   person running Todd McFarlane Productions.

13       Q.    Okay.  Because that was the position you were

14   in in the overwhelming majority of your interactions

15   with Neil Gaiman?

16       A.    Correct.

17       Q.    Okay.  That's fine.

18       A.    Okay.  So, excuse me.  So could you repeat

19   the question?

20            MR. KAHN:  The question had to do with the

21   areas of disagreement between -- specific areas that you

22   tried to reach agreement on but couldn't.

23   BY MR. ARNTSEN:

24       Q.    Right.  Right.

25       A.    Royalties and I think some credit lines.

1    Q.    Any other general areas?

2    A.    Well, I think including this case here

3    somebody's talking about copyrights now.

4    Q.    First talking about credit lines, what

5    disagreements do you recall arising between you and Neil

6    with regard to credit lines?

7    A.    Well, I wouldn't say it was a disagreement.

8    It was just again, you know, "If anything goes out that

9    I had done, can you make sure that my name is -- is

10   affixed to it some place, you know.  I'd hate to see

11   something and not have my name somewhere on it, so make

12   sure that you acknowledge my existence on this stuff."

13   Q.    And did you dispute that?

14   A.    Not really.

15   Q.    Okay.  So to the extent that didn't happen,

16   was it an oversight?

17   A.    Yes.  Probably.

18   Q.    Do you recall any situations where you did

19   not put or associate Neil's name with something he'd

20   created and did so deliberately?

21   A.    Well, the credit is determined by sort of the

22   extent of the use of the character.

23   Q.    Right.

24   A.    So again you can have a hundred characters in

25   a book, you know, and sort of consider all those to be

1    equal.  So, again it was the -- the credits due were

2    dependent upon the work that a person had done or the

3    extent of a credit, a character being used in a book,

4    and again there's varying sort of definitions as to how

5    you get to each one of those.

6          Q.    Well, for instance, Neil wrote a scene for

7    Spawn 26, correct?

8          A.    Right.

9          Q.    Did you give him credit for that?

10         A.    No.

11         Q.    Why not?

12         A.    He asked me not to.

13         Q.    He explicitly asked you not to?

14         A.    Yes.

15         Q.    And was that in a phone call?

16         A.    No.  I think that was actually in person.

17         Q.    Do you recall where this meeting was?

18         A.    If it was -- if it was in person it would

19    have been at one of the Oakland comic conventions and if

20    not, it would have been over the phone.

21         Q.    And as best you -- what can you recall as

22    best you can of this conversation in which he asked you

23    not to give him attribution for Spawn 26?

24         A.    We were talking at that point about the

25    Angela mini series.  Again both of us were satisfied

1   with the work and the end result of the publication of

2   Issue 9.  And so Neil requested to do more work.  I took

3   that as a sign that he was satisfied, asking me to do

4   more work.

5            And so we talked about another project.  The

6   one that he suggested, which was obvious, was to do an

7   Angela mini series.  So he began work on the Angela mini

8   series with Greg Capullo, the artist.

9            In my capacity as a writer in the confines of

10  my comic book, I -- I have a tendency to reference prior

11  issues or foreshadow things that are coming.  The trick

12  in comic books is you put an asterisk in a word balloon,

13  and if you've read comic books then you know that if it

14  goes like sort of a footnote you go to it and it says,

15  you know, "See last issue."  See the upcoming issue, see

16  ten issues ago.  I mean, there's always a footnote

17  there.

18           I had explained to Neil that we were going to

19  try to do something to sort of, you know, get some of

20  the readers from Spawn to sort of pay attention to the

21  Angela mini series.  And so I go, "You know, sort of

22  write a lob, if you will, an asterisk, if you will, into

23  the mini series."

24           Neil requested since she was doing a thing,

25  "Well, could I write that?

1        "No."  And I was like, "Well, that's okay.

2   It's my book I can write it.  Don't worry about it."

3        And he said, "No, no, no.  I feel part of

4   this mini series and, you know, can I write it and you

5   can use it if you want, and if you like it, don't worry

6   about it.  Just let me sort of do it.  You don't have to

7   pay me.  You don't have to give me any credit.  I don't

8   have to do anything.  I just sort of have an attachment

9   here to Angela."

10       And I said, "Okay.  Cool.  You want to do a

11  couple of pages for me?"  And he wrote a couple of pages

12  and we put them in there and again sort of living up to

13  his request.

14       And he sort of didn't want to interfere with

15  my continuity by making it look like he was putting his

16  thumbprint on it.

17       And those pages at the end of it or somewhere

18  within it have an asterisk that say look for the

19  upcoming Angela mini series that was either out on the

20  stands just at that time or just coming out or they were

21  pretty close.  So you were able to give it a little bit

22  of a bump, if you will.

23       Q.    Did you have any creative involvement in the

24  Angela mini series?

25       A.    Not in the traditional sense I would with

1   Spawn.

2       Q.    In what sense did you have creative

3   involvement with the Angela mini series?

4       A.    Just having conversations with Neil to see

5   what he wanted to do, looking over the scripts, looking

6   at the pencils, looking at the inks.  I mean, I'd become

7   essentially the editor at this point and just looking at

8   all the steps of the book and sort of going through the

9   plan, if you will.

10      Q.    Turning back to the Spawn 26 again, did Neil

11  expressly ask that you not give to him credit for that?

12      A.    He says, "You don't have to give me credit."

13      Q.    Okay.  As best you can recall, those were his

14  words?

15      A.    Right.

16      Q.    Did any issue come up with regard to credit

17  lines in connection with the Medieval Spawn or

18  Cogliostro characters between you and Neil?

19      A.    Not that I recall.

20      Q.    Okay.

21      A.    Maybe -- maybe in a toy comic book one time.

22      Q.    What do you recall in that regard?

23      A.    That if he wanted me to put a "created by" or

24  something.  I don't recall if I did or didn't.  But the

25  first toy came with a comic book.

1    Q.    Excuse me?

2    A.    The first toy of -- that I put out came with

3    comic books.

4    Q.    Okay.

5    A.    So there was a comic book, Medieval Spawn.

6    So I don't recall if we put any by-line in there or not.

7    Q.    And do you recall that Neil asked for credit

8    with that?

9    A.    Right.  Saying that again you'd get this with

10   DC, derivative characters and creative stuff.  So I

11   said, "Okay.  I'll put it in there, yes."

12   Q.    And so you did?

13   A.    I don't know.  So we'd have to look at that

14   comic book.

15   Q.    Okay.  And what was the comic book?

16   A.    It was -- there was -- you get the action

17   figure and then instead of it just being cardboard you

18   rip and throw away in the garbage, we inserted a comic

19   book in there.

20   Q.    Okay.  And what was this comic book called?

21   A.    I think it was just called Spawn.

22   Q.    Okay.

23   A.    I don't know.  I think that's what the cover

24   said.

25   Q.    Do you ever recall any disputes arising

1    between you and Neil associated with credit lines with

2    regard to Cogliostro?

3         A.    Not that I recall.

4         Q.    What dispute arose between you and Neil with

5    regard to copyrights prior to the filing of this

6    lawsuit?

7         A.    None.

8         Q.    Okay.  So we covered the disputes that arose

9    between you and Neil other than those that relate to

10   royalties?

11        A.    What was the question?

12        Q.    Have we covered the disputes, that arose

13   between you and Neil other than disputes that relate to

14   royalties?

15             And what I mean by that, we have discussed

16   disputes that have related to royalties, but I just want

17   to make sure that we have fully covered any other kind

18   of disputes and now we'll focus on the royalty disputes.

19        A.    No, I think it was mostly the focus of our

20   disagreements, unfortunately.

21        Q.    What disagreements did you have?  And again

22   what I'd like you to do is just sort of run through them

23   chronologically and don't repeat what you've testified

24   to already, but disputes you had with regard to

25   royalties with Neil.

1      A.    I -- I think that it was -- they were just

2  sort of ongoing conversations of, you know, "If you're

3  going to do this, then how would I get paid?"  And we

4  were always trying to figure out how to make those

5  payments.

6            And again I'd go, "How do you want to be

7  paid?"  And then he would give me those terms, you know,

8  based on the DC information.  And in some instances we

9  applied them and sometimes, you know, again there was

10 inconsistencies or disagreement that we couldn't come

11 to.  So, sometimes we did it, sometimes we didn't.

12     Q.    And what would happen when you didn't?

13     A.    I'd usually get a phone call from Neil.

14     Q.    If you didn't agree with his view, would you

15 pay him something or would you pay him nothing?

16     A.    I think every -- every instance sort of had

17 it's own unique moment depending on where we were in the

18 relationship at that given time.

19     Q.    What I'd like to do is just kind of work

20 through chronologically the disputes that arose over

21 royalties as best you can.  What was the first problem

22 that arose?

23     A.    When did it occur you say?

24            MR. KAHN:  What was the first problem?

25            MR. ARNTSEN:  Yes.

1    Q.    I think you testified earlier you thought

2  that disputes first started coming up around '94

3  sometime and I'm just trying to get a chronology of

4  them.

5    A.    It may have been -- and I wouldn't -- in this

6  case I wouldn't use the word "dispute."  It would just

7  be the conversation coming up about, "Hey, there's now a

8  toy and so do I get paid?  Am I going to get any money

9  from that toy?"

10   Q.    Is that the Angela toy?

11   A.    No.  This was the Medieval Spawn toy.

12   Q.    Okay.  And how was that resolved?

13   A.    I asked him how he'd get paid from a

14  derivative character with toy merchandising and he must

15  have given me a formula because I know some payment was

16  made early on.

17   Q.    Do you recall whether you paid him according

18  to the formula he gave you or --

19   A.    Yes.

20   Q.    -- or on some other basis?

21   A.    No.  I think it was on the formula he gave

22  me.

23   Q.    Okay.  That was on the Medieval Spawn II?

24   A.    Right.

25   Q.    Okay.  What was to the best you recall the

1    next dispute that arose?

2       A.    I wouldn't use "dispute," you know.    Inquiry.

3       Q.    Inquiry.

4       A.    That's a better word.

5             Maybe -- maybe the Angela figure came out

6    maybe in the next series.

7       Q.    Okay.    And how was that resolved?

8       A.    Pretty much the same way.    You know, "How

9    would you get paid for a new character and what's the

10   formula?"    And then I think there may have been the

11   payment based on that conversation and those formulas.

12      Q.    So, as best you can recall, did you pay him

13   based on the formula he gave to you or on some other

14   basis?

15      A.    No, I think on the ones he gave to me.

16      Q.    Okay.    And that was for the first Angela toy?

17      A.    Yes.

18      Q.    Okay.    Were there more than one Angela toy?

19      A.    There was a 13 inch Angela figure later on.

20   Maybe a year later or something.

21      Q.    Okay.    Did you pay Neil for that on the same

22   formula?

23      A.    I don't know the specifics of that, but I

24   believe a payment was made for -- for a 13 inch toy on

25   it.

```
 1        Q.    And on the same formula that Neil gave to
 2   you?
 3        A.    I don't know.  So it would depend on when we
 4   paid it, so --
 5        Q.    Was there a Cosmic Angela figure?
 6        A.    Right.
 7        Q.    Is that what you're referring to?
 8        A.    No.
 9        Q.    Or is that a third one?
10        A.    No.  The 13 inch Angela.
11        Q.    Okay?
12        A.    That was just sort of a bigger version of the
13   first one.
14        Q.    Were there other Angela toys?
15        A.    No.  Those were the only two.
16        Q.    No Cosmic Angela?
17        A.    Oh, that would be a derivative of Angela,
18   wouldn't it?
19        Q.    Yes.  And did you pay Neil anything for that?
20        A.    No.  Because -- because -- I don't know if
21   that's true.  I would have to say I don't know.
22        Q.    You don't know if you paid Neil anything for
23   that?
24        A.    No.
25              MR. KAHN:  Let me at least note we produced
```

1    and Neil has it an actual royalty sheet in '97 that

2    shows calculations based on something for all of these

3    different items.

4                MR. ARNTSEN:  Uh-huh.

5                MR. KAHN:  And if you want to -- if he

6    doesn't remember, you can show him that.

7                MR. ARNTSEN:  No.  Oh, no.  I understand

8    that.

9        Q.    Were there any other derivative Angela toys?

10       A.    I don't think so.

11       Q.    Okay.  There's a Red Angela or --

12       A.    Red Angela.  There was a Red Angela, right,

13   right.

14       Q.    Did you pay Neil for that, do you know?

15       A.    I don't know.

16       Q.    Okay.  Were there any Cogliostro toys?

17       A.    One.

18       Q.    Did you pay Neil for that?

19       A.    I don't know.

20       Q.    Do you recall -- do you recall Neil making an

21   inquiry about that?

22       A.    Yes.

23       Q.    What do you recall in that regard?

24       A.    "How -- how am I going to get paid on this?"

25   Okay.  Remember, we have sort of a slight variation on

1    like where Cog stands in all this.  And so Cog might

2    have -- might have been one of those formulas that may

3    or may not have made sense to both of us collectively,

4    so I don't know if we paid on Cog one way or the other.

5        Q.    So you may have asked -- he may have and

6    asked and you said, "Well, we disagree on this" and that

7    was where it was left?

8        A.    Yes.  I don't recall.

9        Q.    Okay.  Have we covered as best we can your

10   conversation, your discussions about it?

11       A.    We are going chronologically now, right?

12            MR. KAHN:  He's referring just to this

13   Cogliostro toy.

14            THE WITNESS:  Oh, I see.

15            He may have brought it up in subsequent

16   conversations.

17   BY MR. ARNTSEN:

18       Q.    Okay.  Do you have any specific recollection

19   of that?

20       A.    No.

21       Q.    Okay.  What was -- so now what we have --

22   have we covered the inquiries relating to toys or are

23   there some more?

24       A.    No.  I think that's -- I think that covers

25   most of it.

1    Q.    We sort of started chronologically and then

2    we sort of went to subject matter.

3          Now, going back to chronologically, what

4    other inquiries or disputes arose?

5    A.    Specific to what now?

6    Q.    To -- with regard to royalty payments for

7    Neil.  I think we've been talking about toys so far.

8    A.    So another category outside of toys?

9    Q.    Yes.  Any other disputes in any other

10   categories?

11   A.    Well, inquiries.  Disputes, I don't know if

12   we are at a full fledged dispute at this point.

13   Q.    Inquiries.

14   A.    We got to dispute eventually.

15   Q.    Yes.

16   A.    I think that through the confines of

17   licensing some of the Spawn products there were trading

18   cards or odds and ends, things that were -- that were

19   not comic books that every now and then he needed to ask

20   about or he'd see or we'd talk about or something.

21   Q.    And how were those resolved?

22   A.    I don't know.  Like I said, sometimes there

23   was payments and sometimes there weren't, so, you know,

24   somebody would have to show me paperwork and then I'll

25   be able to tell you how they were solved.  I don't know

1    how every conversation was solved or not solved.

2        Q.    Okay.

3        A.    Some were and some weren't.

4        Q.    Okay.  Did any issues occur -- inquiries with

5    regard to royalty payments for reprints?

6        A.    Yes, I believe so.

7        Q.    Okay.  What do you recall in that regard?

8        A.    Well, again the conversations are becoming a

9    little repetitive at this point.  It's just insert blank

10   into, you know.  "Oh, Todd, you know, how is it going to

11   work for this product?"  And so insert whatever product

12   you want, toy, comic books, trade paperbacks, insert

13   whatever you want.

14             "And so how do you think it should be

15   solved," you know.  Well, again, you know, most of the

16   time we are talking about the DC contracts.  "Well, how

17   does it work?  Give me the numbers."  And we were trying

18   to work from those numbers.

19             Just again as time went by those numbers at

20   times either began to move or given that we were

21   starting to get into not specific conversations but

22   again we were starting to get into sort of bigger

23   generality of our not seeing eye to eye that we were

24   starting to head towards not worrying about solving

25   individual problems.  Let's just see if some day we can

1   actually solve the big enchilada as a whole. And so I

2   don't know if those inquiries were tied to a specific

3   need or an overall need.

4       Q.    So at some point in time did you sort of

5   refocus your efforts from solving -- from dealing with

6   specific inquiries to saying, "Look, can we reach a

7   global resolution of these issues so that we can stop

8   squabbling over them?"

9       A.    Yes, I think so.

10      Q.    Okay. How did that come about?

11      A.    How did that come about?

12      Q.    Yes.

13      A.    I'm getting tired of Neil phoning all the

14  time really, so it's like, you know, and there's only

15  one way to keep him quiet; just sort of come to some

16  resolution of what it is he keeps phoning about.

17      Q.    Okay. So how did you go about trying to

18  accomplish that?

19      A.    You know, I think initially Neil and I may

20  have had some conversations together. Given that over

21  time that didn't really solve the dispute, then Larry

22  Marder got brought into it sort of. I think we were

23  hoping if we put somebody between the two of us it would

24  be beneficial to somebody to come in there looking at

25  the two boys and sort of going, "There's a way we can

1    sort of figure this out."

2         So Larry became involved.  Later on even with

3    Larry in there, he wasn't able to sort of crack that nut

4    and so it went back to sort of Neil and I sort of going

5    at it again, if you will, and trying to sort of come to

6    some resolution.

7    Q.    How did it -- who got Larry involved, you or

8    Neil?

9    A.    I don't know.  I probably -- I'd probably say

10   I may have suggested it possibly, yes.

11   Q.    Okay.  And what generally was the framework

12   of the deal you were trying to work out?

13   A.    With Neil at that time?

14   Q.    Yes.

15   A.    Oh, that actually was the question of the

16   day, what was it we were actually all talking about

17   because we couldn't seem to get a handle on it.

18        So Larry's task was to sort of go, "What is

19   it that you think is the problem here, Neil?  What are

20   your concerns?  What are your concerns, Todd?  Is there

21   some place that we can find common ground?"  And then

22   eventually sort of plow our way through it.  So I think

23   that was sort of the bigger task as to what are we even

24   talking about here.

25   Q.    And what were your concerns?

1    A.    What were my concerns?  Wanting more than

2  anything else to have Spawn lock, stock and barrel.

3  Have my baby back whole.  Not have a sliver of it

4  existing some place that I somehow can't control.

5    Q.    All right.  Any other concerns?

6    A.    Having again control over Cogliostro, who I

7  felt was a character that I for all intents and purposes

8  fed to Neil.

9    And then Angela, I sort of understood Angela.

10  I understood Angela.  I don't think Angela in theory was

11  much of a -- of a conflict really other than accounting,

12  but the theory I don't think was ever a problem.

13    Q.    And what was the theory?

14    A.    That within the confines of doing work on a

15  comic book that if somebody creates a new character that

16  is used subsequently that there's certain entitlements

17  to accounting rights.  Not intellectual rights but

18  accounting rights based on the usage, dependent upon

19  what company you're working for or not working for.  So

20  I tried to use some of that.  So I've been involved in

21  that at Marvel and DC.

22    Q.    Who in your view had the intellectual rights

23  to Angela?

24    A.    I did.

25    Q.    And based on what?

1        A.    Based on Neil saying, "Could you match my DC

2   contract?" which maybe was a bad assumption.  I guess

3   we'll find out later.  I'm betting that there's no

4   contract out there in which they give the trademarks or

5   copyrights to the individual free-lancers, and given

6   that he wanted me to match the contract, I bet you

7   paragraph one says, "This is a work for hire contract."

8               (Whereupon, a short recess was then had at

9               4:26 p.m. until 4:30 p.m.)

10  BY MR. ARNTSEN:

11       Q.    So we are talking about the process where you

12  and Neil are trying to work out a sort of global

13  resolution, correct?

14       A.    Correct.  All right.

15       Q.    And initially Larry Marder is involved in

16  that in trying to mediate a deal, correct?

17       A.    I wouldn't use "initially," but he comes into

18  the process.

19       Q.    He comes into the process.  And your

20  primary -- your first concern was getting complete

21  control over Medieval Spawn, correct?

22       A.    Right.

23       Q.    And you also wanted control over Cogliostro,

24  correct?

25       A.    Right.

1    Q.    And in your view kind of, if I understand

2    correctly, you didn't view any real conceptual

3    disagreement between you and Neil with regard to rights

4    to Angela, is that correct?

5    A.    Right generally.

6    Q.    I mean, you have to work out the specific

7    accounting issues?

8    A.    Right.  The devil is in the details.

9    Q.    Right.  But in general terms you thought that

10   that was probably --

11   A.    Yes.

12   Q.    Okay.  And then it was just an issue of

13   accounting issues:  One, past payments and, two, basis

14   for future payments, correct?

15   A.    Right.

16   Q.    Any other issues?

17   A.    In regards to?

18   Q.    This global resolution with Neil.

19   A.    I think it was inclusive.  I mean, again he

20   wanted it to be inclusive.  We both actually, I believe,

21   wanted it to be inclusive.  We didn't want to leave any

22   piece on the table so that it would start this.

23        So I -- I believe that the conversation,

24   those global conversations were trying to not exclude

25   actually anything that -- that when we got to that

1    resolution we would both be one hundred percent

2    satisfied with how we got there or at least equally

3    dissatisfied, if you will.

4       Q.    Right.  And so at least again initially there

5    were sort of the three topics where the three characters

6    that were in Spawn 9, Medieval Spawn, Cogliostro, Angela

7    and sort of intellectual and accounting issues relating

8    to those characters, correct?

9       A.    I don't know the intellectual was ever a big

10   hot topic.  It was -- it was mostly accounting.  It was

11   mostly accounting issues.

12      Q.    Well, for instance, with Medieval Spawn and

13   Cogliostro you wanted the intellectual issues sort of

14   wrapped up in your favor, correct?

15      A.    Right.

16      Q.    Now --

17            MR. KAHN:  Counsel, just so we are clear when

18   we read this transcript, even at trial, when you say the

19   intellectual issues mean intellectual property issues?

20            MR. ARNTSEN:  Yes.

21            MR. KAHN:  Or are you talking about something

22   else?

23            MR. ARNTSEN:  No.  Intellectual property

24   issues.  I used his phrase.

25            MR. KAHN:  Right.

1    BY MR. ARNTSEN:

2        Q.    Now, at some point in time a character called

3    Miracleman came into the mix, correct?

4        A.    Correct.

5        Q.    And, as best I can recall, you sort of

6    offered up Miracleman as something to Neil in connection

7    with a global resolution, is that correct?

8        A.    Yes.

9        Q.    Okay.  Tell me about Miracleman and how you

10    acquired rights to Miracleman?

11        A.    There's a company called Eclipse comics that

12    published a lot of comic books.  They must have -- must

13    have had some financial difficulties because at some

14    point they went into bankruptcy and -- and within the

15    confines of it going into bankruptcy some of the books

16    and the properties that they had in the past were part

17    of what the assets were that you would potentially be

18    bidding on in that bankruptcy hearing or auction or -- I

19    don't even know what it officially was called.  And

20    within the confines of that then in talking about Terry

21    Fitzgerald, you know, I went, "Hey, Eclipse is up.  You

22    know, there's some cool characters in there.  You know,

23    we should sort of stick our nose in and see -- see what

24    sort of comes out of it."

25            I think they held a telephone auction.  A

1    handful of people were on it.  I don't believe they ID'd
2    anybody.  And just to make sure they didn't, I think I
3    even had Terry doing the bidding for me so they didn't
4    think big Daddy Warbucks is here.

5              And so there was a sort of a quick, fairly
6    quick auction and I ended up winning the auction and all
7    the -- all of the provisions that came with it through
8    the bankruptcy trustee that was presiding over it.

9    Q.    And what did you get in that auction?

10   A.    Physically it was like some reprints of comic
11   books or inventory of comic books.  I think there was
12   some trading cards.  There may have been a little bit of
13   film.  Just sort of knicknacks.  I think they were just
14   sort of clearing out Eclipse's warehouse and whatever
15   had dust on it that sort of went, the whole kit and
16   kaboodle at that point.

17   Q.    And how about other than physical things?

18   A.    Then the intellectual properties that went
19   with it, the trademarks and properties that went with
20   the auction that they said there were trademarks and
21   copyrights to some of the characters that went with it.
22   So those were sort of more interesting to me than back
23   issues of books that nobody cared about.

24   Q.    And what rights did you acquire from the
25   Eclipse bankruptcy?  And I'm talking about intellectual

1    property rights to the Miracleman character.

2        A.    The -- the paperwork I think said trademark

3    and copyright.

4        Q.    And so was it a full complete copyright or

5    was it a joint ownership or what were you getting?

6        A.    I think the paperwork didn't break it down at

7    that point.

8        Q.    So, did you know whether anyone else had

9    trademark or copyright rights to Miracleman?

10       A.    No.

11       Q.    Okay.  You just got what Eclipse had?

12       A.    Right.

13       Q.    Okay.  And when did you get these rights?

14       A.    I don't know.  '95, '96.  Some -- some place

15   in the mid '90s.

16       Q.    Did you ever do anything with them?

17       A.    Some of them.  You know, not a lot but some

18   of them.

19             Some of them I -- I did -- I think I did a

20   book called Total Eclipse and put some of the

21   characters -- revamped some of the characters and put

22   them in there, did some art work -- art work, gave some

23   back history to it.

24       Q.    How about the Miracleman character?

25       A.    I don't think he was in that book, so --

1    Q.    Did you do anything with regard to the

2    Miracleman character after you acquired the rights out

3    of the Eclipse bankruptcy?

4         A.    Not initially, no.

5         Q.    And what caused you to believe that Neil

6    Gaiman might be interested in Miracleman rights?

7         A.    I was aware that again the Miracleman comic

8    book that was published by Eclipse had a number of

9    issues and a couple of those issues were done by Neil.

10   And so he had done some of it.

11              I may have read some place where he may have

12   said that the company went belly up before he was able

13   to finish his story or something.  So, you know,

14   somewhere along the line I had heard sort of Neil

15   mention the character before.

16        Q.    Okay.  So what were your thoughts with regard

17   to putting Miracleman into the mix in your attempt to

18   resolve your issues with Neil?

19        A.    Well, again I was -- I was hoping that there

20   may be a wild card in the deck called Miracleman that

21   may or may not have some value, and so if we sort of hit

22   some snag where we couldn't resolve some of the issues

23   that maybe there is a sort of a more non-traditional way

24   to resolve it by going -- let's do a -- let's do a

25   character swap or a hostage swapping, if you will, you

1    know, of some of the characters.  And so Miracleman

2    potentially became -- became that.

3        Q.    Have you finished your answer?  I'm sorry.  I

4    thought it was a "became the."

5            MR. KAHN:  When he stops talking he's

6    finished.

7    BY MR. ARNTSEN:

8        Q.    So, first with regard to sort of character

9    issues, non-percentage, non-money issues, did you --

10   were you and Neil able to work out a general agreement

11   with regard to characters?

12       A.    No.

13       Q.    Okay.  What was your position?

14       A.    My -- my position was that -- and I think it

15   was -- early on I think it was, I'm hoping, close to

16   Neil's, which was to resolve all the global matters.

17           And so I know that as we -- as we got pretty

18   close, I think we came fairly close, that we sort of

19   laid all the cards out and said, okay, here's a value

20   here, here's a value here.  You know, my -- my intent

21   was to get Spawn back.  I want Spawn.  I mean, this

22   is -- at this point I have got a movie coming out.  I

23   have got a TV show and somehow I don't own this guy

24   lock, stock and barrel.  I've got to get my baby back.

25           So I'm trying to -- I'm trying to sort of go,

```
 1    "Well, okay.  I know you got sort of derivative rights
 2    to contracts.  So how do I get it back?"  And, you know,
 3    I'm in no -- I didn't know whether we were going to be
 4    able to resolve it monetarily, so maybe it's like --
 5    maybe he -- there's a piece of a baby out there that he
 6    might like and we could -- we could come to some
 7    agreement and I think that was overall the intent that
 8    we were hoping for is to lay all the cards out and see
 9    if there's some way to mix and match it.
10         Q.   Was Medieval Spawn in the movie?
11         A.   No.
12         Q.   Was he in the TV show?
13         A.   In the TV?  Maybe for a brief moment in one
14    episode.
15         Q.   Okay.  So, what was -- what was the sticking
16    point that kept the deal from getting resolved?
17         A.   From my perspective it was -- it was -- it
18    was Medieval Spawn.
19         Q.   But was Neil willing to essentially convey
20    any rights he would have to Medieval Spawn to you as
21    part of the deal?
22         A.   Yes, I think so.  We had those conversations,
23    right.
24         Q.   Okay.  So what kept the deal from getting
25    closed?
```

1        A.    Well, I'm going to tell you because now we're

2    going to get to the heart of the matter here.

3        Q.    All right.

4        A.    That -- that in my follow-up conversation

5    with Terri Cunningham she told me that what Neil was

6    dangling over me essentially -- now she didn't use those

7    terms.  Let's talk about a derivative character.  That

8    was what was being dangled over my head, which was a

9    derivative character of something that I had created --

10   that essentially using the DC contract that he kept

11   pointing to, that essentially he never had those rights.

12   So the thing that was of the most value that he kept

13   holding against me essentially from my perspective, from

14   my perspective I never had.  And so everything up to

15   that point was based on trying to get it back, my baby

16   back.  And I felt -- I found out that I had my baby all

17   along.  And so those were the moments where if Neil was

18   ever upset, I was equally upset.

19       Q.    And does this -- is this that phone

20   conference with Terri Cunningham that you testified to

21   earlier?

22       A.    Right.

23       Q.    That was the only -- that's the only

24   communication you had in this regard?

25       A.    Right.

1    Q.    Okay.  And so you had this conversation with

2    Terri Cunningham and did that change your -- what you

3    were willing to do as part of the deal?

4    A.    It changed.  It changed.  I don't know if it

5    overly changed the deal.  I may have made some

6    modification, but it -- it -- it changed my willingness

7    that -- that -- but again at this point in spite of

8    my -- my better judgment I just wanted this to be over

9    as much as Neil Gaiman wanted this to be over.

10    Q.    All right.  And so what kept it from being

11    over?

12    A.    Because Neil in trying to settle it gave me

13    some more numbers that when I had another follow-up

14    conversation with Terri she told me that those numbers

15    were not correct either.  So now we're in a spot where I

16    don't know where the beginning of truth is on what it is

17    or even -- we are essentially almost back to square one

18    of going "what are we talking about now" because we

19    can't seem to get a handle or at least from my

20    perspective I can't get a handle on what it is that

21    we're even trying to -- to resolve because -- because

22    now we're going, "Well, who has what?"  So that sort of,

23    unfortunately, leads us to today.

24    Q.    What was the second conversation with Terri

25    Cunningham?

1        A.    It may have been on how you spend money on

2  people in movies or television shows or on how they

3  divide those moneys up.

4        Q.    No.  I mean, I guess you indicated there was

5  a second conversation that really caused the deal to

6  fall apart, correct?

7        A.    Uh-huh.

8        Q.    You have to use words.

9        A.    Oh, yes.

10        Q.    Okay.  And it arose out of Neil giving you

11  some numbers, correct?

12        A.    Right.

13        Q.    And what numbers did he give you with regard

14  to what?

15        A.    I don't recall the specific numbers.  I just

16  felt that whatever it was again was inconsistent with

17  information I was getting.

18        Q.    And what did the numbers relate to?

19        A.    I think it may have been -- I think it may

20  have been film, Hollywood stuff maybe.

21        Q.    Film, Hollywood stuff?

22        A.    Uh-huh.

23        Q.    You have to use words.

24        A.    Yes.

25        Q.    With regard to what characters?

1       A.      I don't recall specifically.

2       Q.      Well, it would have been either Angela,

3   Cogliostro or Medieval Spawn?

4       A.      Right.  One of those three.  Or it might have

5   been actually just a general breakdown of that category.

6       Q.      Film, Hollywood stuff?

7       A.      Right.

8       Q.      And so Neil gave you some numbers in that

9   regard, correct?

10      A.      Correct.

11      Q.      And was that in terms of royalty percentages?

12      A.      Yes.  I think most -- most of the numbers

13  that -- that Neil and I passed back and forth to each

14  other were representatives.

15      Q.      And again this was after you had this

16  conversation with Terri Cunningham with regard to DC's

17  treatment of derivative works, right?

18      A.      Right.

19      Q.      And so if Neil provided some numbers relating

20  to Hollywood stuff and you -- and did he tell you that

21  this was his deal with DC?

22      A.      Yes.  I don't remember the specifics.

23  Alls -- alls I remember was that at the end of the

24  conversation going, "another inconsistency," and I

25  was -- that was my emotional break at that point.

1    Q.    And so Neil gave you these numbers and you

2    decided to verify them with Terri Cunningham, correct?

3    A.    Right, right.

4    Q.    So you called Terri Cunningham?

5    A.    Right.

6    Q.    Okay.  And tell me as best you can that

7    conversation?

8    A.    I don't remember the specifics other than

9    I -- I got the same answer which is, "No, it wouldn't

10   work that way, Todd."

11   Q.    Okay.  What did you tell her?

12   A.    Probably asking her generalities of whatever

13   it was was the last numbers that were put in front of

14   me.

15   Q.    Okay.  And again I'm just surprised because

16   if this is what caused this whole thing to blow up --

17   A.    This is the proverbial straw on the camel's

18   back.  So this is why that conversation isn't as nearly

19   important as to the ongoing burden leading up to this.

20   So that clarifies it hopefully.

21   Q.    Well, it does, but again I'm just puzzled

22   that if this is the straw that broke the camel's back

23   I'm just surprised you can't remember it better.

24   A.    Right.

25   Q.    Have you told me everything you can recall

1    about this second conversation with Terri Cunningham?

2        A.    Right.

3        Q.    And when was this kind of in a time sequence

4    in relation to your first conversation with her?

5    Shortly thereafter, months?

6        A.    Yes.  I don't recall.

7        Q.    It could have been the next day; it could

8    have been a year later?

9        A.    There's -- there's space in between and I

10   don't know -- I don't know the difference between the

11   two.

12       Q.    Okay.  So you had this conversation with

13   Terri Cunningham and then what happened next with regard

14   to this dispute?

15       A.    From -- from my point of view, then

16   everything up to that point was -- was rescinded and

17   null and void.  I just -- I'm -- I'm done.  I'm done.

18   I'm done.  He's got money.  I have been giving him money

19   at this point based on things that may or may not be

20   true.  He's been feeding me potentially things that are

21   not completely truthful.

22            I'm heading into my movie just coming out.

23   The TV show's on.  I can't enjoy the moment that I

24   should be enjoying at this point.  And he potentially

25   has taken as a swap a part of this, Miracleman.  And so

1    I get suckered.  I got suckered here and I just went,

2    "No, no.  It's not going to happen."

3        Q.    So did you communicate that to Neil in any

4    way?

5        A.    No.

6        Q.    Did you tell your people to not make any more

7    payments to Neil?

8        A.    Right.

9        Q.    Do you recall about when this was?

10       A.    It would have been probably in the fourth

11   quarter of '97, late '97, somewhere in there.

12       Q.    What happened next?

13       A.    You know, I don't think much.  I may have

14   gotten on the phone and went, "You know what, grab

15   Miracleman back because he just -- he just took

16   something that wasn't -- that wasn't a fair swap."  And

17   after that probably between Neil and I dead silence.

18            Later on I think after he wasn't getting

19   payments he was going, "What's happening?  What's

20   happening?  Where's my payment?"  I think I sent him out

21   a letter sort of stating that there was no deal, so --

22       Q.    When was the last time you talked to Neil

23   Gaiman?

24       A.    I can't recall.

25       Q.    At some point in time you applied for a

1   trademark for Miracleman, right?

2      A.   Right.

3      Q.   And what was your basis for believing that

4   you were the owner of that trademark at the time of that

5   application?

6      A.   From the assets that I acquired at the

7   bankruptcy.

8      Q.   And what about those assets caused you to

9   believe that you had rights to the Miracleman trademark?

10     A.   I believe there's a document from the court

11  or the trustee or -- that said that it was included as

12  part of that.

13          MR. KAHN:  Just so the record's clear, Allen,

14  I think when they first applied, if you're speaking of

15  the 1997 application, it was an intent to use which is a

16  form of a trademark registration application.

17          MR. ARNTSEN:  Just -- and I think what I'm

18  just going to do is a little bit of clean up here today

19  and then we'll start tomorrow morning with the documents

20  and we'll move through that.

21     Q.   Did you talk to anybody other than your

22  lawyer to get ready for this deposition?

23     A.   I don't think so.

24     Q.   Okay.  Did you look at any documents to

25  prepare for it?

1    A.    Outside of with my lawyer you mean?

2    Q.    Well, I want to know what documents you

3    looked at.

4         MR. KAHN:  Well, I'm trying to avoid --

5    trying to get you an answer without invading

6    work-product privilege.

7         And I'll go this far.  I'll say that I gave

8    Todd for him to look through a chronological sampling of

9    communications between him and Neil and the stuff Larry

10   attempted to mediate.

11   BY MR. ARNTSEN:

12   Q.    Did you look through anything else other than

13   this chronological sampling that Attorney Kahn just

14   referenced?

15   A.    There might have been some accounting

16   spreadsheets.

17   Q.    And where did you get those from?

18        MR. KAHN:  It would have been from me.  That

19   was part of it which was included in the stuff I

20   mentioned earlier.

21   BY MR. ARNTSEN:

22   Q.    Okay.  Does your wife have some duties with

23   your businesses?

24   A.    Yes.

25   Q.    What?  Over what period of time?

1    A.    Off and on starting in 1992.

2    Q.    Up through the present?

3    A.    Yes.

4    Q.    And were there any periods of time that she

5    wasn't involved in your businesses during that time

6    period?

7    A.    Yeah.

8    Q.    What periods were those?

9    A.    Oh, probably in '92 and we had another child

10   in '94, so she probably backed off there.  And then

11   again we had another child in '99.  So sometimes she

12   was -- sometimes she was 100 percent involved.  I mean,

13   it would sort of fluctuate depending upon the need of

14   the family, I guess.

15   Q.    And what were your wife's duties and

16   responsibilities?

17   A.    They varied on a given task.  You know,

18   everything.  She's pretty much done a little bit of

19   everything probably along the way, you know, so --

20   Q.    For instance, was she involved at all in

21   these communications or payments to Mr. Gaiman?

22   A.    I think so.  I think she had some

23   involvement.

24   Q.    Do you recall what that involvement was?

25   A.    Not specifically.

1      Q.    And just some sort of background questions on

2   the various corporate entities here.

3          Todd McFarlane Productions, Inc., are you the

4   sole owner?

5      A.    Yes.

6      Q.    When did you start that company?

7      A.    I think in 1992.

8      Q.    Are there any other officers of the company?

9      A.    Of that company?

10     Q.    Yes.

11     A.    I don't think so.

12     Q.    Okay.  And what's the business of Todd

13   McFarlane Productions?

14     A.    Doing publishing, licensing, holding the

15   trademarks, doing free-lance art work.  I mean, the

16   whole sort of gamut of creating ideas and stuff.

17     Q.    TMP International, Inc., are you the sole

18   owner of that?

19     A.    Yes.

20     Q.    When did you start that?

21     A.    Maybe the beginning of '94 maybe.

22     Q.    And what's its business?

23     A.    Most of it is the manufacturing and selling

24   of action figures.

25     Q.    You said "most of it."  What's the rest of

1    it?

2        A.    I think some -- we do -- I think we have done

3    like the odd vehicle or, you know, a box or something

4    that's a little off center, but, you know, still plastic

5    goods, if you will, plastic toys.

6        Q.    McFarlane Worldwide?

7        A.    I don't know.

8        Q.    Are you the sole owner?

9        A.    Yes, probably.

10        Q.    What does it do?

11        A.    You know what, I don't know.  I've got a lot

12    of accountants and a lot of lawyers and a lot of tax

13    reasons for doing stuff.

14        Q.    Okay.

15        A.    So I don't know what.

16        Q.    Todd McFarlane Entertainment, Inc.

17        A.    That is a company that takes ideas into

18    Hollywood and sees if anybody will bite on any of those.

19        Q.    Has Todd McFarlane Entertainment, Inc. ever

20    involved anything with the Angela, Cogliostro or

21    Medieval Spawn characters?

22        A.    No.

23        Q.    McFarlane Toys Canada, Inc., what's that?

24        A.    That essentially does the same business as

25    McFarlane Toys.  It's just that again there are

1    different rules and regulations when you are

2    distributing products up in Canada, so you need another

3    company to sort of abide by certain tax laws and rules.

4         Q.    Did that company produce any toys showing the

5    Angela, Cogliostro or Medieval Spawn characters?

6         A.    No.

7         Q.    McFarlane Toys, Inc., what's that?

8         A.    I think that -- I think that's probably the

9    dba or something.

10        Q.    Oh, okay.

11        A.    It's what we use.  It's the name an all the

12   toys, McFarlane Toys, not TMP INTERNATIONAL.

13        Q.    So it's the dba with TMP International?

14        A.    I believe so.

15             MR. KAHN:  It may have once been in the

16   McFarlane Toys, Inc.  I don't know.

17   BY MR. ARNTSEN:

18        Q.    TMP Asia, Limited?

19        A.    That helps us have an office in Hong Kong.

20   It helps us with our international sales to our various

21   distributors internationally outside of North America.

22        Q.    With toys or publications?

23        A.    With toys.

24        Q.    Did it produce anything with Angela,

25   Cogliostro or Medieval Spawn?

1      A.    No.

2      Q.    McFarlane Europe DB, what's that?

3      A.    Another channel of being able to distribute

4   our toys into Europe and so --

5      Q.    Does that include any Angela, Cogliostro or

6   Medieval Spawn characters?

7      A.    In terms of what?

8      Q.    Is McFarlane Europe DB involved in

9   distribution?

10     A.    Probably over.  If they were -- if the

11  company was alive when those toys were produced, they

12  probably would have had some involvement.

13     Q.    And when was that?  When were Medieval Spawn

14  toys produced?

15     A.    Medieval Spawn was -- you can't lock me to

16  this.  It might have been '94 and Angela was '95.

17     Q.    And was there ever a Cogliostro toy?

18     A.    Yes.  But that was -- I believe that was done

19  through our collectors club, so that was -- that was

20  never done as a wide distribution product.

21     Q.    Okay.  So were any of these companies we've

22  talked about involved in that toy?

23     A.    Well, I don't know how collectors club falls

24  under all the umbrellas, but the collectors club sells

25  specialty toys, if you will, or limited runs of toys

1    that we don't sell nationally.  So I don't know if

2    that's -- if collectors club I think is actually an

3    official company, you know, so, but --

4              MR. KAHN:  But the toys are made by TMP

5    International, right?

6              THE WITNESS:  Right, right.

7              MR. KAHN:  Just to give Allen that, all roads

8    with toys lead back to TMP International, right?

9              THE WITNESS:  Right.  TMP International is

10   the toy manufacturer.

11   BY MR. ARNTSEN:

12       Q.    All right.  TMP International manufactures

13   all of these toys that some of these various

14   corporations may be involved in the distribution of,

15   correct?

16       A.    Correct.

17       Q.    What's McFarlane Global DB?

18       A.    Don't know.

19       Q.    Okay.  What about TMP Equities, Inc.?

20       A.    Don't know.

21       Q.    Okay.  Quick answer to that.

22             You've testified as to a couple conversations

23   with Terri Cunningham.  Is she someone whom you spoke

24   with on a regular basis?

25       A.    No.

1    Q.   So, I mean, how many phone conversations can

2    you recall that you've had with her?  You talked about

3    two, but I mean I'm just trying to get a sense --

4    A.   In my life you mean?

5    Q.   Yes.

6    A.   Well, I don't know.  Terri Cunningham was the

7    sort of first person I ever knew at DC comic books

8    because I testified earlier I believe that I had a

9    contract with DC comic books early in my career.

10        All those negotiations, all subsequent

11   conversations, all follow-up always ran through Terri.

12   So my point person at DC comic books on any contractual

13   conversations or even looking for answers all went

14   through Terri.

15   Q.   Okay.  How about since you started with

16   Image; since 1992 how often have you talked with her?

17   A.   Not much.  You know, again I run into her the

18   odd time at a convention maybe.  Maybe the odd time I've

19   been in New York swung by the office and said, "Hi,"

20   but --

21   Q.   Have you called her on any occasions other

22   than the two you've testified to?

23   A.   Since then you mean?

24   Q.   Yes.

25   A.   I don't think so.

1       Q.    Okay.  And just if I understand correctly

2    from your testimony, with regard to Neil's DC contract

3    issues, you first had a phone call with her in which you

4    talked about derivative characters, correct?

5       A.    Right.

6       Q.    And then you've testified to that.

7             And I believe it was your testimony that even

8    following that conversation you were still willing to go

9    forward with your deal with Neil, correct?

10      A.    We were still -- I was still willing to try

11   and find a resolution.

12      Q.    Then the second conversation that you

13   testified to was what made you stop trying, is that

14   correct?

15      A.    Yes, yes.  Unfortunately, yes.

16            MR. ARNTSEN:  Okay.  Why don't we take a

17   break for the evening.

18            MR. KAHN:  Okay.

19            (Whereupon, the deposition was then

20                concluded at 5:10 p.m.)

21

22

23                     _____
                            TODD D.M. McFARLANE

24   3442-G

25

1    STATE OF ARIZONA      )
                           )  ss.
2    COUNTY OF MARICOPA    )

3

4            BE IT KNOWN that the foregoing deposition was

5    taken before me, PAUL GROSSMAN, a Notary Public and

6    Certified Court Reporter #50028 in and for the County of

7    Maricopa, State of Arizona; that the witness before

8    testifying was duly sworn by me to testify to the whole

9    truth; that the witness will read and sign the

10   deposition; that the questions propounded to the witness

11   and the answers of the witness thereto were taken down

12   by me in shorthand and thereafter reduced to print by

13   computer-aided transcription under my direction; that

14   the foregoing 131 pages are a true and correct

15   transcript of all proceedings had upon the taking of

16   said deposition, all done to the best of my skill and

17   ability.

18           I FURTHER CERTIFY that I am in no way related

19   to any of the parties hereto, nor am I in any way

20   interested in the outcome hereof.

21           DATED at Phoenix, Arizona, this 22nd day of

22   June, 2002.

23

24   
     OFFICIAL SEAL
     PAUL GROSSMAN          Paul Grossman, Notary Public
     Notary Public - State of Arizona    AZ CCR #50028
     MARICOPA COUNTY
25   My comm. expires Oct. 13, 2005