IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NEIL GAIMAN and MARVELS AND )
MIRACLES, LLC., )
)
                    Plaintiffs, )
)
          -vs- )
)
TODD MCFARLANE, TODD MCFARLANE )
PRODUCTIONS, INC., TMP INTER- )
NATIONAL, INC., MCFARLANE )
WORLDWIDE, INC. and IMAGE )
COMICS, INC., )
)
                    Defendants. )
————————————————————————————— )

**03-1461**

No. DOCKET -C-0048-S   **82**
NUMBER
U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN

AUG - 1 2002

FILED/RECEIVED
JOSEPH W. SKUPNIEWITZ, CLERK
CASE
NUMBER

## 30(b)(6) DEPOSITION OF TODD McFARLANE PRODUCTIONS, INC. AND DEPOSITION OF TODD D.M. McFARLANE

Volume 2
(Pages 133 - 256.)

Phoenix, Arizona
June 20, 2002
8:55 a.m.

U.S.C.A. 7th Circuit
F I L E D

NOV 2 6 2003  JG

GINO J. AGNELLO
CLERK

Prepared for:

U.S. DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
(Original)

Reported by:

PAUL GROSSMAN
AZ CCR #50028
CA CSR #1487

**BROWN**
**& TOLES ltd.**
Court Reporters
101 West Adams

Phoenix, Arizona 85003-2003

Telephone (602) 254-5479        FAX (602) 254-5013

```
 1                        I N D E X

 2

 3
      Examination:                              Page
 4
      BY MR. ARNTSEN                            137
 5    BY MR. KAHN                               241
      BY MR. ARNTSEN                            253
 6

 7

 8

 9                       E X H I B I T S

10    No.  Description                          Page

11    34 (Thumbnail sketches for Spawn Issue 9.)   143

12    35 (Copyright certificate, Spawn 9.)         145

13    36 (Script excerpt, Spawn 26.)              148

14    37 (Copyright certificate, Spawn 26.)       149

15    38 (Series of checks.)                      151

16    39 (Script for Angela Issue No. 1.)         154

17    40 (Script for Angela Issue No. 2.)         154

18    41 (Script for Angela Issue No. 3.)         154

19    42 (Thumbnail sketch of Angela No. 1.)      154

20    43 (Thumbnail sketch of Angela No. 2.)      154

21    44 (Thumbnail sketch of Angela No. 4.)      154

22    45 (Copyright certificates, Angela 1, 2 and 3.)  155

23    46 (Letter from Ms. Heifetz to Mr. McFarland,
             9-26-96.)                           160
24
      47 (Letter from Ms. Cook to Mr. Marder,
25           4-2-97.)                            179
```

1    48 (Handwritten note from Neil to Todd,
          4/22/97.)                                    181
2
     49 (Transcript of tape, 5/24/02.)                 182
3
     50 (Handwritten note from Mr. Gaiman to Todd.
4         8-1-97.)                                     213

5    51 (Payment record, Bonus-Foreign Sales.)         221

6    52 (Trademark application for Miracleman.)         231

7    53 (Trademark application for Miracleman.)         233

8    54 (Statement of Use for Miracleman.)             233

9    55 (Spawn No. 11 cover and inside page.)          240

10   56 (Accounting documents.)                        244

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3      THE CONTINUED DEPOSITION OF TODD D.M. McFARLANE,

4   taken at 8:55 a.m. on June 20, 2002, at the offices of

5   Brown & Toleu, Ltd., 101 West Adams Street, Phoenix,

6   Arizona, before PAUL GROSSMAN, a Notary Public and

7   Certified Court Reporter #50028 in and for the State of

8   Arizona, pursuant to the Federal Rules of Civil

9   Procedure.

10          The plaintiffs were represented by their

11   attorneys, Foley & Lardner, by Allen A. Arntsen, Esq.

12   and Jeffrey A. Simmons, Esq.

13          The defendants Todd McFarlane were

14   represented by their attorneys, Blackwell, Sanders,

15   Peper, Martin, L.L.P., by Michael A. Kahn, Esq.

16          The defendant Image Comics was represented by

17   its attorneys, Brobeck, Phleger & Harrison, LLP, by

18   Matthew C. Lapple, Esq.

19          Also present was Kenneth F. Levin, Esq.,

20   Mr. Neil Gaiman.

21

22

23

24

25

1                                      Phoenix, Arizona

2                                      June 20, 2002

3                                         8:55 a.m.

4

5

6                        TODD D.M. McFARLANE,

7     called as a witness herein, having been previously duly

8     sworn, was examined and testified as follows:

9

10                            EXAMINATION

11    BY MR. ARNTSEN:

12        Q.    Mr. McFarlane, you're aware you're still

13    under oath?

14        A.    Yes.

15        Q.    By the way, have you ever had your deposition

16    taken before?

17        A.    Yes.

18        Q.    On how many occasions?

19        A.    I think twice.

20        Q.    In what context?

21        A.    One was up in Canada in a -- a lawyer billing

22    dispute and the other was a few years back in another

23    suit that was brought against me.

24        Q.    Is that the Tony Twist suit?

25        A.    Correct.

1    Q.    Did you ever testify in court before?

2    A.    Yes.

3    Q.    How many occasions?

4    A.    Once.

5    Q.    Was that in the Tony Twist suit?

6    A.    Yes.

7    Q.    By the way, I didn't -- I said this

8    yesterday, but you understand if you don't understand a

9    question tell me and I'll rephrase it.  Do you

10   understand that?

11   A.    Okay.

12   Q.    And also during your testimony if something

13   comes to mind or if, for instance, something came to

14   mind that, you know, a previous answer you have given is

15   incomplete or inaccurate, you should feel free to jump

16   in to correct or supplement the record.  Okay?

17   A.    Yes.

18   Q.    Image Comics, what percentage of Image do you

19   own?

20   A.    Today?  As a shareholder, one-fourth.

21   Q.    And so did you -- was ownership interest

22   always or your pro rata share depending on the number of

23   shareholders?

24   A.    Right.

25   Q.    Are you the president of Image?

1        A.     Right.

2        Q.     And are there any contracts in place between

3    Image and yourself or any of the other entities that you

4    own?

5               MR. KAHN:   Keep in mind there's written

6    contracts and there's oral contracts and Allen's

7    question will include both.

8               THE WITNESS:   I can't -- I can't -- I can't

9    speak for everybody, no.   I don't know.

10   BY MR. ARNTSEN:

11       Q.     Are there any contracts in place between you

12   individually and Image?

13       A.     Not written.

14       Q.     Are there any oral contracts in place?

15       A.     Yeah.

16       Q.     And what are they?

17       A.     That if I publish comic books that I will run

18   them through the entity called Image comic books.

19       Q.     So Image has a sort of right of first refusal

20   on your comic books, is that right?

21       A.     Yes, something like that.

22       Q.     And then what are the terms of the contract?

23       A.     That Image would do some of the leg work,

24   solicitations, accounting, collecting bills, dealing

25   with the printers, placing ads at times, sometimes

1    helping you with your letter columns and collecting the

2    bills, paying some of those bills and then passing it on

3    to the individual person who had given them the comic

4    book.

5        Q.    So this contract you talked about applies to

6    if Image is publishing a comic book that you create,

7    correct?

8        A.    Right.

9        Q.    Are there any other contracts between you and

10   Image?

11       A.    Image solicits the toys that come from

12   McFarlane Toys, so besides distributing those nationwide

13   we also run ads in the Diamond Catalog that Image comic

14   book puts in the Diamond Catalog.

15       Q.    And does McFarlane Toys pay Image for that?

16       A.    Again, it's not a -- we don't pay.  The way

17   that it works is that Image deducts and then gives out,

18   so there's -- there's rarely ever a time somebody is

19   given.  They sort of take theirs and then pass it on to

20   the individuals after that.

21       Q.    Any other contracts between you and Image?

22       A.    No.  I think that's pretty much it.

23       Q.    Are you aware of any contracts between any

24   other entities that you own and Image?

25       A.    No.

1    Q.    And do you receive any compensation from

2    Image other than the licensor -- no, strike that.

3           What compensation do you receive from Image?

4    A.    I don't know if we do.  I think we have an

5    accrual at the end of the year, but it's really based on

6    sort of back stock sold.  So I think if there's any

7    profits made, then I think they usually divide it

8    amongst the number of shareholders.  So if there's a

9    profit, I'd get whatever fraction of the shareholder I

10   was at that point.

11   Q.    Okay.  Mr. McFarlane, you were just

12   discussing a couple of agreements between you and Image,

13   one related to publishing comic books and the other

14   related to placing ads for toys.  Was that contract

15   between you as an individual and Image or between one of

16   your entities?

17   A.    Between my entities.  The comic books would

18   be Todd McFarlane Productions and Image and the toys

19   would be McFarlane Toys and Image.

20   Q.    Thank you.

21          MR. KAHN:  Just for clarity, but if there's

22   money left over at the end of the year the profits from

23   that goes to you as a shareholder?

24          THE WITNESS:  Right.  A shareholder of Image

25   Comics.

1    BY MR. ARNTSEN:

2        Q.    You as an individual are a shareholder of

3    Image and receive whatever kind of dividends or

4    compensation would accrue from that as an individual,

5    correct?

6        A.    Yes.

7        Q.    Now we're going to start going through some

8    documents and really what I'm going to be doing here,

9    Mr. McFarlane, is sort of going back through the

10   chronology of your relationship with Mr. Gaiman, which

11   we pretty well covered -- which we went through

12   yesterday, but now just in the context of some of the

13   documents that were -- that were drafted on that.

14            Can you identify what was previously marked

15   as Exhibit 12?

16            MR. KAHN:   Do you want him to tell you what

17   it is?

18            MR. ARNTSEN:   Yes.   He doesn't necessarily --

19   I'm not going to ask him in detail, you know, about word

20   for word what it is.   If he can tell us what it is.

21            THE WITNESS:   It appears to be the script

22   that Neil wrote for Issue 9.

23            It also appears to not be the complete

24   script, though.   It looks like it ends on page 15 and it

25   would have been probably a 22 page comic.

1    BY MR. ARNTSEN:

2        Q.    Okay.  So --

3        A.    So a partial script it looks like.

4        Q.    Of Issue 9?

5        A.    Yes.

6        Q.    Okay.  And do you recall whether you made any

7    editorial changes to that script as submitted to you by

8    Neil?

9        A.    No.

10       Q.    No, you don't recall or no, you did not?

11       A.    No, I don't recall.

12             MR. ARNTSEN:  All right.  Mark this.

13             (Deposition Exhibit Number 34 was then

14                marked for identification.)

15   BY MR. ARNTSEN:

16       Q.    Can you identify Exhibit 34?

17       A.    Neil, as I said earlier, used to write full

18   scripts and then he would sometimes put thumbnails with

19   it.  I think these are the thumbnails that went with

20   that partial script that you had shown me.

21       Q.    For Spawn Issue 9?

22       A.    For Spawn 9, right.

23       Q.    And do you recall when these were forwarded

24   to you in connection with the process of creating Spawn

25   Issue 9?

1      A.      I don't understand the question.

2      Q.      Did these accompany the script that Neil sent

3  to you?

4      A.      I don't recall, but I would assume yes.

5      Q.      And did Neil send this to you before you

6  embarked on the art work for Spawn Issue 9?

7      A.      No.  I did the cover and then -- because we

8  have to get a cover out first for solicitation, so we

9  did the cover with the character on the -- on the front

10  and then eventually we had to get the writing, actually

11  putting the book together.

12          You can solicit, but at some point you have

13  to actually do the book, so this -- this comes after

14  putting out the cover.  So, in beginning the process of

15  putting the insides together.

16      Q.      So you got Exhibit 34 after you had drawn the

17  cover, but before you started drawing the insides of the

18  book, is that correct?

19      A.      Yes.

20      Q.      And what use did you make of these thumbnail

21  sketches?

22      A.      Usually when writers do this they are looking

23  for a pacing.  You know, they are looking to sort of

24  say, "Here's sort of the pacing that we have of the

25  book."  So you sort of look at it and most of the

1  writers that do that just go, you know, "Do whatever you

2  want with it," you know.  "If you like what I got there

3  fine, if you don't change it."

4        Just it's, you know, you're the artist and

5  I'm the writer and so you look at it and if anything

6  sort of triggers an idea then you sort of move forward

7  and if you don't, you sort of walk away from it.  You

8  modify.  You are always modifying it.

9        Q.    So you have it as a reference point to use

10  more or less as you choose as the artist, is that

11  essentially it?

12        A.    Right.

13              (Deposition Exhibit Number 35 was then

14              marked for identification.)

15  BY MR. ARNTSEN:

16        Q.    Identify Exhibit 35, please.  Do you know

17  what Exhibit 35 is?

18        A.    Not really.

19        Q.    Have you seen it before?

20        A.    No.

21        Q.    Do you recognize it as a copyright

22  application for Spawn Issue 9?

23        A.    Yes, it looks like it.

24        Q.    And you're the copyright claimant, correct?

25        A.    No.  It should be Todd McFarlane Productions.

1    Q.    But looking down at item 4 on the first page

2    it says it's Todd Dean McFarlane, correct?

3    A.    That's what it says, right.

4    Q.    And up under item 2, do you see the name of

5    author?  That's Todd Dean McFarlane, correct?

6    A.    Right.

7    Q.    And it's got your year of birth, correct?

8    A.    Right.

9    Q.    And you indicate -- you checked "yes" where

10   it says "Was this contribution to the work a 'work made

11   for hire,'" correct?

12   A.    I don't believe I show this on --

13   Q.    You what?

14   A.    I don't believe I filled this in.

15   Q.    Did you authorize someone to fill this out on

16   your behalf?

17   A.    Yep.  That looks like Beth.

18   Q.    And who's Beth?

19   A.    She used to work for me years ago.

20   Q.    And what did she do for you?

21   A.    She was an assistant to one of the presidents

22   at the toy company.

23   Q.    Who?

24   A.    Paul Burke.

25   Q.    Okay.  And she was your authorized agent,

1    correct?

2         A.    It appears.

3         Q.    And it states here that -- under item 2 you

4    state that you are the creator.  It states that you're

5    the creator of the text and art work, correct?

6         A.    Where am I looking?

7         Q.    Nature of Authorship, item 2 a.

8         A.    What did you want me to look at?

9              MR. KAHN:  It says "Work for Hire" and then

10   "Nature of Authorship."

11             THE WITNESS:  Oh, I see.

12   BY MR. ARNTSEN:

13        Q.    Is that correct?

14        A.    Right.

15        Q.    But you weren't the creator of the text of

16   Spawn Issue 9, were you?

17        A.    No.

18        Q.    Neil was, right?

19        A.    Right.

20        Q.    Do you know -- do you recall the process that

21   caused you to apply for a copyright for Spawn Issue 9 in

22   April of 1996?

23        A.    No.  It probably wouldn't have been about

24   Issue Number 9.  It would have been the comic books as a

25   whole.

1    Q.    So you recall applying for a number of

2    copyrights for previous comic books in 1996?

3    A.    I don't recall the date specifically.

4    Q.    No, but generally.  I guess what I'm

5    wondering about is what caused you to apply for a

6    copyright approximately three years after the issue came

7    out?

8    A.    Probably I started having more lawyers

9    hanging around me, so --

10    Q.    Do you have any recollection in that regard

11    or is that --

12    A.    That's probably the closest thing to the

13    truth, so --

14    Q.    But do you recall that?

15    A.    I don't recall.

16    Q.    Okay.  Do you recall addressing the issue of

17    why you did not list Neil as the author of the text of

18    Spawn Issue 9?

19    A.    No.

20    Q.    And do you know why it is that you're listed

21    individually as the copyright claimant instead of Todd

22    McFarlane Productions?

23    A.    No.

24              (Deposition Exhibit Number 36 was then

25               marked for identification.)

BY MR. ARNTSEN:

Q.    Take a look at Exhibit 36.  Can you identify what Exhibit 36 is?

A.    Yes.  It looks like the -- the -- some of the script for a couple pages from Spawn Issue 26.

Q.    And this was written by Neil?

A.    Right.

Q.    And did you make any changes to this portion of the script before incorporating it into Spawn Issue 26?

A.    I don't recall.

MR. ARNTSEN:  Mark this.

(Deposition Exhibit Number 37 was then marked for identification.)

BY MR. ARNTSEN:

Q.    Take a look at Exhibit 37, please.

A.    Okay.

Q.    Can you identify what Exhibit 37 is?

A.    What I think it is or -- or --

Q.    Yes.  Have you seen it before?

A.    No.

Q.    Do you see that it purports to be a Certificate of Registration for a copyright for Spawn Issue 26?

A.    Right.

1      Q.    And you are listed as the author, correct?

2      A.    Right.

3      Q.    And you are listed as the copyright claimant,

4  correct?

5      A.    Right.

6      Q.    And it's dated January 20, 1995, correct?

7      A.    Right.

8      Q.    Does this at all refresh your recollection as

9  to why you would have applied for a copyright for Spawn

10  Issue 26 fifteen months before applying for a copyright

11  on Spawn Issue 9?

12      A.    No.

13      Q.    And it lists you as the author of the text of

14  Spawn Issue 26, correct?

15      A.    What am I looking for?

16      Q.    2 a.

17      A.    Right.

18      Q.    And were you the author of the text of Spawn

19  Issue 26?

20      A.    Most of it.

21      Q.    Was Neil Gaiman the author of the remaining

22  portion of the text of Spawn Issue 26?

23      A.    Right.

24      Q.    Why didn't you list him here as a co-author?

25      A.    I don't know.  I didn't fill that out.

1      Q.    Beth did again?

2      A.    Right.

3      Q.    And again the copyright is claimed for you as

4   an individual, correct?

5      A.    That's what it says.

6      Q.    Do you have any recollection of the process

7   of filling out and submitting these copyright

8   registrations?

9      A.    No.

10          MR. ARNTSEN:  Mark this.

11          (Deposition Exhibit Number 38 was then

12           marked for identification.)

13   BY MR. ARNTSEN:

14      Q.    Take a look through Exhibit 38, please.  Can

15   you identify what Exhibit 38 is?

16      A.    It appears to be checks sent to Neil Gaiman.

17      Q.    From whom or what?

18      A.    From Todd McFarlane Productions.

19      Q.    Do you recall what you paid Neil for his

20   contribution to the script of Spawn 26?

21      A.    Probably not exactly, but it was probably

22   around a thousand a page or something.

23      Q.    Yes.  Do you recall how you would have come

24   up with the calculation of what to pay?

25      A.    Not really.  I can -- again, Neil said he'd

1   write them for free, he didn't want to be paid.  So I

2   didn't think that would be fair.  So I wanted to get him

3   some money.  So I don't know if it was based on anything

4   other than wanting to give him some money for his

5   effort.

6        Q.    Can you take a look at page number 347.  Do

7   you see the check, the check number 1145, the bottom

8   half of that check where in the memo line it says

9   "Angela Intro"?

10       A.    Okay.

11       Q.    Does that represent the payment for this

12  portion of the script of Spawn 26?

13       A.    It's possible, yes.

14       Q.    Do you have any recollection in that regard?

15       A.    No.  I'd have to see if there was any

16  paperwork that accompanied that check.

17       Q.    And do you have -- does this help refresh --

18  just assume for the moment that this is the payment for

19  that.

20       A.    Okay.

21       Q.    It was $3,300.

22       A.    Okay.

23       Q.    Does that refresh your recollection as to how

24  you came up with that number?

25       A.    No.  I'm -- it probably wasn't based on any

1    formula.  He did some work and I wanted to make sure he

2    got paid, so --

3        Q.    It was just essentially a number you thought

4    was fair?

5        A.    Right.

6        Q.    Do you recall whether you made any other

7    payments to Neil for the script for Spawn 26?

8        A.    I don't recall.

9        Q.    I'll show you what was previously marked

10   Exhibit 14.  Mr. McFarlane, is that in your handwriting?

11       A.    No.

12       Q.    Do you recognize it as Terry Fitzgerald's

13   handwriting?

14       A.    I think so.

15       Q.    And did you sign it or -- do you see where

16   it's signed "Todd and Terry"?

17       A.    Right.

18       Q.    Did you sign that or did he just send a note

19   on behalf of both of you?

20       A.    Yeah.

21       Q.    The latter?

22       A.    Yeah.  It's all in his handwriting.

23       Q.    And what does this relate to?

24       A.    I think this is in reference to the Angela

25   mini series.

```
 1              MR. ARNTSEN:  Mark that.

 2              (Deposition Exhibit Number 39 was then

 3              marked for identification.)

 4   BY MR. ARNTSEN:

 5       Q.    Take a look at Exhibit 39, please.

 6              (Deposition Exhibits Numbers 40 through 44,

 7              inclusive, were then marked for

 8              identification.)

 9   BY MR. ARNTSEN:

10       Q.    Can you take a look at Exhibits 39, 40 and

11   41.  Can you identify what Exhibits 39, 40 and 41 are?

12       A.    39 looks like the script to Angela mini

13   series Issue 1.

14              Exhibit 40 looks like the script for the

15   Angela mini series Issue 2.

16              And Exhibit 41 looks like -- there's no page

17   numbers on it -- either a partial or a complete script

18   for Angela mini series Issue Number 3.

19       Q.    And who wrote those scripts?

20       A.    Neil did.

21       Q.    Did you make any edits to those scripts?

22       A.    I don't recall.

23       Q.    Are you aware of anyone at Image making any

24   edits to those scripts?

25       A.    No, nobody else would have been authorized
```

1    to.

2        Q.    Okay.  So if anyone would have, you would

3    have and you don't recall, is that correct?

4        A.    Correct.

5        Q.    And can you identify what Exhibits 42, 43 and

6    44 are?

7            Mark that.

8            (Deposition Exhibit Number 45 was then

9            marked for identification.)

10   BY MR. ARNTSEN:

11       Q.    Can you identify what Exhibits 42, 43 and 44

12   are?

13       A.    They appear to be thumbnail sketches for --

14   Exhibit 42 -- although I can't be sure, but it says for

15   the Angela mini series Issue Number 1.

16           Exhibit 44 appears to be thumbnails that may

17   have been done for Angela mini series -- I guess it says

18   Number 3 here.

19           And Exhibit 43, although we got a duplication

20   in here.  We -- we -- it's done twice here, the

21   duplication, but minus that it appears to be thumbnails

22   that may -- may have accompanied some of the work done

23   on Angela mini series Number 2.

24       Q.    And do you know who drew those thumbnail

25   sketches?

1    A.    I believe Neil did.

2    Q.    And did you receive these thumbnail sketches

3    in connection with the development of the Angela comics?

4    A.    I don't recall.

5    Q.    Would they have come to you?

6    A.    I don't know.

7    Q.    Did you have any involvement in the art work

8    for the Angela mini series?

9    A.    I wasn't the artist on that book, unlike

10    Issue 9.  Greg Capullo was the actual artist.

11    Q.    So, did you have any involvement in the art

12    work?

13    A.    Just in my conversations with -- talking Greg

14    through some of his problems if he had any or what he

15    wanted me to have in it visually.

16    Q.    And do you have any recollection of receiving

17    these thumbnail sketches?

18    A.    No.

19    Q.    Take a look at Exhibit 45.  And I'll

20    represent to you that Exhibit 45 is comprised of three

21    copyright registrations.

22    A.    Okay.

23    Q.    Do you recognize Exhibit 45 as copyright

24    registrations for Angela 1, 2 and 3?

25    A.    I don't understand the question.

1     Q.     What do you understand Exhibit 45 to be?

2     A.     They appear to be Certificates of

3  Registration.

4     Q.     For Angela 1, 2 and 3?

5     A.     Right.

6     Q.     And you are listed as the copyright claimant

7  for those works, correct?

8     A.     Right.

9     Q.     And you are listed as the creator of the text

10  and art work for those works, correct?

11     A.     Where am I looking there again?

12     Q.     2 a, Nature of Authorship.

13     A.     Right.

14     Q.     And you weren't the creator of the text or

15  the art work for those works, were you?

16     A.     Right.

17     Q.     Did you ever tell Neil that you were applying

18  for a copyright for Angela 1, 2 and 3?

19     A.     I don't recall.

20     Q.     Do you recall what you paid Neil for his work

21  for Angela 1, 2 and 3?

22     A.     No.

23     Q.     I'll show you a document that was previously

24  marked Exhibit 9 and I wonder whether that would refresh

25  your recollection at all.

1          Now, I'll also show you a document previously

2    marked Exhibit 38 and I'll call your attention to pages

3    345 and 346 and see if that refreshes your recollection

4    at all.

5          A.    So -- so, what's the question?

6          Q.    Do you have any recollection as to what you

7    paid Neil for his work on Angela and on the Angela mini

8    series?  And then the second, if you do, how you kept --

9    how you determined how much to pay him?

10          A.    No.  It looks like we paid him some advances.

11    Round numbers were usually advances.

12          Q.    Those would be the $10,000 payments?

13          A.    Right.

14          And then the other ones, I don't know how we

15    derived those calculations off the top of my head.

16          Q.    Do you have any recollection of that at all

17    as to how you came up with those calculations?

18          A.    It -- no.

19          Q.    For instance, was it a percentage royalty, do

20    you know that, or do you just have no recollection?

21          A.    I don't have a recollection.  But again

22    most -- most things are percentages, so again I don't

23    know what formula we got to that percentage.

24          Q.    But it would be some percentage of sales?

25          A.    I don't know.  Percentage of something.

1    Q.    Okay.  And the percentage of something, that

2    would in some way be tied to the sales, correct?

3    A.    I can't say it.  A percentage of something.

4    Q.    What kinds of things might it be --

5    A.    I don't know.

6    Q.    -- other than something tied to sales?

7    A.    It could be -- it could be print runs.  It

8    doesn't necessarily mean that you sell everything.  It

9    could be just a percentage of a cover price.  It could

10   be a percentage of other things.  So I don't know what

11   formula we actually used in this case.

12   Q.    Did you and Neil ever discuss what -- how

13   Neil would be paid for the Angela mini series?

14   A.    I don't recall specifically about it, but

15   again I think that we were in the beginnings of the

16   conversations of trying to do some of the stuff that he

17   was getting at DC Comics.

18   Q.    And do you recall any specific discussions in

19   that regard?

20   A.    No.

21   Q.    Would you have been the person who Neil would

22   have had those discussions with or would someone else on

23   your behalf?

24   A.    It's possible he could have talked to others.

25   Q.    Who would it have been?

1      A.      Terry.  He might have.  And if I was busy on

2   the phone he might have talked to Terry.  I think Julia

3   Simmons was working for me at that time.  He might have

4   talked to her.  But you'd have to ask them.

5      Q.      Terry Fitzgerald?

6      A.      Right.

7              (Whereupon, a short recess was then had at

8                 9:38 a.m. until 9:47 p.m.)

9              (Deposition Exhibit Number 46 was then

10                marked for identification.)

11  BY MR. ARNTSEN:

12     Q.      Now I'm shifting gears and talking about

13  this, the sort of dispute resolution process that you

14  and Neil went through in 1996 and 1997.

15              First of all, do you recall Neil coming out

16  to your house in Phoenix in the summer of 1996 to try to

17  work out an agreement with you?

18     A.      I don't recall the date.  I know that Neil

19  came out to the house once.

20     Q.      At kind of sort of early on in this process?

21     A.      Well, during this process some time, yes.

22     Q.      What do you recall about that?

23     A.      That he -- that he came to my house, came up

24  to my office.  I've got an office in the house.  I

25  believe Larry Marder was there.  And again I think that,

1    you know, we exchanged pleasantries, brought each other

2    up to date on some things we were doing.

3            He had, I think, a short clip from some work

4    he was doing for the BBC that he wanted to show, that he

5    was proud of.

6            And then I think I indicated to Larry at some

7    point that -- that Mark Silvestre, one of the Image

8    partners, Larry was the head of Image at that point, had

9    quit, and then I don't recall if Larry stayed or what

10   he -- whether he didn't stay or what he did with the

11   news, and then Neil and I probably went and had some

12   conversations again trying to see if there was any

13   common ground on moving all this forward.

14        Q.    Do you recall that conversation with you and

15   Neil at this time?

16        A.    Not specifically.

17        Q.    Generally what's your recollection of it?

18        A.    That we were having conversations, ongoing

19   conversations, to try to move all this forward to get on

20   with our lives.

21        Q.    When had been the most -- prior to this

22   meeting at your house how long had it been since you'd

23   seen Neil in person approximately?  I'm just trying to

24   get a sense of the frequency of in-person meetings.

25        A.    I don't think there were that many.  Maybe

1   once a year, once every two years or something like

2   that.

3      Q.   And have we exhausted your recollection of

4   that conversation at your house?

5      A.   Correct.

6      Q.   Take a look at Exhibit 46.  Do you recall

7   getting this?

8      A.   No, I don't recall this.

9      Q.   Do you recall any discussions with Merrilee

10   Heifetz with respect to payments to Neil around this

11   time?

12      A.   No.

13      Q.   Do you recall getting Exhibit 45?

14      A.   No.

15      Q.   I'll show you what was marked yesterday as

16   Exhibit 25.  Have you seen that before?

17      A.   I don't recall.

18      Q.   Do you see it indicates that -- Exhibit 25

19   indicates that it had some pages of DC contracts

20   attached to it?  Do you see that?

21      A.   Oh, in the first sentence you mean?

22      Q.   Yes.

23      A.   Yeah, it indicates something like that,

24   right.

25      Q.   Do you recall ever seeing those contract

1    excerpts?

2        A.    I don't recall.

3        Q.    Do you ever recall ever seeing any of Neil's

4    contracts with DC Comics?

5        A.    I recall seeing maybe a page or two of -- of

6    some royalty formulas with sort of blocking-outs above

7    and below, so, you know, maybe a page or two of limited

8    information during this whole process.

9        Q.    Okay.  But that's all?

10       A.    Right.

11       Q.    I'll show you what's been previously marked

12   Exhibit 27.  Do you recall seeing Exhibit 27?

13       A.    Not specifically.

14       Q.    Generally?

15       A.    Generally, uh-huh.

16       Q.    Okay.  What do you recall about it?

17       A.    I think this is the part of the relationship

18   where Larry was in the middle trying to mediate, if you

19   will, a little bit of it and I think that part of his

20   task was again to try and see what both parties were

21   agreeable upon and what -- what they were disagreeing

22   upon and then trying to gather information on what would

23   sort of soothe both sides.

24            It appears that is Larry's attempt to find

25   some of that information out from Neil's end and then

1    possibly pass it on to me.

2        Q.    Do you recall getting that information from

3    Larry?

4        A.    Not specifically, but he sent it to me

5    because I probably did.

6        Q.    But you have no independent recollection of

7    your consideration of that information in Exhibit 27?

8        A.    If I got this, I would have -- I would have

9    either had a follow-up oral conversation with him or

10   made some notes on this concerning some of the

11   information that we have in here, so --

12       Q.    So, do you believe that there is a copy of

13   this document somewhere that has your notes on it?

14       A.    It's possible.

15       Q.    Do you recall seeing any such annotated copy

16   of this document?

17       A.    I don't recall.

18       Q.    Okay.  So, is what you're saying you don't

19   know if you put notes on a copy of this document but

20   that that's your standard practice?  Is that what you're

21   saying?

22       A.    Yeah.  Again I don't type much, you know, so

23   I'm sort of slow at typing, so usually what I'll do --

24   and I don't write a lot of memos either, so what I

25   usually do is when I get information to me I usually

1   scribble on what people are presenting to me and then I

2   use that as a follow-up to a conversation that I'll

3   usually have back saying, you know, "Look at point 2.

4   I've got a question about point 2," so --

5       Q.    And you don't recall whether you did that

6   with regard to Exhibit 27 or not?

7       A.    Yeah.  I don't know.  If Larry had given this

8   to me, then I would have -- I would have at least looked

9   at it.  I don't know what the complete follow-up to it

10  was, but I would have looked at it.

11      Q.    And do you know whether you would have jotted

12  notes on your copy of it?

13      A.    It's possible.  I mean, if I had -- I either

14  would have jotted notes or any clarity or I would have

15  verbalized those questions to get clarity.

16      Q.    Okay.  Do you have any recollection of that

17  at all with regard to this document?

18      A.    Not specifically how I did it one way or the

19  other.

20      Q.    Do you recall doing it one way or the other?

21      A.    No.

22      Q.    Exhibit 26, do you recall getting that?

23      A.    No.

24      Q.    Exhibit 29, take a look at that for a minute.

25            Do you see Exhibit 29 appears to be a FAX to

1    Neil from Larry Marder?

2        A.    Right.

3        Q.    Dated December 17, 1996?

4        A.    Right.

5        Q.    And it says, "Enclosed is TMP's offer

6    regarding royalties for Angela, Medieval Spawn and

7    Cogliostro," correct?

8        A.    Right.

9        Q.    Do you recognize that that is what this is?

10       A.    Right.

11       Q.    Okay.  Describe the process that resulted in

12   your coming up with this offer?

13       A.    I don't recall the specifics, but we were

14   exchanging information back and forth, so this appears

15   to be either an offer or -- or potentially a

16   counter-offer to the ongoing conversations that we were

17   having.

18       Q.    Did these different percentages here, did you

19   come up with those?

20       A.    I would have based on the information that

21   would have been given back to me.

22       Q.    From whom?

23       A.    From Larry and -- and Neil through the

24   process.  I wasn't working independent through all this.

25       Q.    And what information went into your coming up

1   with this offer?  How did you come up with it?

2       A.    I don't know.  It may be looking at some of

3   the information that Neil had passed on either himself

4   or through Larry and then trying to come up with numbers

5   that would make sense in the context of getting to the

6   point that we wanted to, which was to try and get that

7   DC contract.

8       Q.    Okay.  Well, first of all, you see how your

9   counter-offer is organized by character?

10      A.    Right.

11      Q.    And the percentages for the Angela character

12  are five times the percentages for the Medieval Spawn

13  and Cogliostro characters, correct?

14      A.    Correct.

15      Q.    Do you recall making that decision or coming

16  up with that relationship?

17      A.    Only -- only that, again going to what I

18  mentioned yesterday, that I felt that Medieval Spawn and

19  Cogliostro were essentially my characters and that

20  Angela I understood the effort that we both put into it,

21  so I gave her a lot more weight in what I was willing to

22  pay than I did those other two characters.

23      Q.    Okay.  And looking at Exhibit 29, it talks in

24  terms of percentages of net.

25      A.    Right.

1     Q.    What is net?

2     A.    Well, in this case it would depend upon sort

3   of the end result of what Todd McFarlane Productions had

4   done, so --

5     Q.    So what you were saying, for instance, for

6   Angela comic books you were proposing that you would pay

7   Neil 10 percent of what Todd McFarlane Productions

8   received?

9     A.    Right.

10    Q.    And for comic books Todd McFarlane

11  Productions would receive money from Image under the

12  process you had discussed earlier, correct?

13    A.    Right.

14    Q.    Okay.  And then for licensing for foreign

15  comics, that would be again what Todd McFarlane

16  Productions would get?

17    A.    Right.

18    Q.    And what was the -- who would pay Todd

19  McFarlane Productions for foreign comics?

20    A.    It would be the various international comic

21  book distributors around the world.

22    Q.    Such as?  Just give me an example.

23    A.    Well, I think we had one in Italy and one in

24  Japan, I mean, so we would have various contracts with

25  various people for different -- each language was

```
1    usually a different contract, so -- and then they would

2    give you money.

3         Q.   And the money would come -- I mean, these

4    were companies that weren't affiliated with you?

5         A.   Right.

6         Q.   Okay.  And so they would pay -- these are

7    distributors, publishers?  What are they?

8         A.   Yes.  Some of them were both.  You know,

9    again each guy sort of had his own business.  Some were

10   strictly publishers and some did a little bit of both.

11        Q.   And did TMP Asia or TMP Europe have anything

12   to do with publishing or comics or was that just toys?

13        A.   Just toys.

14        Q.   And then foreign trade paperbacks the same

15   thing?

16        A.   Right.

17        Q.   Did Todd McFarlane Productions have standard

18   contracts with foreign companies as to what you would,

19   you know, kind of what your share would be, how that

20   worked?

21             You described how the Image contract worked

22   for domestic companies.  How did it work for foreign

23   companies?

24        A.   I don't know there was a standard.  I think

25   each country potentially had a standard, but you
```

1    couldn't match them all together.  You couldn't say

2    Spain was Japan because again depending upon, I believe,

3    the sort of the need for American comic books depended

4    upon what they were willing to give and the sales that

5    they were projecting, so each one was pretty much

6    individual.

7        Q.    Okay.  And then movies, audio and stage, 5

8    percent of net.  What's the net there?

9        A.    Well, again it would be some calculation of

10   what Todd McFarlane Productions received.

11       Q.    And how does what Todd McFarlane -- I mean, I

12   thought it was Todd McFarlane Entertainment that did

13   that kind of thing.

14       A.    No.  Todd McFarlane Entertainment didn't come

15   into existence until like around '98 or '99 officially,

16   so --

17       Q.    So, as of the end of 1996 what were the kinds

18   of income that Todd McFarlane Productions were receiving

19   from movies, audio or stage?

20       A.    In what year?

21       Q.    At the time of Exhibit 29, the end of '96.

22       A.    Nominal at best.  Maybe even none.

23       Q.    Retail products includes toys.  What does net

24   mean there?

25       A.    Whatever formula we agreed to of what Todd

1  McFarlane Productions ended up with.

2      Q.    And we testified earlier as to your various

3  toy companies.  There are a number of them, correct?

4      A.    Right.

5      Q.    And how does -- how does income they receive

6  from the sale of toys come back to Todd McFarlane

7  Productions?

8      A.    If it's based on ideas that Todd McFarlane

9  Productions is licensing out, then we pay a royalty

10  percentage, it looks like, just like we do with all the

11  other ones.

12          So, if it was, for instance, if we do

13  baseball toys we have to give royalties to the baseball

14  players.  If we do a movie, Austin Powers, we owe money

15  to the company that owns Austin Powers.  If we do Spawn,

16  we owe money to the company that owns Spawn.  That would

17  be Todd McFarlane Productions.  So we pay a percentage

18  to Todd McFarlane Productions.

19      Q.    So that would be the case for Spawn, Angela

20  and Cogliostro?  So, how was that calculated?

21      A.    I think generally it was around 5 percent.

22      Q.    Five percent of?

23      A.    Five percent of the wholesale price that we

24  sold to our vendor.

25      Q.    Okay.  So that would go to Todd McFarlane

1    Productions.   And for the Angela toys you were proposing

2    that Neil accept 10 percent of that 5 percent, correct?

3    Bottom of the first page.

4        A.    Right.

5        Q.    Okay.  Or half of one percent, correct?

6        A.    Correct.

7        Q.    Cards.  Was that Todd McFarlane Productions?

8        A.    Right.

9        Q.    And so is the net with reference to Todd

10   McFarlane Productions, how did payments for cards work

11   with Todd McFarlane Productions?

12       A.    The same as everything else.  So again I

13   believe that the -- eventually we did cards.  I don't

14   know if they are out there or whatever, but another

15   outside company did it and then money would eventually

16   be given to me, Todd McFarlane Productions.

17       Q.    And so let me just understand hypothetically.

18   You had some cards and they would have a number of

19   characters on them and let's say one of the characters

20   was Angela.  How would -- just as a practical matter

21   assume that this was the agreement in place.  How would

22   the 10 percent to Neil be calculated?

23       A.    Well, given we haven't defined all the

24   specifics, but let's use generalities here.  We'll just

25   use round numbers to sort of make it easy for everybody.

1    If there were a hundred cards in a set and

2    let's say one card out of the hundred contained Angela,

3    that would mean that she is 1/100.

4    If I received as Todd McFarlane Productions

5    $100, then I would say, "Hey, I got -- I got -- I got

6    $100 but Angela is at this point 1/100 of that."  And so

7    again at that point actually in that case I'd probably

8    have just split that one dollar in half, half to Todd

9    and half to Neil.

10    Q.    So a 50 percent of net as opposed to a 10

11    percent of net?

12    A.    Well, in that specific case because there's a

13    fraction.

14    Again there's no definitions as to net.  We

15    didn't get that far as to defining and clarifying how we

16    would actually define the net.  You can actually sub

17    break net up into a lot of areas depending upon whether

18    it's an inclusive of one character or whether it's a

19    multitude of characters.  We never got that far.

20    Q.    Well, again this is your proposal, right?

21    A.    Right.

22    Q.    And it was you telling -- and you dictated

23    this to Mr. Marder, correct?

24    A.    Or over the phone, right.

25    Q.    And so -- so -- but what you're saying is at

1    the time you did this you were proposing these

2    calculations in terms of net, but you hadn't nailed down

3    in your own mind what you were meaning by net?

4        A.    Right.

5            Well, what I wanted to do hopefully is to --

6    is to have a dialogue eventually with Neil that we could

7    actually agree what net is.

8            Net is a very ambiguous word, as you may or

9    may not know, in any field.  And so it shouldn't

10    necessarily be a one-sided conversation.  So both

11    parties should agree what net is eventually.

12        Q.    And what Exhibit 30 was is essentially a

13    counter-offer to Neil's proposal which had been in some

14    of the prior exhibits?

15        A.    Right.

16            And again just to sort of add a little bit,

17    some of the reason for nets, too, is that there is

18    always I think confusion that Todd McFarlane Productions

19    and Image comic books weren't the same entity.  And so

20    because Image comic books gathered all the money didn't

21    necessarily mean that's what the money was, where in the

22    case of the DC contract, DC gathers it and like there is

23    no middle man for DC comic books.  So this is making

24    clear to Neil that, you know, I'm not Image.  It's me

25    and you.  This is what I get from Image.  Then I can

1    start splitting the pie that I get because otherwise I

2    don't have anything, so --

3        Q.    Did you ever tell Neil that the percentage

4    with regard to toys is the percentage that went to Todd

5    McFarlane Productions as opposed to TMP International

6    or, you know, your toy companies?

7        A.    Well, given that Neil and I -- communications

8    were always between Todd McFarlane Productions and Neil,

9    I don't know if I ever specifically, but that was our

10   relationship, Todd McFarlane Productions and Neil

11   Gaiman.

12       Q.    And how did you come up with -- with the

13   percentages?

14       A.    You know, I don't recall.  I know that Neil

15   had been giving us some information and Larry passed

16   some, so I was probably trying to amalgamate it all in

17   in a way that would make sense.

18       Q.    And do you recall the process by which in

19   your counter-offer you were proposing payments relating

20   to Medieval Spawn and Cogliostro of one-fifth of the

21   payments for Angela?  Do you recall how you -- where the

22   math came from with that?

23       A.    Not exactly, no.

24       Q.    Generally do you have any recollection?  I

25   mean, I understand your testimony as to why you thought

1    it should be smaller.

2         A.    Uh-huh.

3         Q.    And was this just where you ended up with

4    that?

5         A.    Again it was a counter to what Neil was

6    bringing the information or information that I had.  So

7    again trying to clarify the value of each one of these

8    characters and who sort of created what, it was more of

9    that, you know.

10             I think it was more a generality that I felt

11   just looking at these numbers that, you know, Angela

12   should be getting a lot more because I understood that.

13   I was a little more suspect on the other two.

14        Q.    I'll show you what's been marked Exhibit 31.

15   Do you recall seeing that?

16        A.    No.

17        Q.    Do you have any recollection about Exhibit

18   31?

19        A.    No.

20        Q.    Exhibit 32.

21        A.    Is that the same thing that I just saw or

22   not?

23             MR. KAHN:  There's been some changes.

24             THE WITNESS:  What.

25             MR. KAHN:  Different date.

1    BY MR. ARNTSEN:

2         Q.    If you look at -- if you want to compare

3    Exhibit 32 to Exhibit 30, and Exhibit 32 is about two

4    months later, and what it appears to do is add a

5    reference for McFarlane Toys.

6         A.    Oh, I see.

7         Q.    And what I'm trying to understand is the

8    process that you went through in revising your

9    counter-offer to add that additional reference to

10   McFarlane Toys.

11        A.    Oh, I see.  It appears that although it

12   should read Todd McFarlane Productions, again we sort of

13   ran into it, you and I, that once you start using my

14   name and all these companies, people start to confuse.

15             So this -- this appears to be a clarification

16   that Neil's deal is with Todd McFarlane Productions.

17   And so again people have a tendency to want to jump by

18   the party that they are actually doing business with and

19   lump all my companies, although they are separate, as

20   sort of doing business with them directly.  And so again

21   I think this is clarifying that he would get a

22   percentage of what Todd McFarlane Productions got and

23   from the toy company, not what the toy derived because

24   that's -- that's another number.

25        Q.    Do you recall the process that caused you to

1    modify your counter-offer with this?  Were there some

2    discussions involved that you can recall?

3         A.    There were either -- no.  Somebody might have

4    been confused about a definition.  Somebody might have

5    just been trying to clarify a definition or something.

6         Q.    Do you recall any conversations with Neil

7    during this time about this sort of exchange of

8    information and offers and counter-offers?

9         A.    What was the question?

10        Q.    Do you recall having any conversations with

11   Neil really between the meeting in your house in Phoenix

12   and when you met with him in Oakland in May of '97?

13        A.    Right.

14        Q.    Do you recall any conversations with him in

15   between those two times?

16        A.    Not specifically.

17        Q.    Do you have any general recollection of any

18   such conversations?

19        A.    Yes, I do.  I don't recall.  I know again,

20   because I know Larry was doing most of the go between,

21   so I don't know.  I don't recall if Neil and I ever

22   butted into each other during any of that.

23        Q.    So you don't have any recollection of any

24   such conversations?

25        A.    Right.

1    Q.    Is that correct?

2    A.    Right.

3    Q.    What do you recall happening next after you

4  sent the revised counter-offer, Exhibit 32?

5    A.    Generally, I -- I know it wasn't accepted.

6    Q.    How do you know that?

7    A.    Because we were sitting in the room and Neil

8  is suing me right now.

9    Q.    Do you have any other recollection as to, you

10 know, what happened next after Larry sent out Exhibit 32

11 in February of '97?

12   A.    No, not directly to what the reaction was.

13        MR. ARNTSEN:  Mark this.

14        (Deposition Exhibit Number 47 was then

15         marked for identification.)

16 BY MR. ARNTSEN:

17   Q.    I'll show you what's been marked Exhibit 47.

18        And just for the record here, Mike, just to

19 make this clear with this, we had -- we just came out --

20 Jeff just came up with this yesterday.  Is that correct?

21        MR. SIMMONS:  Yes.

22        MR. ARNTSEN:  We haven't produced it yet.

23        MR. SIMMONS:  This is correct.  We found

24 documents in another attorney's office that we were in

25 the process of going through and producing and some of

1    them may have been produced to you this week and we got

2    it back.

3             (Discussion off the record.)

4    BY MR. ARNTSEN:

5        Q.    Have you seen Exhibit 47 before?

6        A.    No.  Or I don't recall.

7        Q.    Do you have any recollection of seeing

8    Exhibit 47 before?

9        A.    No.

10       Q.    And you see that Exhibit 47 is a letter from

11   Neil's lawyer to Larry Marder, correct?

12       A.    Right.

13       Q.    And that attached is some DC contracts,

14   correct?

15       A.    It appears to be a replication of some type

16   of contract, but I don't know what that contract is.

17       Q.    Right.  But on the third page from the top it

18   says "DC Comics," correct?

19       A.    Right.  But this is a Xerox, so I can't vouch

20   for its authenticity.

21       Q.    Right.

22       A.    So it's a contract here.

23       Q.    Right.  But on the first page it says DC

24   contracts and Neil Gaiman, right, or DC Comics and Neil

25   Gaiman?

1      A.    Right.

2      Q.    And you see on the first page of Exhibit 47

3    the first paragraph indicates that this appears to be a

4    response to your February 18th offer, which is Exhibit

5    32, right?

6           MR. KAHN:   It's sent to Larry Marder for your

7    reference there.

8           THE WITNESS:   Right.  But that's what that

9    line says there.

10   BY MR. ARNTSEN:

11     Q.    And do you recall discussing Exhibit 47 with

12   Mr. Marder?

13     A.    No.

14     Q.    No recollection at all?

15     A.    No.

16           (Deposition Exhibit Number 48 was then

17            marked for identification.)

18   BY MR. ARNTSEN:

19     Q.    I'm showing you what's been marked Exhibit

20   48.

21           Off the record.

22           (Whereupon, a short recess was then had at

23            10:22 a.m. until 10:25 a.m.)

24   BY MR. ARNTSEN:

25     Q.    Take a look at Exhibit 48.  Do you recall

1    seeing that document before?

2        A.    I don't recall, but it appears to have been

3    sent to me.

4        Q.    Do you see how -- it appears to be a note to

5    you from Neil, correct?

6        A.    Correct.

7        Q.    Dated April 22, 1997, correct?

8        A.    Correct.

9        Q.    And you see it indicates in the first

10   sentence, "Further to our yesterday's conversation" and

11   then he talks about toy payment?

12       A.    Correct.

13       Q.    Do you have any recollection of that

14   conversation?

15       A.    Not specifically.

16       Q.    Generally?

17       A.    Well, generally I think all the conversations

18   were we're humming the same bars.  We were still trying

19   to plow through our global sort of agreement here.

20             So I'm -- generally I would say the

21   conversation dealt with us trying to keep moving forward

22   through the process.

23             MR. ARNTSEN:  Mark that.

24             (Deposition Exhibit Number 49 was then

25             marked for identification.)

```
 1    BY MR. ARNTSEN:

 2        Q.    Can you just take a look at Exhibit 49.  And

 3    I'm not going to -- you don't need to -- I mean, it's up

 4    to you.  You certainly are free to read it if you want

 5    to, but I am not going to ask you questions about the

 6    details or substance of it.  I'm going to basically ask

 7    you what it is and put it in context?

 8        A.    Okay.

 9        Q.    So, take as much time as you think you need

10    to feel comfortable with Exhibit 49 and if you decide

11    you want to look at it in more detail because of some

12    question I ask you, you'll have plenty of time to do it

13    at that time, too.

14              Do you recognize what Exhibit 49 is?

15        A.    Yes.  It looks like it's a transcript of --

16    of a conversation Neil and I had.

17        Q.    Was this a conversation in April or early

18    May, 1997?

19        A.    Probably.

20        Q.    Okay.  Where was the meeting?

21        A.    I think it was in Oakland up in somebody's

22    hotel room.

23        Q.    And do you recall that conversation being

24    taped?

25        A.    Right.
```

1    Q.    And then do you recall requesting a copy of

2    that tape?

3    A.    I think later on either a copy of the tape or

4    a transcript or something.  Just some documentation of

5    having -- having it, you know.

6    Q.    And generally what was the -- what was the

7    subject matter or purpose of the meeting that Exhibit 49

8    relates to?

9    A.    I think at this point, having failed to not

10    be able to come to some resolution with Larry Marder

11    working in between, I think that we got back to Neil and

12    talked again, if you will, and either he or I requested

13    trying to just get the two boys in the room and see if

14    we couldn't plow through all this again.  So it was --

15    it was just a continuation of ongoing conversations.

16    Q.    Trying to work out a resolution of the issues

17    between you?

18    A.    Right.

19    Q.    I'll show you what's been marked Exhibit 2.

20    A.    Okay.

21    Q.    Do you recall seeing that before?

22    A.    Yeah.  I think Neil sent it off to me.

23    Q.    And what did you do upon receiving Exhibit 2?

24    A.    I don't recall specifically, but generally I

25    would have done sort of the same thing, taken a look at

1   it.  If I had any follow-up questions or inquiries, I

2   would have -- I would have asked about them.

3       Q.   Okay.  Asked who about them?

4       A.   Well, either get clarification from Neil or

5   if that wasn't enough then possibly try to get answers

6   elsewhere, but again looking at information trying to

7   see whether that's acceptable information or not.

8       Q.   Do you notice that Exhibit 2 has a FAX line

9   across the top dated July 30, 1997 from Todd McFarlane

10  Productions to Paul?

11      A.   Right.

12      Q.   Who's Paul?

13      A.   Probably Paul Burke.

14      Q.   And who is he?

15      A.   The president of the toy company.

16      Q.   Okay.  Do you recall discussing Exhibit 2

17  with anyone after you received it?

18      A.   Not really.

19      Q.   How is that different from "No"?

20           Do you have any recollection of discussing it

21  with anyone?

22      A.   No.

23      Q.   Were there any parts of Exhibit 2 that you

24  didn't understand upon reviewing it?

25      A.   Probably.

1    Q.    Exhibit 2 is Neil's proposal to you for a

2    resolution, correct?

3    A.    Right.

4    Q.    What parts of this didn't you understand?

5    A.    I don't know specifically, but given that we

6    didn't finalize the deal, there must have been something

7    there.

8    Q.    Well, why don't you look through and just

9    tell me as you sit here today if there are any of the

10   provisions there that -- that you don't understand or

11   believe you didn't understand back then?

12   A.    Again they would have been probably more

13   general questions.  So, for instance, let's just start

14   at the top.  Creator royalties; well, what's the

15   definition of a creator?  In some contracts sometimes

16   that includes the writer, the writer, penciler and the

17   writer, penciler, inker.  As a matter of fact, in some

18   cases it also includes the letterer and the colorist.

19   So he's got a creator royalty.  Well, who is that?

20   Because I penciled and inked, so is the inker involved

21   in this or wouldn't he be involved in it?

22   Q.    Okay.

23   A.    Again questions like -- at times it was one

24   of the things that kept sort of hopping in and hopping

25   out was I was getting numbers and I had to clarify again

1    is that number for the creative party?  Then we have to

2    divide it by two because there was at least two of us.

3    Sometimes we even had to divide it by three given that I

4    was the inker.  So is that an inclusive number or isn't

5    it an inclusive number?

6          Later on merchandising, promotional he uses

7    net again as we sort of determined earlier and that's

8    sort of an odd word and I probably would have wanted

9    some clarification or figured out how we got to net and

10   we would have had to sort of make sure that we were all

11   on the same page as to net.

12         And even in some of the pro rata stuff that

13   we would have to come up with some kind of agreement,

14   and again there's different sets of circumstances to

15   different situations and all, so it would have just

16   been -- it would have just been general clarification.

17        Q.    I'll show you what's previously marked

18   Exhibit 1.  Have you seen that before?

19        A.    No.

20        Q.    Do you see that?  Who is Sheila Egger?

21        A.    She is my assistant.

22        Q.    It appears she just indicated to Neil that

23   you were going to get back to him with a response to

24   Exhibit 2, is that correct?

25        A.    Right.

1      Q.    Do you recall doing so?

2      A.    Not specifically, but I might have just said

3   "Tell Neil I'll get back to him."  So whether she did

4   that as a FAX or a phone, I don't know how she would

5   have done it.

6      Q.    What do you recall was the next step in this

7   process?

8      A.    I don't.

9      Q.    I'll show you a document that's marked

10  Exhibit 19.  Do you recall seeing Exhibit 19?

11     A.    Right.

12     Q.    And what is Exhibit 19?

13     A.    It appears to be a letter from Neil to myself

14  and us again trying to get to a resolution of our

15  ongoing discussions.

16     Q.    And he's proposing a resolution, correct?

17     A.    Right.

18     Q.    And what was your --

19     A.    Or he's doing a point.  We're going over big

20  broad strokes here, right.  We're getting the main

21  points, if you will, of some of the accounting, so --

22     Q.    Were there any significant issues with regard

23  to the resolution that were not set -- not discussed in

24  Neil's letter?

25     A.    Well, most of this is accounting, so again

1    eventually we'd have to get around to doing the things

2    that lawyers like to have in contracts, too:    Indemnity

3    clauses, who has jurisdiction, or when you trade off,

4    all those other sort of silly paragraphs, so --

5        Q.    What was your response to Exhibit 19?

6        A.    I think we were -- I think we were heading in

7    a good direction.  I think -- I don't know if this

8    came -- it appears this came after our conversation in

9    Oakland, so this was taking some of what Neil and I had

10   discussed in Oakland and tried to push this all forward.

11       Q.    Okay.  Can you identify what Exhibit 20 is?

12       A.    It is a handwritten FAX.  It looks like it's

13   from me sent to Neil.

14       Q.    I notice that on the third line it says, "All

15   I can say to the point is beauty."

16       A.    Right.

17       Q.    What does that mean?

18       A.    It's a Canadian term.  It says right there.

19       Q.    I know.  What's it mean?

20       A.    It means -- it means pretty good.

21       Q.    Okay.

22       A.    Right.

23       Q.    As of this point in time did you think you

24   pretty well had a deal in place?

25       A.    Well, I -- I thought we had some of the broad

1    strokes of the accounting inching toward where we wanted

2    to go to, right.

3        Q.    And you said there were a couple of other

4    clarification questions you had, right?

5        A.    Right.

6        Q.    And were there any open issues in your mind

7    other than those that you set forth in Exhibit 20?

8        A.    Well, directly everything outside of

9    accounting still is sort of open to discussion, but

10   again this is all accounting.  Most of this stuff that

11   Neil and I were -- the big issues were usually

12   accounting issues, so again there would have to be

13   follow-up details.  But again as far as accounting,

14   these seem to be my -- my concerns at this time.

15       Q.    And again these discussions weren't just

16   limited to accounting.  For instance, sort of central to

17   the transaction was Neil exchanging his rights in

18   Cogliostro and Medieval Spawn for your rights in

19   Miracleman, correct?

20       A.    Right.  His accounting rights.  Not his

21   rights.  His accounting rights.

22       Q.    So, was he still retaining -- he wasn't

23   conveying to you all of his rights to Cogliostro and

24   Medieval Spawn in exchange for all of your rights to

25   Miracleman?

1    A.    I don't understand the question.

2    Q.    Okay.  You said that -- when I asked the

3  question initially you said, no, Neil was only going to

4  convey to you his accounting rights --

5    A.    Right.

6    Q.    -- to Cogliostro and Medieval Spawn.

7    A.    Right.

8    Q.    What rights was he going to retain after

9  having done that?

10    A.    Well, at that point that's all he had --

11    Q.    Okay.

12    A.    -- was accounting rights.

13    Q.    So, he was going to convey what he had to

14  you?

15    A.    What I think it was was that -- is that he

16  was getting paid moneys for some of those characters, so

17  again those accounting rights then would be shifted over

18  to me and I wouldn't have to actually pay him any more

19  for Medieval Spawn or, you know, however we decided the

20  other characters for an example.

21    Q.    Okay.  Right.  So what this deal contemplated

22  was he was going to convey to you whatever rights he had

23  in Cogliostro and Medieval Spawn in exchange for

24  whatever rights you had in Miracleman, correct?

25    A.    For accounting purposes.

1    Q.    Well, for the -- after that transaction he

2    wouldn't have any residual rights of any kind in

3    Cogliostro and Medieval Spawn, correct?

4    A.    I believe that's what we had agreed to.

5    Q.    And you wouldn't have any rights, residual

6    rights, in Miracleman, correct?

7    A.    Correct.

8    Q.    So whatever rights you had, they were getting

9    transferred back and forth, right?

10    A.    Right.

11    Q.    And that was -- I mean, that was one of the

12    terms of the deal that Neil was setting forth in Exhibit

13    19, correct?

14    A.    Right.

15    Q.    And then what the accounting issues related

16    to were sort of back payments relating to Cogliostro and

17    Medieval Spawn up to the time of the deal and then

18    payments for Angela both going backwards and forwards,

19    correct?

20    A.    Right.

21    Q.    Those were the accounting issues, right?

22    A.    Right.

23    Q.    And, for instance, as among the rights that

24    you were going to convey to Neil relating to Miracleman

25    were any copyright or trademark rights you had to

1    Miracleman, correct?

2        A.    Correct.

3        Q.    And again putting aside the question of, you

4    know, whether he had any and what they were, whatever

5    intellectual rights Neil had to Cogliostro and Medieval

6    Spawn were coming to you, correct?

7        A.    It was never a point of conversation, but,

8    you know, we assumed that lock, stock and barrel both

9    ways, yes.

10       Q.    Okay.  I'll show you what's been marked

11   Exhibit 33 and ask you if you've seen that?  And you may

12   want to look at it in the context of Exhibit 20.

13             Do you recognize Exhibit 33 as a response by

14   Neil to you of your note to Neil that's Exhibit 20?

15       A.    Right.  Actually, we -- they both have the

16   same date.

17       Q.    Right.  And in 20 you state in the second

18   paragraph "Before consummating this marriage I just need

19   clarification on a few things," correct?

20       A.    Correct.

21       Q.    And the first one relates to the exchange

22   date, correct?

23       A.    Right.

24       Q.    And that's item 1 of Neil's response,

25   Exhibit 33, correct?

| | |
|---|---|
| 1 | A.   Right. |
| 2 | Q.   And so was that satisfactory to you? |
| 3 | A.   Well, we would probably do a follow-up, |
| 4 | something a little more impressive than two boys doing |
| 5 | handwritten stuff given that we had a complete dispute |
| 6 | at this point, but again the big points -- the big |
| 7 | points for accounting were agreed upon here. |
| 8 | Q.   And nowhere in any of this correspondence |
| 9 | does it discuss this follow-up contract you're talking |
| 10 | about, right? |
| 11 | A.   Right. |
| 12 | Q.   Okay.  So item 1 of Exhibit 33 is Neil's |
| 13 | response to your first request for clarification, |
| 14 | correct? |
| 15 | A.   Right. |
| 16 | Q.   And that was satisfactory to you, correct? |
| 17 | A.   Right. |
| 18 | Q.   Then item 2 was your question on whether the |
| 19 | creator royalty presented, you say, in his DC offer. |
| 20 | Where the heck is that?  What were you referring to |
| 21 | there, the creator royalty presented in his DC offer? |
| 22 |        Is that referring to Exhibit 2, the creator |
| 23 | royalty discussed there? |
| 24 | A.   It may -- it may have been have just been -- |
| 25 | I don't know specific to any one of these papers, but |

1    again just the general term in and of itself because

2    it's -- again royalties are sometimes divisible

3    depending on the number of people.

4        Q.    Right.

5        A.    So again sometimes -- and this was part of

6    the confusion.  Sometimes Neil would use the term and

7    sometimes it related to just the writer's pot and other

8    times it related to more than the writer's pot and it

9    seemed to sort of move at times, so I needed to start to

10   sort of clarify that.

11       Q.    It refers to the creator royalty in Exhibit

12   2, correct?

13       A.    No.  I'm -- I'm asking the question generally

14   as it pertains to the questions that we discussed all

15   the time, so I don't know if it was specific to any one

16   number.  It was just, "Let's be clear that when we're

17   talking about certain things, you know, as a creator

18   royalty in DC, when you use 'creator' is that writer or

19   is that creator?  And if it's creator, then how many

20   people are involved in the creator part of it?"

21       Q.    And then in item 2 of Exhibit 33 he responds

22   to that question, correct?

23       A.    Correct.

24       Q.    And he says no, that's the writer, creator

25   royalty, correct?

1      A.    Right.

2      Q.    And did you have any further discussions with

3   him on this?

4      A.    I don't think so.

5      Q.    Okay.  And then item 3 refers to the -- well,

6   it's not numbered, your third request for clarification

7   which is in that indented paragraph on Exhibit 20,

8   correct?

9      A.    Right.

10     Q.    And you said it relates to a formula DC

11  Comics uses on derivative characters, correct?

12     A.    Right.  Right.  I was asking for the formula.

13     Q.    Right.  And Neil says the formula is 50

14  percent of Angela, right?

15     A.    Correct.

16     Q.    Did you have any further discussions with

17  Neil on that?

18     A.    No, not that I recall.

19     Q.    So Neil had responded to all of your -- to

20  your requests for clarification and you had no further

21  discussions with him on his responses, correct?

22     A.    I don't recall any.

23     Q.    Okay.  So at this point in time did you

24  believe you and Neil had reached an agreement on the

25  royalty and accounting issues?

1    A.    No.

2    Q.    So what was still left to be agreed on?

3    A.    Some of these answers.

4    Q.    Well, and what were you doing -- again I

5    thought you indicated you didn't get back to Neil on any

6    of his answers?

7    A.    Right.

8    Q.    So, what was the disagreement?

9    A.    Well, it -- let's just take it from my

10   perspective now, okay?  We're getting close.  I've got

11   my hopes up.  So I asked a couple follow-up questions to

12   Neil because we're getting close and I get these

13   answers.

14        I'm suspect about the answers.  I've been

15   suspect about some of his answers for quite some time,

16   sir.  So, when I see that he's now making up a formula,

17   he's not saying, "This is how it works."  He's making up

18   a formula.  "I'll just calculate it."

19        Now he's making it up that it's like, well,

20   is it a formula or isn't it a formula?  You keep

21   referring to your DC contract and now are you just going

22   to make it up on the sly here?  You know what, I'll do

23   some investigation on my own.

24        So at this point now I'm not getting again

25   the satisfaction I need out of Mr. Gaiman's answers, so

1    I at this point decide I should sort of investigate a

2    little bit further.

3        Q.    And did you look at the DC contract that was

4    sent to Mr. Marder?

5        A.    No.  I never saw it.

6        Q.    Well, then the --

7        A.    I never saw it.  This is the first time I've

8    ever seen this elusive contract, so it will be quite

9    curious reading tonight.

10       Q.    And did you talk -- Mr. Marder had previously

11   provided to you a summary of Neil's DC contract

12   provisions, correct?

13       A.    I don't know if it came from him, but I got

14   something of one, one page or two pages or something.

15       Q.    We previously discussed Exhibit 27, correct?

16       A.    Right.  I thought you meant from his actual

17   contract.  Excuse me.

18       Q.    No.  But Exhibit 27 is a memo from Larry

19   Marder to you saying enclosed is a breakdown of all the

20   contracts that Neil is working under at DC, correct?

21       A.    Correct.

22       Q.    So, did you check back with Mr. Marder

23   saying, "I want to -- I want to verify some of Neil's

24   statements here"?

25       A.    Well, somewhere along the line Mr. Marder got

1  pushed out of all of this because it wasn't working

2  again.

3       Q.    Right.

4       A.    So again I don't -- I don't quite recall.

5  But again I was getting conflicting information or

6  inconsistent would be sort of a fair term --

7       Q.    All right.

8       A.    -- information and I needed sort of

9  clarification.

10      So, at this point in '97 I believe there is

11 no Larry Marder.  I have pushed both of us somewhat --

12 there is no Larry.  It's Neil and I again.  I'm now

13 having dialogue with Neil and I'm asking Neil questions

14 and I'm getting answers and the answers don't quite sit

15 with me.

16      So now I'm -- at this point I believe this is

17 when I tried to contact Terri Cunningham because she is

18 the keeper of the DC contracts, so, you know, she -- she

19 would have sort of -- she is as close to the horse's

20 mouth as I can get.

21      Q.    Okay.

22      A.    So I wouldn't have talked to anybody really.

23 I wanted to sort of get this down to make sure that we

24 were both sort of consistent and happy with where we

25 wanted to be here and I had outstanding issues at this

1    point.

2         Q.    Did you ask Neil to send you a copy of his DC

3    contract?

4         A.    Casually off and on.  I said, "You want to

5    send me the contract?  It would make it easier."  But

6    again for privacy reasons and I -- I got contracts, too,

7    you know.  So, you know, he didn't want to send it.

8               He gave me his numbers.  I assumed they were

9    truthful numbers based on reality.  So again, you know,

10   that was -- that was sort of our relationship at the

11   beginning, so --

12        Q.    What do you mean he didn't want to send them?

13        A.    I never had it.  I never got it.  So I don't

14   know what his reasons are.  Mr. Gaiman, you can ask him

15   why he never sent it to me.

16        Q.    Okay.  Even though he did send it to

17   Mr. Marder?

18        A.    He sent it to Mr. Marder.  He didn't send it

19   to me, so --

20        Q.    And Mr. Marder was your employee at Image,

21   right?

22        A.    Mr. Marder was -- depending on the date, was

23   probably the head of Image comic books at that time.

24        Q.    And then went from there to work directly for

25   you -- for your company, correct?

1    A.    Correct.

2    Q.    As long as we are talking about -- we are

3    interested in the DC contract, take a look at the third

4    page of Exhibit 47.

5    A.    Okay.

6    Q.    Just a second here.  I'm just going to sort

7    through this stuff.

8          Do you see how in the first paragraph here,

9    the introductory paragraph, the second sentence, it

10   says:  "In accordance with your agreement, you have

11   revised the pre-existing characters of DREAM (SANDMAN)

12   and DESTINY."

13   A.    Excuse me.  Where am I starting to read?

14   Q.    The first paragraph, second sentence.

15   A.    Oh, okay.

16   Q.    In accordance.

17         THE WITNESS:  Right here?

18         MR. KAHN:  Right here.

19         THE WITNESS:  Oh, okay.  Go ahead.

20   BY MR. ARNTSEN:

21   Q.    "In accordance with the agreement, you have

22   revised the pre-existing characters of DREAM, (SANDMAN)

23   and DESTINY, and have created the characters of" -- and

24   then it lists a number of characters, correct?

25   A.    Right.

1    Q.    And then the last sentence of that

2    paragraph -- and then it says after, "collectively

3    referred to herein as the 'Characters'" at the end of

4    that sentence, correct?

5    A.    Right.

6    Q.    Okay.  And then if you turn to the next page,

7    item (b), Retail products and Services.  Do you see

8    that?

9    A.    Uh-huh.

10   Q.    You have to use words.

11   A.    Yes, sir.

12   Q.    And if you can take a look at item -- just

13   read through item (b) there.

14   A.    You want me to read all of (b)?

15   Q.    Yes.  Both paragraphs.

16   A.    Okay.  Okay.

17   Q.    Item (b) relates to royalty payments to Neil

18   when characters -- when the characters are used for

19   retail products, correct?

20            MR. KAHN:  But before he answers I just want

21   to object.  I'm a lawyer and I have trouble following

22   this.

23            THE WITNESS:  I'm not a lawyer and this ain't

24   my contract, so you know what --

25            MR. KAHN:  Let me just --

1      THE WITNESS:  I have no opinion about

2   somebody else's contract or definitions and what the

3   relationship is with somebody else.  So with that said,

4   ask me your questions, please.

5      MR. KAHN:  Let me -- let me --

6      MR. ARNTSEN:  I'll let your lawyer get his

7   objection in first.

8      MR. KAHN:  Let me just also say, you know,

9   this is an isolated paragraph in a document written in

10  dense legalese, which I'm having trouble following.

11     THE WITNESS:  And I have never seen.

12     MR. KAHN:  And my understanding, going back

13  to Exhibit 2, is that we are not using his special deal

14  but we are supposed to be using a standard DC deal with

15  doing these calculations.

16     But, with all of that, you can ask him

17  questions about his special deal over here.

18  BY MR. ARNTSEN:

19     Q.   Can you turn back to paragraph (b) which you

20  were just reading.

21     MR. KAHN:  We're there.

22  BY MR. ARNTSEN:

23     Q.   All right.  That relates to royalty payments

24  for retail products and services relating to characters

25  that Neil -- relating to characters, correct?

1          A.    You know, I can't speak to the definitions of

2     DC comic books, so --

3          Q.    Okay.  So you can't answer my question?

4          A.    Right.

5          Q.    All right.

6          A.    This is not my contract.

7          Q.    Right.  And you note item (b) has two

8     paragraphs, correct?

9          A.    Right.

10          Q.    And the first paragraph contains certain

11     percentage royalty payments relating to retail products

12     and services, correct?

13          A.    I can't say that.

14          Q.    Well, do you see the .8 percent?

15          A.    I see -- here's what I see.  I see that there

16     are numbers in relationship to something.  I don't know

17     exactly what those somethings are, how they derived it

18     and what their definitions are.  But I do see numbers,

19     right.

20          Q.    Right.

21          A.    I can't say specifically what each one of

22     those are for.

23          Q.    Right.  One of those numbers, the first such

24     number is .8 percent, correct?

25          A.    Right.  There is a number .8 percent on this

1    piece of paper, right.

2        Q.    And then that's under small i, correct, in

3    the first paragraph, correct?

4        A.    Right.

5        Q.    And then under small ii there's another

6    percentage, 2.5 percent, correct?

7            MR. KAHN:   We'll stipulate that that number

8    appears under ii.

9    BY MR. ARNTSEN:

10       Q.    All right.  Do you see that, sir?

11       A.    Yes.

12       Q.    All right.  And then the second paragraph

13   starts, "Notwithstanding the foregoing, with respect to

14   the characters of DREAM (SANDMAN) and DESTINY only," and

15   then it contains a following discussion, correct?

16       A.    Okay.

17       Q.    And Dream, Sandman and Destiny were the

18   characters that Neil had revised, correct?

19            If you need to look back at the first

20   paragraph on the first page of the contract you can do

21   so.

22       A.    It appears that way, although I can't

23   specifically verify what this contract is for, right.

24       Q.    And then in the second paragraph of (b) it

25   contains some percentages relating to the Dream, Sandman

1    and Destiny characters, correct?

2        A.    Right.

3        Q.    And those are different percentages than in

4    than those set forth in the first paragraph of item (b),

5    correct?

6        A.    Right.

7        Q.    For instance, instead of .8 percent there's a

8    .592 percent, correct?

9        A.    Right.

10        Q.    And instead of a 2.5 percent there's a 1.85

11    percent, correct?

12        A.    Right.

13        Q.    The numbers in the second paragraph are

14    approximately 75 percent of the numbers in the first

15    paragraph, correct?

16        A.    Well, you know, I don't know that there's any

17    direct correlation.  You're matching numbers.  I don't

18    know that there's any direct match here.

19        Q.    Okay.  So you don't know if it's

20    approximately 75 percent?

21        A.    Well, .5, .592 is not 75 percent of 2.5.

22        Q.    No, but it's --

23        A.    Your math -- you're now making -- you're

24    making an assumption that we're now matching numbers.

25    You're matching one number to another.

1              MR. KAHN:  I think he -- I think all Allen is

2    asking you for is pure math.

3              THE WITNESS:  For pure math, if you're

4    talking .592 and matching it to .8, yes.  If you're

5    matching the number 2.5 to the number 1.8, right.

6    BY MR. ARNTSEN:

7         Q.    Okay.  The numbers in i and ii in the two

8    paragraphs, the item (b), correct?

9         A.    Correct.

10        Q.    All right.  And then can you turn to page 4

11   of the contract.  Do you see under item 2 (a) it

12   discusses spin-offs?

13        A.    Yes.

14        Q.    Why don't you take a look at that paragraph

15   for a minute.

16        A.    Read it all the way down to (b)?

17        Q.    Yes.

18        A.    Okay.

19        Q.    Have you had a chance to read it?

20        A.    Yes.

21        Q.    And that provides for a pro rata allocation

22   in the case of spin-offs correct?

23        A.    You know, I --

24              MR. KAHN:  Before Todd answers, I'm going to

25   object again.  I don't know what it provides for.  I'm a

1   lawyer.  I just read this isolated paragraph.  He may

2   understand.  It's written in legalese.  He's not read

3   the rest of the contract.

4            We will stipulate that this document speaks

5   for itself.  If you want Todd to try to interpret this

6   language in isolation, I'll go ahead and let him do

7   that.  I don't know what the point is.

8            MR. ARNTSEN:  Okay.  Can you read my question

9   back, please?

10           (Whereupon, the record was then read

11             back by the reporter as requested.)

12           THE WITNESS:  You know, I -- I don't

13   understand what this is saying.  I see (a).  Next to the

14   word (a) is the word "Spin-offs."  The rest of it is --

15   is legalese that sort of unfortunately confuses me as I

16   read it.

17   BY MR. ARNTSEN:

18      Q.   Well, you see the phrase "publisher's pro

19   rata allocation," correct?

20           MR. KAHN:  Where is that?

21           MR. ARNTSEN:  The line that begins

22   "Royalties" about six from the end of the first

23   paragraph.

24           THE WITNESS:  That sentence there, it goes

25   all the way up to the top.

1          MR. ARNTSEN:  I'm just showing you where the

2     phrase was.

3          MR. KAHN:  We see a phrase that says

4     "publisher's pro rata allocation."  Do you see that

5     phrase?

6          THE WITNESS:  Yes, I do.

7     BY MR. ARNTSEN:

8          Q.   What do you understand that to mean?

9          A.   I don't know.  It's DC Comics.

10         Q.   Okay.  Can you --

11         MR. KAHN:  You know, my colleague just makes

12    a good point, which at least for the record I will note

13    that this Character Equity Agreement attached to Exhibit

14    47 actually references and apparently incorporates two

15    other agreements which are not before the witness or are

16    in the record.

17         MR. ARNTSEN:  That's fine.

18         Q.   Can you identify what Exhibit 18 is?

19         A.   Yes.  It appears to be the initial stages of

20    an attempt to draw up a contract.

21         Q.   This handwriting on it, whose handwriting is

22    it?

23         A.   Mine.

24         Q.   Who did you have draw -- draft Exhibit 18?

25         A.   I don't recall.

1    Q.    What do you recall about -- first of all, I

2    assume that Exhibit 18 was drafted at your direction?

3    A.    Right.

4    Q.    Who did you direct to do so?

5    A.    I don't know who I got this from.

6    Q.    Okay.  What do you recall with regard to what

7    information did you give whomever you directed to draft

8    Exhibit 18?  What did they use to draft it?

9    A.    I don't recall.  It could have been some of

10   the documents in front of us.  It could have been me

11   just verbalizing everything.

12   Q.    And this was a character agreement entered

13   into as of July 1, 1997 is what it says, correct?

14   A.    At the top, right.

15   Q.    And then what's the last page of Exhibit 18?

16   A.    It appears to be some accounting numbers

17   derived from Medieval Spawn, Angela, Cosmic Angela, 13

18   inch Angela toys.

19   Q.    Okay.  And then royalty calculations?

20   A.    Right.

21   Q.    Whose notes are on this?

22   A.    Mine.

23   Q.    Can you identify what Exhibit 3 is?  Have you

24   seen Exhibit 3 or any part of it before?

25   A.    No.

1    Q.    Is any of the handwriting on Exhibit 3 yours?

2    A.    No.

3    Q.    Okay.  Can you identify what Exhibit 4 is?

4  Do you know what Exhibit 4 is?

5    A.    I'm not done.

6    Q.    Okay.

7    A.    This is Exhibit 4.  It contains notes,

8  additional notes on it.

9    Q.    Have you seen Exhibit 4 before?

10    A.    I don't recall specifically, but it was FAXed

11  to me, so I probably looked at it.

12    Q.    Okay.  Is your handwriting on the first page

13  of Exhibit 4 where it says "16 pages"?

14    A.    No.

15    Q.    Okay.  Is your handwriting on the fourth page

16  which has 474 on the bottom?  Is that your handwriting?

17    A.    No.

18    Q.    Is your handwriting on the next page, 475, on

19  the bottom?

20    A.    Yes.

21    Q.    And then the next three pages are some

22  communications, correct?

23    A.    Correct.

24    Q.    Okay.  Do you recall what the purpose was of

25  Exhibit 4 being FAXed to you at your hotel?

     1          A.    Yes.   Again I think we were trying to head

     2    into a resolution and get some of the accounting out of

     3    the way at Neil's request, and I think this is just sort

     4    of the process of getting -- getting there hopefully.

     5          Q.    Let me show you what was previously marked

     6    Exhibit 4A and ask you if you can take a look at that

     7    and I'll ask you some questions about it.

     8                Have you seen Exhibit 4A before?

     9          A.    Not specifically, but I probably did.

    10          Q.    Does your handwriting appear anywhere on it?

    11          A.    On the page with the number 473 at the

    12    bottom.

    13          Q.    Yes.   Is that -- all the handwriting on that

    14    page is yours?

    15          A.    Yes.

    16          Q.    And the pages 471 and 472 is a memo to you

    17    from Allan Inglis, correct?

    18          A.    Right.

    19          Q.    Regarding the Gaiman agreement, correct?

    20          A.    Right.

    21          Q.    And it's a royalty calculation on Medieval

    22    Spawn and Angela figures, right?

    23          A.    It's his perception of it.

    24          Q.    It says "based on our agreement," correct?

    25          A.    Right.

1     Q.    And the total royalty he calculates is

2   $155,531, correct?

3     A.    Correct.

4     Q.    And then looking at page 473 with your

5   handwriting, is that this creator percentage being

6   divided by two issue that was discussed that you

7   testified to with regard to some of the prior

8   communications between you and Neil?

9     A.    In -- in a general sense this is the end,

10  trying to get a handle on how we apply all these numbers

11  throughout, somewhere throughout this process.

12    Q.    Sure.  Okay.  Mark this.

13          (Deposition Exhibit Number 50 was then

14           marked for identification.)

15  BY MR. ARNTSEN:

16    Q.    Who is Allan Inglis?

17    A.    Allan was my former COO at McFarlane Toys,

18  TMP International.

19    Q.    For what period of time?

20    A.    Maybe from '96 to 2001, for about five, six

21  years.

22    Q.    Where did he go to?

23    A.    Don't know.

24    Q.    Why did he leave?

25    A.    We moved the toy company from Michigan out to

1    Phoenix and I wasn't inclined to bring him with me.

2        Q.    So he stayed in Michigan?

3        A.    Right.

4        Q.    I'll show you what -- I'll show you what was

5    marked Exhibit 50.  Have you seen that before?  Do you

6    recall getting this?

7        A.    No, but it's got my name on it, so --

8        Q.    Do you see the last sentence?  It says, "If

9    this isn't going to happen, let me know and we can

10   renegotiate."

11       A.    Yes.

12       Q.    Did you respond in any way to that?

13       A.    No.  Or I don't recall.  I don't recall.

14       Q.    Do you know where in Michigan Allan Inglis

15   lives?

16       A.    Right now currently?

17       Q.    Lived the last time you knew.

18       A.    Well, the office was in Plymouth.  In the

19   Detroit area.

20       Q.    The best you know he resides in the Detroit

21   area?

22       A.    To the best of my knowledge.

23       Q.    Take a look at what was previously marked

24   Exhibit 5.  What's Exhibit 5?

25       A.    It appears to be some of the calculations for

1    some of the moneys that were to be paid to Mr. Gaiman.

2            MR. ARNTSEN:    Okay.   And this is within the

3    subject area that Mr. McFarlane is a 30(b)(6) designee,

4    correct?

5            MR. KAHN:    Sure.

6    BY MR. ARNTSEN:

7        Q.    What were these calculations, for the moneys

8    due Mr. Gaiman?

9        A.    Right.

10       Q.    And on the various pages -- the first page is

11   a summary page, correct?

12       A.    Correct.

13       Q.    And then it refers to pages A through K,

14   which are attached and there's even a Q on the end of

15   it, correct?

16       A.    Q, right.

17       Q.    Is this your handwriting on the last page?

18       A.    Right.

19       Q.    And what was the -- and so what you're saying

20   is instead of the .8 percent it was supposed to be 3.2

21   percent, correct?

22       A.    Yes.   Probably correcting some errors some

23   place along the line.

24       Q.    And so the $25.24 should be multiplied by

25   four, correct?

1    A.    Right.

2    Q.    That was what your correction was?

3    A.    Yes.

4    Q.    And these royalty calculations were under the

5    accounting agreements that you and Neil had reached over

6    the previous months in some of the documents we have

7    discussed, correct?

8    A.    Correct.

9    Q.    And then on some of these pages there are

10    notes at the bottom?

11    A.    Right.

12    Q.    Are those notes that you dictated?

13    A.    Some may have been.  Some may not have been.

14    They just might have been -- I -- I didn't type these.

15    Q.    Right.

16    A.    So I don't recall how much of this was me

17    dictating, if any, on any of these pages and how much

18    was just giving sort of insight as to what the numbers

19    sort of meant, gave some clarity to some of it.

20    Q.    Okay.  Well, can you take a look at the third

21    page of Exhibit 5.  It's a got a number 528 at the

22    bottom.

23    A.    Okay.

24    Q.    And this relates to Medieval Spawn toys,

25    correct?

1    A.    Right.

2    Q.    And you refer, or the note at the bottom

3 starts, the last paragraph, do you see where it says,

4 "Also, I had a conversation with Terri Cunningham."

5    A.    Right.

6    Q.    That's you, right?

7    A.    Right.

8    Q.    So this would be a note that you had

9 dictated, correct?

10    A.    Probably, right.

11    Q.    And is this the conversation with Terri

12 Cunningham that you testified to yesterday?

13    A.    Right.

14    Q.    And does this refresh your recollection as to

15 when this conversation was?

16    A.    With Terri?

17    Q.    Yes.

18    A.    It references it was just recently, so this

19 is a August 4, 1997 document, so it probably was within

20 a few weeks of that possibly.

21    Q.    Okay.  And this concerns the -- this was the

22 conversation relating to how DC handles derivative

23 characters, correct?

24    A.    Correct.

25    Q.    But your conclusion was that notwithstanding

1    that information, you were -- the last sentence, "Still

2    I'm willing to pay some moneys as long as all the other

3    matters are sorted out," correct?

4        A.    Right.

5        Q.    And then did you state that you had another

6    phone conversation with Terri Cunningham after this

7    time?

8        A.    In the -- in the document?

9        Q.    No.  Yesterday.  Do you recall having another

10   telephone conversation with Terri Cunningham?

11       A.    Right.  I had a follow-up one.  Yes, right.

12       Q.    Do you remember when that was?

13       A.    Probably shortly -- probably in August some

14   time.

15       Q.    Okay.  And what was the -- what was that

16   conversation about?

17       A.    Just getting more clarification on -- on how

18   we prorate stuff.  Again, you know, I think that one may

19   have been about how you prorate potential revenue for

20   television stuff or Hollywood stuff or things like that.

21       Q.    And why was that an open issue?

22       A.    Because I think if we look at some of the

23   other documents it was just part of the big global

24   agreement that, you know, these I think are limited to

25   the specifics of pages A through K and they are not

1    necessarily inclusive of all the accounting that may or

2    may not have been due at that time or was going to come

3    due eventually, so --

4         Q.    And what did Ms. Cunningham tell you in that

5    last conversation?

6         A.    I don't recall specifically. I just know

7    that it was another inconsistency to all of this.

8         Q.    Okay.

9         A.    So --

10        Q.    And you testified about that conversation

11   yesterday and that's all you can recall about it,

12   correct?

13        A.    Right.

14        Q.    Would you like to take a little break?

15        A.    No, I'm -- I'm ready.

16        Q.    Okay.

17             MR. KAHN:  Actually, any time in the next ten

18   minutes I would like to take a little break.  I can

19   wait.

20             MR. ARNTSEN:  Okay.  Why don't we -- let me

21   just go through a couple more documents.

22             MR. KAHN:  Sure.  I don't want to cut you off

23   here.

24             MR. ARNTSEN:  There's a logical break point

25   coming up.

```
1                    MR. KAHN:   Good.

2    BY MR. ARNTSEN:

3         Q.    Showing you what was previously marked

4    Exhibit 7, have you seen that document before?

5         A.    Not specifically, no.

6         Q.    Do you recall what the urgent message

7    referenced in the second paragraph there is?

8         A.    Again just trying to get more follow-up

9    clarification.

10        Q.    Have you seen Exhibit 21 before?

11        A.    No.   I don't recall seeing it.

12        Q.    Do you have any understanding as to what this

13   relates to, Exhibit 21?

14        A.    I think -- I can't be sure, but this may have

15   been in part of the settlement.  Neil wasn't willing to

16   take a verbal apology, so he would like it in cash.

17        Q.    Identify what Exhibit 10 is?

18              First of all, is it your handwriting?

19        A.    Yes.   It looks like me doing some kinds of

20   calculations.

21        Q.    Would this again relate to royalty payments

22   to Neil?

23        A.    I would presume, yes.

24        Q.    Okay.   Why don't we take a little break right

25   now.
```

```
1        A.     Can I just add here that again those numbers
2   are not numbers that were due Neil, but me just trying
3   to get a handle on the process of what we did or did not
4   owe Neil. So those are -- those are not numbers that I
5   would stamp as due Neil.
6        Q.     But -- and you're referring to Exhibit 10,
7   correct?
8        A.     Correct.
9        Q.     Okay. Let's take a little break.
10       A.     Just some calculations.
11              (Whereupon, a short recess was then had at
12              11:38 a.m. until 12:06 p.m.)
13              (Deposition Exhibit Number 51 was then
14              marked for identification.)
15   BY MR. ARNTSEN:
16       Q.     Can you take a look at Exhibit 6, please.
17   What is Exhibit 6?
18              No, that's Exhibit 51. We'll get to that in
19   a minute. But what is Exhibit 6?
20       A.     It appears to be more documents making
21   calculations for potential moneys due to Mr. Gaiman.
22       Q.     And there's a cover memo from Sheila Egger to
23   Neil Gaiman, correct?
24       A.     Correct.
25       Q.     And Sheila sent this on your direction?
```

```
1           A.      Probably, yes.

2           Q.      And the cover memo indicates that Sheila

3     would be sending another check to Neil the next day,

4     right, or that it should be to Neil the next day?

5           A.      Right.

6           Q.      And again that was at your direction,

7     correct?

8           A.      Right.

9           Q.      And this is August 11th, correct, of '97?

10          A.      Right.

11          Q.      And can you take a look at Exhibit 51.  Can

12    you tell me what this is?

13          A.      Not specifically, but the memo says it deals

14    with foreign sales.

15          Q.      And it's a March 26, 1998 check to Neil

16    Gaiman?

17          A.      Yes.

18          Q.      And would that again relate to royalty

19    payments?

20          A.      Right.

21          Q.      And this would have been sent at your

22    direction?

23          A.      Not necessarily.

24          Q.      Who is authorized to send royalty checks for

25    your company without being instructed to do so by you?
```

1    Under what circumstances?

2        A.    By 1998 I've got a lot of accountants, so,

3    you know, we've got -- with all the various companies

4    and all the various people working for me, we've got

5    hundreds if not thousands of bills going in and out all

6    day.  So each of those aren't cleared to me.

7        Q.    But in order to send this check somebody

8    would have had to have confirm that money was owed

9    Mr. Gaiman, correct?

10       A.    Potentially, yes.

11       Q.    And how would they have gone about doing so

12   if they didn't contact you in connection with that?

13       A.    You know, I don't know.  I don't know who --

14   who sent this check out and what the circumstances were

15   for it.

16       Q.    Okay.  At any period of time between August

17   1st of '97 and March 26th of '98 did you contact Neil

18   and say, "Neil, we don't have a deal" or words to that

19   effect?

20       A.    I don't think so.

21       Q.    So during that period of time it would have

22   been reasonable for Neil to assume that the deal was in

23   place, right?

24       A.    You'd have to ask Neil that question.

25       Q.    You don't know of any reason why it wouldn't

```
 1   be, right?
 2        A.    You'd have to ask Neil that question.
 3        Q.    All right.  Because you didn't communicate
 4   with him on that subject, right?
 5        A.    Right.  I didn't.
 6        Q.    And nobody communicated with him on your
 7   behalf to your knowledge on that subject, correct?
 8        A.    Correct.
 9        Q.    Can you take a look at Exhibit 8.  What is
10   that?
11        A.    A letter to Mr. Gaiman that I either typed or
12   dictated sort of officially giving him my stance at that
13   point as to where I was at.
14        Q.    And this letter was January 12, 1999,
15   correct?
16        A.    Correct.
17        Q.    Had you had any communications with
18   Mr. Gaiman between August of 1997 and January of 1999?
19        A.    Me personally?
20        Q.    Yes.
21        A.    Not that I recall.
22        Q.    Or anyone from your business on your behalf
23   other than royalty payments that we've gone over?
24        A.    Probably some of the people in the office.
25        Q.    Do you have any recollection of any?
```

1   A.   Just, you know, Neil phoning, somebody on

2   Neil's behalf, somebody's phoning.

3        Q.   Do you have any specific recollection of any

4   such calls or being told of any such calls?

5        A.   Yes.

6        Q.   What do you recall?

7        A.   "Just put it on hold, you know.  Just don't

8   answer.  Again okay.  You know, click.  Just tell him

9   click."

10       Q.   What do you mean there?

11       A.   Again, we understand.  We understand that

12  Neil's phoning.  We got it.  We got your message.

13       Q.   So Neil is calling your office asking to

14  speak with you?

15       A.   I don't know.  Just Neil, Neil or Neil's

16  representative, somebody is calling again.

17       Q.   Regarding what?

18       A.   Just I don't know.  Again I never took the

19  phone calls.  Just they are phoning again.  Probably

20  you'll have to ask Neil why he was making the phone

21  calls or instructing people.

22       Q.   But how do you know that such phone calls

23  occurred?

24       A.   Because somebody would have said to me, "Hey,

25  you know, Neil phoned again or his representative.

1  Okay.  Okay."

2       Q.    That's the extent of your recollection of

3  these calls?

4       A.    Yes.

5       Q.    All right.  What -- what prompted you to send

6  Exhibit 8?

7       A.    Probably the number of phone calls, you know,

8  just to sort of get my people not to have to keep

9  answering phone calls.  I'll just go, "Here, you know,

10 I'll send him a letter.  Make it quick."

11      Q.    How did you -- describe the process by which

12 you came up with a position set forth in this letter?

13      A.    I sort of went over the ongoing conversations

14 we had, what we had talked about potentially confirming

15 in Oakland and put all that again feeling that Medieval

16 Spawn who was sort of the big crux in my sort of ongoing

17 conversations, was that I essentially all of this from

18 my perspective was just to get Spawn back and that, and

19 that whatever I had traded -- again I felt that I -- I

20 was trading for something I already had.  So at this

21 point I was -- I'm going to keep all of this.

22             And I think in the -- one of the things we

23 had talked about is maybe continuing to give ongoing

24 accounting on Angela, but even that, I mean, we are

25 essentially down to Miracleman and potentially Angela.

1    That's all we have got at this point. He's got my

2    money. He's got my money. I'm not going to get money

3    back out of this guy. So sort of going let's just cut

4    this thing. Let's just cut this thing completely now.

5        Q.    Do you recall getting a telephone call from

6    anyone from DC or Marvel on Neil's behalf relating to

7    one other project that Neil might want to do using

8    Medieval Spawn or Angela?

9        A.    No.

10       Q.    You have no recollection of anything like

11   that?

12       A.    No.

13       Q.    And so what you're saying is that what

14   prompted you to send this letter was because Neil had

15   been calling your office and you wanted him to stop, is

16   that correct?

17       A.    Well, either Neil or some representative.

18   Somebody, you know, so --

19       Q.    Nothing, nothing else? There wasn't anything

20   else involved that caused you to send Exhibit 8 on

21   January 12th of 1999?

22       A.    No, I don't think so.

23       Q.    Okay. Did you receive any response from

24   Neil?

25       A.    No, I don't recall.

1      Q.    Do you have any recollection of any

2   communications with Neil between when you sent Exhibit 8

3   and when this lawsuit was filed?

4      A.    No.

5      Q.    Do you recall any of your representatives or

6   employees having communications with Neil that were

7   transmitted to you?

8      A.    No.

9      Q.    Okay.  So Exhibit 8 is sort of the last

10  communication in the chain, correct?

11     A.    Yeah.  It appears to be.

12     Q.    And you don't know of anything different from

13  that, right?

14     A.    Right.

15     Q.    I apologize.  Just one other question on

16  Exhibit 6, which we discussed already.

17           Can you take a look at the third page.  It's

18  got a number 521 at the bottom.  Are you there?

19     A.    Yes.

20     Q.    And you instructed your staff as to how to go

21  about this calculation, correct?

22     A.    Right.

23     Q.    And looking down, this relates to the Angela

24  and Angela trading card, correct?

25     A.    This is in reference to a Spawn trading card

1    set that had -- it appeared with 109 cards in it.

2         Q.    And 17 of them had Angela on them, correct?

3         A.    I can't -- I can't say that.  I can't say

4    that for a certainty.

5         Q.    The first line is publisher's royalty,

6    correct?

7         A.    Right.

8         Q.    And then the second line is total number of

9    cards that include art work of Angela, correct?

10        A.    That's what the line said.

11              But what I'm saying is that potentially this

12   calculation could have been an inclusive one.  Those 17

13   cards may or may not have been Angela.  They may have

14   included other ones.  So I don't know if we had other

15   calculations for Medieval Spawn and Cogliostro.  We may

16   have just taken all of them and lumped them and somebody

17   may have called them Angela.  I'd have to look at the

18   cards and see if they were all Angela.  They may have

19   included some of the other characters we're talking

20   about.

21        Q.    And so 17 of 109 is 16 percent of the set,

22   correct?

23        A.    Right.

24        Q.    And then you multiply that 16 percent times

25   the publisher's royalty, correct?

1          A.     Right.

2          Q.     And then you come to the publisher's royalty

3     of Angela art work, correct?

4          A.     Right.

5          Q.     And again that's 16 percent of the 323,000,

6     correct?

7          A.     Well, I lost you there.

8          Q.     You're multiplying the $323,341.72 times 16

9     percent to come up with the 51,734.68, correct?

10         A.     Right.

11         Q.     Okay.  What does the next row mean?

12         A.     Given -- it's giving a weight to an

13    individual card within the confines of it, which would

14    mean that the card set was called Spawn.  It was based

15    on Spawn.  The headline was Spawn.  The title was Spawn.

16    It was listed as Spawn, Spawn, Spawn, Spawn.  So, to say

17    that a Spawn card and a 20th ranked character would be

18    of equal value didn't make -- didn't make much sense.

19              So there was a deduction that essentially was

20    from Spawn, the big boy.  And so anything -- anything

21    less than Spawn isn't at the same value.  And then

22    there's a number.  Then it is multiplied.

23         Q.     So you concluded that the Angela character or

24    characters were worth 50 percent of the Spawn character,

25    is that what that means?

```
 1         A.    Right.  Which probably was a generous number
 2   at the time.
 3         Q.    Okay.  I just need to understand the
 4   calculation process.
 5               And again you don't recall if that refers to
 6   just Angela or Angela, Medieval Spawn and Cogliostro,
 7   correct?
 8         A.    Right.  I'd have to look at the set.
 9         Q.    Okay.  Okay.  Here's a small portion that
10   you're probably going to want to mark confidential,
11   attorneys eyes.  I'm going to ask him -- let's go off
12   the record just for a second.
13               (Discussion off the record.)
14               (The following excerpt was designated
15                "Confidential.")
16               (Discussion off the record.)
17               (Deposition Exhibit Number 52 was then
18                marked for identification.)
19   BY MR. ARNTSEN:
20         Q.    Can you identify what Exhibit 16 is?
21               Have you seen Exhibit 16 before?
22         A.    No, not that I recall, but --
23         Q.    What did you do, if anything, to ascertain
24   what intellectual property rights of Eclipse you were
25   obtaining out of the bankruptcy as opposed to tangible
```

1    property?

2        A.    Well, again looking at the documents from the

3    bankruptcy trustee and what it was they put down there

4    and then later on whatever it was that they handed over,

5    probably getting some lawyer to look at it to sort of

6    go, "What did I just buy, you know?"  So --

7        Q.    And do you ever recall finding out somebody

8    letting you know what you just bought with regard to

9    intellectual property rights?

10       A.    Well, again I don't recall what the opinion

11   was once it came back, but "whatever was in that pool is

12   yours now."

13       Q.    Okay.

14       A.    And that there was no disputes at that point

15   over anything.

16       Q.    And do you recall whether Mr. Fitzgerald

17   forwarded a copy of Exhibit 16 and the attached

18   documents to you?

19       A.    I don't recall.

20       Q.    Do you ever recall prior to acquiring the

21   rights out of the Eclipse bankruptcy looking at any

22   contracts that might have been in place between Eclipse

23   and Mr. Gaiman?

24       A.    No.

25       Q.    Do you recall any discussions concerning any

1    such contracts?

2       A.    No, because it was -- it was an Eclipse

3    bankruptcy, so it was Eclipse, not specifically for any

4    one character.

5       Q.    Okay.   You were just getting whatever rights

6    Eclipse had?

7       A.    Right.

8       Q.    Take a look at Exhibit 52.

9             (Deposition Exhibits Numbers 53 and 54

10            were then marked for identification.)

11   BY MR. ARNTSEN:

12      Q.    Did you have a chance to look at Exhibit 52?

13      A.    Yes.

14      Q.    If you look at the second to last page, page

15   number 1391, is that your signature?

16      A.    Yes.

17      Q.    Did you direct your attorney to file this

18   trademark application?

19      A.    Right.

20      Q.    In October of 1997?

21      A.    I told him to -- to go and get the paperwork

22   done for a trademark.

23      Q.    When did you tell him to do that?

24      A.    Probably shortly after my last conversation

25   with Terri Cunningham, which would have been maybe in

1   August, August some time probably, September.  Late

2   August, early September.

3        Q.   Okay.  Did you communicate to Mr. Gaiman in

4   any way that you were going to be doing this?

5        A.   No.

6        Q.   As far as Mr. Gaiman knew he had the rights

7   to Miracleman, is that right?

8        A.   You'd have to ask Mr. Gaiman that question.

9        Q.   He didn't know anything to the contrary,

10  right?

11       A.   You'd have to ask Neil that question.

12       Q.   Why did you ask your lawyer to file the

13  trademark application for Miracleman at this time?

14       A.   We were -- we're now at the tail end of some

15  of -- sort of some of these conversations here and again

16  I thought we were -- I thought we were pretty close.  I

17  thought we were getting pretty close.  We were finally

18  going to get a deal done here.

19            But to get near the finish line made me feel

20  pretty good and given this is August, the movie's coming

21  out, I'm trying to enjoy life.  To find out that some of

22  the information that had been a constant source of

23  discussion may not have been completely forthright was

24  becoming wearisome to me, and so again at some point the

25  straw broke the camel's back.  Neil in good faith had

1    been receiving moneys trying to get the calculations

2    that we were giving him based on what we thought was

3    truthful information and he had my money and my

4    character and was giving me back something that --

5    essentially something that we had that he had

6    represented that he had which from my perspective he

7    didn't and it was -- I was never going to get money back

8    from Neil.  I didn't think that would ever be true.  So

9    I had to grab something.  The only thing that was still

10   left was I gave him money and Miracleman.  The money was

11   gone and so I -- I told him to get Miracleman back.

12       Q.    Okay.  Because you had obtained your rights

13   from Eclipse to Miracleman, whatever those rights were,

14   in early 1996, correct?

15       A.    Well, whenever the auction was held.

16       Q.    Okay.  Take a look at Exhibit 16.

17       A.    Right.

18       Q.    But you didn't do anything with regard to

19   registering any intellectual property rights until the

20   fall of 1997, correct?

21       A.    I don't know.  This is the first time that we

22   did something or later on I know there was a lapse or

23   something they notified me on.

24       Q.    What do you recall with regard to that, with

25   regard to the lapse?

```
 1              A.    That they -- that they -- well, it's my --
 2     Jon is my lawyer.
 3                   Am I allowed to talk about that?
 4                   MR. KAHN:  This is something Jon told him.  I
 5     didn't realize that.
 6                   If you heard something from Jon, your lawyer,
 7     then that's covered by privilege.  There are documents
 8     that we produced and they can answer that.
 9                   You should not get into any discussions about
10     the documents or the situation that you had with Jon
11     Chick, your attorney.  You can talk about discussions
12     you had concerning these matters with non-attorneys, but
13     your discussions with Jon Chick are privileged.
14                   THE WITNESS:  Okay.
15     BY MR. ARNTSEN:
16         Q.    Were all of your discussions concerning the
17     lapse with Attorney Chick?
18         A.    Right.
19         Q.    Did you have any discussions on that subject
20     with anyone else?
21         A.    No.
22         Q.    Okay.  Take a look at Exhibit 53.  Is that
23     your signature on the second to last page?
24         A.    Yes.
25         Q.    And that's you're signing as to the
```

1    declarations set forth therein, correct?

2        A.    Correct.

3        Q.    And you are stating that you're either the

4    owner of the trademark sought to be registered or

5    entitled to use such mark in commerce, correct?

6        A.    Right.

7        Q.    And what did you do to satisfy yourself that

8    those were true statements?

9        A.    Well, again those were discussions with Jon,

10   so --

11       Q.    Okay.  Anything else other than discussions

12   with your lawyer?

13       A.    No.

14       Q.    All right.  Take a look at Exhibit 54.  Is

15   that your signature on the bottom?

16       A.    Yes.

17       Q.    What prompted you to sign and file this

18   document?

19            MR. KAHN:  The same caution, Todd.  If what

20   prompted you was a conversation with Jon Chick, you can

21   answer to other things but not to the subject of the

22   conversation with Jon Chick.  You can identify Jon Chick

23   as the person that prompted you to do this, but that's

24   all you can say.

25            THE WITNESS:  All right.  So after

1  discussions with Jon and then this came out of those

2  conversations.

3  BY MR. ARNTSEN:

4      Q.    Okay.  Anything else other than that?

5      A.    No.

6      Q.    Let me just take a minute to confirm nobody

7  else has any other questions they want me to ask you,

8  but I am all but done.

9      A.    Okay.

10          (Whereupon, a short recess was then had at

11          12:42 p.m. until 12:47 p.m.)

12  BY MR. ARNTSEN:

13      Q.    Mr. McFarlane, who at -- do you know anyone

14  at your company, if I wanted to get hold of Allan

15  Inglis, who would, you know, that would know how to do

16  that?

17      A.    Possibly Steve Peterson.

18      Q.    Is he with the company?

19      A.    Yes.  He is the new COO.

20      Q.    And you can get that from looking at the tax

21  information from 2001, right?

22      A.    Yes.  And Steve might have a phone number,

23  too.

24          MR. ARNTSEN:  Can you get that for me?

25          MR. KAHN:  Yes, we can get that.

1              MR. ARNTSEN:  Do you recall --

2              MR. KAHN:  But just, Allen, so I don't

3    forget, Jeff, if you could just remind me.

4              MR. ARNTSEN:  We will.  We'll put it in a

5    letter.

6              MR. KAHN:  If you put it in a letter, this

7    way I'll --

8              MR. ARNTSEN:  I'm with you.

9              MR. KAHN:  We know where he is.

10   BY MR. ARNTSEN:

11        Q.    Do you recall at a convention panel in 1993

12   saying that you didn't even know there were any other

13   Spawns until Neil told you that?

14        A.    I don't recall.

15        Q.    Okay.  You have no recollection of making

16   such a statement?

17        A.    No.  I've done a lot of panels.

18        Q.    Okay.  And then now I'm just waiting for one

19   more exhibit.

20              On at least some of the Spawn comics there's

21   a letter page and letters and answers to letters.  Do

22   you know what I'm talking about?

23        A.    Yes.

24        Q.    And some of the letters are to you and then

25   there would appear -- and then there would be -- strike

```
 1    that.  I'll just go at it directly.
 2                (Deposition Exhibit Number 55 was then
 3                marked for identification.)
 4    BY MR. ARNTSEN:
 5         Q.    I'm going to show you Exhibit 55 and ask you
 6    if you can identify that.  And I'll represent to you
 7    that it is the cover page and then a page of Spawn 11
 8    and I've got the original there in front of you.
 9                And can you just compare the two and confirm
10    that that's the case?
11         A.    Yes.
12         Q.    And you see on the second page of Exhibit 55
13    there is a letter saying "Dear Todd" from a Matthew
14    O'Brien?
15         A.    Okay.
16         Q.    Do you see what I'm referring to?
17         A.    Right.
18         Q.    And then there's an answer to that letter
19    that starts with "Matthew."
20         A.    Right.
21         Q.    Did you write that answer?
22         A.    Right.  Yes, I wrote that.
23         Q.    Okay.  We're done.  Thank you.
24                MR. KAHN:  Certainly, I have what I hope will
25    be no more than five to ten minutes of follow-up
```

1    questions and then we'll be done.

2                              EXAMINATION

3    BY MR. KAHN:

4         Q.    Todd, yesterday when you were asked about a

5    conversation you had with Terri Cunningham concerning DC

6    Comics contracts and handling of derivative characters,

7    according to my notes you said you thought that

8    conversation took place in 1996.  Today is it my

9    understanding you believe that conversation took place

10   in the summer of 1997?

11        A.    Right.  Yes, 1997.

12        Q.    Earlier today Allen showed you several

13   copyright Certificates of Registration for different

14   issues of Spawn and Angela.

15              As an example, let me show you what has been

16   marked as Plaintiffs' Exhibit 37, which references Spawn

17   Issue Number 26.

18        A.    Okay.

19        Q.    Do you recognize the signature on the second

20   page as being that of Beth Ann, however her last name is

21   pronounced?

22        A.    I don't know her signature, but --

23        Q.    Okay.  So you don't recognize the signature.

24   Do you know who Beth Ann was?

25        A.    Yes.  She was -- she was an assistant to Paul

1    Burke and did some work maybe for Jon.

2        Q.    Where was Beth Ann's office in January of

3    1995, which is the date of Plaintiffs' Exhibit 37?

4        A.    The exact office?

5        Q.    Was it in Phoenix or was it in Michigan?

6        A.    No, it was in the Detroit, Michigan area.

7        Q.    Where was your office in 1995?

8        A.    In Phoenix, Arizona.

9        Q.    Did you review this Certificate of

10   Registration before someone signed it and sent it in on

11   your behalf?

12       A.    No.

13       Q.    Is the name of the author in paragraph 2 of

14   this registration, namely Todd Dean McFarlane, your

15   understanding of who the copyright owner was?

16       A.    No.   Like I said, those should have been Todd

17   McFarlane Productions.  So, Todd McFarlane, an

18   individual, has never grabbed any of those rights.

19       Q.    And did anyone talk to you about why the box

20   under 2 a for contribution to this being a work made for

21   hire, did anyone talk to you about that before that was

22   checked?

23       A.    No.

24       Q.    Earlier today Mr. Gaiman's attorney showed

25   you a group of scripts and thumbnails marked Plaintiffs'

1  Exhibits 39 through 44 and I'm showing them to you again

2  today now, Todd. I have a question for you about these

3  exhibits, two questions.

4         Do you see on the first page of each of these

5  exhibits there is a stamp that says "Library of

6  Congress, August 3, 2000, Copyright Office"?

7      A.    Uh-huh.  Yes.

8      Q.    And there's also what looks like some sort of

9  product code or registration number.

10     A.    A bar code.

11     Q.    Correct.

12         To your recollection were these on the copies

13 of the scripts and the thumbnails that were received

14 originally from Neil back at the time that these issues

15 were being created?

16     A.    I never -- I don't recall seeing the

17 thumbnails, but on the scripts they were to come in in

18 the mid '90s, so it would be tough to have a 2000 date

19 on a 1995 document.

20     Q.    So, do you know where these particular copies

21 of the scripts came from that are bearing these Library

22 of Congress stamps?

23     A.    No.

24         MR. KAHN:  Could you mark this as the next

25 exhibit?

1              (Deposition Exhibit Number 56 was then

2                 marked for identification.)

3   BY MR. KAHN:

4       Q.    Todd, take a look at Exhibit 56 which

5   actually consists of several pages stapled together.

6   And once you have taken a look at it, would you -- if

7   you recognize what this is, describe it?  What is

8   Exhibit 56?

9       A.    It appears to be thirteen pages of various

10  follow-up accounting statements that we would get at

11  Todd McFarlane Productions from Image comic books on

12  various -- various items that we did.

13      Q.    Let me ask you to look, for example, at the

14  page about two-thirds of the way through bearing the

15  number PM 1684.

16      A.    Okay.

17      Q.    Is that a statement you received, you being

18  Todd McFarlane Productions, from Image Comics for Spawn

19  Issue Number 26?

20      A.    Right.  We'd get a statement like this,

21  right.

22      Q.    And what is shown on this statement starting

23  with the first column going down briefly?

24      A.    This page is for some accounting for Spawn

25  Issue Number 26 comic book.  The first column is a first

1   payment and then the other subsequent columns is for --

2   after that are additional accounting that would apply to

3   this same subject matter, Spawn comic book Number 26.

4   Q.   So, for example, the second row in the first

5   column is "Date Shipped 12/27/94." What does that refer

6   to?

7   A.   Probably in reference to when the comic book

8   was sent out to Diamond Comics.

9   Q.   So the comic book is printed by them and is

10  being sent to the distributor?

11  A.   Right.

12  Q.   The next --

13  A.   Or from the printing plant. It could be from

14  the printing plant.

15  Q.   Okay. Then the next line is "Cover Price."

16  That's the cover price on the face of the comic book?

17  A.   Yes.

18  Q.   Take us very quickly down to the first line

19  that says "Net Cash." What are these other entries?

20  A.   From starting with "Total Invoiced"?

21  Q.   Right. We don't need to go line by line.

22  A.   Right.

23  Q.   The next set.

24  A.   So, let me -- let me now switch into Todd

25  McFarlane, Image guy.

1       Q.     Okay.

2       A.     Okay.  A shareholder now.  My understanding

3   of how all this works.

4              Total Invoiced would be the number of copies

5   that were shipped times whatever percentage of the cover

6   price we would receive.  So again if a comic book cost

7   in this case $1.95, you don't get $1.95.  That's the

8   retail price.  We sell it at a wholesale price.  And

9   that wholesale price, just for round numbers, is half,

10  is half the cover price to use generic round numbers

11  then.  Then that's how you would probably get pretty

12  close to that total invoice.

13             "Less Discounts Taken" is a number I believe

14  that is part of our contract with Diamond Distributors,

15  that depending upon volume of comic books coming from

16  our company and various other companies they get to make

17  these deductions based on what's coming through the

18  pipeline of all the companies and sometimes specifically

19  ours.  So that's a -- that's not a in-house deduction.

20  That would actually be something that Diamond comic

21  books would have taken off.

22             We at Image then it appeared would have

23  received the 254,091.01, which is the net revenue to

24  date.

25             And then the "Balance Due" appears to be of

1    what is due to us, they still haven't given all of us.

2    I guess it looks like they need to collect on the

3    35,000.  So, I think -- so I think if you added this up

4    to the line above, it says "Net Revenue to Date."

5            And then in the first column it doesn't

6    appear to be any -- although there's one, two, three,

7    four, there's five other lines, there's no deductions or

8    additions there.

9        Q.    So you get to "Net Cash" which is the amount

10   of money that Image has collected so far on this comic

11   book?

12       A.    Right.

13       Q.    And is there -- anything below that down to

14   the line called "Due to Creator" are all the deductions,

15   all the total expenses?

16       A.    Right.  So -- so, in this example, Image

17   comic books has $218,000, but Image comic books has

18   fronted and paid the printing bills and all those

19   others.  We now have to go back and -- and pay those

20   bills or there's moneys that are due.  So that's what

21   all that is.

22            If you go down here, most of that's probably

23   for printing, Ronald's Printing, which is the next line

24   below the first bolded line.

25       Q.    Right.

```
 1        A.    On this one, this one right here, the
 2   headline says "Ronald's Printing." So that's the bulk
 3   of it. The other categories are Olyoptics, a little bit
 4   of coloring. Studio Color Group is film separations.
 5        Q.    And we don't need to go line by line. These
 6   are the different expenses that Image Comics pays --
 7        A.    Right.
 8        Q.    -- in connection with having this issue
 9   printed?
10        A.    Right.
11        Q.    It brings us down to a gross profit number of
12   $119,406.09.
13        A.    Where are you at? Oh, right here. Yes, yes,
14   yes.
15        Q.    And then if we keep going down that column
16   there are additional expenses until we come down to a
17   column called "Net Income Before Image's Royalty." Do
18   you see that?
19        A.    Yes.
20        Q.    And then you talk about this fee. It looks
21   like for this particular issue it was 2,000 plus 2
22   percent?
23        A.    Right.
24        Q.    That gets deducted from the amount?
25        A.    Right. That's Image's overhead fee, right.
```

1    Q.    And then we get a line called "Due to Creator

2    for Book, $113,278."

3    A.    Right.

4    Q.    And then we have "First Payment to Creator."

5    That would be the check that would go from Image Comics

6    to Todd McFarlane Productions?

7    A.    Right.  In this example, right.

8    Q.    Is this a document, namely this page and all

9    the other pages, in Plaintiffs' Exhibit 56 that was

10   created in the ordinary course of business by Image

11   Comics?

12   A.    Yeah.

13   Q.    And it's a document that Todd McFarlane

14   Productions would have received in the ordinary course

15   of business?

16   A.    Yes.

17   Q.    And for Spawn Issue 26 it shows a shipping

18   date of December 27, 1994.  This is the issue that you

19   testified about earlier for which Mr. Gaiman wrote a

20   portion of the script, is that correct?

21   A.    Yes.  A couple pages, right.

22   Q.    And in your testimony yesterday you stated

23   that Mr. Gaiman had told you that he did not want or

24   need to have credit for that portion of the script that

25   he wrote, correct?

1      A.      Yes.

2      Q.      Between the shipping date of December 27,

3   1994 and the date that this lawsuit was filed, Todd, did

4   Mr. Gaiman ever complain to you about his lack of credit

5   for the portion of the script that he wrote for

6   Issue 26?

7      A.      No.

8      Q.      And at any time before December 27, 1994 did

9   he complain to you or request credit for the portion of

10  Issue 26 that he wrote?

11     A.      No.

12     Q.      If you turn to the next page, is this a

13  similar statement from --

14     A.      1685 at the bottom?

15     Q.      Yes.   Is this a similar Image statement for

16  the first issue of the Angela mini series?

17     A.      Yeah.   This -- the difference on this one as

18  compared to the prior one is that this would be

19  accounting for first payment only.  If there was any

20  moneys due later on and any of the accruals, then those

21  columns begin to get added.  As you can see, there's

22  five columns in 1684.

23     Q.      Right.

24     A.      And there's one column in 1685.

25     Q.      My question:  On Angela Number 1 it indicates

1   a shipment date of December 20, 1994.  Is that

2   consistent with your recollection of when Angela Number

3   1 was published and shipped?

4       A.    I can't say for certain either.  It's in that

5   area.

6       Q.    And December of -- in the December, 1994

7   area?

8       A.    Right.

9       Q.    And the next page is Angela Number 2, page

10  1686.  That shows a shipment date of approximately one

11  month later.

12      A.    Right.

13      Q.    Angela Number 2.  Is that consistent with

14  your recollection of when Angela Issue Number 2 in the

15  mini series was printed and shipped?

16      A.    Well, again we try to get books out on a

17  monthly basis, so it would have been a month after or

18  pretty close to a month after Issue 1.  So that would be

19  consistent in theory.

20      Q.    And then the next one is Angela Number 3.

21  That's page 1687.

22      A.    Okay.

23      Q.    Is that the Image statement for Angela Number

24  3?

25      A.    Right.  Or one of them.

1    Q.    And that shows a shipping date of

2   approximately one month after Angela Number 2.  Is that

3   also consistent with your recollection of the publishing

4   sequence for those three issues in the mini series?

5    A.    There appears to be an error.  So let's

6   correct an error here, young man.

7    Q.    Okay.

8    A.    Okay.  So, 1685 says that the shipping date,

9   if this is the correct date, is December 20, 1994.  So

10   the next one is 1686.

11          If you cross over into a new calendar year

12   somebody should have added that '95 to that since it

13   came out the next year.  So somebody didn't have their

14   date right.  The year that 1167, it should have been

15   1995 because if you go to page 1687 then we're back to

16   1995.  So somebody added a number.

17    Q.    So, in the year -- okay.  Looking at these

18   statements then, is it your recollection that Angela 1,

19   2 and 3 came out roughly --

20    A.    Consecutively.

21    Q.    -- in a three month from December of 1994 to

22   February of 1995?

23    A.    Correct.

24    Q.    Let me have you look at the very last page in

25   this document.

1          What does this page from Image Comics refer

2    to?

3          A.     This appears to be some accounting statements

4    for the Angela trade paperback that was published.

5          Q.     What was the Angela trade paperback?

6          A.     That I think was a collection of at least the

7    Issues 1 through 3 of the Angela mini series.  It may

8    contain some additional pages.

9          Q.     And does this page of Exhibit 56, namely

10   page -- the final page of this exhibit, show or indicate

11   when the Angela trade paperback was published and

12   shipped?

13         A.     It says November 7, 1995.

14         Q.     So the three -- at least the three issues of

15   Angela and possibly some additional materials were put

16   together in a trade paperback in the type of final

17   production and published by Image Comics sometime toward

18   the end of 1995?

19         A.     Right.

20               MR. KAHN:  I have nothing further.

21                         RE-EXAMINATION

22   BY MR. ARNTSEN:

23         Q.     Just a couple of questions on Exhibit 56.

24               Can you just -- just turn to the last page of

25   Exhibit 56.

1          You see the last four rows talk about amounts

2   due to the creator?

3       A.     Right.

4       Q.     Who's the creator?

5       A.     Within the confines of Image, it's

6   essentially the people who give us the comic book.  So

7   it's not specific.

8          It's whoever we owe the cash to is the person

9   that brought us the complete comic book.

10      Q.     So, with regard to the Angela trade

11  paperback, who is the creator as shown on the last page

12  of Exhibit 56?

13      A.     Those payments would have been made to Todd

14  McFarlane Productions.

15      Q.     And would that be true with regard to all of

16  the references to creator on Exhibit 56?  Creator is

17  Todd McFarlane Productions?

18      A.     Payments, right.  The payments would have all

19  gone to Todd McFarlane Productions.

20      Q.     Okay.  So wherever the word "creator" is used

21  that means Todd McFarlane Productions, correct?

22      A.     Correct.  Or licensor.  In this case Todd

23  McFarlane Productions, right.

24      Q.     Okay.  That's all.  Thanks.

25          MR. LAPPLE:  No questions.

1          MR. KAHN:  We will not waive signature.

2          (Whereupon, the deposition was then

3           concluded at 1:20 p.m.)

4

5

6

7                         _____
                          TODD D.M. McFARLANE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24     3442-G

25

```
 1   STATE OF ARIZONA      )
                           )  ss.
 2   COUNTY OF MARICOPA    )

 3

 4           BE IT KNOWN that the foregoing deposition was

 5   taken before me, PAUL GROSSMAN, a Notary Public and

 6   Certified Court Reporter #50028 in and for the County of

 7   Maricopa, State of Arizona; that the witness before

 8   testifying was duly sworn by me to testify to the whole

 9   truth; that the witness will read and sign the

10   deposition; that the questions propounded to the witness

11   and the answers of the witness thereto were taken down

12   by me in shorthand and thereafter reduced to print by

13   computer-aided transcription under my direction; that

14   the foregoing 122 pages are a true and correct

15   transcript of all proceedings had upon the taking of

16   said deposition, all done to the best of my skill and

17   ability.

18           I FURTHER CERTIFY that I am in no way related

19   to any of the parties hereto, nor am I in any way

20   interested in the outcome hereof.

21           DATED at Phoenix, Arizona, this 22nd day of

22   June, 2002.

23

24                                   Paul Grossman, Notary Public
                                     AZ CCR #50028
25
```

OFFICIAL SEAL
PAUL GROSSMAN
Notary Public - State of Arizona
MARICOPA COUNTY
My comm. expires Oct. 13, 2005