UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

**84**

DOCKET #
U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN

AUG - 1 2002

FILED
JOSEPH W. SKUPNIEWITZ CLERK
CASE #

| | |
|---|---|
| NEIL GAIMAN and | ) |
| MARVELS AND MIRACLES, L.L.C., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| TODD MCFARLANE, | ) |
| TODD MCFARLANE PRODUCTIONS, | ) |
| INC., TMP INTERNATIONAL, INC., | ) |
| MCFARLANE WORLDWIDE, INC., and | ) |
| IMAGE COMICS, INC., | ) |
| | ) |
| Defendants. | ) |

Case No.: 02-C-0048-S

**03-1461**

---

### AFFIDAVIT OF ALLEN A. ARNTSEN

STATE OF WISCONSIN

COUNTY OF DANE

03-1461-L07

U.S.C.A.—7th Circuit
**F I L E D**

NOV 2 6 2003   JC

GINO J. AGNELLO
CLERK

Allen A. Arntsen, hereby declares as follows:

1.  I am one of the attorneys representing plaintiffs Neil Gaiman and Marvels

and Miracles, L.L.C. ("Gaiman") in this matter.

2.  Attached as Exhibit A is a true and correct copy of the transcript of the

July 23, 2002 deposition of Terri Cunningham as was provided to me by Manhattan Reporting

Corp., the court reporting service retained to record this deposition.



Allen A. Arntsen

Subscribed and sworn to before me
this 1st day of August, 2002.

Teresa a. Tinker

Notary Public, State of Wisconsin
My Commission: Expires 12-22-02

003.371923.1



1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    NEIL GAIMAN and
     MIRACLES AND MARVELS, LLC,
6
                              Plaintiffs,
7                                       Civil Action No.
               -against-               02-C-0048-S
8
     TODD McFARLANE, et al.,
9
                              Defendants.
10   - - - - - - - - - - - - - - - - - - - - - - - - - - -x

11        **CONFIDENTIAL, ATTORNEYS' EYES ONLY**
          **PURSUANT TO PROTECTIVE ORDER**
12
                    July 23, 2002
13                  1:05 P.M.

14        Deposition of TERRI CUNNINGHAM, taken by

15   the Defendants, pursuant to notice and subpoena,

16   at the offices of Paul, Weiss, Rifkind, Wharton

17   & Garrison, 1285 Avenue of the Americas, New

18   York, New York, before Marlene Lee, Certified

19   Shorthand Reporter, Certified Realtime Reporter

20   and Notary Public within and for the State of

21   New York.

22

23

24

25



Manhattan Reporting  Tel 212-557-7400
Advocate Reporting    Tel 212-697-6565

worldwide court reporting • legal videography • litigation support services

420 Lexington Avenue, Suite 2108  New York  NY 10170
Tel 212-557-7400  Fax 212-692-9171  1-888-325-3376(DEPO)

LTR30

2

1

2   A P P E A R A N C E S:

3       FOLEY LARDNER
        Attorneys for the Plaintiffs
4              150 East Gilman Street
               Madison, Wisconsin  53701-1481
5
        BY:   ALLEN A. ARNTSEN, ESQ.
6

7
        BLACKWELL, SANDERS, PEPER & MARTIN
8       Attorneys for the Defendants
               720 Olive Street, Suite 2400
9              St. Louis, Missouri  63101

10      BY:   MICHAEL A. KAHN, ESQ.
              PETE SALSICH III
11

12
        FROSS, ZELNICK, LEHRMAN & ZISSU
13      Attorneys for the Witness
               866 United Nations Plaza
14             New York, New York  10017

15      BY:   PATRICK T. PERKINS, ESQ.

16                   - and -

17      DC COMICS
        Attorneys for the Witness
18             1700 Broadway
               New York, New York  10019
19
        BY:   LILLIAN J. LASERSON, ESQ.
20

21

22

23

24

25

3

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2           T E R R I   C U N N I N G H A M,

3      having been called as a witness and duly sworn

4      by the notary (Marlene Lee), was examined and

5      testified as follows:

6                  EXAMINATION BY MR. KAHN:

7                  MR. KAHN:   The record should show

8      this is the deposition of Terri Cunningham,

9      taken pursuant to subpoena.

10          Q.     Ms. Cunningham, could you state

11     your full name and your employer and your

12     business address for us.

13          A.     My name is Terri Cunningham.  My

14     employer is DC Comics.  The business address is

15     1700 Broadway, New York, New York.  10019.

16          Q.     Terri, my name is Michael Kahn, and

17     with me is Pete Salsich.  We represent several

18     of the defendants.  I represent Todd McFarlane,

19     Todd McFarlane Productions, Inc., TMP

20     International, Inc., and McFarlane Worldwide,

21     Inc.   There's another defendant, Image Comics,

22     that does not have an attorney here today.

23                 Yesterday your attorneys were kind

24     enough to send over a group of documents that

25     they had stamped with the numbers DC 0001

MANHATTAN REPORTING CORP., A LegaLink Company

4

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2  through 0034.  And what I'd like to do at the

3  outset is ask the court reporter to mark this as

4  Group Exhibit DC and show it to you, and if you

5  could confirm to me that these are the

6  nonprivileged documents that are being produced

7  by DC Comics today, pursuant to that subpoena.

8                      (**Group Exhibit DC** for

9  identification, nonprivileged documents produced

10 pursuant to subpoena.)

11      **Q.**    If you'll take a moment and look

12 through those, Terri.

13      **A.**    Yes, they are.

14                MR. PERKINS:  These records have

15 been designated confidential, attorneys' eyes

16 only, under the protective order that the

17 parties have entered into in the case.  I'm

18 reiterating that on the record, with the hope

19 these will be kept confidential, attorneys' eyes

20 only.

21                MR. ARNTSEN:  Why don't we have the

22 transcript designated confidential, attorneys'

23 eyes only.

24                MR. PERKINS:  I was just going to

25 suggest that.

MANHATTAN REPORTING CORP., A LegaLink Company

5

2              MR. KAHN:  Yes.  There are

3    provisions that would allow a party to challenge

4    those designations, which may never happen or

5    could happen, but if they do, Allen would

6    contact you if one of the parties wanted to

7    challenge that.

8              MR. PERKINS:  Understood.

9         Q.    Terri, before we get into your

10   background and involvement at DC Comics, I just

11   have one other question about this Group Exhibit

12   DC.  Are all of these documents from your own

13   files?  Or are some of these documents from

14   other DC Comics files?

15        A.    I believe these are from my files.

16        Q.    Can you start off by summarizing

17   your educational background?

18        A.    Sure.  College, I went to school

19   for -- I have a degree -- associates degree in

20   science laboratory technology.  Graduated from

21   SUNY Cobleskill in 1977.  That's the extent.

22        Q.    When did you first become an

23   employee of DC Comics?

24        A.    In 1983.

25        Q.    What did you do between '77 and

 1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
 2   '83?
 3       **A.**     I worked for a company in New York
 4   for five and a half years, Bering Hutchinson
 5   Company.
 6       **Q.**     What did you do for them?
 7       **A.**     I actually was a clerical person.
 8       **Q.**     What was your job title, if you
 9   recall, back in 1983 when you joined DC Comics?
10       **A.**     I was coordinator of special
11   projects.
12       **Q.**     What did that mean?
13       **A.**     There was a special projects
14   department, and I did clerical work.
15       **Q.**     Could you just move us through,
16   from '83 to the present, your different job
17   titles, if you can remember the dates, when you
18   got them, and get us to the present.
19       **A.**     I've been at DC for 19 years.
20   After two and a half years in that job I moved
21   into editorial as manager of editorial
22   administration.  And between then and now I've
23   had a few different promotions, the last being
24   six years ago to vice-president, managing
25   editor.  So I've had a few different in there.

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2  I do not recall the dates.
3       **Q.**     That promotion to vice-president
4  would have been in 1996?
5       **A.**     Yes.
6       **Q.**     At what point in your 19 years at
7  DC Comics did you begin dealing at all with
8  contracts with guest writers, freelance writers
9  and artists who were working in comic books for
10 DC Comics?
11      **A.**     Probably the '80s.
12      **Q.**     Would it have been after the time
13 you became manager of editorial administration?
14      **A.**     Yes.
15      **Q.**     What was the nature, back then, of
16 your involvement with contracts with writers and
17 artists who were working in comic books for DC
18 Comics?
19      **A.**     Ensuring they went out and they
20 were signed by the talent.
21      **Q.**     Did that job function ever change
22 over time?
23      **A.**     It grew as I added more
24 responsibilities.
25      **Q.**     You know Todd McFarlane?

8

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2          A.      I do.

3          Q.      What was the origins of your

4  relationship with Todd?

5                  MR. PERKINS:  Object to the form.

6  Misstates prior testimony.  She didn't testify

7  there was a relationship.

8                  MR. KAHN:  That's a good objection.

9          Q.      Tell me when you first met Todd.

10         A.      I don't recall the year.

11         Q.      Did you ever work with Todd when he

12  was doing work for DC Comics?

13         A.      Yes.

14         Q.      And when -- what was that period?

15         A.      I don't recall exactly when it was.

16  Probably in the early -- my early time in

17  editorial.

18         Q.      Sometime during the 1980s?

19         A.      Yes.

20         Q.      And probably an earlier portion of

21  the 1990s?

22         A.      Probably.

23         Q.      What was the nature of your work

24  with Todd back then?

25         A.      I don't recall the specific project

9

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2 that we were working on with him.

3       Q.    Do you think he was involved with

4 some issue for the comic book?

5       A.    Yes.  I think he drew something for

6 us.

7       Q.    He was doing artwork at the time?

8       A.    Yes.

9       Q.    Was he the penciler?  Inker?

10      A.    I believe he was the penciler.

11      Q.    Todd has looked for his copies of

12 any DC contracts that he may have had.  We

13 haven't been able to find any yet.  But was it

14 the practice of DC Comics back at the time that

15 you were working with Todd when he was doing

16 penciling for one of the issues that there would

17 be a written contract with the artist?

18      A.    Yes.

19      Q.    What type of contract was there

20 with an artist?

21      A.    A contract that guaranteed him page

22 rate royalties, book by book.

23      Q.    Was there a name for that type of

24 contract within DC Comics?

25      A.    We call it a voucher.

10

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2        Q.    A voucher.  Was that typically more
3  than one page?
4        A.    No.
5        Q.    Was the voucher form of contract
6  used only for artists?
7        A.    No.  Anyone that provided services.
8        Q.    So writers would also be given a
9  voucher contract?
10       A.    Yes.
11       Q.    And the voucher contract would have
12  in it, among other things, a page rate that the
13  artist was to be paid?
14       A.    Yes.
15       Q.    Were there also royalty provisions?
16       A.    Yes.
17       Q.    And how did those work?  Without
18  getting into the specifics, you got a certain
19  page rate for penciling an issue?
20       A.    Yes.
21       Q.    Then royalties came along
22  afterwards if the sales reached a certain
23  number?
24       A.    Correct.  Yes.
25       Q.    Were the royalty rates for the

11

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2    artists back when Todd was doing work for DC

3    Comics standard?

4       **A.**    Yes.

5       **Q.**    So it didn't matter which artist it

6    was.  If you were working in this comic book,

7    here was your page rate?

8       **A.**    Yes.

9       **Q.**    Was that the same with writers?

10      **A.**    Yes.

11      **Q.**    Back in the 1980s did DC Comics

12   have full-time employees of DC Comics who were

13   providing either artwork services or writing

14   services in comic books?

15      **A.**    I don't believe so.

16      **Q.**    It was mainly freelance, or mostly

17   freelance?

18      **A.**    Yes.

19      **Q.**    And is that the term that you used?

20      **A.**    Yes.

21      **Q.**    Back at the time that Todd was

22   doing penciling artwork on comic books in the

23   1980s, was there something at DC Comics known as

24   a character equity agreement?

25      **A.**    I'm sorry.  I don't understand the

12

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2  whole question.

3      Q.    We've seen in this case -- there

4  has been produced in this case, both from DC

5  Comics and also Neil Gaiman, different types of

6  contracts, including one type of contract which

7  I'll show you in a little bit.  It appears to be

8  called a character equity agreement.  My

9  question to you is: Were there character equity

10  agreements back in the 1980s?

11     A.    I believe so.  Yes.

12     Q.    Were there character equity

13  agreements back in the 1980s for pencilers or

14  other artists?

15     A.    Yes.

16     Q.    So it was not just limited to

17  writers.

18     A.    No.  It wasn't limited.

19     Q.    Did Todd ever have a character

20  equity agreement with DC Comics?

21     A.    I don't recall.  I don't recall.

22     Q.    One way or the other.

23     A.    One way or the other, if he did.

24     Q.    After the 1980s did you have any

25  other professional involvement with Todd

13

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2      McFarlane?

3          **A.**      Yes.

4          **Q.**      What was that?

5          **A.**      DC and Todd entered into an

6      agreement to do Bat Man Spawn crossover, so I

7      interceded in some of the business aspects.

8          **Q.**      When was that?

9          **A.**      I couldn't tell you.  I don't

10     recall.

11         **Q.**      Was that a one-comic deal?

12         **A.**      I don't recall.

13         **Q.**      Other than the Bat Man Spawn

14     crossover, were there any other business or

15     professional relationships between DC Comics and

16     Todd McFarlane that you were privy to?

17         **A.**      Not that I recall.

18         **Q.**      In looking through the various

19     agreements that Neil Gaiman has been a party to

20     with DC Comics over the years, there appear to

21     be two types of agreements.  To speed this up,

22     I'll tell you what there appear to be and you

23     can tell me if I'm right or wrong.  There

24     appears to be a writing services agreement, and

25     there also appear to be something called

14

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2  character equity agreements.  Is that a fair

3  characterization of the types of agreements DC

4  Comics has?

5          A.      Yes.

6          Q.      What are the writer services

7  agreements?

8          A.      They provide work for the writer to

9  provide services for us to write our comics.

10          Q.      And are these -- I realize that

11  they're longer and more detailed -- are these

12  what were formerly known as the vouchers?

13          A.      It depends.

14          Q.      On the typical writer's agreement

15  there is a page rate?

16          A.      Yes.

17          Q.      And are there royalty provisions?

18          A.      Yes.

19          Q.      And does every writer who does work

20  for DC Comics on a comic book do so pursuant to

21  a writer's services agreement?

22          A.      Yes.

23          Q.      What are character equity

24  agreements?

25          A.      They are an agreement that gives a

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2  financial participation to a creator who creates
3  a character in one of our books.
4      Q.    Does every writer who creates a
5  character in one of your books get a character
6  equity agreement?
7      A.    No.
8      Q.    I believe you testified earlier
9  that character equity agreements are also
10  available to at least some artists who work on
11  these books?
12     A.    They are.  Yes.
13     Q.    Terri, I'm going to show you what
14  we previously marked in another deposition as
15  Exhibits 57 and 58, which appear to be a
16  writer's services agreement and a character
17  equity agreement, these signed by Neil and DC
18  Comics.  I'm going to first ask you to take a
19  look at them and tell me if you can identify
20  what they are.
21     A.    Yes, this first one is a writer's
22  services agreement.  And the second one is a
23  character equity agreement.
24     Q.    While I realize that each document
25  with each writer may be slightly different, is

16

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2    there essentially a form for each of these

3    documents or a template that people work from?

4         A.    Yes.

5         Q.    And looking at Exhibit 57 as an

6    example of what I understand to be a services

7    agreement -- is that correct?

8         A.    Yes.  This is a service agreement.

9         Q.    Who would have prepared a DC Comics

10   Exhibit 57?

11        A.    The legal department.

12        Q.    And the same question for Exhibit

13   58, character equity agreement.

14        A.    The legal department.

15        Q.    With respect to these two

16   contracts, what would your involvement have

17   been?

18        A.    My department requests this type of

19   material of the legal department.

20        Q.    So, for example, on Exhibit 57,

21   your department would give some basics of what

22   the agreement was to cover, how many issues,

23   what the title of it is, what the page rate

24   should be --

25        A.    Yes.

17

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2          Q.      -- and then the legal department
3    would generate a contract?
4          A.      Yes.
5          Q.      How would it work for character
6    equity agreements?
7          A.      The same procedure.
8          Q.      Earlier you stated that every
9    writer who was doing writing services for DC
10   Comics would have a writer services agreement
11   similar to, though with different terms, the
12   Deposition Exhibit 57; correct?
13         A.      Yes.  Similar but different.
14   Different terms, yes.
15         Q.      But not every writer would get a
16   character equity agreement.
17         A.      Yes.
18         Q.      How, during the 1980s, did DC
19   Comics determine who was entitled to be given a
20   character equity agreement?  What were the
21   factors involved?
22                 MR. PERKINS:  Objection.
23   Foundation.  You may answer if you know.
24         A.      I don't recall in the early '80s.
25         Q.      I didn't mean the early '80s.  I

18

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2    mean the 1990s.  Sort of the Neil Gaiman era.

3    First question: Did anybody besides Neil Gaiman

4    at DC Comics in the 1990s receive a character

5    equity agreement?

6         **A.**    Yes.

7         **Q.**    Were there many other people who

8    received character equity agreements?

9         **A.**    Yes.

10        **Q.**    During the 1990s many other people

11   received character equity agreements, but not

12   all writers received character equity

13   agreements?

14        **A.**    Yes.

15        **Q.**    How would you determine who was

16   entitled to receive a character equity

17   agreement?

18        **A.**    The creator has to request it.

19        **Q.**    Okay.  So we have our hypothetical

20   creator who says, "I would like a character

21   equity agreement."

22        **A.**    Yes.

23        **Q.**    What did DC Comics then look at to

24   determine whether that writer was entitled to a

25   character equity agreement?

MANHATTAN REPORTING CORP., A LegaLink Company

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2       A.     The company has developed a set of
3  parameters that is used to judge if equity is
4  given.
5       Q.     And what are those parameters?
6       A.     The originality of the character.
7  The costumes.  The powers.  I don't recall
8  actually the rest of them.
9       Q.     When you say "the originality of
10 the character," help me understand what that
11 means.
12      A.     I can't.  Those decisions are made
13 not by me.
14      Q.     Do you have any involvement or any
15 input into those decisions?
16      A.     No.
17      Q.     Who at DC Comics makes those
18 decisions?
19      A.     The president and publisher.
20 Today's president and publisher.
21      Q.     Is that Paul Levitz?
22      A.     It is.
23      Q.     Has any writer ever asked you if he
24 or she could have a character equity agreement?
25      A.     Yes.

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2         Q.     And what is the process at DC
3    Comics from the point when you are asked by a
4    writer for a character equity agreement?  What
5    happens next?
6         A.     My department -- I have a staff
7    working for me, and they literally put the
8    information on a form that is then sent up to
9    the president and publisher who makes a
10   decision, and then it goes to legal for
11   contract.
12        Q.     And does your department on this
13   form make a recommendation one way or another
14   with respect to character equity?
15        A.     No.
16        Q.     If you would take a look at what
17   we've marked as Group Exhibit DC.  Is there in
18   that group an example of that form you just
19   mentioned?
20        A.     No.  The form is not in here, as I
21   recall.
22        Q.     Is the form a one-page form?
23        A.     Yes.
24        Q.     And what is on the form?
25        A.     It's a blank form that has lines

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2 that information needs to be completed by the

3 creator, or the editor on behalf of the creator.

4     **Q.**    So is there, like, a subject --

5     **A.**    Wait.

6         The form is not here.

7     **Q.**    What types of subject matters are

8 to be filled in on these blanks on the form?

9     **A.**    The first appearance of the

10 character.  The name.  Obviously the creator.

11 Publication date of first issue.  And then these

12 parameters: How original.  Costume.  Powers.

13 And something else that I can't think of.

14     **Q.**    Looking at Exhibit 58, there are,

15 under the section entitled "Royalties,"

16 different categories for royalties and different

17 percentages of numbers that are filled in.  I

18 look, for example, on page 3 of this exhibit

19 under D for media rights.  There's an amount

20 that states 15 percent of the publisher's net

21 receipts.

22         Is there a standard number --

23 strike that.  Is there a standard royalty

24 percentage for media rights on DC character

25 equity agreements?

22

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2       A.      Yes.
3       Q.      And what is that standard?
4       A.      The standard would be 10 percent
5  for the creator.
6       Q.      And who is the creator if there is
7  a writer who works on the issue and an artist?
8       A.      It's 10 percent for the writer
9  creator, and 10 percent for the artist creator,
10 for media.
11      Q.      Let me also ask you to look on that
12 same page, page 3, of Exhibit 58.  There's a
13 category called "Merchandising and Promotional
14 Licensing."
15      A.      Yes.
16      Q.      For this contract, which is the one
17 with Neil Gaiman, the number there is 15
18 percent.  Is that the standard writer creator
19 number?  Or is the standard number 10 percent?
20      A.      I don't recall.
21      Q.      Are there character equity
22 agreements where the royalty percentages on
23 media rights and/or merchandising and
24 promotional licensing are less than 10 percent
25 to a writer creator?

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2           A.      I don't recall.

3           Q.      This particular agreement, which is

4    Exhibit 58, is dated apparently February 1st,

5    1993.  And my question is: Looking through the

6    form of this agreement, section 1 entitled

7    "Royalties" and different items for royalties,

8    and section 2 entitled "Contingencies Affecting

9    Royalties," is this a form that was used

10   throughout most of the 1990s?

11          A.      I don't believe so.

12          Q.      How is this form different?

13          A.      I can't give you -- I don't recall.

14          Q.      We'll show you some others that

15   span the period.  If there are some differences,

16   maybe you can point them out.  You mentioned, in

17   determining whether an artist was entitled to a

18   character equity agreement, that one of the

19   factors is the originality of the creation.  Are

20   you familiar with a term known as a derivative

21   or a derivative character?

22          A.      I'm familiar with it.

23          Q.      How would you define "derivative"?

24          A.      A derivative is something that

25   comes from something else.

24

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2          Q.     Are there comic book characters

3   that would be or could be called derivative

4   characters in that they are based on another

5   character?

6          A.     Yes.

7          Q.     Can you think of some examples in

8   the DC Comics world of derivative characters?

9          A.     Not off the top of my head, no.

10         Q.     You're familiar with the Bat Man

11  character from DC Comics?

12         A.     Yes.

13         Q.     Has there ever been, during the

14  time you were at DC Comics, a Bat Man-like

15  character who was not Bat Man but existed either

16  in another era or in another dimension?

17         A.     Not that I recall.

18         Q.     What about Superman?  Have there

19  been other Supermen?

20         A.     Yes.

21         Q.     Give me an example of another

22  Superman.

23         A.     Superman Blue and Red.  I'm trying

24  to remember.

25         Q.     What was Superman Blue and Red?

MANHATTAN REPORTING CORP., A LegaLink Company

25

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2       **A.**    I don't recall exactly except the

3  name.

4       **Q.**    What would you call the Superman

5  Blue and red character?

6       **A.**    It was a form of Superman.

7       **Q.**    A form of Superman.  Would it be

8  called a derivative character, or would it have

9  a different name?

10      **A.**    I don't know.

11      **Q.**    What do they call it within DC

12  Comics?

13      **A.**    I think he was called Superman Blue

14  and Red.  Sorry.

15      **Q.**    That's okay.  When Neil Gaiman

16  began working on the Sandman comics, was there a

17  pre-existing character known as Sandman?

18      **A.**    Yes.

19      **Q.**    And was he a DC Comics character?

20      **A.**    Yes.

21      **Q.**    How would you describe the work

22  that Neil did with that character in either

23  adding originality or other qualities that

24  entitled him to character equity?

25      **A.**    He did just that.  He added

MANHATTAN REPORTING CORP., A LegaLink Company

26

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2    original qualities that was determined gave him

3    character equity in that character that he

4    worked on.

5                            (**Exhibit DC-1** for

6    identification, service agreement, 4-20-88,

7    production Nos. G 04075 through G 04086.)

8                        (Discussion off the record.)

9        **Q.**    I've asked the court reporter to

10   mark and give you as Deposition Exhibit DC-1 a

11   document numbered G 04075 to 4086, dated April

12   20th, 1988.

13                    I ask you, Terri, if you can

14   recognize what this document is.

15       **A.**    By looking at this, I believe this

16   is a service agreement.

17       **Q.**    Can you determine what this service

18   agreement is for?

19       **A.**    For Sandman, to provide full

20   script.

21       **Q.**    Can you tell how many scripts are

22   supposed to be provided?

23       **A.**    No, because paragraph 7 doesn't

24   exist.

25                    Excuse me.  No.  I can't.

MANHATTAN REPORTING CORP., A LegaLink Company

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2       Q.      Let me ask you to look at,

3 actually, paragraph 8 of this agreement, and

4 specifically paragraph 8-C, which reads, "It is

5 understood and agreed that if, after writer has

6 supplied the full script for the first 12

7 consecutive issues of the work, writer shall

8 have created and/or shall subsequently create

9 wholly original characters for the work, DC

10 shall grant writer creator equity in those

11 characters only, according to DC's standard

12 policy."

13             My first question is: Do you

14 recognize this particular contract?

15       A.      I don't.

16       Q.      Does this suggest to you that this

17 April 20, 1988 document marked as Exhibit DC-1

18 was for the first 12 issues of Sandman?

19             MR. PERKINS:  Objection.  The

20 document speaks for itself.  If you can

21 answer --

22       A.      I don't.

23       Q.      Is this the usual paragraph 8-C in

24 your services agreement?

25       A.      No.

28

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2      **Q.**    Do you recall any discussions

3  regarding an agreement with Neil Gaiman that if

4  he wrote 12 issues and would meet certain

5  criteria, he would be entitled to character

6  equity?

7      **A.**    No, I don't recall.

8      **Q.**    Back in the late 1980s and very

9  early 1990s do you recall any discussions with

10 anyone at DC Comics including a request from

11 Neil Gaiman for character equity rights in

12 Sandman or Sandman characters?

13     **A.**    Could you repeat that question?

14     **Q.**    Sure.  Back in the late 1980s and

15 early 1990s do you recall any conversations with

16 others at DC Comics regarding a request by Neil

17 Gaiman for character equity in any of the

18 Sandman characters?

19     **A.**    Yes.

20     **Q.**    What do you recall?

21     **A.**    I recall dealing with his agent at

22 the time, negotiating work for Neil.

23     **Q.**    So those discussions were, in fact,

24 between you and -- is it Merilee Haifetz?

25     **A.**    It is, yes.

MANHATTAN REPORTING CORP., A LegaLink Company

29

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2       Q.      Do you recall the period of time

3  that you and Merilee were negotiating the

4  character equity agreement?

5       A.      Nothing more specific than we

6  negotiated back then.

7                           (**Exhibit DC-2** for

8  identification, letter agreement, 1-2-90, to

9  Gaiman, from Levitz.)

10                  MR. KAHN:  I've asked the court

11  reporter to mark as Deposition Exhibit DC-2 a

12  January 2nd, 1990 letter agreement to Neil

13  Gaiman from Paul Levitz which includes, as you

14  will see, some character equity provisions.

15      Q.      Terri, is this a contract you

16  recognize?

17      A.      No.

18      Q.      Is this exhibit, DC-2, a contract

19  that you participated in the negotiation of?

20      A.      I don't recall.

21      Q.      Do you see in the first paragraph

22  it refers to the earlier agreement?  It says,

23  "This will expand our agreement."  Is this what

24  you would call a 1990 version of a character

25  equity agreement?

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2      A.      No.

3      Q.      What would you call this?

4      A.      It's an amendment to his prior

5 agreement for services.

6      Q.      What does this agreement do for Mr.

7 Gaiman, if anything, in addition to what his

8 prior agreement had done?

9      A.      It amends his page rate.  It adds

10 another 12 issues, I believe, to his services.

11 And it does include equity information.

12      Q.      According to paragraph 3, which

13 maybe is what you're referring to, it upgrades

14 his status from creative team member to creative

15 contributor?

16      A.      According to this, yes, it does.

17      Q.      Is that some sort of equity status

18 or equity participation status?

19      A.      I don't believe so.

20      Q.      What portions of this Exhibit DC-2

21 include the equity participation that you --

22      A.      I believe in paragraph 2 it

23 specifies characters.

24      Q.      And these are characters that Neil

25 had created?

31

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2          A.      I believe so.
3          Q.      And look at the third page,
4  agreement, subparagraph, small "c."  It talks of
5  licensing royalties.  Would these be character
6  equity-type royalties?
7          A.      I don't believe it is.  I really
8  don't know.
9          Q.      So your involvement with Neil and
10  his agent in negotiating an agreement would have
11  taken place after the date of DC-2?
12         A.      I don't recall the timing of that,
13  so I don't know if it was before or after.
14                          (Exhibit DC-3 for
15  identification, two-page letter, 5-24-93, to
16  Haifetz, from Cunningham.)
17                          (A conference was held between the
18  witness and her attorney.)
19         Q.      Terri, I've asked the court
20  reporter to mark and give you a two-page letter
21  that appears to be from you to Merilee Haifetz,
22  dated May 24, 1993, that we've marked as Exhibit
23  DC-3.  I ask you to take a moment to read
24  through the document and tell me if you
25  recognize it.

32

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2        A.      I do recognize it.

3        Q.      What is this letter?

4        A.      It was a letter outlining the

5  details of the terms between Neil Gaiman and DC

6  Comics.

7        Q.      And are these terms that are to be

8  in a writer's services agreement or in a

9  character equity agreement?

10       A.      It could be both.

11       Q.      This indicates, if I understand it

12  correctly, in the second paragraph, that Neil

13  had been working on the Sandman character now

14  for five years?  I'm sorry.  Had been working on

15  the Sandman comic book for five years?

16       A.      Yes.  I believe that's the right

17  time.

18       Q.      And the increase in his creator

19  participation was going to become effective with

20  issue No. 50 of Sandman?

21       A.      Yes.

22       Q.      Just so I can try to correlate

23  these numbers to the numbers in either 57 or 58,

24  those two exhibits, which are the signed

25  agreements in the '92/'93 era, where would I

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2      find the royalty numbers at the end of the
3      second paragraph of Exhibit DC-3?
4                  MR. PERKINS:   Which ones?   There
5      are a lot of different royalty numbers.   Second
6      paragraph?
7                  MR. KAHN:   Yes.
8          Q.     At the end of the second paragraph,
9      creator's share on nonreturnable books would now
10     be 0.5 percent for books selling 40,000 to
11     100,000, and 0.8 percent for any books over
12     100,000.
13                 MR. ARNTSEN:   At the risk of moving
14     this along, look at 1-A-2 --
15                 MR. KAHN:   Of Exhibit 58?
16                 MR. ARNTSEN:   -- of Exhibit 58.   I
17     apologize.
18         Q.     Has Mr. Arntsen directed us to the
19     correct place?
20         A.     Yes.
21         Q.     And that is in the character equity
22     agreement marked 58?
23         A.     Yes.
24         Q.     And this is an increase in royalty
25     rates made after 50 issues of Sandman?

34

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2          A.      Yes, I believe so.

3          Q.      Do you know what the royalty rate

4  was or would have been before the increase?

5          A.      No.

6          Q.      We would just need to look at his

7  earlier contracts to find that?

8          A.      Correct.

9          Q.      I'm sure I've asked you this

10  before, Terri, and I apologize, but were you

11  involved in the preparation of Exhibit 58, which

12  is the character equity agreement?

13          A.      I don't recall.

14          Q.      But at least in your correspondence

15  with Neil's agents, some of the numbers you

16  mentioned to Neil's agent get put into the

17  character equity agreement marked as Exhibit 58;

18  correct?

19          A.      No.   That's not correct.

20          Q.      Explain to me the correlation

21  between --

22          A.      I dealt with Neil's agent during

23  different times during the course of Neil's

24  evolvement with DC.   I don't recall if she was

25  involved with this agreement.

35

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2       Q.      Okay.  Let me ask you to take a

3  look again at Exhibit 58.  We've earlier talked

4  about the different royalty provisions under

5  section 1 entitled "Royalty."  I want to move to

6  section 2, entitled "Contingencies Affecting

7  Royalties."  Are you familiar with this

8  provision of the character equity agreement?

9       A.      Yes.

10      Q.      Who makes the decisions on how

11 these contingencies will affect royalties at DC

12 Comics?

13      A.      I don't know.

14      Q.      Who makes recommendations?  Anybody

15 in your department make a recommendation?

16      A.      No.

17      Q.      Who would know at DC Comics how

18 section 2 of the character equity agreements

19 operate in actual situations where there are

20 contingencies affecting royalties?

21      A.      Perhaps our accounting department.

22 Legal department.

23      Q.      So if I were to give you a

24 hypothetical that involved a character covered

25 by a character equity agreement, and have a

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2      hypothetical in which there would be a certain
3      licensing use of that character or a version of
4      that character, would you be able to tell me how
5      this agreement operated and would affect the
6      royalties being paid in that situation?
7          A.      I don't know if I could.
8          Q.      For example, let us assume that you
9      have a writer who has created a character and is
10     given character equity in that character, and
11     then moves on to other projects.  And subsequent
12     writers continue to use that character but
13     change the character's personality.  And then
14     that changed character's personality gets
15     licensed for a toy or for a movie.
16                 How would paragraph 2 operate?
17         A.      It's a discretion call.
18         Q.      Something DC Comics does?
19         A.      Yes.
20         Q.      Who is involved in making
21     discretion calls at DC Comics?
22         A.      Paul Levitz.
23         Q.      Anybody else?
24         A.      No.
25         Q.      I'll give you one other

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2  hypothetical.  We have a -- actually I'll give

3  you an actual example, and if I mischaracterize

4  it, Allen will correct me.

5          Neil Gaiman creates a character for

6  an issue of Spawn Comics, and the character is a

7  version of Spawn in the middle ages; okay?  And

8  he's wearing armor and other things appropriate

9  for the middle ages.  And he appears in eight

10  pages of the comic book, and then gets killed

11  off.  And a year later a toy is made based on

12  the artwork of that character.

13          Assuming that what was done by Neil

14  was enough to get a character equity agreement,

15  how would that affect -- how would the fact that

16  the character was killed off and then made into

17  a toy get factored into these contingencies

18  affecting royalties?

19      A.      I don't think I can answer that

20  question.  I don't know.

21      Q.      That would be something Paul Levitz

22  would decide?

23      A.      Yes.

24      Q.      It would appear, from looking at

25  Neil Gaiman's contracts, that the first

38

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2    character equity rights granted to him come
3    after he's written 12 issues of the comic.  Does
4    that jibe with your recollection?
5         A.    According to these documents, yes.
6         Q.    Does DC Comics have a requirement
7    of a certain number of issues that a writer has
8    to work on before that writer can get character
9    equity?
10        A.    No.
11        Q.    Have you given character equity to
12   writers who have written one issue?
13        A.    Yes.
14        Q.    Who was that?
15        A.    I don't recall.  There's too many
16   of them.
17        Q.    And do they typically get the 10
18   percent character equity?
19        A.    Typically, yes.
20        Q.    Other than Neil Gaiman with his 15
21   percent numbers, at least for the Sandman
22   characters we've seen so far, are there other
23   writer creators at DC Comics who have worked for
24   DC Comics who have a 15 percent character equity
25   share?

39

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2          A.      I don't recall.

3          Q.      Who would know that?

4          A.      The legal department.

5                  (Brief interruption.)

6                  (Discussion off the record.)

7                           (Exhibit DC-4 for

8   identification, document pages produced by DC

9   Comics in response to subpoena, production Nos.

10  DC 0029 through DC 0033.)

11         Q.      Can you take a look at what the

12  court reporter has marked as Exhibit DC-4, which

13  consists of some of the pages of documents

14  produced by DC Comics in response to a subpoena,

15  namely DC 0029 through 0033.  And then once

16  you've had a chance to look through it, help me

17  understand what it is.

18         A.      Yes, I recognize it.  It's the

19  process of how we requested equity for Timothy

20  Hunter from Bill Gaiman.

21         Q.      Can you take me through the process

22  as reflected in these documents?

23         A.      Start from the back?

24         Q.      Okay.

25         A.      The underlying internal memos is

40

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2   between the editor and my department, in some
3   cases, or myself, providing information so we
4   could turn it into a request for Paul Levitz,
5   which is a memo dated March 24th, 1993.
6       Q.    That's the one stamped DC 0030?
7       A.    Yes, of which was approved.  And
8   the contract request is on top, March 29th,
9   1993, to the legal department requesting the
10  character equity.
11      Q.    So looking at the second page of
12  this exhibit, this is form of request?
13      A.    Second page is a memorandum at the
14  time to Paul Levitz requesting character equity
15  in this character.
16      Q.    And help me understand.  It says,
17  "The following standard equity is requested."
18      A.    At the time, that was the standard
19  equity.  That's how we presented it.
20      Q.    And what is the standard equity?
21      A.    They have changed over the years.
22  I don't recall exactly what it was in 1993.
23      Q.    Okay.  So you're requesting half
24  the normal creator royalty if these characters
25  appear in their own DC title?

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2          **A.**      Yes.

3          **Q.**      And you just don't remember what

4    the normal creator royalty was back then?

5          **A.**      No, I don't.

6          **Q.**      You're requesting 20 percent media,

7    merchandising royalty?

8          **A.**      Yes.

9          **Q.**      Based on net receipts?

10         **A.**      Yes.

11         **Q.**      The first page, then, would suggest

12   that -- you confirm if it's right -- that Paul

13   Levitz has approved the request and you're now

14   restating it for the legal department.

15         **A.**      Yes.  That is correct.

16         **Q.**      And the next step in the process

17   would be for the legal department to draft a

18   character equity agreement?

19         **A.**      Yes.

20         **Q.**      Let me show you the one we have and

21   you tell me if that's the right one.

22                     MR. KAHN:   I'll ask the court

23   reporter to mark it.

24                              (**Exhibit DC-5** for

25   identification, cover letter from J. Brown, with

42

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2 attachment, amendment to a prior agreement,
3 character equity in the Timothy Hunter
4 character.)
5        Q.      Terri, have you had a chance to
6 look at Exhibit DC-5?
7        A.      Yes.
8        Q.      Can you identify it?
9        A.      I believe -- it looks like an
10 amendment or an addition to a prior agreement,
11 but it does look like character equity in the
12 Timothy Hunter character.
13       Q.      And there's a cover letter from
14 Jeddy Brown.  Do you know a Jeddy Brown?
15       A.      Yes.
16       Q.      Who is she?  Was she?
17       A.      She was a coordinator working in my
18 department sending out contracts and back and
19 forth to talent.
20       Q.      So if we look at section 1 under
21 "Royalties."  And I'm tracking back to Exhibit
22 DC-4, which is this memo to the legal
23 department, where it says, "The following
24 standard equity is requested," and then it says,
25 "Half the normal creator royalty of these

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2  characters appear in their own DC title."  And I

3  see here in the contract, which is included in

4  Exhibit DC-5, some royalty numbers for DC

5  editions.

6          A.     Yes.

7          Q.     Do you know why the, quote,

8  "standard," close quote, equity requested was

9  half the normal creator royalty?

10         A.     I believe that was the deal at the

11 time.

12         Q.     And who would get the normal

13 creative royalty as opposed to half of it?

14         A.     I don't know if I can answer that.

15 This is what the deal was for equity.

16         Q.      "This" being what appears in

17 Exhibit DC-5?

18         A.     Right.  This was our deal for

19 equity.  The way this memo was written, that's

20 what's confusing, I believe, because this is the

21 standard.

22         Q.     So the standard deal --

23         A.     I believe are the numbers; okay?

24         Q.     Then let's look also at media

25 right, which is subparagraph small "d" which is

44

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2  in the second page of the contract and third

3  page of the document, which is 10 percent of

4  publisher's net receipts.  Do you see that?

5       A.    Yes.

6       Q.    Does that correlate with

7  information on Exhibit DC-4 of the first page in

8  the request to legal?

9       A.    Yes.

10      Q.    Because 20 percent --

11      A.    Is for both creatives.  That's the

12  key there.

13      Q.    Got you.  So that Neil Gaiman's

14  standard equity in this deal is 10 percent.

15      A.    I believe so, yes.

16      Q.    And then the artist would get a

17  similar character equity agreement with a 10

18  percent number.

19      A.    I believe so.

20      Q.    Let me ask you to turn the page to

21  the third page, the last subparagraph under

22  section 1, which is entitled "Merchandising and

23  Promotional Licensing."  On Neil Gaiman's deal,

24  part of DC-5, it states that the royalty

25  percentage is 10 percent; correct?

45

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2       **A.**     Yes.

3       **Q.**     And if we look back at Exhibit
4  DC-4, that 10 percent to Neil would be the
5  standard equity because the artist would get a
6  10 percent as well.

7       **A.**     Yes.

8       **Q.**     So we're dividing up a 20 percent
9  pool between the artist and writer, giving them
10  both 50 percent.

11      **A.**     Yes.

12      **Q.**     At least on Exhibit DC-4, that was
13  the standard equity deal; correct?

14      **A.**     I believe so.

15               (A conference was held between the
16  witness and her attorney.)

17               (Discussion off the record.)

18               (A brief recess was taken.)

19      **Q.**     Terri, I've asked the court
20  reporter to mark three Neil Gaiman contracts as
21  DC-6, DC-7, and DC-8.

22                      **(Exhibit DC-6** for
23  identification, character equity agreement
24  between Gaiman and DC Comics, Matthew the
25  Raven.)                 **(Exhibit DC-7** for

MANHATTAN REPORTING CORP., A LegaLink Company

46

1   TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2    identification, character equity agreement,
3    1-3-97, between Gaiman and DC Comics, Titanium.)
4                        **(Exhibit DC-8** for
5    identification, character equity agreement
6    between Gaiman and DC Comics, Auberon.)
7        **Q.**    I wonder if you can look at them
8    and tell us what they are.
9        **A.**    They are character equity
10   agreements between Neil and DC Comics for
11   different characters.
12       **Q.**    Are you familiar with the character
13   in Exhibit DC-6, namely Matthew the Raven?
14       **A.**    I know who the character is.
15   That's about it.
16       **Q.**    When we look at the media rights in
17   merchandising and promotional licensing rights,
18   royalty rates on page 3 of this exhibit, I
19   notice that the media right royalty rate is 7.5
20   percent, and the merchandising and promotional
21   licensing rate is 7.5 percent.
22                 Do you know how DC Comics arrived
23   at those royalty rates?
24       **A.**    Neil was granted these percentages.
25       **Q.**    These are percentages different

MANHATTAN REPORTING CORP., A LegaLink Company

1   TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2   than the 15 percent and different than the 10

3   percent that we've seen in other character

4   equity agreements.  Do you know how the 7.5

5   percent was arrived at?

6       A.      This was arrived at -- it was

7   special for Neil.

8       Q.      Was it simply a matter of

9   negotiation that you arrived at 7.5?

10      A.      I believe it was.  I believe it

11  was.  I don't recall the specifics, but I

12  believe it was negotiated.

13      Q.      On Exhibit DC-7, that covers

14  another Sandman character, Titanium.

15      A.      Uh-huh.

16      Q.      On this one, if you look at page 3,

17  the royalty numbers for media rights and

18  licensing are 10 percent.  Do you know how the

19  10 percent number is arrived at in this contract

20  dated January 3rd, 1997?

21      A.      I don't.

22      Q.      It's just a matter of negotiation?

23      A.      I really don't recall, negotiation

24  or otherwise.  I don't recall on this one.

25      Q.      Same question on DC-8, which covers

48

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2      a character named Auberon where the royalty
3      numbers for media rights and licensing are also
4      10 percent.  Do you recall how these numbers got
5      arrived at?
6          A.     I don't.
7          Q.     We've seen on Neil's contracts, at
8      least, royalty numbers from media rights and
9      merchandising and promotional licensing rights
10     of 7.5 percent, of 10 percent, and of 15
11     percent.  Is it fair to say, at least with
12     respect to the character equity agreements in
13     which Neil is involved, that there's no basic
14     standard rate for these different items of
15     royalties?
16         A.     No.  I don't believe that's a fair
17     statement.
18         Q.     How would you characterize it?
19         A.     I believe it depends on the
20     negotiation at the time the character was
21     created.  If he was represented; if he wasn't.
22     That's what I recall.
23         Q.     Is it fair to say that a variety of
24     factors go into the setting of whatever the
25     royalty rates are in these character equity

49

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2      agreements?
3          **A.**     Yes.  Yes.
4          **Q.**     Did you become aware in 1997 that
5      Neil Gaiman and Todd McFarlane were attempting
6      to work out some agreements between the two of
7      them over some of Neil's contributions to the
8      Spawn comic book series?
9          **A.**     I recall that there was some issues
10     about what you're talking about, yes.
11         **Q.**     When did you first learn of it?
12         **A.**     I don't recall.
13         **Q.**     Let me see if we can try to hone in
14     on at least a certain part of the year.
15                 MR. KAHN:   I ask the court reporter
16     to mark as DC-9 a handwritten note from you to,
17     I believe, Neil Gaiman, dated May 2nd, 1997.
18                             **(Exhibit DC-9** for
19     identification, handwritten note, 5-2-97, to
20     Gaiman, from Cunningham.)
21         **Q.**     Is this your note, Terri?
22         **A.**     It is, yes.
23         **Q.**     Is this a note you sent to Neil?
24         **A.**     Yes.
25         **Q.**     Do you recall what was in Oakland

50

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2  earlier that week that you returned from?
3      **A.**    I do.  In Oakland there was a comic
4  book convention that -- the name escapes me
5  right now.  And it happened in April -- or had
6  happened in April every year at Oakland,
7  California.
8      **Q.**    And during that convention that you
9  attended, did you happen to have a conversation
10  with Neil about his dealings with Todd?
11      **A.**    I don't recall the conversation.  I
12  do recall that he asked me to send him a copy of
13  the agreement, which I did.  Of his agreement.
14      **Q.**    Did he tell you why he wanted you
15  to send him a copy of his agreement?
16      **A.**    I don't recall specifically the
17  conversation at all.
18      **Q.**    Do you recall how you picked out
19  the agreement that you sent him?
20      **A.**    I believe he asked me for it
21  specifically.
22      **Q.**    But you don't recall why he asked
23  you for it.
24      **A.**    No, other than I knew there was
25  something with Todd.

51

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2      Q.    Did you happen to talk with Todd as
3 well when you were out in Oakland at --
4      A.    Not that I recall.
5      Q.    Did Neil tell you exactly what he
6 and Todd were trying to work out?
7      A.    I really do not recall the
8 conversation.
9      Q.    So something having to do with his
10 dealings with Todd.
11     A.    Yes, which is why I believe he
12 wanted me to send a copy of our agreement.
13           (Discussion off the record.)
14     Q.    Terri, let me show you what was
15 previously marked as Exhibit 2.  It's really not
16 a very good copy of a faxed letter from Neil to
17 Todd where, as you will see, your name shows up
18 on the second page.
19           MR. ARNTSEN:  So the record is
20 clear, it's not clear it's a fax from Neil to
21 Todd.  It's clear it's a fax from Todd to Paul.
22           MR. KAHN:  Right.  Either a letter
23 or a fax.  It's a letter that either was mailed
24 or faxed.
25     Q.    This letter from Neil to Todd is

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2  dated May 5th, 1997, and I notice that your
3  note, which was Exhibit DC-9, was dated May 2nd,
4  1997.  And there was a reference in the second
5  page of Neil's letter, which is Exhibit 2.  Is
6  this description of a conversation that Neil had
7  with you a conversation that you recall?
8      **A.**    No.  I don't recall a conversation.
9      **Q.**    So it could have happened?
10     **A.**    Possibly.
11     **Q.**    Does it sound -- strike that.  If
12 we go back to the first page, he has, in Exhibit
13 2, various percentages going down this page,
14 starting with something called creator royalty
15 at .5 percent of the cover price, 100,000, and
16 .8 percent after that.  Those two numbers, I
17 believe, are ones that we found in the character
18 equity agreement that was marked as Exhibit 58;
19 correct?
20     **A.**    Yes.  Correct.
21     **Q.**    And that was a set of numbers that
22 actually represented an increase that DC Comics
23 gave Neil after he wrote 50 issues of Sandman;
24 correct?  At least according to your letter to
25 Merilee Haifetz, marked Exhibit DC-3?

MANHATTAN REPORTING CORP., A LegaLink Company

53

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2                    (A conference was held between the
3    witness and her attorney.)
4        A.      I don't believe the dates are
5    right, your Exhibit 58.  I believe this
6    agreement is prior to my correspondence with
7    Merilee.
8        Q.      At least the agreement is dated
9    prior to your conversation with Merilee.
10       A.      Right.  And dealings.
11       Q.      Correct.  So when did the royalty
12   rate, to your recollection, creator royalties,
13   go up to .5 percent of the cover price to
14   100,000 copies, and .8 percent of the cover
15   price?
16       A.      I don't recall the specific dates.
17   It would vary, depending on the agreement we had
18   with Neil.
19       Q.      Does Exhibit DC-3 tend to suggest
20   that this was an increase that was to be made
21   after issue 50?
22              MR. ARNTSEN:  Object.  Vague.  I
23   don't know how a document tends to suggest.  But
24   that's fine.
25              MR. PERKINS:  You may answer, if

54

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2      you like.

3          A.      Yes, I do believe that is the case.

4              MR. KAHN:  Can we take a

5      five-minute break?  I'll come back.  I bet I'll

6      be done.

7              (A brief recess was taken.)

8          Q.      Terri, while you were out on the

9      break, we were looking at your letter which is

10     marked Exhibit DC-3 and is dated May 24th, 1993.

11     We were looking at the character equity

12     agreement that is dated as of -- or originally

13     was dated as of April 20th, 1993.  Someone

14     scratched that out and dated it as of February

15     1, 1993.  We looked down at the document

16     identifier at the bottom of the page in small

17     print that appears on each page, and it's clear

18     on some pages and not others, but there is a

19     code there which appears to be a date of

20     9-30-93.

21              And is it possible that this

22     contract marked as Exhibit 58 was, in fact,

23     finalized after your May 24th, 1993 letter but

24     was dated with an as-of date that was prior to

25     your letter?

55

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2        **A.**    I really don't recall the dates on
3    here, why and how.
4        **Q.**    Let me ask you to look at Exhibit
5    57 which you'll see has a date originally,
6    before it was scratched out, dated as of August
7    1, 1993.  And somebody has typed that out at the
8    top and dated it as of September 1, 1992.  And
9    that covers a certain number of issues of
10   Sandman; correct?
11       **A.**    Yes.
12       **Q.**    Beginning with what issue?
13       **A.**    Issue 50.
14       **Q.**    And your letter of March 24th, 1993
15   states that certain writer creator shares that
16   are being increased will be effective with
17   Sandman No. 50?
18       **A.**    Yes.
19       **Q.**    Was it the practice of DC Comics to
20   date a writer's services agreement for a certain
21   number of issues of a comic book as of a date
22   prior to the commencement of that particular set
23   of issues?
24       **A.**    I don't recall how it was done.  I
25   don't recall.

56

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2       Q.    In any event, in your letter of May

3  24th, 1993, which is Exhibit DC-3, do you

4  understand yourself to be telling Neil's agent

5  that you -- that DC Comics has decided to

6  increase his participation -- creator

7  participation for all DC editions to a full

8  writer creator share of 50 percent that will

9  become effective with Sandman No. 50?

10      A.    Yes.

11      Q.    And that would translate into a

12 creator share on nonreturnable books of 0.5

13 percent for books selling 40,000 and 100,000,

14 and 0.8 percent for any books over 100,000?

15      A.    Yes.

16      Q.    Going back to Exhibit 2 where we

17 have creator royalties with those same numbers

18 of .5 percent and .8 percent, does that appear

19 to you, based on the contracts and the

20 correspondence we've looked at, to be a creator

21 royalty rate that became effective after Mr.

22 Gaiman had written 49 issues of Sandman?

23      A.    Yes.  That's how it appears.

24      Q.    And before he had written those 49

25 issues of Sandman -- or during the time he was

57

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2  writing the 49 issues, 1 through 49, he had a
3  lower royalty rate for creator royalty?
4       A.    Yes, if he had one at all.
5       Q.    At this point, you can't remember.
6       A.    Depends on the agreement, actually.
7       Q.    Okay.  And the reference that Neil
8  makes to a conversation with you in Exhibit 2,
9  you've already testified, may have happened.
10 You just don't recall.
11      A.    Correct.
12      Q.    Other than the one conversation
13 that you had with Neil in Oakland during that
14 convention, which was in late April of 1997,
15 from that point going forward do you recall
16 during the year 1997 any other conversations
17 with Neil Gaiman regarding his discussions and
18 negotiations with Todd McFarlane?
19      A.    I do not recall.
20      Q.    It may have happened?
21      A.    It may have happened.
22      Q.    You just don't recall.
23      A.    I don't recall.
24      Q.    Between your meeting with Neil
25 Gaiman in Oakland in April of 1997, throughout

58

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2      the rest of the year 1997, do you recall any
3      conversations with Todd McFarlane about --
4      either about Neil Gaiman, or his discussions
5      with Neil Gaiman, or more generally about how DC
6      Comics contracts operate?
7          A.      I don't recall.
8          Q.      Could have happened?  You just
9      don't recall?
10         A.      Correct.
11         Q.      Other than your attorneys, Terri,
12     have you spoken to anyone about this deposition?
13     Other than your attorneys and any family
14     members.
15         A.      No.
16         Q.      No conversations with any other
17     lawyers?
18         A.      No.
19         Q.      Not with Mr. Arntsen?
20         A.      No.
21         Q.      Ken Levin?
22         A.      No.
23         Q.      Have you talked to Neil Gaiman
24     about your deposition?
25         A.      No.

59

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2         Q.    I have no further questions, Terri.
3  Thank you.
4         A.    You're welcome.
5               MR. ARNTSEN:   I've just got a
6  couple.
7               EXAMINATION BY MR. ARNTSEN:
8         Q.    Looking at the different -- you've
9  been shown various contracts here with various
10 royalty rates for various things.  Is it the
11 case that the specific numbers that find their
12 way into a particular contract are simply the
13 subject of negotiation between DC and the
14 creator?
15        A.    Yes.
16        Q.    And I gather that by the early
17 1990s, Neil Gaiman -- DC paid Neil Gaiman at the
18 high end of its standard royalty rate; is that
19 correct?
20        A.    Yes.
21        Q.    And that was largely driven by the
22 success of Neil's work on the Sandman comic;
23 correct?
24        A.    Yes, I believe so.
25        Q.    And in Sandman, Neil took a

MANHATTAN REPORTING CORP., A LegaLink Company

60

```
 1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
 2     pre-existing character and modified him;
 3     correct?
 4        A.    Yes.
 5        Q.    He also created some additional
 6     characters; right?
 7        A.    Yes.
 8        Q.    And so the record is clear on this,
 9     do you have any recollection at all about any
10     conversations, phone conversations, with Todd
11     McFarlane in the latter half of 1997 concerning
12     DC's standard policies or provisions relating to
13     character equity agreements?
14        A.    I don't recall.
15        Q.    And if I understand correctly from
16     looking at these agreements -- first of all,
17     specific royalties that go into different
18     provisions are sort of a function of the
19     relative negotiating positions of DC and the
20     creator; is that correct?
21        A.    Yes, it is.
22        Q.    And then there also seems to be
23     another factor that relates to the extent to
24     which the creator contributed to a particular
25     character; is that correct?
```

61

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2       **A.**      For specific agreements?

3       **Q.**      Yes.  For specific agreements.

4   Like there are references to things like spinoff

5   elements.  Things like that.

6       **A.**      Could you repeat your question?

7       **Q.**      Yes.  Is one of the factors that

8   goes into a specific royalty rate that a creator

9   may receive for various applications of a

10  character the extent to which that creator

11  contributed to that particular character?

12      **A.**      Possibly.  Again, that might be a

13  discretion call, if I understand your question.

14      **Q.**      For instance -- do you have Exhibit

15  DC-2 in front of you?

16              Can you turn to -- I believe it's

17  the third page of it.  It says G 4024.  Again --

18  first of all, just for the record, if you look

19  at the first page, this is a January 2, 1990

20  amendment to Neil Gaiman's DC contract; correct?

21      **A.**      Yes.

22      **Q.**      And looking first on this third

23  page, the G 4024, under "Licensing Royalties,"

24  as of that time, Neil is already getting the 15

25  percent of various applications of a character;

62

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2    correct?
3        A.    Yes.  According to this contract,
4    yes.
5        Q.    And that would include motion
6    picture, television, merchandising, promotional
7    licenses; correct?  If you look at the
8    second-to-last sentence of sub "c" on page 4024.
9        A.    Yes.
10       Q.    And then going down, under "d,"
11   "Limitations," that talks about spinoff
12   elements; correct?
13       A.    It does.
14       Q.    And if I understand correctly,
15   looking back to the first page of Exhibit DC-2
16   -- I'm moving back and forth -- if you look in
17   No. 2, the last sentence talks about spinoff
18   elements; correct?
19       A.    Yes, it does.
20       Q.    And that distinguishes between
21   spinoff elements and pre-existing elements;
22   correct?
23       A.    Yes.
24       Q.    Again, what these terms relate to
25   are a particular creator's relative

63

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2   contributions to a character; correct?

3       **A.**    Yes.

4       **Q.**    And that concept can play into the

5   particular royalty rates for a particular

6   character; correct?

7       **A.**    Yes.

8       **Q.**    Again, like anything else, this is

9   ultimately a subject of negotiation; correct?

10      **A.**    The percentage is, yes.

11      **Q.**    That's all I have.  Thank you.

12              MR. KAHN:  I have a few follow-up.

13              FURTHER EXAMINATION BY MR. KAHN:

14      **Q.**    You agreed with Allen when he asked

15  if what Neil had done with Sandman was take an

16  existing character and make modifications to

17  that character; correct?

18      **A.**    Yes.

19      **Q.**    How would you describe those

20  modifications?

21      **A.**    I can't.  He -- I really can't.

22  I'm not a creative person.

23      **Q.**    Is it your understanding there were

24  significant modifications or minor

25  modifications?

64

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2          **A.**      Yes.  They were significant.

3          **Q.**      Significant in what way?

4          **A.**      Significant in -- as far as the

5  person making the decision decided they were

6  significant enough to warrant the deal that we

7  gave him.

8          **Q.**      And as we saw from earlier, those

9  -- that deal took effect after he'd written 12

10  issues of the comic book Sandman; correct?

11          **A.**      I believe so.

12          **Q.**      One thing I neglected to ask you

13  before, because you're my only DC Comics person.

14  If you go to Exhibit 58 we have, under section 2

15  which starts at page 4 of that exhibit,

16  something that Allen just mentioned, spinoffs,

17  among the contingencies affecting royalties.

18  And there's another section called "Commingling

19  of Elements," which is section B.

20              And it states halfway through

21  section B, "Notwithstanding the foregoing, no

22  royalty shall be due for any minor use of the

23  characters."  And then it goes on to define what

24  minor use is.  I'm not a comic maven so I hope

25  you can tell me about these terms.  "Used

65

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
2   herein, 'minor use' shall mean a use of the
3   characters in another property as in, for
4   example" -- the first example is "multiproperty
5   crossovers."  What is that?
6       A.      I am not an expert in legal issues
7   and the way contracts are written, either.  And
8   these are paragraphs that I really don't think I
9   can even answer.
10      Q.      So there's no --
11      A.      I would go to the legal department,
12  personally, to get those answered.
13      Q.      As somebody who's worked in the
14  comic book industry for 19 years, do you have an
15  understanding of what, in the nonlegal context,
16  a multiproperty crossover is?
17      A.      It could mean a number of things.
18      Q.      It has no specific meaning to you?
19      A.      No.
20      Q.      How about "guest appearances"?
21  That's the next example of a minor use.  What is
22  a guest appearance in a comic book?
23      A.      A guest appearance is when a
24  character appears in another title, such as when
25  you put Sandman in with Superman, as an example,

MANHATTAN REPORTING CORP., A LegaLink Company

66

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2    for one issue, as a guest appearance.

3        Q.    So this is saying to Neil, "If

4    Sandman makes a guest appearance in an issue of

5    Superman," using your example, "that will be

6    deemed a minor use and you won't get royalties

7    for that."

8               MR. PERKINS:  I object to the

9    question.  She's already said she can't

10   interpret the agreement.  You asked her what

11   "guest appearance" means to her.  She's not

12   here to --

13       Q.    I will not ask you to interpret the

14   agreement.  But you just gave me your

15   understanding of what a guest appearance is.

16       A.    Yes.

17       Q.    Good.  The next example they give

18   of a minor use is "an occasional team-up."  What

19   does that mean in the comic book world?

20       A.    I believe it would vary on a

21   case-by-case, so I can't give you a definition

22   right now.

23       Q.    Can you give me an example?

24       A.    If two characters or three

25   characters team up in one book, then it's a

67

1  TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2  team-up.  No, I guess I can't, more than that.

3       Q.     Next category, cameos.  In the

4  comic book world, what's a cameo?

5       A.     I believe it's a guest appearance

6  as well.

7       Q.     And then the last two, I think I

8  understand.  Who's Who, or other index-type

9  listings, as those terms are commonly used in

10  comic book --

11       A.     More factual listing of characters.

12  Visual and copy.  Who Bat Man and Superman are.

13  That's what Who's Who is.

14       Q.     Thanks.  No other questions.

15              MR. ARNTSEN:  Just one more.

16              FURTHER EXAMINATION BY MR. ARNTSEN:

17       Q.     If I understand from your answer

18  with Mike's hypothetical, if Sandman made a

19  guest appearance in a Superman comic, you don't

20  know whether Neil would be paid for that?

21       A.     I don't.  I really don't.

22       Q.     Thanks.

23              (Continued to next page to include

24  jurat.)

25

68

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2         **A.**      You're welcome.

3                MR. PERKINS:  I have no questions.

4                (Deposition concluded at 3:05 p.m.)

5

6

7                          _____

8                          TERRI CUNNINGHAM

9

10   Subscribed and sworn to before me

11   this _____ day of _____, 2002.

12

13   _____

14

15

16

17

18

19

20

21

22

23

24

25

69

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY
   STATE OF NEW YORK        )
2                                    ss:
   COUNTY OF NEW YORK       )
3          I wish to make the following changes, for
   the following reasons:
4
   PAGE LINE ____ ____
5                          CHANGE FROM:_____
                           CHANGE TO:  _____
6  REASON: _____

7  ____ ____              CHANGE FROM:_____
                           CHANGE TO:  _____
8  REASON: _____

9  ____ ____              CHANGE FROM:_____
                           CHANGE TO:  _____
10 REASON: _____

11 ____ ____              CHANGE FROM:_____
                           CHANGE TO:  _____
12 REASON: _____

13 ____ ____              CHANGE FROM:_____
                           CHANGE TO:  _____
14 REASON: _____

15 ____ ____              CHANGE FROM:_____
                           CHANGE TO:  _____
16 REASON: _____

17 ____ ____              CHANGE FROM:_____
                           CHANGE TO:  _____
18 REASON: _____

19 ____ ____              CHANGE FROM:_____
                           CHANGE TO:  _____
20 REASON: _____

21

22                        _____
                          TERRI CUNNINGHAM
   Subscribed and sworn to before me
23 this _____ day of _____, 2002.

24 _____

25

MANHATTAN REPORTING CORP., A LegaLink Company

70

1 TERRI CUNNINGHAM - CONFIDENTIAL, ATTORNEYS' EYES ONLY

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK    )

5                              : ss.

6    COUNTY OF NEW YORK   )

7

8              I, MARLENE LEE, a Certified

9    Shorthand Reporter, Certified Realtime Reporter

10   and Notary Public within and for the State of

11   New York, do hereby certify:

12             That TERRI CUNNINGHAM, the witness

13   whose deposition is hereinbefore set forth, was

14   duly sworn by me and that such deposition is a

15   true record of the testimony given by the

16   witness.

17             I further certify that I am not

18   related to any of the parties to this action by

19   blood or marriage, and that I am in no way

20   interested in the outcome of this matter.

21             IN WITNESS WHEREOF, I have hereunto

22   set my hand this 30th day of July, 2002.

23

24                    Marlene Lee

25
                       MARLENE LEE, CSR, CRR

MANHATTAN REPORTING CORP., A LegaLink Company