DOCKET
NUMBER  **85**

U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN

AUG - 1 2002

FILED/RECEIVED
JOSEPH W. SKUPNIEWITZ, CLERK
CASE
NUMBER

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

NEIL GAIMAN and MARVELS AND    )
MIRACLES, LLC,    )
    )
    Plaintiffs,    )
    )
    v.    )
    )    Case No. 02-C-0048-S
TODD McFARLANE, TODD    )
McFARLANE PRODUCTIONS, INC.,    )
TMP INTERNATIONAL, INC., and    )
McFARLANE WORLDWIDE, INC.    )
    )
    Defendants-Counterclaimants,    )
    )
    And    )
    )
IMAGE COMICS, INC.,    )
    )
    Defendant.    )

---

## McFARLANE DEFENDANTS' STATEMENT IN REBUTTAL TO THE PLAINTIFFS' ADDITIONAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

LaFollette Godfrey & Kahn    Blackwell Sanders Peper Martin, LLP
One East Main Street, Suite 500    720 Olive Street, Suite 2400
Madison, WI 53701    St. Louis, MO 63101
Tel: (608) 257-3911    Tel: (314) 345-6000
Fax: (608) 257-0609    Fax: (314) 345-6060

*LaFollette Godfrey & Kahn is the*
*Madison office of Godfrey & Kahn, S.C.*

## REBUTTALS

1.      In 1992, Todd McFarlane was looking for prominent writers to author issues of his Spawn comic book series.  (June 19-20, 2002 Deposition of Todd McFarlane ("McFarlane Dep.") at 35)

      **REBUTTAL:** No dispute.

2.      Earlier that year, McFarlane and six other comic book artists had founded defendant Image Comics, Inc. (Id. at 29:9-20.)

      **REBUTTAL:** No dispute.

3.      Although McFarlane was a prominent comic book artist, "the knock against [Image] what that…we didn't know how to write."  (Id. at 35:10-14.)

      **REBUTTAL:** No dispute.

4.      So McFarlane set out to entice four of the most famous and respected authors in the comic book industry to write issues of *Spawn* for him.  (Id.; July 22, 2002 Declaration of Neil Gaiman ("Gaiman Decl.") ¶ 2.)

      **REBUTTAL:** No dispute.

5.      One of those authors was Neil Gaiman.  McFarlane approached Gaiman because "Neil was given a lot of critical acclaim at that point." (McFarlane Dep. at 36:2-8.)

      **REBUTTAL:** No dispute.

6.      In fact, Gaiman was then author of the *Sandman* comic series, one of the most successful comic series ever.  (June 24, 2002 Deposition of Neil Gaiman ("Gaiman Dep." at 16:14 – 17:6; McFarlane Dep. at 36:8-9.)

      **REBUTTAL:** No dispute.

7.      To encourage Gaiman to write an issue of *Spawn*, McFarlane stressed the rights Gaiman would receive as a creator of the *Spawn* issue he authored.  (See Findings of Fact 15-17 below.)

      **REBUTTAL:** Disputed.  Although the plaintiffs and their expert witness fondly recall the spirit of the "creator rights" movement of the early 1990s, *see* Response Brief at 2-3,

the undisputed facts show little more than Gaiman agreed to be responsible for the script, and

McFarlane responsible for the artwork.  PFOF at 2, ¶ 3.  In addition, Gaiman and McFarlane

discussed the creator's rights Gaiman would receive only in terms of the analogous rights

Gaiman would have received under his DC comics contract:

> Q:  Did you ever have any conversations with Neil concerning, you know, creative credit for what Neil had done or was going to do?
>
> A:  Only – only in regards to his contract and in some of the conversation we had going back and forth over those years.
>
> Q:  Okay.  Tell me what discussions you had with him in that regard again with the idea of creative credit and creator's rights generally in giving credit to creators and that sort of subject?
>
> A:  Again it was not necessarily for creative rights at – "This is what I get at DC."  So again if you create something and somebody maybe appears subsequently in their name thing, they sometimes put a vanity credit some place there to sort of acknowledge somebody's time on something.

McFarlane Dep. at 82:22-83:12.

8.     "Creator rights" was a buzzword in the comic industry at that time.  (July 22, 2002 Declaration of Denis Kitchen ("Kitchen Decl.") ¶ 5.)

    **REBUTTAL:** No dispute.

9.     In 1988, several prominent comic book authors and artists had written "A Bill of Rights for Comics Creators."  (Kitchen Decl. ¶ 5; June 19, 2002 Deposition of Lawrence Marder ("Marder Dep.") at 79.)

    **REBUTTAL:** The McFarlane Defendants do not dispute that there existed such

a "Bill of Rights," but they dispute that this creation bears any relevance to whether the

plaintiffs' remaining copyright claims are time-barred, a central issue on the instant motion for

summary judgment.

10.     The document became a cornerstone of the creators' rights movement in the comic industry.  (Kitchen Decl. ¶ 5.)

**REBUTTAL:** The McFarlane Defendants do not dispute this finding, but dispute its relevance to any issue in this case.

11.    Article 1 of the Bill of Rights for Comic Creators states that comic book creators shall have "The right to full ownership of what we fully create." (Marder Dep at 79:12-14; Ex. 24.)

**REBUTTAL:** To the extent that this proposed finding implies that Gaiman "fully created" any of the works at issue in this lawsuit, the McFarlane Defendants dispute this finding. It is undisputed that Gaiman contributed scripts or partial scripts, and McFarlane was principally responsible for the artwork. PFOFCOL at 2, ¶ 3.

12.    The annotation to the Bill of Rights explains: "This means copyright and trademark." (Kitchen Decl. ¶ 6, Ex. A.)

**REBUTTAL:** No dispute.

13.    When McFarlane and his partners founded Image Comics, "they announced… [Image] was all about creators' rights and treating creators well." (Gaiman Dep. at 18:22 – 19:4.)

**REBUTTAL:** Disputed. The founding of Image Comics is irrelevant to this case. Further, Gaiman and McFarlane discussed the creator's rights Gaiman would receive only in terms of the analogous rights Gaiman would have received under his DC comics contract:

> Q:    Did you ever have any conversations with Neil concerning, you know, creative credit for what Neil had done or was going to do?
>
> A:    Only – only in regards to his contract and in some of the conversation we had going back and forth over those years.
>
> Q:    Okay. Tell me what discussions you had with him in that regard again with the idea of creative credit and creator's rights generally in giving credit to creators and that sort of subject?
>
> A:    Again it was not necessarily for creative rights at – "This is what I get at DC." So again if you create something and somebody maybe appears subsequently in their name thing, they sometimes put a vanity credit some place there to sort of acknowledge somebody's time on something.

McFarlane Dep. at 82:22-83:12.

14.    McFarlane admitted at his deposition that Image was holding itself out as a business that respected creators rights more than the more established comic book companies. (McFarlane Dep. at 83:23 – 84:2.)

REBUTTAL:  Disputed.  How Image Comics may have "held itself out" is

irrelevant to this case.  Further, Gaiman and McFarlane discussed the creator's rights Gaiman

would receive only in terms of the analogous rights Gaiman would have received under his DC

comics contract:

> Q:    Did you ever have any conversations with Neil concerning, you know, creative credit for what Neil had done or was going to do?
>
> A:    Only – only in regards to his contract and in some of the conversation we had going back and forth over those years.
>
> Q:    Okay.  Tell me what discussions you had with him in that regard again with the idea of creative credit and creator's rights generally in giving credit to creators and that sort of subject?
>
> A:    Again it was not necessarily for creative rights at – "This is what I get at DC."  So again if you create something and somebody maybe appears subsequently in their name thing, they sometimes put a vanity credit some place there to sort of acknowledge somebody's time on something.

McFarlane Dep. at 82:22-83:12.

15.    McFarlane told Gaiman that "this is all about creator rights."  (Gaiman Dep. at

40:11-18.)

REBUTTAL:  Disputed.  Gaiman and McFarlane discussed the creator's rights

Gaiman would receive only in terms of the analogous rights Gaiman would have received under

his DC comics contract:

> Q:    Did you ever have any conversations with Neil concerning, you know, creative credit for what Neil had done or was going to do?

> A:    Only – only in regards to his contract and in some of the conversation we had going back and forth over those years.
>
> Q:    Okay. Tell me what discussions you had with him in that regard again with the idea of creative credit and creator's rights generally in giving credit to creators and that sort of subject?
>
> A:    Again it was not necessarily for creative rights at – "This is what I get at DC." So again if you create something and somebody maybe appears subsequently in their name thing, they sometimes put a vanity credit some place there to sort of acknowledge somebody's time on something.

McFarlane Dep. at 82:22-83:12.

16.    He "talked to [Gaiman] about…showing unity with creators, sticking it to the big companies, [and] complete creative freedom." (Gaiman Dep. at 29:5-11. See also id. at 40:11-18.)

**REBUTTAL:**  Disputed.  Gaiman and McFarlane discussed the creator's rights Gaiman would receive only in terms of the analogous rights Gaiman would have received under his DC comics contract:

> Q:    Did you ever have any conversations with Neil concerning, you know, creative credit for what Neil had done or was going to do?
>
> A:    Only – only in regards to his contract and in some of the conversation we had going back and forth over those years.
>
> Q:    Okay. Tell me what discussions you had with him in that regard again with the idea of creative credit and creator's rights generally in giving credit to creators and that sort of subject?
>
> A:    Again it was not necessarily for creative rights at – "This is what I get at DC." So again if you create something and somebody maybe appears subsequently in their name thing, they sometimes put a vanity credit some place there to sort of acknowledge somebody's time on something.

McFarlane Dep. at 82:22-83:12.

17.    Most important, McFarlane emphasized that Gaiman was "not signing anything away" if he became the creator of a *Spawn* issue. (Gaiman Dep. at 53:4-10.)

6

**REBUTTAL:** Disputed. Gaiman and McFarlane discussed the creator's rights

Gaiman would receive only in terms of the analogous rights Gaiman would have received under

his DC comics contract:

> Q:     Did you ever have any conversations with Neil concerning, you
>         know, creative credit for what Neil had done or was going to do?
>
> A:     Only – only in regards to his contract and in some of the
>         conversation we had going back and forth over those years.
>
> Q:     Okay. Tell me what discussions you had with him in that regard
>         again with the idea of creative credit and creator's rights
>         generally in giving credit to creators and that sort of subject?
>
> A:     Again it was not necessarily for creative rights at – "This is what
>         I get at DC." So again if you create something and somebody
>         maybe appears subsequently in their name thing, they sometimes
>         put a vanity credit some place there to sort of acknowledge
>         somebody's time on something.

McFarlane Dep. at 82:22-83:12.

18.     Gaiman, as an experienced author, understood that by "not signing anything
away, he would be retaining his copyright interests in the comic and his characters because under
copyright law "it's not work for hire unless you sign a specific agreement to that effect."
(Gaiman Dep. at 53:12-14, 155:12 – 156:11.)

**REBUTTAL:** Disputed. Regardless of how Gaiman recalls his arrangement

with the McFarlane Defendants, the only undisputed facts expressly indicating copyright

ownership of the disputed works around the times of their creation are the copyright notices that

assert ownership by TMP. PFOFCOL at 2-5, ¶¶ 5, 8, 15, 18, 22.

19.     Under the Copyright Act, an author generally retains his copyright interest in a
work if it is not a work for hire. See 17 U.S.C. §§ 201 (a) and (b).

**REBUTTAL:** Disputed. As this is a conclusion of law, it is an inappropriate

proposal for a finding of fact. In any event, section 201(a) of the Copyright Act only discusses

"initial ownership," and makes no reference to whether and how a joint author may "retain" his

interest over the course of another joint author's contributions and adaptations to, publication of,

7

and assertion of ownership of the work.  17 U.S.C. § 201(a).  Neither does section 201(b) address

a joint author's "retention" of copyright interests—rather, that section provides that "the

employer *or other person for whom the work was prepared* is considered the author for purposes

of this title, and unless the parties have expressly agreed otherwise in a written instrument signed

by them, owns *all of the rights comprised in the copyright*."  17 U.S.C. § 201(b) (emphasis

added).

20.    McFarlane, who had worked under contract with comic book publishers on many
occasions, also knew it was standard practice in the comic book industry for publishers to require
written contracts stating that an author's work was work-for-hire.  (McFarlane Dep. at 17:19 –
18:7, 20:15-19, 106:3-7.)

   **REBUTTAL:**  Disputed.  This proposed finding is not at all consistent with the

cited pages of McFarlane's deposition transcript.  In fact, in recalling his work for Marvel,

McFarlane *actually* said, "I don't know if I *ever* had a contract."  McFarlane Dep. at 20:7

(emphasis added).  The actual exchange between McFarlane and plaintiffs' counsel hardly

suggests that McFarlane "knew it was standard practice ... for publishers to require written

contracts stating that an author's work was work-for-hire."  The transcript illuminates that

McFarlane knew he was creating works for hire, but did not know whether he had signed any

contract to that effect:

|   |   |
|---|---|
| Q: | Was your contractual arrangement with Marvel for Incredible Hulk different in any way from your contractual arrangement with DC? |
| A: | I don't know if I ever had a contract.  Once I went back to Marvel I was just – it was just piecemeal at that point, so I don't recall if I had a contract with them or not. |
| Q: | You were paid per page? |
| A: | Per page, right. |
| Q: | And it was a work for hire arrangement again? |
| A: | Yes. |

| Q: | So you understood you didn't retain any intellectual property rights in the work you had done, is that correct? |
|---|---|
| A: | Right. I think they actually printed it on the back of checks just in case you didn't understand. |

McFarlane Dep. 20:4-19. The plaintiffs' proposed finding suggesting that McFarlane knew about "standard practices" for work-for-hire agreements fully contradicts McFarlane's description of "piecemeal" employment arrangements and not recalling "if I had a contract with them or not."

21.    Despite his knowledge of that industry practice and the importance of copyright ownership issues to publishers and artists, McFarlane claims not to remember whether he spoke to any of the four guest authors about copyright ownership or work for hire agreements. (McFarlane Dep. at 53:3 – 54:9.)

**REBUTTAL:** Disputed. McFarlane did not possess knowledge of what the plaintiffs assume is an "industry practice." *See* Rebuttal No. 20 above.

22.    Relying on McFarlane's assurances that the project was "all about creator rights" and that Gaiman was "not signing anything away," Gaiman agreed to author the script for what became *Spawn* Issue 9 (hereafter "*Spawn* 9"). (Gaiman Dep. at 40:1-19, 29:7-11.)

**REBUTTAL:** Disputed. Gaiman and McFarlane discussed the creator's rights Gaiman would receive only in terms of the analogous rights Gaiman would have received under his DC comics contract:

| Q: | Did you ever have any conversations with Neil concerning, you know, creative credit for what Neil had done or was going to do? |
|---|---|
| A: | Only – only in regards to his contract and in some of the conversation we had going back and forth over those years. |
| Q: | Okay. Tell me what discussions you had with him in that regard again with the idea of creative credit and creator's rights generally in giving credit to creators and that sort of subject? |
| A: | Again it was not necessarily for creative rights at – "This is what I get at DC." So again if you create something and somebody maybe appears subsequently in their name thing, they sometimes put a vanity credit some place there to sort of acknowledge somebody's time on something. |

McFarlane Dep. at 82:22-83:12.

23.      In his script, Gaiman created three new characters for the *Spawn* series: Angela, Cogliostro, and Medieval Spawn.  (McFarlane Dep. at 43:23 – 46:25.)

      **REBUTTAL:**  Disputed.  Although Gaiman's script contained dialogue

concerning these characters, it is undisputed that McFarlane created the artwork depicting these

characters, *see* PFOFCOL at 2, ¶ 3, contradicting the idea that Gaiman alone created these

characters.

24.      Image Comics published *Spawn* 9 in March 1993.  (See Response to Defendants Proposed Findings of Fact and Conclusions of Law (Resp. FOF ¶ 4.)

      **REBUTTAL:**  No dispute.

25.      Consistent with McFarlane's representation that Gaiman was "not signing anything away" to the defendants, *Spawn* 9 does not contain a copyright notice asserting ownership rights in that particular issue.  (See Defendant's Combined Appendix ("Defs.' App."), Ex. B at 2.)

      **REBUTTAL:**  Disputed.  Gaiman and McFarlane discussed the creator's rights

Gaiman would receive only in terms of the analogous rights Gaiman would have received under

his DC comics contract:

> Q:      Did you ever have any conversations with Neil concerning, you know, creative credit for what Neil had done or was going to do?
>
> A:      Only – only in regards to his contract and in some of the conversation we had going back and forth over those years.
>
> Q:      Okay.  Tell me what discussions you had with him in that regard again with the idea of creative credit and creator's rights generally in giving credit to creators and that sort of subject?
>
> A:      Again it was not necessarily for creative rights at – "This is what I get at DC."  So again if you create something and somebody maybe appears subsequently in their name thing, they sometimes put a vanity credit some place there to sort of acknowledge somebody's time on something.

McFarlane Dep. at 82:22-83:12. Furthermore, the copyright notice unambiguously claims

copyright in *Spawn* Issue 9. Combined Appendix, Exhibit B; *see* Reply Brief at 4-5.

      26.    Instead, *Spawn* 9 contains only a general notice for either (sic) the *Spawn* character. The notice reads: "*Spawn* and its logo are trademark™ and copyright © 1993 Todd McFarlane Productions, Inc." (Id.)

      **REBUTTAL:** Disputed. The copyright notice unambiguously claims copyright

in *Spawn* Issue 9. Combined Appendix, Exhibit B; *see* Reply Brief at 4-5.

      27.    Also consistent with his representations to Gaiman, McFarlane did not file an application for copyright registration for *Spawn* 9 at the time that work was published. (McFarlane Dep. at 147:20 – 148:9; Ex. 35.)

      **REBUTTAL:** The McFarlane Defendants' dispute this proposed finding to the

extent it implies that McFarlane made any representation to Gaiman about applications for

copyright registration. McFarlane applied for copyright registrations because he was advised to

do so by his attorneys. McFarlane Dep. at 148:4-13.

      28.    The willingness of Gaiman and the three other authors to write issues for McFarlane was a boon to the *Spawn* franchise. Sales of *Spawn* doubled for the four issues Gaiman and the others authored. (Gaiman Dep. at 31:3-12.)

      **REBUTTAL:** The McFarlane Defendants do not dispute that sales of *Spawn*

increased, but dispute that the record contains admissible evidence of such sales doubling, in that

the cited testimony lacks foundation.

      29.    Gaiman's issue, and the new characters he created, proved especially helpful to McFarlane. McFarlane wrote in *Spawn* Issue 11 that Gaiman "gave me enough spring-board ideas from his issues to keep me going for another year or so." (McFarlane Dep. at 240:5-22; Ex. 55.)

      **REBUTTAL:** No dispute.

30.     In fact, Gaiman's Cogliostro character became a central character in the *Spawn* series, appearing in over 50 issues of *Spawn* and related comics. (McFarlane Dep. at 74:8-18; Simmons Aff. ¶ 6; TM 1523.)

**REBUTTAL:**  The McFarlane Defendants do not dispute that "Cogliostro" was a recurring character in the *Spawn* comic books.  Through those recurrences in subsequent issues, McFarlane substantially changed the character.  McFarlane Dep. at 71:15-73:9.  The McFarlane Defendants dispute that the character was ever "Gaiman's" or that Gaiman had any involvement in *Spawn* issues other than 9 and 26.  The plaintiffs have provided no evidence that Gaiman ever contributed to any other *Spawn* issues.

31.     Gaiman's Angela character was so popular that McFarlane agreed to have Gaiman write a separate three issue mini-series featuring Angela as the main character (hereafter "the *Angela* series").  (McFarlane Dep. at 56:15 – 57:23.)

**REBUTTAL:**  No dispute.

32.     To promote the *Angela* series, McFarlane agreed to have Gaiman write a portion of the script for *Spawn* Issue 26 (hereafter *Spawn* 26) that included a discussion of the Angela character.  (McFarlane Dep. at 90:5 – 91:22; Gaiman Dep. at 81:21 – 82:7; Gaiman Decl. ¶ 4.)

**REBUTTAL:**  Disputed.  The undisputed facts show only that Gaiman provided McFarlane with an unsolicited portion of script with the directions to "File it away, use it if it works, dump it if it doesn't…"  Counterclaims, ¶ 32; Reply, ¶ 32; Combined Appendix, Exhibit N.

33.     *Spawn* 26 was published in December 1994.  (Resp. FOF ¶ 12.)

**REBUTTAL:**  No dispute.

34.     Consistent with McFarlane's representations that Gaiman was "not signing anything away" when he worked for the defendants, *Spawn* 26 does not contain <u>any</u> copyright notice at all.  (Defs.' App., Ex. E at 2.)

**REBUTTAL:** The McFarlane Defendants dispute the plaintiffs' suggestion that McFarlane represented to Gaiman anything about copyright notices. Further, Gaiman and McFarlane discussed the creator's rights Gaiman would receive only in terms of the analogous rights Gaiman would have received under his DC comics contract:

> Q:    Did you ever have any conversations with Neil concerning, you know, creative credit for what Neil had done or was going to do?
>
> A:    Only – only in regards to his contract and in some of the conversation we had going back and forth over those years.
>
> Q:    Okay. Tell me what discussions you had with him in that regard again with the idea of creative credit and creator's rights generally in giving credit to creators and that sort of subject?
>
> A:    Again it was not necessarily for creative rights at – "This is what I get at DC." So again if you create something and somebody maybe appears subsequently in their name thing, they sometimes put a vanity credit some place there to sort of acknowledge somebody's time on something.

McFarlane Dep. at 82:22-83:12.

35.    *Spawn* 26 merely contains a notice stating that Todd McFarlane Productions owns the trademarks to the *Spawn* logo and symbol. (Id.)

**REBUTTAL:** No dispute.

36.    The first issue of the *Angela* series (hereafter "*Angela* 1") was also published in December 1994. (Resp. FOF ¶ 17.)

**REBUTTAL:** No dispute.

37.    Gaiman authored the entire text of *Angela* 1. (Gaiman Decl. ¶ 4; McFarlane Dep. at 157:1-16.)

**REBUTTAL:** No dispute.

38.    Consistent with McFarlane's representations that this was "all about creator rights" and that Gaiman was "not signing anything away," *Angela* 1, like *Spawn* 26, does not contain any copyright notice at all. (Defs.' App., Ex. G at 2.)

**REBUTTAL:** Gaiman and McFarlane discussed the creator's rights Gaiman would receive only in terms of the analogous rights Gaiman would have received under his DC comics contract:

> Q:  Did you ever have any conversations with Neil concerning, you know, creative credit for what Neil had done or was going to do?
>
> A:  Only – only in regards to his contract and in some of the conversation we had going back and forth over those years.
>
> Q:  Okay. Tell me what discussions you had with him in that regard again with the idea of creative credit and creator's rights generally in giving credit to creators and that sort of subject?
>
> A:  Again it was not necessarily for creative rights at – "This is what I get at DC." So again if you create something and somebody maybe appears subsequently in their name thing, they sometimes put a vanity credit some place there to sort of acknowledge somebody's time on something.

McFarlane Dep. at 82:22-83:12.


39.    The second issue in the *Angela* series (hereafter "*Angela* 2") was published in January 1995. (Resp. FOF ¶ 17.)

**REBUTTAL:** No dispute.


40.    Gaiman authored the entire text of *Angela* 2. (Gaiman Decl. ¶ 4; McFarlane Dep. at 157:1-16.)

**REBUTTAL:** No dispute.


41.    *Angela* 2 contained a copyright notice, but it did not claim ownership in the copyright of the issue's story or the *Angela* character, but focused on the stylized logo. The notice stated: "*Angela*, its logo and its symbol are registered Trademarks™ and copyright © 1995 Todd McFarlane Productions, Inc." (Defs.' App., Ex. H at 2.)

**REBUTTAL:** Disputed. The copyright notice unambiguously claims copyright in *Angela* Issue 2. Combined Appendix, Exhibit B; *see* Reply Brief at 4-6, n. 2.


42.    The next month, in *Angela* Issue 3 (hereafter "*Angela* 3"), defendants returned to the same notice that they had used in *Angela* 1, which did not contain any mention of copyright

14

ownership at all.  The notice in *Angela* 3 merely states: "Angela®, its logo and its symbol are registered Trademarks™ 1995 of Todd McFarlane Productions, Inc."  (Id. Ex. I at 2.)

      **REBUTTAL:** No dispute.


43.     Nowhere in *Angela* 3 is there any notice that any of the defendants are claiming any copyright interest in the *Angela* character or any issue of the series.  (See id.)

      **REBUTTAL:** No dispute.


44.     Unbeknownst to Gaiman, in 1995 McFarlane began filing applications for copyright registrations for the work Gaiman authored.  (Gaiman Decl. ¶ 5; McFarlane Dep. at 157:17-19.)

      **REBUTTAL:**  The McFarlane Defendants dispute that "Gaiman authored" any of

the works at issue—it is undisputed that Gaiman wrote scripts, but did not "author" any entire

comic books, which include extensive artwork prepared by someone other than Gaiman.

Combined Appendix, Exhibits B, G, H, I.


45.     McFarlane did not author <u>any</u> of the text or artwork for the issues in the *Angela* series.  (McFarlane Dep. at 91:23 – 92:9, 157:1-16.)

      **REBUTTAL:**  No dispute.


46.     In January 1995, McFarlane also filed an application claiming that he was the sole author of <u>both</u> the text and the artwork in those issues.  (McFarlane Dep. at 157:1-16; Ex. 45.)

      **REBUTTAL:**  No dispute.


47.     In January 1995, McFarlane also filed an application claiming that he was the sole author of the text of *Spawn* 26.  (McFarlane Dep. at 149:16 – 150:25; Ex. 37.)

      **REBUTTAL:**  No dispute.


48.     McFarlane did not file for copyright registration for *Spawn* 9 until April 1996 – more that three years after *Spawn* 9 was first published.  In that application, McFarlane is identified as having authored the text of *Spawn* 9.  (McFarlane Dep. at 147:20 – 148:9; Ex. 35.)

      **REBUTTAL:**  No dispute.

49.    McFarlane never told Gaiman that he was filing any of these applications. (Gaiman Decl. ¶ 5; McFarlane Dep. at 157:17-19.)

REBUTTAL: Disputed. The cited transcript reads as follows: "Q: Did you ever tell Neil that you were applying for a copyright for Angela 1, 2 and 3? A: I don't recall."

50.    In November 1995, the defendants reprinted the *Angela* series in a trade paperback format entitled *Angela* (hereafter "the *Angela* trade paperback") which included all three issues of the comic. (Resp. FOF ¶ 20.)

REBUTTAL: No dispute.

51.    For the first time, the *Angela* trade paperback contained a copyright notice claiming a copyright interest in both the paperback and the Angela character. (See Defs.' Appendix, Ex. P at 2.)

REBUTTAL: No dispute.

52.    Defendants claim to have sent a copy of the *Angela* trade paperback to Gaiman's Minnesota address in November 1995. (Resp. FOF ¶ 21; Marder Aff. ¶ 9, Ex. Bates No. IC 005181.)

REBUTTAL: No dispute.

53.    Gaiman was working in Great Britain during much of the fall of 1995 and 1996. (Gaiman Dep. at 193; Gaiman Decl. ¶ 6.)

REBUTTAL: No dispute.

54.    Gaiman does not remember defendants sending him a copy of the *Angela* trade paperback in 1995. (Gaiman Decl. ¶ 6; see also Gaiman Dep. at 191:25 – 192:2.)

REBUTTAL: No dispute.

55.    Gaiman has in excess of 200 comic books, trade paperbacks, and novels in publication and, understandably, finds it infeasible to keep track of when any individual work is republished unless it is directly called to his attention. (Gaiman Decl. ¶ 6.)

**REBUTTAL:** The McFarlane Defendants dispute the plaintiffs' suggestion that Gaiman may "understandably" ignore his copyrights because of the sheer number of works he publishes.

56.     In June 1996, defendants reprinted *Spawn* 9 in a trade paperback entitled *Spawn* Volume 2. (Resp. FOF ¶ 7.)

**REBUTTAL:** No dispute.

57.     *Spawn* Volume 2 does not contain a copyright notice claiming ownership of the individual issues of *Spawn* reprinted in that volume. (Resp. FOF ¶ 8; Defs.' App., Ex. D at 2.)

**REBUTTAL:** Disputed. The copyright notice unambiguously claims copyright in *Spawn* Volume 2 and all comics and characters contained therein. Combined Appendix, Exhibit D; *see also* Reply Brief at 6, n. 2.

58.     *Spawn* Volume 2 does contain a notice claiming a copyright interest in all *Spawn*-related characters. (Id.)

**REBUTTAL:** Disputed. The copyright notice unambiguously claims copyright in *Spawn* Volume 2 and all comics and characters contained therein. Combined Appendix, Exhibit D; *see also* Reply Brief at 6, n. 2.

59.     Defendants have not presented any evidence that they ever sent Gaiman a copy of *Spawn* Volume 2. (See Resp. PFOF ¶¶ 8-9.)

**REBUTTAL:** No dispute.

60.     In fact, Gaiman testified that "[b]y the time they were publishing trade paperbacks, nobody was sending me stuff automatically." (Gaiman Dep. at 191:25 – 192:2.)

**REBUTTAL:** The McFarlane Defendants do not dispute that Gaiman so testified.

61.     In 1997, Gaiman and McFarlane entered into negotiations to formalize their understanding of Gaiman's rights in the Angela, Cogliostro, and Medieval Spawn characters Gaiman had first created in *Spawn* 9.  (See Proposed Findings of Fact 62-63 below.)

**REBUTTAL:**  No dispute.

62.     On July 15, 1997, Gaiman and McFarlane had a phone conversation in which McFarlane agreed to exchange his rights in an unrelated character named Miracleman for Gaiman's rights in Cogliostro and Medieval Spawn.  (Gaiman dep. at 151; Ex. 19.)

**REBUTTAL:**  The McFarlane Defendants do not dispute the occurrence of this communication, but dispute that an enforceable contract was ever created because not all terms were fully agreed upon.  Answer, ¶¶ 51, 54; McFarlane Dep. at 196-97.

63.     Gaiman confirmed the conversation in a letter sent to McFarlane that same day. In the letter, Gaiman wrote: "my rights in Cogliostro and Medieval Spawn as above will be exchanged for your share of Miracleman."  (Id.)

**REBUTTAL:**  The McFarlane Defendants do not dispute the occurrence of this communication, but dispute that an enforceable contract was ever created because not all terms were fully agreed upon.  Answer, ¶¶ 51, 54; McFarlane Dep. at 196-97.

64.     Gaiman understood that his rights in Cogliostro and Medieval Spawn included his copyright interest.  (Gaiman Dep. at 159:22 – 160:6.)

**REBUTTAL:**  The McFarlane Defendants do not dispute that Gaiman had this understanding.

65.     McFarlane understood that his "share" of Miracleman included the copyright to that character.  (McFarlane Dep. at 110:24 – 111:12, 192:23 – 193:2.)

**REBUTTAL:**  Disputed.  McFarlane testified that he did not know whether anyone else owned trademark or copyright rights to Miracleman, just that he acquired what rights Eclipse formerly had.  McFarlane Dep. at 111:8-12.

66.    McFarlane wanted to enter into the agreement because he "[w]anted more than anything else to have Spawn lock, stock, and barrel...[and] not have a sliver of it existing some place that I somehow can't control." (McFarlane Dep. at 105:1-5. See also id. at 113:22-24, 193:3-9.)

REBUTTAL: No dispute.

67.    He wanted to regain control over the characters Gaiman had created in *Spawn* 9. (McFarlane Dep. at 105:1-5, 193:3-9.)

REBUTTAL: No dispute.

68.    Until 1999, McFarlane appeared to be honoring his agreement with Gaiman.  (See Proposed Findings of Fact 69-71 below.)

REBUTTAL: The McFarlane Defendants do not dispute paying royalties to Gaiman, but dispute that any negotiations between Gaiman and McFarlane created a formal contract.  Answer, ¶¶ 51, 54; McFarlane Dep. at 196-97.

69.    As part of their agreement, McFarlane was to pay Gaiman royalties for various uses of the works and characters Gaiman had created. (McFarlane Dep. at 186 – 196:22; Exs. 2, 19, 20, 33.)

REBUTTAL: The McFarlane Defendants do not dispute they discussed royalties with Gaiman, but they dispute that any final contract was ever created.  Answer, ¶¶ 51, 54; McFarlane Dep. at 196-97.

70.    In August 1997, McFarlane sent Gaiman two separate royalty payments and extensive royalty reports purporting to substantiate those payments. (McFarlane Dep. at 214:23 – 216:8, 221:16 – 222:10; Exs. 5-6.)

REBUTTAL: The McFarlane Defendants do not dispute that the cited exhibits were sent to Gaiman, but dispute that any such communications finalized a formal contract. Answer, ¶¶ 51, 54; McFarlane Dep. at 196-97.  The McFarlane Defendants further dispute that any of the calculations in the royalty reports cited above accurately describe any amount due Gaiman; they merely list potential payments.  McFarlane Dep. at 221:20-21.

19

71.    In April 1998, McFarlane's wife sent Gaiman another royalty payment for foreign sales of Gaiman's work.  (Id. at 222:11 – 223:10; Ex. 51; July 1, 2002 Second Declaration of Neil Gaiman ¶ 4.)

**REBUTTAL:**  No dispute.

72.    Shortly after defendants made the April 1998 royalty payment to Gaiman, they also began republishing *Spawn* 26 and the *Angela* series in new trade paperbacks.  (Resp. FOF ¶¶ 13, 23.)

**REBUTTAL:**  No dispute.

73.    The trade paperback reprinting *Spawn* 26 was entitled both *Spawn* Volume 6 and *Pathways to Judgement*.  (Resp. FOF ¶ 13.)

**REBUTTAL:**  No dispute.

74.    Defendants again presented no evidence that they ever sent Gaiman copies of those publications.  (Resp. FOF ¶ 13.)

**REBUTTAL:**  No dispute.

75.    In fact, Gaiman does not recall ever seeing copies of those publications prior to this litigation.  (Gaiman Decl. ¶ 6.)

**REBUTTAL:**  No dispute.

76.    The 1998 version of the *Angela* trade paperback was entitled *Angela's Hunt*.  (Resp. FOF ¶ 23.)

**REBUTTAL:**  No dispute.

77.    Defendants have failed to produce a copy of the 1998 version of *Angela's Hunt* during this litigation and have not included a copy of that version as part of their motion for summary judgment.  (Resp. FOF ¶ 23.)

**REBUTTAL:**  No dispute.

78.    Defendants have also presented no evidence that they ever sent a copy of that publication to Gaiman.  (Resp. FOF ¶ 24.)

**REBUTTAL:**  No dispute.

79.    Gaiman did not see a copy of *Angela's Hunt* until he happened to run across one at a convention after this case was filed.  (Gaiman Dep. at 192:7-12.)

REBUTTAL:  No dispute.

80.    It was not until after February 14, 1999, when Gaiman received a letter from McFarlane, that Gaiman finally learned McFarlane was rescinding all previous agreements between them.  (Gaiman Dep. at 197:3-10; 198:4-11.)

REBUTTAL:  No dispute.

81.    Although the letter is dated January 12, 1999, Gaiman testified that he did not receive it until he returned from a book tour sometime after Valentine's Day, 1999.  (Gaiman Dep. at 198:4-11.)

REBUTTAL:  No dispute.

82.    Gaiman received a letter from McFarlane, bluntly stating : "This letter rescinds any previous offers I have placed on the table."  (McFarlane Dep. at 224:9-221; Ex. 8.)

REBUTTAL:  No dispute.

83.    McFarlane's letter continued:

Today, I am willing to offer the following deal:

1. All rights to Angela (which has a monetary value) shall be relinquished 100% to Todd McFarlane Productions with no further monies due upon signing and in exchange I will grant you all rights to Miracle Man;

2. All rights to Medieval Spawn and Cogliostro shall continue to be owned by Todd McFarlane Productions with no monies to be paid for any reason whatsoever from past activity or any future use, regardless of whether the transaction between Angela and Miracle Man is finalized...

(Id.)

REBUTTAL:  No dispute.

84.    After reading through McFarlane's letter, Gaiman forwarded it to his lawyer and all further communications between Gaiman and McFarlane were handled through their attorneys.  (Gaiman Dep. at 198:9-11.)

**REBUTTAL:** No dispute.

85.    Gaiman, like McFarlane, had been working in the comic book industry for long enough to know that an author who is not an employee of the publisher retains his copyright interest unless he signs a work-for-hire agreement. (McFarlane Dep. at 17:19 – 18:7, 20:15-19, 106:3-7.)

**REBUTTAL:** Disputed. The McFarlane Defendants do not dispute that Gaiman and McFarlane understood that an author who is not an employee may retain his copyright interest unless he signs a work-for-hire agreement, but dispute the plaintiffs' characterization that the cited deposition transcript establishes that this understanding was acquired from "working in the comic book industry for long enough."

86.    McFarlane admits that Gaiman was not his employee. (McFarlane Dep. at 41:1-3.)

**REBUTTAL:** No dispute.

87.    There is no evidence Gaiman ever received copies of the *Angela* and *Spawn* Volume 2 trade paperbacks. (See Resp. FOF ¶ 7,20)

**REBUTTAL:** No dispute.

88.    Gaiman does not remember receiving copies of *Angela* and *Spawn* Volume 2. (Gaiman Decl. ¶ 6.)

**REBUTTAL:** No dispute.

89.    While defendants claim to have sent copies of *Angela* to Gaiman, they mailed them to his Minnesota address during a time when Gaiman was working in Great Britain for more than a year. (Gaiman Decl. ¶ 6.)

**REBUTTAL:** No dispute.

90.    As for *Spawn* Volume 2, defendants do not even contend that they ever sent Gaiman a copy of that publication. (Resp. FOF ¶¶ 8-9.)

**REBUTTAL:** No dispute.

91.     Defendants have presented no evidence that they ever sent Gaiman copies of *Spawn* Volume 6, *Pathway to Judgement*, and *Angela's Hunt* trade paperbacks. (Resp. FOF ¶ 15.)

      **REBUTTAL:** No dispute.

92.     Defendants have not even produced a copy of the 1998 version of *Angela's Hunt*, so it is impossible to determine what, if any, copyright notice that publication contained. (Resp. FOF ¶ 24.)

      **REBUTTAL:** No dispute.

93.     A reasonable person is unlikely to take the time to examine copyright notices in the hectic environment, with hundreds of people waiting for signatures, of a book signing. (Gaiman Decl. ¶ 7.)

      **REBUTTAL:** The McFarlane Defendants dispute this finding to the extent it

implies that a "reasonable" person would ignore the existence of published works he helped

create, just because he learned of them at a "hectic" book signing.

94.     In fact, it was not until after Gaiman received McFarlane's rescission letter in February 1999 that Gaiman began to refuse to sign paperbacks for which he was not receiving a royalty. (Gaiman Decl. ¶ 7.)

      **REBUTTAL:** No dispute.

95.     McFarlane filed applications for copyright registrations in which he falsely claimed to have authored the text of *Spawn* 9 and both the text and artwork for the *Angela* series. (McFarlane Dep. 145:21-26, 147:3-19, 157:1-16; Exs. 35, 45.)

      **REBUTTAL:** Disputed. The McFarlane Defendants do not dispute that

McFarlane filed copyright registrations, but they dispute any alleged "falsity" in these

registrations. Combined Appendix, Exhibits C, J, K, L.

96.     Defendants are currently selling *Pathway to Judgement*. (Simmons Aff. ¶ 7.)

      **REBUTTAL:** The McFarlane Defendants do not dispute that this work is being

sold.

97.    *Angela's Hunt* is a verbatim reprinting of Gaiman's work in *Angela* Issues 1, 2 and 3.

REBUTTAL:  No dispute.

## ADDITIONAL PROPOSED FINDING OF FACT

1.    McFarlane paid Gaiman a considerable sum of money for his contribution as a guest-writer to *Spawn* Issue 9, at least $100,000 plus additional payments after publication. McFarlane Dep. at 52.

## ADDITIONAL PROPOSED CONCLUSION OF LAW

1.    Recordation of a copyright registration with the United States Copyright Office "gives all persons constructive notice the facts stated in the recorded document ...."  17 U.S.C. § 205(c)

24

Dated:  August 1, 2002

LA FOLLETTE GODFREY & KAHN

*Eugenia G. Carter*

Eugenia G. Carter
Todd G. Smith
Gabriel S. Gross
One East Main Street, Suite 500
Madison, WI  53701
Tel:  (608) 257-3911
Fax:  (608) 257-0609

—and—

Michael A. Kahn
Peter W. Salsich, III
Blackwell Sanders Peper Martin LLP
720 Olive Street, Suite 2400
St. Louis, MO 63101
Tel:  (314) 345-6000
Fax:  (314) 345-6060

Attorneys for Todd McFarlane, Todd McFarlane
Productions, Inc., TMP International, Inc.  and
McFarlane Worldwide, Inc.

MN153341_1.DOC