IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DOCKET # 88

U.S. DISTRICT COURT
WEST DIST OF WISCONSIN
AUG - 1 2002
FILED
JOSEPH W. SKUPNIEWITZ CLERK
CASE #

| | |
|---|---|
| NEIL GAIMAN and MARVELS AND MIRACLES, LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| TODD McFARLANE, TODD McFARLANE PRODUCTIONS, INC., TMP INTERNATIONAL, INC., and McFARLANE WORLDWIDE, INC. | ) ) ) ) ) |
| Defendants-Counterclaimants, | ) ) |
| And | ) ) |
| IMAGE COMICS, INC., | ) ) |
| Defendant. | ) |

Case No. 02-C-0048-S

**AFFIDAVIT OF GABRIEL S. GROSS IN SUPPORT OF DEFENDANTS TODD McFARLANE'S, TODD McFARLANE PRODUCTIONS, INC.'S, TMP INTERNATIONAL, INC.'S AND McFARLANE WORLDWIDE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

STATE OF WISCONSIN    )
                      ) SS.
COUNTY OF DANE        )

After being first duly sworn, Gabriel S. Gross deposes and states as follows:

1.   I am one of the attorneys for the McFarlane Defendants and make this Affidavit upon personal knowledge.

2

    2.      Attached as Exhibit A are true and correct copies of pages 20, 71-73, 82-83, 111, 148, 196-97, and 221 from the transcript of the June 19-20, 2002 deposition of defendant Todd McFarlane.

    Dated this 1st day of August, 2002.

                                                               Gabriel S. Gross

Signed and sworn to before me this
1st day of August, 2002.

_____
Notary Public, State of Wisconsin
My Commission: expires 6/12/2005

MN153422_1.DOC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

NEIL GAIMAN and MARVELS AND )
MIRACLES, LLC, )
 )
       Plaintiffs, )
 )
  -vs- ) No. 02-C-0048-S
 )
TODD McFARLANE, TODD McFARLANE )
PRODUCTIONS, INC., TMP INTER- )
NATIONAL, INC., McFARLANE )
WORLDWIDE, INC. and IMAGE )
COMICS, INC., )
 )
       Defendants. )
 )

<u>30(b)(6) DEPOSITION OF TODD McFARLANE PRODUCTIONS, INC.
AND DEPOSITION OF TODD D.M. McFARLANE</u>

Volume 1
(Pages 1 - 132.)

Phoenix, Arizona
June 19, 2002
1:45 p.m.

Prepared for:

MICHAEL A. KAHN, ESQ.
(Certified Copy)

Reported by:

PAUL GROSSMAN
AZ CCR #50028
CA CSR #1487

**BROWN & TOLEU ltd.**
Court Reporters
101 West Adams
Phoenix, Arizona 85003-2003
Telephone (602) 254-5479     FAX (602) 254-5013

```
 1
 2
 3           THE DEPOSITION OF TODD D.M. McFARLANE,
 4   taken at 1:45 p.m. on June 19, 2002, at the offices of
 5   Brown & Toleu, Ltd., 101 West Adams Street, Phoenix,
 6   Arizona, before PAUL GROSSMAN, a Notary Public and
 7   Certified Court Reporter #50028 in and for the State of
 8   Arizona, pursuant to the Federal Rules of Civil
 9   Procedure.
10           The plaintiffs were represented by their
11   attorneys, Foley & Lardner, by Allen A. Arntsen, Esq.
12   and Jeffrey A. Simmons, Esq.
13           The defendants Todd McFarlane were
14   represented by their attorneys, Blackwell, Sanders,
15   Peper, Martin, L.L.P., by Michael A. Kahn, Esq.
16           The defendant Image Comics was represented by
17   its attorneys, Brobeck, Phleger & Harrison, LLP, by
18   Matthew C. Lapple, Esq.
19           Also present was Kenneth F. Levin, Esq.,
20   Mr. Neil Gaiman.
21
22
23
24
25
```

```
 1        A.    Yes.
 2        Q.    For what period of time?
 3        A.    Probably '88, '89 era.
 4        Q.    Was your contractual arrangement with Marvel
 5   for Incredible Hulk different in any way from your
 6   contractual arrangement with DC?
 7        A.    I don't know if I ever had a contract.  Once
 8   I went back to Marvel I was just -- it was just
 9   piecemeal at that point, so I don't recall if I had a
10   contract with them or not.
11        Q.    You were paid per page?
12        A.    Per page, right.
13        Q.    And it was a work for hire arrangement again?
14        A.    Yes.
15        Q.    So you understood you didn't retain any
16   intellectual property rights in the work you had done,
17   is that correct?
18        A.    Right.  I think they actually printed it on
19   the back of checks just in case you didn't understand.
20        Q.    How long were you working as the penciler for
21   Incredible Hulk?
22        A.    About eighteen months, something like that.
23        Q.    Then what did you do?
24        A.    Did a little bit of Batman back over at DC
25   for a couple months and then moved on to do the
```

```
 1       A.     Well, again let's be clear that Neil wrote
 2  after having conversations with me as to how this
 3  character would speak and what he was about, so let's
 4  just get that on the record.
 5       Q.     But what I'm talking about, Spawn Issue 9
 6  introduces a character named Cogliostro, correct?
 7       A.     Right.
 8       Q.     And it's in the script for Spawn Issue 9
 9  which Neil wrote, correct?
10       A.     Correct.
11       Q.     And then I believe you indicated that, and
12  there was a -- you used the character Cogliostro in
13  subsequent works relating to Spawn, correct?
14       A.     Correct.
15       Q.     And I understood what you were saying earlier
16  that the character that you subsequently used you
17  changed significantly from the Cogliostro character that
18  appears in Spawn Issue 9, is that correct?
19       A.     Right.
20       Q.     Okay.  What were the changes?
21       A.     His mannerisms, his body appearance, his
22  physical appearance, whether he would carry animals with
23  him or not, what he spoke of, why he spoke of it.
24       Q.     And I guess -- I apologize for interrupting,
25  but I guess what I'd like is specifics.  What mannerisms
```

1  did he have and how did you change them, for instance?
2      A.    Instead of -- instead of being a sort of a
3  bum whose concern was getting a 6-pack of Ripple wine,
4  his concern was to be the father image, to actually
5  bring knowledge to people, not to necessarily worry
6  about his own personal drunkard at that stage and to
7  bring insight specifically to the characters around him
8  and more specifically to Spawn and guide him along the
9  path through the 120 issues I've done so far.
10     Q.    Did Cogliostro bring insight to Spawn in
11 Spawn Issue 9?
12     A.    Not -- not any in the way that I wanted, no.
13     Q.    Okay.  And what was different about the way
14 you wanted him to do it than it was done in Spawn Issue
15 9?
16     A.    Again just that he seemed like a high school
17 graduate instead of a Harvard graduate.  So make your
18 inferences from what that means.
19     Q.    Okay.  You wanted him smarter?
20     A.    Right.
21     Q.    What other changes did you make?  And again
22 I'm looking at specifics rather than generalities.
23     A.    I wanted him to be more -- again Moses, Moses
24 coming down the hill with the tablets.  It should be
25 revered when you see him.  It shouldn't be a drunk, if

```
 1   you will, looking for the next bottle of whiskey, which
 2   is sort of what he was in Issue Number 9.  So I was
 3   looking for grandeur and I didn't feel like I got
 4   grandeur.
 5        Q.   Okay.  So you made him grander, correct?
 6        A.   Correct.
 7        Q.   Okay.  What other changes did you make?
 8        A.   Grandeur is a big word, so that qualifies a
 9   lot.  So I'll leave it at that.
10        Q.   Why don't you describe the ways you made him
11   grander then?
12             MR. KAHN:  Let me just at least for the
13   record object.  I think it's been asked and answered --
14             THE WITNESS:  Yes, I thought so.
15             MR. KAHN:  -- if you look at his transcript
16   in the last ten minutes, Todd's efforts that he made to
17   change the character.
18             MR. ARNTSEN:  That's what I'm trying to find
19   out.  I don't think we are going over the same ground.
20   I think we are getting some detail, turning general
21   statements into specific statements.
22             MR. KAHN:  Maybe so.  And the record will
23   speak for itself.  I just want to save the record.
24   BY MR. ARNTSEN:
25        Q.   How did you go about making him grander?
```

1    A.    Of derivative characters?

2    Q.    Correct.

3    A.    No.  That was -- that was the gist of that.

4    Q.    So, if I understand the substance of what she

5  told you, it's that DC would not pay for derivative

6  characters unless there was an extensive reworking of

7  the character, is that correct?

8    A.    Right.

9    Q.    Now, at some point in time some contention

10 arose between you and Neil concerning what Neil was

11 being paid for the work he had done on the Spawn and

12 Angela comics, correct?

13   A.    Yes.  We -- we -- we didn't see eye to eye on

14 some issues, right.

15   Q.    Okay.  When did that first come up?

16   A.    I don't know.  Maybe -- maybe '94 or

17 something.

18   Q.    In what context, do you recall?

19   A.    I think it was -- I think it was -- it was

20 either in -- in the context of a toy maybe or a foreign

21 reprint possibly.

22   Q.    Did you ever have any conversations with Neil

23 concerning, you know, creative credit for what Neil had

24 done or was going to do?

25   A.    Only -- only in regards to his contract and

1   in some of the conversation we had going back and forth
2   over those years.
3       Q.   Okay.  Tell me what discussions you had with
4   him in that regard again with the idea of creative
5   credit and creator's rights generally in giving credit
6   to creators and that sort of subject?
7       A.   Again it was not necessarily for creative
8   rights at -- "This is what I get at DC."  So again if
9   you create something and somebody maybe appears
10  subsequently in their name thing, they sometimes put a
11  vanity credit some place there to sort of acknowledge
12  somebody's time on something.
13      Q.   Did you ever talk to Neil about this in any
14  context other than Neil's DC contract?
15      A.   Yes.  We probably had ongoing conversation
16  about it.
17      Q.   Okay.  What types of conversations, again
18  putting aside --
19      A.   I don't recall the specifics.  I know that --
20  that my mind tells me that those were part of the
21  conversations, but I don't -- I don't recall
22  specifically.
23      Q.   Was one of the things Image was holding
24  itself out as is as a business that respected creators
25  rights perhaps more than the more established comic book

```
 1  property rights to the Miracleman character.
 2       A.   The -- the paperwork I think said trademark
 3  and copyright.
 4       Q.   And so was it a full complete copyright or
 5  was it a joint ownership or what were you getting?
 6       A.   I think the paperwork didn't break it down at
 7  that point.
 8       Q.   So, did you know whether anyone else had
 9  trademark or copyright rights to Miracleman?
10       A.   No.
11       Q.   Okay.  You just got what Eclipse had?
12       A.   Right.
13       Q.   Okay.  And when did you get these rights?
14       A.   I don't know.  '95, '96.  Some -- some place
15  in the mid '90s.
16       Q.   Did you ever do anything with them?
17       A.   Some of them.  You know, not a lot but some
18  of them.
19            Some of them I -- I did -- I think I did a
20  book called Total Eclipse and put some of the
21  characters -- revamped some of the characters and put
22  them in there, did some art work -- art work, gave some
23  back history to it.
24       Q.   How about the Miracleman character?
25       A.   I don't think he was in that book, so --
```

1   Q.   So you recall applying for a number of
2   copyrights for previous comic books in 1996?
3   A.   I don't recall the date specifically.
4   Q.   No, but generally. I guess what I'm
5   wondering about is what caused you to apply for a
6   copyright approximately three years after the issue came
7   out?
8   A.   Probably I started having more lawyers
9   hanging around me, so --
10  Q.   Do you have any recollection in that regard
11  or is that --
12  A.   That's probably the closest thing to the
13  truth, so --
14  Q.   But do you recall that?
15  A.   I don't recall.
16  Q.   Okay. Do you recall addressing the issue of
17  why you did not list Neil as the author of the text of
18  Spawn Issue 9?
19  A.   No.
20  Q.   And do you know why it is that you're listed
21  individually as the copyright claimant instead of Todd
22  McFarlane Productions?
23  A.   No.
24          (Deposition Exhibit Number 36 was then
25            marked for identification.)

1   A.   Right.
2   Q.   And did you have any further discussions with
3   him on this?
4   A.   I don't think so.
5   Q.   Okay. And then item 3 refers to the -- well,
6   it's not numbered, your third request for clarification
7   which is in that indented paragraph on Exhibit 20,
8   correct?
9   A.   Right.
10  Q.   And you said it relates to a formula DC
11  Comics uses on derivative characters, correct?
12  A.   Right. Right. I was asking for the formula.
13  Q.   Right. And Neil says the formula is 50
14  percent of Angela, right?
15  A.   Correct.
16  Q.   Did you have any further discussions with
17  Neil on that?
18  A.   No, not that I recall.
19  Q.   So Neil had responded to all of your -- to
20  your requests for clarification and you had no further
21  discussions with him on his responses, correct?
22  A.   I don't recall any.
23  Q.   Okay. So at this point in time did you
24  believe you and Neil had reached an agreement on the
25  royalty and accounting issues?

```
 1        A.    No.
 2        Q.    So what was still left to be agreed on?
 3        A.    Some of these answers.
 4        Q.    Well, and what were you doing -- again I
 5  thought you indicated you didn't get back to Neil on any
 6  of his answers?
 7        A.    Right.
 8        Q.    So, what was the disagreement?
 9        A.    Well, it -- let's just take it from my
10  perspective now, okay?  We're getting close.  I've got
11  my hopes up.  So I asked a couple follow-up questions to
12  Neil because we're getting close and I get these
13  answers.
14              I'm suspect about the answers.  I've been
15  suspect about some of his answers for quite some time,
16  sir.  So, when I see that he's now making up a formula,
17  he's not saying, "This is how it works."  He's making up
18  a formula.  "I'll just calculate it."
19              Now he's making it up that it's like, well,
20  is it a formula or isn't it a formula?  You keep
21  referring to your DC contract and now are you just going
22  to make it up on the sly here?  You know what, I'll do
23  some investigation on my own.
24              So at this point now I'm not getting again
25  the satisfaction I need out of Mr. Gaiman's answers, so
```

1    A.    Can I just add here that again those numbers
2  are not numbers that were due Neil, but me just trying
3  to get a handle on the process of what we did or did not
4  owe Neil. So those are -- those are not numbers that I
5  would stamp as due Neil.
6    Q.    But -- and you're referring to Exhibit 10,
7  correct?
8    A.    Correct.
9    Q.    Okay. Let's take a little break.
10   A.    Just some calculations.
11         (Whereupon, a short recess was then had at
12         11:38 a.m. until 12:06 p.m.)
13         (Deposition Exhibit Number 51 was then
14         marked for identification.)
15 BY MR. ARNTSEN:
16   Q.    Can you take a look at Exhibit 6, please.
17 What is Exhibit 6?
18         No, that's Exhibit 51. We'll get to that in
19 a minute. But what is Exhibit 6?
20   A.    It appears to be more documents making
21 calculations for potential moneys due to Mr. Gaiman.
22   Q.    And there's a cover memo from Sheila Egger to
23 Neil Gaiman, correct?
24   A.    Correct.
25   Q.    And Sheila sent this on your direction?