DOC NO
REC'D/FILED 89

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN 2002 AUG -1 PM 4: 22

J W CRUPHIEWITZ
CLERK US DIST COURT
W'D OF WI

| | | |
|---|---|---|
| NEIL GAIMAN and | ) | |
| MARVELS AND MIRACLES, L.L.C., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 02-C-0048-S |
| | ) | |
| TODD MCFARLANE, | ) | |
| TODD MCFARLANE PRODUCTIONS, | ) | |
| INC., TMP INTERNATIONAL, INC., | ) | |
| MCFARLANE WORLDWIDE, INC., and | ) | |
| IMAGE COMICS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

---

In an effort to create the appearance of a factual dispute, the McFarlane Defendants raise a number of irrelevant issues and attempt to confuse the Court with extended discussions of the "complexity" of Gaiman's D.C. Comics contracts. In reality, the core material facts are undisputed and straightforward.

First, Gaiman sent McFarlane's representative, Larry Marder, copies of Gaiman's D.C. contracts on two occasions, giving McFarlane the means of learning the "complexities" about which he now claims ignorance. (See Pls.' Reply to Defs.' Response to Pls.' Proposed Findings of Fact ("Reply Facts") ¶¶ 39, 53-54.) Second, McFarlane chose to go forward with the contract despite knowing of Gaiman's alleged "misrepresentations." (See id. ¶¶ 79-91.) Third, Gaiman agreed to accept a royalty of only 7.5% (rather than 15%) for uses of the Medieval Spawn character, making the 10% and 7.5% figures in Gaiman's other contracts irrelevant to McFarlane's decision. (See Pls.' Resp. to Defs.' Proposed Findings of Fact ("Resp.

003.371382.1

Facts") ¶¶ 26, 32.)   Given those undisputed facts, judgment should be entered against the McFarlane Defendants on their fraud counterclaim and affirmative defense.

## ARGUMENT

### I.    The Validity Of The 1997 Agreement Is A Non-Issue.

Defendants attempt to obscure the material issues by repeatedly arguing there is a question of fact about whether the parties ever reached an agreement in 1997.   That argument fails for two reasons.   First, whether or not there is a contract is irrelevant to the present motion. Second, despite McFarlane's denials, the undisputed evidence shows that the parties did reach an agreement and had an enforceable contract.

The McFarlane Defendants assert, without explanation, that "[t]his fundamental factual dispute – namely, the existence or non-existence of a 1997 contract – proves fatal to plaintiffs' partial summary judgment motion."  (Defs.' Br. at 2.)   In fact, that issue is wholly immaterial for purposes of this motion.   Plaintiffs are asking for summary judgment on the McFarlane Defendants' counterclaim for fraud and affirmative defense of fraud.   The McFarlane Defendants carry the burden of proof on both issues.   The existence of a valid contract is a separate issue on which the plaintiffs carry the burden of proof and for which the plaintiffs have not sought summary judgment.   Lundin v. Shimanski, 124 Wis. 2d 175, 184, 368 N.W.2d 676, 681 (1985) ("The party alleging the fraud has the burden of proving the elements by clear and convincing evidence.").   That issue has no bearing on whether the McFarlane Defendants can maintain their fraud counterclaim or affirmative defense at trial.

Moreover, the McFarlane Defendants' counterclaim does not depend on the existence of a valid contract.  (See Counterclaim ¶¶ 61-73.)   In fact, the counterclaim expressly disclaims the existence of such a contract.  (See id. ¶ 69.)   It is therefore difficult to see how a

2

question of fact about the existence of a contract could defeat plaintiffs' motion to dismiss the fraud counterclaim.

Nor is the existence of a valid contract an element of the McFarlane Defendants' fraud affirmative defense. See WIS JI-CIVIL §§ 3068, 2400, 2401. Plaintiffs' motion challenges the defendants' ability to prove the elements of their affirmative defense for fraud. As shown in the briefs and findings of fact, they cannot prove these elements as a matter of law. Therefore, the Court should remove that affirmative defense from the case.

The McFarlane Defendants' contention that there is a question of fact regarding contract formation rests solely on Todd McFarlane's personal belief that he had not reached agreement with Gaiman. (See Defs.' Br. at 4; Reply Facts ¶ 19.) McFarlane's self-serving denial, however, in the absence of any supporting evidence, cannot create a fact issue regarding the existence of a contract. See United States v. O. Frank Heinz Constr. Co., 300 F. Supp. 396, 399 (S.D. Ill. 1969) (defendants' argument that he did not consciously and intentionally accept plaintiff's offer failed to defeat summary judgment where course of conduct demonstrated acceptance); see also Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983) ("a bare contention that an issue of fact exists is insufficient to raise a factual issue").

"An acceptance [of a contractual offer] may be implied from acts or conduct, and performance by the offeree of the promise requested of him may amount to an acceptance." 17A Am. Jur. 2d Contracts § 100 (1991). McFarlane's undisputed conduct establishes the existence of a contract. McFarlane testified that when he received Gaiman's final fax on July 15, 1997, he and Gaiman had reached agreement on "the big points" relating to royalty payments Gaiman was to receive for Angela, Cogliostro and Medieval Spawn. (Reply Facts ¶ 69.) In McFarlane's view, the only remaining issues were "silly paragraphs" "that lawyers like to have in contracts"

3

such as indemnity clauses and jurisdictional provisions. (Reply Facts ¶ 70.) But there is no evidence McFarlane ever conditioned his acceptance on the drafting of those "silly paragraphs." Instead, McFarlane's subsequent conduct indicated that the parties had finalized their agreement. On August 4, 1997, McFarlane sent a royalty check and a royalty report. (Reply Facts ¶ 79.) A week later, on August 11, he sent Gaiman another royalty check and another royalty report. (Reply Facts ¶ 83.) Also during this time, McFarlane sent Gaiman various materials related to the Miracleman character, just as he had agreed to do in his exchange of faxes with Gaiman. (See Reply Facts ¶¶ 62, 65, 84.)

Seven months later, on March 26, 1998, McFarlane's wife sent Gaiman another check from Todd McFarlane Productions for royalties on foreign sales of Gaiman's work. (Reply Facts ¶ 91.) The McFarlane Defendants bury this last payment in a footnote, arguing that because this payment was for foreign sales of the *Angela* series of comic books, it was somehow outside the parties' agreement. (See Defs.' Br. at 16 n.4.) But that argument makes no sense. If McFarlane believed he and Gaiman had no agreement because Gaiman had defrauded him, then under what possible agreement was McFarlane continuing to paying royalties in 1998? In reality, the payments for sales of *Angela* are further evidence of a valid contract because, at that point, Gaiman had traded away his prospective rights in Cogliostro and Medieval Spawn, (see Reply Facts ¶ 62) leaving Angela as the only character for which Gaiman could still receive a royalty.

All the McFarlane Defendants have to face this evidence is McFarlane's testimony that he did not <u>believe</u> he had reached an agreement with Gaiman and that he decided to "do some investigation on my own." (See McFarlane Dep. at 196:23 – 197:1, 197:22-23 (cited in Defs.' Prop. Finding of Fact ¶ 19).) Yet there is no evidence McFarlane ever got back

4

to Gaiman about the results of his "investigation" until <u>seventeen months</u> after his first royalty payment to Gaiman when, in January 1999, he wrote Gaiman a letter stating that he was "rescind[ing]" any previous "offers." (Reply Facts ¶ 93.)

McFarlane's undisputed actions, rather than his self-serving belief, are more than sufficient to establish the existence of a contract under Wisconsin law. <u>See</u> <u>Hoffman v. Ralston Purina Co.</u>, 86 Wis. 2d 445, 456, 273 N.W.2d 214, 218 (Wis. 1979) ("actions of the offeree can constitute acceptance even when accompanying words express a contrary intent").

## II.    Whether D.C. Comics Would Grant A Royalty For Medieval Spawn Is Irrelevant.

The McFarlane Defendants' extensive discussion regarding whether Gaiman would have received royalties from D.C. Comics for his creation of Medieval Spawn (Defs.' Br. at 8-11) is also irrelevant. Even if D.C. Comics would not pay royalties on this particular character (though D.C. would (<u>see</u> Reply Facts ¶ 56)), the undisputed facts show that McFarlane chose to pay royalties to Gaiman despite knowing of Gaiman's alleged misrepresentation. As a result, McFarlane cannot show that he detrimentally relied on that alleged misrepresentation and, thus, his fraud claim and defense must fail. <u>See</u> <u>Fullin v. Martin</u>, 34 F. Supp. 2d 726, 738 (E.D. Wis. 1999) (party cannot justifiably rely on statement already known to be false). <u>See also</u> <u>Foss v. Madison Twentieth Century Theaters, Inc.</u>, 203 Wis. 2d 210, 218-19, 551 N.W.2d 862, 866 (Ct. App. 1996) ("The law will not permit a person to predicate damage upon statements which he does not believe to be true, for if he knows they are false, it cannot be said that he is deceived by them.").

In his first royalty report to Gaiman, on August 4, 1997, McFarlane specifically stated:

003.371382.1

> I had a conversation with Terri Cunningham who said that when a derivative character is created, no money is given [by D.C.] to those creating the knock-off character. . . . <u>Still, I am willing to pay some monies</u> as long as all other matters are sorted out.

(Reply Facts ¶ 81.) This writing was followed by the McFarlane Defendants sending another royalty check and royalty report on August 11, sending Miracleman materials to Gaiman during that same time, and sending another royalty check in March 1998. (Reply Facts ¶¶ 83, 84, 91.)

The McFarlane Defendants attempt to minimize McFarlane's expressed willingness to continue paying royalties by emphasizing McFarlane's "as long as all other matters are sorted out" statement. (Defs.' Br. at 15.) But the McFarlane Defendants present no evidence that McFarlane ever got back to Gaiman about those unspecified "other matters." (<u>See</u> Reply Facts ¶ 82; Resp. Fact ¶ 25.) Indeed, McFarlane testified that he cannot remember having any direct communications with Gaiman between August 1997 and January 1999, when he sent Gaiman his letter "rescind[ing]" all previous "offers." (McFarlane Dep. at 223:16-20, 224:17-21.) Instead, McFarlane kept paying Gaiman royalties and giving every outward appearance of performing the contract. (<u>See</u> Reply Facts ¶¶ 79, 83, 84, 91.) Having decided that the agreement was worth performing despite Gaiman's supposed misrepresentation, McFarlane can no longer use that purported representation as a basis for escaping his contractual obligations.

## III.   McFarlane's Supposed Second Conversation With Terri Cunningham Is Irrelevant.

The McFarlane Defendants suggest that even if McFarlane chose to go forward with the contract after Terri Cunningham allegedly told him about D.C. Comics' policies regarding derivative characters, he was still entitled to rescind the contract because he had a second conversation with Cunningham in which McFarlane supposedly learned about additional misrepresentations by Gaiman. As discussed in Plaintiffs' opening brief, McFarlane's

description of that conversation is so nebulous and suspect that it cannot meet the clear and convincing evidence standard required for fraud. (See Pls.' Br. at 15-16.) That failure of proof has been confirmed by the McFarlane Defendants recent deposition of Terri Cunningham, in which she testified that she has no recollection of talking to McFarlane in 1997 about D.C. Comics' standard policies and contract provisions. (July 23, 2002 Deposition of Terri Cunningham at 60:8-14.)

More important, the McFarlane Defendants' argument fails because, again, McFarlane continued to perform the contract even after that supposed second conversation. (See Reply Facts ¶¶85-91.) The McFarlane Defendants inexplicably assert that "[i]t is also undisputed that McFarlane did not go through with this exchange [of Cogliostro and Medieval Spawn for Miracleman], nor did he continue paying royalties to Gaiman" after his second phone conversation with Cunningham. (Defs.' Br. at 16.) Defendants provide no record support for that assertion.[1] (See id.) In fact, as discussed above, the undisputed facts show that on March 26, 1998 – more than seven months after sending Gaiman his first two royalty payments and the various royalty reports and the Miracleman materials – McFarlane's wife sent Gaiman another check from Todd McFarlane Productions for royalties on foreign sales of Gaiman's *Angela* series. (Reply Facts ¶ 91.) Again, having chosen to go forward with the contract despite

---

[1] Similarly, the McFarlane Defendants provide no citation or proposed finding of fact for their assertion that, prior to calling Cunningham the second time, "McFarlane suspected but had not yet confirmed that Gaiman's [purported] claim to a flat 15% royalty for the use of Cogliostro in the HBO animated series and elsewhere was also false or seriously misleading." (Defs.' Br. at 14.) There is no support for this statement in the record. McFarlane was far from that specific in his deposition testimony. The best McFarlane could muster was that his second conversation with Cunningham "may have been on how you spend money on people in movies or television shows . . . Hollywood stuff maybe." (Reply Facts ¶ 86 (emphasis added).) McFarlane could not remember discussing any particular character. (Id. ¶ 88.) Furthermore, Gaiman never claimed a "flat 15% royalty", but rather that this would be prorated by the number of speaking parts. (See Simmons Aff., Ex. C at Dep. Ex. 2 at 2.)

7

knowing of Gaiman's alleged misrepresentations, McFarlane cannot now turn around and use those same alleged misrepresentations to escape his obligations under the parties' agreement.

## IV.    Gaiman's Other D.C. Contracts Are Irrelevant.

The McFarlane Defendants attempt to create the appearance of fact issues based on the D.C. Comics contracts Gaiman has produced in this litigation. More than a month after receiving those contracts in discovery, the McFarlane Defendants have now filed a separate (and futile) motion to amend their counterclaim, allegedly in response to those contracts.[2]  According to the defendants, their fraud counterclaim and affirmative defense should survive summary judgment because Gaiman had a duty to disclose the terms of those other contracts.[3] The fact is, those additional contracts are irrelevant. First, Gaiman fulfilled his duty to disclose when he sent McFarlane's representative, Larry Marder, contracts containing the very provisions about which McFarlane now complains. Second, the various royalty percentages contained in Gaiman's other contracts are all equal to or greater than the royalty Gaiman agreed to for Medieval Spawn. Finally, under Wisconsin law, a defendant who chooses to go forward with a contract despite knowing of a misrepresentation, cannot later escape the contract by claiming the fraud was more extensive than he realized.

---

[2] Plaintiffs will address the McFarlane Defendants' recent Motion for Leave to File an Amended Counterclaim in a separate response brief. However, as shown in the present brief, the contents of Gaiman's other D.C. contracts do not give defendants a basis for surviving summary judgment. Thus, the proposed amendment should be denied as futile.

[3] Defendants repeatedly, and without explanation, suggest that they suffered some form of prejudice by not receiving copies of Gaiman's other D.C. contracts prior to McFarlane's deposition. (Defs.' Br. at 16 n.3, 18.) That suggestion is baseless. It was the plaintiffs, not the defendants, who were taking the deposition of McFarlane. Since the plaintiffs were not using those contracts as exhibits, it is unclear what purpose would have been served by showing McFarlane those contract prior to his deposition. Plaintiffs produced copies of all of Gaiman's D.C. contracts prior to defendants' deposition of Gaiman, so that defendants would, as is their right, have an opportunity to examine Gaiman about those contracts.

A.    **Gaiman sent McFarlane the D.C. contracts.**

As discussed in plaintiffs' opening brief (Pls.' Br. at 5-7), Gaiman sent copies of his D.C. contracts to McFarlane's representative, Larry Marder, on two separate occasions. (Reply Facts ¶¶ 39, 53.) At that time, Marder was the executive director of defendant Image Comics, Inc., and McFarlane was Image's president and one of its primary shareholders. (Reply Facts ¶ 35.) McFarlane had asked Marder to serve as a mediator to help resolve the outstanding royalty issues between McFarlane and Gaiman. (Id. ¶¶ 34, 38.) Under Wisconsin law, Marder's knowledge of those terms is imputed to McFarlane as a matter of law. See Ivers & Pond Piano Co., Inc. v. Peckham, 29 Wis.2d 364, 369, 139 N.W.2d 57, 59 (1965).

The first time Gaiman sent Marder copies of his D.C. contracts, Marder prepared a memo for McFarlane summarizing the contracts' terms. (Id. ¶ 42.) Five months later, Gaiman had his attorney send Marder copies of drafts of Gaiman's Character Equity Agreement and Writer Services Agreement with D.C. Comics.[4] (See Reply Facts ¶ 53 and Cook Aff., Ex. A, cited therein.) Those agreements contain the very provisions which the McFarlane Defendants now claim Gaiman withheld from McFarlane during their negotiations. Specifically, the Character Equity Agreement sent by Gaiman's attorney includes the "Contingencies Affecting Royalties" and "Spin-Off" provisions which the defendants claim "could have greatly reduced the royalty percentage for Cogliostro and Medieval Spawn." (Compare Cook Aff., Ex. A at 6 with Defs.' Br. at 12.) Since Gaiman disclosed those provisions to McFarlane, their existence cannot create a basis for defeating summary judgment.

---

[4] Defendants suggest in a footnote that the draft agreement is somehow entitled to less weight because it was "an unexecuted draft" that "differed in material respects" from the agreement Gaiman ultimately executed. (Defs.' Br. at 8 n.2.) But defendants fail to point out the "material respects" in which the two agreements supposedly differ.

9

**B.    Gaiman agreed to a 7.5% royalty for Medieval Spawn.**

The McFarlane Defendants also make much of the fact that some of Gaiman's other contracts with D.C. Comics provide him with only a 10% or 7.5% royalty for non-comic book uses of his characters, rather than the "flat 15% royalty" they claim Gaiman represented he received from D.C. (Defs.' Br. at 11.) Because the undisputed facts show that Gaiman and McFarlane expressly agreed to a 7.5% royalty for the Medieval Spawn character about which defendants now complain, the other contracts refute, rather than support a fraud claim.

As part of their July 15, 1997 exchange of correspondence, McFarlane specifically asked for clarification regarding the royalty applicable to Medieval Spawn, asking Gaiman, "Also, accounting on the Medieval Spawn will be done from a formula you said D.C. Comics uses on derivative characters. Not the standard agreement for a new hero. Is this acceptable?" (See Reply Facts ¶ 67 and July 1, 2002 Affidavit of Jeffrey A. Simmons ("Simmons Aff.") Ex. C at Dep. Ex. 20.) To which Gaiman immediately replied, "Medieval Spawn accounting – yes, I should have put that in. (I'd formula him at 50% of Angela.")." (Id. at Dep. Ex. 33 (emphasis added).) McFarlane acknowledged this exchange at his deposition, testifying as follows:

> Q. . . [Y]our third question for clarification which is in the indented paragraph on Exhibit 20, correct?
>
> A.    Right.
>
> Q.    And you said it relates to a formula DC Comics uses on derivative characters, correct?
>
> A.    Right. Right. I was asking for the formula.
>
> Q.    Right. And Neil says the formula is 50 percent of Angela, right?
>
> A.    Correct.

(Resp. Facts ¶ 32; McFarlane Dep. at 196 (Gross Aff., Ex. B).)

10

McFarlane confirmed his understanding that the royalty was 7.5% in the royalty report he sent to Gaiman on August 4, 1997, writing, "As per your merchandising and promotional lic[ensing] number which would include these toys, <u>the number you gave me was 7.5%</u> of publisher's net receipts." (Resp. Facts ¶ 32; Simmons Aff., Ex. C at Dep. Ex. 5 at TM 00528 (emphasis added). <u>See also</u> McFarlane Dep. at 196.)

In order to sustain a counterclaim or defense of fraud, the McFarlane Defendants must show that the royalty percentages in Gaiman's other D.C. contracts would have been material to McFarlane's decision to enter into the agreement. <u>See</u> <u>Schurmann v. Neau</u>, 240 Wis. 2d 719, 624 N.W.2d 157, 161 (Ct. App. 2000) (elements of misrepresentation include representation of "material fact"). A representation is only material if a reasonable person would consider it important. <u>Radford v. J.J.B. Enterprises, Ltd.</u>, 163 Wis. 2d 534, 472 N.W.2d 790, 794 (Ct. App. 1991). Because the 7.5% royalty McFarlane agreed to receive for Medieval Spawn is the <u>lowest</u> royalty Gaiman receives under the other D.C. contracts cited by the defendants, there is no basis for claiming that knowledge of the royalties in those contracts would have been in any way material to McFarlane's decision. Accordingly, summary judgment is appropriate. <u>See</u> <u>Mack v. Earle M. Jorgensen Co.</u>, 467 F.2d 1177, 1179 (7th Cir. 1972) (directed verdict affirmed where alleged statement was not a misrepresentation of material fact).

C.    **Having chosen to go forward with the contract, McFarlane cannot now claim the fraud was more extensive than he realized.**

Ultimately, the McFarlane Defendants knew there was "fraud," went ahead with the contract, and now, fearing preclusion of a defense because they did go forward, claim to have "just discovered" that Gaiman's alleged fraud was more extensive than McFarlane realized. Putting aside the fact that their assertion is untrue, defendants are also precluded from making that argument because, under Wisconsin law, a party who knows about fraud, but chooses to go

11

forward with a contract anyway, cannot later seek to escape the contract by claiming that the extent of the fraud was greater than he realized. See Fullin v. Martin, 34 F. Supp. 2d 726, 738 (E.D. Wis. 1999) (rejecting parties' argument that "they did not realize how badly they had been deceived"). As shown in the preceding discussion, the McFarlane Defendants have presented no reason for setting aside that rule here.

### CONCLUSION

For all of the reasons discussed above, plaintiffs Neil Gaiman and Marvels and Miracles, LLC respectfully request that this Court grant their Motion for Partial Summary Judgment and enter judgment dismissing the McFarlane Defendants fraud counterclaim and fraud affirmative defense.

Dated this ___/___ day of August, 2002.

FOLEY & LARDNER

By: _____
    Allen A. Arntsen
    Joan L. Eads
    Jeffrey A. Simmons
    *Attorneys for Plaintiffs*

Foley & Lardner
150 East Gilman Street
Madison, WI 53703-2808
Tel: (608) 257-5035
Fax: (608) 258-4258

Co-Counsel:
Kenneth F. Levin
20 North Wacker Drive, Suite 2200
Chicago, IL 60606
Tel: (312) 984-6000
Fax: (312) 977-2990

Of Counsel:
Mark Hellmann
Michael Rechtin
Foley & Lardner
1 IBM Plaza
220 N. Wabash Ste. 3300
Chicago, IL 60611
Tel: (312) 755-1900
Fax: (312) 755-1925

003.371382.1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DOC NO
REC'D/FILED

2002 AUG -1  PM 4: 22

J W SKUPNIEWITZ
CLERK US DIST COURT
WD OF WI

NEIL GAIMAN, and
MARVELS AND MIRACLES, LLC,

      Plaintiffs,

    v.

TODD MCFARLANE,
TODD MCFARLANE PRODUCTIONS, INC.,
TMP INTERNATIONAL, INC.,
MCFARLANE WORLDWIDE, INC., and
IMAGE COMICS, INC.,

      Defendants.

Case No.: 02-C-0048-S

---

## CERTIFICATE OF SERVICE

---

I, Brenda Allen-Johnson, hereby certify that I am an employee of Foley &

Lardner and that on the 1st day of August, 2002, I caused true and correct copies of the following

documents:

1.    **Plaintiffs' Reply Brief in Support of Motion for Partial Summary Judgment;**

2.    **Plaintiffs' Response to the McFarlane Defendants' Proposed Findings of Fact and Conclusions of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment; and**

3.    **Plaintiffs' Reply to the McFarlane Defendants' Response to Plaintiffs' Proposed Findings of Fact and Conclusions of Law.**

to be served on counsel for defendants as shown below:

| **Via Hand Delivery:** | **Via Facsimile and U.S. Mail:** Facsimile No. (314) 345-6060 | **Via Facsimile and U.S. Mail:** Facsimile No.: (949) 790-6301 |
|---|---|---|
| Todd G. Smith, Esq. | | |
| LaFollette, Godfrey & Kahn | Michael A. Kahn, Esq. | R. Scott Feldmann, Esq. |
| One East Main Street, Suite 500 | Blackwell Sanders, LLP | Brobeck, Phleger & Harrison, LLP |
| Madison, WI 53703 | 720 Olive Street, Suite 2400 | 38 Technology Drive |
| | St. Louis, MO 63101 | Irvine, CA 92618-5312 |

*Brenda Allen-Johnson*
Brenda Allen-Johnson

003.345959.7