DOC NO **90**
REC'D/FILED

2002 AUG - 1  PM 4: 22

J W ~~SACHREUTZ~~
CLERK US DIST COURT
WD OF WI

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| NEIL GAIMAN and | ) | |
| MARVELS AND MIRACLES, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 02-C-0048-S |
| | ) | |
| TODD McFARLANE, et al. | ) | |
| | ) | |
| Defendants-Counterclaimants. | ) | |

---

**PLAINTIFFS' RESPONSE TO THE MCFARLANE DEFENDANTS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
IN OPPOSITION TO PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

Plaintiffs Neil Gaiman and Marvels and Miracles, LLC respond to the McFarlane

Defendants' Proposed Findings of Fact and Conclusions of Law in Opposition to Plaintiffs'

Motion for Summary Judgment as follows:

**PROPOSED FINDINGS OF FACT**

**Defendants' Proposed Finding No. 1:**

Beginning in 1996, Plaintiff Neil Gaiman and Defendant Todd McFarlane Productions, Inc. ("TMP"), through Defendant Todd McFarlane, entered into negotiations with the goal of executing an agreement regarding the parties' respective rights and obligations with respect to three comic book characters—Angela, Cogliostro, and Medieval Spawn. (June 19-20, 2002 Deposition of Todd McFarlane ("McFarlane Dep.") at 107-08; June 24, 2002 Deposition of Neil Gaiman ("Gaiman Dep.") at 88-90; (*see* July 22, 2002 Affidavit of Gabriel S. Gross ("Gross Aff."), Exs. A-B))

**Plaintiffs' Response:** No dispute.[1]

---

[1]    To the extent plaintiffs state that no dispute exists, it is only for purposes of this motion and is not intended as an admission of fact for purposes of trial.  Plaintiffs vigorously dispute a number the McFarlane Defendants' proposed findings, but those disputes are immaterial to this motion.

**Defendants' Proposed Finding No. 2:**

McFarlane and Gaiman had jointly created these characters for TMP's *Spawn* comic book series several years earlier.  (McFarlane Dep. at 107-08; Gaiman Dep. at 88-90) (Gross Aff., Exs. A-B)

**Plaintiffs' Response:**  No dispute.

**Defendants' Proposed Finding No. 3:**

At some point during these negotiations, TMP's rights in an unrelated comic book character known as Miracleman also become a subject of discussion between the parties. (McFarlane Dep. at 109; Gaiman Dep. at 90-91; Gross Aff., Exs. A-B)

**Plaintiffs' Response:**  No dispute.

**Defendants' Proposed Finding No. 4:**

The focus of these negotiations was Gaiman's request for a percentage of the royalties received by TMP from reissues of the comic books and licenses for toys and other products based on the three comic book characters.  (McFarlane Dep. at 107-08; Gaiman Dep. at 92-93; Gross Aff., Exs. A-B)

**Plaintiffs' Response:**  Disputed, but that dispute is not material to the present motion.

Gaiman was seeking to memorialize his earlier oral agreement with McFarlane.  (See Plaintiffs'

Reply to Defendants' Response to Plaintiffs' Proposed Findings of Fact ("Reply Facts")  Nos. 9,

23, 29-30.)

**Defendants' Proposed Finding No. 5:**

Between 1993 and 1995, TMP had paid Gaiman close to $200,000 for his work on Issue 9 of *Spawn*, Issues 1 through 3 of *Angela*, and Issue 26 of *Spawn*.  (McFarlane Dep. at 52; Gross Aff., Ex. B, and Ex. C at Dep. Ex. 38.)

**Plaintiffs' Response:**  No dispute.

**Defendants' Proposed Finding No. 6:**

Beginning in 1993 and during their negotiations in 1996 and 1997, Gaiman repeated his desire to be paid at rates commensurate with his standard DC Comics contract. (McFarlane Dep. at 61-63, 68; Gross Aff., Ex. B)

**Plaintiffs' Response:** Disputed, but that dispute is not material to this motion. Gaiman

testified that McFarlane told him McFarlane would treat him "as well or <u>better than</u> D.C.

[Comics]." (Gaiman Dep. at 134 (Gross Aff., Ex. A (emphasis added).)

**Defendants' Proposed Finding No. 7:**

The 1996 negotiations, however, marked the first time in their relationship that the parties discussed any specific financial terms. (Gaiman Dep. at 82, 134-35; Gross Aff., Ex. A)

**Plaintiffs' Response:** No dispute.

**Defendants' Proposed Finding No. 8:**

Early on in these discussions, the parties generally agreed that TMP would attempt to work out an arrangement that would be equivalent to the contract Gaiman had with DC Comics, although initially the parties did not actually discuss any of the terms of that DC Comics contract. (*Id.*)

**Plaintiffs' Response:** Disputed, but that dispute is not material to this motion. In the

portions of his deposition cited by defendants, Gaiman actually testified that McFarlane told him

McFarlane would treat him "as well or better than D.C. [Comics]." (Gaiman Dep. at 134 (Gross

Aff., Ex. A).)

**Defendants' Proposed Finding No. 9:**

At no time before these 1996 discussions had Gaiman ever told McFarlane what the actual terms of his DC Comics contract were, or whether he wanted McFarlane to match all of the DC contractual terms or just some. (*Id.* at 58, 79, 81-82, 134-35)

**Plaintiffs' Response:** Disputed, but that dispute is not material to this motion. In his

deposition testimony, Gaiman agreed that the first time he and McFarlane discussed specific

003.371115.1

financial terms "was either in 1995 or 1996." (Gaiman Dep. at 79 (Gross Aff. Ex. A).) That dispute, however, is not material to the McFarlane Defendants' fraud counterclaim and affirmative defense.

### Defendants' Proposed Finding No. 10:

Throughout this entire period, McFarlane repeatedly asked Gaiman to send him a copy of his DC Comics contract so that McFarlane could understand the terms, conditions, and royalty calculations. (McFarlane Dep. at 61-63, 200; Gross Aff., Ex. B)

**Plaintiffs' Response:** Disputed, but that dispute is not material to this motion. Plaintiffs dispute that McFarlane ever asked Gaiman for a copy of his D.C. Comics contract. Moreover, it is undisputed that Gaiman did send McFarlane's representative, Larry Marder, copies of Gaiman's D.C. Comics contracts on two occasions in 1996 and 1997. (See Response Fact No. 11, below.)

### Defendants' Proposed Finding No. 11:

Gaiman never sent McFarlane any DC Comics contract. (*Id.*)

**Plaintiffs' Response:** Disputed, but that dispute is not material to this motion. It is undisputed that Gaiman sent McFarlane's representative, Larry Marder, copies of his D.C. contracts on two occasions. (See Reply Facts Nos. 39, 53-54.) On November 6 or 7, 1996, Gaiman sent McFarlane's representative, Larry Marder a fax attaching portions of his D.C. contracts along with a cover page summarizing the terms most important to Gaiman. (Id. at No. 39.) Marder then sent McFarlane a memo summarizing the terms of those contracts. (Id. at No. 42.) Later, on April 2, 1997, Gaiman had his attorney send Marder copies of two draft D.C. contracts. (Id. at Nos. 53-54.)

4

**Defendants' Proposed Finding No. 12:**

  Indeed, the first time McFarlane ever saw such a contract was at his deposition. (*Id.* at 198)

  **Plaintiffs' Response:**  Disputed, but that dispute is not material to this motion.  While McFarlane claims he never saw a copy of Gaiman's D.C. contract, it is undisputed that McFarlane's representative, Larry Marder, received copies of Gaiman's D.C. contracts on two occasions and that Marder summarized those contract terms for McFarlane.  (See Response Fact No. 11, above.)

**Defendants' Proposed Finding No. 13:**

  In a letter to McFarlane dated May 5, 1997, Gaiman set forth what he represented to be "a set of figures based on the basic DC deal."  (July 1, 2002 Affidavit of Jeffrey A. Simmons ("Simmons Aff."), Ex. C at Dep. Ex. 2)

  **Plaintiffs' Response:**  No dispute.  It also cannot be disputed that the royalty rates Gaiman set forth in that letter were consistent with the royalty rates contained in the draft contract Gaiman's attorney had previously sent to McFarlane's representative, Larry Marder. (Compare July 1, 2002 Cook Affidavit, Ex. A with July 1, 2002 Simmons Affidavit, Ex. 2.)

**Defendants' Proposed Finding No. 14:**

  That letter includes the following royalty numbers under what is described as "Character Equity":

   **Merchandising and promotional licensing:**

     15 % of publisher's net receipts

   **Media:**

   (This includes Motion Pictures, Audio-visual recording, Stage Plays, TV and so forth and only activates if the character has a speaking part)

     15% of publisher's net receipts

(*Id.*)

Plaintiffs' Response:  No dispute.

**Defendants' Proposed Finding No. 15:**

Gaiman and McFarlane subsequently exchanged three letters by facsimile on July 15, 1997.  (*Id.* at Dep. Exs. 19, 20, 33)

Plaintiffs' Response:  No dispute.

**Defendants' Proposed Finding No. 16:**

Two of these letters incorporated by reference the royalty terms summarized in the May 5 letter.  (*Id.* at Dep. Exs. 20, 33)

Plaintiffs' Response:  No dispute.

**Defendants' Proposed Finding No. 17:**

McFarlane's July 15, 1997 fax posed three questions, two having to do with royalty and accounting issues.  (*Id.* at Dep. Ex. 20)

Plaintiffs' Response:  No dispute.

**Defendants' Proposed Finding No. 18:**

Mr. Gaiman's responding July 15, 1997 fax purports to answer those questions.  (*Id.* at Dep. Ex. 33)

Plaintiffs' Response:  No dispute.

**Defendants' Proposed Finding No. 19:**

After the exchange of letters and faxes, the parties had not reached agreement on the terms of any contract.  (McFarlane Dep. at 196-97; Gross Aff., Ex. B)

Plaintiffs' Response:  No genuine or material dispute of fact.  McFarlane's bare denial of the existence of an agreement, by itself, is insufficient to create a genuine dispute of material fact for purposes of summary judgment.  (See Pls.' Reply Br. at 3-5.)  The undisputed facts show that all the elements of contract formation were satisfied.  (See id.)  Regardless, the existence or

6

non-existence of a contract between Gaiman and McFarlane is irrelevant to plaintiffs' motion.

Plaintiffs have not asked for summary judgment that a contract in fact existed. Rather, they are

asking that if a contract is ultimately found to exist, defendants be precluded from asserting fraud

as a defense to that contract. (See Pls.' Reply Br. at 2-5.)

**Defendants' Proposed Finding No. 20:**

In particular, while the parties were close to reaching an agreement, some areas of
disagreement existed, including the accuracy of the formulas Gaiman had described to
McFarlane. (*Id.*)

**Plaintiffs' Response:** No genuine dispute of fact. There is can be no genuine dispute

that McFarlane and Gaiman had reached an agreement. (See Response Fact No. 19, above.)

McFarlane actually testified that after he received Gaiman's final fax on July 15, 1997, he and

Gaiman had reached agreement on "the big points for accounting purposes" and that the only

remaining issues were "silly paragraphs" "that lawyers like to have in contracts," such as

indemnity clauses and jurisdictional provisions. (See Reply Facts Nos. 69-70.) There is no

evidence McFarlane ever conditioned his acceptance of Gaiman's offer on their completion of

those "silly paragraphs."

**Defendants' Proposed Finding No. 21:**

McFarlane felt he needed to conduct further investigation into Gaiman's claims regarding
royalty formulas before he would agree to incorporate those formulas into any contract with
Gaiman. (*Id.*)

**Plaintiffs' Response:** No genuine dispute of fact. The McFarlane Defendants cannot

dispute that McFarlane <u>did</u> incorporate those royalty formulas into an agreement when he paid

Gaiman royalties according to those formulas on August 4, 1997 and August 11, 1997. (See

Reply Facts Nos. 79, 83. See also Pls.' Reply Br. at 3-4.)

7

**Defendants' Proposed Finding No. 22:**

McFarlane proceeded to investigate Gaiman's claims and contacted Terri Cunningham at DC Comics and learned that Gaiman had misrepresented the rights he would have received for his contribution to Medieval Spawn. (McFarlane Dep. at 79-81; Gross Aff., Ex. B)

**Plaintiffs' Response:** Disputed, but that dispute is not material to this motion.

McFarlane never asked Terri Cunningham about the Medieval Spawn character or Gaiman's

specific contracts with D.C. Comics. Instead, McFarlane spoke to Cunningham "in generalities."

(See Reply Facts No. 75-76.) In addition, the undisputed evidence shows that McFarlane chose

to perform the contract despite that conversation by paying Gaiman royalties on more than one

occasion and giving Gaiman Miracleman materials after his conversation with Cunningham.

(See id. at Nos. 79-84.) The undisputed facts also show that D.C. Comics would pay Gaiman

royalties for derivative characters similar to Medieval Spawn. (See id. at Nos. 56, 98)

**Defendants' Proposed Finding No. 23:**

According to Ms. Cunningham, DC Comics did not pay royalties to creators of preexisting derivative characters, such as Medieval Superman or Aqua Batman, unless the creator has extensively reworked the character. (Id. at 79-81, 199, 241)

**Plaintiffs' Response:** Disputed, but that dispute is not material to this motion. (See

Response Fact Nos. 22, 24.)

**Defendants' Proposed Finding No. 24:**

In a royalty report he sent to Gaiman on August 4, 1997, McFarlane references this conversation and his discovery of Gaiman's misrepresentation about his rights in Medieval Spawn. (Simmons Aff., Ex. C at Dep. Ex. 5)

**Plaintiffs' Response:** No dispute, except for defendants' editorial reference to any

alleged "misrepresentation." Regardless, this undisputed fact establishes that McFarlane chose

to go forward with the 1997 Agreement despite what he claims were Gaiman's

misrepresentations.

8

**Defendants' Proposed Finding No. 25:**

In that royalty report, McFarlane makes clear that he is making future royalty payments in a good faith effort as part of a contract negotiation process that, as of August 4, 1997, was still ongoing:

> I had a conversation with Terri Cunningham who said that when a derivative character is created, no money is given to those creating the knock-off character. Only on rare occasions, when extensive reworking and extensive work have been done, is money usually given. I.e., your Sandman book being one of those rare exceptions. So far you have worked on parts of 8 pages that include Medieval Spawn and I wouldn't define that as extensive. **Still, I am willing to pay some monies as long as all other matters are sorted out.**

(*Id.*; emphasis added)

**Plaintiffs' Response:** Disputed, but that dispute is not material to this motion. While defendants seek to emphasize McFarlane's suggestion that "other matters" needed to be "sorted out," the undisputed facts show that McFarlane never contacted Gaiman to discuss those "other matters" and, instead, continued to pay Gaiman royalties on two subsequent occasions along with delivering Miracleman materials. (McFarlane Dep. at 223:17-24, 224:9-21; Reply Facts Nos. 82-83, 91.)

**Defendants' Proposed Finding No. 26:**

Shortly thereafter, however, McFarlane had another conversation with Ms. Cunningham in an effort to determine the truth of Gaiman's representation about his entitlement, under what he labeled "the basic DC deal" (*Id.* at Dep. Ex. 2), to a 15% flat royalty for media uses of his characters. (McFarlane Dep. at 116-17; Gross Aff., Ex. B).

**Plaintiffs' Response:** No genuine dispute of fact. Defendants' proposed finding does not accurately reflect the record and, accordingly, there is no genuine dispute of fact. While Gaiman proposed a flat 15% royalty in his May 5, 1997 fax to McFarlane (Simmons Aff., Ex. C at Dep. Ex. 2), the record shows that in their subsequent July 15, 1997 exchange of correspondence, McFarlane specifically asked Gaiman: "Accounting on the Medieval Spawn

will be done from a formula you said D.C. Comics uses on derivative characters.  Not the standard agreement of a new hero.  Is this acceptable?"  (Id. at Dep. Ex. 20.)  To which Gaiman replied: "Medieval Spawn accounting – yes, I should have put that in.  (I'd formula him at 50% of Angela.)"  (Id. at Dep. Ex. 33 (emphasis added).)  In other words, Gaiman would receive a royalty of only 7.5% for Medieval Spawn, or one-half of the 15% he received for the Angela character.  Defendants do not dispute the existence of this exchange of questions and answers between McFarlane and Gaiman.  (See Defs.' Proposed Finding of Fact Nos. 17-18.)

In addition, there is insufficient evidence that McFarlane's purported second conversation with Terri Cunningham ever took place.  McFarlane's testimony and the McFarlane Defendants' pleadings and interrogatory responses show that the McFarlane Defendants will not be able to meet the clear and convincing evidence standard necessary to prove fraud.  McFarlane's purported recollection of the conversation is extraordinarily nebulous.  (See Reply Facts Nos. 85-89, 94-97; Pls.' Opening Br. at 15-16.)  As for Cunningham herself, she has no recollection of the conversation having occurred.  (See July 23, 2002 Deposition of Terri Cunningham at 60:8-14.)

**Defendants' Proposed Finding No. 27:**

Specifically, Gaiman had given him certain royalty numbers, and McFarlane "decided to verify them with Terri Cunningam."  (Id. at 119)

**Plaintiffs' Response:**  Disputed, but that dispute is not material to this motion.  First, it is undisputed that McFarlane continued go forward with the contract and paid Gaiman royalties as late as March 1998, despite his purported second conversation with Terri Cunningham.  (See Reply Facts Nos. 85-93.)  Second, while McFarlane claims to have had a second conversation with Terri Cunningham, his recollection of that alleged conversation is so hazy and suspect that

10

it cannot meet the clear and convincing evidence standard required for fraud. (See Response

Fact No. 26, above; Pls.' Opening Br. at 15-16.)

**Defendants' Proposed Finding No. 28:**

Cunningham confirmed that the information Gaiman had given him regarding his royalty rate with DC Comics was inconsistent with what Gaiman would actually have received from DC Comics under his contracts with that company. (*Id.* at 117)

**Plaintiffs' Response:** No material or genuine dispute of fact. Plaintiffs dispute the

proposed finding because it is not supported by the evidence of record and, accordingly, there is

no genuine dispute. In any event, the dispute is immaterial because McFarlane continued to pay

Gaiman royalties after the supposed conversation. (See Reply Facts Nos. 83, 91.)

**Defendants' Proposed Finding No. 29:**

When he learned that Gaiman had given him inaccurate information about royalty rates, McFarlane decided not to negotiate further with Gaiman. (*Id.* at 120-21)

**Plaintiffs' Response:** No material or genuine dispute of fact. Plaintiffs dispute the

proposed finding because it is not supported by the evidence of record and, accordingly, there is

no genuine dispute. In any event, the dispute is immaterial because McFarlane continued to pay

Gaiman royalties after the supposed conversation. (See Reply Facts Nos. 83, 91.)

**Defendants' Proposed Finding No. 30:**

At that point, McFarlane determined that he had been suckered by Gaiman into paying royalties to which Gaiman never would have been entitled under his DC Comics contracts and was therefore not entitled to receive from McFarlane. (*Id.*)

**Plaintiffs' Response:** No material or genuine dispute of fact. Plaintiffs dispute the

proposed finding because it is not supported by the evidence of record and, accordingly, there is

no genuine dispute. In any event, the dispute is immaterial because McFarlane continued to pay

Gaiman royalties after the supposed conversation. (See Reply Facts Nos. 83-91.) It is also

11

undisputed that McFarlane did not inform Gaiman that McFarlane considered their agreement "rescinded" until January 1999, approximately seventeen months (or more) after his purported second conversation with Terri Cunningham.  (See Reply Facts No. 92.)

## Defendants' Proposed Finding No. 31:

After McFarlane's deposition was concluded, Plaintiffs produced copies of Gaiman's many different DC Comics contracts.  (Gross Affidavit, Ex. D)

**Plaintiffs' Response:** No dispute.

## Defendants' Proposed Finding No. 32:

In January of 1997—just a few months before his May 5th letter to McFarlane stating that the standard DC contract specifies a flat 15% royalty on licensing and media uses of characters—Gaiman signed two separate "character equity" contracts with DC Comics in which the royalty on licensing and media uses of the two characters was 10%, not 15%.  (Gross Affidavit, Ex. D at G04124-28,G04129-33)

**Plaintiffs' Response:** Disputed, but that dispute is not material for purposes of this motion.  Defendants correctly state that Gaiman's royalty under the two cited contracts was 10%. It is also undisputed that Gaiman received a 15% royalty under the D.C. Comics contracts he sent to Larry Marder.  (See Reply Facts Nos. 43, 55.)  The 10% royalty contained in other contracts is immaterial for two reasons.  First, the undisputed facts show that Gaiman specifically told McFarlane that his royalty for Medieval Spawn should be 7.5% .  As part of their July 15, 1997 exchange of correspondence, McFarlane specifically asked for clarification regarding the royalty applicable to Medieval Spawn, asking Gaiman, "Also, accounting on the Medieval Spawn will be done from a formula you said D.C. Comics uses on derivative characters.  Not the standard agreement for a new hero.  Is this acceptable?"  (July 1, 2002 Affidavit of Jeffrey A. Simmons ("Simmons Aff.") Ex. C at Dep. Ex. 20.)  To which Gaiman immediately replied, "Medieval Spawn accounting – yes, I should have put that in.  (I'd formula him at 50% of

12

Angela.").  (Id. at Dep. Ex. 33 (emphasis added).)  McFarlane acknowledged this exchange at his

deposition, testifying as follows:

> Q. . . [Y]our third question for clarification which is in the indented paragraph on Exhibit
>
> 20, correct?
>
> A.    Right.
>
> Q.    And you said it relates to a formula DC Comics uses on derivative characters,
>
> correct?
>
> A.    Right.  Right.  I was asking for the formula.
>
> Q.    Right.  And Neil says the formula is 50 percent of Angela, right?
>
> A.    Correct.
>
> (McFarlane Dep. at 196 (Gross Aff., Ex. B.)

McFarlane confirmed his understanding that the royalty was 7.5% in the royalty report he

sent to Gaiman on August 4, 1997, writing, "As per your merchandising and promotional

lic[ensing] number which would include theses toys, the number you gave me was 7.5% of

publisher's net receipts."  (Id. at Dep. Ex. 5 at TM 00528 (emphasis added).  See also McFarlane

Dep. at 196)  Since the 7.5% royalty Gaiman agreed to is less than the 10% royalty contained in

the two referenced contracts, it is nonsensical for McFarlane to argue he would not have entered

into the agreement with Gaiman had he known about that 10% royalty.

Second, any agreement Gaiman entered into with D.C. Comics in 1997 are irrelevant

because the 1997 agreement memorialized McFarlane's 1992 agreement to provide Gaiman with

contract terms and compensation equivalent to Gaiman's existing contract with D.C. Comics.

(See Reply Facts No. 9.)  The royalty percentages Gaiman provided to McFarlane were

consistent with what Gaiman was receiving during that earlier time period, as confirmed in the

13

sample contracts Gaiman's attorney sent to McFarlane's representative in April of 1997. (See

Reply Facts No. 53-56.)

**Defendants' Proposed Finding No. 33:**

Gaiman concealed these facts from McFarlane and never told him that his royalty rate
was only 10%. (Plaintiffs' PFOF, ¶ 40; Simmons Aff., Ex. C at Dep. Ex. 2)

**Plaintiffs' Response:** Disputed, but that dispute is not material to the present motion.

Gaiman did not "conceal" any facts from McFarlane. Regardless, what Gaiman received under

two D.C. Comics contracts in 1997 is irrelevant to the McFarlane Defendants' fraud

counterclaim and affirmative defense. (See Response Fact No. 32, above.)

**Defendants' Proposed Finding No. 34:**

Gaiman knew — but never told McFarlane — that his various "Character Equity"
agreements with DC Comics assigned other royalty rates for non-comic-book uses of specific
characters, including one contract that had a maximum royalty of 7.5%. (*Id.* at G04136-41)

**Plaintiffs' Response:** Disputed, but that dispute is not material to this motion. The

undisputed facts show that precisely the opposite is true: Gaiman expressly told McFarlane that a

lower royalty would apply to derivative characters such as Medieval Spawn. McFarlane wrote in

his July 15, 1997 fax to Gaiman: "Also, accounting on the Medieval Spawn will be done from a

formula you said D.C. Comics uses on derivative characters. Not the standard agreement for a

new hero. Is this acceptable?" (July 1, 2002 Affidavit of Jeffrey A. Simmons ("Simmons Aff.")

Ex. C at Dep. Ex. 20.) To which Gaiman immediately replied, "Medieval Spawn accounting –

yes, I should have put that in. (I'd formula him at 50% of Angela.")." (Id. at Dep. Ex. 33

(emphasis added).) The fact that Gaiman received 7.5% in other contracts is irrelevant to the

McFarlane Defendants' fraud counterclaim and affirmative defense because 7.5% is exactly what

14

Gaiman and McFarlane agreed Gaiman would receive for the Medieval Spawn character at issue here. (See Response Fact No. 32, above.)

**Defendants' Proposed Finding No. 35:**

These contracts reveal that there are two distinct types of DC Contracts applicable to Gaiman. (*Compare id.* at G04105-11 *with id.* at G04100-04)

**Plaintiffs' Response:** No dispute.

**Defendants' Proposed Finding No. 36:**

The first type of contract is for his writing services on comic books. These contracts pay royalties based on sales of the comic books themselves, including reprints. (Gross Aff., Ex. C, at Dep. Ex. 57)

**Plaintiffs' Response:** No dispute.

**Defendants' Proposed Finding No. 37:**

The second type of contract is for "Character Equity" and pays royalties for non-comic-book uses of specifically identified characters, such as merchandise licensing, movies, audio-visuals, etc. (*Id.* at Dep. Ex. 58)

**Plaintiffs' Response:** No dispute.

**Defendants' Proposed Finding No. 38:**

The writing services contracts do not give him any rights beyond sales of the comic books themselves. (*Id.* at Dep. Ex. 57)

**Plaintiffs' Response:** No dispute.

**Defendants' Proposed Finding No. 39:**

The contracts used by DC Comics established a rigorous standard for granting writers "character equity"—specifically, paragraph 8(c) of Gaiman's first *Sandman* contract, dated April 20, 1988, establishes the basic foundational requirements of duration and originality before character equity is earned:

003.371115.1

It is understood and agreed that if after Writer [Gaiman] has supplied the full script for the first twelve consecutive issues of the Work, Writer shall have created and/or shall subsequently create <u>wholly original</u> characters for the Work, DC shall grant Writer Creator Equity in those characters only ....

(Gross Affidavit, Ex. D at G04077; emphasis in original)

**Plaintiffs' Response:** Disputed, but that dispute is not material for purposes of this motion. D.C. Comics paid Gaiman for his creation of derivative characters, as evidenced by the royalties D.C. paid him for his work on the "pre-existing" DREAM(SANDMAN) character. (<u>See</u> Reply Facts Nos. 56, 98.)  It is undisputed that McFarlane chose to pay Gaiman royalties despite knowing about the alleged "misrepresentations" by Gaiman regarding whether he would have received royalties for the Medieval Spawn derivative character. (<u>See</u> Reply Facts Nos. 81-84, 91.) Thus, any proposed facts relating to the circumstances under which D.C. would or would not grant royalties for such a derivative character in the 1988 contract is irrelevant to the present motion. (<u>See</u> Pls.' Reply Br. at 5-6.)

**Defendants' Proposed Finding No. 40:**

Thus, Gaiman had to produce twelve consecutive scripts of *Sandman* before he would be entitled to any character equity, and then only for "<u>wholly original</u>" characters. (*Id.*)

**Plaintiffs' Response:** Disputed, but that dispute is not material to the present motion. (<u>See</u> Response Fact No. 39, above.)

**Defendants' Proposed Finding No. 41:**

Although Gaiman used his Sandman contract with DC Comics as the grounds for his alleged right to character equity in what he deemed the "derivative character" of Medieval Spawn, the work he performed on the Sandman character was far greater than what he had done in his eight-page episode involving Medieval Spawn and the rights he obtained from DC Comics were far less than what he claimed for Medieval Spawn. (Combined Appendix, Ex. B; Gross Aff., Ex. D at G04230-33)

16

**Plaintiffs' Response:** Disputed, but that dispute is not material to the present motion.

(See Response Fact No. 39, above.)  It is also undisputed that Gaiman's royalty for his greater

work on the Sandman character was greater than the 7.5% royalty he received for his work on

the derivative Medieval Spawn.  (See Response Fact No. 32.)

## Defendants' Proposed Finding No. 42:

In a letter dated July 10, 1989, Chantal d'Aulnis of DC Comics acknowledged how much Gaiman had changed the Sandman character, and offered to grant Gaiman's request for character equity rights in that character:

> Dear Neil,
>
> As you know, Paul handed to me your letter of April 17 regarding the SANDMAN, and asked me to come up with some innovative answers to your reasonable questions ....
>
> First off, it is clear that "a" Sandman has been sprinkling grains of sand in the eyes of the sleepless throughout mythology.  It is also clear that the character, which you and Sam Keith have created, has little in common with any version previously published by DC.  When we concluded our contract with you on the basis of your original outline, this was not as obvious as it is now, after half a dozen issues have been published, and your point is well taken ....
>
> ... I propose to compromise by upgrading your status and royalties not to those of a full "creator" as you suggested, but to those of a "creative contributor."

(*Id.* at G04230-33)

**Plaintiffs' Response:** Disputed, but that dispute is not material to the present motion.

(See Response Fact No. 39, above.)

## Defendants' Proposed Finding No. 43:

Ms. d'Aulnis then proceeded to outline DC's proposal for licensing royalties on this character, as well as certain limitations on Gaiman's right to claim royalties on the character in the future:

17

Future Financials:

> If one day you leave the book and another writer starts writing it <u>substantially</u> like you, you retain all percentages shown in this letter. That's the good news. Should your successor add substantial changes or new characters, then your share gets pro-rated down so he/she can get a cut. That's the bad news ….

(*Id.*)

    **Plaintiffs' Response:** No dispute of material fact. (<u>See</u> Response Fact No. 39, above.)


**<u>Defendants' Proposed Finding No. 44:</u>**

    Six months later, by letter agreement dated January 2, 1990, Gaiman and DC Comics amended their April 20, 1988 contract to reflect Gaiman's successful completion of the first twelve consecutive issues of *Sandman* and his new status as a "Creative Contributor" to the series. (*Id.* at G04022-29)

    **Plaintiffs' Response:** No dispute of material fact. (<u>See</u> Response Fact No. 39, above.)


**<u>Defendants' Proposed Finding No. 45:</u>**

    This letter agreement expressed DC's appreciation for Gaiman's "innovative interpretation of the central character," and defined "Creative Contributor" as someone who "creates a specific new element (such as a new character) or alters an old element to such an extent that it in DC's judgment qualifies as new, and who is contractually entitled to receive a Creator Royalty and/or Licensing Royalty for any and all substantial use of that element." (*Id.*)

    **Plaintiffs' Response:** No dispute of material fact. (<u>See</u> Response Fact No. 39, above.)


**<u>Defendants' Proposed Finding No. 46:</u>**

    Gaiman did not disclose to McFarlane the requirements for obtaining character equity rights in characters he worked on for DC Comics, instead falsely representing that he obtains such rights simply through the one-time use of a character. (Plaintiffs' PFOF, ¶ 40)

    **Plaintiffs' Response:** Disputed, but that dispute is not material to the present motion.

Plaintiffs' dispute that Gaiman made <u>any</u> "false" representation to McFarlane. Regardless, that

dispute is immaterial because the undisputed facts show that McFarlane chose to go forward with

the contract despite any supposed misrepresentations.  (<u>See</u> Response Facts Nos. 39; Reply Facts

Nos. 81-84, 91.)

### Defendants' Proposed Finding No. 47:

The "Character Equity Agreement" dated February 1, 1993 expressly incorporated Gaiman's April 20, 1988 and January 2, 1990 *Sandman* contracts and specifically listed the characters for which Gaiman was to receive non-comic-book royalties.  (Gross Aff., Ex. D at G4100-04)

**Plaintiffs' Response:**  No dispute.

### Defendants' Proposed Finding No. 48:

It was only Gaiman's extensive alteration of the <u>central</u> character in the *Sandman* series into a character that "has little in common with any version previously published by DC" that convinced DC Comics to give him any equity in that character.  (*Id.* at G04230-33).

**Plaintiffs' Response:**  Disputed, but that dispute is not material to the present motion.

(<u>See</u> Response Facts Nos. 39, 46 above.)  In addition, the contents of the contract speaks for

itself.

### Defendants' Proposed Finding No. 49:

Gaiman's script for *Spawn* Issue 9 contained nothing more than the following very brief description of the character:

> Spawn rides up on a huge horse.  He's wearing a kind of Spawn suit and mask, although the actual costume under the cloak is reminiscent of a suit of armour.  His lettering is like the Spawn lettering, but maybe with a different colour in the border.

(Gross Aff., Ex. C at Dep. Ex. 12)

**Plaintiffs' Response:**  No genuine or material dispute.  First, any proposed facts relating

to the circumstances under which D.C. would or would not grant royalties for such a derivative

character is irrelevant to the present motion.  (<u>See</u> Response Fact No. 39, above)  Second, a full

reading of Gaiman's script for Spawn 9 shows that Gaiman contributed more to the Medieval

Spawn character (described simply as "Spawn" in the script) than the McFarlane Defendants

assert in their proposed finding. Most significantly, Gaiman created the concept of a historical

Spawn character and gave the character a unique personal history, that distinguished him from

other Spawn characters. (See, e.g., Gross Aff., Ex. C at G 00476.)

## Defendants' Proposed Finding No. 50:

By the time the characters of Medieval Spawn and Cogliostro appear in movies, televisions series or action figures, McFarlane and other individuals have transformed the characters with new themes, locales, devices, scripts and artwork. (McFarlane Dep. at 69-74, 77; Gross Aff., Ex. B)

**Plaintiffs' Response:** No genuine or material dispute. The deposition testimony

cited by the McFarlane Defendants does not support the proposed finding.

## Defendants' Proposed Finding No. 51:

Finally, Gaiman knew — but did not tell McFarlane — that *all* of his DC Comics "Character Equity" agreements contained a section entitled "Contingencies Affecting Royalties" that could have greatly reduced the royalty percentage for Cogliostro and Medieval Spawn because of McFarlane's extensive reworking of those characters long before they ever appeared in any other medium. (Gross Aff., Ex. D at G4100-04, G04118-23)

**Plaintiffs' Response:** No genuine or material dispute. It is undisputed that Gaiman's

attorney sent McFarlane's representative, Larry Marder, a copy of Gaiman's Sandman contract,

which included the "Contingencies Affecting Royalties" provision defendants now contend

Gaiman somehow concealed from McFarlane. Thus, there is no genuine dispute of fact. (See

Pls.' Reply Facts Nos. 53-54 and Cook Aff., Ex. A, cited therein.) In addition, there is no

evidence that McFarlane performed the "extensive reworking" asserted by defendants.

## Defendants' Proposed Finding No. 52:

In particular, this section provides that if DC Comics uses or licenses the use of a version of the character that consists primarily of "Spin-Off Elements" —which include, among other things, names, themes, titles, devices, and artwork that were either not created by Gaiman or, if

003.371115.1

created by Gaiman, were later substantially changed or developed by someone else — then DC Comics will reduce the royalties it pays to Gaiman based on its pro-rata allocation of the proportion of Gaiman's contributions to the whole version of the character used. (*Id.*)

**Plaintiffs' Response:**  No genuine dispute.  The "Spin-Off Elements" provision is also present in the D.C. contract Gaiman's attorney sent to Larry Marder, so there can be no genuine dispute regarding a failure to disclose this information.   (See Pls.' Reply Facts Nos. 53-54 and Cook Aff., Ex. A, cited therein.)  Moreover, it is undisputed that Gaiman agreed to reduce the royalty he received for the derivative ("spin-off") Medieval Spawn character to 50% of the royalty he received for Angela.  (See Response Fact No. 32, above.)  In other words, Gaiman and McFarlane agreed to the same type of pro-rata allocation provided for in the D.C. contract.

## Defendants' Proposed Finding No. 53:

Gaiman concealed all of these material facts from McFarlane until after the filing of this lawsuit:  Gaiman had no "standard DC Comics contract"; instead, Gaiman had two distinct types of contracts—one for writing services and a special one for "character equity" in specific types of characters he created; those "character equity" agreements did not uniformly provide for a 15% royalty on licensing and media uses; those "character equity" agreements did not cover all characters, derivative or otherwise, created by Gaiman, but only certain ones that met threshold requirements; and the royalty rates themselves were far more complex and variable than Gaiman revealed to McFarlane. (*Compare* Gross Aff., Ex. C at Dep. Ex. 57 *with id.* at Dep. Ex. 58)

**Plaintiffs' Response:**  Disputed, but that dispute is not material to the present motion.

(See Response Facts 32-34, 39, 49, 51, and 52, above.)

## Defendants' Proposed Finding No. 54:

DC Comics considered a variety of factors when determining the royalty rates assigned to certain characters, including whether Gaiman was the sole creator of the character. (Gross Aff., Ex. D at G04230-33)

**Plaintiffs' Response:**  Disputed, but that dispute is not material to the present motion.

(See Response Facts 32-34, 39, 49, 51, 52, above.)

**Defendants' Proposed Finding No. 55:**

The March 1998 royalty payment made by McFarlane's wife to Gaiman was for foreign sales of comic books, including the Angela series. (Plaintiffs' PFOF, ¶ 91)

**Plaintiffs' Response:**  No dispute.

**Defendants' Proposed Finding No. 56:**

McFarlane did not receive a copy of Gaiman's 1997 DC Comics contract.  Gaiman's attorney only sent an unexecuted draft of an agreement to Marder, a draft which differed in material respects from the agreement Gaiman ultimately executed.  (*Compare* Simmons Aff., Ex. 25 *with* Gross Aff., Ex. D; *see also* McFarlane Dep. at 198; Gross Aff., Ex. B)

**Plaintiffs' Response:**  Disputed, but that dispute is not material to the present motion.

Defendants fail to point out the "material respects" in which the two agreements supposedly

differ.  In fact, the agreement Gaiman's attorney sent to Larry Marder contained the same

"Contingencies Affecting Royalties" and "Spin-Off Elements" provisions about which

defendants now complain.  (See Response Facts 51, 52, above; Cook Aff., Ex. A.)  In addition,

Gaiman's 1997 D.C. contracts are irrelevant because Gaiman and McFarlane were

memorializing an agreement they made in 1992.  (See Response Fact No. 32.)

## CONCLUSIONS OF LAW

**Defendants' Proposed Conclusion No. 1:**

Summary judgment is only appropriate where the record indicates there are no disputes as to any material fact.  *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002).

**Plaintiffs' Response:**  No dispute.

**Defendants' Proposed Conclusion No. 2:**

A factual dispute is "genuine"—and summary judgment thus inappropriate—when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001).

**Plaintiffs' Response:**  No dispute.

**Defendants' Proposed Conclusion No. 3:**

The evidence adduced at this point, including the DC Comics contracts cited in the McFarlane Defendants' brief and proposed findings, establishes genuine disputes about material facts, precluding summary judgment on the McFarlane Defendants' fraud counterclaim and defense.

**Plaintiffs' Response:**  Disputed.  The D.C. Comics contracts cited by the McFarlane Defendants do not create any dispute regarding material facts.  It is undisputed that Gaiman provided McFarlane with copies of contracts containing the same "Contingencies Affecting Royalties" and "Spin-Off" provisions contained in the other D.C. contracts about which defendants now complain.  (See Response Facts Nos. 51-52, above.)  It is also undisputed that Gaiman agreed to a 7.5% royalty for the Medieval Spawn character – the lowest royalty amount in any of the other contracts cited by defendants.  (See Response Fact No. 32, above.)  McFarlane cannot claim that those contracts would have been material to his decision to enter into the contract with Gaiman and, therefore, summary judgment is appropriate.  See Mack v. Earle M. Jorgensen Co., 467 F.2d 1177, 1179 (7th Cir. 1972) (directed verdict affirmed where alleged statement was not a misrepresentation of material fact); Radford v. J.J.B. Enterprises, Ltd., 163 Wis. 2d 534, 472 N.W.2d 790, 794 (Ct. App. 1991) (representation is material if a reasonable person would consider it important).

**Defendants' Proposed Conclusion No. 4:**

The elements of fraud are (1) a false representation of fact, (2) made with the intent to defraud and for the purpose of inducing another to act upon it, (3) upon which another party reasonably relies to his detriment. *Kailin v. Armstrong*, 2002 WI App 70, ¶ 31, 643 N.W.2d 132, 145-46 (Ct. App. 2002).

**Plaintiffs' Response:**  No dispute.

003.371115.1

**Defendants' Proposed Conclusion No. 5:**

Failure to disclose a fact may be a misrepresentation for purposes of a fraud claim, if the person who failed to disclose it had a duty to do so. *Kailin*, 2002 WI App 70, ¶ 32, 643 N.W.2d at 146; *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 26, 288 N.W.2d 95, 100 (1980).

**Plaintiffs' Response:** No dispute.

**Defendants' Proposed Conclusion No. 6:**

Such a duty arises when a person knows that his disclosure of such facts is necessary to prevent his partial or ambiguous statement of the facts from being misleading. *Kailin*, 2002 WI App 70, ¶ 32, 643 N.W.2d at 146.

**Plaintiffs' Response:** No dispute.

**Defendants' Proposed Conclusion No. 7:**

Where, as here, genuine disputes as to the elements of a party's fraud claim or defense exist, summary judgment is inappropriate and must be denied.

**Plaintiffs' Response:** Disputed.  There are no genuine disputes of material fact

regarding the McFarlane Defendants' fraud claim.  <u>See</u> Plaintiffs' Reply Brief.

Dated this ___/___ day of August, 2002.

FOLEY & LARDNER
150 East Gilman Street
Madison, WI 53703-2808
Tel: (608) 257-5035
Fax: (608) 258-4258

By: _____
Allen A. Arntsen
Joan L. Eads
Jeffrey A. Simmons
*Attorneys for Plaintiffs*

Co-Counsel:
Kenneth F. Levin
20 North Wacker Drive, Suite 2200
Chicago, IL 60606
Tel: (312) 984-6000
Fax: (312) 977-2990

Of Counsel:
Mark Hellmann
Michael Rechtin
Foley & Lardner
1 IBM Plaza
220 N. Wabash Ste. 3300
Chicago, IL 60611
Tel: (312) 755-1900
Fax: (312) 755-1925