DOC NO

IN THE UNITED STATES DISTRICT COURT REC'D/FILED **91**
FOR THE WESTERN DISTRICT OF WISCONSIN 2002 AUG -1 PM 4: 23

J W SHUPHIEWITZ
CLERK US DIST COURT
WD OF WI

| | | |
|---|---|---|
| NEIL GAIMAN and MARVELS AND MIRACLES, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 02-C-0048-S |
| TODD McFARLANE, et al. | ) ) | |
| Defendants-Counterclaimants. | ) ) | |

---

### PLAINTIFFS' REPLY TO THE MCFARLANE DEFENDANTS' RESPONSE TO PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

Plaintiffs Neil Gaiman and Marvels and Miracles, LLC, reply to the McFarlane

Defendants' Response to Plaintiffs' Proposed Findings of Fact and Conclusions of Law as

follows:

### PLAINTIFFS' PROPOSED FINDINGS OF FACT

**Plaintiffs' Proposed Finding No. 1:**

Gaiman gained fame in the comic book industry by, among other things, authoring the popular *Sandman* comic book series. (July 24, 2002 Deposition of Neil Gaiman ("Gaiman Dep.") at 16; July 1, 2002 Affidavit of Jeffrey A. Simmons ("Simmons Aff.") at ¶ 2, Ex. A).

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 1.

> **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 2:**

The *Sandman* series was published by D.C. Comics. (Simmons Aff., ¶ 4, Ex. C at Ex. 47 at 3.)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 2.
>
> **Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 3:**

McFarlane gained fame writing the *Spiderman* comic book series for Marvel Comics. (July 19 and 20, 2002 Deposition of Todd McFarlane ("McFarlane Dep.") at 25.) (See Simmons Aff., ¶ 3, Ex. B.)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 3.
>
> **Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 4:**

McFarlane also worked for D.C. Comics at various times in his career and had a written contract with D.C. for some of his work. (McFarlane Dep. at 8, 16, 17-19, 23.)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 4.
>
> **Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 5:**

In 1991, McFarlane and six other comic book artists formed defendant Image Comics, Inc., in order to publish their own works. (Id. at 28-29.)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 5.
>
> **Reply:**  No dispute.

2

**Plaintiffs' Proposed Finding No. 6:**

Shortly thereafter, McFarlane also formed defendant Todd McFarlane Productions, Inc. and began publishing the *Spawn* series of comic books. (Id. at 8, 30-31.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 6.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 7:**

In 1992, McFarlane decided to recruit prominent comic book authors to write issues of *Spawn* in order to boost the comic's reputation. (McFarlane Dep. at 35-36.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit that McFarlane recruited four prominent comic book authors to write issues of *Spawn*. The McFarlane Defendants deny that this was done "in order to boost the comic's reputation." Mr. McFarlane's testimony does not contain any such statement. (June 19-20, 2002 Deposition of Todd McFarlane ("McFarlane Dep.") at 35-36 (*see* July 1, 2002 Affidavit of Jeffrey A. Simmons ("Simmons Aff."), Ex. B.)

**Reply:** No dispute of material fact. No other inference can be drawn from McFarlane's testimony. McFarlane testified that he recruited the four guest writers for *Spawn* because "Image Comics was founded by a bunch of artists and the knock against us was that, you know, we didn't know how to write." (McFarlane Dep. at 35.) Regardless, any dispute on this issue is not material to defendants' fraud counterclaim and affirmative defense.

**Plaintiffs' Proposed Finding No. 8:**

Gaiman was one of those authors. (Id.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 8.

**Reply:** No dispute.

3

**Plaintiffs' Proposed Finding No. 9:**

Although McFarlane and Gaiman at first did not talk about the specifics of Gaiman's compensation, McFarlane eventually agreed to provide Gaiman with contract terms and compensation equivalent to Gaiman's existing contract with D.C. Comics. (Id. at 37, 47, 67, 68.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that McFarlane and Gaiman did not talk about the specifics of Gaiman's compensation but deny that McFarlane eventually agreed to provide Gaiman with any specific contract terms. Gaiman and McFarlane never discussed any specific contract terms until 1996. (June 24, 2002 Deposition of Neil Gaiman ("Gaiman Dep.") at 58, 79, 81-82; July 22, 2002 Affidavit of Gabriel S. Gross ("Gross Aff."), Ex. A.)

> **Reply:** No dispute of material fact. Plaintiffs did not propose that McFarlane agreed to provide "specific" contract terms. Plaintiffs merely proposed that McFarlane agreed to provide contract terms "equivalent to" Gaiman's existing D.C. Comics contract. That proposed fact is fully supported by the cited deposition testimony. (See, e.g., McFarlane Dep. at 67 ("I had told him I'd match the contract." See also Defs.' Response to Finding No. 20.) Regardless, any dispute on this issue is not material to defendants' fraud claim and affirmative defense.

**Plaintiffs' Proposed Finding No. 10:**

Gaiman contends that McFarlane promised that he would provide terms better than those provided in Gaiman's D.C. contract. (Gaiman Dep. at 30.) That dispute, however, is irrelevant to the present motion.

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 10.

> **Reply:** No dispute.

4

**Plaintiffs' Proposed Finding No: 11:**

Gaiman accepted McFarlane's offer and wrote the script for issue 9 of *Spawn* (hereafter "*Spawn* 9"). (McFarlane Dep. at 47; Gaiman Dep. at 40.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that Gaiman wrote the script for *Spawn* Issue 9, but only after extensive consultation with McFarlane as to plot, themes and characters. (McFarlane Dep. at 41-46; Gross Aff., Ex. B; Simmons Aff., Ex. B)

> **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 12:**

Gaiman's script for Spawn 9 included three characters that had never appeared in a prior issue of Spawn: Angela, Cogliostro, and Medieval Spawn. (McFarlane Dep. at 42-47.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that *Spawn* Issue 9, which incorporated Gaiman's script, contained three characters that had not appeared in earlier issues of the *Spawn* comic series. The McFarlane Defendants deny that either Gaiman's script or the completed comic book contained a character named "Medieval Spawn." (Gross Aff., Ex. C at Dep. Ex. 12; *see also* Combined Appendix, Ex. B (*Spawn* Issue 9))

> **Reply:** No genuine dispute. Plaintiffs do not dispute that Gaiman's script did not identify the character as "Medieval Spawn." However, there is no genuine dispute that the character Gaiman created later came to be known as Medieval Spawn. (See Reply to No. 13, below.)

**Plaintiffs' Proposed Finding No. 13:**

The parties agree that the name Medieval Spawn applies to the unnamed character in *Spawn* 9. (McFarlane Dep. at 43-44.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 13. The deposition testimony cited by Plaintiffs in support of this proposed finding states only that Gaiman's counsel and Mr. McFarlane agreed to use the name "Medieval Spawn" for purposes of the deposition questioning. Gaiman's counsel specifically acknowledges that "there are some issues, et cetera, et cetera" regarding the use of this name. (McFarlane Dep. at 43-44; Simmons Aff., Ex. B) Gaiman testified that he killed the unnamed Spawn character from the Middle Ages at the

end of its eight-page appearance in *Spawn* issue 9, and he never used him again. (Gaiman Dep. at 77; Gross Aff., ¶ 2, Ex. A)  The name "Medieval Spawn" was given to a later version of the character by McFarlane, who used the Medieval Spawn character in later issues of *Spawn* and made an action figure based on that version of the character. (Gaiman Dep. at 59; Gross Aff., Ex. A; McFarlane Dep. at 77; Simmons Aff., Ex. B)

      **Reply:**  No genuine dispute.  Defendants are attempting to create an issue of fact where none exists.  There is no support in the record for defendant's assertion that the name "Medieval Spawn" applied to "a later version" of the character appearing in *Spawn* 9.  The deposition testimony cited by defendants does not support their contention.  While the character was unnamed in *Spawn* 9, that character and the Medieval Spawn character appearing in later issues of *Spawn* are unquestionably one and the same.  In fact, defendants specifically alleged in their Counterclaim: "After publication of *Spawn* 9, Mr. McFarlane coined the name Medieval Spawn for the unnamed Spawn character that had appeared in that issue." (Counterclaim ¶ 30.) Consistent with that allegation, McFarlane testified: "Q. Was Medieval Spawn in any subsequent Spawn issues after Issue 9?  A. Yes, I believe so. . . .  Q.  Who came up with the Medieval Spawn name.  A.  I did."  (McFarlane Dep. at 77.)

**Plaintiffs' Proposed Finding No. 14:**

      In the vernacular of the *Spawn* comics, Medieval Spawn is a "Hellspawn" character who was a knight during the Middle Ages. (See Appendix to April 29, 2002 Amended Answer, Ex. B.)  Docket No. 31.

      **McFarlane Defendants' Response:** The McFarlane Defendants admit that the unnamed Spawn character in *Spawn* Issue 9 is known as a "Hellspawn." The McFarlane Defendants deny that this character was called "Medieval Spawn." (Gross Aff., Ex. C at Dep. Ex. 12; Combined Appendix, Ex. B)

      **Reply:** No genuine dispute.  (See Reply No. 13, above.)

**Plaintiffs' Proposed Finding No. 15:**

      Medieval Spawn is based upon, but distinct from, the "Spawn" character that serves as the lead in McFarlane's comics. (Gaiman Dep. at 75-76, 78.)

6

**McFarlane Defendants' Response:** The McFarlane Defendants admit that the unnamed Spawn character from the Middle Ages who appears in *Spawn* Issue 9 is a different version of the Spawn character who is the main character in the *Spawn* series. The McFarlane Defendants deny that the unnamed Spawn character who appears in Issue 9 was called "Medieval Spawn." (*Id.*)

     **Reply:** No genuine dispute. (See Reply No. 13, above.)

**Plaintiffs' Proposed Finding No. 16:**

Angela and Cogliostro, by contrast, were entirely original and not based upon pre-existing characters. (Id. at 78.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit that the Angela character was entirely original, but deny that Cogliostro was entirely original. Gaiman testified that the Cogliostro character was based upon a pre-existing historical and literary character from the French Revolution. (Gaiman Dep. at 63-64; Gross Aff., Ex. A)

     **Reply:** No genuine dispute. In the portion of the deposition cited by defendants,

Gaiman testifies that he named the Cogliostro character after a pre-existing historical figure, not

that the character himself was based on a pre-existing figure or character. (See Gaiman Dep. at

63-64.)

**Plaintiffs' Proposed Finding No. 17:**

The new characters proved popular and, shortly after publication, McFarlane's companies began selling action figure toys of Angela and Medieval Spawn. (McFarlane Dep. at 60, 77; Gaiman Dep. at 83-85.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 17.

     **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 18:**

Gaiman was the only guest author hired by McFarlane who created characters that were later sold as action figures. (McFarlane Dep. at 54.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit that of the new characters introduced to the *Spawn* series in Issues 8, 9, 10 and 11 — each written by a

7

different guest author — only the characters who appeared in Issue 9 were made into action figures. The McFarlane Defendants deny that any of the characters in Issue 9 were created solely by Gaiman. All of the characters in Issue 9 were jointly created by Gaiman and McFarlane. (McFarlane Dep. at 41-46; Gross Aff., Ex. B; Simmons Aff., Ex. B)

> **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 19:**

McFarlane was pleased with Gaiman's work on *Spawn* 9 and, shortly after its publication, began discussing the possibility of having Gaiman author a comic book mini-series featuring the Angela character. (McFarlane Dep. at 56-57.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 19.

> **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 20:**

As with *Spawn* 9, McFarlane agreed that the terms and compensation for Gaiman's work on the *Angela* miniseries would be equivalent to the terms and compensation Gaiman received under his contract with D.C. Comics. (Id. at 57-58; Gaiman Dep. at 30, 82.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that McFarlane and Gaiman agreed that Gaiman would be compensated for his work on the *Angela* mini-series in the same manner as he had been compensated for his work on *Spawn* issue 9. This meant that McFarlane agreed to honor Gaiman's request that he be compensated in a manner equivalent to his compensation under his DC Comics contract. At no time, however, either when discussing *Spawn* issue 9 or the *Angela* mini-series, did Gaiman ever identify any specific terms of his DC Comics contract. (Gaiman Dep. at 58, 79, 81-82; Gross Aff., Ex. A)

> **Reply:** No genuine dispute. Defendants' response is ambiguous as to the time

frame to which it refers. Plaintiffs do not dispute that Gaiman and McFarlane did not discuss

specific contract terms at the time during and prior to publication of *Spawn* 9 and the *Angela*

series. However, it is also undisputed that in 1996 Gaiman sent McFarlane's representative,

Larry Marder, portions of two of Gaiman's D.C. Comics contracts and that Marder prepared a

memo summarizing the specific terms of those contracts for McFarlane. (See Reply Facts Nos.

39, 42, below.)  It is also undisputed that in April 1997, Gaiman's attorney sent Larry Marder, a copies of drafts of Gaiman's D.C. Comics contracts setting forth the specific terms of those contracts.  (See Reply Facts Nos. 53, 54.)

**Plaintiffs' Proposed Finding No. 21:**

Gaiman then wrote the scripts for a three issue Angela mini-series (hereafter "the *Angela* series").  (McFarlane Dep. at 154-55.)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 21.

> **Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 22:**

In addition, Gaiman wrote a portion of the script for issue 26 of *Spawn* (hereafter "*Spawn* 26"), which served as a segue to the *Angela* mini-series.  (Id. at 89-91.)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 22.

> **Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 23:**

Gaiman and McFarlane did not memorialize their initial oral agreements in a written agreement during the time Gaiman was writing the scripts for *Spawn* 9, *Spawn* 26, and the *Angela* series.  (04-19-02 Amended Complaint ¶ 30.)  Docket No. 28.

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 23.

> **Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 24:**

Instead, the parties tended to address compensation issues as they arose.  For example, Gaiman requested that he receive a royalty if any of the issues he authored were ever reprinted or published in a trade paperback (McFarlane Dep. at 47), and also requested royalties for the sale of actions figure toys of his Angela, Medieval Spawn and Cogliostro characters.  (McFarlane Dep. at 96-97.)

9

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 24.

**Reply:** No dispute.

## Plaintiffs' Proposed Finding No. 25:

A collection of several comic issues published in book form. (Gaiman Dep. at 17.)

**McFarlane Defendants' Response:** Plaintiffs' Proposed Finding of Fact No. 25 is an incomplete sentence that cannot be either admitted or denied.

**Reply:** No dispute of material fact. Proposed Finding of Fact No. 25 was intended to read: "A trade paperback is a collection of several comic issues published in book form." (See Pls.' Br. at 4 n.5.) Regardless, this proposed fact is not material to defendants' fraud claim and affirmative defense.

## Plaintiffs' Proposed Finding No. 26:

Those requests were consistent with the terms of Gaiman's contract with D.C. comics. (See generally, Simmons Aff., ¶ 4, Ex. C at Ex. 47.)

**McFarlane Defendants' Response:** Plaintiffs' Proposed Finding of Fact No. 26 is a vague and ambiguous statement that is unsupported by the record cites included therein. The McFarlane Defendants deny the general statement that Gaiman's "requests were consistent with the terms of Gaiman's contract with DC Comics" because Gaiman had many different contracts with DC Comics with many different royalty amounts and conditions affecting these royalty amounts. (Gross Aff., Ex. D)

**Reply:** No genuine dispute. Whether or not Gaiman had other contracts with D.C. Comics is irrelevant. (See Plaintiffs' Reply Br. at 8-11.) Gaiman's requests for royalties on reprints and sales of action figures (see Reply Fact No. 24) were consistent with the D.C. contract Gaiman's attorney provided to McFarlane's representative, Larry Marder, a copy of which is attached as Ex. A to the Affidavit of Melanie Cook and as Dep. 47 to Ex. C of the Simmons Affidavit cited in Plaintiffs' Proposed Finding. That contract expressly provides

10

003.371112.1

Gaiman with royalties for "Retail Products" and "Licensed Reprint Editions." (See Cook Aff. Ex. A at 4; Simmons Aff., Ex. 47 at 4.)

**Plaintiffs' Proposed Finding No. 27:**

Consistent with their oral agreement, McFarlane did make a payment to Gaiman for sale of the Medieval Spawn action figures. (Gaiman Dep. at 83-84.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that McFarlane sent a payment to Gaiman in connection with the Medieval Spawn action figure. The McFarlane Defendants deny that this payment was consistent with McFarlane's and Gaiman's oral agreement because the oral agreement did not contain any terms regarding such payments. (Gaiman Dep. at 58, 79, 81-82; Gross Aff., Ex. A)

**Reply:** No genuine dispute. Because Gaiman's D.C. Comics contract provides him with a royalty for sales of action figures ("Retail Products") (see Reply Facts No. 26, above), McFarlane's payment of royalties for the Medieval Spawn action figure was generally consistent with Gaiman and McFarlane's oral agreement that McFarlane would provide Gaiman with terms equivalent to those of his D.C. contract. (See Reply Facts Nos. 9, 20.)

**Plaintiffs' Proposed Finding No. 28:**

That payment, however, was not accompanied by any accounting showing how the amount had been calculated. (Id. at 84.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 28.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 29:**

In 1996, Gaiman became concerned that he was not receiving the full amount of royalties he was entitled to under his agreement with McFarlane. (Gaiman Dep. at 57-58.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that Gaiman testified that *he believed* he was entitled to royalties under his 1992 oral agreement with McFarlane, but deny that Gaiman was in fact entitled to any royalties under this agreement because until 1996, Gaiman had never provided McFarlane with any specific

11

terms or any copies of any of his DC Comics contracts. (Gaiman Dep. at 58, 79, 81-82; Gross Aff., Ex. A)

**Reply:** No dispute of material fact. Because defendants' counterclaim and affirmative defense of fraud apply only to Gaiman's alleged representations in 1997, defendants' response regarding the non-existence of an agreement prior to 1996 is immaterial to plaintiffs' motion.

**Plaintiffs' Proposed Finding No. 30:**

Gaiman was also concerned that McFarlane's corporations might be purchased by another company that would not honor (or find evidence of) the oral agreement between he and McFarlane. (Id. at 88.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 30.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 31:**

Sometime in the spring of 1996, Gaiman flew to Phoenix and met with McFarlane and the executive director of defendant Image Comics, Larry Marder, to discuss Gaiman's concerns. (Simmons Aff., ¶ 5, Ex. D ("Marder Dep.") at 53, 67.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 31.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 32:**

But the parties were unable to resolve their differences at that meeting. (McFarlane Dep. at 161; Gaiman Dep. at 92.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 32.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 33:**

Gaiman then began phoning McFarlane regularly with questions about his royalty payments and seeking to obtain a written contract. (McFarlane Dep. at 103.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 33.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 34:**

In response, McFarlane asked Marder to serve as a mediator to help resolve all outstanding issues between McFarlane and Gaiman. (McFarlane Dep. at 103-04, 106-07; Marder Dep. at 51, 53.)

**McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 34 because it is unsupported by and inconsistent with the deposition testimony cited by Plaintiffs. Larry Marder testified that he did not recall whether McFarlane or Gaiman asked him to mediate their dispute (Marder Dep. at 55; Simmons Aff., Ex. D) and McFarlane testified that it was "possibly" him, but that he did not know. (McFarlane Dep. at 103-04; Simmons Aff., Ex. B)

**Reply:** No genuine dispute. Defendants are attempting to create a dispute of fact where none exists. McFarlane's deposition testimony is consistent with the proposed finding. McFarlane's deposition testimony is as follows: "Q. How did it -- who got Larry involved, you or Neil? A. I don't know. I probably – I'd probably say I may have suggested it possibly, yes." (McFarlane Dep. at 104.) Regardless, the undisputed facts show that Marder was acting as McFarlane's representative for purposes of the negotiations between Gaiman and McFarlane. (See Reply Facts Nos. 35-37, below.)

**Plaintiffs' Proposed Finding No. 35:**

At that time, McFarlane was the president of Image and one of the company's six shareholders. (Marder Dep. at 20-21, 76-77; McFarlane Dep. at 12.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 35.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 36:**

As Image's executive director, Marder was McFarlane's subordinate (Marder Dep. at 27.)

**McFarlane Defendants' Response:**  The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 36 because it is unsupported by and inconsistent with the deposition testimony cited by Plaintiffs.  Larry Marder testified only that as Executive Director of Image Comics he reported to "the shareholders."  (Marder Dep. 27; Simmons Aff., Ex. D)  McFarlane was one of several shareholders.

**Reply:**  No genuine dispute.  Plaintiffs do not see how Marder's testimony that he reported to the shareholders, of whom McFarlane was one of six, contradicts plaintiffs' proposed finding.  In addition, defendants do not dispute that McFarlane was president of Image Comics during this time (see Reply ¶ 35, above), further confirming that Marder was McFarlane's subordinate.

**Plaintiffs' Proposed Finding No. 37:**

Marder's goal was to understand the terms of Gaiman's contract with D.C. Comics so that McFarlane could match those terms.  (Marder Dep. at 55.)

**McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 37.

**Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 38:**

In particular, Marder understood that the parties wanted to resolve issues relating the royalties Gaiman would receive on future uses of the Angela, Cogliostro and Medieval Spawn characters.  (Id.. at 55; McFarlane Dep. at 106-08.)

**McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 38.

**Reply:**  No dispute.

14

**Plaintiffs' Proposed Finding No. 39:**

On November 6 or 7, 1996, Gaiman sent Marder a fax attaching portions of two of Gaiman's contracts with D.C. Comics and a cover page summarizing the contract terms that were most important to him. (Marder Dep. at 82; Gaiman Dep. at 97; Simmons Aff., Ex. 25.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 39, because the document referred to (Simmons Aff., Ex. 25) did not contain actual contracts; rather, it comprised an alleged "breakdown" of all of Gaiman's DC contracts.

> **Reply:** No genuine dispute. Defendants are attempting to create a dispute of fact

where none exists. Gaiman did provide Marder with "actual contracts." Marder testified as

follows: Q. . . . Do you recall pages of DC contracts being attached to [Ex. 25] when you

received it? A. I believe so, yes." (Marder Dep. at 82.)

**Plaintiffs' Proposed Finding No. 40:**

Gaiman's summary indicated, among other things, that D.C. provided him with a royalty of 15% of the net receipts of any "movies/audio/stage, etc." incorporating characters he created. (Simmons Aff., ¶ 4, Ex. C at Ex. 25.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 40.

> **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 41:**

Although the parties have been unable to locate copies of the contracts Gaiman attached to his fax, Marder does not dispute that he received those contracts from Gaiman. (Marder Dep. at 82.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that Larry Marder testified only that he remembers receiving "pages of DC contracts." The McFarlane Defendants deny that Marder testified that he received any specific DC Comics contracts. (Marder Dep. at 82; Simmons Aff., Ex. D)

15

**Reply:** No genuine dispute. Defendants are attempting to create a dispute of fact where none exists. The portion of Marder's deposition testimony cited by plaintiffs fully supports the proposed finding.

**Plaintiffs' Proposed Finding No. 42:**

Marder then prepared a memo summarizing the terms of Gaiman's D.C. contracts and forwarded that memo to McFarlane. (Marder Dep. at 85, 87, 96; Simmons Aff., ¶ 4, Ex. C at Ex. 27.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 42.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 43:**

Consistent with Gaiman's description of his D.C. contracts, Marder's summary states, among other things, that Gaiman's D.C. contracts provide Gaiman 15% of the net receipts on "movies/audio/stage." (Simmons Aff., ¶ 4, Ex. C at Ex. 27 at 3.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 43.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 44:**

In December 1996, McFarlane dictated a counteroffer to Marder. (Marder Dep. at 96-97.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 44.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 45:**

McFarlane's counteroffer differed from Gaiman and Marder's summaries of Gaiman's D.C. contracts in that the counteroffer assigned different royalty percentages for each of the Angela, Cogliostro and Medieval Spawn characters. (See Simmons Aff., ¶ 4, Ex. C at Ex. 30.)

16

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 45.

      **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 46:**

      In addition, for all of the characters, the percentages McFarlane proposed with regard to "movies/audio/stage" royalties were significantly less than the 15% Gaiman received from D.C. (Compare Ex. 30 (Simmons Aff., ¶ 4, Ex. C) with Exs. 25 and 27.)

      **McFarlane Defendants' Response:** The McFarlane Defendants admit that the percentages McFarlane proposed were less than the percentages that Gaiman represented he received from DC Comics, but deny that McFarlane's proposed percentages were lower than what Gaiman actually received from DC Comics. Gaiman had some DC Comics contracts with royalty percentages less than 15%, and all of his DC Comics contracts contained a section entitled "Contingencies Affecting Royalties" that could significantly reduce the royalty percentage depending on how a particular character was used. (Gross Aff., Ex. D)

      **Reply:** No genuine dispute. There is no dispute that Gaiman received a 15%

royalty from D.C. Comics under the contracts he provided to Marder. (See Simmons Aff., Ex.

27 at 3. See also Cook Aff., Ex. A at § 1(d) "Media Rights".)

**Plaintiffs' Proposed Finding No. 47:**

      For "movies/audio/stage," McFarlane proposed a 10% royalty for Angela and a 1% royalty for Cogliostro and Medieval Spawn. (Compare Ex. 30 with Exs. 25 and 27.)

      **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 47.

      **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 48:**

      Various other percentages McFarlane proposed were less favorable as well. (Compare generally Ex. 30 with Ex. 27 at 3.)

      **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 48 because it is vague and ambiguous and contains an

17

improper record cite in that it invites the Court to generally compare two exhibits without citing any specific support in either exhibit for the proposed finding.

   **Reply:** No genuine dispute.  A comparison of Ex. 30 with Ex. 27 fully supports plaintiffs' proposed finding.  For example, McFarlane proposed a 2% royalty for trading cards and a 2% for retail products (see Ex. 30 at G00194), far less than the 25% and 15% royalties Gaiman received for those items under his D.C. contract as summarized by Marder.  (See Ex. 27 at TM 569.)


**Plaintiffs' Proposed Finding No. 49:**

   Gaiman did not accept McFarlane's offer.  (Marder Dep. at 62-63.)

   **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 49.

   **Reply:** No dispute.


**Plaintiffs' Proposed Finding No. 50:**

   In February 1997, McFarlane had Marder send Gaiman a revised offer.  (Marder Dep. at 100-01.)

   **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 50.

   **Reply:** No dispute.


**Plaintiffs' Proposed Finding No. 51:**

   McFarlane's revised offer increased some of the royalty percentages Gaiman would receive, but they still did not match the royalties he received under his D.C. contracts.  (Compare Simmons Aff., (¶ 4, Ex. C) Ex. 32 with Exs. 25 and 27.)

   **McFarlane Defendants' Response:**  The McFarlane Defendants admit that McFarlane's revised offer increased some of the royalty percentages Gaiman would receive, but deny that these royalties did not match the royalties he received under his DC contracts.  Gaiman's DC contracts contained a variety of royalty percentages as well as specific contingencies that reduced royalty percentages by varying amounts.  The application and effect of these contingencies upon royalty percentages was left to the sole discretion of

18

DC Comics as publisher. Accordingly, McFarlane's discretionary reduction of the royalty percentages in his revised offer was consistent with—or even better than—the terms of Gaiman's D.C. contracts. (Gross Aff., Ex. D, at G04024, G04103, G04121, G04126-27, G04131-32, G04138-39)

**Reply:** No genuine dispute. The royalties McFarlane proposed in his revised offer (Ex. 32) were less favorable than those described by Marder in the summary of Gaiman's D.C. contracts Marder prepared for McFarlane. (Ex. 27.) For example, McFarlane's revised offer continued to offer only a 2% royalty for trading cards (Ex. 32 at G 00198 and G 00199), as opposed to 25% under the D.C. contract (Ex. 27 at TM 00569), and only offered 5% and 1% for "movies/audio/stage" (Ex. 32 at G 00197, 198, 199), as opposed to the 15% royalty Gaiman received from D.C. (Ex. 27 at TM 00569). Gaiman's other contracts with D.C. comics are irrelevant to defendants' fraud counterclaim and affirmative defense. (See Pls.' Reply Br. at 8-12.) Gaiman's attorney sent Marder a draft of Gaiman's D.C. contract that included the various "contingencies" referenced by defendants. (See id. at 9; Pls.' Response Facts Nos. 51-52.) As for other royalty percentages contained in those contracts, the royalties Gaiman received under his agreement with McFarlane were the same as the lowest royalty present in Gaiman's other D.C. contracts and, therefore, are not material for purposes of defendants' fraud counterclaim and affirmative defense. (See Pls.' Resp. Br. at 10-11; Pls.' Response Facts Nos. 32, 34.)

## Plaintiffs' Proposed Finding No. 52:

Again, Gaiman did not accept McFarlane's revised offer. (Marder Dep. at 62-63.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 52.

**Reply:** No dispute.

19

**Plaintiffs' Proposed Finding No. 53:**

Frustrated with McFarlane's refusal to follow-through on his promise to match the terms of Gaiman's D.C. contracts, on April 2, 1997, Gaiman had his attorney send Larry Marder a letter demanding that Gaiman receive the payments he was entitled to under terms equivalent to those of his D.C. contracts. (July 1, 2002 Affidavit of Melanie Cook ("Cook Aff.") ¶ 2, Ex. A; Marder Dep. at 63-64.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that Gaiman's attorney sent Larry Marder a letter demanding that Gaiman receive the payments he was entitled to under terms equivalent to those of his DC contracts. The McFarlane Defendants deny that McFarlane refused to follow through on his promise to match the terms of Gaiman's contracts, because the royalty percentages in McFarlane's revised offer was consistent with—or even better than—the terms of Gaiman's D.C. contracts. (*Id.*)

> **Reply:** No genuine dispute. Defendants are attempting to create an issue of fact

where none exists. (See Reply Fact No. 51, above.)

**Plaintiffs' Proposed Finding No. 54:**

Gaiman's attorney attached copies of drafts of Gaiman's D.C. contracts to the letter for Marder's review. (See Cook Aff., Ex. A.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that Gaiman's attorney attached drafts of two of Gaiman's contracts with DC Comics from 1993. The McFarlane Defendants qualify this admission by further stating that the 15% royalty rate contained in these draft contracts was materially different from the 10% royalty rate contained in two of Gaiman's DC Comics fully-executed contracts dated January 3, 1997, just a few months before Gaiman's attorney's letter. (*Id.* at G04124-33)

> **Reply:** No genuine dispute. Defendants do not dispute that Gaiman's attorney

provided Larry Marder with drafts of two of Gaiman's D.C. Comics. As for the 10% royalty

contained in Gaiman's 1997 D.C. contracts, that royalty was greater than the 7.5% royalty for

Medieval Spawn that Gaiman and McFarlane ultimately agreed to and, therefore, the existence

of the 10% royalty is irrelevant to McFarlane's fraud counterclaim and affirmative defense. (See

Pls.' Response Facts Nos. 32, 34.)

**Plaintiffs' Proposed Finding No. 55:**

In those draft contracts, D.C. Comics offered, among other things, to pay Gaiman a 15% royalty for motion pictures, audio or visual recordings, and stage productions, incorporating any characters he created. (See id. at 5, "Media Rights" provision.)

> **McFarlane Defendants' Response:** The McFarlane Defendants' deny the general statement that the "draft contracts" attached to Gaiman's attorney's letter offered to pay Gaiman a 15% royalty for motion pictures, audio or visual recordings and stage productions incorporating "any characters" he created. The McFarlane Defendants state that only one of the two draft contracts attached to Gaiman's attorney's letter included any royalty percentage for motion pictures, audio visual recordings, and stage productions. Further, that draft contract did not offer to pay Gaiman a 15% royalty for such uses incorporating "any characters" he created, but instead specifically identified characters for which Gaiman would receive such a royalty. Finally, that draft contract included a section entitled "Contingencies Affecting Royalties" which provided several factors that would reduce the royalty for motion pictures, audio or visual records and stage productions downward from 15%, at DC Comics' sole discretion. (See Affidavit of Melanie Cook, Ex. A, attached to Plaintiffs' Proposed Finding of Fact No. 55)

**Reply:** No genuine dispute. Both contracts are for Gaiman's work on the Sandman comic book series. (See Ex. 47 at 3 ("regarding your services on SANDMAN") and 7 (upper right corner: "SANDMAN #50-73").) One contract addresses the royalties Gaiman receives for use of his characters (Ex. 47 at 3 ("Re: Character Equity)) and the other addresses Gaiman's compensation for his services as a writer (Ex. 47 at 7.) Defendants are correct in stating that the Character Equity Agreement identifies the specific characters for which Gaiman receives a royalty. However, that fact is irrelevant because that Agreement specifically provides Gaiman with royalties for Gaiman's "revis[ion of] the pre-existing characters of DREAM (SANDMAN) and DESTINY" (Ex. 47 at 3, first full paragraph (emphasis added)), thus contradicting McFarlane's assertion that Gaiman misrepresented the facts when he suggested that D.C. would provide him with a royalty for revising the preexisting Spawn character to create the new Medieval Spawn character. As for the fact that the draft contract contains a "Contingencies Affecting Royalties" provision, that fact is also irrelevant because, as shown in the cover letter accompanying Ex. 47, those contracts were sent directly to McFarlane's

21

representative, Larry Marder, thus laying to rest McFarlane's contention that Gaiman somehow withheld this information from him.

**Plaintiffs' Proposed Finding No. 56:**

In the draft contracts, those royalties applied to "pre-existing characters" that had been revised by Gaiman. (See id. at 3, introductory paragraph to D.C. offer.)

> **McFarlane Defendants' Response:** The McFarlane Defendants' deny the general statement that royalties apply to "pre-existing characters" that had been revised by Gaiman. The McFarlane Defendants state that the one draft contract which provided royalties for motion pictures, audio or visual recordings, and stage productions, stated that such royalties would be applied only to two specifically identified pre-existing characters. (Id.)

> **Reply:** No genuine dispute. Defendants' response does not contradict plaintiffs'

assertion that Gaiman's D.C. contract provided him with royalties for "pre-existing characters"

revised by Gaiman. (See also Reply Fact No. 55, above.)

**Plaintiffs' Proposed Finding No. 57:**

After Gaiman's attorney sent that letter, Gaiman and McFarlane began dealing directly with each other. (See Marder Dep. at 64-65; McFarlane Dep. at 182-84.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 57.

> **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 58:**

In late April or early May 1997, Gaiman and McFarlane met in Oakland, California to attempt to resolve their differences. (Id. at 183.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 58.

> **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 59:**

After that meeting, on May 5, 1997 Gaiman sent McFarlane another fax summarizing the terms of his contracts with D.C. Comics. (Id. at 184-85; Simmons Aff., ¶ 4, Ex. C at Ex. 2.)

> **McFarlane Defendants' Response:** The McFarlane Defendants' deny that Gaiman's May 5, 1997 letter to McFarlane accurately summarized the terms of his contracts with DC Comics. Among other things, Gaiman's May 5, 1997 letter to McFarlane did not disclose the existence of the section entitled "Contingencies Affecting Royalties," nor did it disclose Gaiman's predicate contractual requirement that he complete 12 issues of a comic book series before he would be entitled to any royalties for merchandise licensing or media use of characters. Finally, it did not disclose that the alleged 15% royalty rate was actually downwardly adjustable and it did not disclose that he had recently signed two DC Comics contracts in which the royalty rate was 10%. (Simmons Aff., Ex. C at Dep. Ex. 2)

> **Reply:** No material or genuine dispute. Defendants are attempting to create the

appearance of a dispute of fact where none exists. Gaiman had sent copies of his contract to

McFarlane's representative, Larry Marder, on two prior occasions. It is undisputed that on at

least the second occasion, the contracts sent to Marder included the "Contingencies Affecting

Royalties" provision about which the McFarlane Defendants now complain. (See Reply Fact

No. 51, above; Response Facts Nos. 32, 34.) As for the varying royalty percentages contained in

Gaiman's other D.C. contracts, the lowest percentage cited by defendants in their brief, 7.5%, is

the same as the 7.5% royalty that Gaiman and McFarlane ultimately agreed to for the Medieval

Spawn character about which they now complain. Thus, the existence of those lower

percentages could not be a material fact for purposes of defendants fraud counterclaim and

affirmative defense. (See Pls.' Br. at 11-11; Pls.' Response Facts Nos. 32, 34.)

**Plaintiffs' Proposed Finding No. 60:**

Gaiman's fax again stated that his D.C. contracts provided him with a 15% royalty for motion pictures, audio-visual recording, stage plays and other similar uses. (See Simmons Aff., ¶ 4, Ex. C at Ex. 2.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 60.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 61:**

On July 15, 1997, Gaiman and McFarlane had a phone conversation in which McFarlane agreed to the royalty amounts set forth in Gaiman's May 5 fax. (McFarlane Dep. at 188-89; Simmons Aff., ¶ 4, Ex. C at Ex. 19.)

**McFarlane Defendants' Response:** The McFarlane Defendants deny that McFarlane agreed to the royalty amounts set forth in Gaiman's May 5, 1997 fax. Specifically, the McFarlane deposition pages cited by Plaintiffs do not contain testimony indicating that McFarlane had agreed to the royalty amounts; rather this deposition testimony only refer to Exhibit 19, which is a July 15, 1997 letter from Gaiman in which <u>Gaiman</u> refers to the phone conversation. When asked about Exhibit 19, McFarlane testified only that "I think we were heading in a good direction." (McFarlane Dep. at 188-89; Simmons Aff., Ex. B and Ex. C at Dep. Ex. 19)

**Reply:** No genuine dispute. McFarlane confirmed the accuracy of the content of

Gaiman's July 15, 1997 letter (which incorporated by reference his May 5, 1997 fax) when he

sent a fax in response that same day stating, "Having read your rather prompt response to my

offer today (re: Angela Cog[liostro], Medieval Spawn, [and] Miracleman) all I can say to the

points is <u>BEAUTY</u>!" (See Reply Fact No. 65, below.) Thus, there is no dispute of fact.

**Plaintiffs' Proposed Finding No. 62:**

In addition, they agreed that Gaiman would exchange his rights in the Cogliostro and Medieval Spawn characters for McFarlane's rights in an unrelated character named "Miracleman." (See <u>id.</u>)

**McFarlane Defendants' Response:** The McFarlane defendants deny that Gaiman agreed to exchange his rights in the Cogliostro and Medieval Spawn characters for McFarlane's rights in an unrelated character named Miracleman for the same reasons set

24

forth in their response to Plaintiff's Proposed Finding of Fact No. 61. Exhibit 19 is just Gaiman's proposal, and McFarlane's deposition testimony states only that he and Gaiman "were heading in a good direction." (McFarlane Dep. at 188-89; Simmons Aff., Ex. B and Ex. C at Dep. Ex. 19)

> **Reply:** No genuine dispute. The undisputed facts show that Gaiman and McFarlane did reach an agreement on July 15, 2002 or, at the latest, in August 1997 when McFarlane began sending Gaiman royalties and Miracleman materials as he had promised in their July 15, 1997 exchange of correspondence. (See Pls.'s Reply Br. at 3-5; Reply Facts Nos. 61, 65, 66, 79, 81, 83, 84, 91 below.)

**Plaintiffs' Proposed Finding No. 63:**

Gaiman and McFarlane agreed that their exchange of characters and accounting of royalty payments would take place on August 1, 1997. (See id.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny that Gaiman and McFarlane reached any agreement in a telephone conversation on July 15, 1997 regarding the exchange of characters, accounting of royalty payments, or the date of exchange. (McFarlane Dep. at 188-89; Simmons Aff., Ex. B and Ex. C at Dep. Ex. 19)

> **Reply:** No genuine dispute. (See Reply Fact No. 62, above.)

**Plaintiffs' Proposed Finding No. 64:**

That same day, Gaiman sent McFarlane a fax memorializing their conversation. (Simmons Aff., ¶ 4, Ex. C at Ex. 19; Gaiman Dep. at 173.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny that Gaiman's fax accurately memorialized their telephone conversation of July 15, 1997, because contrary to Gaiman's assertions in the fax, McFarlane had not agreed to any specific terms in that telephone conversation. (McFarlane Dep. at 188-89; Simmons Aff., Ex. B and Ex. C at Dep. Ex. 19)

> **Reply:** No genuine dispute. (See Reply Fact No. 62, above.)

**Plaintiffs' Proposed Finding No. 65:**

McFarlane replied with a fax stating: "Having read your rather prompt response to my offer today (re: Angela, Cog[liosto], Medieval Spawn, [and] Miracleman) All I can say to the points is <u>BEAUTY</u>!"  (Simmons Aff., Ex. 20 (emphasis in original); McFarlane Dep. at 189.)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 65.

> **Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 66:**

According to McFarlane, "beauty!" is a Canadian term for "pretty good."  (McFarlane Dep. at 189.)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 66.

> **Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 67:**

In his fax, McFarlane also requested that they change the date of exchange and accounting to July 31 and raised some final questions regarding the proper method for calculating royalties.  (<u>Id.</u>)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit that McFarlane requested that the exchange date be changed to July 31, but deny that his fax raised "final questions" because McFarlane testified that he still had questions after this exchange of faxes on July 15, 1997.  (McFarlane Dep. at 190, 197; Gross Aff., Ex. B)

> **Reply:**  No dispute of material fact.  While McFarlane may still have had

questions, there is no dispute that McFarlane began performing the contract in August 1997.

(<u>See</u> Reply Fact No. 62, above.)

**Plaintiffs' Proposed Finding No. 68:**

Gaiman immediately responded to McFarlane's questions in another fax that same day. (McFarlane Dep. 193-94; Gaiman Dep. at 180; Simmons Aff., ¶ 4, Ex. C at Ex. 33.)

> **McFarlane Defendants' Response:**  The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 68.

> **Reply:**  No dispute.

**Plaintiffs' Proposed Finding No. 69:**

McFarlane testified that when he received Gaiman's final fax, he and Gaiman had reached agreement on issues relating to the royalty payments Gaiman was to receive for Angela, Cogliostro and Medieval Spawn. (See McFarlane Dep. at 194 ("the big points for accounting purposes were agreed upon here"); id. at 192 (the "accounting issues" related to payments for the three characters).

> **McFarlane Defendants' Response:**  McFarlane Defendants deny Plaintiff's Proposed Finding of Fact No. 69.  The deposition pages cited by Plaintiffs therein are incomplete and do not support this proposed finding.  McFarlane was specifically asked at his deposition if, after the exchange of faxes identified in Plaintiffs' Proposed Findings of Fact 64-68, he believed that he and Neil had reached an agreement on the royalty and accounting issues.  McFarlane answered: "No." (McFarlane Dep. at 196-97; Gross Aff., Ex. B)

> **Reply:**  No genuine or material dispute of fact.  McFarlane's supposed personal

belief that he had not reached an agreement with Gaiman does not create a fact issue regarding

the existence of a contract between those parties – a contract did exist by virtue of McFarlane's

undisputed performance of the parties' agreement. (See Pls.' Reply Br. at 3-5.)  It is undisputed

that McFarlane began paying Gaiman royalties in August 1997, first on August 4 and again on

August 11. (See Reply Facts Nos. 79, 81.)  At that same time, McFarlane also sent Gaiman

various Miracleman materials, just as promised in their July 15 exchange of correspondence.

(See Reply Facts Nos. 84.)  Finally, in March 1998, McFarlane again sent Gaiman a royalty

check for foreign sales of the *Angela* series. (See Reply Facts Nos. 91.)  It was not until January

1999 – seventeen months after sending Gaiman his first royalty report in August 1997 – that

McFarlane sent Gaiman a letter purporting to "rescind all previous offers." (See Reply Fact No.

93, below.)


**Plaintiffs' Proposed Finding No. 70:**

In McFarlane's view, the only remaining issues were "silly paragraphs" "that lawyers like to have in contracts" such as indemnity clauses and jurisdictional provisions. (McFarlane Dep. at 188-89.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 70 for the same reasons as their denial of Plaintiffs' Proposed Finding of Fact No. 69, namely that McFarlane and Gaiman had not reached any agreement. (*Id.*)

> **Reply:** No genuine dispute. (See Reply No. 69, above.)


**Plaintiffs' Proposed Finding No. 71:**

On August 1, 1997, Gaiman had not yet received any royalty payments or Miracleman material from McFarlane. Gaiman sent McFarlane a fax that day stating, "Todd – I thought we were due to exchange yesterday (31 July '97) – has the accounting been done? . . . . If this isn't going to happen, let me know, and we can re-negotiate." (Gaiman Dep. at 150; Simmons Aff., ¶ 4, Ex. C at Ex. 50.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 71.

> **Reply:** No dispute.


**Plaintiffs' Proposed Finding No. 72:**

At some point during this time period, McFarlane called Terri Cunningham, an executive at D.C. Comics who plays a significant role in negotiating that company's contracts, and inquired about D.C.'s contracting practices. (McFarlane Dep. at 79-82.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 72.

> **Reply:** No dispute.

003.371112.1

**Plaintiffs' Proposed Finding No. 73:**

McFarlane had dealt with Cunningham about contractual issues during the time he worked at D.C. (McFarlane Dep. at 130.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 73.

> > **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 74:**

McFarlane attempted to find out from Cunningham whether D.C. would pay a writer royalties for creating a derivative character such as Medieval Spawn. (McFarlane Dep. at 79-80.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 74.

> > **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 75:**

McFarlane did not, however, ask Cunningham any questions about Gaiman's contracts with D.C. (Id. at 78-79, 81.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 75.

> > **Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 76:**

According to McFarlane, he and Cunningham only "talk[ed] in generalities." (Id. at 79.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 76.

> > **Reply:** No dispute.

003.371112.1

**Plaintiffs' Proposed Finding No. 77:**

Cunningham told McFarlane that, generally, D.C. would not pay royalties for such hypothetical characters as "Medieval Superman" or "Medieval Batman." (Id. at 79-81.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 77.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 78:**

However, Cunningham acknowledged that on certain occasions D.C. had paid royalties where a writer engaged in "extensive reworking" of a character. (Id. at 80-81.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 78.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 79:**

On August 4, 1997, McFarlane sent Gaiman a check for $9,392.30 and a "Royalty Report" purporting to set forth the calculations for the various royalties due Gaiman under their agreement. (McFarlane Dep. at 216-17; Simmons Aff., ¶ 4, Ex. C at Ex. 5.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit that McFarlane sent Gaiman a check and a royalty report on August 4, 1997. The McFarlane Defendants deny that this was done pursuant to any agreement. The testimony cited by Plaintiffs does not indicate the existence of an agreement, but only refers to the payment. In addition, McFarlane testified unequivocally that no agreement had been reached. (McFarlane Dep. at 196-97; 216-17; Gross Aff., Ex. B; Simmons Aff., Ex. B)

**Reply:** No genuine dispute. (See Reply Fact No. 69, above.)

30

003.371112.1

**Plaintiffs' Proposed Finding No. 80:**

McFarlane dictated the substance of the report to his assistant. (July 1, 2002 Second Declaration of Neil Gaiman ("Gaiman Decl.") ¶ 2; McFarlane Dep. at 216-17; July 18, 2002 Deposition of Sheila Egger ("Egger Dep.") at 19-20; Simmons Aff., ¶ 6, Ex. E.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 80.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 81:**

The report includes a note dictated by McFarlane in which he suggests that Gaiman misrepresented what he would have received for his work under the terms of his contracts with D.C. Comics:

> I had a conversation with Terri Cunningham who said that when a derivative character is created, no money is given to those creating the knock-off character. Only on rare occasions, when extensive reworking and extensive work have been done, is money usually given. I.e.: your Sandman book being one of those rare exceptions. So far you have worked on parts of 8 pages that include Medieval Spawn and I wouldn't define that as extensive. Still, I am willing to pay some monies as long as all other matters are sorted out.

(Simmons Aff., ¶ 4, Ex. C at Ex. 5 (emphasis added).)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 81.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 82:**

McFarlane did not explain what "other matters" he was referring to. (See id.)

**McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' editorial characterization of the absence of certain language in the August 4, 1997 report, which document speaks for itself. (Simmons Aff., Ex. C at Dep. Ex. 5)

**Reply:** No genuine dispute. The document cited fully supports plaintiffs'

proposed finding.

31

**Plaintiffs' Proposed Finding No. 83:**

A week later, on August 11, 1997, McFarlane sent Gaiman another Royalty Report and a check for $2,740.28. (Egger Dep. at 21; McFarlane Dep. at 221-22; Gaiman Decl., ¶ 3, Simmons Aff., ¶ 4, Ex. C at Ex. 6.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 83.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 84:**

Also during this time, McFarlane also sent Gaiman various materials related to the Miracleman character, which he had agreed to provide to Gaiman. (Gaiman Dep. at 187-88.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit that McFarlane sent Miracleman film to Gaiman, but deny that this was pursuant to any agreement. The testimony cited by Plaintiffs does not indicate the existence of an agreement, but only refers to the shipment of Miracleman film. In addition, McFarlane testified unequivocally that no agreement had been reached. (McFarlane Dep. at 196-97; Gaiman Dep. at 187-88; Gross Aff., Exs. A-B)

**Reply:** No genuine dispute. (See Reply Fact No. 69, above)

**Plaintiffs' Proposed Finding No. 85:**

McFarlane now claims that sometime during or after the time he made those payments to Gaiman, he had another conversation with Terri Cunningham. (McFarlane Dep. at 116.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 85.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 86:**

However, McFarlane cannot remember the substance of the conversation, but thinks "[i]t may have been on how you spend money on people in movies or television shows or on how they divide those moneys up . . . film, Hollywood stuff maybe." (Id. at 117.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 86.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 87:**

McFarlane cannot remember what specific royalty numbers Cunningham stated to him, but he claims they were "inconsistent with the information [he] was getting [from Gaiman]." (Id. at 117.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 87.

**Reply:** No dispute.

**Plaintiffs' Proposed Finding No. 88:**

Nor can McFarlane remember whether Cunningham's information related to one or more of the Angela, Cogliostro and Medieval Spawn characters or whether it was "just a general breakdown of that category." (McFarlane Dep. at 118.)

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Finding of Fact No. 88.

**Reply:** No dispute.

003.371112.1

**Plaintiffs' Proposed Finding No. 89:**

Despite his inability to remember any of the specifics of the conversation, McFarlane claims that this conversation was "the proverbial straw on the camel's back." (McFarlane Dep. at 119.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' editorial characterization ("despite his inability to remember") of McFarlane's testimony. The McFarlane Defendants admit that McFarlane testified that his second conversation with Terri Cunningham was "the proverbial straw on the camel's back." (McFarlane Dep. at 119; Gross Aff., Ex. B)

> **Reply:** No genuine dispute.

**Plaintiffs' Proposed Finding No. 90:**

According to McFarlane, from that point forward he viewed his agreement with Gaiman as rescinded and he decided not to give Gaiman any further rights in the Miracleman character. (Id. at 120-21.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that from McFarlane's point of view, all of his previous offers and negotiations were rescinded after his second conversation with Terri Cunningham and that he decided not to transfer his *Miracleman* intellectual property rights to Gaiman. (*Id.* at 120-21) The McFarlane Defendants deny the existence of any agreement between McFarlane and Gaiman as asserted in Plaintiff's Proposed Finding of Fact No. 90. (*Id.* at 196-97)

> **Reply:** No genuine dispute. (See Reply No. 69, above.)

**Plaintiffs' Proposed Finding No. 91:**

Despite the fact that McFarlane supposedly considered the agreement rescinded, on March 26, 1998, McFarlane's wife, Wanda Kolomyjec, sent Gaiman a $4,420.62 royalty check for foreign sales of Gaiman's work. (Gaiman Dep. at 195; Gaiman Decl., ¶ 4.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that Wanda Kolomyjec sent Gaiman a royalty check for foreign sales of certain comic books on March 26, 1998. The McFarlane Defendants deny the existence of any agreement between McFarlane and Gaiman as asserted in Plaintiff's Proposed Finding of Fact No. 91. (*Id.*) The McFarlane Defendants further state that the March 26, 1998 royalty payment to Gaiman was for foreign sales of comic books and thus were not related to McFarlane's decision to rescind his offer to exchange intellectual property rights in the *Miracleman* character for Gaiman's claimed royalty rights for non-comic-book uses of the Cogliostro and Medieval Spawn characters.

34

**Reply:** No genuine dispute. Defendants attempt to manufacture a dispute of fact where none exists. Defendants cite no authority for their assertion that McFarlane's March 26, 1998 royalty payment to Gaiman was for foreign sales of anything other than the comics at issue in this case. Defendants state in their own brief and proposed findings of fact that the March 1998 royalty payment was for foreign sales of the *Angela* series. (Defs.' Br. at 16 n.4; Response Facts No. 55.)

**Plaintiffs' Proposed Finding No. 92:**

McFarlane testified that Wanda performs a variety of duties for McFarlane's companies. (McFarlane Dep. at 124.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny the general statement that McFarlane's wife Wanda "performs a variety of duties for McFarlane's companies." McFarlane testified that at various times from 1992 to the present his wife has performed different tasks, but that at other times, she was not working for the company. (McFarlane Dep. at 124; Simmons Aff., Ex. B)

> **Reply:** No genuine dispute. The deposition testimony cited by plaintiffs fully

supports the proposed finding.

**Plaintiffs' Proposed Finding No. 93:**

It was not until January 12, 1999, that McFarlane sent Gaiman a letter officially rescinding their agreement. (McFarlane Dep. at 224; Simmons Aff., ¶ 4, Ex. C at Ex. 8.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that McFarlane sent a letter to Gaiman dated January 12, 1999. The McFarlane Defendants deny that in this letter McFarlane rescinded an agreement with Gaiman, because there was no such agreement. McFarlane's January 12, 1999 letter states that McFarlane is officially rescinding his previous <u>offers</u>, not any agreement. In addition, McFarlane unequivocally testified that he and Gaiman did not reach an agreement. (McFarlane Dep. 196-97; Gross Aff., Ex. B; Simmons Aff., Ex. C at Dep. Ex. 8)

> **Reply:** No genuine dispute. McFarlane's personal belief that he had not reached an

agreement with Gaiman does not change the fact that the requisites of a valid contract were met

by his actions. (<u>See</u> Pls.' Reply Br. at 3-5.) Whether it is called an "agreement" or "previous

35

offers," there is no question that McFarlane stated he was rescinding the arrangement under

which he had been paying royalties to Gaiman.

**Plaintiffs' Proposed Finding No. 94:**

Again, McFarlane's letter makes no mention of a second phone conversation with Terri Cunningham regarding royalties for movies or television shows or anything remotely related to them. (Simmons Aff., ¶ 4, Ex. C at Ex. 8.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' characterization of McFarlane's January 12, 1999 letter. That letter, which speaks for itself, contains no reference to any conversations with Terri Cunningham. (Simmons Aff., Ex. C at Dep. Ex. 8)

> **Reply:** No genuine dispute. The content of McFarlane's letter fully supports

plaintiffs' proposed finding and, therefore, there is no genuine dispute of fact. In addition,

plaintiffs dispute that McFarlane ever requested copies of Gaiman's executed contracts.

**Plaintiffs' Proposed Finding No. 95:**

Instead, McFarlane's letter alludes to McFarlane's first "Medieval Spawn-derivative character" conversation with Terri Cunningham, stating, "Payments for Medieval Spawn were based on false information you gave me regarding D.C. Comics' policy of payment on a derivative character." (See id.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny that McFarlane's letter of January 12, 1999 refers to any specific conversation between McFarlane and Terri Cunningham. The McFarlane defendants admit that McFarlane's letter of January 12, 1999 states that "payments for Medieval Spawn were based on false information you gave me regarding DC Comics' policy of payment on a derivative character." (*Id.*)

> **Reply:** No genuine dispute. The contents of McFarlane's letter speak for

themselves and fully support plaintiffs' proposed finding. The statement in McFarlane's letter is

unquestionably a reference to McFarlane's first conversation with Terri Cunningham. (See

Reply Facts Nos. 72-78, 81.)

36

**Plaintiffs' Proposed Finding No. 96:**

The purported second conversation with Terri Cunningham is also conspicuously absent from the McFarlane Defendants' pleadings and discovery responses. They make no mention of the conversation in their counterclaim for fraud. (See April 29, 2002 Counterclaim, ¶ 70.) Docket No. 30.

> **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' editorial characterizations of the McFarlane Defendants' discovery and pleadings. The McFarlane Defendants further state that despite McFarlane's repeated requests, Gaiman never provided McFarlane with an executed copy of any of his DC Comics contracts until the discovery phase of this litigation. (McFarlane Dep. at 198; Gross Aff., Ex. B)

> **Reply:** No genuine dispute. The pleading cited by plaintiffs fully supports the

proposed finding.

**Plaintiffs' Proposed Finding No. 97:**

Nor do they mention this purported conversation in their response to an interrogatory asking them to state all facts in support of their fraud allegations. (Simmons Aff., ¶ 7, Ex. F, Interrogatory No. 4.)

> **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' Proposed Finding of Fact No. 97. In response to Plaintiffs' Interrogatory No. 4, the McFarlane Defendants stated that Mr. McFarlane had "one or more conversations with Ms. Terri Cunningham." In addition, the McFarlane Defendants stated that their "investigation continues." (Simmons Aff., Ex. F) That continuing investigation has now uncovered Gaiman's many DC Comics contracts, which further detail several specific ways in which Gaiman's representations about his DC Comics contracts were fraudulent, including (1) he did not disclose the existence of the section entitled "Contingencies Affecting Royalties" that provides several factors that could significantly reduce the royalty rate Gaiman quoted; (2) he did not disclose his predicate contractual requirement that he complete 12 issues of a comic book series before he would be entitled to any royalties for merchandise licensing or media use of characters; and (3) he did not disclose that the alleged 15% royalty rate was not uniformly granted, as demonstrated by the 10% royalty rate he received in his two most recent DC Comics contracts. (Gross Aff., Ex. D)

> **Reply:** No genuine dispute. The interrogatory response cited by plaintiffs fully supports

the proposed finding.

**Plaintiffs' Proposed Finding No. 98:**

The D.C. contract Gaiman's attorney sent to Larry Marder in April of 1997 states in its first paragraph that "you have revised the pre-existing characters of DREAM (SANDMAN) and DESTINY" and goes on to provide Gaiman with royalties for those and other characters--in other words, D.C. would pay Gaiman for derivative characters. (Simmons Aff., ¶ 6, Ex. E, at Ex. 47 at 3.)

> **McFarlane Defendants' Response:** The McFarlane Defendants admit that Gaiman's attorney sent a letter to Larry Marder in April of 1997 attaching an unexecuted draft of a contract between Gaiman DC Comics. The McFarlane Defendants further admit that this draft contract included the words "you have revised the pre-existing characters of DREAM (SANDMAN) and DESTINY" and goes on to provide Gaiman with the royalties for those and other characters. The McFarlane Defendants deny Plaintiffs' ultimate Finding of Fact that "D.C. would pay Gaiman for derivative characters," because it is too general and not supported by the record cites therein. Specifically, the finally executed version of the contract whose draft was attached to Gaiman's attorney's letter does not include the pre-existing character of DESTINY among those characters for whom DC Comics would pay royalties (Gross Aff., Ex. C at Dep. Ex. 58)  Furthermore, Gaiman's April 20, 1988 contract with D.C Comics, his correspondence with Chantal d'Aulnis of DC Comics dated July 10, 1989, and his January 2, 1990 contract with DC Comics, all demonstrate that DC Comics only agreed to pay royalties for the pre-existing character of DREAM (a/k/a SANDMAN) *after* Gaiman completed 12 issues of the *Sandman* comic book series and only in recognition of the substantial alternations Gaiman had made in the original *Sandman* character. (Gross Aff., Ex. D at G04022-29, G04075-86, G04230-33)

**Reply:** No dispute of material fact. The content of the D.C. Comics contract supports the proposed finding. Defendants' statement regarding the removal of the DESTINY character from the final version of Gaiman's D.C. contract is irrelevant because, as defendants admit, the final version still provided Gaiman with a royalty for his work on the "pre-existing character of DREAM (SANDMAN)."

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

### Plaintiffs' Conclusion of Law No. 1:

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 1.

**Reply:** No dispute.

### Plaintiffs' Conclusion of Law No. 2:

Where a heightened burden of proof, such as proof by clear and convincing evidence, is applicable to a party's claim or defense, the court must take that heightened standard into consideration when deciding summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 2.

**Reply:** No dispute.

### Plaintiffs' Conclusion of Law No. 3:

"The mere existence of a scintilla of evidence in support of [a party's] position" is insufficient to defeat a motion for summary judgment. Id. at 252. In the case of a claim or defense of fraud, summary judgment is appropriate where a party fails to raise a genuine issue of fact regarding the existence of a fraudulent representation. See Continental Assur. Co. v. American Bankshares Corp., 601 F. Supp. 277, 283 (E.D. Wis. 1984).

**McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 3.

**Reply:** No dispute.

### Plaintiffs' Conclusion of Law No. 4:

Under Wisconsin law, a party claiming that it was fraudulently induced to enter a contract must prove the following elements: 1) an untrue statement of fact, 2) made with intent to

defraud, 3) made for the purpose of inducing the party to act on it, and 3) reasonable reliance on that statement by the party. Kailin v. Armstrong, 2002 WI App 70, ¶ 31, 643 N.W.2d 132, 145-46.

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 4.

> **Reply:** No dispute.

### Plaintiffs' Conclusion of Law No. 5:

Allegations of fraud must be pled with specificity. Fed. R. Civ. P. 9(b).

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 5.

> **Reply:** No dispute.

### Plaintiffs' Conclusion of Law No. 6:

"The party alleging the fraud has the burden of proving the elements by clear and convincing evidence." Lundin v. Shimanski, 124 Wis. 2d 175, 184, 368 N.W.2d 676, 681 (1985).

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 6.

> **Reply:** No dispute.

### Plaintiffs' Conclusion of Law No. 7:

The undisputed facts show that Gaiman did not make false representations to McFarlane and, therefore, their counterclaim and affirmative defense of fraud fail as a matter of law.

> **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' Proposed Conclusion of Law No. 7. The McFarlane Defendants have produced substantial evidence that Gaiman intentionally misrepresented the terms of his DC Comics contracts by failing to disclose to McFarlane, among other things, (1) the existence of the section entitled "Contingencies Affecting Royalties" that provides several factors that could significantly reduce the royalty rate Gaiman quoted; (2) his predicate contractual requirement that he complete 12 issues of a comic book series before he would be entitled to any royalties for merchandise licensing or media use of characters; (3) the fact that the alleged 15% royalty rate was not uniformly granted, as demonstrated by the 10% royalty rate he received in his two most recent DC Comics

contracts. Accordingly, the McFarlane Defendants have raised genuine issues of material fact with respect to the truth or falsity of Gaiman's representations. Summary judgment on this issue is inappropriate because "summary judgment is only appropriate where the record discloses no dispute as to any material fact." *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002); *Taylor v. Monsanto Co.*, 150 F.3d 806, 808 (7th Cir. 1998).

> **Reply:** Disputed. It is undisputed that Gaiman provided McFarlane with copies
>
> of his D.C. Comics contracts containing the "Contingencies Affecting Royalties"
>
> provisions about which they now complain. (See Response Facts Nos. 51-52,
>
> above.) It is undisputed that McFarlane chose to go forward with the contract
>
> despite purported knowledge of what he considered Gaiman's
>
> "misrepresentations". (See Response Fact No. 25.) It is undisputed that, at
>
> McFarlane's request, Gaiman agreed to a 7.5% royalty – less than the 10%
>
> royalty about which defendant now complain. (See Response Facts 26, 32.)

**Plaintiffs' Conclusion of Law No. 8:**

The requirement that a party show reasonable reliance is intended to screen out trivial or concocted fraud claims. In re Barnes, 969 F.2d 526, 529 (7th Cir. 1992).

> **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 8.

> **Reply:** No dispute.

**Plaintiffs' Conclusion of Law No. 9:**

A party's reliance is not reasonable as a matter of law, and cannot sustain a defense or claim of fraudulent inducement, where the party knows of the alleged falsity prior to entering the contract. Fullin v. Martin, 34 F. Supp. 2d 726, 737-38 (E.D. Wis. 1999). See also Foss v. Madison Twentieth Century Theaters, Inc., 203 Wis. 2d 210, 218-19, 551 N.W.2d 862, 218 (Ct. App. 1996) ("The law will not permit a person to predicate damage upon statements which he does not believe to be true, for if he knows they are false, it cannot be said that he is deceived by them.").

> **McFarlane Defendants' Response:** With respect to Plaintiffs' Proposed Conclusion of Law No. 9, the McFarlane Defendants admit that a party's reliance is not reasonable as a matter of law where the party knows that a particular statement is false prior to entering

into a contract based on that same false statement. *Fullin v. Martin*, 34 F. Supp. 2d 726, 737-38 (E.D. Wis. 1999). The McFarlane Defendants have raised a genuine issue of material fact with respect to the reasonableness of McFarlane's reliance on Gaiman's false statements because they have submitted substantial evidence upon which a reasonable fact finder could find that: (1) Gaiman made at least two different misrepresentations about his DC Comics, both of which McFarlane was intended to rely on and did rely on; (2) McFarlane knew of the falsity of only one of these representations when he made the payment to Gaiman; (3) McFarlane's payment to Gaiman was a good faith payment during ongoing contract negotiations and not payment in full of a contractual obligation; and (4) McFarlane did not enter into any agreement with Gaiman based on Gaiman's false statement in that he refused to transfer his Miracleman rights after learning of Gaiman's second false statement.

> **Reply:** Disputed. McFarlane's reliance was unreasonable as a matter of law
>
> because he chose to perform the contract despite knowledge of the alleged
>
> "fraud." (See Response Fact No. 25.) There is also no support in the record for
>
> defendants' assertion that McFarlane refused to transfer his Miracleman rights
>
> after learning of Gaiman's purported second statement. (See Reply Fact No. 84.)
>
> Plaintiffs dispute the remaining facts in defendants' proposed finding, but those
>
> facts are not material to the present conclusion of law.

## Plaintiffs' Conclusion of Law No. 10:

Under Wisconsin law, a party who chooses to go forward with a contract despite knowing of potentially false representations, cannot seek to escape that contract by claiming he later discovered that the misrepresentations were more extensive than he had realized. Fullin, 34 F. Supp. 2d at 738; First Credit Corp. v. Behrend, 45 Wis. 2d 243, 250, 172 N.W.2d 668, 671 (1969).

> **McFarlane Defendants' Response:** With respect to Plaintiffs' Proposed Conclusion of Law No. 10, The McFarlane Defendants admit that a party who chooses to go forward with a contract despite knowing of potentially false representations cannot seek to escape that contract by claiming he later discovered that the misrepresentations were more extensive than he had realized. *Fullin*, 34 F. Supp. 2d at 738; *First Credit Corp. v. Behrend*, 172 N.W.2d 668, 671 (Wis. 1969). The McFarlane Defendants have raised a genuine issue of material fact regarding whether McFarlane chose to go forward with a contract in that they have submitted substantial evidence that McFarlane did not believe that he entered into a contract, broke off further contract discussions after he discovered

Gaiman's second material misrepresentation, and declined to transfer his Miracleman rights to Gaiman after learning of Gaiman's potentially false representations.

>    **Reply:** Disputed. (See Reply No. 9, above.)

**Plaintiffs' Conclusion of Law No. 11:**

A "metaphysical doubt as to the material facts" is insufficient to defeat a motion for summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

>    **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 11.

>    **Reply:** No dispute.

**Plaintiffs' Conclusion of Law No. 12:**

If the facts of record make a party's claim implausible, then the party "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Id. at 587.

>    **McFarlane Defendants' Response:** The McFarlane Defendants admit Plaintiffs' Proposed Conclusion of Law No. 12.

>    **Reply:** No dispute.

**Plaintiffs' Conclusion of Law No. 13:**

Given the extreme ambiguity of McFarlane's testimony, the McFarlane Defendants' fraud claim and defense must fail as a matter of law. See Continental Assur. Co., 601 F. Supp. at 283 (summary judgment dismissing fraud claim appropriate where defendant's deposition testimony was "too vague" regarding necessary element of fraud). See also Schimpf v. Gerald, Inc., 52 F. Supp. 976, 992-93 (E.D. Wis. 1999) (court would not consider conclusory and speculative statements in affidavit because "[t]he object of Rule 56(e) is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit").

>    **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs' Proposed Conclusion of Law No. 13. McFarlane's testimony regarding his conversations with Terri Cunningham of DC Comics, combined with the information contained in Gaiman's various DC Comics contracts, constitutes substantial evidence of the falsity of Gaiman's representations, which is an element of the McFarlane Defendants' fraud claim

and defense. *Kailin v. Armstrong*, 643 N.W.2d 132, 145-46 (Wis. Ct. App. 2002); *Lundin v. Shimansky*, 368 N.W.2d 676, 680-81 (Wis. 1985).

> **Reply:** Disputed. (See Pls.' Opening Br. at 15-16.) Plaintiffs' proposed
>
> conclusion is reinforced by the recent deposition testimony of Terri Cunningham.
>
> At that deposition, she testified that she had no recollection of the conversations
>
> upon which McFarlane bases his fraud claim and defense. (See July 23, 2002
>
> Deposition of Terri Cunningham at 60:8-14.)

**Plaintiffs' Conclusion of Law No. 14:**

That is especially so where, as here, it is the McFarlane Defendants' burden to prove their claims of fraud by clear and convincing evidence. <u>Lundin</u>, 124 Wis. at 184, 368 N.W.2d at 681; <u>Liberty Lobby</u>, 477 U.S. at 255 ("the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions").

> **McFarlane Defendants' Response:** The McFarlane Defendants deny Plaintiffs'
> Proposed Conclusion of Law No. 14. McFarlane's testimony regarding his conversations
> with Terri Cunningham of DC Comics, combined with the information contained in
> Gaiman's various DC Comics contracts, constitutes clear and convincing evidence of the
> falsity of Gaiman's representations, precluding summary judgment on that issue. *Lundin*,
> 368 N.W.2d at 681; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

> **Reply:** Disputed. (See Response No. 13, above.)

Dated this /3ͭ day of August, 2002.

FOLEY & LARDNER
150 East Gilman Street
Madison, WI 53703-2808
Tel: (608) 257-5035
Fax: (608) 258-4258

Allen A. Arntsen
Joan L. Eads
Jeffrey A. Simmons
*Attorneys for Plaintiffs*

Co-Counsel:
Kenneth F. Levin
20 North Wacker Drive, Suite 2200
Chicago, IL 60606
Tel: (312) 984-6000
Fax: (312) 977-2990

Of Counsel:
Mark Hellmann
Michael Rechtin
Foley & Lardner
1 IBM Plaza
220 N. Wabash Ste. 3300
Chicago, IL 60611
Tel: (312) 755-1900
Fax: (312) 755-1925