IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| NEIL GAIMAN and MARVELS AND MIRACLES, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>TODD McFARLANE, TODD McFARLANE PRODUCTIONS, INC., TMP INTERNATIONAL, INC., and McFARLANE WORLDWIDE, INC.<br><br>Defendants-Counterclaimants,<br><br>And<br><br>IMAGE COMICS, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 02-C-0048-S |

DOC NO REC'D/FILED 2002 JUL 30 PM 4: 15 DOCKET # 95 CLERK U.S. DISTRICT COURT WEST. DIST. OF WISCONSIN AUG - 8 2002 FILED JOSEPH W. SKUPNIEWITZ CLERK CASE #

---

### THIRD AMENDED COUNTERCLAIM OF
### TODD McFARLANE AND TODD McFARLANE PRODUCTIONS, INC.

---

Defendants Todd McFarlane and Todd McFarlane Productions, Inc. ("TMP"), allege as follows:

### Parties and Jurisdiction

1.   Mr. McFarlane is a citizen of Canada and a resident of the state of Arizona.

2.   TMP is an Arizona corporation with its principal place of business in Arizona. At all relevant times, Mr. McFarlane was a full-time employee of TMP.

3.   On information and belief, plaintiff-counterclaim defendant Neil Gaiman is a citizen of Great Britain and a resident of Wisconsin.

4. On information and belief, plaintiff-counterclaim defendant Marvels and Miracles, L.L.C. ("M&M") is a Wisconsin limited liability company having a principal place of business in Wisconsin.

5. This Court has jurisdiction over the subject matter of this counterclaim under the following sections of Title 28: 28 U.S.C. § 1338(a), because it is an action arising under the copyright laws of the United States; 28 U.S.C. § 1332(a), because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity of citizenship; 28 U.S.C. § 1367, because the counterclaim satisfies the requirements of "supplemental jurisdiction"; and 28 U.S.C. §§ 2201-02, because the counterclaim includes a claim for declaratory judgment.

## The Origins of Todd McFarlane's *Spawn*

6. From the mid 1980s to the early 1990s, Todd McFarlane worked as the graphic artist and/or writer on a variety of comic books, including *The Incredible Hulk* published by Marvel Enterprises, Inc. d/b/a Marvel Comics and *Batman* published by DC Comics. Eventually, he became the sole writer and graphic artist on Marvel Comics' *Amazing Spider-Man*.

7. In 1991, Mr. McFarlane left Marvel Comics to become an independent artist. One year later, he launched a new comic book series, *Spawn*. The first issue sold 1.7 million copies, making it one of the best-selling independent comic books in history.

8. *Spawn* follows the afterlife of Al Simmons, once a top operative for the U.S. government who was betrayed and murdered by his own men. Down in Hell, Simmons makes a bargain: in exchange for the privilege of returning to Earth to see his wife he must become a "Hellspawn" and lead Hell's army in the upcoming Armageddon. Simmons, now known as

Spawn, returns to Earth to discover that, in a cruel twist of fate, five years have passed and his widow has married his best friend. The comic book series follows his struggles between his curse as a Hellspawn and his desire to do good on Earth.

9. Mr. McFarlane was the sole creator, writer and graphic artist of Issue 1 of *Spawn*, which debuted in May of 1992.

10. TMP owns all copyrights in the *Spawn* series and the character Spawn, beginning with Issue 1 of *Spawn*, which is covered by U.S. copyright registration TX 4-243-065. On occasion, as a result of a clerical error in filling out the registration forms, Mr. McFarlane is mistakenly identified as the owner of the copyright. A true copy of the certificate of copyright registration for Issue 1 of *Spawn* is included as Exhibit A in the Appendix and Supplement to Appendix to Answer to the Amended Complaint and Counterclaims of the McFarlane Defendants (the "Appendix"). Mr. McFarlane and TMP hereby incorporate the contents of the Appendix into this Counterclaim, which become part of this Answer and Counterclaim for all purposes.

11. Copyright registrations obtained by Mr. McFarlane and TMP for the *Spawn* series cover more than one hundred issues of that comic book and related series and include, for example:

| Spawn Issue No. | Publication Date | Certificate of Registration |
|---|---|---|
| 2 | June 1992 | TX 4-243-066 |
| 3 | August 1992 | TX 4-243-067 |
| 4 | September 1992 | TX 4-255-762 |
| 5 | October 1992 | TX 4-256-099 |
| 6 | November 1992 | TX 4-256-098 |
| 7 | January 1993 | TX 4-256-097 |
| 8 | March 1993 | TX 4-256-096 |
| 9 | March 1993 | TX 4-256-095 |
| 10 | May 1993 | TX 4-256-100 |
| 11 | June 1993 | TX 4-256-092 |
| 12 | July 1993 | TX 4-256-091 |

## Mr. Gaiman's Involvement in *Spawn* Issue No. 9

12. In 1992, Mr. McFarlane invited several comic book writers, including Mr. Gaiman, to each collaborate with him in the production of an issue of *Spawn*. Under the proposal, each writer would write a script for a single issue of the comic book and Mr. McFarlane would create the artwork for that issue. Each writer was to collaborate with Mr. McFarlane in such a way that their respective contributions would be merged together into inseparable or interdependent parts of a unitary whole, namely, a single issue of *Spawn*.

13. Mr. Gaiman accepted Mr. McFarlane's offer and began work on the script for *Spawn* Issue 9.

14. During the creative process, Mr. Gaiman and Mr. McFarlane discussed potential characters and themes and plot lines. They specifically discussed the creation of a female character to be known as Angela, a minor elderly male character in robes initially named Count Nicholas Cagliostro, and an unnamed Spawn character from the Middle Ages who would appear in a brief episode set in the past.

15. The result of this collaboration was the creation of a joint work of authorship published in March of 1993 as *Spawn* Issue 9. A true copy of that issue of *Spawn* is included in the Appendix as Exhibit B. Mr. Gaiman understood at all relevant times that Mr. McFarlane and TMP would own the copyrights to *Spawn* Issue 9.

16. When Mr. Gaiman submitted his script for Issue 9 to Mr. McFarlane, he acknowledged the collaborative nature of the work and Mr. McFarlane's ownership of the rights in the comic book. He wrote:

> Don't feel bound by the rough layouts on the comic—that's more to give you a sense of what's happening than it's meant to be a set of thumbnails for you.

4

> When you've done rough pencils, I'm happy to go over it again and tidy up any dialogue; and obviously let me know if there's any continuity problems you can see. It's your playground—I'm just in for an afternoon on the swings.

17. The cover of Issue 9 of *Spawn* (*see* Exhibit B), is a full-page depiction of the character Angela. Mr. McFarlane created this artwork.

18. The Angela character first appears in Issue 9. The unnamed Spawn character from the Middle Ages appears on several early pages in the issue, has about ten lines of dialogue, and is dressed in an armored version of the outfit worn by Spawn in Issues Nos. 1 through 8. The Count Nicholas Cagliostro character appears on a few pages toward the end of the issue.

19. The inside cover page of *Spawn* Issue 9 identifies Mr. Gaiman as the writer of the story and identifies Mr. McFarlane as the creator of the artwork. At the bottom of that page is the following notice of copyright ownership: "*Spawn* and its logo are trademark™ and copyright © 1993 Todd McFarlane Productions, Inc. All rights reserved." (Exhibit B).

20. Prior to publication of Issue 9 of *Spawn*, TMP purchased several print advertisements for that issue, including a full-page advertisement in the November 13, 1992 edition of COMICS BUYER'S GUIDE. The top of the advertisement featured Mr. Gaiman's name and Mr. McFarlane's name. The middle of the advertisement featured the cover of Issue 9, described above. The bottom of the advertisement contained the trademark and copyright notice of ownership, which read: "SPAWN™ is trademark and copyright © 1992 Todd McFarlane. All rights reserved."

21. Upon information and belief, Mr. Gaiman saw a copy of that advertisement around the time of its publication in November of 1992.

STLD01-952849-2

22. Accordingly, by November of 1992 and certainly no later than March of 1993, Mr. Gaiman knew or should have known that someone other than himself was asserting sole ownership of the copyright in *Spawn* Issue 9.

23. On April 12, 1996, Mr. McFarlane obtained a U.S. copyright registration TX 4-256-095 for *Spawn* Issue 9. He is identified as the owner of the copyright. A true copy of the certificate of copyright registration for Issue 9 of *Spawn* is included in the Appendix as Exhibit C.

24. In 1996, Image Comics, as licensee of TMP and Mr. McFarlane, reprinted *Spawn* Issue 9, along with Issues 6, 7, 8 and 11 in Volume 2 of the *Spawn* trade paperback series ("*Spawn* Volume 2"). A true copy of the cover, title page and credits page of *Spawn* Volume 2 and the first two pages of the reprinted version of Issue 9 are included in the Appendix as Exhibit D.

25. The credits page of *Spawn* Volume 2 identifies Mr. Gaiman as one of the writers of the stories and identifies Mr. McFarlane as the creator of the artwork.

26. This attribution given to Mr. Gaiman on the credits page of *Spawn* Volume 2 was consistent with the agreement covering Mr. Gaiman's contribution to *Spawn* Issue 9.

27. At no time did Mr. Gaiman object or otherwise complain to any of the defendants about the use of his name and identity in *Spawn* Volume 2 or request that he not be given attribution for his role in the creation of *Spawn* Issue 9

28. The title page of *Spawn* Volume 2 contains the following notice of trademark and copyright ownership: "*Spawn*®, its logo and its symbol are registered trademarks of Todd McFarlane Productions, Inc. All other related characters are trademark™ and copyright © 1996 Todd McFarlane Productions, Inc. All rights reserved." (Exhibit D).

29. Accordingly, by 1996, Mr. Gaiman once again knew or should have known that someone other than himself was asserting sole ownership of the copyright in *Spawn* Issue 9, including all of the characters contained therein.

30. After publication of *Spawn* Issue 9, Mr. McFarlane coined the name Medieval Spawn for the unnamed Spawn character that had appeared in that issue.

31. After publication of *Spawn* Issue 9, Mr. McFarlane changed the name of the Cagliostro character to Count Alessandro di Cogliostro and changed the character's personality to more closely approximate the character traits that Mr. McFarlane had originally described to Mr. Gaiman as opposed to the Cagliostro character in Mr. Gaiman's script.

## Mr. Gaiman's Involvement In Four Other *Spawn* Publications

32. During 1994, Mr. Gaiman sent Mr. McFarlane an unsolicited letter containing some ideas for Mr. McFarlane's comic book, including the draft of a partial scene for an issue of *Spawn*. At the end of his letter of submission to Mr. McFarlane, Mr. Gaiman wrote: "There. File it away, use it if it works, dump it if it doesn't." A true and correct copy of this letter is included in the Appendix as Exhibit N.

33. Mr. McFarlane accepted Mr. Gaiman's invitation, included some of that scene in *Spawn* Issue 26, which was published in December of 1994, and offered Mr. Gaiman a fee for his contribution, which Mr. Gaiman accepted. A true copy of this Issue 26 is included in the Appendix as Exhibit E.

34. On January 20, 1995, Mr. McFarlane obtained a U.S. copyright registration TX 4-029-098 for *Spawn* Issue 26. He is identified on the registration as the owner of the copyright. A true copy of the certificate of copyright registration for Issue 26 of *Spawn* is included in the Appendix as Exhibit F.

STLD01-952849-2

35. More than three years ago, in the early Spring of 1998, Image Comics, as licensee of TMP and Mr. McFarlane, reprinted *Spawn* Issue 26, along with Issues 27, 28, 29 and 30 in Volume 6 of the *Spawn* trade paperback series ("*Spawn* Volume 6"). A true copy of *Spawn* Volume 6 is included in the Appendix as Exhibit O.

36. The inside back cover of *Spawn* Volume 6 contains the following notice of trademark and copyright ownership: "*Spawn*, its logo and its symbol are registered trademarks 1998 of Todd McFarlane Productions, Inc. All other related characters are TM and © 1998 Todd McFarlane Productions, Inc. All rights reserved."

37. During 1994 and early 1995, Mr. Gaiman collaborated with several others associated with TMP in the production of Issues 1 through 3 of a *Spawn* derivative comic book series published by TMP under the title *Angela* in December 1994 (Issue 1), January 1995 (Issue 2), and February 1995 (Issue 3). True copies of these three issues of *Angela* are included as Exhibits G, H and I in the Appendix.

38. The inside title pages credits five separate artist collaborators for the issues of *Angela*, including "Story—Neil Gaiman."

39. Mr. Gaiman participated in these collaborations with the understanding that the respective contributions of the various artist collaborators would be merged together into inseparable or interdependent parts of a unitary whole, namely, an issue of *Angela*. Mr. Gaiman also understood that Mr. McFarlane and TMP would own the copyrights to the *Angela* series.

40. The inside title page of *Angela* Issue 2 contains the following notice of copyright ownership: "*Angela*, its logo and its symbol are registered trademarks™ and copyright © 1995 of Todd McFarlane Productions, Inc. All rights reserved." (Exhibit H).

8

STLD01-952849-2

41. Accordingly, by January of 1995, Mr. Gaiman knew or should have known that someone other than himself was asserting sole ownership of the copyright in the *Angela* comic books, including all of the characters contained therein.

42. On January 20, January 30, and March 8 of 1995, Mr. McFarlane obtained U.S. copyright registrations TX 4-429-099, TX 4-003-203, and TX 4-010-007 for, respectively, *Angela* Issues 1, 2 and 3. He is identified as the owner of the copyright. True copies of these three certificates of copyright registration for Issue 1, 2 and 3 of *Angela* are included in the Appendix as Exhibit J, K and L.

43. In 1995, Image Comics, as licensee of TMP and Mr. McFarlane, reprinted *Angela* Issues 1, 2 and 3 along with the cover to *Spawn* Issue 9 in a trade paperback entitled *Angela*. A true copy of the *Angela* trade paperback is included in the Appendix as Exhibit P.

44. Mr. Gaiman is given attribution as the writer of the stories reprinted in the *Angela* trade paperback, is mentioned by name in the forward to the paperback, and is featured on the back cover of the paperback. (Exhibit P)

45. This attribution given to Mr. Gaiman on the credits page and elsewhere in the *Angela* trade paperback was consistent with the agreement covering Mr. Gaiman's contribution to *Angela* Issues 1, 2 and 3.

46. At no time did Mr. Gaiman object or otherwise complain to any of the defendants about the use of his name and identity in the *Angela* trade paperback or request that he not be given attribution for his role in the creation of the materials reprinted in the *Angela* trade paperback.

47. The inside title page of the *Angela* trade paperback contains the following notice of trademark and copyright ownership: "*Angela*, its logo and its symbol are (TM) trademarks and

9

(©) copyright 1995, Todd McFarlane Prods, Inc. All other characters are (TM) trademarks and (©) copyright 1995, Todd McFarlane Prods, Inc. All rights reserved." (Exhibit P).

48.     Accordingly, by 1995, Mr. Gaiman once again knew or should have known that someone other than himself was asserting sole ownership of the copyright and other intellectual property in the *Angela* series, including all of the characters contained therein.

### Mr. Gaiman's Copyright Registrations

49.     In August of 2000, Mr. Gaiman filed nine separate copyright registration applications for a variety of alleged creations in connection with Issues 9 and 26 of *Spawn* and Issues 1 through 3 of *Angela*.

50.     The U.S. Copyright Office approved Mr. Gaiman's nine copyright registration applications as follows:

| Description | Publication Date | Certificate of Registration |
|---|---|---|
| Script for Angela Issue 1 | December 1994 | TX 5-276-922 |
| Script for Angela Issue 2 | January 1995 | TX 5-276-923 |
| Script for Angela Issue 3 | February 1995 | TX 5-276-924 |
| Script for Spawn Issue 9 | March 1993 | TX 5-352-460 |
| Portion of Script for Spawn Issue 26 | December 1994 | TX 5-352-461 |
| Treatment for Angela series | N/A | TXu 966-576 |
| Thumbnail sketch of Angela 1 | N/A | VAu 481-446 |
| Thumbnail sketch of Angela 2 | N/A | VAu 481-424 |
| Thumbnail sketch of Angela 3 | N/A | VAu 481-439 |

True copies of these nine copyright registrations are included together in the Appendix as Exhibit M.

51.     Mr. Gaiman filed these nine applications:

    a.     more than seven years after publication of *Spawn* Issue 9 (and thus more than seven years after Mr. Gaiman knew that someone else was claiming sole ownership of the copyright in that comic book),

    b.     more than six years after publication of *Spawn* Issue 26 and more than three years after the reprinting of *Spawn* Issue 26 in Volume 6 of the trade paperback series (and thus more than three years after Mr. Gaiman knew

10

      that someone else was claiming sole ownership of the copyright in that comic book), and

  c.  more than five years after publication of Issues 1 through 3 of *Angela* and more than five years after publication of the *Angela* trade paperback (and thus more than five years after Mr. Gaiman knew that someone else was claiming sole ownership of the copyright in those three comic books).

52. Nowhere in Mr. Gaiman's nine copyright applications does he disclose to the U.S. Copyright Office that he is seeking a separate copyright registration in a portion of a previously registered joint work of authorship in which another party has already claimed ownership of the copyright in the entire work. As such, Mr. Gaiman concealed material facts from the U.S. Copyright Office in his applications to register purported copyrights in preexisting joint works.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment—Copyright Ownership—Spawn and Angela)

53. Mr. McFarlane and TMP reallege and incorporate the preceding paragraphs of their Counterclaim as the first paragraph of this claim.

54. There is now an actual and justiciable controversy before this Court over who owns the copyrights in Issues 9 and 26 of *Spawn* and Issues 1, 2 and 3 of *Angela*, including the copyrights, if any, in the following three characters: Angela, Cogliostro and an unnamed Spawn character from the Middle Ages subsequently named Medieval Spawn.

55. The five comic books that are the subject matter of this claim are joint works under Section 101 of the Copyright Act in that they are "works prepared by two or more authors with the intention that the contributions be merged into inseparable or interdependent parts of a unitary whole."

56. At all relevant times, Mr. Gaiman understood and agreed that Mr. McFarlane and TMP would own the copyrights in these comic books and their characters.

57.   TMP and Mr. McFarlane registered copyrights in the entire contents of all five issues of the comic books that are the subject matter of this Count. TMP and Mr. McFarlane registered each such copyright more than three years ago and all within five years of the date of first publication of that comic book, and thus under Section 410(c) of the Copyright Act, 17 U.S.C. § 410(c) the certificates of registration comprising Exhibits C, F, J, K, and L "constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."

58.   More than three years have elapsed since Mr. Gaiman knew or should have known that a party other than himself was asserting sole ownership of the copyrights in the five comics that are the subject matter of this Count.

59.   Mr. Gaiman obtained his nine copyright registrations as a result of fraud on the U.S. Copyright Office in that he obtained his copyright registration by knowingly misrepresenting or omitting material facts on the registration application that might have occasioned a rejection of the application if properly disclosed.

60.   These wrongfully obtained copyright registrations have caused prejudice to Mr. McFarlane and TMP by casting a shadow over their ownership of the copyrights and embroiling them in this litigation.

61.   Mr. McFarlane and TMP therefore seek a declaration of rights from this Court decreeing:

    a.   That TMP is the sole owner of all copyrights in Issues 9 and 26 of *Spawn* and Issues 1, 2 and 3 of *Angela*, including the Angela, Cogliostro and Medieval Spawn characters that appear in those comic books;

    b.   That TMP's copyright registrations in Issues 9 and 26 of *Spawn* and Issues 1, 2 and 3 of *Angela*—namely, Exhibits C, F, J, K and L—are valid;

    c.   That Mr. Gaiman's challenges to the validity of TMP's copyright registrations in Issues 9 and 26 of *Spawn* and Issues 1, 2 and 3 of *Angela*, and his attempt to assert ownership in the copyrights in those comic

STLD01-952849-2

books, are barred by the three-year statute of limitations set forth in Section 501(b) of the Copyright Act, 17 U.S.C. § 501(b);

d. That Mr. Gaiman's nine copyright registrations in "scripts" and "thumbnails" and "treatments" for Issues 9 and 26 of *Spawn* and Issues 1, 2 and 3 of *Angela*—namely, Exhibit M—are invalid and should be canceled by the U.S. Copyright Office.

### SECOND CLAIM FOR RELIEF
### (Fraud by Mr. Gaiman)

62. Mr. McFarlane and TMP reallege and incorporate the preceding paragraphs of their Counterclaim as the first paragraph of this claim.

### The Initial Payments to Mr. Gaiman

63. Back when Mr. McFarlane and Mr. Gaiman discussed their arrangement in 1992 concerning Mr. Gaiman's contributions to *Spawn* Issue 9, they did not talk about actual payment or royalty terms. Instead, Mr. Gaiman simply requested that TMP compensate him for his writing services on *Spawn* Issue 9 in the same way he would have been compensated for such work under the terms of his DC Comics contract. Mr. McFarlane generally agreed in principle to that request, although Mr. Gaiman disclosed none of the terms—financial or otherwise—of his DC Comics contract.

64. Two years later, when Mr. Gaiman agreed to write the scripts for the *Angela* mini-series, he again requested that TMP compensate him for his writing services in the same way he would have been compensated for such work under the terms of his standard contract with DC Comics. Mr. McFarlane generally agreed in principle to that request, although once again Mr. Gaiman disclosed none of the terms, financial or otherwise, of his DC Comics contract.

65. TMP paid Mr. Gaiman $100,000 for his services in writing the script for the twenty-two pages of *Spawn* Issue 9.

13

66.     As such, Mr. Gaiman received from TMP a payment equal to more than $4,500 per page of the comic book.

67.     TMP paid Mr. Gaiman more than $60,000 for his services in writing the scripts for the *Angela* mini-series and for writing a few pages of *Spawn* Issue 26.

68.     By 1996, TMP had paid Mr. Gaiman approximately $200,000 in connection with the scripts he had written for TMP.

### The Attempts to Resolve Mr. Gaiman's Demands for More Money

69.     Despite these payments, Mr. Gaiman repeatedly called Mr. McFarlane asking about additional moneys he claimed would be due him under what he described as "the standard DC Comics contract" or "the basic DC deal." On several such occasions, Mr. McFarlane asked Mr. Gaiman to send him a copy of his DC Comics contract so that Mr. McFarlane could review those terms and determine whether Mr. Gaiman would indeed be entitled to additional payments. Mr. Gaiman repeatedly declined to send him his DC Comics contract.

70.     Beginning in 1996, Mr. Gaiman and Mr. McFarlane entered into discussions in an attempt to resolve Mr. Gaiman's contentions that he should be paid additional money for his contributions to the five comic books at issue in this lawsuit, including royalty income received by TMP from licenses for toys and other products based on characters Mr. Gaiman allegedly co-created with Mr. McFarlane in *Spawn* Issue 9.

71.     After several months of unsuccessful discussions, Mr. Gaiman and Mr. McFarlane met in Oakland, California, in late April or early May of 1997, to attempt to resolve this dispute face to face. During that meeting Mr. McFarlane agreed in principle to Mr. Gaiman's request that they work out an arrangement in which Mr. Gaiman would have royalty

rights for his work on the Spawn publications equivalent to what those rights would have been under the "basic DC deal."

### Mr. Gaiman's Fraudulent Misrepresentations About
### The Terms of "the Basic DC Comics Deal"

72. In connection with those discussions, Mr. McFarlane once again asked Mr. Gaiman to send him a copy of his DC Comics contract. Mr. Gaiman again declined to do so.

73. Instead, Mr. Gaiman sent to Mr. McFarlane a letter dated May 5, 1997 (the "May Letter") in which he made the following material representations of fact:

   a. That the May Letter contained "a set of figures which are based on the basic DC deal";

   b. That the figures set forth in the May Letter represented "the standard DC deal, and not the kind of superdeluxe deal I've got on, for example, Stardust";

   c. That under the "standard DC deal," he would receive for his work on *Spawn* Issue 9 and the three issues of *Angela* a "creator royalty" of 0.5% of the cover price on the first 100,000 copies of the comic book and 0.8% thereafter;

   d. That under the "standard DC deal" he would receive "character equity" royalty rights in Angela, Medieval Spawn, and Cogliostro;

   e. That these "character equity" rights under the "standard DC deal" would entitle him to additional royalties on sales of comic books that he did not work on but that involved "'extensive use of [the] character,' or character's name in the title of the publication," and that these royalties would be calculated at the rate of 0.5% of the cover price on the first 100,000 copies of the comic book and 0.8% thereafter;

   f. That these "character equity" royalty rights under the "standard DC deal" would entitle him to royalties on "merchandising and promotional licensing" of any of those three characters ("License Royalties") at the flat rate of "15% of publisher's net receipts"; and

   g. That these "character equity" royalty rights under the "standard DC deal" would entitle him to media (motion picture, television, etc.) royalties ("Media Royalties") on any of those three characters at the flat rate of "15% of publisher's net receipts," subject only to a pro rata allocation of

15

>that 15% if characters other than Cogliostro, Medieval Spawn or Angela also had speaking parts in the motion picture or television show.

74.   Mr. Gaiman made these representations with the intent that Mr. McFarlane and TMP rely upon them as an accurate description of the essential terms of the "standard DC Deal."

75.   Mr. McFarlane and TMP reasonably and justifiably relied upon these representations by Mr. Gaiman.

76.   In fact, each representation in the May Letter that is identified above was either materially false or deceptively incomplete.

77.   On July 15, 1997, Mr. Gaiman sent Mr. McFarlane a short letter outlining some of the terms of a proposed settlement, which, as Mr. Gaiman reminded Mr. McFarlane, was to be based upon "the figures we put together [in the May Letter] based upon the DC deal." Included in those terms was a paragraph addressing Mr. Gaiman's purported rights under "the standard DC deal" in the characters known as Cogliostro and Medieval Spawn, which immediately follows a paragraph addressing Mr. Gaiman's purported rights in Angela. The two paragraphs read:

>You agree that with regard to the character of Angela, her appearances, spin-offs, merchandising and foreign translations of Spawn 9 or the Angela mini-series, that you'll be using the figures we put together based on the DC deal. * * *
>
>That my rights in Cogliostro and Medieval Spawn as above will be exchanged for your share of Miracleman. However, you will make all payments up until the date of exchange for the use of the characters, based on the same figures as above.

78.   Although Mr. McFarlane was surprised by Mr. Gaiman's contention that under the standard DC deal he would have been given cognizable rights in and an entitlement to payments for subsequent uses by TMP of the characters Cogliostro or Medieval Spawn, in the

STLD01-952849-2

spirit of settlement Mr. McFarlane wrote back later that day asking several questions about the standard DC contract, including the following:

> Also, accounting on the Medieval Spawn will be done from a formula you said DC Comics uses on derivative characters, not the standard agreement of a new hero. Is this acceptable?

79. Mr. Gaiman responded in writing as follows:

> Medieval Spawn accounting—yes, I should have put that in. (I'd formula him at 50% of Angela.)

80. Although Mr. McFarlane, TMP and Mr. Gaiman never finalized their discussions into a binding contract, after receipt of Mr. Gaiman's second letter of July 15, 1997, and acting in good faith reliance upon the truthfulness of Mr. Gaiman's representations about his "creator," "character equity," and other royalty rights under the standard DC contract, TMP paid Mr. Gaiman a large sum of money in the form of royalties and shipped to him various materials relating to the *Miracleman* comic book that TMP had acquired through a bankruptcy court sale during the Chapter 7 liquidation of the Eclipse Comics, Inc., the publisher of *Miracleman*.

81. Less than a month later, Mr. McFarlane learned that Mr. Gaiman had lied to him about the payments he would have received for Medieval Spawn and Cogliostro under the standard DC contract and had lied to him about the flat 15% royalty he allegedly would have received under the standard DC contract for television and motion picture uses of characters. In fact, as Mr. McFarlane learned in August of 1997, Mr. Gaiman would have received no payments for Medieval Spawn, would have had no cognizable rights in the fully-developed Cogliostro character (who differed in important respects from the Cagliostro character who appeared in Issue 9), and would not have received a flat 15% (or a pro rata share of same) for License or Media Royalties (even if those characters had qualified for "character equity" rights under the standard DC Comics contract, which they didn't).

17

## The Discovery of the Truth About
## Mr. Gaiman's "Standard DC Comics Contract"

82. Only after the commencement of this lawsuit and after the taking of discovery from Mr. Gaiman and others has the full extent of Mr. Gaiman's fraud been discovered. Among other things, and directly contrary to his representation in his May Letter:

   a. There is no "basic DC deal" or "standard DC deal";

   b. Mr. Gaiman had no "basic" or "standard" DC deal;

   c. Under Mr. Gaiman's DC Comics deal, the "creator royalty" that Mr. Gaiman represented he would receive for subsequent comic book uses of the three characters in *Spawn* Issue 9 was only awarded to him after he had written <u>fifty issues</u> of the *Sandman* comic book series;

   d. Under Mr. Gaiman's DC Comics deal, he did not receive any "character equity" royalty rights until <u>after he had written twelve issues</u> of the *Sandman* comic book series;

   e. Under the "standard DC deal," Mr. Gaiman would have received no "character equity" rights in Medieval Spawn or Cogliostro and no royalties on the sale of comic books featuring those characters that he did not write;

   f. Under the "standard DC deal," the actual "character equity" License and Media Royalty rates generally were <u>10%, not 15%</u>;

   g. Mr. Gaiman himself had various "character equity" contracts with DC Comics in which the License and Media royalty percentages ranged from a low of 7.5% to a maximum 15%;

   h. Earlier that same year, Mr. Gaiman had signed two separate "character equity" contracts with DC Comics in which the License and Media Royalty percentages were 10%, and not the 15% he represented to Mr. McFarlane;

   i. Regardless of the License and Media Royalty rates assigned in the "character equity" agreements, those were never flat rates; indeed, <u>every single version of the DC Comics contract Mr. Gaiman signed</u> gave DC Comics the unilateral right to reduce the assigned percentage (or even eliminate it) for a variety of reasons that had direct application to all of TMP's subsequent uses of Cogliostro, Medieval Spawn and Angela.

STLD01-952849-2

83. Mr. Gaiman thus made misrepresentations and omissions of material facts and obtained money from TMP on false pretenses. Moreover, he fraudulently induced TMP and Mr. McFarlane to ship him valuable materials relating to *Miracleman* in exchange for rights that Mr. Gaiman never had or willfully overstated.

84. Mr. McFarlane and TMP justifiably relied upon Mr. Gaiman's misrepresentations to their detriment.

85. As a direct and proximate result of Mr. Gaiman's fraud, Mr. McFarlane and TMP have been damaged in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)

86. Mr. McFarlane and TMP reallege and incorporate the preceding paragraphs of their Counterclaim as the first paragraph of this claim.

87. During the summer of 1997, Mr. McFarlane and TMP conferred a benefit upon Mr. Gaiman in the form of payments and delivery of materials related to *Miracleman*.

88. Plaintiffs have obtained that benefit and profited as a result of it.

89. The acceptance and retention by Plaintiffs of that benefit without compensation to Mr. McFarlane and TMP would be unjust.

90. As a direct and proximate result of the foregoing, Plaintiffs have been unjustly enriched in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Mr. McFarlane and TMP respectfully pray for the following relief:

    a.    A declaration setting forth the rights of Mr. McFarlane and TMP in the copyrights in Issues 9 and 26 of *Spawn* and Issues 1, 2 and 3 of *Angela*, including all characters contained in those comic books;

b.  An order invalidating the nine copyright registrations obtained by Mr. Gaiman in various aspects of Issues 9 and 26 of *Spawn* and Issues 1, 2 and 3 of *Angela*;

c.  An award of compensatory damages in an amount to be determined at trial;

d.  An award of punitive damages;

e.  An award of their costs and attorneys' fees expended in this action to the extent permitted by law; and

f.  Such other and further relief as the Court deems just.

Dated: July 30, 2002

LA FOLLETTE GODFREY & KAHN

*/s/*

Eugenia G. Carter
Todd G. Smith
One East Main Street, Suite 500
Madison, WI 53701
Tel: (608) 257-3911
Fax: (608) 257-0609

—and—

Michael A. Kahn
Peter W. Salsich, III
Stinson, Mag & Fizzell
100 South 4th Street, Suite 700
St. Louis, MO 63102
Tel: (314) 259-4500
Fax: (314) 259-4599

Attorneys for Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc. and McFarlane Worldwide, Inc.

STLD01-952849-2