

REC'D & FILED
2002 SEP -3 PM 3:23
J ___ ___ ___ TZ
CLE___ ___ ___
___ CT COURT
WD ___ ___

# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF WISCONSIN

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

NEIL GAIMAN, a resident of Wisconsin,
and MARVELS AND MIRACLES, LLC,
a Wisconsin Limited Liability Company,

        Plaintiffs,

    vs.                 Case No. 02-C-0048-S

TODD McFARLANE, a resident of Arizona,
TODD McFARLANE PRODUCTIONS, INC.,
an Arizona corporation,
TMP INTERNATIONAL, INC.,
a Michigan corporation,
McFARLANE WORLDWIDE, INC.,
a Michigan corporation,
and IMAGE COMICS, INC.,
a California corporation,

        Defendants.

*03-1461*

= = = = = = = = = = = = = = = = = = = = = = = = = = = = = =

## VOLUME I

Deposition of:

### NEIL RICHARD GAIMAN

= = = = = = = =

U.S.C.A. — 7th Circuit
FILED

___ ___ ___
___ ___ ___
DOC ___ ___

Date:  Monday, June 24, 2002

Time:  9:05 o'clock a.m.

___nted b___



03-1461-D06

MADISON • 608-256-1313           FAX • 608-256-130___
ONE EAST MAIN ___ MADISON WIS___
email: depos@madison-milwaukee.com or depos@professionalreporters.com ___

1                          I N D E X

2   Exhibits Nos.:                                    Page

3   57 - Contract dated September 1, 1992              108

4   58 - Contract dated February 1, 1993              108

5                      = = = = = = =

6                          DEPOSITION of NEIL RICHARD GAIMAN,

7   a witness of lawful age, taken on behalf of the

8   defendants in the above-entitled cause, wherein NEIL

9   GAIMAN, et al., are the plaintiffs and TODD McFARLANE, et

10  al., are the defendants, pending in the District Court of

11  the United States for the Western District of Wisconsin,

12  pursuant to stipulation, before HEIDI L. DAVIS, a Notary

13  Public in and for the State of Wisconsin, at the offices

14  of LaFollette, Godfrey & Kahn, Attorneys at law, One East

15  Main, Madison, Wisconsin, on June 24, 2002, commencing at

16  9:05 o'clock a.m.

17

                     A P P E A R A N C E S
18
        ALLEN A. ARNTSEN and JEFFREY A. SIMMONS,
19          FOLEY & LARDNER, Attorneys at Law
            150 East Gilman, Madison, Wisconsin
20          appearing on behalf of the plaintiffs;

21      KENNETH F. LEVIN,
            Attorney at Law, 20 North Wacker Drive,
22          Suite 2200, Chicago, Illinois, also
            appearing on behalf of the plaintiffs;
23

24

25

                              2

1        <u>APPEARANCES</u>   (Continued)

2        PETE SALSICH, III,
             BLACKWELL, SANDERS, PEPER, MARTIN, LLP,
3            Attorneys at Law, 720 Olive Street,
             Suite 2400, St. Louis, Missouri,
4            appearing on behalf of the defendants;

5        TODD G. SMITH and GABRIEL S. GROSS (a.m.),
             LAFOLLETTE, GODFREY & KAHN,
6            Attorneys at Law, One East Main Street
             Madison, Wisconsin, also appearing on
7            behalf of the defendants.

8                = = = = = = =

9            NEIL RICHARD GAIMAN,

10       called as a witness, after being first

11       duly sworn in the above cause, testified

12       under oath as follows:

13                <u>EXAMINATION</u>

14       <u>BY MR. SALSICH:</u>

15   Q   Could you please state your name for the record.

16   A   Neil Richard Gaiman.

17   Q   And could you spell your last name for me.

18   A   G-a-i-m-a-n.

19   Q   And are you a citizen of the United States,

20       Mr. Gaiman?

21   A   No.

22   Q   Do you reside here in the United States?

23   A   I do.

24   Q   And what state are you a resident of?

25   A   Wisconsin.

3

1   Q  Have you ever had your deposition taken before?

2   A  No.

3   Q  Let me just kind of go through some of the ground

4      rules today.  I understand you were out in Phoenix

5      last week at the depositions of Todd McFarlane and

6      Larry Marder.  You probably observed the procedure.

7          If I could refresh your memory on a few things.

8      As you saw, it's a question and answer process.  And

9      the court reporter here today is making a record for

10     us.  And the goal is that we get a clean record,

11     meaning something that the lawyers can all use later

12     in the case if need be, and it will preserve your

13     testimony.

14         So with that in mind, I would like to make sure

15     that we, in order to make it clean, that when I'm

16     asking you a question, if you will wait until I finish

17     my question and give your answer.  I will do the best

18     I can to wait until you finish your answer before I

19     ask the next question.  Is that all right?

20  A  Yes.

21  Q  And you have just, my next point, you are already

22     doing it correctly, is we do need to have verbal

23     answers to questions and more than just verbal, they

24     actually need to be words.  So things like uh-huh,

25     uh-uh don't translate very well in the record.  Is

4

1       that okay?

2    A  Yes.

3    Q  There will be times when all these rules break down.

4       We start getting into a conversation, and I'm as

5       guilty of it as the next person, so things aren't very

6       clear, we are talking over each other.  If that's the

7       case, I may step back and go back over a few things

8       just to make sure we have things clear.  Do you

9       understand?

10   A  Yes.

11   Q  Also, if at any time you need to take a break, just

12      let us know, that's fine.  We have got refreshments

13      here and there is obviously restrooms.

14          I would ask you, however, if you do need to take

15      a break, if there is a question that's currently

16      pending, you should go ahead and give a response to

17      that question and we will take a break afterwards.

18   A  Okay.

19   Q  Also, you have counsel here.  As you probably saw last

20      week, sometimes lawyers make objections to the

21      questions.  There may be a lot of objections today,

22      there may not, but just so you understand, those

23      objections that your attorney is making are in order

24      to preserve the record.

25          A judge would later on rule on whether the

5

1    question was in fact objectionable.  So it may be that

2    I will change my question or it may be that I will

3    simply ask you to go ahead and answer the question

4    anyway.

5         And unless your attorney specifically instructs

6    you not to answer that question, I will ask that you

7    go ahead and answer.  Do you understand?

8  A  Yes.

9  Q  You are certainly free to consult with your attorney

10    about any of this.  I'm not talking about keeping your

11    attorney out of things.  I just wanted you to

12    understand the process.

13  A  Okay.

14  Q  You said you never had your deposition taken before.

15    Have you ever been a party to a lawsuit prior to this?

16  A  No.

17  Q  Have you ever been a witness in a lawsuit of any kind?

18  A  No.

19  Q  What is your educational background?

20  A  School, English school.

21  Q  Do you have a college degree?

22  A  No.

23  Q  Public school, private school?

24  A  English public school, which is a private school.

25  Q  Did you take any college courses?

6

1  A  No.

2  Q  And I would like to ask you some questions now about

3     your employment history.  And I don't need every

4     single job you have ever done.  We only have a day.

5         And I understand that you are a writer, is that

6     correct?

7  A  Yes.

8  Q  And have you been a writer -- let me step back.  Maybe

9     I can come at it this way.  Since the time that you

10    left public school, have you worked as a writer?

11  A  Yes.

12  Q  Pretty much nonstop that entire time?

13  A  My first -- at the point where I started paying taxes,

14    I was paying taxes, very small ones initially, as a

15    freelance journalist, as a writer.  And that's what I

16    have been paying taxes on ever since.

17  Q  And of course we are going to assume that there wasn't

18    a five-year period where you were working without

19    paying taxes, right?

20  A  I was not -- I worked for a I think about a three-year

21    period after getting out of school as a counselor for

22    the Church of Scientology and was not earning enough

23    to pay taxes during that time.

24  Q  Are you still involved with the Church of Scientology?

25  A  I don't understand the question.

1   Q   Okay.  Thank you, by the way, for telling me that,
2       because that's something I should have mentioned
3       before.
4           If there is a time today, and there may be many,
5       that you don't understand my questions, please just
6       ask me to rephrase them.
7           You stated that you spent three years,
8       approximately three years working as a counselor with
9       the Church of Scientology, is that right?
10  A   Yes.
11  Q   Were you a member of the Church of Scientology at that
12      time?
13  A   Yes, at the time.
14  Q   Are you still a member of the Church of Scientology?
15  A   I don't consider myself as such.
16  Q   When was the first time you published any freelance
17      writing, or maybe I should ask when was the first
18      time, and just generally by year, that writing you did
19      was published?
20  A   In 1981.
21  Q   Do you recall what that was, what the first work was?
22  A   A review of a 10cc concert, I believe.
23  Q   And was that with a newspaper?
24  A   Yes.
25  Q   Did there come a time in your employment or in your

8

1    career as a writer that you began writing in the comic

2    book industry?

3  A  Yes.

4  Q  When was that?

5  A  1986, although I had begun writing comic scripts which

6    were later published in comics form in 1985.

7  Q  So mid eighties you began writing comic scripts, is

8    that correct?

9  A  Yes.

10  Q  And in 1986, was that the first time one of your comic

11    scripts was published in comic book form?

12  A  Yes.

13  Q  Do you recall what comic that was?

14  A  There were a couple that were more or less

15    simultaneous.  It would either have been 2000 A.D. or

16    it would have been Knock About Comics, Outrageous

17    Tales from the Old Testament, which was a bible comic.

18  Q  You said 2000 A.D.  Was that the title of a comic book

19    series?

20  A  It's an English weekly comic, an anthology comic, and

21    they ran a series called Future Shocks, which were

22    three, four, five pages normally with a twist ending.

23  Q  Have you gone back since we hit the year 2000 to see

24    if you were correct in any of the predictions you

25    might have been making back in the mid eighties?

9

1    A  I was never really into prediction.

2    Q  I guess that's a no?

3    A  No, I have never gone back to check.

4    Q  Just curious.  Did there come a time that you began

5       working with DC Comics?

6    A  Yes.

7    Q  When was that?

8    A  1987.

9    Q  And how did that come about?

10   A  I wanted to write for DC Comics.

11   Q  Why is that?

12   A  2000 A.D. stuff that was published, I rapidly realized

13      that they were taking all rights to the work I did.

14   Q  Who do you mean by they?

15   A  2000 A.D., at that point I think it was Fleetway

16      Publications.  One had to sign over all rights and I

17      saw stories I had written reprinted in American

18      editions and that they gave me no copies of and that I

19      was not paid for.

20   Q  When you wrote for the comic 2000 A.D., were you paid

21      for that work?

22   A  Yes.

23   Q  Were you paid a flat fee for turning in the script?

24   A  Yes.

25   Q  Did you sign a contract with, was it Fleetway

1  Publishing?

2  A  Yes, it was a back-of-the-check contract at the time.

3  Q  And did that back-of-the-check contract state that you

4     were granting all rights in the work you were turning

5     in to Fleetway Publishing?

6  A  I no longer remember.

7  Q  How do you know that they were taking all rights?

8  A  Because they never paid anything else for use.

9  Q  Were you finished with that?

10 A  I am now.

11 Q  Did you ever complain about that to Fleetway?

12 A  I spoke to Steve MacManus, the editor, who said that

13    was how they did it and they would love to change it,

14    but it wasn't changed.  And that was the last thing I

15    did for 2000 A.D.

16 Q  When you say they were taking all rights, what do you

17    mean by the term all rights?

18 A  In this case I mean specifically reprint rights

19    without payment.

20 Q  So that I understand your answer, do you mean that

21    Fleetway had the right to reprint your work without

22    paying you, is that what you understand by them taking

23    all rights?

24 A  In this case.

25 Q  When you say this case, we are referring to the 2000

11

1    A.D., correct?

2  A  2000 A.D. short stories, that was their practice.

3  Q  Just so I understand, do you believe that 2000 A.D.

4     should have had the right to do reprints but that they

5     should have paid you for that, is that your

6     contention?

7  A  Yes.

8  Q  So it was the lack of payment that was the real

9     problem, is that correct?

10  A  No other rights issues ever came up on those stories.

11  Q  Did you have an understanding as to who would own the

12     copyrights in the work that you submitted and was

13     ultimately published in 2000 A.D.?

14  A  Not at the time.

15  Q  Do you now have an understanding of who owned the

16     copyrights in the work that you submitted and was

17     later published in 2000 A.D.?

18  A  Can you give me the question again?

19  Q  Sure.  I asked if you had an understanding of who

20     owned the copyrights in the work that you submitted

21     and was later published by 2000 A.D. and I think your

22     answer was not at the time.  So I'm just simply asking

23     at some future time did you come to have an

24     understanding on who owned those copyrights?

25               MR. ARNTSEN:  I'm just going to

12

1   interject here.  In answering the question, to the

2   extent that any understanding is based on

3   communications with lawyers, don't answer as to

4   that.  If your understanding comes from sources

5   other than communications with lawyers, then you

6   can answer it.

7   A   I washed my hands -- after doing those four, maybe

8   five stories for 2000 A.D., I washed my hands of them,

9   have not worked for Fleetway since, have not submitted

10  work for Fleetway since, have not gone back and looked

11  at, nor could I find, I suspect, these days, any

12  pieces of paper signed with Fleetway since, and

13  chalked them up to experience as a bad job.

14      I also have made no specific study recently of or

15  at any time of English copyright law.

16  Q   So is your answer that in fact you do not have an

17  understanding as to the ownership of the copyrights in

18  the work that you submitted and was later published in

19  2000 A.D.?

20  A   I suspect --

21                  MR. ARNTSEN:  Don't speculate.

22      Just listen to the question and answer it.

23  A   No.

24                  MR. ARNTSEN:  I didn't know whether

25  to instruct or kick there.

1          THE WITNESS:   Kick is fine.   I have
2      never done this before.
3    Q  You are doing fine.   Let me just make a statement
4      now.   I'm not going to be interested in learning from
5      you today anything that you learned from your counsel
6      or discussed with your counsel.   I'm not interested in
7      invading the attorney-client privilege.   And Allen
8      will do a good job of making sure that I don't, even
9      if I wander in there accidentally.
10   A  Good.
11   Q  So you understand that.   Also, if you would bear with
12     me a little bit and I'm going to look to you, even
13     though you have not done a deposition before, what you
14     have done that I have never done before is work in the
15     comic book industry.
16         I represent Todd McFarlane.   I know something
17     about the work.   I represented Image Comics.   I know a
18     little bit about their history, but I am not ever
19     going to scratch the surface of what you know.
20         And part of what we are going to be doing today
21     is trying to get your understanding of some events
22     that took place as long as 10 years ago and more
23     recently.   And also, these events have to do and are
24     intimately related with the way comic books are
25     written and published.


                          14

1  A  Understood.

2  Q  So if I'm stumbling about in this area a little bit

3     and I'm asking the wrong question, please help me

4     out.  Okay?  I'm not going to ask you to do my

5     deposition for me, but bear with me.

6        I may say some of the wrong terms.  If you can

7     correct me so that we are cleaner.

8                 MR. SALSICH:  And, Allen, if you

9            can, if it comes up, I looked at Todd's

10           transcript, I know that happened a few times

11           there.

12 Q  So the lawyers are, we are getting up to speed, but we

13    will, I will need your help today.  Is that okay?

14 A  Understood.

15 Q  Also, and I think this probably makes the most sense,

16    I would like to talk primarily in a chronological

17    fashion.

18       Obviously we are here today to discuss events

19    that took place with you and Todd McFarlane over the

20    creation of some issues of Spawn and things that move

21    forward from there.  And I think it makes the most

22    sense to proceed roughly chronologically.

23       We may jump back and forth, but if I'm way off

24    base in my time or you need to explain something that

25    happened prior to what I'm asking about in order to

15

1   give a good answer, please feel free to do so and we

2   will just work our way back around.  Is that okay?

3   A   Okay.

4   Q   And again speaking of chronologically, why don't we

5   start with the beginning.  Will you tell me the first

6   time you met Todd McFarlane?

7   A   It was a convention called Dragoncon in Atlanta in

8   late June or early July of 1992.

9   Q   And what were you doing at that convention?

10  A   I was guest of honor, or one of them.

11  Q   And what were you doing in the comic book world that

12  would have made you guest of honor at that convention

13  in 1992?

14  A   I was the writer of a comic named Sandman, which in

15  1992 was the single-most acclaimed ongoing series of

16  comics probably that there has ever been in terms of

17  literary rewards received and respect in the industry

18  and personal awards that were coming in for the comic

19  and for the writing thereof.

20  Q   Did these personal awards and the literary awards, did

21  those translate into box office success, if you will,

22  of the comics?  Was Sandman a big seller?

23  A   You -- Sandman slowly worked its way up from the first

24  issue through to the last issue, from, on a league

25  table of one to 500 being all the comics published

16

1    that month, we started probably in the low nineties

2    and slowly over the next seven years worked our way up

3    more or less to number one.

4       Since that time Sandman has been collected in

5    trade paperback and has gone on to continue to sell

6    millions of trade paperbacks.

7  Q  And when you say trade paperback, so we understand, is

8    that a collection of three, four, five, six issues

9    that had previously been published?

10 A  Yes.

11 Q  You mentioned seven years. Was that the run of the

12   time that you were working on Sandman during which the

13   book was actually published in a monthly form?

14 A  I would have to work it out exactly. I think the

15   first issue came out in January of, I think the first

16   issue had a January, 1999 cover date.

17 Q  1989?

18 A  1989 cover date and was actually published at the end

19   of '88, because cover dates and time of publication

20   are not necessarily coincident. Our last issue went

21   on sale my recollection is Spring of '96.

22 Q  Do you know how many issues overall were contained in

23   this series?

24 A  75, plus a special.

25 Q  Why did you stop putting out the Sandman issues?

17

1    A   The story was done.

2    Q   We will come back to Sandman in a little bit, but in

3        1992, in the Summer of 1992 you were in Atlanta at a

4        convention and this is where you met Todd McFarlane,

5        is that correct?

6    A   Yes.

7    Q   Did you know of Todd McFarlane prior to meeting him at

8        this convention?

9    A   Yes.

10   Q   How is that?

11   A   When -- as a writer of comics, I would get the DC

12       Comics, they send you everything they publish that

13       month, and I saw Infinity, Inc. which was drawn by

14       Todd, and later I remember somebody coming up to me in

15       the DC offices showing me Spiderman number 1, which

16       Todd drew and which people thought was very funny

17       because the writing demonstrated that the person

18       writing it had never written anything before.  Other

19       than that, I knew nothing about him.

20   Q   So you knew Todd was a comic book artist in 1992, is

21       that correct?

22   A   Yes.  I also knew that in 1992, that he and several

23       other artists whose work I wasn't particularly

24       familiar with because they were all Marvel people, had

25       just left Marvel and founded a comic studio called

18

1    Image or a publisher called Image, which they

2    announced at the time was all about creators' rights

3    and treating creators well and that was -- so I knew

4    that.

5  Q  And how did you come to meet Todd at this convention

6    in Atlanta, were you on a panel together or --

7  A  No.  We were signing in the same room.  And in fact,

8    the room contained the two of us, and I was signing on

9    the left at a table and Todd was signing at the right

10   on a table.  And we had two lines and they both went

11   out of the haul and went down the stairs and went

12   around.

13       And Todd's line was 14-year-old boys and under

14   and my line started with 16 years old and went over,

15   went up from there.

16  Q  Was Todd signing copies of Spiderman?

17  A  Spiderman and Spawn, I think there were the first -- I

18   think he was up to Spawn 2, maybe Spawn 3 at that

19   point.

20  Q  So Spawn had really just started at that time, is that

21   correct?

22  A  Yes.

23  Q  And Image Comics had just started, as far as you knew,

24   right around that same time?

25  A  Yes.

19

1    Q   Did you and Todd at that time talk about working

2        together?

3    A   No.

4    Q   Did there come a time when you did discuss working

5        together with Todd?

6    A   In several months after that, he phoned me up and

7        asked me if I would consider writing an issue of

8        Spawn.  And all, as far as I know the Image people,

9        they were all artists.

10       And when Image started, they were getting a lot

11       of stick from fans and from the comics press for being

12       illiterate garbage, which is probably a polite way of

13       putting the things they were saying about the comics,

14       chiefly those written by Rob Leifeld.

15       And Todd had phoned me up and asked me if I would

16       write one.  He said what he wanted to do was go to the

17       four best, biggest and most important writers in

18       comics and get a guest issue written by each of them

19       to show people that an Image comic could be well-

20       written and to show his, I don't think he used the

21       word humility, it's not a word that Todd would use,

22       but that was what was being communicated, that hey, I

23       can learn, that kind of thing.

24    Q   And that he wasn't already too big to realize that

25       other people could help out as to the quality of his

1  creation, is that right?

2  A  Yes.  And I also think he considered it the ultimate

3  marketing gimmick to have good writing.  He said at

4  one point to me during this that Leifeld and co. were

5  putting foil-embossed stamped covers on things and

6  rolling out new number ones in order to get the

7  numbers.  And he had four issues of good writers and

8  that was his gimmick.

9  Q  So did all of this conversation take place during one

10  telephone call, do you recall, or how did this work?

11  A  There were several conversations.

12  Q  Were they all on the telephone?

13  A  Yes.

14  Q  At some point did you agree to write an issue of

15  Spawn?

16  A  Yes.

17  Q  Was that issue 9?

18  A  Yes.

19  Q  Did you discuss with Todd prior to actually doing the

20  writing that was submitted for issue 9, did you

21  discuss financial terms with Todd?

22  A  No.

23  Q  Never?

24  A  Define never.

25  Q  Never prior to submitting your work -- let me step

21

1    back.  At some point you just testified that you in

2    fact did write an issue of Spawn.  That was issue 9,

3    is that correct?

4    A  Yes.

5    Q  And I want to talk in a little bit more detail about

6    the process of the writing, but at this point was

7    there a time in which you actually submitted a script

8    to Todd McFarlane or his company to be included along

9    with artwork in issue 9?

10   A  No.

11   Q  You never submitted a script?

12   A  A script is not printed along with the artwork in

13   issue 9.  The script is what the artist then draws

14   up.  If the script had been printed, it would have

15   been a completely different thing.

16   Q  Maybe I misspoke.

17   A  I'm not being semantic here.

18   Q  No, I understand.  And I may have misspoke and it is

19   important for you to correct me if I do that because I

20   don't want to use terms incorrectly as they apply to

21   this specific industry.

22       My question was did you in fact submit a script

23   for use in or that later was combined with work to

24   become issue 9?

25   A  Yes.

22

1    Q  Prior to submitting that script, at any time prior to

2       submitting that script, did you ever discuss whether

3       you would get paid by Todd McFarlane for your work?

4    A  I don't think it came up in those terms.  Can I be

5       helpful for a minute so that we don't have to --

6    Q  Sure, yeah.

7    A  There was no initial discussion of payment amounts.

8       As I recall, when I agreed to do it, I got a check and

9       a call from Terry Fitzgerald, who worked for Todd in

10      some capacity, which rather surprised me, but this was

11      after I had agreed to do it, sending a check for

12      $10,000 for having agreed to do it and saying that

13      when the script came in, there will be another $10,000

14      and then after that it would be based on royalties on

15      -- there would be a royalty that would come in on the

16      issue.

17         And when it became apparent that the orders of

18      the issue were, according to them, I believe 1.1

19      million copies, they said it was going to be around

20      $100,000, which would be the kind of royalty that you

21      would have got from any publisher on those kind of

22      sales, but that was not -- none of the financial

23      details were discussed with Todd in those early phone

24      calls.

25   Q  So I understand correctly, I believe you said that you

23

1    were surprised to receive the first $10,000 check from

2    Terry Fitzgerald, is that correct?

3  A  Yes.

4  Q  So when you received that check from Terry Fitzgerald,

5    had you not discussed any financial terms with Todd at

6    that point?

7  A  No.

8  Q  You had not?

9  A  No.

10  Q  Did you call Terry and say "What's this check for"?

11  A  As I recall, it came with a note saying, which I

12    believe we still have in the files, saying here is

13    $10,000, we will send you another when we get the

14    script.

15  Q  How did the size of that -- step back.  Did Terry's

16    note suggest that that was an advance against future

17    royalties?

18  A  Yes.

19  Q  How did the size of that advance, $10,000, compare

20    with advances you had received for other work you were

21    doing at that time?

22  A  It was comparable.

23  Q  Had you ever received a $10,000 advance for one issue

24    of a comic book before?

25  A  If memory serves, I had received more than that for

24

1   Black Orchid, which was a three-issue series that I

2   had done for DC in 1988.  As a novelist, I was used to

3   receiving, I received significantly more than that.

4   As for a one-shot story, it was significantly more

5   than I had received for one comic.

6       Having said that, I had not written at the time,

7   nor had I had any interest in writing comics that

8   would have sold in the numbers that Spawn was.  And

9   also, we were in the middle, actually that was -- we

10  weren't even in the middle, that was the high point of

11  -- you can actually go back and look at the graph.

12  That was the high point of what was called the

13  speculator boom.

14      So it was -- that payment would have been very

15  comparable to anything coming out then as a number one

16  or with a foil-embossed cover or anything.

17      Comics were selling 750,000 to 1.5 million

18  copies.  These days 100,000 is incredibly good.  These

19  days 40,000 is really good.

20  Q  You were at Todd McFarlane's deposition last week,

21     were you not?

22  A  Yes.

23  Q  And you heard Todd tell his version of the events that

24     we are talking about, is that correct?

25  A  Yes.

25

1    Q   Do you recall Todd testifying, and I'm not going to

2        try the exact testimony, but I have read a rough

3        version of the transcript, do you recall Todd

4        testifying to the effect that each of the four guest

5        writers, and that would include you, of Spawn issues 8

6        through 11 received essentially the same financial

7        terms?

8    A   Yes.

9    Q   And that those terms were, as Todd recalled, $100,000

10       each?

11   A   Yes.

12   Q   Was there anything about Todd's -- excuse me.  Let me

13       ask you one other question.

14           Do you recall Todd testifying that regarding the

15       financial terms between you and him for issue 9, that

16       you wanted to make sure that you did not get any worse

17       than the standard DC Comics deal that you were getting

18       for Sandman at the time?  Do you recall Todd

19       testifying to that?

20   A   I recall Todd approximating -- I recall Todd saying

21       that, yes.

22   Q   What I would like to ask you is now is your time to

23       tell your version of those events.  And I would like

24       to ask you maybe just generally tell me what you

25       understand to be all of the discussions you had with

26

1    Todd about money terms and then I will break it down

2    and ask you some questions.

3                        MR. ARNTSEN:  And what time frame

4         here are we talking about?  I think it would make

5         -- for instance, there are some obvious time

6         breaks.  One is before the script is submitted.

7         One is, you know, when the comic is published and

8         then obviously going forward on that -- just wait

9         a second.

10   Q  That's a good point.  And let's try to do it this way,

11      and this may be not always normal deposition

12      procedure, but I think it may help this time.

13          I'm not interested in conversations that you and

14      Todd had in 1995 or 1996 or even later about going

15      back to what was said in 1992.

16          What I'm talking about is the discussions that

17      you had at some point, and correct me if I'm wrong, at

18      some point would you agree with me that you and Todd

19      came to an agreement in and around 1992 that resulted

20      in you submitting the script that ultimately was

21      included in issue 9?

22   A  Yes.

23   Q  And that you, pursuant to that agreement, whatever it

24      was, you received at least $100,000, is that correct?

25   A  $100,000.

27

1   Q  And that you, going forward from that point in time,

2      you did receive some royalty payments as a result of

3      the work you had done in issue 9, is that correct?

4   A  I would have to check to see.

5   Q  I'm not asking you to hold -- right now what you got,

6      but --

7   A  I don't know.  I would have to check.

8   Q  In any event, you did agree to do the work and Todd

9      did agree to pay you something that became $100,000,

10     is that right?

11   A  Yes.

12   Q  That's the time period I'm talking about, just that

13     agreement.  And I don't know whether that agreement

14     took place prior to doing the work or in the process

15     of doing the work or shortly thereafter.  So you will

16     kind of need to tell me all of that discussion.

17   A  Before I got the work, before I agreed to do it, there

18     were several phone calls from Todd promising things

19     and trying to persuade me to do it.  From my

20     perspective, there were a number of downsides to

21     working with Todd and to working with Image.

22        They were, despite their obvious commercial

23     success, the industry laughing stock at the time,

24     which meant that by working with them, by putting

25     Mr. McFarlane in the position where he could use as

28

1   his sole advertisement for Spawn 9, a black page with

2   the word Gaiman written on it, that was something that

3   was lending him cache and I had to decide whether or

4   not I was willing to do that.

5       So Todd was very much courting me.  He very

6   wisely didn't mention money at the time.

7       What he talked to me about was showing unity with

8   creators, sticking it to the big companies, complete

9   creative freedom, not signing anything away, and just

10  being, and also just pointing out that it would shake

11  people up.

12      And I think on the second phone call, when I was

13  still wavering, he also said "Okay, you know, I think

14  I have got Alan now where I have got Alan and I think

15  Dave Sim and Frank Miller are going to say yes.  Come

16  on, it's the big four, you can't be left out."  And

17  those were the things that he used to persuade me.

18      I remember him offering complete creative

19  freedom.  The phrase he used was "You can have 22

20  pages of Spawn reading the newspaper for all I care.

21  You can make up his past, you can do whatever you

22  like, you have complete creative freedom."  And I said

23  yes in the end.

24      Money was not discussed.  The point money was

25  discussed was after that first check came in with a

29

1    little note from Terry Fitzgerald after I had done the

2    first, my first sort of brainstorming.  I had just

3    brainstormed, said here is an idea, here is an idea,

4    here is an idea and sent it off to them.  And I got

5    this check.

6         And the next time Todd phoned, I said "By the

7    way, you know, you sent me a check, you haven't sent

8    me any kind of contract."  And Todd said "We don't

9    send contracts, we treat you better, you know, it's

10   just that's not how we do business, we don't do

11   contracts, but we will treat you" -- he said "But I

12   will tell you what, I will treat you better than DC

13   ever would with their contracts."  And that was the

14   sum total of it.

15        And I thought okay.  And I sent my agent,

16   Merrilee Heifetz, my literary agent, her share of the

17   money, her 10 percent.

18        And she phoned me up and said "Where is the

19   contract that goes with this?"  And I said "There is

20   no contract.  Todd has said he is going to treat me

21   better than anybody would with a contract."

22        And she said "You trust him?"  And I said "Yeah,

23   he seems like a very good guy on the phone and he is

24   not asking me to sign anything away."

25        So obviously I trusted him.  And that was where

                           30

1    we got up to at that point and that was the entire

2    conversation about money.

3        Once the orders started coming in on these books,

4    Spawn from what, this is -- I don't know if this from

5    personal knowledge, but this is what Todd told me at

6    the time, the orders from Spawn, for Spawn 6 or 7 were

7    down to about 600,000 copies.

8        And with the Alan Moore issue, they went up to

9    about 1.2 million.  And for me they were about 1.1

10   million.  So they doubled as a result of the gimmick.

11   And Dave Sim came in at about 800,000 and Frank

12   Miller's was up there around a million.

13       And he decided to just, said "I'm just giving you

14   all $100,000."  And this was after the orders had

15   started coming in and he saw what was actually

16   happening.  And he said "I'm just going to give you

17   all $100,000 rather than do the sums, so you have each

18   got a round number and you can do with it what you

19   will."

20       And I did the sums in my head, figured 1.1

21   million, 195 comics, 100,000 seemed about comparable

22   to the kind of money I would be getting from DC, if I

23   decided to write a number one for them at that point

24   and, yeah, left it about there.

25       I had recently done, about that time, I did

31

1    Sandman number 50, our 50th anniversary edition, which
2    came out with a special cover, extra length issue, and
3    that at the time had sold over a quarter of a million
4    copies.  So, you know, you were looking at a 30,
5    $40,000 royalty check on that.  So it was definitely
6    comparable.
7                    MR. ARNTSEN:  Can we take a quick
8          break here?
9                    MR. SALSICH:  Sure.
10                   (A short recess is taken)
11   Q  Mr. Gaiman, before we took a break, we were talking at
12      some length about your agreement with Todd McFarlane
13      that led to your work on issue 9 on Spawn.  Do you
14      recall that conversation?
15   A  Yes.
16   Q  And I want to break down and just ask you a couple
17      follow-up questions about what you just testified to.
18      First of all, you were having your conversations with
19      Todd McFarlane during this time.
20         Did Todd McFarlane explain to you that he was
21      speaking on behalf of a company he had formed?
22   A  No.
23   Q  Did you ever discuss any of the corporate structure
24      involved with Todd and Image Comics or Todd McFarlane
25      Productions or anything like that?

1               MR. ARNTSEN:   Ever?   What time

2          period?

3     Q    He has got a good point.   Let him make those

4          objections even though if you and I think we

5          understand each other, it's important to make sure we

6          do clarify the record.

7               Again, we are talking about the time frame

8          between your meeting Todd McFarlane in Atlanta in the

9          Summer of 1992 and the time that Spawn issue 9 hits

10         the newsstands.

11    A    He told me that Image Comics was about creators'

12         rights, that the analogy that he would use, that DC

13         and Marvel were the plantation owners and they were

14         the slaves who left the plantation and started a free

15         land, that, you know, from the first he explained that

16         Image would treat me better and treated its creative

17         people better than DC or Marvel ever did and that, and

18         I remember at one point in there he even offered me my

19         own Image comic if I wanted one under him.

20              I remember he explained that the five

21         shareholders, or possibly six shareholders, there was

22         one guy who was sort of graying out on the edges and I

23         don't know if he ever did anything, who left early on,

24         but they could bring comics to the table and they

25         would come out with the Image I on them, which meant

33

1    you would sell at least over half a million copies.

2    If I wanted to do one of those, I could just find an

3    artist and go for it.  So those were the kind of

4    things that were being said.

5  Q  Did you understand that you were making an agreement

6    with Image Comics when you did Spawn issue 9?

7  A  I understood that I was talking to Todd McFarlane who

8    wanted me to write an issue of his comic which was

9    being published by Image.  I assumed that Todd had an

10   agreement with Image.  And as he kept telling me, you

11   know, he was part of Image and the Image I was very

12   important to him, the logo.

13  Q  Did Todd ever tell you that he had formed a company

14   called Todd McFarlane Productions?

15              MR. ARNTSEN:  Again ever?

16              MR. SALSICH:  Same period we were

17        talking about.

18              MR. ARNTSEN:  '92 to '93 is what we

19        are talking about?

20              MR. SALSICH:  Correct.

21              MR. ARNTSEN:  Up to '93?

22  Q  Let me ask a clean question again.  Assuming the same

23   time frame we have been discussing, 1992, 1993, at any

24   point during that time did Todd McFarlane tell you he

25   had started a company called Todd McFarlane

34

1    Productions?

2  A  No.  Phone calls from Todd would begin "Hey, this is

3     the Todd-meister," or "Yo, it's Toddy," not this is

4     Todd McFarlane representing Todd McFarlane Productions

5     or similar.  I don't remember Todd ever mentioning

6     Todd McFarlane Productions.

7         My understanding was that I was, he was the

8     artist, I was the writer and it was two creative

9     people getting together.

10 Q  Who did you understand to be the person or the party

11    that paid you $100,000?

12 A  Todd.

13 Q  Not Image Comics?

14 A  Todd was one-fifth of Image Comics.

15 Q  You are aware that people could be one-fifth of one

16    company and one-tenth of another company?

17 A  Yes, but he was one-fifth of the company that it was

18    coming out.  Todd was talking about Image all the

19    time, you know, bringing it out as an Image comic.  He

20    was definitely representing himself to me on the phone

21    as somebody to whom the success of Image Comics was

22    absolutely vital.

23        And I knew that my comic was being published by

24    Image Comics.  It had that great big Image I on the

25    cover.  Beyond that --


                              35

1   Q  I understand all that.  What I'm really just trying to

2       get to is in the complaint that you have filed in this

3       action, you have named Todd McFarlane as an individual

4       as a defendant, you have named Todd McFarlane

5       Productions, Incorporated as a defendant, you have

6       named TMP International, Inc., you have named

7       McFarlane Worldwide, Inc. and you have also named

8       Image Comics, Inc. as defendants.  Are you aware of

9       that?

10  A  Yes, I am.

11  Q  One of the claims that you make in your amended

12      complaint in this lawsuit refers to what has been

13      called a, excuse me, the 1992 agreement?

14  A  Uh-huh.

15  Q  Okay.  Are you -- do you recognize that?

16               MR. ARNTSEN:  Just to interject

17      here, as you know, counsel drafted the complaint.

18      So again, to the extent you are talking about

19      facts and using the complaint as references for

20      that, that's fine, but it's a legal document.

21  Q  Absolutely, I understand that.  And I'm not going to

22      try to make you make statements that I'm later going

23      to argue are legal conclusions, if there is anything

24      particularly noteworthy about something you may have

25      used in a heading.

1       I'm simply going to ask you about some facts.

2       You or together with your counsel have alleged two

3       agreements that you have with Mr. McFarlane and/or

4       some of the other defendants, both of which you claim

5       have been breached.  And that's the reason for this

6       lawsuit, is that correct, or one of the reasons?

7   A   It is.

8   Q   One of those agreements took place in 1992, is that

9       correct?

10  A   Yes.

11  Q   And one of them took place in 1997, is that correct?

12  A   Yes.

13  Q   I want to focus right now on what we at least today

14      will hope understand is the 1992 agreement, correct?

15  A   Yes.

16  Q   And in 1992 the only agreement that you have testified

17      to so far with Todd McFarlane is the one that led to

18      you writing issue 9 of Spawn, is that correct?

19  A   Yes.

20  Q   And I'm doing that primarily for purposes of narrowing

21      our discussion to the 1992 agreement.  Maybe it's

22      easier if I say regarding the 1992 agreement, we will

23      understand what we mean, rather than trying to get at

24      a particular time frame.  Is that okay?

25  A   That's good.


37

1   Q  If at some point I use that term and you say well,

2      I've got to explain it by going forward to 1994, '95,

3      please do so.  Okay?

4   A  Okay.

5   Q  All right.  And my question is with whom did you enter

6      into the 1992 agreement?

7                  MR. ARNTSEN:  Object to the extent

8           it calls for a legal conclusion, but answer with

9           regard to your understanding.

10  Q  Certainly.  What is your understanding of who were the

11     parties to the 1992 agreement?

12  A  Me and Todd.

13  Q  Just Todd McFarlane the individual?

14  A  I didn't know -- I think that's a legal conclusion.

15     He didn't represent himself to me specifically as I am

16     now talking -- when I saw him do his deposition the

17     other day, he would quite frequently say things like

18     "Now, at that point I, and I'm speaking here as Todd

19     McFarlane Productions."

20         He didn't do any of that stuff to me on the

21     phone, but the -- and I felt that I was talking to

22     somebody who was wearing, in terms of the hats that he

23     was wearing at the time, there was Todd the artist,

24     who was going to be drawing my comic, there was Todd

25     the creator and ongoing controller of Spawn, the

38

1    comic, and there was definitely Todd as one-fifth of

2    the Image partnership.

3        This was being seen -- I wasn't just writing a

4    comic for Todd McFarlane.  I was writing -- it was

5    very important to Todd that I was writing an Image

6    comic.  That was repeated several times, that, you

7    know, he didn't phone and say "I, Todd McFarlane, have

8    been taking hits as a bad writer."

9        In actual fact, by the point that he got -- well,

10   I mentioned earlier that he was laughed at for

11   Spiderman number 1.  By the time he got to Spawn, he

12   was, you know, approaching competency and, you know,

13   was competent.

14       It was the other guys who were getting -- it was

15   Image Comics as a generality, not Todd, that was

16   getting the shit for bad writing and I -- which was

17   one reason for coming to me, getting one of the four

18   most respected writers in comics at that point to come

19   in and write an issue, have an Image comic.

20  Q  Now, you testified before that at the time you agreed

21    to do the writing for issue 9 of Spawn, and I want to

22    focus our time now more narrowly in the time that you

23    entered into what we now will call the 1992

24    agreement.

25  A  Uh-huh.

39

1   Q   Do you understand that at some point in time you and

2       Todd reached an agreement that led to you writing

3       issue 9?

4   A   Yes.

5   Q   That's what I want to focus on, at that point in

6       time.  And I don't know exactly when that is, so you

7       may have to tell me.

8   A   Okay.  Todd phoned me up, Todd gave me a bunch of

9       reasons for writing it.  I said I would think about

10      it.

11          Todd phoned me up again.  Todd gave me a bunch

12      more reasons for writing it.  These would have

13      included, well, these did include at that point it

14      wasn't treating you better than DC would, that was a

15      little way after, but at that point it would have

16      been, you know, we will take care of you better than

17      any of the big companies, this is all about creator

18      rights, it's all about creators banding together, you

19      know, we have to do this to show -- and respect.

20          Respect was one of Todd's things that he kept

21      talking about.  He specifically mentioned his upsets

22      with Marvel and why he left, which is they had foreign

23      reprints of his stuff he didn't get paid for.  They do

24      T-shirts that he never got, posters that he never got,

25      he wouldn't -- he didn't get a share of.

40

1   He talked about a character called Venom, who I
2   don't know very much about, and I don't know if it was
3   somebody he created, but he was saying he didn't get a
4   share of the stuff, and over at Image it wasn't going
5   to be like that.

6   This was about respect, and that I think was the
7   point where I went, I said yes, I will do it,
8   understanding that this was all about respect.

9   And I remember during that period, I don't
10  remember whether it was after I had agreed or after I
11  had said yes that first time, but before he said the
12  better than DC thing, when I had asked for a contract,
13  or whether it was even before that, he had Terry
14  Fitzgerald send me the rough draft of his Comics
15  Journal interview, he did this interview with The
16  Comics Journal, and sent me a bunch of interviews by
17  Todd in which he was just talking about, you know, the
18  respect that people didn't get in comics and how the
19  end of the day he left Marvel because it got down to
20  Spiderman T-shirts with his images on and he got
21  nothing, he didn't even get copy of the T-shirt, and
22  that was never going to happen.

23  So it was that kind of, that was -- we are
24  talking about a conversation, a 10-year-old
25  conversation here and several 10-year-old phone

41

1    conversations, but he was very, he was still very

2    angry about the way that they had been treated at

3    Marvel and was very adamant that Image was not

4    somewhere where people were being treated like that.

5         Does that answer your question?

6  Q  It does.  And just so that I can narrow it down, so I

7    understand again, and I want to just focus on

8    specifically the point in which time you came to the

9    agreement.  And I think you have mentioned that it was

10   during the process of Todd's talking to you about his

11   reason for leaving Marvel, his reasons for starting

12   Image with the other Image founders --

13 A  Would there have been -- I mean, I know asking you is

14   something -- but in terms of context here, you know,

15   my agreement was, you know, at the point where I said

16   yes, I will write an issue for you, you know, there

17   was that as a moment of agreement, but obviously there

18   were things beyond that.

19        I could have handed him an issue and he actually

20   could have gone "You can't use this."  We might have

21   ended it at that point or whatever.

22 Q  That's a good point.  Let's break it down into two

23   steps here.

24 A  For me probably the real moment of, you know, we have

25   separate -- because there was no contract, because

42

1    they declined to send a contract when asked, I felt

2    the agreement was -- you know, I'm not sure I could

3    draw a line in the sand and say before this there was

4    an agreement, after this there was not an agreement,

5    through that, you know, the agreement was much more

6    broad and general.

7  Q  Let's see if we can try to do that today a little

8    bit. Okay. And I realize I'm asking you to go back

9    10 years, but there was a point in time in which you

10    agreed to do the work, correct?

11  A  Yes.

12  Q  And then there was a point in time when you did the

13    work, correct?

14  A  Yes.

15  Q  And there was a point in time when Todd accepted your

16    work --

17  A  Yes.

18  Q  -- correct? And then lastly, there was a point in

19    time in which issue 9 was published?

20  A  Was published.

21  Q  And on that time frame, between item number one, you

22    agreeing to do the work and item number two, when you

23    did the work, you received $10,000 in a check sent

24    with a letter by Terry Fitzgerald, correct?

25  A  Yes.

43

1   Q  And then you did the work, correct?

2   A  Yes.

3   Q  And then you received another $10,000 check upon

4      submission of the work, correct?

5   A  Yes.

6   Q  And then Todd accepted the work and --

7   A  Possibly the check was sent for acceptance of the

8      work.

9   Q  And doing the work and Todd accepting the work were

10     pretty close in time, correct, you doing the work and

11     Todd saying great?

12   A  Yes.  There were a couple of other things that were

13     done in that process before we got there.

14   Q  And rather than go into details in those, would they

15     generally be described as somewhat of an editor-writer

16     function, I mean, he may have suggested oh, what about

17     this or you may have discussed doing something, was it

18     that sort of thing that happened between there or --

19   A  Todd didn't suggest things.  Todd kept repeating "Hey,

20     if you want, whatever you want to do is fine."

21   Q  Let me ask you this.  Did Todd accept the first draft

22     that you sent of the script for issue 9?

23   A  Yes.

24   Q  So that's all I'm talking about, doing the work and

25     Todd accepting the work.  So then you received the

44

1   $10,000 check as part of that, as the result of that

2   little transaction, you doing the work and Todd

3   accepting it, correct?

4   A   Yes.

5   Q   And then some time between issue 9 being -- between

6   what we have just talked about, you submitting the

7   work and Todd saying great and issue 9 being

8   published, in the comic book industry isn't there a

9   step called the solicitation?

10  A   The solicitation of -- yes, there is, but the

11  solicitation was done before that.

12  Q   When would the solicitation have been done?

13  A   The --

14  Q   Prior to you submitting the script, wasn't it?

15  A   Yes.  I got a call from Terry Fitzgerald saying we

16  need something for the solicitation.  And I wrote a

17  paragraph for Terry describing that he could put in

18  his solicitation and I spoke to Todd and told him a

19  little bit about the issue.

20  Q   And based on those conversations with Todd, maybe it

21  was more than one or maybe it was one, and then the

22  paragraph you sent to Terry, it was based on that

23  information prior to you submitting a full script that

24  Todd had to do the solicitation, correct?

25  A   Yes.

45

1  Q  And just so we are clear, what do you understand by my

2     use of the term solicitation in this context?

3  A  In this context two different things, one of which is

4     soliciting into the trade, soliciting the book to the

5     trade, having something to show them and tell them so

6     that the comic stores could order.

7  Q  And you referred earlier to a point in time in which

8     the orders started coming in and it looked like yours

9     was going to be 1.1 million and Alan's was going to be

10    1.2, et cetera.  Are those the orders coming in that

11    you are talking about when you say the solicitation at

12    this context?

13 A  Would you like a quick 35 seconds on sequencing and --

14 Q  Yes.

15 A  Okay.  In order to understand comics, you need to know

16    what, that the body of the greater part of what was

17    being sold in is being sold into something called the

18    direct sales market.  This is not -- it's not

19    newsstands.  It's not supermarkets with a stack of

20    comics.

21       It's the dedicated comic stores that are selling

22    to people who are coming in to buy comics.  They are

23    buying their comics exclusively through a distributor

24    and the distributor is buying them nonrefundably from

25    a publisher, nonreturnably.

46

1    The typical magazine trade, you send out your

2    magazines, 50 percent of them will come back.  When

3    the direct sales market began, you were selling comics

4    in nonreturnably and you were printing them to order

5    because you give the distributor your details on your

6    comic, he or it then brings out a catalog.

7    At the time there were two big distributors,

8    Diamond and Capital, and several smaller ones.  These

9    days it's basically just Diamond.

10    And those phone book sized catalogs then go out

11    to the comic stores, who look through them and go

12    okay, well, I have got X number of people who buy

13    Sandman, so I will order X number of Sandmans.

14    So in order to do that, you need to have material

15    ready before the comic is, you know, in terms of you

16    may have a three-month production cycle for a comic,

17    but you may need your solicitation information four

18    months before the comic is ready so that they can get

19    it printed, so that three months before, you have that

20    sequence.

21    Given the way that that works, you are printing

22    to order when you print.  So that's how, that's how

23    that works, which is why you need something to

24    solicit.

25    Now, you are soliciting to the trade at that

47

1    point, but the trade also is, you know, the comic

2    store owners very well give away, sell, have out there

3    on the front, and so on and so forth, the catalogs

4    from the distributors.  They make sure their customers

5    know, hey, you know, I have got this thing coming up

6    in three months' time, or you will get things, it gets

7    even more to the point where if you are doing a

8    lithograph or a statue or something that's going to

9    take longer to produce, you may solicit it in six

10   months ahead of time with information to the store

11   owners that you are only going to be doing it to order

12   so they better let their customers know and get orders

13   from their customers six months ahead of time.

14 Q Because the store owners, the direct marketing to the

15   dedicated comic stores, they are obviously taking the

16   risk that they will buy too many of a certain issue

17   because they cannot return it, is that correct?

18 A Exactly.

19 Q So they need to then go out and solicit orders from

20   their customers?

21 A Yes.

22 Q Okay.  And so when you earlier stated that, again the

23   point in time we are still talking about are sort of a

24   four-step process here, prior to issue 9 being

25   published --

48

1   A  Prior to it being written.

2   Q  Okay.  Prior to it being written, the solicitation is

3      done?

4   A  Yeah.

5   Q  And as a result of the solicitation, Todd at some

6      point is able to predict that the orders are going to

7      be around 1.1 million of the comic, is that correct?

8   A  Yes, because they need the, you know, they need the

9      numbers in before they get the book printed.

10  Q  And then it was as a result of getting the orders in,

11     the numbers in that came from the solicitations, that

12     Todd McFarlane stated to you and Alan and Dave and

13     Frank that I'm just going to give you guys all

14     $100,000, is that correct?

15  A  That was later.  Initially I just remember hearing

16     from Terry Fitzgerald, I said "What are we, you

17     know -- this is really cool, this advance, what are

18     we talking about, do you think, in terms of the final

19     royalty."  And he said "It looks like about

20     $100,000."

21        I think it was only after Alan Moore's issue was

22     actually published that Todd turned around and just

23     said "Hey, I'm giving you guys $100,000 each."

24  Q  It was based on, again based on what you just

25     explained about the process, somewhere around the time

49

1    that Alan's issue 8 was actually published -- and

2    Spawn is published monthly, correct?

3  A  Yes, ish.

4  Q  Roughly.  So by the time issue 8 hits the stands or

5    the dedicated comic stores, solicitations have

6    probably all gone out all the way through issue 11,

7    would that be correct?

8  A  Yes.

9  Q  So at some point right around that time --

10  A  Yeah.

11  Q  Very close in time?

12  A  Right about there.

13  Q  So right around that time when Alan's has come out and

14    yours is the next to come out, Todd has got a pretty

15    good understanding, as far as you know, about what the

16    numbers for these four issues are going to be, is that

17    right?

18  A  Definitely, yes.

19  Q  And he sees that they are all going to do great, some

20    are a little more than the others, but says I'm just

21    going to give you guys all $100,000, is that right?

22  A  Yes.

23  Q  And as far as you know, or as far as you knew at the

24    time, you said you did the rough calculation based on

25    what you would have expected to receive from DC Comics

50

1     based on an issue that sold like yours did, like issue

2     9 did, and figured that that $100,000 was about right,

3     is that correct?

4   A  Yes.

5   Q  And then shortly after Todd says I'm going to give you

6     all $100,000, is that when issue 9 was actually

7     published?

8   A  I don't recall.

9   Q  Sometime around the time yours was published Todd told

10    everybody he was going to pay them 100,000, does that

11    sound about right?

12                MR. ARNTSEN:   I'm just going to

13        object just for a second.  He is not necessarily

14        going to know what Todd told other people.  He is

15        going to know what Todd told him.  So just with

16        that objection there for sort of clarification.

17   Q  I understand the objection.  Let me ask you, did you

18     not earlier testify that Todd told everybody he was

19     going to give them $100,000?  When I say everybody, I

20     mean the four of you.

21   A  Todd told me that he was, this was around publication

22     as we were heading up into it, that he was going to

23     give everybody $100,000 as a flat check and not try

24     and calculate anything because Todd -- and there would

25     be no paperwork.  It just made everything simpler to

51

1   cut a $100,000 check.  I know from conversation with

2   Dave Sim that Dave got $100,000 check for his issue.

3 Q And you testified before that you thought Dave Sim's

4   issue took orders in around the 800,000 number, is

5   that right?

6 A That is what Todd told me at the time.

7 Q Was there something else?

8 A I remember Todd explicitly saying that all of the --

9   the 1.1 million and the 800,000 excluded newsstand and

10   that there would be more money to come once they got

11   their newsstand figures in during that time, but I

12   don't have recall of seeing another check, nor did he

13   ever mention the newsstand stuff to me again.

14 Q Is it your testimony that you did not receive any more

15   checks or that you just don't recall for issue 9?

16 A For issue 9, yes, I never received another check

17   specifically for sales of issue 9.

18 Q Let me ask you this, and maybe we can do it this way.

19   I think we are very close here, but I think it will be

20   very important to do it like this.

21      Can you tell me as you sit here today what, and I

22   realize I'm asking you to go back to a point in time

23   at which you reached the 1992 agreement as you have

24   described it in your complaint, what you understood

25   the terms of that agreement to be, what were you

52

1    committing yourself to do in the 1992 agreement?

2  A  I was going to write him a really good issue of Spawn.

3  Q  Was that it?

4  A  Well, further than that, I was not being asked to sign

5     anything away.  He made it explicit this was not work

6     for hire.

7  Q  Did Todd actually use those terms?

8  A  He said "I'm not asking," you know, "you don't sign"

9     -- he said "You are not signing anything, but you are

10    not signing anything away."

11 Q  Tell me --

12 A  I don't know that he said anything specifically about

13    work for hire, but I know it's not work for hire

14    unless you sign a specific agreement to that effect.

15 Q  So I just want -- you don't recall Todd using the

16    words work for hire one way or the other?

17 A  No.

18 Q  What exactly do you recall Todd saying, as close as

19    you can remember his words, and I realize it's going

20    back a while, but you have probably given a lot of

21    thought in the last six, nine months now with this

22    lawsuit, it's certainly been discussed a lot on Web

23    sites and interviews and things like that.  So to the

24    extent that that's helped you recall the conversations

25    you had back then --

53

1    A    I don't understand what people discussing it on Web
2         sites would have to do with our conversations.
3    Q    Well, from what I have seen on some of the documents
4         we have been produced and from what I have seen on
5         your Web site, you have had some interviews and you
6         have had other discussions I think on the Web site
7         itself about what happened when you and Todd agreed to
8         work together on Spawn issue 9, is that right?
9    A    You would have to show me the interviews.
10   Q    We may do that in a few minutes.  I just got handed a
11        stack of E-mails that were in response to your request
12        that people send you E-mails about anything Todd may
13        have said back in that time.
14             So my point is this.  Have you had the
15        opportunity in the last six to, let me finish my
16        question, if I can, have you had the opportunity in
17        the last six to nine months, and that time frame may
18        be a little fuzzy, to give some thought to what took
19        place back in 1992 between you and Todd?
20   A    No more than I had previously, you know.  It wasn't
21        big and complicated.
22   Q    What I'm trying to get to then is what was it though,
23        and you stated that your agreement was, in 1992, your
24        obligation under the 1992 agreement were to write a
25        really good issue of Spawn, correct?

54

1    A  Yes.

2    Q  And nothing else, and that includes not signing

3       anything away, is that correct?

4    A  I don't see that not signing anything away was one of

5       my obligations.

6    Q  Well, you were not asked for any further obligations

7       such as signing away anything, is that correct?

8    A  Very explicitly no, yes.

9    Q  Did you have any other obligations as you understood

10      them in 1992 under your 1992 agreement?

11   A  Obligations, further than writing a really good issue

12      of Spawn at that point?

13   Q  That's my question.

14   A  My obligations, no.

15   Q  What were, and I'm going to -- we are going to talk

16      about Todd and not Image Comics or not anybody else,

17      because as you have already testified, Todd didn't

18      really talk about which hat he was wearing at that

19      time, is that correct?

20   A  Uh-huh.

21   Q  As far as you knew you were entering into this

22      agreement with Todd, is that right, Todd McFarlane?

23   A  Yes.

24   Q  What did you understand when you entered into the 1992

25      agreement Todd's obligations to you to be?

55

1    A   I understood that if he liked the issue, he was going

2        to draw it and print it.  I understood that this was

3        not work for hire.

4            I understood that Todd would initially treat me

5        very well as he'd kept saying and later clarified into

6        when I actually asked for a written contract, which I

7        was very -- which I would have liked, that no, I could

8        trust him, but whatever happened, he would treat me

9        better than DC.  I understood that.

10           I'm trying to think of other things specifically

11       from Todd that he would have said at the time that I

12       would have understood.

13   Q   What about financial obligations from Todd, specific

14       financial obligations from Todd to you?

15   A   Well, at the point where we were talking money, I

16       understood he would treat me better financially than

17       DC ever would.

18   Q   Did you ever discuss with Todd what that meant,

19       financially?

20                   MR. ARNTSEN:   Ever?

21   A   Later, yes.

22   Q   No.  When later?  Let's start that way.  We will rule

23       that out.

24   A   1996.

25   Q   So in 1996 is it your testimony that that was the

56

1   first time that you talked with Todd specifically

2   about what the financial terms were back in 1992?

3   A   There may have been a phone conversation in '95, but

4   basically, yes, 1996, when I went out to Phoenix, was

5   the first time that we actually sat there and talked

6   money.

7   I was concerned that toys were coming out, the

8   Angela toys specifically, that I was getting no money

9   for, and they had either just published or about to

10  publish the Angela trade paperback, the first one, and

11  I was concerned, there seemed to be no royalty

12  provisions or anything, and wanted to find out why I

13  was no longer getting anything.

14  And I was also concerned at that point that Todd

15  might get -- at that point I still trusted Todd and I

16  was rather concerned that he might either sell to

17  Mattel or get hit by a car or something and that

18  whoever took over from Todd would find no pieces of

19  paper that had any kind of, that listed what my share

20  of what I had created for him was.

21  Q   So prior to, if I understand correctly, prior to

22  possibly 1995, but maybe 1996, prior to 1995 or 1996

23  there was never anything in writing between you and

24  Todd that discussed royalty calculations, or any

25  specific financial terms with respect to any of the

57

1      work that you had done for Todd to that point, is that

2      correct?

3  A  True.

4  Q  And in 1992, when you are entering into the 1992

5      agreement, you and Todd never discussed the financial

6      terms that you would -- upon which you were doing the

7      agreement other than Todd saying he would treat you

8      better than DC Comics, is that correct?

9  A  Yes.

10  Q  With one addition, that he actually sent you two

11     $10,000 checks and then finished it off with an

12     $80,000 check around the time or shortly after issue 9

13     came out, is that correct?

14  A  Yes.  Could we have a quick break?

15  Q  Sure.

16            (A short recess is taken)

17  Q  When you were working on issue 9, when you did the

18      script for issue 9, among the people that appeared in

19      the story in issue 9, there were three characters that

20      you have claimed in your lawsuit were created by you,

21      and I think Todd has agreed in his deposition that

22      those were characters in the script that you wrote for

23      issue 9.  Do you recall the three characters I'm

24      talking about?

25  A  Of course.

58

1  Q  One of the them is the Angela character, is that
2     right?

3  A  Yes.

4  Q  Cogliostro?

5  A  Yes.

6  Q  And a character that later became known as Medieval
7     Spawn?

8  A  Medieval Spawn.

9  Q  Okay.  Let me just restate something.  We have been
10    going a couple hours.  We have got kind of
11    conversational.  I have talked over you a couple times
12    and you have talked over me, and that's natural, but
13    if we can both try to do the best we can to wait till
14    the other is finished, it will be a lot cleaner and we
15    will end up doing the thing faster too.  Is that okay?

16 A  Absolutely.

17 Q  I would like to ask you some questions about the
18    development of those characters.

19 A  Sure.

20 Q  And first of all, let's just start with Angela.  Where
21    did you get the idea for Angela?

22 A  I asked Todd to explain Spawn to me.  And he said
23    Spawn is an intelligible, or as best I remember, he
24    said Spawn was a CIA operative, he is dead, he gets
25    killed, he goes to hell.  And the devil, who at that

59

1     point he didn't have a name for, later called him,

2     actually Alan Moore called him the Malebolgia, has

3     sent him back to earth with a limited power thing and

4     he is training to be in the Army of Hell.  It was very

5     important he was part of the Army of Hell.

6          And I said to Todd "Okay.  And who are they

7     fighting?"  And Todd said "I don't know."

8          And I thought about it a little.  And I thought

9     well, this wasn't talking to Todd, this was on my own,

10    I thought well, you don't have an Army to fight

11    librarians.  If you are putting together the Army of

12    Hell, one assumes that they are there at some point to

13    fight the Army of Heaven, and that if you have an

14    Army, heaven's army is worse.  I thought cool, that

15    gives me an angle.

16         And I thought well, is there any reason why the

17    angel can't be female.  They were, up to that point, I

18    think Todd sent me three or four issues of Spawn at

19    that point, whatever was published.  There were no

20    women anywhere in them except for Spawn's ex-wife,

21    that I remember.

22         I thought well, let's create a fun female

23    character who is a kick ass angel.  And I thought it

24    would be good to -- there wasn't much up until that

25    point, Todd didn't have a lot in terms of Spawn

60

1   background story at that point.

2        He had his situation, CIA guy dies, goes to hell,

3   comes back, is no longer, you know, is super powered

4   dead thing whose life has moved on, and he had a

5   scenario.

6        He didn't actually have -- from talking to him,

7   it became apparent he didn't have anywhere he was

8   going with it and he didn't have much in the way of

9   background.

10        So I thought it would be a good thing to give him

11   background and to do the kinds of stuff for him that I

12   would do for me in an issue of Sandman, where I will

13   set up, you know, you will toss out a dozen things

14   knowing that in two years' time, or a year's time, or

15   six years' time or whatever, you may need them.

16   Q   Okay.  So you conceived of the idea again building on

17       the foundation that there was an Army of Hell, Alan

18       Moore had started to give some identity to the leader,

19       and you may have not even know that at that point?

20   A   I think at that point I didn't know.

21   Q   So you come up with the idea of the angel, is that

22       correct?

23   A   Yup.

24   Q   And you wrote in your script whatever information was

25       included at least at that time in her story, correct?

61

1  A  There was -- yes.  There was also the solicitation in

2     which that was, if memory serves, that would have been

3     where I named her, which was done before.

4  Q  And you understood from the outset and throughout the

5     process that Todd was going to be the artist who drew

6     the visual image of the character of Angela, correct?

7  A  Yes.

8  Q  And I understand that you sent some thumbnail sketches

9     along with your script to sort of give an idea of how

10    it visually might lay out as the story progressed, is

11    that correct?

12 A  Yes.

13 Q  But did you hear Todd testify the other day that he

14    drew the actual character of Angela who appeared on

15    the cover as part of the solicitation that he

16    submitted prior to receiving your script?

17 A  Yes.

18 Q  Did you agree with that or is that how you recall it?

19 A  Yes.

20 Q  Let me ask you then about the -- another question

21    about Angela.  Then it's my understanding, we will

22    talk a little bit more about this in a few minutes,

23    that the Angela character sort of took on a life of

24    her own, at least to the extent that she ended up

25    getting her own three-issue miniseries about two years

62

1   later, is that right?

2   A   Yes.

3   Q   And you were the author of all three issues of the

4       Angela miniseries, correct?

5   A   Yes.

6   Q   Two other characters that are central to this lawsuit

7       that you have alleged were your creations in issue 9,

8       one is Cogliostro and one is Medieval Spawn, is that

9       right?

10  A   Yes.

11  Q   I would like to ask you about Cogliostro.

12  A   Go for it.

13  Q   Tell me how you got the idea for this character.

14  A   Spawn was kind of dumb, and he was sitting, living in

15      this alley with these bums.  And Todd had this gadget,

16      this sort of device of his power counter going down.

17          And I had to have something for him to do in the

18      alley while he was waiting for Angela to turn up and

19      beat him up, which means that he has to have a

20      conversation with somebody, which means that I wanted

21      a -- it needed to be somebody who knew a little bit

22      more than he did, the idea being that I wanted a

23      character who just was there in order to basically say

24      aha, you don't know what's going on and there is all

25      sorts of mysterious stuff and furthermore, there is

63

1    cool things to learn.

2    Q  Sort of give a little exposition at that point about

3       things that may come up in the future or maybe things

4       that happened in the past?

5    A  Exactly.  And in the first draft of the script I

6       called him old man.  And then I thought well, let's

7       give him a name.  And I called him Count Nicholas

8       Cogliostro.

9          I named him after the assumed name of Joseph

10      Balsamo, who was an eighteenth century fraudulent

11      magician, because I thought, I liked the idea of

12      naming him after a fraud.  He is an old fraud, but he

13      is also a fraud that knows the truth.

14   Q  Is that character you mentioned, the assumed name of

15      the eighteenth century fake magician, fraud magician,

16      you are probably more familiar with this than I am, I

17      have seen that name in some other literary works.  It

18      popped up in last year's movie The Affair of the

19      Necklace, which is the old story of --

20   A  That's --

21   Q  Is that the same character?

22   A  Same guy.

23   Q  So that's where you had the name and decided to be --

24      it made some sense to draw in a name of somebody that

25      had a fraudulent background.  Were you meaning to

                              64

1    imply that this guy was a fraud as well?

2 A  Well, fraudulent and magical and, no, my idea for that

3    character, and to be honest, I have no idea how much

4    of this Todd has or hasn't used because it's been

5    many, many years since I have looked at a Spawn, my

6    idea for the character that I told Todd when he asked

7    me about him was that this guy was one of the hell

8    Spawn from the dawn of time who had survived the --

9    the idea was, Todd had this whole thing set up whereby

10   the Spawns come in with a power counter and when your

11   power counter hit zero, the devil gets you.

12       And I thought well, wouldn't it be cool if there

13   was just one of these old guys, you know, I don't ever

14   have to run my power counter down, I don't have to run

15   around fighting crime, I can work other ways and he

16   would come in sort of as Spawn's mentor wherever he

17   needed him, just somebody.

18       Todd didn't have anybody in the series that could

19   come in and say anything like aha, you shouldn't have

20   done that, a little bit of wisdom over here for you,

21   which gives you a plot.  If you are writing a monthly

22   comic, you need a character that will do that.  You

23   need something that will do that.

24       So while I had Spawn stuck in this alley with a

25   bunch of bums and --

65

1   Q   Let me just stop you right there.  Just so I

2       understand, do you visualize Cogliostro not so much as

3       a character about whom the story was, as much as the

4       plot device, to help the story move along, to help

5       direct or lead Spawn through the path as he went

6       forward, is that right?

7   A   As an author, you can't divide characters into

8       characters and plot devices.  Characters have a

9       function, which can be a plot device, but they are

10      also characters.

11          His basic function was I wanted Spawn to have

12      somebody to talk to.  And I wanted Spawn to be -- I

13      wanted Spawn to be distracted by something, by the

14      conversation at the point where Angela comes up behind

15      him and goes whomp, which meant that -- I had never

16      written a fight scene.  I quite liked the idea of

17      writing a comic with shouting, hitting and running

18      around, which is not something I had written before,

19      but I thought okay, if I'm going to do this, it has to

20      have shape and purpose, it has to be surprising and

21      interesting and I need a conversation.

22          So was he created as a plot device, well, Angela

23      was created as a plot device.  Everybody is created as

24      a plot device, they are part of the story, but yes, he

25      had a function and I assumed that it was a function

66

1     that would just be the action, again, the action of

2     leaving behind more than I was -- more than I could

3     deal with at that point, but it would give Todd stuff

4     that he could do stuff with.

5  Q  You said that all characters are characters, some have

6     plot device type of functions at certain times, I

7     don't want to mischaracterize you, but is that --

8  A  Well, all characters have plot device characters.  The

9     hero is the hero.  He has a function in the plot.  If

10    he meets a mysterious old man who knows something

11    gnomic, that's a character too.  He also has a

12    function in the plot.

13  Q  Would you agree with me that there are characters who

14    are more involved in a particular issue or in the

15    ongoing story than other characters?  In other words,

16    are there major characters and minor characters?

17  A  In what story?

18  Q  In any story, just as a general matter, or are all

19    characters equal in their value to the story?

20  A  You are talking to somebody who made not only a

21    living, but got huge critical recognition out of the

22    fact that one of the things that I would do

23    continually in Sandman was introduce somebody as a

24    minor character and then bring them back several years

25    later as a major character.  Characters who came on

1    for two panels would come back six years later.

2         So if you are talking about an ongoing storyline,

3    there is no such thing as a character who will always

4    be a minor character, because you have a story every

5    month to fill and you are going to want to go back and

6    use them.

7    Q  In fact, wouldn't it be fair to say that only until

8       you got to the end of the story would you be able to

9       look back and say well, that character turned out only

10      to be minor after all and never did come back?

11   A  Yes, but the end of the story would not be the end of

12      the issue.

13   Q  Correct.

14   A  The end of the story would be 10 years down the line.

15   Q  I mean 75 issues as you had in Sandman.  Again, you

16      were at Todd's deposition the other day.  Did you hear

17      his description of how he ultimately, in his mind,

18      changed the Cogliostro character in future issues from

19      the character that appeared in your script?

20   A  Yes.

21   Q  Did you agree that that was an accurate description as

22      far as you know of how Todd treated the Cogliostro

23      character or do you take exception to something he

24      said there?

25   A  His description of me asking him what I wanted putting

68

1    in and him saying he needed the Cogliostro character

2    was a lie, this anti-Moses thing.  As I recall at the

3    end of the issue, once he had drawn it, he phoned me

4    up and he said "Hey, this Cogliostro guy, who is he?"

5    And I said "Well, I have got this idea, you know, an

6    old Spawn," and so forth.

7         He said "Oh, I thought he was Moses."  So I drew

8    him holding this box as if he was Moses going down,

9    with wine*, as if he was Moses going down from the

10   mountain.

11        I heard Todd say he had expanded on the character

12   and made him, he kept saying more of a Harvard man,

13   you know.  He said my guy was a lush, his guy went to

14   Harvard, but characters do change.

15        The most significant change, at least according

16   to the response to our lawsuit, was that Todd had

17   changed the character's name, which Todd admitted

18   during his deposition had occurred during a letterer's

19   error, which changed Cagliostro to Cogliostro, and

20   because he couldn't remember what the character's

21   first name was, at some point later down the line when

22   he had to give him a first name and didn't bother

23   going back and checking.  So that was what

24   Mr. McFarlane testified to at his deposition as to the

25   character's name.

69

1   Q   In any event, you would agree in subsequent issues of

2       Spawn, the character does have a slightly different

3       name than the one you gave it, is that correct?

4   A   Due to a lettering error, absolutely.

5   Q   Would you agree that the character in subsequent

6       issues has a personality that has developed in ways

7       that were not necessarily included in your first

8       script?

9   A   All characters do that.

10  Q   And so that over time, as you have described in the

11      Sandman circumstances, a character who has a

12      relatively minor role perhaps that might be defined in

13      terms of numbers of panels or pages in which that

14      character appears, at a later point in time, maybe

15      years later, takes on a much more substantial role, is

16      that correct?

17  A   I don't understand your question.

18  Q   Well, I'm just trying to understand the change process

19      you described.  You talked about Sandman.  And I

20      believe it was your testimony that there are times

21      when you introduce a character who is minor -- and let

22      me ask you a question right there.

23          When you used the term a minor character who

24      later becomes a major character, do you recall that

25      testimony?

1  A  As I recall it was you that used the phrase minor

2     character from the beginning, but yes.

3  Q  Let me ask you.  Is that a word we can use just so we

4     understand what we are talking about?  And use a

5     different one if I'm using the wrong one.

6        What I'm referring to, I believe you testified

7     that there were characters that you introduce all the

8     time and they may not have a significant role at the

9     time you introduce them, but that at some point in the

10    future they come back and have a much larger role in

11    the story, is that -- am I mischaracterizing your

12    testimony?

13 A  An example of that for me might be the angel whose

14    name I remember possibly incorrectly as Gabrielle in

15    issue 9.  She is a minor character.  In terms of issue

16    9, there are four major characters in it, given the

17    body of what I wrote.  I wouldn't classify any of them

18    as minor characters.

19       I would classify the major characters in what I

20    wrote, just by allocating speaking parts, as Angela,

21    Medieval Spawn, Spawn and Cogliostro.  The minor

22    characters would be Gabrielle and the bums in the

23    alley.  And I think that's it for characters in my

24    issue.

25       In terms of whether any of them would become

71

1   important, if Gabrielle, the angel to whom Angela goes

2   and reports at the beginning, had then gone off to get

3   her own series or then turned up in important ways, as

4   she did in -- I put her in my scene in 26, I used her

5   in the Angela miniseries.  That's more taking a minor

6   character and giving them a major role.

7 Q Can you give me an example of a character in the

8   Sandman series that was introduced in an early issue

9   perhaps and came back to have a larger role in a later

10   issue?

11 A Sure.  I created a character called Barbie in Sandman

12   11 or 12.

13 Q Barbie?

14 A Barbie.

15 Q Bobby?

16 A B-a-r-b-i-e, like the toy.  And she was a ditsy blonde

17   who had a boyfriend named Ken.  And they just thought

18   that was so cute.  And you got to see nothing of her

19   except that she was one of a dozen people or half a

20   dozen people living in a big old rooming house.

21       She had this boyfriend named Ken.  They thought

22   that was cute.

23       And in one panel, maybe two panels, you saw that

24   she had this strange dream life where she was on this

25   odd quest with a giant dog.

72

1       And then in Sandman 32 I think it was, it may

2   have been later, it may have been 34, but, you know,

3   several years later I came back and made Barbie this

4   character who had been in a handful of panels and

5   nothing important.  She was scenery as far as anyone

6   was concerned.

7       She got her own storyline, which was called A

8   Game of You.  And she was the protagonist.  And that,

9   for me, would be taking a minor character and putting

10  them on stage --

11  Q  When the Barbie character got her own storyline, and

12     she's in 32 or 34, whatever it was, issue, A Game of

13     You, did she have character traits in that issue that

14     were not apparent in the first issue?

15  A  Of course.  Characters evolve.  And if they are going

16     to bear more weight, you are going to change them.

17       By that point she had started, she had left her

18     husband and had started painting chessboard designs on

19     the side of her face and went off on this strange and

20     wonderful dream quest which was the subject of the

21     story, but all characters change.  All characters

22     evolve over time.

23  Q  Let me ask you about Medieval Spawn, that character.

24     When you submitted your script for issue 9, did you

25     give that character a name?

73

1  A  No.  I just said he was -- what had happened on him is

2  I had phoned Todd and said -- and I thought, because

3  Todd had this whole thing with this guy in the Army of

4  Hell.  And I thought oh, okay, if you have got the

5  Army of Hell, you don't just want one captain.  This

6  is something that the devil could have been doing for

7  a long time.  And that would give you, that would give

8  -- and my main thing was that will give Todd a lot to

9  play with if you get bored.

10      It's a wonderful thing not to be stuck in 1992

11  and having to do all your stories in 1992.  You could

12  have some past.  You could have some cool stuff.

13      So I phoned Todd up.  I said "I have got an

14  idea.  Tell me, have there ever been any other Spawn

15  characters in the past."  And he said I don't know.

16  And I said "Well, could there have been?"  And he said

17  "Sure, if you want it."  And I said great.

18      And so that was my -- so I took that, I went

19  okay, Spawn is in the past, what would be romantic and

20  what would be sort of cool if I was a 12-year-old boy,

21  because that was my sort of, you know -- a lot of what

22  I was trying to do with Spawn number 9 was okay, so

23  I'm 12 or 13, what would be cool to see.  And I

24  thought well, a knight in armor.

25      So let's do a Spawn who is a knight in armor, and

74

1   that would be fun.  And she can kill him, and it will

2   be 800 years ago and then now she is coming back to

3   kill our guy.  So he was the Spawn then.

4   Q  And he just had the name -- does he have a name?

5   A  I just referred to him as the Spawn.

6   Q  And his costume is pretty similar to the modern day

7      Spawn's, other than it's a suit of armor appropriate

8      for a knight?  I mean, he didn't have --

9   A  Other than it's a suit of armor appropriate for a

10     knight, and not a dark, one piece with chains, it's

11     the same thing.

12         The idea that Alan Moore had come up with that I

13     remember Alan telling me on the phone, I don't think I

14     had seen Alan's issue before I got to write mine just

15     because of the way -- the speed with which these

16     things were being done, but I spoke to Alan and I

17     remember Alan phoning up and saying I have got a great

18     idea, the Spawn costume is alive.

19         Todd had asked him if he could come up with an

20     explanation for why Todd kept forgetting and drawing

21     different numbers of spikes and chains and things on

22     the Spawn from panel to panel.  So Alan's idea was

23     well, the costume is alive, which I just thought was a

24     lovely idea.

25         So I gave him -- I thought okay, we will take

75

1   something like what the Spawn costume is and then

2   reconceive it as you are a medieval knight in armor,

3   you know.  He has a different -- I gave him a little

4   back story in the thing, not much because I didn't

5   have -- I only had 22 pages to play with, and I had,

6   you know, he had to be dead by page 8, but I gave him

7   a little bit of back story.  You got the feeling that

8   he had a similar kind of story to Spawn's but not the

9   same.

10       In this case it was his sister who was somebody

11   who -- the person who was still living who was

12   important to him and not his wife and so forth.

13  Q  Other than the description you gave of him in the

14   script, did you write anything else down or draw any

15   pictures of --

16  A  Yes, I gave Todd my thumbnails.  Sorry I interrupted.

17  Q  That's okay.  Other than the thumbnails and your

18   description of the character, the medieval, the

19   800-year-old Spawn character in the script, did you

20   write -- did you draw any other pictures independent

21   of the thumbnails of the Spawn character?

22  A  I could conceivably have doodled them, but nobody

23   would have seen them but me other than the thumbnails.

24  Q  So your entire submission for issue 9 was made up of

25   the script and the thumbnails you attached with it, is

76

1    that correct?

2    A  Yes.

3    Q  Did the Medieval Spawn character appear in issue 26?

4    A  Not that I recall.

5    Q  Did he appear in the Angela miniseries?

6    A  I think I put his helmet in there on her trophy room.

7       The only other use that I know of that's been made of

8       Medieval Spawn was he was a number of toys, and rather

9       to my surprise, Image put out a series with him in

10      which I was never sent, so I never read.

11   Q  So you never brought him back in a later issue of

12      Spawn that you worked on, is that correct?

13   A  He was dead.  I killed him.  The first thing I did was

14      kill him.

15   Q  What about Cogliostro, did you ever bring him back as

16      a character in either issue 26 or the Angela

17      miniseries that you worked on for Spawn?

18   A  No, there was no need for him.

19   Q  So the only characters that you brought back a second

20      time from issue 9 were Angela and Gabrielle, is that

21      right, as far as you know?

22   A  Yes.

23   Q  And of course Spawn appears?

24   A  And Spawn.

25   Q  But Spawn was obviously created prior to issue 9, is

77

1    that correct?

2  A  Exactly.

3  Q  Would you agree that the character that we have been

4    calling Medieval Spawn was a derivative work of the

5    Spawn character, the original Spawn character?

6  A  Absolutely.

7  Q  But Angela and Cogliostro were not derivative

8    characters, is that correct?

9  A  Yes.

10  Q  There is no earlier incarnation of either of those

11    characters in Spawn issues 1 through 8, is that right?

12  A  Not at all.

13              MR. ARNTSEN:  When you hit a

14        chapter break, let's stop for lunch.

15              MR. SALSICH:  Yeah, I'm thinking

16        this is actually a good time.  Let's do that.

17              (A noon recess is taken)

18              (11:40 a.m. to 12:45 p.m.)

19  Q  Mr. Gaiman, before we took a break, we were talking at

20    some length about what we had agreed to call the 1992

21    agreement.  Do you recall that testimony?

22  A  I do.

23  Q  And I suppose we just, since we have all taken a break

24    and gotten back into our conversational mode, we

25    should remind ourselves that, for the record this

1    afternoon, and I'm going to try to move things along

2    more quickly this afternoon with specific questions

3    and show you some documents and so forth, if we can

4    try to pay attention to those formalities, it will

5    make things go faster and make a cleaner record.   Is

6    that okay?

7  A  Absolutely.

8  Q  And I just want to clarify a couple things that you

9    stated.   You testified, did you not, that the first

10   time you had a conversation with Todd McFarlane about

11   specific financial terms related to the 1992 agreement

12   was either in 1995 or 1996, is that correct?

13 A  Yes.

14 Q  So at the time you were entering into the 1992

15   agreement with Mr. McFarlane, you never discussed any

16   particular percentage royalty rates that might apply,

17   did you?

18 A  No.

19 Q  And you never discussed what would be done in the case

20   of reprints, did you?

21 A  No.

22 Q  And you never discussed even the possibility of toys

23   or action figures being created based on any of the

24   work you were doing, did you?

25 A  I remember at one point in those early days,

1   Mr. McFarlane said that he would have to trademark the
2   characters in his name because of the toys and I
3   didn't have -- but that I shouldn't worry about that
4   and I said fine.

5  Q  When was that conversation, do you know?

6  A  That was some time in early '93.  I don't remember
7     when he got the toy company actually together.  I
8     remember it as being early '93.

9  Q  Was this before or after issue 9 was completed?

10 A  I don't know.

11 Q  Do you recall anything else about that conversation?

12 A  Just that it was in there with a lot of other stuff,
13    but I do remember, that was the only recollection
14    specific I have to toys of those days.

15 Q  You didn't talk anything specific as to if a toy is
16    created based on one of these characters, that you
17    would get some percentage of the sales of that toy,
18    did you?

19 A  I remember him again saying "Hey, I'm going to look
20    after," you know, he said I'm going to do toys and
21    saying that he would look after me, but there was no
22    specific figures mentioned and I assumed his good
23    faith.

24 Q  I understand.  Sometimes lawyers, we've got to get to
25    the specifics.  Certainly if an understanding you have

80

1    generally helps us get to those specifics, please let

2    me know.

3        The 1992 agreement that we have been talking

4    about, was that, as far as you know, was that limited

5    to your work on issue 9?

6  A  Limited to my work on issue 9 and any use that

7    Mr. McFarlane made of it.

8  Q  Of issue 9?

9  A  Yes.

10 Q  What about issue 26, did you not submit some work for

11   issue 26?

12 A  Yes, and I assumed that we were in the same, having

13   heard nothing to the contrary, I assumed we were still

14   in the same ballpark.

15 Q  Would that be true also of the Angela miniseries, the

16   work you did on that?

17 A  Absolutely.

18 Q  When you were doing issue 26, was that around 1994, do

19   you know?

20 A  Around then.

21 Q  And the Angela miniseries came around that same time,

22   did it not?

23 A  I wrote that stuff together.  In fact, I may have even

24   written the bit for 26 after I wrote the Angela

25   series, just going, I really wanted -- there was a

81

1    little piece of bridge information that I really

2    wanted in the storyline, which I hadn't been able to

3    put into the Angela series because it hadn't started

4    there and I just wanted to set things up.

5  Q And so the Angela miniseries and the work you did on

6    issue 26, those would have been 1994?

7  A Yes.

8  Q Does that sound right?  So in any event, prior to the

9    financial discussions you had with Todd McFarlane in

10   1995 or 1996, correct?

11 A Yes.

12 Q And so the work you did on the Angela miniseries and

13   the work you did on issue 26, as far as you knew, was

14   done on the same terms as you had agreed in 1992 with

15   Todd regarding issue 9?

16 A Yes.

17 Q When you started having the conversations with Todd in

18   1995 or 1996 -- and let me ask you specifically.  Have

19   you had a chance, since we had this conversation

20   earlier this morning, to determine whether your

21   meeting with Todd in Phoenix was in 1995 or 1996?

22 A The meeting was in 1996.  There may have been

23   conversations that led to the meeting because

24   otherwise I can't imagine, it's much more me going,

25   you know, I wouldn't have just flown out to Phoenix,

1    to sort it out face-to-face if we haven't had phone

2    conversations or I was obviously not satisfied with

3    the way things were going on the phone.

4    Q  When you had your meeting with Todd in 1996 in

5       Phoenix, is it fair to say that's the first time you

6       and Todd discussed specific financial terms that in

7       your mind should have applied to the 1992 agreement?

8    A  Yes.

9    Q  At that time did you -- well, tell me at that time

10      what you told Todd, if you can remember, that the

11      terms should have been?

12   A  Well, what was happening -- let me just preface this

13      by what was going on at that point.

14   Q  Please do.

15   A  In the meantime Todd did a Medieval Spawn toy.  It was

16      one of his first rollouts of the toys.  He credited

17      me, unasked, which I thought was very nice of him as

18      the co-creator of the character on a comic that came

19      out with the toy and later sent me a check for

20      $20,000, which although it didn't come with any

21      breakdown of how it was derived, and in fact, I think

22      just came with a helpful note "This is for Todd

23      because we love you," or something like that, I was

24      told on the phone was my royalty share of the Medieval

25      Spawn toy, which I thought was really cool.

83

1    And then Todd -- then I wrote the medieval, the

2    Angela series --

3  Q  Let me stop you there if I can.  It's your

4    recollection that the Medieval Spawn toy came out and

5    that you received the $20,000 check --

6  A  It was 20,000 six, there was a bunch of figures.

7  Q  Okay.  I realize that it may have a different, 20,800

8    and something dollars and something cents, we are

9    referring to the same the payment you received for the

10   Medieval Spawn toys, right?

11 A  Yes.

12 Q  I want to get a timing here.  If I understood you

13   correctly, your testimony is that those events

14   occurred, the toy being produced and you receiving

15   payment for it, Medieval Spawn, was prior to your

16   writing the Angela miniseries, is that correct?

17 A  That would be my recollection.  It may have occurred

18   about the same time.

19    It would be easy enough to check.  I mean, it

20   will be in the documents.

21 Q  So in any event, so go on, you were saying you got

22   this money for the toy and lead me up to of you

23   getting to Phoneix.

24 A  So I have been paid money for the toy, don't know how

25   it's been arrived at, but it's $20,000 and that seems

84

1   a fair amount to me and Todd seems to be living up to

2   his hey, you can trust me and I'm looking after you

3   side of the deal.

4       Then 1995, late 1994, early 1995, the Angela toys

5   are out.  I remember being incredibly proud when they

6   made the cover of USA Today as the most inappropriate

7   toy of the year, according to the American Family

8   Association.  And I would hear from Todd that they

9   were selling incredibly well and that they were

10  incredibly popular, cool, the Angela toys.

11      And I thought great, I will get a royalty on

12  these.  Nothing ever happened, no payment ever came

13  in.

14      I would ring Todd's people and say "Is there a

15  payment," and they would go "Oh, yeah, yeah, don't

16  worry about it, we are not businessmen here."  Todd

17  would say that a lot, that he wasn't a businessman, he

18  was a creator and you just had to bear with a certain

19  amount of disorganization and his funny way of doing

20  things.  So I waited.  Never saw any royalty.

21      I had written the Angela miniseries.  And the

22  main reason I had actually written the Angela

23  miniseries was my son, Mike, at that point was 13,

24  going on 14, if memory serves, and he had found a copy

25  of Spawn or he had found one of these Medieval Spawn

85

1    toys and said this is really cool.

2         And he started asking me, you know, "Dad, why

3    didn't you write something I could read.  I love this

4    Spawn stuff."

5         So I found Todd and said "Okay, I think I'm -- it

6    looks like I'm going to be writing another series for

7    you.  Let's do Angela.  And let's do it as a three-

8    issue miniseries."  And Todd said great.

9         And really it was just written for Mike.  The

10   last issue, in the letter column we put a photo of his

11   hockey team, which he loved, so --

12 Q Tell me again, so moving forward again and --

13 A Sir, I really was on the way.

14 Q I apologize for interrupting you.  I don't want to --

15   like I said, I do want to get through some things by

16   five today.

17 A I'm sorry.

18 Q That's all right.  Because it's all important.  It's

19   all part of the story.  But you have got the Angela

20   things coming out?

21 A Anyway, Angela comes out.  I hear from them.  Todd

22   didn't like trade paperbacks.  Todd had said to me

23   several times just in conversation there were things

24   he didn't like and he didn't like trade paperbacks

25   because they weren't proper comics and he didn't trust

86

1    them.

2           And meanwhile, I was making a huge part of my

3    income from trade paperbacks and saw that there was an

4    enormous demand for them.  So at one point in there

5    they said we are going to be bringing out Angela in

6    trade paperback.  And I said great, we should work out

7    a royalty deal on this.  I said -- I was feeling less

8    comfortable by that point with the idea --

9  Q  Let me stop you right there.  You just said that you

10    found out that they were going to do an Angela trade

11    paperback of the three issues that you had done, is

12    that right?

13  A  Yes.

14  Q  And you said "Great, let's work on a royalty deal," is

15    that what you just said?

16  A  Well, I said to them what is the -- do we have a

17    royalty deal on this.  Up until that point the only --

18    the way that things seemed to work was one would get

19    these checks and they would say here is a check for

20    $800 because Todd thinks you are a good guy.  And I

21    actually saw in the press at one point an interview

22    with Todd where he was saying no, we don't do

23    royalties, we just send people love checks and they

24    are better than any royalties could ever be.

25           So I didn't trust the love checks and I went out

87

1   to Phoenix.  I talked to Todd.  I do remember talking

2   to him.  I have no recollection of what the substance

3   of the conversations were in '95.

4        Toward the end of '95 about I think I was getting

5   a little bit testy here, I felt like there were no

6   checks coming in, he had these things and he was not

7   paying and there seemed to be no real effort to pay.

8   And I was concerned that, as I said earlier, that Todd

9   could either sell the toy business to Mattel or he

10  could get hit by a truck and there would be no paper

11  records of any kind of deal and I thought we needed to

12  memorialize it.

13  Q  So you thought in 1995 you have now seen the Medieval

14     Spawn toy you got a check for, but now later there is

15     a Angela toy that apparently is very popular, but you

16     have not seen a check for that, is that correct?

17  A  Yes.

18  Q  And the Angela trade paperbacks coming out and it

19     occurs to you that now it's time to figure out what

20     your royalty arrangement is with Todd because the

21     actions that Todd has taken in the last three years

22     don't tell you what your royalty deal is, is that

23     correct?

24  A  Yes.

25  Q  So then you have your meeting in 1996 --

88

1    A  Yes.

2    Q  -- with Todd and that meeting is in Phoenix?

3    A  It is.

4    Q  Do you recall what time of year?

5    A  I think it would have been late spring, very early

6       summer because I had just come back from England where

7       I had made a TV show and I remember I had a tape of

8       one of the episodes with me.

9    Q  I was going to ask you if it was hot, but that really

10      wouldn't help you in Phoenix.

11   A  It was very, very hot.

12   Q  Well, that tells me it was spring as opposed to hot in

13      January.  Okay.

14      Now, you are up to this meeting in late Spring of

15      '96 and this is when you and Todd sit down and start

16      hashing out --

17   A  We sit -- we are not at this point in any way -- it is

18      not in any way adversarial at this point.  It's me

19      going in and saying look, you said when we started

20      this whole deal, you would take better care of me than

21      DC did, we have to put something down on paper.  You

22      could sell to Mattel tomorrow, you could get hit by a

23      car tomorrow, I don't trust your wife to send me love

24      checks or to know what they are for, I have created

25      characters for you, you are using them, if you go on

89

1   to do TV or movies and put them in, there is a whole

2   other world out here that we have yet not gone into.

3   Let's get this down on paper.

4   Q   So is it correct to say that at the time you meet with

5       Todd in Phoenix, you two do not have a deal regarding

6       future movie rights, you do not have a deal regarding

7       future TV rights based on the use of these characters,

8       would that be correct?

9                   MR. ARNTSEN:  I'm going to just

10              object as vague.  He said in terms of the DC

11              Comics I have a deal in terms of general terms as

12              opposed to say five percent of this or for this.

13  Q   That's fair.  Let's do it this way.  Let me ask you

14      another question or two, then maybe I will hand you

15      some documents and we can start focusing in.

16  A   Okay.  Shall I finish about the Phoenix meeting?

17  Q   Please do.

18  A   Okay.  And Todd kept saying "But you can trust me and

19      I will send you, I will send you bigger checks than

20      you will get if you have a contract."  And I said

21      "Todd, call me silly, but I would much rather have a

22      written contract and $500 in royalties than $1,500

23      that is going to turn up on a whim and could end the

24      moment that you decide it's not convenient."

25                  And he said that he thought that was crazy and I

1  said that that was how, you know, just assume that was

2  how I was billed.  And we then wound up -- then

3  everything ended very badly in terms of Todd had to

4  wrap up rather quickly.  Larry Marder had come out for

5  that meeting because they just learned that Marc

6  Silvestri had left the Image partnership that day, so

7  they had to sort of get on the phone and try to sort

8  that out.

9       The way it was left, ended was Todd saying "Do

10  you trust me?"  I said "I trust you completely."

11       He said "Good.  Then I will work this out in a

12  way that is going to be fine."  He said "I'm really

13  pleased you came down here.  You have been completely

14  reasonable and we will sort this out."

15       And he also said that, he mentioned to me he just

16  bought Miracleman.  And he said "What are you going to

17  do with Miracleman?  What are you thinking about."

18  And I said "I don't know at this point."

19       And he said "Well, I have had lawyers look over

20  the agreement that you made with Alan Moore and we

21  think we could break it, but obviously we are going to

22  honor it.  So you have -- you know, we are going to

23  respect your third of Miracleman, but we need to

24  figure out what it is and it may be a bargaining

25  chip."  And I said "Well, that's fine."

91

1  Q  Let me get this straight and we will ask some

2     specifics.  Let's go at the end.  Is it your testimony

3     that Todd first mentioned Miracleman to you when you

4     were in Phoenix at the meeting in 1996?

5  A  No, it's not.  Todd first mentioned Miracleman to me

6     when he did the Eclipse, when he bought the Eclipse

7     assets, which I think was either some months earlier

8     than that because he had phoned me up and asked if I

9     knew anything about some Canadian guy who was trying

10    to buy Miracleman alone and if I knew anything about

11    this.  And I said yes, the guy had gotten in touch

12    with me and asked if Marc and I would be willing to

13    continue with Miracleman if he got the rights and Todd

14    said that he was, you know, thinking of bidding on the

15    whole of Eclipse, or whatever, or that he had just bid

16    on the whole of Eclipse, one of the two.

17 Q  So you leave the 1996 meeting in Phoenix without

18    specific terms as to royalty rights, is that correct?

19 A  Yes.

20 Q  And when I refer, when I'm saying royalty rights, you

21    leave Phoenix in 1996 after that meeting and you

22    still, you and Todd had still not agreed that any

23    certain percentage of royalty should be applied to

24    reprints or certain percentage should be applied to

25    toys, et cetera?

92

1    A   Todd had -- I'm sorry for interrupting.

2    Q   No, go ahead.

3    A   Todd had absolutely agreed during that meeting that he

4        had said that he would treat me as well as DC or that

5        if he had not said it, it was the kind of thing that

6        he would have said.

7    Q   So you did have an agreement that it would be as good

8        as DC but you didn't have -- you and Todd had not

9        discussed what as good as or better than DC meant, is

10       that correct?

11   A   I went home figuring that paperwork would be done.

12   Q   But my question is up until the point when you left,

13       if I can, okay, I realize we are having a conversation

14       here, this is important and I want to try to get this

15       clearly.

16           When you left Phoenix in 1996, is it accurate to

17       say that you and Todd had still not discussed actually

18       what it meant to be as good as DC Comics or better

19       than DC Comics, is that correct?

20   A   Yes.  We had not discussed it in terms of numbers.

21   Q   That's what I mean.

22   A   We discussed it in terms of --

23   Q   You had discussed, for example, had you not, that to

24       be better than DC Comics meant you didn't have to

25       assign away your rights, is that correct?

93

1   A  That was much earlier.  We didn't talk about that in

2       '96.  What we were talking about in '96 was much more

3       just the kind of stuff -- have you read the Oakland

4       transcript?

5   Q  Yes.

6   A  It was that kind of conversation, where you are going,

7       you know, numbers are not actually being talked about

8       except for hypothetically, but you are saying well,

9       I'm saying look, I like it that they treat me like

10      this, I like it that every quarter I can expect a

11      royalty payment, I like it if they are using a

12      character if I created, if he gets his own title, I

13      get treated well.

14          I was a little uncomfortable at that point with

15      the fact that they had just done these Angela, Glory

16      or Medieval Spawn, Witchblade crossover things or in

17      the process of doing them.  And I was saying well, do

18      I get a royalty on these.

19          And Todd was saying "I don't know how to give you

20      a royalty, because the way it works at Image is Image

21      is all one big family and I don't get a royalty, I

22      just say to the guys go ahead, you can use my

23      character and if I at some point want, I can use one

24      of theirs."

25          So the idea of this big Image publishing family,

94

1   he was saying no money was actually coming back to him

2   for Medieval Spawn, Witchblade and Angela, Glory, so I

3   couldn't -- so he couldn't give me a share.  So he

4   would have to figure out a way to do something like

5   that which wouldn't necessarily be financial.

6        So he might have to come up with alternatives

7   that DC Comics couldn't have come up with, but he

8   would try to ensure they were fair.

9   Q  And you just told me a bunch there, so I'm taking a

10      few notes as you were going.

11  A  Not a problem.

12  Q  All right.  So then at some point after the meeting in

13      Phoenix, you expected to hear from Todd as to his idea

14      of what the specific numbers would be, is that

15      correct?

16  A  Yes.

17  Q  And did you in fact get a proposal from Larry Marder

18      outlining what Todd thought those numbers should be?

19  A  Eventually, but that wasn't the next thing that

20      happened.

21  Q  What was the next thing that happened?

22  A  The next thing that happened was I got a call from

23      Larry saying that Todd had asked him to -- Larry was I

24      think executive director of Image Comics at that point

25      and he said that Todd had asked him to do the nuts and

95

1    bolts figure work with me and put together something

2    that Todd would then sign off on.

3 Q  So Larry began to play sort of an intermediary role

4    between busy Todd McFarlane and busy Neil Gaiman?

5 A  Incredibly busy Todd McFarlane and fairly busy Neil

6    Gaiman.  So Larry was always in the office and was

7    available.

8       So I then photocopied a bunch of my DC Comics

9    contracts for him.  I just grabbed the nearest

10   contracts, photocopied it, wrote a note, cover note,

11   summarizing, you know, from the contracts roughly what

12   the financial stakes in all this stuff was or

13   precisely what the financial stakes in it was, but

14   with the contracts to amplify, and faxed off a, you

15   know, eight, 10-page fax to him.

16 Q  Then did Larry respond at some time after that with a

17   proposal from Todd?

18 A  Yes.

19 Q  I'm going to hand you what's been previously marked in

20   the depositions last week as Exhibit No. 25.  Actually

21   I'm not going to hand it to you because I have got

22   notes all over it, but I'm going to ask you to take a

23   look at what your lawyer will hand you.

24 A  My lawyer will hand me a copy.

25 Q  I would like to take a look at that, if you would, and

1    tell me if you can identify that document?

2  A  That would be the cover sheet, well, the first page,

3     not the cover sheet of the fax to Larry.

4  Q  And down near the lower right-hand corner, do you see

5     some numbers that say TM 00571?

6  A  Yup.

7  Q  I will represent to you that this particular document

8     was marked in I believe it was Larry Marder's

9     deposition as Plaintiff's Exhibit No. 25.  Near the

10    top -- and this entire document is handwritten, is it

11    not?

12 A  It is.

13 Q  With the exception of some fax header information at

14    the bottom?

15 A  Yup.

16 Q  And near the top in the right-hand corner there is the

17    words eight pages total.  Do you see that?

18 A  Yup.

19 Q  Is that what you were referring to as attached to this

20    particular document were some contracts that you

21    grabbed that were DC contracts?

22 A  Yes.

23 Q  What's the date on this particular document, Exhibit

24    25?

25 A  6 of November, '96.

1    Q   So this would have been after your meeting in Phoenix

2        and after Larry called you to say that Todd had asked

3        him to play an intermediary role, is that correct?

4    A   There was a period of time in there where I had still

5        not got any money or anything, still not got anything

6        back and there was dead silence from Todd after the

7        Phoenix meeting. And I believe that my agent wrote a

8        letter to Todd around that time, which was the point

9        where Larry got in touch with me, Todd was no longer

10       taking my phone calls and wasn't responding to my

11       agent and that was when -- so we are now at -- so

12       there was several months that went by in there with no

13       word or response from the Todd camp and then Larry

14       gets in touch and says "I'm going to sort it out."

15       So this would have been a fairly swift response

16       to me from Larry's initial call.

17    Q   In the first sentence it says "Dear Larry, I have

18       grabbed a couple of contracts and have faxed to you

19       all the relevant pages."

20    A   Uh-huh.

21    Q   Would this have been the first time that you supplied

22       anybody on behalf of Todd McFarlane, Todd himself or

23       Terry Fitzgerald or now Larry Marder, with copies of

24       DC contracts?

25    A   I don't know.

1  Q  Do you recall at any time prior to the 6th of

2     November, '96 ever showing Todd McFarlane any part of

3     one of your DC contracts?

4  A  I several times sent Todd, or sent at least Larry, I

5     know that Todd got them because he commented on it

6     once, my DC Comics contracts.

7  Q  The entire contract?

8  A  At one point, yes.

9  Q  When was that?

10 A  That was the letter that Melanie Cook, I forwarded

11    Melanie a complete contract and she just sent it on to

12    Larry when she sent the letter at the end of this

13    saying, you know, no, we are done on your come-backs,

14    you have to stick with this, this is the contract.

15    She sent the entire contract.  I think on this one I

16    left out a couple of pages, just because I was trying

17    to pick them -- pick the relevant stuff.

18 Q  So my question about -- well --

19 A  But as far as I know, this was probably the first

20    time.  I can't say.

21 Q  What you just talked about a second ago with Melanie

22    Cook sending a contract, that was after this, is that

23    correct?

24 A  Yes, I think this was probably the first time.

25 Q  Certainly back in 1992 you hadn't taken a look at each

99

1    other's contracts?

2  A  No, absolutely not.  I might have sent him something

3     in '95 if he asked.  I don't remember what was, or

4     even early '96, I might have well gone out to Phoenix

5     and said here is a contract, you can keep it if you

6     like.

7  Q  I want to take you down through this real quickly.

8     Item number 1, it says movies, audio, stage, et

9     cetera, 15 percent of net receipts, is that correct?

10 A  That's what it says.

11 Q  And then the next item, item 2, retail products.  And

12    this is a little unclear to me.  So if you could

13    explain to me what is contained in item number 2?

14 A  I don't know.  I got it from the contract.

15 Q  Well, it looks to me like, and tell me if I'm

16    mischaracterizing this, it looks like you have three

17    possible ways of calculating what you have marked as

18    writer royalty?

19 A  Uh-huh.

20 Q  And then plus an additional two different ways of

21    calculating a creator royalty when there are retail

22    products, is that correct?

23 A  That is what I understand, but I would have taken this

24    from -- all I would have done on this cover note is

25    just copy out summarizing the figures from the

100

1    relevant paragraph in the DC Comics thing.

2    Q  So that's where all the information in this letter

3       comes from?

4    A  Yeah, and would have been, and I mean -- but the

5       statement at the top that you have left out is the

6       words in brief.  I say "I'm faxing you all the

7       relevant pages in brief."  I was just trying to

8       summarize it to be helpful --

9    Q  No, I understand that.

10   A  -- on it.  So the actual document with how it all

11      would have been done would have been attached to this.

12   Q  I realize that this is just your attempt to summarize

13      the relevant terms that you see, that you saw applying

14      to your relationship with Todd, is that correct?

15   A  Not all of them, but it was an attempt to summarize

16      the numbers from the DC Comics contract that would

17      have been attached.

18   Q  After this meeting, or after you sent this Exhibit No.

19      25 to Larry Marder, did you get a response from

20      Mr. McFarlane or Mr. Marder?

21   A  I got one from Larry after a while that came back with

22      a fairly pitiful offer.  I mean, it was not only not

23      my DC deal, but it was significantly worse.

24         And I thought this is very strange and very

25      silly.  And I phoned Larry and said "Well, can you

101

1   explain some of this stuff to me?  Can you explain how

2   net is going to be calculated," and so on and so

3   forth.  And he said "No, I cannot.  You will have to

4   trust Todd."

5       Then he sent me another version of that with a

6   little more information about the toys on it, and I

7   looked at these and I thought well, these are not what

8   has been promised and this is not -- this isn't

9   even --  I thought we were working together.

10      The last thing Todd said is "You can trust me,"

11  and I'm going I can trust you and so on, so forth.

12  And now he is coming back with this is the deal and it

13  was, you know, these two percent of net for this and

14  half a percent of net for this.  I'm going what,

15  that's not what we are into.  This is, you know,

16  ridiculous.

17      And at that point I forwarded it to my

18  entertainment lawyer.

19                    MR. ARNTSEN:  Be careful about

20          communications with counsel.

21  A  Understood.  Thank you.  I forwarded it to my

22  entertainment lawyer because Mr. McFarlane was not

23  responding to my literary agent and didn't seem to

24  take her seriously.

25      So my entertainment lawyer then sent a letter to

1        Larry Marder as the person that had been negotiating.

2    Q   Let me stop you right there.  If you could take a look

3        at a document that was previously marked in I believe

4        Todd McFarlane's or Larry Marder's deposition as

5        Plaintiff's Exhibit 47.

6    A   Uh-huh.

7    Q   And would you tell me what that is, if you know?

8    A   This is a letter from Melanie Cook, my entertainment

9        attorney, to Larry Marder.

10   Q   Is this the letter that you referred to earlier from

11       Melanie Cook in which she enclosed full copies of your

12       relevant DC Comics contracts?

13   A   She has -- there is a DC Comics contract attached, 12

14       pages.

15   Q   Is this the letter you were referring to earlier when

16       you talked about Melanie Cook sending contracts to

17       Todd McFarlane or to Larry Marder?

18   A   Yes and --

19   Q   Let me ask you a quick question before we talk about

20       this.  You testified before when you were meeting

21       with, in Phoenix that you told Todd that you wanted, I

22       don't know if this is the exact words that you used,

23       but I want to see if I can characterize them, please

24       correct me if I'm doing it wrongly, but you told Todd

25       that you preferred regular statements, knowing when

1     the royalties were going to come and what the

2     royalties were going to be, is that correct?

3  A  Yes.

4  Q  And that Todd in fact preferred a different

5     arrangement, that he believed he would be able to

6     treat you better if he just sent, I think the term you

7     used before were love checks, is that right?

8  A  That was what Todd said.  However, for the previous 18

9     months, no love checks had appeared.

10  Q  I understand that.  I'm just trying to get an

11     understanding of the conversation you had in Phoenix.

12  A  Yeah.

13  Q  Is it fair to say that you understood Todd's opinion

14     of what being better than DC was to be his sending

15     these irregular love checks?

16  A  By that point I don't think Todd -- exactly when are

17     we talking about, because it's pretty broad?

18  Q  We are in Phoenix, it's hot and you guys are having

19     your discussion over, as you said, the lack of any

20     love checks for a while and Angela, the miniseries is

21     coming out.  The lack of what?

22  A  The lack of prediction.

23  Q  Okay.  So you tell Todd, and at this point Todd is

24     still telling you he is going to take care of you, do

25     you trust him, he is going to -- of course he said it

104

1    would be better than DC or I certainly would have said

2    that, isn't that what you testified, is that those are

3    the things that Todd was saying in 1996 in Phoenix?

4  A  Yes, absolutely.

5  Q  And you also testified that in Todd's view you were, I

6     think you used the word crazy to insist on

7     predictability and regular royalty checks and regular

8     royalty rates, is that right?

9  A  Yes.

10 Q  And what I want to understand is that, did Todd tell

11    you that he could do better for you or that you would

12    do better if you did not insist on regular royalty

13    amounts and instead left it up to him to send you

14    checks when he got around to it, so to speak?

15 A  I don't think he specifically said that, no.

16 Q  Did you come away from that meeting with that

17    understanding of Todd's view of the world, in other

18    words, I think you testified that you had to convince

19    him that I may be crazy, Todd and I may be taking

20    less, but I want predictability, is that right?

21 A  Yes, and I also, I wanted predictability and I also

22    wanted some guarantee.  At that point I still trusted

23    Todd.  I didn't trust any other entities.

24 Q  I understand, because as you said before, there was

25    nothing in writing at this point and if he sells out

105

1  to somebody else, all they are going to care about is

2  paper and if there is no paper, you are screwed?

3  A  Exactly.  That was what started this whole thing is

4  trying to get something down on paper.

5  Q  I understand.  Take a look at Exhibit 47, if you

6  would.

7  A  Yup.

8  Q  In the second paragraph -- actually, take a look at

9  the first sentence, first sentence, "This office

10  represents Neil Gaiman and Mr. Gaiman has forwarded to

11  me a copy of your written offer to him dated

12  February 18th, 1997."  Do you see that?

13  A  Yup.

14  Q  Is that the offer you were referring to having

15  received from Mr. Marder which you said was

16  significantly less than the terms that you had sent to

17  him back in November?

18  A  It would be one of those two faxes, yes.

19  Q  The second paragraph says, if you look about three

20  sentences down, excuse me, three lines down --

21  A  Hang on a second.  I have a feeling that we are just

22  sort of starting a long questioning thing.  Could I

23  just pop out and use the toilet?

24  Q  Absolutely.

25                    (A short recess is taken)

106

1  Q  I think we had gotten up to the point in time

2     chronologically, this April, 1997 letter from Melanie

3     Cook to Larry Marder. Do you recall our discussion at

4     that point right before we took a break?

5  A  Yup.

6  Q  If you would look at the second paragraph in Exhibit

7     47 and the third sentence, third line down which

8     begins with the word rather, do you see that?

9  A  Yup.

10  Q  Could you read that sentence outloud for me, please?

11  A  "Rather the characters were created pursuant," which

12     is probably a legal term that I would want to check

13     the meaning of, "in the terms of an oral agreement

14     under which Mr. McFarlane agreed Mr. Gaiman would be

15     compensated on the same terms as set forth in

16     Mr. Gaiman's DC Comics agreement dated August 1, 1993,

17     the DC agreement, a copy of which I have attached

18     hereto."

19  Q  And attached in fact to Exhibit 47 are two agreements,

20     are there not, two separate agreements both with an

21     August 1, 1993 date, is that right?

22  A  Yes.

23  Q  One of, the first beginning on --

24  A  No. As far as I know it's one agreement. There is

25     one signature, but one is a character equity agreement

107

1      and one is a contract to write 13 episodes of Sandman.

2  Q  So is it your testimony that these are two parts to

3      essentially the same agreement?

4  A  Yes.

5  Q  Anywhere in the documents attached to Exhibit 47 is

6      there a signature?

7  A  There is also a Schedule A royalty provisions at the

8      back.  Not on this one.  It looks to me like this was

9      Fed Ex'd -- it was faxed to them from the fax number

10     at the bottom is the same as the fax number of my

11     agent in New York.

12        So I assume that Melanie Cook had contacted

13     Merrilee, my agent, for a copy of the contract and

14     they just pulled one out of their files, which would

15     have been a working document rather than a finished

16     contract which would have come to me and come to DC.

17                 MR. SALSICH:  Could we mark this?

18     (Exhibits 57 and 58 are marked for identification)

19  Q  I have just handed you two documents that we have

20     marked for identification purposes today as Exhibits

21     57 and 58.

22  A  Right.

23  Q  And could you take a look at those for a minute or

24     two, or however long you need, and see if you can tell

25     me what those are?

1   A  These would be my finished contracts, the actual

2      executed contracts.

3   Q  And these are the executed versions of the contracts

4      which were attached, the unsigned contracts which were

5      attached to Melanie Cook's letter, is that correct?

6   A  Yeah.

7                   MR. ARNTSEN:  Just make sure that

8      it's the same dates.

9                 (Witness examines documents)

10  A  Well, the August 1st, 1993 one is actually the

11      September 1st, 1992 one.

12  Q  Yeah.  Could you explain that to me?  And what you are

13      referring to is that on the third page of Exhibit 47

14      is the character equity agreement dated August 1, 1993

15      and that's the one you testified was not executed, is

16      that correct?

17  A  Yes, it's not signed.

18  Q  And the agreement which we have marked as Exhibit No.

19      57 is your executed copy of that same agreement, is

20      that correct?

21  A  Yup.

22  Q  At the upper right-hand corner, the date, there is a

23      line through August 1, 1993 and it has been changed to

24      September 1 of 1992, is that correct?

25  A  Yup.

1    Q   Why is that?

2    A   No idea, but that you would have to check with DC

3        Comics.  Probably, I mean, I know I'm not going to

4        speculate, but can I offer a probably?

5                    MR. ARNTSEN:  Sure.

6    A   My probably on that would be because the contract goes

7        from Sandmans 50 to 73 and the contract negotiations

8        had probably gone for a while and they probably looked

9        back and realized that if they signed it as of August

10       1st, 1993, I would have been without a contract

11       between September the 1st, 1992, which would have been

12       when probably Sandman 49 was handed in and August 1st,

13       1993.  That would be my -- it's the most logical

14       assumption.

15   Q   Do you see right here, just below the line through the

16       date, there appears to be a handwritten initial.  Is

17       that your initial?  Do you see what I'm talking about?

18   A   Yeah.

19   Q   To me it kind of looks like a Y, but is that NG

20       perhaps?

21   A   I think it's more likely an L for Levitz, but I don't

22       know.

23   Q   There is another one at the bottom of page 3.

24   A   There is another one at the bottom.  That can be NG.

25       Well, it also looks like exactly the same as the L in

110

1    Levitz though.

2  Q  Take a look at page 4, right above paragraph 10 there

3     is a correction to the spelling of your agent's name

4     and the same initials appear?

5  A  Don't know.

6  Q  Does that look like a correction you would have made

7     rather than --

8  A  I wouldn't have made them, my agent, I mean, they are

9     all typed, which means that it all would have been

10    done by the time it got to me.

11 Q  Your testimony is that you are not certain as to why

12    the date was changed, but you believe if we checked

13    when Sandman 50 came out, that it would probably

14    correspond to make sure it covered the entire number

15    of issues --

16 A  That would be -- that would be my best guess. All of

17    the changes would have been made at DC and by my agent

18    before it got to me.

19 Q  I think we have just pointed out the only changes in

20    this agreement -- well, I don't know if we pointed out

21    the only changes in this agreement. As far as you

22    know, and take a few minutes to look at it if you need

23    to, is Exhibit 57 the executed signed version of the

24    contract that Melanie Cook sent to Larry Marder on

25    April 2nd of 1997?

1   A  I have absolutely no idea.  I would have to sit there

2      and go through them.  They look incredibly similar.

3   Q  They are both originally dated August 1, 1993,

4      correct?

5   A  Yup.

6   Q  And the reason I'm asking you this, Mr. Gaiman, is

7      your testimony was that the letter sent by Melanie

8      Cook attaching these agreements was, it was your

9      position or your position through her that these were

10     the agreements essentially that Mr. McFarlane had

11     agreed to abide by when you guys met back in Phoenix

12     in 1996, is that correct?

13  A  Mr. McFarlane had agreed to abide by this, as I

14     understood it, or to do better than this in 1992.  In

15     1996 we agreed that we would put in writing what the

16     specific amounts were going to be for future

17     generations and the McFarlane and co. would abide by

18     those.

19  Q  You testified that you never discussed any specific

20     terms as to royalty rates, et cetera, back in 1992,

21     correct?

22  A  No.  I said I would get him contracts.

23  Q  So in 1996 moving on into 1997, you and Todd start out

24     having a face-to-face meeting, eventually it becomes

25     letter writing between you and Larry Marder and

112

1    finally turns into letter writing between a lawyer and

2    Larry Marder, is that correct?

3  A  No.  I was talking on the phone continually with

4    Larry.

5  Q  Let me just get to my --

6  A  And this was not -- I didn't see this as letters from

7    my lawyer to Larry Marder.  I saw this as I have an

8    entertainment lawyer, Todd and Larry are paying no

9    attention to anything they get from my agent, I will

10   ask my entertainment lawyer to please write a letter.

11 Q  I didn't mean to characterize your -- I'm not trying

12   to characterize the tone of the letters or the tone of

13   the conversation.  I'm just trying to be accurate.

14     I want to get from you, tell me whether the

15   language in Exhibit 57, or exhibit, the contracts in

16   Exhibit 47, and they may not be any different from

17   each other for the important parts, but what is it

18   that -- where in these documents are the terms that

19   you understand Mr. McFarlane was supposed to abide by?

20 A  With the provision obviously that I'm not a lawyer

21   and --

22 Q  Sure, and I understand that, but it is your agreement?

23 A  I know.  Schedule A is royalty provisions.  If you go

24   to, it's at the back of Exhibit 57.

25 Q  Is there a page number down at the bottom that starts

113

1    with a G?

2  A  G 01018.  And those are royalty provisions for comics

3     sales.

4  Q  And those, if you look at the second to last page of

5     or the third to the last page of Exhibit 47, that

6     appears to be the exact same thing, does it not,

7     schedule A royalty provisions?

8  A  Without actually sitting here and comparing them --

9  Q  Take a minute or two.

10 A  Would you like me to?

11 Q  Yes, please.

12 A  Okay.

13                 MR. ARNTSEN:  I guess I would

14        object to the question.  They are either the same

15        or they are different.  And I don't know what this

16        witness trying to review them both right now and

17        saying anything about it can add to that.

18 Q  Well, I just want to -- I mean, I will tell you what,

19     the reason I'm doing this, and in the interest of

20     speeding this up, maybe we should take a few minutes

21     to look at these things and if you want to do that off

22     the record, that's fine.

23        My goal is I would like to be able to refer to

24     one document when we start talking about the DC Comics

25     agreement that appears throughout the complaint, as

114

1    the document that, as the agreement that Mr. McFarlane

2    has allegedly breached or that contain the terms that

3    Mr. McFarlane has allegedly breached. And so if we

4    can refer to one of these documents in its terms, then

5    I would prefer to do it that way other than going back

6    and forth three or four times.

7  A  In which case why don't we simply go to the executed

8    agreements.

9  Q  That seems reasonable to me. I want to make sure you

10    are comfortable with that, if you want to talk to your

11    lawyer about that.

12    I will represent to you I have looked at these

13    things pretty darn closely and they appear to be just

14    that, one is an executed version and one is an

15    unexecuted version, but I'm not testifying. I want to

16    make sure you are comfortable before going forward.

17             MR. ARNTSEN: Just to add to that,

18        I haven't gone through all the documents. These

19        are DC contracts as of certain dates and there may

20        be other ones as of other dates, and again it

21        sounds to me like in the discussions prior to '96

22        and '97, it was discussed more generally between

23        the two of them.

24  A  No, I'm perfectly happy with that. And if I can just

25    say also my guess is, as I said earlier, the only

115

1    reason why you have an unexecuted agreement as opposed

2    to the executed agreement being sent to them is

3    because that would have been what was in my agent's

4    files and that was what was faxed over to Melanie when

5    she wanted an example of a contract to send to them.

6                    MR. SIMMONS:  We are operating on

7         the assumption that these contracts are identical?

8    Q  For relevant purposes, and I will -- let's refer to

9         Exhibit 57, which actually has an executed date of

10        September 1, 1992 and refers to work on Sandman issues

11        50 through 73.  Would that be the equivalent of the

12        standard DC Comics deal that you expected

13        Mr. McFarlane to at least match or improve upon for

14        purposes of as is stated in this agreement, work on

15        Sandman issues?

16   A  No.  It would have been the character equity agreement

17        which actually explains the equity that one has that

18        formalizes the agreement with DC on the equity and

19        royalty structure one has from the characters, that's

20        the --

21   Q  Let me stop you right there.  There are not additional

22        royalties due for work on the issues, for example, the

23        character equity agreement does not cover, it's my

24        understanding does not cover reprints simply of issues

25        that you did that may not be triggered by inclusion of

116

1     certain characters, is that correct?

2 A  No.

3 Q  Let me ask you this. Let me ask you this. Under your

4     agreement that's marked as Exhibit 57, that agreement

5     is simply for work done on issues 50 through 73 of

6     Sandman, correct?

7 A  Uh-huh.

8 Q  Nothing in that agreement specifically refers to

9     character equity, does it?

10 A  No.

11 Q  But that particular agreement contains a schedule A of

12     royalty provisions, correct?

13 A  Yes.

14 Q  And in return for doing the work that you do on issues

15     50 through 73 of Sandman, you received certain

16     royalties based on sales of those particular issues,

17     is that correct?

18 A  It is. There is an additional document from DC that

19     we would have produced in document production, in

20     fact, we would have produced many copies of it, which

21     is that before they put out the trade paperback, they

22     put a -- they send you a document to sign clarifying

23     that you are not dealing with the reprint, either

24     clarifying -- these days clarifying that you are not

25     dealing with the reprint rate, in the early days

117

1      offering you a choice.

2          On the last page, G 19, you have a reprint rates,

3      and which says for any pages of the work reprinted,

4      after initial publication, which shall include

5      additional printings, DC agrees to pay writer a sum of

6      no less than $20 at full script and so forth --

7    Q  And I have seen some documents, and I don't have them,

8      I'm not going to show them to you today, but I have

9      seen documents that where that it seemed to be like a

10     one-page agreement in which they say choose A or

11     choose B, and you sign it and say I choose A or B, is

12     that what you are referring to?

13   A  Exactly.

14   Q  Other than that, does Exhibit 57 and schedule A

15     attached thereto provide royalty terms that cover the

16     sales of the specific issues Sandman 50 through 73?

17   A  Yes.

18   Q  Exhibit 58 is a character equity agreement, correct?

19   A  Yup.

20   Q  And that has a date of February 1, 1993, correct?

21   A  Yup.

22   Q  And for purposes of today's deposition, can we treat

23     this also as your executed version of the character

24     agreement, the terms of which you expected

25     Mr. McFarlane to abide by?

118

1            MR. ARNTSEN: Let's just, again I'm

2       just going to object. There are very -- I suspect

3       there are various versions of these agreements

4       with different dates, but the lining out

5       indicates that, just a quick review of comparing

6       Exhibit 58 with an analogous document as part of

7       Exhibit 47, shows some differences in them. And

8       so, Neil, if you can answer the question, fine,

9       but make sure you can answer the question fairly

10      before you do so, because if I were in your shoes

11      I couldn't.

12  Q  Let's do this. And that's a fair clarification. Let

13     me ask you some -- I will ask you some specific

14     questions and if the provision that we are talking

15     about is different in the two agreements, we will

16     point that out.

17            MR. ARNTSEN: And again there may

18      be other agreements too. We may not the have the

19      universe of agreements in this too.

20  Q  I understand that. And let me ask, maybe we can solve

21     it this way. Mr. Gaiman, is this the only character

22     equity agreement, whether it's the draft attached to

23     47 -- well, strike that.

24      I think we can solve our problems this way. If

25     you would look at the third page of Exhibit 47.


119

1   A   Okay.

2   Q   And do you see that that is a character equity

3       agreement that the first paragraph lists a series of

4       characters who have appeared in various Sandman

5       issues, do you see that?

6   A   Yes, I do.

7   Q   Take a moment to look at the characters that are

8       listed there.  I think they are in all capital

9       letters.

10  A   Yup.

11  Q   Okay.  Now, if you would look at the first paragraph

12      of Exhibit 58.

13  A   Yup.

14  Q   And take a look at the characters that are listed in

15      capital letters in Exhibit 58.

16  A   Yup.

17  Q   Do those appear to be the same characters?

18  A   Nope.  I had one removed.

19  Q   Which one is removed?

20  A   I removed Destiny, who was a preexisting character who

21      I didn't feel that I had changed, and they said that I

22      had revised the preexisting character, of which I

23      had.

24          And Destiny, and I just felt the character of

25      Destiny, I had left him the same.  I mean, I had given

120

1  him a house.  I didn't feel that was revising a

2  preexisting character enough to actually warrant my

3  going in there and saying, you know, I would like a

4  share of this character.

5  So I had them remove that.  That was actually

6  them offering something that I was perfectly happy to

7  take away.

8  Q  Other than that change taking Destiny out as one of

9  the characters, do the other characters appear to be

10  the same?

11  A  They do.

12  Q  So for the characters of Dream, also known as Sandman,

13  and the characters of Death, Desire, Despair, Unity

14  Kincaid, which all first appeared in Sandman number

15  10, Delirium, which appeared first in Sandman number

16  21, and Destruction first appearing in the Sandman

17  special, is it fair to say that Exhibit 58 represents

18  your executed agreement regarding character equity in

19  those characters in Sandman?

20  MR. ARNTSEN:  As of February 1,

21  1993?

22  Q  As of February 1, 1993?

23  A  That's my understanding, yes.

24  Q  So again for purposes of the actual agreement that you

25  signed with DC Comics regarding character equity of

121

1 these characters in Sandman, can we refer to the

2 language of Exhibit 58 as being your agreement with DC

3 Comics at least as of February 1, 1993?

4 A Yup.

5 Q Are you aware of at any time signing a character

6 equity agreement with DC Comics other than Exhibit 58

7 that covers these same characters?

8 A I would have to check the various character equity

9 agreements that I have signed with them.

10 Q You in fact have signed later character equity

11 agreements as additional characters in the Sandman

12 series have warranted that treatment, is that correct?

13 A Exactly.

14 Q Is it also true that -- well, let me ask you.  You

15 testified earlier about characters that you may first

16 introduce in an early issue, you gave the example of

17 Barbie and all she did, she was scenery I think is the

18 language you said, right, and then some 20 issues or

19 so later she comes back and gets her own issue, is

20 that right?

21 A Yes.

22 Q Do you know if you got a character equity agreement at

23 some point that included the character of Barbie?

24 A I have no idea.  I have no idea where -- Unity Kincaid

25 was perfectly one of those characters.  She is a woman

122

1    who is on stage for 15, maybe 20 panels in the whole

2    of the second storyline.

3  Q  What issue?

4  A  It says here she first appears in Sandman 10.  It's

5    possible she first appears in Sandman 1.  I would have

6    to check.  But she's just a little old lady who dies

7    in a nursing home.

8       So quite why they put her in there, I think she

9    was meant -- they sort of put her in here to stand in

10   for all of the unnamed characters.

11      And then what happens is when they get to a point

12   with a character where they look up and they go oh,

13   look, we have got a comic coming out with a character

14   or we are doing a toy with this character that Neil

15   created or somebody is spinning it off, at that point

16   they send me a character equity agreement.

17      An example which would be exactly analogous to

18   the Medieval Spawn is again recently I was sent -- I

19   created a character at DC, did an old-fashioned

20   version of an existing DC character --

21 Q  Who was that?

22 A  Character called John Constantine.

23 Q  Where did John Constantine first appear in DC Comics?

24 A  Swamp Thing something or other.

25 Q  Did he have his own title?

123

1    A  Yes, he does.

2    Q  Did he when he first appeared in DC Comics?

3    A  No, he was a character in a crowd.

4    Q  And what did you do with him?

5    A  I created a seventeenth century, eighteenth century

6       version of him.

7    Q  What did you do with the eighteenth century version of

8       him?

9    A  She came on for one scene in Sandman number 14 and

10      tried to capture my hero and failed.

11   Q  Is that the only time that John Constantine appeared?

12   A  No.  That was Lady Joanna, his ancestress.  And then I

13      had her turn up again a couple of years later on an

14      adventure in the French Revolution.

15   Q  Do you have a character equity agreement covering Lady

16      Joanna?

17   A  One is apparently on its way because I just heard they

18      are doing a miniseries starring her.

19   Q  So that's a miniseries starring Lady Joanna?

20   A  Right.

21   Q  The original character was not Lady Joanna, right?

22   A  Right.

23   Q  The original character was John Constantine?

24   A  Correct.

25   Q  And Lady Joanna was John Constantine's ancestor?

124

1  A  Probably.

2  Q  I'm not sure how that's analogous to Medieval Spawn.

3  A  Derivative character.  I did a version of the

4     character, changed her sex this time.

5  Q  Now, the original character John Constantine was not

6     the title character of any DC Comics product, was it?

7  A  Yes, he was the comic, it's either called Hell Blazer

8     or John Constantine Hell Blazer.

9  Q  And that's what originally appeared in DC Comics, is

10     that correct?

11  A  No.  The comic that originally appeared, the character

12     originally appeared in was Swamp Thing where he was a

13     minor character who grew into a major character and

14     then he spun off, not created by me.

15  Q  So you just, in creating the character, the Lady

16     Joanna character who you are now getting a character

17     equity agreement with, that was a derivative character

18     of an existing DC Comics character John Constantine,

19     correct?

20  A  Yup.

21  Q  And you say you have -- a character equity agreement

22     for her is on the way?

23  A  Uh-huh.

24  Q  As far as you know, will it have the same terms that,

25     as far as what royalty percentages, et cetera, are in

125

1    Exhibit 58?

2  A  I cannot say.

3  Q  Have you negotiated for any additional or different

4     terms?

5  A  There is a prorated -- anyway, in answer to your

6     specific question, I haven't negotiated.  I'm waiting

7     for the thing to arrive and I assume that DC will

8     treat me fairly because they always have.  There is

9     certainly -- you should have -- can I mention

10     something?

11                   MR. ARNTSEN:  No, let's just --

12                   THE WITNESS:  Okay.

13  Q  If you think there is a document I should have and you

14     want to ask your attorney, if we can speed things

15     along, please feel free to do so.

16                   (Discussion off the record)

17                   MR. SALSICH:  Nothing?

18                   MR. ARNTSEN:  He says there is, and

19          I don't know if you can find it, a character

20          equity agreement involving Matthew, the Raven,

21          which he thought may be analogous, but --

22  A  Which should be in those piles of stuff that I

23     provided you guys with.

24                   MR. SALSICH:  Let's go off the

25          record for a second.

                          126

1                    (Discussion off the record)

2   Q  As far as you know, Mr. Gaiman, does Exhibit 58

3      represent the agreement that you signed with DC Comics

4      in and around the early 1993, February through April

5      of 1993 regarding character equity in the characters

6      listed in the first paragraph of that document?

7   A  Yes.

8   Q  And is it true that you are not presently aware of any

9      other character equity agreements between yourself and

10     DC Comics related to these specific characters?  I'm

11     not asking you to say if you know or if you are

12     certain that none exist.  I'm asking if you are aware

13     of any others besides this exhibit?

14  A  No.

15  Q  And when you -- let me ask you.  I don't know if you

16     have a copy of your amended complaint.  I brought

17     copies if you need them.

18        Let me just hand you one.  I don't know that we

19     need to mark it as an exhibit.

20                    MR. SALSICH:  This is the amended

21         complaint.  Do you want to look at that, Allen,

22         make sure I have got the right one?

23                    MR. ARNTSEN:  As far as I know

24         there is only one amended complaint.

25                    MR. SALSICH:  Well, I got all the

127

1          pages copied.  It's the one signed at the back.

2    Q   Would you take a look at page 11 of your amended

3        complaint, Mr. Gaiman.

4    A   Yup.

5    Q   Do you see paragraph 48?

6    A   Yup.

7    Q   And right above that there is a subheading with a

8        letter C, and it says the 1997 agreement.  Do you see

9        that?

10   A   Yup.

11   Q   I want to ask you some questions about what's been

12       characterized in your complaint as, your amended

13       complaint as the 1997 agreement.  And the easiest way

14       to do this may simply be to walk through these

15       paragraphs and ask you some questions and we will

16       probably refer to some of these documents.  Okay?

17   A   Okay.

18   Q   In paragraph 48 you allege that you received a memo

19       from Larry Marder of Image Comics setting forth terms

20       regarding royalties for Angela, Medieval Spawn and

21       Cogliostro, and that was around February 18th, 1997.

22       Do you see that?

23   A   Yup.

24   Q   Earlier we were talking about an offer you received

25       from Larry Marder which you said was significantly

128

1  less than what it should have been pursuant to the DC

2  Comics agreements, correct?

3  A  Yes.

4  Q  And that that in fact is the offer that is referred to

5  by Melanie Cook in the letter she sends to Larry

6  Marder attaching the contracts and that letter was

7  marked as Exhibit 47, I believe?

8  A  Yes.

9  Q  Okay.  Second sentence in paragraph 48 of the amended

10  complaint states that "The written offer was

11  substantially worse than the terms of Gaiman's Sandman

12  contract with DC Comics, contrary to the agreed upon

13  standard for the treatment of Gaiman under the 1992

14  agreement."  Do you see that sentence?

15  A  Yup.

16  Q  And I want to make sure that the terms of Gaiman's

17  Sandman contract with DC Comics, are you referring to

18  the Sandman agreement with DC contracts that we have

19  marked as Exhibit 58, which is the executed version of

20  your character equity agreement?

21  A  Not necessarily.  That wouldn't have existed

22  necessarily at the end of '92 when those checks came

23  in.

24  Q  When is the first time you ever got a character equity

25  agreement from DC Comics?

129

1    A   I think this may be the first of the character equity
2        agreements, but it formalized --
3    Q   I'm sorry, I didn't mean to interrupt.
4    A   But it took the April 20th, 1988 contract, amended
5        January 2nd, 1990 and May 20, 1991, and worked out,
6        worked out a formula and put it all down on paper.  So
7        as I understand it, that stuff was implicit in the
8        earlier contracts.
9    Q   But not explicit, correct?
10   A   But not explicit.  This is the first time it was made
11       explicit.
12   Q   Is it your testimony that the terms contained in
13       Exhibit 58, which was executed after your 1992
14       agreement with Todd McFarlane, nevertheless accurately
15       reflect the arrangement you had with DC Comics at the
16       time of your 1992 agreement with Todd McFarlane?
17   A   As I understand it, yes.  I mean, there may have been
18       -- I mean, my agent had been negotiating this contract
19       all through 1992.  So this was long before Todd ever
20       got hold of me.
21           Merrilee had been going backwards and forwards
22       with them, with DC, and figuring out the exact way and
23       shape of the contract, but up until that point it had
24       not become -- when I began doing comics for DC, this
25       was the standard of the comic.  This was the kind of

                              130

1    contract that one was signing.

2                    MR. ARNTSEN:   Referring to Exhibit

3        57?

4  A  Referring to Exhibit 57, which is the agreement is I'm

5     writing a comic for you.

6  Q  And the standard agreement which you said was embodied

7     in Exhibit 57 which in fact covered your work on

8     Sandman issues 50 through 73, correct?

9  A  Uh-huh.

10 Q  And which also amends and updates the agreement

11    originally dated April 20th, 1988, does it not?

12 A  It does.

13 Q  That's the agreement that is the standard DC Comics

14    agreement, in your experience, when one simply writes

15    a comic book issue, is that correct?

16 A  It is.

17 Q  And that --

18 A  By this point, we could see that the characters were

19    able to start spinning off, that merchandising, and so

20    on and so forth, was beginning to occur, which was not

21    happening in 1988 when I signed the original

22    agreement.  So that we were putting into, down on

23    paper how things actually worked so that I didn't wind

24    up phoning them all the time and saying hey, you just

25    sold the movie rights, what do I get, hey, you are

131

1    doing a toy, what do I get, which is what happened.

2  Q  So that Exhibit 58 represents the culmination of

3     negotiations between you or your agent and DC Comics

4     as to how you are going to share in the equity of the

5     characters that you have created up through issue 50

6     of Sandman, is that correct?

7  A  Yes.

8  Q  And that your negotiations with DC Comics that

9     culminated in Exhibit 58 were taking place, sounds

10    like, before, during and after the time that you

11    entered into the 1992 agreement with Todd McFarlane

12    regarding issue 9, is that correct?

13 A  It is.

14 Q  So is it fair to say, when referring to paragraph 48

15    of your complaint, that when you say that the agreed

16    upon standard for treatment of Gaiman under the 1992

17    agreement is embodied in the terms of Gaiman Sandman

18    contract with DC Comics, are you referring to Exhibit

19    57 or are you referring to Exhibit 58?

20 A  I would be referring to the entire run of Sandman

21    contracts, and going back to the 1988 one, which only

22    gives me character equity in ownership if I complete

23    the first 12 issues, for example.  There is a clause

24    in there that I get a share of that, of the characters

25    in that issue.

132

1  Q  Is it fair to say that in fact there really isn't a

2     standard DC contract, DC Comics contract right at the

3     end of 1992 that governs -- that has always governed

4     your relationship with DC Comics -- in fact, isn't it

5     fair to say that based on at least three amendments of

6     an agreement you signed in 1988 with DC Comics and

7     another agreement which you negotiated throughout 1992

8     that ended up in the character equity agreement in

9     Exhibit 58, that your participation in royalties, et

10    cetera, with DC Comics changed over time, isn't that

11    true?

12 A  Absolutely.

13 Q  Do you see my problem here though is you have got an

14    allegation against my client that he agreed to treat

15    you a certain way and the only -- in 1992, and you

16    have already testified that in 1992 that's all that

17    was said, there was no discussion of what percentage

18    of royalty was gained, what was done with this

19    character or that character, what was going to happen

20    with the toy, so that in 1997 you are sending

21    documents to Mr. McFarlane to explain what was meant

22    by your DC Comics contract back in 1992?

23 A  Certainly.  They were the grounds from which we were

24    negotiating our deal.

25 Q  I understand, but let me ask you this.  Is it true

133

1    that you never told Mr. McFarlane in 1992 what

2    percentage of royalty you got based on licensed

3    products?

4  A  Yes.

5  Q  Is it true that you never told Mr. McFarlane in 1992

6     what percentage royalty you would get from DC Comics

7     based on reprints?

8  A  Yes.

9  Q  Is it true that you never told Mr. McFarlane in 1992

10    what percentage of DC Comics would pay you as a

11    royalty for trade paperbacks?

12  A  I have already testified that Mr. McFarlane and myself

13    didn't talk percentages back then.

14  Q  But in 1997 now you are telling Mr. McFarlane that he

15    agreed to match a DC Comics contract, is that right?

16  A  No, I'm not saying to him he agreed to match a

17    contract.  I'm saying to him he agreed to treat me as

18    well or better than DC and this is how DC does it,

19    let's talk, let us negotiate.

20  Q  All right.  Well, then maybe I'm misunderstanding

21    you.  Are you in 1997 negotiating for the first time

22    what the royalty rates should be for the use of Angela

23    and Cogliostro and Medieval Spawn?

24  A  In 1996, as far as I'm concerned, we are memorializing

25    and getting exactly into putting on paper for the

134

1    future a deal that we have, which is that

2    Mr. McFarlane will treat me better, as well or better

3    than DC would have done.

4  Q  I understand that and I know it sounds --

5  A  And so we are trying -- we are obviously -- this is an

6    abstract concept.  We are attempting to attain an

7    abstract contract.

8    I'm not trying to put one over on Mr. McFarlane.

9    I'm trying to say okay, I have grabbed a contract,

10   these are the figures.

11 Q  Let me stop you right there.  And I think it's

12   important for us to try to do the best we can right

13   now in letting each other finish our questions and

14   answers.

15 A  Sorry.

16 Q  That's all right.  I'm doing it too.  I just want to

17   make sure I have got this clear.

18   You said that in 1996 you are memorializing what

19   you both meant back in 1992 when you said treat me

20   better than I get treated at DC Comics, is that right?

21 A  Uh-huh.

22 Q  And that back in 1992 the only specific statement you

23   testified that Mr. McFarlane made regarding being

24   treated better than at DC Comics was that he wasn't

25   going to ask you to sign your rights away, is that

135

1    correct?

2  A  I think there were a lot more.  I mean, if you are

3     going to say specific statement, Mr. McFarlane said a

4     lot more than that.

5  Q  I'm talking about what he said about all the good

6     reasons you should do it.  I realize that, but I'm

7     talking about specific terms that you agreed on.

8        As I understood your testimony earlier today, and

9     you have just repeated it here, you did not talk about

10    a seven and a half percent royalty, or a 15 percent

11    royalty or any other royalty figure for any use of any

12    characters or any reprints of any issues, is that

13    correct?

14 A  Yes.

15 Q  In 1992?

16 A  It is.

17 Q  But in 1996 you are attempting to memorialize in

18    writing what you meant by that back in 1992, is that

19    correct?

20 A  In 1996 I'm just trying to get something down on paper

21    that I feel is analogous to a DC deal, the kind of

22    figures that I would have been getting from DC Comics.

23 Q  And my point is -- well, let me ask you this.  In your

24    complaint on page 20 you have got a claim in the

25    middle of the page, it says count four, breach of

136

1   contract, do you see that?

2   A   Uh-huh.

3   Q   And in paragraph 76 you state, and I will quote,

4       "McFarlane and the McFarlane corporate defendants

5       breached the 1992 and 1997 agreements by, inter alia,

6       failing to pay Gaiman the agreed upon royalties for

7       exploitation of the Angela intellectual property and

8       other intellectual property held by Gaiman."  Do you

9       see that?

10  A   Yup.

11  Q   And then in paragraph 77 you state "McFarlane and the

12      McFarlane corporate defendants breached the 1992 and

13      1997 agreements by, inter alia, interfering with

14      Gaiman's right to do and commercially benefit from

15      publishing 'one-offs' and by interfering with Gaiman's

16      right to do and commercially benefit from a Randy

17      Bowen Design Angela statue."  Do you see that?

18  A   I do.

19  Q   And you state in both paragraph 76 and paragraph 77

20      you allege breaches of the 1992 agreement, okay.  Do

21      you see that?

22  A   Uh-huh.

23  Q   All right.  And I'm really trying to find out what

24      part of the 1992 agreement has Mr. McFarlane or the

25      McFarlane corporate defendants breached?

137

1   A  Are you asking me a question?

2   Q  I am asking you a question.

3   A  Okay.

4   Q  Explain what you mean by paragraph 76 leaving out

5      reference to a 1997 agreement.  I want to know how the

6      1992 agreement was breached.

7   A  Mr. McFarlane did Angela toys.  These were brought

8      out, I believe, in the Spring of 1994 and were very,

9      very popular.

10         He did various models of them, including a

11     12-inch high Angela toy and a red Angela toy, a cosmic

12     Angela.  No payments of any kind were made on these

13     until we finally got to the 1997, that final, the

14     payment that signified that the 1997 agreement had

15     started, nor was there any attempt --

16  Q  Let me stop you right there.  How much was

17     Mr. McFarlane supposed to pay you under the 1992

18     agreement, what percentage royalty was Mr. McFarlane

19     supposed to pay you pursuant to the 1992 agreement as

20     royalties from the Angela toys?

21                    MR. ARNTSEN:  If you know.

22  Q  Well, take all, look at all the documents.  I mean,

23     you have said the DC Comics deal, you have got all

24     these character equity agreements.  I'm just trying to

25     find in here where we can do it.

138

1      I don't want to get short with you, I really

2   don't, but we have got a certain amount of time left

3   and we really need to kind of pin this down.  So if

4   you can point to me what document I should be looking

5   at, what document Mr. McFarlane should be looking at

6   to say oh, I should have paid him 15 percent of net.

7 A Mr. McFarlane managed to make it work for the Medieval

8   Spawn toy.

9 Q That's not my question.

10 A I know, but I'm saying I got a check.

11 Q That's not my question.  Tell me how much, what

12   percentage royalty Mr. McFarlane is supposed to be

13   paying you for the Angela toys under the 1992

14   agreement?

15 A Under the 1992 agreement, a payment.

16 Q Doesn't matter how much?

17 A Well, as long as it in some way reflected a fair-ish

18   share of what I would have -- of something that Todd

19   felt fair, I would have been fine on it.  Nothing came

20   in.  And it became more and more obvious nothing was

21   going to come in.

22 Q And why would you have been satisfied with just

23   something fair, is it because you had never agreed on

24   a royalty rate?

25 A I trusted Todd.

139

1  Q  That's not my question.  Did you ever agree on a

2     royalty rate in 1992?

3  A  No.

4                      MR. ARNTSEN:  Object as he's

5         answered that already.

6  Q  What was the Randy Bowen design Angela statue?

7  A  Randy Bowen is the top guy in comics when it comes to

8     doing statuettes, high end things you can put on, you

9     know, the corners of tables and so forth, not toys,

10    $150 porcelain kind of things.  And he approached me

11    at some point in the nineties and said he would

12    really, really like to do an Angela toy, an Angela

13    statue and, you know, he thought it will be cool and

14    that obviously I would make some money out of it.

15         And I said that was a lovely idea and to contact

16    Todd.  And as far as I know he never heard back from

17    Todd.

18 Q  So how did that prevent you from -- how did Todd

19    prevent you from benefiting from a Randy Bowen design

20    Angela statue?

21 A  If Todd had given his approval on it, he would have

22    gone into, you know, Randy would have made it without

23    Todd's approval without any communication from Todd.

24 Q  Did Randy need Todd's approval in your opinion to make

25    this statue?

                           140

1          MR. ARNTSEN:  Object to the extent

2      it calls for a legal conclusion.

3  Q  As far as you understood, you told Randy Bowen to go

4      talk to Todd.  Why did you do that?

5  A  It seemed polite.

6  Q  Do you believe Todd had some obligation under the 1992

7      agreement -- well, let me step back.  What time was

8      this, what time period did this happen?

9  A  I don't know.

10  Q  You said some time during the nineties, you can't

11      remember?

12  A  Some time during the nineties.  I can't remember.

13  Q  That's a long decade.  Let's try to pin it down.  Was

14      it before you went to Phoenix or not?

15  A  I think so.

16  Q  By the time you leave Phoenix, things are not -- you

17      are not in a great relationship with Todd, is that

18      correct?

19  A  No.  By the time I leave Phoenix I figure everything

20      is sorted out again.

21  Q  Then six months you get the offer and you realize

22      things are not sorted out, is that correct?

23  A  Yes.

24  Q  You learn from Larry Marder that Todd's asked Larry to

25      talk to you about it.  And my question is when Randy

141

1    Bowen comes to you, is this before you have gone to

2    Todd and say hey, I'm not getting any royalty from

3    this stuff, what's going on?

4  A  Yes.

5  Q  So it's well before any 1997 agreement, is that

6    correct?

7  A  Yes.

8  Q  Did you understand that Todd at any time in the 1992

9    agreement made a promise to you that he would make

10   certain statues of these characters?

11 A  Absolutely not.

12 Q  So even if Todd had been paying you royalties all

13   along, you wouldn't say that there is anything in the

14   contract that said Todd should have made this statue

15   with Randy Bowen, is that correct?

16 A  Yes.

17 Q  What are publication one-offs?

18 A  They are comic books or possibly trade paperback

19   originals, not to be confused with one shots.

20 Q  You have to help me more than that.

21 A  I'm sorry.  I'm just pulling my thoughts together.  A

22   one-off is a -- could be anything from a trade

23   paperback original or a hardback original to a

24   series.

25      Angela was a one-off.  It was -- it's not an


     142

1    ongoing series.  It's something that happens probably

2    six, maybe eight, 12 issues is probably as far as you

3    could go and say something was a one-off --

4  Q  Before it becomes its own series?

5  A  After that it becomes its own series.

6  Q  In paragraph 77 you state that "McFarlane and the

7    McFarlane corporate defendants breached the 1992 and

8    1997 agreements by, inter alia, interfering with

9    Gaiman's right to commercially benefit from

10   publication one-offs."  What do you mean by that?

11  A  What I mean specifically is part of the 1997 agreement

12   was what we tied everything down is one of the things

13   that Todd gave me to make up for -- do you remember I

14   mentioned earlier the Angela, Glory and the Medieval

15   Spawn, Witchblade comics that other Image houses did.

16      So Todd said "Look, I can't pay you anything for

17   those, but what I will give you is the right to go and

18   do a one-off, a one-shot payment with other comic

19   companies using Angela or Medieval Spawn."  So if I

20   want to do Medieval Spawn Batman, I could, and I could

21   have done Medieval Spawn Batman as a 120-page graphic

22   novel or I could have done it as a series of four

23   comics, or whatever, and the same with Angela, where

24   if I had wanted to do Angela meets the X-Men, I could

25   have done four issues of Angela meets the X-Men,

143

1    whatever, or if the other idea was if I wanted to just

2    do an Angela series or a Medieval Spawn series, I had

3    to do it with another image -- I had to do it at

4    Image.  If it was a team-up, I could take it to

5    another company.  And that was Todd's agreement in

6    '97.

7  Q  Is that the same as a crossover?

8  A  Not quite, because what you are talking about, a

9    crossover could occur in a regular comic.  A crossover

10   basically is what happens when two characters cross

11   over, you know, they intertwine.  You get a Sandman,

12   turns up in Spawn that will be the famous Sandman,

13   Spawn crossover or whatever.

14 Q  How is that different from Medieval Spawn Batman

15   one-off, is that because of where it appears?

16 A  It's the way it gets published.  It could be -- it

17   could conceivably be a crossover, but a crossover

18   tends to -- we are really into comics trivia, but it

19   tends to imply that you have done, you know, you had a

20   story over here and you have a story over here and now

21   they cross over.

22       The Angela series, the three-issue Angela series

23   I did could have also been considered a Spawn

24   crossover because Spawn is in it, but it wasn't

25   actually Spawn.  It was Angela and Spawn was a

1    character in it.

2  Q  Now, if you look at Exhibit 58 --

3  A  You asked me the question, I don't think I actually

4     answered, you asked how they had breached it.

5  Q  Yes.

6  A  Okay.  I had --

7  Q  Well, let me stop you.  I think you did say, and let

8     me just make sure, you stated that in the 1997

9     agreement, because Todd had said there were no

10    royalties to give you based on the sharing of the

11    characters with Image Comics, that he would make that

12    up to you by allowing you to do a one-off with Angela

13    and a one-off with Medieval Spawn, is that correct?

14 A  Yes.

15 Q  And that in fact, in breach of that 1997 agreement,

16    according to your allegations here, he did not let you

17    do that, is that right?

18 A  What happened was I spoke to people at Marvel Comics

19    and at DC Comics about doing these comics.  They were

20    very enthusiastic at the time.  And when they phoned

21    Todd, nobody would put them through to him and he

22    didn't return calls.

23 Q  Did you hear from anyone at DC Comics or Marvel that

24    Todd specifically said that you could not do a one-off

25    with DC or Marvel?

145

1    A  What I heard was that Todd would not return calls.

2    Q  And is it your understanding that DC Comics or Marvel

3       needed to get permission from Todd before they would

4       agree to do a one-off with you containing the Medieval

5       Spawn or the Angela character?

6    A  Both of them would want, yes.

7    Q  Why is that?

8    A  Otherwise they only have my representation that this

9       is an agreement with Todd and they are going to want

10      to hear it from Todd, yes, it's okay.  They are not

11      going to go ahead and publish Medieval Spawn Batman

12      without knowing that it's going to be Todd, otherwise

13      they would run into trouble further down the road.

14    Q  Why would they run into troubles, because they

15      realized Medieval Spawn was a character owned by Todd

16      McFarlane?

17                MR. ARNTSEN:  Object, calls for a

18      legal conclusion or lack of foundation.

19    Q  You can answer.

20    A  I don't actually understand the question.

21    Q  Well, you just said that DC and Marvel would not do

22      the one-off with you without knowing that Todd had

23      given you permission to do so, is that correct?

24    A  Uh-huh.

25    Q  And I'm asking if you know, based on your 15 plus

146

1    years in the comic book industry, why DC Comics would

2    believe or Marvel Comics would believe that it needed

3    to get Todd's permission rather than just yours to do

4    a one-off with Angela or Medieval Spawn?

5  A  On the case of Medieval Spawn, Todd is the holder of

6    the trademark, I imagine holder of all Spawn

7    copyrights, and they are going to want to know that

8    it's completely okay.  They don't want to run into

9    problems somewhere down the line.

10  Q  Would the same be true of Angela?

11  A  I don't believe that Todd owns all copyrights on

12    Angela, but again you don't want -- Todd is obviously

13    the co-creator of Angela, Todd has previously been the

14    publisher of Angela.

15    You don't want to, you know --  the last thing

16    you want is the polite little letter from the lawyer

17    letting you know that you cannot send a comic that you

18    have already prepared to press.

19  Q  And I just want to get from you the specific actions

20    that McFarlane took and you have got this allegation

21    against the other McFarlane corporate defendants.  I

22    want to be clear.

23    You have this allegation both in paragraph 76 and

24    77 that both McFarlane, meaning Todd the individual

25    and the McFarlane corporate defendants, breached these

147

1    agreements.  Do you see that in your complaint?

2  A  Uh-huh.

3  Q  How did TMP International breach your 1992 agreement?

4     You didn't have a 1992 agreement with TMP

5     International, did you?

6  A  As far as I know I didn't.

7  Q  You didn't have a 1997 agreement with TMP

8     International, did you?

9  A  I don't know.  I would have to go back and look at the

10    stuff that was signed.  I don't know whether that was

11    as all defendants.

12  Q  We will do that in a second.

13  A  Okay.  Having dealt with Todd McFarlane, watched

14    Todd's deposition and watch Todd now speak, I'm

15    speaking as he said, always assume I'm speaking as

16    TMP.

17  Q  Did you make these allegations in your complaint

18    before Todd's deposition?

19  A  Yes.

20              MR. ARNTSEN:  Object,

21        argumentative.  The lawyers drafted the

22        complaint.  Let's take a break.

23              (A short recess is taken)

24  Q  You have alleged that Mr. McFarlane and the other

25    McFarlane defendants breached the 1997 agreement, is

148

1    that correct?

2  A  Yes.

3  Q  I would like to talk about that 1997 agreement, if

4     that's all right.

5  A  Okay.

6  Q  If you would turn to page 14 of your amended

7     complaint.  Do you see paragraph 54 at the bottom?

8  A  Uh-huh.

9  Q  It states "Gaiman's May 5 letter, Gaiman's first July

10    15th letter, McFarlane's July 15th letter and Gaiman's

11    confirming July 15th letter, former written

12    agreement," and that's the 1997 agreement?

13 A  Uh-huh.  I'm sorry.  Yes.

14 Q  My question to you is as far as you are concerned, are

15    there any other documents or communications that

16    supplement those four letters?

17 A  I would have to see what those letters are.  Do we

18    have them?

19 Q  Yes.  I will hand them to you.  They have all been

20    marked as exhibits previously and we ought to look at

21    them altogether probably.  It will be easiest because

22    you may be able to refer back and forth and help

23    explain it to me.

24       They are Exhibits No. 2, No. 19, No. 20 and No.

25    33.

149

1   A   There is one more.

2   Q   What is that?

3   A   My letter of around the 1st of August to Todd.

4   Q   That would be Exhibit 50.

5   A   Yup.

6   Q   If you look at paragraph 55 of your amended complaint

7       on page 15, you state that on August 1, 1997, having

8       not received the Miracleman materials, et cetera, et

9       cetera, Gaiman faxed McFarlane an inquiry letter.  Is

10      that what you are referring to?

11  A   Yup.

12  Q   Does Exhibit 50 form part of the 1997 contract or

13      not?

14              MR. ARNTSEN:  Object, calls for a

15          legal conclusion.

16  Q   As far as you know, Mr. Gaiman?

17  A   I'm not a lawyer.  I couldn't say.

18  Q   In your opinion, I'm asking for what you understand

19      the terms, you were the person that entered into the

20      agreement with Mr. McFarlane, is that correct?

21  A   Yes.

22  Q   1997, the 1997 agreement?

23  A   Yes.

24  Q   Did you have a lawyer help you with drafting any of

25      the terms of that agreement?

150

1   A  No.  Mr. McFarlane stated categorically that he would

2       only talk to me after getting the letter from Melanie

3       Cook, that he would only talk and negotiate and

4       organize something if no lawyers were involved.  It

5       was just me and him mono-a-mono, two guys together.

6           I very much wanted lawyers to sort it out because

7       I figured we wouldn't be in the mess we are now in.

8   Q  So your answer is no, you didn't have a lawyer?

9   A  No, didn't have a lawyer.

10  Q  So is it fair to say that you drafted these letters

11      back and forth, including your May 5th letter and your

12      two July 15th letters --

13  A  I drafted the May 5th letter.  I then had a long phone

14      call with Todd on the 15th of July, 1997 where he

15      phoned me up, agreed to everything, said yes, we had a

16      deal and went over the points of the deal with me and

17      said we had a deal.

18         What I did in my letter of July the 15th was

19      then, from the list that I made, I sat and I typed

20      everything up, and sent it off to him.  I was

21      incredibly relieved that finally this was all going to

22      be done.

23         Mr. McFarlane on July 15th faxed me straight back

24      to say beauty --

25  Q  I'm familiar with what the letters say.  Let's try to

1    do this as a little bit more question and answer, if

2    we could.

3  A  Absolutely.

4  Q  My question to you is did you believe that you had a

5    contract with Mr. McFarlane after you sent back your

6    confirming letter on July 15th, 1997 which has been

7    marked as Exhibit 33?

8  A  Yes.

9  Q  So is it fair to say that the letter you sent on

10   August 1st, 1997, which has been marked as Exhibit 50,

11   was not part of the agreement itself but simply a

12   follow-up letter wondering what's going on?

13 A  Well, and it said at the end if it isn't going to

14   happen, let me know and we can renegotiate.

15 Q  What did you mean by that?

16 A  I meant if Todd had changed his mind, he had somehow

17   reneged or gone back on the deal, I was perfectly

18   happy to roll up my sleeves and say okay, well, what

19   do you want, let's keep going on this until we have

20   something that's a deal, but obviously we had.

21 Q  But your understanding was that you did have a deal on

22   July 15th?

23 A  Yes, entirely.

24 Q  Let's talk about that deal.  In your first July 15th

25   letter, which has been marked previously as Exhibit

152

1  19, your third paragraph down, you state "My rights in

2  Cogliostro and Medieval Spawn as above will be

3  exchanged for your share of Miracleman," correct?

4  A  Uh-huh.

5  Q  I would like to ask you about that.  What did you mean

6  by your rights in Cogliostro and Medieval Spawn?

7  A  I was the creator of Cogliostro and the creator of the

8  derivative character Medieval Spawn.  I had --

9  Q  So what rights did you have by virtue of being a

10  creator of those characters?

11  MR. ARNTSEN:  Object to the extent

12  it calls for a legal conclusion.  Testify as to

13  what your understanding is of those rights.

14  Q  Let me clarify here.  I'm asking you -- I have already

15  asked you if you had a lawyer help you choose these

16  words, correct?

17  A  Yes.

18  Q  And you testified that you did not?

19  A  Yes.

20  Q  These are your words?

21  A  Absolutely.

22  Q  So I'm asking only as to your understanding as to the

23  words you chose to use in the documents which you

24  claim form a contract with my client.  Okay.

25  So I'm asking you what did you mean when you said

153

1    "My rights in Cogliostro and Medieval Spawn," and your

2    answer was I created those characters.  My question to

3    you is what rights did you get by virtue of being the

4    creator as you understood it?

5  A  As I understood it, I had an intellectual property, a

6    share in the intellectual property of these

7    characters.

8  Q  And what do you mean by intellectual property of these

9    characters?

10  A  I mean some share financially and beyond that in who

11    these characters were, what they were as the creator.

12    I had the -- I had written their first appearance, I

13    had made them up.  I created the name of Cogliostro,

14    the character of Medieval Spawn and was willing to

15    hand everything, as far as I understood, had now

16    handed everything, whatever rights I had in those

17    characters, whatever share of the characters as the

18    creator I had, I was giving to Mr. McFarlane.

19  Q  And that's my question.  I understand that.  That

20    hasn't told me what your share is.

21        Did you understand, when you wrote this letter on

22    July 15th of 1997, that you had acquired rights in

23    Cogliostro and Medieval Spawn by virtue of an

24    agreement in 1992 or by virtue of your creation of the

25    characters?

154

1   A  By virtue of my creation of them and never having

2      signed anything away on them.

3   Q  So you did not have any contract in 1992 or any other

4      time that specifically granted you any rights in

5      Cogliostro and Medieval Spawn, is that correct?

6   A  No, I hadn't granted Mr. McFarlane any rights

7      specifically.

8   Q  That's not my question.  I'm asking if you ever got

9      any rights to Cogliostro and Medieval Spawn by virtue

10     of any contract?

11   A  Can I ask my lawyer something, please?

12   Q  Let me ask the questions.  If your lawyer needs to

13      object, that's fine, you can talk with him.

14              MR. ARNTSEN:  I guess I will

15      object.  The question may be vague as to whether

16      you are just referring to written contracts or you

17      are encompassing both oral and written contracts

18      and I think the witness wasn't clear because of

19      that.  That was what I was --

20   Q  Your testimony a few minutes ago, and I don't want to

21      mischaracterize it, but I believe this is accurate,

22      was that you obtained rights in Cogliostro and

23      Medieval Spawn, those characters, by virtue of your

24      creating those characters in issue 9?

25   A  Uh-huh.

1  Q  Coupled with the fact that you were not asked to or

2     obligated to sign any rights away under those

3     characters, is that correct?

4  A  Uh-huh.

5  Q  And is that based on your understanding and based on

6     your experience with DC Comics that you typically,

7     when you do a contract with DC Comics even for

8     characters that you have created, you do sign away the

9     copyrights to those characters, is that correct?

10 A  Not necessarily.  If it is work for hire and has been

11    previously agreed, you did.

12 Q  I understand that.  Let me ask you a question.

13           MR. ARNTSEN:  Let him finish his

14    answer to a question before you interrupt him.

15 Q  Have you ever signed a character equity agreement with

16    DC Comics regarding any character in the Sandman

17    series that was not a work for hire?

18 A  The whole of Sandman was work for hire.

19 Q  Okay.  So it's the work for hire provision in those

20    contracts in which you give up your copyright

21    interest, is it not?

22           MR. ARNTSEN:  Object, calls for a

23    legal conclusion.

24 Q  Take a look at Exhibit 58, please, Mr. Gaiman, excuse

25    me, Exhibit 57.  Do you have that?


156

1    A  Yup.

2    Q  You see paragraph 6?

3    A  Yup.

4    Q  And that states that the work created hereunder is a

5       contribution to a collective work and constitutes a

6       work made for hire, is that correct?

7    A  Yes.

8    Q  Down in the middle of that paragraph, it says "In the

9       event that the work is not deemed to be a work made

10      for hire, then the writer hereby assigns all rights in

11      the work, including the copyright and trademark

12      rights."  Do you see that?

13   A  Yes.

14   Q  And this agreement governs Sandman issues 50 through

15      73, is that correct?

16   A  Yup.

17   Q  And you said Sandman ended on issue 75?

18   A  Yup.

19   Q  Is this the type of provision that you would typically

20      see in your experience in contracts with DC Comics

21      through which you would give up whatever rights you

22      had, your copyright, your intellectual property rights

23      that you referred to?

24   A  I don't understand the question.

25   Q  You testified that you believed, by the fact that you

157

1   did not sign any rights away with Mr. McFarlane in

2   1992, you retained some share in the intellectual

3   property rights of those characters or those

4   creations, is that correct?

5   A   Yes.

6   Q   You testified that that meant you would get to share

7   financially and in other ways, is that correct?

8   A   Yes.

9   Q   I want to clarify what you mean by that.  Do you mean

10  -- do you have any understanding of what a copyright

11  is?

12  A   I thought I did when this thing began.  I have now

13  realized it's an incredibly legal thing and would love

14  to have five years to learn.

15  Q   But you have had -- you have been publishing works,

16  copyrighted works for 15 plus years, is that correct?

17  A   Absolutely.

18  Q   And when you authored American Gods, for example, your

19  novel, that's copyrighted Neil Gaiman, isn't it?

20  A   Yes.

21  Q   Yet when you do work for DC Comics, the work for hire,

22  and the work ends up being published copyright DC

23  Comics, correct?

24  A   Yes.

25  Q   The fact that something gets copyrighted, that the

158

1    copyright ownership belongs to DC Comics, does not

2    affect your ability to share in the royalties based on

3    those characters, is that correct?

4             MR. ARNTSEN:  Object, calls for a

5       legal conclusion.

6    A  I do benefit from the royalties.

7    Q  All of the work that you did for DC Comics on the

8       Sandman series was copyright DC Comics, correct?

9    A  Yes.

10   Q  And you have received royalties, character equity, for

11      much of that work as well, correct?

12   A  Yes.

13   Q  So the fact that you did work for hire for DC Comics

14      and DC Comics retained the copyright to that work did

15      not prevent you from receiving royalties based on that

16      work, is that correct?

17   A  Yes.

18   Q  So you understand there is a difference between

19      royalty rights and intellectual rights in the work

20      that you do in the comic book industry, right?

21   A  Absolutely.

22   Q  Back to Exhibit 19.  When you refer to "My rights in

23      Cogliostro and Medieval Spawn," now I want to clarify,

24      are you referring to contractual royalty rights or are

25      you referring to intellectual property rights or both?

159

1   A  I'm referring to all possible rights, as in the line

2       that you just had me read in this where DC has me

3       assign all rights in the work including copyright and

4       trademark right and all other rights to exploit the

5       work.  I think that's the same kind of territory that

6       we are talking about here.

7   Q  But in that DC Comics contract you don't assume your

8       rights to get royalties, do you?

9   A  No.

10  Q  In other words, you get royalties based on a contract,

11      is that correct, specific percentage royalties based

12      on a contract, has that been your experience?

13  A  Sure.

14  Q  My question is did you understand on July 15th of 1997

15      that you had specific contractual percentage rights at

16      that time in Cogliostro and Medieval Spawn?

17  A  You will have to define percentage rights.  Do you

18      mean financially?

19  Q  Financial, the right to participate.  If you look at

20      Exhibit 2, I know we are jumping around here, but

21      these things were all taken together and I think this

22      is the best way to do it.

23        You list out a series of percentages in that

24      document, do you not?

25  A  Uh-huh.

160

1   Q   Those are royalties, are they not?

2   A   Some of them are royalties, some of them are equities,

3       some of them --

4   Q   Character equity, isn't that a royalty as well?

5   A   It depends how strictly you want to define the word

6       royalty.

7   Q   Is it a percentage of money you receive based on the

8       sales of the publication?

9   A   Absolutely.

10  Q   Is that how you understand the word royalty?

11  A   Yes, but it also goes then on into merchandising and

12      licensing which has nothing to do with sales of a

13      publication.

14  Q   According to this, these figures you have laid out in

15      Exhibit 2, which is your letter of May 5th of 1997 and

16      which refers to the "basic DC deal," when you say that

17      for merchandising and promotional licensing you get 15

18      percent of publisher's net receipts, are you referring

19      to a amount of money that the publisher receives from

20      licensing particular products?

21  A   Yes.

22  Q   Based on the sale of those products?

23  A   Yes.

24  Q   So it is a percentage of the publisher's receipts based

25      on the number of sales of whatever it is, whether it's


                              161

1   an action figure or under the other comic's royalties,

2   it's simply the number of issues sold, correct?

3 A Not necessarily, no.

4 Q What do you mean when I -- I thought this was the

5   simple part of this question and answer, so --

6 A I'm trying to be helpful.

7 Q I know that, but I'm trying to make it clear here.  In

8   Exhibit 2 you've listed comic's royalties, correct,

9   creator royalty and writer royalty, right?

10 A Yes.

11 Q You have listed a percentage royalty for collected

12   editions, trade paperbacks, et cetera, correct?

13 A Uh-huh.

14 Q You have listed some percentages for character equity,

15   correct?

16 A Uh-huh.

17 Q And those appear to be tied to the numbers of sales of

18   the comics themselves, correct?

19 A Well, the first one is, yes.

20 Q And then merchandising and promotional licensing, as

21   you have already testified, that's not related to the

22   sales of the comic book, but it's related to the

23   number of sales of the particular product that may be

24   licensed, correct?

25 A Not necessarily.

162

1  Q  Okay.  Explain to me how it might be different?

2  A  Well, you do $100,000 licensing deal for, let's say,

3     Stardust, something that I did for DC that was

4     completely creator owned, and the company comes to DC

5     or comes to me and, came to DC at that point and said

6     well, we want the rights to do a Stardust T-shirt --

7  Q  Can I stop you right there?  And I'm sorry I'm doing

8     this.  I want to ask, you made a mention that Stardust

9     is completely creator owned, is that correct?

10 A  Uh-huh.

11 Q  Is that a comic book series?

12 A  It was a series I did through DC, yes.

13 Q  And when you say completely creator owned, what do you

14    mean by that, is that not a work for hire?

15 A  No, it's not for hire.

16 Q  So you retained all of the copyright interest in that

17    work, correct?

18 A  Correct.

19 Q  And did you get -- did you license DC Comics to do

20    publication of that, is that how your agreement with

21    DC Comics was in Stardust and I --

22 A  No.  I mean, we signed, we essentially signed a

23    contract with them as you would with any publisher

24    which gave them certain rights.

25 Q  So was that more like a deal you might sign for a

163

1    novel?

2  A  Closer.  There is so many comics.  Comics bring so

3     many things to the equation.  You have the artist to

4     deal with.  You have a lot more merchandising

5     categories and so on and so forth.

6  Q  But as to the ownership interest in its --

7  A  The publisher has no ownership interest of any kind.

8  Q  Does the artist get any ownership interest from you

9     from drawing the pictures that go along with your

10    script for Stardust?

11 A  Absolutely, 50 percent.

12 Q  You and the artist created the Stardust --

13 A  World.

14 Q  -- world and entered into a contract with DC Comics to

15    publish that, correct?

16 A  Yes.

17 Q  And as to the ownership interest, you and the artist

18    agreed that that would be split 50-50, is that

19    correct?

20 A  Uh-huh.

21 Q  But that's not the type of deal you are proposing here

22    for Todd McFarlane in Exhibit 2, correct?

23 A  What I'm saying is I'm not basing the figures on --

24    I'm basing the figures on my standard DC deal at that

25    time rather than on the kind of deal that I got with a

164

1    creator on a project like Stardust which were
2    immensely better.
3  Q I understand.  So I'm clear, so we have got your deal,
4    your proposing terms in Exhibit 2 based on your
5    standard DC Comics deal, which is what we have already
6    talked about as evidence here, at least as far as we
7    know in Exhibits 57 and 58, correct?
8  A Sure.
9  Q Okay.  And under that standard deal in Exhibits 57 and
10    58, you did not retain any ownership rights, those
11    were work for hire deals, correct, with DC Comics?
12  A Can you repeat the question again?
13  Q Your Sandman contracts with DC Comics, which are the
14    ones that are being referred to as the standard DC
15    comic deal or the basic DC deal in Exhibit 2, those
16    were work for hire agreements, correct?
17  A They are, yes.
18  Q And you have no copyright or trademark or intellectual
19    property rights in those characters in Sandman,
20    correct?
21  A No.
22  Q Do you now understand me when I am talking about two
23    different categories of rights that you might have
24    when you use the term my rights in Cogliostro and
25    Medieval Spawn in Exhibit 19?  What I'm asking you

165

1    about is there are rights that you would have by

2    virtue of being the creator of a work that gets

3    published, is that correct?

4  A  Uh-huh.

5  Q  Has that been your experience?

6  A  Yes.

7  Q  So when you published American Gods and you retained

8    copyright as creator, you have certain rights as a

9    copyright holder, correct?

10  A  Absolutely.

11  Q  You are free to enter into contract on any terms you

12    can get, is that correct?

13  A  Uh-huh.

14  Q  And those terms may vary based on the project, who

15    else is involved, your reputation, et cetera, correct?

16  A  Sure.

17  Q  Is it your testimony that you believed you retained

18    the same rights, copyrights, creator rights in Spawn

19    issue 9, the Angela miniseries, your portion of Spawn

20    issue 26 and the individual characters Angela,

21    Cogliostro and Medieval Spawn that you have when you

22    publish a novel like American Gods?

23  A  Sure.  They are not exactly the same because obviously

24    there is an artist involved.  We are co-creators.

25  Q  You are co-creators and you would receive, based on

166

1    those creations, you would receive whatever rights,

2    copyright law, I'm not asking you to make statements

3    as to what that is, but whatever rights the copyright

4    law would give you as a creator or whatever rights you

5    might share with a co-creator, is that correct?

6  A  Yes.

7  Q  My question now is in addition to your copyrights or

8    your, if you want to use the term creator rights, what

9    additional rights, if any, did you believe you had in

10    Cogliostro and Medieval Spawn on July 15th of 1997?

11  A  We have run through a financial interest.

12  Q  And what is the financial interest in those two

13    characters?

14  A  Do you want me to answer your first question or is

15    that a footnote to it?  I'm sorry, I was -- you asked

16    me a question, I was trying to answer.

17  Q  Okay.  My fault.  Let's look back at that exchange for

18    a second.  I asked you in addition to the copyrights

19    or creator rights, what additional rights, if any, did

20    you believe you had in Cogliostro and Medieval Spawn.

21                MR. ARNTSEN:  Why don't you read

22      back the start of his answer before you

23      interrupted.

24                MR. SALSICH:  The start of his

25      answer was we have run through a financial

1          interest, and I answered what is the financial

2          interest in those two characters.

3     A    Good.  So we have run through a financial interest,

4          copyright interest.  What was the other one you said

5          in your original question?

6     Q    I said in addition to -- I don't want to talk about

7          copyright.

8     A    No, I know, but you said in addition, I was just

9          running through the ones that we had already on the

10         table.

11    Q    I just asked you what else you had besides copyright,

12         or I said creator.

13    A    I said I had creator interest and a copyright

14         interest.

15    Q    Excuse me.  I do think it's important to interrupt you

16         here because we have a miscommunication.  You used the

17         term creator rights.  I used the term copyright.

18              I don't want to be in a position of asking you to

19         state a legal conclusion as to what a copyright is or

20         all the rights intendant to it, but so that we

21         understand ourselves, in my view we are talking two

22         categories of rights, we are talking about rights you

23         get by virtue of being the creator.

24    A    Uh-huh.

25    Q    I don't think it would be controversial to state that

168

1  among those rights I think you would agree with me are
2  copyrights?

3  A  Uh-huh.

4  Q  Okay.  That's one category of rights.  I'm not talking
5  about those.

6     I'm talking about only if you have any additional
7  rights by virtue of an agreement with Mr. McFarlane or
8  in any other fashion to Cogliostro and Medieval
9  Spawn.  And let me clarify that again.

10    It's your understanding, is it not, that by
11 virtue of being the creator of these characters, your
12 interest in the copyright or the intellectual property
13 rights that you described would entitle you to receive
14 financial gain from the exploitation of those
15 characters, is that correct?

16 A  Yes.

17 Q  And that whatever that financial gain is, you would
18 split 50-50 with the artist who was your co-creator,
19 is that correct?

20 A  Uh-huh.

21 Q  In addition to that financial gain, in addition to
22 that financial interest that arrives by virtue of your
23 being the creator and nothing else, do you believe,
24 did you believe on July 15th of 1997 that you had any
25 additional rights, any additional financial interest

169

1    in Cogliostro and Medieval Spawn?

2  A  Did I have an additional financial interest in

3     addition to the financial interest that I had in them?

4  Q  All right.  Let's do it this way.  That is my

5     question, but you get a financial interest by virtue

6     of being the creator, that's your testimony, correct?

7  A  Yes.

8  Q  It's your understanding?

9  A  Yeah.

10  Q  And that financial interest derives from whatever

11     ownership you gained in the intellectual property,

12     correct?

13  A  I think that calls probably for more of a legal

14     conclusion than I'm prepared to give.

15  Q  Your term was intellectual property rights?

16  A  Yeah.

17  Q  You looked at the DC Comics deal and copyright

18     trademark and all other rights, correct, those are the

19     rights that you typically signed away in the DC Comics

20     deal that you did not sign away with Mr. McFarlane,

21     correct?

22  A  Sure, but DC it's all rights including.

23  Q  I understand.  Those would be rights that you would

24     get by virtue of being the creator, correct?

25  A  Yup.

170

1   Q   Let's use creator rights because I want it to include

2       whatever you understand that to be.  Earlier you used

3       the term retained the intellectual property in that,

4       the ability to get some financial gain from that,

5       correct?

6   A   Yup.

7   Q   And you also testified that you would have to split

8       that, you would get 50 percent of that gain because

9       you would have to share it with your co-creator,

10      correct?

11  A   Correct.

12  Q   Let's assume that amounts to a figure of $100 --

13  A   Uh-huh.

14  Q   -- as a result of these characters.  Okay?

15  A   Uh-huh.

16  Q   That's a financial interest that arrives solely as a

17      result of your being the creator, nothing else.  Okay?

18  A   Uh-huh.

19  Q   Now I want to know if in addition to that $100 that

20      you would get because you are a creator, did you

21      believe when you wrote this letter on July 15th of

22      1997, that we have marked as Exhibit 19, that you had

23      a right to obtain additional financial benefit from

24      these characters or are your rights all tied up in

25      your being the creator of this --

171

1          MR. ARNTSEN:  Are you talking about

2     contract rights?

3          MR. SALSICH:  Yes, I am, but he has

4     been unwilling to talk about contracts.  I'm just

5     asking in general.

6  A  I'm not willing to talk about anything.  I really

7     don't understand quite what you are getting at here

8     and I'm really not --

9  Q  No, I understand.

10 A  I'm sorry.

11         MR. ARNTSEN:  Let's go off the

12    record just a second.

13         (Discussion off the record)

14 Q  Right before we broke, and we had a conversation off

15    the record, I talked with your counsel and I think we

16    have -- he was helpful to me in trying to understand

17    your difficulties with my questions and my

18    difficulties with your answers I suppose.

19        So let's see if we can clarify it this way.  You

20    understand that there are a category of rights based

21    on the intellectual property based on your creation of

22    these characters that you believe you retained in the

23    creations of Cogliostro and Medieval Spawn as of July

24    of 1997, correct?

25 A  That I believe --

172

1  MR. ARNTSEN:  Prior to the

2  agreement, prior to July 15th.

3  A  Good, prior to that, prior to entering into the

4  agreement when I handed over all my rights, I believe

5  that yes, I had rights.

6  Q  Let's step back because that's an important

7  distinction.  Exhibit 19 is a letter dated July 15th,

8  1997, correct?

9  A  Yes.

10  Q  From you to Mr. McFarlane?

11  A  Yup.

12  Q  And in this letter you state that you are, if I

13  understand correctly, essentially confirming an

14  agreement that you reached on the telephone earlier

15  that day, is that right?

16  A  Absolutely.

17  Q  And among the things that you agreed to were an

18  exchange of collective rights, you were going to

19  exchange rights in Cogliostro and Medieval Spawn in

20  exchange for Mr. McFarlane giving up rights in

21  Miracleman, is that correct?

22  A  Absolutely.

23  Q  And what I'm simply interested in trying to narrow

24  down here is the rights that you believed you had in

25  Cogliostro and Medieval Spawn that in fact you were

173

1   giving to Mr. McFarlane in exchange for Miracleman.

2   Okay?

3   A  Okay.

4   Q  And we have talked about one category of rights, and

5       those were the category of rights that you obtained as

6       a result of creating these characters, is that your

7       testimony?

8   A  Yes.

9   Q  And I'm talking about up until the point that you

10      wrote this letter, your belief, okay, so we are

11      talking from the time of creation up until July 15th,

12      1997.  Okay?

13  A  Uh-huh.  Okay.  I think I see what you are getting

14      at.

15  Q  My question is I understand your belief that you have

16      a right to share in whatever Mr. McFarlane has

17      received by the use of these characters since you

18      created them, correct?

19  A  Uh-huh, yup.

20  Q  Your testimony was that you believed you had a 50-50

21      split in your rights between you and your co-creator

22      Mr. McFarlane in these characters, is that correct,

23      intellectual property rights?

24  A  I don't believe I ever said that.  I think you are

25      misremembering.

174

1  Q  Okay.  Then let me ask you.  Did you believe when you

2     created these characters, and you were not asked to

3     sign anything away, that you retained the ownership

4     interest as a co-creator in those characters?

5  A  Yes.

6  Q  And did you believe that that ownership interest was

7     split 50-50 between you and Mr. McFarlane who was the

8     other co-creator of these characters?

9  A  The specifics of ownership interest were never

10    discussed.  I would never have pushed for a 50-50

11    ownership of Medieval Spawn because I felt it was a

12    derivative character.

13       He is a derivative character.  He is taking what

14    Todd did and then saying okay, there could be more to

15    it.  So on that, although yes, I did, you know, I was

16    the creator of the character, I would not have felt

17    that I was owed a 50 percent share in him.  In the

18    case of Cogliostro, absolutely.

19  Q  All right.  So let's take Cogliostro then.  Is it your

20    testimony that you believe that as the co-creator of

21    Cogliostro with Mr. McFarlane, that you were entitled

22    to a 50-50 share in the financial benefits that were

23    received from the exploitation of that character?

24  A  Yes.

25  Q  In addition to the rights you believed that you had in

175

1   Cogliostro and Medieval Spawn, based on being the

2   co-creator of those characters, whatever amounts those

3   are, I want to know if at the time you wrote this

4   letter, did you believe you were also entitled to

5   royalties?

6   A   Sure.

7   Q   And I want to know on what you base that assertion?

8   A   Because if I was creating characters at another comics

9       company, I would get royalties on them.

10  Q   But if you were creating characters at another comics

11      book company, for example, DC Comics, you wouldn't

12      have creator rights?

13  A   Yes, I would.

14  Q   They would make you sign those away, correct?

15  A   Not at all.  Sandman is not creator owned because it

16      was begun in 1987.  In 1987 the world of comics was

17      just edging very, very fitfully over into, very

18      nervously into the idea of creator ownership and they

19      were very uncomfortable with it.

20      Miracleman, which I did over at Eclipse, was

21      creator owned.  I think everything I ever done for

22      Dark Horse has been creator owned.  I have done

23      Stardust for DC.

24      These days if I went in to do more or less

25      anything for DC, including if we, at any time over the

176

1   last decade, if we were starting Sandman now, it would

2   be a creator owned project.  So I'm -- and I'm giving

3   you that in context because there was a very -- the

4   few years between 1985 and 1990, maybe 1991 were,

5   there was an awful lot of change.

6       And one of the reasons why DC Comics was very,

7   very willing and happy to work with me on everything

8   was because they still had the, you know, in 1998 I

9   did my deal with them for a comic which they knew that

10  if I had come to them in 1990, the people who were

11  coming into Vertigo, which is an imprint of DC, and

12  into DC Comics in the nineties, it was all creator

13  owned and yes, you would get your -- you would keep

14  your intellectual property share of something and yes,

15  you would get royalties too.

16  Q  Okay.

17              MR. ARNTSEN:  Let me go just of the

18          record just a second, Pete.

19              MR. SALSICH:  Sure.

20              (Discussion off the record)

21              (A Short recess is taken)

22  Q  Before we took a break, Mr. Gaiman, I know you were

23  probably getting frustrated with some of my questions

24  and I was getting frustrated with some of my

25  questions.  So I apologize for contributing to the 4

177

1     o'clock afternoon frustration, but I think I hope I

2     can clarify what it was I was trying to get with a few

3     simple questions and we will try to move on from

4     there.  Okay?

5  A  Great.

6  Q  We were referring to what's been previously marked as

7     Exhibit 19.

8  A  Uh-huh.

9  Q  And this was a letter that you sent on July 15th of

10     1997?

11  A  Uh-huh.

12  Q  And we were talking about the sentence, the third

13     paragraph down, in which you state that you are going

14     to exchange with Mr. McFarlane your rights in

15     Cogliostro and Medieval Spawn, correct?

16  A  Yup.

17  Q  And we did talk about the creator rights or

18     intellectual property rights that you had by being the

19     creator of those characters, correct?

20  A  Yes.

21  Q  And I'm not talking about those now.  We also asked a

22     question if you had any -- if you believed at the time

23     you wrote this letter that you had any contractual

24     rights to those characters.  Do you recall that

25     question?

1   A   Yeah.

2   Q   And I believe you testified that yes, you did by

3       virtue of the agreement you entered into in 1992 with

4       Mr. McFarlane, is that correct?

5   A   Yes.

6   Q   And that's all I really want to clarify.  Is it the

7       1992 agreement with Mr. McFarlane which he said he

8       will do better than, treat you better than DC Comics,

9       is that the agreement that you are referring to that

10      gave you contractual rights to Cogliostro and Medieval

11      Spawn?

12  A   Sure.

13  Q   See how easy that was.

14  A   Amazingly easy, almost pleasant.

15  Q   Mr. McFarlane responded to the letter you sent on July

16      15th with a letter of his own faxed to you that same

17      day, did he not?

18  A   Yup.

19  Q   And is that the letter that we have marked Exhibit 20?

20  A   Yup.

21  Q   And in that letter from Mr. McFarlane he states, about

22      half way down, "Before consummating this marriage, I

23      just need clarification on a few things."  Do you see

24      that?

25  A   Yup.

179

1 Q And then it's my understanding that he lists out three

2 specific, really three specific questions that he is

3 uncertain about, is that right?

4 A Yup.

5 Q The first one is an exchange date, correct?

6 A Yup.

7 Q And the second one is a question of whether the

8 creator royalty was divided by two so that the artist

9 shares that piece, correct?

10 A Yup.

11 Q And it probably makes sense to refer now to Exhibit

12 33.

13 A Uh-huh.

14 Q And am I accurate in saying that Exhibit 33 is your

15 written response to Mr. McFarlane's letter which we

16 have marked as Exhibit 20?

17 A Yes.

18 Q And in your letter also of July 15th, 1997, which we

19 have marked as Exhibit 33, you have three numeric

20 sections corresponding one, two and three to the

21 questions asked by Mr. McFarlane in his letter that we

22 have marked as Exhibit 20, is that correct?

23 A Uh-huh.

24 Q And as to the first item, you agree that it's possible

25 to exchange on July 31st, correct?

180

1   A   Yup.

2   Q   And to the second question you clarify that you are

3       referring to the writer-creator royalty and that the

4       artist would get his own deal and so that that amount

5       that you have quoted is the full amount due to you, is

6       that correct?

7   A   Yes.

8   Q   Then finally, the third question, and Mr. McFarlane

9       does not number it, but I think we understand it as

10      the third question, and you understood it as such when

11      you wrote a number three next to your answer, correct?

12  A   Yup.

13  Q   Mr. McFarlane's question in Exhibit 20, his third

14      question is, and I will quote, "Also, accounting on

15      the Medieval Spawn will be done with the form you said

16      DC Comics uses on derivative characters not the

17      standard agreement of a new hero, is that

18      acceptable?"

19          And your answer in Exhibit 33 is "Medieval Spawn

20      accounting, yes, I should have put that in.  I formula

21      him at 50 percent of Angela."  Do you see that?

22  A   Uh-huh.

23  Q   My question for you is about your answer number three

24      in Exhibit 33.  On what formula do you -- how do you

25      arrive at the figure of 50 percent of Angela for

181

1    Medieval Spawn?

2  A  It seemed right.  When DC Comics does it, they do it

3     as per the contract, on a pro rata discretionary

4     basis.  There is no -- they don't have a, you know, a

5     specific formula.  They make a judgment call.

6         I thought okay, yeah, he is right, let's figure

7     something out here, half of Angela looks about right,

8     so.

9  Q  Do you have a particular DC contract, DC Comics

10    contract that you can point to that or that you relied

11    on that would tell you how to arrive at that 50

12    percent figure?

13 A  Well, I had the negotiation that I had done originally

14    with DC, which although we eventually wound up with

15    them deciding to give me 100 percent royalty on

16    Sandman and me just saying I'm not taking a share of

17    Destiny, but at that point when I was negotiating with

18    DC, in Exhibit 47, which would be page 4 of Exhibit 47

19    --

20                    MR. ARNTSEN:  Page 2 of the first

21         contract.

22 A  Page 2 of the first contract, they say "Retail

23    Products and Services:  For each product other than a

24    work and/or for each service produced by publisher and

25    distributed or rendered by publisher for sale to the

                        182

1　public and not by a licensee of publisher, through

2　publisher's wholesale and retail distribution

3　channels, a retail product of service, which is based

4　entirely upon the characters, creative contributor

5　shall be entitled to receive either, one, an amount

6　equal to eight-tenths of one percent, .8 percent, of

7　the suggested retail selling price of such retail

8　product or service multiplied by its net domestic

9　sale, or two, if there shall not be a suggested retail

10　selling price, an amount equal to two and a half

11　percent, 2.5 percent, of publisher's gross receipts

12　derived therefrom." And that's the first one for the

13　full ones.

14　　And then it says "Notwithstanding the foregoing,

15　with respect to the characters of Dream, Sandman and

16　Destiny only, creative contributor shall be entitled

17　to receive either, one, an amount equal to

18　592-thousandths of one percent, .592 percent," which

19　is about three-quarters of .8 percent, "of the

20　suggested retail selling price of such retail product

21　or service multiplied by its net domestic sales, or

22　two, if there shall not be a suggested retail selling

23　price, an amount equal to 185-hundredths of one

24　percent, 1.85 percent, of publishers gross receipts

25　derived therefrom," which is about three-quarters of

1    2.5 percent.

2         And I actually thought, with this going for 50

3    percent, I was being very fair and equitable.  It

4    seemed the kind of -- it certainly seemed perfectly

5    fair.

6         I mean, you know, DC had given me, at one point,

7    for basically simply including this old character

8    Destiny of theirs, which is this bloke who wandered

9    around with a book and a hood and spoke gnomically,

10   and I just basically said there are these seven people

11   and here is one of them.  And they offered me three-

12   quarters of what I would have got for one of the, for

13   a character that I had created simply by virtue of him

14   being, you know, basically me writing him.  And I

15   thought well, a character that I created derived from

16   something of Todd's 50 percent seems fair.

17        If you go down to Contingencies Affecting

18   Royalties on page 4, and I'm sticking with page 47

19   now, but I think you will find this is exactly the

20   same if we go to page 58, and I can, to Exhibit 58,

21   if you are more comfortable with it.

22   Q  No, that's fine.  I think you are right.

23   A  Contingencies affecting royalties, you have spin-offs,

24      commingling of elements.  And in spin-offs, we have

25      "In the event that publisher uses or licenses the use

184

1   of a version of any of the characters that publisher

2   determines consists primarily only of spin-off

3   elements and is published under a substantially

4   different title the characters, if published under any

5   title, or is not substantially as originally created

6   and written or drawn by creative contributor," so if

7   the character changes in some way, "then the publisher

8   shall pay creative contributor royalties based upon

9   publisher's pro rata allocation of the amounts set

10  forth in paragraph 1 among all elements used as

11  created by the creative contributor and all spin-off

12  elements.  The foregoing allocation, and all other

13  allocations, made by publisher pursuant to this

14  agreement shall be made in good faith and in

15  publisher's sole discretion."

16      "As used herein, elements shall include without

17  limitation characters, stories, themes, titles, names,

18  logos, devices.  Spin-off elements shall mean elements

19  either, one, not created by creative contributor, or

20  two, originally created by creative contributor and

21  later substantially changed or developed by another

22  party."

23      Then you get into commingling of elements and so

24  forth.

25  Q  Go ahead.  Rather than continue reading --

1   A   No, I was going to stop at that point.

2   Q   How do you see that operating?

3   A   I just saw that operating the context here and I had

4       spoken to somebody at DC Comics, to Terry Cunningham,

5       as who, bless her, seems to be the place that all of

6       this seems to come together at some point and said how

7       does this work, do you have an exact formula and

8       whatever.  And she said "No, no, it's discretionary.

9       We do it by feel in the seat of our pants and that was

10      how I did this one."  I went fine, it's seat of my

11      pants.

12          Todd said hey, is there something -- I probably

13      should have put back in the reply no, there is not an

14      exact formula, but I thought putting in a formula of

15      50 percent of Angela, saying this is my thing, if he

16      had come back 40 percent sounds good or if he had come

17      back I love you, make it 75 percent, that would have

18      been fine too.

19  Q   Okay.  And that's fine.  You have answered my question

20      very fully.  I appreciate that.

21          You finish then, at Exhibit 33 you finish with

22      the statement "Looking forward to getting done with

23      this"?

24  A   Uh-huh.

25  Q   Now, earlier you testified that you understood these

1    letters ending with Exhibit 33 to being the agreement

2    itself, am I incorrect in that?

3  A  Yes, absolutely.  According to this, I'm saying yes,

4    we will exchange July 31st and everything is done.

5       The point of the letter on the 1st of August is

6    July 31st nothing turned up, which is why I send him a

7    letter saying if this isn't going to happen, let me

8    know and we can renegotiate.

9       And I get a message no, no, no, we still have a

10    deal.  And a couple of days later everything arrives,

11    everything they promised from their part of the deal

12    arrived.

13  Q  So let me ask you about that.  Mr. McFarlane -- you

14    said you get a message a couple of days after August

15    1st that no, no, no, we still have a deal.  What was

16    the nature of that message?

17  A  It was -- it wasn't from Todd.  Todd was on the road

18    or somewhere like that, and it was from Sheila or

19    whoever, I don't remember exactly, saying --

20  Q  Somebody from Todd's company?

21  A  Todd says everything is fine, we are rushing the stuff

22    to you, we are finishing up some numbers.

23  Q  In fact, you did get some payments from --

24  A  And Miracleman film, yes.  Sorry I interrupted you.

25  Q  No, that's okay.  That's all right.  You did get

187

1  payments from McFarlane's company, did you not, in
2  August?

3  A  Yes, I did.

4  Q  And you did get the Miracleman film, is that correct?

5  A  Yes.

6  Q  Did you receive, as far as you know, all of the

7      physical Miracleman film, items or property that Todd

8      or his company had?

9  A  I don't know.  I don't know what they had.

10  Q  When you received the physical Miracleman property,

11     and I'm referring to film and whatever other items

12     there may have been, did you believe that it was not

13     complete?

14  A  I knew that it wasn't -- well, okay, if you define not

15     complete as not everything that Todd had, I didn't

16     know what Todd had.  It wasn't the complete set of

17     Miracleman film, but a phone call from Terry

18     Fitzgerald either when he sent it off or when I got it

19     saying that some of the film had been illicitly sold

20     under the counter by the former owner of Eclipse to

21     some guy in Toronto who was trying to hold Todd up for

22     it and they didn't have that stuff.

23  Q  And were you not actually contacted by somebody in

24     Canada prior to Todd's even buying the Eclipse assets

25     who was saying he had some of the Miracleman stuff and

188

1    wanted to know if you would do a new issue with him?

2  A  No, he never said that.  I wish I remembered the guy's

3    name.  I assumed from actually reading a book called

4    Kimota, which had some interviews and stuff, that

5    probably this was the same guy, but I may be doing him

6    a terrible injustice.

7    There was one man who I mentioned before who said

8    that he was bidding for Miracleman in the Eclipse

9    auction and wanted to know if Mark Buckingham and I

10    would be willing to continue the series if he got the

11    rights to the share of Miracleman that Mark and I did

12    not have.  And I said sure, you know, we wanted to get

13    on with it, you know, good luck in the auction, but he

14    never sent me any of that film or anything like that.

15  Q  You are not aware and you are not claiming that Todd

16    McFarlane Productions, or Todd himself or anybody else

17    who is a defendant in this lawsuit actually held back

18    some of the physical Miracleman property that they

19    obtained from Eclipse, are you?

20  A  Toward the end of '98 I heard there were rumblings in

21    the U.K. that Dez Skinn, who was one of the prior

22    owners of Miracleman -- and I really do understand we

23    have to finish at five, so let me know how much

24    Miracleman history --

25  Q  My question is simply are you making any specific

189

1    allegation that any of the McFarlane defendants

2    withheld physical Miracleman property from you?

3  A  Physical Miracleman property, Terry Fitzgerald phoned

4    me up and wanted to know what I knew about something

5    called Miracleman Triumphant, which was some kind of

6    series that Eclipse had been doing toward the end of

7    Eclipse.  I was never clear whether he had any of the

8    artwork for it or not.

9       And in the late -- in late '98 I sent a fax to

10   Todd saying I hear some rumblings from the U.K.

11   saying that Eclipse may not have owned anything after

12   all, please could you fax me whatever you actually

13   have in the way of documents that you actually got

14   from the bankruptcy court, because I realized at that

15   point that I hadn't received anything from the

16   bankruptcy court.

17                  MR. SIMMONS:  Why don't I jump in

18           here for a second.  We got that inventory I think

19           I used with Terry Fitzgerald.  I haven't had Neil

20           review that.

21                  MR. SALSICH:  That's fine.  We have

22           gone as far into that as we need to at this point.

23  A  And that was why I think they had already warned me

24     that they didn't have a complete inventory or a

25     complete film for Miracleman, which is why it says

190

1     whatever you have.

2  Q  And when you say whatever you have, you are referring

3     to Exhibit 19?

4  A  Yes.

5  Q  You will include whatever you have in the way of

6     inventory or film for Miracleman received from Eclipse

7     in the bankruptcy buyout, correct?

8  A  Uh-huh.

9  Q  You have alleged in this lawsuit that -- hold on.  Did

10    you ever receive a copy of Spawn issue 9?

11 A  Yes.

12 Q  When was that?

13 A  I would have received -- I was first handed one at

14    Oakland in 1993, I think April of 1993.

15 Q  Right about when it came out?

16 A  Right.  It was the day of the publication.  Todd and I

17    were signing them together.

18 Q  What about issue 26, did you ever receive a copy of

19    that?

20 A  Probably.

21 Q  What about the Angela miniseries?

22 A  Yes.  They would have sent me my author copies.

23 Q  Did you ever see the trade paperbacks that were being

24    published of the Spawn series?

25 A  By the time they were publishing the trade paperbacks,

191

1   nobody was sending me stuff automatically.  Getting

2   stuff out of Todd was getting harder.

3 Q Do you know who published the trade paperbacks, and I

4   don't know if they were all published by the same

5   company, were they all published by Image, do you

6   know?

7 A As far as I know, the Image I is on the ones.  I saw

8   the most recent one, Angela's Hunt, for the first time

9   at a convention called Aggicon in Texas several months

10  ago which was the first time I had seen that in the

11  flesh and that was definitely published by Image in

12  2000.

13 Q Do you recall if you ever saw the trade paper, the

14  second trade paperback, the one that contained issue

15  9?

16 A I don't think they sent me a copy of that.

17 Q Do you recall if you ever saw it anywhere?

18 A I have seen it certainly since this case started.

19 Q I'm talking back prior to this case starting?

20 A I might have seen one because somebody would have --

21  at signings people put stuff in front of you, but you

22  don't actually stop and look at it, you sign it.

23 Q You were doing throughout -- let me ask you this.  Was

24  there any time period in 1993 through 1998 that you

25  were not actively pursuing your career as a writer of

192

1    either comic books or novels?

2  A  Yes.

3  Q  When was that?

4  A  Most of 1995 and '96.

5  Q  And what were you doing then?

6  A  I was in the U.K. working on a TV series.

7  Q  Were you still writing?

8  A  I was still writing.

9  Q  During that time?

10  A  But my primary energies were putting together this BBC

11     miniseries, so I was writing for that and pretty much

12     out of the comics loop.

13  Q  When was the first time that you recall complaining to

14     Todd or anybody with any of Mr. McFarlane's companies

15     about copyright notices not mentioning you on any of

16     the work that you did for Spawn?

17  A  I'm trying to remember if there ever was a time when

18     that actually came up specifically.

19  Q  You understand that you have got allegations in your

20     complaint here that you were not credited with the

21     copyright in the actual issues that were published,

22     the Spawn issues that are at issue in this lawsuit, is

23     that correct?

24  A  Yes.  I remember talking with the U.K. with Titan

25     Books at one point and stating that I wanted to make

193

1  sure that I was on the book as an author under the

2  English copyright tax with former rights as an

3  author.  And they said they had to go and check that

4  with McFarlane and came back that Todd said it was

5  absolutely fine as long as he was there too.

6  Q  Now let me ask you this.  The works -- we are not

7      talking about works that were created in the U.K.  We

8      are talking about works that were created in the

9      United States, correct?

10  A  Uh-huh, but they were --

11  Q  When they were published in the U.S., were they the

12      same books, a publication of the identical product in

13      the United Kingdom as opposed to something that had

14      changed between the United States and the U.K.?

15  A  My belief is, and unfortunately I don't, I never

16      stopped to inspect, this is actually sort of figured

17      out from Amazon.com and things, also from signing,

18      that the original Angela trade paperback included the

19      toy, some comic that they put in with the toy which

20      wasn't by me, it was by Beau Smith.  The English one

21      was completely by me and was a different book.

22  Q  I'm not talking about the trade paperback.  I'm

23      talking about the -- well, let me ask you this.  The

24      Angela trade paperbacks and including Angela's Hunt,

25      the most recent version of it, that's simply a

194

1    compilation of the Angela miniseries that you

2    originally did for Todd back in, was it 1994?

3  A  Are you asking me if there is any additional material

4    by me?

5  Q  Correct.

6  A  I don't know.  I never read Angela's Hunt.  They never

7    sent me a copy.  Looking at it got too distasteful.

8  Q  As far as you are aware, it's simply a collection of

9    the work you did?

10  A  I never read -- I'm not trying to be -- I never read

11    this stuff through.  For all I know they could have

12    rewritten words all the way through, as far as I know.

13  Q  Okay.  At what point in time -- or let me step back.

14    You have alleged that Mr. McFarlane and McFarlane

15    defendants breached the 1997 agreement, correct?

16  A  Uh-huh.

17  Q  How did they do that?

18  A  Well, I was under the impression that everything was

19    fine.  Even as late as I think March, April, 1988, we

20    got a healthy royalty payment through, from foreign

21    stuff, from Mr. McFarlane's wife, actually very nice,

22    came straight from Wanda, a check for about 4,000.

23    And I thought great.  I didn't think anything of it at

24    that point, there was anything problematic.

25        And then in the summer I remember talking to the

195

1    people from DC and from Marvel Comics and saying

2    great, I'm going to do these comics, do these one

3    shots, are you interested, do you want to do them.

4        And I think I was looking at trying to decide

5    between doing an Angela Justice League of America and

6    an Angela X-Men at Marvel and probably doing a

7    Medieval Spawn Batman, because I had an idea for

8    something that would work for that.

9        And I mentioned it to these people and then I

10   would ring them up later and say what's happening and

11   they would say Todd is just not calling us back, we

12   wouldn't be put through to him, which I thought was a

13   bit odd.

14       And then toward the end of 1998 there had been no

15   payments of any kind on anything coming in and that

16   was about the same time that I sent the fax to

17   Mr. McFarlane saying by the way, can I have a

18   photocopy of whatever you got, and didn't get anything

19   from him and then went on tour.

20       And I was on a signing tour for my book

21   Stardust.  And I got to San Francisco, I think it was,

22   on the tour and got a message from my assistant that a

23   Fed Ex had just come in from the mail drop.  We have a

24   Minneapolis address and a home address.  And it had

25   come in from there, from Todd McFarlane.  And I said

196

1    great, well, when I get home, I will have to look at

2    it.

3        I was on this, you know, it was about a 30 city

4    signing tour, so everything was waiting till it was

5    done.  And then I got home and I looked at this thing

6    from Todd and it was completely bizarre.

7        It was a letter saying I rescind my previous

8    offer.  I'm going what previous offer, we had a deal,

9    we said we would exchange on the 31st, we did, you

10   paid, that was our deal.

11       And then it said and now my new deal that I'm

12   offering you is this, and my new deal is I keep, I

13   take Angela back, I give you back Miracleman.  I said

14   you gave me Miracleman, what are you saying here, I

15   gave -- you are taking back one thing in exchange for

16   one thing that I held onto.

17       Then he said if we don't have this agreement,

18   then I'm taking Medieval Spawn royalties out of all

19   future royalty.  I'm going but you already subtracted

20   20,000 that you paid me for the toy out of what you

21   paid me for the last thing, you know.  We were looking

22   at, you know, $1,000 or whatever, I have to see the

23   exact figures, total of Medieval Spawn toy payment is

24   $6,000.

25       And so he is saying I have to recoup that, and

197

1       whether he stuck with that or not, I don't know.  He

2       may be carefully counting down his recoup, but I

3       rather doubt it.

4            At that point I -- it was, you know, we are into

5       February, 1999.  I'm off tour.  I'm exhausted.

6       Actually I can tell you, I got off tour on Valentine's

7       Day because the next day was my sister-in-law Ann's

8       birthday.

9            So I got back and I was wiped.  And I read

10      through the stuff from Todd and I sent it off to my

11      lawyer at that point.

12   Q  If I understand you correctly, up until you got the

13      1999 letter, as far as you knew, Todd and his

14      companies, whoever was involved, had performed all the

15      things they were supposed to be performing under your

16      1997 agreement, is that correct?

17   A  Yes.

18   Q  And all of a sudden in 1999 you receive a letter from

19      Todd saying we are not going to perform any more, and

20      I know that's not the language he used, but --

21   A  That is very specifically not the language he used.

22      He said something completely different.

23   Q  Well, you said he would rescind, he was rescinding the

24      offer and he was making a new proposal, correct?

25   A  Yes.

1   Q  And your understanding was that you had a deal in
2      1997?

3   A  Absolutely.

4   Q  And that he had performed his obligation under that
5      deal up until you got this letter in '99, is that
6      correct?

7   A  Absolutely.

8   Q  So was the breach of the 1997 agreement,
9   .  Mr. McFarlane's or his companies failure to perform
10     after, from 1999 on, from early -- from the date you
11     get the letter on?

12                    MR. ARNTSEN:  Object to the extent
13              it calls for a legal conclusion.  Also he
14              testified as to waiting for payments.  So I think
15              there is a confusion there too.

16  Q  Well, that's what I'm trying to get figured out here.
17     As of 1999, early 1999, as far as you knew, had
18     Mr. McFarlane paid you all the money that was due up
19     to that point?

20  A  As far as I knew at that point, without having audited
21     them or actually checked the figures, I was very
22     relieved on the 4th or 5th of August, whenever the
23     checks arrived, checks arrived, we are done.  And I
24     thought good and I have never to worry about that or
25     think about that again, cash the checks, put the stuff

199

1  from Todd into a file and was relieved when the

2  Miracleman came in.

3  Q  So your understanding was that as of the end of August

4     of 1997, roughly in that point after you had gotten

5     these checks, that you had gotten the last checks you

6     were going to get from Cogliostro and Medieval Spawn,

7     you had gotten the physical materials, whatever they

8     were, regarding Miracleman and that you were going to

9     get to do some future projects with Angela and

10    participate on a royalty basis for whatever happens

11    with Angela in the future, is that correct?

12 A  And do the one-off with Medieval Spawn.

13 Q  One-off with Medieval Spawn, okay.  And that you were

14    unable to do the one-off with Medieval Spawn or Angela

15    because you understood from DC Comics and Marvel that

16    Mr. McFarlane was not returning their calls regarding

17    those projects, is that correct?

18 A  Yes.

19 Q  What are you seeking, and again I'm not asking for

20    your legal conclusion, but I am asking you what you

21    are seeking in this lawsuit, if you are seeking to

22    enforce the terms of the 1997 agreement as you

23    understand it?

24 A  I think that's a very good question.

25 Q  Perhaps my first good question all day.  Thanks.  It

200

1    didn't take me that long.

2  A  The bottom line for me is that I get handed comics,

3     these trade paperbacks, by kids to sign that I know

4     that I'm not getting paid a royalty on, nor has

5     Mr. McFarlane ever intended to pay a royalty on.

6  Q  Are you referring to Angela?

7  A  The Angela trade paperbacks, the one with Spawn 9 in

8     it, whatever that's called.  Furthermore --

9  Q  May I stop you right there?

10 A  Yeah.

11 Q  And I just want to ask you, as part of the 1997

12    agreement as evidenced by the letters that you, the

13    four letters you and Mr. McFarlane exchanged on May

14    5th and July 15th of 1997, was there some discussion

15    of --

16 A  Do we have the, the one with the figures?

17              (Counsel hands witness document)

18 Q  So in the first paragraph, second really paragraph of

19    Exhibit 19, it says you agree, and you are referring

20    to Todd, "You agree that with regard to the character

21    of Angela, her appearances, spin-offs, merchandising

22    and foreign translations of Spawn 9 or the Angela

23    miniseries, that you will be using the figures we put

24    together based on the DC deal"?

25 A  Uh-huh.

201

1    Q  So is it your understanding that regarding Angela

2       and/or Spawn 9, that it's the DC deal and the figures

3       as evidenced by the May 5th letter and then as

4       clarified by the July 15th exchange of letters, is

5       that correct?

6    A  Sure, the May 5th letter.

7    Q  Right, May 5th letter.  And that since January or

8       February of 1999 you have not received any royalty

9       payments --

10   A  Since March of 1988.

11   Q  Okay.  Since March of 1998 you have not received any

12      royalty payments?

13   A  Actually since, apart from foreign royalties since in

14      March of 1988 --

15                   MR. ARNTSEN:    '98.

16   A  Sorry, '98, since August of 1997 I have never received

17      nothing from Mr. McFarlane of anything he has in print

18      except in the Spring of 1998.

19                   MR. ARNTSEN:   1998.

20                   THE WITNESS:   What did I say?

21                   MR. ARNTSEN:   I think you said '88.

22   A  Of 1998, the foreign royalty payments.  So that's five

23      years since he has paid royalties on a book that he

24      has in print.

25   Q  So you are still seeking to recover at this point

1    today an accounting of the royalties due for Angela,

2    Angela's appearances and merchandise, as well as the

3    Spawn 9, is that correct?

4  A  That's certainly part of it.

5  Q  Okay.

6  A  I mean, one of the things that I would like is a full,

7    an independent audit and accounting.  I may sound

8    unduly cynical, but I have to say at this point I no

9    longer trust Mr. McFarlane's accounting skills.

10    And in fact, having looked, over a week ago

11    having looked over the figures that I actually got, I

12    realize that they actually have a better relation than

13    to what we had agreed.  And he has sort of cheerfully

14    gone in and halved things, which I didn't look at the

15    time.  I just said great, he's finally done it and

16    cashed the check.

17    So I think that making sure that all moneys that

18    were due previous to the 4th of August, 1997 from a

19    Cogliostro, Medieval Spawn and Angela are all there

20    and that all moneys due in after the 4th of August,

21    1997 from Angela derived things are all there.

22    And the other side of the coin is I'm no longer

23    certain, one would have to get expert witnesses in to

24    testify, but in 1997 going on to 1998, maybe even to

25    1999, the idea of me doing a Medieval Spawn Batman

203

1  story, for example, would have had some value, that

2  Medieval Spawn would have brought to the table.  The

3  idea of Angela and the X-Men would have had some value

4  that Angela would have brought to the table.

5  We are now -- it's now 2002 and frankly Spawn

6  doesn't sell very well anymore.  The comic is a not

7  very well selling comic.  The characters are not very

8  popular characters.

9  Medieval Spawn is long since forgotten.  And the

10  kids who had bought the toys are now throwing up in

11  colleges.

12  And, you know, even Angela, he killed her off as

13  a character in Spawn 100.  And although I'm still very

14  fond of her, I look at it and go how much -- what

15  would be incredibly attractive to any publisher is me

16  doing a book, but me doing a book with Medieval Spawn

17  brings no value to the table.

18  So it might actually be necessary to go well,

19  okay, what would that have generated if I had done it

20  at that time and figure it out from there, because

21  whatever it would generate now, those things don't

22  bring anything to it, if you see what I mean.

23  And, you know, beyond that, I think Todd and I

24  would very much like to get shot of each other,

25  English expression meaning have no more to do.

204

1  Q  I think I followed it.

2  A  At this point if we could work out a solution that did

3     involve, you know, a complete parting of the ways, I

4     think I would be up for working one of those out, but

5     that isn't in regard to the 1997 agreement.  That's in

6     regard to having done this lawsuit.

7             MR. ARNTSEN:  There may be

8          something with Miracleman too.  I'm not trying to

9          mess things up, but I thought --

10 A  We didn't even mention Miracleman.

11            MR. ARNTSEN:  I don't know if you

12         want to go into that or not.

13            MR. SALSICH:  Why don't we take

14         about two or three minutes.  It's 20 minutes to

15         5.  And I will take a quick look and see if there

16         is anything I actually have to cover before we

17         finish today and then we will wind it up.

18            (A short recess is taken)

19 Q  Mr. Gaiman, we are almost done.  I appreciate your

20    time.  I just have a couple of follow-up questions for

21    you.

22       And I just want to tell you I do apologize for

23    some of the struggles we had this afternoon in getting

24    our record together.  As I stated at the outset, there

25    were going to be some times when I didn't understand

205

1    how your industry worked.  And I appreciate your

2    patience in helping me get to the bottom of things.

3        Again, just a very few follow-ups.  You mentioned

4    requesting information from Titan Books in the U.K.

5    regarding the copyright notice or the author's notice

6    on the trade paperbacks being published in the U.K.

7    Do you recall that testimony?

8  A  Yes.

9  Q  Can you tell me specifically what it was that you

10    asked Titan Books for?

11  A  I asked Titan Books -- I should add, I never actually

12    saw what they did until a couple of years ago when I

13    got them to fax it to me because I had never been sent

14    a finished copy of the book in question.

15  Q  What book was that, if I can interrupt?

16  A  The Titan Angela edition.  Titan had been in touch

17    with me about doing an edition of Angela, because they

18    were buying the rights, and they wanted to know if I

19    would write a new introduction to it.  And I said not

20    only did I not want to write an introduction to it,

21    but I felt very uncomfortable about the whole thing

22    knowing that, because they are my publisher on other

23    stuff, and knowing that they were buying a book that I

24    was getting no royalties on.

25  Q  What time period are we talking about here?

1    A  We have the exchange of letters.

2    Q  After you get -- was it after the early 1999 letter

3       from Todd McFarlane?

4    A  Oh, no, before that.  We are in late '96, early '97 I

5       think at this point.  We are prior to -- in fact, I

6       think some of this stuff, my memory of things is that

7       the May, '97-ish, July, '97-ish is one of the things

8       that closed it because Todd -- I spoke to Titan and

9       said, you know, I really don't want you publishing

10      this until you are assured that I will be getting some

11      royalties from it.

12           And they wrote a letter to Todd and got a reply

13      from him saying that he had a deal with me and would

14      definitely be paying me royalties.  So they were

15      incredibly relieved on that.

16           And I asked for them to make sure that I had the

17      standard copyright notice that you get in the U.K. --

18   Q  What is the standard --

19   A  Are you familiar with that?

20   Q  No.  Tell me what you know about the standard

21      copyright notice in the U.K.

22   A  There is a clause in the U.K. copyright where you get

23      identified as the author, the copyrights and patents

24      act, which gives you, you know, your -- it's partly

25      the moral right and partly you are the author from a

1    copyright purpose, so they put in whatever the
2    standard. And I just said look, can I have the
3    standard wording, please.

4  Q  And you were familiar with the fact that there was
5     such a thing as standard wording how?

6  A  Because I'm an author in the U.K. and every book I get
7     of mine would have a standard wording in the front
8     that would say the right of, you know, Gaiman to be
9     identified as the author of this book has been
10    asserted under the copyright and patents act, and so
11    forth. I got books before with it in.

12       And I thought well, I am the author, can I have
13    this, please, to Titan. I said I really feel like I
14    ought to at this point. And they said -- and they put
15    it in and they said -- and I said I never signed any
16    of my rights away from this and as far as I'm
17    concerned I'm certainly the co-copyright holder on
18    there.

19       And I don't know, I don't even know if they
20    checked it with Todd or if they put it in and then
21    Todd complained or something, but it wound up being
22    changed to the rights of Neil Gaiman and Todd
23    McFarlane. They phoned me back and said is this okay
24    and I said yes, it's absolutely fine. So although
25    Todd hasn't actually -- wasn't actually the artist in

                          208

1      the book, that was Greg Capullo.

2    Q  You say that you were familiar with the fact that

3      there was standard language in the U.K., copyright

4      language in the U.K., because you are an author in the

5      U.K., is that correct?  I mean, it was your experience

6      as being an author in the U.K. gave you the knowledge

7      that there was such a thing as standard copyright

8      language that should be put in books in the U.K., is

9      that correct?

10   A  I had seen it in books before.

11   Q  And you are an author -- were you not an author in the

12     United States at the same time?

13   A  Yes, but that language is not language that appears in

14     the front of American books.

15   Q  What do you know about the language that appears in

16     front of the American books?

17   A  Very little, but I know that on some of my stuff I

18     will actually claim, you know, put specific copyright

19     notices.  I'm just sort of starting to educate myself

20     now, very much now that this court case has come up.

21   Q  But you have been publishing books -- when was the

22     first time you published a book in the United States

23     that you held the copyright to, do you know?

24   A  You are going to have to define the word publish in

25     this case.

1   Q   When is the first time one of your works was published

2       in the United States?  And when I say your works, I

3       mean a work that you retain the copyright ownership

4       to.

5   A   I was trying to work out stuff from the U.K. that was

6       being imported into the U.S.?

7   Q   Either way.

8   A   First stuff that would have been imported would have

9       been my book Violent Cases.

10  Q   When was that?

11  A   1987.

12  Q   Do you recall when the first book that was not

13      imported from the U.K. but that it was actually

14      published in the United States as a new work that you

15      retain the copyright interest in?

16  A   Probably a book I did called Don't Panic.

17  Q   When was that?

18  A   I think it was published in '88.

19  Q   1988?

20  A   1988.

21  Q   Not 1888?

22  A   Definitely not, I would remember.

23  Q   You mentioned doing some signings with, you had done

24      some book signings with Todd, correct?

25  A   No.


210

1  Q  Did you ever do -- you never did a book signing with

2     Todd?

3  A  We signed comics.

4  Q  That's what I mean.

5  A  I'm sorry.

6  Q  My fault, comic book signings.

7  A  We did, as I remember, one.  There was one signing at

8     Oakland at a convention called Wondercon, which was

9     held the weekend of 1993, the same weekend that Spawn

10    9 came out and --

11 Q  I think you mentioned that one.

12 A  And I did a mass signing.  They had all of the guys

13    from Image, all of the Image people were there, and

14    they got me to be one of them for that signing.

15 Q  Do you recall doing other signings with or without

16    Todd McFarlane as to the -- after you had published

17    the Angela miniseries, for example?

18                      MR. ARNTSEN:  Signings of?

19 Q  Signings of the Angela comic books?

20 A  No, didn't do any of those.  I mean, people would turn

21    up at signings.  There was -- you have no idea what

22    people will turn up with at signings, whether it's

23    Angela comics, rubber toys, body parts, you know, you

24    are going to be signing them, but I never did a

25    specific signing tour for the Angela stuff.


                          211

1   Q   Do you recall if you received -- I think you said you

2       had got an author's copy of Spawn 9, is that correct?

3   A   Yes.

4   Q   Do you recall if you got an author copy of Spawn 26?

5   A   Don't know.

6   Q   You don't recall one way or the other?

7   A   I don't recall one way or the other.

8   Q   Do you recall if you got an author's copy of the Angela

9       miniseries?

10  A   Yes, I would have got them.

11  Q   What about the first Angela trade paperback?

12  A   Haven't I testified -- did we do this already?

13  Q   I'm not sure if I did.  Bear with me.

14  A   I don't know on the Angela trade paperback.

15      Definitely didn't see -- I definitely haven't seen

16      Angela's Hunt, and there was definitely another

17      version of the Angela trade paperback, I think,

18      because I have signed, I mean, the trouble with --

19  Q   Was it called Pathways to Judgment, does that ring a

20      bell?

21  A   Don't know.  I have signed stuff, people put stuff in

22      front of me at signings and it's been stuff that I

23      have written.  It's been the Angela stuff and I have

24      never seen it before and it was never sent to me,

25      there is -- you know, so I can't say.

212

1    And for some reason, most of this, until we got

2    to this case, I managed somehow to resist the urge to

3    go out and buy my own work in order to have copies of

4    it on my shelves.

5 Q  Would you agree with me that it's possible that some

6    of these book signings you may have signed a copy of

7    the Angela miniseries?

8 A  Oh, absolutely.

9 Q  Would it be possible that you signed a copy of the

10    first Angela trade paperback?

11 A  It's certainly possible that I would have signed

12    copies because people put them in front of you.  You

13    don't stop to look at the book.  You just, you know,

14    you -- I don't know if you have ever done -- well, if

15    it was Mike, he would have done that.

16    You have 500 people.  You grab the book, you open

17    it, you sign it.  It's very often my impulse with the

18    Angela stuff, and I may even have done it on a couple

19    of occasions where I have actually declined to sign

20    it.  People put some of the trade paperbacks in front

21    of me and I would say I don't get royalties on this.

22 Q  Back in 1994, '95, at that point in time, do you

23    recall doing signings which you were handed copies of

24    Spawn 9?

25 A  Yeah.

213

1    Q  Do you recall back --

2    A  Todd and I both sign on the cover, we try to get in

3       the same place because there is one nice white place.

4    Q  Do you recall back in 1994, '95 time frame signing any

5       trade paperbacks, say that trade paperback number 2

6       which contained issue 9 in it?

7    A  I must have signed that at some point, but I, you

8       know, I go on a book signing tour, the Stardust tour

9       was 30 cities, one, probably an average of one signing

10      a day, but several signings were two a day. You have

11      got somewhere between 400 and 800 people that are

12      assigning and you put out a rule limiting everybody to

13      three items a piece --

14                      MR. ARNTSEN:  Since it's after

15          five, let's go with I don't recall.

16   A  Okay.  I'm sorry.

17   Q  Give me 30 seconds here.

18   A  Sorry.

19   Q  No, believe me, you are fine.  One last question, or

20      little issue on the 1997 agreement.  And again I know

21      you heard Todd's deposition in which he explained that

22      at different times he wears different hats, so to

23      speak, because he has different roles in the different

24      companies.

25          Who in your opinion, who in your understanding

214

1   was the party with whom you made the 1997 agreement?

2 A It was definitely one of the Todds.

3 Q Did you have an understanding one way or the other

4   of --

5 A No, there was --

6 Q -- how Todd was functioning?

7 A Todd never said to me at any point "Hey, this is Todd

8   McFarlane president of Image Comics talking to you,"

9   you know, or "this is Todd McFarlane representing

10   TMP."  It was just "This is, you know, it's Toddy, I

11   thought about it, okay."

12 Q Whoever, is it your understanding that whoever,

13   whichever Todd you were negotiating with in 1997 was

14   the same Todd you made an agreement with in 1992?

15 A As far as I know, you know, I don't even remember if

16   that fax that came in from him was on letterhead or

17   whatever, I just -- what was the --

18                MR. LEVIN:  July 15th.

19 A Yeah, the July 15th fax.

20 Q Exhibit 20?

21 A It's from Todd McFarlane Productions and Spawn.com

22   signed Toddy.

23                MR. SALSICH:  I think that's all.

24                (5:05 p.m.)

25


215

1 STATE OF WISCONSIN                    COUNTY OF DANE

2        I, HEIDI L. DAVIS, a Notary Public commissioned and

3 qualified in and for the State of Wisconsin, do hereby

4 certify that there came before me on June 24, 2002, at

5 the offices of LaFollette, Godfrey & Kahn, One East Main,

6 Madison, Wisconsin, the following named person, to wit:

7 NEIL RICHARD GAIMAN, who was by me duly sworn to testify

8 to the truth and nothing but the truth of knowledge

9 touching and concerning the matters in controversy in

10 this cause; that the witness was thereupon carefully

11 examined under oath; that said examination was taken in

12 shorthand by me and reduced to writing using computer-

13 aided transcription; that said deposition is a true

14 record of the testimony given by the witness; that the

15 witness has not waived reading and signing.  I further

16 certify that I am neither attorney or counsel for, nor

17 related to or employed by, any of the parties to the

18 action in which this deposition is taken, and further

19 that I am not a relative or employee of any attorney or

20 counsel employed by the parties or financially interested

21 in the action.

22        In witness whereof I have hereunto set my hand and

23 affixed my notarial seal June 26, 2002.

24 My commission expires: September 7, 2003.

25                    _Heidi L. Davis_
                     Notary Public, State of Wisconsin

216