105

1        UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF WISCONSIN

3

4   NEIL GAIMAN, and MARVELS

5   and MIRACLES, LLC,

6              Plaintiffs,

7       -vs-                    CASE NO. 02-C-0048-S

8   TODD McFARLANE, TODD

9   McFARLANE PRODUCTIONS, INC.,

10   TMP INTERNATIONAL, INC.,               **ORIGINAL**

11   McFARLANE WORLDWIDE, INC.,

12   and IMAGE COMICS, INC.,

13              Defendants.

14   _____/

15

16   DEPONENT:   ALLAN INGLIS

17   DATE:       Thursday, August 22, 2002

18   TIME:       12:05 p.m.

19   LOCATION:   32270 Telegraph Road, Suite 225

20               Bingham Farms, Michigan

21   REPORTER:   Noreen K. Cwidak, CSR-3183, RPR

22

23

24

25

**03-1461**

U.S.C.A.—7th Circuit
FILED
NOV 2 6 2003   JC
GINO J. AGNELLO
CLERK
DOC. #_____

1   APPEARANCES:

2   FOLEY & LARDNER

3   150 East Gilman Street

4   Madison, Wisconsin 53703

5   BY:  JEFFREY A. SIMMONS

6       Appearing on behalf of the Plaintiffs.

7

8   BLACKWELL SANDERS PEPER MARTIN, LLP

9   720 Olive Street, Suite 2400

10   St. Louis, Missouri 63101

11   BY:  PETE SALSICH, III

12       Appearing on behalf of Defendants Todd

13       McFarlane, Todd McFarlane Productions, Inc.,

14       TMP International, Inc., and McFarlane Worldwide,

15       Inc.

16

17   BROBECK, PHLEGER & HARRISON, LLP

18   38 Technology Drive

19   Irvine, California 92618

20   BY:  R. SCOTT FELDMANN

21       Appearing telephonically on behalf of Defendant

22       Image Comics, Inc.

23

24

25

1                              INDEX

2     WITNESS:                                    PAGE

3     ALLAN INGLIS

4          Examination by Mr. Simmons . . . . . . .      4
           Examination by Mr. Feldmann  . . . . . .     80
5          Examination by Mr. Salsich . . . . . . .     85

6     EXHIBITS:

7          Deposition Exhibit Number 121             41
           Deposition Exhibit Number 122             42
8          Deposition Exhibit Number 123             46
           Deposition Exhibit Number 124             49
9          Deposition Exhibit Number 125             56
           Deposition Exhibit Number 126             58
10         Deposition Exhibit Number 127             61
           Deposition Exhibit Number 128             71
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    Bingham Farms, Michigan

2                                    Thursday, August 22, 2002

3                                    12:05 p.m.

4

5

6                    A L L A N     I N G L I S,

7            Being first duly sworn to tell the truth, the

8            whole truth and nothing but the truth, testified

9            under oath as follows:

10

11                            EXAMINATION

12   BY MR. SIMMONS:

13   Q     Could you just state your name for the record,

14         please?

15   A     Allan Inglis.

16   Q     Where do you live?

17   A     In Novi, Michigan.

18   Q     Mr. Inglis, my name is Jeff Simmons.  I'm an

19         attorney for Neil Gaiman, Marvels and Miracles.

20              Do you understand that you're here for a

21         deposition to give some testimony in a lawsuit

22         between Mr. Gaiman, Marvels and Miracles and

23         Todd McFarlane and some of the entities that

24         Mr. McFarlane is associated with?

25   A     Yes, I do.

| 1 | Q | Have you ever given a deposition before? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | When was that? |
| 4 | A | Three years ago in the case of Tony Twist. |

5  Q    Well, why don't I go through some of the rules

6       for you again just to kind of refresh your memory

7       here.  What we're trying to do in a deposition is

8       create a clear record for the court reporter.  I'm

9       just going to ask you a series of questions and

10      you can give me the answer back.

11         In order to make sure we have a clear record,

12      we just have to try not to talk over each other.

13      So try to let me finish my question before you

14      answer and I'll try to let you finish your answer

15      before I ask you another question.

16         Also if you're answering a yes-or-no

17      question, just try to make sure you say yes or no

18      when you answer rather than nodding your head or

19      saying uh-huh because it just doesn't get picked

20      up by the court reporter.

21         If I ask you a question that doesn't make

22      sense or it seems confusing to you, feel free to

23      tell me that.  Tell me to rephrase the question

24      or tell me you don't understand.  Otherwise if I

25      ask you a question and you answer it, I'm going

```
1         to assume that you understood the question.

2              If you need to take a break at any point,

3         just let me know and we can take a short break.

4              Did you do anything in preparation for this

5         deposition?

6    A    I read the material that I was given by Pete.

7    Q    What was the material that you read?

8    A    Material from a file that I created when I was

9         with TMP International, Inc.  I was the chief

10        financial officer.

11             MR. SALSICH:  If I can just speed things up,

12        for the record the documents that I sent to Allan

13        to review were all documents that have already

14        been produced by the McFarlane defendants in the

15        course of discovery in this action and were not

16        maintained -- were not any documents that were

17        maintained by Mr. Inglis individually.  They

18        were documents that TMP or TMP International

19        and one of the McFarlane defendants had which

20        comprised the file and are documents that you all

21        have received.  We did not provide Mr. Inglis

22        with any documents that have not been already

23        produced.

24             MR. SIMMONS:  Maybe we'll see some of those

25        shortly.
```

```
 1              MR. SALSICH:  Sure.
 2    Q    (BY MR. SIMMONS)  Did you talk to Todd McFarlane
 3         at all within the last few weeks or so prior to
 4         this deposition?
 5    A    I did not.
 6    Q    Can you just give me -- why don't you just briefly
 7         walk me through your employment history, say,
 8         after college or high school.  Just hit the high
 9         points.  I don't need to know about waiter jobs or
10         anything like that.
11    A    I'm a graduate of the University of Glasgow,
12         Scotland.  I'm accredited with Canada and I'm a
13         Canadian charter accountant which is the Canadian
14         equivalent of the CPA designation.
15              After I worked in public accounting, I held
16         a number of financial management positions in
17         Canada, the U.S. and in Europe and I joined TMP
18         International, Inc., in August of 1996.  I was
19         the CFO of TMP International until June of 2001.
20    Q    Where had you worked just prior to joining TMP
21         International?
22    A    I was with Magna International, Inc., in Toronto
23         and in Detroit.  Magna International gives us
24         supply to the automotive industry.
25    Q    How did you come to be employed by TMP
```

| | | |
|---|---|---|
| 1 | | International? |
| 2 | A | I had come back to -- I was living in the U.S. and |
| 3 | | I was approached by a recruiter who was recruiting |
| 4 | | for the financial management position at TMP |
| 5 | | International, Inc.  I interviewed with Todd |
| 6 | | McFarlane and his associate and was subsequently |
| 7 | | hired as the CFO. |
| 8 | Q | What were your duties as the CFO? |
| 9 | A | I had full financial management responsibilities |
| 10 | | for TMP International, Inc., including financial |
| 11 | | reporting, cash management, credit and other |
| 12 | | related functions. |
| 13 | Q | Were you the CFO during the entire time you were |
| 14 | | employed by TMP International? |
| 15 | A | Yes. |
| 16 | Q | What were your -- do you recall approximately how |
| 17 | | many employees TMP International had during that |
| 18 | | time? |
| 19 | A | Approximately 30. |
| 20 | Q | Did you have any people working directly below you |
| 21 | | assisting you? |
| 22 | A | Yes. |
| 23 | Q | About how many? |
| 24 | A | Six. |
| 25 | Q | Can you tell me who those people were? |

1  A  The controller, the credit manager, the

2     international manager and some related financial

3     support positions.

4  Q  Do you remember the names of those people?

5  A  Yes.

6  Q  Can you tell me those names?

7  A  Eric Light was the controller, Patrick Carron

8     was the international manager, Bambi Fisher was

9     the credit manager and there were other related

10    financial people.

11 Q  Who were your superiors at TMP International?

12 A  Paul Burke was the minority owner of TMP

13    International, Inc.  He was my direct report in

14    Michigan and I also reported to Todd McFarlane

15    as CEO and owner of the company.

16 Q  Todd McFarlane was the CEO and owner?

17 A  Yes.

18 Q  Was that during the entire time you were employed

19    there?

20 A  Yes.

21 Q  Do you recall what Paul Burke's title was?

22 A  Paul Burke was the -- he was the CEO of TMP

23    International, Inc., and Todd McFarlane was the

24    CEO of the McFarlane group of companies.

25 Q  So is it fair to say Todd McFarlane was Paul

| | | |
|---|---|---|
| 1 | | Burke's superior? |
| 2 | A | Yes. |
| 3 | Q | Did Todd McFarlane have any specific position with |
| 4 | | TMP International to your knowledge? |
| 5 | A | Well, as the majority owner of the company, he |
| 6 | | had overall responsibility and authority for the |
| 7 | | operations of TMP International. |
| 8 | Q | Were you aware of any other -- other than |
| 9 | | Mr. Burke and Mr. McFarlane, are you aware of |
| 10 | | any other shareholders of TMP International at |
| 11 | | the time you worked there? |
| 12 | A | No. |
| 13 | Q | Do you recall who was on the board of directors |
| 14 | | for the company during the time you were there? |
| 15 | A | Todd McFarlane, Paul Burke and I was the director |
| 16 | | of the company. |
| 17 | Q | Anybody else? |
| 18 | A | Not to my recollection and knowledge. |
| 19 | Q | Did you ever perform any duties for any other |
| 20 | | company controlled by Todd McFarlane? |
| 21 | A | Only the toy companies. TMP International, Inc., |
| 22 | | owned McFarlane Toys-Canada and McFarlane |
| 23 | | Worldwide which TMP International, Inc., and |
| 24 | | McFarlane Toys-Canada operated in the North |
| 25 | | American market. McFarlane Worldwide sold to |

```
 1        distributors throughout the world.
 2   Q    Can you explain to me a little bit more about what
 3        McFarlane Worldwide did?  You said they sold to
 4        distributors.  Can you expand on that a little
 5        bit?
 6   A    Yeah.  Just in relationship between TMP
 7        International and McFarlane Worldwide, TMP
 8        International, Inc., did business and does
 9        business as McFarlane Toys.  McFarlane Toys
10        sells toys directly to retailers in the United
11        States.  McFarlane Toys-Canada is the same in
12        Canada.  McFarlane Worldwide sells to distributors
13        of toys who in turn sell to the retailers in the
14        various international markets.
15   Q    During the time you were working for TMP
16        International, was Todd McFarlane Productions
17        working out of the same office as TMP
18        International?
19   A    No.
20   Q    Where was Todd McFarlane Productions located at
21        the time?
22   A    In Tempe, Arizona.
23   Q    Did any Todd McFarlane Productions' employees work
24        out of TMP International's offices?
25   A    No.
```

1   Q   Are you aware of any employees of TMP

2       International who are also employees of Todd

3       McFarlane Productions?

4   A   No.

5   Q   Did anybody at TMP International perform some

6       duties for Todd McFarlane Productions?

7   A   Only in the latter part of my time with TMP

8       International, Inc., the controller of Todd

9       McFarlane Productions left the company in 2000

10      and I assumed responsibility for the accounting

11      of Todd McFarlane Productions from 2000 until

12      2001.

13  Q   You said you were the CFO of Todd -- excuse

14      me -- of TMP International, correct?

15  A   Yes.

16  Q   Was there also a CFO for Todd McFarlane

17      Productions during that time?

18  A   Yes.

19  Q   Do you know who that person was?

20  A   There were a number of accountants between 1996

21      and 1999.  Todd McFarlane Productions then hired

22      a controller and he was with the company I believe

23      for a year or so.  So he was the controller of

24      Todd McFarlane Productions.

25  Q   You considered him your counterpart even though he

```
 1         didn't have the same title as you?
 2    A    That's right.
 3    Q    What was his name?
 4    A    Randy Williams.
 5    Q    You said you left TMP International just this
 6         year, is that right?
 7    A    No, last year.
 8    Q    Why did you leave the company?
 9    A    The Michigan office was closed and all functions
10         were transferred to Tempe, Arizona and I chose to
11         remain in Michigan for family reasons.
12    Q    Where are you employed now?
13    A    I'm retired.
14    Q    TMP International made toys or part of TMP
15         International did at least make or sell toys
16         based on characters in comic books produced by
17         Todd McFarlane Productions, is that correct?
18    A    It was based mainly on the Spawn comic produced
19         by Todd McFarlane Productions.  They also licensed
20         products and products owned by independent
21         licensers.
22    Q    Can you give me some examples of those independent
23         licensers?
24    A    Sony Signatures licensed TMP International, Inc.,
25         to manufacture toys based on the rock group Kiss
```

```
 1        and more recently the National Hockey League
 2        licensed TMP International, Inc., to manufacture
 3        toys based on various ice hockey players.
 4    Q   Do you recall what the contractual arrangement was
 5        with those companies?  Did they receive -- how
 6        were they compensated for TMP International making
 7        those toys?
 8    A   They were compensated by a royalty based on sales
 9        of the toys.
10    Q   Do you recall what those royalties -- what the
11        percentage of those royalties were?
12    A   The percentage varied anywhere from 4 or 5 percent
13        to 10 or 11 percent depending on a negotiated
14        agreement.
15    Q   Did you ever participate in any negotiation of
16        those agreements?
17    A   No.  I participated in the financial analyses
18        and discussions that went into the financial
19        implications of the agreements.
20    Q   That would be prior to entering into the
21        agreements?
22    A   Yes.
23    Q   Then after the agreements were entered into, did
24        you participate in calculating the payments to be
25        made to those licensers?
```

```
 1   A   One of the functions of my department was to
 2       maintain records of all of the license agreements
 3       and to make royalty payments in accordance with
 4       the agreements.
 5   Q   Do you happen to recall which of those licensers
 6       received the largest percentage royalty?  Does
 7       that stand out?
 8   A   Not specifically, but going back -- going to the
 9       most recent agreements on sports figures, probably
10       those agreements were the highest royalty rates.
11   Q   Do you recall what those royalty rates were?
12   A   They were in that 10 or 11 percent range.
13   Q   Who were those license agreements entered into
14       with?
15   A   The sports association themselves, the National
16       Hockey League and the National Football League.
17   Q   Sort of the overarching entities for those various
18       sports?
19   A   Yes.
20   Q   They would be in the 10 or 11 percent range?
21   A   Yes.
22   Q   What was the -- was there a similar arrangement
23       between Todd McFarlane Productions and Todd
24       McFarlane -- excuse me -- TMP International with
25       regard to royalties for characters?
```

1    A    No.

2    Q    Was any money transferred from TMP International

3         to Todd McFarlane Productions as a payment or

4         any sort of royalty for making toys or action

5         figures?

6    A    There was an agreement between Todd McFarlane as

7         the creator of Spawn which ruled royalties payable

8         by TMP International, Inc., to Todd McFarlane.

9         Todd McFarlane assigned his royalty rights to

10        Todd McFarlane Productions.

11   Q    I guess I'm having trouble following how that

12        worked.  You said there was an agreement between

13        TMP International and Todd McFarlane, correct?

14   A    Yes.

15   Q    And then he assigned that agreement to --

16   A    To Todd McFarlane Productions, yes.

17   Q    Do you recall what the terms of that agreement

18        were or what the royalty percentage was

19        specifically?

20   A    It was either 5 percent or 6 percent.  I don't

21        specifically recall.

22   Q    Was that agreement in effect the entire time you

23        were at TMP International?

24   A    Yes, it was.

25   Q    Do you recall the royalty percentage changing at

1        all during your time at TMP International?

2  A    No.

3  Q    What were the mechanics of the royalties?

4        With that 5 or 6 percent royalty, were payments

5        actually -- were checks cut from TMP International

6        to Todd McFarlane or Todd McFarlane Productions?

7  A    I don't recall the period of time, but initially

8        Todd McFarlane deferred all payments under the

9        agreement and it was in 1999 I believe that

10       payments commenced.

11  Q   When you say deferred the payments, Todd McFarlane

12       said something to the effect to TMP International

13       just don't make any royalty payments to me or Todd

14       McFarlane Productions?

15  A   Yes.

16  Q   Now, do you recall a time when you were asked to

17       calculate a royalty payment for Neil Gaiman?

18  A   Yes.

19  Q   Can you describe for me what you remember about

20       that?

21  A   In 1997 I was asked to compute the royalty based

22       on a draft agreement between Gaiman and McFarlane.

23       I don't recall if it was with Todd McFarlane

24       Productions or -- I believe it was with Todd

25       McFarlane Productions.  That draft agreement was

```
 1           figured from discussions that had taken place

 2           between Gaiman and McFarlane.

 3   Q   Who asked you to make that calculation?

 4   A   It would have been Todd.

 5   Q   You say it was a draft agreement.  Do you recall

 6           what it looked like?  Did it look like a formal

 7           typed out contract or was it more of a letter or

 8           a fax sent?

 9   A   It was the basis of a formal contract.

10   Q   What do you mean by that?

11   A   Well, the basis of a formal license agreement

12           between the two parties.

13   Q   Can you describe for me what that document looked

14           like?

15   A   The basic structure is as follows:  There's a

16           definition of the subject of the agreement,

17           whether it's merchandising or, you know, comic

18           book properties, it defines the properties, it

19           defines the royalty or other revenue obligations

20           under the agreement and then the conditions

21           attached to the agreement such as the rights

22           and obligations of the two parties.

23   Q   Do you recall whether that was an agreement

24           drafted by Terry Fitzgerald?

25   A   I don't recall.
```

| | | |
|---|---|---|
| 1 | Q | Do you recall ever seeing an agreement drafted by |
| 2 | | Terry Fitzgerald? |
| 3 | A | No. |
| 4 | Q | So why don't you go on and explain for me what the |
| 5 | | process -- describe for me the process you went |
| 6 | | through in calculating the royalty for Mr. Gaiman |
| 7 | | after you looked at that draft agreement. |
| 8 | A | What I'm going to describe is typical of what I |
| 9 | | did under all agreements.  I was given a draft |
| 10 | | agreement and asked to calculate the financial |
| 11 | | implications of the agreement, i.e., the royalties |
| 12 | | payable under the agreement based on the terms |
| 13 | | and conditions of the agreement. |
| 14 | Q | So did you then come up with an estimate of what |
| 15 | | you thought the royalty should be that would be |
| 16 | | paid to Mr. Gaiman? |
| 17 | A | Yes, I did. |
| 18 | Q | Who did you give that estimate to? |
| 19 | A | I gave it to Todd McFarlane. |
| 20 | Q | What was Todd's reaction to that? |
| 21 | A | He said, "You have interpreted this agreement in |
| 22 | | terms of the typical toy license agreement.  The |
| 23 | | typical toy license agreement is between the |
| 24 | | owner/creator of the property and the licensee, |
| 25 | | i.e., McFarlane Toys was selling toys from the |

1     property.  The owner/creator in a typical toy

2     license agreement is the sole owner/creator

3     of the property."

4          He said, "This deal that I'm discussing

5     with Gaiman is not a toy license agreement.

6     It's an agreement between Todd McFarlane

7     who is the publisher because it was under a

8     publishing situation and Neil Gaiman who was

9     the writer/creator and the rules are quite

10    different between the typical toy license and

11    the license between a creator and a writer."  He

12    then explained -- I had no experience at that

13    time in publishing.  Todd then explained to me

14    how a typical agreement in the publishing world

15    worked.

16  Q  What was that explanation that he gave you?

17  A  The explanation is that there's a royalty payable

18    to the publisher and the writer gets a share of

19    the royalty that is payable to the publisher.

20  Q  So what did you do after Mr. McFarlane gave you

21    that information?

22  A  He said, "I'm going to give you the gist of the

23    discussions that have taken place between Neil

24    Gaiman and myself and I'll ask you to redo the

25    numbers to reflect the second kind of agreement,

```
 1         not the typical toy license agreement."
 2    Q    Did Mr. McFarlane direct you to any portion of
 3         the draft agreement you were looking at to
 4         substantiate what he was saying?
 5    A    No.  There wasn't a draft agreement at that
 6         time other than the original draft of the
 7         agreement.  What he directed me to was handwritten
 8         correspondence between him and Neil.
 9    Q    When in the process did he direct you to that
10         correspondence?
11    A    Right after I had made the initial calculation
12         based on my understanding of what I thought was
13         going to be a toy license agreement.  So this
14         all took place within a matter of days.
15    Q    So how did you go about collecting the information
16         that you needed to calculate the royalty?
17    A    Todd told me that the subject of the agreement
18         was specific comic book figures and I had in the
19         financial records of McFarlane Toys the sales of
20         these figures for the period of time that -- you
21         know, from the time that the characters had
22         been made into toys and July 1997 when these
23         discussions were taking place between Todd and
24         Neil.
25    Q    Do you recall how TMP International maintained its
```

| | | |
|---|---|---|
| 1 | | financial records at that time? |
| 2 | A | We had a fully integrated computer system which |
| 3 | | contained all of the financial records of TMP |
| 4 | | International. |
| 5 | Q | This would have been approximately a year after |
| 6 | | you started with TMP International that you did |
| 7 | | that? |
| 8 | A | Yes. |
| 9 | Q | You worked in financial positions at other |
| 10 | | companies prior to that, correct? |
| 11 | A | Yes. |
| 12 | Q | What was your opinion, just generally, of the |
| 13 | | state of TMP International's financial records at |
| 14 | | the time you came in?  Were they very accurate, |
| 15 | | in great shape or were there pieces missing and |
| 16 | | maybe a little less than complete than you would |
| 17 | | like? |
| 18 | A | It was a very accurate system. |
| 19 | Q | Do you recall what the name of the computer |
| 20 | | program or system was that the records were |
| 21 | | maintained on at that time? |
| 22 | A | It was called Great Plains. |
| 23 | Q | How long -- do you recall how long TMP |
| 24 | | International used that system? |
| 25 | A | I think almost from the inception of the company |

```
 1        in 1994.
 2   Q    In calculating the royalties for Mr. Gaiman, were
 3        there any portions of your calculations that you
 4        had to use estimates?
 5   A    No.
 6   Q    It's your recollection you were able to just pull
 7        out specific numbers for everything off of the
 8        computer system?
 9   A    Yes.
10   Q    During your discussions with Mr. McFarlane about
11        this, did Mr. McFarlane ever tell you that these
12        royalty payments to Mr. Gaiman were going to be
13        ongoing payments from that time forward?
14   A    No, he did not.
15   Q    Did he ever tell you "This is it.  We're just
16        going to make this one payment to Mr. Gaiman" or
17        anything to that effect?
18   A    That was my understanding.
19   Q    It was just a one-time payment?
20   A    Yes.
21   Q    After this conversation with Mr. McFarlane where
22        he explained to you his understanding of the
23        agreement, did you have any further conversations
24        with Mr. McFarlane about the royalty calculation?
25   A    No.
```

1   Q    So what was the last step in the process then as

2          far as you were concerned?

3   A    The calculation of royalties payable to Gaiman

4          according to discussions that had taken place

5          between Gaiman and McFarlane on sales of specific

6          toys for the period 1994 through 1997.

7   Q    The last step was you just provided Todd

8          McFarlane, or was it somebody else, with the

9          royalty payment?

10  A    It was Todd McFarlane.

11  Q    After that did anybody associated with Todd

12         McFarlane ever speak to you again about royalty --

13  A    No.

14  Q    -- calculations?

15         I'm going to start showing you some documents

16         we have here.

17  A    Okay.

18         MR. SIMMONS:  Scott, are you still with us?

19         MR. FELDMANN:  Yes, I am.

20         MR. SIMMONS:  I'm going to start using

21         exhibits here and the first one was previously

22         marked as Exhibit 69.  It appears to be a

23         spreadsheet of some sort.  Do you want the

24         Bates numbers?

25         MR. FELDMANN:  That would be helpful.

```
 1              MR. SIMMONS:  It's TM 410 through TM 432.
 2    Q    (BY MR. SIMMONS)  Mr. Inglis, feel free to just
 3         take a look at that.  Is this document familiar
 4         to you, Mr. Inglis?
 5    A    Not as it's shown here.
 6    Q    What do you mean by that?
 7    A    I have no recollection of this document being
 8         produced by me or somebody in my department.
 9    Q    Does the form of the document look familiar to
10         you?
11    A    I have seen a similar format, yes.
12    Q    If you've seen similar forms, I'm just wondering
13         if you might be able to explain to me just a few
14         pieces of information about it based on having
15         seen documents like this before.  Can you tell me
16         what the first -- I guess it's the second column
17         actually.  What would things like Ames Department
18         Store and Army/Air Force Exchange be?
19    A    The second column?
20    Q    I'm sorry.  It's the second column on the left.
21    A    Okay.
22    Q    Are those just customers?
23    A    Yes.  They're customers.
24    Q    Let's go to the last column on the right.  On the
25         first page it says five ninety-nine.  Do you know
```

1       what that refers to?

2    A  That's the invoice price.

3    Q  That's the price that TMP International charged --

4    A  Charged Ames.

5    Q  Flip towards the back.  I think it's page 19.

6       Excuse me.  Actually why don't you go to page 20.

7    A  Okay.

8    Q  In the second column there's a bunch of entries

9       for TMP-Irwin Licensing Corp. and then moving

10      over to the right-hand column, there are

11      apparently a variety of different prices again.

12      It's no longer the consistent five ninety-nine

13      that it was on the prior page.  Do you see where

14      I'm referring to?

15   A  Yes.

16   Q  Can you explain why those numbers might be

17      different here?

18   A  That refers to the explanation I gave you about

19      the difference between the North American market

20      where McFarlane Toys or TMP International, Inc.,

21      sold directly to retailers and where TMP

22      International, Inc., or McFarlane Worldwide or

23      in this case at that time TMP-Irwin Licensing

24      Corporation sold to distributors in international

25      markets who in turn sold to retailers.  Five

```
 1           ninety-nine is the selling price to a North
 2           American retailer.  These other lower prices
 3           are the selling prices to TMP International or
 4           TMP-Irwin who in turn sold to distributors.
 5    Q      The prices seem to be -- looking at the top
 6           of this page, page 20, it says Cosmic Angela.
 7           Would it be your assumption that all the entries
 8           here are for that one Cosmic Angela action
 9           figure?
10    A      I'm assuming that they are.  As I said, I did
11           not author this document and I haven't seen it
12           before.
13    Q      I understand.
14               Do you have any -- again looking at the
15           right-hand column, the prices that are entered
16           there are not consistent prices.  There's a
17           variety of different prices.  Do you have any
18           idea as to why the prices would vary so much
19           within one customer, TMP-Irwin Licensing?
20    A      Because the products would be going to different
21           markets where the costs would be different.
22    Q      What costs?
23    A      The costs of shipping to different international
24           markets.
25    Q      Jumping back a minute, when you were calculating
```

| | | |
|---|---|---|
| 1 | | the royalty for Mr. Gaiman and you were |
| 2 | | determining the number of units sold, did that |
| 3 | | number include amounts sold to TMP-Irwin Licensing |
| 4 | | or McFarlane Worldwide?  Do you recall whether |
| 5 | | sales for McFarlane Worldwide were included in |
| 6 | | those figures? |
| 7 | A | I don't specifically recall, but the sales |
| 8 | | should have all been inclusive, i.e., sales of |
| 9 | | the particular properties in all markets. |
| 10 | Q | Let me show you what's been previously marked as |
| 11 | | Exhibit 74. |
| 12 | | MR. SIMMONS:  Scott, this is TM 462. |
| 13 | Q | (BY MR. SIMMONS)  Would you take a look at that, |
| 14 | | Mr. Inglis? |
| 15 | A | Okay. |
| 16 | Q | Noting in the lower right-hand column or I guess |
| 17 | | it would be the lower left-hand corner based on |
| 18 | | where you're looking at it, there's a date of |
| 19 | | 7-28-97.  I'm just noting that the date appears |
| 20 | | to be approximately the time you were making the |
| 21 | | royalty calculation for Mr. Gaiman. |
| 22 | A | Yes. |
| 23 | Q | I'm wondering if this is a document that you |
| 24 | | recall seeing before. |
| 25 | A | I haven't seen this specific document, but I know |

```
 1        what it is.

 2    Q   Can you tell me what it is?

 3    A   At the top it says "Spring Shipping Schedule."

 4        That would have come from the records of the

 5        production manager who is also the president of

 6        McFarlane Toys.  So it's his way of tracking the

 7        production and shipments from the factories to

 8        the distribution center in the United States.

 9    Q   Is this a document you would have looked at in

10        trying to calculate the royalty for Mr. Gaiman?

11    A   No.

12    Q   Why not?

13    A   Because it's simply a production and shipping

14        schedule as opposed to a sales record.

15    Q   I'm showing you now what's been previously marked

16        as Exhibit 75.

17            MR. SIMMONS:  Scott, that's TM 463.

18    Q   (BY MR. SIMMONS)  Mr. Inglis, take a look at

19        that.

20    A   Okay.

21    Q   Again I'll just note the date in the lower

22        left-hand corner is July 28, '97.

23    A   Uh-huh.

24    Q   Does this document look familiar to you at all?

25    A   No.
```

1  Q   Does the format of the document look familiar to

2      you?

3  A   Yeah.  It's similar to the Spring Shipping

4      Schedule.  It shows the week in which the product

5      would be shipped from the factory, the quantities

6      able to be shipped and then the quantities by

7      toy.

8  Q   Do you recall whether you would have reviewed

9      any document similar to this in calculating

10     Mr. Gaiman's royalty?

11 A   No, I would not.

12 Q   You would not have?

13 A   No.

14 Q   Why not?

15 A   Because in calculating royalties, we relied

16     entirely on the sales records, not production

17     records.  Royalties are payable in sales.

18 Q   Let me show you what's been previously marked as

19     Exhibit 76.

20         MR. SIMMONS:  Scott, that's TM 464.

21         THE WITNESS:  Okay.

22 Q   (BY MR. SIMMONS)  Again I'll note that this

23     document also has a date of July 28, 1997.

24 A   Uh-huh.

25 Q   Does this document look familiar to you at all?

```
 1   A      No.

 2   Q      Have you seen this form of a document before?

 3   A      Yes, I have.

 4   Q      Can you explain to me what it is?

 5   A      The heading is "Total figures, vehicles, play sets

 6          by ship date" meaning the date of shipment from

 7          the factory.  It shows down the left-hand side

 8          the ship dates by week and then the quantities

 9          shipped by toy.  Again it's a production and

10          shipping record.

11   Q      And you have no recollection of creating a

12          document like this at the time you were

13          calculating Mr. Gaiman's royalty?

14   A      No.

15   Q      Let me show you Exhibit 77.

16               MR. SIMMONS:  Scott, this is TM 465.

17               THE WITNESS:  Okay.

18   Q      (BY MR. SIMMONS)  Again I'll note in the lower

19          either left or right-hand corner, depending on how

20          you're looking at it, the date says July 28th,

21          1997.  Do you recall ever seeing this document

22          before?

23   A      No, I have not.

24   Q      Are you familiar with this form of a document?

25   A      Yes.
```

1  Q    Can you tell me what this document is?

2  A    At the top it says "Spawn 1995 Fall."  That means

3       the Spawn toy line was brought into the market in

4       the fall of 1995.  The left-hand column is headed

5       "Ship HK" which means shipped out of Hong Kong.

6       Below that you see all the dates of the shipments

7       and then across the quantities by toy related to

8       these dates.

9  Q    When you were calculating the royalty for

10      Mr. Gaiman, was anybody on your staff assisting

11      you in that calculation?

12 A    Yes.

13 Q    Who assisted you?

14 A    It was Patrick Carron, C-a-r-r-o-n.  Patrick

15      maintained all of the records relating to all

16      license agreements and royalty payments.

17 Q    Do you recall what you had Mr. Carron do to

18      assist you in calculating the royalty?

19 A    Any royalty or --

20 Q    I'm sorry.  You stated that Mr. Carron assisted

21      you in calculating the royalty for Mr. Gaiman,

22      correct?

23 A    Yes.

24 Q    What specifically did you have Mr. Carron do to

25      assist you in calculating that royalty?

GRUSKIN & ASSOCIATES    (248) 737-6691

1   A    I asked him to compile from the sales records

2        in our financial system the sales by a particular

3        property and the sales would be units sold and

4        quantities -- sorry -- unit sold and sales

5        dollars.

6   Q    Did Mr. Carron provide you with documents that

7        showed you the information he provided or did he

8        just tell you "Here are the sales"?

9   A    Yeah.  We reviewed the detailed sales records and

10       then the summary calculation of the royalties.

11  Q    I'm sorry.  Did you say you reviewed that or

12       Mr. Carron reviewed that?

13  A    Mr. Carron compiled it.  It was my practice to

14       review the details.  Being an accountant, I want

15       to tie the numbers from the sales records to the

16       royalty statements.

17  Q    So you saw some sort of -- Mr. Carron provided you

18       with some sort of printed documents that you then

19       used --

20  A    Yes.

21  Q    -- to figure out what the royalty should be?

22  A    Yes.

23  Q    You stated earlier that in preparing for this

24       deposition you reviewed certain documents that

25       had been produced by the parties.  Were the

1        documents that Mr. Carron provided you among the

2        documents that you reviewed to prepare for this

3        deposition?

4   A    Yes.

5   Q    Do you recall what they looked like?

6            MR. SIMMONS:  Do you want to go off the

7        record?

8            MR. SALSICH:  Let's go off the record for a

9        second.

10           (Off the record.)

11           MR. SIMMONS:  Back on.

12  Q    (BY MR. SIMMONS)  Mr. Inglis, we're back from a

13       short break here.  I had a discussion with your

14       attorney.  It sounds like we want to clarify what

15       your testimony was before.  You testified earlier

16       that you reviewed certain documents provided to

17       you by defense counsel in preparing for this

18       deposition, correct?

19  A    Yes.

20  Q    Were the documents that Mr. Carron showed to you

21       back in 1997 among the documents that counsel

22       provided to you just recently to prepare for this

23       deposition?

24  A    No, they were not.

25  Q    Have you ever -- do you recall ever receiving the

```
 1        document that Mr. Carron provided to you back in

 2        1997?  Do you recall ever seeing those documents

 3        again?

 4   A    Yes.

 5   Q    When did you see those documents again?

 6   A    Yesterday.

 7   Q    The documents that Mr. Carron provided to you in

 8        1997?

 9   A    It was specifically a statement of calculation of

10        royalty.  It was a summary statement.

11   Q    I've got some more documents here so they may be

12        coming up.

13             I'll show you what's been marked as Exhibit

14        73.

15             MR. SIMMONS:  Scott, this is TM 460.

16   Q    (BY MR. SIMMONS)  Do you recognize Exhibit 73,

17        Mr. Inglis?

18   A    I recognize the information in Exhibit 73, yes.

19   Q    Can you tell me what that information is?

20   A    Again it comes from the production records.  It's

21        for the Spawn 12-inch figures.  Again it's a

22        toy line.  It says 1996.  It shows tooling cost

23        and again like previous documents, it shows the

24        dates of shipment out of Hong Kong and then the

25        quantities shipped by toy.
```

1    Q    And then it says --

2    A    That would be the -- the top part I believe would

3         be the planned plant production and shipping.

4         The bottom part, as you can see, shows actual

5         shipments.

6    Q    Then in between those two tables that you just

7         pointed to, there's a section that says tooling,

8         correct?

9    A    Yes.

10   Q    Can you explain to me what that is?

11   A    That's the tooling that is used in the factory to

12        produce the toys.  That tooling is purchased by

13        TMP International, Inc., and then the tool is

14        shipped to the factories for production.  This

15        information says that the total tooling was

16        $117,329 and was to be paid over three payments

17        which was the typical payment schedule.

18   Q    Was this one of the documents that Mr. Carron

19        provided you when you were preparing the royalty

20        in 1997?

21   A    No, it was not.

22   Q    Do you recall whether he provided you with

23        anything similar to this document at that time?

24   A    No, he did not.

25   Q    I'll show you what's been marked as Exhibit 72.

```
 1            MR. SIMMONS:  Scott, that's TM 459.

 2            THE WITNESS:  Okay.

 3   Q   (BY MR. SIMMONS)  Do you recognize Exhibit 72?

 4   A   No, I do not.

 5   Q   Do you recognize the handwriting on Exhibit 72?

 6   A   Yes, I do.

 7   Q   Whose handwriting is that?

 8   A   I believe it's Pat Carron's.

 9   Q   But you don't recall having seen this document

10       before?

11   A   No, I do not.

12   Q   Is this document at all similar to documents you

13       remember Mr. Carron provided you when you were

14       doing the royalty calculation in '97?

15   A   No, it is not.

16   Q   Looking at the table at the top of the page, you

17       see in the left-hand column there's an entry for

18       the Angela figure.  Do you see that?

19   A   Uh-huh.

20   Q   Moving across it says units produced and then it

21       says total units sold.

22   A   Uh-huh.

23   Q   You'll note that it looks like units produced is

24       188,000 whereas units sold is 222,170.  Do you see

25       that?
```

| | | |
|---|---|---|
| 1 | A | Uh-huh. |
| 2 | Q | Units sold appears to be higher than the number of |
| 3 | | units produced. |
| 4 | A | Uh-huh. |
| 5 | Q | I realize you don't remember seeing this specific |
| 6 | | document, but just based on your knowledge of TMP |
| 7 | | International's practices in sales, do you have |
| 8 | | any explanation why the entry for total units sold |
| 9 | | would be higher than the entry for total units |
| 10 | | produced? |
| 11 | A | The total units sold comes from the sales records |
| 12 | | which in turn are derived from the sales invoices |
| 13 | | to the customers.  So the total units sold |
| 14 | | would be -- is a very factual figure.  The units |
| 15 | | produced -- I can't explain the units produced |
| 16 | | figure.  It would presumably come from the |
| 17 | | production records, but I can't account for the |
| 18 | | difference between the two. |
| 19 | Q | Do you think the sales number would be more |
| 20 | | accurate of the two? |
| 21 | A | Absolutely. |
| 22 | Q | I'm wondering if you might be able to explain some |
| 23 | | of the other terms used on this document.  Moving |
| 24 | | across the top of that table it says units sold |
| 25 | | regular. |

| | | |
|---|---|---|
| 1 | A | Uh-huh. |
| 2 | Q | Do you know what that term means? |
| 3 | A | That would be to use pricing from a previous |
| 4 | | schedule.  Units sold regular would be units |
| 5 | | sold at five ninety-nine. |
| 6 | Q | And you're referring to the earlier exhibit we |
| 7 | | showed -- |
| 8 | A | Yes. |
| 9 | Q | -- with the long list of items? |
| 10 | | What is units sold discounted? |
| 11 | A | That would be units sold at something less than |
| 12 | | five ninety-nine. |
| 13 | Q | For example, like the toys that McFarlane |
| 14 | | Worldwide sold? |
| 15 | A | No.  It would be toys sold -- perhaps toys at the |
| 16 | | end of the life of the toy to retailers as we |
| 17 | | cleared out inventory or for whatever reason we |
| 18 | | decided to sell them at a lesser price. |
| 19 | Q | So TMP International could be the entity making |
| 20 | | those sales at a discount? |
| 21 | A | Yes. |
| 22 | Q | Regular revenue and revenue discounted, can you |
| 23 | | explain those terms? |
| 24 | A | That would be just simply an arithmetical |
| 25 | | calculation of units sold regular times whatever |

```
 1        the regular price was for that particular item

 2        and then revenue discounted is again units sold

 3        discounted times whatever the discounted prices

 4        were.

 5   Q    Referring to the handwritten section below that,

 6        on the third line down there's a notation.  It

 7        looks like International sales to TMP-Irwin.

 8   A    Yes.

 9   Q    It says "appear under discounted sales."

10   A    Uh-huh.

11   Q    Can you explain what you think that means?

12   A    That just means that included in that units

13        sold discounted quantity are the units sold by

14        McFarlane Toys to TMP-Irwin, the international

15        distributor.

16   Q    Why is it that it's under discounted sales?

17   A    Simply I would think for the convenience of this

18        particular report since the quantities are

19        relatively small in relationship to the units

20        sold regular.

21   Q    But is the price charged to TMP-Irwin different

22        than the price charged to other entities?

23   A    Yes, as I explained in my explanation of the

24        previous report.

25   Q    I'll give you another exhibit.  This one has not
```

```
1        previously been marked.

2              MR. SIMMONS:  Scott, this is TM 552.

3              We'll mark this as Exhibit 121.

4              (Deposition Exhibit Number 121 was marked

5              for identification by the Court Reporter.)

6   Q    (BY MR. SIMMONS)  Do you recognize this document,

7        Mr. Inglis?

8   A    Yes, I do.

9   Q    Can you tell me what it is?

10  A    I recognize it in that it's in my writing.

11  Q    That's your handwriting?

12  A    Yeah.  It would appear to be my way of explaining

13       in some discussion the factors that are deducted

14       from gross sales in arriving at a net sales

15       number and then other deductions from net sales

16       specifically which you see there was freight,

17       duty, taxes, insurance and shipping.

18  Q    Can you --

19  A    There's no heading as you can see.  So I can't

20       recall the context in which I might have written

21       this.

22  Q    Can you read the last line?  Can you just tell me

23       what that says?

24  A    Marketing expenses.

25  Q    Is that it, marketing expenses?
```

```
 1   A      Yeah.

 2          MR. SIMMONS:  We have another new document.

 3          We'll mark this as Exhibit 122.

 4          Scott, this is TM 485.

 5          (Deposition Exhibit Number 122 was marked

 6          for identification by the Court Reporter.)

 7   Q      (BY MR. SIMMONS)  Have you had a chance to look it

 8          over, Mr. Inglis?

 9   A      Yes.

10   Q      Do you recognize Exhibit 122?

11   A      Yes, I do.

12   Q      Can you tell me what it is?

13   A      This document, as you can see, was compiled on

14          the 29th of July which was the time that I began

15          to do the financial analyses which Todd McFarlane

16          asked me to do in his discussions with Neil

17          Gaiman.  It shows the properties under the column

18          called "Figure," again the units produced and

19          sold and then the sales dollars and then a

20          calculation of the royalty based on my

21          understanding of the agreement that was being

22          discussed.

23   Q      Is this a document you created?

24   A      That's a document that Patrick Carron created.

25   Q      Do you see the line that says whole discounts at
```

```
 1        8 percent?
 2  A     Yes.
 3  Q     Do you know what that means?
 4  A     That means that's the discounts from sales.   If
 5        you relate to the handwritten document that
 6        we just discussed, that would be the allowances
 7        that -- it describes the allowances on the
 8        handwritten schedule and discounts in the
 9        printed schedule.
10  Q     I don't have an accounting background.   Allowances
11        or discounts, can you give me some examples of
12        what would be comprised with those terms?
13  A     In TMP International, Inc.'s negotiations or
14        dealings with a retail customer, the company gave
15        certain allowances to the customer for particular
16        purposes, specifically advertising by the customer
17        of McFarlane Toys products and defective products
18        which is a product that was shipped to the
19        customer which proved to be damaged in some way
20        and any other allowances that were paid to the
21        customer.
22  Q     So how -- it says 8 percent here.   How is the
23        8 percent figure arrived at?
24  A     There's a specific percentage established in these
25        negotiations with the customer.
```

1    Q    So is the 8 percent something that's given across

2         the board to all the customers?

3    A    It's a percentage that is not consistently

4         8 percent, but typically that would be the

5         percentage of all allowances given to or offered

6         to all customers.

7    Q    This entry on Exhibit 122 says 8 percent.  Is it

8         your understanding that the 8 percent represents

9         the total discounts offered to all the customers

10        or each individual customer may get a different

11        percentage, but when you add them all up or

12        average them out, it comes out to 8 percent?

13   A    Yeah, and that may have been when this handwritten

14        document was produced.  As you can see, the

15        allowances there are shown as 8.67 percent.

16   Q    And you're referring to Exhibit 121?

17   A    Yes.

18   Q    On Exhibit 121 the allowances are customer

19        advertising, markdowns and --

20   A    Defective product.

21   Q    Thank you.

22             And then moving down in Exhibit 122, there's

23        an entry for royalty rate.  Do you see that as

24        .035?

25   A    Yes.

| | | |
|---|---|---|
| 1 | Q | Do you know where that figure came from? |
| 2 | A | That came from the original discussion that was |
| 3 | | taking place on the Gaiman/McFarlane royalty |
| 4 | | arrangements with respect to these particular |
| 5 | | figures. |
| 6 | Q | I'm sorry.  I missed the first part.  Did you |
| 7 | | say there was a document or was it just -- did |
| 8 | | somebody tell you about the .035 figure or was |
| 9 | | that something you pulled off of a document? |
| 10 | A | It came from the draft agreement. |
| 11 | Q | That's the draft agreement you were referring to |
| 12 | | earlier? |
| 13 | A | Yes. |
| 14 | Q | And then finally on this document on the last |
| 15 | | line, it indicates royalty due and it says |
| 16 | | $158,690.62, correct? |
| 17 | A | Yes. |
| 18 | Q | And this again is a calculation that Pat Carron |
| 19 | | did for you? |
| 20 | A | Yes. |
| 21 | Q | Actually I have one last question.  There's |
| 22 | | some handwriting just to the right of the |
| 23 | | royalty due amount.  Do you see that there's |
| 24 | | some handwriting? |
| 25 | A | Uh-huh. |

1   Q    Do you know whose handwriting that is?

2   A    No, I do not.

3   Q    Any idea what -- it looks like discounted revenue

4        royalty.  Is that what it looks like to you?

5   A    That's what it looks like.

6   Q    Does that term mean anything to you?

7   A    No, it doesn't.

8          MR. SIMMONS:  This is another new exhibit

9        here.  This will be Exhibit 123.

10       Scott, that's TM 486.

11       (Deposition Exhibit Number 123 was marked

12       for identification by the Court Reporter.)

13   Q    (BY MR. SIMMONS)  Do you recognize Exhibit 123,

14        Mr. Inglis?

15   A    Yes, I do.

16   Q    Can you tell me what that is?

17   A    This document, as you can see from the date and

18        time, was prepared very shortly after the previous

19        document, Exhibit 122.  It simply refines the

20        numbers in Exhibit 122.  It provides some more

21        detail on the deductions from the net wholesale

22        cost and some minor revisions to the sales

23        numbers.

24   Q    Is this a document that you created?

25   A    No.

1    Q    Is this something that Pat Carron created?

2    A    Yes.

3    Q    And then he would have provided it to you?

4    A    Yes.

5    Q    Do you recall having discussions with Mr. Carron

6         in between the time he presented you with

7         Exhibit 122 and the time he presented you with

8         Exhibit 123?

9    A    I don't recall the specific discussion, but it

10        was -- this was done with a considerable amount

11        of urgency.  So I conclude that between 3:56 p.m.

12        and 7:09 p.m. on that day Mr. Carron went back

13        and just reviewed his calculations and made some

14        minor revisions.

15   Q    It looks like -- I'm just going to go through

16        what appear to be some of the differences here.

17        First of all, in Exhibit 123 the amount of total

18        revenue is lower than the amount of total revenue

19        in Exhibit 122, is that correct?

20   A    Yes.

21   Q    Do you know why that would be?

22   A    Again simply because, as you'll see, the units

23        sold regular are the same in both reports and

24        the units sold discounted are less in the second

25        report just in reviewing the numbers.  Pat Carron

```
1        made some minor revisions to the quantities which
2        resulted in a minor revision to the total revenue
3        number.
4   Q    And overall it's a reduction -- a net reduction in
5        total sales, correct?
6   A    Yes.
7   Q    And all of your sales records were maintained on
8        computer, correct?
9   A    Yes.
10  Q    Why would it be that the sales numbers would
11       change?
12  A    These summaries came from very detailed sales
13       records and Patrick may have overlooked or
14       otherwise miscalculated one of the numbers that
15       he took from the detailed sales records.
16  Q    And then moving down on Exhibit 123 where we have
17       some of the costs broken out, I note that the
18       freight percentage is lower in Exhibit 123 than
19       it was in Exhibit 122.  Is that correct?
20  A    Uh-huh.
21  Q    Why would that be?
22  A    I can't explain it at this distance.
23  Q    Sure.
24            Do you recall having any discussions with
25       Mr. Carron about making changes to the costs?
```

```
 1   A   I can't recall, but I'm sure I did.  If you refer

 2       to the handwritten -- my handwritten document,

 3       you'll see that the freight percentage that is in

 4       my handwritten document is 2.54 percent in this

 5       schedule.

 6   Q   And then again moving down to the bottom, the

 7       royalty due under the calculation in Exhibit 123

 8       is a hundred and fifty thousand dollars and some

 9       change, correct?

10   A   Uh-huh.

11   Q   And again on both of these documents, Exhibit 122

12       and 123, where the entry says royalty due, is

13       it your understanding that that was the royalty

14       you believe to be due to Mr. Gaiman under this

15       calculation?

16   A   Yes, based on my understanding of the draft

17       agreement that I was given.

18           MR. SIMMONS:  Mark this as Exhibit 124.

19           (Deposition Exhibit Number 124 was marked

20           for identification by the Court Reporter.)

21           THE WITNESS:  Okay.

22   Q   (BY MR. SIMMONS)  Do you recognize Exhibit 124?

23   A   Yes.  I can't deny the authorship of it.

24   Q   This is a memo authored by you, is that correct?

25   A   Yes.
```

```
 1   Q    In the first sentence of the memo you say this is
 2        your calculation of the royalty payable to Neil
 3        Gaiman and then it moves on to say "based on our
 4        interpretation of the draft agreement," correct?
 5   A    Yes.
 6   Q    And by "draft agreement" you mean that written
 7        agreement that you had initially looked at?
 8   A    Yes.
 9   Q    And you say the total royalty is $155,531?
10   A    Uh-huh.
11   Q    Do you recall Mr. McFarlane contacting you after
12        receiving this letter?
13   A    Yes.  I'm sure he did.
14   Q    Do you recall what Mr. McFarlane said?
15   A    It would be typical of discussions that Todd and
16        I had on all such agreements, license agreements
17        or any other royalty agreements.  He would have
18        had me explain the calculations that I did
19        in arriving at the total royalty and my memo
20        explained some of my interpretations of the key
21        terms in the agreement.  That would be the gist
22        of the discussions that Todd and I would have
23        had about this calculation.  As you can see, the
24        total royalty number agrees with the previous
25        schedule you gave me.
```

1    Q    Do you recall anything specific about your

2         conversation with Mr. McFarlane?

3    A    Yes.  It might not have taken place right at that

4         moment, but there was a follow-up discussion which

5         I referred to earlier in which he said "You have

6         interpreted this agreement in terms of the typical

7         toy license agreement with which you're familiar.

8         This is not a toy license agreement because we're

9         not talking about exclusive owner and licenser and

10        licensee.  We're talking about writer/creator

11        collaboration with the publisher."

12             He then went on to explain the differences

13        between the two where, and I said this earlier,

14        in the second kind of agreement regarding the

15        writer/creator/publisher collaboration, there's a

16        sharing of the royalty revenue.  He then asked me

17        to -- he then referred me to correspondence that

18        had taken place between him and Neil Gaiman on the

19        subject.

20   Q    Turning to page 2 of Exhibit 124, the first

21        sentence says "Because of the time constraint,

22        we have used a percentage in calculating the

23        deductions from gross sales to arrive at sales

24        subject to the royalty."  Can you just explain

25        to me what that is referring to?

1    A    That refers to these items that are shown on the

2         first page such as allowances, freight, duty,

3         taxes, insurance, shipping and marketing.  We

4         used percentages that -- as I said, it's based on

5         historical fact and are supportable.  In other

6         words, we didn't take all of the sales, you know,

7         for all of the customers and identify that that

8         particular customer was paid X percent for

9         advertising and another customer was paid X plus

10        or minus percent for advertising.  We used an

11        overall percentage based on historical fact.

12   Q    So was it an average number?

13   A    Yes, because of the time constraint.

14   Q    I'll show you what's been previously marked as

15        Exhibit 78.

16             MR. SIMMONS:  Scott, that's TM 466.

17   Q    (BY MR. SIMMONS)  Do you recognize Exhibit 78?

18   A    Yes, I do.  It's clearly a worksheet that would

19        have been prepared during these discussions.

20   Q    Is this something prepared by you?

21   A    It would have been prepared by Patrick Carron.

22        The handwritten words and numbers are mine.

23   Q    Looking at some of the handwritten entries, going

24        about three-quarters of the way down, do you see

25        where it says royalty rate?

```
 1   A   Yes.
 2   Q   And then it looks like you handwritten in
 3       publisher, Todd McFarlane, is that right?
 4   A   Uh-huh.
 5   Q   And then you crossed a number out and put in
 6       5 percent?
 7   A   Uh-huh.
 8   Q   Can you tell me why that change was made?
 9   A   That was the royalty that was payable to Todd
10       McFarlane under that agreement that I referred to
11       between Todd McFarlane and TMP International,
12       Inc., on toy sales.
13   Q   It looks like you just take that percentage and
14       multiply that by the net revenue that would have
15       been earned on toys --
16   A   Yes.
17   Q   -- and you come up with a publisher's royalty of
18       approximately $222,000, is that correct?
19   A   Uh-huh.
20   Q   Now in making that calculation, did you do it just
21       as I described?  You simply took 5 percent and
22       multiplied it by the net revenue?
23   A   Yes.
24   Q   You didn't look to any records to see what the
25       actual royalty payments from TMP International to
```

```
 1        Todd McFarlane Productions were, correct?
 2   A    No, but I would have known from the royalty
 3        agreement with Todd that the royalty was
 4        5 percent.
 5   Q    I think you actually may have testified earlier
 6        that during this time period there weren't
 7        even any royalty payments being made from TMP
 8        International to Todd McFarlane Productions
 9        despite the existence of the agreement, correct?
10   A    Yes.
11   Q    And then finally the last line says
12        co-creator's --
13   A    Fee.
14   Q    Is that it?
15   A    Yeah.
16   Q    That has 7.5 percent which I think is higher than
17        the 3.5 that had been listed in the previous
18        documents we looked at.  Do you recall why that
19        number was now 7.5 percent?
20   A    The original document before I made these changes
21        reflected a royalty rate of 3.5 percent of total
22        sales.  That was based on my interpretation of
23        that draft license agreement, 3.5 percent being
24        the rate payable to the creator.
25             Subsequent to that calculation, Todd
```

```
 1          McFarlane, and I explained this earlier, explained
 2          to me how this arrangement was between the
 3          co-creator or the writer/creator and the
 4          publisher.  So I said, "What does that mean in
 5          terms of the numbers?"  He said, "The sales
 6          numbers don't change."  The royalty rate to the
 7          publisher, i.e., Todd McFarlane, is 5 percent
 8          based on Todd McFarlane's agreement with TMP
 9          International, Inc., giving the publisher's
10          royalty number that you see there.  The co-creator
11          fee of seven-and-a-half percent came out of the
12          discussions that he explained to me were taking
13          place between him and Neil Gaiman on the fees that
14          would be paid to the co-creator as it says right
15          here.
16     Q    Regarding this document, Exhibit 78, do you recall
17          sending this off to Todd McFarlane?
18     A    I don't specifically recall, but I'm sure I -- if
19          this came out of the files in Phoenix or Tempe, I
20          would have sent it to him.
21     Q    Do you recall having any sort of communication
22          with Mr. McFarlane where you said "I've
23          recalculated the royalty and it's now
24          approximately $16,000"?
25     A    Yes.
```

```
 1   Q      Do you recall what Mr. McFarlane's reaction was to

 2          that?

 3   A      No, I don't.

 4              MR. SIMMONS:  This is a new exhibit.

 5              (Deposition Exhibit Number 125 was marked

 6              for identification by the Court Reporter.)

 7              MR. SIMMONS:  Scott, this is TM 493 through

 8          495.

 9   Q      (BY MR. SIMMONS)  Do you recognize Exhibit 125?

10   A      Yes, I do.

11   Q      Can you tell me what that is?

12   A      As the memo says, I received correspondence

13          that had taken place between Neil Gaiman and

14          Todd McFarlane dated May 5th and July 15th.  I

15          interpreted Neil Gaiman's July 15th note to

16          say that he's entitled to 15 percent of Todd

17          McFarlane's royalty, i.e., the publisher's royalty

18          for Angela which was one of the properties at

19          issue.  Neil Gaiman agreed that he gets 50 percent

20          of 15 percent, i.e., seven-and-a-half percent,

21          for Medieval Spawn.  That's how the amount owing

22          to Gaiman is calculated in the attached schedules.

23          These percentages, as I said, came out of

24          correspondence that had taken place between Neil

25          and Todd which I had just seen for the first
```

1    time, you know, on July 30th.

2  Q    The correspondence between them?

3  A    Yes.

4  Q    I'll just note that Exhibit 125 looks like it was

5       created the day after the document I just showed

6       you previously, Exhibit 78.

7  A    Uh-huh.

8  Q    The royalty figure is now higher, correct?  It's

9       24,800 in Exhibit 125, correct?

10 A    Yes.

11 Q    And that's a result of adjusting the royalty

12       percentages for each character, is that accurate?

13 A    That's right.

14 Q    Do you recall having any conversations with

15       Mr. McFarlane after you sent him this document?

16 A    I don't recall a specific conversation, but again

17       going back to the process that I explained

18       earlier, he would have had me explain all of

19       the numbers and the various percentages used.

20       He wanted to know specifically whether the

21       publisher's royalty rate and the writer/creator

22       royalty rate reflected these discussions that he

23       had been having with Neil Gaiman.

24 Q    You don't recall him coming back and asking you

25       to make any further changes to the royalty

```
 1        calculation at that point?
 2   A    No, I do not.
 3             MR. SIMMONS:  This is another new document.
 4        This will be Exhibit 126.
 5             (Deposition Exhibit Number 126 was marked
 6             for identification by the Court Reporter.)
 7   Q    (BY MR. SIMMONS)  Do you recognize Exhibit 126?
 8   A    Yes, I do.
 9   Q    Is this a document you created?
10   A    It's a document that Patrick Carron created and I
11        reviewed.  I made the handwritten changes that you
12        see there.
13   Q    I note in comparing this to Exhibit 125 that it
14        looks like there are two other differences to
15        me.  First, looking at Exhibit 126, you have
16        the publisher's royalty rate.  It's now listed as
17        8 percent.  It previously had been listed as
18        5 percent.
19   A    Uh-huh.
20   Q    Do you know why the publisher's royalty rate was
21        now listed as 8 percent?
22   A    In the typical negotiation process that
23        takes place between a licenser/licensee or
24        publisher/creator, there can be many iterations
25        on the calculations that I would do based on
```

1    the discussions that had been taking place between

2    Todd and whoever the other party was.  Typical

3    of the discussions between Todd and myself would

4    be where he would say "What if we set different

5    rates?  How do the numbers come out?"  That would

6    be how this document originated.  He might say

7    "What if the publisher's rate is now 8 percent and

8    the creator royalty rates are unchanged from the

9    previous discussions, 3.75 percent on Medieval

10   Spawn and 7.5 percent on Angela?"  There may have

11   been other documents similar to this that my

12   department would have produced.

13   Q    My understanding, correct me if I'm wrong, is that

14        the publisher's royalty rate refers to the royalty

15        percentage between TMP International and Todd

16        McFarlane Productions, correct?

17   A    Yes.

18   Q    With regard to this 8 percent figure in Exhibit

19        126, was that a royalty percentage that TMP

20        International at least theoretically was paying

21        to Todd McFarlane Productions?

22   A    What do you mean by "theoretically"?

23   Q    Well, my understanding is the payments weren't

24        made during this time period, but there was an

25        agreement to pay royalties.  So was there some

```
 1        sort of agreement to pay the royalty at a

 2        8 percent rate?

 3   A    No.

 4   Q    So why then is the 8 percent figure here?

 5   A    It was just a what if in the discussions that

 6        would take place between Todd and myself.

 7   Q    Why would you have a what if discussion about

 8        the royalty percentage between Todd McFarlane

 9        Productions and TMP International?

10   A    Because the royalty rate that is payable to the

11        creator, as I mentioned in the typical toy license

12        agreement, could vary from property to property.

13        So he might have said to me "What if I say the

14        royalty rate is 8 percent?"

15   Q    Do you recall Todd saying that to you or made some

16        suggestion to that effect?

17   A    No, but he probably did.  I mean I wouldn't have

18        just taken, you know, a number of 8 percent except

19        from a discussion I would have had with him.

20   Q    And then moving down in Exhibit 126, I note that

21        the creator royalty rates are now 3.75 percent and

22        7.5 percent as opposed to 7.5 and 15 percent in

23        Exhibit 125.

24   A    Uh-huh.

25   Q    Do you know why that change was made?
```

```
 1   A    No, I don't.

 2   Q    Any recollection of Mr. McFarlane saying that you

 3        need to cut those amounts in half?

 4   A    No.

 5   Q    But any changes you would have made to this

 6        document would have been made at Mr. McFarlane's

 7        suggestion?

 8   A    Yes.

 9   Q    I just note that the total royalty now appears to

10        be $19,840, correct?

11   A    Yes.

12   Q    That's again the royalty that you believe was

13        payable to Mr. Gaiman under the agreement?

14   A    As compared to $24,800.

15             MR. SIMMONS:  This will be Exhibit 127.

16             Scott, this is TM 496.

17             (Deposition Exhibit Number 127 was marked

18             for identification by the Court Reporter.)

19   Q    (BY MR. SIMMONS)  Do you recognize Exhibit 127?

20   A    Yes, I do.

21   Q    And again this appears to be another iteration of

22        these royalty calculations that you would be

23        performing, correct?

24   A    Yes.

25   Q    Is this a document that you would have created or
```

```
 1         Pat Carron?
 2    A    Pat Carron would have created it.  As you can see,
 3         he created it seven minutes after the previous
 4         document which was typical of the time that Todd
 5         gave me to --
 6    Q    To turn things around?
 7    A    Yes.
 8    Q    Just looking at some of the differences between
 9         Exhibit 127 and Exhibit 126, looking at the sales
10         allowance column, the percentage on Exhibit 127
11         for sales allowances is 12 percent whereas
12         on Exhibit 126 and I think all the previous
13         calculations that we've seen the sales allowances
14         were 8 percent, is that correct?
15    A    Uh-huh.
16    Q    Why would the sales allowances suddenly jump
17         4 percent?
18    A    Again it was just a what if for discussion
19         purposes in this context.
20    Q    But the sales allowances --
21    A    It wouldn't be based on any specific facts from
22         the sales records.  It would just be what if the
23         sales allowances were set at 12 percent as opposed
24         to 8 percent.
25    Q    And that would have been a suggestion
```

| | | |
|---|---|---|
| 1 | | Mr. McFarlane made to you? |
| 2 | A | Yes. |
| 3 | Q | Do you remember Mr. McFarlane making that |
| 4 | | suggestion in this instance? |
| 5 | A | No, I don't. |
| 6 | Q | And then I note on Exhibit 127 looking at the |
| 7 | | publisher's royalty rate, that's now gone back |
| 8 | | down to 5 percent, correct? |
| 9 | A | Yes. |
| 10 | Q | And the writer/creator royalty rate has now jumped |
| 11 | | back up to 7.5 and 15 percent, correct? |
| 12 | A | Yes.  That's reflecting the handwritten |
| 13 | | discussions between Neil and Todd. |
| 14 | Q | Now the total figure is 20,000 -- I can't read |
| 15 | | the rest of it, but approximately 20,000. |
| 16 | A | 20,825, yeah. |
| 17 | Q | So in your discussions with Mr. McFarlane, was |
| 18 | | there an effort to have the final royalty payment |
| 19 | | payable to Mr. Gaiman close to some specific |
| 20 | | amount?  You had been talking recently about |
| 21 | | how you and Mr. McFarlane had sort of what if |
| 22 | | discussions.  For example, if you change this |
| 23 | | percentage, what happens or if you change that |
| 24 | | percentage, what happens.  Do you recall whether |
| 25 | | there was some sort of target you were trying |

```
1            to meet saying the ultimate royalty should be

2            approximately $20,000 or some other figure?

3    A       The discussion would have been based on what

4            Mr. McFarlane had in mind in terms of what he

5            would have called a fair and reasonable royalty.

6            These discussions took place for all agreements,

7            not just this particular agreement.

8    Q       When you say --

9    A       There wasn't a specific target set.

10   Q       When you say "royalty," do you mean a royalty

11           percentage or do you mean a total payment or an

12           actual dollar amount?

13   A       It could be both because the percentage is

14           incorporated in the rate in the profit margin

15           calculations.  So it has to be reasonable and

16           attainable in terms of percentages and the

17           dollars, of course, are significant as well in

18           terms of again what the company or what Todd

19           McFarlane regarded as fair and reasonable.

20   Q       Do you remember in this particular instance or

21           at any point during your calculation of these

22           royalties Mr. McFarlane saying "Here's what I

23           think the fair royalty should be to Mr. Gaiman"?

24   A       Not specifically, no.

25   Q       What do you recall?
```

```
 1  A    He gave me the handwritten notes that he

 2       exchanged with Neil Gaiman and said "Run the

 3       numbers based on what Neil and I are discussing

 4       and then how do the numbers come out when you

 5       make some changes to the factors that we've

 6       discussed."

 7  Q    I'll show you what's been previously marked as

 8       Exhibit 22.

 9            MR. SIMMONS:  Scott, that's TM 508.

10  Q    (BY MR. SIMMONS)  Do you recognize Exhibit 22?

11  A    Yes.

12  Q    This looks to be a fax that you sent to Terry

13       Fitzgerald on August 4th, '97.

14  A    Uh-huh.

15  Q    This would have been a few days after all of

16       the computations that we had been looking at

17       previously, correct?

18  A    Yes.

19  Q    Had you had any previous discussions or

20       communications with Terry Fitzgerald about the

21       calculation of the royalty?

22  A    Not to my recollection, no.

23  Q    Do you recall why you were sending this fax to

24       Mr. Fitzgerald?

25  A    At that time Terry was responsible for all
```

1  license negotiations and he also was an assistant,

2  if you will, to Todd in terms of, you know,

3  these kinds of discussions.  So although I don't

4  recall specifically my discussion with Terry, I

5  would think that he would have -- Todd would

6  have involved him now in the Gaiman/McFarlane

7  discussions and asked Terry to take a look at

8  what I had done.  Terry then -- it says, "As per

9  your request."  Terry would then have asked me

10  to do some of these what if calculations.

11  Q  Looking at the last sentence -- the last two

12  sentences I guess of the last bullet point of

13  this fax, you write "The other two schedules are

14  calculations to make the bottom line come out."

15  You have come out in quotes.  Then you write "I

16  do not like them."  What do you mean that the

17  schedules were made to make the bottom line,

18  quote, come out?

19  A  I had made my calculations based on the

20  McFarlane/Gaiman handwritten notes which gave

21  rise to a royalty of 24,800 and then based on

22  some what ifs reflecting changes to allowances

23  and publisher's royalty rates and expenses, I

24  did the calculations to see whether the revised

25  calculations came out similar to or comparable

```
 1              with, if you will, the royalty rate affecting the
 2              Gaiman/McFarlane discussions.  I didn't mean the
 3              bottom line would come out to some target that
 4              was set.  It would just come out to -- it would
 5              be comparable with the rates that had been
 6              discussed between Neil and Todd.
 7   Q          I guess I don't understand that.  You've got
 8              written documents or Todd has got a combination
 9              of written documents and Todd McFarlane was
10              explaining to you what the royalty percentages
11              are supposed to be, correct?
12   A          Uh-huh.
13   Q          Royalty is based on the sales of toys and revenue
14              earned from the sales of toys, correct?
15   A          Yes.
16   Q          So it would seem to me that making the
17              calculations should be fairly a straightforward
18              application of taking the total revenue and
19              multiplying it by the percentages that
20              Mr. McFarlane is giving you, correct?
21   A          Yes, and that's what the first schedule reflected.
22              It came out to a royalty of $24,800.
23   Q          So what would there be to make it come out?  What
24              would need to be adjusted to make something come
25              out?
```

```
 1   A    Todd would have said, "This schedule reflects

 2        what Neil and I have discussed, but we're

 3        still discussing this whole situation.  If I

 4        were to -- again this takes place with all

 5        licensers.  He would have said "What if I were

 6        to negotiate a different set of parameters?

 7        Would the numbers come out to something similar

 8        to what Neil and I are moving towards agreeing

 9        on more or less?"  As you see from the subsequent

10        schedules, the bottom line, i.e., the royalty,

11        comes out to a similar royalty based on these

12        different parameters, $19,800 and $20,825.

13   Q    So then was Mr. McFarlane telling you that the

14        royalty -- when you say "come out," it should

15        come out to be roughly a specific final dollar

16        amount?

17   A    No.

18   Q    So he was telling you it should come out to some

19        specific percentages?

20   A    He was saying "These are the percentages that

21        Neil and I have discussed that are in Neil's

22        notes.  If in the discussions some of these

23        other factors change for whatever reason or if

24        we were to change them -- I mean nothing is cast

25        in stone in negotiations between, you know, the
```

```
 1        two parties -- how do the numbers come out?"
 2    Q   Then you go on to write "I do not like them."  Why
 3        didn't you like them?
 4    A   Because they didn't reflect the percentages that
 5        Neil and Todd had agreed to.  I'm an accountant.
 6        I've got a document that says "Here's the sharing
 7        of royalties, seven-and-a-half percent on one
 8        property and 15 percent on the other," and this
 9        was agreed upon.  I don't like changing these
10        percentages without, you know, there being
11        another document that says "Here are the new
12        percentages."
13    Q   So your understanding was -- you had an
14        understanding of what the percentages were based
15        on your reading of these documents?
16    A   Yes.
17    Q   Todd was telling you to apply different
18        percentages and you didn't like that, is that
19        a fair characterization?
20    A   Yeah.  I don't like, you know, the percentages
21        because they don't reflect the discussions that
22        have taken place so far.  It's not that I didn't
23        like the numbers.  I didn't like changing the
24        percentages.
25    Q   Do you recall the ways in which the numbers
```

```
1        you were making come out here did not reflect

2        your understanding of the agreements you had

3        looked at?

4   A    Well, changing the royalty rate -- the royalty

5        rate was 5 percent.  I didn't like changing it to

6        8 percent.  The sales allowances were 8 percent.

7        I didn't like changing it to 12 percent.  Changing

8        the creator royalty rates from 3.75 and 7.5

9        to 7.5 and 15 again didn't reflect what had

10       been discussed.  An accountant doesn't like to

11       change something that isn't documented.

12  Q    Do you recall Terry Fitzgerald or Todd McFarlane

13       ever contacting you after you sent -- contacting

14       you about the royalty calculation after you sent

15       this fax to Terry Fitzgerald?

16  A    To my recollection, this was the last of the

17       discussions that had begun on -- was it the 29th

18       of July?

19  Q    The 29th or 28th, yes.

20  A    Yes.  It ended with this fax to Terry on the 4th

21       of August.

22  Q    Regarding the schedules that are referred to in

23       your fax, I wasn't able to figure out in looking

24       at the documents whether those schedules were

25       produced to us.  I don't know if you are able
```

```
 1              to tell whether any of the schedules I had you

 2              looking at this afternoon are the schedules that

 3              would have been attached to this fax.

 4    A         I'm almost certain that the first schedule that

 5              I referred to is the schedule that shows a

 6              royalty payable of $24,800 because the first

 7              schedule is a calculation which I believe

 8              reflects the agreement between Todd and Gaiman,

 9              as Todd explained it to me.  The other two

10              schedules that I referred to in my fax cover

11              sheet I believe are the last two schedules that

12              were discussed --

13    Q         And those would have been --

14    A         -- which come out to a royalty of 20,825 and

15              19,840.  We marked them as exhibits.  Exhibits 126

16              and 127 are the other two schedules.

17                   MR. SIMMONS:  Here's another new document.

18              This will be 128.

19                   (Deposition Exhibit Number 128 was marked

20                   for identification by the Court Reporter.)

21    Q         (BY MR. SIMMONS)  Do you recognize Exhibit 128?

22    A         Yes, I do.

23    Q         This appears to be a memo that you sent to Wanda

24              Kolomyjec.

25    A         Kolomyjec.
```

1  Q    Kolomyjec.  Thank you.

2        Is Ms. Kolomyjec Todd McFarlane's wife?

3  A    Yes, she is.

4  Q    Do you remember what prompted you to send this

5       memo to Wanda?

6  A    From the first sentence, it says "We have no

7       record of any royalty payments to Neil Gaiman."

8       I conclude that I received a phone call from Wanda

9       saying "Have we made any royalty payments to

10      Neil Gaiman based on all of these discussions,

11      if you recall, that took place back in 1997?"

12 Q    Do you recall any of the specifics of the phone

13      conversation with Ms. Kolomyjec?

14 A    No, I don't.

15 Q    Do you have any independent recollection of

16      anything surrounding this communication other

17      than what's actually contained in Exhibit 128

18      itself?

19 A    Everything that I can recall is in the memo.

20 Q    Did anybody contact you from Todd McFarlane

21      Productions or anybody associated with Todd

22      McFarlane contact you again about the royalty

23      payments to Neil Gaiman after you received

24      Exhibit 128?

25 A    Not to my recollection, no.

```
 1  Q    Did there come a time when you -- did you ever
 2       understand that Todd McFarlane had decided to
 3       rescind or no longer follow his royalty agreement
 4       with Mr. Gaiman?
 5            MR. SALSICH:  I'm going to object to the
 6       extent it assumes facts not in evidence and it
 7       assumes that there was a royalty agreement with
 8       Todd McFarlane, but you can answer the question.
 9  Q    (BY MR. SIMMONS)  Did you understand the question?
10  A    Can you repeat it, please?
11  Q    Sure.
12            I want to know if you ever heard from anyone
13       that there was a point in which Todd McFarlane had
14       decided to rescind or no longer continue making
15       royalty payments to Mr. Gaiman for action figures
16       or any other items.
17  A    No, I did not.  As I say in the second to the last
18       sentence to this memo, I was given no information
19       on the final agreement or instructions to make
20       any payment.
21  Q    So Exhibit 128 is the last communication you can
22       remember with anybody about royalty payments to
23       Mr. Gaiman?
24  A    Yes, it is.
25  Q    We're almost done here, by the way, at least on
```

1    my end.  He may have some questions for you.

2         I'll show you what's been previously marked

3    as Exhibit 2.  Do you recognize Exhibit 2,

4    Mr. Inglis?

5  A  Yes, I do.

6  Q  You talked earlier about having reviewed some

7    correspondence between Mr. McFarlane and

8    Mr. Gaiman when you were attempting to calculate

9    the royalties.

10 A  Yes.

11 Q  Is Exhibit 2 one of those documents?

12 A  Yes, it was.

13 Q  So the percentages in Exhibit 2 are some of

14   the percentages you were using in making your

15   calculations, is that fair?

16 A  There are a number of percentages as you can see.

17   The relevant percentage is under merchandising

18   and promotional licensing which says 15 percent

19   of publisher's net receipts.

20 Q  It was your understanding that 15 percent is the

21   royalty Mr. Gaiman was entitled to for the action

22   figures that TMP International was producing?

23 A  According to this memo.  There were these

24   subsequent -- there were at least handwritten

25   memos that accompanied this or came later.

```
 1   Q    I'll show you what's previously been marked as

 2        Exhibit 19.

 3   A    Okay.

 4   Q    Do you recognize Exhibit 19?

 5   A    Yes, I do.

 6   Q    And Exhibit --

 7   A    As you can see, it was sent to me by Sheila Egger.

 8   Q    The Alan (sic) referred to at the top of the fax

 9        is you?

10   A    Yes.  It's misspelled.

11   Q    So Exhibit 19 is another document you referred

12        to in order to develop your understanding of

13        what the agreement was between Mr. Gaiman and

14        Mr. McFarlane?

15   A    Yes, except this document was really outside the

16        scope of the financial analysis that I did in

17        that it refers to other matters besides what Neil

18        may or may not have been entitled to in terms

19        of royalty.  It says "You'll be using the figures

20        we put together based on the DC deal and that my

21        rights to Cogliostro and Medieval Spawn will be

22        exchanged for your share of Miracleman" and so

23        on.  These were obviously discussions between

24        Neil and Todd during the discussions that

25        involved my financial analysis, but I would not
```

```
 1         have been involved in any of these discussions.
 2     Q   So Sheila -- I'm looking at Exhibit 2 and
 3         Exhibit 19 and I'm just noting the fax time on
 4         the top.  It appears to be all part of the same
 5         fax.
 6     A   Yes.
 7     Q   Do you recall Todd McFarlane, Sheila Egger or
 8         anybody else associated with them saying "We're
 9         going to fax you the documents that represent
10         the agreement.  You should use these in making
11         your royalty calculations" or something to that
12         effect?
13     A   Sheila would have called me and said "I'm sending
14         documents that are reflecting discussions that
15         have taken place between Neil and Todd.  Look
16         at them and make sure that, you know, what you're
17         doing is consistent with these documents."  I
18         see there were four pages that went with this
19         fax.  So this memo and -- in fact, the previous
20         memo says page 3 and page 4.  So I would have got
21         both of these memos at the same time.  In fact,
22         the date and time are consistent.
23     Q   I'll show you what's been previously marked as
24         Exhibit 20.  Again regarding Exhibit 20, I'm
25         just wondering if this is a document you've ever
```

1      seen before.

2  A   Yes, it is.

3  Q   Was this a document that Mr. McFarlane or

4      somebody associated with him sent to you at the

5      time you were calculating the royalties for

6      Mr. Gaiman?

7  A   Yes.

8  Q   So did you sort of consider all three of the

9      exhibits I have just shown you, 2, 19 and 20?

10     Did you kind of look at those as a package

11     representing an agreement between the parties?

12 A   Yes, except, as I said, Exhibit 19 was not of

13     particular significance to me in doing the

14     calculation.  Obviously the previous exhibit was

15     relevant and the quotes of royalty percentage.

16         MR. SALSICH:  I would just like to interpose

17     an objection here.  Again it assumes facts not in

18     evidence that there was an agreement between the

19     parties, but obviously subject to that objection,

20     your answer can stand.

21         Give me a chance, I'm reacting slowly, to get

22     my objection out.  Thanks.

23         MR. SIMMONS:  He had to wake up early to

24     catch a flight.  So you got to cut him some

25     slack.

1    Q    (BY MR. SIMMONS)   I think this is my last exhibit.

2         I wasn't anticipating using it so I don't have

3         copies, but we'll make copies afterwards.   This

4         has previously been marked as Exhibit 18.

5              MR. SALSICH:   I have a copy of that.

6              MR. SIMMONS:   Oh, you do?

7              MR. SALSICH:   Yeah.

8    Q    (BY MR. SIMMONS)   You can take a look at my

9         copy.

10   A    Okay.

11   Q    Previously you testified when you first started

12        making the royalty calculations that you based

13        them on some draft agreement that had been

14        provided to you.   I'm wondering if Exhibit 18 or

15        some variation of Exhibit 18, because I note that

16        Exhibit 18 has handwriting on it and some other

17        notes, but the typewritten contract portion of

18        Exhibit 18, I'm wondering if you recognize that

19        to be the draft agreement you were referring to

20        earlier.

21   A    Yes.   That was the draft agreement.

22             MR. SIMMONS:   Let me just take a minute to

23        look at my notes and then I may be done.

24             We can go off the record.

25             (Off the record.)

1  Q   (BY MR. SIMMONS)  I think I've got one more

2        question regarding the action figures, Mr. Inglis,

3        that we've been referring to when you were making

4        your calculations.  There was the Angela action

5        figures, the Medieval Spawn action figures and

6        I think there may or may not have been some

7        Cogliostro action figures in there.  I'm just

8        wondering -- you worked with TMP International

9        till 2001.

10  A   Uh-huh.

11  Q   I'm wondering if you recall roughly how long TMP

12        International continued to manufacture the Angela

13        action figure.

14  A   I don't recall.

15  Q   Do you recall whether they stopped manufacturing

16        it shortly after you made these royalty

17        calculations in 1997 or do you think it went on

18        for a couple more years after that?  I'm curious

19        whether roughly you have any idea how long they

20        continued making those figures.

21  A   I think the Angela action figure ended in terms

22        of retail production pretty soon after -- either

23        at this time or pretty soon after that because I

24        don't recall seeing a lot of Angela sales, you

25        know, subsequent to this period.

```
 1              MR. SIMMONS:  That's it on my end.

 2              MR. SALSICH:  Scott?

 3

 4                         EXAMINATION

 5    BY MR. FELDMANN:

 6    Q     This is Scott Feldmann.  I represent Image

 7          Comics.

 8                Can you hear me?

 9    A     Yes.

10    Q     I just have a few questions for you, sir.

11                Have you ever had any direct discussions with

12          Neil Gaiman before?

13    A     No, I have not.

14    Q     Have you ever met him?

15    A     No, I have not.

16    Q     So in terms of your understanding as to the

17          relationship between Mr. McFarlane or any of his

18          various entities and Mr. Gaiman, that information

19          would be based solely on what Mr. McFarlane told

20          you or the correspondence that you saw that you

21          testified about earlier, is that right?

22    A     That is correct.

23    Q     There are no other written documents other than

24          that correspondence that Mr. McFarlane showed you

25          that would form the basis for your understanding
```

1      of that relationship?

2  A    No, there are not to my knowledge.

3  Q    Now, you used a couple of phrases here that I

4      wrote down and you can correct me if I'm wrong.

5      In terms of Mr. McFarlane's characterization

6      of the relationship with Mr. Gaiman here, you

7      said they were moving towards an agreement in

8      discussions that he had with him.  I take it

9      that as far as you're concerned the person who

10     would know best as to that relationship would be

11     Mr. McFarlane and Mr. Gaiman, is that right?

12  A   Yes.

13  Q   Did anybody else other than Mr. McFarlane at any

14     time and other than counsel have discussions with

15     you about the legal relationship that may or may

16     not exist between Mr. Gaiman and Mr. McFarlane or

17     his company?

18       MR. SALSICH:  Let me just put an objection

19     in here, Scott, simply to the extent that that

20     calls for information that would be protected by

21     the attorney/client privilege.  I'd object to

22     that and instruct you not to answer.

23       All I mean by that, Mr. Inglis, is that I

24     understand Mr. Feldmann's question not to be

25     asking you for any discussions you had with

1    lawyers about any topics he was mentioning but

2    just with any third party.

3         Is that correct, Scott?

4         MR. FELDMANN:  I approached it that way.

5    Q    (BY MR. FELDMANN)  I do not want to know anything

6    about any discussions you had with lawyers either

7    directly or indirectly through intermediaries.

8         MR. SIMMONS:  Can we just have the question

9    reread for my benefit?

10        MR. FELDMANN:  Would you please read it

11   back?

12        MR. SIMMONS:  Can you read it back?

13        (The record was read back by the Court

14   Reporter as follows:

15        "Q    Did anybody else other than

16             Mr. McFarlane at any time and other

17             than counsel have discussions with you

18             about the legal relationship that may

19             or may not exist between Mr. Gaiman

20             and Mr. McFarlane or his company?")

21        THE WITNESS:  Can I just have an explanation

22   as to -- what do you mean by a legal relationship?

23   Q    (BY MR. FELDMANN)  Let me come at it from another

24   approach.  Did you ever have any discussions,

25   again other than with any lawyers, as to whether

1      or not there was a contract that had been formed

2      between Mr. McFarlane and Mr. Gaiman?

3  A   No, I did not.

4  Q   So as far as you know, the contract may have been

5      formed or it may not have?  That's going to depend

6      upon the documents that you've seen and what

7      the parties have to say, would that be a fair

8      assessment?

9  A   That's correct.  As I stated in my memo,

10     Exhibit 128, dated January 5th, 1999 to Wanda

11     Kolomyjec, I was given no information on the

12     final agreement or instructions to make any

13     payment.

14 Q   Now, did you ever have any discussions with anyone

15     at any time about the right to use Neil Gaiman's

16     name in association with any of the toys or comic

17     books that were being sold?

18 A   I did not have any discussions, no.

19 Q   Before this lawsuit was filed, did you ever hear

20     of any complaints by Mr. Gaiman that his name was

21     being used without permission?

22 A   No, I did not.

23 Q   Did you ever hear of any complaints that his name

24     had been left off of a comic book or a toy or

25     poster or any other item when his name should

```
 1        have been used in association with that?
 2  A     No, I did not.
 3  Q     I believe you were the CFO, is that right, of
 4        TMP?
 5  A     Yes.  TMP being TMP International, Inc.?
 6  Q     Yeah, TMP International, Inc.
 7  A     Yes.
 8  Q     Now, was it the common practice at the time you
 9        were there that if action figures were made under
10        a license that TMP had the right to use the
11        artist's name in association with either action
12        figures, posters or any other items?
13  A     There were certain action figures sold or
14        manufactured and sold that did have the creator's
15        name on them, not Neil Gaiman's but other
16        creators.
17  Q     Did you have any general understanding that
18        creators generally want a credit for figures of
19        theirs that were used in any goods that were
20        sold incorporating those figures?
21  A     Could you repeat the question?
22  Q     Is it your general understanding that creators
23        wanted to have their name used in association
24        with goods that incorporated the various
25        characters that they may have created or
```

1         co-created?

2    A    I did not have any specific understanding, no.

3    Q    Did you hear about any complaints that were made

4         by Mr. Gaiman or any of his companies as to any

5         advertising or any promotions that were made by

6         any of the McFarlane companies in association

7         with the Angela, Medieval Spawn or Cogliostro

8         characters?

9    A    No.  I have no information on that.

10             MR. FELDMANN:  That's all that I have.

11

12                      EXAMINATION

13   BY MR. SALSICH:

14   Q    I just have a few questions for you, Mr. Inglis,

15        just to clarify a few points.  I'll try to make

16        this go very quickly.

17             You were shown several different exhibits

18        that you stated were schedules or reports

19        prepared by Mr. Carron that you then sent to

20        Mr. McFarlane.  Do you recall that general

21        discussion?

22   A    Yes.

23   Q    The first of those documents I believe was marked

24        as Exhibit 122 and then there was Exhibit 123 in

25        which you calculated a royalty due to Mr. Gaiman

1        of approximately $155,000.  Do you recall that?

2   A    Yes.

3   Q    Then later the next day or the next several days

4        you also sent to Mr. McFarlane or his companies

5        some other reports in which the royalties

6        calculated owing to Mr. Gaiman were $24,800 and

7        approximately $19,000 and $20,000.  Do you recall

8        that discussion?

9   A    Yes.

10  Q    My question is not about the royalty calculations

11       but about the underlying sales figures included

12       in those documents.  Are you confident in the

13       underlying sales figures, the units sold and the

14       total sales price contained on the reports that

15       you gave to Mr. McFarlane?

16  A    Yes, I am.

17  Q    Other than the first revision between Exhibit 122

18       and Exhibit 123 which I believe you testified

19       was a slight reworking of some of the underlying

20       figures that Mr. Carron had given you, from the

21       point of Exhibit 123 onward, the total units sold

22       and the total revenue figures did not change on

23       any of the subsequent reports, did they?

24  A    That is correct.

25  Q    You were shown Exhibit 125 which was a memo

1    from you dated July 30th and contained a report

2    behind that in which the writer/creator royalty

3    calculated was $24,800.  Do you recall that?

4 A    Yes.

5 Q    Among the various reports and memos that you

6    sent to Mr. McFarlane or his companies regarding

7    the royalty calculations to Mr. Gaiman, is

8    Exhibit 125 the only one that reflects your

9    understanding of the correspondence between

10    Mr. McFarlane and Mr. Gaiman?

11 A    That is correct.

12 Q    You were asked a series of questions and shown

13    some exhibits which had been previously marked

14    in other depositions and I'm going to just hand

15    them to you briefly.  They were Exhibits 69 and

16    then Exhibits 73, 74, 75, 76 and 77.  Do you

17    recall the testimony you gave regarding those

18    exhibits earlier today?

19 A    Yes, I do.

20 Q    I just have a simple question about them.  You are

21    able to identify the format of those documents, is

22    that correct?

23 A    Yes.

24 Q    Are you able, as you sit here today, to vouch for

25    the accuracy of any of the numbers contained in

1   those production records contained in the exhibits

2   I just mentioned?

3 A No, I'm not.

4 Q So you're familiar with the format and you are

5   confident in the testimony you gave that when

6   you said that a particular column referred to a

7   regular price and a particular column referred

8   to a discounted price or an international price

9   that that's what that column referred to, is that

10   correct?

11 A Yes.

12 Q But you're not able to vouch for the accuracy of

13   whether any particular price was correct for any

14   particular item shipped, is that correct?

15 A That's right.

16 Q You were asked some questions early in the

17   deposition describing the relationship between

18   the companies, TMP International and McFarlane

19   Worldwide.  Do you recall that testimony?

20 A Yes.

21 Q I have a question about McFarlane Worldwide.  Did

22   that company only produce or distribute toys or

23   action figures?

24 A Yes.

25 Q McFarlane Worldwide does not have any involvement

```
1            in the shipment or selling of comic books, is that

2            correct?

3   A        That is correct.

4   Q        Or any other materials?

5   A        That is correct.

6   Q        You also listed I think two or three examples of

7            some of the license agreements that TMPI has.  You

8            mentioned Sony Signatures with the Kiss action

9            figures and you also mentioned the National Hockey

10           League and the National Football League.  Were

11           those the only three license agreements that TMP

12           International has with other licensers?

13  A        No.  There were many license agreements besides

14           these.

15  Q        I'm certainly not going to ask you to list them

16           all.  Would you say that TMPI might have somewhere

17           between 10 and 20 license agreements with other

18           licensers or would it be a number higher than

19           50 or some other range of numbers?

20  A        It would be a number probably higher than 50.

21  Q        You testified about the typical practice that

22           you had with Mr. McFarlane in negotiating these

23           various license agreements.  Is it accurate to

24           say that you and Mr. McFarlane frequently

25           discussed a variety of factors including royalty
```

GRUSKIN & ASSOCIATES        (248) 737-6691

1          rates, et cetera, in all of these licensing

2          agreement negotiations?

3   A      Yes.

4   Q      Was it also your testimony that in the context of

5          a license agreement negotiation that Mr. McFarlane

6          would frequently ask you to change various

7          factors in arriving at a royalty rate or royalty

8          agreement, is that correct?

9   A      Yes.

10  Q      When Mr. McFarlane was asking you to change a

11         royalty rate or change some other factor, a

12         definition of net sales, for example, was he doing

13         that during the negotiations of the license

14         agreement or after the negotiations had been

15         completed?

16  A      It would have been during the negotiations.

17  Q      You were asked to look at a document that had

18         been previously marked as Exhibit 72.  Do you

19         see that document?

20  A      Yes.

21  Q      I believe you stated -- you were asked a question

22         about a discrepancy in a certain document between

23         the units produced and the total units sold.  Do

24         you recall that discussion?

25  A      Yes.

```
 1  A     Yes.

 2  Q     There was a mention that the total units sold

 3        appears to be higher than the units produced.

 4  A     Yes.

 5  Q     You were asked a question of whether you believe

 6        that the sales figure was more accurate than the

 7        units produced and I believe the word you used

 8        was absolutely.  Do you recall that?

 9  A     Yes.

10  Q     I understood your testimony to be that that was

11        because you understood units sold to be based on

12        actual sales invoices, is that correct?

13  A     Yes.

14  Q     As you sit here today, though, and you look at the

15        figures in the second column of Exhibit 72 which

16        is a column called "Total Units Sold," are you

17        aware today whether those figures themselves are

18        actually the accurate numbers?

19  A     I'd have to compare the numbers on this schedule

20        with the sales records and of course I haven't had

21        the opportunity to do that.

22  Q     So when you stated that you believe that the

23        figures reflected in the units sold column were

24        more accurate than the units produced column, was

25        that simply because you are aware that when units
```

1      sold are summarized like this, they are taken from

2      actual sales invoices and you're not able to

3      verify how units produced are taken?

4   A  That is correct.

5   Q  As you recall earlier, we had a discussion about

6      the documents that you reviewed in preparation for

7      this deposition and the documents that Mr. Carron

8      assembled for you during July of 1997.  After we

9      went off the record and then we came back on the

10     record, you were asked a question of whether any

11     of the documents Mr. Carron produced you had seen

12     in the documents you reviewed yesterday and you

13     stated yes.  You've testified that a number of

14     reports that we've marked as exhibits today were

15     documents that were prepared by Mr. Carron.  Do

16     you recall that?

17  A  Yes.

18  Q  Are those documents you're referring to when you

19     said that you had seen some of Mr. Carron's

20     documents yesterday the documents you reviewed to

21     prepare for this deposition?

22  A  That is correct.

23  Q  You were asked some questions about a document

24     that was marked today as Exhibit 124 and I've

25     just handed you that document again.  Would you

```
1              take a look at the second page of that document?

2              Do you see -- do you recall being asked some

3              questions about the sentence in there where

4              you state "Because of the time constraint,

5              we have used percentages in calculating the

6              deductions from gross sales," et cetera?  Do

7              you see that?

8    A         Yes, I do.

9    Q         I believe you testified that the percentages you

10             used for the deductions from gross sales were

11             estimates, is that correct?

12   A         Yes.

13   Q         But you do go on to say in that letter that the

14             important numbers, the units sold and the gross

15             sales, do come directly from the sales reports

16             and that those are accurate numbers, is that

17             correct?

18   A         Yes.

19   Q         So the only estimates that you used in preparing

20             the various reports you prepared for Mr. McFarlane

21             were estimates as to the deductions from gross

22             sales, correct?

23   A         Yes.

24   Q         You also testified that while those were estimates

25             or averages that those were based on historical
```

```
 1          fact and that they could be backed up, correct?
 2    A     That's correct.
 3    Q     Do you recall testifying that at least in the
 4          early time period in which you were involved with
 5          TMPI that Todd McFarlane deferred the payments
 6          that he would have been entitled to under his
 7          license agreement --
 8    A     Yes.
 9    Q     -- for the Spawn action figures?
10    A     Yes.
11    Q     I think you testified that in effect it was Todd
12          who told you not to pay those royalties, is that
13          correct?
14    A     That's correct.
15    Q     Do you recall the specifics of anything that
16          Todd told you on that or is it just your general
17          impression that Todd had given you instructions
18          to defer those payments?
19    A     Well, there was in fact an agreement between Todd
20          and the company, TMP International, Inc., that was
21          reflected in board meeting minutes in which Todd
22          agreed to defer the royalties.
23    Q     Other than that, you have no independent knowledge
24          of the arrangement between Todd and TMPI as far
25          as royalty payments or the deferment of royalty
```

```
 1        payments?

 2   A    No, I do not.

 3             MR. SALSICH:  I believe that's all I

 4        have.

 5             Jeff, any follow-up?

 6             MR. SIMMONS:  I'm done.

 7             MR. SALSICH:  Scott?

 8             MR. FELDMANN:  I'm done.

 9             MR. SALSICH:  Mr. Inglis, you'll have

10        the opportunity to read the transcript of your

11        deposition today.  We're going to ask for a

12        fairly expedited production of that transcript

13        and as soon as I get it, I'll get it to you

14        to read and review and make sure that it's

15        accurate.

16             If you see any changes that need to be made

17        to the accuracy, you'll have the opportunity to

18        do so just with the caveat if there are some

19        changes you need to make, the other parties may

20        have the opportunity to ask you questions on if

21        they decided those changes aren't material.

22             Do you understand?

23             THE WITNESS:  Yes, I do.

24             MR. SALSICH:  That's all.

25                      - - -
```

1          (The deposition concluded at or about

2          2:30 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INSTRUCTIONS TO WITNESS

Read your deposition carefully.  It is your right to read your deposition and make changes in form or substance.  You should assign a reason in the appropriate column on the errata sheet for any change made.

After making any change in form or substance which has been noted on the following errata sheet along with the reason for any change, sign your name on the errata sheet and date it.

Then sign your deposition at the end of your testimony in the space provided.  You are signing it subject to changes you have made on the errata sheet, which will be attached to the deposition before filing.  You must sign it in front of a notary public.

Return the original errata sheet to the court reporter promptly.  Court rules require filing within 30 days after you receive the deposition.

```
 1  Deposition of:  Allan Inglis
    Date of Deposition:  August 22, 2002
 2  File No.:  02-C-0048-S
    Case Name:  Neil Gaiman, and Marvels and Miracles,
 3              LLC vs. Todd McFarlane, Todd McFarlane
                Productions, Inc., TMP International,
 4              Inc., McFarlane Worldwide, Inc., and
                Image Comics, Inc.
 5

 6  I WISH TO MAKE THE FOLLOWING CHANGES FOR THE FOLLOWING
    REASONS:
 7
    PAGE      LINE
 8
    _____     _____      CHANGE:  _____
 9
                         REASON:  _____
10
    _____     _____      CHANGE:  _____
11
                         REASON:  _____
12
    _____     _____      CHANGE:  _____
13
                         REASON:  _____
14
    _____     _____      CHANGE:  _____
15
                         REASON:  _____
16
    _____     _____      CHANGE:  _____
17
                         REASON:  _____
18
    _____     _____      CHANGE:  _____
19
                         REASON:  _____
20
    _____     _____      CHANGE:  _____
21
                         REASON:  _____
22

23
    _____     DATE:  _____
24      ALLAN INGLIS

25
```

GRUSKIN & ASSOCIATES      (248) 737-6691

* * * * * * * * * * * * * * *

        I hereby certify that the within and

foregoing is a true and correct transcript of

the testimony as given by me and corrections, if

any, as made and initialed by me.  Dated this

_____ day of _____, 2002.



                        _____
                            ALLAN INGLIS

                        _____
                            Notary Signature

CERTIFICATE

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF OAKLAND    )


I certify that this transcript is a complete, true and correct record of the testimony given by the Witness in the above-entitled matter.

I also certify that prior to taking this deposition the Witness was duly sworn to tell the truth.

I also certify that I am not a relative or employee of or an attorney for a party; or a relative or employee of an attorney for a party; or financially interested in the action.


Noreen K. Cwidak, CSR-3183, RPR
Notary Public, Oakland County
My Commission Expires:  1-17-06