IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| NEIL GAIMAN and MARVELS AND MIRACLES, LLC, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 02-C-0048-S |
| TODD McFARLANE, et al. | ) ) ) | |
| Defendants-Counterclaimants. | ) | |

---

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION *IN LIMINE* TO EXCLUDE ALL TESTIMONY FROM DENIS KITCHEN

---

Defendants Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc., and McFarlane Worldwide, Inc. (collectively, the "McFarlane Defendants"), through their attorneys LaFollette Godfrey & Kahn and Blackwell, Sanders, Peper, Martin, and defendant Image Comics, Inc., through its attorneys, Brobeck, Phleger & Harrison, submit this brief in support of their motion *in limine* to bar the testimony from Denis Kitchen, who has been disclosed as an expert by the plaintiffs.

### INTRODUCTION

Kitchen's testimony should be excluded in its entirety because each component of Kitchen's expected testimony will be either irrelevant, not helpful to the jury, beyond the scope of Kitchen's qualifications, without an objective factual basis, or fundamentally unreliable. Moreover, crucial components of Kitchen's testimony rely solely on Neil Gaiman's own statements and opinions, thereby inviting the jury to believe Gaiman's evidence has been tested and verified by an expert. For these reasons, Kitchen's testimony should be excluded.

According to Kitchen's expert report, Gaiman asked Kitchen to serve as an expert "on matters related to the comic book industry" and "on various related matters." Expert Report, p. 1, attached as Exhibit B to the Affidavit of Todd G. Smith in Support of Motions in Limine. Kitchen expects to testify on five topics:

1. **Capsule history of the comics industry.** Kitchen traces the evolution of the comic book industry, commenting on the popular and critical reception of comic genres. Kitchen also describes the industry as historically "one-sided," in which creators were subject to publisher's "ironclad control."

2. **Creator rights.** Kitchen describes the "underground comix" movement of the 1960s and 1970s, in which creators retained copyright to their work and received royalties from publishers, unlike the traditional business structure of the industry in which creators received flat rate payments and publishers owned their work as works-for-hire.

Kitchen also describes the development of "A Bill of Rights for Comics Creators," which he has attached to his July 22 declaration.

3. **Work-for-hire.** Kitchen explains the legal framework of the work-for-hire doctrine, concluding that "Astute creators understand that, under law, they retain all rights unless they specifically sign them away."

4. **"Star system."** Kitchen explains the development in the 1990s of a "star system" in the comic industry, in which well known writers and artists would increase sales of comic books.

5. **Neil's Right to Author One Offs.** Kitchen examines the value of the two "one-off" projects Gaiman included in his July 15, 1997 letter to McFarlane. Although Kitchen's defines "one-off" to mean "one time only publishing projects," Kitchen interprets Gaiman's one-off projects to include a three- or four-issue comic book series, followed by a trade paperback

2

compilation of the series. Kitchen estimates sales for these one-off projects, based on Gaiman's name value, and on partial information be obtained on sales of other comic book mini-series.

Kitchen's expected testimony fails to meet several well established principles governing the admission of expert testimony. As that of an expert, Kitchen's testimony must be relevant to an issue in the case, *EEOC v. Ind. Bell Tel. Co.*, 256 F.3d 516, 533 (7th Cir. 2001) (Flaum, J., dissenting) (citing *Wilson v. Groaning*, 25 F.3d 581, 584 (7th Cir. 1994)) and helpful to the jury, *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998), and much of Kitchen's testimony is neither. Some of Kitchen's testimony is just common sense, and expert testimony is not helpful if a lay jury can understand the evidence without the expert's specialized knowledge. *Ancho*, 157 F.3d at 519; *United States v. Hall*, 93 F.3d 1337, 1343 (7th Cir. 1996). Some of Kitchen's testimony is not supported by facts, and expert testimony requires an objective factual basis, and may not be pure speculation. *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988). Kitchen also offers legal opinions, and experts may not testify to the legal effects of agreements. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 365-67 (7th Cir. 1990); *Loeb v. Hammond*, 407 F.2d 779, 781 (7th Cir. 1969).

## ARGUMENT

I. **Kitchen's Testimony About The History Of The Comic Book Industry, The Creators' Rights Movement, And A Bill Of Rights For Comics Creators Is Irrelevant And Misleading.**

One of the issues to be tried in this case involves the terms of the parties' agreement in 1992 wherein Mr. Gaiman agreed to author a single issue of the Spawn comic. It is the terms of that agreement that are at issue. To resolve this simple and straightforward issue, there is simply no reason why the jury needs to know about the history of the comic book industry, or that the largest comic publishers, Marvel and DC Comics, had formerly required freelance creators to

3

sign work-for hire-agreements, or that these policies have now changed. As Kitchen's report makes clear, "[t]oday it is common practice for the mainstream comic publishers to offer various forms of royalties, sales bonuses and shares of the ancillary revenue." Report at 3. Again, this case concerns only the agreement between McFarlane and Gaiman – not *other* agreements between *other* parties at *different* times. To whatever extent Kitchen purports to offer testimony on the history of the comic book industry, that testimony is irrelevant and should be prohibited.

The creator's rights movement is also irrelevant to this case, because there is no evidence McFarlane or Gaiman intended that concept to be incorporated into any agreement, in 1992 or thereafter. Indeed, Kitchen concedes that neither Gaiman or McFarlane were among the "vanguard of comic creators" who drafted A Bill of Rights for Comic Creators. Deposition Transcript of Denis Kitchen ("Kitchen transcript"), attached as Exhibit C to the Affidavit of Todd G. Smith in Support of Motions in Limine, p. 42. Kitchen even concedes that *no* mainstream publisher has adopted the Bill of Rights for Comic Creators and any who did would not likely "stay in business." *Id.* Instead, the terms of the parties' contract must be determined from the testimony of the parties themselves, not from the testimony of a so-called comic book industry expert. Indeed, when asked for the relevance of the Bill of Rights "to any issue in the lawsuit," Kitchen conceded, "I don't see it in itself being specifically relevant." *Id.*, p. 44.

Moreover, to whatever extent Gaiman claims that *he* intended to incorporate the ideals of the creator's rights movement into their contract (and, necessarily, that McFarlane understood this), Kitchen's testimony regarding what he sees as the principles of that movement should still be excluded as not helpful to the jury. The creator's rights ideals Kitchen describes are not difficult concepts beyond the jurors' ability to understand. They may be easily described with

4

ordinary, non-technical terms. Expert testimony simply is not needed. *See Ancho*, 157 F.3d at 519, *Hall*, 93 F.3d at 1343.

Indeed, if Gaiman really believes that concepts related to the creator's rights movement are incorporated into his contract, *he himself* is the appropriate party to explain this to a jury. Permitting someone described as an "expert" to explain these concepts would impermissibly suggest to the jury that Gaiman's beliefs are valid or endorsed by a "comic book industry expert." In short, if Gaiman really believes that his contract with McFarlane includes concepts related to the creator's rights movement, he can explain that to the jury himself. He does not need, and should not be permitted to have, an expert say as much.

Kitchen's testimony about the iron-clad control exerted by Marvel and DC Comics and about the aspirations of a vanguard of comic creators is, at best, a waste of time. However, of greater concern, this testimony could prejudice the jury against publishers. Or, even worse, it could mislead the jury into thinking that the agreement between McFarlane and Gaiman should necessarily favor Gaiman, or that Gaiman was reasonable in not looking out for his own interests because McFarlane was somehow associated with the creator's rights movement. Accordingly, this testimony should be excluded if for no other reason than that its prejudicial effect necessarily outweighs its probative value, which is nil.

## II. Kitchen's Testimony About The Work For Hire Doctrine Is Misleading And Contains Inadmissible And Incorrect Legal Opinion.

Kitchen's testimony concerning the work-for-hire doctrine, or the legal effect of the work-for-hire doctrine, must be excluded for multiple reasons. First, such testimony is beyond Kitchen's qualifications: he has been a publisher, a writer, a retailer and an agent, but never a lawyer. Second, the legal effect of an agreement is not a proper subject for expert testimony, even if Kitchen were qualified as an expert on copyright law. *Harbor Ins. Co.*, 922 F.2d at 365-

67. And third, Kitchen is wrong. He contends that "[a]stute creators understand that, under law, they retain all rights unless they specifically sign them away." Report at 4. It is black-letter law that creators of copyrightable work may grant rights to their work generally rather than specifically; they may grant rights orally without signing anything; and they may even grant rights to their work implicitly, without saying anything. *See* 3 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT § 10.03[A][7] (2002); *Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 694 (7th Cir. 1999), *cert. denied*, 120 S. Ct. 1169 (2000).

Kitchen is not qualified to offer expert testimony on the legal effect of any purported agreement. And he surely should not be permitted to testify erroneously. The Court should preclude any testimony from Kitchen on these topics.

### III. Kitchen's Testimony About the Star System Is Obvious To A Lay Jury, And His Testimony That Quantifies Gaiman's Name Value At One-Third The Sales Of Any Comic Book Is Without An Objective Factual Basis.

Kitchen's expected testimony concerning the "star system" in the comics industry is that "[t]he involvement of a well-known writer and/or artist adds substantial value and has significant impact on sales." Report at 4. This testimony should be excluded because it is obvious to a lay juror, as Kitchen admitted:

> Again, I think fairly common sense statement. It would be analogous to a film having a star and being more likely to attract viewers into the theater. A star in a comic book results in more people taking that comic off the shelf.

Kitchen transcript, pp. 50-51. Because the jury needs no assistance understanding these concepts, Kitchen's testimony regarding them should not be permitted.

Moreover, Kitchen's attempt to quantify Gaiman's value as a star is pure speculation. His report suggests that Gaiman's name value adds from 25 to 50% to the sales a publisher would expect from the same title with a writer with ordinary name recognition, based in part on

6

Gaiman's *own* appraisal of his value. Report at 5, 6. Then, Kitchen increases his sales estimates for each of Gaiman's disputed one-off publications by one-third to account for Gaiman's purported "star value." But in his deposition, Kitchen admitted that multiple factors beyond star value influence the sale of comic books, and that he could not quantify the effect, if any, Gaiman's name would have on a publication's sales:

> Q   What source could you go to to test your hypothesis that Neil would have a 50% impact on the sales of "Batman?"
>
> A   I couldn't say that it would have a 50% impact on "Batman." What I said in my report was that the numbers showed a 50% impact on "Spawn". As a general statement, I would say that Neil's name on any comic would improve its sales. But I never broadly said it would be 50% on anything.

Kitchen transcript, p. 53. Kitchen's testimony is therefore not based on any expertise, but rather simply on sales numbers he was given.

Kitchen also admitted that he did not attempt to determine the impact Gaiman's name value had on any comic book other than Spawn:

> Q   And if we took this as an example, this, "Batman Black and White, No. 2," what resources could we go to to determine what impact, if any, his name had on the sales of that comic book?
> A   Well, in an ideal world, you would get the numbers from D.C. Comics.
>
> Q   And how about in the real world?
> A   Then you would have to rely on known distributor information.
>
> Q   And I assume, because it's not mentioned in your report, that you did not attempt to do that for any other publications for which Neil Gaiman wrote single comic books or miniseries, correct?
> A   That's correct.

Kitchen transcript, pp. 53-54. Because he did not examine the very evidence he concedes he must to properly quantify Gaiman's star power, Kitchen's expected opinion that Gaiman's name

7

is worth an additional 25% to 50% in sales is without foundation, constitutes pure speculation, and should be excluded.

Finally, Kitchen also admitted that the sales of any comic book and the value of a star's name on a comic book depend on a multitude of factors, including the other stars involved, choice of cover art, advertising and marketing effort, sales of tied-in merchandise and other media products, such as films and television programs, the publisher's "market clout," and the general strength of the comics market. Kitchen transcript, pp. 9-10, 58-61. Yet he concedes he has not considered how these factors might affect the sales of the disputed Gaiman one-offs. *Id.*, pp. 60-61. Essentially, Kitchen admits his purported testimony is incomplete and without a factual basis. It therefore should be excluded.

If Kitchen testifies only that Gaiman is a "star" and his name increases the sales of a comic book, his testimony is obvious to a lay jury and should be excluded as not proper expert testimony. If Kitchen attempts to quantify Gaiman's name value, his testimony is pure speculation without an objective basis and should be excluded for that reason.

**IV.  Kitchen's Testimony That Gaiman Has The Right To Produce Two Four-Issue Comic Book Series And Two Trade Paperbacks Rests Solely On Gaiman's Own Unsupportable Interpretation Of The Term "One-Off."**

The entire basis of Gaiman's 1997 contract claim is that the contract is expressed in an exchange of letters occurring in 1997. Under his view of the evidence, those letters contain the terms of the parties' agreement. One issue to be tried is the proper interpretation of the term "one-off," as used in Gaiman's July 15, 1997 letter. The parties themselves may offer their own opinions on the meaning of that term. Yet Gaiman also purports to offer Kitchen's "expert" testimony on this issue. Because Kitchen concedes his opinion in this regard was dictated to him straight from Gaiman himself, that opinion must be excluded.

8

Kitchen interprets the term "one-off" in Gaiman's July 15, 1997 letter to mean that Gaiman had the right to produce two three- or four-issue series of comic books, with each series followed by a trade paperback compilation of the series in one volume (also known as a graphic novel). Thus, Kitchen interprets the term "one-off" to mean up to *five* individual publications, and Gaiman's right to do two one-off projects to mean that he can do *ten* publications.

Kitchen was asked about this interpretation in his deposition:

> Q   Did you ask him at the time when you were discussing this with him why he did not use the term miniseries?
> A   I did not.
> Q   Let me ask you this, Dennis. Is the term one-off a term of art within the comic book world?
> A   It's not in any dictionary, but it's a term used often enough, yes.

Kitchen transcript, p. 28. Kitchen is wrong: the term one-off is in standard English dictionaries, where it is defined as a British term that means "limited to a single time, occasion, instance: one-shot, unique." MERRIAM WEBSTER COLLEGIATE DICTIONARY 812 (10th ed. 1998); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000). Kitchen conceded he understood the term "one-shot," which the dictionary definition quoted above offers as a synonym for "one-off." As Kitchen testified, "in my opinion and in my experience, one-shot usually refers to a singular book, a single comic book or a single project." Kitchen transcript, pp. 28-29 (emphasis added).

More importantly, Kitchen further explained that the source of that interpretation was Gaiman himself:

> Q   And why did the term one-off make you believe that it would be a miniseries as opposed to a one comic book project?
> A   I think the word project, and the fact that logic told me that if Neil was negotiating to get this compensation in exchange for "Miracle Man" and other considerations, that he would maximize it, and as a publisher and creator myself, I certainly would have

9

done both. And I just wanted to clarify that he was thinking the same thing.

Q      And just so I'm clear. In your conversation with Neil, he actually used the term miniseries, or he just used the term one-off?
A      When I was clarifying that project, *that one-off project meant miniseries and graphic novel collection. He confirmed that, yes, it was miniseries and the collection.* That was the purpose of that call.

Kitchen transcript, pp. 28-29 (emphasis added). Kitchen later testifies:

Q      Was Neil Gaiman the person who told you in this conversation that concept of the one-offs were to be a three or four issue miniseries of "Batman," "Medieval Spawn" and a three or four issue miniseries of "Angela Phoenix?"
A      No. I believe I described earlier in the report that a miniseries typically is three to four issues and there are sometimes, you know, two issue miniseries and conceivably longer ones, but three or four is by far the most common. *And Neil did not seem to have in mind whether it was three or four, just that it was a miniseries.* ....

Q      Right. And this one you said you assumed although he was talking three to four, he would do all four?
A      Yes.

Q      And my question was actually simpler than that, Dennis. Did Neil tell you in his conversation with you that he was planning to do a three to four?
A      No, he used the term miniseries.

*Id.*, pp. 63-64.[1]

In this testimony, Kitchen makes clear that he is not using any comic book industry expertise to determine that "one-off" means a three or four edition miniseries. Instead, he simply asked Gaiman what that term means and he "confirmed" that it meant a miniseries and collection. Accordingly, Kitchen's opinion that Gaiman had the right to do *ten* publications, not

---

[1] In this sense, if Gaiman wanted to establish that in the comic book industry, "miniseries" typically meant a three or four issue series, as opposed to something larger or smaller, Kitchen's expert opinion would be appropriate. But that is not the issue here. The issue here is whether the term "one-off" can possibly mean "miniseries" or

10

just two, is merely Gaiman's opinion "dressed up and sanctified" as the opinion of an expert. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987). The obvious danger of this testimony is that it invites the jury to believe that Gaiman's interpretation has been vouched for by a qualified expert. *See Hall*, 93 F.3d at 1344 (citing *U.S. v. Whitted*, 11 F.3d 782, 787 (8th Cir. 1993)). The court must exclude this testimony as unsupportable and lacking objective factual support.

V.   **Kitchen's Sales Projections Are Fundamentally Unreliable, and Should Be Excluded Under *Daubert*.**

Kitchen's testimony must use reliable data and reliable methods. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Before Kitchen's testimony can be admitted, the Court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. This requirement, and these standards, apply to anyone whose testimony is offered because they allegedly possess some "technical or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).

Applying these principles, the Seventh Circuit Court of Appeals in *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183 (7th Cir. 1993), found that the trial court improperly permitted the testimony of an accountant who offered an opinion on the valuation of investments. Why? Because the proposed expert "concluded that he did not employ the methodology that experts in valuation find essential." *Id.*, 2 F.3d at 186. Kitchen's expert testimony regarding the likely

---

several comic book issues. On this disputed point, Kitchen offers no opinion and only relies on Gaiman's instructions.

sales of Gaiman's one-off projects has the same defect: it does not meet the threshold of reliability Kitchen himself sets out as a requirement for accurate sales projections.

Kitchen clearly explains what is required to accurately project sales of comic books, and why his projections are necessarily inaccurate:

> Projecting sales figures in hindsight requires comparisons to similar projects in a similar time frame. In my opinion *nothing truly comparable* to Gaiman's proposed one-offs appeared in the comics market in the year following their May 1997 exchange.

Report at 5 (emphasis added). In the absence of "truly comparable" publications, Kitchen must make due with publications that are "somewhat analogous." *Id.* As explained above, Kitchen acknowledges that many factors influence the sale of comics, and that "In a proper study, yes. You would try to analyze all those factors." Kitchen transcript, p. 61. But Kitchen only considers one reason why these projects are dissimilar from Gaiman's: Gaiman's star value. Without an analysis of the many factors that influence comic sales, projections based on "somewhat analogous" publications is just guesswork.

Not only does Kitchen lack truly comparable publications to use as the base of his projections, he uses highly suspect data about the sales of those publications. As he explained in his deposition, the source he used for newsstand sales data, Michael Martens of Dark Horse Comics, would not disclose to Kitchen to the actual sales figures for those publications, because the information was confidential, and Martens did not want to go to the file to get the actual figures. Kitchen transcript, pp. 73-74. Martens gave Kitchen "a range for the purpose of this analysis," a range that Kitchen did not verify, and which simply cannot be tested by anyone in this case.

12

The Court should exclude Kitchen's testimony concerning the sales of Gaiman's propsed one-off projects because Kitchen's methods and data are fundamentally unreliable. Moreover, Kitchen's sales projections are inescapably tied to the assumption that each of Gaiman's one-off projects would comprise a series of five separate publications. If this assumption is invalid and Gaiman is not entitled to produce two mini-series, then Kitchen's projections based on sales of "somewhat analogous" mini-series are completely groundless.

## CONCLUSION

Kitchen's purported "expert" testimony should be excluded in its entirety because it will be either irrelevant, not helpful to the jury, beyond the scope of Kitchen's qualifications, without an objective factual basis, or, worst yet, merely Gaiman's own opinions dressed up as an expert's. For the foregoing reasons, the Court should enter an order *in limine* excluding the testimony of Denis Kitchen in its entirety.

LaFOLLETTE GODFREY & KAHN

Dated: September 13, 2002

By _____
Eugenia G. Carter
Todd G. Smith
Gabriel S. Gross
LaFollette Godfrey & Kahn
One East Main Street, Suite 500
Madison, WI 53701
Tel: (608) 257-3911
Fax: (608) 257-0609
*LaFollette Godfrey & Kahn is the Madison office of Godfrey & Kahn, S.C.*

—and—

Michael A. Kahn
Peter W. Salsich, III
Blackwell Sanders Peper Martin
720 Olive Street, Suite 2400

St. Louis, MO 63101
Tel: (314) 345-6000
Fax: (314) 345-6060

Attorneys for Todd McFarlane, Todd McFarlane Productions, Inc., TMP International, Inc. and McFarlane Worldwide, Inc.

—and—

R. Scott Feldmann
Brobeck, Phleger & Harrison LLP
38 Technology Drive
Irvine, CA 92618-5312
Tel: (949) 790-6300
Fax: (949) 790-6301

Attorneys for Defendant Image Comics, Inc.

MN156223_1.DOC

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was served on all counsel of record via facsimile transmission and regular mail this 13th day of September, 2002, addressed to the following:

Allen A. Arntsen
Jeffrey A. Simmons
Foley & Lardner
150 East Gilman Street
Madison, WI 53703-2808
Fax: 608-258-4258

Kenneth F. Levin
Kenneth F. Levin & Associates
20 North Wacker Drive, Suite 2200
Chicago, IL 60606
Fax: 312-977-2990