DENIS KITCHEN EXPERT REPORT

## Introduction

I have been asked by counsel for Neil Gaiman and Marvels and Miracles, LLC to serve as an expert on matters related to the comic book industry, both generally and as they relate to this case and on various related matters. I understand that I may be called to present expert testimony at trial and I have been asked to prepare a written report regarding that possible testimony.

I reserve the right to supplement this report to accommodate any additional discovery that may impact my testimony and opinions.

I am being compensated for my time in this matter at the rate of $125 per hour, plus expenses. My compensation is not based on the outcome of the case.

I have not previously testified as an expert either at deposition or at trial.

## Background and Professional Experience

My experience stems from over thirty years in the comics industry, primarily as a publisher but also as a retailer, distributor, cartoonist, writer/editor and agent.

**Publishing.** My principle publishing company, Kitchen Sink Press (1969-1999), produced a wide variety of material. Its editorial scope ranged from underground comix (R. Crumb), collections of classic newspaper strips (*Steve Canyon, Flash Gordon, Li'l Abner*) and graphic novels (Will Eisner, Harvey Kurtzman) including material adapted to the big screen (*The Crow, From Hell*). KSP also published traditional color comic books (*Megaton Man, The Spirit*), treatises (*Understanding Comics*) and a wide variety of cartoon-based merchandise. Kitchen Sink received a disproportionate number of industry nominations and awards during the course of its existence. In 2000 I founded a small press, Denis Kitchen Publishing, which focuses on periodic books by some of the field's most respected creators. I have also co-published books with companies such as DC Comics (*Batman, Superman*).

**Retailer.** In the 1970s I co-owned a comics retail store in Milwaukee, WI (Strickly Uppa Crust) which spawned a national mail order business (Krupp Mail Order) in Boulder, CO. I currently own and oversee a web-based retail operation (www.deniskitchen.com) which specializes in rare comics-related collectibles and original cartoon art.

**Distributor.** I founded and operated Krupp Distribution (1970-1983) which pioneered the distribution of underground comix, predating the current "direct market" distribution system. Krupp was purchased in 1983 by Capital City Distribution.

**Cartoonist.** My professional career began in the late '60s with the self-published *Mom's Homemade Comics* and a weekly syndicated strip for alternative and college papers. This aspect of my career was quickly subjugated by the business side of comics, but I continued to contribute to publications as varied as *Playboy, Arcade, Comix Book, Blab* and as recently as last year contributed to the *Dark Horse Maverick Anthology*.

**Writer/Editor.** I edited many of the books published by Kitchen Sink Press over the years, sometimes contributing introductions and text. I recently wrote the introductions and extensive annotations for Dark

Horse Comics' 2-volume *Little Annie Fanny* collections and am currently doing the same for a multi-volume set of *Li'l Abner Sundays*.

**Agent.** Since 1991 I have owned and operated the Denis Kitchen Art Agency which represents clients and estates for literary rights (Harvey Kurtzman estate, Russell Keaton estate, Al Capp estate) and original art sales (Will Eisner), or both. Since 2000 I've been a partner in Kitchen & Hansen, a literary agency representing cartoonist/writer clients such as Eisner, Mark Schultz, James O'Barr, James Vance, Wendy & Richard Pini, James Sturm and other creators.

### Other Industry Activities

**Comic Book Legal Defense Fund, Inc.** In 1986 I founded and continue to chair this 501 (c) 3 non-profit organization which is dedicated to protecting First Amendment rights in the comics industry.

**Harvey Awards.** Since 2000 I have chaired this committee which oversees one of the two (with the Eisner Awards) most prestigious comics industry awards.

### Data and Other Information Considered

In preparing this report, I reviewed the Amended Complaint and Answer, the transcripts of the depositions of Neil Gaiman and Todd MacFarlane and the following documents related to their dispute:

- 5/5/97 letter from Gaiman to McFarlane (TM 00355, TM 00356)
- 7/15/97 fax letter from Gaiman to McFarlane (TM 00358, TM 00359)
- 7/15/97 fax letter from McFarlane to Gaiman (TM 00362)
- 7/15/97 fax letter from Gaiman to McFarlane (TM 00360)
- 7/6/98 internal memo from Beau Smith to McFarlane (TM 01661)
- Relevant portions of Neil Gaiman's Stardust contract with DC Comics (GO3985-GO4013)

I spoke to Neil Gaiman regarding his right to produce one-offs. I spoke to Michael Martens, Vice-President of Marketing at Dark Horse Comics. I also consulted *The Standard Catalog of Comic Books* for circulation data and referred to "The Creator's Bill of Rights." Prior to my involvement as an expert witness I read miscellaneous media reports relating to the case.

### Basis for Testimony and Opinions

The basis for my testimony and opinions are the materials identified above, my background, and over thirty years of working experience in various aspects of the comics industry.

### Summary of Expected Testimony

1. **Capsule history of the comics industry.** The comic book industry was born in the midst of the Great Depression in the 1930s. Printed on low-grade pulp paper and carrying a 10-cent cover price, comic books were a cheap form of entertainment and escapism. Typical of the entertainment industry in general during this era, the publishers maintained strict control over intellectual property rights and revenue streams. Comic books, like their first cousins the newspaper comics, were enormously popular, often spinning-off radio and film adaptations and licensed merchandise, from which publishers solely benefited.

003.369270.1

The first challenge to publishers' ironclad control came in the 1940s when Superman creators Jerry Siegel and Joe Shuster sued DC Comics to reclaim control of the character they signed away as very young men. Though they lost at least two legal challenges, their publicized fights drew attention to the one-sided control of the industry.

In the late '40s and early '50s comic books came under widespread attack. Magazine articles, parent and teacher groups, television commentators and a best-selling book (*Seduction of the Innocent*) alleged that comic books contributed to the rise of juvenile delinquency in America. The industry became the subject of a congressional investigation. These events lead to the defensive formation of a self-regulated industry censorship board called The Comics Code Authority, which severely restricted content in comics produced after 1954. This emasculation of the form, in conjunction with earlier bad publicity, contributed to a steady decline in sales during the rest of that decade.

The industry was reinvigorated in the early '60s by the emergence of offbeat and rebellious superheroes (principally from Marvel Comics) which captured the imagination of a new generation of readers. During this same period comic books began to become collectible commodities. In the 1970s a network of specialty comic book shops emerged, selling both collectible back issues and new comics, forming the core of a much more efficient "direct market" distribution system. In 1978 "graphic novels" emerged. These are essentially longer comic book stories in traditional "square-bound" book format and are sometimes called trade paperbacks. Direct market sales rose steadily, peaking around 1993.

In contrast to their humble pulp beginnings, comics during this period began utilizing higher grades of paper and printing technologies. Standard format comics currently retail for approximately three dollars. Story lines and subject matter simultaneously became more sophisticated and often darker, appealing to an older demographic audience. A speculator boom in the early '90s artificially stimulated comic book sales, followed by an inevitable bust and considerable cynicism on the part of many readers. Since 1993-94 comic book sales have steadily declined. During the same period the increasing popularity of graphic novels has resulted in wider distribution of the medium into mainstream bookstores and the genre has simultaneously benefited from increasing critical recognition.

2.   **Creator rights.**   As noted above, from the inception of the comic book industry in the 1930's, publishers held all intellectual property rights. They kept artists' original drawings and they paid artists and writers a simple flat page rate for their services, which were always work-for-hire. The "underground comix" movement in the late '60s and early '70s challenged the traditional business structure, offering the first alternative economic and legal model to cartoonists. Under the underground comix system, based closely on the traditional book industry, creators received advances against royalties (fixed percentages of copies sold) and the creators almost always owned the copyrights to the original material they created. Underground comix publishers respected the right of artists to retain ownership of the physical artwork they created and artists and writers retained all rights not otherwise granted to the publisher. When a publisher was granted broader rights by the creator, any revenue received from outside licensing, foreign translations, merchandise, etc. was shared with the respective creator on terms mutually negotiated. This flip-flopped the traditional relationship in which publishers held all the cards.

These new business practices eventually affected the way the large traditional comic book publishers (notably DC Comics and Marvel) conducted business with creators. Today it is common practice for the mainstream comic publishers to offer various forms of royalties, sales bonuses and shares of ancillary revenue. The details of such revenue sharing vary with the company and the market clout of the creator, but generally speaking they still do not approach the royalty percentages and rights offered by the alternative small press publishers. And despite a certain liberalization of revenue sharing, the large

3

publishers still require creators to sign work-for-hire agreements, particularly when the work is based on established "house characters."

In the late '80s a group of comic book creators convened and wrote a document called "A Bill of Rights for Comics Creators," which was widely circulated in the industry. The document was somewhat idealistic but it reflected the intellectual thought process of many comic creators and underscored the ongoing debate and struggle of creators' rights vs. publishers' rights. It was in this climate that Todd MacFarlane left Marvel Comics in 1991, along with several other creators, and announced the formation of Image with great fanfare. The industry looked at Image with considerable interest. It was expected that this creator-based company would provide a creator-friendly alternative to the dominant publishers, Marvel and DC Comics.

3. **Work-for-hire.** In the comic book industry it is widely understood by creators and publishers alike that intellectual property is either creator-owned or publisher-owned (or, on occasion, jointly-owned). It is clearly understood that creative work done by employees of a publishing company is work-for-hire. It is common industry practice for free-lance artists and writers who are not employees of the publisher to sign written agreements specifically stating that a particular work falls under the work-for-hire provisions of copyright law. Astute creators understand that, under law, they retain all rights unless they specifically sign them away.

4. **"Star system."** For the first several decades of their existence comic book sales were driven principally by the popularity of specific characters (such as Superman or Batman) and, to a lesser degree, genre popularity (such as superhero or crime). By the early 1990's, a "star system" developed in the comic book industry and had become a critical element in sales and marketing. The involvement of a well-known writer and/or artist adds substantial value and has significant impact on sales.

Neil Gaiman was one of the biggest "stars" among comic book creators during the time of this dispute. He was among the relatively few star creators to enjoy both commercial success and critical success. He was the recipient of numerous industry awards, including Harveys and Eisners, the comic world equivalents of Oscars.

A star's association with a comic can be expected to add substantially to bottom line profits on that comic. Star creators consequently have strong negotiating power with comic publishers, and can negotiate rights to share in the overall value of characters that they create, far disproportionate to the negotiating power of "ordinary" comic creators.

5. **Neil's Right to Author One Offs.** It is my understanding that Neil Gaiman acquired from Todd McFarlane in 1997 the right to produce and benefit from two separate "one offs" (one time only publishing projects) involving Medieval Spawn and Angela. From examining the documents it is my further understanding that Gaiman had the option of doing his one-offs as "cross-overs" (an industry term for comics which co-feature name characters, often from competing publishing houses) in comic format as well as trade paperback collections. From my conversation with Neil Gaiman and from examined documents it is my understanding that Gaiman initiated plans to create a 3 or 4 issue *Batman/Medieval Spawn* cross-over with DC Comics, and separately initiated plans for a 3 or 4 issue *Angela/Phoenix* (*X-Men*) cross-over with Marvel Comics. Such cross-overs, written by Gaiman, would have had substantial appeal in the comic book industry at that point in time. The combination of Gaiman's star power, Spawn's continuing popularity and the added market value of perennial best sellers *Batman* and *X-Men* respectively would have assured commercial success. In my opinion such one-offs would have been virtually certain to have beeen among the best-selling comics in their respective months of release.

4

*The Standard Catalog of Comic Books* (Krause Publications, 2002) includes partial and complete circulation data for most modern comic books. It often cites order data from the archives of Capital City Distribution (CCD), the longtime second largest direct market comic distributor. This data indicates that *Spawn* #9 (written by Neil Gaiman and drawn by Todd McFarlane) enjoyed an approximate 50% jump in CCD orders compared to *Spawn* #2 through #7, which were written and drawn by McFarlane alone. *Spawn* #8, 10 and 11 written by other "star" writers showed comparable sales jumps. After the impact of the guest writers crested, CCD orders on *Spawn* quickly declined to pre-"star" levels and below. Projecting publishing sales is an inexact science. But based on the CCD *Spawn* data and my long experience in projecting sales, my opinion is that Gaiman's name value adds from 25 to 50% to the sales a publisher would ordinarily expect on the same title by a creator or team with average name recognition.

Projecting sales figures in hindsight requires comparisons to similar projects in a similar time frame. In my opinion nothing truly comparable to Gaiman's proposed one-offs appeared in the comics market in the year following their May 1997 exchange. Below I have selected the most comparable material and used both relevant sales data and my experience to try to determine how the proposed one-offs would have fared.

In both instances I interpreted Gaiman's plan to do "three or four issues" of the one-off mini-series as *four* issues. My reasoning is that he would have been motivated in the final analysis to maximize his financial return on the one-offs. In every other respect I have made an effort to err on the low side with all projections.

a.) ***Batman/Medieval Spawn***. The closest analogous mini-series to the proposed *Batman/Medieval Spawn* during this time period following the 1997 agreement in my opinion would be *Batman/Predator III*, a 4-issue cross-over co-published by DC Comics and Dark Horse Comics from November 1997 to February 1998. Diamond Distribution's direct market non-returnable preorders (initial orders prior to any reorders) were 55,891 on the first issue, falling to 43,389 by the 4th issue. Cumulative non-returnable preorders were 192,956. Reorders would have conservatively added 5% to this total, making the estimated total direct market sales about 202,603. In addition, this mini-series was distributed on newsstands. According to Michael Martens, Vice-President of Marketing at Dark Horse Comics, another 60 to 80,000 copies of each issue would have been shipped to newsstands on a returnable basis, with a 17 to 20% sell-through (the percentage of shipped copies that actually sell). Taking an average 18.5% sell-through multiplied by an average of 70,000 units shipped adds another 12,950 sales per issue, for an average sale of about 63,600 per copy. Thus, conservatively, a total slightly in excess of 250,000 copies of this somewhat analogous mini-series would have sold. I say "somewhat analogous" because the *Batman/Predator III* cross-over did not benefit from a "star" writer or artist. Neil Gaiman's name attached to a *Batman/Medieval Spawn* mini-series would, in my opinion, have added significantly to the sales numbers attributed to the cited example of *Batman/Predator III*. I earlier provided an impact estimate of 25 to 50%. A conservative middle ground approach here would be a sales bump of one-third. Using this impact factor the total estimated sales (250,000) of the most analogous mini-series during the time frame multiplied by 1.333 comes to 333,250 for the 4-issue *Batman/Medieval Spawn* mini-series, or about 83,000 average sales per issue.

b.) ***Angela/Phoenix***. With regard to a cross-over mini-series matching Angela from *Spawn* and Phoenix, a popular female cast member from *X-Men*, there is likewise not an ideal analogous mini-series during the time frame. X-Men was Marvel's best-selling superhero group during this period. The "original" *Uncanny X-Men* series had a combined (direct market and newsstand) circulation in September 1997 of 300,732. A simultaneously published Marvel series, simply called *X-Men,* had a combined circulation of 303,708 in September 1997. By October 1998 this title had a combined circulation of 200,070. *X-Men*

5

spin-offs during the time frame, without star contributors, did not do as well as the flagship titles. A 2-issue *X-Men/Alpha Flight* cross-over in May-June 1998 had Diamond preorders of 60-65,000 copies per issue (without star contributors) and is somewhat analogous to the proposed *Angela/Phoenix* cross-over. Reorders would add at least 5% to those preorder numbers, but there would also be a certain drop-off of average sales when extended to a 4-issue series. A round number of 250,000 cumulative non-returnable direct market sale for a 4-issue Angela/Phoenix min-series is a safe assumption. To calculate supplemental newsstand sales I used the average Dark Horse sell-through percentage because Marvel's actual average sell-through percentage was not available to me (if it were available I would expect it to be higher). On the reasonable assumption that Marvel would have shipped at least 80,000 copies of each *Angela/Phoenix* to the returnable newsstand market, the projected 18.5% sell-through would have resulted in approximately 14,800 additional sales per issue or 59,200 for the 4-issue series. My estimate presumes a slightly larger newsstand basis than *Batman/Predator III*, because *X-Men* was a better-selling title overall than *Batman* at this time. I believe this is a very conservative adjustment. Thus, the total combined circulation of *Angela/Phoenix*, in my opinion would have been 309,200 (250,000 + 59,200). Again using the 1.333 sales impact formula for Gaiman's name factor, a 4-issue *Angela/Phoenix* cross-over would have sold approximately 412,163 copies, or 103,000 average sales per issue

c.)   **Trade paperback collections.**   It is my understanding that Neil could also have benefited from a trade paperback collection of each of the one-off mini-series. In general, a trade paperback collection (with a considerably higher retail price) based on a mini-series will result in unit sales 10 to 15% of the average sales of the mini-series. Gaiman maintains that his trade paperbacks average closer to 20-25%, a figure I have no reason to dispute, given, as already stated, that Gaiman's name value adds considerably to sales. Perhaps the best way to project sales in this category would be to compare the ratio of the *Angela* trade paperback sales to Image's 3-issue *Angela* mini-series (1994-95), but I did not have access to those complete sales figures at the time of this report. Using 17.5% (half way between 15% and 20%) as a conservative predictor, I believe trade paperback sales of a *Batman/Medieval Spawn* collection would have sold 14,525 copies (17.5% of 83,000 average comic book sale). With the same formula an *Angela/Phoenix* trade paperback (17.5% x 103,000) would have sold 18,025 copies.

d.)   **Royalties for One-Offs.**   Having reviewed the relevant portions of Gaiman's *Stardust* agreement with DC Comics, it is safe to conclude that Gaiman received relatively favorable industry terms from DC. It is reasonable to conclude that Gaiman could have negotiated comparable royalty terms with DC for the *Batman/Medieval Spawn* one-off and with Marvel for the *Angela/Phoenix* one-off.

e.)   **Summation.**   Had the *Medieval Spawn/Batman* and *Angela/Phoenix* one-offs and respective trade paperbacks been published within a year or so of the 1997 agreement, it is my opinion that both mini-series and collections would have received considerable publicity because of Neil Gaiman's involvement and the projects would have been commercially successful.

### Exhibits

During my testimony at trial, I may use exhibits to assist the jury. I have not yet prepared any such exhibits but may do so in the future.

Date: July 22, 2002                              Denis L. Kitchen
                                                 _____
                                                 Denis L. Kitchen