```
1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF WISCONSIN
2
       NEIL GAIMAN and MIRACLES AND      )
3      MARVELS, LLC.,                     )
                                          )
4            Plaintiffs,                  )
                                          )
5      vs.                                )   NO.  02-C-0048-S
                                          )
6      TODD MCFARLANE, et al,             )
                                          )
7            Defendants-Counterclaimants.)

8      APPEARANCES:

9      FOLEY & LARDNER
       By:  Joan Eads, Atty  (Via Telephone)
10     Jeffrey A. Simmons, Esq. (Via Telephone)
       150 East Gilman Street
11     Madison, WI  53703-2808

12           On Behalf of the Plaintiffs

13     BLACKWELL, SANDERS, PEPER, MARTIN, LLP
       By:  Michael Kahn, Esq.
14     720 Olive Street, Suite 2400
       St. Louis, MO  63101
15           On Behalf of The McFarlane Defendants

16     LAFOLLETTE, GODFREY & KAHN
       By:  Eugenia Carter, Atty. (Via Telephone)
17     Jim Peterson, Esq. (Via Telephone)
       Todd Smith, Esq. (Via Telephone)
18     One East Main Street, Suite 500
       Madison, WI  53701
19
             On Behalf of The McFarlane Defendants
20
       BROBECK, PHLEGLER & HARRISON
21     By:  R. Scott Feldmann, Esq. (Via Telephone)
       38 Technology Drive
22     Irvine, CA  92618-5312

23           On Behalf of Image Comics, Inc.

24     ALSO PRESENT:  TODD MCFARLANE, WYMAN DENNISON (Both via

25     telephone.)
```

1

1    INDEX

2    DIRECT EXAMINATION BY MR. KAHN:             4 - 81

3    CROSS EXAMINATION BY MR. FELDMANN:          81 - 104

4    EXHIBITS:

5    DEFENDANT'S EXHIBIT 201:                        4

6    DEFENDANT'S EXHIBIT 202:                        5

7    (Exhibits retained by Mr. Kahn)

8          IT IS STIPULATED AND AGREED by and between

9    counsel for plaintiffs and counsel for defendants that

10   the deposition of DENNIS KITCHEN (via telephone

11   conference call) may be taken by and on behalf of the

12   defendants, pursuant to the provisions of the Federal

13   Rules of Civil Procedure and applicable court rules on

14   September 10, 2002, at the office of Blackwell, Sanders,

15   Peper, Martin, 720 Olive Street, 24th Floor, St. Louis,

16   MO  63101, by LISA A. SMITH, RPR, CCR, IL CSR, a Notary

17   Public within and for the County of Jefferson, State of

18   Missouri; that this deposition may be taken with the

19   same force and effect as if all statutory requirements

20   had been complied with.

21          IT IS FURTHER STIPULATED AND AGREED that any and

22   all objections to all or any part of this deposition are

23   hereby reserved and may be raised on the trial of this

24   cause, except as to the form of the question, and that

25   the signature of the deponent is reserved.

```
1              MR. KAHN:  Joan, is that you?

2              MS. EADS:  It is, and I have the witness, Dennis

3      Kitchen with me.

4              MR. KAHN:  Good.  And let's make sure everybody

5      is on the line.  Joan, this is Michael Kahn.  I'm in

6      St. Louis and I represent the McFarlane defendants.  And

7      I guess the other people on the line, why don't you go

8      one by one and give your name to the court reporter, who

9      is here in St. Louis, and state who you represent.

10             MR. FELDMANN:  This is Scott Feldmann, and I

11     represent Defendant Image Comics, Inc.

12             MS. CARTER:  Gina Carter and Jim Peterson are

13     here, Co-Counsel of the McFarlane Defendants.

14             MS. EADS:  I'm here in Massachusetts.  My name is

15     Joan Eads.  That's spelled E as in Edward, A as in

16     apple, D as in dog, S as in Sam.  And the witness is

17     Dennis Kitchen, K-I-T-C-H-E-N.

18             MR. DENNISON:  And Wyman Dennison.

19             MS. EADS:  And Wyman Dennison is with me.

20             MR. MCFARLANE:  This is Todd McFarlane, the

21     individual.

22             MR. SIMMONS:  One more.  This is Jeffrey Simmons

23     in Madison.

24             MR. KAHN:  That's right.  Sorry Jeffrey.  And he

25     represents the plaintiffs as well.
```

3

```
 1           MR. SIMMONS:  Yes.
 2           MR. KAHN:  All right, Dennis, if you wouldn't
 3      mind, long distance, if you raise your hand, the court
 4      reporter here in St. Louis will swear you and we'll
 5      begin the deposition.
 6                         DENNIS KITCHEN,
 7      Of lawful age, being produced, sworn, and examined on
 8      the part of the Defendants, deposes and says:
 9                        DIRECT EXAMINATION
10      BY MR. KAHN:
11           Q    Dennis, why don't we start by having you state
12      your full name and give us your address for the record?
13           A    Dennis Kitchens, 62 Sand Hill Road, and that's in
14      Shutesbury, Massachusetts.
15           Q    Dennis, we're here today to take your deposition
16      directed to an expert witness report that you prepared
17      and submitted and signed.  It was dated July 22nd, 2002.
18      And so that you'll know what we're referring to, here in
19      St. Louis, we've had the court reporter mark that report
20      as Deposition Exhibit 201.  Do you have a copy of your
21      report up there before you?
22           A    Yes, I do.
23           Q    Very good.  And also for the record, the only
24      other exhibit that we are marking today is a deposition
25      exhibit that I believe Jeff Simmons is faxing up to you
```

1    so you know what it is when you get it, is a comic book

2    bibliography that is several pages long that we printed

3    off of the Neil Gaiman website, www.nielgaiman.com, and

4    it's entitled, "Neil Gaiman Bibliography, Part II, The

5    Comics," and it lists about 10 or 12 pages worth of

6    comic books.  And when that arrives in the conference

7    room, that would be Exhibit 202.

8          MS. EADS:  We do not have that currently.

9          MR. SIMMONS:  Jeff Simmons here.  Joan, Brenda is

10   faxing that out right now.

11         MS. EADS:  Okay.

12    Q    (By Mr. Kahn)  Dennis, why don't we start with a

13   little background information for us.  Could you

14   summarize your educational background?

15         THE WITNESS:  Graduated from the University of

16   Wisconsin, Milwaukee in 1968 with a degree in

17   journalism.

18    Q    Any further degrees after that?

19    A    No.

20    Q    How old are you, Mr. Kitchen?

21    A    56.

22    Q    Are you married?

23    A    Yes.

24    Q    Any children?

25    A    Yes.

1      Q   Your Expert Witness Report, which is marked as

2   Exhibit 201, begins by giving some of your background

3   and your personal experience.  And my question for you,

4   sir, is can you compare for us how the Kitchen Sink

5   Press is similar to and different from a publisher such

6   as D.C. Comics or Marvel Comics?

7      A   Sure.  The most obvious would be the size.

8   Kitchen Sink Press was a much smaller publisher, and it

9   was a creative friendly publisher.  D.C. Comics, as I'm

10   sure you know, is a division of AOL Time Warner, while

11   Marvel is experiencing problems and is in Chapter 11,

12   they're also a much larger company and they specialize

13   in what would generically be known as superhero comics.

14   I specialize in more idiosyncratic comics.  Those would

15   be the most obvious differences.

16      Q   Does Kitchen Sink Press publish superhero comics?

17      A   Well, you had should use past tense.  Kitchen

18   Sink Press is no longer in business.  It published

19   characters like "The Spirit," which is a masked

20   character, "Megathon Man," which was a parody of

21   superheros.  But as a matter of policy, I did not

22   publish superheros, per se.

23      Q   You mentioned that the arrangements between

24   Kitchen Sink Press and the artists were -- I believe you

25   said more artist friendly?

1    A    Yes.

2    Q    And what do you mean by that?

3    A    It means that in nearly all instances, the

4    creators owned the copyrights of the work they created.

5    Q    And to your understanding, how was that different

6    than the way D.C. Comics and Marvel Comics handled

7    creators with the superhero comics?

8    A    Yes.  Traditionally, they own all of the property

9    that they publish and the creators work for them on a

10   work-for-hire basis.

11   Q    What is your understanding of a work-for-hire

12   basis, sir?

13   A    Under copyright law that the creator, the writer

14   or the artist signs away their copyright in exchange for

15   compensation, knowing that the fruit of their labor is

16   owned by the person they're doing the work for.

17   Q    How is Dennis Kitchen Publishing different from

18   either D.C. Comics and Marvel or from your prior

19   publisher, Kitchen Sink Press?

20   A    I would describe them as Kitchen Publishing at

21   this point as simply a hobby publishing house.  I've

22   only done two books in the past year, and it's not

23   primarily motivated by profit.  It's simply to keep my

24   foot in the industry, and I love publishing.  But I

25   don't regard it as a means of making money at this point

1     in time.

2          Q    You use the term publishing books, and just so

3     we're clear, when you say books, do you mean books or do

4     you mean comic books?

5          A    The two books published by Dennis Kitchen

6     Publishing to date have been books, not comic books.

7          Q    During the years that you operated Kitchen Sink

8     Press, did that publisher make an effort to market its

9     various publications?

10         A    I couldn't quite hear the last part.

11         Q    Did your prior company, Kitchen Sink Press,

12    during the time that you ran it make efforts to market

13    its publications?

14         A    Of course.

15         Q    And what kind of marketing efforts did Kitchen

16    Sink Press engage in?

17         A    Well, that's a pretty broad question.  We relied

18    on the distributors that were available in the direct

19    market.  We relied on mail order catalogs, the Internet,

20    exports, anything that was available to us.

21         Q    How did those marketing efforts differ in your

22    experience from the marketing efforts by D.C. Comics and

23    Marvel Comics during the same period?

24         A    I'd say the two significant differences were they

25    utilized newsstand distribution, which I did not.  And I

1    had a mail-order catalog, which I don't believe they

2    ever utilized.

3        Q    Are you familiar with the monthly publication

4    that I believe is either published by or goes under the

5    name of "Diamond?" And I think it's a publication that

6    goes to newsstands or comic book stores.

7        A    Do you mean "Diamond Previews."

8        Q    Yes.    "Diamond Previews."

9        A    Yes.    I'm familiar with that.

10        Q    Is "Diamond Previews" a marketing vehicle that

11    Kitchen Sink Press used?

12        A    Yes.    Except for the one year or so in which

13    Kitchen Sink Press was exclusively allied with Capital

14    City Distributions.    Other than that, yes, I used

15    Diamond from its inception.

16        Q    And if you were to describe the way that you used

17    Diamond from its inception versus the way that D.C. and

18    Marvel Comics used it, how would you make that

19    comparison?

20        A    Well, essentially the difference would come from

21    market clout.    D.C. in particular has a special

22    relationship with "Diamond" in which it has the prime

23    real estate in that monthly publication.    It has the

24    majority of the cover space and the promotional space

25    within it.    And I understand from news accounts, D.C.

1    has the option to acquire "Diamond" in the near future.

2    And so those are significant differences.

3        Q    And I've looked through a few issues of that

4    publication and noticed that Image Comics and D.C.

5    Comics and Marvel Comics seem to have sections within

6    each issue where they advertise their upcoming comic

7    books.  Is that something Kitchen Sink Press was doing

8    as well?

9        A    Yes, it did, although it had less prominent real

10    estate, in principle, it was doing the same thing.

11        Q    And do you believe that marketing efforts can

12    have a significant impact on the sale of a particular

13    comic book?

14        A    Certainly.

15        Q    Can you think of any examples, I mean good

16    examples as you think back over the years of an

17    effective marketing effort on a particular comic book or

18    series of comic books?

19        A    Well, marketing encompasses a number of things.

20    Certainly if you're including advertising, I've

21    certainly seen instances where more aggressive

22    advertising resulted in higher sales, but that seems

23    like common sense.  I'm not sure what your point is.

24        Q    I think that's fine.  I want to briefly also

25    discuss two other aspects of your background that you

10

1    mentioned in Exhibit 201.  One is your career as a

2    cartoonist, and the other is your career as a writer and

3    editor.

4        A    Sure.

5        Q    What was "Mom's Homemade Comics?"

6        A    That's a comic book that I wrote myself, I drew

7    myself, and I published myself, and I distributed myself

8    back in 1969.

9        Q    Was this what you would call one of either an

10   underground comic or an alternative comic?

11       A    Yes.

12       Q    And is that the same also for your weekly

13   syndicated strip for alternative and college papers?

14       A    Well, that wasn't a comic book.  That was a

15   newspaper strip.  You mean was it an alternative?  Is

16   that your question?

17       Q    No, you know what.  You actually clarified that.

18   I didn't notice that it was -- I see you have it here

19   stated as a syndicated strip.

20       A    Yes.

21       Q    Have you ever had any experience as a cartoonist

22   in the area of superhero comics?

23       A    No.

24       Q    Have you ever had any experience as a cartoonist

25   or an artist in a comic book that you would consider

1    comparable to "Spawn Comics?"

2        A    Comparable, no.

3        Q    And let me ask you the same question in your

4    experiences as a writer.  Have you ever done any writing

5    for a superhero comic?

6        A    Very briefly.  I was once a guest contributor to

7    "The Badger", and I've done guest shots in "The Spirit",

8    and there are a few examples like that, but I wouldn't

9    regard those as being true work experiences.

10        Q    Let me move now to the section in your report

11    where you talk about the data and the other information

12    that you've considered.  You mention five documents

13    which we have actually in other depositions marked as

14    deposition exhibits.  And I don't know whether your

15    attorney there has copies of the deposition exhibits

16    themselves.

17            MR. KAHN:  Joan, do you have those?

18            MS. EADS:  I believe we have copies of the

19    particular items mentioned on Page 2.  We also have

20    received the fax from Jeff that you referred to earlier.

21        Q    (By Mr. Kahn)  I just want to make sure so that

22    we're all clear for the record, Dennis, if you could

23    take a look at the deposition exhibits that your

24    attorney has that were previously marked, and compare it

25    to this list of letters and faxes and internal memos

1      which you identify in Page 2.  I have an exhibit

2      that's marked as Exhibit 2, which is a May 5, 1997, two-

3      page faxed letter from Neil Gaiman to Todd McFarlane.

4      And is that exhibit the same document that you are

5      referencing in the first bullet point under the data and

6      other information considered?

7            THE WITNESS:  Yes.  I believe it is.

8        Q   And let's move to the second item, which is a

9      7/15/97 fax.  Is that fax the same as what we have

10     marked as Exhibit 19?

11       A   Yes.  It appears to be.

12       Q   Then there is another 7/15/97 fax.  It's a letter

13     from McFarlane to Gaiman.  And would you compare that to

14     what we've marked as Exhibit 20?

15       A   Yes.  The handwritten letter I believe, yes.

16       Q   Yes.  And then there is in your bullet points

17     another fax of that same date, July 15, 1997, and this

18     is from Neil to Todd.  And we have an exhibit that seems

19     to match that description that's been marked as

20     Deposition Exhibit 33, and is that is --

21       A   Give us a moment.  It's not apparent.

22            MS. EADS:  It doesn't look like we have that one.

23            MR. KAHN:  If you don't have that one, I can

24     describe what our exhibit looks like and you can look at

25     the --

13

1            THE WITNESS:  Oh, yes.  I believe we have it.

2    This is the handwritten one from Neil?

3        Q    (By Mr. Kahn)    Yes.  It starts off, "Dear Todd,

4    Hurrah ..."

5        A    Yes.  We have that now.

6        Q    Okay.  That's Exhibit 33.  And then you also make

7    mention of a July 6th, 1998 memo from Bo Smith to Todd

8    McFarlane, and we have one that's marked Exhibit 129.

9    Is that the same document?

10       A    Yes, it is.

11       Q    You also mentioned in this section on the Data

12   and Other Information Considered that you reviewed what

13   you described as relevant portions of Mr. Gaiman's

14   Stardust contract with D.C. Comics.  Do you see that?

15       A    Yes.

16       Q    What were the relevant portions for your report?

17       A    I believe I only referred in there to the royalty

18   sections.  That's my recollection.

19       Q    And why did you believe the "Stardust" contract

20   would be relevant to your report?

21       A    My recollection is that Neil Gaiman made

22   reference to it in his discussions with Todd as being an

23   agreement that was favorable to him and one that he

24   expected to be matched or exceeded.

25       Q    What did the "Stardust" contract cover?

14

1     A    I believe it was the "Stardust" graphic novel

2    that he cocreated with Charles Vest.

3     Q    And is it your understanding that Neil Gaiman

4    owned the copyright in that comic book?

5     A    I don't specifically recall because I didn't look

6    at that portion.

7     Q    Okay.  So you were looking principally at the

8    royalty provisions?

9     A    That's correct.

10     Q    In connection with your duties as an expert

11    witness in this case, or prior to that time in

12    connection with anything you did, have you had an

13    opportunity to review any D.C. Comics contracts other

14    than that "Stardust" contract for Neil?

15     A    Yes, because I've been involved in copublishing

16    with D.C.  And I've also, as an agent, dealt with D.C.

17    representing other talent.

18     Q    And have you in either dealings with D.C. on your

19    own behalf or in representing other talent had an

20    opportunity to review D.C. Comics contracts for writers?

21     A    Not specifically writers, no.

22     Q    For whom have you -- or what types of D.C. Comics

23    contracts have you reviewed?

24     A    For example, Will Eisner is a client, and I

25    brought his pre-existing library of graphic novels to

15

1    D.C.  And there was a contract on that.  Did a separate

2    contract to bring Will Eisner's "Spirit" character to

3    D.C.  for a series of 20 or so archive editions.  And in

4    this case, Will Eisner was both the writer and the

5    artist, so there was no separate writer agreement.  And

6    these were pre-existing materials.  Subsequent to those,

7    we brought two newer graphic novels, and again, Will

8    Eisner was the sole creator.  So there was no separate

9    writer component.

10        Q    And on those newer graphic novels, were those

11    novels that were written specifically for D.C. Comics

12    pursuant to those contracts?

13        A    They were not created for D.C.  They were offered

14    to D.C.  In other words, Will Eisner created them

15    without knowing who had published them.

16        Q    Got you.  Have you ever seen a D.C. Comics

17    contract for a writer or an artist for an ongoing comic

18    book?

19        A    Not other than this "Stardust" contract, no.  Not

20    specifically.

21        Q    Did Neil Gaiman show you any of his own D.C.

22    Comics contracts in connection with your duties as an

23    expert witness?

24        A    No.  I didn't ask him for that.

25        Q    And he did not offer them to you; did he?

16

1        A    No, not specifically.

2        Q    In your expert witness report, you mention you

3    have an hourly rate of $124 an hour.  I assume that

4    means that you are --

5        A    Did you say $124?

6        Q    I'm sorry.  $125 an hour.  Pardon me.  I assume

7    that means that you are keeping track of the time you

8    are spending or the time that you spent in researching

9    and preparing this expert witness report?

10       A    Correct.

11       Q    And what is the total time that you spent in

12   researching and preparing the actual witness report that

13   we've marked as Exhibit 201?

14       A    I don't remember the specific number of hours,

15   but I remember the last invoice, but not the exact

16   number of hours.

17       Q    How many invoices have you sent?

18       A    Just one to date.

19       Q    And what was the amount of that invoice?

20       A    $3,500.

21       Q    Did that invoice include any costs in addition to

22   your time?

23       A    Actually at the time I billed that, I did not

24   have all of my receipts at hand, and so I did not

25   include them.  That included some transportation, but it

17

1    was relatively negligible and I didn't think it was

2    important enough.

3        Q    So that first invoice was principally for your

4    time?

5        A    It was entirely for time.

6        Q    And that amount was $3,500, sir?

7        A    Right.

8        Q    So if I divided $125 into that number, we would

9    have a pretty good number of the hours that you've spent

10   on researching and preparing the report?

11       A    Correct.

12       Q    Is there any further research or investigation

13   that you intend to do in connection with your duties as

14   an expert witness in this case?

15       A    Well, this morning I was handed a fax that

16   included some numbers I hadn't seen earlier on sales of

17   the "Spawn" "Angela" comics and trade paperback.  I just

18   saw that about an hour ago.  So I would probably want to

19   update the report to include that information.

20       Q    How would that information be relevant to your

21   report?

22       A    Because it wasn't available earlier and it shows

23   numbers specifically for "Angela" books that were not

24   available.

25       Q    Other than updating your report with those

1    numbers, is there any other research or investigation

2    that you planned on doing in connection with your duties

3    as an expert witness in this case?

4        A    There certainly may be.  At this moment I can't

5    be more specific.

6        Q    Well, is there any further research or

7    investigation that you believe you might be doing?

8        A    At this moment, no.

9        Q    Mr. Kitchen, how long have you known Neil Gaiman?

10       A    I can't recall the exact year, but I'm sure we

11   met at some convention or another going back 10 years or

12   so.  I didn't know him well for a long time.  I can't

13   say that I know him well now, but I've known him for

14   roughly a decade.

15       Q    How would you describe your relationship with

16   him, and let's first start at the personal level.  Are

17   you friends?

18       A    I would regard him as an industry friend, yes.

19       Q    And how would you describe an industry friend?

20       A    Someone that I know through the industry.

21       Q    Before this lawsuit got filed in January this

22   year, how often would you and Neil communicate with each

23   other about industry matters or as industry friends?

24       A    My principal contact with Neil in recent years

25   has been through the Comic Book Legal Defense Fund,

19

1    which is a 501C-3 nonprofit organization devoted to

2    defending First Amendment rights in the comics industry.

3    That's an organization that I founded in 1986 and

4    continue to chair.  And Neil was -- I'm not sure the

5    exact year, but several years ago he joined the Board.

6    Prior to that he was a significant fundraiser for the

7    fund, and virtually all of my communication with him

8    would have been through the CBLDF.

9        Q    When did Neil join the Board?

10       A    I can't remember the precise year, but I'm going

11   to guess about three years ago.

12       Q    How often does the Board meet?

13       A    It meets face to face once a year, but we have

14   periodic telephonic conferences.

15       Q    How many members are on the Board?

16       A    At this moment eight.

17       Q    Who are the other members?

18       A    I take it back.  We just added a ninth.  Do you

19   want me to list the names right now?  That would be

20   myself, Neil, Frank Manguracina, Milton Greek, Chris

21   Spiros, Louise Nemschaff, Greg Ketter, John Davis.  I

22   seem to be forgetting one person.  You'll have to

23   forgive me.

24       Q    That's okay.  I will forgive you.  Has Neil

25   spoken either to you or to the Board about any money

1    that the comic book legal defense fund might receive as

2    a result of this lawsuit?

3        A    Could you please repeat that question?

4        Q    Sure.  Has Neil Gaiman spoken with you or with

5    the Board as a Board about any money that the comic book

6    legal defense funds might receive as a result of this

7    lawsuit?

8        A    No, never.  That subject has never come up.

9        Q    Has he ever mentioned that he would donate any

10   recovery he might receive from this lawsuit or from the

11   publication of "Miracle Man" to the Comic Book Legal

12   Defense Fund?

13       A    No.  Never came up.

14       Q    We've talked about your personal relationship

15   with Neil, which is as an industry friend.  Have you or

16   your companies had any business relationship with Neil?

17       A    I'm hesitating because there were a couple of

18   things that I think were discussed, but no, I don't

19   think specifically I ever did any business with Neil,

20   other than -- well, I can think of one exception.  He

21   was a contributor to "The Spirit, The New Adventures."

22   He wrote a story called "Mink Stole", which was

23   illustrated by -- sorry, I'm tongue tied at the moment.

24   He wrote a story for "The Spirit."

25       Q    Was that a single issue of "The Spirit" that he

1    wrote a story for?

2        A    No.  It was a contribution to an anthology.

3        Q    Was that anthology published as a book?

4        A    It was a color comic book.

5        Q    When was that comic book published?

6        A    Probably 1998.

7        Q    And just so I have my terminology correct, when

8    you say that that was published as a comic book, was it

9    the length of a typical comic book, or was it much

10   longer?

11       A    A typical comic book.

12       Q    How many other writers were involved in that

13   comic book?

14       A    Probably three.

15       Q    And Neil's story about the "Mink Stole" appeared

16   as a separate story within the comic book?

17       A    Correct.

18       Q    How many issues of that comic book were sold?

19       A    Eight.

20       Q    Was that comic book marketed generally to the

21   public?

22       A    Only through "Diamond" and mail order, and the

23   marketing outlets we discussed earlier.  Everything but

24   newsstands.

25       Q    And a total of eight issues of that particular

22

```
1    comic book were sold?
2        A    Well, that series.  That was a series with a
3    variety of contributors.
4        Q    Okay.  And this particular issue of that series,
5    this particular comic book itself, how many copies were
6    sold?
7        A    I would guess about 30,000 to 35,000.
8        Q    How did those sales compare with the other seven
9    issues of that comic book?
10       A    They were all in the similar range.  They all
11   featured star creators, and I don't think any stood out
12   from the rest.  This particular series, because it was
13   an homage to a highly respected creator, Will Eisner, it
14   attracted the top talent in the industry.
15       Q    Who were the other writers who contributed who in
16   your opinion were stars?
17       A    Allen Moore, for example.  Curt Busiek.
18       Q    Would you spell his last name?
19       A    B-U-S-I-E-K.
20       Q    Okay.
21       A    Those are the ones that come to mind offhand.
22       Q    But it's your testimony that there was a star
23   from each of the eight comic books?
24       A    Well, I'm including artists as stars.  For
25   example, Dave Gibbons, Mark Schultz, Bill Stout.  Again,
```

1    I don't have the series in front of me.  So I'm just

2    recalling some names that pop into my mind.

3        Q    To give me some sense of what 30,000 copies means

4    in 1998 --

5        A    To Kitchen Sink Press that was a good solid

6    number, given that the market was quite weak at that

7    point and my company was quite weak.  It was the last

8    year of its existence and it was on a shaky financial

9    basis.  So there was not any appreciable marketing

10   budget for that series or anything I was doing at that

11   point in time.

12       Q    Do you know what comparable sales were during

13   1998?  And as I look through Exhibit 202, for something

14   that Neil had wrote called "Stardust" 1, 2, 3, and 4,

15   which seems to be published during the 1997/98 period

16   for D.C. Comics.  Do you know what those sales were?

17       A    I wouldn't offhand, no.

18       Q    During the 1998 period, do you know what the

19   sales of the typical issue of a popular D.C. Comics

20   comic book were?

21       A    I wouldn't offhand.

22       Q    But that's something you could look up?

23       A    Certainly, using the earlier reference book one

24   could determine that.  And just from conventional

25   knowledge, I could hazard a guess.  But I certainly

24

1    wouldn't be privy to those numbers.

2        Q    Okay.  Other than this one issue of "The Spirit"

3    that Neil participated as a writer for Kitchen Sink

4    Press, have you had any other business relationship with

5    Mr. Gaiman?

6        A    I don't believe so.  There was at one point a

7    script he'd written for a series I'd published called

8    "Cherry."  But I don't believe that was ever published.

9    I lost the rights to that series, so I don't believe

10   there was ever a contract entered into.  And unless I'm

11   mistaken, I don't recall any other business transaction.

12       Q    Who approached you in this case about the

13   possibility of becoming an expert witness?

14       A    Joan Eads.

15       Q    And is this something that Neil had raised with

16   you before Ms. Eads talked to you?

17       A    No, he did not.

18       Q    When did Joan Eads approach you?

19       A    Do you remember Joan?

20           MS. EADS:  I'm not the witness.

21           THE WITNESS:  Several months ago.

22       Q    (By Mr. Kahn)  Did she at the time tell you what

23   areas of expertise they were interested in having you

24   opine on?

25       A    I believe it was as a general expert witness to

25

1    help explain to a jury how the comic book industry works

2    and to explain terminology and common practices.

3        Q    Going back to the other data and information that

4    you considered, you mentioned a conversation you had

5    with Neil Gaiman regarding his right to produce one-

6    offs.  Did you discuss anything else with Mr. Gaiman

7    besides his right to produce one-offs?

8        A    No.  It was a very focused conversation.  I

9    wanted to just clarify something with him.

10       Q    What did you want to clarify?

11       A    My reading of the documents regarding the one-

12   offs didn't make it completely clear to me that it was

13   comic books and a collection of graphic novel of them

14   referred to a comic book project as I recall, and I just

15   wanted to make sure that in his mind that it was both

16   comic books and a collection.  I presumed that was the

17   case, but I wanted to make sure it was his

18   understanding, and he did confirm that.  That was the

19   sole purpose of the conversation.  And in fact, that's

20   the only time I've spoken to him during the period of

21   time I've been the expert witness.  I've had no other

22   communication with him.

23       Q    Let me ask you and your attorney to look at

24   what's been marked as Deposition Exhibit 19, which is

25   Neil's letter, typed letter to Todd, dated July 15,

```
 1    1997.

 2        A    Yes, I have that.

 3        Q    And there is a paragraph about two-thirds of the

 4    way down the page that I will read into the record, and

 5    then I want to ask you if that is the paragraph that you

 6    wanted to call Neil about to discuss one-offs.  The

 7    paragraph reads, "That I have, exclusive of any other

 8    'Angela' projects I might do with the Todd McFarlane

 9    Division of Image, the right to a one-off 'Angela'

10    comics project, and a one-off 'Medieval Spawn' project

11    on each of which I would keep 100% of the revenue.

12    That if these are team-up projects, they could go to

13    other comic companies, but if they exclusively feature

14    the character in the title, I agree to do them with

15    Image, although not necessarily with you."

16        A    Yes.  I believe that is one.  And I believe there

17    was also another letter that made reference two projects

18    without being as specific.

19        Q    I'm not aware of -- at least among the documents

20    you identified, any other reference in correspondence

21    between Neil and Todd.  I suppose there is one, perhaps

22    there is a reference to that in the Bo Smith memo, which

23    is Exhibit 129.

24        A    Yes.  That may have been it as well.  I don't

25    recall specifically at this moment.  But I just wanted
```

27

1    to clarify that it was a miniseries that would be

2    collected into a graphic novel.

3    Q    And why did the term one-off make you believe

4    that it would be a miniseries as opposed to a one comic

5    book project?

6    A    I think the word project, and the fact that logic

7    told me that if Neil was negotiating to get this

8    compensation in exchange for "Miracle Man" and other

9    considerations, that he would maximize it, and as a

10    publisher and creator myself, I certainly would have

11    done both.  And I just wanted to clarify that he was

12    thinking the same thing.

13    Q    Did you ask him at the time when you were

14    discussing this with him why he did not use the term

15    miniseries?

16    A    I did not.

17    Q    Let me ask you this, Dennis.  Is the term one-off

18    a term of art within the comic book world?

19    A    It's not in any dictionary, but it's a term used

20    often enough, yes.

21    Q    By whom is it used?

22    A    People in the industry.

23    Q    And I ask you this because I've also heard the

24    term one-shot.  Have you heard that term?

25    A    Yes.  In my opinion and in my experience, one-

1    shot usually refers to a singular book, a single comic

2    book or a single project.  One-off to me is a broader

3    definition that encompasses more than a single title.

4        Q   If you know, what is the etymological origin of

5    the term one-off?

6        A   I do not.  It's a slang term used in the

7    industry, and as I said earlier, you won't find in the

8    dictionary.

9        Q   So if I understand your testimony, you read this

10   letter, Exhibit 19, which had this reference to a one-

11   off "Angela" comic project and a one-off "Medieval

12   Spawn" project, and you called Neil to confirm your

13   belief that this was referring not to what you've called

14   a one-shot, but was, in fact, referring to a miniseries.

15       A   Essentially, yes.

16       Q   And Neil told you that it was?

17       A   Yes.

18       Q   What else did Neil tell you during that

19   conversation that you've described as a focused

20   conversation about his plans or efforts to bring the

21   one-off projects to life?

22       A   Honestly we did not discuss it in any detail

23   whatsoever.  I told him I was working on the expert

24   report and I wanted to make sure that my interpretation

25   of the project was his.  He confirmed that.  It was a

 1    fairly brief conversation, no more than five or ten

 2    minutes.

 3        Q    Later in your report, and we'll get to this.

 4    We'll try to do it in order.  You actually have some

 5    specific estimates and descriptions of two separate one-

 6    off miniseries projects, one of which is a "Batman

 7    Medieval Spawn," and the other is an "Angela Phoenix"

 8    miniseries.  Where did you come up with the titles for

 9    these two?

10        A    From the testimony or from the materials that I

11    reviewed.

12        Q    Where did you see a reference to an "Angela

13    Phoenix" miniseries?

14        A    It must have come from Neil's deposition in which

15    he talked to Marvel.  That's my best recollection.

16        Q    And just so that we're all clear, in your actual

17    conversation with Neil, did you discuss with him any of

18    his conversations or negotiations with either Marvel or

19    D.C. Comics for doing these one-off projects?

20        A    It may have come up.  I mean, I don't remember

21    specifically.  Obviously, I got those combinations

22    either from the phone conversation or from the materials

23    that I've read.  Obviously, the correspondence between

24    Todd and Neil makes reference only to "Medieval Spawn"

25    and "Angela," but it leaves open the possibly of team-

                              30

1    ups.  And so the team-ups, which I refer to as

2    crossovers here are based specifically on the "Phoenix"

3    character from Marvel and "Batman" character from D.C,

4    which would have had to have come from Neil since he is

5    the one who attempted to make those publishing projects

6    happen.

7        Q    And other than his deposition, did Neil tell you

8    anything about his efforts to make these two projects

9    happen?

10       A    I don't believe so, no.

11       Q    And I take it, since it's not mentioned here,

12   that you did not attempt to discuss these projects with

13   any representative of D.C. Comics or Marvel Comics to

14   see whether they would be willing to do such a team-up

15   project with Neil?

16       A    I did not.

17       (A short recess was taken.)

18       Q    (By Mr. Kahn)  Mr. Kitchen, in your conversation

19   with Neil Gaiman in connection with his duties as an

20   expert witness, has he advised you of any role or

21   involvement of Marvel Comics in this lawsuit?

22       A    You're asking me if Neil brought this up?

23       Q    Yes.

24       A    No.  That subject was not discussed.

25       Q    And has anyone else involved on Neil's side of

31

1    the case talked to you about any role that Marvel Comics

2    is playing in this lawsuit?

3        A    No.  It has not come up.

4        Q    In addition to conversations that you had that

5    you identified in your Data and Other Information

6    Considered section of Exhibit 201, did you have an

7    opportunity to have any discussion with any other expert

8    witness retained by the plaintiffs in this lawsuit?

9        A    I have had conversations with a gentleman named

10   Jim Cavin, who I believe has been retained to determine

11   damages.

12       Q    How many conversations did you have with

13   Mr. Cavin?

14       A    A couple of very brief ones.  I'd say we had a

15   couple of substantial conversations.

16       Q    Were those telephone conversations?

17       A    Could you please repeat that?

18       Q    Were those telephone conversations?

19       A    Yes, they were.  I've never met him.

20       Q    So you had a couple brief ones and a couple

21   substantial conversations with him?

22       A    Yes.  In other words, I've had several, a couple

23   of which were just I think trying to arrange times to

24   speak.

25       Q    Tell me about the substantial conversations.

32

1       A    Would you mind repeating the question?

2       Q    Sure.  Tell me about, beginning with the first

3    one, your first substantial conversation with Mr. Cavin.

4    And by that I mean, tell me roughly when it took place,

5    how long it lasted, and what you talked about.

6       A    To the best of my recollection, it was several

7    weeks ago, and it focused primarily on industry

8    definitions.  He just wanted to clarify that he

9    understood some of the terms, royalties, sliding scales

10   various things that were applicable here.  I got the

11   impression he wasn't -- certainly wasn't familiar with

12   the comic book industry and perhaps publishes.  I'm not

13   sure.  We mostly discussed terminology.

14      Q    During that conversation, did you discuss one-

15   offs and miniseries?

16      A    I'm sure it came up, yes.

17      Q    Did he ask you to send him anything?

18      A    No.

19      Q    And did you send him anything?

20      A    No.

21      Q    About how long did that conversation last?

22      A    I'm going to guess 20 minutes.

23      Q    And it was mainly going through different terms

24   in the industry, and by that I mean royalties, sliding

25   scales, one-offs, miniseries, things like that?

33

1      A    Yes.  It was a general conversation on how it

2   typically was handled, and I think he just wanted to be

3   comfortable that he understood what the physical product

4   was and how -- I believe we discussed returnable versus

5   nonreturnable markets.  That was something he needed

6   clarification on.  I had to explain that or clarify that

7   royalties only applied to books or comics actually sold,

8   and that in the returnable system, a good deal of those

9   books were destroyed and royalties didn't apply.  Things

10   like that.

11      Q    Do you recall anything other than industry

12   terminology during that first substantial conversation?

13      A    Well, not really.  I didn't take notes, and I

14   don't recall anything more specifically.

15      Q    Tell me about the second substantial conversation

16   with Mr. Cavin.

17      A    More recently, a week or so ago, he called to ask

18   me if there was another way to approach Neil Gaiman's

19   revenue sharing here.  I had gone on the assumption that

20   Neil would be compensated by Marvel or D.C. on a royalty

21   basis.  And he asked if it could also have been done on

22   a profit share basis.  And in fact, I told him that that

23   was an alternative and that, in fact, I probably should

24   have mentioned it earlier.  The team-up comics, the

25   crossovers are typically done on a profit share basis

34

1    publisher to publisher.  And in discussing this with

2    Mr. Cavin, I realized that, in fact, there was no reason

3    why Neil could not have inserted himself in the one-offs

4    as essentially the other publisher.  And so he discussed

5    the possibly of calculating an alternative method of

6    compensation.

7        Q    And do you know what method of compensation he

8    ultimately decided to use?

9        A    No.  It was very general.  It was just a concern

10   that, in fact, that was a valid precedent, and I

11   confirmed that it was.

12       Q    And how did you personally know that?

13       A    Know that that was a typical way of doing it?

14       Q    Yes.

15       A    I've been involved in copublishing, and

16   specifically with D.C, and I know they're structured in

17   my experience as a 50/50 profit split.

18       Q    Do you recall anything else you discussed in the

19   second conversation with Mr. Cavin?

20       A    I think that was the primary focus.

21       Q    Anything else you recall?

22       A    Not offhand.

23       Q    Did you take notes at that conversation?

24       A    No, I did not.

25       Q    And the other conversations you had, beyond

1    simply setting up times for the substantial

2    conversations, do you remember anything of substance in

3    these other conversations with Mr. Cavin?

4        A    I don't think so.

5        Q    Mr. Kitchen, prior to this lawsuit, had you ever

6    been retained in a lawsuit to serve as an expert

7    witness?

8        A    No, I have not.

9        Q    Have you ever written any articles for

10   publication on any of the topics that you have offered

11   your expert witness on in this report?

12       A    Well, that's a broad question.  I've written a

13   lot of articles over the years.

14       Q    I would think more to the extent that they exist

15   within the comic book industry, what we would call

16   scholarly articles.

17           MS. EADS:  Objection as to form.  Answer if you

18   can.

19           THE WITNESS:  I've written a lot of articles over

20   the last 30 years that some of which could be regarded

21   as scholarly, I think, yes, historical, state of the

22   art, all kinds of topics.  So I hope that's helpful.

23       Q    (By Mr. Kahn)  Have you written any articles,

24   scholarly or otherwise on which you described in your

25   report as the star system?

36

1      A   Not specifically, no.

2      Q   And help us understand what you mean when you say

3   not specifically.

4      A   In other words, I haven't written articles

5   specifically about the star system.

6      Q   Have you written articles that have discussed the

7   star system?

8      A   I don't think it would have been relevant in any

9   of those articles.

10     Q   So that answer is no?

11     A   I believe it would be, yes.

12     Q   You believe, yes; it would be no?

13     A   In other words, I have not specifically written

14  about the star system other than in this report.

15     Q   And I assume that you've written no articles on

16  the topic of one-offs?

17     A   That's correct.

18     Q   Let me ask you now in your exhibit, which is

19  Exhibit 201, your report, to turn to the bottom of Page

20  2 under the Summary of Expected Testimony, to the first

21  subheading, which is Capsule History of the Comics

22  Industry.

23     A   Yes.

24     Q   Which is a five-paragraph capsule history,

25  correct?

37

1       A    Yes.

2       Q    What is this based on?

3       A    Based on my observations and my readings

4    throughout my career.  The purpose is to just try to

5    summarize.  As it says, it's a capsule history.

6       Q    I mean, there are no sources cited for these five

7    paragraphs, and based upon your age, some of the events

8    took place before you were born.  So I'm wondering what

9    material you actually relied upon in writing this?

10      A    Well, again, you could have a very long answer to

11   that, but I would say to begin with, I've been closely

12   associated for the last 30 years with Will Eisner, who

13   was, in fact, there at the birth of the comic book

14   industry, and I've had countless discussions with him

15   about the origin and history of the comics industry.  So

16   one of my closest friends and associates in the industry

17   was there.  And most of this is based on my having read

18   a number of accounts and having talked to people who

19   were there.  I don't think anything that's written here

20   is controversial.  I think it's based upon fact.

21      Q    Is the language that appears here your own

22   language, or is this taken from other sources?

23      A    This is entirely my own language.

24      Q    You mentioned in the last paragraph something

25   that begins I guess with a speculator boom in the early

38

1    90's, and then a decline in sales after that.  Could you
2    describe that in a little more detail for us?
3        A    The speculator boom?
4        Q    Well, both the boom, and what period is covered
5    by the decline.
6        A    Well, in my experience and my observation,
7    starting about 1993 industry sales began tapering off
8    after previously showing considerable growth.  So it's
9    been, again, based on reports in various trade
10   publications, there's been a steady and measurable
11   decline in comic sales.
12       Q    And has that steady and measurable decline
13   continued through today?
14       A    I couldn't quite hear that.  Could you please
15   repeat it?
16       Q    Sure.  Has that decline, which you described here
17   as steady, has that decline in sales which began in
18   1993, 1994, continued through today?
19       A    Actually the past year or so there's been some
20   evidence of it bottoming out.  There still seems to be
21   some debate on that.  But, hopefully for the industry's
22   sake, it has bottomed out.
23       Q    So from an overall comic book sales perspective,
24   were I to compare let's say the top 10 selling comic
25   books in 1993 with the top 10 selling comic books in

39

1      1996, would you expect that the sales would be lower in

2      '96 than they were in '93?

3          A    Absolutely.

4          Q    And would you expect the sales would be lower in

5      1999 than they were in 1996?

6          A    Yes, I would.

7          Q    And that would continue until the last year or

8      so?

9          A    Yes.

10         Q    And I assume that that decline in sales would not

11     simply be the top selling comic books.  It would be

12     across the board?

13         A    Correct.  I'm talking overall, because there are

14     certainly occasional exceptions, occasional blockbusters

15     that could skew the top seller list, but not the overall

16     trends.

17         Q    Let's turn to the second section, which is

18     entitled Creative Rights.  And actually before we start

19     on that section, what is your understanding, based on

20     your conversations with the plaintiff's lawyers and your

21     own investigation, the relevance of your "Capsular

22     History of the Comic Book Industry" to this lawsuit?

23         A    As I said at the beginning, when I spoke to Joan,

24     she thought it was important that I be able to convey

25     some background to presumably a jury.  And so I felt it

1    was important for someone who's not familiar with the

2    comics industry to understand its brief history and how

3    we got to the point, because particularly I think it's

4    relevant to creator's rights.  I wanted the

5    nonprofessional to understand how the industry has

6    evolved.

7        Q    Okay.  Now, let's shift to Creator's Rights,

8    which is No. 2, and it begins on Page 3 of Exhibit 201.

9        A    Yes.

10       Q    And there are some date references that go as far

11   back as the 1930's.  And I assume that's based either on

12   your conversations with Mr. Eisner or others who were

13   there then, or your readings during that period?

14       A    Correct.  And it's also basis in fact.  Any of

15   the books published from that period are clearly owned

16   by the publisher.  There were no creator-owned comic

17   book properties in the 1930's or for a number of years

18   afterwards.

19       Q    The last paragraph of this section talks about

20   something that occurred in the late 1980's that

21   culminated in a document called a "Bill of Rights for

22   Comic Creators."  And I want to ask you something about

23   that.  Were you among the group of comic book creators

24   that convened and wrote that document?

25       A    No, not at all.

41

1       Q    Do you know who was?

2       A    I know some of the names.  I wasn't there.  I

3   know Scott McCloud is probably the primary architect.  I

4   believe Steve Visset was part of it.  And I'm trying to

5   remember.  Someone I think told me Larry Martyr was part

6   of it.  Another Vermont artist, I can't think of his

7   name at the moment, but again, I wasn't there.  I saw

8   the documents.  And since I was principally a publisher

9   when that came out, I would not have been invited.  I

10  would have been regarded as part of the enemy in the

11  most general sense.

12      Q    And is it your understanding that Todd McFarlane

13  was not a part of this group of comic book creators who

14  wrote this document?

15      A    To my knowledge he was not.

16      Q    And what about Neil Gaiman?  Was he part of that

17  group?

18      A    I don't recall hearing his name associated with

19  the formation of it, no.

20      Q    So at some point out of this meeting of these

21  comic book creators who include some of the names you've

22  mentioned here, Scott McCloud, Steve Visset, and others,

23  a document called a "Bill of Rights for Comic Creators,"

24  comes out, correct?

25      A    Yes.

42

1      Q    What happens to that document after it comes out?

2      A    Well, as I noted in the report, it was widely

3    circulated in the industry.  It simply, as I said here,

4    it was -- it reflected the ongoing struggle between

5    those who published and those who created.  And I simply

6    cited in that context that it wasn't regarded as gospel

7    by anyone other than perhaps the ones who wrote it.  And

8    even then I think they regarded it as a somewhat

9    idealistic set of goals that most people in the industry

10   would not have accepted in the literal sense.  But from

11   a scale of, you know, 1 to 10, 1 being the publishers

12   have complete control, and 10 being creators have all

13   the control, this would certainly be a 10.  And in my

14   view, somewhere around 5 is where it makes sense to

15   enter into mutually profitable relationships.

16     Q    Since the time that the "Comic Book Creator's

17   Bill of Rights" has been drafted, have other artists or

18   have any publishers signed on or formerly adopted it?

19     A    I think not.  As I said, I cited it only to show

20   the intellectual thought process that was going on among

21   a vanguard of creators that was articulate and very

22   active.  There were many, many countless discussions

23   going on between individuals.  Certainly at comic book

24   conventions, anywhere they were gathering, you know, one

25   of the burning issues of the day.

43

1    Q   And to your knowledge, no mainstream comic book

2    publisher has ever adopted this, correct?

3    A   If a mainstream publisher adopted this, I don't

4    think they would stay in business.  As I said, I think

5    it's a very idealistic document, not a pragmatic

6    document.

7    Q   Mr. Kitchen, let me ask you the same question for

8    this Section 2 that I asked you about Section 1, which

9    is, what is your understanding of the relevance of this

10    portion of your report to any issue in the lawsuit?

11    A   Because creator's rights seem to be an essential

12    element in the dispute between Neil and Todd.

13    Q   Okay.  And how would the "Bill of Rights for

14    Comics Creators" be relevant to that?

15    A   I don't see it in itself being specifically

16    relevant.  I'm going to reread my report here.  It says,

17    "It reflected the intellectual thought process of many

18    comic creators and underscored the ongoing debate and

19    struggle of creators' rights versus publishers' rights."

20    It was in this climate that Todd McFarlane left Marvel

21    Comics in 1991, etc.  I think that's the relevance.

22    Q   Have you ever had a conversation with Todd

23    McFarlane about the "Bill of Rights for Comic Creators?"

24    A   No, I have not.

25    Q   Do you know Mr. McFarlane?

44

```
 1        A    We've met.  We played softball together one time.

 2        Q    When did you play softball together?

 3        A    In San Diego there was a long time tradition of a

 4   softball game between publishers and artists on one side

 5   and distributors and retailers on the other side.  I had

 6   been the captain of the publisher/artists team for a

 7   number of years, and I heard that Todd had played semi-

 8   pro ball, and so I recruited him to be a ringer for our

 9   team.

10        Q    Was he any good?

11        A    He was great.

12        Q    Other than playing softball with him, have you

13   had any other relationship with Todd McFarlane over the

14   years, either with Todd McFarlane or any of his

15   companies?

16        A    I made an attempt to communicate with Todd some

17   years back and failed to elicit any responses from him.

18   So I don't know if you'd characterize that as a

19   relationship.

20        Q    And what was that attempt to communicate with him

21   about?

22        A    In my capacity as the Chair of the Comic Book

23   Legal Defense Fund, I sent him a fax asking if we could

24   use his "Spawn" character on a lunch box that would be

25   sold to raise money for the CBLDF, essentially asking
```

45

1   him for a free, one-time nonexclusive license.  And I

2   did not get a response.  And sometime later, sent a

3   follow-up fax asking if he'd gotten the earlier one

4   telling him that we were hoping he would cooperate and

5   did not get a response.  And as I recall, I think I sent

6   a third fax saying:  I just want to make sure that you

7   aren't too busy or were distracted, but I said:  Your

8   failure to communicate, I presume is a negative.  So I

9   won't bother you anymore.  And that was to paraphrase.

10  I made several attempts and never got a response.  And

11  other than that, I've had no interaction with Todd

12  whatever to my recollection.

13      Q   And have you had any interaction with any of his

14  companies?

15      A   A few months ago I, on behalf of a client my

16  agency represents, I wrote to his company asking for

17  some information regarding royalty payments.  I didn't

18  deal with Todd directly.  I dealt with a woman who

19  handles his royalty accounting.  And I can't offhand

20  recall any other communications with his company.

21      Q   And was that in connection with Mr. James O'Barr?

22  Was he your client?

23      A   Yes, that's correct.

24      Q   And what was the nature of your letter?  Was it a

25  dispute with one of Todd's companies?

```
 1      A    No.  I wouldn't characterize it as a dispute.
 2    Our client believed that he was not paid what he was
 3    supposed to have been paid under a pro licensing
 4    agreement.  And so I simply asked for clarification of
 5    the accounting, and Todd's company was quite
 6    cooperative.  And based on what they provided, I believe
 7    the client was incorrect in his conclusion.  In his own
 8    mind, his claim I think was incorrect and it predated my
 9    representation of him.  So I simply had to look at the
10    evidence.
11      Q    And did the evidence make you believe that Todd's
12    company had actually paid your client the royalty your
13    client was due?
14      A    Yes.  I -- subject to any audit or anything, yes.
15    I'm convinced that he acted honorably.
16      Q    Do you have any familiarity in either first hand
17    or what you've read of a lawsuit that Todd McFarlane and
18    his companies got involved with where they were sued by
19    a former professional hockey player name Tony Twist?
20      A    I read the media accounts.
21      Q    Was it your belief that there were any First
22    Amendment issues involved in that lawsuit?
23      A    There might have been.  And actually I think I
24    remember that the CBLDF discussed the fact that Todd
25    might even be approaching us.  But I think, obviously,
```

47

1   he did not and he handled it himself and he prevailed as

2   I understand it.

3       Q    And to your knowledge, did anyone from Todd

4   McFarlane or his companies or anyone from Image Comics

5   approach the Comic Book Legal Defense Fund in connection

6   with the Tony Twist case?

7       A    No.  To my recollection we were never approached.

8   The closest I can think of is that Larry Martyr was at a

9   CBLDF party, and he and I casually discussed it.  But

10  there was no formal discussion of any kind.

11      Q    And does the Comic Book Legal Defense Fund

12  normally operate that way?  Mainly they wait to be

13  approached by somebody in the comic book world?

14      A    We're a widely publicized organization, and our

15  800 number is posted everywhere in publications, store

16  windows, and so on.  Standard procedure is people ask

17  for our financial assistance.  And the board runs it by

18  an attorney who specializes in those cases, makes his

19  open recommendations, and the Board votes on whether to

20  support and to what extent it will provide support.

21      Q    Mr. Kitchen, before you were retained in this

22  case to be an expert witness, were you at all familiar

23  with the "Spawn" comics?

24      A    It would have been impossible not to be aware of

25  it.

48

1      Q    And why do you say that?

2      A    Well, certainly in our industry because it was a

3    best seller, because it spawned, so to speak, a lot of

4    media and publicized spinoffs.

5      Q    Before you were retained for this lawsuit, were

6    you aware that Neil Gaiman had once written an issue of

7    "Spawn?"

8      A    I was vaguely aware.  It's not something I had

9    read.

10      Q    And were you vaguely aware at the time that there

11    were some other guest writers during that same period

12    who wrote issues of "Spawn?"

13      A    Yes, I was, because it was publicized, and to

14    that extent I was aware, yes.

15      Q    Was it a novel marketing effort to have these

16    four guest writers to those issues of "Spawn?"

17      A    Yeah.  I thought it was actually a brilliant move

18    at the time.

19      Q    How so?

20      A    Well, that it served two purposes.  It got free

21    publicity, and because it was a way of "Spawn" to

22    respond to a general criticism that the writing was a

23    weaker element in the publication.  So they went out and

24    found the best writers he could.  And I thought that

25    showed a certain sense of humor and marketing savvy.

1       Q    And if I have read your report correctly, you've

2    at least reviewed the sales figures for those issues in

3    which there were guest writers?

4       A    Yes.

5       Q    And that marketing strategy paid off?

6       A    Yes.  I believe it showed a roughly 50% jump in

7    the issues done by the four writers.

8       Q    That actually brings me to Topic 4 in your

9    report, which is the star system, which begins on Page 4

10   of Exhibit 201.

11      A    Yes.

12      Q    Now, other than your observations of the

13   industry, and that may be enough, what is this section

14   of your report based upon?

15      A    Well, I think you just said it.  It's based on my

16   observation and experience.  It's what I would regard as

17   common knowledge in the industry.

18      Q    I look at the third paragraph here where you

19   state in your opening sentence that a star's association

20   with a comic can be expected to add substantially to

21   bottom line profits on that comic.  What is that

22   statement based on?

23      A    Based on my experience as a publisher and from

24   talking to other publishers.  Again, I think fairly

25   common sense statement.  It would be analogous to a film

1    having a star and being more likely to attract viewers

2    into the theater.  A star in a comic book results in

3    more people taking that comic off the shelf.

4        Q    Other than your discussion in this expert report

5    of which you believe Neil's impact on the "Spawn" sales

6    with his Issue No. 9 as part of that four-writer group

7    of issues where the sales jumped you calculated

8    approximately 50%, have you done any other empirical

9    investigation into the impact that the star system has

10   in comic book sales?

11       A    Well, it would be based on my own experience and

12   in talking to other publishers over the years.

13       Q    Well, for example, have you looked at circulation

14   or sales numbers of Neil Gaiman's and other comic books

15   to determine what impact his name has on comic books

16   outside of "Spawn" comics?

17       A    I'm not quite sure I heard that question

18   completely.  Would you please repeat it?

19       Q    Sure.  Have you had an opportunity to look at any

20   sales or circulation numbers for other comic books that

21   Neil Gaiman has been involved with over the years to

22   determine what impact his name under your star system

23   description, what impact his name has on the bottom line

24   profits of those comic books?

25       A    Well, I certainly wouldn't know the bottom line

1    profits, not specifically, but the same references I'm
2    sure could be referred to.  My opinion is that largely
3    in talking to people at D.C. Comics who have told me
4    that Neil's name on books are pretty much guaranteed
5    success, but I'm not privy to the specific numbers.
6    That's proprietary.
7         Q    But there are some numbers that are available in
8    reference books, correct?
9         A    Yes, they are.  It requires some extrapolation in
10   many cases because the Crowzy book I referenced utilizes
11   numbers that were taken from the archives of Capital
12   City Distribution, and you have to calculate their
13   approximate market share during the period you use them.
14   In other cases they have "Diamond's" preorder numbers,
15   but those aren't complete.  So there are very few
16   instances in that book where there is an absolute,
17   positive, you know, number without any slight ambiguity.
18   But you can still extrapolate pretty closely.
19        Q    Well, for example, let me ask you to look at
20   Exhibit 202, which is this Bibliography of Neil's.  If
21   you look at Page 2.
22             MS. EADS:  Just a minute.
23             THE WITNESS:  We just got it so I haven't looked
24   at it at all.
25        Q    (By Mr. Kahn)   That's okay.  What I did is I


52

1    looked through it to try to find examples of what

2    appeared to be special writing projects by Neil roughly

3    during the same time period.  And I look at one on Page

4    2.  It's a "Batman Black and White, No. 2."

5        A    Okay.

6        Q    I think which is a D.C. Comics publication in

7    1996.  What source could you go to to test your

8    hypothesis that Neil would have a 50% impact on the

9    sales of "Batman?"

10       A    I couldn't say that it would have a 50% impact on

11   "Batman."  What I said in my report was that the numbers

12   showed a 50% impact on "Spawn".  As a general statement,

13   I would say that Neil's name on any comic would improve

14   its sales.  But I never broadly said it would be 50% on

15   anything.  I imagine there are some books that would be

16   a smaller percentage.  And I imagine there are some

17   books he could double in circulation, but I couldn't

18   tell you offhand what it would have on a single title

19   that you point out.

20       Q    I'm just trying to find out how we could go ahead

21   and test your theory of his impact under the star

22   system.  And if we took this as an example, this,

23   "Batman Black and White, No. 2," what resources could we

24   go to to determine what impact, if any, his name had on

25   the sales of that comic book?

1       A    Well, in an ideal world, you would get the

2    numbers from D.C. Comics.

3       Q    And how about in the real world?

4       A    Then you would have to rely on known distributor

5    information.

6       Q    And I assume, because it's not mentioned in your

7    report, that you did not attempt to do that for any

8    other publications for which Neil Gaiman wrote single

9    comic books or miniseries, correct?

10      A    That's correct.

11      Q    You mentioned some of the other stars when we

12   were talking earlier about your star system, and we can

13   just go with Allen Moore and Frank Miller who were both

14   writers in this early "Spawn" issue, and who, along with

15   Neil, were in that group where the circulation went up

16   50%.  Have you attempted to test your star system theory

17   with any other publications by Allen Moore or Frank

18   Miller?

19      A    I wasn't asked to do that.

20      Q    So your answer is no?

21      A    Correct.

22      Q    Now, you state that during this time period, and

23   this is the second paragraph of your Star System

24   section.  And I quote, "That Neil Gaiman was one of the

25   biggest stars among comic book creators during the time

54

```
 1    of this dispute."  And then you go on to make some

 2    additional statements on that topic in the rest of that

 3    paragraph.  And other than what you've set forth in that

 4    paragraph, do you have any other basis for stating that

 5    Neil Gaiman was one of the biggest stars in the comic

 6    book industry during the time of that dispute?

 7        A    Well, sure.  He was the subject -- he was a guest

 8    at many conventions where I saw very long lines.  He was

 9    the subject of a lot of interviews and media attention

10    when I had many occasions to go to the D.C. offices to

11    conduct business, and I know he was treated very

12    reverentially there.  In other words, he was treated

13    like a star.  When the CBLDF had a fundraising cruise

14    four years ago, Neil was one of the first people we

15    approached to be on there because of his star

16    attraction.  That was before he was on the Board.  So I

17    mean, there are countless examples of --

18        Q    Okay.  Well that's good.  And you don't need to

19    give me all of them, but I understand where you're

20    coming from.  During this period of time --

21        A    I can give you one example that's rather unusual.

22    He donated his leather jacket for an auction and it

23    raised about $12,000.  So I mean, essentially he's the

24    comic book equivalent of a rock star.

25        Q    Okay.  During this period, and let's call it 1992
```

1     to 1996, "Spawn" was being published by Image Comics,

2     correct, for the most part, throughout most of that

3     period?

4          A     You're asking me?

5          Q     Yes.

6          A     If "Spawn" was published by Image?

7          Q     Yes.

8          A     Yes.

9          Q     Yes.  So you're somewhat familiar with Image

10    Comics where it fits into the constellation of comic

11    book publishers?

12         A     Sure.

13         Q     Was Image Comics a larger publisher or a smaller

14    publisher than D.C. Comics?

15         A     Smaller than D.C.

16         Q     Would it be fair to stay it was much smaller?

17         A     Depends on what you mean by much.  Marvel and

18    D.C. obviously dominate, but Image was among that second

19    tier, and it was in that cluster of what I would call

20    middle-sized publishers.

21         Q     Are you familiar during that time period with a

22    comic book series that Neil Gaiman was the principal

23    writer of for D.C. Comics called, "Sandman?"

24         A     Yes.

25         Q     In fact, if we look at Exhibit 202, which is

1    arranged alphabetically by title, it appears that

2    "Sandman" begins, number one, back in 1989, and runs at

3    least through 1995.  And that was a comic book series

4    published by D.C. Comics, correct?

5       A    Yes.

6       Q    Do you know what the approximate circulation

7    numbers were for "Sandman" during the time that Neil

8    Gaiman was the principal writer for that series?

9       A    Not offhand, no.

10      Q    Do you know approximately how the "Sandman"

11   circulation numbers compared to some of the biggest

12   selling titles during that period of time?

13      A    I haven't done a comparison so I cannot tell you

14   specifically, no.  I only know that D.C. was very happy

15   with it and it would appear that it was a very

16   successful title for them.

17      Q    And according to you, Neil Gaiman was the

18   equivalent of a rock star within the comic book world?

19      A    As a personality, yes.  He was treated as one.

20   And I also say that because at conventions a

21   disproportionate number of female fans were always

22   milling about.  I mean, he had a certain strong cult

23   following is the only way to describe it.  I say the

24   equivalent of a rock star because, as you may not be

25   aware, most cartoonists are generally speaking more

1    nerdish types as well as the writers.  And so the fact

2    that he has a certain persona and a certain manner of

3    dressing and speaking makes him stand out from the

4    crowd, and it adds to that what I would call rock star

5    persona.

6        Q    Do you have any knowledge of how the "Sandman"

7    sales figures during the 1993 to 1996 period compared

8    with the "Spawn" sales figures?

9        A    I don't know, but I would suspect "Spawn" outsold

10   it.  That's only my guess.

11       Q    And do you believe that "Spawn" outsold it even

12   when Neil Gaiman was not writing for "Spawn"?

13       A    Honestly I'd have to look it up.  I'd rather not

14   speculate on that.

15       Q    Would you have an explanation if it turns out

16   that "Spawn" was consistently outselling "Sandman"

17   during that period after Neil stopped writing for

18   "Spawn," why "Spawn" would continue to outsell a comic

19   book title published by D.C. Comics featuring one of the

20   biggest stars in the comic book world?

21       A    I would suppose because of the media push behind

22   "Spawn", the fact that there was the animated show, the

23   movie, the toys, and the fact that it was a central

24   character with a costume as opposed to "Sandman," which

25   is more mythological and did not have a TV show or media

58

1   push behind it.

2       Q   Now, are you aware that during the same time

3   period Neil wrote a three-issue miniseries for Todd

4   McFarlane Productions featuring the main character

5   "Angela?"

6       A   I'm aware of it, yes.

7       Q   And trying to apply your star system to those

8   issues in that miniseries, how would you expect the

9   sales of that miniseries to compare with the sales of

10  "Spawn" itself during that same period?

11      MS. EADS:  Could you repeat that, please?

12      Q   (By Mr. Kahn)  Sure.  Taking the sales figures

13  for the "Angela" miniseries, those three issues being

14  written by Neil Gaiman under your star system theory and

15  opinion, Mr. Kitchen, how would you expect the "Angela"

16  sales to compare to the "Spawn" sales during that same

17  period?

18      A   If his name was exploited properly and all things

19  being equal, I would expect there to be an impact.

20      Q   Would you expect the "Angela" miniseries issues,

21  assuming that his name was exploited properly, to be

22  outselling the "Spawn" comic book issues during that

23  same period?

24      A   Not necessarily, because "Spawn" was an

25  established best seller with a name recognition that

1    "Angela" did not have.  And without having done

2    personally any marketing survey, the character "Angela"

3    may not have been properly -- may not have been as well

4    known.  "Spawn," for example, I think I mentioned in my

5    report that the "X Men" series was a best seller for

6    Marvel.  But the spin-offs of "X Men" sold considerably

7    less.  Basically it's the flagship title series, just

8    like "Spiderman," "Batman," all of the primary

9    characters have spin-offs, and publishers try to exploit

10   them.  But there is a flagship title that really anchors

11   the sales, and my observation is that the "Angela" with

12   a spin-off wouldn't have done as well as the flagship,

13   but I would say that Neil associated with a spin-off

14   would have made it sell better than a comparable spin-

15   off by a nonstar.

16       Q   And have you had an opportunity to test that

17   opinion by looking at actual sales data?

18       A   I went through the book that I have in front of

19   me, the catalog.  And I did make some general

20   observation, but I did not apply empirical data, no.

21       Q   I mean, I assume there would be many factors and

22   many variables that would affect sales, correct?

23       A   Well, yes, including things like the cover artist

24   and the subject of the cover, timing, promotion.  There

25   are all kinds of factors.  It's very hard to completely

60

1    generalize.

2        Q    Okay.  And so the actual cover art could have a

3    major impact on the sales of an issue?

4        A    Well certainly, because the star system doesn't

5    just apply to writers, it applies to artists.  I think

6    there are probably a few ordinary comic titles out there

7    that if Todd McFarlane had done a guest cover, you would

8    have seen a jump in sales because a certain number of

9    his fans would have wanted it.  Those are the kinds of

10   marketing tricks and devices publishers and editors are

11   always trying to do.  You try to get your best

12   combination of writer and artist.  And since there is

13   only a handful of stars, you make do with your ordinary

14   talent in most cases.

15       Q    And I think you also mentioned that the

16   marketing campaign would have an impact on sales?

17       A    Well, that's what logic would say, yes.

18       Q    And that would be another variable or another

19   factor?

20       A    Certainly.

21       Q    That you'd need to include in whatever study you

22   made?

23       A    In a proper study, yes.  You'd try to analyze all

24   those factors.

25       Q    In continuing on to Section 5, which is entitled,

```
 1    Neil's Right to Author One-offs.

 2        A    Yes.

 3        MR. EADS:  Mike, this is Joan Eads.  It's 2:00

 4    here and the witness is actually getting a little

 5    hungry.  If you're going to be finished in about half an

 6    hour, I'd say we go on, but it doesn't look like to me

 7    you will be.

 8        MR. KAHN:  I mean, I can't speak for anybody else

 9    on the line.  I don't think I have more than about a

10    half hour.  That could be famous last words.

11        MS. EADS:  I just don't want the witness to faint

12    on us.

13        MR. KAHN:  Well, no.  I certainly don't.  And we

14    can handle this, Joan, any way that you want.  I know

15    you wanted to get out of there.

16        MS. EADS:  Well, it's up to the witness really.

17    Would you like to take a break and get a quick sandwich

18    and then come back?

19        THE WITNESS:  No.  If it's less than an hour, I'm

20    happy to continue right now.

21        MR. KAHN:  Do you want to take a five minute

22    break or do you want to proceed?

23        THE WITNESS:  Well, we didn't have lunch and I

24    wasn't sure if we'd be getting a snack here or something

25    soon.  Five minutes would be good.
```

62

1        (A short recess was taken.)

2        Q    (By Mr. Kahn)  Dennis, we are back on the record

3    and I just had some more questions I wanted to try to

4    get the answers to on the remaining portion of your

5    report.  Was Neil Gaiman the person who told you in this

6    conversation that his concept of the one-offs were to be

7    a three or four issue miniseries of "Batman," "Medieval

8    Spawn" and a three or four issue miniseries of "Angela

9    Phoenix?"

10       A    No.  I believe I described earlier in the report

11   that a miniseries typically is three to four issues and

12   there are sometimes, you know, two issue miniseries and

13   conceivably longer ones, but three or four is by far the

14   most common.  And Neil did not seem to have in mind

15   whether it was three or four, just that it was a

16   miniseries.  And so as I stated, I believe the -- I'm

17   looking for the paragraph here, but basically that was

18   the only place I took what I would consider an

19   aggressive position.  I based it on the assumption that

20   he would want to maximize his opportunity on a one-off,

21   and on everything else I tried to err on the

22   conservative side.

23       Q    Right.  And this one you said you assumed

24   although he was talking three to four, he would do all

25   four?

63

1      A    Yes.

2      Q    And my question is actually simpler than that,

3    Dennis.  Did Neil tell you in his conversation with you

4    he was planning to do a three to four?

5      A    No he used the term miniseries.

6      Q    Okay.  And you said there had been two issue

7    miniseries, but the more common ones are three to four

8    issues?

9      A    Correct.

10      Q    And that's Dennis Kitchen's interpretation of

11    what Neil Gaiman meant when he said miniseries?

12      A    Yes.  In that single instance, I took a more

13    aggressive position because if I were Neil Gaiman and I

14    saw this as an opportunity for economic compensation, I

15    would want to get that extra issue in there.  And so

16    yes, I made that conclusion.  In other words, it was

17    ambiguous and that's how I interpreted it.  And every

18    other instance where there was a choice, I took a

19    conservative position.

20      Q    And just so I'm clear.  In your conversation with

21    Neil, he actually used the term miniseries, or he just

22    used the term one-off?

23      A    When I was clarifying that project, that one-off

24    project meant miniseries and graphic novel collection.

25    He confirmed that, yes, it was miniseries and the

1    collection.  That was the purpose of that call.

2        Q   Okay.

3        A   I did not -- I mean, I suppose you could say I

4    could have or should have at that moment asked him if

5    the miniseries was a particular number.  I in my mind,

6    and I think if you ask the average person in the

7    industry, a miniseries would be three or four issues.

8        Q   And forgive me if this is a stupid question

9    coming from someone who's not as familiar with the comic

10   book industry as you.  If Neil was thinking of a two-

11   issue miniseries, would there also be a trade paperback

12   collection?

13       A   Not likely.  It would have been too thin.  And

14   it's not unprecedented, but, you know, you'd be talking

15   about a 56 page book or something.  You'd barely get a

16   square spine around that.

17       Q   And so then if it was a one-issue series or a

18   one-issue project, there definitely would not be a trade

19   paperback collection, correct?

20       A   Well -- correct.

21       Q   Okay.  Like I said, it could be a stupid

22   question, but I just needed to clarify it.  In this

23   section, which is No. 5 in your report, you talk about

24   your 50% impact by going back and comparing sales

25   numbers for "Spawn" issues 2 through 7, and then

1      comparing them with the four issues by the star writers,

2      and then stating, "After the impact of the guest writers

3      crested (you go on to state) that the orders on 'Spawn'

4      quickly declined to prestar levels and below."  Do you

5      actually -- do you have those numbers written down

6      somewhere of what these different orders were?

7          A    I don't have that book with me today, but I

8      remember that after the 50% jump, there were a handful

9      of issues that stayed in that range, and then it dropped

10     back to the pre guest writer numbers.  My conclusion on

11     that was that, obviously, the novelty effect wore off,

12     and then the core readers were there.

13         Q    And then as you mention earlier, one would expect

14     from that point on the sales to continue to decline as

15     they were across the board in the industry?

16         A    Yes.  And I think without having it in front of

17     me, that was the case even with "Spawn", which was

18     regarded as certainly one of the more successful titles.

19     It certainly didn't maintain numbers that it had during

20     that period of time.  I don't have them in front of me,

21     but I do remember observing the decline.

22         Q    Based on your conversation with Neil and your

23     review of the deposition and the documents, what is your

24     understanding of the time frame in which Neil was going

25     to publish these one-off projects?

66

1      A    My understanding is that he would do it as soon

2    as he could put together the deal.  Normally there was a

3    gestation period of nine months to a year, in my

4    experience on a project, once you decide to do it.  So

5    that's as close to an answer as I can give you.

6      Q    I mean, you say gestation period.  You mean once

7    you've actually signed the deal, it then takes nine

8    months to a year to get it onto the newsstands?

9      A    Right.  Now, some will take longer if they are

10    more complex.  But assuming Neil delivered the script in

11    a timely manner, and his collaborator was identified and

12    was available and so on, there is a number of variables,

13    it would be tough to do in a short period of time.

14    Could have taken longer.

15      Q    And what is your experience as to how long it

16    would take to put together that deal?

17      A    Well, that's a loaded question.  I would say

18    given that Neil had a very good relationship with D.C.

19    and had already a template in place contractually, that

20    would have taken very little time at all.  I'm not sure

21    what his professional relationship was with Marvel, but

22    I suspect that Marvel would have been very eager to work

23    with Neil just because of his reputation and known

24    appeal.  In my own experience, depending on the attorney

25    and depending on, you know, whether there are

67

1    distractions, you can do a deal in a couple weeks.  You

2    can do it in a couple months.  They can take longer, but

3    that's the normal range.

4        Q    Other than what you've already testified to and

5    the documents you reviewed, you don't know whether Neil

6    was actually negotiating to put these two deals

7    together, correct?

8        A    All I know is that he approached them and when

9    they called Todd for confirmation that Neil had the

10   right, there was a nonresponse.  That's my knowledge.

11       Q    And where did you gain that knowledge?

12       A    It must have been from the depositions with Neil.

13       Q    And do you know who Neil approached at either

14   D.C. Comics or Marvel Comics?

15       A    I do not.  I was not privy to that.

16       Q    One of the documents you mentioned you looked at

17   is one we've marked as Exhibit 129, which is the Bo

18   Smith memo to Todd?

19       A    Yes.

20       Q    Did that indicate to you that at least as of

21   July, 1998, Neil's deal with D.C. Comics had not been

22   finalized to do a "Medieval Spawn" "Batman?"

23            MS. EADS:   John, give the witness a chance to

24   look it over.

25       Q    (By Mr. Kahn)  Okay.

68

1          THE WITNESS:  Okay.  I've reviewed it.  Your

2     question was?

3     Q    Does that indicate to you that at least by July

4     of 1998 this first step in doing the one-off project,

5     namely signing the deal with D.C. Comics, had not yet

6     happened?

7     A    Yeah.  I certainly could conclude that, yes.  And

8     do you have any idea of what Neil's time frame for doing

9     the deal with Marvel was?

10    A    No.  I only know from his deposition that he was

11    very frustrated that they could not get a confirmation

12    from Todd or his company that this was, in fact,

13    something he was permitting.  They kept to the essence

14    of this I guess, which was Neil thought they had a deal,

15    and Todd concluded that he didn't want to go ahead.  I

16    can't tell you more than that because I wasn't privy to

17    who Neil was talking to.

18    Q    Using your gestation period and deal period, was

19    it likely, based on what you know, that these one-off

20    projects would have come out in the year 1999 had they

21    been able to go forward?

22    A    I don't have my notes in front of me, but I

23    believe my conclusion was it would have come earlier.  I

24    think I based it on the initial correspondence here, the

25    earlier documents from July of '97, thinking that if

1        they had come to an essential agreement here, that in

2        approximately a year, perhaps the fall of '98, I thought

3        was a realistic time line.  Not much earlier.  It

4        certainly could have stretched into '99.

5            Q    And that really would just depend on whatever

6        deal the parties were able to strike, correct?

7            A    Well, yes.  I mean -- yes.

8            Q    Right.  In other words, you don't have any

9        independent knowledge of where those deals were at other

10       than this brief conversation you had with Neil, the

11       depositions you reviewed, and these documents we've

12       identified that you looked at?

13           A    Correct.  I have no other independent

14       information.

15           Q    Do you know who Paul Levitz is at D.C. Comics?

16           A    Yes, I do.

17           Q    Based on what you've reviewed, would you be

18       surprised to know that Mr. Levitz has testified that he

19       has no memory of any such "Batman" "Medieval Spawn" deal

20       being discussed at D.C. Comics?

21           A    Not necessarily, because he's at the very top of

22       that company.  And in all likelihood, Neil would have

23       been talking to mid level people.

24           Q    And my understanding is in your discussion of the

25       "Angela Phoenix" crossover, which is at the bottom of

1      Page 5, this is a title that as near as you can recall

2      you saw referenced in Neil's deposition?

3          A    It could only have come from his deposition or a

4      phone conversation, and I believe it's the former.

5          Q    Have you negotiated any deals with Marvel Comics?

6          A    Not in many years.  I worked for Marvel in the

7      1970's.  I haven't had any business with them since.

8          Q    So you would have no basis for knowing how long

9      it would take Marvel Comics to do such a deal, correct?

10         A    No.  But I do know from other observers who have

11     written about the two companies recently, that Marvel

12     actually moves much more quickly.  It's less

13     bureaucratic and it has the ability to turn on a dime,

14     which is one reason it's had a market advantage of late.

15     So I would surmise from that, that in fact, they might

16     even be faster than D.C.  The only reason I said earlier

17     I thought a deal with D.C. would go quickly is that

18     there was a pre-existing relationship.

19         Q    And this stuff that you've read and heard about

20     Marvel, does that apply to the Marvel of the year 2002

21     or the Marvel of the year 1997?

22         A    Well, the specific article I recall was "The

23     Comic Buyers' Guide," an article by Brian Hibbs, that I

24     believe was based on his visit to both offices -- would

25     have been the Christmas of 2000 as I recall.  And he is

1    a fairly prominent retailer, and he visited both

2    companies and met with the heads of both companies.  And

3    then he wrote an article, front-page article, in which

4    he compared the styles of the company.  And having not

5    been in Marvel's offices in many years, I am basing it

6    in part on his observations and from, you know,

7    conversations that get mentioned and so forth and people

8    who deal with Marvel.  And D.C. is without any question

9    a more layered bureaucratic company.

10       Q    In your discussion of your efforts to try to

11   project the sales for a "Medieval Spawn" "Batman" one-

12   off project in Subsection A on Page 5 of Exhibit 201 --

13       A    Yes.

14       Q    -- you talk about a conversation you had with

15   Michael Martin, Vice-president of Marketing with Dark

16   Horse?

17       A    Yes.

18       Q    In which he tells you a certain number of copies

19   of each issue would have been shipped to newsstands on a

20   returnable basis and he tells you what the sell through

21   would be of 17% to 20%, and these are numbers I assume

22   that you used in coming up with your estimates?

23       A    Yes.  And again, I assume that they were

24   conservative numbers because Dark Horse probably has the

25   least clout on newsstands as any of the comics

72

1    publishers do.  But it was a -- it was the only

2    information I was able to get.  This is ordinarily

3    regarded as pretty proprietary.

4        Q   And I guess that's my next question.  Other than

5    these examples that Mr. Martin gave you, did he actually

6    give you the actual numbers?

7        A   Yes, he did.

8        Q   Because here it says he told you that 60,000 to

9    80,000 copies of each issue would have been shipped on a

10   returnable basis with a 17% to 20% sell through.  And

11   then you take averages from that.  Did he actually give

12   you the numbers?  That is, did he give you the actual --

13       A   He gave me that range.  In other words, he didn't

14   say 70,000,he said 60,000 to 80,000, and that was based

15   on his best recollection.  And I think, frankly, he was

16   uncomfortable going and getting the exact number because

17   he would have required his superior's permission, and I

18   think he was doing this as a favor to me and did not

19   want to go so far as to go into the files and pull the

20   exact numbers.  He gave me a range for the purpose of

21   this analysis.

22       Q   Okay.  And I guess, Dennis, that was my only

23   question was that he didn't give you the actual numbers

24   for those issues; is that correct?

25       A   That is correct.

1       Q    And based on your experience in publishing, the

2   actual numbers would exist somewhere, correct?

3       A    Yes.  Either the publisher or the distributor

4   would have those, or both.

5       Q    And let me ask you similar questions for the

6   "Angela Phoenix."  When you're trying to put together

7   numbers, you come up with some specific numbers for some

8   comparative ones --

9       A    Right.  This is the "X Men Alpha Flight?"

10      Q    Right.  I see here you had Diamond preorders of

11  60,000 to 65,000 copies per issue?

12      A    Right.

13      Q    Reorders would add at least 5% to those?

14      A    Right.

15      Q    And you said there would be a certain drop off.

16  Did you have any actual numbers?

17      A    The numbers, the Diamond preorders came from the

18  Crowzy catalog we referenced earlier.  The 5% comes from

19  my personal experience in talking to other publishers as

20  kind of a minimal overrun, in other words, the risk a

21  publisher takes when he establishes a print run.  You

22  can order from your printer exactly as many books as you

23  know your distributor orders, or you can overprint and

24  hope you'll sell them.  A conservative edition is 5%.

25  If you're bullish about a book, you may pick any

74

1    percentage beyond that.  And I and other publishers

2    have.  But it's rare to print exactly as many as your

3    distributor's preorders would indicate.

4        Q   Okay.  Here was my question, and try and

5    understand.  At the top of Page 6 you say that this two

6    issue, "X Men Alpha Flight," you said you had "Diamond"

7    preorders of 60,000 to 65,000 copies per issue?

8        A   Yes.

9        Q   Where do you get -- I mean, that is not an exact

10   number.  That's an estimate, correct?

11       A   Yes.  What I believe I did was I took the two

12   numbers that were in the catalog that were in that

13   range, and rather than I guess bore people here with

14   something like 62,763 and the other, I just took the

15   general range since this was an attempt to find an

16   analogous miniseries, that was a good round number

17   range.  If we went to the catalog, if you have that, you

18   can find out yourself by looking it up.

19       Q   And then if I understand it, you come up with an

20   estimate of an additional 14,800 sales per issue based

21   on --

22       A   This is based on Dark Horse's numbers because I

23   want privy to Marvels, and I was comfortable doing that

24   very conservatively because I knew if anything I would,

25   you know, come close to betting the bank on this, that

1     Marvel has more clout in the marketplace, and probably

2     would have shipped probably more books, but certainly

3     probably at a better sell through because their

4     trademark is much more recognizable in the general

5     market.  So again, I stress these are conservative.

6     Without being privy to their exact numbers, this is the

7     best I could do to come up with some analogous book and

8     a projected sales.

9         Q   Got you.  And the Dark Horse numbers that you

10    reference, those are the numbers that you've got in that

11    telephone conversation where you were actually giving

12    sort of round numbers without being given exact numbers?

13        A   The newsstand numbers were, yes.  The "Diamond"

14    numbers would have come from the catalog.

15        Q   Right.  And I was only referring to these

16    newsstands, which have you estimating an additional

17    14,800 sales per issue?

18        A   Right.  Which is not a great deal, but you know,

19    that's not considered a profit center for most

20    publishers.  That's one reason I never dealt with

21    newsstands.

22        Q   And then you raise everything by this 1.333 sales

23    impact formula for Gaiman's name factor?

24        A   Right.  Again, that was averaging the percentages

25    referenced earlier.

1      Q    The 25% to 50%?

2      A    Right.

3      Q    And that was based, if I understand you

4    correctly, entirely on the circulation numbers that you

5    observed for "Spawn" issues 2 through roughly 14 or 15,

6    correct?

7      A    Well, in part, in part.  We know that was 50.

8    And I --

9      Q    Well, my only question is, you've done no other

10   attempt to quantify Neil's impact on a particular title

11   of a comic book series, correct?

12     A    I did not.  And it certainly could be done.  I

13   think --

14     Q    Okay.  I have one other area which will be very

15   brief.  This goes back to something you mentioned

16   earlier, and then we'll be done, although maybe somebody

17   else will have some questions.  You mentioned earlier,

18   Dennis, that you'd written a lot of articles over the

19   years.  When I'd asked you if you'd written any

20   scholarly articles, you said you'd written a lot of

21   articles and some of them could have been considered

22   scholarly.  Which ones that you wrote would you consider

23   to be scholarly?

24     A    Well, that's a relative term.  I would most

25   recently, for example, Dark Horse put out a two-volume

1    series on the collective "Little Annie Fannie" by Harvey

2    Kurtzman and Will Elder.  I wrote the introduction.  I

3    wrote all of the annotations to those.  Those I would

4    regard as scholarly.  I'm doing the same for a series of

5    "Li'l Abner" books based on Sunday strips from 1954 to

6    1961 by Al Capp and Frank Prezeda.  Those I would regard

7    as scholarly in that they are very specific in nature.

8    They're based on a lot of historical data and political

9    and cultural information.  And the audience for those

10   are relatively small and esoteric.  That I consider

11   scholarly.  If I did something in more of a general

12   publication, I would be less inclined to call it

13   scholarly.  That's a relative term.

14      Q    Are there either in academia or otherwise, are

15   there scholarly or academic publications or periodicals

16   devoted to the comic book world?

17      A    There are professors at various colleges who

18   write books and articles.  And yes, they appear -- I

19   don't think there is one specifically devoted to

20   scholarly research in comics.  If there is, it's pretty

21   obscure.  But for example, I can't think of the exact

22   name of it.  It's basically the pop culture association

23   that comes out of I think Ball State in Indiana.  They

24   have a periodical, and articles in it will from time to

25   time be about comics, but they'll also be about pop

1     culture in general.

2        Q    And are these of a more academic or scholarly

3     nature?

4        A    Sure.  By definition these are academics who are

5     contributing to it.

6        Q    Have you ever contributed articles to that

7     publication?

8        A    No.  I'm not a professor and I'm not a member of

9     that association.

10       Q    And over the years, have you written and had

11    published any scholarly or academic journal, any

12    articles about the comic book world?

13       A    I'm not sure I understand your question.  Could

14    you repeat it?

15       Q    Sure.  We've talked about this pop culture

16    focused academic periodical that's published by Ball

17    State.  And my question to you is, other than that

18    particular publication, are there any other publications

19    that you would consider to be scholarly or academic in

20    nature that have published any articles by you?

21       A    I would say no.  I have written for trade

22    publications, more popular publications than

23    specifically academic publications.

24       Q    Which trade publications have you written for?

25       A    Most recently I've done articles in "Comics

79

1      Buyers' Guide," for example.  I've done them in the past

2      for "Comics Journal."  Gosh, I mean, I don't know that I

3      can recall all of them over the years.  It's been a long

4      time.  Probably some that are no longer in publication.

5      Wrote a lot for my own publications such as

6      introductions and so forth.  I mean, basically that's

7      the whole point of my being an expert here is based on

8      30 years of raw experience.  And I don't claim to be a

9      professor.

10      Q    In looking through your expert report, by subject

11     number under Summary of Expected Testimony where you

12     have five separate subjects beginning with Capsule

13     History of the Comics Industry --

14      A    Yes.

15      Q    Going back to your description of some of the

16     industry publications, "Comics Buyers' Guide," "Comics

17     Journal," and others, can you just briefly tell me

18     whether you have published articles on any of these

19     subjects?  And you can take them one at a time.

20      A    Have I published books on the subjects?

21      Q    Yes.  Either books or articles, beginning with

22     Topic 1, which is a Capsule History of the Comics

23     Industry.

24      A    Sure.  I published a two-volume set called

25     "Century of Comic Strips" that cover literally the first

80

1     hundred years of the media.  I published "The Definitive

2     Book on the Yellow Kid," which is regarded as the first

3     popular comic strip.

4         Q    You know, I may have asked that the wrong way.

5     What I meant to ask is, have you written articles or

6     books that have been published of these topics, not

7     whether you as a publisher have published them?

8         A    No.  I'm not an author of books other than my own

9     comics.  The articles I've written have been, again, for

10    trade publications or introductions to books that I've

11    either published or someone else has published.  I don't

12    claim to be an author.

13         MR. KAHN:  Well, I have no further questions,

14    Mr. Kitchen.  Thank you for sitting here.  And I'll turn

15    this over to anyone else that may have any questions and

16    I will shut up.

17         THE WITNESS:  Okay.

18                   CROSS EXAMINATION

19    BY MR. FELDMANN:

20        Q    This is Scott Feldmann.  Unless other counsel

21    prefer to go first, I have I would estimate several

22    minutes worth of questions if you want to proceed to try

23    to wrap those up?

24        A    Sure.

25        Q    Okay.  Mr. Kitchen, you mentioned you had some

81

1    discussions with the other expert, Mr. Cavin; is that

2    correct, about this case?

3      A    Yes.

4      Q    Did you discuss appearance fees with Mr. Cavin?

5      A    No, not at all.

6      Q    Did you ever discuss with him what the value of

7    using Mr. Gaiman's name in connection with a comic book

8    or trade paperback might be?

9      A    I don't specifically recall that that came up,

10   no.

11     Q    Do you have a general recollection of discussing

12   with Mr. Cavin the value of Mr. Gaiman's name?

13     A    He may have made -- I mean, he obviously has read

14   my report, and I think there was a general discussion,

15   but I can't recall that specificity.

16     Q    Did you discuss with him the value of using an

17   author's biographical information in connection with

18   publishing a trade paperback?

19     A    No.  We absolutely didn't discuss that.

20     Q    Do you have an opinion as to whether or not using

21   an author's biographical information on a book would

22   increase sales of that book?

23     A    By biographical information, you're talking about

24   having a capsule paragraph about them or their photo on

25   a back cover or something of that effect?

1      Q   Well, excluding the photo, just a narrative

2    description of prior publications and other works,

3    whatever general biographical information that a

4    publisher might choose to use.

5      A   In my personal opinion, I don't think that would

6    have a significant impact.

7      Q   Can you quantify that in a range?  Would that be

8    less than 20% or nonmaterial impact at all, 0%?

9      A   The author's name on the cover has a significant

10    impact.  The biographical information itself -- I mean,

11    obviously, depending on the author, you know, there may

12    be a factor.  But the paragraph itself on the back cover

13    is not what I would consider something with major

14    marketing impact.

15      Q   What would your opinion be in terms of any

16    incremental sales would be due to using biographical

17    information about Mr. Gaiman in addition to using his

18    name, not including the value of the name, just the

19    information on a trade paperback?

20      A   Well, I think from a publisher's point of view,

21    it would just be smart marketing to take advantage of

22    the name recognition.  And then if a consumer heard the

23    name but wasn't sure who he was, speaking as a consumer,

24    I often will go to the back and just see if that's who I

25    thought it was or if there was an added motive for me to

1    pick up that book or buy it.  So it's a secondary

2    marketing tool.  I would not regard it as a primary

3    tool.

4       Q    Okay.  Well, taking your opinion that using

5    Mr. Gaiman's name has value, and let's just specify in

6    terms of percentages.  Let's just say that 100% of the

7    value that is used is due to the use of Mr. Gaiman's

8    name, his photograph, and his biographical information.

9    How would you attribute percentages to those three

10   categories in terms of whatever value is added in terms

11   and a percentage?

12      A    The name on the cover and the photo on the back

13   and a bio on the back, those are the three?

14      Q    Sure.

15      A    I would say the name on the cover was by far the

16   most important.  In terms of breaking it down by

17   percentages, that's pretty abstract.  I would certainly

18   rank the name first, the photo second, and depending

19   on -- I would say in Neil's case, since he is photogenic

20   and has a significant female readership, that the photo

21   would be the most important second factor, and the bio

22   third.

23      Q    Well, would it be fair to say, and correct me if

24   I'm wrong, that you assign a zero percentage weight to

25   the biographical information then?

84

1      A   No, not zero, but I would rank it third.

2      Q   Well, could it be as much as 30% then?

3      A   Boy, that's tough to say.  If you force me to

4   pick a number, I would say more like 20 or so.

5      Q   Approximately 20%.  And then what percentage

6   would you give weight to the photo?

7      A   Again, in Neil's case, I would say it's another

8   25% or 30%.

9      Q   The balance being the name?

10     A   Yeah.  The name clearly is on the front cover.

11  It's what causes you to pick it off the shelf.  It's

12  only after you pick it off the shelf that the secondary

13  elements might urge you to take it home and read it or

14  put it back on the shelf.

15     Q   Now, as an expert in the comic book industry,

16  have you come across information about what various

17  authors might be paid as a personal appearance fee say

18  at a comic book signing?

19     A   It varies a great deal.  I know some who might do

20  it for free, and I know others who get thousands of

21  dollars.

22     Q   What would be the upper end?

23     A   Understand that I'm not in the business of

24  booking artists at conventions, but I'm familiar --

25  Robert Krohn, for example, I know was enticed to come to

1    a Chicago convention for $5,000.  And that was some

2    years ago.  And typically creators are paid a fee plus

3    transportation if they're regarded as a star attraction.

4    A lot of them go on their own.  And I'm not sure that I

5    can answer.  I'm not an expert in that particular area.

6         Q    Well, is it your experience that artists are

7    sometimes paid a separate amount of money for use of

8    their name in connection with a book as opposed to just

9    a royalty basis?

10        A    Am I aware of a fee paid for the use of a name

11   that's separate from a royalty?

12        Q    Yes.  Are you aware of any instances where there

13   has been an arrangement between the publisher and

14   author that way?

15        A    I can't say that I have first-hand experience of

16   that, no.

17        Q    Have you heard of any such arrangements on a

18   second-hand basis?

19        A    Honestly, no.  That's not to say it never

20   happened, but I'm not aware of it.

21        Q    Well, in the hypothetical where a comic book

22   publisher were to publish a trade paperback using an

23   artist's name without permission, what do you think

24   would be the most appropriate measure of damages for the

25   use of that name?  Would it be royalty based or a flat

1    fee?

2        A    Well again, I'm hesitating because this is an

3    unprecedented situation for me.  I can tell you that

4    when I -- it really depends on the context.  I've had a

5    situation many times where a printer has misprinted a

6    book, and our choices usually are to insist that they

7    reprint it or that they pay a monetary penalty, in other

8    words, they reduce their bill.

9        Q    That's to the publisher; is that correct?

10       A    That's correct.  I haven't had a personal

11   experience where I omitted an author's name.  So I can't

12   tell you.  I can only tell you the printer, which would

13   be the closest analogy.  And my decision then would be

14   based on the severity of the omission or error or flaw.

15   And there have been times when we've insisted it be

16   reprinted, and there are times when we would just say:

17   We can live with it, but knock $1,000 off the bill or

18   some such -- I would say if it would be -- if it

19   happened with an author, I would negotiate that in good

20   faith, and it would depend on the circumstances.

21       Q    Actually my question is a little different, but

22   your response is helpful.  Do you have an opinion as to

23   what the value of omitting an author's name from a comic

24   book would be?

25       A    No, because I think there is damages in two

1  different levels.  I mean, depending on the prominence,

2  but I'm not sure the context of your question, but if,

3  for example, a star creator believed his name should be

4  on the cover and it was omitted, that would harm his

5  reputation, arguably, and it would also harm the

6  publisher's sales.  So it's hard to -- I'm not sure what

7  exactly you're looking for here.

8     Q    Well, is it your understanding that it's

9  typically within the publisher's discretion to list an

10  author on the cover if there are multiple authors and

11  characters used in the book?

12     A    In my own experience that's usually defined

13  contractually.  I am sometimes obliged to use a name

14  when I would not ordinarily.  And there are times when I

15  want to use a name even if the author doesn't care.  And

16  again, that's all across the board.

17     Q    And there are also times when you have the

18  discretion as to whether or not to use the author's

19  name?

20     A    That is true.  For example, in "The Spirit"

21  anthologies I mentioned earlier, there were usually too

22  many creators to put on the cover.  So I would instruct

23  my editor to list the two or three biggest names on the

24  cover.

25     Q    Right.

1    A    While not contractually obligated to use any

2    other than Will Eisner, the creator.

3    Q    Now, going back to the other situation, that is

4    using an author's name without his permission on a trade

5    paperback, and we'll take the time period -- we'll say

6    around 1996.  What is your opinion as to the value of

7    using Mr. Gaiman's name without his permission on a

8    trade paperback in or about 1996?

9    A    I don't think I can quantify that in a vacuum.

10    Q    Can you quantify it at all?

11    A    Not from personal experience.  It never happened

12    to me, and I don't recall having an author tell me about

13    their experience.  But I'm sure there is some value one

14    could determine, from -- you have to put it in some

15    monetary context, and I think a circulation context.  In

16    other words, if this were a first printing of a book and

17    the author objected, I would probably come to some

18    reasonable settlement on the omission and then I would

19    agree to put the name on subsequent printings.

20    Q    Actually, my question is different than an

21    omission.  I'm now focusing on using an author's name

22    without his permission, not leaving it off, but using it

23    on a trade paperback.  And my question would be, you say

24    it's difficult to come up with a value for that, what

25    would be the criteria you would use?  Would it be the

89

1    sales, the cover price?

2      A   I think -- yeah.  I think you'd have to start

3    with the circulation and the cover price.  Certainly you

4    have to come up with -- in my own opinion, you'd

5    calculate a profit and you'd say what portion of that

6    profit applied.  And you can't do it in a vacuum.

7    I can't --

8      Q   So your expert opinion would be it should be

9    based on profits and not royalties; is that accurate?

10         MS. EADS:  Objection as to form.

11         THE WITNESS:  Yeah.  Just because it's

12   unprecedented for me.  You're asking me to kind of

13   invent something to a very uncommon situation.

14     Q   (By Mr. Feldmann)   Well, would you be more

15   comfortable with the statement, and correct me if I'm

16   wrong, that because it's unprecedented, it would just be

17   too speculative to come up with an appropriate measure

18   for using someone's name on a trade paperback, that is

19   Mr. Gaiman's name on a trade paperback without

20   permission?

21     A   No.  I think you could come up with something

22   specific, but what you're giving me is just too vague a

23   context.  I think if --

24     Q   Well, what other information would you need?

25     A   Again, if it were me and if the author's name was

90

1    used without permission, if I did not have the

2    contractual permission to use that name and the author

3    objected, then I would have to calculate fair

4    compensation.  And I would say it would be -- a portion

5    of the profit would be one way of doing it, or a portion

6    of a royalty would be one way of doing it.

7        Q    Well, do you think that the author would be

8    entitled to both or would it be an either or?

9        A    Well, to be honest, I would negotiate it in good

10   faith.  Without a precedent I can tell you in my own

11   self interest I would probably start with the one that

12   most benefited me.  But I think either course would be

13   logical.  I guess, you know, when you started out

14   hypothetical and then you made it Neil, so I'm just

15   trying to think in the context of if it were Neil and I

16   was sitting across the table from him and he was angry

17   at me because I used his name without permission, I

18   would say:  What would make you happy here?  That would

19   be the logical response.  If he said he wanted a portion

20   of the royalty, I'd say how much, and if it sounded

21   reasonable to me, I would either compromise or I would

22   say:  That's insane, you know, sue me.  But I would try

23   to come up with a reasonable solution.  And it might be,

24   Neil, I'll give you, you know -- again, depending on if

25   it were say two authors in the book, an artist and an

1    author, or whether there were multiple contributors, I'd

2    have to know the whole context and I would try to come

3    up with an equitable compensation, because you know,

4    those are the kinds of problems you want to go away.

5    You don't want to anger a creator, and you don't want to

6    be sued.  And in my experience, you work those things

7    out.

8        Q    Well, you mentioned the words reasonable and

9    equity and good faith.  If there were two authors, that

10    is someone for the script and someone for the art work,

11    and this is a use of a name without permission on a

12    trade paperback, what do you think would be a reasonable

13    royalty payment for that?

14        A    You're saying there were two authors and one

15    artist?

16        Q    No.  I used the word author to include the artist

17    so I'll withdraw that.  We'll say an author of a script

18    and an artist, two cocreators as it were.

19        A    Right.

20        Q    And the author who authored the script, his name

21    has been used on a trade paperback without permission.

22    What do you think would be a reasonable royalty to pay

23    him for use of his name without permission?

24        A    Depending in part on the what the normal royalty

25    would have been in the first place, and I would just say

92

1    off the top of my head, 10% of cover being a normal

2    range royalty.  And assuming a 50/50 contributory level,

3    you know, maybe 25% of the normal royalty.

4        Q   So if I'm correct, that would be another 1-1/2%

5    additional payment for a total of 6-1/2% where there

6    were cocreators?

7        A   To me that would be a reasonable area, and that's

8    what I would suggest.  Maybe it could be twice that.  I

9    would say in the range of a reasonable settlement I

10   would find that a comfortable range.  That's all I can

11   tell you.

12       Q   Just so that I'm clear here, taking the

13   assumption of 10% overall royalties split two ways, 5%

14   to the artist, 5% to the author, you feel that an

15   additional payment of 1-1/2% to 3% would be reasonable

16   compensation for using an artist's name on a trade

17   paperback without permission?

18       A   I personally would find that in a comfortable

19   range, but it depends on the names.  Again, for example,

20   if you're specifically talking about Neil, and arguably

21   his name is more valuable or he would argue that the

22   book had harmed his reputation or the -- again, the

23   context of it is important.  This could be something

24   that embarrassed the author.

25       Q   I'm talking about the assumption here where the

93

1    author did write the script and we're talking about Neil

2    Gaiman.

3        A    Okay.

4        Q    Would your reasonable range of 1-1/2% to 3%

5    change at all under those assumptions?

6        A    That's my gut instinct of where I would start.

7    And I'm speaking as a publisher here, not as an author.

8    If I was the author I might be more aggressive in the

9    other position, obviously.  As I said at the beginning,

10   I'm answering from my sole self-interest, speaking as a

11   publisher in this instance.

12       Q    Well, speaking as an expert in this case, would

13   your opinion change as to the reasonableness of that

14   range?

15       A    You've got to remember.  I'm here as an expert,

16   but my background falls into several categories.  I've

17   been a publisher, a retailer, an artist, all kinds of

18   hats that I've worn.  I was speaking in the context of a

19   publisher trying to settle that kind of a claim.

20       Q    Okay.  Well now, putting on a different hat, that

21   of an expert who is coming to an opinion based on a

22   market price for that claim, what do you think a

23   reasonable range would be to compensate Neil Gaiman

24   under that set of assumptions we discussed?

25       A    Well again, it's difficult for me here because I

1    haven't been asked to offer any opinions in this area
2    and I haven't done any independent investigation of this
3    area.  As I said, it's to me unprecedented.  In 30 years
4    I never had an issue where a name was used without
5    permission.  So I'm giving you a theoretical response.
6    And as I said earlier, it's not a common situation at
7    all.
8       Q    No.  I understand that, and I understand that's
9    difficult.  I guess sitting here today testifying as an
10   expert I would ask you to either tell me a range or
11   agree with the assertion that you cannot offer me a
12   range sitting here today right now.
13      A    I'd want to investigate further before I could
14   really give you a specific response.  I just don't feel
15   it's fair to opine on this theoretical situation.  It's
16   out in left field in my experience.  I'd just want to
17   investigate further.
18      Q    So sitting here today, though, you have no
19   opinion?
20      A    Well, the most honest response I can give you is,
21   if I had to answer this, I would say let me do a little
22   research.  I'd call people in the publishing industry.
23   I'd talk to other agents, authors, people and say:  Has
24   this happened to you or your client, and how was it
25   resolved?

95

1       Q    And I appreciate that, but I mean as of right
2    now, do you have an opinion as to what a reasonable
3    range would be for that type of claim?
4       A    I would only say I would negotiate something and
5    I just can't give you a specific number.
6       Q    Okay.  All right.  What percentage of your time
7    is spent on Comic Book Legal Defense Fund matters, which
8    I'll refer to as CBLDF?
9       A    It's strictly voluntary.  I'm not paid for that.
10   And I have one monthly meeting that takes probably the
11   better part of a day.  And I have periodic conference
12   calls and one annual meeting that goes on interminably.
13   I've never added it up, but I would guess in a given
14   month, oh, 10 hours a month ball park, except when there
15   is a crisis.
16      Q    Okay.  You founded the CBLDF; is that right?
17      A    Yes, I did.
18      Q    And its purpose is to protect the first
19   amendment; is that right?
20      A    As it pertains to the comic book industry.
21      Q    And generally, that organization would want to
22   see a broader interpretation of the First Amendment
23   rather than narrowing authors' rights; is that accurate?
24      A    Correct.
25      Q    Did you ask Neil Gaiman to join the Board of that

1    organization?

2        A    Did I personally?

3        Q    Yes.

4        A    My recollection is that when we had a vacancy a

5    number of names were thrown out, and because Neil had

6    been very active and because of his high name

7    recognition, we felt that he would be a great addition.

8    It was a group discussion.  I don't recall if I

9    specifically invited him.  It was a Board decision.

10       Q    So it's possible you did solicit him to join your

11   Board?

12       A    I may have been the one who specifically invited

13   him.  My best recollection is that the Executive

14   Director may have done that.  But honestly I don't

15   recall.

16       Q    What approximately is the annual budget of that

17   organization?

18       A    Budget or revenue?  I mean we raise about

19   $250,000 a year.  And depending on the cases that we're

20   dealing with, we may have a surplus at the end of the

21   year or we may dip into our reserves.  But that's the

22   approximate revenue in a engineer.

23       Q    How much money has Mr. Gaiman or any organization

24   affiliated with him raised for the CBLDF?

25       A    Well, I certainly don't have that data at hand.

```
1      I know that Neil has on several occasions made national
2      tours we called the Guardian Angel Tour, and he would
3      speak.  And all of the money from the gate at every
4      venue would go to the CBLDF, less any direct overhead
5      for the venue itself.  Neil didn't take anything. One
6      hundred percent of it went to the fund.
7          Q   How much did that raise?
8          A   You know, I just don't have those numbers
9      memorized, but it was a substantial sum.  Subject to
10     verifying it, I believe the last tour raised $30,000 or
11     $40,000.
12         Q   Does he raise more than $100,000 for that
13     organization?
14         A   It's conceivable cumulatively, but if not, it
15     would be certainly close to that.
16         Q   In total or on an annual basis?
17         A   No.  I'm saying in total.
18         Q   Is it industry practice to get written consent
19     from an artist to use his name to publish a trade
20     paperback if the artist has already consented to using
21     his name in the original comic books?
22         A   In my experience that's in the contract, and
23     every contract I had over the last decade or so, I had a
24     specific clause which allowed us to use the name and
25     image for publicity purposes, for book jackets, that
```

98

1    sort of thing.  It's the kind of thing in my view and

2    experience publishers spelled out, because it's

3    dangerous to not have it spelled out.

4        Q    You're referring to written contracts?

5        A    Yes.

6        Q    Now, suppose you have a situation where a comic

7    book is being published pursuant to an oral contract.

8    Is it industry practice that the artist has to give

9    permission a second time, orally, written, or otherwise

10   before using his name in a trade paperback incorporating

11   those original comic books?

12       A    Well, as I'm sure you know, an oral contract

13   isn't worth the paper it's written on, but -- an old

14   lawyer's joke, right.

15       Q    That's your legal opinion; is that correct?

16       A    The problem -- I mean, in my experience, this is

17   why I certainly try to avoid oral contracts.  It's been

18   my personal experience to always get things in writing,

19   both in terms of correspondence and in terms of

20   contracts.  So that's the dangerous ground.  I in

21   general, my own experience, err on the side of being

22   cautious, and you check with authors, you asks their

23   permission for almost everything.  That's what I

24   instruct my editors to do.

25       Q    Are you aware of any situations where comic books

99

1    have been published pursuant to just an oral contract?

2        A    Yes, I am.

3        Q    And in those situations, are you aware of a

4    publisher having to receive permission a second time to

5    use the artist's name on a trade paperback?

6        A    I can't specifically say that I am.  And again,

7    by the nature, a verbal contract is usually between two

8    parties who trust each other very much, and I've had

9    those over the years.  Or they're between what I would

10   regard as more amateurish professionals who aren't

11   experienced enough to get it in writing.  It's just a

12   dangerous thing in general to rely on a handshake.  It's

13   one of the earliest lessons I learned in the industry.

14   In fact, I wrote an article in the "Comics Buyers'

15   Guide" a couple of years ago about how Will Eisner

16   forced me to enter into a contract with him when I was a

17   young hippie publisher and I resisted it.  He gave me a

18   lecture and explained to me how a contract protects both

19   parties, a good contract, and changed my entire business

20   philosophy.  So I from a very early point on taking his

21   advice, and I found myself in that situation, unless it

22   were a very good friend and his handshake was gold to

23   me, and even then I have misgivings.

24       Q    Are you aware of any situations where a comic

25   book or trade paperback has been published pursuant to

100

1    an oral contract where the publisher had to receive

2    permission to use the artist's or the author's

3    biographical information in the trade paperback?

4        A    No.    That's way too specific for me to be aware

5    of.    No, I'm not aware.    You have to understand, also,

6    that in general I would not be aware of whether someone

7    had a contractual agreement or an oral agreement,

8    because these aren't the things that come out unless

9    there is litigation like this.    My presumption always in

10    publishing is that there is a written agreement.

11        Q    Now, I think you testified earlier, correct me if

12    I'm wrong, that you haven't had any direct conversations

13    with Mr. Gaiman about an intention of his to contribute

14    any proceeds from "Miracle Man" or "Marvel Man" to the

15    CBLDF; is that correct?

16        A    That's absolutely correct.

17        Q    Now, I'm not asking about direct communications

18    with him, my question is geared towards are you aware of

19    that intention by Mr. Gaiman from any other sources,

20    other than Mr. Gaiman?

21        A    No, not at all.    I assure you.    In fact, I've

22    taken great pains to keep at arm's length.    I regard my

23    serving as an expert here as completely separate from my

24    role with CBLDF and we've had absolutely no cross

25    conversations.

101

```
 1      Q   Now, is it your opinion that requiring a
 2  publisher to get an author's prior consent to print the
 3  author's biographical information is consistent with the
 4  First Amendment?
 5      A   I don't --
 6          MS. EADS:  Objection as to form.  Do you want to
 7  repeat that question?
 8      Q   (By Mr. Feldmann)  Well, I --
 9          THE WITNESS:  Would you please repeat it?
10      Q   Sure.  Is it your understanding that -- you're
11  apparently President of the Comic Books Legal Defense
12  Fund; is that correct?
13      A   Right.
14      Q   Is it your opinion that requiring a publisher to
15  get an author's prior consent to print the author's
16  biographical information is consistent with First
17  Amendment freedom of expression?
18      A   I don't see it specifically as First Amendment
19  related.  I mean to me, there is standard practices in
20  the industry, and you, again, normally have a written
21  understanding about these things.  You're asking me if
22  Mr. McFarlane's First Amendment right was violated by
23  not being able to use that?  Is that what you're asking
24  me in essence?
25      Q   Yes.  If Mr. McFarlane or any other publisher at
```

102

1      Image Comics decided that it wanted to publish

2      biographical information about an author, would it be

3      required to get that author's consent, or would it face

4      liability in a court of the law for not having done

5      that?

6           A    I would say the only way I can answer that is

7      customarily, yes, it's required to have permission.  But

8      I guess it comes under perhaps a fair use argument.  But

9      I can tell you that in 17 years, I mean, we've never had

10     anybody come to the CBLDF with this kind of a question.

11     Usually they're much more substantive in terms of

12     dealing with censorship, somebody being arrested,

13     somebody being -- you know, some significant violation

14     of the First Amendment.  I would regard this as,

15     frankly, a little too small to be -- to ever come before

16     us.  That's not to say in the very broadest sense you

17     can't make a free expression argument, but I just don't

18     see the --

19          Q    Well, I just have one more question just to

20     confirm my understanding of your answer.  So is it true

21     that the CBLDF has not sought an opinion from its

22     outside counsel as to whether or not the relief sought

23     by Mr. Gaiman in this lawsuit violates the First

24     Amendment?

25          A    I can assure you that that has not happened.

103

```
 1              MR. FELDMANN:  All right.  Thank you, sir.  I
 2     don't have any further questions.
 3              MS. EADS:  Anybody else?
 4              MR. KAHN:  This is Mike Kahn, I have nothing
 5     further.
 6              MS. EADS:  Gina?
 7              MR. SMITH:  This is Todd Smith.  No.  We have
 8     nothing further from Wisconsin.
 9              MS. EADS:  Okay.  We all thank the witness.
10
11              I, DENNIS KITCHEN, hereby state that I have read
12     the foregoing questions and answers appearing in this
13     transcript of my deposition, and that this is a true and
14     accurate (corrected) report of said answers given in
15     response to the questions appearing herein.
16
17                                 _____
18                                 DENNIS KITCHEN
19              Subscribed and sworn to before me this _____
20     day of _____, 2002.
21
22                                 _____
23                                 NOTARY PUBLIC
24
25
```

104

```
 1

 2

 3                    CERTIFICATE

 4

 5        I, Lisa A. Smith, RPR, CCR, IL CSR, Notary Public

 6   in and for the State of Missouri, do hereby certify

 7   that, pursuant to notice, the deposition (via telephone

 8   conference) of DENNIS KITCHEN was held on the 10th day

 9   of September, 2002, said witness was by me first duly

10   sworn upon his oath to testify to the truth of his

11   knowledge touching and concerning the matters in

12   controversy in this cause; that he was thereupon

13   examined upon his oath, and his examination was taken in

14   shorthand by me and later transcribed into computer-

15   aided transcription under my supervision,  and that the

16   deposition is a true record of the testimony given by

17   the witness.

18        IN WITNESS WHEREOF, I have hereunto subscribed my

19   name and affixed my seal this 11th day of September,

20   2002.

21

22                        _____

23                        Lisa A. Smith, RPR, CCR, IL CSR

24                        CCR #647

25
```