131

SEP 13 2002

FILED

## DEPOSITION SUMMARY OF ALLAN INGLIS

02-C-48-S

My name is Allan Inglis. On August 22, 2002 I provided sworn testimony relating to this case, at which time I was under oath and swore to tell the truth.

I'm a graduate of the University of Glasgow, Scotland. I'm accredited in Canada and I'm a Canadian charter accountant which is the Canadian equivalent of a CPA designation. After I worked in public accounting, I held a number of financial management positions in Canada, the U.S. and in Europe. From August 1996 through June 2001, I was employed as the CFO of TMP International, Inc. I had full financial management responsibilities for TMP International, Inc., including financial reporting, cash management, credit and other related functions.

During the time I was employed by TMP International there were approximately thirty employees, six of whom worked directly below me. Among them, Patrick Carron was the International Manager. Mr. Carron assisted me in calculated royalties for Mr. Gaiman.

While employed with TMP International, I also performed duties for toy companies controlled by Todd McFarlane. TMP International, Inc., owned McFarlane Toys-Canada and McFarlane Worldwide which TMP International, Inc., and McFarlane Toys-Canada operated in the North American market. In a relationship between TMP International and McFarlane Worldwide, TMP International, Inc., does business as McFarlane Toys and sells toys directly to retailers in the United States. McFarlane Toys-Canada is the same in Canada. McFarlane Worldwide sells to distributors of toys who in turn sell to the retailers in international markets.

I provided testimony in this case about TMP International, agreements, licensees and royalties.

TMPI made toys based on the *Spawn* comic produced by Todd McFarlane Productions. They also licensed products owned by independent licensors. These companies were

compensated by a royalty based on sales of the toys. The royalty paid by TMPI varied from 4 or 5% to 10 or 11%, depending on a negotiated agreement.

Prior to the entering of the various license agreements, I participated in the financial analyses and discussions that went into the financial implications of the agreements. I did not participate in the negotiation of the agreements.

One of the functions of my department was to maintain records of all of the license agreements and to make royalty payments in accordance with the agreements.

There was an agreement between Todd McFarlane as the creator of *Spawn* which governed royalties payable by TMP International, Inc., to Todd McFarlane. Todd McFarlane assigned his royalty rights to Todd McFarlane Productions. The royalty percentage was either 5 percent or 6 percent. I don't specifically recall. This agreement was in effect the entire time I was at TMP International.

I provided testimony about the royalty issues regarding Mr. Gaiman and TMP International.

In 1997, I was asked by Todd McFarlane to compute the royalty based on a draft agreement between Mr. Gaiman and Mr. McFarlane. I believe it was with Todd McFarlane Productions. The process was typical of what I did under all agreements. I was given a draft agreement and asked to calculate the financial implications of the agreement, i.e., the royalties payable under the agreement based on the terms and conditions. I came up with an estimate that I gave to Todd McFarlane of what I thought the royalty should be that would be paid to Mr. Gaiman. Todd's reaction to the estimate was that I interpreted this agreement in terms of the typical toy license agreement, whereas his discussions with Mr. Gaiman involved a different type

of agreement, in which TMPI pays a royalty to the publisher (TMP) and the writer gets a share the royalty that is payable to TMP.

Todd asked me to redo the numbers to reflect the second kind of arrangement, not the typical toy license agreement. Todd McFarlane directed me to handwritten correspondence between him and Neil. Todd told me that the subject of the discussion was specific comic book figures and I had in the financial records of McFarlane Toys.

At that time we had a fully integrated computer system which contained all of the financial records of TMP International. It was a very accurate system and I am confident in the accuracy of the sales data upon which I relied. Mr. Carron and I reviewed TMPI's detailed sales records and then the summary calculation of the royalties.

I was shown a copy of Trial Exhibit number 581 and Trial Exhibit number 582. These two documents are worksheets I prepared as a result of preliminary calculations Mr. Carron and I did based on my initial but inaccurate understanding of the discussions between Todd McFarlane and Mr. Gaiman.

I was shown a copy of Trial Exhibit number 583. This document is a memo prepared by me based on the calculations contained in Trial Exhibit 582. Mr. McFarlane contacted me after I sent this memo to him and he explained to me that I had misinterpreted the proposed arrangement with Mr. Gaiman. He sent me copies of correspondence that had been exchanged by him and Mr. Gaiman. On the basis of my understanding of that correspondence, I recalculated the royalties to Mr. Gaiman. The correct calculation is contained in Trial Exhibit 584.

I was shown a copy of Trial Exhibit number 587. This is a memo prepared by me in which I stated that TMP had no record of any royalty payments to Mr. Gaiman. In this memo, I

also stated that I was given no information on the final agreement or instructions to make any payment. Trial Exhibit 587 is the last communication I can remember with anybody about royalty payments to Mr. Gaiman.

I was shown a copy of Trial Exhibit number 349. This is the draft agreement upon which I based my initial inaccurate royalty calculations for Mr. Gaiman.