DOCKET
U.S. DISTRICT COURT
WEST. DIST. OF WISCONSIN
SEP 17 2002
FILED
JOSEPH W. SKUPNIEWITZ CLERK
02-C-48-S
134

# REVISED DEPOSITION SUMMARY OF ALLAN INGLIS

My name is Allan Inglis. On August 22, 2002 I provided sworn testimony relating to this case, at which time I was under oath and swore to tell the truth. (4:1-15).

I'm a graduate of the University of Glasgow, Scotland. I'm accredited in Canada and I'm a Canadian charter accountant which is the Canadian equivalent of a CPA designation. After I worked in public accounting, I held a number of financial management positions in Canada, the U.S. and in Europe. From August 1996 through June 2001, I was employed as the CFO of TMP International, Inc. (7:11-20). I had full financial management responsibilities for TMP International, Inc., including financial reporting, cash management, credit and other related functions. (8:8-12).

During the time I was employed by TMP International there were approximately thirty employees, six of whom worked directly below me. Among them, Patrick Carron was the International Manager. (8:16-9:10). Mr. Carron assisted me in calculated royalties for Mr. Gaiman (32:9-12).

While employed with TMP International, I also performed duties for toy companies controlled by Todd McFarlane. TMP International, Inc., owned McFarlane Toys-Canada and McFarlane Worldwide which TMP International, Inc., and McFarlane Toys-Canada operated in the North American market. In a relationship between TMP International and McFarlane Worldwide, TMP International, Inc., does business as McFarlane Toys and sells toys directly to retailers in the United States. McFarlane Toys-Canada is the same in Canada. McFarlane Worldwide sells to distributors of toys who in turn sell to the retailers in international markets. (10:19-11:14).

I provided testimony in this case about TMP International, agreements, licensees and royalties.

TMPI made toys based on the *Spawn* comic produced by Todd McFarlane Productions. They also licensed products owned by independent licensors. (13:14-21). These companies were compensated by a royalty based on sales of the toys. The royalty paid by TMPI varied from 4 or 5% to 10 or 11%, depending on a negotiated agreement. (14:4-14).

Prior to the entering of the various license agreements, I participated in the financial analyses and discussions that went into the financial implications of the agreements. I did not participate in the negotiation of the agreements. (14:15-22).

One of the functions of my department was to maintain records of all of the license agreements and to make royalty payments in accordance with the agreements. (15:1-4).

There was an agreement between Todd McFarlane as the creator of *Spawn* which governed royalties payable by TMP International, Inc., to Todd McFarlane. Todd McFarlane assigned his royalty rights to Todd McFarlane Productions. The royalty percentage was either 5 percent or 6 percent. I don't specifically recall. This agreement was in effect the entire time I was at TMP International. (16:6-24).

I provided testimony about the royalty issues regarding Mr. Gaiman and TMP International.

In 1997, I was asked by Todd McFarlane to compute the royalty based on a draft agreement between Mr. Gaiman and Mr. McFarlane. I believe it was with Todd McFarlane Productions. (17:16-18:4). The process was typical of what I did under all agreements. I was given a draft agreement and asked to calculate the financial implications of the agreement, i.e., the royalties payable under the agreement based on the terms and conditions. I came up with an

estimate that I gave to Todd McFarlane of what I thought the royalty should be that would be paid to Mr. Gaiman. Todd's reaction to the estimate was that I interpreted this agreement in terms of the typical toy license agreement, whereas his discussions with Mr. Gaiman involved a different type of agreement, in which TMPI pays a royalty to the publisher (TMP) and the writer gets a share the royalty that is payable to TMP. (19:4-20:19).

Todd asked me to redo the numbers to reflect the second kind of arrangement, not the typical toy license agreement. (20:20-21:1). Todd McFarlane directed me to handwritten correspondence between him and Neil. (20:20-21:8). Todd told me that the subject of the discussion was specific comic book figures and I had in the financial records of McFarlane Toys. (21:15-20).

At that time we had a fully integrated computer system which contained all of the financial records of TMP International. (22:2-4). It was a very accurate system and I am confident in the accuracy of the sales data upon which I relied. (22:12-18; 23:2-9; 92:22-93:22). Mr. Carron and I reviewed TMPI's detailed sales records and then the summary calculation of the royalties. (32:24-33:10).

I was shown a copy of Trial Exhibit number 581 and Trial Exhibit number 582. (42:10-11; 46:13-15). These two documents are worksheets prepared by Mr. Carron at my direction as a result of preliminary calculations Mr. Carron and I did based on my initial but inaccurate understanding of the discussions between Todd McFarlane and Mr. Gaiman. (44:22-45:20; 46:13-47:4; 49:6-17).

I was shown a copy of Trial Exhibit number 583. This document is a memo prepared by me based on the calculations contained in Trial Exhibit 582. Mr. McFarlane contacted me after I sent this memo to him and he explained to me that I had misinterpreted the proposed

arrangement with Mr. Gaiman. He sent me copies of correspondence that had been exchanged by him and Mr. Gaiman. (49:22-51:18). On the basis of my understanding of that correspondence, I recalculated the royalties to Mr. Gaiman. The correct calculation is contained in Trial Exhibit 584. (56:9-57:9; 87:5-11).

I was shown a copy of Trial Exhibit number 587. (71:21-22). This is a memo prepared by me in which I stated that TMP had no record of any royalty payments to Mr. Gaiman. (72:4-7). In this memo, I also stated that I was given no information on the final agreement or instructions to make any payment. Trial Exhibit 587 is the last communication I can remember with anybody about royalty payments to Mr. Gaiman. (73:12-24).

I was shown a copy of Trial Exhibit number 349. This is the draft agreement upon which I based my initial inaccurate royalty calculations for Mr. Gaiman. (78:11-21).

MN156570_1.DOC