IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

**144**

DOCKET

U.S DISTRICT COURT
WEST DIST OF WISCONSIN

NEIL GAIMAN and MARVELS AND
MIRACLES, LLC,

      Plaintiffs,

      v.

TODD McFARLANE, TODD
McFARLANE PRODUCTIONS, INC.,
TMP INTERNATIONAL, INC., and
McFARLANE WORLDWIDE, INC.

      Defendants-Counterclaimants,

And

IMAGE COMICS, INC.,

      Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

SEP 2 0 2002

FILED/RECEIVED
JOSEPH W. SKUPNIEWITZ, CLERK

CASE
NUMBER

Case No. 02-C-0048-S

# 03-1461

U.S. CA ___ ___
FILED

NOV 2 ___ ___

GINO J. AGNELLO
CLERK

DOC. # _____

## AFFIDAVIT OF GABRIEL S. GROSS

STATE OF WISCONSIN    )
                  ) SS.
COUNTY OF DANE    )

03-1461-L11

After being first duly sworn, Gabriel S. Gross deposes and states as follows:

1.      I am one of the attorneys for the McFarlane Defendants and make this Affidavit upon personal knowledge.

2.      Attached as Exhibit A is a true and correct copy of Defendants' Trial Exhibit No. 588, a printed copy of material contained on Plaintiff Neil Gaiman's web site, www.neilgaiman.com.

3.       Attached as Exhibit B is a true and correct copy of the transcript from the September 17, 2002 deposition of Plaintiffs' expert James P. Caven.

4.       Attached as Exhibit C is a true and correct copy of Defendants' Trial Exhibit No. 314, a copy of the script for *Spawn* Issue 9.

5.       Attached as Exhibit D is a true and correct copy of Plaintiffs' Trial Exhibit No. 3/Defendants' Trial Exhibit No. 350, a copy of a July 15, 1997 letter from Gaiman to McFarlane.

6.       Attached as Exhibit E is a true and correct copy of Plaintiffs' Trial Exhibit No. 4/Defendants' Trial Exhibit No. 351, a copy of a July 15, 1997 letter from McFarlane to Gaiman.

7.       Attached as Exhibit F is a true and correct copy of Plaintiffs' Trial Exhibit No. 5/Defendants' Trial Exhibit No. 364, a copy of a second July 15, 1997 letter from McFarlane to Gaiman.

Dated this 20th day of September, 2002.

Gabriel S. Gross

Signed and sworn to before me this
20th day of September, 2002.

Notary Public, State of Wisconsin
My Commission expires   *Aug. 21, 2005*

MN156981_1.DOC



Home | Journal | Exclusive Material | The Stories | Where's Neil | About Neil | Gallery | Message Boards

ba

## Neil Gaiman Bibliography

## Part II - The Comics

### Key: Title, Story, publisher, year, notes in ( ) or [ ]

100 Graphic Novels For Public Libraries (Comic edition only), "Foreword" (text), Kitchen Sink Press, 1996

9-11 V. 2, "The Wheel," DC Comics, 2002

1963 #5, Letter (text), Image Comics, 1993

2000AD #488, "You're Never Alone With A Phone", Fleetway, 1986

2000AD #489, "Conversation Piece", Fleetway, 1986

2000AD #536, "I'm A Believer," Fleetway, 1987 [Severly edited from original script]

2000AD #538, "What's In A Name," Fleetway, 1987

2000AD 1994 Annual, "Conversation Piece," Fleetway, 1994

A1 #1, "Mr. X: Heartsprings And Watchstops," Atomeka Press, 1989

A1 #5, "Cover Story," Atomeka Press, 1991

Aargh!, "From Homogenous To Honey," Mad Love Publishing Ltd., 1988

Adventures Of Luther Arkwright #10: ARKeology, "Villanelle" (AKA "Luther's Villanelle") (version A),  Valkyrie Press, 1989

Adventures Of Professor Thinthwistle And His Incredible Aether Flyer, "Introduction" (text),  Fantagraphics, 1991

Neil Gaiman

Angela #1, "Angela Part One, " Image Comics, 1994

Angela #2, "Angela Part Two," Image Comics, 1995

Angela #3, "Angela Part 3," Image Comics, 1995

Angela Volume 1, "Angela Parts One through Three," Image, 1995

Angela's Hunt, "Angela Parts One through Three," Image, 1998

Astro City: Confession, "Introduction" (text), Homage Comics, 1997

Asylum #2, "Feeders & Eaters," Millennium Publications Inc., 1993

Bacchus #1, "But What Has That To Do With Bacchus?" (text), Letter (text), Eddie
Campbell Comics, 1995

Ballads, "The False Knight On The Road," Green Man Press, 1997

Batman Black & White #2, "A Black And White World," DC Comics, 1996

Batman Black & White Collection, "A Black And White World," DC Comics, 1997

Batman Featuring Two-Face And The Riddler, "Original Sins," "When Is A Door," DC
Comics, 1995

Being An Account Of The Life And Death Of The Emperor Heliogabolus, "Being An Accoun
Of The Life And Death Of The Emperor Heliogabolus," No Publisher Listed, 1992

Best Of Asylum Volume 1, "Feeders And Eaters," Millennium, 1994

BLAAM, "The Great Cool Challenge," Willyprods, 1988

Black Orchid #1, "One Thing Is Certain...," DC Comics, 1988

Black Orchid #2, "Going Down...," DC Comics, 1989

Black Orchid #3, "Yes...," DC Comics, 1989

Black Orchid Collection, "One Thing Is Certain...," "Going Down...," "Yes...,"
"Acknowledgments" (text), DC Comics, 1991

Blood Childe #4, "Sweat And Tears" (codeveloped story ideas), Millennium Publications,
1995 [Credited without his knowledge]

The Book Of Ballads And Sagas Special San Diego Comic Con Preview, "The False Knight
On The Road Excerpt," Green Man Press, 1995

The Book Of Ballads And Sagas #1, "The False Knight On The Road," Green Man Press, 1995

Book Of Twilight, "Rat Sketch" (art),  Caliber, 1994

Books Of Magic Miniseries #1, "The Invisible Labyrinth," DC Comics, 1990

Books Of Magic Miniseries #2, "The Shadow World," DC Comics, 1990

Books Of Magic Miniseries #3, "The Land Of Summer's Twilight," DC Comics, 1991

Books Of Magic Miniseries #4, "The Road To Nowhere," DC Comics, 1991

Books Of Magic Miniseries Collection, "The Invisible Labyrinth," "The Shadow World," "Th Land Of Summer's Twilight," "The Road To Nowhere," "Acknowledgments" (text),  DC Comics, 1993

Born To Be Wild, "Babycakes," Eclipse Comics, 1991

Brat Pack, "Introduction" (text), King Hell / Tundra, 1992

Breakthrough, "Vier Mauern," Catalan Communications, 1990

Breathtaker Collection, "Introduction" (text), DC Comics, 1994

British Science Fiction Eastercon Program, "An Honest Answer," 1994

Captain Confederacy #4, Letter (text), Steel Dragon Press, 1986

Cartoonist, "Introduction" (text), Sirius Entertainment (Dogstar Press), 1997

Cerebus #147, "Being An Account Of The Life And Death Of The Emperor Heliogabolous, Aardvark-Vanaheim, 1991

Cerebus #150, Letter (text), Aardvark-Vanaheim, 1991

Cherry Deluxe #1, "The Innkeeper's Soul," Cherry Comics, 1998

Chicago Comicon Souvenir Book, "My Dream," "Self Portrait" (art), Chicago Comicon, 1993

The Children's Crusade #1, "The Children's Crusade," DC Comics (Vertigo), 1993

The Children's Crusade #2, "The Children's Crusade" (cowriter), DC Comics (Vertigo), 1994

Collected Omaha V.5, "Introduction" (text), Kitchen Sink Press, 1993

Neil Gaiman

Comic Relief Comic (AKA "The Totally Stonking, Surprisingly Educational and utterly mindboggling... Comic Relief Comic"), wrote various parts, Fleetway Publications, 1991

Comix Experience Fifth Anniversary Ashcan, "Comix Ecsperience," Comix Experience, 1994

Compleat Alice Cooper, "Foreword" (text), "Bad Place Alone," "Unholy War," "Cleansed B Fire," Marvel Comics, 1995

Complete Bone Adventures V.2 (Original edition only), "Foreword" (text), Cartoon Books 1994

Alice Cooper: The Last Temptation #1-white cover, "Bad Place Alone," Marvel Comics, 1994

Alice Cooper: The Last Temptation #1-black cover, "Bad Place Alone," Marvel Comics, 1994

Alice Cooper: The Last Temptation #2, "Unholy War," Marvel Comics, 1994

Alice Cooper: The Last Temptation #3, "Cleansed By Fire," Marvel Comics, 1994

The Crystal Palace Exhibition Of 1990, "A Villanelle For Luther" (AKA "Luther's Villanelle") (version B), Propaganda, 1990

Deadface: Earth Water Air Fire #4, Letter (text), Dark Horse Comics, 1992

Deadface: Immortality Isn't Forever, "But What Has That To Do With Bacchus?" (text), Dark Horse Comics, 1995

Death Gallery #1, "Introduction" (text), "Sandman #8 Cover Sketch" (art), DC Comics (Vertigo), 1994

Death: The High Cost Of Living #1, "Chapter One: The Spirit Of The Stairway," DC Comic (Vertigo), 1993

Death: The High Cost Of Living #1 Collector's Edition, "Chapter One: The Spirit Of The Stairway," DC Comics (Vertigo), 1993

Death: The High Cost Of Living #2, "Chapter Two: A Night To Remember," DC Comics (Vertigo), 1993

Death: The High Cost Of Living #3 (Price On Cover), "Chapter Three: The High Cost Of Living," DC Comics (Vertigo), 1993

Death: The High Cost Of Living #3 Corrected Edition (No Price On Cover), "Chapter Three The High Cost Of Living," DC Comics (Vertigo), 1993

Death: The High Cost Of Living Collection, "Chapter One: The Spirit Of The Stairway," "Chapter Two: A Night To Remember," "Chapter Three: The High Cost Of Living," "Death Talks About Life," DC (Vertigo), 1994

Death Talks About Life, "Death Talks About Life," DC Comics (Vertigo), 1994

Death: The Time Of Your Life #1, "Prologue; Chapter One: The Things You Just Do When You're Bored," DC Comics (Vertigo), 1996

Death: The Time Of Your Life #2, "Chapter Two: Imaginary Solutions," DC Comics (Vertigo), 1996

Death: The Time Of Your Life #3, "Death: The Time Of your Life," DC Comics (Vertigo), 1996

Death: The Time Of Your Life Collection, "Prologue; Chapter One: The Things You Just Do When You're Bored," "Chapter Two: Imaginary Solutions," "Death: The Time Of your Life" (expanded), "Afterword" (text),  DC (Vertigo), 1997

Death: The Time Of Your Life Collection Advance Preview Copy, "Prologue; Chapter One: The Things You Just Do When You're Bored," DC (Vertigo), 1997

Dirtbag #3, Cover art, Twist And Shout Comics, 1994

A Distant Soil #25, "Troll Bridge" (adaptation of Neil short story), Image Comics, 1998

A Distant Soil #25 Limited Edition, "Troll Bridge" (adaptation of Neil short story), Image Comics, 1998

A Distant Soil: The Gathering, "Introduction" (text),  Image, 1997

Dori Stories, "Dori Seda: An Introduction" (text), Lasp Gasp, 1999

The Dreaming #8, "The Wake," DC Comics (Vertigo), 1996

Dustcovers: The Collected Sandman Covers 1989-1997, "The Last Sandman Story," "Commentary" (text), DC Comics (Vertigo), 1997

Echoes, "A Recognition" (text), Vanguard Publishing, 2000

Elric #0 (AKA One Life), "One Life-Furnished In Early Moorcock" (adaptation of Neil short story), Topps Comics Inc., 1996

Elric: Stormbringer, "One Life-Furnished In Early Moorcock" (adaptation of Neil short story), Topps Comics Inc., 1998

Endless Gallery #1, "Introduction" (text), DC Comics (Vertigo), 1995

Ex-Directory: The Secret Files Of Bryan Talbot!, "Sloth," "An Honest Answer," Knockabou Comics, 1997

The Face V.2 #9, "1. Prelude," Nick Logan, 1989

The Face V.2 #10, "2. Occlusion," Nick Logan, 1989

The Face V.2 #11, "3. Disillusion," Nick Logan, 1989

The Face V.2 #12, "4. Deconstruction," Nick Logan, 1989

The Face V.2 #13, "Interlude," Nick Logan, 1989

The Face V.2 #14, "6. Seclusion," Nick Logan, 1989

The Face V.2 #15, "7. Conclusion," "8. Postlude," Nick Logan, 1989

A Fall Of Stardust, "Wall: A Prologue" (text), Green Man Press, 1999 [Extra print by Aragones also available]

Free Speeches, "A Modest Proposal" (text), Oni Press, 1998

Neil Gaiman's Mr. Hero #1, "Brain Scan" (text interview), Tekno Comix, 1995

Neil Gaiman's Wheel Of Worlds #0 Deluxe, "Wheel Of Worlds" (co-plotted), "Compendium Of Nearly-Lost Lore" (art), Tekno Comix, 1995

Gods & Tulips, "Good Comics And Why You Should Sell Them" (text),  "On Signings" (text), "Writing" (text), Westhampton House, 1999

Green Lantern / Superman: Legend Of The Green Flame, "Green Lantern / Superman: Legend Of The Green Flame," "Introduction" (text), DC Comics, 2000

Guest Of Honor 1993 (Neil Gaiman) , "Self Portrait" (art), Moondog's Inc., 1993. Alternate covers: Red, Brown

Guest Of Honor 1994 (Harlan Ellison) , "Harlan & Me...," Chicago Comicon, 1994

Harlequin Valentine, "Harlequin Valentine" (adaptation of Neil short story), "Notes On A Harlequinade," Dark Horse Books, 2001

Haunted Shadows, "Drawn In Darkness" (text), Halloween Concept, 1998

Heart Of Empire #1, Letter (text), Dark Horse Comics, 1999

Heart Of Empire #5, "Villanelle" (AKA "Luther's Villanelle") (corrected version A in color), Dark Horse Comics, 1999

Hearts Of Africa, "Intro From The Heart" (text), Slave Labor Graphics, 1994

Hellblazer #27, "Hold Me," DC Comics, 1990

Hellblazer #62, "Death Talks About Life," DC Comics, 1993

Clive Barker's Hellraiser #20, "Wordsworth," Eclipse Comics, 1993

Neil Gaiman

Heroes, "The Song Of The Lost" (text), Marvel, 2001
Images Of Omaha #1, "Afterword" (text), Kitchen Sink Press, 1992
Instant Piano #3, Letter (text), Dark Horse Comics, 1995
It's Dark In London, "The Court," Serpent's Tail, 1996
Judge Dredd Yearbook 1988, "Judge Hershey: Sweet Justice" (text), Fleetway, 1988
Judge Dredd Yearbook 1995, "Judge Hershey: Sweet Justice" (text), Fleetway, 1995
[Reprinted/altered without Neil's knowledge]
Last Temptation, "Introduction" (text), "Bad Place Alone," "Unholy War," "Cleansed By
Fire," Dark Horse Comics, 2000
Lucifer: Devil In The Gateway, "Foreword" (text), DC Comics (Vertigo), 2001
Marvel Age #136, "The Last Temptation Of Alice" (text), Marvel Comics, 1994
Midnight Days, "Introduction" (text), "Commentary" (text), "Sandman Midnight Theatre,
"Hold Me," "Brothers," "Shaggy God Stories," "Jack-In-The-Green," DC (Vertigo) 2000
Miracleman #17, "A Prayer And Hope...," "Retrieval 1," Eclipse Comics, 1990
Miracleman #18, "Skin Deep," "Trends," "Retrieval 2," Eclipse Comics, 1990
Miracleman #19, "Notes From The Underground," "Retrieval 3," Eclipse Comics, 1990
Miracleman #20, "Winter's Tale," "Retrieval 4," Eclipse Comics, 1991
Miracleman #21, "Spy Story," "Retrieval 5," "Screaming," Eclipse Comics, 1991
Miracleman #22, "Carnival," "Retrieval 6," Eclipse Comics, 1991
Miracleman #23, "The Secret Origin Of Young Miracleman!," Eclipse Comics, 1992
Miracleman #24, "When Titans Clash!," Eclipse Comics, 1993
Miracleman Book Four: Golden Age, "A Prayer And A Hope...," "Trends," "Screaming,"
"Skin Deep," "Notes From The Underground," "Winter's Tale," "Spy Story," "Carnival,"
Eclipse, 1992
Miracleman: Apocrypha #1, "The Library Of Olympus," Eclipse Comics, 1991
Miracleman: Apocrypha #2, "The Library Of Olympus," Eclipse Comics, 1992
Miracleman: Apocrypha #3, "The Library Of Olympus," Eclipse Comics, 1992
Miracleman: Apocrypha Collection, "The Library Of Olympus," Eclipse, 1992
Mr. Punch, "The Tragical Comedy Or Comical Tragedy Of Mr. Punch-A Romance," DC
Comics (Vertigo), 1995
Alan Moore's Songbook, "The Murders On The Rue Morgue" (art), Caliber Press, 1998
Negative Burn #11, "We Can Get Them For You Wholesale" (adaptation of Neil short
story), Caliber Press, 1994
Negative Burn #13, "The Murders On The Rue Morgue" (art), Caliber Press, 1994
Negative Burn #25, "Sketchbook" (art), Caliber Press, 1995
Negative Burn #50, "The Old Warlock's Reverie: A Pantoum" (adaptation of Neil short
story) , Caliber Press, 1997
Negative Burn: Best Of Year One,  "We Can Get Them For You Wholesale" (adaptation of
Neil short story), Caliber Press, 1995
Noodles (AKA Tundra Sketchbook Series V. 3) , "Introduction" (text), Tundra Publication
Ltd, 1991
The One (Collection) , "Change Or Die!" (text), King Hell Press, 1989
Oni Double Feature #6, "Only The End Of The World Again: Part 1" (adaptation of Neil
short story), Oni Press, 1998
Oni Double Feature #7, "Only The End Of The World Again: Part 2" (adaptation of Neil
short story), Oni Press, 1998
Oni Double Feature #8, "Only The End Of The World Again: Part 3" (adaptation of Neil

short story), Oni Press, 1998

Only The End Of The World Again, "Only The End Of The World Again" (adaptation of Nei
short story, colorized), Oni Press, 2000

Outrageous Tales From The Old Testament, "The Book Of Judges," "Jael and Sisera,"
"Jepthah and His Daughter," "Journey To Bethlehem," "The Tribe Of Benjamin," "The
Prophet Who Came To Dinner," Knockabout Publications, 1987

Rare Bit Fiends #2, "My Dream," "-" (Untitled dream transcription), King Hell Press, 1994

Rare Bit Fiends #3, "-" (Untitled dream transcription), King Hell Press, 1994

Redfox #20, "Fragments," Valkyrie Press, 1989

Revolver Horror Special, "Feeders And Eaters," Fleetway, 1990

Rising Stars #1, "Foreword" (text), Image Comics, 1999: Alternate covers A, B, C, D,
Monster A, B, C, D, Wizard, Top Cow reprint

Rising Stars: Born In Fire, "Foreword" (text), Image Comics (Joe's Comics), 2000

Sandman #1, "Sleep Of The Just," DC Comics, 1989

Sandman #2, "Imperfect Hosts," DC Comics, 1989

Sandman #3, "...Dream A Little Dream Of Me," DC Comics, 1989

Sandman #4, "A Hope In Hell," "The Origin Of The Comic You Are Now Holding (What It
And How It Came To Be)" (text), DC Comics, 1989

Sandman #5, "Passengers," "Letters Column" (text), DC Comics, 1989

Sandman #6, "24 Hours," DC Comics, 1989

Sandman #7, "Sound And Fury," DC Comics, 1989

Sandman #8, "The Sound Of Her Wings," DC Comics, 1989

Sandman #9, "Tales In The Sand," DC Comics, 1989

Sandman #10, "The Doll's House," "-" (text note in letters column) , DC Comics, 1989

Sandman #11, "Moving In," DC Comics, 1989

Sandman #12, "Playing House," DC Comics, 1990

Sandman #13, "Men Of Good Fortune," DC Comics, 1990

Sandman #14, "Collectors,"  DC Comics, 1990

Sandman #15, "Into The Night," DC Comics, 1990

Sandman #16, "Lost Hearts," DC Comics, 1990

Sandman #17, "Calliope," DC Comics, 1990

Sandman #18, "A Dream Of A Thousand Cats," "Letters Column" (text), DC Comics, 199

Sandman #19, "A Midsummer Night's Dream," DC Comics, 1990

Sandman #20, "Façade," DC Comics, 1990

Sandman #21, "Season Of Mists: A Prologue," DC Comics, 1990

Sandman #22, "Season Of Mists Chapter One,"  DC Comics, 1991

Sandman #23, "Season Of Mists Chapter Two,"  DC Comics, 1991

Sandman #24, "Season Of Mists Chapter Three,"  DC Comics, 1991

Sandman #25, "Season Of Mists Chapter Four,"  DC Comics, 1991

Sandman #26, "Season Of Mists Chapter Five,"  DC Comics, 1991

Sandman #27, "Season Of Mists Chapter Six,"  DC Comics, 1991

Sandman #28, "Season Of Mist Epilogue," "Letters Column" (text),  DC Comics, 1991

Sandman #29, "Thermidor," DC Comics, 1991

Sandman #30, "Avgvst," DC Comics, 1991

Sandman #31, "Three Septembers And A January,"  DC Comics, 1991

Sandman #32, "Slaughter On Fifth Avenue,"  DC Comics, 1991

Sandman #33, "Lullabies Of Broadway," DC Comics, 1991

Neil Gaiman

Sandman #34, "Bad Moon Rising," DC Comics, 1992

Sandman #35, "Beginning To See The Light," DC Comics, 1992

Sandman #36, "Over The Sea To Sky," DC Comics, 1992

Sandman #37, "I Woke Up And One Of Us Was Crying," DC Comics, 1992

Sandman #38, "The Hunt," DC Comics, 1992

Sandman #39, "Soft Places," DC Comics, 1992

Sandman #40, "The Parliament Of Rooks," DC Comics, 1992

Sandman #41, "Blossom For A Lady-Rain In The Doorway-Not Her Sister-Want / Not Want-The View From The Backs Of Mirrors-Journal Of The Plague Year-"The Number You Have Dialed...," "Letters Column" (text), DC Comics, 1992

Sandman #42, "It Always Rains On The Unloved-Wet Dreams-A Fishing Expedition-She Kisses Wyverns (The Disneyland Analogy)-Dinner Etiquette And Chocolate Lovers-Desire Swears By The First Circle-"Things Are Changing"-What Can Possibly Go Wrong?," DC Comics, 1992

Sandman #43, "The People Who Remember Atlantis-Concerning Mammoths, And Falling Walls-Who Controls Transportation?-Bored, She Makes Little Frogs-Truth Or Consequences, And Other Places-Ancestral Voices Prophesying-The Dogs Of Art-"When I dream, Sometimes I Remember How To Fly.," DC Comics, 1992

Sandman #44, "The Other Side Of The Sky-A Bear And His Shadow-Departed Secrets-"Twinkle's A Nice Word. So's Viridian. Three Keys-A Treatise On optics-The Perils Of Smoking In bed?," DC Comics, 1992

Sandman #45, "The Things We Do To Be Loved-Her Hands Do Not Go To The Moon-The Driving Instructor-Tiffany Watches I-White Knights And / Or Pond-Scum-Are Dalmatians Flowers?-Nancy Displays Her Erudition-Wham Bam Thank You Ma'am-Tiffany Watches II, DC Comics, 1993

Sandman #46, "Life Isn't Pleasant, Petrified-The Parting Of The Ways-The Trouble With Mortals-Dreamings Of Meeting Or Meetings Of Dreaming?-The Trouble With Gods-Mervyn Sets Him Straight-"Have You Got Anything With A Happy Ending?"-Tempus Frangit," "Death Talks About Life," DC Comics, 1993

Sandman #47, "Cooking Considered As One Of The Fine Arts-"My Envelope Isn't Any Goo Anymore"-Where All Mazes Meet-The Other Side Of The Coin-Life As A Glass Of Bitter Wine-Cherries Are Counted, And A Bargain Is Made-An Unlikely Growth.," DC Comics, 1993

Sandman #48, "Journey's End-Brains, A Heart, A Ride In A Balloon-Dinner-Something New-The Illusion Of Permanence-A Wreath Of Bright Stars-Echoes Of Darkness-Up. Out., "Letter's Column" (text), DC Comics (Vertigo), 1993

Sandman #49, "Farewells-Answered Prayers-The Flowers Of Romance-Journey's End-The Gates Of Horn-Things Unlooked For-Brief Lives," DC Comics (Vertigo), 1993

Sandman #50, "Ramadan," DC Comics (Vertigo), 1993

Sandman #50 platinum, "Ramadan," DC Comics (Vertigo), 1993

Sandman #51, "A Tale Of Two Cities," DC Comics (Vertigo), 1993

Sandman #52, "Cluracan's Tale," DC Comics (Vertigo), 1993

Sandman #53, "Hob's Leviathan," DC Comics (Vertigo), 1993

Sandman #54, "The Golden Boy," DC Comics (Vertigo), 1993

Sandman #55, "Cerements," DC Comics (Vertigo), 1993

Sandman #56, "World's End," DC Comics (Vertigo), 1993

Sandman #57, "Kindly Ones: 1," DC Comics (Vertigo), 1993

Neil Gaiman

Sandman #58, "Kindly Ones: 2," DC Comics (Vertigo), 1994
Sandman #59, "Kindly Ones: 3," DC Comics (Vertigo), 1994
Sandman #60, "Kindly Ones: 4," DC Comics (Vertigo), 1994
Sandman #61, "Kindly Ones: 5," DC Comics (Vertigo), 1994
Sandman #62, "Kindly Ones: 6," "Note" (text, brief note), DC Comics (Vertigo), 1994
Sandman #63, "Kindly Ones: 7," DC Comics (Vertigo), 1994
Sandman #64, "Kindly Ones: 8," DC Comics (Vertigo), 1994
Sandman #65, "Kindly Ones: 9," DC Comics (Vertigo), 1994
Sandman #66, "Kindly Ones: 10," DC Comics (Vertigo), 1995
Sandman #67, "Kindly Ones: 11," DC Comics (Vertigo), 1995
Sandman #68, "Kindly Ones: 12," DC Comics (Vertigo), 1995
Sandman #69, "The Kindly Ones," DC Comics (Vertigo), 1995
Sandman #70, "Chapter One: Which Occurs In the Wake Of What Has Gone Before," DC
Comics (Vertigo), 1995
Sandman #71, "Chapter Two: In Which A Wake Is Held," DC Comics (Vertigo), 1995
Sandman #72, "Chapter Three: In Which We Wake," DC Comics (Vertigo), 1995
Sandman #73, "The Wake: An Epilogue: Sunday Mourning," "Next Issue" (text, brief
note), DC Comics (Vertigo), 1995
Sandman #74, "Exiles," DC Comics (Vertigo), 1996
Sandman #75, "The Tempest," "The Afterword" (text), DC Comics (Vertigo), 1996
Essential Vertigo: The Sandman #1-32: Each issue reprints same issue number of the
Sandman, except #32 which reprints the Sandman Special. #1 also reprints "The Origin
Of The Comic You Are Now Holding (What It Is And How It Came To Be)" (text).
Sandman #1 Millennium edition, "Sleep Of The Just," DC Comics (Vertigo), 2000
-The Sandman collections were all available in hardcover and trade paperback, and later
given new covers as the Sandman Library Vol. I-X. The first three volumes were origina
released in TPB form, the rest originally in HC.
Sandman: Preludes And Nocturnes (V. I), "Sandman #1-8," "Afterword" (text), DC, 1991
(TPB) 1995 (HC)
Sandman: The Doll's House (V. II), "Sandman #8-16" (later editions omit #8), "In The
Beginning..." (text), "Envoi" (text), DC, 1990 (TPB) 1995 (HC)
Sandman: Dream Country (V. III), "Sandman #17-20," "Script Introduction" (text),
"Original Script For Calliope" (text), "Afterword" (text), DC, 1991 (TPB) 1995 (HC)
Sandman: Season Of Mists (V. IV), "Sandman #21-28," DC, 1992
Sandman: A Game Of You (V. V), "Sandman #32-37," "A Brief Afterword" (text), DC,
1993
Sandman: Fables And Reflections (V. VI), "Sandman #29-31, 38-40, 50," "Sandman
Special #1," "Fear Of Falling" (expanded), DC, 1993
Sandman: Brief Lives (V. VII), "Sandman #41-49," "Not An Introduction: A Few
Words" (text), DC, 1994
Sandman: World's End (V. VIII), "Sandman #51-56," "Acknowledgments" (text), DC,
1994
Sandman: The Kindly Ones (V. IX), "Sandman #57-69," "The Castle," "Was It A Bear Or
Russian Or What?" (text), DC, 1996
Sandman: The Wake (V. X), "Sandman #70-75" (includes the expansion printed in the
Dreaming #8), "Acknowledgments" (text), "-" (art), DC, 1997
Sandman: The Dream Hunters, "The Dream Hunters," DC Comics (Vertigo), 1999

Sandman Gallery #1, "Introduction" (text), "Sketches" (art), DC Comics (Vertigo), 1994

Sandman Midnight Theatre, "Sandman Midnight Theatre," DC Comics (Vertigo), 1995

Sandman Special #1, "The Song Of Orpheus," DC Comics, 1991

Savior Book One, "Introduction" (text), Trident Comics, 1990

The Screwtape Letters, "The Screwtape Letters: An Introduction" (text), Marvel Comics, 1994

Secret Origins #36, "Pavane," DC Comics, 1989

Secret Origins Special #1, "Original Sins," "When Is A Door," DC Comic, 1989

Seven Deadly Sins, "Sloth," Knockabout Comics, 1989

Shade The Changing Man #32, "Death Talks About Life," DC Comics, 1993

Shockwave #1, "One Thing Is Certain" (About half of Black Orchid #1), DC (UK), 1991 [series probably continued]

Signal To Noise, "Signal To Noise" (expanded and revised from original serial version in The Face), Dark Horse Comics, 1992 (originally published in Hardcover in the UK by VG Graphics)

Sing Out V. 40 #4, "False Knight On The Road," April 1996

Soloman Kane Sketchbook, "Foreword" (text), Wandering Star, 1997

Sonovawitch, "Introduction" (text), Exhibit A Press, 2000

Spawn #9, "Angela," Image Comics, 1993

Spawn #26, "The Dark," Image Comics, 1994 [Uncredited writer of 'partial script']

Spawn Collection V. 2, "Angela," Image Comics, 1996

Spawn Collection V. 6, "The Dark," Image Comics, 1998 [Uncredited writer of 'partial script']

The Spirit: The New Adventures #2, "The Return Of Mink Stole," Kitchen Sink Press, 199

Starchild #8, Letter (text), Taliesin Press, 1993

Starchild #9, Letter (text), Taliesin Press, 1993

Starchild: Crossroads, "Introduction" (text), Coppervale Press, 1998

Stardust #1, "Stardust Chapters 1 & 2," DC Comics (Vertigo), 1997

Stardust #2, "Stardust Chapters 3 & 4," DC Comics (Vertigo), 1998

Stardust #3, "Stardust Chapters 5, 6, &7," DC Comics (Vertigo), 1998

Stardust #4, "Stardust Chapters 8, 9, & Epilogue," DC Comics (Vertigo), 1998

Stardust Collection, "Stardust," DC Comics (Vertigo), 1998

Swamp Thing #51, "Home Free" (Alan Moore used a few lines from Neil's first, and still unpublished, comics script 'The Day My Pad Went Mad'), DC Comics, 1986

Swamp Thing Annual #5, "Brothers," "Shaggy God Stories," DC Comics, 1989

Swamp Thing V. 2, "Of Blood And Bad Craziness..." (text), Titan Books, 1987

Swamp Thing V. 3, "Why Dead Birds Move And Flowers Go To Hell" (text), Titan Books, 1987

Swamp Thing V. 4, "Trifles Light As Air And Otherwise" (text), Titan Books, 1987

Swamp Thing V. 5, "Growing Pains" (text, credited as "Gerry Musgrave," one of the pseudonyms Neil is listed as having in a 1986 story), Titan Books, 1988

Swamp Thing V. 8 , "How Do You Baffle A Vegetable? And Other God Jokes" (text), "Hom Free" (Alan Moore used a few lines from Neil's first, and still unpublished, comics script 'The Day My Pad Went Mad'), Titan Books, 1988

Swamp Thing Love And Death, "Love And Death: Overture" (text, mostly from his earlier UK Swamp Thing introductions), DC Comics, 1990

Sweeney Todd Penny Dreadful, "Sweeney Todd The Demon Barber Of Fleet Street,"

Tundra Publishing Inc., 1992

Taboo #4, "Babycakes," SpiderBaby Grafix & Publications, 1990

Taboo #6, "Blood Monster," "Holly's Story" (comic written by Neil's second child, Holly Gaiman), Tundra Publishing Ltd., 1992

Taboo #7, "Sweeney Todd, The Demon Barber Of Fleet Street: Prologue," Tundra Publishing Ltd., 1992

Tale Of One Bad Rat #1, "Introduction" (text), Dark Horse Comics, 1994

Tantrum, "Introduction" (text), Fantagraphics Books, 1997

Tekno: The Official Tekno Comix Handbook, "-" (text about Lady Justice), Tekno Comix, 1996

Time Twisters #17, "Conversation Piece" (colorized), "You're Never Alone With A Phone!" (colorized), Quality Comics, 1988/9

Time Twisters #18, "I'm A Believer" (colorized), Quality Comics, 1988/9

Total Eclipse #4, "Screaming," Eclipse Comics, 1989

Trident #1, "Light Brigade Chapter One: The Path Of The Just" (credited as cowriter), "Light Brigade Chapter Two: Take Five" (credited as sole writer), Trident Comics, 1989

Trident Sampler #1, "Light Brigade Chapter One: The Path Of The Just Excerpt" (credited as cowriter), "Light Brigade Chapter Two: Take Five Excerpt" (credited as sole writer), Trident Comics, 1989

Tyrant #1, Letter (text), SpiderBaby Grafix & Publications, 1994

Unknown Quantities, "An Honest Answer," Funny Valentine Press, 1999

Vertigo Jam #1, "The Castle," DC Comics (Vertigo), 1993

Vertigo Preview #1, "Death: The High Cost Of Living #1 Excerpt," "Fear Of Falling," DC Comics (Vertigo), 1992

Vertigo Rave #1, "Mr. Punch Excerpt," "Sandman #64 Excerpt," "Sandman #65 Excerpt," DC Comics (Vertigo), 1994

Vertigo Sampler, "Death: The High cost Of Living #1 Excerpt," DC Comics (Vertigo), 199

Vertigo Secret Files: Hellblazer #1, "Straight To Hell" (contributor), DC Comics (Vertigo), 2000

Vertigo Winter's Edge #1, "The Flowers Of Romance," DC Comics (Vertigo), 1998

Vertigo Winter's Edge #2, "Death: A Winter's Tale," DC Comics (Vertigo), 1999

Vertigo Winter's Edge #3, "How They Met Themselves," DC Comics (Vertigo), 2000

Violent Cases (UK Black & White), "Violent Cases," Titan Books, 1987

Violent Cases (UK Color), "Violent Cases," "Introduction" (text), Titan Books, 1991

Violent Cases (US Color), "Violent Cases," "Introduction" (text), Tundra, 1992

Violent Cases (US Color Hardcover), "Violent Cases," Tundra, 1992

Violent Cases (US Color Hardcover & Trade paperback), "Violent Cases," Kitchen Sink Press, 1997

Vogarth #20 (AKA V. 2 #1), "An Honest Answer," Vogarth Comix, 1994

WATCH 1996 Annual (AKA Barron Storey's...), "On Barron Storey" (text), Vanguard Productions, 1996

Welcome Back To The House Of Mystery, "Welcome Back To The House Of Mystery: Preamble And Bits," DC Comics (Vertigo), 1998

Who's Who In The DC Universe #8, "Death" (uncredited writer), DC Comics, 1991

WIIndows #16, "Villanelle" (AKA "Luther's Villanelle") (version C), Cult Press, 1994

WIIndows #21, "An Honest Answer," , Cult Press, 1994

The Worm, "What This Book Is Really About" (text), Slab-O-Concrete Publications, 1999

**Upcoming:** Murder Mysteries (adaptation of text story), Endless Nights (new Sandman/Endless tales), 1602 (from Marvel), Hellraiser collection (reprinting "Wordsworth")
**Unfinished:** Sweeney Todd, Miracleman
**Consultant:** Neil is listed as consultant on many of his spin off books (such as the Dreaming and Books of Magic)
**Other:** Neil also created the characters used in several Tekno Comics titles, such as Lady Justice and Mr. Hero, but did not actively work on the series. Neil has also been used as character in other peoples stories. Here are a few notable appearances:
*Eddie Campbell's Bacchus # 4-8, 14, 16, 44, 49, 52, as a character and also in true anecdotes
*Donna Mia #1-2 as a main character
*Rare Bit Fiends #3-5, 7, 10, 13, as he appeared in Rick Veitch's dreams
*Star Child #4, 6, 10, Negative Burn #8, 50 has "Lil Neil"

to

Newsletter | Links | FAQ



If you find any technical problems, have any suggestions,
or just want to comment on how much you love the site,
please email Julia Bannon, online marketing manager for HarperCollins at
julia.bannon@harpercollins.com. Thanks!

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF WISCONSIN

3     = = = = = = = = = = = = = = = = = = = = = = = = = = = =

4     NEIL GAIMAN, a resident of Wisconsin,
      and MARVELS AND MIRACLES, LLC,
5     a Wisconsin Limited Liability Company,

6                      Plaintiffs,

7          vs.                           Case No. 02-C-0048-S

8     TODD McFARLANE, a resident of Arizona,
      TODD McFARLANE PRODUCTIONS, INC.,
9     an Arizona corporation,
      TMP INTERNATIONAL, INC.,
10    a Michigan corporation,
      McFARLANE WORLDWIDE, INC.,
11    a Michigan corporation,
      and IMAGE COMICS, INC.,
12    a California corporation,

13                     Defendants.

14    = = = = = = = = = = = = = = = = = = = = = = = = = = = =

15

16                    Deposition of:

17                  JAMES P. CAVEN

18                  = = = = = = = =

19

20

21          Date:   Tuesday, September 17, 2002

22          Time:   10:15 o'clock a.m.

23

24

25                Reported by NANCY L. DELANEY

# PROFESSIONAL REPORTERS
L      I      M      I      T      E      D

Deposition of JAMES P. CAVEN  9-17-02

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF WISCONSIN

3    = = = = = = = = = = = = = = = = = = = = = = = = = = = =

4    NEIL GAIMAN, a resident of Wisconsin,
     and MARVELS AND MIRACLES, LLC,
5    a Wisconsin Limited Liability Company,

6    Plaintiffs,

7    vs.        Case No. 02-C-0048-S

8    TODD McFARLANE, a resident of Arizona,
     TODD McFARLANE PRODUCTIONS, INC.,
9    an Arizona corporation,
     TMP INTERNATIONAL, INC.,
10   a Michigan corporation,
     McFARLANE WORLDWIDE, INC.,
11   a Michigan corporation,
     and IMAGE COMICS, INC.,
12   a California corporation,

13   Defendants.

14   = = = = = = = = = = = = = = = = = = = = = = = = = = = =

15

16   Deposition of:

17   JAMES P. CAVEN

18   = = = = = = = =

19

20

21   Date:  Tuesday, September 17, 2002

22   Time:  10:15 o'clock a.m.

23

24

25   Reported by NANCY L. DELANEY

**Page 2**

1    DEPOSITION of JAMES P. CAVEN,

2    a witness of lawful age, taken on behalf of the

3    defendants in the above-entitled cause, wherein NEIL

4    GAIMAN, et al., are the plaintiffs and TODD McFARLANE, et

5    al., are the defendants, pending in the District Court of

6    the United States for the Western District of Wisconsin,

7    pursuant to stipulation, before NANCY L. DELANEY, a

8    Notary Public in and for the State of Wisconsin, at the

9    offices of LaFollette, Godfrey & Kahn, Attorneys at Law,

10   One East Main Street, Madison, Wisconsin, on September

11   17, 2002, commencing at 10:15 o'clock a.m.

12   A P P E A R A N C E S

13   JOAN L. EADS and JEFFREY A. SIMMONS,
        FOLEY & LARDNER, Attorneys at Law
14      150 East Gilman Street, Madison, Wisconsin
        appearing on behalf of the plaintiffs;
15

16   PETE SALSICH, III, (by telephone)
        BLACKWELL, SANDERS, PEPER, MARTIN, LLP,
17      Attorneys at Law, 720 Olive Street,
        Suite 2400, St. Louis, Missouri,
18      appearing on behalf of the defendants;

19   EUGENIA G. CARTER and TODD G. SMITH,
        LAFOLLETTE, GODFREY & KAHN,
20      Attorneys at Law, One East Main Street,
        Madison, Wisconsin, also appearing on
21      behalf of the defendants;

22   R. SCOTT FELDMANN, (by telephone)
        BROBECK, PHLEGER & HARRISON, LLP,
23      Attorneys at Law, 38 Technology Drive,
        Irvine, California, appearing on behalf of
24      the defendants, Image Comics, Inc.

25   ALSO PRESENT:  THOMAS R. KLINGELE

**Page 3**

1    EXHIBIT INDEX

2    203   Expert witness report of James P. Caven     7
           dated September 11, 2002
3
     204   Schedules to expert witness reports of   7
4          James P. Caven
5    205   Supplemental expert witness report of    8
           James P. Caven dated September 13, 2002
6
     206   Royalty agreement dated December 12, 1996     133
7
     207   Letter to Neil Gaiman dated December 14,      193
8          1993 from Big Entertainment, Inc.

9

10   EXAMINATION INDEX

11   JAMES P. CAVEN

12   BY MR. SALSICH.    3

13   BY MR. FELDMANN  . . . . . . . . 190

14   = = = = = = =

15   JAMES P. CAVEN,

16   called as a witness, after being first

17   duly sworn in the above cause, testified

18   under oath as follows:

19   EXAMINATION

20   BY MR. SALSICH:

21   Q  Would you state your name for the record, please.

22   A  James P. Caven.

23   Q  And Mr. Caven, you have been asked to prepare an

24   expert witness report and provide expert witness

25   testimony by the plaintiffs Neil Gaiman and Marvels

**Page 4**

1    And Miracles, LLC in this case, is that correct?

2    A  Yes.

3    Q  Do you have a doctoral degree of any type?

4    A  No doctoral degree.

5    Q  So if I call you Mr. Caven, is that okay?

6    A  That is correct.

7    Q  Have you ever been -- have you ever testified before?

8    A  Yes.

9    Q  And have you ever given your deposition before?

10   A  Yes.

11   Q  So you recall that we're going to proceed with a

12   question and answer process this morning and this

13   afternoon.  I will do the best I can to wait until you

14   have finished your answer, if you will do the best

15   that you can to wait until I finish my question, is

16   that fair?

17   A  That's fair.

18   Q  And we should note for the record that we have several

19   attorneys, myself included, participating in this

20   deposition via telephone conference call and so we'll

21   not have eye contact or be able to see nods and things

22   like that, so it's going to be very important for us

23   to be clear in our questions and our answers, is that

24   all right?

25   A  Fair enough.

Deposition of JAMES P. CAVEN   9-17-02

5

1  Q Great. And you're doing a good job so far, but for
2     the same reasons I just mentioned, we need to make
3     sure that we have yes and no answers or a clearly
4     stated answer, rather than uh-huh and uh-uh, is that
5     all right?
6  A That's correct.
7  Q Great, thank you very much. If at any time you don't
8     understand a question that I've asked, please correct
9     me or ask me to clarify that. Will you do that?
10 A Yes.
11 Q And I'm not going to assume that you understand,
12    because I don't want to assume anything today, so if
13    we're at all unclear about it, will you help me do the
14    best we can to resolve any vagueness that we have?
15 A Yes.
16 Q Thanks. Are you being paid for your services?
17 A Yes.
18 Q How much?
19 A My hourly rate today is $295 an hour. I have other
20    staff people that have worked on this engagement, so
21    it's a blended rate that we're charging.
22 Q And what is that blended rate?
23 A It's probably averaging out to about $200 an hour.
24 Q And do you get paid a different rate for giving a
25    deposition than simply for preparing your report?

6

1  A No, it's always the same rate.
2  Q And would that be true for testifying at trial?
3  A Yes.
4  Q Have you been asked to testify at the trial of this
5     case?
6  A Yes.
7  Q And are you preparing to do so?
8  A Yes.
9  Q How many hours have you worked so far on this case?
10 A I think we've probably logged in about 250 hours.
11 Q And that's you along with the staff people that you
12    referred to?
13 A Yes.
14 Q Have you sent any bills or invoices to the plaintiffs
15    yet?
16 A We sent one bill and we received a retainer payment
17    pursuant to our engagement letter.
18 Q Do you plan on doing any more work after today?
19 A There is some additional reading of depositions that I
20    have not completed. There are additional exhibits
21    that I may prepare for trial.
22       There are additional framework discussions that
23    may account for the accounting of Medieval Spawn and
24    Cogliostro, post August 4th, but we have not discussed
25    that further. Those are the only things that I

7

1     anticipate, other than preparing for trial and reading
2     Mr. Klingele's report and rebutting anything necessary
3     within the context of his analysis and conclusions.
4  Q Anything else besides -- and I realize that's not --
5     that was a general list of tasks that you still have
6     to complete, are there any other general areas that
7     you intend to continue working on?
8  A Not at this time.
9         (Exhibit 203 is marked for identification)
10 Q You have prepared an expert witness report as well as
11    a supplemental expert witness report that the
12    plaintiffs' lawyers have provided us, and we have
13    marked those for identification purposes today as
14    deposition Exhibits 203 and 205.
15       In addition, we've also received a set of
16    schedules that are identified in your expert witness
17    report, and it is my understanding they fully detail
18    the calculations you've made and that you identified
19    in your report and that's been marked as deposition
20    Exhibit 204.
21         (Exhibit 204 is marked for identification)
22       I'd like to ask you generally, you just testified
23    that you have some additional work you may need to do
24    in reviewing depositions and you may still be
25    preparing some additional exhibits. I want to

1     understand how much we can rely on the reports that
2     you already provided us as a complete as possible
3     statement of your opinions that you intend to give at
4     the trial in this case.
5         (Exhibit 205 is marked for identification)
6  A The change of exhibits may only be not in content, but
7     in format only, just so that they're in presentation
8     form, either larger print for the jury, so the content
9     I don't anticipate changing, other than the caveat
10    that upon reading any of the depositions, things that
11    I've learned through conversations with counsel
12    regarding those depositions may change, but my
13    understanding of those depositions and their contents
14    is what I have relied on within the context of
15    preparing my report.
16 Q And what depositions are you still waiting to read
17    that have already taken place?
18 A I was handed a stack recently, but I think if I can
19    remember all the names, Terri Cunningham, I think,
20    there's a Mr. Levitz, I think there is a
21    Mr. Valentino, Alan Inglis, I-n-g-l-i-s, I'd have to
22    kind of review my notes. I was given about a
23    four-inch stack of depositions and I don't recall all
24    the parties there, but those are the ones that come to
25    mind off the top of my head.

Deposition of JAMES P. CAVEN   9-17-02

9

1   Q Okay. With respect to -- well, let me just take
2     this -- we'll break it down. Leaving aside those
3     depositions that you have not read, did you read the
4     deposition transcript of Todd McFarlane's deposition?
5   A Yes.
6   Q Have you read the deposition transcript from Neil
7     Gaiman's deposition?
8   A No, that's also in the stack.
9   Q Have you had any discussions with Mr. Gaiman?
10  A Yes.
11  Q Have you had any discussions with Mr. Gaiman since you
12    wrote your expert witness report that we've marked as
13    Exhibit 203?
14  A Yes.
15  Q Has Mr. Gaiman reviewed your expert witness report
16    that's been marked as Exhibit 203?
17  A I can't answer that.
18  Q Did you have any discussions with Mr. Gaiman about the
19    conclusions and calculations contained in Exhibit
20    203?
21           MS. EADS: Objection as to form.
22        Are you talking about subsequent to the report or
23        before the report?
24  Q At any time.
25  A It's such a broad question, could you be more

10

1     specific?
2   Q Sure. When you were preparing your expert witness
3     report, Exhibit 203, during the time you were
4     preparing it and prior to the time it was provided to
5     us by plaintiffs' attorneys, during that time, did you
6     have any conversations with Mr. Gaiman about the
7     specific calculations or conclusions that are
8     contained in that report?
9   A Yes.
10  Q I'm going to ask you, we will go through that fairly
11    detailed along with the schedules, so I may ask you to
12    point out at what point in time Mr. Gaiman may have
13    been the source of your information, so we'll take
14    those up as they come.
15        You also prepared recently a supplemental expert
16    witness report which we've marked as Exhibit 205, do
17    you see that?
18  A Sorry, there's been a slight interruption here.
19           MS. CARTER: Why don't you
20        continue? I need to get a couple more copies,
21        unless you can work from his.
22           MS. EADS: Why don't you get them.
23           MS. CARTER: Pete, will you hold
24        up, please. They'll bring them in. Maybe we can
25        continue and you can look on.

11

1           MS. EADS: Okay.
2           MS. CARTER: Okay, Pete.
3   Q Okay. We were talking, I think, about Exhibit 205 and
4     I will go into more detail, I just want to ask you
5     generally the same questions I asked about Exhibit
6     203.
7        During your preparation of Exhibit 205, your
8     supplemental expert witness report, but prior to the
9     time that the plaintiffs' attorneys provided us with a
10    copy of that supplemental report, did you have any
11    conversations with Mr. Gaiman about the conclusions or
12    calculations contained in that report?
13  A We discussed the framework of these particular
14    calculations and the basis for the calculations, but
15    in detail of how some of the data was arrived and
16    concluded, no.
17  Q You mentioned that you have testified previously as an
18    expert witness, is that correct?
19  A Correct.
20  Q How many times, approximately?
21  A I can only give you an estimated range of probably
22    over 400 times.
23  Q And during any of those times, have you evaluated any
24    business or been involved in any litigation involving
25    the comic book industry?

12

1   A No.
2   Q I'd like you to take a look -- do you have a copy of
3     your expert witness report, Exhibit 203, that you can
4     work from?
5   A Yes.
6   Q I'd like to work through that now and just start by
7     asking you some general questions. First of all, I'd
8     like to ask you to list for me, and I'm going to write
9     them down, the specific opinions that you intend to
10    offer at the trial in this case on behalf of the
11    plaintiffs, and if you need to do so, please point to
12    me in either your original report, Exhibit 203, or
13    your supplemental report, Exhibit 205, where I can see
14    that opinion.
15           MS. EADS: Object as to form.
16        You're going to have to rephrase that question,
17        Counsel. His opinions are contained in both
18        Exhibit 203 and 205 and the question, the way you
19        framed it, is almost impossible to answer.
20  Q Did you understand my question, Mr. Caven?
21  A Well, it's awfully broad.
22  Q Well, we'll start broad and work our way down. I
23    simply want you to list for me one through two, one
24    through ten, one through 20, the opinions you intend
25    to offer at trial.

Deposition of JAMES P. CAVEN   9-17-02

**13**

1    MS. EADS: I'll renew my objection.
2    MR. SALSICH: That's fine.
3  Q What's your first opinion that you're going to offer
4    in this trial, Mr. Caven?
5  A I mean, this is a broad question, but if you turn to
6    page 4 of 15 under toys and that carries also onto
7    page 5, that the calculations for toys that Todd
8    McFarlane Productions received from TMP International
9    were at a rate of five percent of net revenues.
10    The document that we were provided for the
11    royalty agreement by both companies stipulates a
12    royalty rate at 100 percent of gross sales, not net
13    sales.
14  Q So what is your opinion there?
15  A My opinion is that the information that both companies
16    were working off of is understated, but we have not
17    been able to obtain the gross sales information due to
18    accounting system problems, changeovers. Those are
19    actually observations and conclusions I reached on
20    that issue.
21  Q Are you making a conclusion and offering an opinion as
22    to the accuracy of the royalties paid by Todd
23    McFarlane Productions in August of 1997 on toys?
24    MS. EADS: Objection as to form.
25  Q You may answer.

**14**

1  A Can you restate the question?
2  Q Well, you know, I'm trying to find out what you're
3    going to say to the jury. Specifically, is it your
4    statement that the royalties calculated for toys by
5    Todd McFarlane Productions in August of 1997 was
6    accurate or inaccurate?
7    MS. EADS: Objection as to form.
8    Counsel, what this witness is going to say to the
9    jury is essentially contained in these reports and
10    if you want him to read the reports in word for
11    word, he'll be happy to do that. Otherwise,
12    you're going to need to be very specific in your
13    questions.
14    MR. SALSICH: Let's go off the
15    record, please.
16    (Discussion off the record)
17    MS. CARTER: Okay. We have the
18    witness back, Pete.
19    MR. SALSICH: Okay, let's go back
20    on the record.
21  Q Mr. Caven, are you represented by counsel here today?
22  A Yes.
23  Q Who's your lawyer?
24  A Joan Eads.
25  Q Is she your individual counsel today?

**15**

1  A No.
2  Q That was my question, are you personally represented
3    by your own lawyer in this deposition?
4  A I—
5    MS. EADS: If I might, Jeff and I
6    are here representing the plaintiff and the
7    witness is an experienced witness and is not
8    personally represented by an attorney, if that's
9    your question.
10    MR. SALSICH: Yes, it is. Okay,
11    thank you.
12  Q We were talking a few minutes ago about Exhibit 203
13    and I was asking you if you would state for me, list
14    for me so that we can work from today the opinions you
15    intend to give at trial. You told me that opinions
16    are contained in your report and I just want to make
17    sure that I understand specifically what the opinions
18    are.
19    If at some point, Mr. Caven, you believe that I
20    am being too broad or unclear, please tell me so, all
21    right?
22  A Okay.
23  Q I have only your words to work from and I'm going to
24    try to do the best that I can from them, but if there
25    are things that I do not understand, because I don't

**16**

1    have your expertise, I'm going to need you to clarify
2    that for me, is that all right?
3  A Okay.
4  Q Let me ask you first, I realize that you've got some
5    additional work to do, as you've described, but based
6    on the work you've done so far, do you intend to offer
7    any opinions at trial that are not contained in either
8    Exhibits 203, 204 or 205?
9  A My understanding of the additional work that I would
10    be performing would only confirm information that I
11    have received orally, and so it would be my opinion
12    today that I would not be changing any opinions in
13    203, 204 or 205.
14  Q And you don't have any opinions today or don't expect
15    to have any opinions at trial that are not contained
16    somewhere in 203, 204 or 205, is that correct?
17  A My understanding is that there may be some changes in
18    some of the numbers, if I gained some additional
19    information.
20  Q Aside from that possible alteration, I'm looking for
21    specific opinions to see if there are any that you
22    anticipate giving at trial or that you're aware of
23    today that are not contained in Exhibits 203, 204 or
24    205.
25    MS. EADS: Objection as to form.

Deposition of JAMES P. CAVEN   9-17-02

17

1  Q You may answer.
2  A Only to the extent that as you've stated, new
3     information such as the defendants' report or other
4     information necessary to rebut that report. I do not
5     anticipate changing the documents of 203, 204 or 205,
6     but if there is additional information that comes to
7     light upon reviewing of depositions or other matters,
8     I will notify you of those changes.
9  Q I understand that and I think we're pretty clear on
10    that, but my question is a little bit different than
11    that. I'm not asking about changes to the opinions
12    that are already contained in 203, 204 or 205, I'm
13    asking about whether there are any additional,
14    substantively different opinions that you are aware of
15    now or that you intend to offer at trial that are not
16    contained in any way in 203, 204 or 205.
17            MS. EADS: Objection as to form.
18 Q You may answer.
19 A There are no additional tasks that I'm requested to
20    provide an additional opinion on that would not be
21    part of this framework that is contained in 203, 204
22    or 205, absent any other information that is provided
23    regarding damages.
24 Q I understand, okay. We can work from these documents,
25    thank you. Now, a few minutes ago we were talking

18

1     about your first opinion and you pointed me to page 5
2     of Exhibit 203, and you said, if I understood
3     correctly, that in general terms, it appeared that
4     Todd McFarlane Productions was paying some royalties
5     or stating that it had received royalties from TMP
6     International at a rate of five percent of net
7     revenues and you said something about it should have
8     been 100 percent of gross sales. Do you recall our
9     discussion about that?
10           MS. EADS: Objection as to form.
11 Q You may answer.
12 A Yes, I do recall, in general, the discussion we had.
13 Q I'd like to clear up that rather confused discussion
14    we had and let's just start with -- if you would point
15    to me where on page 5 of Exhibit 203 the substance of
16    this opinion is contained.
17 A In the first full paragraph on page 5.
18 Q That starts with the words, "In our review of certain
19    financial documents"?
20 A Yes.
21 Q I read what appears to be two sentences in the first
22    seven lines of that paragraph, could you read to me
23    those two sentences and tell me if that contains your
24    opinion in this matter? If you can read those into
25    the record, please.

19

1  A "In our review of certain financial documents or
2     schedules produced by the defendants, royalties paid
3     to Todd McFarlane Productions from TMP International,
4     Inc. were paid at a raid of five percent of certain
5     net revenues (TM00489). The calculation of royalties
6     due Todd McFarlane Productions from TMP International
7     did not appear to be in compliance with the royalty
8     agreement provided by McFarlane (TM01237-01248) which
9     stipulates a royalty rate of, 'Five percent of 100
10    percent of all gross sales by licensee.'"
11 Q And I understand those two sentences. My question for
12    you is this, and I believe this was the question I was
13    trying to ask you before, are you stating when you say
14    those two sentences that you are going to offer an
15    opinion that the calculation that appears on TM00489
16    and is reflected in the royalties ultimately paid to
17    Neil Gaiman in August of 1997 for toys was incorrect
18    in some way?
19 A Yes, based upon my interpretation of TM01237 to 01248.
20 Q And is it your statement that the manner in which the
21    royalties paid to Neil Gaiman in August of 1997 on
22    toys, the manner in which those royalties were
23    incorrectly calculated was that the pool upon which
24    those royalties were calculated was too small, because
25    it was based on TMP International's net revenues,

20

1     rather than 100 percent of TMP International's gross
2     sales?
3            MS. EADS: Objection as to form.
4  Q You may answer.
5            THE WITNESS: Can you read back the
6     question.
7            (Reporter reads back previous question)
8  A That is one of the opinions I will hold on that issue.
9  Q Any other opinions on that issue that you intend to
10    state?
11 A That the royalty rate between the companies could be
12    manipulated to an understated value as evidenced by
13    the Capcom, that's C-a-p-c-o-m, contract or the 989
14    Studios royalty statement, in which it shows that TMP
15    received a nine percent royalty as well as an 11
16    percent royalty.
17 Q So I understand what you just said, you said -- and I
18    was writing this down and I'm going to try to do this
19    today as accurately as I can, Mr. Caven, but if I do
20    it incorrectly, you'll catch me here. I do not
21    want -- I'm not trying to trick you in any way.
22           I wrote down that you said the royalty rate
23    between the companies could be manipulated to an
24    understated value, is that correct?
25 A Correct.

Deposition of JAMES P. CAVEN   9-17-02

**21**

1  Q I'd like you to explain that to me first by telling me
2    what you are referring to when you say the royalty
3    rate between the companies.
4  A Well, TMP International pays a royalty or a licensing
5    for selling toys with characters that have been the
6    rights to Todd McFarlane Productions. Both companies
7    are owned, it is my understanding, 100 percent by Todd
8    McFarlane. When you have related enterprises, there's
9    not an arm's length negotiation to pay profits between
10   related businesses.
11       And we asked for evidence of other royalties that
12   had gone to other parties and were provided the Capcom
13   and the 989 Studios royalty statements which evidenced
14   that there was a higher royalty paid. Therefore, we
15   concluded that it is possible that the characters for
16   toys could be understated and the royalty could be in
17   the ten percent range as opposed to the five percent
18   range.
19 Q Anything else?
20 A Are you referring to other opinions on this issue?
21 Q I just want to make sure I understand just this one
22   opinion. Sticking to this one opinion, I understand
23   you gave me a lengthy explanation. I want to ask,
24   basically, are you finished with your explanation of
25   how you arrived at a ten percent royalty instead of a

**22**

1    five percent royalty between Todd McFarlane
2    Productions and TMP International?
3          MS. EADS: Objection as to form, is
4      that a question?
5  Q No, actually it wasn't, good point. It was just a
6    statement. I want to make sure I understand your
7    entire rationale for the conclusion that you just made
8    and maybe we can do it this way, let me see if I can
9    break it down.
10      Am I correct in characterizing your opinion, your
11   second opinion in this matter that the royalty rate
12   between Todd McFarlane Productions and TMP
13   International, Inc. with respect to toys made by TMP
14   International on Spawn characters should have been ten
15   percent to TMP, rather than five percent, is that your
16   opinion?
17          MS. EADS: Objection as to form.
18      You can answer. Do you need it read back?
19          THE WITNESS: Please read it back.
20          (Reporter reads back previous question)
21 A That is my opinion, that that's the upper range that
22   one could determine as a royalty rate between the
23   enterprises.
24 Q So that is the upper range that one could determine,
25   would you agree with me that there might be other

**23**

1    percentage rates that one could determine within a
2    range between five percent and ten percent?
3  A There's -- under that hypothetical, yes, there's a
4    possibility that it could be between five and ten, but
5    these are based on net sales, not on gross sales, so
6    you'd have to take that into consideration.
7  Q So let me see if I understand that. When you say
8    these are based on net sales, what are you referring
9    to?
10 A Well, the calculations we did on a five percent and
11   a ten percent calculation were done on net sales,
12   because that's all the information we had, not on
13   gross sales.
14 Q But how did that affect the range, the choice of a
15   percentage between five percent and ten percent in a
16   range?
17 A Well, ten percent of $8 is different than ten percent
18   of $10, with $8 being the net sales and $10 being the
19   gross sales.
20 Q Okay, I understand that, but that doesn't tell me why
21   ten percent is appropriate instead of nine percent or
22   eight percent or seven percent.
23 A Seven percent may be of gross sales, but it may equate
24   to ten percent of net sales. They may be the same
25   number.

1  Q I think we're getting a little afield here, Mr. Caven,
2    and let's focus back on what you've already told me.
3    You've told me that your first opinion is that there
4    was an incorrect calculation of royalties paid to
5    Mr. Gaiman in August of '97 for toys, because it
6    appeared that Todd McFarlane Productions calculated
7    its royalty payments based on net revenues of TMP
8    International rather than gross sales, is that
9    correct?
10 A Yes.
11 Q So I understand that there's a -- and that's one of
12   the ways that that royalty payment was incorrect and I
13   understand that there's a -- that your first opinion
14   is that it should have been calculated on gross
15   sales. I'm asking now about your second opinion, that
16   five percent was incorrect and ten percent is the
17   upper range that one could determine, as you said,
18   that's what I'm talking about now and let me ask you
19   this question with respect to that discussion.
20      Is it your opinion that the license agreement
21   identified with document TM01237 which you identified
22   in your report as requiring a payment of five percent
23   of 100 percent of all gross sales, is that license
24   agreement incorrectly negotiated, in other words, that
25   five percent of gross sales, is that incorrect in some

Deposition of JAMES P. CAVEN  9-17-02

25

1  fashion?
2            MS. EADS: Objection as to form.
3  Q You may answer.
4  A I'm not sure I completely understand the question.
5  Q Well, let me ask you this, you've just told us that
6     you think the five percent royalty figure between TMP
7     and TMP International was, I believe you said,
8     manipulated to an understated value, do you recall
9     that?
10            MS. EADS: Objection as to form.
11  Q You may answer.
12  A I think what I said was that there could be a
13     manipulation between the companies to manipulate the
14     profits between both enterprises, since they are owned
15     by the same person.
16  Q Were you provided -- let me ask you this, were you
17     provided any documents in your work on this case to
18     give you any indication that the royalty agreements
19     between TMP International and Todd McFarlane
20     Productions was not the result of an arm's length
21     negotiation?
22            MS. EADS: Objection as to form.
23  Q You may answer.
24  A Are you referring to someone else's formal opinion
25     that it's an understated --

26

1  Q No, that's not my question.
2  A Well, I don't understand your question then.
3  Q We may be here a while. I'm going to do the best I
4     can to try to ask clear questions. I thought that was
5     clear. Let me try again. You stated, and we can read
6     back your testimony if you want, but you stated that
7     these related enterprises, and I'm referring to Todd
8     McFarlane Productions and TMP International which are
9     both owned by Todd McFarlane the individual, I believe
10     you stated that therefore it was not an arm's length
11     negotiation and that is what could allow the royalties
12     between those companies or the profits between those
13     companies to be manipulated. Did I misunderstand you?
14  A No, that's correct.
15  Q Now, I'm asking you what evidence you were shown, what
16     documents you reviewed for your conclusion that the
17     royalty agreement between Todd McFarlane Productions
18     and TMP International was not the result of an arm's
19     length negotiation or that there was anything improper
20     in the negotiation of the royalty rate contained in
21     that royalty agreement?
22            MS. EADS: Objection as to form.
23  Q You may answer.
24  A We were provided only two other instances that the
25     defendant would release to us regarding royalty

27

1  statements, as I discussed earlier, the Capcom and the
2  989 Studios royalties appeared to be at a nine percent
3  and 11 percent rate, which is higher than the five
4  percent rate.
5  Q Do you know if the Capcom and the 989 agreements to
6     which you just referred, whether the royalty rate was
7     calculated on the basis of 100 percent of gross sales
8     or some other measure?
9  A Without reviewing it again at this particular moment,
10     I would have to defer to the document.
11            MR. SALSICH: Gina, do we have a
12     copy of the license agreement between Capcom and
13     Todd McFarlane Productions? It's Deposition
14     Exhibit 84, it should be in that group of
15     documents that Matt assembled, TM01255, do you see
16     that?
17            MS. CARTER: Isn't it 1257?
18            MR. SALSICH: That's the third page
19     of it.
20            MS. CARTER: Yes, we have it.
21            MR. SALSICH: Would you show that,
22     please, to Mr. Caven.
23            MS. CARTER: It's marked Exhibit
24     84?
25            MR. SALSICH: That's correct,

28

1     previously marked in a deposition as Exhibit 84.
2            MS. CARTER: Okay, he's got it in
3     front of him.
4  Q Would you turn to the third page of that agreement,
5     it's TM01257, do you see that?
6  A Correct.
7  Q And I believe that in fact is the very page that you
8     cited on page 5 of your report, is that correct?
9  A Correct.
10  Q And do you see the royalty rate in the middle there
11     where it says nine percent?
12  A Yes.
13  Q Could you read that into the record, please.
14  A "Nine percent of net sales for all licensed products
15     sold."
16  Q Didn't you just tell me a few minutes ago that a
17     smaller percentage of gross sales might actually equal
18     a hire percentage of net sales?
19            MS. EADS: Objection as to form.
20  Q You may answer.
21            THE WITNESS: Can you read back the
22     question?
23            (Reporter reads back previous question)
24  A Yes.
25  Q So wouldn't it be fair to say that a straight

Deposition of JAMES P. CAVEN    9-17-02

29

1  comparison of percentage rate is not appropriate when
2  those percentage rates are calculated on a different
3  pool of revenues, in other words, you cannot make an
4  equal comparison of percentage rates when one is
5  calculated on the basis of net sales and another is
6  calculated on the basis of gross sales, is that
7  correct?
8              MS. EADS: Objection as to form.
9  Q You may answer.
10             THE WITNESS: Can you read back
11     that question?
12             (Reporter reads back previous question)
13 A Yes, that would be true.
14 Q Okay, thank you. Now, before we got off on that, we
15     were talking about your statement that because Todd
16     McFarlane is the owner of Todd McFarlane Productions
17     and the owner of TMP International, that the royalty
18     agreement was not at arm's length negotiations, is
19     that what you said?
20 A Yes, that's my answer on the basis that both companies
21     are owned by the same party, by its very nature would
22     not be an arm's length deal.
23 Q Let's see if I understand what you're telling us
24     here. Are you saying that -- let me ask you this --
25     strike that. You told me before that you've testified

30

1  in probably over 400 cases, is that correct?
2  A Yes.
3  Q I didn't ask you this, but I'd like to ask you this
4     now, how many of those would you say -- and you can
5     just give me an estimate, are cases involving
6     businesses, not family law?
7  A You mean business --
8  Q That involves a business valuation or a breach of
9     contract action between two businesses. I don't want
10     to talk about personal finances here, so I just would
11     like you to rule out cases involving, you know,
12     people's personal assets.
13             MS. EADS: Objection as to form.
14 A Well, within the context of family law matters,
15     there's been businesses involved, so we're doing
16     valuations of family held businesses.
17 Q So you have lots of experience dealing with
18     businesses, many of which may be owned, wholly owned
19     by individuals, is that correct?
20 A Yes.
21 Q Have you ever once seen a situation in which one
22     individual was the sole owner of more than one
23     business?
24 A Yes.
25 Q And is it your testimony that in every single

31

1  circumstance, simply the fact that one person is the
2  owner of two different businesses means that those --
3  that a negotiation or an agreement between those two
4  businesses is somehow improper?
5              MS. EADS: Objection as to form.
6  Q You may answer.
7  A I didn't hear the last part of that question.
8  Q Okay, I'll make it clear. Is it your testimony that
9     the lone fact that two businesses are owned by one
10     individual means that any negotiations or agreements
11     or contracts between those two businesses, two
12     corporate entities, is somehow improper, is that your
13     testimony?
14             MS. EADS: Renew my objection.
15 A I didn't say the word improper.
16 Q Okay, that's an important distinction here. I want to
17     make sure we understand what you mean by arm's length
18     negotiation and that really gets to the guts of my
19     question.
20             Are you saying that there's anything improper in
21     the royalty agreement or the negotiated royalty rate
22     between Todd McFarlane Productions and TMP
23     International, Inc.?
24 A And are you referring to the improperness in the
25     context of Todd being the shareholder of both

corporations?
2  Q I just want to know what it is about Todd McFarlane
3     being the sole shareholder of both those corporations
4     that provides the basis for you to tell the jury that
5     the negotiations between those two companies that
6     resulted in a five percent of gross sales royalty rate
7     was improper in some fashion.
8              MS. EADS: Objection as to form.
9  Q You may answer.
10 A Within the context of Todd McFarlane negotiating with
11     himself, being the left side and the right side, as a
12     shareholder of both corporations, it's a net sum
13     game. Profits in Company A can be moved to Company
14     B. We are making the conclusion based on other items
15     of evidence, that that royalty was a higher rate when
16     it was done with outside parties.
17             Thus, the impact to Neil Gaiman is that he is
18     receiving a royalty on a lower number. That's my
19     opinion.
20 Q You just said, I believe, that Todd McFarlane
21     negotiating on behalf of one company is really
22     negotiating with himself when he's dealing with TMP
23     and TMP International, is that right?
24 A That's correct.
25 Q And that he can move profits from one to the other

Deposition of JAMES P. CAVEN  9-17-02

**33**

1  because he gets 100 percent of the profits of both
2  companies, is that right?
3          MS. EADS: Objection as to form.
4  Q You may answer.
5          THE WITNESS: Read back the
6    question again.
7          (Reporter reads back previous question)
8  A Yes, that's my understanding, that he owns 100 percent
9    of TMP as well as TMP International and that he would
10   enjoy the benefits of both companies.
11 Q Are you aware of whether TMP International and TMP
12   employ the same people or different people?
13 A I don't recall the composition of both entities.
14 Q Well, let me ask you to speculate on a few things
15   here. You're an expert and you're entitled to do
16   this. If the evidence shows that Todd McFarlane
17   Productions and TMP International employed entirely
18   different sets of employees, other than Todd
19   McFarlane, the sole owner, at the time that this
20   royalty agreement was negotiated in 1996, if the
21   evidence showed that, would that affect your
22   conclusion about the relative ease with which
23   Mr. McFarlane might manipulate the profits between
24   those two companies?
25 A No.

**34**

1  Q So let me ask you this, would you agree with me that
2    while it may not make any difference to Mr. McFarlane
3    which of his companies makes a profit, it might make a
4    difference to the employees of those companies?
5          THE WITNESS: Read back the
6    question.
7          (Reporter reads back previous question)
8  A It's entirely possible under that hypothetical, but
9    the controlling manager or ultimate decision maker of
10   both entities is Todd McFarlane.
11 Q Do you have any evidence, Mr. Caven, were you shown
12   any documents or told anything by any person that
13   would allow you to conclude that Todd McFarlane
14   manipulated the profits from TMP International, Inc.
15   to TMP or vice versa?
16 A I don't recall receiving any documentation either by
17   e-mails or exhibits or documents from his accountant
18   stating that that strategy would be in place.
19 Q So the sole basis for your statement that the five
20   percent royalty negotiated between TMP and TMP
21   International was too low was because you saw an
22   agreement between TMP and Capcom, for example, where
23   the royalty rate was a higher rate, nine percent, and
24   then another one where it was 11 percent, is that
25   right?

**35**

1          MS. EADS: Objection as to form.
2  Q You may answer.
3          THE WITNESS: Read back the
4    question.
5          (Reporter reads back previous question)
6  A That's the only evidentiary documents coming from Todd
7    McFarlane. The other basis of my opinion is my
8    experience as a CPA relating to consulting with
9    closely held businesses and performing other business
10   valuations when there are related party enterprises.
11 Q I'm talking about specific to this case, just things
12   having to do with these two closely held companies,
13   Todd McFarlane Productions and TMP International, just
14   those two, the only evidence that you have seen and
15   the only documents that you've relied on are the
16   Capcom agreement at nine percent and the 989 Studios
17   agreement at 11 percent, is that correct?
18          MS. EADS: Objection as to form.
19 Q You may answer.
20 A Those are the only two documents that have given me an
21   indication that they have exceeded the five percent
22   rate.
23 Q And you just explained to me, didn't we just look at
24   that Capcom agreement and you just explained to me how
25   a five percent and nine percent comparison between the

**36**

1  TMP International royalty agreement and the Capcom
2    royalty agreement aren't really a true comparison,
3    because one is based on gross sales and one is based
4    on net sales, isn't that right?
5  A We discussed that the two agreements are different.
6    However, our calculations are done on net sales,
7    because gross sales information was not available, so
8    they are apples and apples.
9  Q So you're saying your calculations were based on net
10   sales, is that right?
11 A That's correct.
12 Q Would you read for me the last sentence of that
13   paragraph, please, on page 5 that we've been looking
14   at? Read it into the record, please.
15 A "The second method is to assume that the appropriate
16   rate for Todd McFarlane Productions should be at a ten
17   percent of gross revenues with Gaiman's royalty based
18   on 15 percent of the revised royalty due Todd
19   McFarlane Productions."
20 Q Now read for me the last sentence of the previous
21   paragraph, please.
22 A "Additionally, we have based those royalties on gross
23   sales as stipulated in the royalty agreement between
24   Todd McFarlane Productions and TMP International."
25 Q So you based -- you've taken a ten percent royalty of

Deposition of JAMES P. CAVEN  9-17-02

37

1  gross sales and stated that that's what should have
2  been the negotiation between TMP International and TMP
3  and that that's the amount upon which you based
4  Gaiman's royalty in this case, is that correct, and
5  that's what you just read or I heard you say?
6      MS. EADS: Hang on.
7      (Witness examines document)
8  A Yes, both calculations that we have done -- I have to
9  retract my earlier comments, are done on gross
10  revenue.
11 Q So your opinion is that for Mr. Gaiman's royalties on
12  toys related to the Angela and Medieval Spawn and
13  Cogliostro characters should be 15 percent of the
14  revised royalty to Todd McFarlane Productions, and I'm
15  reading from your report, is that correct, and that
16  that revised royalty due Todd McFarlane Productions is
17  ten percent of TMP International's gross sales on
18  those products, correct?
19 A Correct.
20 Q Would you agree with me that ten percent of gross
21  sales might be significantly higher than nine percent
22  of net revenues on the same products?
23      MS. EADS: Objection as to form.
24 Q You may answer.
25 A Under your hypothetical, that's possible.

38

1  Q Isn't it likely?
2  A Not likely if they have small returns, or I mean, if
3  net sales are close to gross sales, that difference
4  may not be a factor.
5  Q That would be true with respect to Todd McFarlane's
6  calculations back in 1997 in choosing net revenue over
7  gross sales, isn't that true?
8      MS. EADS: Objection as to form.
9      THE WITNESS: Read back that last
10  one.
11      (Reporter reads back previous question)
12 A I'm not sure I understand the question.
13 Q When you were telling me why it was incorrect for Todd
14  McFarlane Productions to calculate based on net
15  revenues instead of gross sales, my understanding is
16  you told me there were two problems. One, it seemed
17  to differ from the royalty agreement, and, two, it
18  would result in a significantly lower number because
19  the gross sales might be a significantly higher pool
20  among which to calculate a percentage, is that right?
21      MS. EADS: Objection as to form.
22 A Yes.
23 Q And then you also gave me an example where I think you
24  said five percent of gross sales, I think your example
25  was eight percent of gross sales might be the same as

39

1  ten percent of net sales on the same products, do you
2  recall that?
3  A Yes.
4  Q So, again, my question is, isn't it likely that ten
5  percent of gross sales, a higher percentage of a
6  larger pool, could be significantly higher than nine
7  percent of net sales on the same products?
8  A That's true.
9  Q Okay, thanks. When you said that the fact that Todd
10  McFarlane was the owner of both TMP International and
11  Todd McFarlane Productions, that fact meant that the
12  royalty agreement between those two parties was not an
13  arm's length negotiation, that is your testimony,
14  isn't that correct?
15 A Yes.
16 Q And I want to understand exactly what you mean by
17  arm's length negotiation, because I think sometimes
18  that has a meaning in court and I want to make sure we
19  understand what you mean by that term.  Are you
20  referring to simply the fact that Todd McFarlane as an
21  individual was technically on both sides of that
22  negotiation, is that the basis for your statement that
23  it's not an arm's length negotiation?
24 A Fundamentally, yes.
25 Q But you're not aware, I believe you testified this is

1  true, you're not aware of anything improper or any
2  actual manipulation from one company to the other of
3  profits or anything else that's evident in the royalty
4  agreement negotiated between Todd McFarlane
5  Productions and TMP International, is that correct?
6      MS. EADS: Objection as to form.
7  Q You may answer.
8  A Do you want to define -- I'm not sure I understand
9  your word of improper.
10 Q Well, illegal, wrong, something that would cause
11  employees or other accountants to question the
12  reporting.
13      MS. EADS: Which of all three of
14  those are you asking about?
15      MR. SALSICH: We can break them
16  down. I thought that was sort of different ways
17  of saying the same thing.
18 Q I'm just trying to make sure that I understand you
19  when you say this is not an arm's length negotiation,
20  that your only statement is that it's simply not an
21  arm's length negotiation is because that definition
22  cannot apply when one person sits on both sides of the
23  agreement.
24      If that's what you're saying, I understand that,
25  but I want to make sure you're not saying anything

Deposition of JAMES P. CAVEN    9-17-02

41

1  more and that's why I'm asking you these questions.
2  Do you understand?
3            MS. EADS:  Why don't you just ask
4      him to define it?  Can you answer his question?
5  Q Do you understand my premise, Mr. Caven?
6  A I'll try to restate the premise so that --
7  Q Please do.
8  A If I understand the question, is that is the premise,
9      because Shareholder A and Shareholder -- or
10     shareholder of Company A or shareholder of Company B
11     are one and the same person and that there isn't a
12     willing buyer and willing seller who are different
13     parties, that is the basis of my conclusion.
14  Q That's what I want to break down.  Are you saying that
15     it's impossible for two different companies -- strike
16     that.  I just want to know, are you going to testify,
17     are you going to offer opinion that there was some
18     actual manipulation of profit between TMP
19     International and Todd McFarlane Productions in the
20     negotiations and entering into of the royalty
21     agreement negotiated between those two parties in
22     1996?
23            MS. EADS:  Objection as to form.
24            THE WITNESS:  Read back the
25      question, please.

42

1            (Reporter reads back previous question)
2            THE WITNESS:  Read that back again
3      a little slower.
4            (Reporter reads back previous question)
5  A I have one question and that is -- maybe that's an
6      assumption, that the agreement I don't have in front
7      of me, but that it was a 1996 agreement.
8  Q I'm sorry, yes, it's TM01237 and it's the agreement
9      that you referred to and cite on page 5 of your
10     report.
11  A I agree that it's -- I only have one of the pages, I
12     don't have all three pages in front of me, so I just
13     wanted to make sure that that's the date.
14  Q I'm sorry, I will read it to you and I'll read it into
15     the record.  The first page of that agreement states
16     it's a royalty agreement, it's page number TM01237.
17     It states that, "Agreement, (hereinafter 'agreement')
18     is entered into as of the 12th day of December 1996 by
19     and between Todd McFarlane Productions (hereinafter
20     licensor,)" et cetera, et cetera, et cetera, and, "TMP
21     International, Inc. (hereinafter licensee,)" does that
22     help you answer my question?  I think we know which
23     royalty agreement we're talking about, do we not?
24            MS. CARTER:  He has it in front of
25      him.

43

1  Q And, again, my question to you, maybe I can make it
2      simpler rather than asking to read it again, is simply
3      this, are you going to offer testimony at trial, offer
4      an opinion that there was any manipulation of profits
5      or improper manipulation of royalty rates or anything
6      else improper or illegal in the negotiations of this
7      royalty agreement between Todd McFarlane Productions
8      and TMP International, Inc.?
9            MS. EADS:  Objection as to form.
10  Q You may answer.
11  A I will not be giving an opinion that it was illegal
12     because the only party or shareholder is common to
13     both entities.
14  Q So in other words, the fact that Mr. McFarlane owns
15     these two companies doesn't make anything illegal, is
16     that correct?
17  A That's correct.
18  Q And the fact that Todd McFarlane owns both those
19     companies doesn't automatically mean he has
20     manipulated the profits between those companies, isn't
21     that correct?
22  A He has the ability to manipulate.
23  Q It's possible, isn't it?
24  A Yes, and then provided by other evidence such as the
25     Capcom, where three or four months later he enters

44

1      into an agreement at a higher rate.
2  Q At a higher rate based on a different, smaller spool
3      of revenues, correct?
4            MS. EADS:  Objection as to form.
5  A How are you defining smaller?
6  Q Well, isn't Capcom a nine percent royalty rate based
7      on net revenues?
8  A Yes.
9  Q And didn't you tell me that -- isn't the royalty
10     agreement between TMP International and TMP five
11     percent of gross sales?
12  A Yes.
13  Q Thank you.  Other than what we've just talked about
14     and what's contained in the -- it looks like the first
15     two complete paragraphs on page 5 of Exhibit 203, is
16     there anything else upon which you base your opinion
17     that Mr. Gaiman should have been paid a royalty of 15
18     percent of ten percent of Todd McFarlane Productions'
19     revenues?  Let me restate that, I misspoke that last
20     part, I want to make sure it's clear.
21            You offered opinion that the royalty rate between
22     Todd McFarlane Productions and TMP International
23     should have been ten percent of TMP International's
24     gross sales and that that's the amount of revenues
25     upon which Neil Gaiman's 15 percent toy royalty should

Deposition of JAMES P. CAVEN  9-17-02

45

1  have been calculated, is that correct?
2           THE WITNESS: Could you read that
3      back.
4           (Reporter reads back previous question)
5  A Yes.
6  Q Other than what we've just been talking about here and
7      what's contained in the two full paragraphs on page 5
8      of your report and the sources that are referred to
9      therein, do you have any other basis for offering that
10     opinion?
11 A No.
12 Q Thank you.
13 A Can we take a two-minute break?
14          MR. SALSICH: Yes, let's take a
15     break now. Off the record.
16          (A short recess is taken)
17 Q Mr. Caven, I'd like to ask you a few sort of
18     background questions about your report here. We got
19     started talking about your opinions and we jumped
20     right to page 4 and 5 of Exhibit 203, but I wanted to
21     ask you some questions about some of the things you
22     stated in the earlier pages. Do you have that Exhibit
23     203 in front of you?
24 A Yes.
25 Q Can you tell me, did anyone assist you in the

46

1      preparation of this report?
2  A Yes.
3  Q Were they people on your staff?
4  A Yes.
5  Q Did you verify all of the work that those people did?
6  A To the best of my abilities, yes.
7  Q And are you confident in the work that those people
8      did such that you're confident that this is your
9      individual expert witness report?
10 A Yes.
11 Q Is the same true of the schedules that we've marked as
12     Exhibit 204?
13 A Yes.
14 Q And is the same true of the supplemental report that
15     we've marked as Exhibit 205?
16 A Yes.
17 Q If you would take a look at page 2 of Exhibit 203, and
18     I'm going to work primarily from that one and not the
19     supplemental report, at least initially, okay?
20 A Okay.
21 Q Under the subheading and background of key factors in
22     the case, in your first sentence you say that it is
23     your understanding that in 1992, Todd McFarlane, Todd
24     McFarlane Productions, Inc. et al reached an oral
25     agreement with Neil Gaiman as to Gaiman's contribution

47

1      of the Spawn comic book series, do you see that?
2  A Yes.
3  Q On what basis do you make the statement that these
4      people reached an oral agreement?
5  A Only in my conversations with Neil and his counsel.
6  Q Anything else?
7  A No.
8  Q You did tell me that you reviewed the deposition
9      transcript of Todd McFarlane, is that correct?
10 A Yes.
11 Q Did anything in that deposition transcript influence
12     your statement that these parties reached an oral
13     agreement in 1992?
14 A I don't recall, without having to review that one more
15     time, that there was a discussion specifically
16     discussing the foundation in 1992 of that
17     understanding.
18 Q So but as far as you know, your basis was
19     conversations with Neil and his counsel, is that
20     right?
21 A Correct.
22 Q And do you have any understanding as to the specific
23     terms of the oral agreement that you referred to in
24     the first sentence of page 2 of Exhibit 203?
25 A Well, my understanding is that the agreement was to be

1      better than his DC contract that Neil was working
2      under. Those were really the premise or terms that he
3      was discussing with Todd.
4  Q Better than or equal to or exactly what compared to
5      Neil's DC contract?
6  A My understanding was better than.
7  Q Better than in any particular fashion or just
8      generally better?
9  A I would have to say generally better.
10 Q Did Neil tell you in any specific fashion how the oral
11     agreement between him and Todd in 1992 was going to be
12     better than his DC comic contract?
13 A Not that I can recall at this time. If there was a
14     specific framework, I just don't recall that.
15 Q Do you recall anything else about the terms of the
16     oral agreement?
17 A Not at this time, without reviewing any of my notes
18     from Neil.
19 Q Whatever you might recall would come from your
20     discussions with Neil Gaiman, is that correct?
21 A Yes, and his counsel.
22 Q You stated that your understanding was that the terms
23     would be better than the DC Comics contract that Neil
24     was working under at the time, did I understand you
25     correctly?

Deposition of JAMES P. CAVEN   9-17-02

49

1  A  I don't know if I said at the time, I just said his DC
2     contract. I think it was at that time that he had
3     various agreements with DC, but I would have to kind
4     of go back to that document.
5  Q  Neil didn't tell you that he and Todd agreed in 1992
6     that their terms would be better than an agreement
7     Neil might negotiate in the future, did he?
8  A  I don't know if he made that distinction.
9  Q  A couple sentences down, you state, and I quote, "It
10    is Gaiman's assertion that McFarlane made oral
11    representations as to the financial compensation to be
12    paid to Gaiman concerning Spawn issue number nine," do
13    you see that?
14 A  Yes.
15 Q  What were those oral representations that
16    Mr. McFarlane made?
17 A  That the payment or royalties for the Spawn 9 issue
18    would need to -- it is my understanding that there was
19    additional work to be done and that there would be
20    royalties paid on that project that would be better
21    than other writer royalties that he had received in
22    the past.
23 Q  And what's your basis for that testimony you just
24    gave?
25 A  Just my discussion with Neil.

50

1  Q  So Neil told you that Todd made these representations?
2  A  I think that was the discussion in our meeting with
3     counsel, that he felt that that was the only way he
4     was going to continue on the project.
5  Q  Which project are you referring to?
6  A  The Spawn 9.
7  Q  And what exactly did you mean by Neil -- the only way
8     Neil felt he was going to continue on that project?
9  A  Is if Todd agreed to the terms to pay royalties on his
10    character.
11 Q  What do you mean by that?
12 A  Well, that the writer royalty would be paid and that
13    there were characters being derived within the context
14    of that project and that there would be royalties
15    based on those characters.
16 Q  So are you telling me that Neil has told you that
17    during or before Neil's completion of Spawn issue 9
18    that he and Todd McFarlane specifically discussed and
19    agreed on royalties paid for future use of characters
20    Neil was creating in Spawn 9?
21 A  No, I don't think I'm saying that at that time,
22    because I don't know if I was in the discussion in
23    which we broke down at what point of evidence of when
24    those discussions -- because I understand it was a
25    series of discussions over time. Those issues were

51

1     raised between Neil and Todd.
2  Q  So maybe I can just -- we can move this along if I ask
3     you this, other than what Neil may have told you he
4     and Todd talked about, do you have any independent
5     understanding or verification of any of the terms or
6     discussion points that led to or were part of the 1992
7     oral agreement to which you refer in your Exhibit 203?
8  A  Not that I'm going to be testifying to or giving a
9     legal opinion on. Those were all documents that we
10    have a series of discussions, I would imagine,
11    deposition discussions on this, but I'm not opining to
12    those discussions.
13 Q  Are you saying you've seen documents that outline
14    terms that were discussed in the oral agreement in
15    1992?
16 A  No, I didn't say that.
17 Q  Well, that's what I'm trying to get at, I'm only
18    talking about the 1992 oral agreement that you refer
19    to in the first paragraph of page 2 of Exhibit 203,
20    that's the only agreement of any kind I'm talking
21    about right now.
22 A  Okay.
23 Q  And I just want to know, and as you sit here, it's
24    your statement that Gaiman asserted to you that
25    McFarlane made oral representations as to

52

1     financial compensation to be paid for Spawn 9, only at
2     least that's where your period is in this paragraph?
3  A  Yes.
4  Q  And that's what I'm talking about, what do you know
5     about oral representations made by Todd McFarlane
6     regarding Gaiman's compensation for Spawn 9?
7  A  I would have to review my notes on the specifics of
8     Spawn 9, other than the fact that it's my
9     understanding that there would be royalties paid at or
10    better than what he was receiving and Neil stressed
11    the word better to me over the phone with respect to
12    the Spawn 9 project.
13 Q  And when you say better, you're referring to Neil's DC
14    Comics contract, is that correct?
15 A  That's correct.
16 Q  So it's your understanding based on Neil's assertions
17    to you that -- strike that, let me start that over.
18    Other than Neil's assertions to you that he and Todd
19    reached an oral agreement in 1992 that Neil would be
20    compensated at or better than his DC Comics contract,
21    you are not aware of any other terms that may or may
22    not have existed in an oral agreement in 1992 to which
23    you referred?
24 A  That's correct, nothing has been brought to my
25    attention at this time.

PROFESSIONAL REPORTERS, LTD

Deposition of JAMES P. CAVEN   9-17-02

**53**

1  Q That's fine, we can move on from there. Let's turn to
2    page 3 of Exhibit 203. In your second full paragraph,
3    beginning with the words on or about December 17,
4    1996, do you see that?
5  A Yes.
6  Q You mention that Larry Marder sent memos to Neil
7    Gaiman proposing compensation terms for Gaiman's work
8    on the comics, do you see that?
9  A Yes.
10 Q And then you go on to say, quote, "As the proposed
11   terms were not in accordance with Gaiman's
12   understanding of the oral agreement, Gaiman rejected
13   the offers," do you see that?
14 A Yes.
15 Q How were the proposed terms from Larry Marder
16   different from Gaiman's understanding of the oral
17   agreement?
18            MS. EADS: Objection as to form.
19 Q You may answer.
20 A Without going back to all of the documents and my
21   notes, I think in general, I'll just say that Neil
22   felt the proposed terms were not what he understood,
23   and therefore sent further documents subsequent to
24   February outlining to Todd an outline of the terms
25   that he was thinking that the two were working under

**54**

1    for these projects.
2  Q Maybe I can just ask you this question, if you look
3    at -- starting with page 2 of Exhibit 203 and the
4    subheading background and key factors of the case,
5    starting there and going up to the end of the second
6    full paragraph on page 3, the one we just discussed,
7    is it fair to say that your recitation in those four
8    paragraphs is simply your understanding of the
9    background as Neil Gaiman explained it to you?
10 A And his counsel, yes.
11 Q Now, the next --
12 A Can I amend that answer?
13 Q Certainly, go ahead.
14 A At the top, there is a statement between the years '92
15   through '96, Gaiman received $194,000. We actually
16   verified that information from Neil's --
17 Q I see that, so the first sentence of the first full
18   paragraph on page 3 that references a specific amount
19   of money paid to Neil Gaiman, you didn't take that
20   figure from Neil Gaiman's statement, you independently
21   verified that, is that correct?
22 A Yes, we at least worked through a lot of his exhibits
23   and exhibits that we received from McFarlane to know
24   how much the payments were during a period of time,
25   yes.

**55**

1  Q Let me just ask you this generally and I'll ask it
2    more specifically from time to time. You've just
3    explained to us that a number of your -- a significant
4    part of the background information or some of the
5    background information and some of the data upon which
6    you relied was provided to you by Neil Gaiman, is that
7    correct, or his counsel?
8  A Yes.
9  Q And you've just given me an example of one particular
10   place where you were able to independently verify the
11   accuracy of what Mr. Gaiman or his counsel told you?
12 A Correct.
13 Q Wherever possible, did you independently verify things
14   that Mr. Gaiman or his counsel told you?
15 A I'd have to think about that question, I'm not sure I
16   could respond, were there examples in which I
17   independently verified --
18 Q Well, I will ask you some specific examples, but let
19   me ask you this, as a general matter in your business,
20   as a professional in your industry, is it your
21   practice to independently verify as much as possible
22   the information given to you by your clients in
23   evaluating a business or in discussing litigation
24   damages?
25 A I'm not sure of what you mean by as much as possible.

**56**

1  Q I don't really know how else to say it, I certainly
2    would expect that there might be certain circumstances
3    that the only source of a piece of information might
4    be from the client and there's nothing else you can do
5    except take it at face value, but I would also imagine
6    that there are instances where if your client told
7    you, for example, that my contract with ABC Company
8    gives me ten percent of such and such, that you would
9    not simply take that at face value, but that you would
10   look at his contract with ABC Company to see if that
11   is accurate.
12       That seems to me to be the kind of independent
13   verification that someone of your professional stature
14   would do as a matter of course, but I don't want to
15   assume that, so that's why I'm asking you those kinds
16   of questions. I realize it's a general question and
17   that's all I'm asking at this point, but that's the
18   basis, so I'm going to ask you the question again.
19       Wherever possible, in your professional
20   expertise, did you in this case make an attempt to
21   independently verify information provided to you by
22   Mr. Gaiman or his counsel in your calculations of the
23   damages that you state that Mr. Gaiman is owed in this
24   case?
25 A Only to the extent that I felt it was professionally

Deposition of JAMES P. CAVEN    9-17-02

57

1    necessary to verify that information.
2  Q So if we use professionally necessary as our
3    benchmark, if I ask you specific questions, will you
4    tell me whether you believe it was professionally
5    necessary in a certain circumstance to independently
6    verify what Neil told you?
7  A Yes, I'll tell you whether or not it was, in my
8    judgment, necessary to independently verify it.
9  Q That's fair, okay. Moving on, on page 3, in the
10    center of the page, you start a paragraph that is
11    followed by some bullet indents that says you have
12    provided documents, do you see that?
13  A Yes.
14  Q And I see five bullet points right below that, the
15    first of which simply describes a meeting that
16    Mr. Gaiman and Mr. McFarlane had in and around April
17    1997, do you see that?
18  A Yes.
19  Q Were you provided with any information or documents or
20    did you have any discussions with Neil or his lawyers
21    as to what was discussed during that meeting between
22    Mr. Gaiman and Mr. McFarlane?
23  A Not in specific terms that I can recall at the moment,
24    without consulting my notes or looking at other
25    documents, other than the documents that we received

58

1    or the facts at that time, that's all I can recall.
2  Q Did you bring any of your notes with you today,
3    Mr. Caven?
4  A No, I was not asked to.
5  Q You mentioned a few times when I've asked you
6    questions, you said that without consulting your
7    notes, you wouldn't be able to answer that. You know,
8    I understand that that may be true, but let me ask you
9    this, did you prepare extensive notes or any notes,
10    written notes in compiling your expert reports that we
11    have here today?
12        MS. EADS: Objection as to form.
13  A Can you read back the question?
14  Q I can do better than that, let me ask you a different
15    question. You have answered me a half dozen times or
16    so today by saying that you were not able to answer
17    with any certainty a particular question without
18    referring to your notes, would you agree with me that
19    that's something you said today?
20  A Yes.
21  Q So I'd like to ask you, are you referring to written
22    notes that you prepared in preparation of your expert
23    report?
24  A There are some written notes, it also may be in the
25    form that I've categorized or assembled my documents

59

1    that relate to these particular correspondences or
2    other documents that have been Bates stamped and
3    transitioned, that I would recall the information
4    based upon that review.
5  Q My specific question is, did you prepare written notes
6    in the process of preparing the expert reports which
7    you've provided to us in this case?
8  A Yes, I have written notes with respect to preparing
9    these exhibits 203, 204 and 205.
10  Q And do those written notes reflect conversations that
11    you had with Mr. Gaiman and/or Mr. Gaiman's lawyers
12    about any of the statements or opinions or rationale
13    contained in your expert report?
14  A They may contain some, but not all.
15        MR. SALSICH: Have we been provided
16        a copy of those notes?
17        MS. EADS: I don't think you've
18        asked for one.
19        MS. CARTER: Well, we're asking
20        now, so if we can get them at your earliest
21        convenience.
22        MS. EADS: Sure.
23        MR. SALSICH: I didn't realize we
24        needed to ask under Federal rules of procedure,
25        but we are doing so now.

60

1  Q Let's me move on, Mr. Caven. The second bullet you
2    have on the middle of page 3 there and the third and
3    the fourth and the fifth, I see point to four pieces
4    of correspondence, am I accurate on that?
5  A Yes.
6  Q And I understand them to be a May 5, 1997 letter from
7    Neil Gaiman to Todd McFarlane and then a July 15, 1997
8    letter from Gaiman to McFarlane along with a July 15,
9    1997 reply from McFarlane back to Gaiman and an
10    additional July 15, 1997 reply from Gaiman back to
11    McFarlane, did I accurately characterize those four
12    pieces of correspondence?
13  A That's what's stated in the report, yes.
14  Q Do you have those four pieces of correspondence with
15    you?
16  A No, I do not.
17        MR. SALSICH: Gina, can we --
18        MS. CARTER: I have them right
19        here.
20        MR. SALSICH: -- give them to him?
21        MS. CARTER: Here's May 5, July 15
22        to Todd, July 15 from Todd to Neil, am I one
23        short?
24        MR. SALSICH: I think these have
25        all been previously marked as deposition exhibits.

Deposition of JAMES P. CAVEN   9-17-02

61

1    MS. CARTER: I'm just trying to see
2    if the pile reflects the exhibits that Mr. Caven
3    relied on in preparing his report contained the
4    last July 15, '97 from Gaiman to McFarlane. If
5    not, that would be the last one, in any event, you
6    could start with the other ones.
7    MR. SALSICH: I think that's
8    deposition Exhibit 33, Gina.
9    MS. CARTER: Why don't you go ahead
10   and I'll get them.
11   MR. SALSICH: That's fine, we won't
12   get into a lot of detail on these just yet.
13   Q I have some questions just generally for you, though,
14   Mr. Caven. Do you have in front of you a May 5, 1997
15   letter that appears to be from Neil Gaiman to Todd
16   McFarlane and I think it's TM00475 and 476?
17   A Those aren't the same Bates numbers we have.
18   Q Probably because this document's been marked by both
19   parties.
20   MS. CARTER: Why don't you just go
21   by the date and how it starts.
22   Q The May 5, 1997 letter has been previously marked in
23   Sheila Egger's deposition as Deposition Exhibit 2.
24   A That's correct, I have that.
25   Q We can refer to that, it's the same document. Let's

62

1    refer to it as its exhibit number, is that the May 5,
2    1997 letter that you referred to on page 3 of your
3    expert report, Exhibit 203?
4    A Yes.
5    Q And then do you have in front of you a July 15, 1997
6    letter to Todd McFarlane from Neil Gaiman that appears
7    to -- I believe it's been previously marked as
8    Deposition Exhibit 19?
9    A Yes.
10   Q Is that the July 15, 1997 fax correspondence that you
11   referred to on page 3 of your expert report, Exhibit
12   203?
13   A Yes.
14   Q And then do you have in front of you a handwritten
15   letter from Todd McFarlane to Neil Gaiman dated July
16   15, 1997 which I believe has been previously marked as
17   Deposition Exhibit 20?
18   A Yes.
19   Q It starts with the words, "My Dearest Neil"?
20   A Yes.
21   Q And at one point, it says, "Beauty," really big?
22   A Yes.
23   Q Is that the July 15, 1997 fax correspondence from
24   McFarlane that you referred to on page 3 of your
25   expert report, Exhibit 203?

63

1    A Yes.
2    Q And then lastly, there's an additional handwritten
3    note from Neil Gaiman back to Todd McFarlane also
4    dated July 15, 1997, with the first word, "Hurrah," do
5    you have that in front of you?
6    MS. CARTER: That's the one we
7    don't have, so we will get that.
8    MR. SALSICH: We can work off the
9    first three for now.
10   MS. CARTER: That's fine, we'll get
11   the other one.
12   Q You state that you were provided the following dialog
13   between the parties and we just discussed those
14   documents that you received, did you receive from
15   Mr. Gaiman or his counsel or from any source any other
16   documents that you believe clarify or describe the
17   terms of the discussion between Neil Gaiman and Todd
18   McFarlane in the summer of 1997?
19   A I may have, but these are the ones that I extracted
20   the framework to formulate my opinions.
21   Q So as far as any opinions you're going to offer, these
22   are the sum total of the documents in this category
23   upon which you relied, is that correct?
24   A Correct.
25   Q You go on immediately after those five bullet points

1    and you have a statement that says, "The agreement
2    reached as of July 15, 1997 provided in part," and
3    there's some additional discussion, do you see that?
4    A Yes.
5    Q I'd like to ask you what you mean by the term the
6    agreement reached as of July 15, 1997.
7    A Well, the agreement being the series of correspondence
8    between the parties and my discussion with Neil, that
9    this was the framework that they were agreeing to for
10   purposes of the royalty calculations.
11   Q Now, you used the word framework and you also used the
12   word agreement, do you understand those words to mean
13   the same thing or do you intend for those words to
14   mean the same thing?
15   A Not being a lawyer, I guess I would be using those to
16   be the same thing.
17   Q I don't want to trick you and I'm not asking you to
18   make a legal statement. In fact, let me ask you this
19   right now, are you going to offer any opinion in this
20   case as to whether or not at any time in 1992 or 1997
21   or any time, Todd McFarlane or any of his companies
22   entered into a legally binding contract with Neil
23   Gaiman?
24   MS. EADS: Objection as to form.
25   Q You may answer.

Deposition of JAMES P. CAVEN    9-17-02

65

1  A If I understand the question, I'm not going to be
2    providing a legal opinion to the basis or binding
3    element within the context of this agreement as a
4    lawyer, saying that there's a reasonable meeting
5    between the parties and that it's a binding agreement
6    or a legal conclusion. I'm not going to be stating
7    that as one of my opinions.
8  Q So when you say agreement and then other times you use
9    the term contract in some of your schedules, you are
10   referring, correct, to the exchange of four letters
11   we've just discussed and which you have identified
12   here on page 3 of your expert report, is that correct?
13 A Yes.
14 Q And you're not offering any testimony as to whether
15   those four letters actually did form a legally binding
16   contract, are you?
17 A No, I'm not offering a legal opinion.
18 Q You're making an assumption, however, that they did,
19   when you go on to calculate royalties due under that
20   contract, as you call it, is that correct?
21 A That's correct.
22 Q I'd like to know what is the basis of your assumption
23   that that was a contract, is that something Neil
24   Gaiman told you or his lawyers told you?
25 A I don't remember who specifically made the final

66

1    conclusion, but it was a discussion that this was the
2    deal that we agreed to and that was the basis of my
3    calculations and my report.
4  Q So when you were asked to calculate the royalties
5    owed, which you've done in your report, you were asked
6    by Neil Gaiman or his lawyers to assume that these
7    four letters exchanged in May and July of 1997 formed
8    a contract between the parties and also specifically
9    outlined all the terms of that contract, is that
10   correct?
11 A Yes.
12 Q In the first bullet after the language we've just
13   discussed about the agreement reached as of July 15,
14   1997, do you see the first bullet where you make
15   reference to something called a one off?
16 A Yes.
17 Q The second full sentence there, could you read that
18   for me into the record, please.
19 A "The industry term of one off means a short series of
20   comic books followed by a trade paperback(s)
21   containing the same works, and may involve other
22   characters from different publishers."
23 Q And I'd like to ask you, where did you get that
24   definition of the term one off?
25 A The original discussion was with Neil, that one off

67

1    was a project that he would have taken that particular
2    character, similar to what that other character had
3    done at Image, within the form of a series or multiple
4    comic books or a miniseries, I think is another
5    industry term, with that particular character.
6       It was my understanding from my discussions with
7    Neil that he could use his creativity in terms of how
8    to market, put artistic covers or put together a trade
9    paperback, which is a collection of comic books all in
10   one particular bound set.
11 Q I believe in there you stated that the industry term
12   miniseries and the industry term one off mean the
13   same thing, did I understand you correctly?
14       MS. EADS: Objection as to form.
15 Q You may answer.
16 A I said that one off and miniseries, in my discussions
17   with Neil, were the same thing, that Neil said it is
18   common in our industry to do a series of these
19   particular comic books and it would be almost akin to
20   another definitional term that is used called
21   miniseries.
22 Q And you got this from Neil, is that right?
23 A Neil and subsequently when I was talking with Mike
24   Martens, which was part of my Exhibit 205 and Denis
25   Kitchen, we used that word interchangeably.

68

1  Q And who is Mike Martens?
2  A He's the VP of product development, I think now, or
3    business development for Dark Horse Comics. He used
4    to also work here in Madison for Capital City.
5  Q And what kind conversations did you have with
6    Mr. Martens?
7  A Several conversations with Mr. Martens regarding
8    splitting of profits, developing a crossover type
9    project in which you collaborate a character with a
10   character with a different publisher and take on that
11   project to be a series of comics and then how it
12   evolves into a trade paperback.
13 Q Did you ask Mr. Martens or did Mr. Martens tell you
14   that the term one off by itself, with no other
15   explanatory terms, means a miniseries as opposed to
16   just one issue of something?
17 A He was familiar with the term one shot, but when I
18   explained that Neil was using the term one off to be a
19   collection, we then described the project to really be
20   a multiple set of comics then that would be assembled
21   into a trade paperback at a later point in time.
22 Q So is it fair to say or is it accurate to say that
23   Mr. Martens did not tell you that the term one off
24   appearing by itself meant a miniseries, but rather,
25   you told Mr. Martens that that's what Neil Gaiman was

69

1  using the term to mean, is that correct?
2              MS. EADS: Objection as to form.
3  Q You may answer.
4              THE WITNESS: Read back the
5      question.
6              (Reporter reads back previous question)
7  A Yes, I probably initiated the conversation in terms of
8      the premise of what the nature of my question was with
9      respect to crossovers and laid that as the
10     foundation. I did not ask him to opine the definition
11     in the industry as one off being a one shot or one
12     project definition. I did not ask him to make that
13     distinction.
14 Q So when you talked to Mr. Martens, you started from
15     the assumption that you were dealing with a miniseries
16     that would involve trade paperbacks and you simply
17     discussed with him how different publishers might do
18     that and what profit splitting arrangements might take
19     place under that type of arrangement, is that correct?
20 A That's correct.
21 Q And your understanding -- your basis for assuming that
22     a miniseries was contemplated by Neil was that in this
23     July 15, 1997 exchange that came from Neil, is that
24     correct?
25 A Yes, it initially started with Neil and I think it was

70

1      fair to say that that was the foundation that both I
2      and Denis Kitchen were furthering our discussions on
3      this issue.
4  Q So it's based on Neil's assertion that when he used
5      the term one off in his July 15, 1997 letter to Todd,
6      he meant a miniseries and trade paperbacks, is that
7      correct?
8  A Correct, and I think it also goes to Exhibit 19 in
9      Neil's letter to Todd towards the bottom of the bigger
10     paragraph that starts, "That I have, exclusive of any
11     other Angela projects I might do with the Todd
12     McFarlane division."
13             When we asked Neil to explain that, that's where
14     he was stating that the project wouldn't just be one
15     comic, but it would be a series of comics similar to
16     other Image projects that had been done in the past,
17     that there was a series of one, two, three, five, he
18     even envisioned that there could be five or up to ten
19     different comics.
20 Q Let's look at that language and I'll ask you to take a
21     closer look at that language on Exhibit 19, that first
22     sentence to which you just referred. As I read it,
23     follow along with me, it says, "That I have," meaning
24     Neil has, as part of what he believes they've agreed
25     to, "Exclusive of any other Angela project I might do

71

1      with the Todd McFarlane division of Image, the rights
2      to do a one off Angela comics project and a one off
3      Medieval Spawn project," do you see those three lines
4      there or two lines?
5  A Yes.
6  Q Did I read that correctly?
7  A Yes.
8  Q Now, you just were telling me that because -- that
9      Neil explained that he might do other Angela projects
10     with the Todd McFarlane division of Image Comics and
11     that those were the two, three, five issues or series
12     things he might do?
13 A Correct.
14 Q Is that right, is that what you're referring to?
15 A Those are the comics, yes, the subsequent issues with
16     Spawn and Angela.
17 Q Now, I'm going now to the next phrase, the next clause
18     in that sentence where he says, "Exclusive of those
19     other projects, I have the rights to do a one off
20     Angela comics project and a one off Medieval Spawn
21     project."
22             And I just want to focus on one off Angela comics
23     project and one off Medieval Spawn, which in Neil's
24     words, are exclusive of these other sources or other
25     things he might do with Image, do you follow me?

1  A Yes.
2  Q I'm only focusing on the definition of one off Angela
3      comics project and one off Medieval Spawn project, and
4      so my question is, you have made a -- you offered an
5      opinion in this case and I believe we'll get to it
6      shortly in your schedules, that that particular clause
7      in this letter would have entitled Neil Gaiman to do
8      at least a four issue miniseries and trade paperbacks
9      and you calculated royalties based on that assumption,
10     am I correct?
11             MS. EADS: Objection as to form.
12             THE WITNESS: Can you read back the
13         question?
14             MS. EADS: The question is awful
15         long. There's probably nothing wrong with it,
16         except I lost track of it.
17 Q That's a good enough reason to make a short one,
18     because I want to make sure you understand me. The
19     premise of the question is this, I'll tell you the
20     premise and ask you the question. My premise is I'm
21     looking at the language of Exhibit 19 that we've just
22     been discussing and I'm only referring to the language
23     in the second line, where it says a one off Angela
24     comics project and a one off Medieval Spawn project,
25     do you see that?

Deposition of JAMES P. CAVEN   9-17-02

73

1   A Yes.
2   Q Would you agree with me that based on that language
3      that Neil used, the one off Angela comics project and
4      the one off Medieval Spawn project, were separate from
5      or exclusive of any other projects that he might do
6      with Image Comics?
7               MS. EADS: Objection as to form.
8         You're asking him to interpret a document at this
9         point.
10  Q You may answer the question.
11              MS. EADS: Maybe it's just that
12        we're hungry, I don't know.
13              MS. CARTER: Why don't we just let
14        him answer the question, which would be finished
15        quickly if you can let him answer.
16  Q Did you understand my question?
17  A I think I do and I'll try to restate it the best I
18     can.
19  Q Sure.
20  A As I understand it, you're asking whether or not Neil
21     had the right to do projects with Image, in addition
22     to a project or -- can I use the word with another
23     comic company.
24  Q Let me stop you there, because that wasn't what I
25     meant and I'm glad you attempted to clarify it,

74

1      because we would have spent a bunch of time going down
2      the wrong road there. I'm not referring to anything
3      that Neil might do with Image Comics or any other
4      language other than to the extent he mentioned right
5      here that those might exist.
6         Would you agree with me that the first sentence
7      there in that large paragraph on Exhibit 19 that we've
8      been reading indicates that Neil contemplates that he
9      might have other Angela projects with the Todd
10     McFarlane division of Image, would you agree with me
11     that that's stated there?
12              MS. EADS: Objection as to form.
13              THE WITNESS: Read back the
14        question.
15              (Reporter reads back previous question)
16  A I don't know if I can interpret that that's a
17     contemplation, other than to keep a variable open,
18     meaning I can do comics with Image, I can do them with
19     DC, Dark Horse, whomever.
20  Q Let me ask you this, are you offering an opinion, have
21     you calculated any royalties on anything referenced in
22     this paragraph we've been talking about in Exhibit 19,
23     other than the short phrase one off Angela comics
24     project and one off Medieval Spawn project?
25              MS. EADS: Objection as to form.

75

1   Q You may answer.
2   A Are you referring to -- maybe stated differently, are
3      you referring -- or clarification, are you referring
4      to the fact that have we calculated any future
5      projects that Image and Todd McFarlane would have
6      produced in a future Angela project that Neil and Todd
7      collaborated on, is that --
8   Q Or might collaborate on, yes, that is what I'm asking
9      you.
10  A And we're not talking about the use of the Angela
11     character by Image or Todd, that they have actually --
12  Q That's correct, we're not talking about that. Let me
13     see if I can make this simpler and I've probably
14     mucked it up because I'm hungry, too. I simply want
15     to know if you're offering an opinion, and we'll get
16     to the schedules later, but I believe it's contained
17     in your schedules B-17 through B-20.
18        You calculate an amount of royalties due to Neil
19     Gaiman that he would have been entitled to under this
20     particular paragraph on Exhibit 19, if he were
21     permitted to do the one off Angela comics project and
22     the one off Medieval Spawn project, is that correct,
23     that you may have made calculations of royalties due,
24     assuming Neil would have been able to do a one off
25     Angela comics project and a one off Medieval Spawn

76

1      project?
2   A Yes.
3   Q And you've made a calculation there on those schedules
4      that -- and you make a statement here on page 3 of
5      Exhibit 203 that the term one off means a short series
6      of comic books and you've actually, based on Denis
7      Kitchen's report, assumed that that would equal four
8      comic books, is that right?
9               MS. EADS: Objection as to form.
10  Q You may answer.
11  A I've defined it within the context that I'm making the
12     premise, it's a crossover project not with Image, but
13     with other publishers.
14  Q I understand that, I'm only talking about how many
15     issues it would contain.
16  A Right, and I relied upon the opinion of Denis Kitchen
17     on the amount of comic books or trade paperbacks that
18     would have been sold, had there been the crossover
19     project with other publishers.
20  Q I understand, and you and Denis Kitchen -- is it your
21     understanding that you and Denis Kitchen both relied
22     on Neil Gaiman for the assumption that whatever that
23     crossover project might have been, it would have
24     contained four issues instead of three or two or one?
25              MS. EADS: Objection as to form.

Deposition of JAMES P. CAVEN  9-17-02

77

1  Q You may answer.
2  A No, I didn't rely solely on Denis Kitchen or solely on
3     Neil Gaiman. In fact, in talking with Mike Martens,
4     it was his opinion that a trade paperback would be
5     approximately 120 to 130 pages, which using an average
6     comic book of 32 pages, would have a minimum page
7     count of about 120 to make a trade paperback.
8         There are trade paperbacks that, yes, have gone
9     less than 120, but it was kind of a thought process
10    that 120 comic book pages or more in a trade paperback
11    is about the rule of thumb.
12 Q So in your discussion with Mr. Martens, is it your
13    testimony that either you and Mr. Martens or
14    Mr. Martens worked backwards from the existence of a
15    trade paperback to determine approximately how many
16    issues would be contained in that, in other words, did
17    Mr. Martens assume that in your discussion with him,
18    that a trade paperback was part of the equation and he
19    had an understanding of approximately how many pages
20    would be appropriate in a trade paperback?
21        It is from that information that he worked back
22    to the opinion that four issues seemed correct for a
23    one off?
24        MS. EADS: Objection as to form.
25 A I don't recall if it was a front to back or a back to

78

1     front final conclusion, but I do recall as we were
2     stating, the premise of the questions that I was
3     posing to him, that that was the ultimate conclusion,
4     but I don't know if that was derived as a starting
5     point from a, hey, let's work backwards or work
6     frontward. I think it was a fluent conversation.
7  Q But you've already told me before that Mr. Martens did
8     not define the term one off to mean miniseries, that
9     was simply the discussion that you all had based on
10    Neil's -- when Neil had told you he and Todd had
11    agreed to, is that right?
12        MS. EADS: Objection as to form.
13 Q You may answer.
14        THE WITNESS: Read the question
15    back, please.
16        (Reporter reads back previous question)
17        THE WITNESS: Read that back one
18    more time.
19        (Reporter reads back previous question)
20 A Yes, it was basically our discussion that the project
21    that we were talking about was relating to the concept
22    of a multiple issue project that would then ultimately
23    be collected into a trade paperback.
24        MS. EADS: How much longer do you
25    intend to go on?

79

1        MS. CARTER: Could we stop here
2     maybe, Pete?
3        MR. SALSICH: Sure, this is as good
4     a point as any.
5        MS. CARTER: One hour?
6        MR. SALSICH: Or less, whatever you
7     want to do.
8        (Noon recess is taken)
9        (12:45 p.m. to 1:45 p.m.)
10       (Mr. Smith takes the place of Ms. Carter)
11 Q Mr. Caven, before we took our lunch break, we were
12    working our way through the opinions that you stated
13    in your expert witness report, your initial report
14    which we marked as Exhibit 203. I'd like to continue
15    to ask you some questions about that and hopefully
16    fairly quickly we can move on to the schedules which
17    you attached to that report, and, finally, your
18    supplemental report.
19        If you can turn to page 3 of Exhibit 203, do you
20    recall right before lunch we were discussing the first
21    bullet in the bottom section there, referring to one
22    offs, do you recall that discussion?
23 A Yes.
24 Q It's my understanding that your opinion when
25    calculating royalties on schedules B-17 through B-20

1     is going to be that those royalties are calculated on
2     the basis of Neil Gaiman being contractually entitled
3     to do a four part miniseries for the Angela -- as an
4     Angela one off and a four part series as a Medieval
5     Spawn one off, is that correct?
6        THE WITNESS: Can you read back the
7     question? That seemed to be multiple parts.
8        (Reporter reads back previous question)
9  Q You know what, let me try to -- I'm going to do it
10    more quickly, so we can try to cut down on how many
11    times we have to read things back and I'm glad you're
12    being careful to make sure you understand my
13    question.
14 A I also just want to apologize, I'm just getting over
15    an ear infection, so being on speaker phone and the
16    sound of the room, that just makes it difficult.
17 Q Sure, no, I understand. I'm going to be try to be a
18    little bit more concise this afternoon, if I can.
19    That might not be genetically possible, so I just want
20    to make sure I understand.
21        In schedules B-17 through B-20 you calculate a
22    minimum and a maximum royalty that you claim Neil
23    Gaiman is entitled to under the letter that we've
24    marked as -- that was marked as Exhibit 19 wherein it
25    refers to his rights to do a one off Angela project

PROFESSIONAL REPORTERS, LTD

Deposition of JAMES P. CAVEN   9-17-02

81

1 and a one off Medieval Spawn project, is that right?
2 A Can I ask for clarification?
3 Q Sure, please do.
4 A When you say B-17 through B-20 on minimum and maximum,
5    you're referring to the exhibits in Exhibit 205 as
6    opposed to the schedules in Exhibit 204?
7 Q Yes, yes, the most recent -- correct, that's right, my
8    understanding is that those numbers still correspond
9    to the Angela and Medieval Spawn one off projects, but
10   yes, I'm referring to your schedules B-17, B-18, B-19
11   and B-20 that were attached to your supplemental
12   report.
13 A So the question as it stands is did I rely on --
14 Q No, the question stands as simply this, is the royalty
15   calculation contained -- both the minimum and maximum,
16   contained on schedules B-17 through B-20, based on an
17   assumption that the one off project as defined and as
18   described in the 1997 letters refers to a four part
19   comic miniseries?
20 A Yes, it does refer to a four part miniseries and trade
21   paperback.
22 Q It's stated in the second sentence on the first
23   full -- on the bottom of page 3 of Exhibit 203, where
24   you say that the industry term one off means a short
25   series of comic books followed by a trade paperback,

82

1    correct?
2 A Yes?
3 Q My question to you now is this, if the evidence shows
4    that a one off does not mean a miniseries of three or
5    four issues, but rather means simply a one issue
6    project, would that affect the royalty calculations
7    you have on schedules B-17 through B-20?
8          MS. EADS: This is a hypothetical
9          you're asking?
10 A Hypothetically, yes, it would, because you would be
11    describing a one shot, is I guess the theory to
12    your -- it's not a one off, but a one shot, so you
13    would have one comic book versus a series of comic
14    books. We have used the estimate of four comic books
15    in our analysis, but you are describing only a one
16    comic, I guess, comic project under your hypothetical.
17 Q So it would affect the royalty calculations if it
18    turns out that what the parties contemplated in 1997
19    was a one issue project as opposed to a four
20    issues project, correct?
21 A Well, you have two different assumptions, one versus
22    four, and, yes, they are going to be different, but
23    that's contrary to what I was held to believe in my
24    discussions with Neil, as well as reading Exhibit 19.
25 Q I understand that, I'm simply asking you if the

83

1    evidence turned out that it was really only one and
2    not four, that that would affect the calculations of
3    royalties you made on schedules B-17 through B-20, and
4    my understanding is that your testimony is it would
5    affect those calculations?
6 A Yes.
7 Q Okay, that's all I have. Moving on to page 4 of your
8    Exhibit 203, the paragraph that you have under the
9    subheading assignment?
10 A Yes.
11 Q In the first sentence, you say that towards the end of
12    the first sentence, you are to determine the economic
13    sums due Gaiman under the terms of the agreement, do
14    you see that?
15 A Yes.
16 Q When you say terms of the agreement, are you referring
17    to the four letters exchanged in July, in May and July
18    of 1997 between Neil Gaiman and Todd McFarlane?
19 A Yes, I'm generically describing that is the framework
20    of the agreement, whether there is any other
21    additional framework which I don't recall at this
22    moment, but it would all be contained within the
23    context of those bullet points in the mid part of
24    page 3.
25 Q You're not referring to any economic sums due Gaiman

84

1    under the terms of any DC Comics contract, are you?
2          MS. EADS: Objection as to form.
3 Q You may answer.
4 A I'm not sure I understand the question.
5 Q Well, I just want to make sure I understand. When you
6    say the terms of the agreement, you said that you're
7    referring to the four letters exchanged and identified
8    by your bullet points on page 3 of your expert
9    report.
10        And my question is simply a follow-up to that, to
11   make sure that you were not referring to any economic
12   sums that might be due to Neil Gaiman under a DC
13   Comics contract, is that correct?
14        MS. EADS: Same objection.
15        MR. SMITH: Is your objection as to
16   form in general?
17        MS. EADS: That's the only legal
18   objection that you are permitted to make in a
19   deposition, and that includes all of the various
20   objections. I believe it is currently the belief
21   that if you say objection cumulative, objection
22   asked and answered, or in fact in any way describe
23   your objection, it could be considered coaching,
24   and that's why objection as to form is the only
25   proper objection, although I'll be happy to make

Deposition of JAMES P. CAVEN   9-17-02

**Page 85**

1  them more specific, if you like.
2          MR. SMITH: Are you addressing your
3  question to me, Joan?
4          MR. SALSICH: Let's go off the
5  record a second.
6          (Discussion off the record)
7          MR. SALSICH: Can you read back the
8  last question, please.
9          (Reporter reads back previous question)
10  A What I don't understand to the question is under a DC
11  contract.
12  Q All right. You know what, I'm going to take your
13  answer as it stands. If it comes up later, I'll ask
14  you again. We can spend all day on this. If you
15  would turn to page 8 of Exhibit 203, please.
16  A I'm there.
17  Q Okay. At the top of the page under the heading comics
18  and trade paperbacks, you state in the -- well,
19  actually, why don't you, if you would, read for me,
20  please, into the record the first sentence of that
21  paragraph.
22  A "Based on our review of documents and assertion by
23  Gaiman, the primary basis for payments to Gaiman is
24  presented in Gaiman's letter dated May 5, 1997
25  addressed to Todd (McFarlane) (TM00355)".

**Page 86**

1  Q And we've already discussed that May 5 letter that
2  you're referring to there, which is a document that
3  was previously marked in a deposition as Exhibit
4  Number 2, correct?
5  A Correct.
6  Q I'd like you to keep that nearby, because I may have
7  some questions about that. I understand the first
8  part of that sentence where you say, "Based on our
9  review of documents," but then you say, "Assertion by
10  Gaiman," and I'd like to know what assertion by Gaiman
11  you're referring to in that sentence.
12  A Give me a minute to review the --
13  Q Please take your time.
14  A -- documents in Exhibit 204.
15          (Witness examines document)
16  A Okay, assertions by Gaiman, it essentially would be
17  noted as it's relative industry practice that the
18  advance or script fee, royalty fees paid in advance
19  would actually be the total amounts due, if the actual
20  units sold times the royalty rates were actually less
21  than the advance payments.
22  Q We'll get to that.
23  A That would be one assertion.
24  Q Okay, I was really looking just -- I want to make sure
25  that I understand the very first sentence of this.

**Page 87**

1  A Well, you asked the question.
2  Q I understand and maybe my question was too broad. Let
3  me see if I can clarify that, we'll get to that point,
4  and any additional assertions by Neil, because I know
5  that that comes up frequently. I just want to take
6  this first sentence.
7          Your statement here is that the primary basis for
8  payments to Gaiman is presented in Gaiman's letter
9  dated May 5, 1997, correct?
10  A Yes.
11  Q And I want to -- and I understand -- are you saying
12  that your basis for saying that that's the primary
13  basis for payments to Gaiman and not something else is
14  that Neil Gaiman told you that that was the primary
15  basis of how royalties to him should be calculated?
16  A What I recall him telling me is that the outline in
17  Exhibit 2 was the framework that the two parties were
18  working on to do the comics and trade paperbacks for
19  royalty purposes.
20  Q And Exhibit 2 is what you used in calculating the
21  royalties that you've done here in your schedules and
22  your reports for comics and trade paperbacks, correct?
23  A Correct.
24  Q Let's take a look at Exhibit 2, if you would. The
25  second paragraph -- and read that two sentence

1  paragraph into the record for me, if you would.
2  A "As we discussed, I've put together a set of figures
3  which are based on the basic DC deal. (This is the
4  standard DC deal, and not the kind of super deluxe
5  deal I've got on, for example, Stardust.)"
6  Q Let me ask you this, did you take a look at whatever
7  Neil might have called the basic DC deal in
8  calculating your royalties based on the percentages in
9  Exhibit 2?
10  A I may have looked at it, I don't recall if I studied
11  it at length, because I was not asked to do that, to
12  see if it matched this particular document.
13  Q So you did not independently verify whether the --
14  whether Neil's listing of royalty rates on Exhibit 2
15  in fact was based on the basic DC deal, did you?
16  A No, I was not asked to do it.
17  Q Is it the circumstance where you believe it was not
18  professionally necessary to make that verification?
19  A Yes, I would say it was not professionally necessary,
20  because this is the document that the two parties were
21  working off of and whether it's a shorter version or a
22  longer version of the DC contract, it was not
23  pertinent, because under the assertions by Gaiman,
24  these were the factors or framework that I should be
25  working off of.

Deposition of JAMES P. CAVEN    9-17-02

89

1  Q So you trusted Gaiman's assertions that the royalty
2    rates he's got in Exhibit 2 were in fact based on the
3    basic DC deal, as he said in that letter?
4          MS. EADS: Objection as to form.
5  Q You may answer.
6          THE WITNESS: Read back the
7          question.
8          (Reporter reads back previous question)
9  A Yes, I relied on that information.
10 Q If you can turn to page 9 of your Exhibit 203, please.
11 A I'm there.
12 Q Three subheadings from the bottom, you've got a
13   category called, "Other appearances of Angela
14   (schedule B-12)," do you see that?
15 A Yes.
16 Q And in there, you say that the May 5, 1997 letter from
17   Gaiman to McFarlane provides Gaiman with royalties
18   for, quote, "Extensive use," close quote, of the
19   characters in other publications, do you see that?
20 A Yes.
21 Q And point to me in Exhibit 2 where you see that.
22 A That's the third paragraph from the bottom.
23 Q Could you read it please, including the subheadings?
24 A "Character equity: (This activates in the event of
25   'Extensive Use of Character, or character's name in

91

1    determine the definition of extensive use in that
2    contract.
3  Q Other than brainstorming with Neil and his lawyers
4    about what would be a reasonable measurement as to
5    come up with the term extensive use, did you look at
6    any other documents where a character appearing on
7    five pages would trigger some sort of royalty?
8  A I don't recall if I saw any other documents.
9  Q If you saw any other documents and relied on them for
10   anything in your expert report, would you have listed
11   that information in your expert report?
12 A Yes.
13 Q Is it possible that extensive use can mean appearing
14   on ten pages out of 20 or 22, that that might have
15   been a reasonable measure of extensive use?
16 A It's open to interpretation, that it could be ten
17   pages, it could be 20 out of 20 pages under your
18   hypothetical.
19 Q And I see that in schedule B-13 and schedule B-14 as
20   you've got them reflected here on page nine of your
21   exhibit, you also use that same calculation for
22   extensive use, is that correct, for Cogliostro and
23   Medieval Spawn?
24 A Yes.
25 Q And based on that same discussion that you had with

90

1    the title of the publication'.)"
2  Q Anywhere in Exhibit 2, is there any definition of what
3    extensive use of character means?
4  A No.
5  Q You go on, on page 9 of your expert report, to say
6    that for purposes of this analysis we have defined,
7    quote, "Extensive use," close quote, to be an
8    appearance by the characters on more than five pages
9    of the publication, do you see that?
10 A Yes.
11 Q How did you arrive at that conclusion?
12 A In discussions with Neil and counsel, we just asserted
13   that there's, on average, 20 to 22 pages of content
14   within a publication and determined that through our
15   discussions with Neil, that a reasonable, I guess,
16   ratio would be approximately 20 to 25 percent for
17   purposes of the extensive use of a character.
18 Q Neil stated in Exhibit 2 that all these royalty terms
19   he's identified, including that character equity in
20   Exhibit 2, are based on the basic DC deal, did you
21   take a look at the basic DC deal to see if extensive
22   use of a character in this provision is defined?
23        MS. EADS: Objection as to form.
24 Q You may answer.
25 A I don't recall going back to the DC contract to

92

1    Neil and his lawyers as to what a reasonable
2    definition of extensive use might be, is that correct?
3  A Yes.
4  Q Nothing else?
5  A Not that I recall at this time.
6  Q But if there was something else, you would have
7    included that in your report, correct?
8  A Yes, we would have included it in our report.
9  Q Where are your work papers right now, Mr. Caven?
10 A A couple different locations, my office at home, my
11   office at Virchow Krause, some in my possession now.
12 Q You have some in your possession now?
13 A Minor, just copies of the exhibits and there are on
14   occasion certain other subdocuments, but not all
15   documents.
16 Q Have we been provided with copies of everything that
17   you have with you now?
18 A No.
19        MR. SALSICH: I'd like to formally
20        request on the record that we be provided those
21        documents and that copies be made so that we can
22        use them in the deposition.
23        MS. EADS: Sure, that will mean a
24        break.
25        MR. SALSICH: We don't have to do

Deposition of JAMES P. CAVEN  9-17-02

93

1  it right now, I just want to make sure we can get
2  it done.
3  　　　　MR. SMITH:  Did you say you don't
4  want to do it right now?
5  　　　　MR. SALSICH:  Yes, we don't need to
6  take a break right now.
7  　　　　MR. SMITH:  Okay, just checking.
8  　　　　MR. SALSICH:  I don't have much
9  more until we get into the schedules and that will
10  be an easy place to take a break.
11  　　　　THE WITNESS:  Maybe you just want
12  to review what are documents that are not exhibits
13  and make copies of those.
14  　　　　MR. SMITH:  Sure, we'll do that on
15  a break.
16  　　　　THE WITNESS:  Rather than copy the
17  whole thing, because 60 or 70 percent of it is a
18  copy of 204.
19  　　　　MR. SMITH:  We'll look at it on the
20  break.  I'm sorry, Pete, go ahead.
21  Q On page 11 of Exhibit 203, you have a category of a
22  subheading called use of names, do you see that?
23  A Yes.
24  Q And I believe in there you calculate that Gaiman is
25  entitled to the compensation of the use of his name

94

1  and biography in the publication of Angela's Hunt in
2  an amount of $45,000, is that correct?
3  A Yes.
4  Q How did you arrive at that calculation?
5  A It's based on another contract that Neil signed with,
6  I think, a publisher called Techno Comics or it was
7  Big Productions, I don't recall the exact name here at
8  the moment.
9  Q Do you have that with you?
10  A Yes, I do.  And what Neil had -- it was with Big
11  Entertainment, Inc. and Neil thumbed up quickly some
12  character sketches for this particular publisher and
13  they paid him an advance of $45,000 to use whatever
14  quick brainstorms that he had put with this
15  publication.
16  　　They actually did all the writing and all the
17  artistic work and just used his name on the front
18  cover to sell these particular products or comics, and
19  Neil felt this was the best illustration of when he's
20  actually given his name or lent his name to a project
21  and this is the fee that he charged.
22  Q Now, that was a fee he charged for lending his name to
23  a project that he did not write, correct?
24  A Correct.
25  Q He had not gotten paid for any services on that

95

1  project, other than he contributed some ideas and
2  sketches?
3  A He gave a couple ideas, which they ultimately, as I
4  understand it, took these ideas and ran with it, but
5  you know, essentially, they were very rough ideas or
6  concepts and that essentially what they wanted is to
7  use his name on a particular work of art in which they
8  were going to be writing and drawing.
9  　　And this was kind of his payment that he
10  requested, I think there was also a royalty of eight
11  percent that was part of the deal, but my
12  understanding from Neil is that he only got the
13  $45,000 payment.
14  Q How does that arrangement with Big Entertainment
15  equate with what happened with Angela's Hunt?
16  A My understanding is that Neil's name was used on
17  Angela's Hunt as being the named person on the cover,
18  which Neil did not provide any efforts artistically,
19  either writing, art, whatever, editing, to the
20  project.
21  Q So if it turned out that Neil in fact did contribute
22  writing, et cetera, to Angela's Hunt, would your
23  conclusion be different?
24  A I'm not sure of your hypothetical, I'd have to look.
25  Q I'm just trying to understand how this fits together.

1  You said that Neil got $45,000 from the Big
2  Entertainment contract for lending his name to
3  something that he didn't work on, and I asked you how
4  that related to the situation with Angela's Hunt.
5  　　And you said it was your understanding that on
6  Angela's Hunt, Neil's name, et cetera, was used on the
7  cover, just like in the Big Entertainment deal, and
8  without, you know, being his work and stuff.
9  　　And so my question to you is, if it turned out to
10  be true that the Angela's Hunt situation was different
11  than the Big Entertainment situation, because in fact
12  Neil's name is on the cover, because Neil was the
13  author of Angela's Hunt, would that change your
14  conclusion that the Big Entertainment contract is an
15  appropriate measure of your damages here?
16  　　MS. EADS:  Objection as to form.
17  　　Your genetics are getting to you again.
18  A I'm not sure how it would change my opinion under that
19  hypothetical, since I haven't been provided any of the
20  facts to support that hypothetical.
21  Q Well, let me ask you this, Mr. Caven, you're going to
22  be testifying as an expert witness and one of the
23  things that expert witnesses do on the stand all the
24  time, as I'm sure you very well know from all of your
25  experience, is they're asked to offer an opinion based

Deposition of JAMES P. CAVEN   9-17-02

97

1  on hypotheticals including facts that may or may not
2  be put into evidence.
3      So I'm going to ask you right now to give me your
4  answer to this, based on -- assuming one piece of
5  evidence. You've already given me the basis for why
6  you think $45,000 is due for the use of Neil's name
7  and biography on Angela's Hunt.
8      Now, I'm asking you to change one factor and
9  that is this, if the evidence shows that Neil Gaiman
10 was the author of Angela's Hunt, would you agree with
11 me that that is a different situation than you've
12 described or Neil described in relation to the Big
13 Entertainment contract?
14      MS. EADS: Objection as to form.
15 Q You may answer.
16 A For quickly going through any of the schedules, do you
17   have a reference?
18 Q I don't believe this is part of a schedule, I think
19   the only place that I've seen this number is right
20   here on this page.
21 A No, only to Angela's Hunt, is Angela's Hunt a
22   different name? We have multiple names on certain
23   things.
24 Q I'm just asking you to assume one piece of evidence
25   for me, okay, assume that Neil wrote Angela's Hunt.

98

1  If Neil wrote Angela's Hunt, would you agree with me
2  that that is a different situation than Neil described
3  and you relied on as Neil's arrangement with Big
4  Entertainment?
5      MS. EADS: Object as to form. Do
6    you understand the question?
7  Q You may answer.
8  A I'm not -- because I have Angela's Hunt as a trade
9    paperback, is that a correct assumption?
10 Q Angela's Hunt is a trade paperback. It contains the
11   three issues of Angela, every word of which were
12   written by Neil Gaiman. Let's assume that's the
13   evidence. I think the record will bear that out, but
14   let's assume that's the evidence, even if I'm off a
15   little bit.
16      Let's assume that the evidence shows that
17   Angela's Hunt contains comic books, collects comic
18   book issues that Neil Gaiman was the author of. Would
19   you agree with me that that circumstance regarding
20   Angela's Hunt is different than the circumstance you
21   described and Neil described to you regarding his
22   relationship with Big Entertainment?
23 A Under your hypothetical, I would have to say that the
24   standard writer and creator royalty or collected
25   editions royalty would apply.

99

1  Q And in my hypothetical where Neil is the author of
2    Angela's Hunt, the Big Entertainment situation would
3    not apply, correct?
4      MS. EADS: Objection as to form.
5  Q You may answer.
6  A What troubles me is the fact that there is a clause
7    here that says he may do additional Todd projects with
8    Image, which my understanding. This particular trade
9    paperback came after the deal as a collection.
10 Q Mr. Caven, we're getting a little far afield. I just
11   have a very simple question for you and I think you've
12   given me the answer, but I just want to make sure I
13   understand it. I'm not asking about Exhibit 2, I'm
14   not asking about negotiations back in 1997, I'm simply
15   asking a simple question.
16      Angela's Hunt is a trade paperback collecting
17   Angela issues one, two and three. It's not a new
18   project that Neil did, it's not an Angela project he
19   did after this agreement, it's simply a collection of
20   three publications that Neil did prior to this
21   agreement or this discussion of the agreement back in
22   1997. It contains three comic book issues that Neil
23   wrote.
24      I think you and I are in agreement here, but I
25   want to make sure that the Angela's Hunt situation as

100

1  I've just described it is very different from Neil's
2  situation as reflected in the Big Entertainment
3  contract, where he was paid a certain amount of money
4  for the use of his name in connection with something
5  that he did not work on, isn't that true?
6      MS. EADS: Objection as to form.
7  Q You may answer.
8  A He worked in forming the sketch under the Big
9    Entertainment, which they then performed all of the
10   remaining tasks under the Big Entertainment contract
11   and it was a fee which was used to compensate him for
12   the artistic statement or on the cover, that this was
13   a Neil Gaiman publication. The --
14 Q So did Neil's work appear in the Big Entertainment
15   project or not?
16 A My understanding is Neil actually wrote down 12
17   different sketches of which six were used by Big
18   Entertainment.
19 Q So is Neil's payment from Big Entertainment for the
20   use of his name as a marketing tool or is it for the
21   contribution of the ideas upon which the publication
22   was based?
23      MS. EADS: Objection as to form.
24 Q You may answer.
25 A Neil asserts that it's for the contribution of his

Deposition of JAMES P. CAVEN  9-17-02

101

1  name, even though there was some efforts provided, but
2  he thought the major thrust of the core of the payment
3  was to compensate him for the use and marketing of his
4  name on the product.
5  Q And that is a product in which no words or artwork of
6  Neil Gaiman's actually appeared in the finished
7  project, correct?
8  A I don't know about words, because once again, he
9  provided the outline or sketch, so there could have
10  been words as part of that sketch that were infused
11  into the product.
12  Q Was Neil compensated as an author under the Big
13  Entertainment contract?
14  A He was to get eight percent of royalties on that Big
15  Entertainment contract.
16  Q So was the $45,000 simply an advance for the use of
17  his name or an advance for the use of his ideas?
18  A Both.
19  Q Well, we're trying here to figure out how you can say
20  that that makes a legitimate leap to govern the
21  situation with Angela's Hunt.
22  A Because with Angela's Hunt, Neil's name was put on the
23  cover or used without his permission, and Neil asserts
24  that he would have requested or needed permission to
25  use his name on that particular publication.

102

1  Q Are you offering an opinion in this trial as to
2  whether or not Neil needed -- or whether Neil needed
3  to give his consent before the McFarlane people could
4  put his name on Angela's Hunt?
5  I realize that's what Neil's asserted, I'm asking
6  whether you are going to offer an expert opinion as to
7  whether or not Neil's consent was necessary to use his
8  name in connection with the publication of Angela's
9  Hunt.
10  A That would be a legal conclusion.
11  Q You're not offering an opinion?
12  A I'm not offering that.
13  Q I'm not asking you about consent. You testified that
14  you came up with a -- you've assumed that Neil needed
15  to give his consent for the use of his name on
16  Angela's Hunt and that he did not give his consent and
17  therefore he's entitled to some measure of damages for
18  that use, is that correct?
19  A Yes.
20  Q Now, in order to come up with $45,000 instead of
21  $75,000 or $5000, you've relied on one document and
22  that's the contract that Neil had with an outfit
23  called Big Entertainment, correct?
24  A Yes.
25  Q And in order to make sure that we're comparing apples

103

1  to apples here, I've asked you some questions about
2  the relationship defined in that Big Entertainment
3  contract, okay?
4  A Yes.
5  Q And you've told us that Neil told you that in the Big
6  Entertainment contract, he received $45,000, he
7  contributed some sketches on some of the pages, but
8  basically that was payment for use of his name in
9  connection with it and that's it, is that correct?
10  A Yes.
11  Q And you also testified, I believe, it's true that that
12  was payment for the use of his name on something that
13  he was not the author of, as far as you know, correct?
14  A Correct.
15  Q Now, back to my simple question, wouldn't you agree
16  with me, and this is a very simple proposition --
17  MS. EADS: Counsel, you know, it's
18  inappropriate for you to keep characterizing your
19  own questions, but go ahead, if you're compelled
20  to do it.
21  Q Wouldn't you agree with me that the circumstances
22  involved in the publication and the use of Neil's name
23  in connection with Angela's Hunt differ from the
24  circumstances involved with the use of Neil's name
25  under the Big Entertainment contract in at least one

1  respect, and that respect is that Neil is the author
2  of Angela's Hunt and he's not the author, as far as
3  you know, of whatever was published under the Big
4  Entertainment contract deal?
5  MS. EADS: Objection as to form.
6  A Those would be the two differences or the difference
7  between the two contracts.
8  MR. SALSICH: Okay, that's all I
9  have. Why don't we take a short break now and
10  then we're going to go into the schedules, and I'm
11  going to do a little comparison between your
12  Exhibit 203 and Exhibit 205. Why don't we take a
13  short break now and make sure we get those work
14  papers copied and a bathroom break, et cetera, and
15  come back in like five minutes.
16  (A short recess is taken)
17  (Ms. Carter takes the place of Mr. Smith)
18  MS. EADS: It sounds like everybody
19  is ready and I think the witness wanted to make a
20  statement after he's checked some of his
21  documents.
22  A The Angela's Hunt, what I was looking for in my cheat
23  sheet, largely because, you know, we have some
24  different names used for Angela's Hunt and Angela
25  Spawn and all those types of things, so I couldn't

Deposition of JAMES P. CAVEN   9-17-02

105

1  find my little cross reference. In looking at that
2  publication, yes, we did calculate the royalties and
3  that the use of the name is really for, as I
4  understand it, a separate cause of action.
5     If we have no agreement or no contract, that the
6  calculation of that $45,000 should not be listed as
7  part of the table on page 13 in the grouping, but
8  should be a stand alone entry right below that and
9  that's really an alternative course of damages, rather
10  than inclusive part of all damages, because we are
11  calculating the royalty on that publication.
12  Q So if I understand you correctly, your $45,000
13  assertion of damages for the use of the name is
14  identified in your expert witness report on page 11
15  that we were talking about?
16  A Page 11?
17  Q Page 11 of your Exhibit 203?
18  A I've got page 13.
19  Q Well, page 13 is your --
20  A Oh, yes, I understand where you're going on page 11.
21  Q That's what we were talking about before and I see
22  that on page 13, it shows up as a category under use
23  of name, the $45,000 appears there, correct?
24  A Correct, and I guess the best way to clarify it is
25  that should be a drop down damage below this

106

1  particular table, because it's -- this particular
2  table is under the premise or assumption that there is
3  a contract where the use of the name is below where
4  there would be no contract and his name should be
5  compensated.
6  Q Okay, so let me ask you two questions about that.
7  First of all, just to clarify, your $45,000 figure
8  there for use of name is not based on any contractual
9  royalty that Neil might or might not be entitled to
10  under a contract because he's the author of Angela's
11  Hunt, correct?
12  A Correct.
13  Q The $45,000 is based, as you said before, on Neil's
14  analysis of the Big Entertainment deal as a comparable
15  use of his name, correct?
16  A Correct.
17  Q Now, my second question about what you just said is to
18  make sure I understand you correctly on where you
19  believe it actually belongs on the table on page 13,
20  and just so -- this leads me to a second question and
21  I want to make sure we're working from the right
22  document, so let me real quickly, while we're doing
23  this, ask you to take a look at page 5 of your
24  supplemental report that's been marked as Exhibit 205.
25  A Correct.

107

1  Q And it's my understanding both page 5 of Exhibit 205
2  and page 13 of Exhibit 203 are entitled attachment
3  table I, correct?
4  A Yes.
5  Q And they are tables that reflect, in your words,
6  quote, "A range of compensation earned and balance
7  due," correct?
8  A Correct.
9  Q Which of these two figures, as you sit here today --
10  excuse me, which of these two tables, as you sit here
11  today, should we be working from?
12  A Well, the more recent table is on Exhibit 205.
13  Q That's on page 5 of 14 on Exhibit 205?
14  A Correct.
15  Q Wherever necessary, in referring to a table, I'll do
16  my best to refer to this one, because I don't want to
17  use old data, if it's going to make a difference,
18  okay?
19  A Correct.
20  Q So my question is about your table that reflects the
21  range of compensation earned and balance due. I
22  understood you just to clarify that the use of name
23  category amounting to $45,000 should not be above the
24  line as compensation earned under the contract, but
25  rather should be below the line as something that

108

1  would be earned if there was no contract, is that
2  correct?
3  A That's correct, it's an alternative form of damage.
4  Q I follow you. Anything else you wanted to clarify
5  based on earlier testimony?
6  A That's the only thing that I recall after flipping
7  through to show Mr. Smith the documents, that's when I
8  found my document that I was actually looking for.
9  Q And thanks for doing that, Mr. Caven. I know it's
10  been a long day and we still have some more time, but
11  if you feel the need to do some clarification again
12  like that, it's perfectly appropriate and we welcome
13  it.
14     Let me ask you now some questions about the
15  attachment table I which is part of Exhibit 203 and
16  then attachment table I that is part of Exhibit 205.
17  You told us that we should use the more recent of
18  those two and I'd like to ask you why we should use
19  the more recent of the two.
20  A Well, 205 on its face is our supplemental report to
21  Exhibit 203.
22  Q And what changes have you made to attachment table I
23  in the supplemental report?
24  A The only difference is under comics. I shouldn't say
25  the -- only the category of comics have changed and

Deposition of JAMES P. CAVEN  9-17-02

109

1    the category of foreign royalties from the one off
2    trade paperback, which is really a subcategory of
3    comics, but I listed it separately.
4  Q And that's been added in its entirety, correct?
5  A That's correct.
6  Q And comics has been changed to reflect a new maximum
7    royalty or maximum compensation, correct?
8  A Yes.
9  Q Has the minimum compensation changed under comics?
10 A It did, yes.
11 Q Okay, it looks like by about $6000 or so?
12 A Yes.
13 Q Will you be able to, when we get to it, point to me
14   where that change appears in your schedules?
15 A Without checking the software, I will try my best.
16 Q Would it be on page 9 of your supplemental report?
17 A Yes.
18 Q And that is a summary of compensation for comics,
19   correct?
20 A Yes.
21 Q And that is page 9 of 14 on Exhibit 205, correct?
22 A Yes.
23 Q In the schedules that you provided with your first
24   report that we've marked as Exhibit 204, the second
25   page that I have of that, it's not numbered, but it's

110

1    the second page in my stack, is also titled summary of
2    compensation for comics.  Do you have that in front of
3    you?
4  A Yes.
5  Q And it looks to me, if we look first at the summary of
6    compensation you provided in Exhibit 204, it looks to
7    me like there's no difference between the minimum
8    compensation and the maximum compensation, is that
9    correct?
10           THE WITNESS:  Can you read back the
11      question?
12           (Reporter reads back previous question)
13 A Yes.
14 Q Now, in the summary of compensation for comics on page
15   9 of Exhibit 205, there is a difference of, it looks
16   like, around $110,000 or $105,000, can you explain to
17   me why there is a difference, why there's a new
18   maximum compensation in your supplemental report?
19 A Under the maximum, which we had discussed that we
20   would be investigating, was the concept of splitting
21   of profits on the trade paperbacks and comics from the
22   one off projects, and so Exhibits B-17 through B-20
23   reflect a change between the two exhibits, Exhibit 204
24   and Exhibit 205.
25 Q And so is it -- I just went down the two columns, the

111

1    minimum and maximum on page 9 of Exhibit 205 and the
2    only places that I see a difference are in the last
3    four entries on Schedules B-17 through B-20, which
4    refer to one offs and one off trade paperbacks, is
5    that correct?
6  A That's what I just testified to.
7  Q I'm just making sure we're on the same page.  I also
8    see that the minimum royalty, the minimum compensation
9    has been increased in the supplemental report over
10   what it was on Exhibit 204 and the only places that I
11   see that were increased were the compensation on B-18
12   and B-20 for one off trade paperbacks, is that
13   correct?
14 A That's correct.
15 Q Then we can use the summary of compensation in Exhibit
16   205.  Other than the change in method of calculating
17   royalties for the one offs including the second
18   category of the sharing of property on the one offs,
19   are there any other changes in your opinions between
20   your initial expert report and your supplemental
21   expert witness report?
22 A Well, the minimum changes due to B-18 and B-20 is
23   reflecting the updated supplemental report by Denis
24   Kitchen calculating or estimating the units sold.
25 Q Right, okay, so we have -- it's saying that there are

1    two differences in your supplemental report as regard
2    opinions with the initial report, the first is that
3    based on Denis Kitchen's supplemental report, he's
4    calculated a higher amount of sales for the one off
5    trade paperbacks, correct?
6  A Correct.
7  Q And based on his calculation of sales of the one off
8    and the one off trade paperbacks, you have calculated
9    compensation due on those, correct?
10 A Correct.
11 Q And the second change or new opinion in your
12   supplemental report is this additional measure of
13   damages or method of calculating the damage on the one
14   offs by doing it in a sharing of profits method with
15   Neil Gaiman in the publisher's position, is that
16   correct?
17 A Correct.
18 Q And that results in the new category of maximum Gaiman
19   compensation reflected in schedules B-17, 18, 19 and
20   20, correct?
21 A Correct.
22 Q Other than those two changes, are there any other
23   opinions that appear in your supplemental report that
24   are different from or in addition to those that
25   appeared in your initial report?

Deposition of JAMES P. CAVEN   9-17-02

113

1  A That are not noted in the bottom footnotes of each of
2    those four pages?
3  Q I'm just asking you to tell me if there's something
4    else in addition to those two categories of changes
5    that I should be looking at in your supplemental
6    report. I don't think so, but I don't want to
7    characterize it, that's why I'm asking you.
8  A Those are the only two columns that have been
9    modified.
10 Q And in addition -- I'm sorry, there was one more you
11    added, foreign royalties on one off trade paperbacks,
12    correct, based on your conversations with Michael
13    Martens at Dark Horse?
14 A Correct.
15 Q I do have a question for you on page 3 of your
16    supplemental report, Exhibit 205, and in the first
17    full paragraph on that page, you refer to further
18    investigation with Mr. Martens and Mr. Kitchen, do you
19    see that?
20 A Yes.
21 Q And that's I believe where you discuss Mr. Gaiman's
22    ability to publish an Angela one off under an
23    arrangement with another publisher as if he was in the
24    same position as the publisher, is that right?
25 A Correct.

114

1  Q Now, the second to last sentence in that paragraph
2    starts with the words, "Since Gaiman," do you see
3    that?
4  A Yes.
5  Q Could you read that sentence to me, please.
6  A "Since Gaiman is similar to a publisher (as the
7    assignee of McFarlane's rights to the use of the
8    character), Gaiman could have negotiated a 50/50
9    sharing of profits with Marvel Comics."
10 Q What did you mean, and I'm not asking for a legal
11    definition of the term, I'm asking what you meant when
12    you used the words, "As the assignee of McFarlane's
13    rights to the use of the character," in that sentence?
14 A My understanding is that Angela still is part of
15    McFarlane or Todd McFarlane Productions and that the
16    use or one off concept is Todd allowing or giving the
17    right or the assignment of that right to use that
18    character with another publisher.
19 Q So it's your understanding that in Exhibit 19 where
20    Neil discusses the exchange of characters and
21    discusses the one offs, that it is in that term that
22    Todd McFarlane assigned his rights to Neil Gaiman to
23    the use of the Angela character, is that correct?
24       MS. EADS: Objection to form.
25 Q You may answer.

115

1        THE WITNESS: Can you read back the
2    question?
3        (Reporter reads back previous question)
4  A In a nonlegal sense or in a nonlegal opinion, that's
5    what I read from this particular concept, is that he
6    is giving his right to Neil to use that for this
7    crossover project.
8  Q Did you discuss this publication -- excuse me, let me
9    strike that. When I asked you at the start of the
10    deposition if you had conversations with Neil Gaiman
11    during the preparation of your supplemental report,
12    you said you thought you had, but you didn't remember
13    specifics. Now, I want to ask you a specific
14    question.
15        This method of damages that you calculated in
16    your supplemental report which is reflected in the
17    first full paragraph on page 3 of Exhibit 205, I'm
18    asking if you discussed that particular method of
19    damages with Neil Gaiman.
20 A No, I did not specifically discuss with Neil the
21    actual mechanics of the sharing of profits.
22 Q I'm not talking about necessarily the mechanics with
23    you, how about the assumption that Gaiman would have
24    been in a position of Todd McFarlane as the assignee
25    of his rights, did you discuss that with Neil?

116

1  A We probably didn't use the word assignee, we probably
2    discussed in our conversation that Neil would have the
3    ability to go to these other companies with the right
4    to keep that particular revenue from that project when
5    he went to DC or Marvel to do a Batman crossover or to
6    do a Phoenix crossover.
7        But the way Neil described it was basically this
8    is a character that Neil gets to take to a different
9    comic publisher and assert his rights with that
10    character.
11 Q And he gets the right to take that character to
12    another publisher based on the letters exchanged which
13    Neil refers to as a contract between him and Todd
14    McFarlane back in July of 1997, correct?
15        MS. EADS: Objection as to form.
16        THE WITNESS: Read back the
17    question.
18        (Reporter reads back previous question)
19 A Yes, on Exhibit 19.
20 Q And so is your conclusion that Neil Gaiman is entitled
21    to -- in this paragraph you say a total amount he
22    could have earned of $95,700 under the 50/50 sharing
23    of profits for crossovers -- strike that, I don't even
24    have a question on that. Let me see if I can make
25    this clear.

Deposition of JAMES P. CAVEN   9-17-02

117

1    On page 9 of Exhibit 205, on schedule B-17, the
2    maximum Gaiman compensation, you have the figure
3    $95,700, correct?
4  A Correct.
5  Q And then on B-19 for the Medieval Spawn figure, you
6    have the figure of $67,700 for the maximum
7    compensation?
8  A Correct.
9  Q And those are based on the 50/50 sharing of profits
10   model, correct?
11 A Correct.
12 Q My question is this, is your conclusion as to the
13   amount of those, the amount of that compensation,
14   dependent upon your assumption that Gaiman is the
15   assignee or is standing in the shoes, basically, of
16   Mr. McFarlane as a publisher in these negotiations?
17        MS. EADS: Objection as to form.
18 A In a nonlegal sense, that's my understanding of the
19   agreement between the parties.
20 Q I understand that, I'm not asking for your
21   understanding of the agreement of the parties here,
22   but I'm just making sure I have the building blocks to
23   the dollar figures you're concluding in the maximum
24   compensation on the one offs.
25        And so really what my question is, simply, is

118

1    your conclusion as to the maximum Gaiman compensation
2    reflected in schedules B-17, B-18, B-19 and B-20 all
3    dependent upon the operation of the 50/50 sharing of
4    profits method that you describe on page 3 of Exhibit
5    205?
6  A Read that back.
7  Q Let me see if I can ask it a little cleaner, I'm
8    sorry. You have a maximum Gaiman compensation
9    calculated on schedules B-17, B-18, B-19 and B-20,
10   correct?
11 A Correct.
12 Q My question is, are those maximum compensation totals
13   reflected on schedules B-17 through B-20 dependent
14   upon the operation of this 50/50 sharing of profits
15   method or business model that you described on page 3
16   of Exhibit 205?
17 A It would be pages -- well, all the pages of my Exhibit
18   2 through 4, but yes, that's a true statement.
19 Q You're right, not just limited to page 3, because
20   that's the Angela only, but on your supplemental
21   report, okay, so now my next question is, is the
22   operation of the 50/50 sharing of profits business
23   model reflected in your supplemental report dependent
24   on your assumption that Gaiman is standing in the
25   shoes of or is the assignee of Todd McFarlane with

119

1    respect to the right to use the Angela and Medieval
2    Spawn characters?
3  A Yes, in an economic sense, yes.
4  Q What do you mean by an economic sense?
5  A Well, I'm not opining to the legal sense of assignee
6    or making a characterization or opinion of assignee,
7    only in that he would share equally or share in those
8    economic sums under that arrangement with whomever he
9    negotiated.
10 Q And as far as you -- in an economic sense, in your own
11   calculations, a necessary building block to arriving
12   at the maximum Gaiman compensation under schedules
13   B-17 through B-20 is the underlying assumption that
14   Gaiman is standing in the shoes of or is the assignee
15   of Todd McFarlane with respect to the right to use the
16   characters of Angela and Medieval Spawn, correct?
17 A Yes.
18 Q Let's move on to the schedules that you provided to us
19   in Exhibit 204, and also I think we'll have to refer a
20   little bit back and forth to the attachments in your
21   supplemental report, to the extent that they may be
22   different than those in Exhibit 204, okay?
23 A Okay.
24 Q So let's start with summary of royalties for toys
25   which I believe is page 8 of 14 in Exhibit 205.

1  A Okay.
2  Q And the way I look at the first page of Exhibit 204,
3    which is also summary of royalties, there's been no
4    change in your supplemental report on this summary, is
5    that correct?
6  A Correct.
7  Q So we'll work from the latter one. Beginning with
8    schedule A-1, and actually, let's start with the
9    general question so that I understand how your
10   summaries work. In attachment table I, page 5 of
11   Exhibit 205, you state your ultimate conclusion as to
12   the minimum and maximum Gaiman compensation that's due
13   in this case, correct?
14 A Yes.
15 Q And is it accurate to say that your calculations for
16   the minimum and maximum Gaiman compensation reflected
17   on attachment table I of your supplemental report are
18   based on the assumption that the four letters
19   exchanged between Neil Gaiman and Todd McFarlane in
20   May and July of 1997 formed a binding contract?
21 A Yes.
22 Q And is it also accurate to say that your conclusions
23   regarding the minimum and maximum Gaiman compensation
24   reflected on attachment table I of Exhibit 205 are
25   based on the assumption that the four letters

PROFESSIONAL REPORTERS, LTD

Deposition of JAMES P. CAVEN   9-17-02

121

1  exchanged between Todd McFarlane and Neil Gaiman in
2  May and July of 1997 contain all of the terms of the
3  contract between those two parties?
4          MS. EADS: Objection as to form.
5          THE WITNESS: Can you read that
6    back.
7          (Reporter reads back previous question)
8  A That is the basic framework that I have made the
9    assumption to do page 8, table IV of Exhibit 205.
10 Q And would that be true for attachment table I of
11   Exhibit 205, which is the total minimum and maximum
12   compensation?
13 A That information that rolls up to table I, yes.
14 Q And really what I just want to make sure is that --
15   and my final question is this, in making calculations
16   that ultimately were -- strike that. In arriving at
17   the minimum and maximum Gaiman compensation reflected
18   on attachment table I of your supplemental report, did
19   you rely solely on the terms listed in Exhibit 2 for
20   calculating royalty rates and royalty percentages?
21 A Exhibit 2 is the Egger?
22 Q Correct, the May 5 letter from Neil to Todd.
23 A And this document is -- I just want to make sure I
24   have all the documents.
25 Q Okay.

122

1  A Yes.
2  Q Now, is it true that attachment table I which reflects
3    the range of compensation earned and balance due
4    represent -- strike that. In attachment table I
5    reflecting the range of compensation earned and
6    balance due, you have various total minimum and total
7    maximum compensation for toys, comics, media, et
8    cetera, do you see that?
9  A Yes.
10 Q And my question is this, is each one of those total
11   figures, the minimum and the maximum compensation for
12   each category, does that appear on some other part of
13   your report or schedules?
14 A They are in more detail in Exhibit 204 by category and
15   in Exhibit 205, we have each of the categories.
16 Q I guess what I want to get at is I want to work back
17   from attachment table I to each of the figures that's
18   included in there and I want you to show me -- let's
19   take, for example, the toys attachment table I. You
20   have a minimum Gaiman compensation of $46,684.76 and a
21   maximum Gaiman compensation of $78,172.61, do you see
22   that?
23 A Yes.
24 Q Tell me where either in later attachment tables or
25   schedules I can find those figures.

123

1  A Well, if you go to attachment 4, page 8 of 14 in
2    Exhibit 205.
3  Q Okay, and I see at the bottom of attachment table IV,
4    page 8 of Exhibit 205 there is a tentative balance due
5    in the minimum Gaiman royalty column and the maximum
6    Gaiman royalty column, is that correct?
7  A Yes.
8  Q And up above that, two lines above that there's a
9    total royalties due on toys and there's $46,000 and
10   $78,000 and minimum to maximum Gaiman royalties,
11   correct?
12 A Correct.
13 Q And those two figures under the line, total royalties
14   due on toys, are those the figures now that you have
15   put on your summary and attached as table I?
16 A Yes, on page 5 of 14?
17 Q Yes.
18 A Yes.
19 Q And if we look at page 9 of Exhibit 205 which is
20   attachment table V, summary of compensation for
21   comics?
22 A Yes.
23 Q I see three lines from the bottom, you have a total
24   compensation due on comics, minimum Gaiman
25   compensation is $388,000 plus and the maximum Gaiman

124

1    compensation is $493,000 plus, do you see that?
2  A Yes.
3  Q Are those the same numbers that are reflected in the
4    second line of attachment table I under the line
5    comics?
6  A Yes.
7  Q And then attachment table VI works the same way with
8    respect to media, is that correct?
9  A Yes.
10 Q Is it your statement that the total royalties -- let's
11   look at attachment table IV, the total royalties due
12   on toys, minimum and maximum Gaiman royalties. Those
13   figures that appear in the line item on attachment
14   table I, is it your opinion in this case that those
15   are royalties due under the terms of the contract as
16   you've used that term reflected in the May 5 letter or
17   Exhibit 2?
18 A Yes, this is all based upon the framework agreement, I
19   don't know if I want to use the word contract.
20 Q Well, let's do this, let's make it easier on ourselves
21   so we don't have to have such long winded questions
22   and answers, because I think we're talking about the
23   same thing and I want to make sure that you're
24   comfortable and your counsel is comfortable with my
25   question.

Deposition of JAMES P. CAVEN    9-17-02

125

1    Would you agree with me that for purposes of all
2    of your calculations on these schedules and
3    supplemental reports and attachments, that you relied
4    on the terms set forth in Exhibit 2?
5    A I relied on that to be the basic framework, yes.
6    Q And when you say in your main report on page 4,
7    Exhibit 203 under the subheading assignment, that you
8    were asked to determine the economic sums due Gaiman
9    under the terms of the agreement, you're also
10   referring to the terms set forth in Exhibit 2,
11   correct?
12   A Two, and I guess I would have to caveat it with 19.
13   Q To the extent that 19 adds a glass on, too, we just
14   want to make sure that we don't have to be back to
15   Exhibit 2 or 19.
16   A I guess collectively that I would like to say two, 19
17   and 20 were the basis or framework that really results
18   in how we did the calculations, other than additional
19   notations that may be on an individual exhibit.
20   Q And let's for these purposes, let's refer to that, if
21   this term is agreeable to you, as to -- the alleged
22   1997 contract. Can we use that term, and if I use
23   that term then I'm referring to that exchange of
24   letters which you've just identified as that range of
25   deposition exhibits and which is included in your

126

1    bullet points contained on page 3 of your Exhibit
2    203?
3        I'm just trying to come up with a term we can use
4    to short circuit some of this stuff.
5    A That would be fine.
6    Q So then my question is, is it your testimony that the
7    total royalties due on toys contained in attachment
8    table IV and reflected in the line item on attachment
9    table I under toys is your calculation of the
10   royalties due on toys under the alleged 1997 contract?
11   A Yes.
12   Q And then the same with attachment table V, is it your
13   testimony that the total compensation due on comics
14   which is reflected in the minimum and maximum Gaiman
15   compensation and then contained again in the line item
16   under comics on attachment table I, that that is the
17   total compensation due on comics under the terms of
18   the alleged 1997 contract?
19   A Yes.
20   Q And then the same question with respect to attachment
21   table VI regarding the summary of royalties for media,
22   the total royalties due on media which is reflected in
23   the minimum and maximum Gaiman royalty and then also
24   contained in the line item attachment table I, is it
25   your testimony that the total royalties due on media

127

1    reflected on these documents is the amount due under
2    the terms of the alleged 1997 contract?
3    A Yes, using that framework.
4    Q Let's look at schedule A-1. On Exhibit 204, all of
5    the schedules are individually contained in Exhibit
6    204 with the exception of B-17 through 20, which are
7    in the supplemental report, we'll get to those later.
8    Do you have schedule A-1 in front of you?
9    A Yes, I do.
10   Q On attachment table IV, page 8 of Exhibit 205, you
11   reference the Angela figure and then you have a
12   minimum Gaiman royalty of $20,154.09, do you see that?
13       MS. EADS: Could I --
14   A We're a little slow, Pete, because you're going
15   through six different tables.
16   Q I'm sorry, here's what I want to do here, just going
17   to attachment table IV right now, summary of royalties
18   for toys, that's page 8 of Exhibit 205.
19   A Fair enough.
20   Q And that lists schedule A-1 through A-13, correct?
21   A Correct.
22   Q So in discussing these schedules, keep that attachment
23   table IV with you for cross-reference.
24   A Correct.
25   Q Now, I want to understand on your schedule A-1, point

1    to me where on schedule A-1 are the figures that
2    ultimately make their way into attachment table IV
3    with minimum Gaiman royalties and maximum Gaiman
4    royalties.
5    A Well, if you go to the amount due line under the
6    minimum column, it's $20,154.09 and that corresponds
7    attachment table IV under the minimum.
8    Q And then the same with the maximum of $40,308?
9    A Yes.
10   Q And you're referring on schedule A-1 to a gray box
11   that says amount due, correct?
12   A Correct.
13   Q And it's your testimony that that amount due is the
14   amount due under the terms of the alleged 1997
15   agreement for Angela figures, correct?
16   A Correct.
17   Q And we discussed at length earlier today the two
18   different royalty rates, the five percent and ten
19   percent, resulting in a minimum and maximum royalty,
20   do you recall that testimony earlier today regarding
21   toys?
22   A Yes.
23   Q Where on schedule A-1 are those different royalty
24   rates reflected?
25   A It's reflected in the minimum column and the maximum

Deposition of JAMES P. CAVEN    9-17-02

129

1  column.
2  Q Point to me where that is, under what line item, is
3    that publisher's royalty rate?
4  A Correct.
5  Q Note 2 says per TMP contract, TMP royalties would be
6    five percent of gross sales and then note 3, analysis
7    also includes TMP royalty based on a ten percent
8    publisher's royalty rate?
9  A Correct.
10 Q And schedule A-1 in those two different royalty
11   calculations, the only difference between the minimum
12   royalty and the maximum royalty is the application of
13   this additional five percent of publisher's royalty,
14   is that correct?
15 A Correct.
16 Q And your reasons for using a ten percent publisher's
17   royalty rate here are all set forth in your report and
18   contained in this discussion we had earlier in your
19   deposition, correct?
20 A Correct.
21 Q On schedule A-2 for Medieval Spawn figures, there's
22   also a minimum and a maximum amount due, correct?
23 A Correct.
24 Q Contained in the gray box in bold print on schedule
25   A-2 and the minimum amount is $10,384 and the maximum

130

1  amount is $20,768, correct?
2  A Correct.
3  Q And those are reflected in the second line item,
4    Medieval Spawn figures on attachment table IV,
5    correct?
6  A Correct.
7  Q And, again, you have publisher's royalty rate
8    calculated at five percent and also at ten percent,
9    correct?
10 A Correct.
11 Q And my same questions with respect to schedule A-1, is
12   the basis for your ten percent royalty calculation
13   contained in your expert report and in your deposition
14   testimony earlier today?
15         THE WITNESS: Can you read back
16      that question? I got lost.
17         (Reporter reads back previous question)
18 A Yes.
19 Q I also see you have a line item in schedule A-2 called
20   derivative character factor, could you explain that to
21   me, please?
22 A Because Medieval Spawn is a derivative of Spawn, the
23   discussions we had with Neil and his counsel was that
24   Neil was not to get the normal royalty rate for that
25   derivative character, so when he had that derivative

131

1  character, he would have gotten one-half of the 15
2    percent royalty rate.
3  Q And rather reflect that as a 7.5 percent royalty
4    rate, you simply showed reflected on schedule A-2 as a
5    15 percent royalty rate divided or multiplied by 50
6    percent, correct?
7  A Correct, it was easier for keeping the template for
8    all the schedules of tables consistent, that's all.
9  Q Schedule A-3, do you have an amount due in gray,
10   minimum of $949 and a maximum of $1899, do you see
11   that?
12 A Correct.
13 Q My conversion of schedule A-3 does not contain any
14   calculations above that amount due under the maximum
15   royalty column, why is that?
16 A As you read footnote 2 next to the amount due, we
17   assumed the royalty rate on the maximum to be two
18   times the minimum, has been consistent with A-1 and
19   A-2 so far.
20 Q So A-3 really has the exact same calculations, it just
21   doesn't have the predicate calculations of the
22   publisher's royalty rate of five percent in the
23   minimum column and ten percent in the maximum column,
24   is that correct?
25 A Correct, only because I couldn't opine or know if the

132

1  gross revenue numbers were correct, since we still
2    have not been provided that information. So according
3    to the accounting people at McFarlane, they couldn't
4    come up with this information on this particular
5    Angela figure and so we had to use what was in his
6    royalty sheet as the publisher's royalty and had just
7    to make the assumption that that's our net revenue to
8    TMP that we applied the royalty rate to.
9  Q So your reading in schedule A-3, if I read schedule
10   A-3 and I read publisher's royalty in the first
11   column, $6330.10, you're making the assumption that
12   that is the same calculation or as close as possible
13   as you can to the calculations in schedule A-2
14   reflecting five percent of the gross revenues or five
15   percent of the net revenues or five percent of some
16   figures?
17 A Right, I can only rely on that information, because
18   there's not good data to make the same calculation as
19   I did in A-1 and A-2.
20 Q I understand. In Schedule A, four appears blank and
21   is that because it's your understanding that there
22   were no Cogliostro figures made as of the date --
23   after the exchange date?
24 A It was not until after the exchange date, based on the
25   final information we received.

Deposition of JAMES P. CAVEN   9-17-02

133

1  Q And when you refer to the exchange date, what do you
2    mean there?
3  A August 4, 1997.
4  Q And that is reflected in your assumption that all of
5    your calculations are based on the terms of the
6    alleged 1997 contract, correct?
7  A Correct. Can we take a quick five-minute break?
8           MR. SALSICH: Absolutely, that's
9    fine.
10          (A short recess is taken)
11          MR. SALSICH: Gina, if you have
12    that royalty agreement we talked about marking
13    earlier.
14          (Exhibit 206 is marked for identification)
15          MS. CARTER: We marked it Exhibit
16    206.
17          MR. SALSICH: Just let the record
18    reflect that we've marked as Exhibit 206 the
19    royalty agreement between the Todd McFarlane
20    Productions, Inc. and TMP International that we
21    spent some time discussing in the deposition
22    earlier today and that document is marked
23    confidential and it bears Bates number TM01237
24    through TM01248 inclusive.
25  Q Mr. Caven, can you take a quick look at Exhibit 206

134

1    for me, please.
2  A Yes.
3  Q And do you agree with me that that is the royalty
4    agreement that we discussed earlier today and the
5    pages of which you referred to in your expert witness
6    report?
7  A Yes.
8  Q Let's look at schedule A-9.
9  A Yes.
10  Q And schedule A-10 and schedule A-11, I have the same
11    questions on all three. On each of those schedules,
12    you show a line item that has total number of cards
13    that include artwork of Angela, do you see that?
14  A Yes.
15  Q And on schedule A-9, it indicates that there are 17
16    out of the 109 cards that depict Angela, on schedule
17    A-10, it looks like 10.5 out of 177?
18  A Yes.
19  Q And on schedule A-11, it looks like two out of 18, is
20    that right?
21  A Yes.
22  Q And my question for you is the same on all three
23    schedules, where did you get that number?
24  A TM00521.
25  Q And is that the same document that is contained in the

135

1    royalty reports prepared by Todd McFarlane Productions
2    in 1997?
3  A Yes, to further clarify, 10 and 11 are TM00522 and
4    00523.
5  Q I understand, and they reflect three separate royalty
6    payments in 1997 for three separate types of trading
7    cards, correct?
8  A Correct.
9  Q So did you not do any independent verification of the
10    number of Angela related cards included in these card
11    sets?
12  A That was information we asked for, but we never
13    received any additional verification of that.
14  Q So your basis for these numbers is based on the
15    numbers apparently calculated by TMP back in 1997, is
16    that right?
17  A Correct.
18  Q In note 2, each of those three schedules, A-9, A-10
19    and A-11, you have a statement that says contract
20    includes no provision for weighting of toys between
21    main character and subject character, what do you mean
22    by that?
23  A Well, the alleged agreement or alleged contract.
24  Q And you are referring now to what we've decided to
25    call the alleged 1997 contract reflected in the May

136

1    and July of 1997 letters between Todd and Neil?
2  A Correct, that there is no discussion that if there is
3    a weighting, because one character is more extensive
4    than the other subject character, there's no
5    discussion of that whatsoever in these
6    correspondences.
7          And we took the position that there would not be
8    a weighting as Todd did in his calculation in TM00521
9    through 00523.
10  Q And that you really answered that my second question,
11    when you use the word contract there, you're referring
12    to what we've decided to call the alleged 1997
13    contract, correct?
14  A Correct.
15  Q On schedule A-12, you have a line item of conversion
16    for U.S. dollars to Canadian dollars, correct?
17  A Correct.
18  Q You used a conversion rate of 0.275, at least that's
19    what I read on there?
20  A Correct.
21  Q Can you tell me how you arrived on that conversion
22    rate?
23  A I forget what website we went to, but it was on the
24    internet. We looked at the conversion rate back in
25    1997 at that time.

Deposition of JAMES P. CAVEN   9-17-02

137

1  Q So you went to an internet site that contained
2    historical data regarding conversion between Canadian
3    dollars and United States dollars in 1997?
4  A Correct.
5  Q Was that a conversion rate, an average conversion rate
6    or the entire year or did you focus on August of 1997?
7  A August of -- August 4, actually.
8  Q Do you have any notes or any documents that would
9    support your research on this issue on the internet?
10 A Yes, you have made a copy this afternoon and it's
11   contained in those copies you made.
12 Q Is that a printout from the website?
13 A Correct.
14 Q Can you tell me what schedule A-14 is?
15 A A-14 is attempting to consolidate the requests for
16   information on McFarlane toy sales as noted by the
17   exhibits below of TM01981, TM02013, TM2014, TM2367 and
18   TM2639, and then to prorate that information between
19   the characters of Angela and Medieval Spawn.
20 Q So in some of the -- we don't need to spend a lot of
21   time on this, but just so I understand it correctly,
22   did you base all of your calculations contained on
23   schedule A-14 and I guess the same with schedule A-15,
24   which is a later -- from 1998 to 2001, correct,
25   schedule A-15?

138

1  A A-15 is from 1998 to 2001.
2  Q Between the combination of schedules A-14 and A-15, it
3    appears that that is an attempt to summarize the toy
4    sales on those Angela and Medieval Spawn characters
5    from 1994 up through 2001, is that correct?
6  A Can you read back the question.
7  Q I can make it simpler, I just want to make sure if you
8    read schedule A-14 and A-15 to be an attempt to
9    summarize the total sales for the Angela and Medieval
10   Spawn toys between 1994 and 2001.
11 A We compiled from the information we received on
12   McFarlane sales between '94 and 2001. However, the
13   information in A-14 for Angela and Medieval Spawn do
14   not carry back to A-1 and A-2, largely because the
15   information we were getting, we couldn't reconcile to
16   the original documents prepared by McFarlane.
17         And we went with the -- as footnote one says in
18   A-1 and footnote one in A-2, we used the gross
19   revenues that were compiled back in July of '97 as
20   being more accurate than the latest release of
21   information, largely because of testimony by Julaine
22   or other requests were not provided, that there was
23   some accounting problems extracting the data out of
24   the old Quick Books or Quicken files to go from '97 to
25   '98 to '99 or even back into the historical, because

139

1    they didn't have old copies of the software, so the
2    data was very difficult for them to extract.
3          So we relied on, I guess, more A-14 is going to
4    be more informational, but not conclusive and we
5    relied on then A-15 to augment, which is line two, so
6    to speak, of A-1 and A-2.
7  Q Okay, I follow that.
8  A Actually, just for A-1. A-2, we used the $2.7 million
9    in gross revenue and yet on A-14, the new data shows
10   it's $2.8 million, so we still went back with the old
11   data, even though the new data may support a higher
12   number. We went conservative on that assumption
13   there.
14 Q So for purposes of A-14 and A-15, is it accurate to
15   say that those are primarily informational, because we
16   can rely on the -- and you have relied on schedules
17   A-1 and A-2 and whatever supporting document is
18   identified therein in arriving at your minimum and
19   maximum toy royalties for Angela and Medieval Spawn,
20   is that correct?
21 A That's correct, we couldn't reconcile from the
22   company's records that they were providing to an
23   accurate number.
24 Q Is there anything else we need to know about schedules
25   A-14 and A-15 or any other way in which you have used

140

1    the information on those schedules?
2  A No.
3  Q Now, if you would turn in Exhibit 205, the
4    supplemental report, to attachment table V which is
5    the summary of compensation for comics?
6  A Correct.
7  Q And it reflects supporting schedules B-1 through B-20,
8    correct?
9  A Correct.
10 Q And it contains a minimum Gaiman compensation and
11   maximum Gaiman compensation column for various comic
12   book issues, correct?
13 A Correct.
14 Q And is it accurate to say that each supporting
15   schedule references compensation due for just one
16   particular comic book issue, in other words, you
17   haven't, with the exception of the other appearances,
18   catalogs or schedules you've broken out, each
19   particular comic book issue or trade paperback has its
20   own supporting schedule, correct?
21 A Yes, for B-1 through B-11.
22 Q Okay. Is it also true that the calculations -- let's
23   look at schedule B-1, we'll do it one by one.
24   Schedule B-1 reflects an amount due for the comic book
25   issue Angela number one, is that correct?

Deposition of JAMES P. CAVEN  9-17-02

141

1  A Correct.
2  Q And you have $27,851.04 and that corresponds to both
3     the minimum and maximum Gaiman compensation on
4     attachment table V, correct?
5  A Correct.
6  Q And the calculations that you made on schedule B-1, do
7     those reflect the terms as you understand them of the
8     letters that we've agreed to call the alleged 1997
9     contract?
10 A Yes.
11 Q On schedule B-2, there's an amount of $26,342.91 for
12    minimum and maximum Gaiman compensation with respect
13    to Angela issue number two, correct?
14 A Correct.
15 Q And is that also an amount due based on your
16    understanding of the terms set forth in the alleged
17    1997 contract?
18 A Correct.
19 Q Schedule B-3, that shows an amount due of $16,987.64
20    and you've carried that over into line item for Angela
21    number three on attachment table V for both a minimum
22    and maximum Gaiman compensation, correct?
23 A Correct.
24 Q And does that amount due reflect your understanding of
25    the terms of the alleged 1997 contract?

142

1  A Yes, with the additional supplemental discussions with
2     Gaiman, Martens and I guess Kitchen, that it is common
3     when the advance or script fee and advanced royalty
4     fee are paid, those are the payments even if the
5     royalties under any sort of calculation are less.
6  Q Let me make sure I understand that. Is it your
7     testimony that nothing in the terms of the alleged
8     1997 contract between Neil and Todd as reflected in
9     the letters that we've identified as Exhibit 2, 19 and
10    20 and that you've relied on in your expert report,
11    nothing in that alleged 1997 contract tells you to
12    count the greater of the royalties earned or the
13    payments received as advances, is that correct?
14 A Correct.
15 Q So you take that -- you make that assumption and
16    you've identified that as note 2 in your schedule B-3,
17    am I reading that correctly?
18 A Yes.
19 Q And you make that assumption based entirely on
20    discussions you had with Neil Gaiman, Denis Kitchen
21    and Michael Martens, correct?
22 A Correct, that it was kind of an industry practice.
23 Q But it's not reflected in the contract, in the alleged
24    1997 contract, as you've reviewed it, is that correct?
25         MS. EADS: Objection as to form.

143

1  Q You may answer.
2  A As I stated, it is not specifically outlined in the
3     alleged agreement.
4  Q Now, if we take away the information you received from
5     Neil Gaiman, Denis Kitchens and Mike Martens as to
6     industry practice and we just look at the terms of the
7     1997 contract as reflected in the letters we've
8     identified as Exhibit 2, 19 and 20, and you relied on
9     in your expert report, if we just look at those terms,
10    is the higher line item total royalties per above, is
11    that the accurate amount due under the terms of the
12    1997 contract? Schedule B indicates that that would
13    be $13,645.53.
14         MS. EADS: Objection as to form.
15 Q Did you understand my question?
16 A Yes, I'm reviewing a few other pieces of paper to the
17    alleged document, just to -- under your hypothetical,
18    that would be the hypothetical royalties calculated
19    under the --
20 Q I wasn't asking about a hypothetical, though, here.
21 A Well, you have made it a hypothetical, because you've
22    removed the assumption that I had talked to three
23    people who said this was industry practice.
24 Q Okay. Well, let's look at this, I see what you're
25    saying, let me see if I can do it another way, because

     I don't want it to appear hypothetical. I'd like to
     simply refer to the documents that we've identified as
     the alleged 1997 contract.
          And I'm looking at schedule B-1 and schedule B-2
     and I see line items for units sold, cover price,
     creator royalty rate, creator royalty amount, writer's
     royalty rate, writer's royalty amount and total
     royalties per above, do you see that on schedule B-1,
     did I leave anything out?
10 A B-1 or B-3?
11 Q B-1, please.
12 A Yes, I'm looking at B-1.
13 Q Did I leave anything out in listing the various line
14    items there in your calculation?
15 A You have creator royalty rate and writer royalty rate.
16 Q Right, and then amounts for each of those as well as
17    the units sold and a cover price?
18 A Correct.
19 Q And that leaves me with total royalties per above of
20    $27,851.04 and then you identified that as simply the
21    amount due, correct?
22 A Correct.
23 Q And you told me that calculation was based on the
24    terms of the alleged 1997 contract, right?
25 A Those are outlined specifically in the contract, yes.

Deposition of JAMES P. CAVEN  9-17-02

145

1  Q Now, B-2 looks, to me, I know the numbers are
2     different because the units sold are different, but
3     the calculations appear to be identical and the line
4     items appear to be identical as they are in B-1,
5     correct?
6  A Correct.
7  Q And B-3, they're also identical up until -- down to
8     the line that says total royalties per above, correct?
9  A Correct.
10 Q Now, I understand that you've testified that you took
11    the larger of the amounts paid by Mr. McFarlane as
12    advances and royalty fees and called that the amount
13    due, I understand that. My question is, doesn't the
14    total royalties per above line item on schedule B-3,
15    which is $13,645.53, doesn't that equal the amount due
16    if you rely solely on the terms of the alleged 1997
17    contract?
18         MS. EADS: Objection as to form.
19 Q You may answer.
20 A The framework or the alleged contract doesn't speak to
21    an industry practice.
22 Q I understand that and that's why I just want to leave
23    that aside. I'm not saying -- I'm not challenging
24    your addition, I understand how you added that in and
25    where you got it from, I'm just trying to understand

146

1     the calculation under the contract that you started
2     with.
3         Would you agree with me that if it turned out
4     that the amounts you calculated under the 1997
5     contract, if that line that's indicated in total
6     royalties per above, if that line was greater than the
7     amount paid by Mr. McFarlane, then you would call that
8     the amount due, correct?
9  A Well, in Exhibit 1 and Exhibit 2, we had the same
10    script or payments and since they were lower than the
11    amount due, we omitted them within the context of this
12    exhibit when we were doing our final edit, because the
13    higher amount was what was calculated per unit.
14 Q And I just want to focus on the amount calculated, not
15    the amount paid, but the amount you calculated based
16    on reading the alleged 1997 contract. What amount did
17    you calculate based on the terms of the 1997 contract
18    only on schedule B-3?
19 A We calculated $13,645.53.
20 Q Schedule B-5, that appears to have the same note 2 as
21    schedule B-3, correct?
22 A Correct.
23 Q And, again, is it your testimony that the alleged 1997
24    contract, the written letters exchanged by Neil and
25    Todd in 1997, did not contain any provision providing

147

1     that the amount due would be the greater of the
2     royalties earned from the advances from McFarlane, is
3     that correct?
4         MS. EADS: Objection as to form.
5  Q In other words, that note 2 comes, as you said, from
6     Neil Gaiman, Denis Kitchen and Mike Martens, correct?
7  A Correct, as well as this particular Spawn 9, it is my
8     understanding that Todd and Neil, mainly Todd, said I
9     will pay you, no matter what, for Spawn 9 $100,000,
10    because that's what I'm doing.
11 Q I understand whatever Todd and Neil may have said back
12    in 1992 or done back in 1992, it's my understanding
13    that you were not asked to make a calculation based on
14    that, but you were asked to make a calculation based
15    on the alleged 1997 contract, correct?
16 A Correct, so I'm illustrating what the actual royalties
17    would have been based upon the information that we
18    received on total print run and print units sold.
19 Q And that would be, again, that $68,943.50 which has a
20    double line under it, under the line item total
21    royalties per above, correct?
22 A Correct, that's assuming that the print run and units
23    sold, you know, are accurate information.
24 Q I understand. And really, the print run is
25    meaningless, isn't it, you calculated the royalties

148

1     based on units sold, correct?
2  A Correct.
3  Q Also in schedule B-5, I notice that you have a creator
4     royalty rate and a creator royalty amount calculated
5     for Mr. Gaiman with respect to Spawn issue 9, correct?
6  A Correct.
7  Q Why did you include a creator royalty rate in addition
8     to writer royalty rate for Spawn 9?
9  A It is my understanding that there are characters that
10    were created, such as Angela, in Spawn 9, so that we
11    actually did the calculation under a creator royalty
12    as well.
13 Q I'm not sure I followed you there. Could you explain
14    it to me again?
15 A Well, to the context that there's the Angela character
16    that was developed within this particular production,
17    we made this calculation with the creator royalty in
18    there.
19 Q Did you do that based on your earlier testimony that
20    you decided that extensive use of the character would
21    be any time the character appeared on more than five
22    pages of an issue?
23 A Yes, that kind of goes to that context. I don't know
24    if we specifically analyzed Spawn 9, as to how many
25    pages, but that Angela was a page or character.

Deposition of JAMES P. CAVEN   9-17-02

149

1  Q So who told you to include that, was that Neil?
2  A It would have been within a joint conversation with
3     Neil and his attorney and I don't recall at this time
4     who specifically stated that, but it was concluded out
5     of that discussion that we should be treating the
6     creator royalty as part of the calculation.
7  Q Did you look at any DC Comics contracts to see whether
8     that would be appropriate?
9  A No, I did not add that in, no. I did not review that
10     DC contract for that issue.
11 Q Did you -- you testified a few minutes ago about what
12     Neil Gaiman and Denis Kitchen and Mike Martens told
13     you about the industry standard of the greater the
14     royalties earned or the advances paid, do you recall
15     stating that?
16 A Yes.
17 Q I want to make sure I understand that. What exactly
18     did Neil Gaiman himself tell you that led you to
19     conclude that you should calculate the amount due as
20     the greater of the amount paid or the amount which you
21     calculated?
22 A It's pretty consistent with everybody's discussion and
23     that is that as a writer/creator, when you work on a
24     project, the advance rate that is negotiated between
25     the parties is then kept 100 percent by that

150

1     writer/creator.
2  Q So let me try to understand that. Is it your
3     statement simply that because Neil got paid more in
4     advances for Spawn 9, for example, than ultimately he
5     would have earned under a royalty calculation in the
6     alleged '97 contract, simply that he gets to keep that
7     extra money because he was paid that in advance?
8  A Yes, that's kind of the -- as I understand from
9     Martens and Kitchen, they specifically said that's
10     kind of the risk for the publisher.
11 Q So that may be an industry standard that the writer
12     gets to keep that money, I understand that, but what I
13     want to find out is are you testifying that now,
14     sitting here, reviewing the terms of the contract
15     based on royalties, that you would conclude that he's
16     contractually entitled to an amount equal to $100,000?
17        MS. EADS: Objection as to form.
18 A Well, under the alleged contract, that specifically is
19     not addressed, and, in fact, you know, the question of
20     adding in these advance payments is -- to the context
21     that Todd made his statement, it is my understanding
22     to Neil, it's $100,000 no matter what the royalty
23     calculation would come to.
24 Q The $100,000 that he got paid and the $100,000 that he
25     got to keep, correct?

151

1  A Correct.
2  Q That's not really my question. I think we're clear,
3     but I want to make sure I understand. Just based on
4     the terms of the alleged 1997 contract, though, based
5     on the total units sold, you calculate a figure of
6     $68,943.50, correct?
7  A Correct.
8  Q And your basis for adding a creator royalty rate and a
9     creator royalty amount for Spawn issue 9 is that you
10     had a discussion between yourself and Neil Gaiman and
11     his lawyers that that would be appropriate, because
12     Angela was created in that comic book, is that
13     correct?
14 A That's my understanding, yes.
15 Q You did not independently verify whether that was
16     something that would be done in any of Neil's other
17     contracts, including any contracts with DC Comics,
18     correct?
19 A No, I did not review any contracts. I didn't think it
20     was professionally necessary.
21 Q On schedule B-6, you also included a creator royalty
22     rate and creator royalty amount for Spawn issue number
23     26, correct?
24 A Correct.
25 Q Again, I'd ask you why you did that with Spawn issue

1     26.
2  A Once again, I don't recall if Spawn 26 is where
3     Cogliostro comes in.
4  Q I can tell you that it's not.
5  A I'd have to check my notes, but once again, that would
6     have been because of the major character being Angela,
7     is the only thing that I can recall.
8  Q If you look right above the creator royalty rate on
9     your schedule B-6, you've got an allocation as Gaiman
10     contribution based on number pages, based on Gaiman's
11     script, based on total number of pages, do you see
12     that?
13 A Yes.
14 Q If I'm reading that correctly, it appears that Gaiman
15     contributed three out of the 24 pages in Spawn 26, is
16     that right?
17 A Correct.
18 Q Now, before you defined extensive use, you guys came
19     up with a figure of five pages out of 20 or in this
20     case, I guess 24, as something that would be extensive
21     use and trigger the creator's royalty rate, correct?
22        MS. EADS: Objection as to form.
23 A Correct.
24 Q You've got here Gaiman only contributed three pages
25     out of 24, so why do we have the creator royalty rate

Deposition of JAMES P. CAVEN  9-17-02

153

1 here?

2 A I think it's a difference of appearance of a character

3   as opposed to contribution of writing.

4 Q So any time -- so if I understand your definition of

5   extensive use, any time the character appears on a

6   page, whether it says anything or does anything or

7   advances the story at all, if it appears on the page

8   visually, you count that page and if you get up to

9   five counted pages, that's extensive use in your

10  definition and Neil gets a creator royalty on sales of

11  that comic book, is that correct?

12          MS. EADS: Objection as to form.

13 Q You may answer.

14          THE WITNESS: Can you read back the

15      question.

16          (Reporter reads back previous question)

17 A That's my understanding, yes.

18 Q And you got that understanding from Neil and his

19   lawyers?

20 A Yes.

21 Q Schedule B-7, Spawn trade paperback II, which includes

22   Spawn 9, do you see that?

23 A Yes.

24 Q You've got a four percent royalty rate here and in

25   your note 2, it says Gaiman receives creator royalty

154

1 as well as writer royalty, am I reading that

2   correctly?

3 A Correct.

4 Q And so if I look back at the earlier schedules that

5   four percent is simply the addition of the 3.2 percent

6   and 0.8 percent writer and creator royalty that appear

7   on the earlier schedules, correct?

8 A Well, it's under the Exhibit 2 where it says collected

9   editions or trade paperbacks, et cetera, that it's at

10  creator royalty of .8 and the writer of 3.2, so that

11  equals four.

12 Q Do you understand -- let me ask you this, maybe this

13  will make it clear. I'm not sure why -- well, let me

14  step back. What is the basis for your note 2 on

15  schedule B-7 that says Gaiman receives creator royalty

16  as well as writer royalty, is it the same thing as

17  your conclusion that he receives a creator royalty for

18  Spawn issue 9 or does it come from your reading of the

19  alleged contract, Exhibit 2, in which Neil had a

20  separate section that just said collected editions,

21  trade paperbacks, et cetera?

22          THE WITNESS: Can you read back the

23      last question.

24          (Reporter reads back previous question)

25 A Well, it goes to two issues. One is that in Spawn 9,

155

1 he did get a creator royalty and then when you

2   actually read Exhibit 2 of the alleged contract,

3   instead of having a cutoff at 100,000 copies, the

4   cutoff doesn't apply here anyway, but it's a shortcut

5   that says anything below 100,000 copies is still at

6   the .5 under a creator royalty, where under the

7   collected or trade paperback, it's .8, we used the .8.

8 Q I'm just trying to -- I'm not necessarily at this

9   point asking you a question about whether .5 or .8 is

10  the appropriate percentage for creator royalty, I'm

11  asking you specifically whether a creator royalty

12  applies at all, and I want to know whether you're

13  basing your assertion that it does on schedule B-7 on

14  the fact -- on some opinion that there's extensive use

15  of the character in Spawn 9 which appears in the trade

16  paperback, or are you referring to the other provision

17  in Exhibit 2 which simply lists a creator royalty

18  calculation under collected editions?

19 A Well, it's under Spawn 9, he did create Spawn 9, a

20   character, and we're doing a proration, because the

21   stories written by Gaiman is one and total stories in

22   the book is five, so there is really a proration

23   related to this particular trade paperback only

24   relating to Spawn 9.

25 Q So the simple fact that it's a trade paperback or

156

1 collected edition doesn't automatically trigger

2   creator royalty, is that correct, there still has to

3   be some extensive use of the character or a created

4   character as you argue in Spawn 9?

5 A Well, Spawn 9 is part of B-7 or that particular

6   collection and since we calculated that in B-5,

7   when it becomes part of this additional collection,

8   the creator royalty on these units applies.

9 Q I think I follow you. Let me ask you this question,

10  maybe we can come at it this way. Take a look at

11  Exhibit 2, if you would, please.

12 A Yes.

13 Q I believe you testified for the most part this

14  document contains the royalty terms of the alleged

15  1997 contract, correct?

16 A Correct.

17 Q And it's this document that you used for all your

18  calculations of royalty terms in your various

19  schedules and your expert reports today, correct?

20 A This is the framework, yes.

21 Q In the very middle of that Exhibit 2 where it says

22  comics and then there's a creator royalty and a writer

23  royalty, do you see that?

24 A Yes.

25 Q Then down below in collected editions, there's a

Deposition of JAMES P. CAVEN    9-17-02

157

1 creator royalty and a writer royalty, correct?
2 A Correct.
3 Q If you stop right there and don't read anything below
4   that, put your hand over the remaining text there,
5   would you read that? And I realize I'm asking you to
6   speculate, but you're an expert, you can do this.
7   Would you read that as stating that on all the comics
8   that Neil was involved with or that contained a
9   character -- or how would you determine what comic
10   books Neil gets a creator royalty and which comics
11   books he doesn't?
12        MS. EADS: You're not talking about
13     trade paperbacks anymore now?
14        MR. SALSICH: They're included in
15     the collected editions, too.
16 Q If you see there, there's nothing that indicates --
17   until you get down to the words character equity in
18   Exhibit 2, there's nothing at that point that
19   indicates why there's a difference between a creator
20   royalty and a writer royalty or what those terms mean,
21   would you agree with me on that, at least?
22        MS. EADS: Are you asking him to
23     interpret this contract?
24        MR. SALSICH: I'm asking him to
25     tell me what he reads on these pages and if he

158

1   agrees with my interpretation. I'm not asking him
2   to offer a legal interpretation of this as a
3   contract or anything else, but I'm asking him to
4   help me work my way through this, because he
5   testified that that's in fact exactly what he did
6   in coming to his conclusions.
7        MS. EADS: I think you are asking
8     him for legal conclusions and I object as to
9     form. You can answer, if you can.
10 A Can you repeat the question?
11 Q Sure. Well, all right, let's try it this way. Do you
12   see where it says character equity on Exhibit 2?
13 A Yes.
14 Q And it says, "(This activates in the event of
15   'Extensive use of character, or character's name in
16   the title of a publication')," right?
17 A Right.
18 Q Do you understand that to be or did Neil tell you that
19   that was the same as the creator royalty that's
20   reflected under comics and collected editions above?
21        MS. EADS: Objection as to form.
22 Q You may answer.
23        MS. EADS: Do you understand or did
24     Neil tell you? It's two questions.
25 A Neil never equated those two particular paragraphs to

159

1   be equal.
2 Q Well, that's what I'm trying to do. Let's do a little
3   math with me here, let's just work our way down
4   Exhibit 2, okay, we'll do this in a hypothetical
5   situation. Let's assume that we're going to talk
6   about a comic book, we'll call it Spawn 2000, are you
7   with me?
8 A Correct.
9 Q And Spawn 2000 includes the character of Angela on six
10   pages, and if I understood your testimony correctly,
11   that means that this character equity would be
12   triggered, because that would constitute extensive use
13   of the character, okay?
14 A Okay.
15 Q Now, looking at -- and say we have total sales of
16   99,999 units on Spawn 2000, okay?
17 A Okay.
18 Q But under 100,000 copies.
19 A Okay.
20 Q And the only reason I'm doing that is so we don't have
21   to add five percent of one figure and 8 percent of
22   another or .5, let's say 99,999 issues of Spawn 2000
23   and Angela appears on six pages.
24 A Okay.
25 Q And I want to calculate the royalty Neil is due under

1   Exhibit 2, and I realize we don't have a dollar
2   figure, because I haven't given you a sales price, but
3   let's say we have a sales price. Do you have a
4   calculator with you?
5 A Yes, I'll have to take your notes on your assumptions
6   then.
7 Q This won't take long, but I think it's important.
8        MS. EADS: Speaking of taking long,
9     so far this deposition has almost gone six hours,
10     just to let you know. I believe the Federal rule
11     says seven.
12        MR. SALSICH: Thanks.
13 A Okay.
14 Q Let's assume -- let's make it easy, let's assume
15   90,000 sales.
16 A Units?
17 Q 90,000 units sold at $1 per issue, that's the sales
18   price, cover price.
19 A Okay.
20 Q That equals, according to my calculations, $90,000 in
21   gross sales, correct?
22 A Correct.
23 Q This is Spawn 2000 and Angela appears on six pages and
24   therefore Angela -- that is considered to be extensive
25   use of the character as you have defined it and that

Deposition of JAMES P. CAVEN   9-17-02

161

1 activates the character equity provision in Exhibit 2,
2 correct?
3 A Correct.
4 Q Now, walk me right down Exhibit 2 and tell me how to
5 calculate the royalty, as you've done it on all of
6 your schedules under this set of facts.
7         MR. SIMMONS:  This is Jeff, just
8    one point of clarification.  In your hypothetical,
9    did Neil write this comic book or did he not write
10   the comic book?
11        MR. SALSICH:  Let's say he wrote
12   it, so he gets a writer royalty, he was the
13   author, maybe we can call it Angela 2000 or
14   something like that, if you want to do that.  It
15   doesn't matter what we call it, Neil is the
16   writer.
17 A So Neil's the writer, he would get a creator royalty
18   and a writer royalty under the --
19 Q Work through the calculation, $90,000 in gross sales
20   and let's look at schedule -- you can look at schedule
21   B-5, or that's not a good one, because you don't have
22   advance payments.  Let's look at schedule B-1 and that
23   will just gave us the calculations we're going to
24   make.
25 A So you get half of one percent on $90,000.

162

1 Q For the creator royalty rate?
2 A Correct.
3 Q So we take $90,000 and we multiply that by .5 percent?
4 A Correct.
5 Q That's the creator royalty?
6 A Correct.
7 Q And what does that amount come out to?
8 A $450.
9 Q What do we do next?
10 A Two percent times $90,000.
11 Q And what does that come out to?
12 A $1800.
13 Q And what we've done here on Exhibit 2 is we've taken
14   the creator royalty in the middle of the page under
15   comics and the writer royalty in the middle of the
16   page under comics, correct?
17 A Correct.
18 Q We don't have a collected edition, so we don't have to
19   worry about that part of Exhibit 2.  Now, what about
20   that character equity, Angela appears on six pages,
21   how does that operate, does he get another .5 percent?
22 A Not if he's the writer, because he's getting the
23   creator royalty and the writer royalty.
24 Q So is the character equity, extensive use of the
25   character, that .5 percent on Exhibit 2 up to 100,000

163

1 copies, is that really the same thing as the creator
2 royalty .5 percent up above?
3         MS. EADS:  Objection as to form.
4 A I don't know how it was derived.
5 Q What I'm saying is when I look at schedule B-1, I
6   don't see an additional .5 for character equity, and
7   so it's my understanding that what Neil was trying to
8   say is that the -- and I realize I'm telling you my
9   understanding here, but my understanding of what Neil
10   was trying to say here is that the creator royalty is
11   essentially the same thing as character equity that
12   kicks in when there's extensive use of the character.
13      And I believe you explained to me earlier when
14   you were testifying about schedule B-12, for example,
15   that you assigned Neil a creator royalty for those
16   other appearances of Angela, because there was, quote,
17   "Extensive use of the character," and that Angela had
18   appeared on five or more pages, is that correct?
19         MS. EADS:  Object as to the form,
20    to the extent the entire first part of your
21    question was consistent of your own
22    interpretations of the contract.
23 Q Did you understand my question, Mr. Caven?
24 A Well, I understand the question to be almost to me a
25   hypothetical, because you're making a statement that I

164

1 haven't been provided that same information, that the
2 two, creator royalty and character equity, are the
3 same thing, so I was --
4 Q You don't have an opinion one way or the other on
5   that, is that correct?
6 A No, I do not have an opinion that character equity and
7   creator royalty are the same.
8 Q You don't have an interpretation one way or the other,
9   is that correct?
10 A I think that would be a legal interpretation and
11   that's beyond the scope of what I was asked to
12   provide.
13 Q Did Neil tell you anything about when creator royalty
14   applies?
15 A I'd have to recall notes, if we took those notes at
16   the meeting, but my understanding of the creator
17   royalty is when there is a character created within
18   the context of that comic book, the creator royalty
19   applied.
20 Q Only the sales of that comic book in which the
21   character was created or for all future appearances by
22   that character?
23         MS. EADS:  Objection as to form, to
24    the extent you're asking for a legal conclusion.
25 Q Go ahead and answer.

Deposition of JAMES P. CAVEN  9-17-02

165

1 A My understanding is that the creator royalty
2   terminated upon the exchange date and that the
3   extensive use or other appearances or publications in
4   which Neil did not write or author or participate in
5   the project, but the character was continued on.
6 Q Did the character have to be continued on on any
7   number of pages or just on one page?
8 A Under schedule B-12 and B-13 and B-14, we used the
9   threshold that it was to be on at least five pages.
10 Q And that's what you've defined as extensive use of the
11   character, correct?
12 A Correct.
13 Q Again, if you look at schedule B-8, you assert with
14   respect to Spawn paperback 6, which includes Spawn
15   number 26?
16 A Correct.
17 Q That Gaiman received a creator royalty as well as a
18   writer royalty, correct?
19 A Correct.
20 Q Is that because you concluded that for Spawn 26, the
21   issue itself, Gaiman gets both a creator royalty and a
22   writer royalty?
23 A Correct.
24 Q Look at schedule B-12.
25 A Got it.

166

1 Q You've only calculated a creator royalty for these
2   five issues of Spawn in which Angela appears, correct?
3 A No, we used the character equity provision.
4 Q But you've got it as a line item called creator's
5   royalty, correct, on B-12?
6 A We've used that word interchangeably.
7 Q That's what I was trying to get to earlier. So we
8   look at that and you don't have a writer's royalty,
9   because Neil did not write any of these comic books
10   that appear on schedule B-12, correct?
11 A Correct.
12 Q And you've chosen to opine that he has a creator's
13   royalty coming to him of $10,520.08 based on the sales
14   of these five comic book issues, correct?
15 A Correct.
16 Q And in your narrative report and earlier testimony,
17   you stated that that was because in these five Spawn
18   issues, Angela appeared on at least five pages and
19   that satisfied your definition of extensive use, is
20   that correct?
21 A Correct.
22 Q My question is this, would you agree with me that if
23   extensive use of the character as that term is used in
24   Exhibit 2 meant something other than appearing on five
25   pages, that it's possible that Mr. Gaiman might not be

167

1   entitled to any royalties on these issues?
2 A Under your hypothetical, you've changed all the
3   variables to a negative, so I would have to agree with
4   that.
5 Q Let's see if we can get a litter clearer. The only
6   variable I'm changing is I'm changing the definition
7   of extensive use.
8 A Correct.
9 Q It's no longer five issues, five pages, let's say it's
10   15 pages and it turns out that Angela doesn't appear
11   on 15 pages in these issues and I realize these are
12   speculations, but I'm asking you if that definition of
13   extensive use changes, is it possible that Mr. Gaiman
14   may not be entitled to any royalties?
15 A Well, it's the same answer, because as I said, you've
16   changed two variables. One is the threshold and one
17   is the variable of actually how many pages that they
18   actually appear, so based upon those two variable
19   changes, you've changed it to the negative. I have to
20   agree that it's possible because you've changed the
21   information.
22 Q When you look at Exhibit 2 and you see the phrase
23   character equity, and there's that provision that says
24   this activates in the event of, quote, extensive use
25   of character?

1 A Correct.
2 Q If I look at Exhibit 2, I see that extensive use of
3   character, each of those words is capitalized at the
4   start of that and it appears in quotes, is that
5   correct?
6 A Correct.
7 Q Does that appear to you to be some sort of a defined
8   term or typical of what you would see when someone is
9   trying to use a defined term, to put those terms
10   either in quotes or capital letters?
11         MS. EADS: Objection as to form.
12 A That would probably be more for a legal stylistic
13   approach, rather than a conclusion.
14 Q So perhaps a legal stylistic approach that would come
15   out of a contract, correct?
16 A Perhaps, I wouldn't have an opinion whether or not
17   that's correct.
18 Q If you look above on Exhibit 2, where Neil says, "I've
19   put together a set of figures which are based on the
20   basic DC deal," is it reasonable that perhaps the term
21   extensive use of character is something that's defined
22   in the basic DC deal?
23         MS. EADS: Objection as to form.
24 A It's hypothetical. Without having reviewed the DC
25   provisions that I can recall at this time to see

Deposition of JAMES P. CAVEN  9-17-02

169

1  whether or not that definition was in there, I can't
2  answer that.
3  Q Would it have been professionally appropriate, in your
4  opinion, when you say what appears to be a defined
5  term, it's the only place that I see where capital
6  letters are used and quotes are used and elsewhere in
7  the agreement, there's reference to a different
8  contract.
9  Do you believe it would have been professionally
10  necessary for you to verify what that term meant or to
11  see if that term actually appeared and was defined in
12  the contract that's referenced above?
13  MS. EADS: Counsel, in the first
14  place, you've misrepresented the document. There
15  are a great many capital letters in there such as
16  gross, net, motion pictures, audiovisual, stage
17  plays, et cetera, et cetera, so I object as to
18  form. You can answer the question and I'd like a
19  break before we head into this last hour.
20  A Only to the extent that it would have necessitated a
21  legal conclusion and I'm not rendering a legal
22  conclusion on the definition of extensive use.
23  Q You did come up with a definition of extensive use,
24  didn't you, though?
25  A As I defined it in our report.

170

1  Q And you did that based on what Neil told you, right?
2  A And his counsel.
3  Q And his counsel, but you didn't bother to look at the
4  DC Comics contract that Neil says these figures were
5  all based on, correct?
6  MS. EADS: Objection as to form and
7  to tone, by the way.
8  A I may have looked at it, but relied on Neil and his
9  counsel for its interpretation.
10  MR. SALSICH: Fair enough, let's
11  take a break.
12  (A short recess is taken)
13  (Mr. Smith takes the place of Ms. Carter)
14  Q A couple of quick questions, Mr. Caven, and I
15  appreciate your patience with us today. I know it's
16  been long, but I don't think we have a great deal left
17  to cover. You have a lot of pages of schedules and a
18  lot of detail in your reports and we just want to make
19  sure that we understand the opinions you're going to
20  offer at trial.
21  So again, I appreciate your patience in working
22  with us on this. I'd like to ask you another question
23  about schedule B-12, do you have that in front of you?
24  A Yes.
25  Q For your note 2, it appears that you've made an

171

1  assumption on estimate of the units sold for Spawn
2  issue number 100, correct?
3  A Correct.
4  Q Can you explain how you came up with that number of
5  units sold?
6  A Well, it's based on a print run of 223,792.
7  Q Okay.
8  A And the only way we had total print run and actual
9  units sold collectively together on any issue is we
10  used the Spawn 9 ratio of units printed versus units
11  sold.
12  Q Now, you had information about the print run of Spawn
13  number 100 in November of 2000, but you didn't yet
14  have information on how many units were actually sold,
15  correct?
16  A Correct.
17  Q And the only other issue that you had a print run to
18  units sold ratio was for Spawn issue 9, is that right?
19  A That's what my footnote says, yes.
20  Q Well, I don't read your footnote saying that that's
21  the only other issue, it just tells me that that's the
22  issue you chose. Do you have print run information on
23  other issues?
24  A Not that I'm aware of, without having to go back to
25  all the documents, but because we got 134 so late --

172

1  Q Let's test that. Take a look, if you would, at your
2  schedule B-9.
3  A Yes.
4  Q You have units sold of 138,000 -- excuse me, I'm
5  sorry, units sold for Exhibit Number 134 of 253,007,
6  is that right?
7  A Correct.
8  Q Now, I'm sorry, I'm at the wrong place. Look at
9  schedule B-10, units sold, 234,283?
10  A Correct.
11  Q Did you get print run information on any of these
12  documents, any of these issues?
13  MS. EADS: Of what issues? Be more
14  specific.
15  MR. SALSICH: Curse of Spawn, 9, 10
16  or 11.
17  A I don't see in my current set of documents that I have
18  any print run information.
19  Q You know what, that's fine. I thought I had seen some
20  print run information and I guess I didn't.
21  A If we did, it may have been conflicting information.
22  Q That's fine, I just want to understand. So you took
23  the Spawn 9 ratio of print run to sales and applied
24  that to the issue 91 issues later, is that correct?
25  A Correct, because we may have -- now that I think about

Deposition of JAMES P. CAVEN   9-17-02

173

1   it, we may have received print run information on a
2   couple copies, but when we actually looked at it, the
3   one had a typo in it. Other information appeared to
4   be inconsistent with another quarterly statement, so
5   we just used the Spawn 9.
6   Q Did you have any indication that Spawn 100 had a
7   substantially higher print run than Spawn 97, 98 or
8   99?
9   A We did not have any information, I think, on 98 or 99
10  to know how much those total print runs were.
11  Q Would you expect that -- I'm going to test a
12  hypothesis here. Is it your opinion that it's
13  appropriate to use the Spawn 9 sales to print run
14  ratio for Spawn 100, would it be appropriate to use
15  the Spawn 9 print run to sales ratio for any other
16  sales that you don't have units sold for any other
17  issues?
18  A I think this is the only one that we didn't have
19  actual numbers coming from Image.
20  Q I'm just trying to ask you if your decision to use the
21  Spawn 9 print run to sales ratio was based on -- for
22  Spawn 100, excuse me, was based on an assumption that
23  it would be reasonable to expect a similar sales to
24  print run ratio for other Spawn issues, is that part
25  of your assumption?

174

1   A Based on the information we had, yes.
2   Q So would you agree with me that you would then expect
3   that Spawn 99, printed just two months prior to Spawn
4   100, would have a similar print run to sales ratio?
5   A It may or may not, not knowing the content, the
6   characters.
7   Q So would you agree with me that content and characters
8   and maybe other factors might affect print run to
9   sales ratio?
10  A It may, I just had to use the best information that
11  was made available to me and if I had to make some
12  sort of judgment that that was a reasonable
13  calculation.
14  Q Would another possible reasonable calculation be to
15  have averaged the sales of the three prior issues, 97,
16  98, and 99, which you had units sold information for
17  and which were published in the few months prior to
18  Spawn 100?
19  A I don't know if I had print run information for those.
20  Q No, but you had units sold information for those,
21  right, and you were trying to come up with a units
22  sold figure for Spawn 100, not a print run figure,
23  correct?
24  A But if I had actual units sold, why would I go back
25  and try to do a ratio.

175

1   Q My point is, you had units sold for 97, 98 and 99,
2   correct?
3   A Correct.
4   Q You don't have units sold for 100?
5   A Correct.
6   Q Would a reasonable method for estimating the units
7   sold for issue 100 have been to average the sales of
8   the three previous issues that were published in the
9   few months prior to the issue for which you do not
10  have sales?
11  A That's under the assumption that the print runs were
12  identical in the other three.
13  Q Well, I'm not talking about the print runs, I'm simply
14  asking if you don't have any print run information on
15  any of them, you simply have sales and you need to
16  estimate sales for the fourth one in a series, a
17  possible reasonable alternative method to the one that
18  you chose, would that have been simply to average the
19  actual units sold of the three previous issues to come
20  up with an estimate of units sold for the fourth
21  issue?
22  A It's a method, I don't know if I could classify it as
23  being a reasonable method.
24  Q But it would be an alternative that someone could use,
25  correct?

1   A It's mathematically feasible to use that calculation.
2   Q And it's also mathematically feasible, as you said, to
3   take a ratio, to have sales to print runs to an issue
4   91 issues earlier and apply it here, correct?
5   A That's also reasonable in my conclusions.
6   Q Schedule B-15.
7   A Yes.
8   Q You have just one note down there that you've made an
9   estimate because the information on Spawn foreign
10  printing is incomplete, and I'm not sure I understand
11  what your estimate is, how you've arrived at your
12  estimate. Could you explain that to me, please.
13  A If you go to B-16.
14  Q Okay.
15  A It calculated amount due of $33,967.60.
16  Q Okay.
17  A And those were foreign royalties on Angela and so what
18  we did was based on those royalties, domestic Angela
19  royalties, we took that ratio, so $33,000 divided by
20  $96,634, determined a ratio -- let's just use a third
21  for rounding purposes, and we multiplied the $76,713
22  by a third.
23  Q Okay. If I understand you correctly, you simply made
24  an assumption that the ratio of Angela royalties,
25  Angela domestic royalties to Angela foreign royalties,

Deposition of JAMES P. CAVEN   9-17-02

177

1    would be similar to the ratio of Spawn domestic
2    royalties to Spawn foreign royalties, correct?
3    A Correct.
4    Q Now, in the Angela royalties, both the foreign and
5    domestic, you've included a creator royalty in
6    addition to the writer royalty, correct?
7    A Correct.
8    Q And I know that you testified earlier that you also
9    included a creator royalty in the Spawn royalties for
10   Spawn 9 and Spawn 26 and the two Spawn trade
11   paperbacks in which those issues appear, correct?
12   A Correct.
13   Q My question is this, if the evidence shows that
14   creator royalties were not appropriate for the Spawn
15   issues, would you have to change your ratio or would
16   you still be able to use this same ratio that you used
17   here?
18       In other words, if for the Spawn 9 and the Spawn
19   26 and the two trade paperbacks, if Neil were only
20   entitled contractually to writer's royalties and not
21   creator's royalties, would you be able to use the same
22   ratio that you used in comparing Angela royalties to
23   Angela sales?
24   A Under your hypothetical, I would have to modify that
25   ratio.

178

1    Q And we talked at some length earlier, although we
2    didn't specifically look at these documents, about
3    schedules B-17, B-18, B-19 and B-20, which we should
4    use not in Exhibit 204, but Exhibit 205, and I just
5    want to make sure that I understand what's reflected
6    on schedules B-17, B-18, B-19 and B-20 as attachments
7    to Exhibit 205. Do you have those in front of you?
8    A Yes.
9    Q Let's look at B-17, and first, let me ask you this,
10   did you make the same basic calculation on all four of
11   these schedules?
12   A Yes.
13   Q And it's really two different methods of calculating
14   that you testified earlier, correct?
15   A Correct.
16   Q One is based on Neil's startup contract, is that
17   right?
18   A Correct.
19   Q And the other method is based on the 50/50 profit
20   split where Neil is sitting in the position of
21   Mr. McFarlane, is that correct?
22   A Correct.
23   Q Let me just ask you this question then, on each of
24   your calculations here, both the minimum and the
25   maximum, on schedule B-17?

179

1    A Yes.
2    Q You relied on the average units sold per issue figure
3    contained in Denis Kitchen's report, correct?
4    A Correct.
5    Q If Mr. Kitchen's estimates of units sold were
6    inaccurate, would you have to alter your calculations
7    as to the amounts due Mr. Gaiman?
8    A Yeah, they could be higher or they could be lower.
9    Q And I believe you answered this question for me
10   before, but if it turned out that the number of issues
11   anticipated in the one off, which you have as the last
12   line item here, was something other than four, than
13   that would also change your calculations, correct?
14   A Yes, that would change the calculations.
15   Q And that's the same for schedule B-18 -- I'm sorry,
16   not B-18, that's the same for schedule B-19, correct?
17   A That's correct.
18   Q And B-18 and B-20 are trade paperback calculations, so
19   there isn't an estimate of any more than one
20   publication, correct?
21   A I'm not sure I understand the question.
22   Q I mean for B-18, that's a trade paperback and so it's
23   only contemplated that there will be one publication,
24   correct, there's not going to be four trade
25   paperbacks?

180

1    A No, it was -- it's a collection of four comic books in
2    one trade paperback.
3    Q And that's the same for B-20 as well, correct?
4    A Correct.
5    Q For B-18, B-19 and B-20, the initial estimated units
6    sold is entirely dependant on Denis Kitchen's
7    calculations, correct?
8    A Repeat the question.
9    Q On schedule B-18, B-19 and B-20, the estimated units
10   sold, the first line item on each of those schedules,
11   that figure is based entirely on Denis Kitchen's
12   expert report, correct?
13   A Correct.
14   Q Could you look at schedule C-2, do you have that in
15   front of you?
16   A Yes.
17   Q Can you explain your calculations in schedule C-2?
18   A I took the HBO revenue for Spawn video number one and
19   took a number of speaking roles, which I think there
20   were ten, per the worksheet we got off -- I don't know
21   if it was the internet, but there was a source
22   document that I had viewed that there was ten speaking
23   roles within the context of that video, so we took a
24   proration of the HBO media payments and then applied
25   the 15 percent royalty.

Deposition of JAMES P. CAVEN  9-17-02

181

1   Q Where did you get the payment from HBO?
2   A It's a royalty statement, 01542.
3   Q Do you have that document with you?
4   A Yes.
5   Q I thought I had that, but I don't appear to have that
6     in front of me, but I think I'm familiar with it. Let
7     me ask you a question about it. Does it identify that
8     that's a payment for videotape number one totally?
9   A It says HBO video Spawn royalty statement number 10
10     through December of '99.
11   Q And how does it describe the product?
12   A It doesn't describe it any further than that.
13   Q It's your understanding that that's Spawn video number
14     one, correct?
15   A That's my understanding, yes.
16   Q And what do you base that understanding on?
17   A Just in our requests for documentation with respect to
18     the HBO, this was what was provided to us.
19   Q And Spawn video number one, let me ask you to assume a
20     couple of facts for me, which I believe the evidence
21     will bear out. If the evidence is that Spawn video
22     number one is a collection on videotape of the first
23     series -- excuse me, the first season of the Spawn
24     video HBO miniseries -- strike that. Let's start
25     over.

182

1       Assume for me that Spawn video number one is a
2     videotape collection of the first season of the Spawn
3     HBO series, okay?
4   A Okay.
5   Q And I believe interrogatory answers and the document
6     production will bear this out, and then the evidence
7     is that that first season consisted of six episodes,
8     all right?
9   A Okay.
10   Q And Angela appeared only in one of those episodes and
11     in that episode in which Angela appeared, there were
12     ten speaking roles, okay?
13   A I understand.
14   Q Wouldn't you have to make one further calculation in
15     your amount due on schedule C-2 with that additional
16     bit of information?
17   A Under that hypothetical, yes, I'd have to consider
18     that.
19   Q And how would you apply that additional bit of
20     information?
21   A Well, you've actually created it to be ten speaking
22     roles in one video, which is a one-sixth, if that's
23     the total number of speaking roles in every video, but
24     you'd have to make some sort of proration there that
25     the total royalty paid by HBO would reflect the number

183

1     of speaking parts in aggregate and what Angela was in.
2   Q Well, I think it might be easier to do this, we don't
3     know how many -- let's assume that we don't know in
4     the second episode, the fourth episode, there might be
5     four speaking roles, there might be 40, but in the
6     episode in which Angela appears, there are ten, but
7     that that episode is only one issue out of six.
8       And my question is, wouldn't you have to take
9     first the payment from HBO, $347,000 and divide that
10     by six to arrive at the payment from HBO for the
11     episode in which Angela appeared?
12       MS. EADS: Objection as to form.
13     Counsel, I want you to know that we are planning
14     on leaving at 6:00, so you might want to leave
15     some time for your co-counsel.
16   Q You can answer the question, Mr. Caven.
17       MS. EADS: Do you have any idea
18     what he's talking about?
19   A I think what you're trying to say is that you're
20     trying to prorate each video having equal royalty.
21   Q Well, we only have a royalty statement for the entire
22     videotape, the videotape it is consists of six
23     episodes and Angela appears only in one of those
24     episodes.
25   A Right, is each episode equal --
1   Q Each episode is an equal amount of time, because they
2     originally aired in a 30-minute or half an hour show
3     on HBO.
4       MS. EADS: Counsel, that's an
5     argument you can make at trial.
6       MR. SMITH: He's got to have a
7     right to question the witness on it.
8       MR. SIMMONS: Pete, just to clarify
9     under your hypothetical -- this is Jeff, are you
10     saying that there would be hypothetically 60
11     speaking roles in the entire video?
12       MR. SALSICH: No, maybe that's
13     where we're getting confused.
14       MR. SIMMONS: Because it's one
15     videotape with six episodes, but there may or may
16     not be -- you know, there's ten, there might be
17     ten speaking roles in the one episode, but those
18     same ten speaking roles may also be in all the
19     other episodes as well.
20       MR. SALSICH: Under my
21     hypothetical, Jeff, at least one of those speaking
22     roles doesn't appear in the other five issues and
23     that's Angela, so I think the speaking roles can
24     be easily divided by episode based on how HBO
25     originally aired the program.

Deposition of JAMES P. CAVEN   9-17-02

185

1      The videotape is a collection of
2   the first six episodes and Angela appears in only
3   one of those episodes.
4 Q So I'm asking you, Mr. Caven, under that hypothetical,
5   if it wouldn't be appropriate to take the payment from
6   HBO for the entire videotape and first divide it by
7   six in order to determine the payment from HBO on the
8   episode in which Angela appeared.
9 A Yes, you could prorate it based on the number of
10   episodes and then apply the number of speaking roles
11   within that particular video. You could aggregate all
12   of the speaking roles in all six videos and take a
13   proration of one by the aggregate.
14 Q So you could do either of those two methods and come
15   to an amount due under that hypothetical, correct?
16 A Under that hypothetical, yes.
17 Q Mr. Caven, I really just have one more question or one
18   more area of inquiry. Would you take a look for me
19   at -- and I want you to flip through these briefly on
20   schedules A-1 -- basically A-1 through A-13, not every
21   single one of them in there, but that's basically the
22   group. Just have those at hand.
23 A Okay.
24 Q I'm asking really a group of questions based on your
25   observation of all of the schedules, so follow along

186

1   with me, if you would. Schedule A-1, you have a
2   column entitled, "Memo only per royalty report through
3   7/31/97," correct?
4 A Correct.
5 Q And it's my understanding that that reflects the
6   royalty report and payment sent by Todd McFarlane
7   Productions to Neil Gaiman at the end of July or early
8   August of 1997, correct?
9 A Correct, with respect to the toys.
10 Q And schedule A-2 has a similar column and also
11   reflects the royalty calculations and payments made by
12   McFarlane, Todd McFarlane Productions in August of
13   1997 for the Medieval Spawn figures, correct?
14 A Correct.
15 Q And the same with A-3, it has a similar memo only per
16   royalty report, correct?
17 A Correct.
18 Q So does A-5 for the Spawn Angela poster, correct?
19 A Correct.
20 Q And A-6 for Angela poster?
21 A Correct.
22 Q A-9 for trading cards has a similar memo only per
23   royalty report reflecting Todd McFarlane Productions
24   calculations of royalties due and payments made in
25   August of 1997?

187

1 A Correct.
2 Q And that's the same with A-10?
3         MS. EADS: Through 13.
4 Q A-11, A-12 and A-13, that's correct?
5 A Correct.
6 Q Would you agree with me that in every single one of
7   those schedules we've just discussed, Todd McFarlane
8   Productions calculated the royalties due to Neil
9   Gaiman for these various products differently than you
10   calculated them based on the alleged 1997 contract set
11   forth in Exhibit 2?
12 A Correct.
13 Q And Exhibit 2 the alleged 1997 contract, and in fact,
14   the four letters that you've testified that Neil
15   Gaiman has told you comprise the 1997 contract?
16         MS. EADS: Objection as to form.
17 Q The latest of those letters was dated July 15, 1997,
18   correct?
19         MS. EADS: We never did get the
20   fourth one, so I don't know what date.
21 A We've allegedly only marked 2, 19 and 20 as being
22   three of the four.
23         MR. SMITH: I have the fourth,
24   Pete, if you want.
25 Q I realize we didn't find one, but if we look at page 3

188

1   of your Exhibit 203 and you identify the four letters,
2   you also have July 15, 1997 as the last of the four
3   pieces of correspondence, correct?
4 A That's correct, and observing it over the opposing
5   counsel's shoulder, yes, that's the date.
6 Q The next sentence on page 3 of Exhibit 203, the
7   agreement reached as of July 15, 1997 provided, et
8   cetera, et cetera, correct?
9 A That's correct, I was only flipping through the three
10   pages.
11 Q So it's your testimony and your opinions are based
12   upon an assumption that an agreement was in fact
13   reached between Neil and Todd on July 15 of 1997,
14   correct?
15 A Correct.
16 Q And yet you would agree with me that as of early
17   August of 1997, two to three weeks later than July 15,
18   1997, Todd McFarlane has calculated on numerous
19   examples royalties based on an entirely different set
20   of terms, would that be correct?
21 A I don't know if it's an entirely new set of terms.
22 Q Well, at least with respect to the royalty rates, it's
23   different on almost every single one of those
24   schedules, is that not correct?
25 A Correct, I think there's an assumption from Todd that

Deposition of JAMES P. CAVEN  9-17-02

189

1  he's a co-creator and therefore splits the creator
2  royalty rate in half.
3  Q He does that, he actually does some different things,
4  too, on A-10, he adds a factor for weight of
5  characters against main character, does he not?
6  A That's correct, on A-10 there is a difference for a
7  weighting, on A-11, the same weighting.
8  Q And so my question is simply this, does it appear to
9  you in observing the correspondence from Mr. McFarlane
10  and the royalty calculations from Mr. McFarlane in
11  August of 1997 that he understood things differently
12  than Neil Gaiman regarding the amount and calculation
13  of royalties that Mr. Gaiman was entitled to?
14           MS. EADS: Objection to form,
15      there's no foundation for that question.
16  Q I'm just asking how it appears to you.
17  A I don't know to his understanding as much as what he
18  did.
19  Q Does it appear on the face of the document you
20  reviewed and you included in your schedule that
21  Mr. McFarlane or Todd McFarlane Productions calculated
22  the royalties differently than you interpret Exhibit 2
23  to require?
24  A Yes, he applied them differently.
25           MS. EADS: Okay, 15 minutes left.

190

1           MR. SALSICH: Do you want to talk
2      about a debate?
3           MS. EADS: Yes.
4           MR. SALSICH: Scott's, it's with
5      great pleasure that I turn the questioning over to
6      you right now.
7           MR. FELDMANN: I'll do my best to
8      finish within the next 15, if we can we can and if
9      not, then we'll take it up later.
10              EXAMINATION
11  BY MR. FELDMANN:
12  Q Mr. Caven, I represent Image Comics and I appreciate
13  your patience. You testified earlier that you did
14  have some work left to do, you mentioned the
15  deposition transcripts and so forth. Do you have
16  any -- and that as a result of that review, you might
17  make some adjustments to your findings in your expert
18  report, is that correct?
19  A Yes, based upon what I read out of those depositions.
20  Q Other than that, do you have any specific analysis in
21  mind that you've been tasked to do, but you've not yet
22  done?
23  A Well, the analysis would be specifically to look at
24  Mr. Klingele's report, provide any analysis and
25  rebuttal or supplemental report to that report that

191

1  he's provided.
2  Q Very good. Other than the supplemental rebuttal
3  analysis and reviewing deposition transcripts and
4  making any adjustments as a result of that, is there
5  any other specific analysis that you presently have in
6  mind that remains to be done?
7  A No, not that I'm aware of.
8  Q Do you have any work to do with respect to any other
9  causes of action that are not reflected in your expert
10  report and supplemental report?
11  A Well, now that we have determined that the $45,000 use
12  of name should be really reflected as a separate cause
13  of action, that will be segregated or supplemented via
14  my report.
15  Q But --
16  A Or to the extent that because now we have
17  distinguished between the analysis that if there is a
18  contract or there isn't a contract, I don't know if
19  there's analysis or at least discussion within the
20  context of the framework of how you would go about
21  determining profits, if that's to be part of my
22  testimony or not. We have not described or detailed
23  whether or not it would be part of that at this time.
24  Q Well, we'll get to the publicity issue in a moment,
25  but other than with respect to that claim, is there

1  any analysis that you've been tasked to do with
2  respect to any other new claims or causes of action
3  that you've not yet done?
4  A Not that I'm aware of.
5  Q For example, have you been tasked to do any analysis
6  on an unjust enrichment plan?
7  A I've not been made aware of that cause of action
8  issue.
9  Q How about false advertising?
10  A No, I've not been made aware of any work to be done on
11  that issue.
12  Q How about Lanham trademark infringement, also known as
13  reverse passing off?
14  A No, I've not been asked to do any work on that issue.
15  Q Do you expect to do any work and present any testimony
16  with respect to that last cause of action?
17  A Counsel and I have not discussed that issue at this
18  time.
19  Q Same question with respect to false advertising.
20  A I don't know, because I've not discussed that issue
21  with counsel.
22  Q Sitting here today, you don't intend to testify on
23  either the false advertising or Lanham claims, do you?
24  A I haven't been asked at this point to comment on
25  those, so I don't know what counsel has in mind on

Deposition of JAMES P. CAVEN  9-17-02

193

1  those issues.
2  Q You've done no analysis with respect to those two
3    claims?
4  A Correct.
5  Q Now, turning your attention now back to the right of
6    publicity claim, and if you would please turn your
7    attention to Exhibit 203, on page 11, you reference
8    this document, G05356-05361?
9  A Correct.
10 Q For the record, I don't believe that document has been
11   produced to Image Comics. Co-defense counsel has
12   given me a brief description of it. Is there any
13   other basis for the right of publicity analysis that
14   you've done, other than that document that's been
15   identified?
16 A Sorry for the pause, we're looking for the document.
17 Q It's the Big Entertainment, Inc.
18 A I understand, we just have several piles of paper in
19   front of us and it may have --
20       MS. EADS: It was produced.
21       MR. SMITH: Has it been marked as
22   an exhibit? I haven't been here, so I wouldn't
23   know.
24       MS. EADS: Yes, it was marked as an
25   exhibit, I'm pretty sure.

194

1       MR. SALSICH: I don't believe it
2    was actually marked as an exhibit, no, that was
3    the royalty agreement that we marked. Let's make
4    that 207.
5       (Exhibit 207 is marked for identification)
6       MR. FELDMANN: Then we're on an
7    even playing field.
8       MR. SMITH: I've handed 207 to the
9    witness.
10 Q In fact, Mr. Caven, my question is other than that
11   document, is there anything else other than your
12   discussions with Mr. Gaiman and his counsel that forms
13   the basis of the damages analysis you did on the use
14   of name claim?
15 A No other additional analysis, other than in discussion
16   with counsel and Mr. Gaiman that this was an instance
17   in which he had used his name, but in fact, I think I
18   did talk about this with Mr. Kitchen, now that I
19   recall, and Mr. Martens.
20   And not to the actual amount, but if that is
21   something that is done within the context of the
22   industry and it is my understanding, yes, there is
23   some sort of advance that can be paid to a major
24   author for lending their name.
25 Q Let's take those in order, since you referenced two

195

1    gentlemen. What specifically did Mr. Kitchen tell
2    you?
3  A I think he only related, as well as Mr. Martens,
4    specific instances in which, in their experience, they
5    have been approached by a particular publisher to
6    revive or use a particular author and character within
7    the context of not doing any work on the project, but
8    at least lending their name to the project.
9  Q Well, I'd like you for now to exclude any comments you
10   may have with respect to Mr. Martens, just
11   Mr. Kitchen. Is your testimony still the same just
12   with respect to Mr. Kitchen, your last answer?
13 A Yes.
14 Q Would it surprise you to learn that Mr. Kitchen has
15   testified that this is an unprecedented situation for
16   him in discussing a hypothetical where an artist's
17   name was used without permission on a trade paperback,
18   and would that change your analysis to learn that
19   Mr. Kitchen was unaware of any situation where that
20   has occurred before?
21 A I think I was answering it in the form of not the
22   hypothetical where somebody's name was used without
23   permission, I think it was within the context that if
24   somebody came and asked him for permission to use
25   somebody's name with a project that there is some sort

196

1    of negotiation between that publisher and the author.
2  Q Well, if Mr. Kitchen were to testify that or to tell
3    you that he's unaware of that ever occurring in the
4    past, would that change the basis for your opinion
5    that plaintiffs are due $45,000 for use of their name
6    on the Angela trade paperback?
7       MS. EADS: Objection as to form.
8    When you said that, you didn't define it and we
9    don't know which that you're talking about.
10       THE WITNESS: Can you read back the
11   question?
12       (Reporter reads back previous question)
13 A Once again, I'm not clear when you say Mr. Kitchen
14   will testify to that.
15 Q That he's unaware of any deal where an artist or
16   author has been paid solely for use of his name for a
17   trade paperback.
18       MS. EADS: Objection as to form.
19 A No, because this would really be specific to Neil,
20   because Neil would be the one that would have
21   negotiated any sort of particular advance or royalty
22   for that particular use of his name, so whether
23   Mr. Kitchen would testify that he is unaware, that
24   would be not something that would influence my
25   decision, because Mr. Gaiman actually effectuated that

Deposition of JAMES P. CAVEN  9-17-02

197

1 transaction back in 1993.
2 Q You're referring to forming an alleged contract?
3 A I'm not sure I understand the question, I'm sorry.
4 Q I'll withdraw that one. Let me just ask with respect
5   to your conversations with Mr. Martens, would your
6   answer be the same as well?
7         MS. EADS: Objection as to form,
8       answer to what?
9 Q I'll be happy to just restate it. If Mr. Martens were
10   to tell you that he was unaware of any deals in the
11   comic book industry where an author had negotiated to
12   be paid solely for the use of his name on a trade
13   paperback, would that change your opinion as to the
14   value of the use of name claim?
15 A No, because really, the sole reliance that I'm placing
16   on it is the fact that Neil has already, in his
17   opinion, negotiated a transaction which reflected the
18   use of his name within the context of that deal and I
19   think it would be really specific to an author such as
20   Neil, Neil's stature and background, which may be
21   different than other authors, solely because of his
22   popularity.
23 Q You're referring to 207, is that right, the Big
24   contract?
25 A Correct.

198

1 Q Now, with respect to that, you mentioned that he was
2   paid for brainstorming, some sketches and use of his
3   name, is that correct?
4 A That's my understanding.
5 Q Do you know if those sketches were written?
6 A Can you be more specific?
7 Q You stated that he came up with 12 sketches and your
8   understanding is that six of them were used, my
9   question to you is, did he deliver something written
10   to the other party in the Big deal?
11 A I didn't ask if he had submitted those in writing to
12   the other party in the context of the negotiations, I
13   don't know what was delivered.
14 Q And if I heard you correctly at first, you testified
15   that he was entitled to $45,000 plus eight percent of
16   the royalties and then later, that it was simply an
17   advance, the $45,000 was simply an advance on an eight
18   percent royalty, is that latter statement an accurate
19   description of the terms of the Big deal?
20         MS. EADS: Objection as to form. I
21       think you've mischaracterized his testimony and I
22       realize that you're at a disadvantage and you
23       can't actually see the contract.
24 A You don't have the contract in front of you, I'll just
25   clarify it, whether or not there was ambiguity in the

199

1 earlier testimony and subsequent testimony. With the
2   document in front of us being 207, it is an advance of
3   $45,000 which then is applied against a royalty rate
4   of eight percent and one percent.
5 Q And the one percent is on what?
6 A Guest appearance character or a secondary character.
7 Q Now, in your analysis, did you separate a breakout
8   between the use of Neil's name and the value of his
9   sketches?
10 A No, I did not.
11 Q Do you have an opinion as to what the value was of the
12   sketches that he submitted?
13 A Only under the reliance of Neil's conclusions that
14   these sketches were worth very little, if nothing,
15   because really, he thought the majority, if not all
16   they wanted from him, was the use of his name.
17 Q Well, correct me if I'm wrong then, would it be fair
18   to state that your opinion rests upon an assumption
19   that the value of those sketches was zero percent?
20 A Yes.
21 Q Now, under the terms of 207, if Neil was fully paid
22   all of his royalties, then he wouldn't be due anything
23   else for the use of his name, is that correct?
24         MS. EADS: Objection as to form.
25         THE WITNESS: Can you read back the

200

1   question.
2         (Reporter reads back previous question)
3 A I think the character of the contract was that if he
4   was paid royalties, that was reflecting the use of his
5   name under the assumption that the sketches were worth
6   zero.
7 Q Right, and so the $45,000 simply is a minimum royalty
8   on a pay out scheme where he's paid based on
9   royalties, is that right?
10 A Correct, if he received total royalties of $100,000
11   from that particular project, you know, and there's no
12   value ascribed to the sketches, his total use of the
13   name would have been $100,000.
14 Q Now, I think you also pointed out an adjustment you
15   wanted to make to your report stating that the $45,000
16   was an alternative, noncontract measure, is that
17   accurate?
18 A Correct.
19 Q So in effect, as I understand it, if there was a
20   contract formed between Todd and Neil, then the proper
21   measure of damages is the royalty rate reflected in
22   the schedule, and if there wasn't, then the proper
23   measure is the $45,000 for use of his name, is that
24   right?
25         MS. EADS: Objection as to form.

Deposition of JAMES P. CAVEN   9-17-02

201

1  A Essentially, yes, that's what's going to be within our
2    revisions.
3  Q So there's not going to be any double recovery,
4    correct?
5  A Correct.
6  Q Now, why in your professional opinion is the eight
7    percent royalty rate in 207 a reasonable one?
8              MS. EADS: Objection as to form, I
9        don't think this witness ever testified it was.
10 Q Well, I'll be happy to back up. Mr. Caven, do you
11   believe that the eight percent royalty rate reflected
12   in 207 is a reasonable one?
13 A I haven't done any research to know whether or not
14   this eight percent is a reasonable royalty, other than
15   to know that in licensing on foreign particular
16   projects, that eight percent royalty, seven percent
17   royalty is within the range, but I have not done any
18   research to determine eight percent is reasonable.
19   All I know is that the advance payment was the advance
20   payment for this project.
21 Q Well, turning your attention to Exhibit 204, the
22   schedules, your schedule B-1 and onwards, I believe,
23   assume a four percent royalty rate, is that correct,
24   if one gets a -- sells over 100,000 copies?
25 A Yes, to the extent that they are the writer and the

202

1    creator, there's a four percent royalty.
2  Q So sitting here today, with the testimony being that
3    the value of the sketches is zero and the royalty rate
4    is eight percent, versus four percent for being the
5    writer and creator used in your own analysis, would
6    you agree that the eight percent rate reflected in
7    Exhibit 207 is on the high side?
8              MS. EADS: Objection as to form.
9  A I don't know if it's on the high side, because there
10   is risk of a project not meeting his standards and
11   since he cannot control the final output of the writer
12   and creator characters, it may be within the relative
13   range, given the risk of his name being lent to that
14   particular project.
15 Q What percentage of the time that you spent in this
16   engagement has been spent on the use of name claim?
17 A I couldn't gave you a breakdown.
18 Q Well, would it be more than 20 percent?
19 A No.
20 Q Would it be more than ten percent?
21 A Probably somewhere between five and ten percent.
22 Q Now, why did you have any conversations with Michael
23   Martens at Dark Horse?
24 A Just as another industry resource person, given that
25   their company is somewhat equal to Image, as I

203

1    understand it from him, Image and Dark Horse are
2    roughly three and four or four and three, depending on
3    what day you talk to them, to gain more understanding
4    of crossover projects, splitting of profits,
5    collaboration.
6  Q Who suggested that you speak with Mr. Martens?
7  A I think it was kind of a collaboration of counsel. I
8    think in one conversation with Mr. Kitchen when I
9    approached him on this issue, he had mentioned Dark
10   Horse being a similar competitor to Image and maybe
11   that they would have information with respect to this
12   issue.
13 Q Did you tell Mr. Martens why you were speaking with
14   him, the purpose of your discussions?
15 A Yes.
16 Q So he was aware of the fact that Image Comics is a
17   defendant in this lawsuit?
18             MS. EADS: Objection as to form.
19 A I didn't recall whether or not we spoke of all
20   defendants and what his knowledge of all defendants
21   were in this particular litigation.
22 Q Do you recall Image Comics' name ever being mentioned
23   in any of your discussions with Mr. Martens?
24 A As being a defendant?
25 Q Just being mentioned.

204

1  A Well, I think we mentioned Image only from the
2    standpoint that Image is where these particular comics
3    were published for the Spawn and Angela projects and
4    that Todd had used Image, and I think it was pretty
5    well known in the industry who does what work, but I
6    don't think there was anything specifically discussed
7    about Image's role in this lawsuit.
8  Q Just for clarification, would it be true that you have
9    not formed any opinions as to any damages allegedly
10   claimed by plaintiffs for not using Mr. Gaiman's name
11   on a publication, is that true?
12             THE WITNESS: Can you read back the
13       question.
14       (Reporter reads back previous question)
15 Q And since there's a double negative there, I'll just
16   rephrase it.
17 A Thank you, it's been a long day.
18 Q Mr. Caven, have you formed any opinion as to any
19   damages sustained by plaintiffs for not using
20   Mr. Gaiman's name on a publication?
21 A Yes.
22 Q And again, I'm referring to not using his name. What
23   is the amount?
24 A Oh, I'm sorry.
25 Q Did you want to clarify your answer?

Deposition of JAMES P. CAVEN   9-17-02

205

1  A Yes, I would clarify the answer, because it is --
2          MS. EADS:  It's been a very long
3      day.
4  A And it's still a double negative, so to speak.
5  Q My apologies on that.  With respect to not using
6      Mr. Gaiman's name on a publication, have you formed an
7      opinion as to any damages that would be due to
8      plaintiffs?
9  A I'm not aware that there has been that circumstance
10     and have not calculated a damage accordingly.
11 Q So you could not identify any publications, for
12     example, that might support the basis of any opinion,
13     is that right?
14 A That's correct.
15 Q Mr. Caven, you said that you relied upon 207, did you
16     look at any other documents?  I understand that you're
17     relying solely upon 207, Mr. Gaiman and his counsel's
18     statement to you, but did you look at any other
19     documents in coming to an assessment of the value of a
20     right of publicity claim?
21 A No, I did not look at any other documents, because I
22     was told that there weren't any other documents that
23     existed that Neil had entered into.
24 Q And sitting here today, you're not aware of any other
25     documents that would be relevant to forming that

206

1      opinion, is that right?
2  A That's correct.
3  Q And coming up with the $45,000 claim, you have not
4      distinguished at all between plaintiffs' statutory and
5      common-law causes of action, is that right?
6          MS. EADS:  Objection as to form.
7  A Your question sounds more legal conclusions than
8      accounting or economic conclusions, so.
9  Q I just want to make sure there's only one claim out
10     there for use of Mr. Gaiman's name.  As far as you
11     know, there's only one claim for damages and that's
12     $45,000, is that correct?
13 A Correct.
14         MR. FELDMANN:  Thank you very much
15     for your patience.  That concludes my questioning.
16         MS. EADS:  Thank you.
17         MR. SALSICH:  I have nothing
18     further to add.  I'm all finished.
19             (6:10 p.m.)
20
21
22
23
24
25

207

1          STATE OF WISCONSIN          COUNTY OF DANE
2      I, NANCY L. DELANEY, a Notary Public commissioned
3  and qualified in and for the State of Wisconsin, do
4  hereby certify that there came before me on September 17,
5  2002, at the offices of LaFollette, Godfrey & Kahn,
6  Attorneys at Law, One East Main Street, Madison,
7  Wisconsin, the following named person, to wit:  JAMES P.
8  CAVEN, who was by me duly sworn to testify to the truth
9  and nothing but the truth of knowledge touching and
10 concerning the matters in controversy in this cause; that
11 the witness was thereupon carefully examined under oath;
12 that said examination was taken in shorthand by me and
13 reduced to writing using computer-aided transcription;
14 that said deposition is a true record of the testimony
15 given by the witness; that the witness has not waived
16 reading and signing.  I further certify that I am neither
17 attorney or counsel for, nor related to or employed by,
18 any of the parties to the action in which this deposition
19 is taken, and further that I am not a relative or
20 employee of any attorney or counsel employed by the
21 parties or financially interested in the action.
22     In witness whereof I have hereunto set my hand and
23 affixed my notarial seal September 19, 2002.
24 My commission expires:
25             Notary Public, State of Wisconsin

SPAWN 9.

•••

Todd – the idea with the stuff I've done here in italics – the 'Hunting Manual'– is that we drop it in through the first Nine pages, with all the Olden Days Spawn and Angela stuff – a little bit here, a little bit there, so it counterpoints the meeting, the couple riding through the forest, the cave, and the fight. The language is intentionally slightly harder than some of your readers may feel comfortable with, but I wanted to give the impression we're dealing with a hunting manual, or an instruction manual of some kind, which is going to use its share of $2 words.

cap: *HELLSPAWN:*

cap: *Identification: The livery of Hell (see illustrations pages 1131-1150 for basic design and variants) is a sentient carapace, which covers the Hellspawn. Many Hellspawn are shapeshifters.*

cap: *Characteristics: In this manual we shall address only Hellspawn in the Worlds of the Living. Hellspawn in the Realms Beyond are not Game, and cannot be hunted unless and until a formal condition of War has been declared. Caution is always advised.*

cap: *Those Hellspawn in the Living Worlds are, however, fair game. They are the officer material that Malebolgia considers may prove worthy of high rank in The War To Come. Its usual technique is to consign them to Earth with a high, although limited, supply of power.*

cap: *Hunting Methods:*

cap: *Young Hellspawn make the best sport.*

cap: *Firstly, they are often time-disoriented, having been kept in Stasis fields for five to ten years. Our opponent has found that releasing them into what is, for them, their near future, obliterates and confuses family and emotional connections.*

cap: *The young hellspawn are often confused and emotional, and respond to 'good' or 'noble' impulses as easily – or more easily – than they do to 'evil'. This tendency can be exploited by any experienced hunter.*

cap: *Secondly, and more importantly, the young hellspawn has learned nothing about the harnessing and control of its abilities – some of which, particularly those concerning transmutation and reality adjustment, it may never fully learn or control. It is a thing of raw, but unfocussed power, and an intelligent hunter can turn this to advantage.*

cap: *As Hellspawn get older they also get wilier and more ruthless. They also become much more careful of power expenditure, something with which young Spawn are rash and reckless.*

cap: *Thirdly, by destroying Hellspawn young, a hunter is performing a valuable service. Each Hellspawn is a potential officer in the army of Hell. The discovery and empowering of a Hellspawn takes much energy and time on the part of the Malebolgia: thus far it has not created more than one in 50 years, and usually not more than one a century.*

cap: *At the point where its power reservoir is exhausted the Earthbound Hellspawn return to the Ninth Level. At this point they face the Ordeal of the Dark Carcass. Those who pass become*

G00425



Spawn 9 -- draft Script for Todd.
Page 2

officers in the Army of Hell. Those who fail become food for the soldiers of Hell. Either way, the power of the Maleboige has increased.

cap:   Some older Hellspawn can become quite desperate when they realise what waits for them at the point of power depletion, and will go through quite remarkable efforts to avoid battle or any further depletion of energy.

cap:   *Hunting Methods:*

cap:   Only a hunter with plenty of time on her hands, a full arsenal, and a willingness to undergo a potentially lengthy period of hardship and discomfort should even consider hunting Hellspawn.

cap:   Hellspawn hunting is unlike other methods of Hunting.

cap:   Stalking a Hellspawn is advisable. Learn its habits. The Hellspawn when roused are rapid and tireless.

cap:   It is wise to Decoy a Spawn, by diverting its attention.

cap:   A first hard strike will often take a Spawn out.

cap:   Caution: in many young Hellspawn, the carapace is more wily and vicious than the occupant. This must always be guarded against.

cap:   WEAPONRY: A multitude of weapons can be used to weaken and goad the creature: needlebands, shiver-shivs, scarabands, stoners, mutileers, and morningstars, amongst others, according to the hunter's own preferences. (See part XIII "WEAPONRY" , chapters 97-104)

cap:   However, the most important weapon, and that without which hunting Spawn is not only foolish, but pointless, and virtually suicidal, is the Lance.

cap:   The Hellspawn's Carapace  sets up interference that will prevent the Lance from activating. It needs to be close in to the Hellspawn before being activated.

cap:   Once activated it sets up a dimensional resonance that will lance the Hellspawn from this level of existence like pus from a boil.

cap:   If the Carapace is left behind at this point, it will be in a weakened condition, and easily terminated.

cap:   Then all you need to do is take your trophy back, and bask in the praise and admiration of your follow hunters.

..................

SPAWN 9


"ANGELA"

Page 1


G00426

Spawn 9 — draft Script for Todd.
Page 3

It's 800 years ago, in the middle of a forest.

We start by looking at a beautiful woman. Her clothes are ripped and torn. She's scratched up. She was wearing something like a gown and peasant clothes. This is Angela, in disguise.

Angela:        Mercy! Help me!

              For the love of god, will no-one come? Will no-one save us?

Angela: Please... Help me...

Spawn rides up on a huge horse. He's wearing a kind of Spawn suit and mask, although the actual costume under the cloak is reminiscent of a suit of armour. His lettering is like the Spawn lettering, but maybe with a different colour in the border.

Page 2

spawn:  Good day, sweet maiden. You are hurt.

Angela:        I am hurt, my lord, but I am a maiden no longer.

Spawn:         You need help.

Angela:        It is not I who needs help, my lord, but my sister. The ogre who dealt with me thus has taken her back to his cave.

              Great Lord, my sister is little more than a child...

(Spawn reaches down one arm, and sweeps her up onto his horse. We realise that he is huge — a really big man — and that she's a teeny thing in comparison).

Spawn:  Where is this ogre?

Angela:        Through the glen, there. In a cave under the waterfall.

Page 3

They ride on the horse in silence, through the woodland. They can be silhouetted against the sky as much as you like.

Angela:        My lord — why do you cover your face?

Spawn:         You would not wish to see my face, sweet maiden.

              Your sister, you say...?

              I also had a sister, beautiful and wise, whom I swore I would see married before I died.

Angela:        And did you?

Spawn:         I...went away, for many years. When I... returned, my sister was indeed married...

G00427

Spawn 9 — draft Script for Todd.
Page 4

Not to the man I would have chosen, alas.

If we knew the future, well, what then?

Page 4

Angela:        You have not told me your name, my lord.

Spawn:        I no longer have a name.

They've reached a waterfall, underneath which we can see a cave.

Angela:        There! That is the cave, in which the ogre has my sister. My lord, he is most strong and
               fearsome...

Spawn: I also am most strong and fearsome. You shall wait here.

Page 5

Angela:        I will come in with you. I know the secrets of the cavern, after all.

Spawn: Very well.

(they dismount. Enter the cave — walk under the waterfall.)

(In the cave: it's very dark.)


Angela: It is very dark.

Spawn raises his hand. It bursts into flame. Now they're lit, orange, almost silhouetted figures, walking
through the darkness.

Angela: You are a wizard!

Spawn:        No wizard, fair one. Once I was a man... a bad man... now... I know not what I am.

       This cave... how much further must we go?

Angela:        Oh, I think we've come far enough.

There's a glittery shimmering around her as she says this.

Page 6

Over the page and she's in full Battle armour, as on the cover of Spawn 9.

Spawn: What magic is this?

Angela: No magic, little hellspawn.

G00428

Spawn 9 – draft Script for Todd.
Page 5

Page 7

(Fighting. We see them fighting. He shoots power blasts. She rolls out of the way. Jabs him with she shivershiv.)

(The Spawn power readouts are in old-fashioned gothic lettering.)

Page 8

She winds up above him, with the big power lance in his face.

Spawn:          What... what manner of creature are you?

Angela:          *What manner of creature?* Oh, poor little Hellspawn. You have been hunted...

          Now you'll never be a captain in the army of the Malebolgia.

          You're one more little pawn who will never become a queen.

          You're in the army. Haven't you ever wondered who you were meant to be fighting?

          Poor Hellspawn. You aren't that bright, are you?

Spawn: I don't understand..

She's thrust the Lance into his face. Activates it by pressing a button on the side.

Spawn screams and screams and winds up a smoking mess.

Page 9

The costume-armour lays on the floor. The chains shoot up at her. She stabs it with the lance.

Costume:          Aaaagh!

She reaches down and picks up the spawn tag. Fits it over her little spear thing, or holds it up, with pleasure, grinning.

Close in on Spawn logo image, and we end the sequence of "Hunting Manual" captions, with the line: *"Then all you need to do is take your trophy back, and bask in the praise and admiration of your fellow hunters."*

Then we got a shot of Angela, walking through present-day Manhattan, spawn-logo earrings on her ears. She's wearing a present-day suit, and it's obviously now. She's got a purse or a bag over her shoulder.

·······

Page 10:

Over the page:

G00429

Spawn 9 — draft Script for Todd.
Page 6

The initial image is the one Dave faxed me, that he wants set up in his issue. It's in black and white — no colour on it: Spawn in the middle, with all the arms reaching out to him.

Pull back. We're looking at Spawn asleep in the back of the waste ground where the bums are. He's underneath an old car, or something: wherever he is, he's hidden, anyway.

A bum — someone who looks like an unshaven JFK might look, if he was around today, and in his seventies, and a wino — reaches down and shakes his shoulder.

Bum: Hey, Mister.

Spawn: Uhn...

Bum: Not a morning person, huh? I can dig it.

> Just thought you'd want to know. The cops wuz around again this morning. They was askin' whether we'd seen some guy in a big cloak.

> They got one-a them things. Y'know. Artist's rendition.

> Not a bad one at that.

Page 11.

Spawn:          What did you tell them?

Bum:            Lessee. I said, I ain't seen nothing. Jimmy D, he said he hadn't seen nothing. Sherlock, he just belched and made like he was going to throw up.

> An tricky Dicky, he tol' 'em he'd seen you alright, an for a dollar he'd tell 'em where. So they gave him a dollar, and he sez he sees you flying over the city every morning, in a giant pink cadillac, with a big green gorilla.

> He told them he thinks you nest inna Chrysler building.

> That Dicky. Whadda scream, huh? I tellya, if he ran again, I'd vote for him, Watergate or no Watergate.

Spawn: I'm grateful. Do you think they'll be back?

Bum:    They'll keep coming back. We'll keep covering for you.

Spawn: Is there anything I can do for you in return?

Bum:    After what the cops did to [name of the guy who was hit by the car]? What the mob did to Freddy? Stickin' it to any of them any way we can...

> Hey. It's a pleasure.

Page 12

G00430

Spawn 9 — draft Script for Todd.
Page 7

There's a really old bum, a skinny, balding old man, with a grubby greyish-yellow beard, like a skinny santa claus. He calls himself Count Nicholas Cagliostro.

Cagliostro:        Now, Jack-boy, don't you be so <u>hasty.</u> It ain't <u>often</u> we have an offer like that.

He takes Spawn by the arm.

        Say... If you could <u>create</u> for us maybe a crate of <u>Strawberry Ripple wine.</u> I think we could consider all debts settled.

spawn: I'm not sure that I...

Cagliostro:        You just have to <u>close</u> your eyes and <u>concentrate,</u> lad.

Spawn closes his eyes...

Cagliostro: Feel it <u>deep inside</u> yourself.

The Spawn Power Rating comes up between the panels.

Cagliostro:        No... Not like <u>that.</u> You do it like that, you'll just lower your <u>energy</u> levels.

        The trick is pulling energy from your <u>costume.</u> It's a neural parasite after all, but that doesn't mean you can't <u>borrow</u> a little energy from <u>it</u> in return...
                                        And  suddenly Spawn's holding a cardboard box full
of bottles of wine.

Spawn:            It <u>worked!</u>

Count: Sure it did.

Page 13

The Count reaches into the box, unscrews a bottle of ripple wine. Chugs it back.

Count: Hey. Y'know, <u>some</u> bums talk about Chateau Lafite, or Mouton Rothschild, or that fancy stuff. But for <u>my</u> money <u>nothin'</u> compares to a good 1989 strawberry ripple.

        <u>Hey,</u> kid. You're <u>okay.</u>

The other bums are sharing out the bottles.

One bum to another:    Looky Elv. It says in the *Weekly World News* you just got married again.

Other bum who looks like an old Elvis:  Not me, suh. Uh-uh.

Spawn:            Yeah? Well, <u>thank</u> you, Mister...

Cagliostro:        <u>Count.</u> Count Nicholas Cagliostro.

        At your <u>service,</u> Mr Simmons...

G00431

Spawn 9 – draft Script for Todd.
Page 8

A beat. Then:

Spawn:        What did you just call me?

...

Page 14

Cut to an office building, somewhere in mid-town. The kind of office building that DC always has its offices in. We're looking at a modern-day version of the same woman we saw in the opening pages. She's wearing a raincoat, with a fairly  sensible suit underneath. Sh's carrying a large shopping bag. She's wearing a little spawn-symbol earring. She goes in to elevator bank. Up a huge elevator. She gets out at the top. It's a large reception space with a secretary in it. I think we might want to make the secretary a man.

Angela: Is Ms Gabrielle available?

Sec:     Do you have an appointment?

Angela:       I don't need an appointment. Just tell her that Angela's here to see her.

Secretary does something on the phone while Angela looks out the window.

Secretary:       She says you should go straight in.

Page 15

Angela goes through the door, and finds herself in a huge, ballroom-sized room – it's two corners of a skyscraper floor – huge glass windows going from wall to wall, with a view out on New York. Waiting for her in the office – a huge room with, in one corner, a desk and a couple of chairs. Waiting in the room is another angel woman: Gabrielle. She's a little smaller than Angela, white hair, glasses. She looks slightly similar to Angela. She obviously doesn't like Gabrielle very much.

Gabrielle:       Angela.

Angela:              Hello, Gabrielle.

                    You're looking wonderful.

Gabrielle        :       I'm looking almost the same as the last time you saw me. When you described me as a pasty-faced, runty little desk-bound beaurocrat obsessed with tiny details and with no prospects of promotion.

Angela:       Did I say that?

Gabriell:       Why, yes you did.

                    And now I'm the Director of Terran Affairs, and you're still a freelance.

They walk together over to the huge picture window. Look out over the expanse of New York: the skyline of New York stretches out below them.

Gabrielle:       So. This whole world is my region of responsibility, since Raphaela was called upstairs.

G 00432

Spawn 9 – draft Script for Todd.
Page 9

**Angela:**   I know.

**Gabrielle:**   And I'm very busy. So if you think I'm letting you get out there and make my job any harder, you'd better think again.

**Angela:**   Oh,  but that's exactly what I am thinking.

Gabrielle stares up at her.

**Gabrielle:**   This had better be good.

Angela opens her purse, holds up a piece of something magically glowing in front of Gabrielle.

**Angela:**   It is. It's a hunting permit.

Page 16

**Gabriella:**   I see.

Put that away, Angela.

Hm. Yes, I'd heard that a new Hellspawn had surfaced. It's not exactly high on my list of priorities...

Okay. But none of that stalking and trailing nonsense.

I can't stop you from hunting. But I want this one quick and clean.

Cut to spawn. He's holding Cagliostro up with one arm.

**Spawn:**   For the last time: I want to know how you knew I was Al Simmons.

**Cagliostro:**   Jeez. You're a good kid, but you're really not very bright. You got a way to go.

I mean, I knew all about your costume. That didn't phase you.

So I know about the Malebolgia...

**Spawn:**   The what?

**Cagliostro:**   The guy you did the deal with. You know, "give me my wife back and I'll serve you for ever". That guy.

Page 17

**Spawn:**   I see. So you know that I did a deal with the devil.

**Cagliostro:**   You did a deal with the Devil, huh? You hadn't even stopped to think about which one?

G00433

Spawn 9 — draft Script for Todd.
Page 18

Spawn:          Which one? There is only one. The Devil.

Cagliostro:     You really don't get it.

                Listen, kid, half the guys in this alley did a deal with a devil at some point.

                Their devil gave them power and wealth and love and fame, everything they'd ever want.
                Then he collected, and they have to be bums in alleyways for the next however long.

Cagliostro:     Look, sonny. There's a lot you don't understand about what's been happening to you...

Angela (off):   Excuse me. Can we talk?

(This is Angela.)

page 18 to 20

(I've put in extra space here for lots of zapping and running around, Todd. You can take out a page or
two if you want to. I'd suggest that you might want to have Angela shooting bolts of power — huge
flashes of blue white light that Steve oliff can have fun with.)

Spawn:          Huh?

                Who are you?

Angela:         Men call me Angela.

Spawn:          Look, Angela, if you don't mind... I'm kind of busy right now. And I've got a lot on my
                mind.

Angela:         I know. That's how I got this close.

She shimmers, and now she's in full battle-dress mode. She's holding a short spear, has a longer spear
over her shoulder.

She shoots him with the short spear thing; a blast of power zaps out. Spawn throws himself out of the
way.

SPAWN POWER READING at bottom page.

A little shooting and running about. Darts get flung, and Spawn seems reluctant to fight back. This is a
lady, after all.

Spawn:          Hey, lady. I don't want to hurt you.

Angela:         I know. I don't want to hurt you either. I want to destroy you.

She shoots him, head on.

Page 21

G00434

There's a zapping, and Spawn's costume flutters to the ground. It's as if he's been destroyed or vaporised and there's nothing left but the costume.

Angela looks triumphant. She lays down the long nasty giant can-opener staff.

She walks over to the costume – reaches down to the costume to pick up the mask.

Two hands – spawn's – shoot up from the costume. Remember the end of Carrie, when the hands shoot up from the grave and grab Amy Irving's leg? Well, it's like that, only, because she's bending over, one hand grabs her shoulder, the other grabs her around the neck.

Page 22

She's pulled down – actually into the costume.

Large panel: the spawn face, the rotting, scabby nasty spawn face is pressed close against hers, nose to nose. Slowly the rotten spawn face cracks into a smile.

The background is just blackness, or dark weird zipatone. We're in another dimension, in the world inside the costume – although Spawn doesn't know know that's what it is or that that's what he's done.

Spawn doesn't say anything. He just looks mean as hell. He's got one hand around her throat, and he's squeezing away.

She can't say anything. There's a hand around her neck after all.

Page 23

Angela (very very small lettering): Please. I can't...

She's going to die.

Angela (even smaller lettering – fading away):   Please...

Angela's eyes begin to glow with light.

Back in the real world. The Spawn costume is on the ground. The hobos and bums are standing around, nervously, staring at it. Nearby is the big power lance.

Next panel: time for Steve Oliff to go to town. It's as if there's a wonderful twinkly silver explosion – as if a comet is coming out of the cape. Somewhere at the top of the comet is something transparent and vaguely Angela-shaped, fleeing in a great deal of pain.

Page 24

There's a fluttering. Spawn is standing there, filling the costume, and he's normal again.

The other bums begin to wander off, a few of them looking up into the sky.

Cagliostro stands next to him.

G00435

Spawn 9 – draft Script for Todd.
Page 12

Cagliostro:    Hey, Simmons, that was pretty impressive. You don't often see an angel take off like a bat outta hell. Heheheh...

Spawn:         That was an angel? But she tried to kill me!

Cagliostro:    Like I said. There's a lot you don't know.

Spawn:         She dropped this.

He picks up the lance.

Cagliostro:    Put that down. Don't touch it!
Spawn:         But what is it? What does it do?

He's looking straight down at the end of the spear now.

Spawn:         There's some kind of button on the side...

Cagliostro:    I said don't—

Close-up: his thumb presses the button.

A bolt of power comes up at him, from the end of the staff.

The Spawn power reading just shows "-.-.-."

He disintegrates.

Page 25

Now there's nothing left where he was but some black smoke vanishing on the breeze..

Cagliostro turns to some of the other bums.

Cagliostro:    Like I said. A good kid. Just not very bright.

               Hey guys. I'm outta here.

               Pity. Simmons showed potential. He couldda been The One...

The last of the smoke evaporates. Cagliostro shuffles off and the bums stand around

ENDS.

There you go. Between the rough comic I've sent, and this script, it should be pretty obvious what's meant to be going on.

Don't feel bound by the rough layouts on the comic – that's more to give you a sense of what's happening than it's meant to be a set of thumbnails for you.

G 00436

Spawn 9 – draft Script for Todd.
Page 13

When you've done rough pencils, I'm happy to go over it again and tidy up any dialogue; and obviously let me know if there's any continuity problems you can see. It's your playground – I'm just in for afternoon on the swings.

Give me a ring if you've got any questions...

All the best as always,


Neil

G00438

07-30-1997 10:44AM    FROM TODD McFARLANE PRODS. INC    TO    PAUL  P.01

| Post-it® Fax Note | 7671 | Date 7-20 | pages ▶ 4 |
|---|---|---|---|
| To ALAN | | From SHEILA | |
| Co./Dept. | | Co. | |
| Phone # | | Phone # | |
| Fax # | | Fax # | |

July 15, 1997

Dear Todd —

this is to confirm the main points touched on in our conversation of July 15, 1997.

You agree that with regard to the character of Angela, her appearances, spin-offs, merchandising and foreign translations of Spawn 9 or the Angela mini-series, that you'll be using the figures we put together based on the DC deal. (I'll attach my letter to you following the Oakland meeting to this.)

That my rights in Cogliostro and Medieval Spawn as above will be exchanged for your share of Miracleman. However, you will make all payments up until the date of exchange for the use of the characters, based on the same figures as above.

You'll include whatever you have in the way of inventory or film for Miracleman, received from Eclipse in the bankruptcy buy-out.

The date of exchange will be that of the first accounting, currently planned for August 1st.

That there will be a $5,000 'bonus' paid to me on the handover fee, essentially as an apology for having dragging this thing on so long.

That I send you a copy of the tape of our Oakland meeting.

That I have, exclusive of any other Angela projects I might do with the Todd McFarlane division of Image, the rights to do a one-off Angela comics project, and a one-off Medieval Spawn project, on each of which I would keep 100% of the revenue; that if these are team-up projects they could go to other comics companies, but if they exclusively feature the character in the title, I agreed to do them with Image (although not necessarily with you).

That you will make your best efforts to ensure that there is a 'created by Neil & Todd' credit for Angela in her appearances in other comics, or other media.

That you'll have a tape of the HBO Spawn episode with Angela in sent here.

Can you review this, and confirm that this is what was agreed?

Yours sincerely (and very pleased to be in sight of wrapping all this up,)

Neil Gaiman

PS: As a separate point, not sure that I quite made this clear, but Terri Cunningham at DC

EXHIBIT
19
6-18-02

TM 00358


EXHIBIT
350

07-30-1997 10:45AM    FROM, TODD McFARLANE PRODS. INC    TO    PAUL  P.02

(2.)

explained that in the case where an animated TV show is adapted from an existing comic they pay a bonus to the author of the comic.

TM 00359

07-30-1997 10:54AM    FROM TODD McFARLANE PRODS. INC    TO          PAUL   P.01

## TODD McFARLANE
### P R O D U C T I O N S

TODD McFARLANE PRODUCTIONS, INC.
12240 SOUTH NORAH LEE COURT
PHOENIX, AZ 85044 USA
TEL_602.598.8765
FAX_602.598.8766
http://www.spawn.com

JULY - 15 - 1997

MY DEAREST NEIL —

HAVING READ YOUR RATHER PROMPT RESPONSE TO MY
OFFER TODAY ( RE: ANGELA, COG, MEDEIVAL SPAWN, MIRACLE MAN)
ALL I CAN SAY TO THE POINTS IS *BEAUTY!*

( THAT IS A CANADIAN TERM.)

BEFORE CONSUMATING THIS MARRIAGE I JUST NEED CLARIFICATION
ON A FEW THINGS. 1) CAN WE EXCHANGE ON JULY 31 SO
AS TO BE AT THE END OF A MONTH FOR ACCOUNTING PURPOSES.
AND 2) IS THE CREATOR ROYALTY PRESENTED IN YOUR DC
OFFER USUALLY DIVIDED BY 2. SO THAT THE ARTIST ALSO SHARES
THIS PIECE?

ALSO, ACCOUNTING ON THE MEDEIVAL SPAWN WILL BE DONE
FROM A FORMULA YOU SAID DC COMICS USES ON DIRIVATIVE
DIRIVATIVE CHARACTERS. NOT THE STANDARD AGREEMENT
OF A NEW HERO. IS THIS ACCEPTABLE?

IF ALL THIS LOOKS FINE PLEASE FAX YOUR OKAY AND
I'LL MAKE THIS A PRIORITY TO FINISH.   THANKS FOR YOUR
                                        PATIENCE — TODDY ☺

MY RESERVE TO CANADA UNFORTUNATELY DELAYED THIS FROM BEING SOONER. FAMILY VACATION TIME.

EXHIBIT
20
6-18-02

TM 00362



July 15 '97

Dear Todd —

Hurrah!

① Yes, we can exchange July 31st — but the exchange should be tied to the day of accounting (so if the accounting is delayed, so is the exchange).

② Nope — it's the writer creator royalty. (They do the same deal for the artist.) So that's the full amount.

③ Medieval Spawn accounting — yes, I should have put that in. (I'd formula him at 50% of Angela.)

Looking forward to getting done with this —

Tra! la!

*[signature]*

TM 00360



EXHIBIT
33
6-19-02



EXHIBIT
364